**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

```
-------------------------------------------------------- x
                                                         :
In re:                                                   :   Chapter 11
                                                         :
DOCUDATA SOLUTIONS, L.C., et al.,                        :   Case No. 25-90023 (CML)
                                                         :
          Debtors.¹                                      :   (Joint Administration Requested)
                                                         :
-------------------------------------------------------- x
```

**<u>EMERGENCY</u> MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) <u>MODIFYING THE AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF</u>**

> **Emergency relief has been requested. Relief is requested not later than 10:30 a.m. (prevailing Central Time) on March 4, 2025.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on March 4, 2025 at 10:30 a.m. (prevailing Central Time) in Courtroom 401, 4th floor, 515 Rusk Street, Houston, Texas 77002.**
>
> **Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's home page. The meeting code is "JudgeLopez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Lopez's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

¹   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/DocuDataSolutions.  The Debtors' mailing address for the purposes of these cases is 2701 E. Grauwyler Road, Irving, TX 75061 USA.

The above-captioned debtors in possession (collectively, the "***Debtors***") respectfully state as follows in support of this motion (this "***Motion***"):

**RELIEF REQUESTED**

1.     By this Motion, the Debtors seek entry of interim and final orders (the "***Interim Order***" and the "***Final Order***," and together with the Interim Order, the "***DIP Orders***"), substantially in the forms attached hereto:

      (i)    authorizing Exela Finance, Inc. and Exela Intermediate LLC, in their capacity as borrowers (the "***Borrowers***") to obtain postpetition financing, and for each of the other Debtors (the "***Guarantors***" and, together with the Borrowers, the "***DIP Loan Parties***") to guarantee, on a joint and several basis, the Borrowers' obligations in connection with a debtor-in-possession financing facility, comprising a superpriority priming term loan facility in an aggregate principal amount of not less than $185,000,000 (the "***DIP Facility***"), which consists of (A) a new money term loan facility in the aggregate original principal amount of up to $80,000,000 (the commitments thereunder, the "***New Money DIP Commitments***," and the Interim Term Loans and Final Term Loans (each as defined in the Interim DIP Order) advanced thereunder, collectively, the "***New Money Loans***"), and (B) (x) subject to entry of the Interim Order, the conversion of up to $75,000,000 of April 2026 Notes (the "***Interim Roll-Up Loans***"), and (y) subject to entry of the Final Order, the conversion of up to $30,000,000 of April 2026 Notes (the "***Final Roll-Up Loans***" and, together with the Interim Roll-Up Loans, the "***Roll-Up Loans***"; and the Roll-Up Loans, together with the New Money Loans, collectively, the "***DIP Loans***"), to be funded by certain April 2026 Noteholders (as defined in the Interim DIP Order) (the "***DIP Lenders***") in accordance with the terms and conditions set forth in the DIP Credit Agreement (as defined in the Interim DIP Order) attached to the Interim Order as **Exhibit A**;

      (ii)    authorizing the Debtors to enter into that certain *Superpriority Priming Debtor-in-Possession Financing Agreement* in substantially final form attached to the Interim Order as **Exhibit A** (as may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "***DIP Credit Agreement***"), by and among the DIP Loan Parties, Ankura Trust Company, LLC, as administrative agent and collateral agent (in such capacities, together with its successors and permitted assigns, the "***DIP Agent***"), and the DIP Lenders (together with their successors and permitted assigns, the DIP Lenders, together with the DIP Agent, the "***DIP Secured Parties***"), and to execute and deliver and perform under the DIP Credit Agreement and any other agreements, instruments, pledge agreements, intercreditor agreements, guarantees, fee letters, control agreements, and other ancillary documents related thereto (including any security agreements, intellectual property security agreements,

2

or notes), including the "Loan Documents" as defined in the DIP Credit Agreement (as amended, restated, supplemented, waived, and/or otherwise modified from time to time, collectively with the DIP Credit Agreement and the DIP Orders, the "***DIP Documents***"); and to perform such other acts as may be necessary or desirable in connection with the DIP Orders and the DIP Documents, and the transactions contemplated hereby and thereby;

(iii)    authorizing the Borrowers to incur, and the Guarantors to guarantee on an unconditional joint and several basis, the principal, interest, fees, costs, expenses, obligations (whether contingent or otherwise), and all other amounts and "Obligations" as defined in the DIP Credit Agreement, owing under and/or secured by the DIP Documents (collectively, the "***DIP Obligations***");

(iv)    subject only to the Carve Out and the February 28 Funding Superpriority Claims (each as defined in the Interim DIP Order) and to the lien priorities set forth in the Interim DIP Order, and as further set forth on **Exhibit B** to the Interim Order, granting to the DIP Agent, for the benefit of the DIP Secured Parties, allowed superpriority administrative expense claim status in each of the Chapter 11 Cases and any Successor Cases (as defined in the Interim DIP Order), as and to the extent provided in the DIP Orders;

(v)    subject only to the Carve Out and the February 28 Funding Liens (as defined in the Interim DIP Order) and to the relative priorities set forth in the Interim DIP Order, and as further set forth on **Exhibit B** to the Interim Order granting to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, automatically and validly perfected security interests in and liens on all of the DIP Collateral (as defined in the Interim DIP Order), including all property constituting Cash Collateral (as defined in the Interim DIP Order);

(vi)    authorizing and directing the Debtors to pay the principal, interest, premiums, fees, expenses, indemnities, and other amounts payable under the DIP Documents, as set forth in the Interim DIP Order and as such become earned, due and payable;

(vii)    authorizing the Debtors to use the Prepetition Collateral (as defined in the Interim DIP Order), including any Cash Collateral of the Prepetition Secured Parties under the April 2026 Notes (each as defined in the Interim DIP Order), as provided for in the Interim DIP Order;

(viii)    providing adequate protection to the Prepetition Secured Parties as provided in the Interim DIP Order for, among other things, any diminution in value of the Prepetition Collateral, from and after the Petition Date (as defined in the Interim DIP Order), including on account of the Debtors' sale, lease, or use of the Prepetition Collateral (including Cash Collateral), the imposition and enforcement of the automatic stay pursuant to section 362 of the Bankruptcy Code, the priming of the Prepetition Secured Parties' respective interests in the Prepetition Collateral (including by the Carve Out (as defined in the Interim

DIP Order)), and for any other reason authorized by the Bankruptcy Code ("***Diminution in Value***");

(ix)  authorizing the Debtors to waive, upon entry of the Final Order, on behalf of themselves and their estates, (a) any right to surcharge the Prepetition Collateral and/or DIP Collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, (b) the equitable doctrine of marshaling and other similar doctrines, and (c) the "equities of the case" exception under section 552(b) of the Bankruptcy Code with respect to the Prepetition Collateral, DIP Collateral and/or the DIP Obligations (other than for the benefit of the DIP Secured Parties);

(x)  authorizing the Debtors to use the proceeds of the DIP Loans in accordance with the terms of the DIP Orders, the DIP Budget (as defined in the Interim DIP Order), and the other DIP Documents, subject to Permitted Variances (as defined in the Interim DIP Order), to (a) fund, among other things, ongoing working capital, general corporate expenditures, and other financing needs of the Debtors, (b) pay certain fees and other costs and expenses of administration of these Chapter 11 Cases, (c) pay agency fees and the fees and expenses of the DIP Agent and DIP Lenders owed under the DIP Documents, (d) pay the Adequate Protection Obligations (as defined below) (including reasonable and invoiced attorneys' fees and expenses) as set forth in the Interim DIP Order, (e) use the proceeds of the Roll-Up Loans solely to refinance on a cashless, dollar-for-dollar basis the April 2026 Notes outstanding under the April 2026 Notes Indenture, and (f) pay the February 28 Funding (as defined below);

(xi)  approving certain stipulations and releases by the Debtors with respect to the April 2026 Notes and the Prepetition Collateral as set forth in the Interim DIP Order;

(xii)  vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the DIP Orders, and waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the DIP Orders, and providing for the immediate effectiveness of the Interim Order;

(xiii)  scheduling a final hearing (the "***Final Hearing***") to consider entry of the Final Order, authorizing and approving, on a final basis, among other things, the Borrowers' borrowing from the DIP Lenders under the DIP Documents, up to an aggregate amount of New Money DIP Commitments less the original principal amount of the Interim Term Loans (the "***Final Term Loans***"), the Final Roll-Up Loans and the continued use of Cash Collateral, and granting of adequate protection, in each case, as described in the Motion and set forth in the DIP Documents; and

(xiv)  granting related relief.

2.     In support of this Motion, the Debtors submit the *Declaration of Randall S. Eisenberg in Support of Chapter 11 Petitions and First Day Motions* (the "***First Day Declaration***") and the *Declaration of Steven Spitzer in Support of (A) the Debtors' DIP Motion and (B) The Debtors' Securitization Program Motion* (the "***Financing Declaration***"), each filed contemporaneously herewith.  The Debtors' initial budget reflecting the anticipated disbursements for each calendar week during the period from the Petition Date through and including the end of the thirteenth (13th) calendar week following the Petition Date is attached as **Schedule 1** to the Interim Order (the "***DIP Budget***").

## JURISDICTION AND VENUE

3.     The United States Bankruptcy Court for the Southern District of Texas (the "***Court***") has jurisdiction to consider this Motion under 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Court may enter a final order consistent with Article III of the United States Constitution.

4.     Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

5.     The statutory and legal predicates for the relief requested herein are sections 105, 361, 362, 363, 364(c), 364(d), 503, 506, 507 and 552 of title 11 of the United States Code; 11 U.S.C. §§ 101–1532  (the "***Bankruptcy Code***"); Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"); Rules 2002-1, 4001-1, and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "***Bankruptcy Local Rules***"); and the Procedures for Complex Cases in the Southern District of Texas (the "***Complex Case Procedures***").

## BACKGROUND

6.      On the date hereof (the "***Petition Date***"), the Debtors filed voluntary petitions in the Court commencing cases for relief under chapter 11 of the Bankruptcy Code (the "***Chapter 11 Cases***"). The Debtors continue to manage and operate their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been requested and no committee has been appointed in the Chapter 11 Cases.

7.      The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the *Declaration of Randall S. Eisenberg in Support of Chapter 11 Petitions and First Day Motions*, filed contemporaneously herewith (the "***First Day Declaration***"), which is fully incorporated herein by reference.[2]

8.      Contemporaneously with the filing of the Motion, the Debtors filed a motion with the Court pursuant to Bankruptcy Rule 1015(b) requesting joint administration of the Chapter 11 Cases for procedural purposes only.

9.      Members of an ad hoc group of holders of the Debtors' 11.5% secured notes due 2026 (the "***April 2026 Notes***") holding, in aggregate, approximately 73.7% of unaffiliated bonds (the "***Ad Hoc Group***") have agreed to provide postpetition financing to the Debtors in the amount of $80 million of new money (the "***DIP Facility***").  Upon emergence, the DIP Facility will roll into an exit facility, totaling $245 million, comprised of the DIP Facility, plus $60 million in additional new money, certain fees, and April 2026 Notes that were rolled up into the DIP Facility.

---

[2]     Capitalized terms used but not defined herein have the meanings given to them in the First Day Declaration, the Financing Declaration, or the Interim Order, as applicable.

10.     In connection with the entry into the DIP Facility, the Debtors reached an agreement with the Ad Hoc Group on a non-binding term sheet (the "Restructuring Term Sheet") that contemplates an expedited "prearranged" chapter 11 plan that will be filed shortly after the commencement of the cases implementing the terms of the Restructuring Term Sheet. The Restructuring Term Sheet also enjoys the support of entities affiliated with the Debtors holding, in aggregate, approximately 30.7% of April 2026 Notes (the "Affiliated Bondholders"). Accordingly, in total, the Restructuring Term Sheet has the support of holders of over 81.7%, in aggregate, of outstanding April 2026 Notes.

11.     Pursuant to the Restructuring Term Sheet, the Debtors, the Ad Hoc Group, and the Affiliated Bondholders will have ten (10) business days from the Petition Date to reach agreement on the terms of a restructuring support agreement and plan of reorganization that will implement the transactions contemplated by the Restructuring Term Sheet, subject to a further ten (10) business-day extension.  Accordingly, in the days following the commencement of the Chapter 11 Cases, the Debtors intend to enter into a restructuring support agreement and file a chapter 11 plan of reorganization consistent with the Restructuring Term Sheet, along with a corresponding disclosure statement and motion for approval of the disclosure statement and associated solicitation procedures.  To minimize the disruption to the Debtors' business and any associated erosion of value, the Debtors intend to seek confirmation of their chapter 11 plan of reorganization as quickly as the Court's schedule and requisite notice periods will permit.

**PRELIMINARY STATEMENT**

12.     The DIP Facility is critical to the Debtors' ability to reach a consensual restructuring, enter into a restructuring support agreement, and operate during the Chapter 11 Cases.  To achieve their chapter 11 objectives, the Debtors require the consensual use of Cash Collateral, new money financing, and related financial accommodations provided under the DIP

Facility and DIP Orders. The DIP Facility, which is fully backstopped with certain April Noteholders guaranteeing that the DIP Facility will be fully funded, will ensure that the Debtors are able to stabilize their business, which in turn, will allow the Debtors to pursue a chapter 11 plan that maximizes value for their creditors. The DIP Facility also sends a crucial message to the Debtors' employees, suppliers, vendors, and customers that the Debtors intend to and will have the means to maintain ordinary course operations and meet and honor their financial commitments throughout the course of the Chapter 11 Cases.

13.     Absent the DIP Facility, the Debtors' lenders would be unwilling to agree to the Debtors' use of their Cash Collateral and would not agree to the priming of their prepetition liens that would otherwise be necessary to obtain postpetition financing. Without access to Cash Collateral or the incremental liquidity provided by the DIP Facility, the Debtors would face severe, immediate, and irreparable harm.

14.     In addition, through the DIP Facility, certain DIP Lenders are expected to fund the Debtors' exit facilities by converting their DIP Loans into exit financing facilities ensuring that the Debtors have sufficient liquidity to fund ongoing business operations upon emergence from chapter 11. As a result, the DIP Facility will assist the Debtors in locking in long-term exit financing for the Debtors' continued operations at the outset of the Chapter 11 Cases and provides the reorganized Debtors with runway to operate post-emergence.

