# **EXHIBIT A**

**Backstop Commitment Letter**

March 3, 2025

PERSONAL AND CONFIDENTIAL

Exela Finance, Inc. and Exela Intermediate LLC
[2701 East Grauwyler Road
Irving, Texas 75061]
Attention: [●]

Senior Secured Superpriority Priming Debtor-In-Possession and Exit Financing
Backstop Commitment Letter

Ladies and Gentlemen:

Exela Finance, Inc., a Delaware corporation and Exela Intermediate LLC, a Delaware limited liability company (each, a "Borrower", "you" or "your" and together, the "Borrowers") has (i) advised the parties listed on the signature pages hereto as Backstop Commitment Parties (each, a "Backstop Commitment Party" and together, the "Backstop Commitment Parties", "we", "us" or "our"), that the Borrower and certain of its affiliates and subsidiaries (collectively with the Borrowers, the "Debtors"), are considering filing voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code"), and (ii) in connection with the foregoing, requested that the Backstop Commitment Parties agree to commit to provide a senior secured superpriority priming debtor-in-possession term loan credit facility for the Borrowers under Sections 364(c) and 364(d) of the Bankruptcy Code of up to $185,000,000, consisting of (x) $80,000,000 of new money term loans ("New Money DIP Loans") and (y) $105,000,000 of roll-up loans, and an equal amount of Prepetition April 2026 Notes (as defined in the DIP Financing Agreement (as defined below)) will be deemed to have been converted on a cashless, dollar-for-dollar basis ("Roll-Up DIP Loans" and together with the New Money DIP Loans, the "DIP Loans") (such superpriority priming debtor-in-possession term loan credit facility, the "DIP Facility"); provided that, the Roll-Up DIP Loans shall be the priority set forth in the DIP Orders (as defined in the DIP Financing Agreement (as defined below)), which priority shall be junior to the Prepetition Financing Agreement, in each case subject to the conditions set forth in Article V of the DIP Financing Agreement that are applicable to the relevant borrowing.

In addition, the Backstop Commitment Parties agree, for the benefit of each other Backstop Commitment Party, to the terms of a senior secured exit term loan or senior secured note facility, consisting of (i) take back exit term loans or senior secured notes in an aggregate outstanding principal amount equal to the amount of the Obligations under the DIP Financing Agreement outstanding on the effectiveness of the Exit Facility ("Rollover Exit Loans") and (ii) $60,000,000 of new money exit term loans or senior secured notes ("New Money Exit Loans" and together with the Rollover Exit Loans, the "Exit Loans") which shall be funded or deemed funded (such senior secured term loan facility, the "Exit Facility"), on the terms set forth in the Exit Term Sheet (as defined below) or as otherwise agreed by the Required Lenders (as defined in the DIP Financing Agreement).

Unless otherwise specified herein, all references to "$" shall refer to U.S. dollars. Capitalized terms used herein without definition shall have the meaning assigned thereto in the DIP Financing Agreement or the Exit Term Sheet, as applicable.

1. Backstop Commitments.

To provide assurance that the DIP Facility shall be available on the terms and conditions set forth herein, each Backstop Commitment Party is pleased to advise the Borrowers of its several commitment (the

"DIP Commitment") to provide, itself or through one or more funds managed by such Backstop Commitment Party, its Affiliates, designees or beneficial holders (collectively, each a "Related Lender Party"), the amount of the New Money DIP Loans set forth on Schedule 1 hereto opposite such Backstop Commitment Party's name, on the terms set forth substantially in the form of the Superpriority Priming Debtor-In-Possession Financing Agreement attached hereto as Exhibit A (the "DIP Financing Agreement", subject solely to the conditions set forth in the sections of Article V of the DIP Financing Agreement that are applicable to the relevant borrowing).

Each Backstop Commitment Party is pleased to confirm to the Borrowers and each other Backstop Commitment Party to its agreement to the terms set forth on the term sheet for the Exit Facility attached hereto as Exhibit B (the "Exit Term Sheet", and together with this letter and the DIP Financing Agreement, the "Backstop Commitment Letter") to, subject to completion of satisfactory due diligence in accordance with the Exit Term Sheet, provide its several commitment (the "Exit Commitment", and together with the DIP Commitment, the "Backstop Commitments") to provide the amount of New Money Exit Loans set forth on Schedule 2 hereto opposite such Backstop Commitment Party's name, on the terms set forth in the Exit Term Sheet.