15.     As described in greater detail in the Financing Declaration, prior to the Petition Date, the Debtors engaged in good-faith, arm's-length negotiations with the Ad Hoc Group and assessed and engaged with potential financing sources, including third parties, for postpetition financing in an effort to obtain sufficient postpetition financing and consensual use of Cash Collateral to fund operations and administer the Chapter 11 Cases. Following the process, the

Debtors, in their business judgment, elected to proceed with the proposed DIP Facility and agreement on consensual use of Cash Collateral, which will allow the Debtors to pursue the restructuring transaction contemplated by the Restructuring Term Sheet and ultimately inure to the benefit of all stakeholders.

16.     The terms of the DIP Facility, including the DIP Budget (subject to permitted variances), interest rate, and fees, were heavily negotiated through an iterative, arm's-length process.  Funding pursuant to the Interim Order will be provided by the April 2026 Noteholders party to the backstop agreement, with the funding of the DIP Facility pursuant to the Final Order open to all April 2026 Noteholders.

17.     Taken as a whole, the terms of the DIP Facility are reasonable and fair under the circumstances of the Chapter 11 Cases.  Further, as described in the Financing Declaration, the Debtors do not believe that more favorable or comparable financing was or is available in light of (a) their thorough evaluation of potential alternatives, (b) their liquidity position, (c) the lack of unencumbered assets to serve as a third-party lender's collateral, and (d) the Prepetition Secured Parties' refusal to permit third-party priming of their debt (and the benefits of avoiding the cost and uncertainty of a priming fight).  As described in the Financing Declaration, no third party indicated willingness to provide financing on a junior or unsecured basis.

18.     The Debtors believe that the DIP Facility is the best financing package available to the Debtors and is a key component of their overall restructuring efforts with their supporting creditors.  For these reasons and others stated herein, the Debtors respectfully submit that the relief requested in the Motion should be granted.

## CONCISE STATEMENT PURSUANT TO COMPLEX CASE PROCEDURES AND BANKRUPTCY RULE 4001[3]

19.     Pursuant to paragraph 8 of the Complex Case Procedures, the proposed DIP Facility and/or Interim Order contains the following provisions:[4]

| Summary of Material Terms of DIP Facility | |
|---|---|
| **Parties to the DIP Facility**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **DIP Borrowers**:  Exela Finance, Inc. and Exela Intermediate LLC<br><br>**DIP Agent:**  Ankura Trust Company, LLC as administrative agent and collateral agent<br><br>**Guarantors**:  The Debtors (other than Exela Finance, Inc. and Exela Intermediate LLC)<br><br>**DIP Lenders**: Certain April 2026 Noteholders |
| **Borrowing Limits**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Aggregate principal amount of not less than $185,000,000, consisting of (a) $80,000,000 of New Money DIP Commitments, (b) $75,000,000 of Interim Roll-Up Loans, and (c) $30,000,000 of Final Roll-Up Loans.<br><br>*See* DIP Credit Agreement ¶ 2.01. |
| **Budget**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | A copy of the DIP Budget is attached as **Schedule 1** to the Interim Order. |
| **Maturity Date**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The DIP Loan maturity shall be the earliest of:<br><br>(i)     July 1, 2025,<br><br>(ii)    the date of the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of an Acceptable Reorganization Plan,<br><br>(iii)   thirty-five (35) days after the Petition Date unless on or before such day the Final DIP Order shall have been entered by the Bankruptcy Court,<br><br>(iv)    the date the Bankruptcy Court converts any of the Chapter 11 Cases to a Chapter 7 case,<br><br>(v)     the date the Bankruptcy Court dismisses any of the Chapter 11 Cases,<br><br>(vi)    the date on which the Loan Parties consummate a sale of all or substantially all of the assets of the Loan Parties pursuant to section 363 of the Bankruptcy Code or otherwise, and<br><br>(vii)   such earlier date on which the Loans shall become due and payable by acceleration or otherwise in accordance with the terms of this Agreement and the other Loan Documents; provided, that, in each case if such date is not a Business Day, the immediately preceding |

---

[3]     Capitalized terms used in this summary chart but not defined therein have the meanings given to them in the DIP Loan Documents or the Interim Order, as applicable.

[4]     This statement is qualified in its entirety by reference to the applicable provisions of the DIP Documents.  To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Documents or the DIP Orders, the provisions of the DIP Documents or the DIP Orders, as applicable, will control.  Capitalized terms used but not otherwise defined in this section have the meaning ascribed to such terms in the Interim Order or the DIP Documents.

| Summary of Material Terms of DIP Facility |
|---|

| | Business Day. |
|---|---|
| | *See* DIP Credit Agreement § 1.01; definition of "Final Maturity Date". |
| **Roll-Up Loans**<br><br>*Complex Case Procedures, ¶ 8(c)* | Subject to entry of the Interim Order and Final Order (as applicable), the Roll-Up Loans as provided for under the DIP Facility are appropriate and the DIP Lenders would not be willing to provide New Money Loans or extend credit to the Debtors thereunder without the inclusion of the Roll-Up Loans within the DIP Facility.  The Roll-Up Loans consist of, subject to entry of the Interim Order, the conversion of up to $75,00,000 of April 2026 Notes (the "***Interim Roll-Up Loans***"), and (y) subject to entry of the Final Order, the conversion of up to $30,000,000 of April 2026 Notes (the "***Final Roll-Up Loans***" and, together with the Interim Roll-Up Loans, the "***Roll-Up Loans***").<br><br>*See* Interim Order ¶ L |
| **DIP Termination Events**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B);*<br><br>*Complex Case Procedures, ¶ 8(e)* | The occurrence of any of the following, unless waived or extended (as applicable) in writing, which may be by email from counsel to the Required DIP Lenders, shall constitute a "DIP Termination Event" under the Interim Order (each a "***DIP Termination Event***," and the date upon which the earliest such DIP Termination Event occurs, the "***DIP Termination Date***"):  (a) the occurrence of the Final Maturity Date (as defined in the DIP Credit Agreement); (b) if a default under the Restructuring Support Agreement by any of the Company Parties (to be defined in the Restructuring Support Agreement) shall have occurred and be continuing (with all applicable grace periods having expired) or if the Company (to be defined in the Restructuring Support Agreement) has exercised its fiduciary out under the Restructuring Support Agreement; (c) failure by the DIP Loan Parties to comply with any of the Milestones (as defined in the DIP Credit Agreement); and (d) the occurrence of any "Event of Default" (as defined in the DIP Credit Agreement) (subject to any applicable notice or grace periods specified in the Interim and under the DIP Credit Agreement); *provided* that, for the avoidance of doubt, each of the foregoing shall also constitute a "Cash Collateral Termination Event" which shall allow the Prepetition Collateral Agent (acting at the direction of the Required Consenting Creditors) to terminate and/or revoke the use of Cash Collateral.<br><br>*See* Interim Order ¶ 29. |
| **Carve-Out**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed by final order, all unpaid fees and expenses (the "***Allowed Professional Fees***") incurred by Persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "***Debtor Professionals***") and the Committee (if any) pursuant to section 328 or 1103 of the Bankruptcy Code (the "***Committee Professionals***" and together with the Debtor Professionals, the "***Professional Persons***") at any time before or on the first business day following delivery by the DIP Agent (at the direction of the Required DIP Lenders (with email from the DIP Lender Advisors being sufficient)) of a Carve Out Trigger Notice, whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; (iv) Allowed Professional Fees of Debtor Professionals in an aggregate amount not to exceed $1,000,000 incurred after the first business day following delivery by the DIP Agent (at the direction of the Required DIP Lenders (with email from the DIP Lender Advisors being sufficient)) of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise; (v) Allowed Professional Fees of the Committee Professionals in an aggregate amount not to exceed $250,000 incurred after the first business day following delivery by the DIP Agent (at the direction of the Required DIP Lenders (with email from counsel being sufficient)) of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise; and all amounts determined, by assessment, final judgment, or decree, and expenses related thereto to be owed by the CROs with respect to any prepetition and/or postpetition fiduciary tax liability (including but not limited to, payroll and sale tax obligations) of any of the Debtors and its direct and |

| Summary of Material Terms of DIP Facility | |
|---|---|
| | indirect subsidiaries that are controlled by the Debtors (the amount set forth in clauses (iv) through (vi) the "***Post-Carve Out Trigger Notice Cap***").  For purposes of the foregoing, "***Carve Out Trigger Notice***" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (at the direction of the Required DIP Lenders (with email from the DIP Lender Advisors being sufficient)) to the Debtors, their lead restructuring counsel Latham & Watkins LLP, the U.S. Trustee, counsel to each of the Prepetition Secured Parties, and counsel to the Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked (the date on which a Carve-Out Tigger Notice is delivered, a ("***Termination Declaration Date***")); provided that in the event that the DIP Agent (at the direction of the Required DIP Lenders) is permitted to exercise Remedies Against Collateral pursuant to any order granting a Stay Relief Motion, the DIP Agent shall automatically be deemed to have delivered the Carve Out Trigger Notice in accordance with paragraph 31 of the Interim DIP Order.  The Carve Out shall include the Funded Reserve Account (as defined below) and amounts therein.<br><br>*See* Interim Order ¶ 31. |
| **Priority of Claims and Liens; Collateral**<br><br>*Fed. R. Bankr.  P. 4001(c)(1)(B)(i)* | As security for the prompt and complete payment and performance of all DIP Obligations when due (whether at stated maturity, by acceleration, or otherwise), effective immediately and automatically upon entry of the Interim Order (and without the need for any execution, recordation, or filing of any mortgages, deeds of trust, pledge or security agreements, lockbox or control agreements, financing statements, or any other similar documents or instruments, or the possession or control by the DIP Agent of, or over, any assets), pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the other DIP Secured Parties, is hereby granted, subject and subordinate only to the Carve Out, to any Prior Liens, to the liens (the "***February 28 Funding Liens***") hereby granted to the Securitization Agent on all DIP Collateral (as defined below) to secure prompt payment of the $5,164,000 advanced by the Securitization Agent to the Debtors on February 28, 2025 (the "***February 28 Funding***"), and with the relative rank and priority as set forth in paragraph 8 of the Interim Order, **Exhibit B** attached to the Interim Order, and solely with respect to the Roll-Up Loans, the Prepetition Intercreditor Agreement, the following valid, binding, continuing, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens (such liens, the "***DIP Liens***") on all real and personal property, whether existing on the Petition Date or thereafter acquired and wherever located, tangible, or intangible, of each of the Debtors (collectively, the "***DIP Collateral***"), including, without limitation, (a) all of the Debtors' other now-owned or hereafter-acquired real and personal property, assets and rights of any kind or nature, wherever located, whether encumbered or unencumbered, including without limitation, and all prepetition property and post-petition property of the Debtors' estates, and the proceeds, products, rents, and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise, including without limitation, all equipment, all goods, all accounts, cash, payment intangibles, bank accounts, and other deposit or securities accounts of the Debtors (including any accounts opened prior to, on, or after the Petition Date), insurance policies and proceeds thereof, equity interests, instruments, intercompany claims, accounts receivable, other rights to payment, all general intangibles, all contracts and contract rights, securities, investment property, letters of credit and letter of credit rights, chattel paper, all interest rate hedging agreements, all owned real estate, real property leaseholds, fixtures, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, all commercial tort claims, and all claims and causes of action, and any and all proceeds, products, rents, and profits of the foregoing, (b) all Prepetition Collateral, whether existing on the Petition Date or thereafter acquired, (c) all property of the Debtors subject to Prior Liens, (d) all property of the Debtors, whether existing on the Petition Date or thereafter acquired that is not subject to valid, perfected, and non-avoidable liens or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code (the "***Previously Unencumbered Property***"), (e) a 100% equity pledge of all direct subsidiaries of Debtors (including non-Debtor subsidiaries, other than ER3 Holdco, ER3, and BR SPV) and all such assets of such entities to the extent such entities are Debtors (including any cash held in deposit accounts or any |

| Summary of Material Terms of DIP Facility |
|---|

other accounts at such entities), and (f) subject to entry of the Final Order, the proceeds of any avoidance actions brought pursuant to chapter 5 of the Bankruptcy Code or section 724(a) of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or applicable state law or foreign law equivalents (such actions, "***Avoidance Actions***"); *provided* that, for the avoidance of doubt and notwithstanding anything to the contrary in the Interim DIP Order, to the extent a lien cannot attach to such property, assets or rights pursuant to applicable law, the liens granted pursuant to the Interim Order shall attach instead to the Debtors' economic rights therein, including, without limitation, any and all proceeds thereof; *provided*, *further*, that for the avoidance of doubt, the DIP Collateral shall exclude (a) property identified in the DIP Documents as "Excluded Collateral," (b) all accounts receivable and related assets from time to time sold or contributed to, or otherwise encumbered in favor of, ER3 Holdco and ER3 and their assignees in accordance with the ER3 Securitization Program, and all proceeds thereof (other than any such proceeds released to ER3 and ER3 Holdco and used by them to pay the Debtors, in each case, in accordance with the terms of the ER3 Securitization Program), (c) any equity or membership interest in non-Debtors ER3 Holdco and ER3, (d) all accounts receivables and related assets, and the proceeds thereof, sold, assigned, pledged or contributed by any of the Rust Originators to or for BR SPV or BR EXAR in connection with the Rust Securitization Program, (e) any deposit accounts of the Rust Originators pledged as collateral to BR EXAR as part of the Rust Securitization Program, and (f) any and all cash held in non-Debtor accounts, which includes, without limitation, the "Lock-Box Accounts," "Restricted Operations Account," and "PNC Receiving Account," (each as defined in the Cash Management Motion) (collectively, the "***DIP Excluded Collateral***").