2. Election Procedures.

The parties hereto agree that each Eligible April 2026 Noteholder may participate with the other Prepetition April 2026 Noteholders to provide the New Money DIP Loans in accordance with Section 2.01(c) of the DIP Financing Agreement.

On the first day following the Election Deadline, the commitment schedules to the definitive documentation governing the DIP Facility will be revised to reflect each lender under the DIP Facility, and each Backstop Commitment Party's Backstop Commitment under the DIP Facility will be automatically reduced ratably to account for the commitments of the Electing DIP Lender.

3. Information.

You hereby represent and warrant that (a) all written factual information concerning you and your subsidiaries and your and their respective business (other than financial projections, estimates, forecasts and budgets and other forward-looking information (collectively, the "Projections") and information of a general economic or industry specific nature) (the "Information") that has been or will be made available in connection with the transactions contemplated hereby to us or any of our respective affiliates by or on behalf of you is or will be, when furnished, complete and correct in all material respects, when taken as a whole, and does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to all supplements and updates provided for in the penultimate sentence of this Section 3) and (b) the Projections that have been or will be made available in connection with the transaction contemplated hereby to us or any of our affiliates by or on behalf of you or any of your representatives have been or will be prepared in good faith based upon assumptions that are believed by the preparer thereof to be reasonable at the time made and at the time the related Projections are made available to us or any of our affiliates (it being acknowledged that (i) such Projections are merely a prediction as to future events and are not to be viewed as facts, (ii) such Projections are subject to significant uncertainties and contingencies, many of which are beyond your control, (iii) the actual results during the period or periods covered by any such Projections may differ significantly from the projected results, and (iv) no guarantee or assurance can be given that the projected results will be realized). You agree that if, at any time prior to the closing of the DIP Facility, any of the representations, warranties and covenants in the preceding sentence would be incorrect in any material respect if the Information and Projections were being furnished, and such representations, warranties and

covenants were being made, at such subsequent time, then you will promptly supplement the Information and the Projections so that such representations, warranties and covenants would be correct in all material respects; provided, that for the avoidance of doubt, there will be no requirement to update previously delivered Projections to reflect new assumptions so long as the assumptions were reasonable at the time made and made available to us or any of our affiliates. Notwithstanding anything to the contrary herein, the accuracy of the foregoing representations and warranties, whether or not cured, shall not be a condition to the obligations of the Backstop Commitment Parties hereunder or the availability of the DIP Facility.

4. Fees.

As consideration for the DIP Commitment and agreements of the Backstop Commitment Parties hereunder, the Borrowers agree to pay (or cause to be paid) to the Backstop Commitment Parties (or, at any Backstop Commitment Party's option, a Related Lender Party), a premium (the "Backstop Commitment Premium") in an amount equal to (x) 5.00% of the equity of reorganized Exela Technologies BPA, LLC, issued and outstanding as of the Takeback Facility Exchange Date pursuant to the Borrowers' and their co-debtors' plan of reorganization (which, for the avoidance of doubt, will be exchanged substantially contemporaneously with its issuance for newly issued equity interest in XBP Europe Holdings, Inc. in connection with, and in accordance with the terms of, the merger between Exela Technologies BPA, LLC and XBP Europe Holdings, Inc., which merger shall be on terms and conditions acceptable to the Required Lenders (as defined in the DIP Financing Agreement)) or, (y) if the Takeback Facility Exchange Date does not occur, $4,000,000, which, in each case, shall be earned on the date hereof, and paid on the earlier of (i) the Takeback Facility Exchange Date in the case of clause (x), or (ii) the Final Maturity Date in the case of clause (y).

The treatment of the Backstop Commitment Premium for U.S. federal (and applicable state and local) income tax purposes shall be determined by Backstop Commitment Parties prior to the Takeback Facility Exchange Date with consultation in good faith with the Borrowers. The Borrowers shall pay the Backstop Commitment Premium free and clear of any withholding on account of taxes (except for any Taxes arising as a result of a Backstop Commitment Party's failure to provide an IRS Form W-9 or appropriate IRS Form W-8, as applicable).

5. Conditions.

The Backstop Commitment Parties' Backstop Commitments and agreements hereunder in respect of the DIP Facility are subject to the satisfaction (or waiver) of conditions precedent set forth in the sections of Article V of the DIP Financing Agreement that are applicable to the relevant borrowing.