DIP Lien Priority.  The DIP Liens shall have the priorities set forth below:

(a) Pursuant to section 364(d) of the Bankruptcy Code, the DIP Liens shall be senior priming liens with respect to any Prepetition Collateral, subject only to the Carve Out, the February 28 Funding Liens, and the Prior Liens, and senior to all other liens on such assets, including Adequate Protection Liens and the Prepetition Liens, except solely with respect to the DIP Liens securing the Roll-Up Loans as set forth on **Exhibit B** to the Interim Order and subject to the relative priorities set forth therein.

(b) Pursuant to sections 364(c)(2) and 363(c)(3) of the Bankruptcy Code, the DIP Liens shall be first priority senior liens with respect to all other property of the Debtors, including all Previously Unencumbered Property (including, subject to the entry of the Final Order, proceeds of Avoidance Actions), subject only to the Carve Out, and junior only to (i) Prior Liens, if any, on such assets, and (ii) the February 28 Funding Liens, and senior to all other liens on such assets, including the Adequate Protection Liens, except solely with respect to the DIP Liens securing the Roll-Up Loans as set forth on **Exhibit B** to the Interim Order and subject to the relative priorities set forth therein.

(c) Other than as set forth in the Interim DIP Order (including as set forth in **Exhibit B** to the Interim Order and the relative priorities therein) or expressly permitted under the DIP Documents, and solely with respect to the Roll-Up Loans, the Prepetition Intercreditor Agreement, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of any of the Chapter 11 Cases to any Successor Case, and/or upon the dismissal or conversion of any of the Chapter 11 Cases or Successor Cases.  The DIP Liens shall not be subject to any of sections 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

DIP Superpriority Claims.  Subject and subordinate only to the Carve Out and the February 28 Funding Superpriority Claims and in accordance with the priority set forth in the Interim DIP Order and in **Exhibit B** of the Interim Order, effective immediately upon entry of the Interim Order, the

| Summary of Material Terms of DIP Facility | |
|---|---|
| | DIP Agent (on behalf of the DIP Secured Parties) is hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim against each of the Debtors in each of the Chapter 11 Cases and any Successor Cases (collectively, the "**DIP Superpriority Claims**") on account of all DIP Obligations, with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of the Chapter 11 Cases or any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113, or 1114 of the Bankruptcy Code or any other provision of the Bankruptcy Code and any other claims against the DIP Loan Parties, including any 507(b) Claims; *provided* that the DIP Superpriority Claims shall be subject to and *pari passu* with the Securitization Program Superpriority Claims and junior to the superpriority claims hereby granted to the Securitization Agent in respect of the February 28 Funding in scope coterminous with the DIP Superpriority Claims (the "**February 28 Funding Superpriority Claims**"). The DIP Superpriority Claims and the February 28 Funding Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under sections 503(b) and 507(a)(2) of the Bankruptcy Code. The DIP Superpriority Claims and the February 28 Funding Superpriority Claims shall have recourse against each of the Debtors, on a joint and several basis. *See* Interim Order ¶¶ 7-9 |
| **Adequate Protection / Identity of Each Entity with Interest in Cash Collateral** *Fed. R. Bankr. P. 4001(c)(1)(B)(ii); (b)(1)(B)(i), (iv)* | Adequate Protection for the Prepetition Secured Parties. The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(c)(2), 363(e), 364(d), and 507 of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, including Cash Collateral, to the extent of any Diminution in Value of their interests therein. As adequate protection, the Prepetition Secured Parties are hereby granted the following (the "Adequate Protection Obligations"): (a) *Prepetition Term Loan Adequate Protection Liens*. To the extent of any Diminution in Value of their interests in the Prepetition Collateral, the Prepetition Credit Agreement Agent, for the benefit of the Prepetition Credit Agreement Parties, is hereby granted (effective and automatically perfected upon the Petition Date and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements, or other agreements), valid, perfected, postpetition senior replacement and additional security interests in and liens (the "**Prepetition Term Loan Adequate Protection Liens**") on (i) all property of the Debtors that was subject to the Prepetition Liens, including the Prepetition Collateral and Cash Collateral, as of the Petition Date, and (ii) all DIP Collateral (collectively, the "**Prepetition Term Loan Adequate Protection Collateral**"), in each case subject to the Carve-Out, the Prior Liens, and the February 28 Funding Liens and otherwise subject to the relative priorities set forth on **Exhibit B** to the Interim Order. For the avoidance of doubt and notwithstanding anything to the contrary in the Interim DIP Order, to the extent a lien cannot attach to such property, assets or rights pursuant to applicable law, the liens granted pursuant to the Interim Order shall attach instead to the Debtors' economic rights therein, including, without limitation, any and all proceeds thereof. The Prepetition Term Loan Adequate Protection Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) any lien or security interest arising after the Petition Date, except as expressly provided in the Interim Order. The Prepetition Term Loan Adequate Protection Liens shall be in addition to all valid and enforceable liens and security interests now existing in favor of the Prepetition Credit Agreement Parties and not in substitution therefor. (b) *April 2026 Notes Adequate Protection Liens*. To the extent of any Diminution in Value of their interests in the Prepetition Collateral, the Prepetition Collateral Agent, for the benefit of the Prepetition Notes Secured Parties, is hereby granted (effective and automatically |

| Summary of Material Terms of DIP Facility |
|---|

perfected upon the Petition Date and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements, or other agreements, valid, perfected, postpetition senior replacement and additional security interests in and liens (the "***April 2026 Notes Adequate Protection Liens***" and together with the Prepetition Term Loan Adequate Protection Liens, the "***Adequate Protection Liens***") on (i) all property of the Debtors that was subject to the Prepetition Liens, including the Prepetition Collateral and Cash Collateral, as of the Petition Date, and (ii) the DIP Collateral (collectively, the "***April 2026 Notes Adequate Protection Collateral***" and together with the Prepetition Term Loan Adequate Protection Collateral, the "***Adequate Protection Collateral***"), in each case subject to the Carve-Out, the Prior Liens, and the February 28 Funding Liens and otherwise subject to the relative priorities set forth on **Exhibit B** to the Interim Order.  For the avoidance of doubt and notwithstanding anything to the contrary in the Interim DIP Order, to the extent a lien cannot attach to such property, assets or rights pursuant to applicable law, the liens granted pursuant to the Interim Order shall attach instead to the Debtors' economic rights therein, including, without limitation, any and all proceeds thereof.  The April 2026 Notes Adequate Protection Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) any lien or security interest arising after the Petition Date, except as expressly provided in the Interim Order.  The April 2026 Notes Adequate Protection Liens shall be in addition to all valid and enforceable liens and security interests now existing in favor of the Prepetition Notes Secured Parties and not in substitution therefor.

(c) <u>Section 507(b) Claims</u>.  To the extent of any Diminution in Value of their respective interests in the Prepetition Collateral, each Prepetition Notes Secured Party and each Prepetition Credit Agreement Party is hereby granted an allowed administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code (respectively, each an "***April 2026 Notes 507(b) Claim***" and a "***Prepetition Term Loan 507(b) Claim***" and together, the "***507(b) Claims***") against the Debtors and their estates on a joint and several basis, consistent with the Prepetition Intercreditor Agreement and in accordance with the relative priorities set forth on **Exhibit B** to the Interim Order, which 507(b) Claims shall have priority over all other claims and administrative claims in the Chapter 11 Cases, including, without limitation, all claims of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 726(b), 1113 and 1114 of the Bankruptcy Code, 503(b) and 507(b) of the Bankruptcy Code, in each case subject only to the Carve Out and the February 28 Funding Superpriority Claims, and immediately junior to the DIP Superpriority Claims and the Securitization Program Superpriority Claims, which 507(b) Claims shall have recourse to and be payable from all assets and property of the Debtors.

<u>Fees and Expenses</u>.  The Debtors shall provide the Prepetition Secured Parties indefeasible cash payments in full of all reasonable and documented prepetition and postpetition fees and expenses, including, without limitation, the fees and out-of-pocket expenses of primary, special, conflicts, regulatory, and local counsel (in each applicable jurisdiction) and financial advisors to (i) the Ad Hoc April 2026 Group (as defined in the First Day Declaration), including, without limitation, Ropes & Gray LLP ("***R&G***"), as counsel, any local counsel to the Ad Hoc April 2026 Group, and SOLIC Capital Advisors, LLC and SOLIC Capital, LLC ("***SOLIC***"), as financial advisor, (ii) the Prepetition Notes Agents, including Troutman Pepper Locke LLP, as counsel to the Prepetition Trustee and one local counsel, and (iii) the Prepetition Credit Agreement Agent, including Paul Hastings LLP, as counsel to the Prepetition Credit Agreement Agent (such counsels and advisors, the "***Prepetition Advisors***"), in each case subject to the procedures set forth in paragraph 40 of the Interim DIP Order (the "***Adequate Protection Fees and Expenses***").  Any payments made pursuant to paragraph 14(d) of the Interim DIP Order may be subject to being recharacterized or reallocated pursuant to section 506(b) of the Bankruptcy Code as payments of principal, interest or otherwise.

| Summary of Material Terms of DIP Facility | |
|---|---|
| | *Adequate Protection Payments.*  The Debtors shall pay (x) to the Prepetition Credit Agreement Agent (i) all accrued and unpaid interest under the Prepetition Credit Documents as of the Petition Date in cash on the Effective Date, and (ii) as and when due under the Prepetition Credit Agreement, all interest accruing under the Prepetition Credit Documents from and after the Petition Date at the Post-Default Rate (as defined in the Prepetition Credit Agreement); and (y) to the Prepetition Credit Agreement Agent, all agency fees and expenses, whether accrued before, on or after the Petition Date as and when due under the Prepetition Credit Documents.<br><br>*See* Interim Order ¶ 14. |
| **Debtors' Stipulations**<br><br>*Fed. R. Bankr.  P. 4001(c)(1)(B)(iii)* | April 2026 Notes.<br><br>• April 2026 Notes Indenture.  Under that certain *Indenture*, dated as of July 11, 2023 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "***April 2026 Notes Indenture***" and, together with the Notes Documents (as defined in the April 2026 Notes Indenture), the "***April 2026 Notes Documents***"), by and among Exela Intermediate LLC, Exela Finance Inc. (collectively, the "***Co-Issuers***"), the Guarantors (as defined in the April 2026 Notes Indenture), the Affiliated Guarantors (as defined in the April 2026 Notes Indenture and, collectively, with the Guarantors, the "***Prepetition Notes Guarantors***"), and U.S. Bank Trust Company, National Association, as Trustee (as defined in the April 2026 Notes Indenture) (the "***Prepetition Trustee***"), certain 11.500% First Priority Senior Secured Notes Due 2026 (the "***April 2026 Notes***") were issued to certain noteholders (the "***April 2026 Noteholders***" and, together with the Prepetition Trustee and the Prepetition Collateral Agent (as defined in the Interim DIP Order), the "***Prepetition Notes Secured Parties***") in an aggregate principal amount of $1,252,267,105 as of the Petition Date.  As used herein, the "***Prepetition Note Parties***" shall mean, collectively, the Borrowers, the Co-Issuers, and the Prepetition Notes Guarantors.<br><br>• April 2026 Notes Indebtedness.  As of the Petition Date, the Prepetition Note Parties were jointly and severally indebted and liable to the Prepetition Secured Parties pursuant to the April 2026 Notes Documents without defense, challenge, objection, claim, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $1,252,267,105 on account of outstanding April 2026 Notes under the April 2026 Notes Indenture, in each case, *plus* accrued and unpaid interest and any additional fees, costs, premiums, expenses, and disbursements (including, without limitation, any attorneys', accountants', consultants', appraisers', financial advisors', and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, guarantee obligations, other contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing, in each case to the extent reimbursable pursuant to the terms of the April 2026 Notes Documents and all other Obligations (as defined in the April 2026 Notes Indenture) owing under or in connection with the April 2026 Notes Documents (collectively, the "***April 2026 Notes Indebtedness***").<br><br>• Prepetition Notes Liens.  The April 2026 Notes Indebtedness is secured by valid, binding, non-avoidable, properly perfected, and enforceable security interests in and liens (the "***Prepetition Notes Liens***") on all of the Collateral (or any other comparable term defined in the April 2026 Notes Documents describing the assets subject to security interests and liens securing the April 2026 Notes Indebtedness) consisting of substantially all of each Debtor's assets subject to certain exclusions set forth in the April 2026 Notes Documents (the "***Prepetition Notes Collateral***").<br><br>• Validity, Perfection, and Priority of Prepetition Notes Liens and April 2026 Notes Indebtedness.  Each of the Debtors acknowledges and agrees that, in each case as of the Petition Date:  (i) the Prepetition Notes Liens encumber all of the Prepetition Notes Collateral, as the same existed on the Petition Date; (ii) the Prepetition Notes Liens are valid, binding, enforceable, non-avoidable, and properly perfected liens on and security interests |