The Backstop Commitment Parties' Backstop Commitments and agreements hereunder in respect of the Exit Facility are subject to the satisfaction (or waiver) the conditions precedent set forth in the Exit Term Sheet.

6. Absence of Fiduciary Relationship.

You acknowledge that the Related Party Lenders may be engaged, either directly or through affiliates in various activities, including securities trading, investment management, and principal investment activities. In the ordinary course of these activities, each Related Party Lenders may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and/or financial instruments (including bank loans) for their own account and for the accounts of their investors and may at any time hold long and short positions in such securities and/or instruments. Such investment and other activities may involve securities and instruments of the Borrowers, as well as of other entities and persons and their affiliates which may (i) be involved in transactions arising from or relating to the

engagement contemplated by this Backstop Commitment Letter, (ii) be customers or competitors of the Borrowers, or (iii) have other relationships with the Borrowers. In addition, each Related Party Lender may provide services to such other entities and persons. Each Related Party Lenders may also co-invest with, make direct investments in, and invest or co-invest client monies in or with funds or other investment vehicles managed by other parties, and such funds or other investment vehicles may trade or make investments in securities of the Borrowers or such other entities. The transactions contemplated by this Backstop Commitment Letter may have a direct or indirect impact on the investments, securities, or instruments referred to in this paragraph. Although the Related Party Lenders in the course of such other activities and relationships may acquire information about the transaction contemplated by this Backstop Commitment Letter or other entities and persons which may be the subject of the transactions contemplated by this Backstop Commitment Letter, the Related Party Lenders shall have no obligation to disclose such information, or the fact that the Related Party Lenders are in possession of such information, to the Borrowers or to use such information on the Borrowers' behalf.

The Related Party Lenders may have economic interests that conflict with those of the Borrowers, its equity holders, and/or its affiliates. You acknowledge and agree that nothing in this Backstop Commitment Letter or the nature of our services or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between any Related Party Lender on the one hand, and you, your equity holders or your affiliates, on the other hand, and you waive, to the fullest extent permitted by law, any claims you may have against any Related Party Lender for breach of fiduciary duty or alleged breach of fiduciary duty and agree that no Related Party Lender of any of the foregoing will have any liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on your behalf, including your equity holders, employees or creditors. You acknowledge that the transactions contemplated hereby (including the exercise of rights and remedies hereunder) are arms'-length commercial transactions and that we are acting as principal and in our own respective best interests. You are relying on your own experts and advisors to determine whether the transactions contemplated hereby are in your best interests and are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated hereby. In addition, you acknowledge that we may employ the services of our respective affiliates in providing certain services hereunder and may exchange with such affiliates information concerning the Borrowers and the other Debtors that may be the subject of the transactions contemplated hereby and such affiliates will be entitled to the benefits afforded to us hereunder.

7.  Indemnification and Expenses.

You agree to (a) indemnify and hold harmless each Backstop Commitment Party, their respective affiliates and their and their affiliates' officers, directors, employees, agents, attorneys, accountants, advisors, consultants, representatives, controlling persons, members and permitted successors and assigns (each, an "Indemnified Person") from and against any and all losses, claims, damages, liabilities and expenses, joint or several ("Losses") to which any such Indemnified Person may become subject arising out of or in connection with this Backstop Commitment Letter, the DIP Facility, the Exit Facility, the use of proceeds of the DIP Facility or any claim, litigation, investigation or proceeding relating to any of the foregoing, and to (b) reimburse each Backstop Commitment Party from time to time within ten (10) days of receipt of their reasonable demand by presentation of a summary statement, for any reasonable and documented out-of-pocket legal or other expenses incurred in connection with the Chapter 11 Cases, the DIP Facility, the Exit Facility, the enforcement of this Backstop Commitment Letter, the definitive documentation for the DIP Facility and the Exit Facility, and any ancillary documents and security arrangements in connection therewith; provided, that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses to the extent (a) they are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from such Indemnified Person's (i) gross negligence, bad faith or willful misconduct or (ii) material breach of its obligations under this Backstop Commitment Letter,

or (b) they relate to a dispute solely among Indemnified Persons and not arising out of any act or omission of the Debtors or any of their respective subsidiaries.