| Summary of Material Terms of DIP Facility |
|---|

|  | in the Prepetition Notes Collateral; (iii) the Prepetition Notes Liens are subject and subordinate only to (a) valid, perfected, and enforceable liens (if any) which are senior to the Prepetition Notes Secured Parties' liens or security interests as of the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, and senior to the Prepetition Notes Secured Parties' liens or security interests as of the Petition Date (such liens, the "***Prior Notes Liens***") and (b) the relative rights and priorities set forth in the Prepetition Intercreditor Agreement; (iv) the Prepetition Notes Liens were granted to or for the benefit of the Prepetition Collateral Agent (as defined in the Interim DIP Order) and the other Prepetition Notes Secured Parties for fair consideration and reasonably equivalent value and were granted contemporaneously with, or covenanted to be provided as an inducement for, the making of the loans and/or commitments and other financial accommodations secured thereby; and (v) the April 2026 Notes Indebtedness constitutes legal, valid, binding, and non-avoidable obligations of the Debtors.<br><br>Prepetition Credit Agreement.  Under that certain *Financing Agreement*, dated as of July 11, 2023 (the "***Prepetition Credit Agreement***," and all instruments and documents executed at any time in connection therewith, the "***Prepetition Credit Documents***" and all obligations due thereunder the "***Prepetition Credit Agreement Obligations***"), by and among the Borrowers, the Guarantors (as defined in the Prepetition Credit Agreement) (the "***Prepetition Loan Guarantors***"), the lenders from time to time party thereto (the "***Prepetition Lenders***"), Blue Torch Finance LLC, as administrative agent and collateral agent (the "***Prepetition Credit Agreement Agent***" and, together with the Prepetition Lenders, the "***Prepetition Credit Agreement Parties***," and together with the Prepetition Notes Secured Parties, the "***Prepetition Secured Parties***"), the Prepetition Lenders issued term loans (the "***Prepetition Term Loans***") in an aggregate principal amount of $38,500,000 as of the Petition Date.  As used in the Interim DIP Order, the "***Prepetition Loan Parties***" shall mean, collectively, the Borrowers and the Prepetition Loan Guarantors.<br><br>• Prepetition Credit Agreement Indebtedness.  As of the Petition Date, the Prepetition Loan Parties were lawfully liable and obligated to the Prepetition Credit Agreement Parties, without defense, challenge, objection, claim, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $38,500,000 on account of outstanding Prepetition Term Loans under the Prepetition Credit Agreement, in each case, *plus* accrued and unpaid interest and any additional fees, costs, premiums, including the Applicable Premium (as defined in the Prepetition Credit Agreement), expenses, and disbursements (including, without limitation, any attorneys', accountants', consultants', appraisers', financial advisors', and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, guarantee obligations, other contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing, in each case to the extent reimbursable pursuant to the terms of the Prepetition Credit Agreement Documents and all other Obligations (as defined in the Prepetition Credit Agreement) owing under or in connection with the Prepetition Credit Agreement Documents (collectively, the "***Prepetition Credit Agreement Indebtedness***" and together with the April 2026 Notes Indebtedness, collectively the "***Prepetition Secured Indebtedness***").<br><br>• Prepetition Term Loan Liens.  The Prepetition Credit Agreement Indebtedness is secured by valid, binding, non-avoidable, properly perfected, and enforceable security interests in and liens (the "***Prepetition Term Loan Liens***" and together with the Prepetition Notes Liens, the "***Prepetition Liens***") on all of the Collateral (or any other comparable term defined in the Prepetition Credit Agreement Documents describing the assets subject to security interests and liens securing the Prepetition Credit Agreement Indebtedness) consisting of substantially all of each Debtor's assets subject to certain exclusions set forth in the Prepetition Credit Agreement Documents (the "***Prepetition Term Loan Collateral***" and together with the Prepetition Notes Collateral, collectively, the "***Prepetition Collateral***"). |

| Summary of Material Terms of DIP Facility |
|---|

|  | •   *Validity, Perfection, and Priority of Prepetition Term Loan Liens and Prepetition Credit Agreement Indebtedness.*  Each of the Debtors acknowledges and agrees that, in each case as of the Petition Date:  (i) the Prepetition Term Loan Liens encumber all of the Prepetition Term Loan Collateral, as the same existed on the Petition Date; (ii) the Prepetition Term Loan Liens are valid, binding, enforceable, non-avoidable, and properly perfected liens on and security interests in the Prepetition Term Loan Collateral; (iii) the Prepetition Term Loan Liens are subject and subordinate only to valid, perfected, and enforceable liens (if any) which are senior to the Prepetition Credit Agreement Parties' liens or security interests as of the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, and senior to the Prepetition Credit Agreement Parties' liens or security interests as of the Petition Date (such liens, the "***Prior Term Loan Liens***" and collectively with the Prior Notes Liens, the "***Prior Liens***") and (b) the relative rights and priorities set forth in the Prepetition Intercreditor Agreement; (iv) the Prepetition Term Loan Liens were granted to or for the benefit of the Prepetition Credit Agreement Agent and the other Prepetition Credit Agreement Parties for fair consideration and reasonably equivalent value and were granted contemporaneously with, or covenanted to be provided as an inducement for, the making of the loans and/or commitments and other financial accommodations secured thereby; and (v) the Prepetition Credit Agreement Indebtedness constitutes legal, valid, binding, and non-avoidable obligations of the Debtors. |
|  | <u>Prepetition Intercreditor Agreement.</u>  The Prepetition Trustee, Wilmington Savings Fund Society, FSB (the "***Prepetition Collateral Agent***" and, together with the Prepetition Trustee, the "***Prepetition Notes Agents***"), and the Prepetition Credit Agreement Agent are parties to that certain *Super Senior Intercreditor Agreement*, dated as of July 11, 2023 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "***Prepetition Intercreditor Agreement***"). The Prepetition Notes Agents and the Prepetition Credit Agreement Agent entered into the Prepetition Intercreditor Agreement for the benefit of the Senior Secured Parties and the Junior Secured Parties (each, as defined in the Prepetition Intercreditor Agreement), to govern the respective rights, interests, obligations, priority and positions of the Senior Secured Parties and the Junior Secured Parties.  Pursuant to section 510 of the Bankruptcy Code, the Prepetition Intercreditor Agreement (including, without limitation, any applicable turnover provisions provided therein) shall (a) remain in full force and effect; (b) continue to govern the relative obligations, priorities, rights, and remedies of the Senior Secured Parties and the Junior Secured Parties; and (c) not be deemed to be amended, altered, or modified by the terms of the Interim Order. |
|  | <u>No Challenges/Claims.</u>  Subject to paragraph 45 of the Interim Order, no offsets, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the respective Prepetition Liens or the Prepetition Secured Indebtedness exist, and no portion of the respective Prepetition Liens or the Prepetition Secured Indebtedness is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law.  The Debtors and their estates have no valid Claims (as such term is defined in section 101(5) of the Bankruptcy Code), objections, challenges, causes of action, and/or choses in action against any of the Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees with respect to the April 2026 Notes Documents, the Prepetition Credit Agreement Documents, the Prepetition Secured Indebtedness, the Prepetition Liens, or otherwise, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, avoidance, recovery, disallowance, reduction, or other claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable state law equivalents.  The (a) April 2026 Notes Indebtedness constitutes allowed, secured claims, within the meaning of sections 502 and 506 of the Bankruptcy Code, subject to the value of the Prepetition Notes Collateral and (b) Prepetition Credit Agreement Indebtedness constitutes allowed, secured claims, within the meaning of sections 502 and 506 of the Bankruptcy Code, subject to the value of the Prepetition Term Loan |

| Summary of Material Terms of DIP Facility | |
|---|---|
| | Collateral, in each case, after giving effect to the relative priorities of the Prepetition Secured Parties in respect of "Shared Collateral" as defined in the Prepetition Intercreditor Agreement. |
| | <u>Cash Collateral</u>. All of the Debtors' cash, whether existing as of the Petition Date or thereafter, wherever located (including, without limitation, all cash on deposit or maintained by the Debtors in any account or accounts), whether as original collateral or proceeds of other Prepetition Collateral, constitutes or will constitute "cash collateral" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code ("*Cash Collateral*") and is Prepetition Collateral of the Prepetition Secured Parties, subject in all respects to the priorities set out in the Prepetition Intercreditor Agreement. For the avoidance of doubt, Cash Collateral shall exclude (a) proceeds of the receivables and related assets sold or contributed to, or otherwise encumbered in favor of, the non-Debtors Exela Receivables 3 Holdco, LLC ("*ER3 Holdco*") and Exela Receivables 3, LLC ("*ER3*") from time to time (other than any such proceeds released to ER3 and ER3 Holdco and used by them to pay the Debtors, in each case, in accordance with the terms of the ER3 Securitization Program), (b) proceeds of any and all receivables and related assets sold, assigned or contributed by any of the Debtors Rust Consulting, Inc., Banctec (Canada), Inc. Novitex Enterprise Solutions Canada, Inc. / Solutions D'Enterprise Novitex Canada, Inc., HOVG, LLC and SourceHOV Canada Company, as originators (collectively, the "*Rust Originators*") to Exela BR SPV, LLC ("*BR SPV*") or BR EXAR, LLC ("*BR EXAR*") or otherwise subject to the Receivables Purchase Agreement, dated as of February 12, 2024, as amended from time to time (the "*Rust RPA*"), among the Rust Originators, BR SPV, as seller and BR EXAR or part of the Rust Securitization Program and (c) without limiting the foregoing, any and all cash held in non-Debtor accounts, which includes, without limitation, the "Lock-Box Accounts," "Restricted Operations Account," and "PNC Receiving Account" (each as defined in the Cash Management Motion). |
| | <u>No Control</u>. None of the DIP Agent, the other DIP Secured Parties, the Prepetition Notes Agents, or the Prepetition Secured Parties controls the Debtors or their properties or operations, has authority to determine the manner in which any of the Debtors' operations are conducted, or is a control Person or insider of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the Interim Order, the DIP Facility, the DIP Documents, the Prepetition Secured Indebtedness, the Prepetition Credit Documents, and/or the April 2026 Notes Documents. |
| | *See* Interim Order ¶ F. |
| **Waiver or Modification of Automatic Stay**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iv)* | <u>Modification of Automatic Stay</u>. The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of the Interim Order, including, without limitation, to: (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, DIP Superpriority Claims, and 507(b) Claims; (b) permit the Debtors to perform such acts as each of the DIP Agent, the Required DIP Lenders, the Prepetition Collateral Agent (on behalf of the other Prepetition Notes Secured Parties), or the Prepetition Credit Agreement Agent (on behalf of the other Prepetition Credit Agreement Parties) may reasonably request to assure the perfection and priority of the liens granted in the Interim DIP Order; (c) permit the Debtors to incur all liabilities and obligations to the DIP Secured Parties and the Prepetition Secured Parties under the April 2026 Notes Documents, the Prepetition Credit Agreement Documents, and the DIP Documents, and the DIP Facility, as applicable, and the Interim Order, as applicable; and (d) authorize the Debtors to pay, and the DIP Secured Parties and the Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of the Interim Order.<br><br>*See* Interim Order ¶ 22. |
| **Effect of Stipulation on Third Parties** | The Debtors' Stipulations and all other admissions, agreements, and releases contained in the Interim Order, including the releases set forth in paragraph 51 of the Interim Order (the "*Releases*"), are and shall be irrevocably binding on the Debtors and any and all of the Debtors' successors in interest and assigns in all circumstances and for all purposes upon entry of the Interim Order. The Debtors' Stipulations and all other admissions, agreements, and Releases contained in the Interim Order, |

| Summary of Material Terms of DIP Facility | |
|---|---|
| *Fed. R. Bankr. R. 4001(c)(1)(B)(iii), (viii)* | including the Releases, shall also be binding on all creditors and other parties in interest and all of their respective successors and assigns, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, including the Committee (if appointed), and any other person or entity acting or seeking to act on behalf of the Debtors' estates in all circumstances and for all purposes, unless, and solely to the extent (i) the Committee or a party in interest with the requisite standing (in each case, to the extent requisite standing is obtained pursuant to an order of this Court entered prior to the Challenge Deadline and subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to commence such proceeding) has timely commenced an appropriate proceeding or contested matter as required under the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules, including, without limitation, as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in the Interim Order, including paragraph 45(a) of the Interim Order) by the Challenge Deadline challenging any of the Debtors' Stipulations, the Releases, with respect to the April 2026 Notes Indebtedness or the Prepetition Credit Agreement Indebtedness (each such proceeding or contested matter, a "***Challenge***") and (ii) there is entered a final non-appealable order in favor of the plaintiff in any such timely and properly filed Challenge sustaining such Challenge; *provided*, that, any pleadings filed in connection with any Challenge shall set forth with specificity the basis for such Challenge (and any Challenges not so specified prior to the Challenge Deadline shall be deemed forever, waived, released, and barred). |
| | • If no such Challenge is timely and properly filed by a party in interest with the requisite standing and authority as contemplated in the Interim DIP Order prior to the Challenge Deadline or the Court does not rule in favor of the plaintiff in any such proceeding, then (i) the Debtors' Stipulations and the Releases, shall nonetheless remain binding and preclusive (as provided in paragraph 45 of the Interim Order) on the Committee (if appointed) and on any other person or entity and the Debtors, (ii) the obligations of the Debtors under the April 2026 Notes Documents, including the April 2026 Notes Indebtedness, and the Prepetition Credit Agreement Documents, including the Prepetition Credit Agreement Indebtedness, in each case, shall constitute allowed claims not subject to defense, claim, counterclaim, recharacterization, subordination, recoupment, offset, or avoidance, for all purposes in the Chapter 11 Cases, (iii) the Prepetition Liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination, avoidance, or other defense, and (iv) the Prepetition Secured Indebtedness and the Prepetition Liens on the Prepetition Collateral shall not be subject to any other or further claim or challenge by any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any party in interest acting or seeking to act on behalf of the Debtors' estates and any defenses, claims, causes of action, counterclaims, and offsets by any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any other party acting or seeking to act on behalf of the Debtors' estates, (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors), whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties or their respective representatives arising out of or relating to any of the April 2026 Notes Documents, the April 2026 Notes Indebtedness, the Prepetition Credit Agreement Documents, the Prepetition Secured Indebtedness, the Prepetition Liens, or the Prepetition Collateral, as applicable, shall be deemed forever waived, released and barred, in each case except to the extent that such Debtors' Stipulations, admissions, agreements, and releases contained in the Interim Order, including the Releases set forth in paragraph 51 of the Interim Order, were expressly and successfully challenged by such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction.<br><br>• If any such Challenge is timely and properly filed prior to the Challenge Deadline by any statutory or non-statutory committee appointed or formed in the Chapter 11 Cases or any other person or entity, in each case, with requisite standing and authority, (i) any claim or action that is not brought shall forever be barred, and (ii) the Debtors' Stipulations, including |