None of you, the other Debtors, any of your or their respective subsidiaries, we nor any other Indemnified Person will be responsible or liable to one another for any indirect, special, punitive or consequential damages which may be alleged as a result of or arising out of, or in any way related to, the DIP Facility, the Exit Facility, the enforcement of this Backstop Commitment Letter, the definitive documentation for the DIP Facility and the Exit Facility, or any ancillary documents and security arrangements in connection therewith; provided, that your indemnity and reimbursement obligations under this Section 7 shall not be limited by this sentence.

8.  Assignments, Amendments.

This Backstop Commitment Letter shall not be assignable by you or us without the prior written consent of the other parties hereto (and any attempted assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto, the Indemnified Persons and is not intended to confer any benefits upon, or create any rights in favor of, any person or entity other than the parties hereto and the Indemnified Persons.  This Backstop Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by the Backstop Commitment Parties and you.

This Backstop Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement.  Delivery of an executed counterpart of a signature page of this Backstop Commitment Letter by facsimile or other electronic transmission (including E-Signature) shall be effective as delivery of a manually executed counterpart hereof.  The words "execution," "signed," "signature," and words of like import in this Agreement or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act. Section headings used herein are for convenience of reference only, are not part of this Backstop Commitment Letter and are not to affect the construction of, or to be taken into consideration in interpreting, this Backstop Commitment Letter.  You acknowledge that information and documents relating to the DIP Facility and the Exit Facility may be transmitted through the internet, e-mail or similar electronic transmission systems and that neither any Backstop Commitment Party nor the Administrative Agent, nor any of their respective affiliates, shall be liable for any damages arising from the unauthorized use by others of information or documents transmitted in such manner.

This Backstop Commitment Letter supersedes all prior understandings, whether written or oral, between us with respect to the DIP Facility or the Exit Facility.

9.  Governing Law, Etc.; Jurisdiction.

EXCEPT TO THE EXTENT SUPERSEDED BY THE BANKRUPTCY CODE, THIS BACKSTOP COMMITMENT LETTER SHALL BE GOVERNED BY, AND CONSTRUED IN

ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK.

Each of the parties hereto hereby irrevocably and unconditionally (a) submits, for itself and its property, to the non-exclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in the Borough of Manhattan in New York City, and any appellate court from any thereof and the Bankruptcy Court, in any suit, action or proceeding arising out of or relating to this Backstop Commitment Letter, the DIP Facility or the Exit Facility, and agrees that all claims in respect of any such suit, action or proceeding may be heard and determined in such New York State court or, to the extent permitted by law, in such Federal court, or, to the extent applicable, the Bankruptcy Court; provided, that suit for the recognition or enforcement of any judgment obtained in any such court may be brought in any other court of competent jurisdiction, (b) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Backstop Commitment Letter, the DIP Facility or the Exit Facility in any New York State court, in any such Federal court or in Bankruptcy Court, (c) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such suit, action or proceeding in any such court, and (d) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

You hereby agree that you shall not bring any suit, action, proceeding, claim or counterclaim under this Backstop Commitment Letter or with respect to the transactions contemplated hereby in any court other than such New York State court or Federal Court of the United States of America sitting in the Borough of Manhattan in New York City. Service of any process, summons, notice or document by registered mail addressed to you at the address above shall be effective service of process against you for any suit, action or proceeding brought in any such court.

10.     Waiver of Jury Trial.

EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS BACKSTOP COMMITMENT LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

11.     Confidentiality.

This Backstop Commitment Letter is delivered to the Borrowers on the understanding that neither this Backstop Commitment Letter nor any of its terms or substance shall be disclosed, directly or indirectly, to any other person or entity except (a) you, and your and their officers, directors, employees, legal counsel, accountants, financial advisors, existing and prospective holders of indebtedness and their respective affiliates, representatives, officers, directors and legal counsel, in each case, who are involved in the consideration of the financing transactions contemplated hereby who have been informed by you of the confidential nature of this Backstop Commitment Letter and have agreed to treat such information confidentially, (b) in any legal, judicial or administrative proceeding or as otherwise required by law or regulation or as requested by a governmental authority (in which case you agree, to the extent not prohibited by law, to inform Backstop Commitment Parties promptly in advance thereof), (c) the office of the U.S. Trustee, any *ad-hoc* or statutorily appointed committee of unsecured creditors, and their respective representatives and professional advisors on a confidential and "need to know" basis and (d) to the Bankruptcy Court to the extent required to obtain Bankruptcy Court approval in connection with any acts

or obligations to be taken pursuant to this Backstop Commitment Letter or the transactions contemplated hereby.