| Summary of Material Terms of DIP Facility |
|---|
| <br><br>the Releases, shall nonetheless remain binding and preclusive on each other statutory or non-statutory committee appointed or formed in the Chapter 11 Cases and on any other person or entity, except to the extent that such stipulations, admissions, agreements, and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction.<br><br>● The "***Challenge Deadline***" shall mean (i) as to the Committee, sixty (60) days from the date of the formation of the Committee (if appointed) and (ii) if no Committee has been appointed, by any other party in interest with requisite standing seventy-five (75) days following the entry of the Interim Order.  The Challenge Deadline may be extended in writing prior to the expiration of the Challenge Deadline from time to time in the sole discretion of the Required DIP Lenders or by this Court for good cause shown pursuant to a motion filed by a party in interest prior to the expiration of the Challenge Deadline; provided, however, that if, prior to the Challenge Deadline (a) these Chapter 11 Cases are converted to chapter 7, or (b) a chapter 11 trustee is appointed, then in each case, the Challenge Deadline shall be extended for a period of sixty (60) days solely with respect to any such trustee; *provided, that*, the Challenge Deadline shall be tolled for fifteen (15) business days (or, if the Court is not available during the fifteen (15) day period, to the first day after the Court is available) if the Committee seeking to file a Challenge files a motion, on an emergency basis, seeking standing to file a Challenge during the Challenge Period, which attaches a proposed Challenge.  The Debtors and the Prepetition Secured Parties expressly consent to the motion seeking standing to file a Challenge to be heard on an emergency basis.  The Debtors and Prepetition Secured Parties expressly waive any argument that the Committee is precluded from seeking derivative standing, or lacks standing if granted by an order, to pursue a Challenge under the Delaware LLC Act, any provision of any Debtors' organizational documents, or otherwise.  The Court may fashion any appropriate remedy following a successful Challenge.<br><br>● Nothing in the Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including the Committee (if appointed) or any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect the Debtors' Stipulations, admissions, agreements, and other Releases contained in the Interim Order with respect to the DIP Secured Parties and the Prepetition Secured Parties, including the Releases set forth in paragraph 51 of the Interim Order, to the DIP Secured Parties and the Prepetition Secured Parties, and all rights to object or to oppose such standing or any Challenge in any manner are expressly reserved.<br><br>● For the avoidance of doubt, notwithstanding anything to the contrary in the Interim Order, upon the entry of the Interim Order, (i) the Challenge Deadline shall automatically be deemed to have lapsed as to the Debtors with regard to the Debtors' Stipulations, including the Releases, (ii) such stipulations, admissions, agreements, and other Releases shall be binding upon the Debtors, and (iii) any Challenges by the Debtors with respect to the Prepetition Secured Parties, including with respect to the Releases as to the Prepetition Secured Parties, shall be deemed forever waived, released, and barred.<br><br>● Any successor to the Debtors (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors or any other estate representative appointed in the Chapter 11 Cases or any Successor Cases) shall be bound by the terms of the Interim Order to the same extent as the Debtors, including with respect to the Releases.<br><br>*See* Interim Order ¶ 45. |
| **Milestones**      The DIP Credit Agreement shall contain the following milestones (as may be extended and/or waived in writing (email from counsel being sufficient) by the Required Lenders): |

| Summary of Material Terms of DIP Facility | |
|---|---|
| *Fed. R. Bankr. P. 4001(c)(1)(B)(vi)*;<br><br>*Complex Case Procedures, ¶ 8(a)* | • No later than ten (10) Business Days following the Petition Date, the Restructuring Support Agreement (as defined in the DIP Credit Agreement) shall have been executed by the parties thereto; provided, that, this Milestone may not be extended past twenty (20) Business Days following the Petition Date without the written consent (email sufficient) of each Lender; and<br><br>• No later than fifteen (15) Business Days following the Petition Date, the Debtors shall have retained, at the Debtors' sole cost and expense, a chief restructuring officer (a "CRO") from a list of at least three (3) individuals provided by the Required Lenders. The CRO shall (i) assist the Debtors with all budgeting and financial reporting matters, and any other financial matters, (ii) report to the Debtors, and (iii) work with the Debtors to try to reduce expenses and increase revenue as much as reasonably possible.<br><br>*See* DIP Credit Agreement ¶ 7.01(r). |
| **Indemnification**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(ix)* | The DIP Secured Parties and the Prepetition Secured Parties**,** respectively, have acted in good faith and without negligence, misconduct, or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens, respectively, any challenges or objections to the DIP Facility, or the use of Cash Collateral, the DIP Documents, and all other documents related to and all transactions contemplated by the foregoing. Accordingly, without limitation to any other right to indemnification, the Prepetition Secured Parties and DIP Secured Parties shall be and hereby are indemnified (as applicable) as provided in the respective April 2026 Notes Documents, the Prepetition Credit Agreement Documents, and the DIP Documents, as applicable. The Debtors agree that no exception or defense in contract, law, or equity exists as of the date of the Interim Order to any obligation set forth, as the case may be, of the Interim Order, the DIP Documents, the Prepetition Credit Agreement, or the April 2026 Notes Documents to indemnify and/or hold harmless the DIP Agent, any other DIP Secured Party, the Prepetition Notes Agents, the Prepetition Credit Agreement Agent, or any other Prepetition Secured Party, as the case may be, and any such defenses are hereby waived.<br><br>*See* Interim Order ¶ 43 |
| **Section 506(c) Claims / Section 552(b) Waiver**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(x)* | Subject to and upon entry of the Interim Order, except to the extent of the Carve Out, no costs or expenses of administration that have been or may be incurred in the Chapter 11 Cases at any time shall be charged against the Prepetition Notes Agents, the Prepetition Credit Agreement Agent, or the DIP Agent, the other Prepetition Secured Parties or the other DIP Secured Parties, the Prepetition Collateral, DIP Collateral, or the Adequate Protection Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Agent (at the direction of the Required DIP Lenders), the Prepetition Notes Agents (at the direction of Required Consenting Creditors), or the Prepetition Credit Agreement (at the direction of the Required Lenders (as defined in the Prepetition Credit Agreement)), as may be applicable, and no such consent shall be implied from any action, inaction, or acquiescence by any party.<br><br>*See* Interim Order ¶ 48.<br><br>Subject to and upon entry of the Final Order (but retroactive to the Petition Date), and subject to the priorities set forth in the Interim Order (including, for the avoidance of doubt, **<u>Exhibit B</u>** to the Interim Order), the DIP Secured Parties and the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception thereunder shall be waived by the Debtors, except for the benefit of the DIP Secured Parties or the Prepetition Secured Parties with respect to proceeds, products, offspring, or profits of any of the DIP Collateral or the Prepetition Collateral, respectively.<br><br>*See* Interim Order ¶ 50. |

| Summary of Material Terms of DIP Facility | |
|---|---|
| **Fees**<br><br>*Fed. R. Bankr. P. 4001(c)(1)* | Backstop Fee:  In consideration for providing the backstopping the DIP Facility, the DIP Backstop Parties shall receive 5.00% of the equity of the reorganized Debtors earned and payable in accordance with the Backstop Commitment Letter attached hereto as **Exhibit A**.<br><br>*See* DIP Credit Agreement § 1.01; definition of "Backstop Commitment Letter". |
| **Cross-Collateralization**<br><br>*Complex Case Procedures, ¶ 8(b)* | No provision of the DIP Credit Agreement, the Interim Order, or the Final Order grants cross-collateralization protection. |
| **Releases**<br><br>*Complex Case Procedures, ¶ 8(f)* | Upon entry of the Interim Order, but subject to the Challenge Deadline provided for in the Interim DIP Order (with respect to the Prepetition Secured Parties), in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each of the Debtors and (subject to paragraph 45 of the Interim Order) each of their estates, on its own behalf and on behalf of it and their respective predecessors, successors, heirs, and past, present and future subsidiaries and assigns (collectively, the "***Releasing Parties***") hereby unconditionally and irrevocably releases, acquits, absolves, forever discharges and covenants not to sue the DIP Secured Parties, the Prepetition Secured Parties, and each such entities' current and former affiliates, and each such entity's current and former directors, officers, managers and equityholders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, and direct and indirect subsidiaries, and each of such entity's current and former officers, members, managers, directors, equityholders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, attorneys (including the DIP Advisors and Prepetition Advisors), independent contractors, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, and partners (including both general and limited partners) (the "***Released Parties***") and their respective property and assets from any and all acts and omissions of the Released Parties, and from any and all claims, interests, causes of action, Avoidance Actions, counterclaims, defenses, setoffs, demands, controversies, suits, judgments, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, objections, legal proceedings, equitable proceedings, executions of any nature, type, or description and liabilities whatsoever (including any derivative claims asserted or assertable on behalf of the Debtors, their estates, or such entities' successors or assigns, whether individually or collectively), which the Releasing Parties now have, may claim to have or may come to have against the Released Parties through the date of the Interim Order, at law or in equity, by statute or common law, in contract or in tort, including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all "claims" (as defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code, and (c) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether liquidated or unliquidated, fixed or contingent, known or unknown, suspected or unsuspected, disputed or undisputed, whether arising at law or in equity, including any recharacterization, recoupment, subordination, disallowance, avoidance, challenge, or other claim or cause of action arising under or pursuant to section 105, chapter 5, or section 724(a) of the Bankruptcy Code or under other similar provisions of applicable state, federal, or foreign laws, including, without limitation, any right to assert any disgorgement or recovery, and further waives and releases any defense, right of counterclaim, right of setoff, or deduction on the payment of the April 2026 Notes Indebtedness, the Prepetition Credit Agreement Indebtedness, or the DIP Obligations; *provided* that the foregoing shall not release any claims resulting from actual fraud, gross negligence, or willful misconduct of any Released Party as determined by a final, non-appealable judgment of a court of competent jurisdiction.  This paragraph is in addition to and shall not in any way limit any other release, covenant not to sue, or waiver by the Releasing Parties in favor of the Released Parties set forth in the Restructuring Support Agreement (as defined in the DIP Credit Agreement) or the chapter 11 plan contemplated therein. |

| Summary of Material Terms of DIP Facility | |
|---|---|
| | As of the entry of the Interim Order, the releases granted in this paragraph are final and binding and are not subject to a Challenge except as expressly outlined in the Interim DIP Order.<br><br>*See* Interim Order ¶ 51. |
| **Limitations on Use of DIP Proceeds, Cash Collateral, and Carve Out**<br><br>*Complex Case Procedures, ¶ 8(g)* | No proceeds of the DIP Facility, the DIP Collateral, the Prepetition Collateral, the Carve Out, or any Cash Collateral may be used by the DIP Loan Parties or any other party in interest, or their representatives, to (or support any other party to) (a) for any purpose that is prohibited under the Bankruptcy Code or the Interim Order; (b) in any manner except as set forth in the DIP Budget; (c) directly or indirectly to finance in any way (i) any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type, or the investigation or preparation for any of the foregoing, that could be adverse to the interests of any or all of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties or (ii) any other action, which with the giving of notice or passing of time, would result in an Event of Default under the DIP Facility; and (d) to make any distribution under a chapter 11 plan that does not provide for the indefeasible payment of DIP Obligations and the Prepetition Term Loans in full in cash unless agreed by the Required DIP Lenders; *provided* that, advisors to the Committee, if one is appointed, may investigate the Prepetition Liens granted pursuant to, or any claims under or causes of action with respect to, the April 2026 Notes or the Prepetition Term Loans at an aggregate expense not to exceed $75,000, *provided, further,* that no portion of such amount may be used to prosecute any claims.<br><br>*See* Interim Order ¶ 36. |
| **Non-Consensual Priming Liens**<br><br>*Complex Case Procedures, ¶ 8(h)* | None. |
| **Any Other Provision That Limits Estate Fiduciaries to Fulfill Duties**<br><br>*Complex Case Procedures, ¶ 8(i)* | N/A. |

## **THE DEBTORS' PREPETITION SECURED INDEBTEDNESS**

20.     As set forth in the following table, as of the Petition Date, the Debtors have approximately $1.293 billion of secured and unsecured funded debt obligations.

| Debt | Relevant Parties | Maturity Date | Outstanding Principal Amount[5] |
|---|---|---|---|
| Senior Secured Term Loan (Blue Torch Facility) | • **Borrower:** Exela Intermediate<br>• **Borrower:** Exela Finance | July 11, 2026 | $38,500,000 |
| April 2026 Notes | • **Issuer:** Exela Intermediate<br>• **Co-Issuer:** Exela Finance | April 15, 2026 | $1,231,060,507 (of which approximately $363,000,000 is held by certain non-Debtor affiliates)[6] |
| July 2026 Notes[7] | • **Issuer:** Exela Intermediate<br>• **Co-Issuer:** Exela Finance | July 15, 2026 | $23,953,211 (of which $1,211 is held by certain non-Debtor affiliates) |
| | | | **$1,293,513,718** |

### A.     Senior Secured Term Loan (the "***Blue Torch Facility***")

21.     On July 11, 2023, Debtor Exela Intermediate LLC ("***Exela Intermediate***") and Debtor Exela Finance, Inc. ("***Exela Finance***"), entered into that certain financing agreement (the "***Blue Torch Financing Agreement***") with Blue Torch Credit Opportunities Fund III LP, Blue Torch Credit Opportunities Unlevered Fund III LP, BTC Holdings SBAF Fund LLC, BTC Holdings KRS Fund LLC, and BTC Holdings SBAF Fund-B LLC, as lenders (collectively, the "***Blue Torch Lenders***"), and Blue Torch Finance LLC (the "***Blue Torch Facility Agent***"), as

---

[5]     The Outstanding Principal Amounts listed herein exclude the unpaid accrued interest under each debt facility. In addition, such balances may differ from the figures listed in the DTC-based register due to certain differences with DTC accounting conventions.

[6]     The amount of April 2026 Notes held by certain non-Debtor affiliates is exclusive of the $6 million of such notes sold to external holders in January 2025.

[7]     As discussed below, the July 2026 Notes were originally secured obligations of the Company but pursuant to the terms of the Supplemental Indenture (defined below), all collateral securing the July 2026 Notes pursuant to the Security Agreement was released and, accordingly, the July 2026 Notes are no longer secured obligations of the Company.

administrative and collateral agent.  Pursuant to the Blue Torch Financing Agreement, the Blue Torch Lenders agreed to extend a $40 million term loan to the Debtors (the "***Senior Secured Term Loan***").  As of the Petition Date, the principal amount outstanding under the Blue Torch Financing Agreement is approximately $38.5 million.