Each Backstop Commitment Party agrees to keep confidential, and not to publish, disclose or otherwise divulge, confidential information with respect to the transactions contemplated hereby or obtained from or on behalf of you or your and its respective affiliates in the course of the transactions contemplated hereby, except that the Backstop Commitment Parties shall be permitted to disclose such confidential information (a) to their affiliates and their and their affiliates' respective directors, officers, agents, employees, attorneys, accountants and advisors involved in the transactions contemplated hereby on a "need to know" basis and who are made aware of and agree to comply with the provisions of this paragraph, in each case on a confidential basis (with the Backstop Commitment Party responsible for such persons' compliance with this paragraph), (b) on a confidential basis to any bona fide prospective Lender, prospective participant or swap counterparty (in accordance with the terms of the DIP Financing Agreement) that agrees to keep such information confidential in accordance with (x) the provisions of this paragraph (or language substantially similar to this paragraph that is reasonably acceptable to you) for your benefit or (y) other customary confidentiality language in a "click-through" arrangement, (c) as required by the order of any court or administrative agency or in any pending legal, judicial or administrative proceeding, or otherwise as required by applicable law, regulation or compulsory legal process (in which case you agree, to the extent not prohibited by law, to inform Backstop Commitment Parties promptly in advance thereof), (d) to the extent such information: (i) becomes publicly available other than as a result of a breach of this Backstop Commitment Letter or other confidentiality obligation owed by such Backstop Commitment Party to you or your affiliates or (ii) becomes available to the Backstop Commitment Parties on a non-confidential basis from a source other than you or on your behalf that, to such Backstop Commitment Party's knowledge, is not in violation of any confidentiality obligation owed to you or your affiliates, (e) to the extent you shall have consented to such disclosure in writing (which may include through electronic means), (f) as is necessary in protecting and enforcing the Backstop Commitment Parties' rights with respect to this Backstop Commitment Letter, the DIP Facility and/or the Exit Facility, (g) to the extent independently developed by such Backstop Commitment Party or its affiliates without reliance on confidential information, (h) with respect to the existence and contents of the DIP Financing Agreement or Exit Term Sheet, in consultation with you, to the rating agencies or (i) with respect to the existence and contents of the Backstop Commitment Letter, the DIP Facility and the Exit Facility, to market data collectors or similar service providers in connection with the arrangement, administration or management of the DIP Facility or the Exit Facility and to industry trade organizations where such information with respect to the DIP Facility is customarily included in league table measurements. The Backstop Commitment Parties' and their respective affiliates', if any, obligations under this paragraph shall terminate automatically to the extent superseded by the confidentiality provision in the DIP Financing Agreement and, in any event, will terminate one year from the date hereof.

12. <u>Miscellaneous</u>.

The Backstop Commitment Parties hereby notify the Borrowers that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "<u>PATRIOT Act</u>"), it and its affiliates are required to obtain, verify and record information that identifies NMG, each other Debtor, which information includes names, addresses, tax identification numbers and other information that will allow Backstop Commitment Parties and its affiliates to identify the Borrowers and each other Debtor in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective for Backstop Commitment Parties and its affiliates.

Each of the parties hereto agrees that this Backstop Commitment Letter is a binding and enforceable agreement with respect to the subject matter contained herein, including an agreement to negotiate in good faith the definitive documentation for the DIP Facility and the Exit Facility by the parties hereto in a manner

consistent with this Backstop Commitment Letter, it being acknowledged and agreed that the availability of each of the DIP Facility and the Exit Facility is subject to the conditions precedent expressly set forth in Section 5 hereof.