22.     Pursuant to that certain pledge and security agreement dated as of July 11, 2023 (the "***Blue Torch Pledge and Security Agreement***"), the obligations arising pursuant to the Blue Torch Financing Agreement are secured by security interests in all or substantially all personal property and fixtures of the grantors thereunder.[8]

B.     **April 2026 Notes**

23.     On July 11, 2023, Debtors Exela Intermediate and Exela Finance (together, the "***Issuers***"), certain guarantors thereunder,[9] and U.S. Bank Trust Company, National Association, as indenture trustee (the "***April 2026 Notes Trustee***"), executed an indenture (the "***April 2026 Notes Indenture***")[10] pursuant to which the Issuers issued approximately $1.082 billion aggregate principal amount of 11.5% first-priority senior secured notes due April 15, 2026 (the "***April 2026 Notes***"), which includes April 2026 Notes issued (a) as consideration in the discounted exchange (the "***2023 Exchange***") of $956.0 million aggregate principal amount of the July 2026 Notes (defined below), (b) as consideration for the private exchange of certain term loans (none of which remain outstanding), (c) in exchange for certain secured notes held by affiliates of the Debtors

---

[8]     The guarantors thereunder are comprised of all Debtor entities, except for Exela Intermediate and Exela Finance.

[9]     The guarantors thereunder are comprised of each of the Debtors, except for Exela Finance, Exela Intermediate, Debtor Exela Technologies BPA, LLC, Debtor SIG-GP, L.L.C., and Services Integration Group, L.P.

[10]    Wilmington Savings Fund Society, FSB served as collateral agent (the "***First-Priority Collateral Agent***") for the First-Priority Secured Parties (as defined therein).

(none of which remain outstanding), and (d) certain non-Debtor affiliates in satisfaction of prior cash payments made by such non-Debtor affiliates to or on behalf of the Issuers.

24.     The interest on the April 2026 Notes has historically been partly paid in kind, subject to the terms of the April 2026 Notes Indenture.  As a result of the foregoing PIK Interest and the issuance of additional April 2026 Notes from time to time in accordance with the April 2026 Notes Indenture, the outstanding principal amount as of the Petition Date is approximately $1.231 billion.  Certain non-Debtor affiliates of the Debtors hold approximately $363 million in principal amount of the April 2026 Notes.[11]

25.     The Issuers' obligations under the April 2026 Notes (the "*April 2026 Notes Obligations*") are secured by the terms of the "Security Documents" as defined in the April 2026 Notes Indenture.  Under the Security Documents, the April 2026 Notes Obligations are first priority senior secured obligations of the Issuers and the guarantors thereunder.  Specifically, the obligations are secured by security interests in substantially all of the existing and future assets of the Issuers and the grantors thereunder.

### C.     Intercreditor Agreement[12]

26.     The respective rights of the April 2026 Notes Trustee, First-Priority Collateral Agent, and the Blue Torch Facility Agent (collectively, the "*Intercreditor Agreement Parties*") with respect to their shared collateral are governed by that certain intercreditor agreement, dated as of July 11, 2023, by and between the Intercreditor Agreement Parties, the Issuers, and certain guarantors thereunder (as may be amended from time to time, the "*Intercreditor Agreement*").

---

[11]   The non-Debtor affiliate holders of April 2026 Notes include GP 3XCV LLC and XCV-STS LLC.

[12]   Certain Debtors are party to a *Pari First Lien Intercreditor Agreement* (the "*Pari Intercreditor*") dated as of July 12, 2017.  While the Pari Intercreditor has not been terminated, there are no outstanding debt obligations underlying this agreement.

The Intercreditor Agreement governs, among other items, the lien priorities and subordination of the relevant collateral as well as the enforcement rights of each Intercreditor Agreement Party. Notably, the Intercreditor Agreement also governs the respective rights of the Intercreditor Agreement Parties in connection with insolvency proceedings, including post-petition financing.

### D. The July 2026 Notes (Unsecured)

27. On December 9, 2021, the Issuers, certain guarantors thereunder[13], and U.S. Bank National Association, as trustee (the "***July 2026 Notes Trustee***"), entered into that certain indenture (the "***July 2026 Notes Indenture***")[14] pursuant to which the Issuers issued certain 11.5% first-priority senior secured notes due July 15, 2026, (the "***July 2026 Notes***").[15]

28. The Issuers' obligations under the July 2026 Notes (the "***July 2026 Notes Obligations***") were secured by that certain collateral agency and security agreement (as further amended, supplemented, modified, extended, renewed, restated, refunded or refinanced from time to time, the "***Security Agreement***") dated as of July 12, 2017 and any additional relevant security agreements, pledge agreements, collateral assignments and mortgages (together with the Security Agreement, the "***Security Documents***").[16] Prior to the 2023 Exchange, the Security Documents (subject to the conditions thereof) provided that the July 2026 Notes Obligations were secured by security interests in, and liens upon, all or substantially all assets of, among other parties, Exela Finance and Exela Intermediate.

---

[13] The guarantors thereunder are comprised of by substantially the same guarantors as the April 2026 Notes except for entities formed after December 2021.

[14] Wilmington Savings Fund Society, FSB served as collateral agent (the "***First-Priority Collateral Agent***") for the First-Priority Secured Parties (as defined therein).

[15] Interest on the July 2026 Notes is payable on January 15 and July 15 of each year.

[16] The Security Agreement was initially executed in connection with the 10.000% First-Priority Senior Secured Notes due 2023 issued on July 12, 2017 (the "***Old Notes***").

29.     As of January 1, 2023, the aggregate principal amount of the Company's indebtedness under the July 2026 Notes was approximately $1.278 billion (inclusive of amounts held by certain affiliates).  However, following the 2023 Exchange and certain periodic debt repurchases by the Company, only approximately $24 million in aggregate principal amount remained outstanding under the July 2026 Notes as of the Petition Date (of which certain non-Debtor affiliates hold approximately $1,211.00).[17]  Further, on July 11, 2023, the Issuers, April 2026 Notes Trustee (as successor to the July 2026 Notes Trustee), and Wilmington Savings Fund Society, FSB, as collateral agent executed a seventh supplemental indenture (the "***Supplemental Indenture***") to govern the July 2026 Notes.  The Supplemental Indenture eliminated substantially all restrictive covenants and certain events of default, including those relating to covenant or warranty breaches, cross-acceleration rights, certain insolvency events and judgments, contained in the July 2026 Notes Indenture and the July 2026 Notes.  Notably, all collateral securing the July 2026 Notes pursuant to the Security Agreement was released under the Supplemental Indenture.  Accordingly, the July 2026 Notes are no longer secured obligations.

## THE DEBTORS' SECURITIZATION AND OTHER RECEIVABLES FINANCING ARRANGEMENTS

30.     The Company maintains three trade receivables financing arrangements: the ER3 Securitization Program (as defined below), the Second Lien Note (as defined below) and the Rust Securitization Program (as defined below) (collectively, the "***Receivables Facilities***").  The workings of the Receivables Facilities, and their proposed treatment during and as a result of these Chapter 11 Cases, is described in greater detail in the Securitization Program Motion[18] and the

---

[17] The non-Debtor affiliate holders of the July 2026 Notes include GP 3XCV LLC, GP 2XCV LLC, and XCV-STS LLC.

[18] "***Securitization Program Motion***" means *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Certain Debtors to Continue Selling, Contributing and Servicing Receivables and Related Rights*

Cash Management Motion.[19]  The following chart sets forth the obligations outstanding under the

Receivables Facilities as of the Petition Date:

| Facilities | Relevant Parties | Maturity | Outstanding Principal |
|---|---|---|---|
| ER3 Securitization Program | • **Originators:** *Following Debtor entities*: BancTec, Inc.; Economic Research Services, Inc.; Exela Enterprise Solutions, Inc.; HOV Enterprise Services, Inc.; HOV Services, Inc.; HOV Services, LLC; J & B Software, Inc.; Novitex Government Solutions, LLC; Regulus Group LLC; Regulus Group II LLC; Regulus Integrated Solutions LLC; SOURCECORP BPS Inc.; SOURCECORP Management, Inc.; SourceHOV Healthcare, Inc; and United Information Services, Inc.<br>• **Seller:** Non-Debtor Exela Receivables 3, LLC<br>• **Pledgor:** Non-Debtor Exela Receivables 3 Holdco LLC | June 17, 2025 | $94,300,000 |
| Second Lien Note | • **Borrower:** Non-Debtor Exela Receivables 3 Holdco, LLC | June 17, 2025 | $22,625,000 |
| BR Exar Accounts Receivable Facility | • **Originators**: Debtor Novitex Enterprise Solutions Canada, Inc., Debtor Rust Consulting, Inc., Debtor HOVG LLC, Debtor BancTec (Canada) Inc., and Debtor SourceHOV Canada Company<br>• **Seller:** Non-Debtor Exela BR SPV LLC | - | $9,981,630 |
| | | | **$126,925,000** |

A.     **The PNC Accounts Receivable Facility**

31.     On June 17, 2022, non-Debtor Exela Receivables 3 LLC ("***Receivables 3***"), as

seller, and non-Debtor Exela Receivables 3 Holdco, LLC ("***Receivables 3 Holdco***," and together

with Receivables 3, the "***SPEs***"), as pledgor, Parent, as initial servicer, PNC Bank, National

Association ("***PNC***"), as administrative agent for the benefit of the secured parties (the "***PNC***

---

*Pursuant to the Securitization Program, (II) Modifying the Automatic Stay, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief.*

[19]   "***Cash Management Motion***" means the *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Existing Cash Management System, (B) Maintain Existing Business Forms and Intercompany Arrangements, and (C) Continue Intercompany Transactions and (II) Granting Related Relief.*

*Securitization Secured Parties*") and as letters of credit bank, PNC Capital Markets LLC, as structuring agent, and PNC, as purchasers, entered into that certain amended and restated receivables purchase agreement, dated as of June 17, 2022 (as further amended, supplemented, modified, extended, renewed, restated, refunded or refinanced from time to time, the "***PNC Receivables Purchase Agreement***").  The PNC Receivables Purchase Agreement extended the term of an existing $150 million securitization facility among the SPEs (*i.e.*, Receivables 3 and Receivables 3 Holdco), as borrower, and a certain group of lenders to allow the SPEs to sell and finance receivables until December 31, 2025 (the "***ER3 Securitization Program***").  Each SPE is a non-Debtor structured as a special-purpose, bankruptcy-remote entity created for the purpose of facilitating the ER3 Securitization Program.  As noted, certain Debtor entities (the "***PNC Securitization Originators***") transfer their receivables on an ongoing basis at fair market value to the SPEs to create and maintain the "Capital Coverage Amounts" (substantially equivalent to a borrowing base) for the ER3 Securitization Program, with the proceeds of those sales to the SPEs funding in part the Debtors', and the larger Company's, liquidity.[20]  The PNC Receivables Purchase Agreement was further amended on February 27, 2023 in connection with the Second Lien Note (defined below) to, among other objectives, permit the addition of subordinated debt by B. Riley Commercial Capital, LLC.

32.     The main transaction documents for the ER3 Securitization Program consist of (1) the PNC Receivables Purchase Agreement, (2) the Amended and Restated First Tier Purchase and Sale Agreement, dated as of June 17, 2022, among Parent, as initial servicer, the PNC

---

[20]     The PNC Securitization Originators include the following Debtor entities:  BancTec, Inc.; Economic Research Services, Inc.; Exela Enterprise Solutions, Inc.; HOV Enterprise Services, Inc.; HOV Services, Inc.; HOV Services, LLC; J & B Software, Inc.; Novitex Government Solutions, LLC; Regulus Group LLC; Regulus Group II LLC; Regulus Integrated Solutions LLC; SOURCECORP BPS Inc.; SOURCECORP Management, Inc.; SourceHOV Healthcare, Inc; and United Information Services, Inc.

Securitization Originators, as sellers, and Receivables 3 HoldCo, as buyer (as further amended, supplemented, modified, extended, renewed, restated, refunded or refinanced from time to time, the "***PNC First Tier Purchase Agreement***"), (3) the Amended and Restated Second Tier Purchase and Sale Agreement, dated as of June 17, 2022, among Parent, as initial servicer, Receivables 3 HoldCo, as seller, and Receivables 3, as buyer (as further amended, supplemented, modified, extended, renewed, restated, refunded or refinanced from time to time, the "***PNC Second Tier Purchase Agreement***"), (4) the Amended and Restated Pledge and Guaranty Agreement, dated as of June 17, 2022, by the Receivables 3 Holdco in favor of PNC, as administrative agent for the benefit of the secured parties and the other beneficiaries set forth therein (as further amended, supplemented, modified, extended, renewed, restated, refunded or refinanced from time to time, the "***PNC Equity Pledge Agreement***"), (5) the Amended and Restated Performance Guaranty, dated as of June 17, 2022, by Parent, as performance guarantor, in favor of PNC, as administrative agent (as further amended, supplemented, modified, extended, renewed, restated, refunded or refinanced from time to time, the "***PNC Performance Guaranty***") (together with the other Transaction Documents (as defined in the PNC Receivables Purchase Agreement), collectively, the "***PNC Facility Transaction Documents***"), and (6) the Amended and Restated Sub-Servicing Agreement, dated as of June 17, 2022, by Parent, as initial Servicer, and each of the PNC Securitization Originators, as sub-servicers (as further amended, supplemented, modified, extended, renewed, restated, refunded or refinanced from time to time, the "***PNC Sub-Servicing Agreement***").