If the foregoing correctly sets forth our agreement, please indicate each Borrower's acceptance of the terms of this Backstop Commitment Letter by returning to the Backstop Commitment Parties executed counterparts of this Backstop Commitment Letter not later than 11:59 p.m., New York City time, on March 3, 2025. This offer will automatically expire at such time if the Backstop Commitment Parties have not received such executed counterparts in accordance with the preceding sentence. This Backstop Commitment Letter shall automatically terminate on March 5, 2025 unless the Closing Date under the DIP Facility shall have occurred on or prior as of such date. Notwithstanding the immediately preceding sentence, Section 3 above, as well as the indemnification and expenses, confidentiality, information, jurisdiction, governing law and waiver of jury trial provisions contained herein shall remain in full force and effect in accordance with their terms notwithstanding the termination of this Backstop Commitment Letter or the Backstop Commitment Parties' Backstop Commitments hereunder; *provided*, that your obligations under this Backstop Commitment Letter shall automatically terminate and be superseded by, (a) with respect to the DIP Commitment, the applicable provisions in the DIP Financing Agreement and (b) with respect to the Exit Commitment, the applicable provisions in the definitive documentation governing the Exit Facility, in each case, to the extent covered thereby, upon the closing of each respective facility, and you shall be released from all liability in connection therewith at such time.

## EXELA TECHNOLOGIES, INC.

### TERM SHEET FOR EXIT FINANCING FACILITY

This term sheet is intended for discussion purposes only and does not constitute a commitment to lend.  This term sheet is non-binding and the proposals contained herein are subject to, among other things, the negotiation, documentation and execution of definitive documentation.  Only execution and delivery of definitive documentation relating to the transactions shall result in any binding or enforceable obligations of any party relating to the transactions. The terms and conditions for the extension of credit described herein are dependent upon, among other things, (i) authorization and approval by the Bankruptcy Court (as defined below) and (ii) completion of all legal, regulatory and business due diligence.  The terms and conditions with respect to such commitments are mutually dependent on each other and the Lenders shall not be obligated to extend credit unless agreement with the Loan Parties (as defined below).

Capitalized terms used herein but not defined have the respective meanings ascribed to such terms in the Backstop Commitment Letter to which this Term Sheet is attached.

| | |
|---|---|
| **Borrower/Issuer** | An entity to be determined on or prior to the effective date of the Plan (the "**Plan Effective Date**") (the "**Borrower**"). |
| **Guarantors** | Each of the Borrower's direct and indirect domestic subsidiaries, or any successors thereto, by merger, consolidation, or otherwise, as reorganized on or after the Plan Effective Date, and each entity that guaranteed the DIP Facility (the "**Guarantors**"), and together with the Borrower, the "**Loan Parties**". |
| **Exit Financing** | Senior secured term loan facility or senior secured notes (the "**Exit Financing**" and the loans or notes thereunder, the "**Exit Loans**") comprised of: |

(i) Exit term loans or senior secured notes in an aggregate outstanding principal amount equal to the obligations under the DIP Facility outstanding on the Plan Effective Date, which Exit Loans shall be funded on a cashless basis by rolling over such amounts outstanding under the DIP Loans (the Exit Loans described in this clause (i), the "**Rollover Exit Loans**" and the term loan facility or senior secured notes consisting of such loans, the "**Rollover Facility**"); and

(ii) New money term loans or senior secured notes in an aggregate principal amount equal to $60,000,000 (the Exit Loans described in this clause (ii), the "**New Money Exit Loans**", the term loan facility or senior secured notes consisting of such loans, the "**New Money Facility**", and the commitments of each Lender to make such term loans or purchase such senior secured notes, the "**New Money Commitments**"), which shall be funded in a single draw on the Plan Effective Date.

If a New Money Exit Loan or any Rollover Exit Loan is not fungible for U.S. federal income tax purposes with one or more other portions of the Exit Loans, each such New Money Exit Loan and/or Rollover Exit Loan will trade separately under its own separate CUSIP or other identifying number from each such other portion of the Exit Loans with which such New Money Exit Loan or Rollover Exit Loan, as applicable, is not fungible.

Exit Loans that are prepaid may not be reborrowed.

The "**Plan**" means the Chapter 11 Plan of Reorganization of the "Loan Parties" under, and as defined in, the DIP Facility and other affiliated entities (collectively, the "**Debtors**") filed with the Bankruptcy Court on March 3, 2025 the "**Petition Date**"). The reorganization contemplated by the Plan is referred to herein as the "**Reorganization**".

| | |
|---|---|
| **Use of Proceeds** | The proceeds of (a) the Rollover Exit Loans will be used to consummate the cashless rollover of the obligations under the DIP Facility (as set forth under the heading "Exit Financing" above) and |