33.     Under the ER3 Securitization Program, (a) the Receivables 3 Holdco purchases and receives as capital contributions receivables from the PNC Securitization Originators pursuant to the PNC First Tier Purchase Agreement, (b) Receivables 3 purchases and receives as capital

contributions, such receivables from Receivables 3 Holdco (consisting of all the receivables transferred to Receivables 3 Holdco pursuant to the PNC First Tier Purchase Agreement) pursuant to the PNC Second Tier Purchase Agreement, (c) Receivables 3 may request that the purchasers make payments of Capital (as defined in the PNC Receivables Purchase Agreement but substantially similar to the outstanding principal of a loan in the transactions under the PNC Receivables Purchase Agreement were structured as loans) to Receivables 3 from time to time, secured by, among other things, the receivables and all other property owned by Receivables 3, pursuant to the terms set forth in the PNC Receivables Purchase Agreement and the other PNC Transaction Documents, (d) Parent, as Servicer, agrees to perform certain servicing duties with respect to the receivables, (e) each PNC Securitization Originator, as sub-servicers under the PNC Sub-Servicing Agreement, agrees to perform such duties of the Servicer with respect to the receivables originated by such PNC Securitization Originator, and (f) Parent, as performance guarantor under the PNC Performance Guaranty, guarantees the performance of the obligations of the PNC Securitization Originators and Parent, as servicer, or any replacement servicer, under the PNC Transaction Documents to which they are a party.  The obligations under the PNC Receivables Purchase Agreement (the "***PNC Securitization Obligations***") are guaranteed by Receivables 3 Holdco, which guarantee is secured by the PNC Equity Pledge Agreement.  Pursuant to the PNC Equity Pledge Agreement, Receivables 3 Holdco, as guarantor, has provided collateral primarily consisting of a pledge of its equity in Receivables 3.

34.     As set forth in greater detail in the Securitization Motion, PNC has agreed to maintain the ER3 Securitization Program, and to continue to provide the Debtors with the liquidity arising therefrom, subject to the terms and conditions set forth in the motion and accompanying proposed order.

**B.      Second Lien Note**

35.      On February 27, 2023, Receivables 3 Holdco entered into a Secured Promissory Note (the "***Second Lien Note***") with B. Riley Commercial Capital, LLC, which was later assigned to BRF Finance Co., LLC ("***B. Riley***").  Pursuant to the Second Lien Note, B. Riley agreed to lend up to $35 million to Receivables 3 Holdco secured by a second lien pledge of Receivables 3 Holdco's equity interests in Receivables 3.  The Second Lien Note has a maturity date of June 17, 2025, and bears an interest rate of one-month Term SOFR plus 7.5%.

36.      As of February 2025, approximately $22.6 million remained outstanding under the Second Lien Note.

37.      The relative rights and priorities of PNC, B. Riley, and the PNC Securitization Secured Parties (collectively, the "***Subordination Agreement Parties***") are governed by that certain subordination and intercreditor agreement, dated as of February 27, 2023, by and between the Subordination Agreement Parties, Receivables 3 Holdco, Receivables 3, and Parent (as may be amended from time to time, the "***PNC/2L Note Subordination Agreement***").  The PNC/2L Note Subordination Agreement governs, among other things, subordinated debt payment restrictions, subordination of liens and security interest, as well as the Subordination Agreement Parties' rights in liquidation, dissolution, or bankruptcy.  Under the PNC/2L Note Subordination Agreement, B. Riley in general is prohibited from taking actions to enforce its security interest prior to payment in full of the PNC Securitization Obligations.  In addition, PNC, as administrative agent, and the PNC Securitization Secured Parties agree not to permit certain amendments to the PNC Transaction Documents without the consent of B. Riley.

**C.      BR Exar Accounts Receivable Facility**

38.      On February 12, 2024, certain affiliates of the Company, including Debtor Novitex Enterprise Solutions Canada, Inc., Debtor Rust Consulting, Inc., Debtor HOVG LLC, Debtor

BancTec (Canada) Inc., and Debtor SourceHOV Canada Company, as originators (the "**BR Exar Originators**"), and non-Debtor Exela BR SPV LLC, as seller (the "**BR Exar Seller**"), entered into a receivables purchase agreement with BR Exar, LLC ("**BREL**"), an affiliate of B. Riley (as subsequently amended on February 29, 2024, March 29, 2024, March 31, 2024, April 24, 2024, May 24, 2024 and June 25, 2024, July 29, 2024, August 13, 2024, August 30, 2024 September 27, 2024, October 30, 2024, November 26, 2024, December 30, 2024, January 23, 2025, and February 14, 2025 the "**Rust Securitization Program**").

39.     In turn, the BR Exar Originators, agreed to sell certain existing accounts receivable and all future receivables to BREL until such time as BREL will have collected approximately $59 million, net of any costs or expenses.  As of the Petition Date, there is approximately $10 million outstanding under the Rust Securitization Program.

40.     The obligations under the Rust Securitization Program (the "**BR Exar Obligations**") are secured by that certain pledge agreement dated as of February 27, 2023 (the "**Pledge Agreement**").  Under the Pledge Agreement, the BR Exar Originators and BR Exar Seller provided a pledge and assignment of the bank account(s) established for the purpose of receiving payments and other monies and proceeds collected with respect to purchased receivables to BREL as collateral security for the BR Exar Obligations.

## LIQUIDITY NEEDS AND FINANCING EFFORTS

**I.     THE DEBTORS HAVE AN IMMEDIATE NEED TO ACCESS THE DIP FACILITY AND USE CASH COLLATERAL**

41.     The Debtors require immediate access to the DIP Facility, in addition to continued use of the Prepetition Secured Parties' and DIP Secured Parties' Cash Collateral.  The Debtors' business is cash intensive, with significant daily and weekly costs required to satisfy obligations to, among others, employees, printers, paper providers, postage costs, third-party service

providers, landlords, technology vendors, and common carriers.  The ability of the Debtors to satisfy their expenses when due is essential to the Debtors' continued operation of their business during the Chapter 11 Cases.

42.     As described in the Financing Declaration, among other things, a majority of the Debtors' accounts receivable have been sold in accordance with the Prepetition Securitization Program, and the Debtors will incur significant working capital expenses in order to generate and collect new receivables from its operations.  Accordingly, absent the continued access to the Securitization Program, the Debtors will have no access to cash to fund operations.  Additionally, the Debtors are currently out of formula for the Prepetition Securitization Program, and the Debtors will require additional financing to support the business while the facility pays itself down through the collection of receivables during these cases.  As of the Petition Date, the Debtors' total cash balance is approximately $0.1 million.  Without additional postpetition financing in the amounts set forth in the DIP Budget, current and anticipated liquidity in the form of Cash Collateral is wholly insufficient to cover the Debtors' operating expenses, including making outstanding payments to vendors, and other costs of administering these cases.

43.     As described more fully in the Securitization Program Motion, the Debtors seek authority to enter into the Postpetition Securitization Program, which contemplates the continuation of available financing thereunder in an amount of $110 million.  However, while access to the Postpetition Securitization Program is critical to ensuring the Debtors have sufficient liquidity during the Chapter 11 Cases, it is still insufficient to adequately satisfy all of the Debtors' postpetition financing needs.  Thus, the Debtors also require access to the DIP Facility and the use of Cash Collateral to fund their operations and avoid irreparable harm until the Final Hearing. Specifically, without access to such financing at this critical early stage, the Debtors would be

unable to pay employees, vendors, or other critical operating expenses in the coming weeks, which would result in a value-destructive interruption to their business and, simultaneously, eliminate their best chance for consummating the restructuring contemplated under the Restructuring Support Term Sheet.

44.     Accordingly, the proposed DIP Facility is, together with the Postpetition Securitization Program, necessary to provide the Debtors with the liquidity they need to fund the Chapter 11 Cases, which would not be possible to fund solely on a Cash Collateral basis.

## II.     THE PROPOSED DIP FACILITY IS THE BEST POSTPETITION FINANCING OPTION CURRENTLY AVAILABLE

45.     As described further in the Financing Declaration, given the Debtors' prepetition capital structure and the challenges facing their business, the DIP Facility represents the best and only actionable postpetition financing to supplement the Postpetition Securitization Program and meet the Debtors' liquidity needs.  As discussed in greater detail below, prior to the Petition Date, the Debtors, with the aid of their advisors, reviewed and considered several potential alternatives with the goal of maximizing enterprise value.  None of these alternatives proved actionable in light of the Debtors' capital structure and market environment.  As a result, the Debtors determined that the DIP Facility, was the best and only path forward under the circumstances.

46.     Specifically, in early 2025, the Debtors, with the assistance of AlixPartners, reached out to 6 potential financing sources, including existing noteholders and third parties.  While the Debtors received term sheets from three of these parties, except for the DIP Lenders, none of term sheets represented an actionable postpetition financing proposal.  Among other things, the parties that responded with financing proposals generally expressed an unwillingness to lend on a junior basis, provide the level of liquidity necessary to fund the Debtors' operations, and/or engage in a priming fight with the Debtors' prepetition noteholders, which likely would be necessary as the

Debtors believe that they have few, if any, unencumbered assets which could otherwise be used to secure any such postpetition financing.  Additionally, during discussions with the advisors to the Debtors' prepetition noteholders about the Debtors' financing needs in the weeks leading up to the Chapter 11 Cases, the prepetition noteholders indicated that they would not consent to the Debtors' incurrence of financing by any other party having priming or *pari passu* liens on the collateral securing the obligations to them.

47.     Given the foregoing, the Debtors, in consultation with AlixPartners and their other advisors, focused on addressing the Debtors' liquidity needs through two means: (a) postpetition financing provided by the Debtors' prepetition noteholders and term loan lender and (b) the continuation of the Securitization Program during the Chapter 11 Cases.  Ultimately, however, the Debtors' prepetition term loan lender was unable to provide financing given the terms of the intercreditor agreement governing the rights between the term loan lender and April 2026 Noteholders and the Debtors were forced to look elsewhere.  Ultimately, the Debtors' only viable option was to negotiate potential debtor-in-possession financing with the prepetition noteholders.  Specifically, as noted in the Motions, with the assistance of their advisors, while negotiating the terms of the DIP Facility with certain of their prepetition noteholders, the Debtors also negotiated certain amendments to the Prepetition Securitization Program and related documents (the "***Securitization Program Amendments***"), which are effectively designed to continue the Securitization Program postpetition.

48.     As further explained in the Financing Declaration, the principal economic terms proposed under the DIP Facility, including the contemplated fees and interest rates, are customary and usual for financings of these types.  In connection with the DIP Facility, the Debtors have agreed, subject to Court approval, to pay interest and certain fees to the DIP Lenders.  Specifically,

the Debtors have agreed to pay an interest rate of 12% paid in kind.  Additionally, in connection with a backstop agreement with the parties guaranteeing that the facility will be fully funded, the Debtors have agreed to a the DIP Backstop Fee, whereby each DIP Backstop Party shall receive its pro rata share of 5.00% of the equity interest of the reorganized Debtors, which shall be fully earned upon entry of the Interim Order and due and payable upon Effective Date of the chapter 11 plan contemplated by the Restructuring Term Sheet.  Moreover, the interest rates and fees were the subject of arm's-length and good-faith negotiations, are integral components of the overall terms of the proposed DIP Facility, and were required by the DIP Lenders as consideration for the extension of postpetition financing.

49.    The DIP Facility ensures the Debtors' continued access to Cash Collateral on a consensual basis and, together with the Postpetition Securitization Program, provides the financing necessary to consummate the de-leveraging transactions set forth in the Restructuring Term Sheet. Accordingly, for the reasons set forth herein, the Debtors believe the DIP Facility is in the best interests of the Debtors' estates and should be approved.

## BASIS FOR RELIEF REQUESTED

## I.    THE DEBTORS SHOULD BE AUTHORIZED TO ACCESS THE DIP FACILITY

50.    Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that a debtor seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c).

51.    In addition, under section 364(d)(1) of the Bankruptcy Code, courts may, after notice and a hearing, authorize a debtor to obtain postpetition credit secured by a "priming" lien from affected secured parties if (a) the debtor obtains the consent of such parties or (b) the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected.

11 U.S.C. § 364(d)(1).  Specifically, section 364(d)(1) provides, in relevant part, that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if-
>
> (A)  the [debtor] is unable to obtain credit otherwise; and
>
> (B)  there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

52.    For the reasons discussed herein, including the terms of the DIP Facility, as well as the inferior alternative sources of financing, the Debtors satisfy the standards required to access postpetition financing on a superpriority claim and priming lien basis under sections 364(c) and 364(d) of the Bankruptcy Code.

### A.    Entry into the DIP Loan Documents Reflects the Debtors' Reasonable Business Judgment

53.    Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re Estrada*, No. 16-80003-G3-11, 2016 WL 745536, at *3 (Bankr. S.D. Tex. Feb. 24, 2016) ("In determining whether to approve a motion to obtain credit, courts generally permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties."); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("Courts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the

financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

54.     Further, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

55.     For the reasons set forth above, entry into the DIP Facility is a reasonable exercise of the Debtors' business judgment.   The Debtors' determination (in consultation with their advisors) was made following a careful and thorough evaluation of all restructuring and financing alternatives.  The terms and conditions of the DIP Facility are favorable to the Debtors in light of their circumstances and in the best interests of their estates.  Specifically:

     i.    the DIP Facility is being funded by a group of the Debtors' prepetition noteholders who have a vested interest in the success of the Chapter 11 Cases and will become the Debtors' post-emergence equity holders;

     ii.    certain DIP Lenders will roll their DIP Loans into an exit facility, which provides the Debtors with a clear path to emergence, sets the stage for a successful restructuring, minimizes costs associated with potential business disruption due to a lack of (or significant delay in obtaining) exit financing, and allows the reorganized Debtors sufficient runway to flexibly operate post-emergence; and

     iii.    the DIP Facility avoids additional costs that would be incurred on account of an exit financing marketing process that would otherwise be due if the Debtors separately sought exit financing at a later date.

56.     The DIP Facility will provide the Debtors with sufficient liquidity necessary to maintain their business operations, and the terms of the DIP Facility, which are the result of good faith, arm's length negotiations, are the best available to the Debtors in light of their circumstances.

**B.     The Debtors Should Be Authorized to Grant Liens and Superpriority Claims to the DIP Lenders**

57.     The Debtors propose to obtain financing under the DIP Facility, in part, by granting superpriority claims and liens pursuant to sections 364(c) and 364(d) of the Bankruptcy Code. Significantly, the Debtors propose to provide first priority liens on substantially all of the Debtors' assets, including liens on previously unencumbered property and "priming" liens on other property (subject to the terms of the DIP Orders).