1

|  |  |
|---|---|
|  | (b) the New Money Exit Loans will be used to make payments and distributions under the Plan, including to repay amounts owing under the Prepetition Credit Agreement and for general corporate purposes not otherwise prohibited by the definitive Exit Financing Documentation; *provided* that the proceeds of New Money Exit Loans may not be used to prepay or redeem the Permitted Securitization Financing (as defined in the DIP Credit Agreement). |
| **Closing Date** | The date on which the Exit Loans are issued under the Exit Financing and the Reorganization is consummated pursuant to the Plan.  (the "**Closing Date**"). |
| **Maturity** | The date that is three years after the Closing Date. |
| **Collateral** | A perfected first priority lien on all assets of the Borrower and the Guarantors, subject to customary exclusions (the "**Collateral**"). |
| **Conditions to Closing** | Usual and customary for facilities of this type and including, without limitation, the following: |

*Bankruptcy Related Conditions*

A. The satisfaction of the Required Lenders (as defined below), in their sole discretion, with:

- the Plan and the related disclosure statement (it being agreed that the Plan and disclosure statement as filed with the Bankruptcy Court on the Petition Date are in form and substance satisfactory to the Required Lenders); and

- the terms, entry and effectiveness of a final, non-appealable confirmation order with respect to the Plan.

B. The Reorganization shall have been consummated in accordance with the Plan (all conditions set forth therein having been satisfied or waived (with any such waiver having been approved by the Required Lenders)), and substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of the Plan in accordance with its terms shall have occurred contemporaneously with the closing of the Exit Financing.

C. The Required Lenders shall be reasonably satisfied that, on the Closing Date, immediately after giving effect to the consummation of the Plan, the issuance of the Exit Loans to occur on the Closing Date and any other transactions to occur on the Closing Date, the Borrower and its Subsidiaries shall not have outstanding indebtedness or preferred stock other than indebtedness outstanding under the Exit Financing and other limited indebtedness to be agreed.

*General Conditions*

D. The negotiation, execution and delivery of customary definitive documentation in respect of the Exit Financing consistent with the terms set forth in this Term Sheet and otherwise satisfactory to the Exit Agent and the Required Lenders (the "**Exit Financing Documentation**").

E. The Exit Agent and the Required Lenders shall be satisfied with the terms and conditions of the Exit Financing, and the Exit Financing shall have become effective.

F. Delivery of evidence that all required insurance has been maintained and that the Exit Agent has been named as loss payee and additional insured.

G. Accuracy of representations and warranties contained in the Exit Financing Documentation in all material respects (or, in the case of representations and warranties that are qualified by materiality, in all respects) and absence of default under the Exit Financing Documentation.

H. Compliance with customary documentation conditions, including the delivery of customary legal opinions and closing certificates (including a customary solvency certificate), good standing certificates and certified organizational documents, in each case, in form and substance satisfactory to the Required Lenders.