58.     Section 364(c) provides that, if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, a court:

> May authorize the obtaining of credit or the incurring of debt
> (1) with priority over any or all administrative expenses of the kind
> specified in section 503(b) or 507(b) of [the Bankruptcy Code];
> (2) secured by a lien on property of the estate that is not otherwise
> subject to a lien; or (3) secured by a junior lien on property of the
> estate that is subject to a lien.

11 U.S.C. § 364(c); *see also In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained); *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of sections 364(c)).

59.     Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1).   Accordingly, the Debtors may "prime" the liens of the Prepetition Secured Parties if the Debtors are unable to obtain unsecured or junior secured credit

and either (a) the Prepetition Secured Parties have consented or (b) the Prepetition Secured Parties' interests in collateral are adequately protected.

60.     First, the Debtors are not able to obtain unsecured or junior secured credit.  Despite the Debtors' efforts to secure alternative financing, the Debtors do not have any actionable financing alternative, other than the proposed Postpetition Securitization Program, which, by itself is insufficient to satisfy all of the Debtors' postpetition financing needs.  The DIP Facility is necessary to provide the Debtors with the liquidity they need to consummate the restructuring transactions contemplated under the Restructuring Term Sheet.  The Debtors' prepetition noteholders were not willing to provide postpetition financing on an unsecured or junior basis, nor has any third party presented such a proposal.  Absent such consent, the Debtors risk a potentially costly and difficult nonconsensual priming dispute with any potential postpetition priming lenders and the Prepetition Secured Parties at a time when the Debtors' liquidity is severely limited.  Following extended negotiations with the Prepetition Secured Parties, the Debtors were able to negotiate the proposed DIP Facility and obtain concessions that materially improved the terms of the proposed financing.  Thus, as a result of these negotiations, the Debtors determined that the DIP Facility is the best actionable alternative available to fund these cases under the circumstances.

61.     Second, the Prepetition Secured Parties have consented (or are deemed to consent) to their prepetition liens and claims being primed on the terms set forth in the DIP Orders, which includes a negotiated consensual adequate protection package.  As further described in the Interim Order, the proposed adequate protection package for the Prepetition Secured Parties includes, subject to the Carve Out, (a) valid and perfected security interests in and liens on DIP Collateral in accordance with the priorities set forth in the DIP Orders, (b) superpriority administrative expense claims under sections 503(b) and 507(b) of the Bankruptcy Code, in accordance with the

priorities set forth in the DIP Orders, (c) the reasonable and documented fees and expenses of the counsel and other professionals as set forth in the DIP Orders, and (d) certain information rights as set forth in the DIP Orders.

62.    Overall, the DIP Facility is the only actionable financing under the circumstances and will avoid the risk of a costly and value-destructive priming fight with the Debtors' prepetition lenders, and will provide the Debtors (together with the Postpetition Securitization Program) with the liquidity needed to administer the Chapter 11 Cases and implement the de-leveraging transactions contemplated under the Restructuring Term Sheet.  Accordingly, the Debtors submit that the DIP Facility (including the superpriority claims and priming liens provided thereunder) is both warranted and appropriate under the circumstances.

**C.    The Debtors Should Be Authorized to Pay the Fees and Payments Required by the DIP Agents and the DIP Lenders Under the DIP Loan Documents**

63.    In addition to the various Adequate Protection Payments and other reimbursement obligations, in each case, specified under the DIP Loan Documents and the DIP Orders, the Debtors have agreed, subject to Court approval, to pay certain fees and other payments to the DIP Agents and the DIP Lenders.  In particular, under the DIP Loan Documents, the Debtors have agreed to pay:

    i.    an interest rate of 12.00% per annum, payable in kind, in the form of additional DIP Loans; and

    ii.    the DIP Backstop Fee, whereby each DIP Backstop Party shall receive its pro rata share of 5.00% of the equity interests of the reorganized Debtors, which shall be fully earned upon entry of the Interim Order and due and payable upon Effective Date of the chapter 11 plan contemplated by the Restructuring Term Sheet.

64.    As set forth in the Financing Declaration, the interest rates and fees were the subject of arm's-length and good-faith negotiations, are integral components of the overall terms of the DIP Facility and were required by the proposed DIP Lenders as consideration for the extension of

postpetition financing.  The benefits to the Debtors and their estates provided by the DIP Facility significantly outweigh the fees incurred by the Debtors thereunder and are, taken as a whole, reasonable and appropriate under the circumstances of the Chapter 11 Cases.  Additionally, interest and fees under the DIP Facility or payable to the DIP Backstop Parties are payable in kind or in the form of post-emergence equity, neither of which will impact the Debtors' liquidity. Accordingly, the Court should authorize the Debtors to pay the interest and fees provided under the DIP Documents in connection with the DIP Facility.

## II.    APPROVAL OF USE OF CASH COLLATERAL IS APPROPRIATE

65.    Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell, or lease cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."

66.    In general, what constitutes adequate protection is decided on a case-by-case basis. While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection in each case.  *See In re Timbers of Inwood Forest* Assocs., Ltd., 793 F.2d 1380, 1393 (5th Cir. 1986) (citing legislative history for proposition that the form of adequate protection is determined on a case-by-case basis); *see also In re Las Torres Dev., L.L.C.*, 413 B.R. 687, 696-97 (Bankr. S.D. Tex. 2009) (noting that the Bankruptcy Code "contains no specific, definitive definition of adequate protection").  Adequate protection is designed to shield a secured creditor from diminution in value of its interest in collateral during the period of a debtor's use of the collateral.  *See Timbers*, 793 F.2d at 1412 (citing to Adequate Protection Under the Bankruptcy Reform Act, in W. Norton, 1978 Annual Survey of Bankruptcy Law 171, 173 ("Section 361 is designed to prevent loss or diminution of assets.")).

45

67.     Substantially all of the Debtors' cash constitutes the Cash Collateral under section 363(a) of the Bankruptcy Code.  The Debtors have an urgent need for the immediate use of the Prepetition Collateral, including the Cash Collateral, and seek to use all Cash Collateral existing on or after the Petition Date pursuant to the terms of the DIP Loan Documents.  The Debtors need the Cash Collateral to fund their businesses and operations, as well as to fund the Chapter 11 Cases so they can pursue a value-maximizing restructuring under the terms of the Restructuring Term Sheet.  Indeed, absent such relief, the Debtors' businesses will likely be brought to an immediate halt, with damaging consequences for the Debtors and their estates and creditors.

68.     The Debtors believe that the terms and conditions of their use of the Cash Collateral (including the provision of adequate protection described above) are appropriate and reasonable and that such adequate protection is sufficient to secure any adequate protection obligations under the circumstances.  Furthermore, the Prepetition Secured Parties have consented to the Debtors' use of the Cash Collateral, subject to the terms and conditions of the DIP Loan Documents and the DIP Orders.  Therefore, the Debtors submit that they should be authorized to use the Cash Collateral on the terms set forth in the DIP Loan Documents.

## III.     THE DIP LENDERS SHOULD BE DEEMED GOOD-FAITH LENDERS

69.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not

such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

70.     As explained herein and in the Financing Declaration, the DIP Loan Documents are the result of: (a) the Debtors' reasonable business judgment that the DIP Lenders provided the best postpetition financing option available under the circumstances; and (b) extended arm's-length, good-faith negotiations between the Debtors and the DIP Lenders (through the Ad Hoc Group and its advisors).  The Debtors submit that the terms and conditions of the DIP Loan Documents are reasonable under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

## IV.     MODIFICATION OF AUTOMATIC STAY

71.     The Interim Order provides that the automatic stay under section 362 of the Bankruptcy Code is modified to (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, DIP Superpriority Claims, and 507(b) Claims; (b) permit the Debtors to perform such acts as each of the DIP Agent, the Required DIP Lenders, the Prepetition Collateral Agent (on behalf of the other Prepetition Notes Secured Parties), or the Prepetition Credit Agreement Agent (on behalf of the other Prepetition Credit Agreement Parties) may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Secured Parties and the Prepetition Secured Parties under the April 2026 Notes Documents, the Prepetition Credit Agreement Documents, and the DIP Documents, and the DIP Facility, as applicable, and the Interim Order, as applicable; and (d) authorize the Debtors to pay, and the DIP Secured Parties and the Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of the Interim Order.

72.    Stay modification provisions of this sort are common features of postpetition financing facilities and, in the Debtors' business judgment, are reasonable under the circumstances. Accordingly, the Debtors request that the Court modify the automatic stay solely to the extent contemplated by the DIP Loan Documents and the DIP Orders.

## V.    THE DIP ROLL-UP LOANS SHOULD BE APPROVED

73.    As noted above, the DIP Facility provides for a roll-up of up to $105 million of obligations outstanding under the April 2026 Notes held by DIP Lenders, subject to entry of the Final Order. The Debtors respectfully submit that the roll-up is fair and appropriate under the circumstances of these Chapter 11 Cases. This provision was required by the DIP Lenders as a condition to the overall benefits provided by the Debtors' DIP financing as a whole, and the Debtors submit that such a roll-up will not unduly advantage any party. In addition, prior to entry of the Final Order, each of the April 2026 Noteholders will be afforded the opportunity to become a DIP Lender and participate in the roll-up.

## VI.    APPROVAL OF INTERIM RELIEF

74.    Bankruptcy Rules 4001(b)(2) and 4001(c)(2) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the court may conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit on an interim basis "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2); (c)(2).  Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3).  Furthermore, the Complex Case Procedures provide that on motion by a debtor, a hearing will "routinely be conducted as a first-

day hearing to consider either cash collateral use and/or interim debtor-in-possession financing." Complex Case Procedures, ¶ 5.

75.    As described above, the Debtors have an urgent and immediate need for cash in order to maintain business relationships with their vendors, suppliers, customers, and other parties, to make capital expenditures, and to satisfy other working capital and operational needs and otherwise finance their operations and the Chapter 11 Cases.  Given the immediate and irreparable harm to be suffered by the Debtors, their estates, and their creditors absent interim relief, the Debtors request that, pending the Final Hearing, the Court schedule an interim hearing within one day of the Petition Date or as soon thereafter as practicable to consider the interim relief requested in this Motion.

## VII.    REQUEST FOR A FINAL HEARING

76.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing within 28 days following entry of the Interim Order, and fix the time and date before the Final Hearing for parties to file objections to this Motion.

## EMERGENCY CONSIDERATION

77.    The Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Local Rule 9013-1(i), the Complex Case Procedures, and Bankruptcy Rule 6003, which authorizes a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." The Debtors believe that an immediate and orderly transition into chapter 11 is critical to the viability of their operations and the success of the Chapter 11 Cases.  As discussed in detail above and in the Financing Declaration, immediate and irreparable harm would result if the relief requested herein is not granted.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003, and the Debtors believe that

emergency consideration is necessary and respectfully request that this Motion be heard on an emergency basis.

## WAIVER OF BANKRUPTCY RULE 6004(a) AND (h)

78.     Additionally, with respect to any aspect of the relief sought herein that constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a), to the extent not otherwise satisfied, and of the fourteen-day stay under Bankruptcy Rule 6004(h).  As described above, the relief that the Debtors seek in this Motion is immediately necessary for the Debtors to be able to continue to operate their businesses and preserve the value of their estates.  The Debtors thus submit that the requested waiver of the notice requirements of Bankruptcy Rule 6004(a) and of the fourteen-day stay imposed by Bankruptcy Rule 6004(h) is appropriate, as the exigent nature of the relief sought herein justifies immediate unstayed relief.

## RESERVATION OF RIGHTS

79.     Nothing in this Motion shall be deemed:  (a) an implication or admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a concession by the Debtors that any lien (contractual, common, statutory or otherwise) satisfied pursuant to the Motion is valid (and all rights to contest the extent, validity, or perfection or seek avoidance of all such liens are expressly reserved); (f) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (g) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (h) a waiver of the obligation

of any party in interest to file a proof of claim; or (i) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.  If the Court enters any order granting the relief sought herein, any payment made pursuant to such order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## **NOTICE**

80.     Notice of the Motion will be given to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) counsel to the DIP Agent; (c) counsel to the Ad Hoc Group; (d) counsel to the Prepetition Indenture Trustee; (e) counsel to the administrative agent under the ER3 Securitization Program; (f) the creditors listed on the Debtors' consolidated list of thirty (30) creditors holding the largest unsecured claims; (g) the Banks; (h) the United States Attorney for the Southern District of Texas; (i) the Internal Revenue Service; (j) the Securities and Exchange Commission; (k) the state attorneys general for states in which the Debtors conduct business; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, under the circumstances, no other or further notice is required.

81.     A copy of the Motion is available on (a) the Court's website, at www.txs.uscourts.gov, and (b) the website maintained by the Debtors' proposed claims and noticing agent, Omni Agent Solutions, Inc., at https://omniagentsolutions.com/DocuDataSolutions

[*Remainder of page intentionally left blank.*]

**WHEREFORE**, the Debtors respectfully request that the Court enter the proposed DIP Orders granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated:  March 3, 2025
       Houston, Texas

Respectfully submitted,

*/s/ Timothy A. ("Tad") Davidson II*

**HUNTON ANDREWS KURTH LLP**
Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Ashley L. Harper (Texas Bar No. 24065272)
Philip M. Guffy (Texas Bar No. 24113705)
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone:  (713) 220-4200
Email:  taddavidson@hunton.com
         ashleyharper@hunton.com
         pguffy@hunton.com

- and –


**LATHAM & WATKINS LLP**
Ray C. Schrock (NY Bar No. 4860631)
Alexander W. Welch (NY Bar No. 5624861)
Hugh Murtagh (NY Bar No. 5002498)
Adam S. Ravin (NY Bar No. 4079190)
Jonathan J. Weichselbaum (NY Bar No. 5676143)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email:  ray.schrock@lw.com
        alex.welch@lw.com
        hugh.murtagh@lw.com
        adam.ravin@lw.com
        jon.weichselbaum@lw.com

*Proposed Co-Counsel for the Debtors*
*and Debtors in Possession*

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on March 3, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.

*/s/ Timothy A. ("Tad") Davidson II*
Timothy A. ("Tad") Davidson II