I. The Exit Agent shall have a perfected first priority security interest in the Collateral.

J. Receipt by the Exit Agent and the Required Lenders of reasonably satisfactory results of

|   |   |   |
|---|---|---|
|   |   | customary lien searches. |
|   | K. | None of the Required Lenders becoming aware after the Petition Date of any information or other matter affecting the Borrower and its Subsidiaries or the transactions contemplated hereby which is inconsistent in a material and adverse way with the information or other matters, taken as a whole. |
|   | L. | Since the Petition Date there not having occurred any event, occurrence, development or state of circumstances or facts that has had or could reasonably be expected to have, individually or in the aggregate a Material Adverse Effect.  "**Material Adverse Effect**" means (i) a material adverse effect on the business, assets, liabilities, operations, results of operations, or condition (financial or otherwise) of the Borrower and its Subsidiaries, taken as a whole, other than as customarily occurs as a result of events leading up to and following the commencement of the Chapter 11 Cases and the continuation and prosecution thereof, (ii) a material adverse effect on the ability of the Borrower and its Subsidiaries (taken as a whole) to perform their respective obligations under the Exit Loans or (iii) a material adverse effect on the validity or enforceability of documentation with respect to the Exit Loans or the rights and remedies of the Lenders thereunder. |
|   | M. | All requisite governmental and third party approvals shall have been obtained, and there shall be no litigation, governmental, administrative or judicial action that could reasonably be expected to restrain, prevent or impose burdensome restrictions on the Reorganization or the Exit Loans. |
|   | N. | Delivery of all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including without limitation the Patriot Act, in each case at least two (2) business days prior to the Closing Date to the extent requested and at least five (5) business days prior to the Closing Date. |
|   | O. | Payment by the Borrower on the Closing Date of (i) the administrative and collateral agency fee due on such date, (ii) the fees of Ropes & Gray LLP and SOLIC Capital Advisors, LLC in connection with the transactions hereunder and (iii) all expenses payable on the Closing Date pursuant to the terms hereof. |
|   | P. | The Required Lenders shall be satisfied with the flow of funds in connection with the closing. |
|   | Q. | No default or event of default shall have occurred and be continuing under the DIP Facility. |
|   | R. | Solely with respect to each lender's obligation to fund New Money Exit Loans (and not, for avoidance of doubt, such lender's Rollover Exit Loans), legal, regulatory and business due diligence shall be satisfactory to such lender in its sole discretion; provided that any lender that does not fund New Money Exit Loans (a "Declining Exit Lender") may be penalized as determined by the Required Lenders (excluding for the purpose of such determination of Required Lenders the Exit Loans held by Declining Exit Lenders) in a manner no more onerous than such Declining Exit Lender receiving common equity in lieu of Rollover Exit Loans at the same valuation as the common equity received under the Plan in respect of such Declining Exit Lender's April 2026 Notes (such penalty, the "Penalty"); provided further that the Penalty shall not apply if the Exit Financing occurs as a result of the Loan Parties refinancing the New Money Facility with an alternative debt financing on cheaper terms. |
| **Exit Notes** |   | At the sole election of the Required Lenders, the Exit Financing may be incurred (and issued) as securities in the form of notes reflected by global notes that are made eligible for clearance on the facilities of The Depository Trust Company, and the Exit Financing Documentation shall be modified in a usual and customary manner to give effect to such change from loans to such securities. To the extent the exemption provided by Section 1145(a) of the Bankruptcy Code is not available for the issuance of such securities, the notes shall be made eligible for trading under Rule 144A, Regulation S and Accredited Investor CUSIPs. |
| **Interest Rate** |   | Interest shall accrue on the Exit Loans at the rate of 12.00% per annum to be paid in cash on a quarterly basis. |

| | |
|---|---|
| **Default Interest** | During the continuation of an Event of Default, the above rates shall be increased by 2.00% per annum. |
| **Upfront Fees** | 5.00% of New Money Exit Loans to be paid in kind on the Closing Date. |
| **Scheduled Amortization** | None. |
| **Call Protection** | Callable at 2.0% of par in year 1, at 1.0% of par in year 2 and thereafter at par. |
| **Mandatory Prepayments** | The Exit Loans shall be prepaid with:<br>(i) Excess cash flow subject to thresholds and exclusions to be agreed;<br>(ii) 100% of the net cash proceeds of any asset sales or casualty or condemnation events without any reinvestment rights (subject to de minimis exclusions to be agreed); and<br>(iii) 100% of the proceeds of debt incurrences (other than debt permitted under the Exit Financing Documentation). |
| **Representations and Warranties** | Usual and customary for facilities of this type. |
| **Affirmative and Negative Covenants** | Usual and customary for facilities of this type, to include customary prohibitions on liability management transactions with customary operating flexibility.<br><br>Within 30 days of the Closing Date, the Borrower shall use its reasonable best efforts to cause the Exit Facility to receive and at all times thereafter maintain a rating from each of Standard & Poor's Ratings Services and Moody's Investors Services, Inc. |
| **Financial Covenants** | None |
| **Events of Default** | Usual and customary for facilities of this type. |
| **Financial and Other Reporting** | Usual and customary for facilities of this type. |
| **Amendments and Voting** | Usual and customary for facilities of this type. |
| **Required Lenders** | Lenders holding a majority of the Exit Loans (the "**Required Lenders**"). |
| **Expenses and Indemnification** | Usual and customary for facilities of this type. |
| **Other Provisions** | The Exit Financing Documentation will include customary provisions regarding increased costs, illegality, tax indemnities, waiver of trial by jury and other similar provisions. |
| **Assignments and Participations** | Usual and customary for facilities of this type. |
| **Governing Law** | State of New York. |
| **Administrative Agent or Trustee and Collateral Agent** | An entity to be selected by the Required Lenders (the "**Exit Agent**"). |
| **Counsel to the Required Lenders** | Ropes & Gray LLP |