**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

---------------------------------------------------------- x
                                                           :
In re:                                                     :    Chapter 11
                                                           :
DOCUDATA SOLUTIONS, L.C., *et al.*,                        :    Case No. 25-90023 (CML)
                                                           :
                    Debtors.[1]                            :    (Jointly Administered)
                                                           :
---------------------------------------------------------- x

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION**
**FINANCING, (II) GRANTING ADEQUATE PROTECTION TO THE PREPETITION**
**SECURED PARTIES, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV)**
**MODIFYING THE AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "***Motion***"),[2] of the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "***Chapter 11 Cases***"), as debtors and debtors in possession (collectively, the "***Debtors***") seeking entry of an interim order (together with all exhibits hereto, this "***Interim Order***") and final order (the "***Final Order***," and together with the Interim Order, the "***DIP Orders***") pursuant to sections 105, 361, 362, 363, 364(c), 364(d), 364(e), 503, 506, 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "***Bankruptcy Code***"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Rules 2002-1, 4001-1(b), 4002-1, and 9013-1 of the Local Rules of the United States Bankruptcy Court for the Southern District of Texas and the

---

[1]  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/DocuDataSolutions.  The Debtors' mailing address for the purposes of these cases is 2701 E. Grauwyler Road, Irving, TX 75061 USA.

[2]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion, the Restructuring Term Sheet, the DIP Credit Agreement, the Financing Declaration, or the documents referred to therein, as applicable.

Southern District of Texas Complex Chapter 11 Case Procedures (together, the "***Bankruptcy Local Rules***"), seeking relief, among other things:

(i) authorizing Exela Finance, Inc. and Exela Intermediate LLC, in their capacity as borrowers (the "***Borrowers***") to obtain postpetition financing, and for each of the other Debtors (the "***Guarantors***" and, together with the Borrowers, the "***DIP Loan Parties***") to guarantee, on a joint and several basis, the Borrowers' obligations in connection with a debtor-in-possession financing facility, comprising a superpriority priming term loan facility in an aggregate principal amount of not less than $185,000,000 (the "***DIP Facility***"), which consists of (A) a new money term loan facility in the aggregate original principal amount of up to $80,000,000 (the commitments thereunder, the "***New Money DIP Commitments***," and the Interim Term Loans and Final Term Loans (each as defined herein) advanced thereunder, collectively, the "***New Money Loans***"), and (B) (x) subject to entry of this Interim Order, the conversion of up to $75,000,000 of principal of and accrued interest on April 2026 Notes (the "***Interim Roll-Up Loans***"), and (y) subject to entry of the Final Order, the conversion of up to $30,000,000 of principal of and accrued interest on April 2026 Notes (the "***Final Roll-Up Loans***" and, together with the Interim Roll-Up Loans, the "***Roll-Up Loans***"; and the Roll-Up Loans, together with the New Money Loans, collectively, the "***DIP Loans***"), to be funded by certain April 2026 Noteholders (as defined herein) (the "***DIP Lenders***") in accordance with the terms and conditions set forth in the DIP Credit Agreement (as defined herein) attached hereto as **<u>Exhibit A</u>**;

(ii) authorizing the Debtors to enter into that certain *Superpriority Priming Debtor-in-Possession Financing Agreement* in substantially final form attached hereto as **<u>Exhibit A</u>** (as may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "***DIP Credit Agreement***"), by and among the DIP Loan Parties, Ankura Trust Company, LLC, as administrative agent and collateral agent (in such capacities, together with its successors and permitted assigns, the "***DIP Agent***"), and the DIP Lenders (together with their successors and permitted assigns, the DIP Lenders, together with the DIP Agent, the "***DIP Secured Parties***"), and to execute and deliver and perform under the DIP Credit Agreement and any other agreements, instruments, pledge agreements, intercreditor agreements, guarantees, fee letters, control agreements, and other ancillary documents related thereto (including any security agreements, intellectual property security agreements, or notes), including the "Loan Documents" as defined in the DIP Credit Agreement (as amended, restated, supplemented, waived, and/or otherwise modified from time to time, collectively with the DIP Credit Agreement and this Interim Order, the "***DIP Documents***"); and to perform such other acts as may be necessary or desirable in connection with this Interim Order and the DIP Documents, and the transactions contemplated hereby and thereby;

(iii)    authorizing the Borrowers to incur, and the Guarantors to guarantee on an unconditional joint and several basis, the principal, interest, fees, costs, expenses, obligations (whether contingent or otherwise), and all other amounts and "Obligations" as defined in the DIP Credit Agreement, owing under and/or secured by the DIP Documents (collectively, the "***DIP Obligations***");

(iv)    subject only to the Carve Out and the February 28 Funding Superpriority Claims (each as defined herein) and to the lien priorities set forth herein, and as further set forth on **Exhibit B**, granting to the DIP Agent, for the benefit of the DIP Secured Parties, allowed superpriority administrative expense claim status in each of the Chapter 11 Cases and any Successor Cases (as defined herein), as and to the extent provided herein;

(v)    subject only to the Carve Out and the February 28 Funding Liens (as defined herein) and to the relative priorities set forth herein, and as further set forth on **Exhibit B**, granting to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, automatically and validly perfected security interests in and liens on all of the DIP Collateral (as defined herein), including all property constituting Cash Collateral (as defined herein);

(vi)    authorizing and directing the Debtors to pay the principal, interest, premiums, fees, expenses, indemnities, and other amounts payable under the DIP Documents, as set forth herein and as such become earned, due and payable;

(vii)    authorizing the Debtors to use the Prepetition Collateral (as defined herein), including any Cash Collateral of the Prepetition Secured Parties under the April 2026 Notes (each as defined herein), as provided for herein;

(viii)    providing adequate protection to the Prepetition Secured Parties as provided herein for, among other things, any diminution in value of the Prepetition Collateral, from and after the Petition Date (as defined herein), including on account of the Debtors' sale, lease, or use of the Prepetition Collateral (including Cash Collateral), the imposition and enforcement of the automatic stay pursuant to section 362 of the Bankruptcy Code, the priming of the Prepetition Secured Parties' respective interests in the Prepetition Collateral (including by the Carve Out (as defined herein)), and for any other reason authorized by the Bankruptcy Code ("***Diminution in Value***");

(ix)    authorizing the Debtors to waive, upon entry of the Final Order, on behalf of themselves and their estates, (a) any right to surcharge the Prepetition Collateral and/or DIP Collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, (b) the equitable doctrine of marshaling and other similar doctrines, and (c) the "equities of the case" exception under section 552(b) of the Bankruptcy Code with respect to the Prepetition Collateral, DIP Collateral and/or the DIP Obligations (other than for the benefit of the DIP Secured Parties);

(x)     authorizing the Debtors to use the proceeds of the DIP Loans in accordance with the terms of the DIP Orders, the DIP Budget (as defined herein), and the other DIP Documents, subject to Permitted Variances (as defined herein), to (a) fund, among other things, ongoing working capital, general corporate expenditures, and other financing needs of the Debtors, (b) pay certain fees and other costs and expenses of administration of these Chapter 11 Cases, (c) pay agency fees and the fees and expenses of the DIP Agent and DIP Lenders owed under the DIP Documents, (d) pay the Adequate Protection Obligations (as defined below) (including reasonable and invoiced attorneys' fees and expenses) as set forth herein, (e) use the proceeds of the Roll-Up Loans solely to refinance on a cashless, dollar-for-dollar basis the April 2026 Notes outstanding under the April 2026 Notes Indenture, and (f) pay the February 28 Funding (as defined below);

(xi)    approving certain stipulations and releases by the Debtors with respect to the April 2026 Notes and the Prepetition Collateral as set forth herein;

(xii)   vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order, and waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Interim Order, and providing for the immediate effectiveness of this Interim Order;

(xiii)  scheduling a final hearing (the "***Final Hearing***") to consider entry of the Final Order, authorizing and approving, on a final basis, among other things, the Borrowers' borrowing from the DIP Lenders under the DIP Documents, up to an aggregate amount of New Money DIP Commitments less the original principal amount of the Interim Term Loans (the "***Final Term Loans***"), the Final Roll-Up Loans and the continued use of Cash Collateral, and granting of adequate protection, in each case, as described in the Motion and set forth in the DIP Documents; and

(xiv)   granting related relief.

The Court having considered the Motion, the exhibits attached thereto, the First Day Declaration, and the Financing Declaration, the evidence submitted or proffered, and arguments of counsel made at the interim hearing held by the Court on March 4, 2025 (the "***Interim Hearing***"); and proper and sufficient notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), and all applicable Bankruptcy Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any,

- 4 -

to the interim relief requested in the Motion and to entry of this Interim Order having been withdrawn, resolved, or overruled by the Court; and it appearing to the Court that granting the relief requested is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, creditors and parties in interest; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

A. **Petition Date**.  On March 3, 2025 (the "***Petition Date***"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.

B. **Debtors in Possession**.  The Debtors have continued in the management and operation of their businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Chapter 11 Cases.

C. **Jurisdiction and Venue**.  This Court has jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334.  Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter a final order approving the relief sought in the DIP Motion consistent with Article III of the United States Constitution.  Venue for the Chapter 11 Cases and proceedings with respect to the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[3]   The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

D.   **Committee Formation**.  As of the date hereof, the United States Trustee for the Southern District of Texas (the "***U.S. Trustee***") has not appointed a committee of unsecured creditors in these Chapter 11 Cases (such committee, if and when appointed, the "***Committee***") or any other statutory committee.

E.   **Notice**.  Proper, timely, adequate, and sufficient notice of the Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules, and no other or further notice of the Motion or the entry of this Interim Order shall be required.  The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing.

F.   **Debtors' Stipulations, Releases, and Acknowledgements**.  In requesting the use of Cash Collateral and approval of the DIP Facility, and in exchange for and as a material inducement to the Prepetition Secured Parties to agree to enter into the DIP Facility and to consent to provide access to Cash Collateral, and subordinate the Prepetition Liens (as defined herein) to the Carve Out and DIP Liens (as defined herein), as applicable and solely to the extent provided herein, and as a condition to such consent to the use of Cash Collateral and extending the DIP Loans, and without prejudice to the rights of parties-in-interest set forth in paragraph 45 hereof, the Debtors admit, stipulate, acknowledge, and agree, as follows (collectively, with the admissions, stipulations, acknowledgements, and agreements set forth in this paragraph F, the "***Debtors' Stipulations***"):

(i)        *April 2026 Notes*.

(a)   *April 2026 Notes Indenture*.  Under that certain *Indenture*, dated as of July 11, 2023 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "***April 2026 Notes Indenture***" and, together with the Notes Documents (as defined in the April 2026 Notes Indenture), the "***April 2026 Notes Documents***"),

by and among Exela Intermediate LLC, Exela Finance Inc. (collectively, the "**Co-Issuers**"), the Guarantors (as defined in the April 2026 Notes Indenture), the Affiliated Guarantors (as defined in the April 2026 Notes Indenture and, collectively, with the Guarantors, the "**Prepetition Notes Guarantors**"), and U.S. Bank Trust Company, National Association, as Trustee (as defined in the April 2026 Notes Indenture) (the "**Prepetition Trustee**"), certain 11.500% First Priority Senior Secured Notes Due 2026 (the "**April 2026 Notes**") were issued to certain noteholders (the "**April 2026 Noteholders**" and, together with the Prepetition Trustee and the Prepetition Collateral Agent (as defined herein), the "**Prepetition Notes Secured Parties**") in an aggregate principal amount of $1,252,267,105 as of the Petition Date.  As used herein, the "**Prepetition Note Parties**" shall mean, collectively, the Borrowers, the Co-Issuers, and the Prepetition Notes Guarantors.

(b)     *April 2026 Notes Indebtedness*.  As of the Petition Date, the Prepetition Note Parties were jointly and severally indebted and liable to the Prepetition Secured Parties pursuant to the April 2026 Notes Documents without defense, challenge, objection, claim, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $1,252,267,105 on account of outstanding April 2026 Notes under the April 2026 Notes Indenture, in each case, *plus* accrued and unpaid interest and any additional fees, costs, premiums, expenses, and disbursements (including, without limitation, any attorneys', accountants', consultants', appraisers', financial advisors', and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, guarantee obligations, other contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing, in each case to the extent reimbursable pursuant to the terms of the April 2026 Notes Documents and all other Obligations (as defined in the April 2026 Notes Indenture) owing under or in connection with the April 2026 Notes Documents (collectively, the "**April 2026 Notes Indebtedness**").

(c) *Prepetition Notes Liens*. The April 2026 Notes Indebtedness is secured by valid, binding, non-avoidable, properly perfected, and enforceable security interests in and liens (the "***Prepetition Notes Liens***") on all of the Collateral (or any other comparable term defined in the April 2026 Notes Documents describing the assets subject to security interests and liens securing the April 2026 Notes Indebtedness) consisting of substantially all of each Debtor's assets subject to certain exclusions set forth in the April 2026 Notes Documents (the "***Prepetition Notes Collateral***").

(d) *Validity, Perfection, and Priority of Prepetition Notes Liens and April 2026 Notes Indebtedness*. Each of the Debtors acknowledges and agrees that, in each case as of the Petition Date:  (i) the Prepetition Notes Liens encumber all of the Prepetition Notes Collateral, as the same existed on the Petition Date; (ii) the Prepetition Notes Liens are valid, binding, enforceable, non-avoidable, and properly perfected liens on and security interests in the Prepetition Notes Collateral; (iii) the Prepetition Notes Liens are subject and subordinate only to (a) valid, perfected, and enforceable liens (if any) which are senior to the Prepetition Notes Secured Parties' liens or security interests as of the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, and senior to the Prepetition Notes Secured Parties' liens or security interests as of the Petition Date (such liens, the "***Prior Notes Liens***") and (b) the relative rights and priorities set forth in the Prepetition Intercreditor Agreement; (iv) the Prepetition Notes Liens were granted to or for the benefit of the Prepetition Collateral Agent (as defined herein) and the other Prepetition Notes Secured Parties for fair consideration and reasonably equivalent value and were granted contemporaneously with, or covenanted to be provided as an inducement for, the making of the loans and/or commitments and other financial

accommodations secured thereby; and (v) the April 2026 Notes Indebtedness constitutes legal, valid, binding, and non-avoidable obligations of the Debtors.

(ii)     *Prepetition Credit Agreement*.  Under that certain *Financing Agreement*, dated as of July 11, 2023 (the "***Prepetition Credit Agreement***," and all instruments and documents executed at any time in connection therewith, the "***Prepetition Credit Documents***" and all obligations due thereunder the "***Prepetition Credit Agreement Obligations***"), by and among the Borrowers, the Guarantors (as defined in the Prepetition Credit Agreement) (the "***Prepetition Loan Guarantors***"), the lenders from time to time party thereto (the "***Prepetition Lenders***"), Blue Torch Finance LLC, as administrative agent and collateral agent (the "***Prepetition Credit Agreement Agent***" and, together with the Prepetition Lenders, the "***Prepetition Credit Agreement Parties***," and together with the Prepetition Notes Secured Parties, the "***Prepetition Secured Parties***"), the Prepetition Lenders issued term loans (the "***Prepetition Term Loans***") in an aggregate principal amount of $38,500,000 as of the Petition Date.  As used herein, the "***Prepetition Loan Parties***" shall mean, collectively, the Borrowers and the Prepetition Loan Guarantors.

(iii)     *Prepetition Credit Agreement Indebtedness*.  As of the Petition Date, the Prepetition Loan Parties were lawfully liable and obligated to the Prepetition Credit Agreement Parties, without defense, challenge, objection, claim, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $38,500,000 on account of outstanding Prepetition Term Loans under the Prepetition Credit Agreement, in each case, *plus* accrued and unpaid interest and any additional fees, costs, premiums, expenses, and disbursements (including, without limitation, any attorneys', accountants', consultants', appraisers', financial advisors', and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, guarantee obligations, other contingent obligations, and other charges of whatever nature, whether

or not contingent, whenever arising, due, or owing, in each case to the extent reimbursable pursuant to the terms of the Prepetition Credit Agreement Documents and all other Obligations (as defined in the Prepetition Credit Agreement) owing under or in connection with the Prepetition Credit Agreement Documents (collectively, the "***Prepetition Credit Agreement Indebtedness***" and together with the April 2026 Notes Indebtedness, collectively the "***Prepetition Secured Indebtedness***").

(iv)       *Prepetition Term Loan Liens*.   The Prepetition Credit Agreement Indebtedness is secured by valid, binding, non-avoidable, properly perfected, and enforceable security interests in and liens (the "***Prepetition Term Loan Liens***" and together with the Prepetition Notes Liens, the "***Prepetition Liens***") on all of the Collateral (or any other comparable term defined in the Prepetition Credit Agreement Documents describing the assets subject to security interests and liens securing the Prepetition Credit Agreement Indebtedness) consisting of substantially all of each Debtor's assets subject to certain exclusions set forth in the Prepetition Credit Agreement Documents (the "***Prepetition Term Loan Collateral***" and together with the Prepetition Notes Collateral, collectively, the "***Prepetition Collateral***").

(v)       *Validity, Perfection, and Priority of Prepetition Term Loan Liens and Prepetition Credit Agreement Indebtedness*.   Each of the Debtors acknowledges and agrees that, in each case as of the Petition Date:  (i) the Prepetition Term Loan Liens encumber all of the Prepetition Term Loan Collateral, as the same existed on the Petition Date; (ii) the Prepetition Term Loan Liens are valid, binding, enforceable, non-avoidable, and properly perfected liens on and security interests in the Prepetition Term Loan Collateral; (iii) the Prepetition Term Loan Liens are subject and subordinate only to valid, perfected, and enforceable liens (if any) which are senior to the Prepetition Credit Agreement Parties' liens or security interests as of the Petition Date

or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, and senior to the Prepetition Credit Agreement Parties' liens or security interests as of the Petition Date (such liens, the "***Prior Term Loan Liens***" and collectively with the Prior Notes Liens, the "***Prior Liens***") and (b) the relative rights and priorities set forth in the Prepetition Intercreditor Agreement; (iv) the Prepetition Term Loan Liens were granted to or for the benefit of the Prepetition Credit Agreement Agent and the other Prepetition Credit Agreement Parties for fair consideration and reasonably equivalent value and were granted contemporaneously with, or covenanted to be provided as an inducement for, the making of the loans and/or commitments and other financial accommodations secured thereby; and (v) the Prepetition Credit Agreement Indebtedness constitutes legal, valid, binding, and non-avoidable obligations of the Debtors.

(vi)     *Prepetition Intercreditor Agreement*.  The Prepetition Trustee, Wilmington Savings Fund Society, FSB (the "***Prepetition Collateral Agent***" and, together with the Prepetition Trustee, the "***Prepetition Notes Agents***"), and the Prepetition Credit Agreement Agent are parties to that certain *Super Senior Intercreditor Agreement*, dated as of July 11, 2023 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "***Prepetition Intercreditor Agreement***").  The Prepetition Notes Agents and the Prepetition Credit Agreement Agent entered into the Prepetition Intercreditor Agreement for the benefit of the Senior Secured Parties and the Junior Secured Parties (each, as defined in the Prepetition Intercreditor Agreement), to govern the respective rights, interests, obligations, priority and positions of the Senior Secured Parties and the Junior Secured Parties.  Pursuant to section 510 of the Bankruptcy Code, the Prepetition Intercreditor Agreement (including, without limitation, any applicable turnover provisions provided therein) shall (a) remain in full force and effect; (b) continue to

govern the relative obligations, priorities, rights, and remedies of the Senior Secured Parties and the Junior Secured Parties; and (c) not be deemed to be amended, altered, or modified by the terms of this Interim Order.

(vii)     *No Challenges/Claims*.   Subject to paragraph 45 below, no offsets, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the respective Prepetition Liens or the Prepetition Secured Indebtedness exist, and no portion of the respective Prepetition Liens or the Prepetition Secured Indebtedness is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law.  The Debtors and their estates have no valid Claims (as such term is defined in section 101(5) of the Bankruptcy Code), objections, challenges, causes of action,[4] and/or choses in action against any of the Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees with respect to the April 2026 Notes Documents, the Prepetition Credit Agreement Documents, the Prepetition Secured Indebtedness, the Prepetition Liens, or otherwise, whether arising at law or at equity, including,

---

[4]    As used in this Interim Order, "causes of action" means any action, claim, cause of action, controversy demand, right, action, lien, indemnity, interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, and license of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Effective Date (as defined herein), in contract or in tort, in law (whether local, state, or federal U.S. or non-U.S. law) or in equity, or pursuant to any other theory of local, state, or federal U.S. or non-U.S. law.  For the avoidance of doubt, "cause of action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, fraudulent transfer or fraudulent conveyance or voidable transaction law, violation of local, state, or federal or non-U.S. law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code or similar local, state, or federal U.S. or non-U.S. law; (d) any Claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of title 11 of the United States Code; (e) any state or foreign law pertaining to actual or constructive fraudulent transfer, fraudulent conveyance, and (f) any "lender liability" or equitable subordination claims or defenses.

without limitation, any challenge, recharacterization, subordination, avoidance, recovery, disallowance, reduction, or other claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable state law equivalents. The (a) April 2026 Notes Indebtedness constitutes allowed, secured claims, within the meaning of sections 502 and 506 of the Bankruptcy Code, subject to the value of the Prepetition Notes Collateral and (b) Prepetition Credit Agreement Indebtedness constitutes allowed, secured claims, within the meaning of sections 502 and 506 of the Bankruptcy Code, subject to the value of the Prepetition Term Loan Collateral, in each case, after giving effect to the relative priorities of the Prepetition Secured Parties in respect of "Shared Collateral" as defined in the Prepetition Intercreditor Agreement.

(viii)     *Cash Collateral*.  All of the Debtors' cash, whether existing as of the Petition Date or thereafter, wherever located (including, without limitation, all cash on deposit or maintained by the Debtors in any account or accounts), whether as original collateral or proceeds of other Prepetition Collateral, constitutes or will constitute "cash collateral" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code ("***Cash Collateral***") and is Prepetition Collateral of the Prepetition Secured Parties, subject in all respects to the priorities set out in the Prepetition Intercreditor Agreement. For the avoidance of doubt, Cash Collateral shall exclude (a) proceeds of the receivables and related assets sold or contributed to, or otherwise encumbered in favor of, the non-Debtors Exela Receivables 3 Holdco, LLC ("***ER3 Holdco***") and Exela Receivables 3, LLC ("***ER3***") from time to time (other than any such proceeds released to ER3 and ER3 Holdco and used by them to pay the Debtors, in each case, in accordance with the terms of the ER3 Securitization Program[5]), (b) proceeds of any and all receivables and

---

[5]  The ER3 Securitization Program and Rust Securitization Program are defined and described in greater detail in the Debtors' *Emergency* Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Certain Debtors to

related assets sold, assigned or contributed by any of the Debtors Rust Consulting, Inc., Banctec (Canada), Inc. Novitex Enterprise Solutions Canada, Inc. / Solutions D'Enterprise Novitex Canada, Inc., HOVG, LLC and SourceHOV Canada Company, as originators (collectively, the "**Rust Originators**") to Exela BR SPV, LLC ("**BR SPV**") or BR EXAR, LLC ("**BR EXAR**") or otherwise subject to the Receivables Purchase Agreement, dated as of February 12, 2024, as amended from time to time (the  "**Rust RPA**"), among the Rust Originators, BR SPV, as seller and BR EXAR, as buyer (as ultimate successor by assignment from B. Riley Securities, Inc. ("**B. Riley**")), or part of the Rust Securitization Program and (c) without limiting the foregoing, any and all cash held in non-Debtor accounts, which includes, without limitation, the "Lock-Box Accounts," "Restricted Operations Account," and "PNC Receiving Account" (each as defined in the Cash Management Motion.[6]

(ix)    *No Control*.  None of the DIP Agent, the other DIP Secured Parties, the Prepetition Notes Agents, or the Prepetition Secured Parties controls the Debtors or their properties or operations, has authority to determine the manner in which any of the Debtors' operations are conducted, or is a control Person or insider of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from this Interim Order, the DIP Facility, the DIP Documents, the Prepetition Secured Indebtedness, the Prepetition Credit Documents, and/or the April 2026 Notes Documents.

---

*Continue Selling, Contributing and Servicing Receivables and Related Rights Pursuant to the Securitization Program, (II) Modifying the Automatic Stay, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* (the "**Securitization Motion**"), filed contemporaneously herewith.    The term "**Securitization Program Superpriority Claims**" shall have the same meaning as the term "**Superpriority Claims**" (as defined in the order (the "**Securitization Program Order**") approving the Securitization Motion).

[6]   The "**Cash Management Motion**" means the *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Existing Cash Management System, (B) Maintain Existing Business Forms, and (C) Continue Intercompany Arrangements and Transactions and (II) Granting Related Relief* filed contemporaneously herewith.

G. **Findings Regarding Corporate Authority**.  Each of the Debtors has all requisite power and authority to execute and deliver the DIP Documents to which it is a party and to perform its obligations hereunder and thereunder.

H. **Findings Regarding Postpetition Financing and Use of Cash Collateral**.

(i)      *Request for Postpetition Financing and Use of Cash Collateral*.   The Debtors seek authority to (a) enter into the DIP Facility and incur the DIP Obligations on the terms described herein and in the DIP Documents and (b) use Cash Collateral on the terms described herein, in each case, to administer their Chapter 11 Cases and fund their operations.  At the Final Hearing, the Debtors will seek final approval of the DIP Facility and use of Cash Collateral pursuant to the Final Order, which shall be in form and substance acceptable to the Required Consenting Creditors (to be defined in the Restructuring Support Agreement), the Required Lenders (as defined in the DIP Credit Agreement) (the "***Required DIP Lenders***"), and the DIP Agent.  Notice of the Final Hearing and the proposed Final Order will be provided in accordance with this Interim Order.

(ii)      *Good Cause*.  Good and sufficient cause has been shown for the entry of this Interim Order and for authorization of the Debtors to obtain financing pursuant to the DIP Facility and the DIP Documents and to use Cash Collateral as set forth herein.

(iii)      *Priming of the Prepetition Liens*.  The priming of the Prepetition Liens under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Documents, and the Carve Out, as provided herein, will enable the Debtors to obtain the financing needed to continue to operate their business during the pendency of the Chapter 11 Cases, to the benefit of their estates and creditors.

(iv)  *Adequate Protection*.  The applicable Prepetition Secured Parties are entitled to receive adequate protection as set forth in this Interim Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, to the extent of any Diminution in Value of their respective interests in the Prepetition Collateral (including Cash Collateral), including, without limitation, as a result of the priming of the Prepetition Liens.

(v)  *Need for Postpetition Financing and Use of Cash Collateral*.  The Debtors have demonstrated an immediate and critical need to use Cash Collateral on an interim basis and to obtain credit pursuant to the DIP Facility in order to, among other things, enable the orderly continuation of their operations, to maintain business relationships with vendors, suppliers and customers, to make payroll, to satisfy other working capital and operational needs, to fund administrative expenses of these chapter 11 cases, and to fund the Debtors' restructuring efforts. The ability of the Debtors to maintain business relationships with their vendors, suppliers, and customers, to pay their employees, and otherwise finance their operations requires the availability of working capital from the DIP Facility and the use of Cash Collateral, the absence of either of which would immediately and irreparably harm the Debtors, their estates, and parties-in-interest. The Debtors do not have sufficient available sources of working capital and financing to operate their businesses, maintain their properties in the ordinary course of business and fund the Chapter 11 Cases without the authorization to use Cash Collateral and to borrow the DIP Loans.  The Prepetition Secured Parties are entitled to receive adequate protection as set forth in this Interim Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, to the extent of any Diminution in Value of their respective interests in the Prepetition Collateral (including Cash Collateral) as a result of, among other things, the Debtors' use of the Prepetition Collateral, including Cash Collateral.

(vi)      _No Credit Available on More Favorable Terms_.  The DIP Facility is the best source of debtor-in-possession financing available to the Debtors.  Given their current financial condition, financing arrangements, and capital structure, the Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the DIP Facility.  The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors have also been unable to obtain (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  Financing on a postpetition basis is not otherwise available without granting the DIP Agent, for the benefit of itself and the other DIP Secured Parties, (1) perfected security interests in and liens on (each as provided herein) the DIP Collateral, with the priorities set forth herein; (2) superpriority claims; and (3) the other protections set forth in the DIP Documents and this Interim Order and without incurring the 507(b) Claims and Adequate Protection Liens (each as defined herein) (the foregoing described in clauses (1)–(3), collectively, the "**_DIP Protections_**").

(vii)      _Use of Cash Collateral and Proceeds of the DIP Facility_.  As a condition to entry into the DIP Facility, the extension of credit under the DIP Facility, and the authorization to use the Prepetition Collateral (including Cash Collateral), the DIP Secured Parties and the Prepetition Secured Parties require, and the Debtors have agreed, that proceeds of the DIP Facility and the Prepetition Secured Parties' Cash Collateral shall be used in accordance with the terms and conditions of this Interim Order, the Prepetition Intercreditor Agreement, and the DIP

Documents, and consistent with the DIP Budget (subject to Permitted Variances),[7] solely for the purposes set forth in the DIP Documents and this Interim Order, including: (a) to pay professional fees and other restructuring charges arising on account of the Chapter 11 Cases, including statutory fees of the U.S. Trustee and allowed professional fees and expenses the Committee (if any); (b) to pay agency and professional fees and expenses (including legal, financial advisor, appraisal, and valuation-related fees and expenses) incurred by the Prepetition Secured Parties, the DIP Agent, and the DIP Lenders as provided under the DIP Facility, including those incurred in connection with the preparation, negotiation, documentation, and court approval of the DIP Facility; (c) to provide for working capital, and for other general corporate purposes of the Debtors; (d) to pay administration costs of the Chapter 11 Cases and claims or amounts approved by the Bankruptcy Court; and (e) to pay the February 28 Funding.

(viii)    *Application of Proceeds of DIP Collateral*.  As a condition to entry into the DIP Facility, the extension of credit under the DIP Facility, and authorization to use the Prepetition Collateral (including Cash Collateral), the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties have agreed that, as of and upon entry of this Interim Order, the Debtors shall utilize the proceeds of the Prepetition Collateral and the DIP Collateral in accordance with this Interim Order and the DIP Budget.

I.    **Adequate Protection**.  The Debtors have agreed, pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code, to provide the Prepetition Secured Parties adequate protection, as and to the extent set forth in this Interim Order, against the risk of any Diminution in Value of their respective interests in the Prepetition Collateral.  The (i) Prepetition Notes Agents, for the benefit of the Prepetition Notes Secured Parties, are entitled to receive adequate protection of their

---

[7]  A copy of the Budget is attached hereto as **Schedule 1**.

interests in the Prepetition Notes Collateral, including, without limitation, the Cash Collateral and (b) Prepetition Credit Agreement Agent, for the benefit of the Prepetition Credit Agreement Parties, is entitled to receive adequate protection of its interests in the Prepetition Term Loan Collateral, including, without limitation, the Cash Collateral, in each case, subject to the terms of and priorities set forth in the Prepetition Intercreditor Agreement.  Pursuant to sections 361, 362, 363, and 507(b) of the Bankruptcy Code, as adequate protection, the Prepetition Secured Parties will receive, to the extent of any Diminution in Value of their respective interests in the applicable Prepetition Collateral (subject to the terms of the Prepetition Intercreditor Agreement), Adequate Protection Liens, and 507(b) Claims as set forth herein, as well as the Adequate Protection Fees and Expenses (as defined herein).

J.     **Sections 506(c), 552(b), and Marshaling**.  Subject to entry of the Final Order, in light of (i) the DIP Secured Parties' agreement that their liens and superpriority claims shall be subject to the Carve Out; (ii) the Prepetition Secured Parties' agreement that their respective Prepetition Liens and claims, including any Adequate Protection Liens and claims (including any 507(b) Claims), shall be subject to the Carve Out, as set forth herein; and (iii) the DIP Secured Parties' and the Prepetition Secured Parties' agreement to the payment (in a manner consistent with the DIP Budget (subject to Permitted Variances), and subject to the terms and conditions of this Interim Order and the DIP Documents), of certain expenses of administration of the Chapter 11 Cases, the DIP Secured Parties and the Prepetition Secured Parties are each entitled to the rights and benefits of section 552(b) of the Bankruptcy Code, a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code (other than for the benefit of the Prepetition Secured Parties and the DIP Secured Parties), and a waiver of the provisions of section

506(c) of the Bankruptcy Code and of the equitable doctrine of marshaling and other similar doctrines.

      K.    **<u>Good Faith of the DIP Secured Parties and the Prepetition Secured Parties</u>**.

      (i)    Based upon the pleadings and proceedings of record in the Chapter 11 Cases, (a) the extensions of credit under the DIP Facility are fair and reasonable, are appropriate for secured financing to debtors in possession, are the best available to the Debtors under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration; (b) the terms and conditions of the DIP Facility, the use of proceeds under the DIP Facility, the use of the Cash Collateral, the DIP Protections, and the Adequate Protection Obligations (as defined herein) have been negotiated in good faith and at arm's length among the Debtors, DIP Secured Parties, and the Prepetition Secured Parties, with the assistance and counsel of their respective advisors; (c) the use of Cash Collateral pursuant to this Interim Order has been allowed in "good faith" within the meaning of section 364(e) of the Bankruptcy Code; (d) any credit committed to be extended, loans to be made, and other financial accommodations to be extended to the Debtors by the DIP Secured Parties or the Prepetition Secured Parties, including, without limitation, pursuant to this Interim Order, have been allowed, advanced, committed, extended, issued, or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code by the DIP Secured Parties and the Prepetition Secured Parties in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code; and (e) the DIP Facility, the DIP Liens, the DIP Superpriority Claims (as defined herein), the Adequate Protection Liens, and the 507(b) Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, modified, on appeal, or otherwise.

(ii)      Absent an order of this Court, the consent of the Prepetition Notes Secured Parties and the Prepetition Credit Agreement Parties is required for the Debtors' use of Cash Collateral and other Prepetition Collateral.  The requisite Prepetition Notes Secured Parties and Prepetition Credit Agreement Parties have consented, or are deemed pursuant to the April 2026 Notes Documents or the Prepetition Intercreditor Agreement, as applicable, to have consented (or have not objected), to the Debtors' use of Cash Collateral and other Prepetition Collateral and to the Debtors' entry into the DIP Documents in accordance with and subject to the terms and conditions in this Interim Order and the DIP Documents; *provided* that nothing in this Interim Order or the DIP Documents shall (x) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of the Prepetition Collateral, including the Cash Collateral, other than on the terms set forth in this Interim Order and in the context of the DIP Facility authorized by this Interim Order to the extent such consent has been or will be given, (y) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior), or (z) prejudice, limit, or otherwise impair the rights of any of the Prepetition Secured Parties to seek new, different, or additional adequate protection.

L.      **Roll-Up Loans**.  Subject to entry of the Interim Order and Final Order (as applicable), the Roll-Up Loans as provided for under the DIP Facility are appropriate and the DIP Lenders would not be willing to provide New Money Loans or extend credit to the Debtors thereunder without the inclusion of the Roll-Up Loans within the DIP Facility.

M.      **Immediate Entry**.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and 4001(c)(2).

N. **Notice**.  Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors, whether by facsimile, email, overnight courier, or hand delivery to certain parties in interest, including the Notice Parties (as defined in the Motion).  Notice of the Motion and the Interim Hearing constitutes due, sufficient and appropriate notice and complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001(b) and (c), and 9014, and the Bankruptcy Local Rules, and no other notice is required in connection with the relief set forth in this Interim Order.

**BASED UPON THE FOREGOING FINDINGS AND CONCLUSIONS, THE MOTION, AND THE RECORD BEFORE THE COURT WITH RESPECT TO THE MOTION, AND AFTER DUE CONSIDERATION AND GOOD AND SUFFICIENT CAUSE APPEARING THEREFOR,**

**IT IS HEREBY ORDERED THAT:**

1.  <u>DIP Facility Approved on Interim Basis</u>.  The DIP Facility and the Backstop Commitment Letter are hereby authorized and approved to the extent set forth herein, and the use of Cash Collateral on an interim basis is authorized, in each case subject to the terms and conditions set forth in the DIP Documents and this Interim Order.  All objections to this Interim Order (if any), to the extent not withdrawn, waived, settled, or resolved, are hereby denied and overruled. This Interim Order shall become effective immediately upon its entry.

2.  <u>Authorization of the DIP Facility</u>.  The DIP Facility and the Backstop Commitment Letter are hereby approved as set forth herein.  The Debtors are expressly and immediately authorized and empowered to execute and deliver, and perform under, the DIP Documents and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to deliver all instruments, certificates, agreements, and

documents that may be required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens. The Debtors are authorized and directed to, in accordance with and subject to the terms of this Interim Order, pay all principal, interest, premiums, indemnities, fees, payments, expenses, and other amounts (including any arrangement, backstop, commitment, exit and/or administrative premiums and fees, including in any separate letter agreement or in any other DIP Document) described in the DIP Documents as such amounts become due and payable, without the need to obtain further Court approval, whether or not such fees were paid or arose before, on, or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, and to take any other actions that may be necessary or appropriate, all as provided in this Interim Order or the DIP Documents; *provided* that the payment of legal and other professionals' fees and expenses of the DIP Secured Parties (other than legal and other professionals' fees and expenses incurred prior to the Petition Date) shall be subject to the requirements of paragraph 40 hereof. The Debtors shall pay, in accordance with and subject to the terms of this Interim Order, the principal, interest, fees, premiums, indemnities, payments, expenses, and other amounts described in the DIP Documents as such amounts become due and without need to obtain further Court approval, including without limitation, all other amounts owed to the DIP Secured Parties, and the reasonable fees and disbursements of the DIP Agent Advisors and the DIP Lender Advisors, in each case whether or not such fees or other amounts arose before, on, and after the Petition Date, in accordance with and subject to the terms of this Interim Order and the DIP Documents. To the extent not entered into as of the date hereof, the Debtors and the DIP Secured Parties shall negotiate the DIP Documents in good faith, and in all respects such DIP Documents shall be, subject to the terms of this Interim Order, consistent with the terms of the DIP Credit Agreement and otherwise reasonably acceptable to the DIP Agent and the Required DIP

Lenders and subject to the consent rights provided for under the Restructuring Support Agreement. Upon entry of this Interim Order and until execution and delivery of all DIP Documents required to be delivered thereunder, the Debtors and the DIP Secured Parties shall be bound by (i) the terms and conditions and other provisions set forth in the other executed DIP Documents (including the fee letters executed in connection with the DIP Facility), with the same force and effect as if duly executed and delivered to the DIP Agent by the Debtors, and (ii) this Interim Order. Upon entry of this Interim Order, the DIP Credit Agreement and the other DIP Documents shall govern and control the DIP Facility. The DIP Agent is hereby authorized to execute and enter into its respective obligations under the DIP Documents, subject to the terms and conditions set forth therein and in this Interim Order. Upon execution and delivery thereof, the DIP Documents shall constitute valid and binding obligations of the Debtors enforceable in accordance with their terms. To the extent there exists any conflict among the terms and conditions of the DIP Documents and this Interim Order, the terms and conditions of this Interim Order shall govern and control.

3. _Authorization to Borrow the DIP Loans and Use Cash Collateral_. Subject to the terms, conditions, and limitations on availability set forth in the DIP Documents and this Interim Order, including the DIP Budget, the Borrowers are hereby authorized to borrow, and the Guarantors are hereby authorized to guarantee, borrowings up to an aggregate principal amount of $50,000,000 in New Money Loans (the "***Interim Term Loans***"), which Interim Term Loans shall be made available to the Debtors solely in accordance with the terms and conditions set forth in the DIP Credit Agreement attached hereto as **Exhibit A**, and subject to the amounts in the DIP Budget and the withdrawal mechanics in the DIP Credit Agreement. The Debtors are hereby authorized to use the Cash Collateral of the Prepetition Secured Parties, but solely for the purposes set forth in this Interim Order and in accordance with the DIP Documents and the DIP Budget

(subject to Permitted Variances), including, without limitation, to make payments on account of the Adequate Protection Obligations provided for in this Interim Order.

4.     <u>Roll-Up Loans</u>.  Upon entry of this Interim Order, the Interim Roll-Up Loans shall automatically be deemed funded pursuant to the DIP Credit Agreement (on a cashless, dollar-for-dollar basis) and shall constitute DIP Obligations on the day such roll-up becomes effective, without constituting a novation, and shall satisfy and discharge an amount of April 2026 Notes that, together with accrued and unpaid interest thereon, equal such amount, beneficially held by such DIP Lender (or its affiliate), as if payment in such amount had been made under the April 2026 Notes Indenture on such date, subject to the provisions of paragraph 45 hereof (the "***Interim Roll-Up***").  The Debtors are authorized to take such acts as shall be necessary or desirable to effect the Interim Roll-Up and conversion of the April 2026 Notes beneficially owned by the DIP Lenders (or affiliates thereof).  Upon entry of the Final Order, the Final Roll-Up Loans shall automatically be deemed funded pursuant to the DIP Credit Agreement (on a cashless, dollar-for-dollar basis) and shall constitute DIP Obligations on the day such roll-up becomes effective, without constituting a novation, and shall satisfy and discharge an amount of April 2026 Notes that, together with accrued and unpaid interest thereon, equal such amount, beneficially held by such DIP Lender (or its affiliate), as if payment in such amount had been made under the April 2026 Notes Indenture on such date, subject to the provisions of paragraph 45 hereof (the "***Final Roll-Up***").  The Debtors are authorized to take such acts as shall be necessary or desirable to effect the Final Roll-Up and conversion of the April 2026 Notes beneficially owned by the DIP Lenders

(or affiliates thereof).  The Roll-Up Loans shall be treated as "Junior Obligations" for all purposes under the Prepetition Intercreditor Agreement.

    5.    <u>Amendment of the DIP Documents</u>.[8]  No provision of this Interim Order, the DIP Credit Agreement, or any other DIP Document may be amended other than by an instrument in writing signed by the Debtors, the Required DIP Lenders, and such other parties as may be required under the DIP Documents.  The DIP Documents may from time to time be amended, modified, waived, or supplemented in accordance with their terms without further order of the Court if the amendment, modification, waiver, or supplement is non-material and in accordance with the DIP Documents and the DIP Budget or is necessary to conform the terms of the DIP Documents or the DIP Budget to this Interim Order, except that any modifications or amendments to the DIP Documents that shorten the maturity thereof or increase the aggregate commitments thereunder or the rate of interest payable with respect thereto shall be subject to Court approval, as necessary; *provided* that updates to the DIP Budget approved by the Required DIP Lenders as provided in paragraph 19 and the DIP Credit Agreement shall not require any further order or approval of the Court.  In the case of a material and adverse amendment, modification, waiver, or supplement to the DIP Documents, the Debtors shall provide notice (which may be provided through email) to (i) the Consenting Creditors (to be defined in the Restructuring Support Agreement), (ii) lead counsel to any Committee (if appointed), (iii) the U.S. Trustee, (iv) the Prepetition Credit Agreement Agent and counsel thereto, (v) the DIP Agent and DIP Agent Advisors, (vi) the Administrative Agent (as defined in the Securitization Motion, the "***Securitization Agent***") and counsel thereto, (vii) B. Riley and counsel, and (viii) counsel to the DIP Lenders, which parties

---

[8]    Any consent, agreement, amendment, approval, waiver or instruction of the Borrowers, Guarantors, DIP Agent, or DIP Secured Parties to be delivered hereunder, may be delivered by any written instrument, including by way of email, by the Borrowers, Guarantors, DIP Agent, or DIP Secured Parties or their respective counsel on their behalf.

shall have five (5) business days from the date of such notice within which to object, in writing, to such amendment, modification, waiver, or supplement; *provided, further,* that any amendments or modifications to this Interim Order that are material or adversely impact the Prepetition Secured Parties shall also require the consent (not to be unreasonably withheld, conditioned, or delayed) of the Prepetition Credit Agreement Agent. The foregoing shall be without prejudice to the Debtors' right to seek approval from the Court of a material amendment, modification, waiver, or supplement on an expedited basis. For the avoidance of doubt, the extension of a Milestone (as defined in the DIP Credit Agreement) or waiver of compliance with covenants in the DIP Documents shall not constitute a material amendment, modification, waiver, or supplement to the DIP Documents.

6.    <u>DIP Obligations</u>.  The DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the DIP Obligations which shall be enforceable against each of the Debtors, their estates, and any successors thereto, including, without limitation, any trustee appointed in the Chapter 11 Cases or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "***Successor Cases***").  Upon entry of this Interim Order, the DIP Obligations in each case will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to any of the DIP Secured Parties under the DIP Documents and under this Interim Order or secured by the DIP Liens, including, without limitation, all principal, accrued and unpaid interest, premiums, costs, fees, expenses, indemnities, and other amounts owing under the DIP Documents.  The Debtors shall be jointly and severally liable for the DIP Obligations.  No obligation, payment, transfer, or grant of collateral security hereunder or under the DIP Documents

(including any DIP Obligation or DIP Liens) shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under chapter 5 of the Bankruptcy Code, section 724(a) of the Bankruptcy Code, or any other provision with respect to Avoidance Actions (as defined herein) under the Bankruptcy Code or applicable state or foreign law equivalents) or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise, but other than to the Carve Out or as expressly provided in this Interim Order), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.  Notwithstanding anything to the contrary contained in this Interim Order or the DIP Documents, none of the DIP Secured Parties shall receive any payment, distribution or any other recovery on account of Roll-Up Loans, whether in connection with an exercise of remedies (including any credit bid), pursuant to a chapter 11 plan, a chapter 7 liquidation or otherwise, until the Payment in Full (as defined in the Prepetition Intercreditor Agreement) of all of the Prepetition Credit Agreement Obligations and all Prepetition Term Loan 507(b) Claims.  To the extent any DIP Secured Party receives any such payment, distribution or any other recovery on account of Roll-Up Loans until the Payment in Full (as defined in the Prepetition Intercreditor Agreement) of all of the Prepetition Credit Agreement Obligations and all Prepetition Term Loan 507(b) Claims, such DIP Secured Party shall promptly turn over any such payment, distribution or other recovery to the Prepetition Credit Agreement Agent for application in accordance with the Prepetition Credit Documents.

7.      <u>DIP Liens</u>.  As security for the prompt and complete payment and performance of all DIP Obligations when due (whether at stated maturity, by acceleration, or otherwise), effective immediately and automatically upon entry of this Interim Order (and without the need for any

execution, recordation, or filing of any mortgages, deeds of trust, pledge or security agreements, lockbox or control agreements, financing statements, or any other similar documents or instruments, or the possession or control by the DIP Agent of, or over, any assets), pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the other DIP Secured Parties, is hereby granted, subject and subordinate only to the Carve Out, to any Prior Liens, to the liens (the "***February 28 Funding Liens***") hereby granted to the Securitization Agent on all DIP Collateral (as defined below) to secure prompt payment of the $5,164,000 advanced by the Securitization Agent to the Debtors on February 28, 2025 (the "***February 28 Funding***"), and with the relative rank and priority as set forth in paragraph 8 of this Interim Order, **Exhibit B** attached hereto, and solely with respect to the Roll-Up Loans, the Prepetition Intercreditor Agreement, the following valid, binding, continuing, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens (such liens, the "***DIP Liens***") on all real and personal property, whether existing on the Petition Date or thereafter acquired and wherever located, tangible, or intangible, of each of the Debtors (collectively, the "***DIP Collateral***"), including, without limitation, (a) all of the Debtors' other now-owned or hereafter-acquired real and personal property, assets and rights of any kind or nature, wherever located, whether encumbered or unencumbered, including without limitation, and all prepetition property and post-petition property of the Debtors' estates, and the proceeds, products, rents, and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise, including without limitation, all equipment, all goods, all accounts, cash, payment intangibles, bank accounts, and other deposit or securities accounts of the Debtors (including any accounts opened prior to, on, or after the Petition Date), insurance policies and proceeds thereof, equity interests, instruments, intercompany claims, accounts receivable, other rights to payment,

all general intangibles, all contracts and contract rights, securities, investment property, letters of

credit and letter of credit rights, chattel paper, all interest rate hedging agreements, all owned real

estate, real property leaseholds, fixtures, patents, copyrights, trademarks, trade names, rights under

license agreements and other intellectual property, all commercial tort claims, and all claims and

causes of action, and any and all proceeds, products, rents, and profits of the foregoing, (b) all

Prepetition Collateral, whether existing on the Petition Date or thereafter acquired, (c) all property

of the Debtors subject to Prior Liens, (d) all property of the Debtors, whether existing on the

Petition Date or thereafter acquired that is not subject to valid, perfected, and non-avoidable liens

or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy

Code (the "**_Previously Unencumbered Property_**"), (e) a 100% equity pledge of all direct

subsidiaries of Debtors (including non-Debtor subsidiaries, other than ER3 Holdco, ER3, and BR

SPV) and all such assets of such entities to the extent such entities are Debtors (including any cash

held in deposit accounts or any other accounts at such entities), and (f) subject to entry of the Final

Order, the proceeds of any avoidance actions brought pursuant to chapter 5 of the Bankruptcy

Code or section 724(a) of the Bankruptcy Code or any other avoidance actions under the

Bankruptcy Code or applicable state law or foreign law equivalents (such actions, "**_Avoidance_**

**_Actions_**"); _provided_ that, for the avoidance of doubt and notwithstanding anything to the contrary

herein, to the extent a lien cannot attach to such property, assets or rights pursuant to applicable

law, the liens granted pursuant to this Interim Order shall attach instead to the Debtors' economic

rights therein, including, without limitation, any and all proceeds thereof; _provided_, _further_, that

for the avoidance of doubt, the DIP Collateral shall exclude (a) property identified in the DIP

Documents as "Excluded Collateral," (b) all accounts receivable and related assets from time to

time sold or contributed to, or otherwise encumbered in favor of, ER3 Holdco and ER3 and their

assignees in accordance with the ER3 Securitization Program, and all proceeds thereof (other than any such proceeds released to ER3 and ER3 Holdco and used by them to pay the Debtors, in each case, in accordance with the terms of the ER3 Securitization Program), (c) any equity or membership interest in non-Debtors ER3 Holdco and ER3, (d) all accounts receivables and related assets, and the proceeds thereof, sold, assigned, pledged or contributed by any of the Rust Originators to or for BR SPV or BR EXAR in connection with the Rust Securitization Program, (e) any deposit accounts of the Rust Originators pledged as collateral to BR EXAR as part of the Rust Securitization Program, and (f) any and all cash held in non-Debtor accounts, which includes, without limitation, the "Lock-Box Accounts," "Restricted Operations Account," and "PNC Receiving Account," (each as defined in the Cash Management Motion) (collectively, the "***DIP Excluded Collateral***").

8.   <u>DIP Lien Priority</u>.  The DIP Liens shall have the priorities set forth below:

(a)   Pursuant to section 364(d) of the Bankruptcy Code, the DIP Liens shall be senior priming liens with respect to any Prepetition Collateral, subject only to the Carve Out, the February 28 Funding Liens, and the Prior Liens, and senior to all other liens on such assets, including Adequate Protection Liens and the Prepetition Liens, except solely with respect to the DIP Liens securing the Roll-Up Loans as set forth on **<u>Exhibit B</u>** and subject to the relative priorities set forth therein.

(b)   Pursuant to sections 364(c)(2) and 363(c)(3) of the Bankruptcy Code, the DIP Liens shall be first priority senior liens with respect to all other property of the Debtors, including all Previously Unencumbered Property (including, subject to the entry of the Final Order, proceeds of Avoidance Actions), subject only to the Carve Out; and junior only to (i) Prior Liens, if any, on such assets, and (ii) the February 28 Funding Liens, and senior to all other liens on such

assets, including the Adequate Protection Liens, except solely with respect to the DIP Liens securing the Roll-Up Loans as set forth on **Exhibit B** and subject to the relative priorities set forth therein.

(c)     Other than as set forth herein (including as set forth in **Exhibit B** and the relative priorities therein) or expressly permitted under the DIP Documents, and solely with respect to the Roll-Up Loans, the Prepetition Intercreditor Agreement, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of any of the Chapter 11 Cases to any Successor Case, and/or upon the dismissal or conversion of any of the Chapter 11 Cases or Successor Cases.  The DIP Liens shall not be subject to any of sections 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

9.     <u>DIP Superpriority Claims</u>.  Subject and subordinate only to the Carve Out and the February 28 Funding Superpriority Claims and in accordance with the priority set forth herein and in **Exhibit B**, effective immediately upon entry of this Interim Order, the DIP Agent (on behalf of the DIP Secured Parties) is hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim against each of the Debtors in each of the Chapter 11 Cases and any Successor Cases (collectively, the "***DIP Superpriority Claims***") on account of all DIP Obligations, with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of the Chapter 11 Cases or any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including,

without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113, or 1114 of the Bankruptcy Code or any other provision of the Bankruptcy Code and any other claims against the DIP Loan Parties, including any 507(b) Claims; *provided* that the DIP Superpriority Claims shall be subject to and *pari passu* with the Securitization Program Superpriority Claims and junior to the superpriority claims hereby granted to the Securitization Agent in respect of the February 28 Funding in scope coterminous with the DIP Superpriority Claims (the "***February 28 Funding Superpriority Claims***").  The DIP Superpriority Claims and the February 28 Funding Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under sections 503(b) and 507(a)(2) of the Bankruptcy Code.  The DIP Superpriority Claims and the February 28 Funding Superpriority Claims shall have recourse against each of the Debtors, on a joint and several basis.

10.  <u>No Obligation to Extend Credit</u>.  The DIP Lenders shall have no obligation to make any loan under the DIP Documents unless (and subject to the occurrence of the Effective Date) all of the conditions precedent to the making of such extension of credit under the DIP Documents and/or this Interim Order, as applicable, have been satisfied in full or waived in accordance with the DIP Credit Agreement.

11.  <u>Use of DIP Facility Proceeds</u>.

(a)  The DIP Loans shall be made available to the Debtors: (i) on and/or after the Effective Date, to pay the fees, costs and expenses incurred in connection with the transactions contemplated hereby; (ii) on the Effective Date, to pay the February 28 Funding in full in cash; and (iii) on and/or after the Effective Date: (x) for the Debtors' (and the Debtors' affiliates and subsidiaries as provided herein) working capital requirements and for general corporate purposes

(including to fund the costs, fees, and expenses in connection with administration of the Chapter 11 Cases) in accordance with the DIP Budget (subject to the Permitted Variances), and (y) to fund the Carve Out as provided herein, in the case of each of (i), (ii) and (iii) above, in accordance with the terms of the DIP Documents and this Interim Order.

(b)     For the avoidance of doubt, absent the prior written consent of the Required DIP Lenders or otherwise in compliance with (x) the DIP Budget (subject to Permitted Variances), and/or (y) the DIP Documents, as applicable, no proceeds of the DIP Loans (including payments from DIP Collateral) shall be used (i) to make any payment in settlement or satisfaction of any prepetition claim or administrative claim (other than the DIP Obligations as provided herein and in the DIP Documents); (ii) to make any payment or distribution, directly or indirectly, to any non-Debtor affiliate, including Exela Technologies, Inc.; (iii)  to make any payment or distribution to any insider of the Debtors or any non-Debtor affiliate that is outside the ordinary course, and in no event shall any non-ordinary course management, advisory, consulting or similar fees be paid to or for the benefit of any affiliate that is not a Debtor; (iv) to make any payment, advance, intercompany advance or transfer, or any other remittance or transfer whatsoever; (v) to make any payment otherwise prohibited by this Interim Order; or (vi) to make any intercompany loans or investments (including to and in foreign subsidiaries).

(c)     Subject to the terms and conditions of this Interim Order and the other DIP Documents, the Debtors are authorized to use proceeds of the DIP Facility in the amounts and for the line item expenditures set forth in the DIP Budget (subject to Permitted Variances).

(d)     On the Effective Date, the Debtors shall pay the Securitization Agent in full in cash the aggregate amount of the February 28 Funding.

12.   <u>Payments Free and Clear</u>.  Any and all payments or proceeds remitted to the DIP Agent on behalf of itself and the other DIP Secured Parties, or to the Prepetition Trustee on behalf of itself or the other Prepetition Notes Secured Parties, or to the Prepetition Credit Agreement Agent on behalf of itself and the other Prepetition Credit Agreement Parties, or to any DIP Secured Parties, pursuant to the provisions of this Interim Order or any subsequent order of this Court shall be, subject in the case of the Prepetition Secured Parties to paragraph 35 of this Final Order, received free and clear of any claim, charge, assessment or other liability.

13.   <u>Authorization to Use Cash Collateral</u>.  Subject to the terms and conditions of this Interim Order (including paragraph 27 hereof), the DIP Budget (subject to the Permitted Variances), and the DIP Documents, respectively, the Debtors are authorized to use Cash Collateral.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order (including with respect to the Carve Out) and the DIP Documents.  For the avoidance of doubt, except as otherwise set forth in the DIP Budget (subject to Permitted Variances) or otherwise consented to by the Required DIP Lenders, Cash Collateral may not be used (i) by any non-Debtor entity or (ii) to pay any fees, costs, expenses and/or any other amounts of any non-Debtor entity.

14.   <u>Adequate Protection for the Prepetition Secured Parties</u>.  The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(c)(2), 363(e), 364(d), and 507 of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, including Cash Collateral, to the extent of any Diminution in Value of their interests therein.  As adequate protection, the Prepetition Secured Parties are hereby granted the following (the "<u>Adequate Protection Obligations</u>"):

(a)      *Prepetition Term Loan Adequate Protection Liens*.  To the extent of any Diminution in Value of their interests in the Prepetition Collateral, the Prepetition Credit Agreement Agent, for the benefit of the Prepetition Credit Agreement Parties, is hereby granted (effective and automatically perfected upon the Petition Date and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements, or other agreements), valid, perfected, postpetition senior replacement and additional security interests in and liens (the "***Prepetition Term Loan Adequate Protection Liens***") on (i) all property of the Debtors that was subject to the Prepetition Liens, including the Prepetition Collateral and Cash Collateral, as of the Petition Date, and (ii) all DIP Collateral (collectively, the "***Prepetition Term Loan Adequate Protection Collateral***"), in each case subject to the Carve-Out, the Prior Liens, and the February 28 Funding Liens and otherwise subject to the relative priorities set forth on **Exhibit B**.  For the avoidance of doubt and notwithstanding anything to the contrary herein, to the extent a lien cannot attach to such property, assets or rights pursuant to applicable law, the liens granted pursuant to this Interim Order shall attach instead to the Debtors' economic rights therein, including, without limitation, any and all proceeds thereof.   The Prepetition Term Loan Adequate Protection Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) any lien or security interest arising after the Petition Date, except as expressly provided in this Interim Order.  The Prepetition Term Loan Adequate Protection Liens shall be in addition to all valid and enforceable liens and security interests now existing in favor of the Prepetition Credit Agreement Parties and not in substitution therefor.

(b)     *April 2026 Notes Adequate Protection Liens*.   To the extent of any Diminution in Value of their interests in the Prepetition Collateral, the Prepetition Collateral Agent, for the benefit of the Prepetition Notes Secured Parties, is hereby granted (effective and automatically perfected upon the Petition Date and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements, or other agreements), valid, perfected, postpetition senior replacement and additional security interests in and liens (the "**April 2026 Notes Adequate Protection Liens**" and together with the Prepetition Term Loan Adequate Protection Liens, the "**Adequate Protection Liens**") on (i) all property of the Debtors that was subject to the Prepetition Liens, including the Prepetition Collateral and Cash Collateral, as of the Petition Date, and (ii) the DIP Collateral (collectively, the "**April 2026 Notes Adequate Protection Collateral**" and together with the Prepetition Term Loan Adequate Protection Collateral, the "**Adequate Protection Collateral**"), in each case subject to the Carve-Out, the Prior Liens, and the February 28 Funding Liens and otherwise subject to the relative priorities set forth on **Exhibit B**.  For the avoidance of doubt and notwithstanding anything to the contrary herein, to the extent a lien cannot attach to such property, assets or rights pursuant to applicable law, the liens granted pursuant to this Interim Order shall attach instead to the Debtors' economic rights therein, including, without limitation, any and all proceeds thereof.  The April 2026 Notes Adequate Protection Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) any lien or security interest arising after the Petition Date, except as expressly provided in this Interim Order.  The April 2026 Notes Adequate Protection Liens shall be in addition to all valid and enforceable liens and security interests now existing in favor of the Prepetition Notes Secured Parties and not in substitution therefor.

(c) *Section 507(b) Claims*. To the extent of any Diminution in Value of their respective interests in the Prepetition Collateral, each Prepetition Notes Secured Party and each Prepetition Credit Agreement Party is hereby granted an allowed administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code (respectively, each an "***April 2026 Notes 507(b) Claim***" and a "***Prepetition Term Loan 507(b) Claim***" and together, the "***507(b) Claims***") against the Debtors and their estates on a joint and several basis, consistent with the Prepetition Intercreditor Agreement and in accordance with the relative priorities set forth on **Exhibit B**, which 507(b) Claims shall have priority over all other claims and administrative claims in the Chapter 11 Cases, including, without limitation, all claims of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 726(b), 1113 and 1114 of the Bankruptcy Code, 503(b) and 507(b) of the Bankruptcy Code, in each case subject only to the Carve Out and the February 28 Funding Superpriority Claims, and immediately junior to the DIP Superpriority Claims and the Securitization Program Superpriority Claims, which 507(b) Claims shall have recourse to and be payable from all assets and property of the Debtors.

(d) *Fees and Expenses*. The Debtors shall provide the Prepetition Secured Parties indefeasible cash payments in full of all reasonable and documented prepetition and postpetition fees and expenses, including, without limitation, the fees and out-of-pocket expenses of primary, special, conflicts, regulatory, and local counsel (in each applicable jurisdiction) and financial advisors to (i) the Ad Hoc April 2026 Group (as defined in the First Day Declaration), including, without limitation, Ropes & Gray LLP ("***R&G***"), as counsel, any local counsel to the Ad Hoc April 2026 Group, and SOLIC Capital Advisors, LLC and SOLIC Capital, LLC ("***SOLIC***"), as financial advisor, (ii) the Prepetition Notes Agents, including Troutman Pepper

Locke LLP, as counsel to the Prepetition Trustee and one local counsel, and (iii) the Prepetition Credit Agreement Agent, including Paul Hastings LLP, as counsel to the Prepetition Credit Agreement Agent (such counsels and advisors, the "*Prepetition Advisors*"), in each case subject to the procedures set forth in paragraph 40 hereof (the "*Adequate Protection Fees and Expenses*"). Any payments made pursuant to this paragraph 14(d) may be subject to being recharacterized or reallocated pursuant to section 506(b) of the Bankruptcy Code as payments of principal, interest or otherwise.

(e)     *Adequate Protection Payments*.  The Debtors shall pay (x) to the Prepetition Credit Agreement Agent (i) all accrued and unpaid interest under the Prepetition Credit Documents as of the Petition Date in cash on the Effective Date, and (ii) as and when due under the Prepetition Credit Agreement, all interest accruing under the Prepetition Credit Documents from and after the Petition Date at the Post-Default Rate (as defined in the Prepetition Credit Agreement); and (y) to the Prepetition Credit Agreement Agent, all agency fees and expenses, whether accrued before, on or after the Petition Date as and when due under the Prepetition Credit Documents.

(f)     *Right to Seek Additional Adequate Protection*.  This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Secured Parties to request further or alternative forms of adequate protection at any time or the rights of the Debtors or any other party to contest such request, in each case, subject to the terms of the Prepetition Intercreditor Agreement.  Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Chapter 11 Cases.  Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the

Prepetition Secured Parties that the adequate protection granted herein does in fact adequately protect any of the Prepetition Secured Parties against any Diminution in Value of their respective interests in the Prepetition Collateral (including the Cash Collateral). For avoidance of doubt, nothing contained herein shall expand, limit, modify, or affect in any way the rights of any party under the Prepetition Intercreditor Agreement.

(g)    *Other Covenants*. The Debtors shall maintain their cash management arrangements in a manner consistent with the order authorizing the Debtors to continue to use the Debtors' existing cash management system. The Debtors shall comply with the covenants contained in the DIP Documents regarding conduct of business, including, without limitation, preservation of rights, qualifications, licenses, permits, privileges, franchises, governmental authorizations, and intellectual property rights material to the conduct of their business in the ordinary course consistent with historical practices and the maintenance of properties and insurance.

(h)    *Reporting Requirements*. As additional adequate protection to the Prepetition Secured Parties, the Debtors shall comply with all reporting requirements set forth in the DIP Documents. The Prepetition Credit Agreement Agent and the Committee, if any, B. Riley, and the Securitization Agent shall be provided all reporting provided to the DIP Agent or DIP Lenders under the DIP Documents.

(i)    *Resignation of Prepetition Notes Agents*. The Debtors are authorized to execute any and all documents and make any payments in connection with any resignation by either of the Prepetition Notes Agents and the appointment of a successor in the event of such resignation.

15.   Budget Maintenance.  The Debtors shall use the proceeds of all borrowings under the DIP Facility and Cash Collateral in accordance with the 13-week statement of receipts and operating disbursements attached hereto as **Schedule 1** (as may be amended, replaced, supplemented, or otherwise modified with the consent of the Required DIP Lenders and in accordance with the terms of this Interim Order, the "***DIP Budget***"), subject to Permitted Variances (as defined herein); *provided* that, notwithstanding the foregoing, for the avoidance of doubt, the DIP Budget will not operate as a cap on professional fees; *provided*, *further*, that notwithstanding anything to the contrary herein, the Debtors shall not make any disbursements or payments of the proceeds of the DIP Facility or Cash Collateral to Exela Technologies, Inc., without the prior written consent (which can be by email from the DIP Lender Advisors (as defined below)) of the Required DIP Lenders.

16.   Variance Testing Period.  As used in this Interim Order, the "***Variance Testing Period***" means, (a) for aggregate operating disbursements (i) on the second Reporting Date (as defined herein) the two-week period ended the Friday prior thereto; (ii) on the third Reporting Date, the three-week period ended the Friday prior thereto; and (iii) for each Reporting Date thereafter, the four-week period ended on the Friday prior thereto and (b) for aggregate receipts, (i) on the third Reporting Date, the three-week period ended the Friday prior thereto; and (ii) on the fourth Reporting Date and each Reporting Date thereafter, the four-week period ended on the Friday prior thereto.

17.   Variance Budget Testing.  The Debtors may use the Cash Collateral and DIP Loans strictly in accordance with the DIP Budget, subject only to Permitted Variances.  Commencing for the first full week following the Petition Date, on the Thursday of each calendar week (each, a "***Reporting Date***"), the Debtors shall deliver to the DIP Agent a variance report in form acceptable

to the DIP Lenders in their sole discretion (each, a "***Variance Report***") setting forth (i) the Debtors' aggregate cash receipts, expenditures and operating disbursements during the immediately preceding calendar week ending on Friday and (ii) the variance in dollar amounts of the actual receipts, expenditures and operating disbursements (including debt service and capital expenditures but excluding professional fees) for each weekly period ending on Friday from those reflected for the corresponding period in the DIP Budget (such comparison, the "***Variance***").

18.     Permitted Variances.  The Debtors shall not permit a Variance from the then-current DIP Budget during any Variance Testing Period that (x) for the second Reporting Date, is not more than 20% of the aggregate operating disbursements, and on the third Reporting Date and thereafter, is not more than 15% above the aggregate operating disbursements in such DIP Budget, and (y) for the third Reporting Date, is not less than 20% of the aggregate cash receipts, and on the fourth Reporting Date and thereafter, is not less than 15% of the aggregate cash receipts in such DIP Budget.

19.     Proposed Budget Reporting.  By no later than 5:00 p.m. commencing on the fourth Friday after the Petition Date (*i.e.*, March 28, 2025), and no less frequently than each fourth Friday thereafter, the Debtors shall deliver to the DIP Lender Advisors, a 13-week statement of receipts and operating disbursements for the next 13 weeks of the Debtors, broken down by week, including the anticipated uses of the DIP Facility for such period (each, a "***13-week Projection***"), which 13-week Projection must in each case be satisfactory in the sole discretion of the Required DIP Lenders.  It shall be a condition precedent to the effectiveness of the DIP Facility and the Debtors' use of Cash Collateral that the Debtors shall have delivered the DIP Budget in form and substance satisfactory to the Required DIP Lenders on or prior to the entry of this Interim Order (it being

agreed and understood that a form substantially consistent with the form attached as Schedule 1 is satisfactory to the Required DIP Lenders).

20.   <u>DIP Reporting</u>.   In addition to the DIP Budget reporting required by paragraph 19 above, the Debtors shall timely provide the DIP Secured Parties, and the respective DIP Lender Advisors, with the following (in each case as any applicable deadlines may be extended by the DIP Lender Advisors (which may be by email)):

(a)   *Management Conference Calls*.   Every week, or at the reasonable request of the DIP Lenders, but in no event less than at least four times a month during the pendency of the Chapter 11 Cases, the Debtors' management team shall participate in a teleconference call with the DIP Secured Parties and the DIP Lender Advisors, to be held at such times as may be reasonably agreed by the parties.   The Debtors and their advisors (as applicable) shall provide a status update on the following topics, with additional topics as requested by the Required DIP Lenders and the DIP Lender Advisors (with questions provided in advance of such call if practical): (i) general business update; (ii) budget variance reporting; and (iii) status of the Chapter 11 Cases, in each case, subject to applicable legal privileges and requirements of confidentiality, including requirements imposed by law or contract.

(b)   *Quarterly and Monthly Financial Reporting*.   As soon as available, and in any event within 30 days after the end of each fiscal month, the Debtors shall provide the Prepetition Secured Parties and the Prepetition Advisors the consolidated income statement, capital expenditures, and key financial indicators of the Debtors and their subsidiaries as at the end of such month and for the period from the beginning of the then current fiscal year to the end of such month, and setting forth in each case in comparative form the corresponding figures for the corresponding periods of the business plan, all in reasonable detail.   As soon as available, and in

any event within 30 days after the end of each fiscal quarter, the Debtors shall provide the Prepetition Secured Parties and the Prepetition Advisors the consolidated balance sheet, income statement, and cash flows of the Borrowers and their subsidiaries as at the end of such fiscal quarter and for the period from the beginning of the then current fiscal year to the end of such fiscal quarter, and setting forth in each case in comparative form the corresponding figures for the corresponding periods of the business plan, all in reasonable detail.

(c)   *Access to Records*.  Upon reasonable notice to counsel to the Debtors (email being sufficient), the Debtors shall permit representatives, agents, and employees of the Prepetition Advisors to have reasonable access to (i) inspect the Debtors' assets, and (ii) all information (including historical information and the Debtors' books and records) and personnel, including regularly scheduled meetings as mutually agreed with senior management of the Debtors and their advisors (during normal business hours), and the Prepetition Advisors shall be provided with access to all information they shall reasonably request, excluding any information for which confidentiality is owed to third parties, information subject to attorney client or similar privilege, or where such disclosure would not be permitted by any applicable requirements of law.[9]

21.   <u>Prepetition Intercreditor Agreement</u>.   Pursuant to Section 510 of the Bankruptcy Code, that certain Prepetition Intercreditor Agreement and any other applicable intercreditor or subordination provisions contained in any of the other April 2026 Notes Documents or Prepetition Credit Agreement Documents shall (i) remain in full force and effect, (ii) continue to govern the relative priorities, rights, and remedies of the Prepetition Secured Parties (including the relative priorities, rights and remedies of such parties with respect to replacement liens, administrative

---

[9] The Securitization Agent and B. Riley shall receive proposed DIP Budgets and budget variance reporting as well as access to information described in paragraph 20 herein.

expense claims and superpriority administrative expense claims or amounts payable in respect thereof), and (iii) not be deemed to be amended, altered or modified by the terms of this Interim Order and the DIP Documents, unless expressly set forth herein or therein.

22.    <u>Modification of Automatic Stay</u>.  The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to: (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, DIP Superpriority Claims, and 507(b) Claims; (b) permit the Debtors to perform such acts as each of the DIP Agent, the Required DIP Lenders, the Prepetition Collateral Agent (on behalf of the other Prepetition Notes Secured Parties), or the Prepetition Credit Agreement Agent (on behalf of the other Prepetition Credit Agreement Parties) may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Secured Parties and the Prepetition Secured Parties under the April 2026 Notes Documents, the Prepetition Credit Agreement Documents, and the DIP Documents, and the DIP Facility, as applicable, and this Interim Order, as applicable; and (d) authorize the Debtors to pay, and the DIP Secured Parties and the Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of this Interim Order.

23.    <u>Perfection of DIP Liens and Adequate Protection Liens</u>.

(a)    This Interim Order shall be sufficient and conclusive evidence of the priority, automatic perfection, and validity of the DIP Liens, the Adequate Protection Liens, and the other security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, execution, filing, registration, recording, or possession or control of the DIP Collateral, or other

act to validate or perfect such security interest or lien, including, without limitation, entering into any control agreements with any financial institution(s) party to a control agreement or other depository account consisting of DIP Collateral or requirement to register liens on any certificates of title (a "***Perfection Act***") required to validate or perfect (in accordance with applicable law) such liens, or to entitle the DIP Secured Parties and the Prepetition Secured Parties to the liens and priorities granted herein.  Notwithstanding the foregoing, if the DIP Agent or Prepetition Collateral Agent or the Prepetition Credit Agreement Agent (in the latter cases, solely with respect to such Adequate Protection Liens), as applicable, in its sole discretion, elect for any reason to file, record, or otherwise effectuate any Perfection Act, then such DIP Agent or the Prepetition Collateral Agent or the Prepetition Credit Agreement Agent (solely with respect to such Adequate Protection Liens), as applicable, is authorized to perform such act, and the Debtors are authorized to perform such act to the extent necessary or required by the DIP Documents, which act or acts shall be deemed to have been accomplished effective as of the Petition Date notwithstanding the date and time actually accomplished, and, in such event, the subject filing or recording office is authorized to accept, file, or record any document in regard to such act in accordance with applicable law.  The DIP Agent or the Prepetition Collateral Agent or the Prepetition Credit Agreement Agent (solely with respect to such Adequate Protection Liens), as applicable, may choose to file, record, or present a certified copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file, or record such certified copy of this Interim Order in accordance with applicable law.  Should any of the DIP Agent or the Prepetition Collateral Agent or the Prepetition Credit Agreement Agent (solely with respect to such Adequate Protection Liens), as applicable, so choose and attempt to file, record, or perform a Perfection Act, no defect or failure in connection

with such attempt shall in any way limit, waive, or alter the validity, enforceability, attachment, priority, or perfection of the postpetition liens and security interests granted herein by virtue of the entry of this Interim Order.  Any fees or expenses incurred by the Prepetition Collateral Agent or the Prepetition Credit Agreement Agent in connection with filing, recording, or performing a Perfection Act shall be Adequate Protection Fees and Expenses, payable in accordance with paragraphs 14(d) and 40 of this Interim Order.

(b)     Upon the request of the DIP Agent (at the direction of the Required DIP Lenders), each applicable Debtor shall use commercially reasonable efforts to execute, acknowledge, and deliver, or shall cause to be executed, acknowledged, and delivered, all such further agreements, instruments, certificates or documents, that the DIP Agent (at the direction of the Required DIP Lenders) shall reasonably request in order to ensure and perfect, as applicable, the priorities, rights, security interests and remedies of the DIP Collateral for the benefit of the DIP Agent and the DIP Lenders with respect to the DIP Collateral, including any filings or other action with respect to the perfection of security interests in any jurisdiction outside of the United States.

(c)     To the extent that the Prepetition Collateral Agent or the Prepetition Credit Agreement Agent, as applicable, is a secured party under any account control agreement, listed as an additional insured and/or loss payee under any of the Debtors' insurance policies, or is the secured party under any loan document, financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction to validate, attach, perfect, or prioritize liens (any such instrument or document, a "***Security Document***"), the DIP Agent shall also be deemed to be the secured party under each such Security Document, and shall have all the rights and powers attendant to that position (including, without limitation, rights of enforcement), and shall act in that capacity and distribute any proceeds

recovered or received subject to the Carve Out and in accordance with the terms of this Interim Order and the other DIP Documents, and subject to the terms and conditions of the Prepetition Intercreditor Agreement.  The Prepetition Collateral Agent or the Prepetition Credit Agreement Agent, as applicable, shall serve as gratuitous bailee for the DIP Agent solely for the purposes of perfecting its security interests in and liens on all DIP Collateral that is of a type such that perfection of a security interest therein (but for the entry of this Interim Order) may be accomplished only by possession or control by a secured party to the extent the Prepetition Collateral Agent or the Prepetition Credit Agreement Agent possesses or controls any such DIP Collateral.

24.   <u>Protections of Rights of the DIP Agent and DIP Secured Parties.</u>

(a)   *<u>DIP Secured Parties</u>*.  Unless the Required DIP Lenders shall have provided their prior written consent, there shall not be entered in any of the Chapter 11 Cases or any Successor Cases any order (including any order confirming any plan of reorganization or liquidation) that authorizes any of the following: (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral and/or that is entitled to administrative priority status, other than the Carve Out, the February 28 Funding Superpriority Claims, and the Securitization Program Superpriority Claims, in each case that is superior to or *pari passu* with (A) the DIP Liens, the DIP Superpriority Claims, and/or the other DIP Protections provided to the DIP Secured Parties and/or (B) the Adequate Protection Liens, the 507(b) Claims, and or other Adequate Protection Obligations provided to the Prepetition Secured Parties; (ii) the use of Cash Collateral for any purpose that is not permitted in the DIP Documents and this Interim Order, or (iii) any modification of any of the DIP Secured Parties' rights under this Interim Order and the DIP Documents with

respect to the DIP Obligations, in each case, unless (x) the Required DIP Lenders otherwise agree in writing or (y) solely with respect to clauses (i) and (ii) above, the discharge of DIP Obligations has occurred or will occur simultaneously with such incurrence of indebtedness or use of Cash Collateral.

(b)     The Debtors will, whether or not the DIP Obligations have been paid in full, (i) maintain books, records, and accounts in the ordinary course of business, (ii) reasonably cooperate with, consult with, and provide to the DIP Secured Parties and the DIP Lender Advisors and DIP Agent Advisors, respectively, all such information and documents that any or all of the Debtors are obligated (upon their reasonable request) to provide under the DIP Documents or the provisions of this Interim Order, excluding any information subject to privilege, (iii) upon reasonable advance notice, permit consultants, advisors, and other representatives of the DIP Secured Parties access to any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations, and accounts with their respective officers, employees, independent public accountants, and other professional advisors (other than legal counsel), (iv) permit the DIP Secured Parties and their respective consultants, advisors, and other representatives to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations, and assets, and (v) upon reasonable advance notice, but subject to the terms of this Interim Order, permit the DIP Agent (acting at the direction of the Required DIP Lenders) to conduct at the Debtors' cost and expense, reasonable field audits, collateral examinations and inventory appraisals at reasonable times in respect of any or all of the DIP Collateral.  Notwithstanding anything to the contrary contained herein, the Debtors do not

waive any right to attorney-client, work product, or similar privilege, and the Debtors shall not be required to provide the DIP Secured Parties or any of their respective counsel and financial advisors with any information subject to attorney-client privilege or consisting of attorney work product, or any information where such disclosure would not be permitted by any applicable requirements of law; *provided, further*, the Debtors' obligations to provide or disclose any information under this paragraph 24(b) shall be subject to reasonable requirements of confidentiality.

25.   <u>Credit Bidding</u>.  In connection with any sale process authorized by the Court, whether effectuated through sections 363, 725, or 1123 of the Bankruptcy Code, subject to the terms of this Interim Order, and solely with respect to the Roll-Up Loans, the Prepetition Intercreditor Agreement, (a) the DIP Agent (at the direction of the Required DIP Lenders), for the benefit of the DIP Secured Parties, shall have the right to credit bid the full amount of the DIP Obligations, in whole or in part, in connection with any sale or disposition of assets in the Chapter 11 Cases and shall not be prohibited or limited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code; (b) the Prepetition Collateral Agent (at the direction of holders of a majority of the applicable April 2026 Notes Indebtedness), for the benefit of the applicable Prepetition Notes Secured Parties, shall have the right to credit bid the April 2026 Notes Indebtedness, in whole or in part, in connection with any sale or disposition of assets in the Chapter 11 Cases, and shall not be prohibited or limited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code; and (c) the Prepetition Credit Agreement Agent (at the direction of the Required Lenders (as defined in the Prepetition Credit Agreement)), for the benefit of the Prepetition Credit Agreement Parties, shall have the right to credit bid the Prepetition Credit Agreement Indebtedness, in whole or in part, in connection with any sale or disposition of assets

in the Chapter 11 Cases, and shall not be prohibited or limited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code.

26.    <u>Proceeds of Subsequent Financing</u>.  If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in the Chapter 11 Cases or any Successor Cases shall obtain credit or incur debt pursuant to sections 364(b), 364(c), 364(d) of the Bankruptcy Code in violation of the DIP Documents or this Interim Order at any time, including subsequent to the confirmation of any chapter 11 plan with respect to any or all of the Debtors (if applicable), then all the cash proceeds derived from such credit or debt shall immediately be applied in accordance with this Interim Order, the DIP Documents and the Prepetition Intercreditor Agreement, the Securitization Program Order, and the Securitization Transaction Documents (as defined in the Securitization Motion).

27.    <u>Disposition of DIP Collateral</u>.   Except as otherwise provided for in the DIP Documents and the Restructuring Support Agreement, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral (or enter into any binding agreement to do so) and no such consent shall be implied from any other action, inaction, or acquiescence by any of the DIP Secured Parties, or any order of this Court, until the DIP Obligations are paid in full in cash or the discharge of DIP Obligations has otherwise occurred. From the Petition Date until the DIP Obligations have been paid in full in cash or such other treatment with respect to the DIP Obligations solely to the extent permitted under the DIP Credit Agreement, as applicable, and all commitments to extend credit under the DIP Facility are terminated, all cash receipts, Cash Collateral, and all proceeds from the sale, lease, transfer, encumbrance, or other disposition of, or other revenue of any kind attributable to, any DIP Collateral that is now in, or shall hereafter come into, the possession or control of any of the

Debtors, or to which any of the Debtors is now or shall hereafter become entitled shall, to the extent provided in this Interim Order, be subject to the DIP Liens and Adequate Protection Liens, respectively (and shall be treated in accordance with this Interim Order and the other DIP Documents).

28.   <u>Maintenance of DIP Collateral and Prepetition Collateral; Cash Management</u>.  Unless the Debtors have the consent of the DIP Agent (at the direction of the Required DIP Lenders), until the DIP Obligations have been paid in full in cash and all commitments to extend credit under the DIP Facility are terminated, the Debtors shall (a) insure the Prepetition Collateral and the DIP Collateral as required under DIP Documents, the Prepetition Credit Agreement Documents, and the April 2026 Notes Documents, and (b) maintain the cash management system in effect as of the Petition Date, as modified by this Interim Order, or as otherwise agreed to by the DIP Agent (at the direction of the Required DIP Lenders).  Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Agent shall be, and shall be deemed to be, without any further action or notice, named as an additional insured and lender's loss payee on each insurance policy maintained by the DIP Loan Parties that in any way relates to the DIP Collateral, and the DIP Agent shall distribute any proceeds recovered or received in respect of any such insurance policies, in accordance with the terms of the DIP Documents and this Interim Order, and subject to the terms and conditions of the Prepetition Intercreditor Agreement.

29.   <u>DIP Termination Events</u>.  The occurrence of any of the following, unless waived or extended (as applicable) in writing, which may be by email from counsel to the Required DIP Lenders, shall constitute a "DIP Termination Event" under this Interim Order (each a "***DIP Termination Event***," and the date upon which the earliest such DIP Termination Event occurs, the "***DIP Termination Date***"):  (a) the occurrence of the Final Maturity Date (as defined in the DIP

Credit Agreement); (b) if a default under the Restructuring Support Agreement by any of the Company Parties (to be defined in the Restructuring Support Agreement) shall have occurred and be continuing (with all applicable grace periods having expired) or if the Company (to be defined in the Restructuring Support Agreement) has exercised its fiduciary out under the Restructuring Support Agreement; (c) failure by the DIP Loan Parties to comply with any of the Milestones (as defined in the DIP Credit Agreement); and (d) the occurrence of any "Event of Default" (as defined in the DIP Credit Agreement) (subject to any applicable notice or grace periods specified in this Interim and under the DIP Credit Agreement); *provided* that, for the avoidance of doubt, each of the foregoing shall also constitute a "Cash Collateral Termination Event" which shall allow the Prepetition Collateral Agent (acting at the direction of the Required Consenting Creditors) to terminate and/or revoke the use of Cash Collateral.

30.   <u>Rights and Remedies Upon Event of Default</u>.

(a)   *<u>DIP Facility Termination</u>*.  Immediately upon the occurrence and during the continuance of a DIP Termination Event and/or Cash Collateral Termination Event, but subject to any applicable notice and cure periods set forth in the DIP Credit Agreement, the automatic stay provisions of section 362 of the Bankruptcy Code shall be modified to the extent necessary to permit the DIP Agent (acting at the direction of the Required DIP Lenders) and/or the Prepetition Collateral Agent (acting at the direction of the Required Consenting Creditors), as applicable, to deliver a notice (which may be by email) to counsel to the Debtors, the Prepetition Advisors, counsel to the Securitization Agent, counsel to B. Riley, counsel to any Committee (if appointed), and the U.S. Trustee (the "***Termination Notice Parties***") declaring the occurrence of a DIP Termination Event and/or Cash Collateral Termination Event (such declaration, a "***Termination Declaration***"), and, subject to the Carve Out and paragraph 33, take any or all of the following

actions, at the same or different time, in each case, without further order or application of the Court:  to (i) declare all DIP Obligations, including any and all accrued interest, premiums, fees and expenses constituting the DIP Obligations owing under the DIP Documents, to be immediately due and payable; (ii) declare the termination, reduction or restriction of the commitment of each DIP Lender to make DIP Loans (to the extent any such commitment remains under the DIP Facility); (iii) terminate the DIP Facility and the DIP Documents as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Liens or the DIP Obligations; (iv) terminate and/or revoke the Debtors' right, if any, under this Final Order to use any Cash Collateral, other than as provided for in paragraph 30(c) and as expressly permitted by paragraph 33; (v) deliver a Carve Out Trigger Notice (as defined herein), and (vi) charge and accrue interest at the default rate under the DIP Facility.

(b)       Following the Termination Declaration, subject to paragraph 33 hereof, the DIP Agent (at the direction of the Required DIP Lenders) may also (i) set-off or consolidate any amounts then owing by the DIP Lenders to a DIP Loan Party against the DIP Obligations; (ii) enforce any and all rights against the DIP Collateral, including, without limitation, disposition of such DIP Collateral; and (iii) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Documents, or applicable law or equity, including any and all remedies under debtor relief laws and the Uniform Commercial Code and analogous relief in foreign jurisdictions; *provided* that, in the case of the enforcement of DIP Liens or any other remedies with respect to the DIP Collateral as described in paragraphs 30(a) and 30(b) (collectively, "***Remedies Against Collateral***"), the DIP Agent (at the direction of the Required DIP Lenders) shall first file a motion (the "***Stay Relief Motion***") with the Court seeking emergency relief to exercise such remedies on at least five (5) business days' written notice (the "***Remedies***

*Notice Period*") seeking an emergency hearing before the Court (a "***Stay Relief Hearing***"). Notwithstanding anything in this Interim Order or the DIP Documents to the contrary, none of the Prepetition Secured Parties shall be permitted to exercise any rights or remedies with respect to any Prepetition Collateral or DIP Collateral unless and until the DIP Obligations are indefeasibly paid in full in cash and all commitments to extend credit under the DIP Facility are terminated; *provided* that subject to the Prepetition Intercreditor Agreement, the Prepetition Credit Agreement Agent may seek and obtain relief from the stay to the extent the DIP Secured Parties have sought such relief; *provided, further*, that the Prepetition Credit Agreement Agent may exercise remedies in the event the New Money Loans have been indefeasibly paid in full.  In the event a circumstance exists that would (i) cause the Restructuring Support Agreement to terminate automatically or (ii) give the Required Consenting Creditors the right to deliver a written notice of termination of the Restructuring Support Agreement, in each case notwithstanding any other provision of this Interim Order, the automatic stay of section 362 of the Bankruptcy Code is hereby modified to permit the Required Consenting Creditors to immediately terminate the Restructuring Support Agreement as provided therein.  At a Stay Relief Hearing, the Court may consider, among other things, whether an Event of Default or a DIP Termination Event has occurred in connection with the disposition of the Stay Relief Motion, and may fashion any appropriate remedy.

(c)     Within five (5) business days of a Termination Declaration, the Debtors or the Committee, as applicable, may file a motion (a "***Non-Consensual Cash Collateral Motion***") and seek an emergency hearing (which shall not be prior to the Stay Relief Hearing, if any) before the Court, and must provide prompt notice of such hearing to the respective counsel to the DIP Secured Parties and the Prepetition Secured Parties, to seek non-consensual use of Cash Collateral (provided that the DIP Secured Parties' and Prepetition Secured Parties' rights to object to any

non-consensual use of Cash Collateral are preserved in all respects); *provided*, that, pending resolution of the Non-Consensual Cash Collateral Motion, the Debtors shall be permitted to use Cash Collateral solely (x) with respect to amounts already drawn in accordance with the DIP Budget and only to fund expenses necessary to preserve the value of the Debtors' business and the DIP Collateral, including, without limitation, payroll obligations, and (y) to fund the Funded Reserve Account (as defined herein) in accordance with this Interim Order.  Notwithstanding the foregoing, and irrespective of the Remedies Notice Period, but except solely as otherwise expressly provided with respect to the Carve Out, the DIP Lenders shall not be obligated to provide any DIP Loans or advances at any time an Event of Default has occurred and is continuing or after the DIP Termination Event.

31.  <u>Carve Out</u>.  Subject to the terms and conditions contained in this paragraph 31, each of the DIP Liens, Prepetition Liens, Adequate Protection Liens, and 507(b) Claims shall be subject to and subordinate to the payment of the Carve Out.  The Carve Out shall have priority over all assets of the Debtors, including the Prepetition Collateral and the Adequate Protection Collateral. As used in this Interim Order, the "***Carve Out***" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed by final order, all unpaid fees and expenses (the "***Allowed Professional Fees***") incurred by Persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "***Debtor Professionals***") and the Committee (if any) pursuant to section 328 or 1103 of the Bankruptcy Code (the "***Committee Professionals***" and together with the Debtor

Professionals, the "**Professional Persons**") at any time before or on the first business day following delivery by the DIP Agent (at the direction of the Required DIP Lenders (with email from the DIP Lender Advisors being sufficient)) of a Carve Out Trigger Notice, whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; (iv) Allowed Professional Fees of Debtor Professionals in an aggregate amount not to exceed $1,000,000 incurred after the first business day following delivery by the DIP Agent (at the direction of the Required DIP Lenders (with email from the DIP Lender Advisors being sufficient)) of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise; (v) Allowed Professional Fees of the Committee Professionals in an aggregate amount not to exceed $250,000 incurred after the first business day following delivery by the DIP Agent (at the direction of the Required DIP Lenders (with email from counsel being sufficient) of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise; and (vi) all amounts determined, by assessment, final judgment, or decree, and expenses related thereto to be owed by the "**CROs**"[10] with respect to any prepetition and/or postpetition fiduciary tax liability (including but not limited to, payroll and sale tax obligations) of any of the Debtors and its direct and indirect subsidiaries that are controlled by the Debtors (the amount set forth in clauses (iv) through (vi) the "**Post-Carve Out Trigger Notice Cap**").  For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (at the direction of the Required DIP Lenders (with email from the DIP Lender Advisors being sufficient) to the Debtors, their lead restructuring counsel Latham & Watkins LLP, the U.S. Trustee, counsel to each of the Prepetition Secured Parties, and counsel to

---

[10] The "**CROs**" mean (i) Randall S. Eisenberg as Chief Restructuring Officer and (ii) Steve Spitzer as Deputy Chief Restructuring Officer, in each case, of Exela Technologies BPA, LLC, Exela Intermediate LLC, Exela Finance Inc., XCV-EMEA, LLC, and Neon Acquisition, LLC.

the Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked (the date on which a Carve-Out Tigger Notice is deliver, a ("**Termination Declaration Date**"); *provided* that in the event that the DIP Agent (at the direction of the Required DIP Lenders) is permitted to exercise Remedies Against Collateral pursuant to any order granting a Stay Relief Motion, the DIP Agent shall automatically be deemed to have delivered the Carve Out Trigger Notice in accordance with this paragraph 31.  The Carve Out shall include the Funded Reserve Account (as defined below) and amounts therein.

32.  <u>Carve Out Reserves</u>.  The Debtors shall establish and fund a segregated account (the "**Funded Reserve Account**") for purposes of funding the Carve Out.  The Funded Reserve Account may be funded from the DIP Facility and/or Cash Collateral.  Notwithstanding anything to the contrary in this Interim Order, the DIP Documents, the Prepetition Credit Agreement Documents, or the April 2026 Notes Documents, in no circumstances (which, for the avoidance of doubt, includes but is not limited to a DIP Termination Event or a Cash Collateral Termination Event) shall the Debtors be prohibited in any way from accessing or drawing upon the DIP Facility and/or Cash Collateral for the purpose of funding the Funded Reserve Account.  The Debtors shall deposit in the Funded Reserve Account an amount equal to 100% of the aggregate amount of Allowed Professional Fees of Debtor Professionals projected to accrue in the DIP Budget through March 7, 2025 (the "**Initial Funded Reserve Amount**").  Commencing March 10, 2025 (or the first business day thereafter), on the first business day of each week, the Debtors shall deposit in the Funded Reserve Account an amount equal to 100% of the aggregate amount of Allowed Professional Fees of Debtor Professionals projected to accrue for such week in the DIP Budget (the "**Weekly Funded**

*Reserve Amount*").  Each Debtor Professional may deliver to the Debtors a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred in the preceding week (each such statement, a "*Fee Statement*"), and to the extent the amount of Allowed Professional Fees of Debtor Professionals accrued and claimed in a Fee Statement exceeds the Initial Funded Reserve Amount or the Weekly Funded Reserve Amount for the applicable period or week, respectively, and such fees and expenses have otherwise not been paid by the Debtors, the Debtors shall, within three business days, fund additional amounts into the Funded Reserve Account equal to the difference between, as applicable, the Initial Funded Reserve Amount or the weekly Funded Reserve Amount and the amount accrued and claimed in the applicable Fee Statement (each, a "*Top Off Amount*").   At any time, if the Debtors in good faith believe a restructuring, sale, financing, or other success fee has been earned by a Debtor Professional, the Debtors shall deposit in the Funded Reserve Account an amount equal to such fee.  The Funded Reserve Account shall be maintained, and the funds therein (the "*Funded Reserve Amount*") shall be held in trust for the benefit of Debtor Professionals.  Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, after the Termination Declaration Date, the DIP Agent shall not sweep or foreclose on cash of the Debtors until the Post-Carve Out Trigger Notice Cap has been fully funded, but shall have an automatically perfected lien and a security interest in any residual interest in the Post-Carve Out Trigger Notice Cap, the Funded Reserve Account, the Initial Funded Reserve Amount, the Weekly Funded Reserve Amount, any Top Off Amount, and the Funded Reserve Amount, with any excess paid to the DIP Agent for application in accordance with the DIP Documents or if the DIP Obligations have been indefeasibly paid in full, to the Prepetition Trustee, for application in accordance with the April 2026 Notes Documents.

33.     Payment of Carve Out on or After the Termination Declaration Date.     Any reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis. Any funding of the Carve Out shall be added to and made a part of the DIP Obligations secured by the DIP Collateral, and shall otherwise be entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

34.     No Direct Obligation to Pay Allowed Professional Fees.     Other than the Debtor Professionals, subject to the terms of the Restructuring Support Agreement, the DIP Lenders and the April 2026 Noteholders reserve the right to object to the allowance of any fees and expenses, whether or not such fees and expenses were incurred in accordance with the DIP Budget.  Except for permitting the funding of the Funded Reserve Account in paragraph 32 above as provided herein, none of the DIP Lenders or the April 2026 Noteholders shall be responsible for any fees or expenses of the U.S. Trustee or Clerk of the Court incurred in connection with these Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this DIP Order or otherwise shall be constructed to obligate the DIP Lenders and the April 2026 Noteholders, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

35.     Reservation of Rights.  Nothing in this Interim Order shall be construed as a waiver of any right of the DIP Secured Parties, and the Prepetition Secured Parties with respect to any fee statement, interim application, or monthly application issued or filed by the Professional Persons. Notwithstanding anything to the contrary herein or in the DIP Documents, (x) in no event shall any DIP Lender be required to fund any amounts in excess of its DIP Commitment and (y) the

payment of any Allowed Professional Fees pursuant to the Carve Out shall not (i) reduce any Debtor's obligations owed to the DIP Secured Parties, the Prepetition Notes Agents, and the other Prepetition Secured Parties (whether under this Interim Order or otherwise) or (ii) modify, alter or otherwise affect any of the liens and security interests of such parties (whether granted under this Interim or otherwise) in the Prepetition Collateral or the DIP Collateral (or their claims against the Debtors).

36.    <u>Limitations on Use of DIP Proceeds, Cash Collateral, and Carve Out</u>.  No proceeds of the DIP Facility, the DIP Collateral, the Prepetition Collateral, the Carve Out, or any Cash Collateral may be used by the DIP Loan Parties or any other party in interest, or their representatives, to (or support any other party to) (a) for any purpose that is prohibited under the Bankruptcy Code or this Interim Order; (b) in any manner except as set forth in the DIP Budget; (c) directly or indirectly to finance in any way (i) any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type, or the investigation or preparation for any of the foregoing, that could be adverse to the interests of any or all of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties or (ii) any other action, which with the giving of notice or passing of time, would result in an Event of Default under the DIP Facility; and (d) to make any distribution under a chapter 11 plan that does not provide for the indefeasible payment of DIP Obligations and the Prepetition Term Loans in full in cash unless agreed by the Required DIP Lenders; *provided* that, advisors to the Committee, if one is appointed, may investigate the Prepetition Liens granted pursuant to, or any claims under or causes of action with respect to, the April 2026 Notes or the Prepetition Term Loans at an aggregate expense not to exceed $75,000, *provided*, *further*, that no portion of such amount may be used to prosecute any claims.

37.   <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order</u>.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, waived, or vacated by a subsequent order of this Court or any other court of competent jurisdiction, each of the DIP Secured Parties, and the respective Prepetition Secured Parties is entitled to the protections provided in section 364(e) of the Bankruptcy Code.  Any such modification, amendment, waiver, or vacatur shall not affect the validity and enforceability of any advances previously made, including advances made or deemed made hereunder, or any lien, claim, priority, or other DIP Protections, 507(b) Claims, or Adequate Protection Liens authorized or created hereby, unless such authorization and the incurring of such debt, or the granting of such priority or lien, is stayed pending appeal.  Any liens, claim, priority, or other DIP Protections, 507(b) Claims, or Adequate Protection Liens granted to the DIP Secured Parties and Prepetition Secured Parties, respectively, hereunder arising prior to the effective date of any such reversal, modification, amendment, or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including, without limitation, entitlement to all rights, remedies, privileges, and benefits granted herein; *provided* that this Interim Order was not stayed by court order after due notice had been given to the DIP Agent and the Prepetition Secured Parties at the time the advances were made or the liens, claims, priority, or other DIP Protections, 507(b) Claims, or Adequate Protection Liens were authorized and/or created.

38.   <u>DIP Interest, Fees, Costs, Indemnities, and Expenses</u>.  The DIP Obligations shall bear interest and incur premiums and fees at the rates, and be due and payable (and paid), as set forth in, and in accordance with the terms and conditions of, this Interim Order and the DIP Documents,

in each case without further notice, motion, or application to, order of, or hearing before, this Court. The Debtors shall pay all reasonable and invoiced fees, costs, indemnities, expenses (including reasonable and invoiced legal and other professional fees and expenses) of the DIP Secured Parties and respective DIP Lender Advisors and DIP Agent Advisors (each, as defined herein), and other charges payable under the terms of the DIP Documents to the DIP Secured Parties as and when due thereunder.   All such fees, costs, indemnities, expenses, and disbursements, whether incurred, paid or required to be paid prepetition or postpetition and whether or not budgeted in the Budget, are hereby affirmed, ratified, authorized, and payable (and any funds held by DIP Secured Parties, and their respective professionals as of the Petition Date for payment of such fees, costs, indemnities, expenses, and disbursements may be applied for payment) as contemplated in this Interim Order and the DIP Documents, and, subject to the provisions of this paragraph 38 with respect to the fees and expenses of the DIP Lender Advisors and DIP Agent Advisors, shall be non-refundable and not subject to challenge in any respect and shall be payable without need to obtain further Court approval.

39.   The Debtors shall, and are authorized and directed to, pay all reasonable and documented out-of-pocket costs and expenses of the DIP Secured Parties and the DIP Agent in connection with the DIP Facility (including, without limitation, costs and expenses incurred prior to the Petition Date) in accordance with the DIP Documents, and are authorized and directed to, pay in full in cash and in immediately available funds to the DIP Agent and the DIP Lenders, any and all reasonable and invoiced fees, costs, expenses, and charges of the DIP Lenders and the DIP Agent (including, without limitation, the expenses and disbursements of counsel and other third-party consultants and/or experts, including financial advisors) including, without limitation, fees, expenses, and disbursements incurred by (x) R&G and SOLIC, as advisors to the DIP Lenders

(collectively, the "DIP Lender Advisors") and (y) R&G, counsel to the DIP Agent, and any local counsel (the "DIP Agent Advisors"), including, in each case, (i) any unpaid reasonable and invoiced fees, costs, and expenses accrued prior to entry of this Interim Order (whether incurred before or after the Petition Date) immediately upon entry of this Interim Order without need to obtain further Court approval, and any unpaid reasonable and invoiced fees, costs, and expenses accrued after entry of this Interim Order, within ten (10) calendar days after the presentment of any such invoices to the Debtors, the U.S. Trustee, and counsel to any Committee, but subject to this paragraph 39 with respect to any postpetition reimbursement for postpetition professional fees. None of the foregoing fees, expenses and disbursements shall be subject to separate approval by this Court or require compliance with the U.S. Trustee fee guidelines, and no attorney or advisor to any of the DIP Secured Parties or Prepetition Secured Parties, or any recipient of any such payment shall be required to file any interim or final fee application with respect thereto or otherwise seek the Court's approval of any such payments.  Notwithstanding the foregoing, the Debtors are authorized and directed to pay on the Effective Date all reasonable and documented fees, costs, and expenses, including the fees and expenses of counsel to the DIP Lenders, the DIP Agent, and each of the Prepetition Secured Parties, incurred on or prior to such date without the need for any professional engaged by the DIP Lenders, the DIP Agent, the Prepetition Secured Parties to first deliver a copy of its invoice as provided for herein.

40.   Any time that a DIP Lender Advisor, a DIP Agent Advisor, or a Prepetition Advisor seeks payment of postpetition fees and expenses from the Debtors to the extent provided by this Interim Order, such professional shall deliver an invoice in summary form to the Debtors, the U.S. Trustee, and the Committee (which shall not be required to include time entry detail but shall include a summary regarding hours worked by each timekeeper for the applicable professional and

such timekeepers' hourly rates (except for financial advisors compensated on other than an hourly basis), and may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work-product doctrine; *provided* that the Debtors, U.S. Trustee, and the Committee (if any) reserve their rights to request additional detail regarding the services rendered and expenses incurred by such professionals, subject to redaction for privilege); *provided*, *further*, that notwithstanding the foregoing, the out-of-pocket expenses (including, without limitation, all attorneys' and other professionals' fees and expenses) incurred by the DIP Secured Parties, the DIP Lender Advisors, the DIP Agent Advisors, or any Prepetition Advisors, respectively, prior to and unpaid as of the Effective Date shall be paid indefeasibly upon the occurrence of the Effective Date without the DIP Agent, the DIP Secured Parties, the DIP Lender Advisors, the DIP Agent Advisors, and Prepetition Advisors being required to deliver an invoice in summary form as set forth herein (other than to the Debtors).

41.   If no written objection (such objection to be limited to the issue of the reasonableness of such fees and expenses) is received by 12:00 p.m., prevailing Eastern Time, on the date that is ten (10) calendar days after delivery (which may be by email) of such invoice to the Debtors, the U.S. Trustee, and any Committee, the Debtors shall promptly pay such fees and expenses in full. If an objection to a professional's invoice is timely received, the Debtors shall promptly pay in full the undisputed amount of the invoice, and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually.  The DIP Secured Parties, the DIP Lender Advisors, the DIP Agent Advisors, and Prepetition Advisors shall not be required to file applications or motions with, or obtain approval of, the Court for the

payment of any of their fees or out-of-pocket expenses (other than with respect to disputed amounts).  Any and all fees, commissions, costs, and expenses paid prior to the Petition Date by any Debtor to the DIP Agent, the Prepetition Notes Agents, the DIP Lenders, and the Prepetition Secured Parties, respectively, in connection with or with respect to the DIP Facility, the DIP Credit Agreement or the DIP Documents, the Prepetition Credit Agreement Documents, or the April 2026 Notes Documents, are hereby approved in full and non-refundable and shall not otherwise be subject to any Challenge.

42.   In consideration for the DIP Facility and the consent to the use of Cash Collateral in accordance with the terms of this Interim Order, effective as of the date of entry of this Interim Order, and without limiting any of the foregoing or any other provision of this Interim Order, the Backstop Commitment Letter, and any fees specified in any separate fee letter (including any agency fees) with respect to the DIP Facility, is, upon entry of this Interim Order and irrespective of any subsequent order approving or denying the DIP Facility or any other financing pursuant to section 364 of the Bankruptcy Code, fully entitled to all protections of section 364(e) of the Bankruptcy Code, and is deemed fully earned, non-refundable, irrevocable, and non-avoidable as of the date of this Interim Order.  Such premiums and fees shall be part of the DIP Obligations.

43.   Indemnification.   The DIP Secured Parties and the Prepetition Secured Parties, respectively, have acted in good faith and without negligence, misconduct, or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens, respectively, any challenges or objections to the DIP Facility, or the use of Cash Collateral, the DIP Documents, and all other documents related to and all transactions

contemplated by the foregoing. Accordingly, without limitation to any other right to indemnification, the Prepetition Secured Parties and DIP Secured Parties shall be and hereby are indemnified (as applicable) as provided in the respective April 2026 Notes Documents, the Prepetition Credit Agreement Documents, and the DIP Documents, as applicable. The Debtors agree that no exception or defense in contract, law, or equity exists as of the date of this Interim Order to any obligation set forth, as the case may be, of this Interim Order, the DIP Documents, the Prepetition Credit Agreement, or the April 2026 Notes Documents to indemnify and/or hold harmless the DIP Agent, any other DIP Secured Party, the Prepetition Notes Agents, the Prepetition Credit Agreement Agent, or any other Prepetition Secured Party, as the case may be, and any such defenses are hereby waived.

44.   <u>Proofs of Claim</u>. The Prepetition Secured Parties will not be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases for any claim allowed herein, including any claims arising under the April 2026 Notes Documents or the Prepetition Credit Agreement, as applicable. Upon approval of this Interim Order, the Prepetition Secured Parties shall be treated under section 502(a) of the Bankruptcy Code as if they filed a proof of claim. However, in order to facilitate the processing of claims, to ease the burden upon the Court and to reduce any unnecessary expense to the Debtors' estates, the Prepetition Collateral Agent and the Prepetition Credit Agreement are authorized (but not directed or required), in their sole discretion, to file in the Debtors' lead Chapter 11 Case *In re DocuData Solutions*, L.C., Case No. 25- 25-90023 (CML), a master proof of claim on behalf of the applicable Prepetition Secured Parties, on account of any and all of their respective claims arising under their April 2026 Notes Documents or the Prepetition Credit Agreement, as appliable, and hereunder (as applicable) (each, a "<u>Master Proof of Claim</u>") against each of the applicable Debtors. Upon the filing of any such Master Proof of Claim, the

Prepetition Collateral Agent and/or the Prepetition Credit Agreement Agent shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims of any type or nature whatsoever with respect to the applicable April 2026 Notes Documents or Prepetition Credit Agreement Documents, as applicable, and the claim of each applicable Prepetition Secured Party (and each of its successors and assigns), named in a Master Proof of Claim shall be treated as if such entity had filed a separate proof of claim in each of the Chapter 11 Cases of the applicable Debtors.  The Master Proofs of Claim shall not be required to attach any instruments, agreements, or other documents evidencing the obligations owing by the Debtors to the applicable Prepetition Secured Parties.  Any proof of claim filed by the Prepetition Collateral Agent or the Prepetition Credit Agreement Agent shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the Prepetition Secured Parties.  Any order entered by the Court in relation to the establishment of a bar date for any claim (including, without limitation, administrative claims) in any of the Chapter 11 Cases or any Successor Cases shall not apply to the Prepetition Secured Parties with respect to the April 2026 Notes Indebtedness or any claims arising under the April 2026 Notes Documents or the Prepetition Credit Agreement Indebtedness or any claims arising under the Prepetition Credit Agreement Documents.  Any fees or expenses incurred by the Prepetition Collateral Agent or the Prepetition Credit Agreement Agent in connection with filing such Master Proof of Claim shall be Adequate Protection Fees and Expenses, payable in accordance with this Interim Order.

45.   Effect of Stipulations on Third Parties.

(a)   *Generally*.  The Debtors' Stipulations and all other admissions, agreements, and releases contained in this Interim Order, including the releases set forth in paragraph 51 (the "**Releases**"), are and shall be irrevocably binding on the Debtors and any and all of the

Debtors' successors in interest and assigns in all circumstances and for all purposes upon entry of this Interim Order.  The Debtors' Stipulations and all other admissions, agreements, and Releases contained in this Interim Order, including the Releases, shall also be binding on all creditors and other parties in interest and all of their respective successors and assigns, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, including the Committee (if appointed), and any other person or entity acting or seeking to act on behalf of the Debtors' estates in all circumstances and for all purposes, unless, and solely to the extent (i) the Committee or a party in interest with the requisite standing (in each case, to the extent requisite standing is obtained pursuant to an order of this Court entered prior to the Challenge Deadline and subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to commence such proceeding) has timely commenced an appropriate proceeding or contested matter as required under the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules, including, without limitation, as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in this Interim Order, including this paragraph 45(a)) by the Challenge Deadline challenging any of the Debtors' Stipulations, the Releases, with respect to the April 2026 Notes Indebtedness or the Prepetition Credit Agreement Indebtedness (each such proceeding or contested matter, a "***Challenge***") and (ii) there is entered a final non-appealable order in favor of the plaintiff in any such timely and properly filed Challenge sustaining such Challenge; *provided,* that, any pleadings filed in connection with any Challenge shall set forth with specificity the basis for such Challenge (and any Challenges not so specified prior to the Challenge Deadline shall be deemed forever, waived, released, and barred).

(b)      If no such Challenge is timely and properly filed by a party in interest with the requisite standing and authority as contemplated herein prior to the Challenge Deadline or the

Court does not rule in favor of the plaintiff in any such proceeding, then (i) the Debtors' Stipulations and the Releases, shall nonetheless remain binding and preclusive (as provided in paragraph 45 hereof) on the Committee (if appointed) and on any other person or entity and the Debtors, (ii) the obligations of the Debtors under the April 2026 Notes Documents, including the April 2026 Notes Indebtedness, and the Prepetition Credit Agreement Documents, including the Prepetition Credit Agreement Indebtedness, in each case, shall constitute allowed claims not subject to defense, claim, counterclaim, recharacterization, subordination, recoupment, offset, or avoidance, for all purposes in the Chapter 11 Cases, (iii) the Prepetition Liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination, avoidance, or other defense, and (iv) the Prepetition Secured Indebtedness and the Prepetition Liens on the Prepetition Collateral shall not be subject to any other or further claim or challenge by any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any party in interest acting or seeking to act on behalf of the Debtors' estates and any defenses, claims, causes of action, counterclaims, and offsets by any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any other party acting or seeking to act on behalf of the Debtors' estates, (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors), whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties or their respective representatives arising out of or relating to any of the April 2026 Notes Documents, the April 2026 Notes Indebtedness, the Prepetition Credit Agreement Documents, the Prepetition Secured Indebtedness, the Prepetition Liens, or the Prepetition Collateral, as applicable, shall be deemed forever waived, released and barred, in each case except to the extent that such Debtors' Stipulations, admissions, agreements, and releases

contained in this Interim Order, including the Releases set forth in paragraph 51, were expressly and successfully challenged by such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction.

(c)     If any such Challenge is timely and properly filed prior to the Challenge Deadline by any statutory or non-statutory committee appointed or formed in the Chapter 11 Cases or any other person or entity, in each case, with requisite standing and authority, (i) any claim or action that is not brought shall forever be barred, and (ii) the Debtors' Stipulations, including the Releases, shall nonetheless remain binding and preclusive on each other statutory or non-statutory committee appointed or formed in the Chapter 11 Cases and on any other person or entity, except to the extent that such stipulations, admissions, agreements, and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction.

(d)     The "***Challenge Deadline***" shall mean (i) as to the Committee, sixty (60) days from the date of the formation of the Committee (if appointed) and (ii) if no Committee has been appointed, by any other party in interest with requisite standing seventy-five (75) days following the entry of this Interim Order.  The Challenge Deadline may be extended in writing prior to the expiration of the Challenge Deadline from time to time in the sole discretion of the Required DIP Lenders or by this Court for good cause shown pursuant to a motion filed by a party in interest prior to the expiration of the Challenge Deadline; provided, however, that if, prior to the Challenge Deadline (a) these Chapter 11 Cases are converted to chapter 7, or (b) a chapter 11 trustee is appointed, then in each case, the Challenge Deadline shall be extended for a period of sixty (60) days solely with respect to any such trustee; *provided, that*, the Challenge Deadline shall be tolled for fifteen (15) business days (or, if the Court is not available during the fifteen (15) day

period, to the first day after the Court is available) if the Committee seeking to file a Challenge files a motion, on an emergency basis, seeking standing to file a Challenge during the Challenge Period, which attaches a proposed Challenge. The Debtors and the Prepetition Secured Parties expressly consent to the motion seeking standing to file a Challenge to be heard on an emergency basis. The Debtors and Prepetition Secured Parties expressly waive any argument that the Committee is precluded from seeking derivative standing, or lacks standing if granted by an order, to pursue a Challenge under the Delaware LLC Act, any provision of any Debtors' organizational documents, or otherwise. The Court may fashion any appropriate remedy following a successful Challenge.

(e)      Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including the Committee (if appointed) or any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect the Debtors' Stipulations, admissions, agreements, and other Releases contained in this Interim Order with respect to the DIP Secured Parties and the Prepetition Secured Parties, including the Releases set forth in paragraph 51, to the DIP Secured Parties and the Prepetition Secured Parties, and all rights to object or to oppose such standing or any Challenge in any manner are expressly reserved.

(f)      For the avoidance of doubt, notwithstanding anything to the contrary in this Interim Order, upon the entry of this Interim Order, (i) the Challenge Deadline shall automatically be deemed to have lapsed as to the Debtors with regard to the Debtors' Stipulations, including the Releases, (ii) such stipulations, admissions, agreements, and other Releases shall be binding upon the Debtors, and (iii) any Challenges by the Debtors with respect to the Prepetition Secured Parties,

including with respect to the Releases as to the Prepetition Secured Parties, shall be deemed forever waived, released, and barred.

(g)    Any successor to the Debtors (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors or any other estate representative appointed in the Chapter 11 Cases or any Successor Cases) shall be bound by the terms of this Interim Order to the same extent as the Debtors, including with respect to the Releases.

46.    No Third-Party Rights.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

47.    Insurance.  Until the DIP Obligations have been indefeasibly paid in full, at all times the Debtors shall maintain casualty and loss insurance coverage for the Prepetition Collateral and the DIP Collateral on substantially the same basis as maintained prior to the Petition Date and shall name the DIP Agent as lender's loss payee or additional insured, as applicable, thereunder.

48.    Section 506(c) Claims.  Subject to and upon entry of this Interim Order, except to the extent of the Carve Out, no costs or expenses of administration that have been or may be incurred in the Chapter 11 Cases at any time shall be charged against the Prepetition Notes Agents, the Prepetition Credit Agreement Agent, or the DIP Agent, the other Prepetition Secured Parties or the other DIP Secured Parties, the Prepetition Collateral, DIP Collateral, or the Adequate Protection Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Agent (at the direction of the Required DIP Lenders), the Prepetition Notes Agents (at the direction of Required Consenting Creditors), or the Prepetition Credit Agreement (at the direction of the Required Lenders (as defined in the Prepetition Credit

Agreement)), as may be applicable, and no such consent shall be implied from any action, inaction, or acquiescence by any party.

49.  <u>No Marshaling or Application of Proceeds</u>.  Subject to entry of the Final Order (but retroactive to the Petition Date), the priorities set forth in this Interim Order (including, for the avoidance of doubt, **Exhibit B**), the DIP Credit Agreement, the April 2026 Notes Documents, the Prepetition Credit Agreement, and the Prepetition Intercreditor Agreement, in no event shall the DIP Agent, the DIP Secured Parties, the Prepetition Collateral Agent, the Prepetition Credit Agreement Agent, or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral, Adequate Protection Collateral, or the Prepetition Collateral, respectively, and the DIP Obligations, at the option of the Required DIP Lenders, to be exercised in their sole and absolute discretion, shall be repaid (a) first, from the DIP Collateral comprising Previously Unencumbered Property and (b) second, from all other DIP Collateral.

50.  <u>Section 552(b)</u>.  Subject to and upon entry of the Final Order (but retroactive to the Petition Date), and subject to the priorities set forth in this Interim Order (including, for the avoidance of doubt, **Exhibit B**), the DIP Secured Parties and the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception thereunder shall be waived by the Debtors, except for the benefit of the DIP Secured Parties or the Prepetition Secured Parties with respect to proceeds, products, offspring, or profits of any of the DIP Collateral or the Prepetition Collateral, respectively.

51.  <u>Releases</u>.  Upon entry of this Interim Order, but subject to the Challenge Deadline provided for herein (with respect to the Prepetition Secured Parties), in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each of the Debtors and

(subject to paragraph 45 hereof) each of their estates, on its own behalf and on behalf of its and their respective predecessors, successors, heirs, and past, present and future subsidiaries and assigns (collectively, the "*Releasing Parties*") hereby unconditionally and irrevocably releases, acquits, absolves, forever discharges and covenants not to sue the DIP Secured Parties, the Prepetition Secured Parties, and each such entities' current and former affiliates, and each such entity's current and former directors, officers, managers and equityholders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, and direct and indirect subsidiaries, and each of such entity's current and former officers, members, managers, directors, equityholders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, attorneys (including the DIP Advisors and Prepetition Advisors), independent contractors, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, and partners (including both general and limited partners) (the "*Released Parties*") and their respective property and assets from any and all acts and omissions of the Released Parties, and from any and all claims, interests, causes of action, Avoidance Actions, counterclaims, defenses, setoffs, demands, controversies, suits, judgments, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, objections, legal proceedings, equitable proceedings, executions of any nature, type, or description and liabilities whatsoever (including any derivative claims asserted or assertable on behalf of the Debtors, their estates, or such entities' successors or assigns, whether individually or collectively), which the Releasing Parties now have, may claim to have or may come to have against the Released Parties through the date of this Interim Order, at law or in equity, by statute or common law, in contract or in tort, including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all "claims" (as defined in the

Bankruptcy Code) and causes of action arising under the Bankruptcy Code, and (c) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether liquidated or unliquidated, fixed or contingent, known or unknown, suspected or unsuspected, disputed or undisputed, whether arising at law or in equity, including any recharacterization, recoupment, subordination, disallowance, avoidance, challenge, or other claim or cause of action arising under or pursuant to section 105, chapter 5, or section 724(a) of the Bankruptcy Code or under other similar provisions of applicable state, federal, or foreign laws, including, without limitation, any right to assert any disgorgement or recovery, and further waives and releases any defense, right of counterclaim, right of setoff, or deduction on the payment of the April 2026 Notes Indebtedness, the Prepetition Credit Agreement Indebtedness, or the DIP Obligations; *provided* that the foregoing shall not release any claims resulting from actual fraud, gross negligence, or willful misconduct of any Released Party as determined by a final, non-appealable judgment of a court of competent jurisdiction.   This paragraph is in addition to and shall not in any way limit any other release, covenant not to sue, or waiver by the Releasing Parties in favor of the Released Parties set forth in the Restructuring Support Agreement or the chapter 11 plan contemplated therein.   As of the entry of this Interim Order, the releases granted in this paragraph are final and binding and are not subject to a Challenge except as expressly outlined herein.

52.   Limits on Lender Liability.   Nothing in this Interim Order, any of April 2026 Notes Documents, the Prepetition Credit Agreement Documents, or the DIP Documents, or any other documents related thereto, shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or any of the Prepetition Secured Parties, respectively, of any liability for any claims arising from any activities by the Debtors in the operation of their

businesses or in connection with the administration of the Chapter 11 Cases or any Successor Cases. The DIP Secured Parties and the Prepetition Secured Parties shall not, solely by reason of having made loans under the DIP Facility or authorized the use of Cash Collateral, as applicable, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal or state statute). Nothing in this Interim Order or the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties, or any of the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors.

53. <u>Joint and Several Liability</u>. Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and all the DIP Obligations in accordance with the terms hereof and of the DIP Documents.

54. <u>Rights Preserved</u>. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the DIP Secured Parties' and the Prepetition Secured Parties', as applicable, right to seek any other or supplemental relief in respect of the Debtors (including, the right to seek additional or different adequate protection); (b) the rights of any of the Prepetition Secured Parties or the DIP Secured Parties to seek the payment by the Debtors of fees pursuant to section 506(b) of the Bankruptcy Code; or (c) any of the rights of the DIP Secured Parties and the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation,

the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases or Successor Cases, conversion of any of the Chapter 11 Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, (iii) seek an injunction, (iv) object to any sale of assets, or (v) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; *provided* that the rights of the DIP Secured Parties and the Prepetition Secured Parties, respectively, with respect to sections (a)–(c) of this paragraph shall be subject to the Prepetition Intercreditor Agreement and the agreements provided for in the Restructuring Support Agreement (only with respect to the signatories thereto), as applicable, and all rights of the Debtors and any other party in interest to oppose are also reserved.  Other than as expressly set forth in this Interim Order, any other rights, claims or privileges (whether legal, equitable or otherwise) of the Prepetition Secured Parties and DIP Secured Parties are preserved.

55.   <u>No Waiver by Failure to Seek Relief</u>.  The failure or delay on the part of any of the DIP Secured Parties or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents, the April 2026 Notes Documents, the Prepetition Credit Agreement Documents, or applicable law, as the case may be, shall not constitute a waiver of any of their respective rights hereunder, thereunder, or otherwise. No delay on the part of any party in the exercise of any right or remedy under this Interim Order shall preclude any other or further exercise of any such right or remedy or the exercise of any other right or remedy.  None of the rights or remedies of any party under this Interim Order shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the party against whom such amendment, modification, suspension, or waiver is sought.  No consents required hereunder

by any of the DIP Secured Parties or the Prepetition Secured Parties shall be implied by any inaction or acquiescence by any of the DIP Secured Parties or the Prepetition Secured Parties, respectively.

56.  <u>Binding Effect of Interim Order</u>.  The provisions of this Interim Order shall be binding upon and inure to the benefit of the Debtors, the DIP Secured Parties, the Prepetition Secured Parties, the Prepetition Notes Agents, the Prepetition Credit Agreement Agent, any Committee appointed in the Chapter 11 Cases, all other creditors of any of the Debtors, and all other parties in interest and, in each case, their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors whether in the Chapter 11 Cases or any Successor Case).  To the extent permitted by applicable law, this Interim Order shall bind any trustee hereafter appointed for the estate of any of the Debtors, whether in the Chapter 11 Cases or in the event of the conversion of any of the Chapter 11 Cases, any Successor Cases, or upon dismissal of any Chapter 11 Case or Successor Case, to a liquidation under chapter 7 of the Bankruptcy Code.  Such binding effect is an integral part of this Interim Order.

57.  <u>No Modification of Interim Order</u>.  Absent the prior written consent of the Required DIP Lenders and the Prepetition Credit Agreement Agent (solely to the extent that any modification or amendment to this Interim Order adversely impacts the Prepetition Secured Parties), as applicable, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly: (a)(i) any reversal, modification, stay, vacatur or amendment to this Interim Order; or (ii) a priority claim for any administrative expense or unsecured claim against

the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 503(b), 507(a), or 507(b) of the Bankruptcy Code) in any of the Chapter 11 Cases or Successor Cases, equal or superior to the DIP Superpriority Claims, the Securitization Program Superpriority Claims, the 507(b) Claims, the Adequate Protection Liens, other than the Carve Out, and except to the extent expressly provided in this Interim Order or the DIP Documents; (b) except as expressly set forth in this Interim Order, allowing use of Cash Collateral other than in accordance with the DIP Budget; and (c) except as expressly set forth in this Interim Order (including with respect to the Carve Out), any lien on any of the DIP Collateral or Prepetition Collateral with priority equal or superior to the DIP Liens or the Prepetition Liens.  Except as expressly set forth in this Interim Order, the Debtors irrevocably waive any right to seek any amendment, modification, or extension of this Interim Order without the prior written consent, as provided in the foregoing, of the DIP Agent (at the direction of the Required DIP Lenders), the Prepetition Credit Agreement Agent (at the direction of the Required Lenders (as defined in the Prepetition Credit Agreement, and solely to the extent that any modification or amendment to this Interim Order adversely impacts the Prepetition Secured Parties), and/or the Prepetition Notes Agents (at the direction of holders of a majority of the applicable April 2026 Notes Indebtedness), if applicable, and no such consent shall be implied by any other action, inaction, or acquiescence of the DIP Agent or any of the DIP Lenders, the Prepetition Notes Agents, and/or the Prepetition Secured Parties.

58.   Interim Order Controls.  In the event of any inconsistency between the terms and conditions of the April 2026 Notes Documents, the Prepetition Credit Agreement Documents, the DIP Documents and this Interim Order, the provisions of this Interim Order shall control.

59.   <u>Discharge Waiver</u>.   The DIP Obligations, the DIP Superpriority Claims, the DIP Liens, and the obligations of the Debtors with respect to adequate protection hereunder, including granting the Adequate Protection Liens and the 507(b) Claims, shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash or the discharge of DIP Obligations has otherwise occurred, on or before the effective date of such confirmed plan of reorganization, or each of the DIP Secured Parties, and the Prepetition Secured Parties, respectively, has otherwise agreed in writing.   Subject to the terms of the Restructuring Support Agreement and the DIP Documents, none of the Debtors shall propose or support any plan or sale of all or substantially all of the Debtors' assets or entry of any confirmation order or sale order without the consent of the DIP Secured Parties.

60.   <u>Survival</u>.   The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Chapter 11 Cases or Successor Cases.   The terms and provisions of this Interim Order, including, without limitation, the claims, liens, security interests and other protections granted to the DIP Secured Parties and Prepetition Secured Parties (including, with respect to the DIP Secured Parties, the DIP Protections) pursuant to this Interim Order and/or the DIP Documents, notwithstanding the entry of any such order, shall continue in the Chapter 11 Cases, in any Successor Cases, or following dismissal of the Chapter 11 Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until (i) the DIP Obligations have been indefeasibly paid in full in cash or the Discharge of

DIP Obligations has otherwise occurred and all commitments to extend credit under the DIP Facility are terminated, (ii) all Prepetition Secured Indebtedness have been indefeasibly paid in full in cash, and (iii) all letters of credit have been cancelled or otherwise terminated.  The terms and provisions in this Interim Order concerning indemnification shall continue in the Chapter 11 Cases and in any Successor Cases, following dismissal of the Chapter 11 Cases or any Successor Cases, following termination the DIP Documents and/or the repayment of the DIP Obligations.

61.    Headings.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

62.    Retention of Jurisdiction.   The Bankruptcy Court has and retains exclusive jurisdiction to resolve any dispute arising from or related to the interpretation or enforcement of the DIP Facility and/or this Interim Order.

SO ORDERED by the Court this ___ day of _____, 2025.


_____
THE HONORABLE [●]
UNITED STATES BANKRUPTCY JUDGE

## SCHEDULE 1

**Budget**

**DocuData Solutions, et al**
**Initial Budget**

($ in thousands)

| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | 13 Wk Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending: | 3/7 | 3/14 | 3/21 | 3/28 | 4/4 | 4/11 | 4/18 | 4/25 | 5/2 | 5/9 | 5/16 | 5/23 | 5/30 | 5/30 |
| Actual / Forecast: | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| **Receipts** | | | | | | | | | | | | | | |
| Receipts | $0 | $12,237 | $15,988 | $14,082 | $16,664 | $16,835 | $11,154 | $9,220 | $14,942 | $17,278 | $12,131 | $17,387 | $17,447 | $175,366 |
| **Total Receipts, Net** | - | 12,237 | 15,988 | 14,082 | 16,664 | 16,835 | 11,154 | 9,220 | 15,342 | 18,278 | 13,131 | 16,387 | 16,447 | 175,766 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Accounts Payable - Post Petition | (2,297) | (2,256) | (2,213) | (2,213) | (2,170) | (2,646) | (2,539) | (2,539) | (2,431) | (3,573) | (2,978) | (2,978) | (2,382) | (33,215) |
| Postage | (3,432) | (3,042) | (3,042) | (4,042) | (4,023) | (4,018) | (4,018) | (4,018) | (4,018) | (4,018) | (4,018) | (2,682) | (2,682) | (47,051) |
| Payroll & Benefits | (5,697) | (7,104) | (3,863) | (5,708) | (5,338) | (5,363) | (3,609) | (5,391) | (3,608) | (6,975) | (3,545) | (5,299) | (3,102) | (64,600) |
| Taxes | (1,434) | (1,327) | (1,572) | (1,149) | (2,298) | (1,600) | (966) | (541) | (384) | (314) | (324) | (314) | (236) | (12,458) |
| Foreign Operations | (2,359) | (1,670) | (707) | (125) | (3,135) | (461) | (1,041) | (152) | (3,143) | (933) | (969) | (271) | (3,519) | (18,484) |
| Other Disbursements | (848) | (1,627) | (595) | (470) | (1,271) | (1,202) | (590) | (290) | (910) | (1,202) | (290) | (290) | (470) | (10,054) |
| **Total Operating Disbursements** | (16,066) | (17,025) | (11,992) | (13,706) | (18,235) | (15,290) | (12,763) | (12,931) | (14,495) | (17,015) | (12,123) | (11,833) | (12,390) | (185,864) |
| **OPERATING CASH FLOW** | (16,066) | (4,788) | 3,996 | 376 | (1,571) | 1,545 | (1,609) | (3,710) | 848 | 1,263 | 1,007 | 4,554 | 4,056 | (10,098) |
| **Non-Operating Cash Flows** | | | | | | | | | | | | | | |
| Vendor Payments - Pre Petition | - | - | (1,754) | (1,754) | (1,754) | (1,754) | (1,754) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (14,769) |
| Interest and Financing Fees | (8,578) | - | - | (548) | (272) | - | - | - | (685) | (272) | - | - | (548) | (10,904) |
| Bankruptcy Related Payments | - | (350) | - | - | - | - | - | - | (500) | - | - | - | - | (850) |
| Professional Fees (Restructuring) | (1,125) | (1,125) | (1,125) | (2,775) | (875) | (2,675) | (875) | (2,525) | (580) | (580) | (1,900) | (580) | (2,230) | (18,970) |
| **Total Non-Operating Cash Flows** | (9,703) | (1,475) | (2,879) | (5,077) | (2,901) | (4,429) | (2,629) | (3,525) | (2,765) | (1,852) | (2,900) | (1,580) | (3,778) | (45,493) |
| **NET CASH FLOW** | ($25,769) | ($6,263) | $1,118 | ($4,701) | ($4,472) | ($2,884) | ($4,238) | ($7,235) | ($1,918) | ($589) | ($1,893) | $2,974 | $278 | ($55,591) |
| **Beginning Cash** | $100 | $24,331 | $18,068 | $19,186 | $44,485 | $40,013 | $37,130 | $32,892 | $25,657 | $23,739 | $23,150 | $21,257 | $24,231 | $100 |
| Net Cash Flow | (25,769) | (6,263) | 1,118 | (4,701) | (4,472) | (2,884) | (4,238) | (7,235) | (1,918) | (589) | (1,893) | 2,974 | 278 | (55,591) |
| DIP Funding / (Repayment) | 50,000 | - | - | 30,000 | - | - | - | - | - | - | - | - | - | 80,000 |
| **Ending Cash** | $24,331 | $18,068 | $19,186 | $44,485 | $40,013 | $37,130 | $32,892 | $25,657 | $23,739 | $23,150 | $21,257 | $24,231 | $24,509 | $24,509 |

Receipts / Disbursements / Non-Operating / Liquidity

# <u>EXHIBIT A</u>

**DIP Credit Agreement**

**SUPERPRIORITY PRIMING DEBTOR-IN-POSSESSION**

**FINANCING AGREEMENT**

**Dated as of March [•], 2025**

**by and among**

**EXELA INTERMEDIATE LLC,**

**a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code, as a Borrower**

**and**

**EXELA FINANCE INC.,**

**a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code, as a Borrower,**

**EACH AFFILIATED GUARANTOR AND EACH SUBSIDIARY OF BORROWERS LISTED AS A GUARANTOR ON THE SIGNATURE PAGES HERETO,**
**debtors and debtors-in-possession under Chapter 11 of the Bankruptcy Code, as Guarantors,**

**THE LENDERS FROM TIME TO TIME PARTY HERETO,**
**as Lenders,**

**and**

**ANKURA TRUST COMPANY, LLC,**
**as Administrative Agent and Collateral Agent**

## Table of Contents

                                                                                    **Page**

ARTICLE I DEFINITIONS; CERTAIN TERMS................................................................. 2

   Section 1.01   Definitions............................................................................................ 2

   Section 1.02   Terms Generally.................................................................................. 41

   Section 1.03   Certain Matters of Construction......................................................... 41

   Section 1.04   Accounting and Other Terms.............................................................. 42

   Section 1.05   Time References.................................................................................. 43

   Section 1.06   Obligation to Make Payments in Dollars............................................ 43

ARTICLE II THE LOANS........................................................................................... 43

   Section 2.01   Commitments and Roll-Up Loans ...................................................... 43

   Section 2.02   Making the Loans ............................................................................... 45

   Section 2.03   Repayment of Loans; Evidence of Debt ............................................. 46

   Section 2.04   Interest................................................................................................ 47

   Section 2.05   Prepayment of Loans ......................................................................... 48

   Section 2.06   Fees .................................................................................................... 50

   Section 2.07   [Reserved].......................................................................................... 50

   Section 2.08   [Reserved].......................................................................................... 50

   Section 2.09   Taxes .................................................................................................. 50

   Section 2.10   Increased Costs and Reduced Return.................................................. 53

   Section 2.11   [Reserved].......................................................................................... 55

   Section 2.12   [Reserved].......................................................................................... 55

   Section 2.13   [Reserved].......................................................................................... 55

   Section 2.14   Exit Facility Closing .......................................................................... 55

ARTICLE III [INTENTIONALLY OMITTED]............................................................. 56

ARTICLE IV APPLICATION OF PAYMENTS; DEFAULTING LENDERS; JOINT AND SEVERAL LIABILITY OF BORROWERS................................................................... 56

   Section 4.01   Payments; Computations and Statements ........................................... 56

   Section 4.02   Sharing of Payments .......................................................................... 56

   Section 4.03   Apportionment of Payments .............................................................. 57

   Section 4.04   Defaulting Lenders............................................................................. 58

   Section 4.05   Administrative Borrower; Joint and Several Liability of the Borrowers.......... 59

ARTICLE V CONDITIONS TO LOANS...................................................................... 60

Section 5.01   Conditions Precedent to Effectiveness and Funding Interim DIP New Money Loans 60

Section 5.02   Conditions to Availability of All New Money Loans......................................... 63

ARTICLE VI REPRESENTATIONS AND WARRANTIES ....................................................... 64

Section 6.01   Representations and Warranties.......................................................................... 64

ARTICLE VII COVENANTS OF THE LOAN PARTIES AND OTHER COLLATERAL MATTERS ............................................................................................................................ 73

Section 7.01   Affirmative Covenants ...................................................................................... 73

Section 7.02   Negative Covenants .......................................................................................... 82

Section 7.03   [Reserved] ........................................................................................................ 100

Section 7.04   Additional Covenants Applicable to the Affiliated Guarantors..................... 100

Section 7.05   Additional Covenants Applicable to XBP Parent and the other XBP Entities 102

ARTICLE VIII [INTENTIONALLY OMITTED] ..................................................................... 102

ARTICLE IX EVENTS OF DEFAULT ..................................................................................... 102

Section 9.01   Events of Default .............................................................................................. 102

ARTICLE X AGENTS ................................................................................................................ 108

Section 10.01   Appointment .................................................................................................... 108

Section 10.02   Nature of Duties; Delegation ......................................................................... 109

Section 10.03   Rights, Exculpation, Etc ................................................................................ 111

Section 10.04   Reliance............................................................................................................ 113

Section 10.05   Indemnification ............................................................................................... 113

Section 10.06   [Reserved] ....................................................................................................... 114

Section 10.07   Successor Agent .............................................................................................. 114

Section 10.08   Collateral Matters........................................................................................... 115

Section 10.09   Agency for Perfection ..................................................................................... 117

Section 10.10   No Reliance on any Agent's Customer Identification Program ................. 117

Section 10.11   No Third-Party Beneficiaries ......................................................................... 117

Section 10.12   No Fiduciary Relationship .............................................................................. 117

Section 10.13   Reports; Confidentiality; Disclaimers........................................................... 118

Section 10.14   Collateral Custodian ....................................................................................... 118

Section 10.15   [Reserved] ....................................................................................................... 119

Section 10.16   [Reserved] ....................................................................................................... 119

Section 10.17   Administrative Agent May File Proofs of Claim........................................... 119

Section 10.18   Lender Direction ............................................................................................. 119

Section 10.19   [Reserved]........................................................................................................ 119

Section 10.20    Erroneous Distribution ................................................................ 120

ARTICLE XI GUARANTY ................................................................................... 122

Section 11.01    Guaranty .................................................................................... 122

Section 11.02    Guaranty Absolute ..................................................................... 122

Section 11.03    Waiver ........................................................................................ 123

Section 11.04    Continuing Guaranty; Assignments ............................................ 124

Section 11.05    Subrogation ................................................................................ 124

Section 11.06    Contribution ............................................................................... 124

ARTICLE XII MISCELLANEOUS ....................................................................... 125

Section 12.01    Notices, Etc ............................................................................... 125

Section 12.02    Amendments, Etc ....................................................................... 127

Section 12.03    No Waiver; Remedies, Etc ......................................................... 129

Section 12.04    Expenses; Taxes; Attorneys' Fees ............................................... 129

Section 12.05    Right of Set-off .......................................................................... 130

Section 12.06    Severability ................................................................................ 131

Section 12.07    Assignments and Participations ................................................. 131

Section 12.08    Counterparts .............................................................................. 134

Section 12.09    Governing Law ........................................................................... 134

Section 12.10    Consent to Jurisdiction; Service of Process and Venue .............. 134

Section 12.11    Waiver of Jury Trial, Etc ............................................................ 135

Section 12.12    Consent by the Agents and Lenders ............................................ 136

Section 12.13    No Party Deemed Drafter ........................................................... 136

Section 12.14    Reinstatement; Certain Payments ............................................... 136

Section 12.15    Indemnification; Limitation of Liability for Certain Damages .... 136

Section 12.16    Records ...................................................................................... 137

Section 12.17    Binding Effect ............................................................................ 137

Section 12.18    Highest Lawful Rate ................................................................... 138

Section 12.19    Confidentiality ........................................................................... 139

Section 12.20    Platform; Borrower Materials. .................................................... 139

Section 12.21    Public Disclosure ....................................................................... 141

Section 12.22    Integration .................................................................................. 142

Section 12.23    USA PATRIOT Act ..................................................................... 142

Section 12.24    Judgment Currency ..................................................................... 142

Section 12.25    Waiver of Immunity .................................................................... 142

Section 12.26    English Language.........................................................................143

Section 12.27    Conflicts.......................................................................................143

Section 12.28    Restructuring Term Sheet .............................................................143

<u>SCHEDULE AND EXHIBITS</u>

Schedule 1.01(A)            Lenders and Lenders' Commitments and Roll-Up Loans
Schedule 1.01(B)            Facilities
Schedule 6.01(e)            Capitalization; Subsidiaries
Schedule 6.01(f)            Litigation
Schedule 6.01(i)            ERISA
Schedule 6.01(l)            Nature of Business
Schedule 6.01(p)            Labor Matters
Schedule 6.01(q)            Environmental Matters
Schedule 6.01(r)            Insurance
Schedule 6.01(u)            Intellectual Property
Schedule 7.02(a)            Existing Liens
Schedule 7.02 (k)(iii)(1)   Contractual Encumbrances or Restrictions
Schedule 7.02(v)            Existing Indebtedness
Exhibit A                   Form of Election Joinder
Exhibit B                   Form of Assignment and Acceptance
Exhibit C                   Form of Notice of Borrowing
Exhibit D                   Restructuring Term Sheet
Exhibit E                   Form of Compliance Certificate
Exhibit F                   Form of Initial DIP Budget
Exhibit G                   Form of Interim DIP Order
Exhibit H                   Form of Securitization Order
Exhibit 2.09(d)             Forms of U.S. Tax Compliance Certificate
Exhibit 2.14                Exit Facility Term Sheet

150146488_20

## FINANCING AGREEMENT

Superpriority Priming Debtor-In-Possession Financing Agreement, dated as of March [•], 2025, by and among Exela Intermediate LLC, a Delaware limited liability company ("Exela Intermediate"), Exela Finance Inc., Delaware corporation ("Exela Finance" and together with Exela Finance LLC, each as Debtors and debtors-in-possession under Chapter 11 of the Bankruptcy Code, each a "Borrower" and collectively, the "Borrowers"), each Affiliated Guarantor (such term and each other capitalized term used but not defined herein having the meaning given to it in Section 1.01) party hereto from time to time, as Debtors and debtors-in-possession under Chapter 11 of the Bankruptcy Code, each Guarantor party hereto from time to time, as Debtors and debtors-in-possession under Chapter 11 of the Bankruptcy Code, the Lenders from time to time party hereto, Ankura Trust Company, LLC ("Ankura"), as collateral agent for the Secured Parties (in such capacity, together with its successors and assigns in such capacity, the "Collateral Agent"), and Ankura, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "Administrative Agent" and together with the Collateral Agent, each an "Agent" and collectively, the "Agents").

## RECITALS

WHEREAS, the Loan Parties (as defined herein) have commenced voluntary cases (the "Chapter 11 Cases") under Chapter 11 of the Bankruptcy Code (as defined herein) in the United States Bankruptcy Court for the Southern District of Texas (Houston Division) (the "Bankruptcy Court"), and the Loan Parties continue to operate their businesses and manage their properties as debtors and debtors-in-possession (collectively, the "Debtors") pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Borrowers have asked the Lenders to make post-petition loans and advances to the Borrowers in the aggregate principal amount of $185,000,000, of which (x) will be comprised of $80,000,000 New Money Loans and (y) will be comprised of $105,000,000 Roll-Up Loans. The Lenders have severally, and not jointly, agreed to extend such credit to the Borrowers subject to the terms and conditions hereinafter set forth; and

WHEREAS, to provide security for the repayment of the Loans (as defined herein), and the payment of the other Obligations (as defined herein) of the Loan Parties hereunder and under the Loan Documents (as defined herein), the Loan Parties will provide and grant to the Collateral Agent, for its benefit and the benefit of the other Secured Parties, certain security interests, liens, and other rights and protections pursuant to the terms hereof, and security interests and liens pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, and super-priority administrative expense claims pursuant to Section 364(c)(1) of the Bankruptcy Code, and other rights and protections, as more fully described herein and the DIP Order; provided that, the Roll-Up Loans shall have the priority set forth in Exhibit B to the DIP Orders, which priority shall be junior to the Prepetition Financing Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein and in the other Loan Documents, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

150146488_20

# ARTICLE I

## DEFINITIONS; CERTAIN TERMS

Section 1.01    Definitions.  As used in this Agreement, the following terms shall have the respective meanings indicated below:

"Acceptable Disclosure Statement" means the disclosure statement relating to an Acceptable Reorganization Plan in form and substance acceptable to the Required Lenders in their sole discretion.

"Acceptable Reorganization Plan" means a Plan of Reorganization for each of the Chapter 11 Cases in form and substance satisfactory to the Required Lenders in their sole discretion (and with respect to any provisions that affect the rights or duties of the Agents, to the Agents).

"Acquired Indebtedness" means, with respect to any specified Person:

(1)    Indebtedness of any other Person existing at the time such other Person is merged, consolidated or amalgamated with or into or became a Subsidiary of such specified Person, so long as no such Indebtedness was created or incurred in connection with, or in contemplation of, such merger, consolidated or amalgamation, and

(2)    Indebtedness secured by a Lien encumbering any asset acquired by such specified Person, so long as such Indebtedness secured thereby does not exceed the cost or fair market value, whichever is lower, of the asset being acquired on the date of acquisition.

Acquired Indebtedness will be deemed to have been Incurred, with respect to clause (1) of the preceding sentence, on the date such Person becomes a Subsidiary and, with respect to clause (2) of the preceding sentence, on the date of consummation of such acquisition of such assets.

"Action" has the meaning specified therefor in Section 12.12.

"Additional Amount" has the meaning specified therefor in Section 2.09(a).

"Administrative Agent" has the meaning specified therefor in the preamble hereto.

"Administrative Agent's Accounts" means one or more accounts designated by the Administrative Agent at a bank designated by the Administrative Agent from time to time as the accounts into which the Loan Parties shall make all payments to the Administrative Agent for the benefit of the Agents and the Lenders under this Agreement and the other Loan Documents.

"Administrative Borrower" has the meaning specified therefor in Section 4.05.

"Administrative Questionnaire" means an administrative questionnaire in a form supplied by or acceptable to the Administrative Agent.

"<u>Adverse Proceeding</u>" means any action, suit, proceeding (whether administrative, judicial or otherwise, governmental investigation or arbitration (whether or not purportedly on behalf of any Loan Party or any Subsidiary of the foregoing), at law or in equity, or before or by any Governmental Authority, domestic or foreign, whether pending or, to the knowledge of any Loan Party, threatened against Loan Party or any Subsidiary of the foregoing or any property thereof

"<u>Affiliate</u>" means, with respect to any Person, any other Person that directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the Equity Interests having ordinary voting power for the election of members of the Board of Directors of such Person or (b) direct or cause the direction of the management and policies of such Person whether by contract or otherwise. Notwithstanding anything herein to the contrary, in no event shall any Agent or any Lender be considered an "Affiliate" of any Loan Party.

"<u>Affiliated Guarantors</u>" means, collectively, Neon Parent, each other Neon Entity and XBP Parent, in each case, only (i) for so long as any such Person remains a guarantor under this Agreement pursuant to the terms hereof and (ii) so long it is a Debtor in the Chapter 11 Cases.

"<u>After-Acquired Property</u>" means any property or assets (other than Excluded Property) of the Borrowers, any Guarantor or any Affiliated Guarantor that secures or is required to secure any Obligations that is not already subject to the Lien under the Collateral Documents.

"<u>Agent</u>" and "<u>Agents</u>" have the respective meanings specified therefor in the preamble hereto.

"<u>Agreement</u>" means this Financing Agreement, including all amendments, modifications and supplements and any exhibits or schedules to any of the foregoing, and shall refer to the Agreement as the same may be in effect at the time such reference becomes operative.

"<u>Ankura</u>" has the meaning specified therefor in the preamble hereto.

"<u>Anti-Corruption Laws</u>" means all Requirements of Law concerning or relating to bribery or corruption, including, without limitation, the United States Foreign Corrupt Practices Act of 1977, as amended, the UK Bribery Act of 2010, and the anti-bribery and anti-corruption laws and regulations of those jurisdictions in which the Loan Parties do business.

"<u>Anti-Money Laundering Laws</u>" means all Requirements of Law concerning or relating to terrorism or money laundering, including, without limitation, the Money Laundering Control Act of 1986 (18 U.S.C. §§ 1956-1957), the USA PATRIOT Act and the Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act," 31 U.S.C. §§ 5311-5332 and 12 U.S.C. §§ 1818(s), 1820(b) and §§ 1951-1959) and the rules and regulations thereunder, and any law prohibiting or directed against the financing or support of terrorist activities (*e.g.*, 18 U.S.C. §§ 2339A and 2339B).

"<u>Approved Budget</u>" means, initially, the Initial DIP Budget and thereafter, the most recent budget for the Borrowers and the other Debtors substantially in the form of the Initial DIP

Budget for the following 13 calendar weeks delivered by the Borrowers and approved by the Required Lenders (email from the Lender Advisors being sufficient) in accordance with Section 7.01(a)(xx); provided that if the Required Lenders objects to such Approved Budget, the Loan Parties and the Required Lenders will work in good faith to reconcile the Approved Budget.

"Assignment and Acceptance" means an assignment and acceptance entered into by an assigning Lender and an assignee, and accepted by the Administrative Agent, in accordance with Section 12.07 hereof and substantially in the form of Exhibit B hereto or such other form acceptable to the Administrative Agent.

"Authorized Officer" means, with respect to any Person, the chief executive officer, chief operating officer, chief financial officer, treasurer or other financial officer performing similar functions, president or executive vice president of such Person.

"Backstop Commitment Lenders" means each of the Backstop Commitment Parties as defined in the Backstop Commitment Letter.

"Backstop Commitment Letter" means that certain Senior Secured Superpriority Priming Debtor-In-Possession and Exit Credit Facilities Backstop Commitment Letter, dated as of March 3, 2025, by the Backstop Commitment Parties and agreed to and accepted by the Borrowers.

"Bankruptcy Code" means, as applicable, Title 11 of the U.S. Code (11 U.S.C. § 101 et seq), as now and hereafter in effect, or any successor statute, and any rule or regulation issued thereunder.

"Bankruptcy Court" has the meaning specified therefor in the recitals hereto.

"Board" means the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Board of Directors" means with respect to (a) any corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board, (b) a partnership, the board of directors of the general partner of the partnership, (c) a limited liability company, the managing member or members or any controlling committee or board of directors of such company or the sole member or the managing member thereof, and (d) any other Person, the board or committee of such Person serving a similar function.

"Borrower" and "Borrowers" have the respective meanings specified therefor in the preamble hereto.

"Borrower Materials" has the meaning specified therefor in Section 12.20.

"BTC" means BTC International Holdings, Inc., a Delaware corporation and any successor or subsidiary thereof that is a direct or indirect holder of the Equity Interests of XBP Europe.

"Budget Event" means (a) the actual amount of aggregate operating disbursements and expenditures (excluding professional fees and expenses) during any Budget Testing Period

exceeding the projected operating disbursements in the Approved Budget for such Budget Testing Period by an amount greater than the Permitted Variance or (b) the actual amount of aggregate cash receipts during any Budget Testing Period being less than the projected amount of cash receipts in the Budget for such Budget Testing Period by an amount greater than the Permitted Variance; provided that amounts not used in any Budget Testing Period may be carried forward and used in the following Budget Testing Period.

"Budget Testing Period" (a) for aggregate operating disbursements (i) on the second Reporting Date (as defined herein) the two-week period ended the Friday prior thereto; (ii) on the third Reporting Date, the three-week period ended the Friday prior thereto; and (iii) for each Reporting Date thereafter, the four-week period ended on the Friday prior thereto and (b) for aggregate receipts, (i) on the third Reporting Date, the three-week period ended the Friday prior thereto; and (ii) on the fourth Reporting Date and each Reporting Date thereafter, the four-week period ended on the Friday prior thereto.

"Business Day" means any day that is not a Saturday, Sunday or any day which is a federal holiday or any other day on which banks are authorized or required by any Requirement of Law to close in New York.

"Capital Stock" means:

(1)     in the case of a corporation, corporate stock or shares;

(2)     in the case of an association or business entity, any and all shares,

(3)     interests, participations, rights or other equivalents (however designated) of corporate stock;

(4)     in the case of a partnership or limited liability company, partnership or

(5)     membership interests (whether general or limited); and

(6)     any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"Capitalized Lease Obligations" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) in accordance with GAAP; provided, that obligations of the Borrowers or their Subsidiaries, or of a special purpose or other entity not consolidated with the Borrowers or their Subsidiaries, either existing on the Effective Date or created thereafter that (a) initially were not included on the consolidated balance sheet of the Borrowers as capital lease obligations and were subsequently recharacterized as capital lease obligations or, in the case of such a special purpose or other entity becoming consolidated with the Borrowers and their respective Subsidiaries were required to be characterized as capital lease obligations upon such consolidation, in either case, due to a change in accounting treatment or otherwise, or (b) did not exist on the Effective Date and were required to be characterized as capital lease obligations but would not have been required to be treated as

capital lease obligations on the Effective Date had they existed at that time, shall for all purposes not be treated as Capitalized Lease Obligations or Indebtedness.

"Cash Equivalents" means:

(1)     U.S. dollars, pounds sterling, euros, the national currency of any member state in the European Union or such local currencies held by an entity from time to time in the ordinary course of business;

(2)     securities issued or directly and fully guaranteed or insured by the U.S. government or any country that is a member of the European Union or any agency or instrumentality thereof in each case maturing not more than two years from the date of acquisition;

(3)     certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances, in each case with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank having capital and sur*plus* in excess of $250,000,000 and whose long-term debt is rated "A" or the equivalent thereof by Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency);

(4)     repurchase obligations for underlying securities of the types described in clauses (2) and (3) above entered into with any financial institution meeting the qualifications specified in clause (3) above;

(5)     commercial paper issued by a corporation (other than an Affiliate of the Borrower) rated at least "A-1" or the equivalent thereof by Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency) and in each case maturing within one year after the date of acquisition;

(6)     readily marketable direct obligations issued by any state of the United States of America or any political subdivision thereof having one of the two highest rating categories obtainable from either Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency) in each case with maturities not exceeding two years from the date of acquisition;

(7)     Indebtedness issued by Persons with a rating of "A" or higher from S&P or "A-2" or higher from Moody's (or reasonably equivalent ratings of another internationally recognized ratings agency) in each case with maturities not exceeding two years from the date of acquisition;

(8)     investment funds investing at least 95% of their assets in securities of the types described in clauses (1) through (7) above; and

(9)     instruments equivalent to those referred to in clauses (1) through (8) above denominated in any foreign currency comparable in credit quality and tenor to those referred to above and commonly used by corporations for cash management purposes in any jurisdiction outside the United States of America to the extent reasonably required in connection with any business conducted by any Subsidiary organized in such jurisdiction.

150146488_20

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation, judicial ruling, judgment or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided, that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives concerning capital adequacy promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities shall, in each case, be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means the occurrence of any of the following:

(1)    the sale, lease or transfer, in one or a series of related transactions, of all or substantially all the assets of the Borrowers and their respective Subsidiaries, taken as a whole, to a Person;

(2)    the Borrowers become aware (by way of a report or any other filing pursuant to Section 13(d) of the Exchange Act, proxy, vote, written notice or otherwise) of the direct or indirect acquisition by any Person or group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision), including any group acting for the purpose of acquiring, holding or disposing of securities (within the meaning of Rule 13d-5(b)(1) under the Exchange Act), in a single transaction or in a related series of transactions, by way of merger, consolidation, amalgamation or other business combination or purchase of beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act, or any successor provision), of more than 50% of the total voting power of the Voting Stock of Exela Intermediate; or

(3)    Exela Intermediate ceases to own 100% of the total voting power of the Voting Stock of Exela Finance.

"Chapter 11 Cases" has the meaning specified therefor in the recitals hereto.

"Claims Administration Arrangements" means any and all arrangements entered into by any Borrower or any of its Subsidiaries and any Claims Administration Bank whereby short-term loans (which loans shall be secured solely by Claim Administration Liens) are made by such Claims Administration Bank to any Borrower or any of its Subsidiaries; provided, that the proceeds of such loans are deposited in one or more segregated deposit or securities accounts and are solely used to purchase Claims Administration Investments (which shall be held in such segregated accounts) and pay transaction costs in connection therewith.

"Claims Administration Bank" means any third-party financial institution meeting the qualifications specified in clause (3) of the definition of "Cash Equivalents" that is designated by any Borrower or any of its Subsidiaries to hold and distribute certain legal settlement funds

administered by any Borrower or its Subsidiaries in connection with the Borrowers' claims administration business.

"Claims Administration Indebtedness" means Indebtedness for borrowed money of any Borrower or any of its Subsidiaries in favor of the Claims Administration Bank in respect of loans made pursuant to Claims Administration Arrangements.

"Claims Administration Investments" means Cash Equivalents invested with proceeds of Claims Administration Indebtedness.

"Claims Administration Liens" means Liens in favor of the Claims Administration Bank on Claims Administration Investments and related segregated deposit and securities accounts securing Claims Administration Indebtedness solely to the extent the amount of such Claims Administration Investment equals or exceeds the amount of such Claims Administration Indebtedness.

"Collateral" means all of the property and assets and all interests therein and proceeds thereof now owned or hereafter acquired by any Person upon which a Lien is granted or purported to be granted by such Person as security for all or any part of the Obligations.

"Collateral Agent" has the meaning specified therefor in the preamble hereto.

"Commitments" means, with respect to each Lender, the obligation of each Lender to make New Money Loans to the Borrowers hereunder, expressed as an amount representing the maximum principal amount of the New Money Loans to be made by such Lender under this Agreement, as such Commitment may be reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to an Assignment and Acceptance or an Election Joinder pursuant to Section 2.01(c). The initial amounts of the Commitments are set forth on Schedule 1.01A or, otherwise, in the Assignment and Acceptance, pursuant to which such Lender shall have assumed its Commitment, as the case may be. The initial aggregate amount of the Commitments is $80,000,000.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Compliance Certificate" means a Compliance Certificate, substantially in the form of Exhibit E, duly executed by an Authorized Officer of the Parent.

"Contingent Indemnity Obligations" means any Obligation constituting a contingent, unliquidated indemnification obligation of any Loan Party, in each case, to the extent (a) such obligation has not accrued and is not yet due and payable and (b) no claim has been made or is reasonably anticipated to be made with respect thereto.

"Contingent Obligations" means, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that do not constitute Indebtedness ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent:

(1)      to purchase any such primary obligation or any property constituting direct or indirect security therefor,

(2)      to advance or supply funds:

(a)      for the purchase or payment of any such primary obligation; or

(b)      to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; or

(3)      to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"CRO" has the meaning specified therefor in Section 7.01(r)(ii).

"Debtor Relief Law" means the Bankruptcy Code and any other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief law of the United States or other applicable jurisdiction from time to time in effect.

"Debtors" has the meaning set forth in the preamble.

"Deemed Date" has the meaning specified in Section 7.02(v)(iii)(B).

"Default" means an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Defaulting Lender" means any Lender that (a) has failed to (i) fund all or any portion of its Loans within 2 Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Administrative Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within 2 Business Days of the date when due, (b) has notified the Administrative Borrower and the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within 3 Business Days after written request by the Administrative Agent or the Administrative Borrower, to confirm in writing to the Administrative Agent and the Administrative Borrower that it will comply with its prospective funding obligations

9

hereunder (provided, that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Administrative Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity. Notwithstanding anything to the contrary herein, a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permits such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender upon delivery of written notice of such determination to the Administrative Borrower and each Lender.

"Designated Non-cash Consideration" means the Fair Market Value (as determined in good faith by the Borrower) of non-cash consideration received by the Borrowers or a Subsidiary in connection with a Disposition that is so designated as Designated Non-cash Consideration pursuant to an officer's certificate, setting forth such valuation, less the amount of Cash Equivalents received in connection with a subsequent sale of such Designated Non-cash Consideration.

"DIP Orders" means the Interim DIP Order and, upon entry thereof, the Final DIP Order, as applicable.

"DIP Superpriority Claims" means allowed superpriority expense claims pursuant to Bankruptcy Code Sections 364(c)(1), 503 and 507 granted by the DIP Orders.

"Disinterested Director" means Alan Carr, an disinterested director of Exela Intermediate.

"Disposition" means any transaction, or series of related transactions, pursuant to which any Person or any of its Subsidiaries sells, assigns, transfers, leases, licenses (as licensor) or otherwise disposes of any property or assets (whether now owned or hereafter acquired) to any other Person, in each case, whether or not the consideration therefor consists of cash, securities or other assets owned by the acquiring Person.  For purposes of clarification, "Disposition" shall include (a) the sale or other disposition for value of any contracts, (b) the early termination or modification of any contract resulting in the receipt by any Loan Party of a cash payment or other consideration in exchange for such event (other than payments in the ordinary course for accrued and unpaid amounts due through the date of termination or modification) or (c), any sale of merchant accounts (or any rights thereto (including, without limitation, any rights to any residual payment stream with respect thereto)) by any Loan Party.

"<u>Disqualified Stock</u>" means, with respect to any Person, any Capital Stock of such Person which, by its terms (or by the terms of any security into which it is convertible or for which it is redeemable or exchangeable), or upon the happening of any event:

(1)    matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise (other than as a result of a change of control or asset sale),

(2)    is convertible or exchangeable for Indebtedness or Disqualified Stock of such Person or any of its Subsidiaries, or

(3)    is redeemable at the option of the holder thereof, in whole or in part (other than solely as a result of a change of control or asset sale),

in each case prior to 91 days after the earlier of the Final Maturity Date or the date the Obligations are no longer outstanding; <u>provided</u>, <u>however</u>, that only the portion of Capital Stock which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock; <u>provided</u>, <u>further</u>, <u>however</u>, that if such Capital Stock is issued to any employee or to any plan for the benefit of employees of the Borrowers or its Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Stock solely because it may be required to be repurchased by such Person in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability; <u>provided</u>, <u>further</u>, that any class of Capital Stock of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of Capital Stock that is not Disqualified Stock shall not be deemed to be Disqualified Stock.

"<u>Dollar</u>," "<u>Dollars</u>" and the symbol "<u>$</u>" each means lawful money of the United States of America.

"<u>Domestic Subsidiary</u>" means a Subsidiary that is not a Foreign Subsidiary.

"<u>Effective Date</u>" has the meaning specified therefor in Section 5.01.

"<u>Electing DIP Lender</u>" has the meaning specified therefor in Section 2.01(c).

"<u>Election Deadline</u>" has the meaning specified therefor in Section 2.01(c).

"<u>Election Joinder</u>" has the meaning specified therefor in Section 2.01(c).

"<u>Eligible April 2026 Noteholder</u>" has the meaning specified therefor in Section 2.01(c).

"<u>Employee Plan</u>" means an employee benefit plan within the meaning of Section 3(3) of ERISA (other than a Multiemployer Plan), regardless of whether subject to ERISA, that any Loan Party or any of its ERISA Affiliates maintains, sponsors or contributes to or is obligated to contribute to.

"Environmental Claim" means any action, suit, complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter or other communication, from any Person or Governmental Authority relating to or arising out of any threatened, alleged or actual (a) violation of, non-compliance with, or liability under, any Environmental Law, or (b) the manufacture, use, handling, processing, distribution, labeling, generation, transportation, storage, treatment, Release, threatened Release, disposal or arranging for the disposal of, or exposure to, any Hazardous Materials.

"Environmental Law" means any Requirement of Law relating to, regulating or governing (i) the pollution or protection of the environment, any environmental media, natural resources, human health or safety, or (ii) the manufacture, use, handling, processing, distribution, labeling, generation, transportation, storage, treatment, Release, threatened Release, disposal or arranging for the disposal of, or exposure to, any Hazardous Materials.

"Environmental Liability" means all liabilities (contingent or otherwise, known or unknown), monetary obligations, losses (including monies paid in settlement), damages, natural resource damages, costs and expenses (including all reasonable fees, costs, client charges and expenses of counsel, experts and consultants), fines, penalties, sanctions and interest arising directly or indirectly as a result of, from, or based upon (a) any Environmental Claim, (b) any actual, alleged or threatened violation of  or non-compliance with any Environmental Law or Environmental Permit, (c) any actual, alleged or threatened Release of, or exposure to, Hazardous Materials, (d) any Remedial Action, (f) any adverse environmental condition or (g) any contract, agreement or other arrangement pursuant to which liability is assumed or imposed contractually or by operation of law with respect to any of the foregoing (a)-(f).

"Environmental Lien" means any Lien in favor of any Governmental Authority arising out of any Environmental Liability.

"Environmental Permit" means any permit, license, authorization, approval, registration or entitlement required by or issued pursuant to any Environmental Law or by any Governmental Authority pursuant to Environmental Law.

"Equity Interests" means (a) all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting and (b) all securities convertible into or exchangeable for any of the foregoing and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any of the foregoing, whether or not presently convertible, exchangeable or exercisable.

"Equity Issuance" means either (a) the sale or issuance by any Loan Party or any of its Subsidiaries of any shares of its Equity Interests or (b) the receipt by the Parent of any cash capital contributions.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute of similar import, and regulations thereunder, in each case, as

in effect from time to time.  References to sections of ERISA shall be construed also to refer to any successor sections.

"ERISA Affiliate" means, with respect to any Person, any trade or business (whether or not incorporated) which is a member of a group of which such Person is a member and which would be deemed to be a "controlled group" or under "common control" within the meaning of Sections 414(b), (c), (m) or (o) of the Internal Revenue Code or Sections 4001(a)(14) or 4001(b)(1) of ERISA.

"ERISA Event" means (a) the occurrence of a Reportable Event with respect to any Pension Plan; (b) the failure to meet the minimum funding standards of Section 412 or 430 of the Internal Revenue Code or Section 302 or 303 of ERISA with respect to any Pension Plan (whether or not waived in accordance with Section 412(c) of the Internal Revenue Code or Section 302(c) of ERISA) or the failure to make a contribution or installment required under Section 412 or Section 430(j) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (c) a determination that any Pension Plan is, or is expected to be, in "at risk" status (as defined in Section 430 of the Internal Revenue Code or Section 303 of ERISA); (d) a determination that any Multiemployer Plan is, or is expected to be, in "critical" or "endangered" status under Section 432 of the Internal Revenue Code or Section 305 of ERISA; (e) the filing of a notice of intent to terminate a Pension Plan or the treatment of an amendment to a Pension Plan as a termination under Section 4041 of ERISA; (f) the withdrawal by any Loan Party or any of its ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability to any Loan Party or any of its ERISA Affiliates pursuant to Section 4063 or 4064 of ERISA; (g) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition that might constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (h) the imposition of liability on any Loan Party or any of its ERISA Affiliates pursuant to Section 4062(e) or 4069(a) of ERISA or by reason of the application of Section 4212(c) of ERISA; (i) the withdrawal of any Loan Party or any of its ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan or the receipt by any Loan Party or any of its ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (j) the occurrence of an act or omission which could give rise to the imposition on any Loan Party or any of its ERISA Affiliates of fines, penalties, taxes or related charges under Sections 4975 or 4971 of the Internal Revenue Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Employee Plan; (k) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent, upon any Loan Party or any of its ERISA Affiliates; (l) the assertion of a claim (other than routine claims for benefits) against any Employee Plan or the assets thereof, or against any Loan Party or any of its ERISA Affiliates in connection with any Employee Plan or Multiemployer Plan; (m) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any such Pension Plan (or such other Employee Plan) to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; (n) the imposition on any Loan Party of any material fine, excise tax or penalty with respect to any Employee Plan or Multiemployer Plan

13

resulting from any noncompliance with any Requirements of Law; (o) the imposition of a Lien pursuant to Section 430(k) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan; or (p) the occurrence of any Foreign Plan Event.

"Erroneous Payment" has the meaning specified therefor in Section 10.20.

"Erroneous Payment Subrogation Rights" has the meaning specified therefor in Section 10.20.

"ETI" means Exela Technologies, Inc., a Delaware corporation.

"Event of Default" has the meaning specified therefor in Section 9.01.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Property" has the meaning specified therefor in the Security Agreement.

"Excluded Subsidiary" means, with respect to any Subsidiary of the Borrowers, (a) each Subsidiary that is prohibited from guaranteeing the Obligations by any requirement of law or that would require consent, approval, license or authorization of a governmental (including regulatory) authority to guarantee the Obligations (unless such consent, approval, license or authorization has been received), (b) any Special Purpose Securitization Subsidiary or (c) any Subsidiary that is not a Debtor in the Chapter 11 Cases.

"Excluded Swap Obligation" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason not to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time the guarantee of such Guarantor becomes effective with respect to such related Swap Obligation.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.09, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.09(d) and (d) any U.S. federal withholding Taxes imposed under FATCA.

14

"<u>Exela Finance</u>" has the meaning specified therefor in the preamble hereto.

"<u>Exela Intermediate</u>" has the meaning specified therefor in the preamble hereto.

"<u>Exit Facility</u>" means the Loans made pursuant to the Exit Facility Documents on or after the Exit Facility Closing Date.

"<u>Exit Facility Agent</u>" means the administrative agent and collateral agent under the Exit Facility.

"<u>Exit Facility Closing Date</u>" means the first date on which an Acceptable Reorganization Plan is consummated and becomes effective and the conditions to the effectiveness of the Exit Facility as set forth in the Exit Facility Documents are satisfied or waived in accordance with the terms thereof.

"<u>Exit Facility Documents</u>" has the meaning specified therefor in Section 2.14(c).

"<u>Exit Facility Loan Parties</u>" means the Loan Parties, its Subsidiaries and Affiliates that are obligors under the Exit Facility.

"<u>Exit Facility New Money Loans</u>" means the new money term loans or senior secured notes as set forth in <u>Exhibit 2.14</u> to be made by the Lenders under the Exit Facility on a *pro rata* basis in accordance with the proportion of (x) the outstanding principal amount of such Lender's New Money Loans hereunder on the Exit Facility Closing Date to (x) the aggregate outstanding principal amount of New Money Loans of all Lenders on the Exit Facility Closing Date.

"<u>Extraordinary Receipts</u>" means any cash received by the Parent or any of its Subsidiaries not in the ordinary course of business (and not consisting of proceeds described in Section 1.01(a)(ii) hereof), including, without limitation, (a) foreign, United States, state or local tax refunds, (b) pension plan reversions, (c) proceeds of insurance (other than to the extent such insurance proceeds are (i) immediately payable to a Person that is not the Parent or any of its Subsidiaries in accordance with applicable Requirements of Law or with Contractual Obligations entered into in the ordinary course of business or (ii) received by the Parent or any of its Subsidiaries as reimbursement for any out-of-pocket costs incurred or made by such Person prior to the receipt thereof directly related to the event resulting from the payment of such proceeds), (d) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (e) condemnation awards (and payments in lieu thereof), (f) indemnity payments (other than to the extent such indemnity payments are (i) immediately payable to a Person that is not an Affiliate of the Parent or any of its Subsidiaries or (ii) received by the Parent or any of its Subsidiaries as reimbursement for any costs previously incurred or any payment previously made by such Person) and (g) any purchase price adjustment received in connection with any purchase agreement.

"<u>Facility</u>" means the real property identified on Schedule 1.01(B) and any new Facility hereafter acquired by the Parent or any of its Subsidiaries, including, without limitation, the land on which each such facility is located, all buildings and other improvements thereon, and all fixtures located thereat or used in connection therewith.

"Fair Market Value" means, with respect to any asset or property, the price which could be negotiated in an arm's-length transaction, for cash, between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction.

"FASB ASC" means the Accounting Standards Codification of the Financial Accounting Standards Board.

"FATCA" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any fiscal, tax or regulatory legislation, rules or official practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of Sections 1471 through 1474 of the Internal Revenue Code and the Treasury Regulations thereunder.

"Federal Funds Rate" means, for any period, a fluctuating interest rate per annum equal to, for each day during such period, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Fee Letter" means the agency fee letter, dated as of the date hereof, among the Borrowers and the Agents.

"Final DIP Loan Date" means the date on which the conditions specified in Section 5.02 are satisfied (or waived in accordance herewith) and the Interim DIP New Money Loan is funded in accordance with the terms hereof.

"Final DIP New Money Loan" has the meaning specified therefor in Section 2.01(a).

"Final DIP New Money Loan Amount" has the meaning specified therefor in Section 2.01(a).

"Final DIP Order" means a final order of the Bankruptcy Court in the Chapter 11 Cases authorizing and approving this Agreement and the other Loan Documents under Sections 364(c) and (d) of the Bankruptcy Code on a final basis in form and substance satisfactory to the Agents (solely in respect of provisions relating to the Agents) and the Required Lenders (in their reasonable discretion).

"Final DIP Order Entry Date" means the date on which the Final DIP Order is entered by the Bankruptcy Court.

"Final Maturity Date" means the earliest of (a) July 1, 2025, (b) the date of the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of an Acceptable Reorganization Plan, (c) thirty-five (35) days after the Petition Date unless on or before such day the Final DIP Order shall have been entered by the Bankruptcy Court, (d) the date the Bankruptcy Court converts any of the Chapter 11 Cases to a Chapter 7 case, (e) the date the Bankruptcy Court dismisses any of the Chapter 11 Cases, (f) the date on which the Loan Parties consummate a sale of all or substantially all of the assets of the Loan Parties pursuant to section 363 of the Bankruptcy Code or otherwise, and (g) such earlier date on which the Loans shall become due and payable by acceleration or otherwise in accordance with the terms of this Agreement and the other Loan Documents; provided, that, in each case if such date is not a Business Day, the immediately preceding Business Day.

"Final Roll-Up Loans" has the meaning specified therefor in Section 2.01(b).

"Financial Statements" means (a) the audited consolidated balance sheet of the ETI and its Subsidiaries for the Fiscal Year ended December 31, 2023, and the related consolidated statement of operations, shareholders' equity and cash flows for the Fiscal Year then ended, and (b) the unaudited consolidated balance sheet of the ETI and its Subsidiaries for the Fiscal Year ended December 31, 2024, and the related consolidated statement of operations and shareholder's equity for the Fiscal Year then ended.

"Fiscal Year" means the fiscal year of ETI and its Subsidiaries ending on December 31 of each year.

"Foreign Lender" has the meaning specified therefor in Section 2.09(d).

"Foreign Plan" means any employee benefit plan, program, policy, arrangement or agreement maintained, sponsored or contributed to, or for which there is an obligation to contribute to, by any Loan Party or any of its ERISA Affiliates that is subject to any Requirements of Laws other than, or in addition to, the laws of the United States or any state thereof or the laws of the District of Columbia.

"Foreign Plan Event" means, with respect to any Foreign Plan, (a) the existence of unfunded liabilities in excess of the amount permitted under any Requirement of Law, or in excess of the amount that would be permitted absent a waiver from a Governmental Authority, (b) the failure to make any required contribution or payment under any Requirement of Law within the time permitted by any Requirement of Law for such contributions or payments, (c) the receipt of a notice from a Governmental Authority relating to the intention to terminate any such Foreign Plan or to appoint a trustee or similar official to administer any such Foreign Plan, or alleging the insolvency of any such Foreign Plan, (d) the incurrence of any liability by any Loan Party or any Subsidiary under any law on account of the complete or partial termination of such Foreign Plan or the complete or partial withdrawal of any participating employer therein, or (e) the occurrence of any transaction with respect to a Foreign Plan that is prohibited under any Requirement of Law and that could reasonably be expected to result in the incurrence of any liability by any Loan Party or any Subsidiary, or the imposition on any Loan Party or any Subsidiary of any fine, excise tax or penalty with respect to a Foreign Plan resulting from any noncompliance with any Requirement of Law.

"<u>Foreign Sovereign Immunities Act</u>" means the US Foreign Sovereign Immunities Act of 1976 (28 U.S.C. Sections 1602-1611), as amended.

"<u>Foreign Subsidiary</u>" means a Subsidiary not organized or existing under the laws of the United States of America or any state thereof or the District of Columbia.

"<u>GAAP</u>" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, which are in effect on the Effective Date. For the purposes of this Agreement, the term "<u>consolidated</u>" with respect to any Person shall mean such Person consolidated with its Subsidiaries.

"<u>Governing Documents</u>" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization, and the operating agreement; (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture, declaration or other applicable agreement or documentation evidencing or otherwise relating to its formation or organization, governance and capitalization; and (d) with respect to any of the entities described above, any other agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization.

"<u>Governmental Authority</u>" means any nation or government, any foreign, Federal, state, territory, provincial, city, town, municipality, county, local or other political subdivision thereof or thereto and any department, commission, board, bureau, instrumentality, agency or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"<u>Guaranteed Obligations</u>" has the meaning specified therefor in Section 11.01.

"<u>Guarantor</u>" means (a) Parent, (b) each Subsidiary of the Parent listed as a "Guarantor" on the signature pages hereto, (c) each Affiliated Guarantor, and (d) each other Person which guarantees, pursuant to Section 7.01(b) or otherwise, all or any part of the Obligations, and in each case of clauses (a) through (d), only to the extent each Person is a Debtor in the Chapter 11 Cases.

"<u>Guaranty</u>" means (a) the guaranty of each Guarantor party hereto contained in ARTICLE XI hereof and (b) each other guaranty, in form and substance satisfactory to the Required Lenders and the Collateral Agent, made by any other Guarantor in favor of the Collateral Agent for the benefit of the Secured Parties guaranteeing all or part of the Obligations.

"<u>Hazardous Material</u>" means any element, material, substance, waste, compound or chemical that is defined, listed or otherwise classified as a contaminant, pollutant, toxic or hazardous substance, hazardous waste, universal waste, special waste, or solid waste or is

18

otherwise characterized by words of similar import under any Environmental Law or that is regulated under, or for which liability or standards of care are imposed, pursuant to any Environmental Law, including, without limitation, petroleum, polychlorinated biphenyls; asbestos-containing materials, lead or lead-containing materials, urea formaldehyde-containing materials, radioactive materials, radon, per- and polyfluoroalkyl substances and mold.

"Hedging Obligations" means, with respect to any Person, the obligations of such Person under:

(1)     currency exchange, interest rate or commodity swap agreements, currency exchange, interest rate or commodity cap agreements and currency exchange, interest rate or commodity collar agreements; and

(2)     other agreements or arrangements designed to protect such Person against fluctuations in currency exchange, interest rates or commodity prices.

"Highest Lawful Rate" means, with respect to any Agent or any Lender, the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Obligations under laws applicable to such Agent or such Lender which are currently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than applicable laws now allow.

"Incur" means issue, assume, guarantee, incur or otherwise become liable for; provided, however, that any Indebtedness or Capital Stock of a Person existing at the time such Person becomes a Subsidiary (whether by merger, amalgamation, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Person at the time it becomes a Subsidiary. "Incurred" and "Incurrence" shall have correlative meanings.

"Indebtedness" means, with respect to any Person:

(1)     the principal of any indebtedness of such Person, whether or not contingent, (a) in respect of borrowed money, (b) evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof), (c) representing the deferred and unpaid purchase price of any property (except any such balance that constitutes (i) a trade payable or similar obligation to a trade creditor Incurred in the ordinary course of business, (ii) any earn-out obligations until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP and (iii) liabilities accrued in the ordinary course of business), which purchase price is due more than twelve months after the date of placing the property in service or taking delivery and title thereto, (d) in respect of Capitalized Lease Obligations, or (e) representing any Hedging Obligations, if and to the extent that any of the foregoing indebtedness would appear as a liability on a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

(2)     to the extent not otherwise included, any obligation of such Person to be liable for, or to pay, as obligor, guarantor or otherwise, the obligations referred to in clause (1) of another Person (other than by endorsement of negotiable instruments for collection in the ordinary course of business); and

19

(3)      to the extent not otherwise included, Indebtedness of another Person secured by a Lien on any asset owned by such Person (whether or not such Indebtedness is assumed by such Person); <u>provided</u>, <u>however</u>, that the amount of such Indebtedness will be the lesser of: (a) the Fair Market Value (as determined in good faith by the Borrower) of such asset at such date of determination, and (b) the principal amount of such Indebtedness of such other Person;

<u>provided</u>, <u>however</u>, that, notwithstanding the foregoing, Indebtedness shall be deemed not to include (1) Contingent Obligations incurred in the ordinary course of business and not in respect of borrowed money; (2) deferred or prepaid revenues; (3) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller; (4) Obligations under or in respect of Permitted Securitization Financings; (5) trade and other ordinary course payables, accrued expenses and intercompany liabilities arising in the ordinary course of business; (6) [reserved]; (7) obligations in respect of Third Party Funds; (8) in the case of the Borrowers and their respective Subsidiaries (x) all intercompany Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of business and (y) intercompany liabilities in connection with cash management, tax and accounting operations of the Borrowers and their respective Subsidiaries; (9) [reserved]; (10) any obligations under Hedging Obligations; and (11) any Claims Administration Indebtedness of the Borrowers and Subsidiaries (except to the extent that any such Claims Administration Indebtedness exceeds the Claims Administration Investments of such Person); <u>provided</u>, that such agreements are entered into for bona fide hedging purposes of the Borrowers or their Subsidiaries (as determined in good faith by the Board of Directors or senior management of the Borrowers, whether or not accounted for as a hedge in accordance with GAAP) and, in the case of any foreign exchange contract, currency swap agreement, futures contract, option contract or other similar agreement, such agreements are related to business transactions of the Affiliated Guarantors, the Borrowers or their Subsidiaries entered into in the ordinary course of business and, in the case of any interest rate protection agreement, interest rate future agreement, interest rate option agreement, interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedge agreement or other similar agreement or arrangement, such agreements substantially correspond in terms of notional amount, duration and interest rates, as applicable, to Indebtedness of the Affiliated Guarantors, the Borrowers or their Subsidiaries Incurred without violation of this Agreement.

Notwithstanding anything in this Agreement to the contrary, Indebtedness shall not include, and shall be calculated without giving effect to, the effects of Statement of Financial Accounting Standards No. 133 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this Agreement as a result of accounting for any embedded derivatives created by the terms of such Indebtedness; and any such amounts that would have constituted Indebtedness under this Agreement but for the application of this sentence shall not be deemed an Incurrence of Indebtedness under this Agreement.

"<u>Indemnified Matters</u>" has the meaning specified therefor in Section 12.15.

"<u>Indemnified Taxes</u>" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any Obligation any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

20

"Indemnitees" has the meaning specified therefor in Section 12.15.

"Initial DIP Budget" means a projected statement of receipts and operating disbursements for the Borrowers and the other Debtors as of the Petition Date for the following 13 calendar weeks, including the anticipated uses of the Loans, attached as Exhibit F hereto and delivered pursuant to Section 5.01(m).

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of any Debtor Relief Law.

"Intellectual Property" has the meaning specified therefor in the Security Agreement.

"Intellectual Property Contracts" means all agreements concerning Intellectual Property, including without limitation license agreements, technology consulting agreements, confidentiality agreements, co-existence agreements, consent agreements and non-assertion agreements.

"Intercompany Subordination Agreement" means an Intercompany Subordination Agreement made by the Parent and its Subsidiaries in favor of the Collateral Agent for the benefit of the Secured Parties, in form and substance satisfactory to the Collateral Agent and the Required Lenders.

"Interest Payment Date" has the meaning specified therefor in Section 2.04(d).

"Interim DIP New Money Loan" has the meaning specified therefor in Section 2.01(a).

"Interim DIP New Money Loan Amount" has the meaning specified therefor in Section 2.01(a).

"Interim DIP Order" means the order of the Bankruptcy Court in the Chapter 11 Cases authorizing and approving this Agreement and the other Loan Documents for an interim period under sections 364(c) and (d) of the Bankruptcy Code, in the form attached as Exhibit G hereto or otherwise in form and substance satisfactory to the Agents (solely in respect of provisions relating to the Agents) and the Required Lenders (in their reasonable discretion).

"Interim DIP Order Entry Date" means the date on which the Interim DIP Order is entered on the docket of the Bankruptcy Court.

"Interim Roll-Up Loans" has the meaning specified therefor in Section 2.01(b).

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended.

"Investment Grade Securities" means:

(1)     securities issued or directly and fully guaranteed or insured by the U.S. government or any agency or instrumentality thereof (other than Cash Equivalents),

(2)      securities that have a rating equal to or higher than Baa3 (or equivalent) by Moody's and BBB- (or equivalent) by S&P, but excluding any debt securities or loans or advances between and among the Borrowers and their respective Subsidiaries,

(3)      investments in any fund that invests exclusively in investments of the type described in clauses (1) and (2) which fund may also hold immaterial amounts of cash pending investment and/or distribution, and

(4)      corresponding instruments in countries other than the United States customarily utilized for high quality investments and in each case with maturities not exceeding two years from the date of acquisition.

"Investments" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees of loans), advances or capital contributions (excluding accounts receivable, trade credit and advances to customers and commission, travel and similar advances to officers, employees and consultants made in the ordinary course of business and any assets or securities received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss and any prepayments and other credits to suppliers made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person and investments that are required by GAAP to be classified on the balance sheet of such Person in the same manner as the other investments included in this definition to the extent such transactions involve the transfer of cash or other property.

"Lender Advisors" means Ropes & Gray LLP and SOLIC Capital Advisors, LLC.

"Lease" means any lease, sublease or license of, or other agreement granting a possessory interest in, real property to which any Loan Party or any of its Subsidiaries is a party as lessor, lessee, sublessor, sublessee, licensor or licensee.

"Lenders" means collectively, means (a) each financial institution and other persons listed on Schedule 1.01(A) as having Commitments and (b) each financial institution or other person that becomes a party hereto pursuant to an Election Joinder or Assignment and Assumption that shall hold Commitments or Loans, other than, in each case, any such financial institution or person that has ceased to be a party hereto pursuant to an Assignment and Assumption.

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or similar encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law (including any conditional sale or other title retention agreement or any lease in the nature thereof); provided, that in no event shall an operating lease or an agreement to sell be deemed to constitute a Lien.

"Loan" means the  New Money Loans and Roll-Up Loans made or deemed made by a Lender to the Borrowers pursuant to ARTICLE II hereof.

"<u>Loan Document</u>" means this Agreement, the DIP Orders, the Fee Letter, any Guaranty, the Intercompany Subordination Agreement, any Security Agreement, any landlord waiver, any collateral access agreement and any other agreement, instrument, certificate, report and other document executed and delivered pursuant hereto or thereto or otherwise evidencing or securing any Loan or any other Obligation.

"<u>Loan Party</u>" means any Borrower and any Guarantor.

"<u>Material Adverse Effect</u>" means a material adverse effect on any of (a) the operations, assets, liabilities, financial condition or prospects of the Loan Parties taken as a whole (excluding the Chapter 11 Cases and the events and conditions relating, leading up to, and/or resulting from the Chapter 11 Cases and any action required to be taken under the Loan Documents or the DIP Orders, and the Chapter 11 Cases themselves), (b) the ability of the Loan Parties taken as a whole to perform any of their obligations under any Loan Document, (c) the legality, validity or enforceability of this Agreement or any other Loan Document, (d) the rights and remedies of any Agent or any Lender under any Loan Document, or (e) the validity, perfection or priority of a Lien in favor of the Collateral Agent for the benefit of the Secured Parties on Collateral (taken as a whole).

"<u>Material Contract</u>" means, with respect to any Person, (a) each contract or agreement to which such Person or any of its Subsidiaries is a party involving aggregate consideration payable to or by such Person or such Subsidiary of $10,000,000 or more in any Fiscal Year (other than purchase orders in the ordinary course of the business of such Person or such Subsidiary and other than contracts that by their terms may be terminated by such Person or Subsidiary in the ordinary course of its business upon less than 60 days' notice without penalty or premium) and (b) all other contracts or agreements as to which the breach, nonperformance, cancellation or failure to renew by any party thereto could reasonably be expected to have a Material Adverse Effect.

"<u>Milestone</u>" has the meaning specified therefor in Section 7.01(r).

"<u>Moody's</u>" means Moody's Investors Service, Inc. or any successor to the rating agency business thereof.

"<u>Multiemployer Plan</u>" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which any Loan Party or any of its ERISA Affiliates has contributed, or has been obligated to contribute, to at any time during the preceding the six calendar years.

"<u>Neon Entity</u>" means, each of Neon Parent, Neon Acquisition, LLC, a Delaware limited liability company, Exela Enterprise Solutions, Inc. a Delaware corporation and Novitex Enterprise Solutions Canada, Inc., a Canadian corporation, and any future Subsidiary or successor of any of the foregoing, and "<u>Neon Entities</u>" means, collectively, all of the foregoing.

"<u>Neon Parent</u>" means Neon Acquisition, LLC, a Delaware limited liability company, together with any future Subsidiary or successor of the foregoing.

"<u>Neon Sale</u>" means, (i) any direct or indirect sale, disposition, monetization or other transfer of any assets or property of Neon Parent or the other Neon Entities (whether directly or

23

indirectly or synthetically, including through derivative transactions) and (ii) the sale, disposition, monetization or other transfer (whether directly, indirectly or synthetically, including through derivative transactions or by means of a transaction involving Neon Parent or any other entity that directly or indirectly owns equity interests in Neon Parent) of equity interests of Neon Parent or any Neon Entity by ETI or its subsidiaries. Notwithstanding the preceding, none of the following will be deemed to be a Neon Sale:

(1)     a sale, exchange or other disposition of cash or Cash Equivalents, or of obsolete, damaged, unnecessary, unsuitable or worn out equipment or other assets, in each case in the ordinary course of business, or dispositions of property no longer used, useful or economically practicable to maintain in the conduct of the business of the Neon Entities (including allowing any registrations or any applications for registrations of any intellectual property to lapse or become abandoned as otherwise permitted under this Agreement);

(2)     any transfer or disposition of property or assets or issuance or sale of Equity Interests by a Subsidiary of Neon Parent to Neon Parent or by Neon Parent or a Subsidiary of Neon Parent to another Subsidiary of Neon Parent;

(3)     the sale, lease, assignment, license or sublease of inventory, equipment, accounts receivable, notes receivable or other current assets held for sale in the ordinary course of business, liquidation of inventory in the ordinary course of business or the conversion of accounts receivable to notes receivable or dispositions of accounts receivable in connection with the collection or compromise thereof;

(4)     the lease, assignment, license, sublicense or sublease of any real or personal property in the ordinary course of business;

(5)     the surrender or waiver of obligations of trade creditors or customers or other contract rights that were incurred in the ordinary course of business of the Neon Entities, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer or compromise, settlement, release or surrender of a contract, tort or other litigation claim, arbitration or other dispute; and

(6)     dispositions arising from foreclosures, condemnation, eminent domain, seizure, nationalization or any similar action with respect to assets, or dispositions of property subject to casualty events.

"Net Cash Proceeds" means the aggregate cash proceeds received by an Affiliated Guarantor, the Borrowers or any Subsidiary in respect of any Disposition (including, without limitation, any cash received in respect of or upon the sale or other disposition of any Designated Non-cash Consideration received in any Disposition and any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise, but only as and when received, but excluding the assumption by the acquiring Person of Indebtedness relating to the disposed assets or other consideration received in any other non-cash form), net of the direct costs relating to such Disposition and the sale or disposition of such Designated Non-cash Consideration (including, without limitation, legal, accounting and investment banking fees, and brokerage and sales commissions), and any relocation expenses Incurred as a result thereof,

taxes paid or payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements related solely to such disposition), amounts required to be applied to the repayment of principal, premium (if any) and interest on Indebtedness required to be paid as a result of such transaction, and any deduction of appropriate amounts to be provided by the Borrowers as a reserve in accordance with GAAP against any liabilities associated with the asset disposed of in such transaction and retained by the Borrowers after such sale or other disposition thereof, including, without limitation, pension and other post- employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction, and payments made to holders of minority interests in Subsidiaries that are joint ventures as a result of such Disposition permitted by, or otherwise not prohibited by, the DIP Orders.

"New Money Loans" has the meaning specified therefor in Section 2.01(a).

"Notice of Borrowing" has the meaning specified therefor in Section 2.02(b).

"Obligations" means all present and future indebtedness, obligations, and liabilities of each Loan Party to the Secured Parties arising under or in connection with this Agreement or any other Loan Document, whether or not the right of payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured, unsecured, and whether or not such claim is discharged, stayed or otherwise affected by any proceeding referred to in Section 9.01. Without limiting the generality of the foregoing, the Obligations of each Loan Party under the Loan Documents include (a) the obligation (irrespective of whether a claim therefor is allowed in an Insolvency Proceeding) to pay principal, interest, charges, expenses, fees, premiums, attorneys' fees and disbursements, indemnities and other amounts payable by such Person under the Loan Documents, and (b) the obligation of such Person to reimburse any amount in respect of any of the foregoing that any Secured Party (in its sole discretion) may elect to pay or advance on behalf of such Person. Notwithstanding any of the foregoing, Obligations shall not include any Excluded Swap Obligations.

"OFAC" means the Office of Foreign Assets Control of the U.S. Department of the Treasury.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document.

"Parent" means Exela Technologies BPA, LLC, a Delaware limited liability company.

25

"Participant Register" has the meaning specified therefor in Section 12.07(i).

"PBGC" means the Pension Benefit Guaranty Corporation or any successor thereto.

"Pension Plan" means an Employee Plan that is subject to Section 412 of the Internal Revenue Code, Section 302 of ERISA or Title IV of ERISA maintained, sponsored or contributed to, or for which there is an obligation to contribute to, by any Loan Party or any of its ERISA Affiliates at any time during the preceding six calendar years.

"Perfection Certificate" means a certificate in form and substance satisfactory to the Agents and the Required Lenders providing information with respect to the property of each Loan Party.

"Permitted Dispositions" means:

(1)     sale of Inventory in the ordinary course of business of the Borrowers, any Subsidiary of the Borrowers, any Affiliated Guarantor, any other Neon Entity or any XBP Entity;

(2)     licensing, on a non-exclusive basis, Intellectual Property rights in the ordinary course of business of the Borrowers, any Subsidiary of the Borrowers, any Affiliated Guarantor, any other Neon Entity or any XBP Entity;

(3)     leasing or subleasing assets in the ordinary course of business of the Borrowers, any Subsidiary of the Borrowers, any Affiliated Guarantor, any other Neon Entity or any XBP Entity;

(4)     (i) the lapse of Registered Intellectual Property of the Borrowers, any Subsidiary of the Borrowers, any Affiliated Guarantor, any other Neon Entity or any XBP Entity to the extent not economically desirable in the conduct of their business or (ii) the abandonment of Intellectual Property rights in the ordinary course of their business so long as (in each case under clauses (i) and (ii)), (A) with respect to copyrights, such copyrights are not material revenue generating copyrights, and (B) such lapse is not materially adverse to the interests of the Secured Parties; and

(5)     so long as no Event of Default has occurred and is continuing or would result therefrom, transfers of assets (i) from the Borrowers, any Subsidiary of the Borrowers, any Affiliated Guarantor, any other Neon Entity or any XBP Entity (other than the Borrowers) to a Loan Party (other than the Parent), and (ii) from any Subsidiary of the Parent that is not a Loan Party to any other Subsidiary of the Parent.

"Permitted Investments" means:

(1)     any Investment in the Borrowers or any of its Subsidiaries that is Guarantor;

(2)     any Investment by either Borrower, any Subsidiary or any Neon Entity in Cash Equivalents or Investment Grade Securities for the account of such Person;

(3)     any Investment by any Borrower or any of its Subsidiaries in a Person if as a result of such Investment (a) such Person becomes a Subsidiary of the Borrowers that is a Guarantor, or (b) such Person, in one transaction or a series of related transactions, is merged, consolidated or amalgamated with or into, or transfers or conveys all or substantially all of its assets to, or is liquidated into, the Borrowers or a Subsidiary of the Borrowers that is a Guarantor;

(4)     any Investment in securities or other assets not constituting Cash Equivalents and received by either Borrower, any Subsidiary or any Neon Entity in connection with a Disposition made by such respective Person pursuant to Section 7.02(c)(ii) or any other disposition of assets not constituting a Disposition;

(5)     any Investment existing on, or made pursuant to binding commitments existing on, the Effective Date or an Investment consisting of any extension, modification or renewal of any Investment existing on the Effective Date, in each case, that is disclosed on Schedule 1 hereto;

(6)     advances of payroll payments, business related travel expenses, moving expenses and other similar expenses and expenses to employees in the ordinary course of business;

(7)     Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with or judgments against, customers and suppliers, in each case in the ordinary course of business of either Borrower, any Subsidiary or any Neon Entity or Investments acquired by any Neon Entity, any Borrower or any of its Subsidiaries as a result of a foreclosure by any Neon Entity, any Borrower or any of its Subsidiaries, respectively, with respect to any secured Investments or other transfer of title with respect to any secured Investment in default;

(8)     Hedging Obligations permitted under Section 7.02(v)(ii)(J);

(9)     Investments that are made in accordance with the Approved Budget (including Permitted Variances thereto);

(10)     [reserved];

(11)     [reserved];

(12)     Investments the payment for which consists of Equity Interests of the Borrowers (other than Disqualified Stock) or any direct or indirect parent of either Borrower, as applicable;

(13)     any transaction to the extent it constitutes an Investment that is permitted by and made in accordance with the provisions of Section 7.02(j)(ii) (except transactions described in clauses (B), (D), (I)(2) and (P) of Section 7.02(j)(ii);

(14)     [reserved];

(15)     (i) Investments consisting of the licensing or contribution of intellectual property (on a non-exclusive basis) pursuant to joint marketing arrangements with other Persons

27

in the ordinary course of business; (ii) Investments consisting of purchases and acquisitions of inventory, supplies, materials and equipment or purchases of contract rights or licenses (on a non-exclusive basis) or leases of intellectual property in each case in the ordinary course of business;

(16)    Investments in any Special Purpose Securitization Subsidiary consisting of Securitization Assets or the purchase price payable by such Special Purpose Subsidiary therefor, in each case, in connection with a Permitted Securitization Financing or arising as a result of Permitted Securitization Financings;

(17)    [reserved];

(18)    [reserved];

(19)    Investments in the ordinary course of business consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Uniform Commercial Code Article 4 customary trade arrangements with customers;

(20)    advances in the form of a prepayment of expenses, so long as such expenses are being paid in accordance with customary trade terms of the Affiliated Guarantors, the Borrowers or their Subsidiaries in the ordinary course of business;

(21)    any Investment consisting of intercompany current liabilities in connection with the cash management, tax and accounting operations of the Affiliated Guarantors, the Borrowers and their respective Subsidiaries;

(22)    [reserved];

(23)    [reserved];

(24)    Investments resulting from pledges and deposits referred to in clauses (1), (4), (21), (34) and (35) of the definition of "Permitted Liens";

(25)    (i) accounts receivable, security deposits and prepayments arising, and trade credit granted, in the ordinary course of business and (ii) any securities received in satisfaction or partial satisfaction of defaulted accounts receivable from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss; and

(26)    guarantees by the Affiliated Guarantors, the Borrowers or any Subsidiary of the Borrowers of operating leases (other than Capitalized Lease Obligations) or of other obligations that do not constitute Indebtedness, in each case, entered into by the Affiliated Guarantors, the Borrowers or any Subsidiary of the Borrowers in the ordinary course of business and in effect on the Petition Date.

"Permitted Liens" means, with respect to any Person:

(1)    pledges and deposits and other Liens made in the ordinary course of business in compliance with the Federal Employers Liability Act or any other workers' compensation, unemployment insurance and other social security laws or regulations and deposits

securing liability to insurance carriers under insurance or self-insurance arrangements in respect of such obligations and (ii) pledges and deposits and other Liens securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to such Person;

(2)     Liens imposed by law, such as landlord's, carriers', warehousemen's, mechanics', materialmen's, repairmen's, supplier's, construction or other like Liens securing obligations of any Neon Entity, the Borrowers or any Subsidiary that are not overdue by more than 30 days or that are being contested in good faith by appropriate proceedings and in respect of which, if applicable, such Neon Entity, the Borrowers or any Subsidiary of the Borrowers, respectively, shall have set aside on its books reserves in accordance with GAAP;

(3)     Liens for taxes, assessments or other governmental charges or levies not yet overdue by more than 15 days or that are being contested in good faith by appropriate proceedings;

(4)     deposits and other Liens by any Neon Entity, the Borrowers or any Subsidiary to secure the performance of bids, trade contracts (other than for Indebtedness), leases (other than Capitalized Lease Obligations), statutory obligations, surety and appeal bonds, performance and return of money bonds, bids, leases, government contracts, trade contracts, agreements with public utilities, and other obligations of a like nature (including letters of credit in lieu of any such bonds or to support the issuance thereof) incurred by such Person in the ordinary course of business, including those incurred to secure health, safety, insurance and environmental obligations in the ordinary course of business;

(5)     zoning restrictions, building codes and laws, survey exceptions, easements, trackage rights, leases (other than Capitalized Lease Obligations), licenses, special assessments, rights-of-way, covenants, conditions, restrictions and declarations on or with respect to the use of real property, servicing agreements, development agreements, site plan agreements and other similar encumbrances, in each case, incurred in the ordinary course of business and title defects or irregularities that are of a minor nature and that, in the aggregate, do not interfere in any material respect with the ordinary conduct of the business of the Affiliated Guarantors, the Borrowers or any Subsidiary of the Borrowers;

(6)     Liens in effect on the Petition Date securing obligations in respect of Indebtedness Incurred pursuant to Sections 7.02(v)(ii)(A)(1), Sections 7.02(v)(ii)(A)(4) and 7.02(v)(ii)(B); provided, that such Liens referred to in this clause (6) other than Liens securing Indebtedness pursuant to Section 7.02(v)(ii)(A)(4) shall be subordinated to the Liens securing the Obligations on terms acceptable to the Collateral Agent; and

(7)     Liens existing on the Effective Date and disclosed on Schedule 7.02(a) hereto (other than Liens in favor of the lenders under this Agreement);

(8)     Liens secured Indebtedness incurred under Section 7.02(v)(ii)(D) solely to the extent such Indebtedness is expressly permitted to be secured under the Approved Budget;

(9)     [reserved];

(10)     [reserved];

(11)     [reserved];

(12)     Liens by a Neon Entity, the Borrowers or any Subsidiary of the Borrowers on goods or inventory the purchase, shipment or storage price of which is financed by a documentary letter of credit, bank guarantee or bankers' acceptance issued or created for the account of such Neon Entity, the Borrowers or any Subsidiary of the Borrowers in the ordinary course of business and consistent with past practice; provided, that such Lien secures only the obligations of such Neon Entity, the Borrowers or such Subsidiaries in respect of such letter of credit, bank guarantee or banker's acceptance to the extent permitted under this Agreement;

(13)     leases and subleases not constituting Capitalized Lease Obligations of real property not material to the conduct of any business line of the Neon Entities, the Borrowers or any Subsidiary of the Borrowers granted to others in the ordinary course of business that do not interfere with the ordinary conduct of the business of the Neon Entities, the Borrowers or any Subsidiary of the Borrowers and which are set forth on Schedule 7.02(a);

(14)     Liens arising from precautionary Uniform Commercial Code financing statements or consignments entered into in connection with any transaction otherwise permitted under this Agreement;

(15)     Liens in favor of a Borrower or any Guarantor;

(16)     Liens in respect of Permitted Securitization Financings that extend only to the Securitization Assets subject thereto;

(17)     Liens securing the Obligations;

(18)     licenses of intellectual property and software that are not material to the conduct of any of the business lines of the Neon Entities, the Borrowers or any Subsidiary of the Borrowers and the value of which does not constitute a material portion of the assets of the Neon Entities, taken as a whole, or the Borrowers and their respective Subsidiaries, taken as a whole, respectively, and such license does not interfere with the ordinary course of conduct of the business of the Neon Entities, the Borrowers or any of its Subsidiaries;

(19)     [reserved];

(20)     non-consensual Liens (not incurred in connection with borrowed money) on equipment of any Neon Entity, any Borrower or any of its Subsidiaries granted in the ordinary course of business to any Neon Entity or the Borrowers' or such Subsidiary's client at which such equipment is located;

(21)     judgment and attachment Liens not giving rise to an Event of Default;

(22)     Liens arising out of consignment or similar arrangements for the sale of goods entered into in the ordinary course of business;

(23)     Liens that (i) are contractual rights of set-off (and related pledges) (a) relating to the establishment of depository relations with banks and other financial institutions not given in connection with the issuance of Indebtedness or (b) relating to pooled deposits, sweep accounts, reserve accounts or similar accounts of any Affiliated Guarantor, the Borrowers or any Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of such Affiliated Guarantor, the Borrowers or any Subsidiary, including with respect to credit card charge-backs and similar obligations, or (ii) relate to purchase orders and other agreements entered into with customers, suppliers or service providers of such Affiliated Guarantor, the Borrowers or any Subsidiary (a) in the ordinary course of business or (b) in connection with implementation of business optimization programs;

(24)     [reserved];

(25)     Liens on any amounts held by a trustee or agent under any indenture or other debt agreement issued in escrow pursuant to customary escrow arrangements pending the release thereof, or under any indenture or other debt agreement pursuant to customary discharge, redemption or defeasance provisions;

(25)     Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code in effect in the State of New York or similar provisions in similar codes, statutes or laws in other jurisdictions on items in the course of collection, (ii) attaching to commodity trading accounts, other commodity brokerage accounts or securities incurred in the ordinary course of business, (iii) in favor of banking institutions arising as a matter of law encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry, (iv) encumbering customary initial deposits and margin deposits and similar Liens attaching to brokerage accounts incurred in the ordinary course of business and not for speculative purposes, (v) in respect of Third Party Funds or (vi) in favor of credit card companies pursuant to agreements therewith;

(27)     [reserved];

(28)     any interest or title of a lessor or sublessor under any leases or subleases entered into by any Affiliated Guarantor, the Borrowers or any Subsidiary in the ordinary course of business;

(29)     Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights;

(30)     Liens on securities that are the subject of repurchase agreements constituting Cash Equivalents under clause (4) of the definition of "Cash Equivalents";

(31)     Liens securing insurance premium financing arrangements; provided, that such Liens are limited to the applicable unearned insurance premiums;

(32)     [reserved];

(33)     [reserved];

31

150146488_20

(34)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(35)     Liens solely on any cash earnest money deposits made by the Borrowers or any of their Subsidiaries in connection with any letter of intent or purchase agreement in respect of any Investment permitted under this Agreement;

(36)     Liens to secure cash management services in the ordinary course of business; provided, that such Liens are not incurred in connection with, and do not secure, any borrowings or Indebtedness;

(37)     [reserved];

(38)     Claims Administration Liens;

(39)     Liens on cash and Cash Equivalents on deposit with lenders and affiliates of lenders securing obligations owing to such Persons under any treasury, depository, overdraft or other cash management services agreements or arrangements with the Borrowers or any of their Subsidiaries; and

(40)     [reserved].

"Permitted Securitization Financing" means the "Securitization Program" under, and as defined in, the Securitization Order.

"Permitted Specified Liens" means Permitted Liens other than those described in clauses (6) and (17) of the definition of Permitted Liens.

"Permitted Variance" means, for purposes of testing whether a Budget Event has occurred during any Budget Testing Period, (x) for the second Budget Testing Period, not more than 20% of the aggregate operating disbursements, and on the third Budget Testing Period and thereafter, not more than 15% above the aggregate operating disbursements in such Approved Budget, and (y) for the third Budget Testing Period, not less than 20% of the aggregate cash receipts, and on the fourth Budget Testing Period and thereafter, not less than 15% of the aggregate cash receipts in such Approved Budget.

"Person" means an individual, corporation, limited liability company, partnership, association, joint-stock company, trust, unincorporated organization, joint venture or other enterprise or entity or Governmental Authority.

"Petition Date" means March 3, 2025.

"PIK Interest Amount" has the meaning specified therefor in Section 2.04(d).

"Plan of Reorganization" means a plan of reorganization with respect to the Loan Parties and their Subsidiaries pursuant to the Chapter 11 Cases.

"Platform" has the meaning specified therefor in Section 12.20.

32

"<u>Post-Default Rate</u>" means (a) with respect to principal of a Loan, a rate of interest per annum equal to the rate of interest otherwise in effect from time to time therefor pursuant to the terms of this Agreement plus 2.00%, or (b) otherwise, interest at the highest rate specified herein for any Loan then outstanding prior to an Event of Default plus 2.00%.

"<u>Preferred Stock</u>" means any Equity Interest with preferential right of payment of dividends or upon liquidation, dissolution, or winding up.

"<u>Prepetition Agent</u>" means Blue Torch Finance LLC, in its capacities as administrative agent and collateral agent under the Prepetition Financing Documents, or any successor administrative agent and collateral agent under the Prepetition Financing Documents.

"<u>Prepetition Financing Agreement</u>" means that certain term financing agreement, dated as of July 11, 2023 (as amended, supplemented or otherwise modified on or prior to the date hereof), by and among the Borrowers, the guarantors party thereto, the lenders party thereto and the Prepetition Agent.

"<u>Prepetition Financing Documents</u>" means the Prepetition Financing Agreement and the other "Loan Documents" as defined in the Prepetition Financing Agreement, including the Prepetition Intercreditor Agreement.

"<u>Prepetition 2026 Notes</u>" means Prepetition April 2026 Notes and the Prepetition July 2026 Notes.

"<u>Prepetition 2026 Notes Documents</u>" means Prepetition April 2026 Notes Documents and the Prepetition July 2026 Notes Documents.

"<u>Prepetition April 2026 Noteholders</u>" means the holders of the Prepetition April 2026 Notes.

"<u>Prepetition April 2026 Notes</u>" means the Borrowers' 11.500% First-Priority Senior Secured Notes due 2026 issued on July 11, 2023 pursuant to the Indenture, dated as of July 11, 2023, by and among the Borrowers, the subsidiary guarantors party thereto, U.S. Bank Trust Company, National Association, as trustee, as it may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof (the "<u>Prepetition April 2026 Notes Indenture</u>").

"<u>Prepetition April 2026 Notes Documents</u>" means the collective references to the Prepetition April 2026 Notes Indenture, the Prepetition April 2026 Notes issued pursuant thereto, and the guarantees and the collateral documents relating to the foregoing, as amended or supplemented, in whole or in part, from time to time, in each case, in accordance with the terms thereof.

"<u>Prepetition Intercreditor Agreement</u>" means the Super Senior Intercreditor Agreement, dated as of July 11, 2023 (as amended, supplemented or otherwise modified on or prior to the date hereof), by and among the Loan Parties, U.S. Bank Trust Company, National Association, Wilmington Savings Fund Society, FSB, and the Prepetition Agent.

"<u>Prepetition July 2026 Notes</u>" means the Borrowers' 11.500% First-Priority Senior Secured Notes due 2026 issued on December 9, 2021 pursuant to the Indenture, dated as of December 9, 2021, by and among the Borrowers, the subsidiary guarantors party thereto, U.S. Bank Trust Company, National Association, as trustee, as it may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof (the "<u>Prepetition July 2026 Notes Indenture</u>").

"<u>Prepetition July 2026 Notes Documents</u>" means the collective references to the Prepetition July 2026 Notes Indenture, the Prepetition July 2026 Notes issued pursuant thereto, and the guarantees and the collateral documents relating to the foregoing, as amended or supplemented, in whole or in part, from time to time, in each case, in accordance with the terms thereof.

"<u>Pro Rata Share</u>" means, with respect to:

(a)      a Lender's obligation to make or be deemed to make the Loans, as of any date of determination, (A) in the case of the New Money Loans, the percentage obtained by dividing (i) such Lender's unused Commitment by (ii) the aggregate amount of all unused Commitments, and (B) in the case of the Roll-Up Loans, the percentage obtained by dividing (i) the principal amount of Roll-Up Loans that have not been deemed made prior to such date, by (ii) the aggregate principal amount of all Roll-Up Loans that have not been deemed made prior to such date; and

(b)      all other matters (including, without limitation, a Lender's right to receive payments of interest, fees, and principal with respect to the Loans and the indemnification obligations arising under Section 10.05), the percentage obtained by dividing (i) the unpaid principal amount of such Lender's portion of the Loans, by (ii) the sum of the aggregate unpaid principal amount of the Loans.

"<u>Public Lender</u>" has the meaning specified therefor in Section 12.20.

"<u>Rating Agency</u>" means each of Moody's and S&P (and their respective successors and assigns).

"<u>Receivables Assets</u>" means accounts receivable (including any bills of exchange) and related assets and property from time to time originated, acquired or otherwise owned by the Borrowers or any Subsidiary.

"<u>Recipient</u>" means any Agent or any Lender, as applicable.

"<u>Reference Rate</u>" means, for any period, the greatest of (a) 4.00% per annum, (b) the Federal Funds Rate plus 0.50% per annum and (c) the rate last quoted by The Wall Street Journal as the "Prime Rate" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the

Administrative Agent). Each change in the Reference Rate shall be effective from and including the date such change is publicly announced as being effective.

"Register" has the meaning specified therefor in Section 12.07(f).

"Registered Intellectual Property" means Intellectual Property that is issued, registered, renewed or the subject of a pending application.

"Regulation T", "Regulation U" and "Regulation X" mean, respectively, Regulations T, U and X of the Board or any successor, as the same may be amended or supplemented from time to time.

"Related Fund" means, with respect to any Person, an Affiliate of such Person, or a fund or account managed by such Person or an Affiliate of such Person.

"Related Parties" means, with respect to any Person, such Person's Affiliates and their respective direct and indirect equityholders, partners, directors, officers, employees, agents (including sub-agents and co-agents), consultants, trustees, administrators, managers, members, attorneys, attorneys-in-fact, advisors and representatives of such Person and of such Person's Affiliates.

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, seeping, migrating, dumping or disposing of any Hazardous Material (including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Material) into the indoor or outdoor environment, including, without limitation, the movement of Hazardous Materials through or in any environmental media, including the indoor or outdoor air, soil, surface or ground water, sediments or property.

"Remedial Action" means any action (a) to correct, mitigate, or address any actual, alleged or threatened violation of or non-compliance with any Environmental Law or Environmental Permit, or (b) to clean up, remove, remediate, mitigate, abate, contain, treat, monitor, assess, evaluate, investigate, prevent, minimize or in any other way address any environmental condition or the actual, alleged or threatened presence, Release or threatened Release of any Hazardous Materials (including the performance of pre-remedial studies and investigations and post-remedial operation and maintenance activities).

"Report" has the meaning set forth in Section 10.13.

"Reportable Event" means an event described in Section 4043 of ERISA (other than an event not subject to the provision for 30-day notice to the PBGC under the regulations promulgated under such Section)

"Reporting Date" means, commencing the first full week following the Petition Date, the Thursday of each calendar week.

"Reporting Entity" means, any Affiliated Guarantor, any other Neon Entity, any XBP Entity, either Borrower, or any of the Borrowers' Subsidiaries.

150146488_20

"<u>Required Lenders</u>" means, at any time, at least three (3) Lenders that are not Affiliates of each other, including at least one Lender that is an Affiliate of any of HoldCo Asset Management, LP, CCUR Holdings, Inc. or OSP, LLC, having Loans and unused Commitments representing more than 67.1% of the aggregate principal amount of outstanding Loans and unused Commitments at such time; <u>provided</u>, that, to the extent set forth in Section 12.02, whenever there are one or more Defaulting Lenders, the total outstanding principal amount of the Loans and unused Commitments of each Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"<u>Requirements of Law</u>" means, with respect to any Person, collectively, the common law and any and all federal, state, provincial, local, foreign, multinational or international laws, statutes, codes, treaties, standards, rules and regulations, guidelines, ordinances, orders, judgments, writs, injunctions, decrees (including administrative or judicial precedents or authorities), and the interpretation or administration thereof by, and other determinations, directives, requirements or requests of any Governmental Authority, in each case that are applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"<u>Restricted Investment</u>" means an Investment other than a Permitted Investment.

"<u>Restricted Payments</u>" has the meaning specified therefor in Section 7.02(h).

"<u>Restructuring Support Agreement</u>" means a restructuring support agreement, among, inter alia, the Debtors, the Required Lenders, and certain additional stakeholders, in a form acceptable to (i) holders of greater than 67% of Prepetition April 2026 Notes not held by Affiliates of the Debtors, and (ii) Required Lenders, which shall attach as an exhibit an Acceptable Reorganization Plan.

"<u>Restructuring Term Sheet</u>" has the meaning specified therefor in Section 12.28

"<u>Roll-Up Loans</u>" has the meaning specified therefor in Section 2.01(b).

"<u>S&P</u>" means S&P Global Ratings or any successor to the rating agency business thereof.

"<u>Sale/Leaseback Transaction</u>" means an arrangement relating to property now owned or hereafter acquired by the Borrowers or a Subsidiary or by an Affiliated Guarantor or a Subsidiary thereof whereby the Borrowers or such Subsidiary, or such Affiliated Guarantor or such Subsidiary thereof, transfers such property to a Person and the Borrowers or such Subsidiary leases it from such Person, other than leases between the Borrowers and a Subsidiary or between Subsidiaries, or leases between any Neon Entities.

"<u>Sanctioned Country</u>" means, at any time, a country or territory that is the subject or target of any Sanctions that broadly prohibit dealings with that country or territory (which, as of the Effective Date, include Crimea, Cuba, Iran, North Korea, Sudan and Syria).

"<u>Sanctioned Person</u>" means, at any time, (a) any Person listed in OFAC's Specially Designated Nationals and Blocked Persons List, OFAC's Sectoral Sanctions Identification List,

and any other Sanctions-related list of designated Persons maintained by OFAC, the U.S. Department of State, the United Nations Security Council, the European Union, or His Majesty's Treasury of the United Kingdom, Germany, Canada, Australia, or other relevant sanctions authority, (b) a Person that resides in, is organized in or located in, or has a place of business in, a country or territory named on any list referred to in clause (a) of this definition or a country or territory that is designated as a "Non-Cooperative Jurisdiction" by the Financial Action Task Force on Money Laundering, or whose subscription funds are transferred from or through any such jurisdiction (each of the foregoing in this clause (b), a "Sanction Target"), or a Person that owns 50% or more of the Equity Interests of, or is otherwise controlled by, or is acting on behalf of, one or more Sanction Targets, (c) any Person with whom or with which a U.S. Person is prohibited from dealing under any of the Sanctions, or (d) any Person owned or controlled by any Person or Persons described in clause (a) or (b).

"Sanctions" means Requirements of Law concerning or relating to economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by OFAC, the U.S. Department of State, the European Union, or His Majesty's Treasury of the United Kingdom, or other relevant sanctions authority.

"SEC" means the Securities and Exchange Commission or any other similar or successor agency of the Federal government administering the Securities Act.

"Secured Parties" means, collectively, the Agents, the Lenders, and each co-agent, sub-agent and attorney-in-fact appointed by any Agent from time to time pursuant to Section 10.02.

"Securities Act" means the Securities Act of 1933, as amended, or any similar Federal statute, and the rules and regulations of the SEC thereunder, all as the same shall be in effect from time to time.

"Securitization" has the meaning specified therefor in Section 12.07(l).

"Securitization Assets" means any of the following assets (or interests therein) from time to time originated, acquired or otherwise owned by the Borrowers or any Subsidiary or in which the Borrowers or any Subsidiary has any rights or interests, in each case, without regard to where such assets or interests are located: (1) Receivables Assets, (2) franchise fees, royalties and other similar payments made related to the use of trade names and other intellectual property, business support, training and other services, (3) revenues related to distribution and merchandising of the products of the Borrowers and their respective Subsidiaries, (4) intellectual property rights relating to the generation of any of the types of assets listed in this definition, (5) parcels of or interests in real property, together with all easements, hereditaments and appurtenances thereto, all improvements and appurtenant fixtures and equipment, incidental to the ownership, lease or operation thereof, (6) any Equity Interests of any Special Purpose Securitization Subsidiary or any Subsidiary of a Special Purpose Securitization Subsidiary and any rights under any limited liability company agreement, trust agreement, shareholders agreement, organizational or formation documents or other agreement entered into in furtherance of the organization of such entity, and (7) any other assets and property to the extent customarily included

37

in securitization transactions of the relevant type in the applicable jurisdictions (as determined by the Borrowers in good faith).

"Securitization Order" means the order of the Bankruptcy Court in the Chapter 11 Cases authorizing and approving the Permitted Securitization Financing for an interim period under section 364(c) and (d) of the Bankruptcy Code, in the form attached as Exhibit H hereto or otherwise in form and substance satisfactory to the Required Lenders (in their reasonable discretion), which order may be superseded by an order on a final basis in form and substance satisfactory to the Required Lenders (in their reasonable discretion).

"Security Agreement" means a Pledge and Security Agreement, dated as of the date hereof, made by a Loan Party in favor of the Collateral Agent for the benefit of the Secured Parties securing the Obligations.

"Significant Subsidiary" means any Subsidiary that would be a "Significant Subsidiary" of the Borrowers within the meaning of Rule 1-02 under Regulation S-X promulgated by the SEC (or any successor provision).

"Similar Business" means any business, the majority of whose revenues are derived from (i) the business or activities of the Borrowers and their respective Subsidiaries as of the Effective Date, (ii) any business that is a natural outgrowth or a reasonable extension, development or expansion of any such business or any business similar, reasonably related, incidental, complementary or ancillary to any of the foregoing or (iii) any business that in the Borrowers' good faith business judgment constitutes a reasonable diversification of business conducted by the Borrowers and their respective Subsidiaries.

"Special Purpose Securitization Subsidiary" means each of Exela Receivables 3 Holdco, LLC and Exela Receivables 3, LLC.

"Subordinated Indebtedness" means (a) (x) the Prepetition 2026 Notes and (y) the loans under the Prepetition Financing Documents, (b) with respect to a Borrower, any Indebtedness of such Borrower which is subordinated in right of payment to the Obligations on terms acceptable to the Agents and the Required Lenders, (c) with respect to any Guarantor or Affiliated Guarantor, any Indebtedness of such Guarantor or Affiliated Guarantor which is subordinated in right of payment to its Guaranty on terms acceptable to the Agents and the Required Lenders and (d) unsecured Indebtedness.

"Subsequent Testing Date" has the meaning specified therefor in Section 7.01(a)(xxi).

"Subsidiary" means, with respect to any Person, (1) any corporation, association or other business entity (other than a partnership, joint venture or limited liability company) of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof, and (2) any partnership, joint venture or limited liability company of which (x) more than 50% of the capital accounts, distribution rights, total equity and voting interests or general and limited partnership interests, as

38

applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof, whether in the form of membership, general, special or limited partnership interests or otherwise, and (y) such Person or any Subsidiary of such Person is a controlling general partner or otherwise controls such entity. Unless otherwise indicated in this Agreement or the context requires otherwise, all references to Subsidiaries shall mean Subsidiaries of the Borrowers (which, for the avoidance of doubt, does not include Neon Parent, the other Neon Entities, XBP Parent, the other XBP Entities or XBP Europe).

"Swap Obligation" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Tax Distribution Payments" means, with respect to any taxable period during which the Borrower or any of its Subsidiaries are members of a consolidated, combined or similar income tax group for U.S. federal and/or applicable state, local or foreign income or similar tax purposes of which a direct or indirect parent of the Borrower is the common parent or other applicable taxpayer, the portion of any U.S. federal, state, local and/or foreign income and similar Taxes (including any alternative minimum taxes) of such tax group that are attributable to the Borrower and its Subsidiaries; provided that the aggregate amount of such payments with respect to such taxable period (regardless of when paid) shall not exceed the lesser of (x) the aggregate amount of such Taxes that the Borrower and its applicable Subsidiaries would have been required to pay with respect to such taxable period (taking into account prior year losses) were such entities stand-alone corporate taxpayers or a stand alone corporate tax group and (y) the amount therefor specified in the Approved Budget.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Third Party Funds" means any accounts or funds, or any portion thereof, received by an Affiliated Guarantor, any Borrower or any of its Subsidiaries as agent on behalf of third parties in accordance with a written agreement that imposes a duty upon such Affiliated Guarantor, any Borrower or one or more of its Subsidiaries to collect and remit those funds to such third parties.

"Uniform Commercial Code" or "UCC" has the meaning specified therefor in Section 1.04.

"USA PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (PATRIOT) Act of 2001 (Title III of Pub. L. 107-56, Oct. 26, 2001)) as amended by the USA Patriot Improvement and Reauthorization Act of 2005 (Pub. L. 109-177, March 9, 2006) and as the same may have been or may be further renewed, extended, amended, or replaced.

"U.S. Government Obligations" means securities that are:

(1)     direct obligations of the United States of America denominated in U.S. dollars for the timely payment of which its full faith and credit is pledged, or

(2)      obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America, the timely payment of which is unconditionally guaranteed as a full faith and credit obligation by the United States of America, which, in each case, are not callable or redeemable at the option of the issuer thereof, and shall also include a depository receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act) as custodian with respect to any such U.S. Government Obligations or a specific payment of principal of or interest on any such U.S. Government Obligations held by such custodian for the account of the holder of such depository receipt; provided, that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the U.S. Government Obligations or the specific payment of principal of or interest on the U.S. Government Obligations evidenced by such depository receipt.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Internal Revenue Code.

"Variance" has the meaning specified therefor in Section 7.01(a)(xxi).

"Variance Report" has the meaning specified therefor in Section 7.01(a)(xxi).

"Voting Stock" of any Person as of any date means the Equity Interests of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"WARN" has the meaning specified therefor in Section 6.01(p).

"Wholly Owned Subsidiary" of any Person means a Subsidiary of such Person 100% of the outstanding Capital Stock or other ownership interests of which (other than directors' qualifying shares or shares required pursuant to applicable law) shall at the time be owned by such Person or by one or more Wholly Owned Subsidiaries of such Person.

"Withholding Agent" means any Loan Party and the Administrative Agent.

"XBP Entity" means each of XBP Parent and BTC, together with any present or future Subsidiary or successor of any of the foregoing (other than XBP Europe).

"XBP Europe" means XBP Europe Holdings Inc., a Delaware corporation, and each of its present and future Subsidiaries and successors.

"XBP Parent" means XCV-EMEA, LLC, a Delaware limited liability company and any Subsidiary or successor entity which is the holder (directly or indirectly) of the Equity Interests of BTC.

"XBP Sale" means, (i) any direct or indirect sale, disposition, monetization or other transfer of assets or property of XBP Parent or the other XBP Entities, whether directly or indirectly or synthetically (including through derivative transactions) and (ii) the sale, disposition, monetization or other transfer (whether directly, indirectly or synthetically, including through derivative transactions or by means of a transaction involving XBP Parent or any other entity that

directly or indirectly owns equity interests in XBP Parent) of equity interests of XBP Parent or any other XBP Entity by ETI or its subsidiaries.

Section 1.02   <u>Terms Generally</u>.   The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any right or interest in or to assets and properties of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

Section 1.03   <u>Certain Matters of Construction</u>.

(a)      References in this Agreement to "determination" by any Agent include good faith estimates by such Agent (in the case of quantitative determinations) and good faith beliefs by such Agent (in the case of qualitative determinations).  A Default or Event of Default shall be deemed to exist at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing pursuant to this Agreement or, in the case of a Default, is cured within any period of cure expressly provided for in this Agreement; and an Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in writing by the Required Lenders.  Any Lien referred to in this Agreement or any other Loan Document as having been created in favor of any Agent, any agreement entered into by any Agent pursuant to this Agreement or any other Loan Document, any payment made by or to or funds received by any Agent pursuant to or as contemplated by this Agreement or any other Loan Document, or any act taken or omitted to be taken by any Agent, shall, unless otherwise expressly provided, be created, entered into, made or received, or taken or omitted, for the benefit or account of the Secured Parties. Wherever the phrase "to the knowledge of any Loan Party" or words of similar import relating to the knowledge or the awareness of any Loan Party are used in this Agreement or any other Loan Document, such phrase shall mean and refer to (i) the actual knowledge of a senior officer of any Loan Party or (ii) the knowledge that a senior officer would have obtained if such officer had engaged in good faith and diligent performance of such officer's duties, including the making of such reasonably specific inquiries as may be necessary of the employees or agents of such Loan Party and a good faith attempt to ascertain the existence or accuracy of the matter to which such phrase relates.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or otherwise within the limitations of, another covenant shall not avoid the occurrence of a default if

41

such action is taken or condition exists.  In addition, all representations and warranties hereunder shall be given independent effect so that if a particular representation or warranty proves to be incorrect or is breached, the fact that another representation or warranty concerning the same or similar subject matter is correct or is not breached will not affect the incorrectness of a breach of a representation or warranty hereunder.

(b)     Any reference herein to a merger, consolidation, amalgamation, liquidation, winding up, dissolution, assignment, sale, lease, Investment, disposition, Restricted Payment, conveyance or transfer, or similar term, shall be deemed to apply to a division (whether pursuant to a divisive merger, plan of division, or other comparable event under any jurisdiction's law) of or by a Person, or an allocation of assets to any Person or series of Persons, as if it were a merger, consolidation, amalgamation, liquidation, winding up, dissolution, assignment, sale, lease, Investment, disposition, Restricted Payment, conveyance or transfer, or similar term, as applicable, to, of or with a separate Person. Any division (whether pursuant to a divisive merger, plan of division, or other comparable event under any jurisdiction's law) of a Person shall constitute a separate Person hereunder (and each division of any, and such separate Person shall be deemed to have been organized on the first date of its existence by the holders of its stock at such time.

Section 1.04   Accounting and Other Terms.

(a)     Unless otherwise expressly provided herein, each accounting term used herein shall have the meaning given it under GAAP.  For purposes of determining compliance with any incurrence or expenditure tests set forth in Section 7.01 and Section 7.02, any amounts so incurred or expended (to the extent incurred or expended in a currency other than Dollars) shall be converted into Dollars on the basis of the exchange rates (as shown on the Bloomberg currency page for such currency or, if the same does not provide such exchange rate, by reference to such other publicly available service for displaying exchange rates as may be reasonably selected by the Agents or, in the event no such service is selected, on such other basis as is reasonably satisfactory to the Agents) as in effect on the date of such incurrence or expenditure under any provision of any such Section that has an aggregate Dollar limitation provided for therein (and to the extent the respective incurrence or expenditure test regulates the aggregate amount outstanding at any time and it is expressed in terms of Dollars, all outstanding amounts originally incurred or spent in currencies other than Dollars shall be converted into Dollars on the basis of the exchange rates (as shown on the Bloomberg currency page for such currency or, if the same does not provide such exchange rate, by reference to such other publicly available service for displaying exchange rates as may be reasonably selected by the Agents or, in the event no such service is selected, on such other basis as is reasonably satisfactory to the Agents) as in effect on the date of any new incurrence or expenditures made under any provision of any such Section that regulates the Dollar amount outstanding at any time). Notwithstanding the foregoing, (i) the accounting for leases as either operating leases or capital leases and the impact of such accounting in accordance with FASB ASC 842 on the definitions and covenants herein, GAAP as in effect on December 31, 2018 shall be applied, (ii) for purposes of determining compliance with any covenant contained herein, Indebtedness of the Parent and its Subsidiaries shall be deemed to be carried at 100% of the outstanding principal amount thereof, and the effects of FASB ASC 825 and FASB ASC 470-20 on financial liabilities shall be disregarded and (iii) with respect to revenue recognition and the impact of such accounting in accordance with FASB ASC 606 on the definitions and covenants herein, GAAP as in effect on December 31, 2017 shall be applied.

(b)     All terms used in this Agreement which are defined in Article 8 or Article 9 of the Uniform Commercial Code as in effect from time to time in the State of New York (the "Uniform Commercial Code" or the "UCC") and which are not otherwise defined herein shall have the same meanings herein as set forth therein; provided, that terms used herein which are defined in the Uniform Commercial Code as in effect in the State of New York on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute

Section 1.05   Time References.  Unless otherwise indicated herein, all references to time of day refer to Eastern Standard Time or Eastern daylight saving time, as in effect in New York City on such day.  For purposes of the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; provided, however, that with respect to a computation of fees or interest payable to any Secured Party, such period shall in any event consist of at least one full day.

Section 1.06   Obligation to Make Payments in Dollars.  All payments to be made by any Loan Party of principal, interest, fees and other Obligations under any Loan Document shall be made in Dollars in same day funds, and no obligation of any Loan Party to make any such payment shall be discharged or satisfied by any payment other than payments made in Dollars in same day funds.

## ARTICLE II

## THE LOANS

Section 2.01   Commitments and Roll-Up Loans.  (a) Subject to the terms and conditions set forth herein (including in Section 5.01 or Section 5.02, as applicable) and relying upon the representations and warranties herein set forth and in the DIP Orders, each Lender severally agrees to make New Money Loans on the Effective Date (or one Business Day thereafter) and the Final DIP Loan Date to the Borrowers denominated in Dollars in an aggregate principal amount equal to such Lender's Commitment in respect of the Interim DIP New Money Loan Amount or the Interim DIP New Money Loan Amount, as applicable. There shall be no more than two borrowings with respect to the Lenders' Commitments which borrowings shall consist of (i) loans (the "Interim DIP New Money Loans") borrowed on the Effective Date (or one Business Day thereafter) in an aggregate principal amount of $50,000,000 (the "Interim DIP New Money Loan Amount"), which shall be made by each Lender in accordance with its respective Pro Rata Share of the Interim DIP New Money Loan Amount, and (ii) loans (the "Final DIP New Money Loans" and, collectively with the Interim DIP New Money Loans, the "New Money Loans") in an aggregate principal amount not to exceed the aggregate amount of remaining unfunded Commitments (the "Final DIP New Money Loan Amount") on the Final DIP Loan Date, which shall be made by each Lender in accordance with its respective Pro Rata Share of the Final DIP New Money Loan Amount. The Commitments shall be reduced by (x) the Interim DIP New Money Loan Amount upon funding of the Interim DIP New Money Loans and (y) the Final DIP New Money Loan Amount upon funding of the Final DIP New Money Loans, and shall terminate automatically after the making of the Final DIP New Money Loans on the Final DIP Loan Date.

43

Any principal amount of the New Money Loans which are repaid or prepaid may not be reborrowed.

(b)    (i) Upon the Effective Date, each Lender shall be deemed to have advanced additional loans in an aggregate principal amount equal to $75,000,000, and an amount of Prepetition April 2026 Notes that, together with accrued and unpaid interest thereon, equals such amount, held by such Lender, directly or indirectly, through their Affiliate, designees or beneficial holder, will be deemed to have been converted on a cashless, dollar-for-dollar basis (such loans, the "<u>Interim Roll-Up Loans</u>"), and such Interim Roll-Up Loans shall be deemed made in accordance with its respective Pro Rata Share of the aggregate amount of the Interim Roll-Up Loans, and (ii) upon entry of the Final DIP Order, each Lender shall be deemed to have advanced additional loans in an aggregate principal amount equal to $30,000,000, and an amount of Prepetition April 2026 Notes that, together with accrued and unpaid interest thereon, equals such amount, held by such Lender, directly or indirectly, through their Affiliate, designees or beneficial holder will be deemed to have been converted on a cashless, dollar-for-dollar basis (such loans, the "<u>Final Roll-Up Loans</u>" and, collectively with the Interim Roll-Up Loans, the "<u>Roll-Up Loans</u>"), and such Final Roll-Up Loans shall be deemed made in accordance with its respective Pro Rata Share of the aggregate amount of the Final Roll-Up Loans. Any principal amount of the Roll-Up Loans which are repaid or prepaid may not be reborrowed.  The amount of each Lender's Interim Roll-Up Loans and Final Roll-Up Loans to be deemed made in accordance with this Section 2.01(b) is set forth on Schedule 1.01(A).

(c)    Each Lender as of the Effective Date and the Borrowers hereby acknowledge and agree that each Prepetition April 2026 Noteholder that is not a Backstop Commitment Lender and is not an Affiliate of the Parent that becomes a party to the Restructuring Support Agreement (in such capacity, an "<u>Eligible April 2026 Noteholder</u>") may participate with the other Eligible April 2026 Noteholders to provide a portion of the Final DIP New Money Loans and Commitments hereunder and the Exit Facility New Money Loans by executing an election joinder in the form of <u>Exhibit A</u> (an "<u>Election Joinder</u>") and delivering such Election Joinder to the Lender Advisors and the Administrative Agent, together with a completed Administrative Questionnaire, all tax forms required under Section 2.09, and all documentation and other information that each Agent reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering or terrorist financing rules and regulations, including the USA PATRIOT Act, no later than five (5) Business Days prior to the hearing to consider entry of the Final Order (as may be extended with the consent of the Required Lenders (email from the Lender Advisors being sufficient), the "<u>Election Deadline</u>") (each Eligible April 2026 Noteholder that delivers the foregoing by the Election Deadline, an "<u>Electing DIP Lender</u>").  Such participation of the Electing DIP Lenders shall be on a pro rata basis in accordance with the proportion of (1) the obligations under the Prepetition April 2026 Notes owed to each such Prepetition April 2026 Noteholder to (2) the obligations owed to all Prepetition April 2026 Noteholders which are held by Prepetition April 2026 Noteholders that are not an Affiliate of the Parent on the Election Deadline; <u>provided</u> that if the total amount of New Money Loans that all Electing DIP Lenders elect to participate exceeds the total amount of the Final DIP New Money Loans, the amount of New Money Loans allocated to each Electing DIP Lender will be reduced proportionately such that the total amount of New Money Loans all Electing DIP Lenders shall equal the Final DIP New Money Loans. For the avoidance of doubt, while Electing DIP Lenders shall solely fund Final DIP New Money Loans, each Electing DIP

Lender's eligible allocation shall be based on the aggregate amount of all New Money Loans (subject to the proviso above). On the first Business Day following the Election Deadline, the aggregate outstanding Commitments and Final Roll-Up Loans of the Backstop Commitment Lenders shall be reduced by the aggregate amount of the Commitments and Final Roll-Up Loans of the Electing DIP Lenders and re-allocated among the Backstop Commitment Lenders, such that, assuming that the full amount of the remaining Commitments are drawn on the Final DIP Loan Date and the Final Roll-Up Loans are deemed made as of the date of entry of the Final DIP Order, the Final DIP New Money Loans and Final Roll-Up Loans held by the Backstop Commitment Lenders and the Electing DIP Lenders on the Final DIP Loan Date shall be held in the same proportion as if the Electing DIP Lenders had made their respective Commitments and were allocated Final Roll-Up Loans on the Effective Date.  For the avoidance of doubt, the Electing DIP Lenders will be deemed to make the Final Roll-Up Loans on the date of entry of the Final DIP Order in accordance with Section 2.01(b)(ii). On the first Business Day following the Election Deadline, the Lender Advisors shall deliver a revised Schedule 1.01(A) to the Administrative Agent which shall (x) reflect the Commitments of the Electing DIP Lenders and the adjustments to the Commitments of the Backstop Commitment Lenders to account for the participation of the Electing DIP Lenders, (y) reflect the Final Roll-Up Loans of the Electing DIP Lenders and the adjustments to the Final Roll-Up Loans of the Backstop Commitment Lenders to account for the participation of the Electing DIP Lenders and (z) upon such delivery, be deemed to replace the existing Schedule 1.01(A) for all purposes. The Agents shall be entitled to conclusively rely upon such revised Schedule 1.01(A) for all purposes under the Loan Documents (without further investigation or inquiry).  Each such Electing DIP Lender shall become a Lender in respect of its applicable Commitment on the date of delivery of such revised Schedule 1.01(A) to the Administrative Agent. Each Electing DIP Lender shall become party to the Restructuring Support Agreement to the extent the Restructuring Support Agreement is in effect as of the Election Deadline.

Section 2.02   Making the Loans.  (a) The Administrative Borrower shall give the Administrative Agent prior written notice, in substantially the form of Exhibit C hereto (a "Notice of Borrowing"), appropriately completed and executed by an Authorized Officer of the Administrative Borrower, not later than 12:00 noon (New York City time) on the date which is 1 Business Days prior to the date of the proposed New Money Loan (or such shorter period as the Administrative Agent is willing to accommodate from time to time in its sole discretion, but in no event later than 2:00 p.m. (New York City time) on the date which is one Business Day prior to the date of the proposed New Money Loan).  Such Notice of Borrowing shall be irrevocable and shall specify (i) whether the requested borrowing is to be of Interim DIP New Money Loans or Final DIP New Money Loans, (ii) the aggregate principal amount of such proposed New Money Loans, (iii) the proposed borrowing date, which shall be a Business Day and (iv) the Borrower's wiring instructions.  The Administrative Agent and the Lenders may act without liability upon the basis of written notice believed by the Administrative Agent in good faith to be from the Administrative Borrower (or from any Authorized Officer thereof designated in writing purportedly from the Administrative Borrower to the Administrative Agent).  Each Borrower hereby waives the right to dispute the Administrative Agent's record of the terms of any such Notice of Borrowing.  The Administrative Agent and each Lender shall be entitled to rely conclusively on any Authorized Officer's authority to request a New Money Loan on behalf of the Borrowers until the Administrative Agent receives written notice to the contrary.  The

Administrative Agent and the Lenders shall have no duty to verify the authenticity of the signature appearing on any written Notice of Borrowing.

(b)     Each Notice of Borrowing pursuant to this Section 2.02 shall be irrevocable and the Borrowers shall be bound to make a borrowing in accordance therewith. Each Lender shall make each New Money Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds to such account in New York City as the Administrative Agent may designate from time to time not later than 11:00 a.m., New York City time, and the Administrative Agent shall promptly credit the amounts so received to an account specified by the Borrowers or, if a borrowing shall not occur on such date because any condition precedent herein specified shall not have been met, return the amounts so received to the respective Lenders within two Business Days.

(c)     Except as otherwise provided in Section 2.01(c) and this Section 2.02(c), all New Money Loans under this Agreement shall be made by the Lenders simultaneously and proportionately to their Pro Rata Shares of the Interim DIP New Money Loan Amount or the Final DIP New Money Loan Amount, as the case may be, it being understood that no Lender shall be responsible for any default by any other Lender in that other Lender's obligations to make a New Money Loan requested hereunder, nor shall the Commitment of any Lender be increased or decreased as a result of the default by any other Lender in that other Lender's obligation to make a New Money Loan requested hereunder, and each Lender shall be obligated to make the New Money Loans required to be made by it by the terms of this Agreement regardless of the failure by any other Lender.

(d)     Promptly following receipt of a Notice of Borrowing in accordance with Section 2.02(a), the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's New Money Loan to be made as part of the requested borrowing to be deposited in the account specified by the Administrative Borrower, in accordance with Section 2.02(b).

(e)     The Borrowers shall be deemed to have given a Notice of Borrowing as of (i) the Effective Date with respect to the Interim Roll-Up Loans (subject to entry of the Interim DIP Order) and (ii) the entry of the Final DIP Order, with respect to the Final Roll-Up Loans (subject to entry of the Final DIP Order).

Section 2.03    Repayment of Loans; Evidence of Debt.

(a)     Except as otherwise provided in Section 2.14, on the Final Maturity Date, the Borrowers shall repay in cash to the Administrative Agent for the ratable account of each Lender, the aggregate principal amount of such Lender's Loans outstanding on such date, together with all other Obligations.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrowers to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)     The Administrative Agent shall maintain a Register in which it shall record (i) the amount of each Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)     The entries made in the Register and accounts maintained pursuant to Section 2.03(b) or Section 2.03(c) shall be prima facie evidence of the existence and amounts of the Obligations recorded therein; provided, that (i) the failure of any Lender or the Administrative Agent to maintain such accounts or such Register or any error therein shall not in any manner affect the obligation of the Borrowers to repay the Loans in accordance with the terms of this Agreement and (ii) in the event of any conflict between the entries made in the accounts maintained pursuant to Section 2.03(b) and the Register maintained pursuant to Section 2.03(c), the Register maintained pursuant to Section 2.03(c) shall govern and control.

(e)     Any Lender may request that Loans made by it be evidenced by a promissory note.  In such event, the Borrowers shall execute and deliver to such Lender a promissory note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns) in a form furnished by such Lender and reasonably acceptable to the Administrative Borrower.  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 12.07) be represented by one or more promissory notes in such form payable to the payee named therein (or to such payee and its registered assigns).

Section 2.04    Interest.

(a)     [Reserved].

(b)     Loans.  Each Loan shall bear interest on the principal amount thereof from time to time outstanding, from the date of the borrowing of such Loan until repaid, at a rate per annum equal to (i) 12.00%, with respect to New Money Loans and (ii) 11.50%, with respect to Roll-Up Loans.

(c)     Default Interest.  To the extent permitted by law and notwithstanding anything to the contrary in this Section, upon the occurrence and during the continuance of an Event of Default, the principal of, and all accrued and unpaid interest on, all Loans, fees, indemnities or any other Obligations of the Loan Parties under this Agreement and the other Loan Documents, shall bear interest, from the date such Event of Default occurred until the date such Event of Default is cured or waived in writing in accordance herewith, at a rate per annum equal at all times to the Post-Default Rate.

(d)     Interest Payment.  Interest on each Loan shall be payable (i) monthly, in arrears, on the first Business Day of each month (each, an "Interest Payment Date"), commencing on the first Business Day of the month following the month in which the Interim DIP New Money Loans and Interim Roll-Up Loans are made or deemed made, and (ii) on the Final Maturity Date. Interest at the Post-Default Rate shall be payable on demand. On each Interest Payment Date, the Borrowers shall pay-in-kind (in lieu of cash payment) all interest accrued from the immediately

prior Interest Payment Date (or in the case of the first Interest Payment Date for the Interim DIP New Money Loans, accrued from the initial borrowing of the Interim DIP New Money Loans and in the case of the first Interest Payment Date for the Interim Roll-Up Loans, accrued from the Effective Date) to such Interest Payment Date in respect of all Loans (the "PIK Interest Amount"), in which case, on and as of such Interest Payment Date, an amount equal to the PIK Interest Amount in respect of such Loans for such period shall be automatically capitalized and added to the then-outstanding principal amount of such Loans.

(e)     General.  All interest shall be computed on the basis of a year of 360 days for the actual number of days, including the first day but excluding the last day, elapsed.

Section 2.05   Prepayment of Loans.

(a)     [Reserved].

(b)     Optional Prepayment.

(i)     Loans.  The Borrowers may, at any time and from time to time, upon at least 5 Business Days' prior written notice by 11:00 a.m. to the Administrative Agent, prepay the principal of the Loans in accordance with Section 2.05(d), in whole or in part, which written notice shall specify the date (which shall be a Business Day) and amount of such prepayment. Each prepayment made pursuant to this Section 2.05(b)(i) shall be accompanied by the payment of accrued interest to the date of such payment on the amount prepaid.

(ii)     Termination of Agreement.  The Borrowers may, upon at least 5 Business Days' prior written notice to the Administrative Agent, terminate this Agreement by paying to the Administrative Agent, in cash, the Obligations in full.

(c)     Mandatory Prepayment.

(i)     [Reserved].

(ii)     Immediately upon any Disposition (excluding Dispositions which qualify as Permitted Dispositions) by any Loan Party or its Subsidiaries, the Borrowers shall prepay the outstanding principal amount of the Loans in accordance with Section 2.05(d) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with such Dispositions.  Nothing contained in this Section 2.05(c)(ii) shall permit any Loan Party or any of its Subsidiaries to make a Disposition of any property other than in accordance with Section 7.02(c)(ii); provided that, so long as the Net Proceeds are less than $[•] in the aggregate during the term of this Agreement or if otherwise provided for in the Approved Budget, the Borrowers may, within 90 days after the receipt thereof (or such longer time agreed to by the Required Lenders), invest such Net Cash Proceeds in the business of the Borrowers or any of their Subsidiaries so long as such use of such Net Cash Proceeds is consistent with the Approved Budget, and not be required to make such prepayment; provided further that, to the extent of any such Net Cash Proceeds therefrom that have not been so invested by the end of such 90 day period, at which time a prepayment shall be required in an amount equal to such Net Cash Proceeds that have not been so invested.

(iii)    Upon the issuance or incurrence by any Loan Party or any of its Subsidiaries of any Indebtedness (other than permitted Indebtedness), or upon an Equity Issuance (other than any excluded Equity Issuances), the Borrowers shall prepay the outstanding principal amount of the Loans in accordance with Section 2.05(d) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection therewith.  The provisions of this Section 2.05(c)(iii) shall not be deemed to be implied consent to any such issuance, incurrence or sale otherwise prohibited by the terms and conditions of this Agreement.

(iv)    Upon the receipt by any Loan Party or any of its Subsidiaries of any Extraordinary Receipts, the Borrowers shall prepay the outstanding principal of the Loans in accordance with Section 2.05(d) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection therewith.

(d)    <u>Application of Payments</u>.  Notwithstanding anything herein to the contrary, in connection with any voluntary or mandatory prepayments by the Borrowers of the Loans pursuant to this Section 2.05, and subject to the Prepetition Intercreditor Agreement, such prepayments shall be applied (i) *first*, to the New Money Loans, ratably among the Lenders entitled thereto in accordance with the amounts of principal, interest and premium, if any, due to such Lenders until paid in full in cash, (ii) *second*, to the Prepetition Agent for payment of the obligations under the Prepetition Financing Agreement in accordance with the Prepetition Intercreditor Agreement and (iii) *third*, to the Roll-Up Loans, ratably among the Lenders entitled thereto in accordance with the amounts of principal and interest due to such Lenders until paid in full in cash.  Notwithstanding the foregoing, after the occurrence and during the continuance of an Event of Default, if the Administrative Agent has elected, or has been directed by the Required Lenders to so elect, to apply payments in respect of any Obligations in accordance with Section 4.03(b), optional and mandatory prepayments shall be applied in the manner set forth in Section 4.03(b).

(e)    <u>Interest and Fees</u>.  Any prepayment made pursuant to this Section 2.05 shall be accompanied by (i) accrued interest on the principal amount being prepaid to the date of prepayment and (ii) if such prepayment would reduce the amount of the outstanding Loans to zero, such prepayment shall be accompanied by the payment of all other outstanding Obligations.

(f)    <u>Cumulative Prepayments</u>.  Except as otherwise expressly provided in this Section 2.05, payments with respect to any subsection of this Section 2.05 are in addition to payments made or required to be made under any other subsection of this Section 2.05.

(g)    <u>Notice of Mandatory Prepayment</u>.  In the event that the Borrowers are required to make any mandatory prepayment of the Loans pursuant to Section 2.05(c), not less than 3 Business Days prior to the date on which the Borrowers are required to make such mandatory prepayment, the Administrative Borrower shall notify the Administrative Agent in writing of the date on which the Borrowers to make such mandatory prepayment, the amount of such mandatory prepayment, and the basis for such mandatory prepayment and include a reasonably detailed calculation of the amount of such mandatory prepayment. The Administrative Agent will promptly thereafter notify each Lender of the amount of such Lender's Pro Rata Share of such mandatory prepayment.

Section 2.06    Fees.

(a)    Fee Letter.  As and when due and payable under the terms of the Fee Letter, the Borrowers shall pay to the Agents the fees set forth in the Fee Letter. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

(b)    Audit and Collateral Monitoring Fees.  The Borrowers acknowledge that pursuant to Section 7.01(f), representatives and advisors of the Agents may visit any or all of the Loan Parties and/or conduct inspections, audits, physical counts, valuations, appraisals, environmental site assessments and/or examinations of any or all of the Loan Parties at any time and from time to time.  The Borrowers agree to pay (i) $1,500 per day per examiner plus the examiner's out-of-pocket costs and reasonable expenses incurred in connection with all such visits, inspections, audits, physical counts, valuations, appraisals, environmental site assessments and/or examinations and (ii) the cost of all visits, inspections, audits, physical counts, valuations, appraisals, environmental site assessments and/or examinations conducted by a third party on behalf of the Agents.

Section 2.07    [Reserved].

Section 2.08    [Reserved].

Section 2.09    Taxes.  (a) Any and all payments by or on account of any obligation of any Loan Party hereunder or under any other Loan Document shall be made free and clear of and without deduction or withholding for any and all Taxes, except as required by applicable Requirements of Law.  If any applicable Requirements of Law (as determined in the good faith discretion of any Withholding Agent) requires the deduction or withholding of any Taxes from or in respect of any such payment, (i) the applicable Withholding Agent shall make such deduction or withholding, (ii) the applicable Withholding Agent shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Requirements of Law and (iii) if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased by the amount (an "Additional Amount") necessary such that after making all required deductions and withholdings (including deductions and withholdings applicable to additional sums payable under this Section 2.09) the applicable Recipient receives the amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    In addition, each Loan Party shall pay to the relevant Governmental Authority in accordance with applicable Requirements of Law any Other Taxes, or at the option of any Secured Party timely reimburse it for the payment of any Other Taxes by such Secured Party.  Each Loan Party shall deliver to each applicable Secured Party official receipts in respect of any Taxes or Other Taxes payable hereunder promptly after payment of such Taxes or Other Taxes.

(c)    The Loan Parties hereby jointly and severally indemnify and agree to hold each Secured Party harmless from and against Indemnified Taxes and Other Taxes (including, without limitation, Indemnified Taxes and Other Taxes imposed on any amounts payable under this Section 2.09) paid or payable by such Secured Party or required to be withheld or deducted from a payment to such Secured Party and any expenses arising therefrom or with respect thereto,

whether or not such Indemnified Taxes or Other Taxes were correctly or legally asserted. Such indemnification shall be paid within 10 days from the date on which any such Person makes written demand therefor specifying in reasonable detail the nature and amount of such Indemnified Taxes or Other Taxes. A certificate as to the amount of such payment or liability delivered to the Borrowers by a Secured Party (with a copy to the Administrative Agent) or by any Agent on its own behalf or on behalf of another Secured Party shall be conclusive absent manifest error.

(d) (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrowers and the Administrative Agent, at the time or times reasonably requested by the Borrowers or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrowers or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrowers or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrowers or the Administrative Agent as will enable the Borrowers or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.09(d)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii) Without limiting the generality of the foregoing,

(A) any Lender that is a U.S. Person shall deliver to the Borrowers and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B) any Lender that is not a U.S. Person (a "<u>Foreign Lender</u>") shall, to the extent it is legally entitled to do so, deliver to the Borrowers and the Administrative Agent (in such number of copies as shall be reasonably requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Administrative Agent), whichever of the following is applicable:

(1) in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

51

(2)      executed copies of IRS Form W-8ECI;

(3)      in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Internal Revenue Code, (x) a certificate substantially in the form of Exhibit 2.09(d)-1 hereto to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, a "10 percent shareholder" of the Borrowers within the meaning of Section 881(c)(3)(B) of the Internal Revenue Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Internal Revenue Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or W-8BEN-E; or

(4)      to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit 2.09(d)-2 or Exhibit 2.09(d)-3, IRS Form W-9, or other certification documents from each beneficial owner, as applicable; provided, that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit 2.09(d)-4 on behalf of each such direct and indirect partner;

(C)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrowers and the Administrative Agent (in such number of copies as shall be reasonably requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrowers or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)      if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such Lender shall deliver to the Borrowers and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrowers or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by the Borrowers or the Administrative Agent as may be necessary for the Borrowers and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Administrative Agent in writing of its legal inability to do so.

52

(e)     Each Lender shall severally indemnify each Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified such Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 12.07(i) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by such Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by such Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes each Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by such Agent to the Lender from any other source against any amount due to such Agent under this paragraph (e).

(f)     If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.09 (including by the payment of Additional Amounts pursuant to this Section 2.09), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.09 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (f) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (f), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (f) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(g)     The agreements in this Section 2.09 shall survive the resignation or replacement of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of the Loans and all other Obligations payable hereunder and under any other Loan Document, and the termination of this Agreement or any other Loan Document.

Section 2.10   Increased Costs and Reduced Return.  (a) If any Secured Party shall have determined that any Change in Law shall (i) subject such Secured Party, or any Person controlling such Secured Party to any tax, duty or other charge with respect to this Agreement or any Loan made by such Agent or such Lender, or change the basis of taxation of payments to such Secured Party or any Person controlling such Secured Party of any amounts payable hereunder

(except for taxes on the overall net income of such Secured Party or any Person controlling such Secured Party), (ii) impose, modify or deem applicable any reserve, special deposit or similar requirement against any Loan or against assets of or held by, or deposits with or for the account of, or credit extended by, such Secured Party or any Person controlling such Secured Party or (iii) impose on such Secured Party or any Person controlling such Secured Party any other condition regarding this Agreement or any Loan, and the result of any event referred to in clauses (i), (ii) or (iii) above shall be to increase the cost to such Secured Party of making any Loan, or agreeing to make any Loan, or to reduce any amount received or receivable by such Secured Party hereunder, then, upon demand by such Secured Party, the Borrowers shall pay to such Secured Party such additional amounts as will compensate such Secured Party for such increased costs or reductions in amount.

(b) If any Secured Party shall have determined that any Change in Law either (i) affects or would affect the amount of capital required or expected to be maintained by such Secured Party or any Person controlling such Secured Party, and such Secured Party determines that the amount of such capital is increased as a direct or indirect consequence of any Loans made or maintained, or any agreement to make Loans, or such Secured Party's or such other controlling Person's other obligations hereunder, or (ii) has or would have the effect of reducing the rate of return on such Secured Party's or such other controlling Person's capital to a level below that which such Secured Party or such controlling Person could have achieved but for such circumstances as a consequence of any Loans made or maintained, or any agreement to make Loans, or such Secured Party's or such other controlling Person's other obligations hereunder (in each case, taking into consideration, such Secured Party's or such other controlling Person's policies with respect to capital adequacy), then, upon demand by such Secured Party, the Borrowers shall pay to such Secured Party from time to time such additional amounts as will compensate such Secured Party for such cost of maintaining such increased capital or such reduction in the rate of return on such Secured Party's or such other controlling Person's capital.

(c) All amounts payable under this Section 2.10 shall bear interest from the date that is 10 days after the date of demand by any Secured Party until payment in full to such Secured Party at the Reference Rate. A certificate of such Secured Party claiming compensation under this Section 2.10 (with a copy to the Administrative Agent), specifying the event herein above described and the nature of such event shall be submitted by such Secured Party to the Administrative Borrower (with a copy to the Administrative Agent), setting forth the additional amount due and an explanation of the calculation thereof, and such Secured Party's reasons for invoking the provisions of this Section 2.10, and shall be final and conclusive absent manifest error.

(d) Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section 2.10 shall not constitute a waiver of such Lender's right to demand such compensation; provided, that the Borrowers shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section 2.10 for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Administrative Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

54

150146488_20

(e)     The obligations of the Loan Parties under this Section 2.10 shall survive the resignation or replacement of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of the Loans and all other Obligations payable hereunder and under any other Loan Document, and the termination of this Agreement or any other Loan Document.

Section 2.11    [Reserved].

Section 2.12    [Reserved].

Section 2.13    [Reserved].

Section 2.14    Exit Facility Closing. Upon the effectiveness of an Acceptable Reorganization Plan and subject to the satisfaction, or waiver by the Required Lenders, of the conditions set forth on Exhibit 2.14, in lieu of repayment in cash of the Obligations, each Lender agrees that it will (x) fund its *pro rata* portion of the Exit Facility New Money Loans and (y) receive Indebtedness under the Exit Facility in exchange for the Obligations upon the Exit Facility Closing Date pursuant to the Exit Facility Documents, subject to the following:

(a)     upon (A) the execution and delivery by the Exit Facility Loan Parties, the Exit Facility Agent and the Exit Facility Lenders of the Exit Facility Documents and (B) the satisfaction (or waiver in accordance with the terms of the Exit Facility Documents) of the other conditions precedent set forth in the Exit Facility Documents as determined by the Required Lenders in their sole discretion, each of the Exit Facility Loan Parties, the Exit Facility Agent and the Exit Facility Lenders shall have assumed and/or acquired the same respective rights and obligations under the Exit Facility Documents in place of the rights and obligations under this Agreement;

(b)     the Loans hereunder shall be converted into loans under the Exit Facility Documents, which loans will be *pari passu* in right of payment and with respect to security with the Exit Facility New Money Loans; and

(c)     the terms and conditions of the definitive documentation governing the Exit Facility shall have the terms set forth on Exhibit 2.14, or otherwise acceptable to the Exit Facility Agent and the Required Lenders in their sole discretion (the "Exit Facility Documents"); provided, that the Exit Facility Documents may include modifications to the terms of this Agreement and each other Loan Document as are necessary and usual and customary for financings provided to debtors exiting from chapter 11 of the Bankruptcy Code, giving effect to the then-current market conditions.

(d)     with respect to the Loans, this Agreement and all Obligations hereunder with respect thereto shall terminate and be superseded and replaced by the Exit Facility Documents (other than Obligations that survive in accordance with their terms, and provided that all fees and expenses of the Agents and the Lenders under this Agreement shall have been paid in full on the Exit Facility Closing Date).

# ARTICLE III

## [INTENTIONALLY OMITTED]

# ARTICLE IV

## APPLICATION OF PAYMENTS; DEFAULTING LENDERS;
## JOINT AND SEVERAL LIABILITY OF BORROWERS

Section 4.01   <u>Payments; Computations and Statements</u>.  The Borrowers will make each payment under this Agreement not later than 12:00 noon (New York City time) on the day when due, in lawful money of the United States of America and in immediately available funds, to the Administrative Agent's Accounts.  All payments received by the Administrative Agent after 12:00 noon (New York City time) on any Business Day may, in Administrative Agent's sole discretion, be deemed received on the next succeeding Business Day.  All payments shall be made by the Borrowers without set-off, counterclaim, recoupment, deduction or other defense to the Agents and the Lenders.  Except as provided in Section 2.02, after receipt, the Administrative Agent will promptly thereafter cause to be distributed like funds relating to the payment of principal ratably to the Lenders in accordance with their Pro Rata Shares and like funds relating to the payment of any other amount payable to any Lender to such Lender, in each case to be applied in accordance with the terms of this Agreement.  Whenever any payment to be made under any such Loan Document shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day (unless otherwise provided herein) and such extension of time shall in such case be included in the computation of interest or fees, as the case may be.  All computations of fees shall be made by the Administrative Agent on the basis of a year of 360 days for the actual number of days.  Each determination by the Administrative Agent of an interest rate or fees hereunder shall be conclusive and binding for all purposes in the absence of manifest error.

Section 4.02   <u>Sharing of Payments</u>.  Except as provided in Section 2.02 hereof, if any Lender shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) on account of any Obligation in excess of its ratable share of payments on account of similar obligations obtained by all the Lenders, such Lender shall forthwith purchase from the other Lenders such participations in such similar obligations held by them as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; <u>provided</u>, <u>however</u>, that (a) if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each Lender shall be rescinded and each Lender shall repay to the purchasing Lender the purchase price to the extent of such recovery together with an amount equal to such Lender's ratable share (according to the proportion of (i) the amount of such Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid by the purchasing Lender in respect of the total amount so recovered and (b) the provisions of this Section shall not be construed to apply to (i) any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender and any payment of an amendment, consent or waiver fee to consenting Lenders pursuant to an effective amendment, consent or waiver with respect to this Agreement), or (ii) any payment obtained by a Lender as consideration for the assignment of or

56

sale of a participation in any of its Loans, other than to any Loan Party or any Subsidiary thereof (as to which the provisions of this Section shall apply).  The Borrowers agree that any Lender so purchasing a participation from another Lender pursuant to this Section may, to the fullest extent permitted by law, exercise all of its rights (including the Lender's right of set-off) with respect to such participation as fully as if such Lender were the direct creditor of the Borrowers in the amount of such participation.

Section 4.03    Apportionment of Payments.  Subject to Section 2.02 hereof and to any written agreement among the Agents and/or the Lenders:

(a)    All payments of principal and interest in respect of outstanding Loans, all payments of fees (other than the fees set forth in Section 2.06 hereof to the extent set forth in any written agreement among the Lenders) and all other payments in respect of any other Obligations, shall be allocated by the Administrative Agent among such of the Lenders as are entitled thereto, in proportion to their respective Pro Rata Shares or otherwise as provided herein or, in respect of payments not made on account of Loans, as designated by the Person making payment when the payment is made.

(b)    After the occurrence and during the continuance of an Event of Default, the Administrative Agent may, and upon the direction of the Required Lenders shall, apply all payments in respect of any Obligations, including without limitation, all proceeds of the Collateral, subject to the provisions of this Agreement, (i) *first*, ratably to pay the Obligations in respect of any fees, expense reimbursements, indemnities and other amounts then due and payable to the Agents until paid in full; (ii) *second*, ratably to pay the Obligations in respect of any fees, expense reimbursements, indemnities and other amounts then due and payable to the Lenders until paid in full; (iii) *third*, ratably to pay interest then due and payable in respect of the New Money Loans until paid in full; (iv) *fourth*, ratably to pay principal of the New Money Loans until paid in full; (v) *fifth*, to the Prepetition Agent for payment of the obligations under the Prepetition Financing Agreement in accordance with the Prepetition Intercreditor Agreement; (vi) *sixth*, ratably to pay interest then due and payable in respect of the Roll-Up Loans until paid in full; (vii) *seventh*, ratably to pay principal of the Roll-Up Loans until paid in full; and (viii) *eighth*, to the ratable payment of all other Obligations then due and payable.

(c)    For purposes of Section 4.03(b) (other than clause (vi) thereof), "paid in full" means payment in cash of all amounts owing under the Loan Documents according to the terms thereof, including loan fees, service fees, professional fees, interest (and specifically including interest accrued after the commencement of any Insolvency Proceeding), default interest, interest on interest, and expense reimbursements, whether or not same would be or is allowed or disallowed in whole or in part in any Insolvency Proceeding, except to the extent that default or overdue interest (but not any other interest) and loan fees, each arising from or related to a default, are disallowed in any Insolvency Proceeding; provided, however, that for the purposes of clause (vi), "paid in full" means payment in cash of all amounts owing under the Loan Documents according to the terms thereof, including loan fees, service fees, professional fees, interest (and specifically including interest accrued after the commencement of any Insolvency Proceeding), default interest, interest on interest, and expense reimbursements, whether or not the same would be or is allowed or disallowed in whole or in part in any Insolvency Proceeding.

(d)     In the event of a direct conflict between the priority provisions of this Section 4.03 and other provisions contained in any other Loan Document, it is the intention of the parties hereto that both such priority provisions in such documents shall be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of Section 4.03 shall control and govern.

Section 4.04   Defaulting Lenders.   Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(a)     Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 12.02.

(b)     The Administrative Agent shall not be obligated to transfer to such Defaulting Lender any payments made by any Borrower to the Administrative Agent for such Defaulting Lender's benefit, and, in the absence of such transfer to such Defaulting Lender, the Administrative Agent shall transfer any such payments to each other non-Defaulting Lender ratably in accordance with their Pro Rata Shares (without giving effect to the Pro Rata Shares of such Defaulting Lender) (but only to the extent that such Defaulting Lender's Loans were funded by the other Lenders) or, if so directed by the Administrative Borrower and if no Default or Event of Default has occurred and is continuing (and to the extent such Defaulting Lender's Loans were not funded by the other Lenders), retain the same to be re-advanced to the Borrowers as if such Defaulting Lender had made such Loans to the Borrowers.  Subject to the foregoing, the Administrative Agent may hold and, in its discretion, re-lend to the Borrowers for the account of such Defaulting Lender the amount of all such payments received and retained by the Administrative Agent for the account of such Defaulting Lender.

(c)     Any such failure to fund by any Defaulting Lender shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle the Borrowers to replace the Defaulting Lender with one or more substitute Lenders, and the Defaulting Lender shall have no right to refuse to be replaced hereunder.  Such notice to replace the Defaulting Lender shall specify an effective date for such replacement, which date shall not be later than 15 Business Days after the date such notice is given.  Prior to the effective date of such replacement, the Defaulting Lender shall execute and deliver an Assignment and Acceptance, subject only to the Defaulting Lender being repaid its share of the outstanding Obligations without any premium or penalty of any kind whatsoever.  If the Defaulting Lender shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, the Defaulting Lender shall be deemed to have executed and delivered such Assignment and Acceptance.  The replacement of any Defaulting Lender shall be made in accordance with the terms of Section 12.07.

(d)     The operation of this Section shall not be construed to increase or otherwise affect the Commitments of any Lender, to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by any Borrower of its duties and obligations hereunder to any Agent or to the Lenders other than such Defaulting Lender.

(e)     This Section shall remain effective with respect to such Lender until either (i) the Obligations under this Agreement shall have been declared or shall have become immediately due and payable or (ii) the non-Defaulting Lenders, the Agents, and the Borrowers shall have waived such Defaulting Lender's default in writing, and the Defaulting Lender makes its Pro Rata Share of the applicable defaulted Loans and pays to the Agents all amounts owing by such Defaulting Lender in respect thereof; provided, that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrowers while such Lender was a Defaulting Lender; provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from such Lender's having been a Defaulting Lender.

Section 4.05    Administrative Borrower; Joint and Several Liability of the Borrowers.

(a)     Each Borrower hereby irrevocably appoints Exela Intermediate LLC as the borrowing agent and attorney-in-fact for the Borrowers (the "Administrative Borrower") which appointment shall remain in full force and effect unless and until the Agents shall have received prior written notice signed by all of the Borrowers that such appointment has been revoked and that another Borrower has been appointed Administrative Borrower.  Each Borrower hereby irrevocably appoints and authorizes the Administrative Borrower (i) to provide to the Agents and receive from the Agents all notices with respect to Loans obtained for the benefit of any Borrower and all other notices, certificates and instructions under this Agreement and (ii) to take such action as the Administrative Borrower deems appropriate on its behalf to obtain Loans and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement.

(b)     Each Borrower hereby accepts joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Agents and the Lenders under this Agreement and the other Loan Documents, for the mutual benefit, directly and indirectly, of each of the Borrowers and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Obligations.  Each of the Borrowers, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers, with respect to the payment and performance of all of the Obligations (including, without limitation, any Obligations arising under this Section 4.05), it being the intention of the parties hereto that all of the Obligations shall be the joint and several obligations of each of the Borrowers without preferences or distinction among them.  If and to the extent that any of the Borrowers shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event, the other Borrowers will make such payment with respect to, or perform, such Obligation.  Subject to the terms and conditions hereof, the Obligations of each of the Borrowers under the provisions of this Section 4.05 constitute the absolute and unconditional, full recourse Obligations of each of the Borrowers, enforceable against each such Person to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement, the other Loan Documents or any other circumstances whatsoever.

(c)     The provisions of this Section 4.05 are made for the benefit of the Agents, the Lenders and their successors and assigns, and may be enforced by them from time to time against any or all of the Borrowers as often as occasion therefor may arise and without requirement on the part of the Agents, the Lenders or such successors or assigns first to marshal any of its or their claims or to exercise any of its or their rights against any of the other Borrowers or to exhaust any remedies available to it or them against any of the other Borrowers or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy.  The provisions of this Section 4.05 shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied.

(d)     Each of the Borrowers hereby agrees that it will not enforce any of its rights of contribution or subrogation against the other Borrowers with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to the Agents or the Lenders with respect to any of the Obligations or any Collateral, until such time as all of the Obligations have been paid in full in cash.  Any claim which any Borrower may have against any other Borrower with respect to any payments to the Agents or the Lenders hereunder or under any other Loan Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations.

## ARTICLE V

## CONDITIONS TO LOANS

Section 5.01    Conditions Precedent to Effectiveness and Funding Interim DIP New Money Loans.  This Agreement and the obligation of each Lender to fund the Interim DIP New Money Loans on the Effective Date shall become effective as of the Business Day (the "Effective Date") when each of the following conditions precedent shall have been satisfied in a manner satisfactory to the Agents and the Required Lenders:

(a)     Payment of Fees, Etc.  The Borrowers shall have paid on or before the Effective Date all fees, costs, expenses and taxes then payable pursuant to Section 2.06 and Section 12.04.

(b)     [Reserved].

(c)     Legality.  The making of the initial Loans shall not contravene any law, rule or regulation applicable to any Secured Party.

(d)     Delivery of Documents.  The Administrative Agent and the Lenders (or their respective counsel) shall have received on or before the Effective Date the following, each in form and substance satisfactory to the Agents and the Required Lenders and, unless indicated otherwise, dated the Effective Date and, if applicable, duly executed by the Persons party thereto:

(i)     a Security Agreement, together with the original stock certificates representing all of the Equity Interests and all promissory notes required to be pledged thereunder, accompanied by undated stock powers executed in blank and other proper instruments of transfer;

60

(ii)     the results of searches for any effective UCC financing statements, tax Liens or judgment Liens filed against any Loan Party or its property, which results shall not show any such Liens (other than Permitted Liens acceptable to the Required Lenders);

(iii)    a Perfection Certificate;

(iv)    [reserved];

(v)     the Intercompany Subordination Agreement;

(vi)    a certificate of an Authorized Officer of each Loan Party, certifying (A) as to copies of the Governing Documents of such Loan Party, together with all amendments thereto (including, without limitation, a true and complete copy of the charter, certificate of formation, certificate of limited partnership or other publicly filed organizational document of each Loan Party certified as of a recent date not more than 30 days prior to the Effective Date by an appropriate official of the jurisdiction of organization of such Loan Party which shall set forth the same complete name of such Loan Party as is set forth herein and the organizational number of such Loan Party, if an organizational number is issued in such jurisdiction), (B) as to a copy of the resolutions or written consents of such Loan Party authorizing (1) the borrowings hereunder and the transactions contemplated by the Loan Documents to which such Loan Party is or will be a party, and (2) the execution, delivery and performance by such Loan Party of each Loan Document to which such Loan Party is or will be a party and the execution and delivery of the other documents to be delivered by such Person in connection herewith and therewith, (C) the names and true signatures of the representatives of such Loan Party authorized to sign each Loan Document (in the case of a Borrower, including, without limitation, Notices of Borrowing and all other notices under this Agreement and the other Loan Documents) to which such Loan Party is or will be a party and the other documents to be executed and delivered by such Loan Party in connection herewith and therewith, together with evidence of the incumbency of such Authorized Officers and (D) as to the matters set forth in Section 5.02(b);

(vii)   a certificate of an Authorized Officer of the Parent attaching a copy of the Financial Statements described in Section 6.01(g) hereof and certifying as to the compliance with the representations and warranties set forth in Section 6.01(g);

(viii)  a certificate of the appropriate official(s) of the jurisdiction of organization and each jurisdiction of foreign qualification of each Loan Party certifying as of a recent date not more than 30 days prior to the Effective Date as to the subsistence in good standing of, and the payment of taxes by, such Loan Party in such jurisdictions; and

(ix)    [reserved].

(e)     [Reserved].

(f)     [Reserved].

(g)     Approvals.  All consents, authorizations and approvals of, and filings and registrations with, and all other actions in respect of, any Governmental Authority or other Person required in connection with the making of the Loans, or the conduct of the Loan Parties' business,

61

or the consummation of any of the underlying transactions, shall have been obtained and shall be in full force and effect.

(h)     Proceedings; Receipt of Documents.  All proceedings in connection with the making of the Interim DIP New Money Loans and the other transactions contemplated by this Agreement and the other Loan Documents, and all documents incidental hereto and thereto, shall be satisfactory to the Agents, the Required Lenders, and their counsel, and the Agents, the Required Lenders, and such counsel shall have received all such information and such counterpart originals or certified or other copies of such documents as the Agents, the Required Lenders, or such counsel may reasonably request.

(i)     [Reserved].

(j)     [Reserved].

(k)     Security Interests.  The DIP Orders shall create, and the Loan Documents shall further evidence, in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable first priority security interest in the Collateral secured thereby (subject only to Permitted Liens) and no senior Liens other than Permitted Specified Liens, to the extent such Liens would have priority over the Liens in favor of the Collateral Agent pursuant to the DIP Orders.

(l)     Litigation.  Except for the Chapter 11 Cases, there shall exist no claim, action, suit, investigation, litigation or proceeding (including, without limitation, shareholder or derivative litigation) pending or threatened in any court or before any arbitrator or Governmental Authority which relates to the Loans or which, in the opinion of the Required Lenders, is reasonably likely to be adversely determined, and that, if adversely determined, would reasonably be expected to have a Material Adverse Effect.

(m)     Initial DIP Budget.  The Lenders shall have received the Initial DIP Budget.

(n)     Chapter 11 Cases.  The Chapter 11 Cases shall have been commenced in the Bankruptcy Court and all of the "first day orders" and all related pleadings to be filed at the time of commencement of the Chapter 11 Cases or shortly thereafter shall have been reviewed in advance by the Required Lenders and shall be in form and substance reasonably acceptable to the Required Lenders.

(o)     Interim DIP Order.  The Interim DIP Order Entry Date shall have occurred, and the Interim DIP Order shall be in full force and effect.

(p)     First Day Orders.  All of the "first day orders" entered by the Bankruptcy Court on or about the Petition Date or the Effective Date (and if any such orders shall have not been entered by the Bankruptcy Court, the form of such orders submitted to the Bankruptcy Court for approval) relating to (i) the Debtors' cash management systems and arrangements, (ii) any rights or remedies of any Secured Party, (iii) this Agreement, (iv) the Collateral, any Liens thereon or any DIP Superpriority Claims, (v) the use of cash collateral, (vi) debtor-in-possession financing, (vii) adequate protection or otherwise relating to the Prepetition Financing Agreement and the Prepetition April 2026 Notes Indenture or (viii) any chapter 11 plan shall, in each case, be in form

and substance satisfactory to the Agents (solely in respect of provisions materially relating to the Agents) and the Required Lenders in their reasonable discretion.

(q)     <u>Other Orders</u>.  All orders entered by the Bankruptcy Court pertaining to any payment of the Loan Parties' vendors, shippers, or other trade counterparties and all motions and other documents filed, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance reasonably satisfactory to the Required Lenders.

Section 5.02   <u>Conditions to Availability of All New Money Loans</u>.  The obligation of each Lender to make any New Money Loan (including the Interim DIP New Money Loans) hereunder shall be subject to, and to the satisfaction of, each of the conditions precedent set forth below.

(a)     <u>Notice</u>.  The Administrative Agent shall have received a Notice of Borrowing as required by Section 2.02 hereof.

(b)     <u>Representations and Warranties</u>. The following statements shall be true and correct:  (i) the representations and warranties contained in ARTICLE VI and in each other Loan Document, certificate or other writing delivered to any Secured Party pursuant hereto or thereto on or prior to the Effective Date or the Final DIP Loan Date, as applicable, are true and correct on and as of the Effective Date or the Final DIP Loan Date, as applicable, as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct on and as of such earlier date) and (ii) no Default or Event of Default shall have occurred and be continuing on the Effective Date or the Final DIP Loan Date, as applicable, or would result from this Agreement or the other Loan Documents becoming effective in accordance with its or their respective terms.

(c)     <u>No Material Adverse Effect</u>.  Since the Petition Date, there shall have been no events or occurrences that have resulted in a Material Adverse Effect.

(d)     <u>Fees and Expenses</u>.  The Agents and the Lenders shall have received all fees and other amounts due and payable, including reimbursement or payment of all out-of-pocket fees and expenses (including the legal fees and expenses of counsel to the Agents and the Lenders) required to be reimbursed or paid by a Loan Party under any Loan Document.

(e)     <u>Final DIP New Money Loans</u>.  With respect to the Final DIP New Money Loans, within thirty-five (35) days of the Petition Date, the Final DIP Order Entry Date shall have occurred and the Administrative Agent and the Lenders shall have received a true and complete copy of the Final DIP Order, and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated absent prior written consent of the Required Lenders and the Agents.

(f)     <u>Compliance with DIP Orders</u>.  The Loan Parties shall be in compliance in all material respects with the DIP Orders.

(g)     <u>No Dismissal</u>.  The Chapter 11 Cases of any of the Debtors shall not have been dismissed or converted to cases under Chapter 7 of the Bankruptcy Code.

(h)     No Trustee.  No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Chapter 11 Cases, and no Debtor shall have applied for, consented to or acquiesced in any such appointment.

(i)     Closing Certificate.  In the case of any borrowing of Loans, the Administrative Agent and the Lenders shall have received a certificate of an Authorized Officer of the Administrative Borrower confirming satisfaction of the conditions set forth in Section 5.02(b) and Section 5.02(c).

Each Notice of Borrowing  submitted by the Borrowers after the Effective Date shall be deemed to be a representation and warranty that the conditions specified in Section 5.02(b), Section 5.02(c) and Section 5.02(f) have been satisfied on and as of the date of the applicable borrowing. For purposes of determining whether the conditions specified in this Section 5.02 have been satisfied, each Lender that has executed this Agreement (or an Assignment and Acceptance or Election Joinder on or prior to the Final DIP Loan Date) shall be deemed to have consented to, approved or accepted, or to be satisfied with, each document or other matter required hereunder to be consented to or approved by or acceptable or satisfactory to such Lender, unless the Administrative Agent shall have received written notice from such Lender prior to the requested date of the borrowing specifying its objection thereto.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES

Section 6.01   Representations and Warranties.  Each Loan Party hereby represents and warrants to the Secured Parties on the Effective Date, on the date of each borrowing (to the extent required by ARTICLE V) as follows:

(a)     Organization, Good Standing, Etc.  Each Loan Party (i) is a corporation, limited liability company or limited partnership duly organized, validly existing and in good standing under the laws of the state or jurisdiction of its organization, (ii) subject to the entry and terms of the DIP Orders and other orders of the Bankruptcy Court, as applicable, has all requisite power and authority to conduct its business as now conducted and as presently contemplated and, in the case of the Borrowers, to make the borrowings hereunder, and to execute and deliver each Loan Document to which it is a party, and to consummate the transactions contemplated thereby, and (iii) is duly qualified to do business and is in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary, except (solely for the purposes of this subclause (iii)) where the failure to be so qualified and in good standing could not reasonably be expected to have a Material Adverse Effect.

(b)     Authorization, Etc.  Other than the DIP Orders, the execution, delivery and performance by each Loan Party of each Loan Document to which it is or will be a party, (i) have been duly authorized by all necessary action, (ii) do not and will not contravene (A) any of its Governing Documents, (B) any applicable Requirement of Law or (C) any Contractual Obligation binding on or otherwise affecting it or any of its properties, (iii) do not and will not result in or

150146488_20

require the creation of any Lien (other than pursuant to any Loan Document) upon or with respect to any of its properties, and (iv) do not and will not result in any default, noncompliance, suspension, revocation, impairment, forfeiture or nonrenewal of any permit, license, authorization or approval applicable to its operations or any of its properties, except, in the case of clauses (ii)(B), (ii)(C) and (iv), to the extent where such contravention, default, noncompliance, suspension, revocation, impairment, forfeiture or nonrenewal could not reasonably be expected to have a Material Adverse Effect.

(c)     Governmental Approvals.  No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority is required in connection with the due execution, delivery and performance by any Loan Party of any Loan Document to which it is or will be a party other than filings and recordings with respect to Collateral to be made, or otherwise delivered to the Collateral Agent for filing or recordation, on the Effective Date.

(d)     Enforceability of Loan Documents.  Subject to the entry and terms of the DIP Orders, this Agreement is, and each other Loan Document to which any Loan Party is or will be a party, when delivered hereunder, will be, a legal, valid and binding obligation of such Person, enforceable against such Person in accordance with its terms, except as enforceability may be limited by the DIP Orders, applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity.

(e)     Capitalization.  On the Effective Date, after giving effect to the transactions contemplated hereby to occur on the Effective Date, the authorized Equity Interests of the Parent and each of its Subsidiaries and the issued and outstanding Equity Interests of the Parent and each of its Subsidiaries are as set forth on Schedule 6.01(e).  All of the issued and outstanding shares of Equity Interests of the Parent and each of its Subsidiaries have been validly issued and are fully paid and nonassessable, and the holders thereof are not entitled to any preemptive, first refusal or other similar rights.  All Equity Interests of such Subsidiaries of the Parent are owned by the Parent free and clear of all Liens (other than Permitted Specified Liens).  Except as described on Schedule 6.01(e), there are no outstanding debt or equity securities of the Parent or any of its Subsidiaries and no outstanding obligations of the Parent or any of its Subsidiaries convertible into or exchangeable for, or warrants, options or other rights for the purchase or acquisition from the Parent or any of its Subsidiaries, or other obligations of the Parent or any of its Subsidiaries to issue, directly or indirectly, any shares of Equity Interests of the Parent or any of its Subsidiaries.

(f)     Litigation.  Except for the Chapter 11 Cases or as set forth in Schedule 6.01(f), there is no pending or, to the best knowledge of any Loan Party, threatened action, suit or proceeding affecting any Loan Party or any of its properties before any court or other Governmental Authority or any arbitrator that (i) if adversely determined, could reasonably be expected to have a Material Adverse Effect or (ii) relates to this Agreement or any other Loan Document or any transaction contemplated hereby or thereby.

(g)     Financial Statements. The Financial Statements, copies of which have been delivered to each Lender, fairly present the consolidated financial condition of the ETI and its Subsidiaries as at the respective dates thereof and the consolidated results of operations of the ETI and its Subsidiaries for the fiscal periods ended on such respective dates, all in accordance with

65

GAAP.  All material indebtedness and other liabilities (including, without limitation, Indebtedness, liabilities for taxes, long-term leases and other unusual forward or long-term commitments), direct or contingent, of the ETI and its Subsidiaries are set forth in the Financial Statements.  Since the Petition Date no event or development has occurred that has had or could reasonably be expected to have a Material Adverse Effect.

(h)     Compliance with Law, Etc.  Except for the Chapter 11 Cases or as otherwise disclosed to the Lenders, there are no Loan Party or any of its Subsidiaries is in violation of (i) any of its Governing Documents, (ii) any Requirement of Law, except where the failure to so comply could not reasonably be expected to have a Material Adverse Effect, or (iii) any material term of any Contractual Obligation (including, without limitation, any Material Contract) binding on or otherwise affecting it or any of its properties, except where the failure to so comply could not reasonably be expected to have a Material Adverse Effect, and no default or event of default has occurred and is continuing thereunder.

(i)     ERISA.  Except as set forth on Schedule 6.01(i), (i) each Loan Party and each Employee Plan is in compliance with all Requirements of Law in all material respects, including ERISA, the Internal Revenue Code and the Patient Protection and Affordable Care Act of 2010, as amended by the Health Care and Education Reconciliation Act of 2010, (ii) no ERISA Event has occurred nor is reasonably expected to occur with respect to any Employee Plan or Multiemployer Plan, (iii) the most recent annual report (Form 5500 Series) with respect to each Pension Plan, including any required Schedule B (Actuarial Information) thereto, copies of which have been filed with the Internal Revenue Service and delivered to the Required Lenders (or their counsel), is complete and correct and fairly presents the funding status of such Pension Plan, and since the date of such report, there has been no material adverse change in such funding status, (iv) copies of each agreement entered into with the PBGC, the U.S. Department of Labor or the Internal Revenue Service with respect to any Employee Plan have been delivered to the Required Lenders (or their counsel), and (v) each Employee Plan that is intended to be a qualified plan under Section 401(a) of the Internal Revenue Code has been determined by the Internal Revenue Service to be qualified under Section 401(a) of the Internal Revenue Code and the trust related thereto is exempt from federal income tax under Section 501(a) of the Internal Revenue Code.  No Loan Party or any of its ERISA Affiliates has incurred any liability to the PBGC which remains outstanding other than the payment of premiums, and there are no premium payments which have become due which are unpaid.  There are no pending or, to the best knowledge of any Loan Party, threatened claims, actions, proceedings or lawsuits (other than claims for benefits in the normal course) asserted or instituted against (A) any Employee Plan or its assets, (B) any fiduciary with respect to any Employee Plan, or (C) any Loan Party or any of its ERISA Affiliates with respect to any Employee Plan.  Except as required by Section 4980B of the Internal Revenue Code, no Loan Party or any of its ERISA Affiliates maintains an employee welfare benefit plan (as defined in Section 3(1) of ERISA) that provides health benefits (through the purchase of insurance or otherwise) for any retired or former employee of any Loan Party or any of its ERISA Affiliates or has any obligation to provide any such benefits for any current employee after such employee's termination of employment.

(j)     Taxes, Etc.  Subject to the terms of the DIP Orders, (i) all Tax returns and other reports required by applicable Requirements of Law to be filed by any Loan Party have been timely filed and (ii) all Taxes imposed upon any Loan Party or any property of any Loan Party

which have become due and payable on or prior to the date hereof have been paid, except (A) Taxes contested in good faith by proper proceedings which stay the imposition of any Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof on the Financial Statements in accordance with GAAP and (B) Taxes stayed by the Chapter 11 Cases.

(k)    Regulations T, U and X.  No Loan Party is or will be engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation T, U or X), and no proceeds of any Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock or for any purpose that violates, or is inconsistent with, the provisions of Regulation T, U and X.

(l)    Nature of Business.

(i)    No Loan Party is engaged in any business other than as set forth on Schedule 6.01(l).

(ii)    The Parent does not have any material liabilities (other than liabilities arising under the Loan Documents), own any material assets (other than the Equity Interests of its Subsidiaries) or engage in any operations or business (other than the ownership of its Subsidiaries).

(m)    Adverse Agreements, Etc.  Except for the Chapter 11 Cases and the DIP Orders, no Loan Party or any of its Subsidiaries is a party to any Contractual Obligation or subject to any restriction or limitation in any Governing Document or any judgment, order, regulation, ruling or other requirement of a court or other Governmental Authority, which (either individually or in the aggregate) has, or in the future could reasonably be expected (either individually or in the aggregate) to have, a Material Adverse Effect.

(n)    Permits, Etc.  Subject to the terms of the DIP Orders, each Loan Party has, and is in compliance with, all permits, licenses, authorizations, approvals, entitlements and accreditations, including Environmental Permits, required for such Person lawfully to own, lease, manage or operate, or to acquire, each business and Facility currently owned, leased, managed or operated, or to be acquired, by such Person, except to the extent the failure to have or be in compliance therewith could not reasonably be expected to have a Material Adverse Effect.  No condition exists or event has occurred which, in itself or with the giving of notice or lapse of time or both, would result in the suspension, revocation, impairment, forfeiture or non-renewal of any such permit, license, authorization, approval, entitlement or accreditation, including any such Environmental Permit, and there is no claim that any of the foregoing is not in full force and effect.

(o)    Properties.  Subject to the terms of the DIP Orders, each Loan Party has good and marketable title to, valid leasehold interests in, or valid licenses to use, all property and assets material to its business, free and clear of all Liens, except Permitted Liens.  All such properties and assets are in good working order and condition, ordinary wear and tear excepted.

(p)    Employee and Labor Matters.  Except as set forth on Schedule 6.01(p), (i) each Loan Party and its Subsidiaries is in compliance with all Requirements of Law in all material respects pertaining to employment and employment practices, terms and conditions of

67

employment, wages and hours, and occupational safety and health, (ii) no Loan Party or any Subsidiary is party to any collective bargaining agreement, nor has any labor union been recognized as the representative of the employees of any Loan Party of Subsidiary, (iii) there is no unfair labor practice complaint pending or, to the best knowledge of any Loan Party, threatened against any Loan Party or any Subsidiary before any Governmental Authority and no grievance or arbitration proceeding pending or threatened against any Loan Party or any Subsidiary which arises out of or under any collective bargaining agreement, (iv) there has been no strike, work stoppage, slowdown, lockout, or other labor dispute pending or threatened against any Loan Party or any Subsidiary, and (v) to the best knowledge of each Loan Party, no labor organization or group of employees has made a pending demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or threatened to be brought or filed, with the National Labor Relations Board or any other labor relations tribunal or authority. No Loan Party or Subsidiary has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act ("WARN") or any similar Requirement of Law, which remains unpaid or unsatisfied. All payments due from any Loan Party or Subsidiary on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of such Loan Party or Subsidiary except where the failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(q)     Environmental Matters.  Except as set forth on Schedule 6.01(q) hereto, (i) no Loan Party or any of its Subsidiaries is in violation of any Environmental Law, (ii) each Loan Party and each of its Subsidiaries has, and is in compliance with, all Environmental Permits for its respective operations and businesses, except to the extent any failure to have or be in compliance therewith could not reasonably be expected to result in any adverse consequence to any Loan Party (other than immaterial consequences) or any Secured Party; (iii)  there has been no Release or threatened Release of Hazardous Materials on, in, at, under or from any properties currently or formerly owned, leased or operated by any Loan Party, its Subsidiaries or a respective predecessor in interest or at any disposal or treatment facility which received Hazardous Materials generated by any Loan Party, its Subsidiaries or any respective predecessor in interest, which in any case of the foregoing could reasonably be expected to result in any adverse consequence to any Loan Party (other than immaterial consequences) or any Secured Party; (iv)  there are no pending or threatened Environmental Claims against, or Environmental Liability of, any Loan Party, its Subsidiaries or any respective predecessor in interest that could reasonably be expected to result in any adverse consequence to any Loan Party (other than immaterial consequences) or any Secured Party; (v) neither any Loan Party nor any of its Subsidiaries is performing or responsible for any Remedial Action that could reasonably be expected to result in any adverse consequence to any Loan Party (other than immaterial consequences) or any Secured Party; and (vi)  the Loan Parties have made available to the Required Lenders (or their counsel) true and complete copies of all material environmental reports, audits and investigations in the possession or control of any Loan Party or any of its Subsidiaries with respect to the operations and business of the Loan Parties and its Subsidiaries.

(r)     Insurance.  Each Loan Party maintains all insurance required by Section 7.01(h).  Schedule 6.01(r) sets forth a list of all such insurance maintained by or for the benefit of each Loan Party on the Effective Date.

(s)     Use of Proceeds.  The proceeds of the Loans will be used in accordance (i) in all material respects with the terms of the DIP Orders and the Loan Documents and (ii) with and subject to the Approved Budget, subject to Permitted Variances, in each case including, without limitation (a) to pay professional fees and other restructuring charges arising on account of the Chapter 11 Cases, including statutory fees of the United States Trustee and allowed professional fees and expenses of an unsecured creditors' committee appointed in the Chapter 11 Cases (if any), (b) to pay amounts due to Lenders and the Agents hereunder and professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by Lenders, the Agents and the Loan Parties, including those incurred in connection with the preparation, negotiation, documentation and court approval of the transactions contemplated hereby, (c) to repay obligations under the Prepetition April 2026 Notes Documents solely in connection with the deemed funding of the Roll-Up Loans, (d) to pay the February 28 Funding (as defined in the Interim DIP Order) and (e) to provide working capital, and for other general corporate purposes of the Loan Parties, and to pay administration costs of the Chapter 11 Cases and claims or amounts approved by the Bankruptcy Court and for any other purpose not prohibited by the terms hereof, in all cases, subject to the Approved Budget as then in effect (subject to any Permitted Variances).

(t)     Collateral Documents. The DIP Orders are effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid, binding and enforceable security interest in the Collateral and the proceeds and products thereof without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements or other agreements or documents. The Security Agreement further evidences the legal and valid Liens on all the Collateral in favor of the Collateral Agent, for the benefit of the Secured Parties. When the Interim DIP Order Entry Date occurs, the Liens created by the DIP Orders shall constitute fully perfected first priority Liens on, and security interests in, all right, title and interest of the grantors thereunder in the Collateral, subject to no Liens other than Permitted Liens and subject to no senior Liens other than Permitted Specified Liens, to the extent such Liens would have priority over the Liens in favor of the Collateral Agent pursuant to the DIP Orders, in each case as further evidenced by (i) financing statements in appropriate form filed in the offices specified in the  Security Agreement and (ii) any other filings contemplated hereby and by the Security Agreement.

(u)     Intellectual Property.  Except as set forth on Schedule 6.01(u), each Loan Party owns or licenses or otherwise has the right to use all Intellectual Property rights that are necessary for the operation of its business, without infringement upon or conflict with the rights of any other Person with respect thereto, except for such infringements and conflicts which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  Set forth on Schedule 6.01(u) is a complete and accurate list as of the Effective Date of (i) each item of Registered Intellectual Property owned by each Loan Party; (ii) each material work of authorship owned by each Loan party and which is not Registered Intellectual Property, and (iii) each material Intellectual Property Contract to which each Loan Party is bound.  No trademark or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Loan Party infringes upon or conflicts with any rights owned by any other Person, and no claim or litigation regarding any of the foregoing is pending or threatened, except for such infringements and conflicts which could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. To the

69

knowledge of each Loan Party, no patent, invention, device, application, principle or any statute, law, rule, regulation, standard or code pertaining to Intellectual Property is pending or proposed, which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(v)     Material Contracts.  Each Material Contract (i) is in full force and effect and is binding upon and enforceable against each Loan Party that is a party thereto and, to the best knowledge of such Loan Party, all other parties thereto in accordance with its terms, (ii) has not been otherwise amended or modified, and (iii) is not in default due to the action of any Loan Party or, to the best knowledge of any Loan Party, any other party thereto.

(w)     Investment Company Act.  None of the Loan Parties is (i) an "investment company" or an "affiliated person" or "promoter" of, or "principal underwriter" of or for, an "investment company", as such terms are defined in the Investment Company Act of 1940, as amended, or (ii) subject to regulation under any Requirement of Law that limits in any respect its ability to incur Indebtedness or which may otherwise render all or a portion of the Obligations unenforceable.

(x)     Customers and Suppliers.  There exists no actual or threatened termination, cancellation or limitation of, or modification to or change in, the business relationship between (i) any Loan Party, on the one hand, and any customer or any group thereof, on the other hand, whose agreements with any Loan Party are individually or in the aggregate material to the business or operations of such Loan Party, or (ii) any Loan Party, on the one hand, and any supplier or any group thereof, on the other hand, whose agreements with any Loan Party are individually or in the aggregate material to the business or operations of such Loan Party; and there exists no present state of facts or circumstances that could give rise to or result in any such termination, cancellation, limitation, modification or change.

(y)     [Reserved].

(z)     Sanctions; Anti-Corruption and Anti-Money Laundering Laws.  None of any Loan Party, any Subsidiary thereof, any of their respective directors, officers, or employees, shareholders or owners, nor, to the knowledge of any Loan Party, any of their respective agents or Affiliates, (i) is a Sanctioned Person or currently the subject or target of any Sanctions, (ii) has assets located in a Sanctioned Country, (iii) conducts any business with or for the benefit of any Sanctioned Person, (iv) directly or indirectly derives revenues from investments in, or transactions with, Sanctioned Persons, (v) is a "Foreign Shell Bank" within the meaning of the USA Patriot Act, i.e., a foreign bank that does not have a physical presence in any country and that is not affiliated with a bank that has a physical presence and an acceptable level of regulation and supervision, or (vi) is a Person that resides in or is organized under the laws of a jurisdiction designated by the United States Secretary of the Treasury under Section 311 or 312 of the USA Patriot Act as warranting special measures due to money laundering concerns.  Each Loan Party and its Subsidiaries has implemented and maintains in effect policies and procedures designed to ensure compliance by each Loan Party and its Subsidiaries and their respective directors, officers, employees, agents and Affiliates with all Anti-Corruption Laws and Anti-Money Laundering Law. Each Loan Party and each Subsidiary is in compliance with all Sanctions, Anti-Money Laundering Laws and Anti-Corruption Laws.  Each Loan Party and each Affiliate, officer, employee or director

acting on behalf of any Loan Party is (and is taking no action that would result in any such Person not being) in compliance with (A) all applicable OFAC rules and regulations, (B) all applicable United States of America, United Kingdom, United Nations, European Union, German, Canadian, Australian and all other internationally respected national autonomous sanctions, embargos and trade restrictions and (C) all applicable provisions of the USA Patriot Act.  In addition, no Loan Party or any Subsidiary is engaged in any kind of activities or business of or with any Person or in any country or territory that is subject to any sanctions administered by OFAC, the United Kingdom, the European Union, Germany, Canada, Australia or the United Nations.

(aa)    Anti-Bribery and Corruption.

(i)    Neither any Loan Party nor, to the best knowledge of any Loan Party, any director, officer, employee, or any other Person acting on behalf of any Loan Party, has offered, promised, paid, given or authorized the payment or giving of any money or other thing of value, directly or indirectly, to or for the benefit of any Person, including without limitation, any employee, official or other Person acting on behalf of any Governmental Authority, or otherwise engaged in any activity that may violate any Anti-Corruption Law.

(ii)    Neither any Loan Party nor, to the best knowledge of any Loan Party, any director, officer, employee, or any other Person acting on behalf of any Loan Party, has engaged in any activity that would breach any Anti-Corruption Laws.

(iii)    To the best of each Loan Party's knowledge and belief, there is no pending or, to the best knowledge of any Loan Party, threatened action, suit, proceeding or investigation before any court or other Governmental Authority against any Loan Party or any of its directors, officers, employees or other Person acting on its behalf that relates to a potential violation of any Anti-Corruption Laws, Anti-Money Laundering Laws or Sanctions.

(iv)    The Loan Parties will not directly or indirectly use, lend or contribute the proceeds of the advances for any purpose that would breach the anti-bribery and Anti-Corruption Laws.

(bb)    Approved Budget.  The Approved Budget was prepared in good faith based on assumptions believed by the Loan Parties to be reasonable at the time made and upon information believed by the Authorized Officers of the Loan Parties to have been reasonable based upon the information available at the time such Approved Budget was furnished; it being understood and agreed that the information and/or projections included in the Approved Budget are not to be viewed as facts and are subject to significant contingencies, many of which are not within the control of the Loan Parties and/or any Subsidiary, and that projected or estimated information may differ from actual results, and such differences may be material. On and after the delivery of any Variance Report in accordance with this Agreement, such Variance Report fairly represents, in all material respects, the information covered thereby. To the knowledge of the Loan Parties, no facts exist that (individually or in the aggregate) would result in any material change in the then-applicable Approved Budget.

(cc)    DIP Orders.

(i)        The Interim DIP Order (and when applicable, the Final DIP Order) is, following the entry thereof, effective to (i) cause the Obligations to be DIP Superpriority Claims, having the status and priority set forth in the Interim DIP Order (and when applicable, the Final DIP Order) and (ii) create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid, binding and enforceable perfected first priority security interest (in accordance with the priorities set forth in the Interim DIP Order (and when applicable, the Final DIP Order)) in the Collateral without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements or documents.

(ii)        The Interim DIP Order (and when applicable, the Final DIP Order) is in full force and effect, and has not been vacated, reversed, terminated, stayed, modified or amended in any manner without the consent of the Agents and the Required Lenders in their reasonable discretion.

(iii)        Upon the occurrence of the Final Maturity Date (whether by acceleration or otherwise), the Secured Parties shall, subject to ARTICLE IX and the applicable provisions of the Interim DIP Order (and when applicable, the Final DIP Order), be entitled to immediate payment of the Obligations and to enforce the remedies provided for under this Agreement and the other Loan Documents in accordance with the terms hereof and thereof, in each case without further application to or order by the Bankruptcy Court.

(iv)        If the Interim DIP Order (and when applicable, the Final DIP Order) is the subject of a pending appeal in any respect, none of the Interim DIP Order (and when applicable, the Final DIP Order), the extension of credit or the performance by any Loan Party of any of its obligations under this Agreement or any of the other Loan Documents shall be the subject of a presently effective stay pending appeal. The Debtors, the Agents and the Lenders shall be entitled to rely in good faith upon the Interim DIP Order (and when applicable, the Final DIP Order), notwithstanding objection thereto or appeal therefrom by any interested party. The Debtors, the Agents and the Lenders shall be permitted and required to perform their respective obligations in compliance with the Loan Documents notwithstanding any such objection or appeal, unless the Interim DIP Order (and when applicable, the Final DIP Order) has been stayed by a court of competent jurisdiction.

(dd)        <u>Appointment of Trustee or Examiner; Liquidation</u>. No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Chapter 11 Cases, and no Debtor shall have applied for, consented to or acquiesced in any such appointment. No order has been entered in any of the Chapter 11 Cases to convert any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or to dismiss any of the Chapter 11 Cases.

(ee)        <u>Adverse Proceedings</u>. Other than the Chapter 11 Cases, there are no material unstayed Adverse Proceedings now pending or threatened or affecting the Borrowers, the Guarantors or any of their respective Subsidiaries before any court, Governmental Authority or arbitrator.

(ff)        [Reserved].

(gg)   <u>Full Disclosure</u>.   Each Loan Party has disclosed to the Agents all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.   None of the reports, financial statements, certificates or other information furnished by or on behalf of any Loan Party to the Agents (other than forward-looking information and projections and information of a general economic nature and general information about Borrowers' industry) in connection with the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which it was made, not misleading.

## ARTICLE VII

## COVENANTS OF THE LOAN PARTIES AND OTHER COLLATERAL MATTERS

Section 7.01   <u>Affirmative Covenants</u>.   So long as any principal of or interest on any Loan or any other Obligation (whether or not due) shall remain unpaid (other than Contingent Indemnity Obligations) or any Lender shall have any Commitment hereunder, the Parent, the Affiliated Guarantors and the Borrowers shall and shall cause each other Reporting Entity and the Parent to comply with their respective obligations set forth in this Section 7.01, unless the Required Lenders shall otherwise consent in writing:

(a)   <u>Reporting Requirements</u>.

(i)   [Reserved].

(ii)   [Reserved].

(iii)   [Reserved].

(iv)   [Reserved].

(v)   [Reserved].

(vi)   as soon as available, and in any event within 30 days after the end of each fiscal month of the Reporting Entities commencing with the first fiscal month of the Reporting Entities ending after the Effective Date, (A) (x) internally prepared consolidated and consolidating balance sheets, statements of operations and retained earnings and statements of cash flows as at the end of such fiscal month, and for the period commencing at the end of the immediately preceding Fiscal Year and ending with the end of such fiscal month, setting forth in each case in comparative form the figures for the corresponding date or period set forth in the financial statements for the immediately preceding Fiscal Year, in reasonable detail and certified by an Authorized Officer of the Parent as fairly presenting the financial position of the Reporting Entities as at the end of such fiscal month and the results of operations, retained earnings and cash flows of the Reporting Entities for such fiscal month and for such year-to-date period, in accordance with GAAP applied in a manner consistent with that of the most recent audited financial statements furnished to the Lenders, subject to the absence of footnotes and normal year-end adjustments and (y) a report of key performance indicators by category during such fiscal

73

month for the business of the Reporting Entities and any additional financial information as may be reasonably requested by the Required Lenders, and (B) the same information and reports referenced in the foregoing clause (vi)(A) for the Reporting Entities (but expressly excluding the Neon Entities and the XBP Entities).

(vii)    [Reserved].

(viii)    [Reserved].

(ix)    Promptly after submission to any Governmental Authority, all documents and information furnished to such Governmental Authority in connection with any investigation of any Loan Party other than routine inquiries by such Governmental Authority.

(x)    As soon as possible, and in any event within 3 days after the occurrence of an Event of Default or Default or the occurrence of any event or development that could reasonably be expected to have a Material Adverse Effect, the written statement of an Authorized Officer of the Administrative Borrower setting forth the details of such Event of Default or Default or other event or development having a Material Adverse Effect and the action which the affected Loan Party proposes to take with respect thereto.

(xi)    As soon as possible and in any event: (A) at least 10 days prior to any event or development that could reasonably be expected to result in or constitute an ERISA Event, and, to the extent not reasonably expected, within 5 days after the occurrence of any ERISA Event, notice of such ERISA Event (in reasonable detail), (B) within three days after receipt thereof by any Loan Party or any of its ERISA Affiliates from the PBGC, copies of each notice received by any Loan Party or any of its ERISA Affiliates of the PBGC's intention to terminate any Pension Plan or to have a trustee appointed to administer any Pension Plan, (C) within 10 days after the filing thereof with the Internal Revenue Service, copies of each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) with respect to each Pension Plan, (D) within 3 days after receipt thereof by any Loan Party or any of its ERISA Affiliates from a sponsor of a Multiemployer Plan or from the PBGC, a copy of each notice received by any Loan Party or any of its ERISA Affiliates concerning the imposition or amount of withdrawal liability under Section 4202 of ERISA or indicating that such Multiemployer Plan may enter reorganization status under Section 4241 of ERISA, and (E) within 10 days after any Loan Party sends notice of a plant closing or mass layoff (as defined in WARN) to employees, copies of each such notice sent by such Loan Party.

(xii)    Promptly after the commencement thereof but in any event not later than 2 days after service of process with respect thereto on, or the obtaining of knowledge thereof by, any Loan Party, notice of each action, suit or proceeding before any court or other Governmental Authority or other regulatory body or any arbitrator which, if adversely determined, could reasonably be expected to have a Material Adverse Effect.

(xiii)    As soon as possible and in any event within 5 days after execution, receipt or delivery thereof, copies of any material notices that any Loan Party executes or receives in connection with any Material Contract.

(xiv)   As soon as possible and in any event within 5 days after execution, receipt or delivery thereof, copies of any material notices that any Loan Party executes or receives in connection with the sale or other Disposition of all of the assets of, any Loan Party.

(xv)   [Reserved].

(xvi)   Promptly upon receipt thereof, copies of all financial reports (including, without limitation, management letters), if any, submitted to any Loan Party by its auditors in connection with any annual or interim audit of the books thereof.

(xvii)   Promptly upon request, any certification or other evidence requested from time to time by any Lender in its sole discretion, confirming the Borrowers' compliance with Section 7.02(r).

(xviii)   Simultaneously with the delivery of the financial statements of the Reporting Entities required by clause (i) of this Section 7.01(a), if, as a result of any change in accounting principles and policies from those used in the preparation of the Financial Statements that is permitted by Section 7.02(q), the consolidated financial statements of Reporting Entities required by clause (i) of this Section 7.01(a) will differ from the consolidated financial statements that would have been delivered pursuant to such subdivisions had no such change in accounting principles and policies been made, then, together with the first delivery of such financial statements after such change, one or more statements of reconciliation for all such prior financial statements in form and substance satisfactory to the Required Lenders.

(xix)   [Reserved].

(xx)   Approved Budgets. On the Thursday of every fourth week, commencing with April 3, 2025 (or more frequently at the option of the Loan Parties to accommodate changes in business operating activity), the Administrative Borrower shall provide the Administrative Agent and the Lenders with an updated Approved Budget, which Approved Budget shall modify and supersede any prior Budget upon the approval of the Required Lenders in their reasonable discretion; provided, that the Required Lenders shall be deemed to have approved the updated Approved Budget unless they shall object thereto by written notice to the Administrative Borrower within four (4) Business Days after having received such updated Approved Budget; provided, further, that, for the avoidance of doubt, until the conditions for the most recently delivered Approved Budget are met, the prior Approved Budget shall remain in full force and effect for all purposes; provided, further, that after approval of each Approved Budget, the Borrowers shall direct the Administrative Agent (and hereby grants its consent to the Administrative Agent) to distribute such Approved Budget to all Lenders.

(xxi)   Variance Reporting. Subject to the terms of the DIP Orders, commencing on the first full calendar week following the Petition Date and for each calendar week thereafter, on the Thursday of such calendar week (the "Subsequent Testing Date", in each case, testing the trailing four (4) week period ending on the Friday before the applicable testing date), the Administrative Borrower shall deliver to the Administrative Agent a variance report in a form reasonably satisfactory to the Required Lenders (each, a "Variance Report") for the applicable Budget Testing Period setting forth, in reasonable detail, any differences between (i) the aggregate

cumulative actual "receipts" for such Budget Testing Period compared to the projected aggregate cumulative "receipts" set forth in the Approved Budget for such Budget Testing Period and (ii) the aggregate cumulative actual "disbursements" and "expenditures" on a cumulative basis (excluding, for the avoidance of doubt, professional fees) for such Budget Testing Period compared to the projected aggregate "disbursements:" (excluding, for the avoidance of doubt, professional fees) set forth in the Approved Budget for such Budget Testing Period (any such difference in clauses (i), (ii) and (iii) above, a "Variance"), together with a statement from the CRO or the Borrower's deputy restructuring officer certifying the information contained in such Variance Report.  The Variance Report shall also provide a reasonably detailed explanation for any variance that exceeds the Permitted Variance. Amounts not used in a Budget Testing Period are not available in a subsequent Budget Testing Period.

(xxii)   Other Information. The Borrowers shall deliver:

(A)   to counsel to the Required Lenders, (x) as soon as reasonably practicable (if at all) in advance of filing with the Bankruptcy Court or delivering to an unsecured creditors' committee appointed in the Chapter 11 Cases (if any) or the U.S. Trustee, as the case may be, the Final DIP Order and all other proposed orders, motions, filings and pleadings reasonably related to the Loans and the Loan Documents, any Plan of Reorganization and/or any disclosure statement related thereto and (y) by the earlier of (A) three (3) Business Days prior to being filed (and if impracticable, then as soon as possible and in no event later than promptly after being filed) on behalf of any of the Debtors with the Bankruptcy Court or (B) at the same time as such documents are provided by any of the Debtors to any statutory committee appointed in the Chapter 11 Cases or the U.S. Trustee, all other notices, filings, motions, pleadings or other information concerning the financial condition of the Borrowers or any of their Subsidiaries or other Indebtedness of the Loan Parties or any request for relief under Section 363, 365, 1113 or 1114 of the Bankruptcy Code or Section 9019 of the Federal Rules of Bankruptcy Procedure, in each case, other than notices, filings, motions, pleadings or other information concerning less than $1,000,000 in value;

(B)   to counsel to the Required Lenders, promptly after the same are available and to the extent feasible not later than three (3) Business Days prior to the filing thereof (other than in exigent circumstances in which case as soon as practicable), all pleadings, motions, applications and any other documents to be filed by or on behalf of the Loan Parties;

(C)   subject to any applicable confidentiality restrictions, to counsel to the Required Lenders, receipt (and copy of) of any proposal or indication of interest for the restructuring or recapitalization of any Loan Party or any Subsidiary of any Loan Party or the sale of all or any of any Loan Party's assets or businesses;

(D)   to the Administrative Agent for prompt further distribution to each Lender, any motion for the appointment of a trustee or examiner;

(E)   to the Administrative Agent for prompt further distribution to each Lender, receipt of any written notice of a default or event of default delivered to any Loan Party under any debt agreements or instruments in respect of Indebtedness in excess of $1,000,000; and

150146488_20

(F)     to the Administrative Agent for prompt further distribution to each Lender, (1) the filing or commencement of, or any written threat or notice of intention of any Person to file or commence, any Adverse Proceeding not previously disclosed in writing by the Borrowers to the Administrative Agent and the Required Lenders, or (2) written notice of any material development in any Adverse Proceeding that would reasonably be expected to be adversely determined and that, if adversely determined, would reasonably be expected to have a Material Adverse Effect, or that seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated hereby.

(b)     <u>Additional Guarantors and Collateral Security</u>.  Subject to the DIP Orders, the Borrowers shall cause each Subsidiary that is not an Excluded Subsidiary, and each Affiliated Guarantor shall cause each of Neon Parent and each other Neon Entity to:

(i)     execute and deliver to the Collateral Agent promptly and in any event within 3 days after the formation, acquisition or change in status thereof, (A) a joinder agreement pursuant to which such Subsidiary shall be made a party to this Agreement as a Guarantor, (B) a supplement to the Security Agreement, together with (1) certificates evidencing all of the Equity Interests of any Person owned by such Subsidiary required to be pledged under the terms of the Security Agreement, (2) undated stock powers for such Equity Interests executed in blank with signature guaranteed, and (3) such opinions of counsel as the Collateral Agent or the Required Lenders may reasonably request, (C) [reserved], and (D) such other agreements, instruments, approvals or other documents reasonably requested by the Collateral Agent or the Required Lenders in order to create, perfect, establish the first priority of or otherwise protect any Lien purported to be covered by any such Security Agreement or otherwise to effect the intent that such Subsidiary shall become bound by all of the terms, covenants and agreements contained in the Loan Documents and that all property and assets of such Subsidiary shall become Collateral for the Obligations; and

(ii)     cause each owner of the Equity Interests of any such Subsidiary to execute and deliver promptly and in any event within 3 days after the formation or acquisition of such Subsidiary a Pledge Amendment (as defined in the Security Agreement), together with (A) certificates evidencing all of the Equity Interests of such Subsidiary required to be pledged under the terms of the Security Agreement, (B) undated stock powers or other appropriate instruments of assignment for such Equity Interests executed in blank with signature guaranteed, (C) such opinions of counsel as the Collateral Agent or the Required Lenders may reasonably request and (D) such other agreements, instruments, approvals or other documents requested by the Collateral Agent or the Required Lenders.

Notwithstanding the foregoing, no Excluded Subsidiary shall be required to become a Guarantor hereunder (and, as such, shall not be required to deliver the documents required by clause (i) above); <u>provided</u>, <u>however</u>, that (I) if the Equity Interests of a Foreign Subsidiary that is an Excluded Subsidiary are owned by a Loan Party, such Loan Party shall deliver all such documents, instruments, agreements (including, without limitation, at the reasonable request of the Required Lenders, a pledge agreement governed by the laws of the jurisdiction of the organization of such Excluded Subsidiary, in form and substance satisfactory to the Collateral Agent and the Required Lenders) and certificates described in clause (ii) above to the Collateral Agent, and take all commercially reasonable actions reasonably requested by the Required Lenders

77

or otherwise necessary to grant and to perfect a first-priority Lien (subject to Permitted Specified Liens) in favor of the Collateral Agent, for the benefit of the Secured Parties, in 65% of the voting Equity Interests of such Foreign Subsidiary and 100% of all other Equity Interests of such Foreign Subsidiary owned by such Loan Party, and (II) promptly and in any event within 20 days after the effectiveness of any amendment of the Internal Revenue Code to allow for 100% of the voting Equity Interests of such Foreign Subsidiary to be pledged to the Collateral Agent without material adverse tax consequences to the Parent and its Subsidiaries, 100% of such voting Equity Interests shall be pledged pursuant to clause (ii) above.

(c)     Compliance with Laws; Payment of Taxes.

(i)     Comply, and cause each of its Subsidiaries to comply, in all material respects, with all Requirements of Law, judgments and awards (including any settlement of any claim that, if breached, could give rise to any of the foregoing.

(ii)     Pay, and cause each of its Subsidiaries to pay, in full before delinquency or before the expiration of any extension period, all Taxes imposed upon any Loan Party or any of its Subsidiaries or any property of any Loan Party or any of its Subsidiaries, except Taxes contested in good faith by proper proceedings which stay the imposition of any Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof in accordance with GAAP.

(d)     Preservation of Existence, Etc.  Maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, its existence, rights and privileges, and become or remain, and cause each of its Subsidiaries to become or remain, duly qualified and in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary, except to the extent that the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect.

(e)     Keeping of Records and Books of Account.  Keep, and cause each of its Subsidiaries to keep, adequate records and books of account, with complete entries made to permit the preparation of financial statements in accordance with GAAP.

(f)     Inspection Rights.  Permit, and cause each of its Subsidiaries to permit, the agents, advisors and representatives of any Agent at any time and from time to time during normal business hours, at the expense of the Borrowers, to examine and make copies of and abstracts from its records and books of account, to visit and inspect its properties, to verify materials, leases, notes, accounts receivable, deposit accounts and its other assets, to conduct audits, physical counts, valuations, appraisals or examinations and to discuss its affairs, finances and accounts with any of its directors, officers, managerial employees, independent accountants or any of its other representatives.  In furtherance of the foregoing, each Loan Party hereby authorizes its independent accountants, and the independent accountants of each of its Subsidiaries, to discuss the affairs, finances and accounts of such Person (independently or together with representatives of such Person) with the agents and representatives of any Agent in accordance with this Section 7.01(f).

(g)     Maintenance of Properties, Etc.  Maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, all of its properties which are necessary or useful in the

78

proper conduct of its business in good working order and condition, ordinary wear and tear and casualty excepted, and comply, and cause each of its Subsidiaries to comply, at all times with the provisions of all leases to which it is a party as lessee or under which it occupies property, so as to prevent any loss or forfeiture thereof or thereunder, thereunder, except to the extent the failure to so maintain and preserve or so comply could not reasonably be expected to have a Material Adverse Effect.

        (h)    <u>Maintenance of Insurance</u>.  Maintain, and cause each of its Subsidiaries to maintain, insurance with responsible and reputable insurance companies or associations (including, without limitation, comprehensive general liability, hazard, flood,  rent, worker's compensation and business interruption insurance) with respect to the Collateral and its other properties (including all real property leased or owned by it) and business, in such amounts and covering such risks as is (i) carried generally in accordance with sound business practice by companies in Similar Businesses similarly situated, (ii) required by any Requirement of Law, (iii) required by any Material Contract and (iv) in any event in amount, adequacy and scope reasonably satisfactory to the Required Lenders.  All policies covering the Collateral are to be made payable to the Collateral Agent for the benefit of the Secured Parties, as their interests may appear, in case of loss, under a standard non contributory "lender" or "secured party" clause and are to contain such other provisions as the Collateral Agent or the Required Lenders may require to fully protect the Secured Parties' interest in the Collateral and to any payments to be made under such policies.  All certificates of insurance are to be delivered to the Collateral Agent and the policies are to be premium prepaid, with the loss payable and additional insured endorsement in favor of the Collateral Agent for the benefit of the Secured Parties, as their respective interests may appear, and such other Persons as the Collateral Agent may designate from time to time, and shall provide for not less than 30 days' (10 days' in the case of non-payment) prior written notice to the Collateral Agent of the exercise of any right of cancellation.  If any Loan Party or any of its Subsidiaries fails to maintain such insurance, the Collateral Agent may arrange for such insurance, but at the Borrowers' expense and without any responsibility on the Collateral Agent's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims.  Upon the occurrence and during the continuance of an Event of Default, the Collateral Agent shall have the sole right, in the name of the Secured Parties, any Loan Party and its Subsidiaries, to file claims under any insurance policies, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

        (i)    <u>Obtaining of Permits, Etc</u>.  Obtain, maintain and preserve, and cause each of its Subsidiaries to obtain, maintain and preserve, and take all necessary action to timely renew, all permits, licenses, authorizations, approvals, entitlements and accreditations that are necessary or useful in the proper conduct of its business, in each case, except to the extent the failure to obtain, maintain, preserve or take such action could not reasonably be expected to have a Material Adverse Effect.

        (j)    <u>Environmental</u>.

        (i)    Keep the Collateral free of any Environmental Lien;

(ii)     Obtain, maintain and preserve, and cause each of its Subsidiaries to obtain, maintain and preserve, and take all necessary action to timely renew, all Environmental Permits that are necessary or useful in the proper conduct of its business, and comply, and cause each of its Subsidiaries to comply, with all Environmental Laws and Environmental Permits, except to the extent the failure to so obtain, maintain, preserve or comply could not reasonably be expected to result in a material Environmental Claim or Environmental Liability;

(iii)     Take all commercially reasonable steps to prevent any Release or threatened Release of Hazardous Materials in violation of any Environmental Law or Environmental Permit at, in, on, under or from any property owned, leased or operated by any Loan Party or its Subsidiaries that could reasonably be expected to result in material Environmental Liabilities;

(iv)     Provide the Collateral Agent with written notice within ten (10) days of any of the following:  (A) discovery of any Release of a Hazardous Material or environmental condition at, in, on, under or from any property currently or formerly owned, leased or operated by any Loan Party, Subsidiary or predecessor in interest or any violation of Environmental Law or Environmental Permit that in any case could reasonably be expected to result in any material Environmental Claim or Environmental Liability; (B) notice that an Environmental Lien has been filed against any Collateral; or (C) a material Environmental Claim or Environmental Liabilities; and provide such reports, documents and information as the Collateral Agent or the Required Lenders may reasonably request from time to time with respect to any of the foregoing.

(k)     <u>Fiscal Year</u>.  Cause the Fiscal Year of the ETI and its Subsidiaries to end on December 31 of each calendar year unless the Agents and the Required Lenders consent to a change in such Fiscal Year (and appropriate related changes to this Agreement).

(l)     [Reserved].

(m)     <u>After Acquired Real Property</u>.  Upon the acquisition by a Borrower or any Guarantor or Affiliated Guarantor of any After-Acquired Property, or upon any additional Subsidiary of the Parent or of any Affiliated Guarantor becoming a Guarantor or Affiliated Guarantor, as applicable, such Borrower or such Subsidiary shall execute and deliver such mortgages, deeds of trust, security instruments, financing statements and other Collateral Documents as shall be reasonably necessary to vest in the Collateral Agent a perfected first-priority security interest, subject only to Permitted Liens and Liens permitted under Section 7.02(a), in such After-Acquired Property and to have such After-Acquired Property (but subject to the limitations as described in the Collateral Documents and the DIP Orders) added to the Collateral (or in the case of a Guarantor or Affiliated Guarantor, as applicable, all of its assets that constitute After-Acquired Property), and thereupon all provisions of this Agreement relating to the Collateral shall be deemed to relate to such After- Acquired Property to the same extent and with the same force and effect.

(n)     <u>Anti-Corruption Laws; Anti-Money Laundering Laws; Sanctions</u>.

(i)     Maintain, and cause each of its Subsidiaries to maintain, policies and procedures designed to promote compliance by each Loan Party, its Subsidiaries and their

80

150146488_20

respective directors, officers, employees and agents with all Anti-Corruption Laws and Anti-Money Laundering Laws.

(ii)     Comply, and cause each of its Subsidiaries to comply, with all applicable Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions.

(iii)     Neither Loan Party nor, to the best knowledge of any Loan Party, any director, officer, employee or any Person acting on behalf of any Loan Party will engage in any activity that would breach any Anti-Corruption Law.

(iv)     Promptly notify the Administrative Agent in writing of any action, suit or investigations by any court or Governmental Authority in relation to an alleged breach of the Anti-Corruption Law.

(v)     Not directly or indirectly use, lend or contribute the proceeds of any Loan for any purpose that would breach any Anti-Corruption Law.

(vi)     Each Loan Party and Affiliate, officer, employee or director, acting on behalf of the Loan Party is (and will take no action which would result in any such Person not being) in compliance with (A) all applicable OFAC rules and regulations, (B) all applicable United States of America, United Kingdom, United Nations, European Union, German, Canadian, Australian and all other reasonable internationally respected national autonomous sanctions, embargos and trade restrictions and (C) all applicable provisions of the USA Patriot Act.  In addition, none of the activities or business of any Loan Party includes any kind of activities or business of or with any Person or in any country or territory that is subject to any Sanctions.

(vii)     In order to comply with the "know your customer/borrower" requirements of the Anti-Money Laundering Laws, promptly provide to each Agent and each Lender upon its reasonable request from time to time (A) information relating to individuals and entities affiliated with any Loan Party that maintain a business relationship with such Agent or such Lender, and (B) such identifying information and documentation as may be available for such Loan Party in order to enable any Agent or any Lender to comply with Anti-Money Laundering Laws.

(o)     [Reserved].

(p)     Disinterested Director.  The Disinterested Director shall be the sole disinterested director of Exela Intermediate and all decisions related to the Chapter 11 Cases and the Loan Documents regarding Exela Intermediate shall be voted on solely by the Disinterested Director and no other director of Exela Intermediate shall have the power or authority to vote or decide on any on any issues related to the Chapter 11 Cases or the Loan Documents of Exela Intermediate.  None of the Borrowers or any Guarantor shall not be permitted to remove (or allow the board of directors or manager of any Borrower or Guarantor to remove) the Disinterested Director without the prior written consent of the Required Lenders.

(q)     Further Assurances.  Subject to the DIP Orders, take such action and execute, acknowledge and deliver, and cause each of its Subsidiaries to take such action and execute, acknowledge and deliver, at its sole cost and expense, such agreements, instruments or

150146488_20

other documents as any Agent or the Required Lenders may require from time to time in order (i) to carry out more effectively the purposes of this Agreement and the other Loan Documents, (ii) to subject to valid and perfected first priority Liens any of the Collateral or any other property of any Loan Party and its Subsidiaries, (iii) to establish and maintain the validity and effectiveness of any of the Loan Documents and the validity, perfection and priority of the Liens intended to be created thereby, and (iv) to better assure, convey, grant, assign, transfer and confirm unto each Secured Party the rights now or hereafter intended to be granted to it under this Agreement or any other Loan Document.   In furtherance of the foregoing, to the maximum extent permitted by applicable Requirements of Law, each Loan Party (i) authorizes each Agent to execute any such agreements, instruments or other documents in such Loan Party's name and to file such agreements, instruments or other documents in any appropriate filing office, (ii) authorizes each Agent to file any financing statement required hereunder or under any other Loan Document, and any continuation statement or amendment with respect thereto, in any appropriate filing office without the signature of such Loan Party, and (iii) ratifies the filing of any financing statement, and any continuation statement or amendment with respect thereto, filed without the signature of such Loan Party prior to the date hereof.

(r)    Milestones and Governance Covenants. Unless such time is extended by written consent of the Required Lenders (email from the Lender Advisors being sufficient, with a copy to the Administrative Agent), the Loan Parties shall comply with each of the following milestones (each, a "Milestone" and collectively, the "Milestones"):

(i)    No later than ten (10) Business Days following the Petition Date, the Restructuring Support Agreement shall have been executed by the parties thereto; provided, that, this Milestone may not be extended past twenty (20) Business Days following the Petition Date without the written consent (email sufficient) of each Lender.

(ii)    (A) Retain, at the Borrower's expense, Randall Eisenberg of AlixPartners, LLP as chief restructuring officer for the Loan Parties (a "CRO").

(B)    The Borrowers shall, and shall cause each of the other Loan Parties to, fully cooperate with the CRO, and permit the CRO to perform all tasks under the CRO's engagement letter.

(iii)    Within thirty-five (35) days of the Petition Date, the Final DIP Order Entry Date shall have occurred.

(s)    Lender Calls. From and after the Effective Date, the Borrowers shall hold a weekly conference call attended by members of management of the Borrowers and its restructuring advisors, to which the Lenders shall be invited to discuss the financial condition of the Loan Parties and the results of operations.

Section 7.02    Negative Covenants.  So long as any principal of or interest on any Loan or any other Obligation (whether or not due) shall remain unpaid (other than Contingent Indemnity Obligations) or any Lender shall have any Commitment hereunder, the Parent, the Affiliated Guarantors and the Borrowers shall not, and shall not permit any of the Borrowers' Subsidiaries or any other Neon Entity or other XBP Entity to do any of the following, unless the

82

Required Lenders shall otherwise consent in writing, except as expressly directed otherwise by the DIP Orders:

        (a)    <u>Liens, Etc</u>.

        (i)    The Parent, the Affiliated Guarantors and the Borrowers shall not, and shall not permit any of the Borrowers' Subsidiaries or any other Neon Entity or other XBP Entity to, directly or indirectly, create, Incur or suffer to exist any Lien (except Permitted Liens) on any asset or property of the Parent, the Borrowers or such Affiliated Guarantor or such Subsidiary or Neon Entity or XBP Entity securing Indebtedness of the Parent, the Borrowers or any Affiliated Guarantor or any of the Borrowers' Subsidiaries or other Neon Entity or XBP Entity.

        (ii)    For purposes of determining compliance with this Section 7.02(a), (i) a Lien securing an item of Indebtedness need not be permitted solely by reference to one category of permitted Liens (or any portion thereof) described in the definition of "Permitted Liens" or pursuant to Section 7.02(a)(i) but may be permitted in part under any combination thereof and (ii) in the event that a Lien securing an item of Indebtedness (or any portion thereof) meets the criteria of one or more of the categories of permitted Liens (or any portion thereof) described in the definition of "Permitted Liens" or pursuant to Section 7.02(a)(i), the Borrowers may, in its sole discretion, classify or reclassify, or later divide, classify or reclassify (as if Incurred at such later time), such Lien securing such item of Indebtedness (or any portion thereof) in any manner that complies with this covenant and will be entitled to only include the amount and type of such Lien or such item of Indebtedness secured by such Lien (or any portion thereof) in one of the categories of permitted Liens (or any portion thereof) described in the definition of "Permitted Liens" or pursuant to Section 7.02(a)(i) and, in such event, such Lien securing such item of Indebtedness (or any portion thereof) will be treated as being Incurred or existing pursuant to only such clause or clauses (or any portion thereof) or pursuant to Section 7.02(a)(i) without giving pro forma effect to such item (or portion thereof) when calculating the amount of Liens or Indebtedness that may be Incurred pursuant to any other clause or paragraph (or portion thereof) at such time. In addition, with respect to any revolving loan Indebtedness or commitment to Incur Indebtedness that is designated to be Incurred on any Deemed Date pursuant to Section 7.02(v)(iii)(C), any Lien that does or that shall secure such Indebtedness may also be designated by the Borrowers or any Subsidiary to be Incurred on such Deemed Date and, in such event, any related subsequent actual Incurrence of such Lien shall be deemed for all purposes under this Agreement to be Incurred on such prior date, including for purposes of calculating usage of any "Permitted Lien" (and any calculations on and after the Deemed Date until the termination of such commitments shall be made on a pro forma basis after giving effect to the deemed Incurrence or issuance and related transactions in connection therewith).

        (iii)    With respect to any Lien securing Indebtedness that was permitted to secure such Indebtedness at the time of the Incurrence of such Indebtedness, such Lien shall also be permitted to secure any increased amount of such Indebtedness. The increased amount of any Indebtedness shall mean any increase in the amount of such Indebtedness in connection with any accrual of interest, the accretion of accreted value, the amortization of original issue discount, the payment of interest in the form of additional Indebtedness with the same terms or in the form of common stock of the Borrowers, the payment of dividends on Preferred Stock in the form of additional shares of Preferred Stock of the same class, accretion of original issue discount or

liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies or increases in the value of property securing Indebtedness described in clause (3) of the definition of "Indebtedness."

(b)      [Reserved].

(c)      Fundamental Changes; Dispositions.

(i)      Fundamental Changes.

(A)      [reserved].

(B)      Exela Finance may not, directly or indirectly, consolidate, amalgamate or merge with or into or wind up or convert into (whether or not Exela Finance is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions, to any Person unless Exela Finance is the surviving Person.

(C)      Other than as may be permitted by the Restructuring Support Agreement, no Guarantor shall, and the Borrowers shall not permit any Subsidiary that is a Guarantor to, consolidate, amalgamate or merge with or into or wind up into (whether or not such Guarantor is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions to, any Person.

Notwithstanding the foregoing, a Subsidiary that is a Guarantor may merge, amalgamate or consolidate with a Borrower or any other Subsidiary that is a Guarantor.

In addition, notwithstanding the foregoing, a Guarantor may consolidate, amalgamate or merge with or into or wind up into, liquidate, dissolve, or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets to the Borrowers or any of the Borrowers' Subsidiaries that is a Guarantor.

(ii)      Dispositions. The Parent, the Affiliated Guarantors and the Borrowers shall not, and shall not permit any of the Borrowers' Subsidiaries or any other Neon Entity or other XBP Entity to make any Disposition, whether in one transaction or a series of related transactions, of all or any part of its business, property or assets, whether now owned or hereafter acquired (or agree to do any of the foregoing), or permit any of its Subsidiaries to do any of the foregoing; provided, however, that any Loan Party and its Subsidiaries may make Permitted Dispositions.

(d)      Change in Nature of Business.

(i)      The Parent, the Affiliated Guarantors and the Borrowers shall not, and shall not permit any of the Borrowers' Subsidiaries or any other Neon Entity or other XBP Entity to make, or permit any of its Subsidiaries to make, any change in the nature of its business as described in Section 6.01(l).

84

(ii)     The Parent shall not have any material liabilities (other than liabilities arising under the Loan Documents), own any material assets (other than the Equity Interests of its Subsidiaries) or engage in any operations or business (other than the ownership of its Subsidiaries).

(e)     <u>Loans, Advances, Investments, Etc</u>.  The Parent, the Affiliated Guarantors and the Borrowers shall not, and shall not permit any of the Borrowers' Subsidiaries or any other Neon Entity or other XBP Entity to make or commit or agree to make, or permit any of its Subsidiaries make or commit or agree to make, any Investment in any other Person except for Permitted Investments.

(f)     <u>Sale/Leaseback Transactions</u>.  The Parent, the Affiliated Guarantors and the Borrowers shall not, and shall not permit any of the Borrowers' Subsidiaries or any other Neon Entity or other XBP Entity to enter into, or permit any of its Subsidiaries to enter into, any Sale/Leaseback Transaction.

(g)     <u>[Reserved]</u>.

(h)     <u>Restricted Payments</u>.

(i)     The Parent, the Affiliated Guarantors and the Borrowers shall not, and shall not permit any of the Borrowers' Subsidiaries, any other Neon Entity or any XBP Entity to, directly or indirectly:

(A)     declare or pay any dividend or make any distribution on account of any of the Parent, the Affiliated Guarantors', the Borrowers' or any of its Subsidiaries', or any Neon Entity's or XBP Entity's Equity Interests, including any payment made in connection with any merger, amalgamation or consolidation involving the Borrowers (other than (A) dividends or distributions payable solely in Equity Interests (other than Disqualified Stock) of the Borrowers; or (B) dividends or distributions by (i) an Affiliated Guarantor to another Affiliated Guarantor that is a parent thereof, or (ii) a Subsidiary, Neon Entity or XBP Entity, in each case, so long as, in the case of any dividend or distribution payable on or in respect of any class or series of securities issued by a Subsidiary that is not a Wholly Owned Subsidiary, the Borrowers or a Subsidiary receives at least its pro rata share of such dividend or distribution in accordance with its Equity Interests in such class or series of securities) and, in the case of a Neon Entity or XBP Entity, the recipient of such dividend or distribution is Neon Parent or another Neon Entity or XBP Parent or another XBP Entity, respectively;

(B)     purchase or otherwise acquire or retire for value any Equity Interests of an Affiliated Guarantor, any other Neon Entity or XBP Entity or of the Borrowers or any direct or indirect parent of the Borrowers or of an Affiliated Guarantor;

(C)     make any principal payment on, or redeem, repurchase, defease or otherwise acquire or retire for value, in each case prior to any scheduled repayment or scheduled maturity, any Indebtedness for borrowed money (other than the Obligations) of a Borrower or any Guarantor or Affiliated Guarantor;

(D)     make any Restricted Investment;

(E)      make any principal payment on, or redeem, repurchase, defease or otherwise acquire or retire for value, at maturity thereof or otherwise, any Indebtedness owed to any Affiliate of the Borrowers that is not a Borrower, a Subsidiary of the Borrowers or a Guarantor; or

(F)      [reserved];

(ii)      (all such payments and other actions set forth in clauses (A) through (E) above being collectively referred to as "<u>Restricted Payments</u>").

(iii)      The provisions of Section 7.02(h)(i) shall not prohibit:

(A)      [reserved];

(B)      [reserved];

(C)      [reserved];

(D)      [reserved];

(E)      [reserved];

(F)      [reserved].

(G)      [reserved];

(H)      [reserved];

(I)      [reserved];

(J)      [reserved];

(K)      [reserved];

(L)      Restricted Payments that are made in accordance with the Approved Budget (including Permitted Variances thereto);

(M)      any Restricted Payment, if applicable:

(1)      in amounts required for Tax Distribution Payments;

(2)      [reserved]; and

(3)      [reserved];

(N)      [reserved];

(O)      [reserved];

(P)      [reserved];

(Q)      [reserved];

(R)      [reserved];

(S)      [reserved];

(T)      [reserved];

(U)      [reserved]; and

(V)      [reserved];

provided, however, that at the time of, and after giving effect to, any Restricted Payment permitted under clause (M) of this Section 7.02(h), no Default shall have occurred and be continuing or would occur as a consequence thereof; provided, further, that any Restricted Payments made with property other than cash shall be calculated using the Fair Market Value (as determined in good faith by the Borrower) of such property.

(iv)     Notwithstanding the foregoing or any other term of this Agreement, none of the Borrowers, the Parent or any Affiliated Guarantor shall, nor shall the Borrowers, the Parent or any Affiliated Guarantor permit any of their respective Subsidiaries (other than XBP Europe) to, directly or indirectly, invest, transfer, sell or otherwise convey any intellectual property rights or intellectual property to any Affiliate of the Borrowers other than the Borrowers or a Subsidiary of the Borrowers.

(i)      Federal Reserve Regulations.  The Parent, the Affiliated Guarantors and the Borrowers shall not, and shall not permit any of the Borrowers' Subsidiaries or any other Neon Entity or other XBP Entity to permit any Loan or the proceeds of any Loan under this Agreement to be used for any purpose that would cause such Loan to be a margin loan under the provisions of Regulation T, U or X of the Board.

(j)      Transactions with Affiliates.

(i)      the Parent and the Borrowers shall not and shall not permit any of its Subsidiaries, and neither XBP Parent nor Neon Parent shall, and shall not permit any other Neon Entity or other XBP Entity to, in each case, directly or indirectly, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction or series of transactions, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Borrowers (each of the foregoing, an "Affiliate Transaction"), unless:

(A)      such Affiliate Transaction is in the ordinary course of business and on terms that are not materially less favorable to the Borrowers or the relevant Affiliated Guarantor or Subsidiary than those that could have been obtained in a comparable transaction by the Borrowers or such Affiliated Guarantor or Subsidiary with an unrelated Person;

87

(B)      [reserved];

(C)      [reserved].

(ii)      The provisions of Section 7.02(j)(i) shall not apply to the following:

(A)      transactions between or among the Borrowers and/or any of its Subsidiaries (or an entity that becomes a Subsidiary as a result of such transaction) in the ordinary course of business and any merger, consolidation or amalgamation of the Borrowers and any direct parent of either Borrower; provided, that such parent shall have no material liabilities and no material assets other than cash, Cash Equivalents and the Capital Stock of the Borrowers and such merger, consolidation or amalgamation is otherwise in compliance with the terms of this Agreement and effected for a bona fide business purpose;

(B)      Restricted Payments permitted by Section 7.02(h) and Permitted Investments;

(C)      the payment of reasonable and customary fees and reimbursement of expenses paid to, and indemnity provided on behalf of, officers, directors, employees or consultants of either Borrower, any Affiliated Guarantor, any Subsidiary, or any direct or indirect parent of the Borrowers in the ordinary course of business;

(D)      [reserved];

(E)      payments of compensation in the ordinary course of business to officers, directors, employees or consultants which are approved by a majority of the Board of Directors of the Borrowers or applicable Affiliated Guarantor in good faith;

(F)      [reserved];

(G)      the existence of, or the performance by the Borrowers or any Affiliated Guarantor or Subsidiary of the Borrowers or of an Affiliated Guarantor of its obligations under the terms of, any stockholders or similar agreement (including any registration rights agreement or purchase agreement related thereto) to which it is a party as of the Effective Date, in each case, any amendment thereto or similar transactions, agreements or arrangements which it may enter into thereafter; provided, however, that the existence of, or the performance by the Borrowers or any Affiliated Guarantor or Subsidiary of the Borrowers or of an Affiliated Guarantor of its obligations under, any future amendment to any such existing transaction, agreement or arrangement or under any similar transaction, agreement or arrangement entered into after the Effective Date shall only be permitted by this clause (G) to the extent that the terms of any such existing transaction, agreement or arrangement together with all amendments thereto, taken as a whole, or new transaction, agreement or arrangement are not otherwise more disadvantageous to the Lenders in any material respect than the original transaction, agreement or arrangement as in effect on the Effective Date, as determined in good faith by the Borrowers;

(H)      [reserved];

(I)  (1) transactions with customers, clients, suppliers or purchasers or sellers of goods or services, or transactions otherwise relating to the purchase or sale of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Agreement, which are fair to the Borrowers, Affiliated Guarantors and the Subsidiaries of the Borrowers or of an Affiliated Guarantor in the reasonable determination of the Board of Directors or the senior management of the Borrowers or such Affiliated Guarantor or (2) transactions with joint ventures entered into in the ordinary course of business;

(J)  transactions pursuant to any Permitted Securitization Financing;

(K)  [reserved];

(L)  [reserved];

(M)  [reserved];

(N)  [reserved];

(O)  transactions permitted by, and complying with, Section 7.02(c)(i);

(P)  transactions between the Borrowers or any of their Subsidiaries and any Person that would constitute an Affiliate Transaction solely because a director of such other Person is also a director of such Borrower or any direct or indirect parent of either Borrower; provided, however, that such director abstains from voting as a director of such Borrower or such direct or indirect parent, as the case may be, on any matter involving such other Person;

(Q)  [reserved];

(R)  the formation and maintenance of any consolidated group or subgroup for tax, accounting or cash pooling or management purposes in the ordinary course of business;

(S)  [reserved];

(T)  [reserved];

(U)  [reserved];

(V)  [reserved]; and

(W)  [reserved].

(k)  Limitations on Dividends and Other Payment Restrictions Affecting Subsidiaries.  The Parent, the Affiliated Guarantors and the Borrowers shall not, and shall not permit any of the Borrowers' Subsidiaries, any other Neon Entity or any XBP Entity to, directly

or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or consensual restriction on the ability of any such Subsidiary, other Neon Entity or XBP Entity to:

(i)     (A) pay dividends or make any other distributions to the Borrowers or any Subsidiary or to Neon Parent or XBP Parent, respectively, (1) on its Capital Stock; or (2) with respect to any other interest or participation in, or measured by, its profits; or (B) pay any Indebtedness owed to the Borrowers or any Subsidiary of the Borrowers or to Neon Parent or XBP Parent, respectively;

(ii)    make loans or advances to the Borrowers or any Subsidiary of the Borrowers or to Neon Parent or XBP Parent, respectively; or

(iii)   sell, lease or transfer any of its properties or assets to the Borrowers or any Subsidiary of the Borrowers or to Neon Parent or XBP Parent, respectively;

except in each case for such encumbrances or restrictions existing under or by reason of:

(1)     contractual encumbrances or restrictions in effect on the Effective Date and described in Schedule 7.02(k)(iii)(1) hereto and any similar contractual encumbrances or restrictions or any amendments, modifications, restatements, renewals, supplements, refundings, replacements or refinancings of such agreements or instruments to the extent not more restrictive with respect to such dividend and other payment restrictions than those contained in the dividend or other payment restrictions prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing;

(2)     the Loan Documents;

(3)     applicable law or any applicable rule, regulation or order;

(4)     any agreement or other instrument of a Person acquired by the Borrowers or any Subsidiary which was in existence at the time of such acquisition (but not created in contemplation thereof or to provide all or any portion of the funds or credit support utilized to consummate such acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person and its Subsidiaries, or the property or assets of the Person and its Subsidiaries, so acquired;

(5)     contracts or agreements for the sale of assets, including any restriction with respect to a Subsidiary imposed pursuant to an agreement entered into for the sale or disposition of the Capital Stock or assets of such Subsidiary;

(6)     Secured Indebtedness otherwise permitted to be Incurred pursuant to Section 7.02(v) that limit the right of the debtor to dispose of the assets securing such Indebtedness;

(7)     restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

90

(8)     customary provisions in joint venture agreements and other similar agreements entered into in the ordinary course of business;

(9)     purchase money obligations for property acquired and Capitalized Lease Obligations in the ordinary course of business that impose restrictions of the nature discussed in Section 7.02(k)(iii) above on the property so acquired;

(10)     customary provisions contained in leases, licenses and other similar agreements entered into in the ordinary course of business or consistent with industry norm;

(11)     in the case of Section 7.02(k)(iii) above, any encumbrance or restriction that restricts in a customary manner the subletting, assignment or transfer of any property or asset that is subject to a lease, license or similar contract, or the assignment or transfer of any such lease, license (including without limitation, licenses of intellectual property(on a non-exclusive basis)) or other contracts;

(12)     any encumbrances or restrictions of a Special Purpose Securitization Subsidiary effected in connection with a Permitted Securitization Financing; provided, however, that such restrictions apply only to such Special Purpose Securitization Subsidiary;

(13)     [reserved];

(14)     any Restricted Investment not prohibited by Section 7.02(h) and any Permitted Investment; or

(15)     any encumbrances or restrictions of the type referred to in Section 7.02(k)(i), (ii) or (iii) above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (1) through (14) above; provided, that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Borrowers, not more restrictive with respect to such dividend and other payment restrictions than those contained in the dividend or other payment restrictions prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

For purposes of determining compliance with this Section 7.02(k), (i) the priority of any Preferred Stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on common stock shall not be deemed a restriction on the ability to make distributions on Capital Stock and (ii) the subordination of loans or advances made to the Borrowers or a Subsidiary to other Indebtedness Incurred by the Borrowers or any such Subsidiary shall not be deemed a restriction on the ability to make loans or advances.

(l)     Limitations on Negative Pledges.  The Parent, the Affiliated Guarantors and the Borrowers shall not, and shall not permit any of the Borrowers' Subsidiaries or any other Neon Entity or other XBP Entity to enter into, incur or permit to exist, or permit any Subsidiary to enter into, incur or permit to exist, directly or indirectly, any agreement, instrument, deed, lease or other

91

arrangement that prohibits, restricts or imposes any condition upon the ability of any Loan Party or any Subsidiary of any Loan Party to create, incur or permit to exist any Lien upon any of its property or revenues, whether now owned or hereafter acquired, or that requires the grant of any security for an obligation if security is granted for another obligation, except the following:  (i) this Agreement and the other Loan Documents, (ii) restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by Section 7.02(v) of this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, (iii) any customary restrictions and conditions contained in agreements relating to the sale or other disposition of assets or of a Subsidiary pending such sale or other disposition; provided, that such restrictions and conditions apply only to the assets or Subsidiary to be sold or disposed of and such sale or disposition is permitted hereunder, (iv) customary restrictions and conditions contained in the agreements governing a Permitted Securitization Financing so long as such restrictions and conditions apply only to the related Securitization Assets and (v) customary provisions in leases restricting the assignment or sublet thereof.

(m)      Modifications of Indebtedness, Organizational Documents and Certain Other Agreements; Etc.  The Parent, the Affiliated Guarantors and the Borrowers shall not, and shall not permit any of the Borrowers' Subsidiaries or any other Neon Entity or other XBP Entity to:

(i)      other than as permitted under the DIP Orders, amend, modify or otherwise change (or permit the amendment, modification or other change in any manner of) any of the provisions of any of its or its Subsidiaries' Indebtedness or of any instrument or agreement (including, without limitation, any purchase agreement, indenture, loan agreement or security agreement) relating to any such Indebtedness if such amendment, modification or change would shorten the final maturity or average life to maturity of, or require any payment to be made earlier than the date originally scheduled on such Indebtedness, or would change the subordination provision, if any, of such Indebtedness, or would otherwise be adverse to the Lenders or the issuer of such Indebtedness in any respect;

(ii)      make any payment of principal or interest or otherwise on account of the loans under the Prepetition Financing Agreement or the Prepetition 2026 Notes or other amounts owing under the Prepetition Financing Documents or the Prepetition 2026 Notes Documents, other than (i) current cash payment of interest at the post-default rate under the Prepetition Financing Agreement, as provided in the DIP Order; (ii) payments agreed to in writing by the Required Lenders, and (iii) payments approved by the DIP Orders (including the Roll-Up Loans) and, if necessary, authorized by the Bankruptcy Court (including any adequate protection payment);

(iii)      (a) amend, modify or otherwise change, or permit any Subsidiary to amend, modify or otherwise change, any of its Governing Documents (including, without limitation, by the filing or modification of any certificate of designation, or any agreement or arrangement entered into by it) with respect to any of its Equity Interests (including any shareholders' agreement), or enter into any new agreement with respect to any of its Equity Interests' or (b) amend, modify or otherwise change the tax designation (i.e. corporation, partnership, etc.) of Parent or its Subsidiaries (or any direct or indirect parent of Parent) in a manner that would cause an adverse tax consequence to the Parent or any of its Subsidiaries;

(n)     Investment Company Act of 1940.  The Parent, the Affiliated Guarantors and the Borrowers shall not, and shall not permit any of the Borrowers' Subsidiaries or any other Neon Entity or other XBP Entity to engage in any business, enter into any transaction, use any securities or take any other action or permit any of its Subsidiaries to do any of the foregoing, that would cause it or any of its Subsidiaries to become subject to the registration requirements of the Investment Company Act of 1940, as amended, by virtue of being an "investment company" or a company "controlled" by an "investment company" not entitled to an exemption within the meaning of such Act.

(o)     ERISA.  The Parent, the Affiliated Guarantors and the Borrowers shall not, and shall not permit any of the Borrowers' Subsidiaries or any other Neon Entity or other XBP Entity to (i) cause or fail to prevent, or permit any of its ERISA Affiliates to cause or fail to prevent, an ERISA Event, or (ii) adopt, or permit any of its ERISA Affiliates to adopt, any employee welfare benefit plan within the meaning of Section 3(1) of ERISA that provides benefits to employees after termination of employment other than as required by Section 601 of ERISA or other Requirements of Law.

(p)     Environmental.  The Parent, the Affiliated Guarantors and the Borrowers shall not, and shall not permit any of the Borrowers' Subsidiaries or any other Neon Entity or other XBP Entity to permit the use, handling, generation, storage, treatment, Release or disposal of Hazardous Materials on, in, at, under or from any property owned, leased or operated by it or any of its Subsidiaries, except in compliance with Environmental Laws (other than any noncompliance that could not reasonably be expected to result in any material Environmental Liability).

(q)     Accounting Methods.  The Parent, the Affiliated Guarantors and the Borrowers shall not, and shall not permit any of the Borrowers' Subsidiaries or any other Neon Entity or other XBP Entity to modify or change, or permit any of its Subsidiaries to modify or change, its method of accounting or accounting principles from those utilized in the preparation of the Financial Statements (other than as may be required to conform to GAAP).

(r)     Sanctioned Persons; Anti-Corruption Laws; Anti-Money Laundering Laws. The Parent, the Affiliated Guarantors and the Borrowers shall not, and shall not permit any of the Borrowers' Subsidiaries or any other Neon Entity or other XBP Entity to make to:

(i)     conduct, nor permit any of its Subsidiaries to conduct, any business or engage in any transaction or deal with or for the benefit of any Sanctioned Person, including the making or receiving of any contribution of funds, goods or services to, from or for the benefit of any Sanctioned Person; or

(ii)    use, nor permit any of its Subsidiaries to use, directly or indirectly, any of the proceeds of any Loan, (A) to fund any activities or business of or with any Sanctioned Person or in any other manner that would result in a violation of any Sanctions by any Person (including by any Person participating in any Loan, whether as underwriter, advisor, investor or otherwise), or (B) for the purpose of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Law.

(s)     Use of Proceeds. No Loan Party shall use any portion of the New Money Loans or the Collateral:

(i)     for any purpose that is prohibited under the Bankruptcy Code or the DIP Orders;

(ii)     to finance any contested matter, adversary proceeding, suit, arbitration, application, motion or other litigation of any type adverse to the interests of any or all of the Secured Parties or the Prepetition April 2026 Noteholders or their respective rights and remedies under Loan Documents, the DIP Orders or the Prepetition April 2026 Notes Documents;

(iii)     for the payment of fees, expenses, interest or principal under the Prepetition April 2026 Notes or the Prepetition July 2026 Notes (other than the Roll-Up Loans or otherwise as permitted or required by an order of the Bankruptcy Court and the DIP Orders);

(iv)     other than as set forth in the Acceptable Reorganization Plan, to make any distribution under a Plan of Reorganization confirmed in the Chapter 11 Cases that does not provide for the payment of the Loans and the Prepetition April 2026 Notes (and associated obligations) in full and in cash on the effective date of such plan; or

(v)     to file a motion seeking, consent to, or make any payment in excess of $1,000,000 in the aggregate in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the Administrative Agent acting at the direction of the Required Lenders;

Nothing herein shall in any way prejudice or prevent any Agent or any Lender from objecting, for any reason, to any requests, motions, or applications made in the Bankruptcy Court, including any application of final allowances of compensation for services rendered or reimbursement of expenses incurred under Sections 105(a), 330 or 331 of the Bankruptcy Code, by any party in interest.

Notwithstanding the foregoing , the unsecured creditors' committee appointed in the Chapter 11 Cases, if one is appointed, may investigate the Liens granted pursuant to, or any claims under or causes of action with respect to, the Prepetition April 2026 Notes at an aggregate expense for such investigation not to exceed $150,000, provided, further, that no portion of such amount may be used to prosecute any claims.

(t)     Additional Bankruptcy Matters. The Parent, the Affiliated Guarantors and the Borrowers shall not, and shall not permit any of the Borrowers' Subsidiaries or any other Neon Entity or other XBP Entity to do any of the following other than as permitted by the DIP Orders:

(i)     use any portion or proceeds of the credit extensions hereunder or the Collateral for payments or purposes that would violate the terms of the DIP Orders;

(ii)     incur, create, assume, suffer to exist or permit, except as otherwise expressly permitted by the DIP Orders or any other order of the Bankruptcy Court reasonably acceptable to the Required Lenders, any other superpriority administrative claim which is *pari passu* with or senior to the claim of the Secured Parties against any Debtor;

(iii)     subject to the terms of the DIP Orders, assert, join, investigate, support or prosecute any claim or cause of action against any of the Secured Parties (in their capacities as such), unless such claim or cause of action is in connection with the enforcement of the Loan Documents against any of the Secured Parties;

(iv)     seek, consent to, or permit to exist any order granting authority to take any action that is prohibited by the terms of this Agreement, the DIP Orders, the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement, the DIP Orders or any of the other Loan Documents;

(v)     subject to the terms of the DIP Orders, object to, contest, delay, prevent or interfere with in any material manner the exercise of rights and remedies by the Agents, the Lenders or other Secured Parties with respect to the Collateral following the occurrence of an Event of Default, including without limitation a motion or petition by any Secured Party to lift any applicable stay of proceedings to do the foregoing (provided that any Debtor may contest or dispute whether an Event of Default has occurred in accordance with the terms of the DIP Orders and the Loan Documents);

(vi)     without the consent of the Required Lenders, move to assume or reject any material lease, license or other material contract of any Loan Party pursuant to Section 365 of the Bankruptcy Code;

(vii)     except as expressly provided or permitted hereunder or as otherwise contemplated in the then-in-effect Approved Budget (including Permitted Variances thereto) or any order entered by the Bankruptcy Court in respect of the debtors' cash management system, make any payment or distribution to any non-Subsidiary Affiliate or insider of any debtor outside of the ordinary course of business;

(viii)     assert any right of subrogation or contribution against any other Loan Party under this Agreement or any other Loan Document;

(ix)     amend or modify, or grant any waiver or release under or terminate in any manner, the articles or certificate of incorporation or formation, by-laws, limited liability company agreement, partnership agreement or other organizational documents of the Borrowers or any of the other Loan Parties; or

(x)     file or pursue or support any other Person in filing or pursuing any Plan of Reorganization or other Chapter 11 plan or disclosure statement in respect of any Loan Party that is not an Acceptable Reorganization Plan or Acceptable Disclosure Statement.

(u)     Payments to ETI. Notwithstanding anything to the contrary contained herein, none of the Borrowers, the Parent or any Affiliated Guarantor shall, nor shall the Borrowers, the Parent or any Affiliated Guarantor permit any of their respective Subsidiaries to, directly or indirectly, make any payment or disbursement to ETI, other than such payments that are permitted by Section 7.02(h) and set forth in the Approved Budget in effect at the time of such payment.

(v)      Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock.

(i)      (A) The Parent, the Affiliated Guarantors and the Borrowers shall not, and shall not permit any of the Borrowers' Subsidiaries, any Neon Entity or any XBP Entity to, directly or indirectly, Incur any Indebtedness (including Acquired Indebtedness) or issue any shares of Disqualified Stock; and (B) XBP Parent shall not permit any other XBP Entity and the Borrowers shall not permit any of its Subsidiaries (other than any Subsidiary that is a Guarantor) to issue any shares of Preferred Stock.

(ii)      The limitations set forth in Section 7.02(v)(i) shall not apply to:

(A)      the Incurrence by the Borrowers or any Subsidiary of the Indebtedness represented by (1) the Obligations, (2) the loans under the Prepetition Financing Documents, (3) the Prepetition July 2026 Notes and (4) Permitted Securitization Financings;

(B)      Indebtedness of the Borrowers or any Subsidiary in respect of the Prepetition April 2026 Notes, and the Incurrence by the Affiliated Guarantors of guaranty obligations in respect of the Indebtedness thereunder;

(C)      Indebtedness existing on the Effective Date and described on Schedule 7.02(v) hereto (other than Indebtedness described in clause (A) of this Section 7.02(v)(ii));

(D)      Indebtedness expressly permitted under the Approved Budget;

(E)      Indebtedness Incurred by the Borrowers, any Subsidiary of the Borrowers or any Affiliated Guarantor owed to (including obligations in respect of letters of credit or bank guarantees or similar instruments for the benefit of) any Person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance to the Borrowers or any of the Borrowers' Subsidiaries or any Affiliated Guarantor (including any XBP Entity), respectively, pursuant to reimbursement or indemnification obligations to such Person, in each case, provided in the ordinary course of business or consistent with industry practices;

(F)      Indebtedness arising from agreements of the Borrowers or any Subsidiary providing for indemnification, adjustment of purchase price or similar obligations, in each case, Incurred or assumed in connection with the disposition of any business, assets or a Subsidiary, other than guarantees of Indebtedness Incurred by any Person acquiring all or any portion of such business, assets or a Subsidiary for the purpose of financing such acquisition, in each case, to the extent such obligation or transaction is permitted by this Agreement;

(G)      Indebtedness of the Borrowers to any of its Subsidiaries; provided, that (except in respect of intercompany current liabilities incurred in the ordinary course of business in connection with the cash management, tax and accounting operations of the Borrowers and their respective Subsidiaries) any such Indebtedness owed to a Subsidiary that is not a Borrower or a Subsidiary that is a Guarantor is subordinated in right of payment to the

Obligations on terms acceptable to the Agents and the Required Lenders; provided, further, that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such Subsidiary ceasing to be a Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Borrowers or another Subsidiary of the Borrowers or any pledge of such Indebtedness constituting a Permitted Lien but not the transfer thereof upon foreclosure) shall be deemed, in each case, to be an Incurrence of such Indebtedness not permitted by this clause (G);

(H)     shares of Preferred Stock of a Subsidiary issued to the Borrowers or another Subsidiary; provided, that any subsequent issuance or transfer of any Capital Stock or any other event which results in any Subsidiary that holds such shares of Preferred Stock of another Subsidiary ceasing to be a Subsidiary or any other subsequent transfer of any such shares of Preferred Stock (except to the Borrowers or another Subsidiary) shall be deemed, in each case, to be an issuance of shares of Preferred Stock not permitted by this clause (H);

(I)     Indebtedness of any Subsidiary to the Borrowers or any other Subsidiary; provided, that if a Subsidiary that is a Guarantor incurs such Indebtedness to a Subsidiary that is not a Borrower or a Guarantor (except in respect of intercompany current liabilities incurred in the ordinary course of business in connection with the cash management, tax and accounting operations of the Borrowers and their respective Subsidiaries), such Indebtedness is subordinated in right of payment to the Guaranty of such Subsidiary pursuant to the Intercompany Subordination Agreement; provided, further, that any subsequent issuance or transfer of any Capital Stock or any other event which results in any Subsidiary of the Borrowers holding such Indebtedness ceasing to be a Subsidiary of the Borrowers or any other subsequent transfer of any such Indebtedness (except to the Borrowers or another Subsidiary of the Borrowers or any pledge of such Indebtedness constituting a Permitted Lien but not the transfer thereof upon foreclosure) shall be deemed, in each case, to be an Incurrence of such Indebtedness not permitted by this clause (I);

(J)     Hedging Obligations by a Person that are not incurred for speculative purposes but (A) for the purpose of fixing or hedging interest rate risk with respect to any Indebtedness of such Person that is permitted by the terms of this Agreement to be outstanding; (B) for the purpose of fixing or hedging currency exchange rate risk of such Person with respect to any currency exchanges; or (C) for the purpose of fixing or hedging commodity price risk of such Person with respect to any commodity purchases or sales and, in each case, extensions or replacements thereof;

(K)     Indebtedness of the Affiliated Guarantors, the Borrowers and the Subsidiaries in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations, in each case, reasonably required in the conduct of their respective business (giving effect to any growth or expansion of such business permitted hereunder), including those incurred to secure health, safety, insurance and environmental obligations of the Affiliated Guarantors, the Borrowers and the Subsidiaries, respectively, as conducted in accordance with good and prudent business industry practices and otherwise as permitted by this Agreement;

(L)     [reserved];

(M)     [reserved];

(N)     any guarantee by the Borrowers or any Subsidiary of Indebtedness or other obligations of the Borrowers or any Subsidiary so long as the Incurrence of such Indebtedness or other obligations by the Borrowers or such Subsidiary is permitted under the terms of this Agreement; provided, that if such Indebtedness is by its express terms subordinated in right of payment to the Obligations or the Guaranty of the Borrowers or such Subsidiary, as applicable, any such guarantee with respect to such Indebtedness shall be subordinated in right of payment to the Obligations or such Guaranty, as applicable, substantially to the same extent as such Indebtedness is subordinated to the Obligations or the Guaranty, as applicable,;

(O)     [reserved]:

(P)     [reserved];

(Q)     [reserved];

(R)     Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business (provided that such Indebtedness is extinguished within five Business Days of its Incurrence) or other cash management services in the ordinary course of business;

(S)     [reserved];

(T)     [reserved];

(U)     Indebtedness of the Borrowers or any Affiliated Guarantor or Subsidiary consisting of (A) the financing of insurance premiums or (B) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(V)     Indebtedness of the Borrowers, the Affiliated Guarantors and their respective Subsidiaries in respect of letters of credit, bank guarantees, warehouse receipts or similar instruments issued to support their respective performance obligations and trade letters of credit (other than obligations in respect of other Indebtedness) in the ordinary course of business;

(W)     [reserved];

(X)     [reserved];

(Y)     [reserved];

(Z)     [reserved];

(AA)    deposits raised by any Subsidiary that is subject to state and/or federal banking regulations that constitute Indebtedness owing to such depositor;

(BB)    [reserved];

(CC)   customer deposits and advance payments received in the ordinary course of business from customers for goods and services purchased in the ordinary course of business;

(iii)   For purposes of determining compliance with this Section 7.02(v):

(A)   [reserved];

(B)   at the time of Incurrence, classification or reclassification, the Borrowers will be entitled to divide and classify an item of Indebtedness in more than one of the categories of Indebtedness described in Section 7.02(v)(i) or clauses (A) through (DD) of Section 7.02(v)(ii) (or any portion thereof) without giving pro forma effect to the Indebtedness Incurred, classified or reclassified pursuant to any other clause or paragraph of this Section 7.02(v) (or any portion thereof) when calculating the amount of Indebtedness that may be Incurred, classified or reclassified pursuant to any such clause or paragraph (or any portion thereof) at such time; provided, that, for the avoidance of doubt, it is understood and agreed that for any Indebtedness Incurred, classified or reclassified in reliance on a category of permitted Indebtedness involving the calculation of a ratio, such Indebtedness will be included in the calculation of such ratio at the time of such Incurrence, classification or reclassification; and

(C)   in connection with (x) the Incurrence or issuance, as applicable, of revolving loan Indebtedness under this Section 7.02(v) or (y) any commitment to Incur or issue Indebtedness, Disqualified Stock or Preferred Stock under this Section 7.02(v), the Borrowers or applicable Subsidiary or Affiliated Guarantor may designate such Incurrence or issuance as having occurred on the date of first Incurrence of such revolving loan Indebtedness or commitment (such date, the "Deemed Date"), and any related subsequent actual Incurrence or issuance will be deemed for all purposes under this Agreement to have been Incurred or issued on such Deemed Date.

Accrual of interest, the accretion of accreted value, the payment of interest or dividends in the form of additional Indebtedness, Disqualified Stock or Preferred Stock, as applicable, amortization of original issue discount, the accretion of liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies will not be deemed to be an Incurrence of Indebtedness, Disqualified Stock or Preferred Stock for purposes of this Section 7.02(v). Guarantees of, or obligations in respect of letters of credit relating to, Indebtedness which is otherwise included in the determination of a particular amount of Indebtedness shall not be included in the determination of such amount of Indebtedness; provided, that the Incurrence of the Indebtedness represented by such guarantee or letter of credit, as the case may be, was in compliance with this Section 7.02(v).

For purposes of determining compliance with any U.S. dollar-denominated restriction on the Incurrence of Indebtedness, the U.S. dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was Incurred, in the case of term debt, or first committed or first Incurred (whichever yields the lower U.S. dollar equivalent), in the case of revolving credit debt. However, if the Indebtedness is Incurred to refinance other Indebtedness denominated in a foreign currency, and the refinancing would cause the applicable U.S. dollar-

99

denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of the refinancing, the U.S. dollar-denominated restriction will be deemed not to have been exceeded so long as the principal amount of the refinancing Indebtedness does not exceed the principal amount of the Indebtedness being refinanced.

Notwithstanding any other provision of this Section 7.02(v), (i) any intercompany Indebtedness owed by the Borrowers or any Guarantor to an Affiliated Guarantor or any other Neon Entity or XBP Entity shall be subordinated to the Borrowers' or such Guarantor's Obligations or its Guaranty, respectively, in each case, on terms acceptable to the Agents and the Required Lenders and (ii) the maximum amount of Indebtedness that the Affiliated Guarantors and the Borrowers and their respective Subsidiaries may Incur pursuant to this Section 7.02(v) shall not be deemed to be exceeded, with respect to any outstanding Indebtedness, solely as a result of fluctuations in the exchange rate of currencies. The principal amount of any Indebtedness Incurred to refinance other Indebtedness, if Incurred in a different currency from the Indebtedness being refinanced, will be calculated based on the currency exchange rate applicable to the currencies in which the respective Indebtedness is denominated that is in effect on the date of the refinancing.

(w)    Chapter 11 Modifications. Except as permitted pursuant to the terms of this Agreement and the applicable DIP Order or otherwise consented to by the Agents and the Required Lenders, the Affiliated Guarantors, the Parent and the Borrowers shall not, and shall not permit any of the Borrowers' Subsidiaries or any other Neon Entity or other XBP Entity to: (1) make to or permit to be made any change, amendment or modification, or any application or motion for any change, amendment or modification, to the DIP Orders or (2) incur, create, assume or suffer to exist or permit any other superpriority administrative claim which is pari passu with or senior to the DIP Superpriority Claims of the Agents and the Lenders hereunder.

(x)    Compliance With Approved Budget. Except as otherwise provided herein or approved by the Required Lenders (or the Administrative Agent at the direction of the Required Lenders), the Affiliated Guarantors Parent and the Borrowers shall not, and shall not permit any of the Borrowers' Subsidiaries or any other Neon Entity or other XBP Entity to, directly or indirectly make any payment (as adequate protection or otherwise), or application for authority to pay, on account of any Indebtedness arising prior to the Petition Date other than payments consistent with the Approved Budget (or any Permitted Variance) and approved by the Bankruptcy Court.

(y)    CRO. The Loan Parties shall not, and shall not permit their respective Subsidiaries to, terminate its engagement with the CRO unless consented to by the Required Lenders.

Section 7.03    [Reserved].

Section 7.04    Additional Covenants Applicable to the Affiliated Guarantors.

(a)    No Affiliated Guarantor shall, by any voluntary action, directly or indirectly through any subsidiary, including by amending its governing documents or through any reorganization, reclassification, transfer of assets, consolidation, merger, dissolution, issue or sale

100

of securities or any other similar voluntary action, avoid the observance or performance of any of the covenants set forth in this Article VII. The business of the Neon Entities shall be conducted, directly or indirectly through Neon Parent. The business of the XBP Entities shall be conducted, directly or indirectly through XBP Parent.

(b)     Subject to Section 11.01 and the DIP Orders, if any Affiliated Guarantor or any XBP Entity receives any distribution on account of equity interests in any Affiliated Guarantor or XBP Europe, then the applicable Affiliated Guarantor or XBP Entity shall promptly apply such proceeds as set forth in Section 2.05(c).

(c)     Unless consented to by the Required Lenders, no Neon Sale or XBP Sale may occur.

(d)     No Affiliated Guarantor shall take or knowingly or negligently omit to take, any action which action or omission might reasonably or would (in the good faith determination of the Borrower) have the result of materially impairing the value of the security interests taken as a whole (including the lien priority with respect thereto) with respect to the Collateral for the benefit of the Secured Parties.

(e)     No Affiliated Guarantor shall (and none shall permit its Subsidiaries to) take any action that causes, directly or indirectly (including by amendment, modification, recapitalization, reclassification, reincorporation, redomiciling, share exchange, merger, consolidation, liquidation, dissolution or otherwise), such Affiliated Guarantor's certificate of incorporation or similar governing document, to be amended, altered or otherwise modified in a manner materially adverse to the Lenders.

(f)     In the event of any sale, conveyance, exchange or transfer of all or substantially all of any Affiliated Guarantor's property or assets, or the consolidation, merger or amalgamation of any Affiliated Guarantor with or into any other entity, or the consolidation, merger or amalgamation of any other entity with or into any Affiliated Guarantor, the successor or acquiring Person (if other than an Affiliated Guarantor) shall expressly assume the due and punctual observance and performance of each and every covenant and condition of this Agreement to be performed and observed by the Affiliated Guarantors and all of the obligations and liabilities thereof under this Agreement, mutatis mutandis.

(g)     No Affiliated Guarantor shall, nor shall it permit any of its Subsidiaries to, directly or indirectly (whether by merger, consolidation, amendment, recapitalization or otherwise) make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction or series of transactions, contract, agreement, understanding, loan (including intercompany loans), advance or guarantee with, or for the benefit of, Parent or any Affiliates of Parent, or any other Affiliates of such Affiliated Guarantor (other than the Borrowers and Guarantors), except for any reasonable, customary and arm's length payments to or arrangements relating to the allocation of shared expenses (if any) between such Affiliated Guarantor and Parent and their respective Affiliates.

101

(h)      No Affiliated Guarantor shall, nor shall it permit any of its Subsidiaries to, directly or indirectly (whether by merger, consolidation, amendment, recapitalization or otherwise), (i) take any action, including forming a subsidiary, recapitalization or reorganization, that results in any Person existing between (A) Neon Parent and the other Neon Entities or (B) XBP Parent and the other XBP Entities, in each case, other than entities that are wholly owned Subsidiaries of Neon Parent or XBP Parent, as applicable, or (ii) liquidate, dissolve or wind-up, or voluntarily petition for bankruptcy or fail to defend involuntary acts of bankruptcy.

Section 7.05    Additional Covenants Applicable to XBP Parent and the other XBP Entities.

(a)      Neither XBP Parent, nor any other XBP Entity, shall create or acquire any new direct or indirect Subsidiary unless such new Subsidiary is a direct or indirect Subsidiary of XBP Europe. Neither XBP Parent nor any other XBP Entity shall (i) dissolve or liquidate, (ii) merge with or consolidate with another Person or (iii) transfer all of substantially all of its assets to another Person.

(b)      Other than XBP Parent, no XBP Entity shall, directly or indirectly (whether by merger, consolidation, amendment, recapitalization or otherwise), authorize, issue or increase the authorized amount of Equity Interests of any XBP Entity that rank senior to its common equity interests, other than (i) in the case of BTC, issuances of such equity to XBP Parent or (ii) in the case of any other XBP Entity, issuances of such equity to another XBP Entity.

(c)      Neither XBP Parent nor any other XBP Entity, shall engage at any time in any business or business activity other than the following (and activities or operations incidental thereto): (i) ownership of equity interests in other XBP Entities, (ii) the maintenance of its legal existence (including the ability to incur fees, costs and expenses relating to such maintenance), (iii) performance of its obligations under and in connection with this Agreement, its charter and other organizational documents and any other agreements, instruments or other documents entered into in connection therewith; (iv) as otherwise required to comply with laws and any applicable court orders; and (v) participating in tax, accounting, legal and other administrative matters. XBP Parent and each other XBP Entity shall (x) own no material assets other than the equity interests of XBP Entities, (y) grant no Lien on any of equity interests it holds in any XBP Entity other than Liens created pursuant to this Agreement and (z) shall not create, incur, guarantee, assume or be or remain liable with respect to any Indebtedness, other than Indebtedness with respect to the Prepetition Financing Documents or the Prepetition April 2026 Notes.

## ARTICLE VIII

## [INTENTIONALLY OMITTED]

## ARTICLE IX

## EVENTS OF DEFAULT

Section 9.01    Events of Default.  Subject to the terms of the DIP Orders, each of the following events shall constitute an event of default (each, an "Event of Default"):

(a)      any Borrower shall fail to pay, when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), (i) any interest on any Loan or any fee, indemnity or other amount payable under this Agreement (other than any portion thereof constituting principal of the Loans) or any other Loan Document, and such failure continues for a period of three (3) Business Days or (ii) all or any portion of the principal of the Loans;

(b)      any representation or warranty made or deemed made by or on behalf of any Affiliated Guarantor, any other Neon Entity, any XBP Entity, the Borrowers, the Parent, the Parent's Subsidiaries or any of the Borrowers' Subsidiaries or by any officer of the foregoing under or in connection with any Loan Document or under or in connection with any certificate or other writing delivered to any Secured Party pursuant to any Loan Document shall have been incorrect in any material respect (or in any respect if such representation or warranty is qualified or modified as to materiality or "Material Adverse Effect" in the text thereof) when made or deemed made;

(c)      any Affiliated Guarantor, any other Neon Entity, any XBP Entity, the Borrowers, the Parent or any of the Borrowers' Subsidiaries shall fail to perform or comply with any covenant or agreement contained in Section 7.01(a), Section 7.01(c), Section 7.01(d), Section 7.01(f), Section 7.01(h), Section 7.01(k), Section 7.01(m), Section 7.01(s) or Section 7.02, or any Affiliated Guarantor, any other Neon Entity, any XBP Entity, either Borrower, or any of the Borrowers' Subsidiaries shall fail to perform or comply with any covenant or agreement contained in any Security Agreement to which it is a party;

(d)      any Affiliated Guarantor, any other Neon Entity, any XBP Entity, either Borrower, the Parent or any of the Borrowers' Subsidiaries shall fail to perform or comply with any other term, covenant or agreement contained in any Loan Document to be performed or observed by it and, except as set forth in subsections (a), (b) and (c) of this Section 9.01, such failure, if capable of being remedied, shall remain unremedied for 15 days after the earlier of the date a senior officer of any Affiliated Guarantor, any other Neon Entity, any XBP Entity, either Borrower, or any of the Borrowers' Subsidiaries has knowledge of such failure and the date written notice of such default shall have been given by any Agent to such Affiliated Guarantor, any other Neon Entity, any XBP Entity, either Borrower, or any of the Borrowers' Subsidiaries;

(e)      except as a result of commencement of the Chapter 11 Cases or unless the payment, acceleration and/or the exercise of remedies with respect to any such Indebtedness is stayed by the Bankruptcy Court (including, for the avoidance of doubt, by operation of the Bankruptcy Code), Parent, Borrower, any Affiliated Guarantor, any other Neon Entity, any XBP Entity, or any Significant Subsidiary (other than any Special Purpose Securitization Subsidiary) (or any group of Subsidiaries that together would constitute a Significant Subsidiary, other than any Special Purpose Securitization Subsidiary) shall fail to pay when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) any principal, interest or other amount payable in respect of Indebtedness (excluding Indebtedness evidenced by this Agreement) having an aggregate amount outstanding in excess of $5,000,000 and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Indebtedness, or any other default under any agreement or instrument relating to any such Indebtedness, or any other event, shall occur and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such default or event is to accelerate, or to permit the acceleration of, the maturity of such Indebtedness; or any such

Indebtedness shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased or an offer to prepay, redeem, purchase or defease such Indebtedness shall be required to be made, in each case, prior to the stated maturity thereof;

(f)    [reserved];

(g)    [reserved];

(h)    any Security Agreement, the Interim DIP Order, the Final DIP Order or any other security document, after delivery thereof pursuant hereto, shall for any reason fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien in favor of the Collateral Agent for the benefit of the Secured Parties on any Collateral purported to be covered thereby;

(i)    the Parent, any Borrower, any Affiliated Guarantor, any other Neon Entity, any XBP Entity, or any Significant Subsidiary (other than any Special Purpose Securitization Subsidiary) is enjoined, restrained or in any way prevented by the order of any court or any Governmental Authority from conducting, or otherwise ceases to conduct for any reason whatsoever, all or any material part of its business for more than 7 days;

(j)    any material damage to, or loss, theft or destruction of, any Collateral, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than 7 consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of the Parent, any Borrower, any Affiliated Guarantor, any other Neon Entity, any XBP Entity, or any Significant Subsidiary (other than any Special Purpose Securitization Subsidiary), if any such event or circumstance could reasonably be expected to have a Material Adverse Effect;

(k)    the loss, suspension or revocation of, or failure to renew, any license or permit now held or hereafter acquired by the Parent, the Borrowers, any Affiliated Guarantor, any other Neon Entity, any XBP Entity, or any Significant Subsidiary (other than any Special Purpose Securitization Subsidiary), if such loss, suspension, revocation or failure to renew could reasonably be expected to have a Material Adverse Effect;

(l)    the indictment, or the threatened indictment of the Parent, the Borrowers, any Affiliated Guarantor, any other Neon Entity, any XBP Entity, or any Significant Subsidiary (other than any Special Purpose Securitization Subsidiary) under any criminal statute, or commencement or threatened commencement of criminal or civil proceedings against the Parent, Borrower, any Affiliated Guarantor, any other Neon Entity, any XBP Entity, or any Significant Subsidiary (other than any Special Purpose Securitization Subsidiary), pursuant to which statute or proceedings the penalties or remedies sought or available include forfeiture to any Governmental Authority of any material portion of the property of such Person;

(m)    (i) there shall occur one or more ERISA Events that individually or in the aggregate results in, or could reasonably be expected to result in, liability of the Parent, any Borrower, any Affiliated Guarantor, any other Neon Entity, any XBP Entity, or any Significant Subsidiary (other than any Special Purpose Securitization Subsidiary) or any of its ERISA

104

Affiliates in excess of $5,000,000, or (ii) there exists any fact or circumstance that could reasonably be expected to result in the imposition of a Lien pursuant to Section 430(k) of the Internal Revenue Code or Section 4068 of ERISA upon the property or rights to property of the Parent, any Borrower, any Affiliated Guarantor, any other Neon Entity, any XBP Entity, or any Significant Subsidiary (other than any Special Purpose Securitization Subsidiary) or any of its ERISA Affiliates;

(n)      except for any order of the Bankruptcy Court fixing the amount of any claim in the Chapter 11 Cases, one or more judgments, orders or awards (or any settlement of any litigation or other proceeding that, if breached, could result in a judgment, order or award) for the payment of money exceeding $5,000,000 in the aggregate (except to the extent fully covered (other than to the extent of customary deductibles) by insurance pursuant to which the insurer has been notified and has not denied coverage) shall be rendered against any of the Parent, Borrower, any Affiliated Guarantor, any other Neon Entity, any XBP Entity, or any Significant Subsidiary (other than any Special Purpose Securitization Subsidiary) (or any group of Subsidiaries that together would constitute a Significant Subsidiary, other than any Special Purpose Securitization Subsidiary) and remain unsatisfied and (i) enforcement proceedings shall have been commenced by any creditor upon any such judgment, order, award or settlement or (ii) there shall be a period of 5 consecutive days after entry thereof during which (A) a stay of enforcement thereof is not be in effect or (B) the same is not vacated, discharged, stayed or bonded pending appeal;

(o)      any material provision of any Loan Document shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against any Loan Party intended to be a party thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by any Loan Party or any Governmental Authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or any Loan Party shall deny in writing that it has any liability or obligation purported to be created under any Loan Document;

(p)      (i) there shall occur and be continuing any "Event of Default" (or any comparable term) under, and as defined in the documents evidencing or governing any Subordinated Indebtedness, (ii) any of the Obligations for any reason shall cease to be "Senior Indebtedness" or "Designated Senior Indebtedness" (or any comparable terms) under, and as defined in the documents evidencing or governing any Subordinated Indebtedness, (iii) any Indebtedness other than the Obligations shall constitute "Designated Senior Indebtedness" (or any comparable term) under, and as defined in, the documents evidencing or governing any Subordinated Indebtedness, (iv) any holder of Subordinated Indebtedness shall fail to perform or comply with any of the subordination provisions of the documents evidencing or governing such Subordinated Indebtedness, or (v) the subordination provisions of the documents evidencing or governing any Subordinated Indebtedness shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Subordinated Indebtedness, in each case, that is not stayed by the Chapter 11 Cases;

(q)      there is a failure by a Borrower, any Guarantor or Affiliated Guarantor to comply for 5 days after notice to such Borrower, Guarantor or Affiliated Guarantor with its other agreements contained in the Collateral Documents except for a failure that would not be material to the Lenders and would not materially affect the value of the Collateral taken as a whole;

105

(r)      a Change of Control shall have occurred;

(s)      there occurs any Budget Event;

(t)      any Loan Party shall file a motion in the Chapter 11 Cases to obtain additional or replacement financing from a party other than the Lenders under Section 364(d) of the Bankruptcy Code (unless (x) such additional or replacement financing provides for the repayment in full in cash of all Obligations and (y) such repayment occurs on or before the earlier of 23 days after the filing of such motion and two Business Days after the entry of an order of the Bankruptcy Court approving such additional or replacement financing) or to use cash collateral of the Lenders under Section 363(c) of the Bankruptcy Code, except with the express written consent of the Required Lenders (it being understood that, in any event, the Secured Parties shall retain and hereby reserve all rights and objections relating to any such motion);

(u)      any Loan Party shall file a motion seeking an order (i) approving payment of any prepetition claim other than (x) as provided for in the "first day" or "second day" orders, (y) contemplated by the Approved Budget (including Permitted Variances), or (z) otherwise consented to by the Required Lenders in writing, (ii) granting relief from the automatic stay under Section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets having a book value in excess of $250,000 in the aggregate, or (iii) approving any settlement or other stipulation not approved by the Required Lenders and not included in the Approved Budget with any secured creditor of any Loan Party providing for payments as adequate protection or otherwise to such secured creditor;

(v)      an order is entered in any of the Chapter 11 Cases appointing, or any Loan Party, or any Subsidiary of a Loan Party shall file an application for an order seeking the appointment of, (i) a trustee under Section 1104, or (ii) an examiner with enlarged powers relating to the operation of the Loan Parties' business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code;

(w)      an order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, in each case, which does not contain a provision for termination of the Commitments, and payment in full in cash of all Obligations (other than contingent indemnification obligations as to which no claim has been asserted) of the Loan Parties hereunder and under the other Loan Documents upon entry thereof;

(x)      an order is entered by the Bankruptcy Court in any of the Chapter 11 Cases without the express prior written consent of the Required Lenders and the Agents, (i) to revoke, reverse, stay, modify, supplement or amend the DIP Orders in a manner that is inconsistent with this Agreement, (ii) to permit any superpriority adequate protection lien or claim to have administrative priority as to the Loan Parties equal or superior to the priority of the DIP Superpriority Claim shall be entered by the Bankruptcy Court except as otherwise permitted under this Agreement or (iii) dismissing any of the Chapter 11 Cases which does not contain a provision for termination of all Commitments, and payment in full of all Obligations upon entry thereof;

(y)　　any Loan Party violates any term, provision or condition in the Interim DIP Order or Final DIP Order, as applicable;

(z)　　an application for any of the orders described in Section 9.01(v), (w), (x), (y) and (aa) shall be made by a Person (including, for the avoidance of doubt, the Loan Parties) and such application is not contested by the Loan Parties in good faith and such Person actually obtains entry of a final, non-appealable, order under § 506(c) of the Bankruptcy Code against any Secured Party or obtains a final, non-appealable, order materially adverse to any Secured Party or any of their respective rights and remedies under the Loan Documents or in the Collateral;

(aa)　　the entry of an order by the Bankruptcy Court terminating or shortening the exclusive right of any Loan Party to file a Chapter 11 plan pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of the Required Lenders;

(bb)　　(i) any Loan Party shall attempt to invalidate, reduce or otherwise impair the Liens or security interests of the Secured Parties, claims or rights against such Person or to subject any Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code, (ii) the Lien or security interest created by the Collateral Documents or the DIP Orders with respect to the Collateral shall, for any reason, on and after the entry of the DIP Orders, cease to be valid or (iii) any action is commenced by the Loan Parties which contests the validity, perfection or enforceability of any of the Liens and security interests of the Secured Parties created by any DIP Order, this Agreement, or any Collateral Document;

(cc)　　any Loan Party shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of such Loan Party) any other Person's motion to, disallow in whole or in part the Secured Parties' claim in respect of the Obligations or contest any material provision of any Loan Document or any material provision of any Loan Document shall cease to be effective (other than in accordance with its terms);

(dd)　　the failure of the Loan Parties to timely satisfy the Milestones;

(ee)　　the Loan Parties or any of their Subsidiaries attempt to consummate a sale of substantially all of its assets via a Plan of Reorganization or a 363 sale without consent of the Required Lenders;

(ff)　　there shall be any Plan of Reorganization confirmed in the Chapter 11 Cases that is not in accordance with the Restructuring Support Agreement or otherwise is not acceptable to the Required Lenders in their sole discretion, other than to the extent that such Plan of Reorganization provides for the repayment of the Prepetition April 2026 Notes and the Obligations in full and in cash on the effective date of such Plan of Reorganization;

(gg)　　the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to the holder or holders of any security interest to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Debtors which have a value in excess of $1,000,000 in the aggregate or (ii) permit other actions that would have a Material Adverse Effect on the Debtors or their estates (taken as a whole);

107

(hh)    an order of the Bankruptcy Court shall be entered denying or terminating use of cash collateral by the Loan Parties or imposing any additional conditions on such use (and such order remains unstayed for more than three (3) Business Days);

(ii)    any Loan Party (or any direct or indirect parent entity or Subsidiary thereof), or any Person claiming by or through the Loan Parties or any of their Subsidiaries, shall (x) obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against any Secured Party (in any of their respective capacities as such) relating to the Loans or the Loan Documents, unless such suit or other proceeding is in connection with the enforcement of the Loan Documents against such Secured Party, in its capacities as such or (y) file, assist or otherwise participate in any pleading that, if the relief requested therein were granted, would result in an Event of Default;

(jj)    the payment by any Loan Party of any of obligations under the Prepetition Financing Documents or Prepetition 2026 Notes other than (i) as permitted by any "first day" or "second day" order entered by the Bankruptcy Court on or prior to the Effective Date or (ii) as permitted by any other order of the Bankruptcy Court in amounts reasonably satisfactory to the Required Lenders, in each case consistent with the Approved Budget;

(kk)    following the execution of the Restructuring Support Agreement, the termination of the Restructuring Support Agreement; or

(ll)    an event or development occurs which could reasonably be expected to have a Material Adverse Effect;

then, and in any such event, the Administrative Agent may, and shall at the request of the Required Lenders, by notice to the Administrative Borrower, (i) terminate or reduce all Commitments, whereupon all Commitments shall immediately be so terminated or reduced, (ii) declare all or any portion of the Obligations then outstanding to be accelerated and due and payable, whereupon all or such portion of the aggregate principal of all Loans, all accrued and unpaid interest thereon, all fees and all other Obligations payable under this Agreement and the other Loan Documents shall become due and payable immediately, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by each Loan Party and (iii) exercise any and all of its other rights and remedies under applicable law, hereunder and under the other Loan Documents.

## ARTICLE X

## AGENTS

Section 10.01 <u>Appointment</u>.  Each Lender (and each subsequent maker of any Loan by its making thereof) hereby irrevocably appoints, authorizes and empowers the Administrative Agent and the Collateral Agent to perform the duties of each such Agent as set forth in this Agreement and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto, including:  (i) to receive on behalf of each Lender any payment of principal of or interest on the Loans outstanding hereunder and all other amounts accrued hereunder for the account of the Lenders and paid to such Agent, and, subject to Section 2.02 of

this Agreement, to distribute promptly to each Lender its Pro Rata Share of all payments so received; (ii) to distribute to each Lender copies of all material notices and agreements received by such Agent and not required to be delivered to each Lender pursuant to the terms of this Agreement; provided, that the Agents shall not have any liability to the Lenders for any Agent's inadvertent failure to distribute any such notices or agreements to the Lenders; (iii) to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Loans, and related matters and to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Collateral and related matters; (iv) to execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to this Agreement or any other Loan Document; (v) [reserved]; (vi) to perform, exercise, and enforce any and all other rights and remedies of the Lenders with respect to the Loan Parties, the Obligations, or otherwise related to any of same to the extent reasonably incidental to the exercise by such Agent of the rights and remedies specifically authorized to be exercised by such Agent by the terms of this Agreement or any other Loan Document; (vii)  to incur and pay such fees necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to this Agreement or any other Loan Document; (viii) subject to Section 10.03, to take such action as such Agent deems appropriate on its behalf to administer the Loans and the Loan Documents and to exercise such other powers delegated to such Agent by the terms hereof or the other Loan Documents (including, without limitation, the power to give or to refuse to give notices, waivers, consents, approvals and instructions and the power to make or to refuse to make determinations and calculations); and (ix) to act with respect to all Collateral under the Loan Documents, including for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations.  As to any matters not expressly provided for by this Agreement and the other Loan Documents (including, without limitation, enforcement or collection of the Loans), the Agents shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), and such instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) shall be binding upon all Lenders and all makers of Loans; provided, however, the Agents shall not be required to take any action which, in its opinion or the opinion of its counsel, may (i) expose such Agent to liability or which is contrary to this Agreement or any other Loan Document or applicable Requirements of Law or (ii) be in violation of the automatic stay under any requirement of law relating to bankruptcy, insolvency, reorganization, or relief of debtors; provided, further, that if any Agent so requests, it shall first be indemnified and provided with adequate security to its sole satisfaction (including reasonable advances as may be requested by such Agent) by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such directed action; provided, further, that any Agent may seek clarification or further direction from the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) prior to taking any such directed action and may refrain from acting until such clarification or further direction has been provided.

Section 10.02  Nature of Duties; Delegation.  (a) The Agents shall have no duties or responsibilities except those expressly set forth in this Agreement or in the other Loan

Documents.  The permissive rights of each Agent to take any actions permitted by this Agreement or any other Loan Document shall not be construed as an obligation or duty to do so. The duties of the Agents shall be mechanical and administrative in nature.  The Agents shall not have by reason of this Agreement or any other Loan Document a fiduciary, principal-agency, or trustee relationship in respect of any Lender, regardless of whether a Default or Event of Default has occurred or is continuing.  Nothing in this Agreement or any other Loan Document, express or implied, is intended to or shall be construed to impose upon the Agents any obligations in respect of this Agreement or any other Loan Document except as expressly set forth herein or therein, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against any Agent.  Each Lender has made its own independent investigation of the financial condition and affairs of the Loan Parties in connection with the making and the continuance of the Loans hereunder and shall make its own appraisal of the creditworthiness of the Loan Parties and the value of the Collateral without reliance upon any Agent or any other Lender or any of their respective Related Parties, and neither the Agents nor any of their Related Parties shall have any duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into their possession before the initial Loan hereunder or at any time or times thereafter; provided, that, upon the reasonable request of a Lender, each Agent shall provide to such Lender any documents or reports delivered to such Agent by the Loan Parties pursuant to the terms of this Agreement or any other Loan Document.  Each Lender has made its own independent investigation of the financial condition and affairs of the Loan Parties in connection with the making and the continuance of the Loans hereunder and has made its own appraisal of the creditworthiness of the Loan Parties and the value of the Collateral without reliance upon any Agent or any other Lender or any of their respective Related Parties, and neither the Agents nor any of their Related Parties shall have any duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into their possession before the initial Loan hereunder or at any time or times thereafter, provided that, upon the reasonable request of a Lender, each Agent shall provide to such Lender any documents or reports delivered to such Agent by the Loan Parties pursuant to the terms of this Agreement or any other Loan Document.  Each Lender acknowledges that it will, independently and without reliance upon any Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any other agreement or document furnished hereunder or thereunder. Each Lender acknowledges that no Agent or its Related Parties have made any representation or warranty to it, and that no act by any Agent or its Related Parties hereinafter taken shall be deemed to constitute any representation or warranty by such Agent or its Related Parties to any Lender. Each Lender agrees that it will not assert any claim against any Agent based on an alleged breach of fiduciary duty by such Agent in connection with this Agreement, the other Loan Documents, or the transactions contemplated hereby or thereby.

(b)     Except for notices, reports, and other documents expressly herein required to be furnished to the Lenders by any Agent, such Agent and its Related Parties shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of the Loan Parties or any other Person party to a Loan Document that may come into the possession or control of such Agent or its Related Parties

(c)     Each Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents or of exercising any rights and remedies thereunder) by or through any one or more co-agents, sub-agents and attorneys-in-fact appointed by such Agent, and shall be entitled to advice of counsel, both internal and external, and other consultants or experts concerning all matters pertaining to such duties.  Each Agent and any such co-agents, sub-agents and attorneys-in-fact may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  All provisions of this Article X and Article XII (including Sections Section 12.04 and Section 12.15) and all other rights, privileges, protections, immunities, and indemnities granted to each Agent hereunder and under the other Loan Documents shall apply to any such co-agents, sub-agents and attorneys-in-fact, and to the Related Parties of each Agent and any such co-agents, sub-agents and attorneys-in-fact.  Each Agent shall not be responsible for the negligence or misconduct of any such co-agents, sub-agents and attorneys-in-fact except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such co-agents, sub-agents and attorneys-in-fact.

Section 10.03  Rights, Exculpation, Etc.

(a)     The Agents and their Related Parties shall not be liable for any action taken or omitted to be taken by them under or in connection with this Agreement or the other Loan Documents (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) (and such consent or request and such action or action not taken pursuant thereto shall be binding upon all the Secured Parties) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and non-appealable judgment (which shall not include any action taken or omitted to be taken in accordance with clause (i), for which the Agents and their Related Parties shall have no liability).

(b)     Without limiting the generality of the foregoing, the Agents and their Related Parties (i) are entitled to treat the holder of any Loan as set forth in the Register as the owner thereof until such Loan is assigned in accordance with Section 12.07 hereof; (ii) may consult with legal counsel (including, without limitation, counsel to any Agent or counsel to the Loan Parties), independent public accountants, and other consultants or experts selected by any of them and shall be entitled to rely, shall be fully protected in relying, and shall not incur any liability for relying (including taking any action or omitting to take any action in reliance), upon advice and statements of such counsel, accountants, consultants or experts; (iii) make no warranty or representation; and (iv) shall not be responsible or liable for or have any duty to ascertain or inquire into or monitor (A) any recital, statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (B) the contents of any certificate, report, statement, or other document referred to, provided for, or delivered hereunder or thereunder or in connection herewith or therewith, (C) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein, the use of proceeds of the New Money Loans, or the occurrence or possible existence of any Default or Event of Default, (D) the execution, validity, legality, validity, enforceability, effectiveness, genuineness, collectability or sufficiency or value of this Agreement, any other Loan Document or any other agreement,

111

instrument or document or the creation, preservation, perfection, maintenance or continuation of perfection, or priority of any Lien purported to be created by the Collateral Documents, (E) the value or the sufficiency of any Collateral, (F) whether the Collateral exists, is owned by Borrower or its Subsidiaries, is cared for, protected, insured, or maintained, or has been encumbered, or meets the eligibility criteria applicable in respect thereof, (G) the satisfaction of any condition set forth in Article V or elsewhere, other than to confirm receipt of items expressly required to be delivered to such Agent, or the inspection of the properties (including any Collateral), books or records of any Loan Party or any Affiliate thereof, or (H) the financial condition or business affairs of any Loan Party or any other Person liable for the payment of any Obligations.

(c)     The Agents shall not be liable for any apportionment or distribution of payments made in good faith pursuant to Section 4.03, and if any such apportionment or distribution is subsequently determined to have been made in error, and the sole recourse of any Lender to whom payment was due but not made shall be to recover from other Lenders any payment in excess of the amount which they are determined to be entitled.  The Agents may at any time request instructions from the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) with respect to any actions or approvals which by the terms of this Agreement or of any of the other Loan Documents the Agents are permitted or required to take or to grant, and the Agents shall be absolutely entitled to refrain from taking any action or to withhold any approval under any of the Loan Documents until they shall have received such instructions from the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), and the Agents shall be entitled to rely, shall be fully protected in relying, and shall not incur any liability for relying, upon such instructions.  Without limiting the foregoing, no Lender shall have any right of action whatsoever against any Agent as a result of such Agent acting or refraining from acting under this Agreement or any of the other Loan Documents in accordance with the instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents).

(d)     The Agents and their Related Parties shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrowers, the Loan Parties, or any of their Affiliates that is communicated to or obtained by the Person serving as any Agent or any of its Related Parties in any capacity.

(e)     Nothing in this Agreement or any other Loan Document shall require any Agent or its Related Parties to expend or risk its own funds or otherwise incur any financial liability in the performance of any duties, obligations or responsibilities or in the exercise of any right, power, authority or discretion hereunder or under the other Loan Documents.

(f)     No Agent or its Related Parties shall be responsible or liable for any failure or delay in the performance of its obligations under this Agreement or any other Loan Document, in each case, arising out of or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; pandemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of

civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

(g)     If at any time, any Agent is served with any judicial or administrative order, judgment, decree, writ or other form of judicial or administrative process (including orders of attachment or garnishment or other forms of levies or injunctions or stays relating to the transfer of any Collateral), such Agent is authorized to comply therewith in any manner as it or its legal counsel of its own choosing deems appropriate, and if such Agent complies with any such judicial or administrative order, judgment, decree, writ or other form of judicial or administrative process, such Agent shall not be liable to any of the Loan Parties, the Secured Parties, or to any other Person even though such order, judgment, decree, writ or process may be subsequently modified or vacated or otherwise determined to have been without legal force or effect.

(h)     Any corporation or association into which any Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate agency business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which such Agent is a party, will be and become the successor Agent under this Agreement and will have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

(i)     For the avoidance of doubt, and without limiting the other protections set forth in this Article X, with respect to any approval, determination, designation, or judgment to be made by any Agent herein or in the other Loan Documents, such Agent shall be entitled to request that the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary) make or confirm such approval, determination, designation, or judgment.

(j)     No Agent shall be deemed to have knowledge of any Default or Event of Default unless and until written notice describing such Default or Event of Default and stating that such notice is a "notice of default" is given to such Agent by a Borrower or a Lender.

Section 10.04 <u>Reliance</u>.  Each Agent shall be entitled to rely, shall be fully protected in relying, and shall not incur any liability for relying, upon any instrument, writing, resolution, notice, consent, request, certificate, affidavit, letter, facsimile, telecopy, telex or teletype message, statement, order or other document, communication or conversation (including any electronic message, Internet or intranet website posting or other distribution and any statement made orally or by telephone) believed by it to be genuine and correct and to have been signed, sent, made, or otherwise authenticated by the proper Person, and with respect to all matters pertaining to this Agreement or any of the other Loan Documents and its duties hereunder or thereunder, upon advice of counsel selected by it.

Section 10.05 <u>Indemnification</u>.  To the extent that any Agent or any Related Party of the foregoing is not reimbursed and indemnified by any Loan Party, and whether or not such Agent has made demand on any Loan Party for the same, the Lenders will, within five days of written demand by such Agent, reimburse such Agent and such Related Parties for and indemnify

such Agent and such Related Parties from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, fees, costs, expenses (including, without limitation, client charges and expenses of counsel or any other advisor to such Agent and such Related Parties), advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against such Agent and such Related Parties in any way relating to or arising out of the Commitments, the Loans, this Agreement or any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby, the performance of its duties or exercise of any of its rights or powers hereunder or thereunder, or any action taken or omitted by such Agent and such Related Parties under this Agreement or any of the other Loan Documents, in proportion to each Lender's Pro Rata Share (or, if indemnification is sought after the date upon which the Loans shall have been paid in full, ratably in accordance with their Pro Rata Share in effect immediately prior to such date), including, without limitation, advances and disbursements made pursuant to Section 10.08; provided, however, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements for which there has been a final and non-appealable judgment of a court of competent jurisdiction that such liability resulted from such Agent's or such Related Party's gross negligence or willful misconduct; provided that no action taken by any Agent in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or the other Loan Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 10.05.  In the case of any investigation, litigation or proceeding giving rise to any such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, fees, costs, expenses, advances or disbursements, this Section 10.05 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.  Without limiting the foregoing, each Lender shall reimburse any Agent upon demand for its ratable share of any fees, costs or out-of-pocket expenses (including attorneys' fees and expenses) incurred by such Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that such Agent is not reimbursed for such expenses by or on behalf of the Borrowers, provided that such reimbursement by the Lenders shall not affect the Borrowers' continuing reimbursement obligations with respect thereto.  The obligations of the Lenders under this Section 10.05 shall survive the resignation or replacement of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of the Loans and all other Obligations payable hereunder and under any other Loan Document, and the termination of this Agreement or any other Loan Document.

Section 10.06  [Reserved].

Section 10.07  Successor Agent.  (a) Any Agent may at any time give at least 30 days prior written notice of its resignation to the Lenders and the Administrative Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right to appoint a successor Agent.  If no such successor Agent shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "Resignation Effective Date"), then the retiring Agent may (but shall not be obligated to), on behalf of the

114

Lenders, appoint a successor Agent.  Whether or not a successor Agent has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b)     With effect from the Resignation Effective Date, (i) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by such Collateral Agent on behalf of the Secured Parties under any of the Loan Documents, the retiring Collateral Agent shall continue to hold such collateral security until such time as a successor Collateral Agent is appointed) and (ii) all payments, communications and determinations provided to be made by, to or through such retiring Agent shall instead be made by or to each Lender directly, until such time, if any, as a successor Agent shall have been appointed as provided for above.  Upon the acceptance of a successor Agent's appointment as Agent hereunder, such successor Agent shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section 10.07).  After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article X, Section 12.04 and Section 12.15 shall continue in effect for the benefit of such retiring Agent, its co-agents, sub-agents and attorneys-in-fact and their respective Related Parties in respect of any actions taken or omitted to be taken by it while the retiring Agent was acting as Agent.

Section 10.08  Collateral Matters.

(a)     [Reserved].

(b)     The Lenders hereby irrevocably authorize the Collateral Agent, at its option and in its discretion, to release any Lien granted to or held by the Collateral Agent upon any Collateral upon termination of all Commitments and payment and satisfaction of all Loans and all other Obligations (other than Contingent Indemnity Obligations) in accordance with the terms hereof; or constituting property being sold or disposed of in the ordinary course of any Loan Party's business or otherwise in compliance with the terms of this Agreement and the other Loan Documents; or constituting property in which the Loan Parties owned no interest at the time the Lien was granted or at any time thereafter; or if approved, authorized or ratified in writing by the Lenders in accordance with Section 12.02.  Upon request by the Collateral Agent at any time, the Lenders will confirm in writing the Collateral Agent's authority to release particular types or items of Collateral pursuant to this Section 10.08(b).

(c)     Without in any manner limiting the Collateral Agent's authority to act without any specific or further authorization or consent by the Lenders (as set forth in Section 10.08(b)), each Lender agrees to confirm in writing, upon request by the Collateral Agent, the authority to release Collateral conferred upon the Collateral Agent under Section 10.08(b).  Upon receipt by the Collateral Agent of confirmation from the Lenders of its authority to release any particular item or types of Collateral, and upon prior written reasonable request by and at the expense of any Loan Party, the Collateral Agent shall (and is hereby irrevocably authorized by the Lenders to) execute such documents as may be necessary to evidence the release of the Liens granted to the Collateral Agent for the benefit of the Agents and the Lenders upon such Collateral;

115

provided, however, that (i) the Collateral Agent shall not be required to execute any such document or take any action to evidence such release on terms which, in the Collateral Agent's opinion or the opinion of its counsel, could expose the Collateral Agent to liability or create any obligations or entail any consequence other than the release of such Liens without recourse to or representation or warranty by the Collateral Agent of any kind, (ii) the Loan Parties shall have provided the Collateral Agent with such certifications or documents as the Collateral Agent shall reasonably request in order to demonstrate that the requested release is permitted hereunder, and (iii) such release shall not in any manner discharge, affect or impair the Obligations or any Lien upon (or obligations of any Loan Party in respect of) all interests in the Collateral retained by any Loan Party.

(d)      Anything contained in any of the Loan Documents to the contrary notwithstanding, the Loan Parties, each Agent and each Lender hereby agree that (i) no Lender shall have any right individually to realize upon any of the Collateral under any Loan Document or to enforce any Guaranty, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the Collateral Agent for the benefit of the Secured Parties in accordance with the terms thereof, (ii) in the event of a foreclosure by the Collateral Agent on any of the Collateral pursuant to a public or private sale, the Administrative Agent or the Collateral Agent (including pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code), or any Lender (except with respect to a "credit bid" pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code), may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and the Collateral Agent, as agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities) shall be entitled, upon instructions from the Required Lenders, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale or disposition, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Collateral Agent at such sale or other disposition and (iii) the Collateral Agent, as agent for and representative of the Secured Parties (but not any other Agent or any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled (either directly or through one or more acquisition vehicles) for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral to be sold (A) at any public or private sale, (B) at any sale conducted by the Collateral Agent under the provisions of the Uniform Commercial Code (including pursuant to Sections 9-610 or 9-620 of the Uniform Commercial Code), (C) at any sale or foreclosure conducted by the Collateral Agent (whether by judicial action or otherwise) in accordance with applicable law or (D) any sale conducted pursuant to the provisions of any Debtor Relief Law (including Section 363 of the Bankruptcy Code), to use and apply all or any of the Obligations as a credit on account of the purchase price for any Collateral payable by the Collateral Agent at such sale.  For the avoidance of doubt, no Agent shall be required to take title to any Collateral without its prior written consent.

(e)      The Collateral Agent shall have no obligation whatsoever to any Lender to assure that the Collateral exists or is owned by the Loan Parties or is cared for, protected or insured or has been encumbered or that the Lien granted to the Collateral Agent pursuant to this Agreement or any other Loan Document has been properly or sufficiently or lawfully created, perfected, protected or enforced or is entitled to any particular priority, or to exercise at all or in any particular

116

manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Collateral Agent in this Section 10.08 or in any other Loan Document, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Collateral Agent may act in any manner it may deem appropriate, in its sole discretion, given the Collateral Agent's own interest in the Collateral as one of the Lenders (if applicable) and that the Collateral Agent shall have no duty or liability whatsoever to any other Lender, except as otherwise provided herein.

Section 10.09  Agency for Perfection.  Each Agent and each Lender hereby appoints each other Agent and each other Lender as its sub-collateral agent and gratuitous bailee for the purpose of perfecting the security interests in and liens upon the Collateral in assets which, in accordance with Article 9 of the Uniform Commercial Code, can be perfected only by possession or control (or where the security interest of a secured party with possession or control has priority over the security interest of another secured party) and each Agent and each Lender hereby acknowledges that it holds possession of or otherwise controls any such Collateral for the benefit of the Agents and the Lenders as secured party.  Should the Administrative Agent or any Lender obtain possession or control of any such Collateral, the Administrative Agent or such Lender shall notify the Collateral Agent in writing thereof, and, promptly upon the Collateral Agent's request therefor shall deliver possession or control of such Collateral to the Collateral Agent and take such other actions as sub-collateral agent or gratuitous bailee in accordance with the Collateral Agent's instructions.  In addition, the Collateral Agent shall also have the power and authority hereunder to appoint such other sub-agents as may be necessary or required under applicable state law or otherwise to perform its duties and enforce its rights with respect to the Collateral and under the Loan Documents. Each Loan Party by its execution and delivery of this Agreement hereby consents to the foregoing.

Section 10.10  No Reliance on any Agent's Customer Identification Program.  Each Lender acknowledges and agrees that neither such Lender, nor any of its Related Parties, participants or assignees, may rely on any Agent to carry out such Lender's, Related Parties', participant's or assignee's customer identification program, or other requirements imposed by the USA PATRIOT Act or the regulations issued thereunder, including the regulations set forth in 31 C.F.R. §§ 1010.100(yy), (iii), 1020.100, and 1020.220 (formerly 31 C.F.R. § 103.121), as hereafter amended or replaced ("CIP Regulations"), or any other Anti-Money Laundering Laws, including any programs involving any of the following items relating to or in connection with any of the Loan Parties, their Related Parties or their agents, the Loan Documents or the transactions hereunder or contemplated hereby:  (1) any identity verification procedures, (2) any recordkeeping, (3) comparisons with government lists, (4) customer notices or (5) other procedures required under the CIP Regulations or other regulations issued under the USA PATRIOT Act.  Each Lender, Affiliate, participant or assignee subject to Section 326 of the USA PATRIOT Act will perform the measures necessary to satisfy its own responsibilities under the CIP Regulations.

Section 10.11  No Third-Party Beneficiaries.  The provisions of this Article X are solely for the benefit of the Secured Parties, and no Loan Party shall have rights as a third-party beneficiary of any of such provisions.

Section 10.12  No Fiduciary Relationship.  It is understood and agreed that the use of the term "agent" herein or in any other Loan Document (or any other similar term) with

reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

Section 10.13  Reports; Confidentiality; Disclaimers.  By becoming a party to this Agreement, each Lender:

(a)      is deemed to have requested that each Agent furnish such Lender, after it becomes available, a copy of each field audit or examination report with respect to the Parent or any of its Subsidiaries (each, a "Report") prepared by or at the request of such Agent, and each Agent shall so furnish each Lender with each such Report,

(b)      expressly agrees and acknowledges that the Agents (i) do not make any representation or warranty as to the accuracy of any Reports, and (ii) shall not be liable for any information contained in any Reports,

(c)      expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that any Agent or other party performing any audit or examination will inspect only specific information regarding the Parent and its Subsidiaries and will rely significantly upon the Parent's and its Subsidiaries' books and records, as well as on representations of their personnel,

(d)      agrees to keep all Reports and other material, non-public information regarding the Parent and its Subsidiaries and their operations, assets, and existing and contemplated business plans in a confidential manner in accordance with Section 12.19, and

(e)      without limiting the generality of any other indemnification provision contained in this Agreement, agrees:  (i) to hold any Agent and any other Lender preparing a Report harmless from any action the indemnifying Lender may take or fail to take or any conclusion the indemnifying Lender may reach or draw from any Report in connection with any loans or other credit accommodations that the indemnifying Lender has made or may make to the Borrowers, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a loan or loans of the Borrowers, and (ii) to pay and protect, and indemnify, defend and hold any Agent and any other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including, attorneys' fees and costs) incurred by any such Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

Section 10.14  Collateral Custodian.   Upon the occurrence and during the continuance of any Default or Event of Default, the Collateral Agent or its designee may at any time and from time to time employ and maintain on the premises of any Loan Party a custodian selected by the Collateral Agent or its designee who shall have full authority to do all acts necessary to protect the Secured Parties' interests.  Each Loan Party hereby agrees to, and to cause its Subsidiaries to, cooperate with any such custodian and to do whatever the Collateral Agent or its designee may reasonably request to preserve the Collateral.

150146488_20

Section 10.15  [Reserved].

Section 10.16  [Reserved].

Section 10.17  Administrative Agent May File Proofs of Claim.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether any Agent shall have made any demand on the Borrowers) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Secured Parties and their respective Related Parties (including any claim for the compensation, expenses, indemnities, disbursements and advances of the Secured Parties and their respective Related Parties and all other amounts due the foregoing hereunder and under the other Loan Documents) allowed in such judicial proceeding; and

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Secured Party to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Secured Parties, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, indemnities, disbursements and advances of any Agent and its Related Parties, and any other amounts due to any Agent and its Related Parties hereunder and under the other Loan Documents. Nothing contained herein shall be deemed to authorize any Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize any Agent to vote in respect of the claim of any Lender in any such proceeding.

Section 10.18  Lender Direction.  Each Lender authorizes and directs each Agent to enter into, and agrees to be bound by, this Agreement, the Collateral Documents, and the other Loan Documents, including, without limitation, each Loan Document to be executed by any Agent. Each Lender hereby acknowledges and agrees that (x) the foregoing instructed actions constitute an instruction from all the Lenders under this Article X and (y) this Article X and Section 12.04 and Section 12.15 and any other rights, privileges, protections, immunities, and indemnities in favor of any Agent hereunder apply to any and all actions taken or not taken by such Agent in accordance with such instruction. Each Lender agrees that any action taken by any Agent in accordance with the terms of this Agreement or the other Loan Documents relating to the Collateral and the exercise by such Agent of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.

Section 10.19  [Reserved].

119

Section 10.20  <u>Erroneous Distribution</u>.

(a)      If any Agent notifies a Lender or Secured Party, or any Person who has received funds on behalf of a Lender or Secured Party (any such Lender, Secured Party or other recipient, and each of their respective successors and assigns, a "<u>Payment Recipient</u>") that such Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds (as set forth in such notice form such Agent) received by such Payment Recipient from such Agent or any of its Related Parties were erroneously or mistakenly transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender, Secured Party or other Payment Recipient on its behalf) (any such funds, whether transmitted or received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "<u>Erroneous Payment</u>") and demands the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of such Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of such Agent, and such Lender or Secured Party shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two (2) Business Days thereafter, return to such Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to such Agent in same day funds at the greater of the (x) a rate determined by such Agent to represent its cost of overnight or short-term funds (which determination shall be conclusive absent manifest error) and (y) a rate determined by such in accordance with banking industry rules on interbank compensation from time to time in effect.  A notice of any Agent to any Payment Recipient under this clause (a) shall be conclusive, absent manifest error.

(b)      Without limiting the immediately preceding clause (a), each Lender or Secured Party (or any Payment Recipient who received such funds on its behalf), hereby further agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from any Agent (or any of its Related Parties) (x) that is in a different amount than, or on a different date from, that specified in this Agreement or in a notice of payment, prepayment or repayment sent by such Agent (or any of its Related Parties) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by such Agent (or any of its Related Parties), or (z) that such Lender or Secured Party, or other such Payment Recipient otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part) then in each such case:

(i)      it acknowledges and agrees that (A) in the case of immediately preceding clauses (x) or (y), an error and mistake shall be presumed to have been made (absent written confirmation from such Agent to the contrary) or (B) an error and mistake has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

(ii)      such Lender or Secured Party shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly

120

(and, in all events, within one (1) Business Day of any of the circumstances described in immediately preceding clauses (x), (y), and (z)) notify such Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying such Agent pursuant to this Section 10.20.

For the avoidance of doubt, the failure to deliver a notice to such Agent pursuant to this Section 10.20 shall not have any effect on a Payment Recipient's obligations pursuant to Section 10.20 or on whether or not an Erroneous Payment has been made.

(c)     Each Lender or Secured Party hereby authorizes the Agents to set off, net and apply any and all amounts at any time owing to such Lender or Secured Party under any Loan Document, or otherwise payable or distributable by any Agent to such Lender or Secured Party from any source, against any amount due to any Agent under immediately preceding clause (a), Section 10.05, or any other indemnity obligations from such Lender to any Agent or its Related Parties under the Loan Documents.

(d)     The parties hereto agree that (x) irrespective of whether an Agent may be equitably subrogated, in the event that an Erroneous Payment (or portion thereof) is not recovered from any Payment Recipient that has received such Erroneous Payment (or portion thereof) for any reason, such Agent shall be subrogated to all the rights and interests of such Payment Recipient (and, in the case of any Payment Recipient who has received funds on behalf of a Lender or other Secured Party, to the rights and interests of such Lender or other Secured Party, as the case may be) under the Loan Documents with respect to such amount (the "Erroneous Payment Subrogation Rights") and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrowers or any other Loan Party; *provided* that this Section 10.20(d) shall not be interpreted to increase (or accelerate the due date for), or have the effect of increasing (or accelerating the due date for), the Obligations of the Borrowers relative to the amount (and/or timing for payment) of the Obligations that would have been payable had such Erroneous Payment not been made by such Agent; *provided*, *further*, that for the avoidance of doubt, the immediately preceding clauses (x) and (y) shall not apply to the extent any such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by such Agent from the Borrowers for the purpose of making such Erroneous Payment.

(e)     Notwithstanding anything to the contrary contained herein, and for the avoidance of doubt, in no event shall the occurrence of an Erroneous Payment (or the existence of any Erroneous Payment Subrogation Rights or other rights of any Agent in respect of an Erroneous Payment) result in such Agent becoming, or being deemed to be, a Lender hereunder or the holder of any Loans hereunder.

(f)     The parties hereto agree that an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrowers or any other Loan Party, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by such Agent from the Borrowers or any other Loan Party for the purpose of making such Erroneous Payment.

(g)     To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by any Agent for the return of any Erroneous Payment received, including, without limitation, waiver of any defense based on "discharge for value" or any similar doctrine.

Section 10.21 <u>Survival</u>.   The agreements in this Article X shall survive the resignation or replacement of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of the Loans and all other Obligations payable hereunder and under any other Loan Document, and the termination of this Agreement or any other Loan Document.

## ARTICLE XI

## GUARANTY

Section 11.01 <u>Guaranty</u>.   Each Guarantor hereby jointly and severally and unconditionally and irrevocably guarantees the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of all Obligations of the Borrowers now or hereafter existing under any Loan Document, whether for principal, interest (including, without limitation, all interest that accrues after the commencement of any Insolvency Proceeding of any Borrower, whether or not a claim for post-filing interest is allowed in such Insolvency Proceeding) fees, commissions, expense reimbursements, indemnifications or otherwise (such obligations, to the extent not paid by the Borrowers, being the "<u>Guaranteed Obligations</u>"), and agrees to pay any and all expenses (including reasonable counsel fees and expenses) incurred by the Secured Parties in enforcing any rights under the guaranty set forth in this Article XI.  Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by the Borrowers to the Secured Parties under any Loan Document but for the fact that they are unenforceable or not allowable due to the existence of an Insolvency Proceeding involving any Borrower.   Notwithstanding any of the foregoing, Guaranteed Obligations shall not include any Excluded Swap Obligations.  In no event shall the obligation of any Guarantor hereunder exceed the maximum amount such Guarantor could guarantee under any Debtor Relief Law.

Section 11.02 <u>Guaranty Absolute</u>.   Each Guarantor jointly and severally guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Secured Parties with respect thereto. Each Guarantor agrees that this Article XI constitutes a guaranty of payment when due and not of collection and waives any right to require that any resort be made by any Secured Party to any Collateral.   The obligations of each Guarantor under this Article XI are independent of the Guaranteed Obligations, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce such obligations, irrespective of whether any action is brought against any Loan Party or whether any Loan Party is joined in any such action or actions.   The liability of each Guarantor under this Article XI shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now or hereafter have in any way relating to, any or all of the following:

122

(a)     any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto;

(b)     any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any other amendment or waiver of or any consent to departure from any Loan Document, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Loan Party or otherwise;

(c)     any taking, exchange, release or non-perfection of any Collateral, or any taking, release or amendment or waiver of or consent to departure from any other guaranty, for all or any of the Guaranteed Obligations;

(d)     the existence of any claim, set-off, defense or other right that any Guarantor may have at any time against any Person, including, without limitation, any Secured Party;

(e)     any change, restructuring or termination of the corporate, limited liability company or partnership structure or existence of any Loan Party; or

(f)     any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by the Secured Parties that might otherwise constitute a defense available to, or a discharge of, any Loan Party or any other guarantor or surety.

This Article XI shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by Secured Parties or any other Person upon the insolvency, bankruptcy or reorganization of any Borrower or otherwise, all as though such payment had not been made.

Section 11.03 <u>Waiver</u>.   Each Guarantor hereby waives (i) promptness and diligence, (ii) notice of acceptance and any other notice with respect to any of the Guaranteed Obligations and this Article XI and any requirement that the Secured Parties exhaust any right or take any action against any Loan Party or any other Person or any Collateral, (iii) any right to compel or direct any Secured Party to seek payment or recovery of any amounts owed under this Article XI from any one particular fund or source or to exhaust any right or take any action against any other Loan Party, any other Person or any Collateral, (iv) any requirement that any Secured Party protect, secure, perfect or insure any security interest or Lien on any property subject thereto or exhaust any right to take any action against any Loan Party, any other Person or any Collateral, and (v) any other defense available to any Guarantor.  Each Guarantor agrees that the Secured Parties shall have no obligation to marshal any assets in favor of any Guarantor or against, or in payment of, any or all of the Obligations.  Each Guarantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated herein and that the waiver set forth in this Section 11.03 is knowingly made in contemplation of such benefits.  Each Guarantor hereby waives any right to revoke this Article XI, and acknowledges that this Article XI is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

150146488_20

Section 11.04  Continuing Guaranty; Assignments.  This Article XI is a continuing guaranty and shall (a) remain in full force and effect until the later of the cash payment in full of the Guaranteed Obligations (other than Contingent Indemnity Obligations) and all other amounts payable under this Article XI and the Final Maturity Date, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Secured Parties and their successors, pledgees, transferees and assigns.  Without limiting the generality of the foregoing clause (c), any Agent or any Lender may pledge, assign or otherwise transfer all or any portion of its rights and obligations under this Agreement (including, without limitation, all or any portion of its Commitments, its Loans owing to it) to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to such Agent or such Lender herein or otherwise, in each case as provided in Section 12.07.

Section 11.05  Subrogation.  No Guarantor will exercise any rights that it may now or hereafter acquire against any Loan Party or any other guarantor that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under this Article XI, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Secured Parties against any Loan Party or any other guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from any Loan Party or any other guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations (other than Contingent Indemnity Obligations) and all other amounts payable under this Article XI shall have been paid in full in cash and the Final Maturity Date shall have occurred.  If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the later of the payment in full in cash of the Guaranteed Obligations (other than Contingent Indemnity Obligations) and all other amounts payable under this Article XI and the Final Maturity Date, such amount shall be held in trust for the benefit of the Secured Parties and shall forthwith be paid to the Secured Parties to be credited and applied to the Guaranteed Obligations and all other amounts payable under this Article XI, whether matured or unmatured, in accordance with the terms of this Agreement, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this Article XI thereafter arising.  If (i) any Guarantor shall make payment to the Secured Parties of all or any part of the Guaranteed Obligations, (ii) all of the Guaranteed Obligations and all other amounts payable under this Article XI shall be paid in full in cash and (iii) the Final Maturity Date shall have occurred, the Secured Parties will, at such Guarantor's reasonable request and expense, execute and deliver to such Guarantor appropriate documents, without recourse to and without representation or warranty by the Secured Parties of any kind, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment by such Guarantor.

Section 11.06  Contribution.  All Guarantors desire to allocate among themselves, in a fair and equitable manner, their obligations arising under this Guaranty.  Accordingly, in the event any payment or distribution is made on any date by a Guarantor under this Guaranty such that its Aggregate Payments exceeds its Fair Share as of such date, such Guarantor shall be entitled to a contribution from each of the other Guarantors in an amount sufficient to cause each Guarantor's Aggregate Payments to equal its Fair Share as of such date. "Fair Share" means, with respect to any Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the

124

Fair Share Contribution Amount with respect to such Guarantor, to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Guarantors multiplied by, (b) the aggregate amount paid or distributed on or before such date by all Guarantors under this Guaranty in respect of the obligations Guaranteed.  "Fair Share Contribution Amount" means, with respect to any Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Guarantor under this Guaranty that would not render its obligations hereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of state law; provided, solely for purposes of calculating the "Fair Share Contribution Amount" with respect to any Guarantor for purposes of this Section 11.06, any assets or liabilities of such Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Guarantor.  "Aggregate Payments" means, with respect to any Guarantor as of any date of determination, an amount equal to (A) the aggregate amount of all payments and distributions made on or before such date by such Guarantor in respect of this Guaranty (including, without limitation, in respect of this Section 11.06), minus (B) the aggregate amount of all payments received on or before such date by such Guarantor from the other Guarantors as contributions under this Section 11.06.  The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Guarantor.  The allocation among Guarantors of their obligations as set forth in this Section 11.06 shall not be construed in any way to limit the liability of any Guarantor hereunder.  Each Guarantor is a third-party beneficiary to the contribution agreement set forth in this Section 11.06.

## ARTICLE XII

## MISCELLANEOUS

Section 12.01  Notices, Etc.

(a)    Notices Generally.  All notices and other communications provided for hereunder or under any other Loan Document shall be in writing and shall be delivered by hand, sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, e-mail or telecopier.  In the case of notices or other communications to any Loan Party, Administrative Agent or the Collateral Agent, as the case may be, they shall be sent to the respective address set forth below (or, as to each party, at such other address as shall be designated by such party in a written notice to the other parties complying as to delivery with the terms of this Section 12.01):

[c/o Exela Technologies, Inc.
2701 East Grauwyler Road
Irving, Texas 75061
Attention: President
Email: legalnotices@exelatech.com][1]

---

[1] Note to LW: Please update and confirm.

with a copy to:

Latham & Watkins LLP
Attention: [●]
Email: [●]

if to the Administrative Agent or the Collateral Agent, to it at the following address:

Ankura Trust Company, LLC
140 Sherman Street, 4th Floor
Fairfield, CT 06824
Attention: Beth Micena
Email: Beth.Micena@ankura.com

with a copy (which shall not constitute notice) to:

Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036-8704
Attention: Mark Somerstein, Patricia Chen
Email: Mark.Somerstein@ropesgray.com; Patricia.Chen@ropesgray.com

All notices or other communications sent in accordance with this Section 12.01, shall be deemed received on the earlier of the date of actual receipt or 3 Business Days after the deposit thereof in the mail; provided, that (i) notices sent by overnight courier service shall be deemed to have been given when received, (ii) notices by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient), provided, further that any notice or other communication to any Agent shall not be effective until received by such Agent during its normal business hours, and (iii) notices by electronic communications shall be deemed given as provided in Section 12.01(b); provided, further that, in no event shall a voice mail message be effective as a notice, communication or confirmation hereunder.

(b)     Electronic Communications.

(i)     Each Agent and the Administrative Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided, that approval of such procedures may be limited to particular notices or communications. Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Agents; provided, that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Agents that it is incapable of receiving notices under such Article by electronic communication.

(ii)     Unless the Administrative Agent otherwise prescribes, (A) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt

126

requested" function, as available, return e-mail or other written acknowledgement), and (B) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (A), of notification that such notice or communication is available and identifying the website address therefor; provided, that, for both clauses (A) and (B) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient. Notwithstanding any other provision of this Agreement, none of the Agents or their Related Parties will be responsible or liable to the Borrowers or any other Person for damages arising from the use by others of any information or other materials obtained through internet, electronic, telecommunications or other information transmission systems.

Section 12.02  Amendments, Etc.  (a) No amendment or waiver of any provision of this Agreement or any other Loan Document (excluding the Fee Letter and the DIP Orders), and no consent to any departure by any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed (x) in the case of an amendment, consent or waiver to cure any ambiguity, omission, defect or inconsistency or grant a new Lien for the benefit of the Secured Parties or extending an existing Lien over additional property, by the Agents and the Borrowers (or by the Administrative Borrower on behalf of the Borrowers), (y) in the case of any other waiver or consent, by the Required Lenders (with a copy to the Agents) (or by the Agents with the consent of the Required Lenders) and (z) in the case of any other amendment, by the Required Lenders (with a copy to the Agents) (or by the Agents with the consent of the Required Lenders) and the Borrowers (or by the Administrative Borrower on behalf of the Borrowers), and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no amendment, waiver or consent shall:

(i)  other than pursuant to Section 2.14, increase the Commitment of any Lender, reduce the principal of, or interest on, the Loans payable to any Lender, reduce the amount of any fee payable for the account of any Lender (other than pursuant to  Section 2.01(c)), or postpone or extend any scheduled date fixed for any payment of principal of, or interest or fees on, the Loans payable to any Lender, in each case, without the written consent of such Lender;

(ii)  change the percentage of the Commitments or of the aggregate unpaid principal amount of the Loans that is required for the Lenders or any of them to take any action hereunder without the written consent of each Lender;

(iii)  amend the definition of "Required Lenders" or "Pro Rata Share" without the written consent of each Lender; provided, that, the definition of Required Lenders may be amended by Lenders constituting Required Lenders as of such date; provided, further, in no event shall the definition of "Required Lenders" require less than Lenders having Loans and unused Commitments representing more than 50.1% of the aggregate principal amount of outstanding Loans and unused Commitments.

(iv)  amend or modify the DIP Superpriority Claim status of the Lenders under the DIP Orders or under any Loan Document without the written consent of each Lender directly and adversely affected thereby;

(v)    release all or a substantial portion of the Collateral (except as otherwise provided in this Agreement and the other Loan Documents), subordinate any Lien granted in favor of the Collateral Agent for the benefit of the Secured Parties, or release any Borrower or any Guarantor (except in connection with a Disposition of the Equity Interests thereof permitted by Section 7.02(c)(ii)), in each case, without the written consent of each Lender; provided, that the Required Lenders may elect to release all or a substantial portion of the Collateral without the requirement to obtain the written consent of each Lender if such release is in connection with (x) an exercise of remedies by the Collateral Agent at the direction of the Required Lenders pursuant to Section 9.01 or (y) any Disposition of all or a substantial portion of the Collateral by one or more of the Loan Parties with the consent of the Required Lenders after the occurrence and during the continuance of an Event of Default so long as such Disposition is conducted in a commercially reasonable manner as if such Disposition were a disposition of collateral by a secured creditor in accordance with Article 9 of the UCC; or

(vi)    amend, modify or waive Section 4.02, Section 4.03 or this Section 12.02 of this Agreement without the written consent of each Lender.

(b)    Notwithstanding anything to the contrary in Section 12.02(a):

(i)    no amendment, waiver or consent shall, unless in writing and signed by each Agent, affect the rights or duties of, or any fees or other amounts payable to, such Agent (but not in its capacity as a Lender) under this Agreement or the other Loan Documents; provided that only the consent of the parties to the Fee Letter shall be required to amend, modify or supplement the terms thereof;

(ii)    any amendment, waiver or consent to any provision of this Agreement (including Sections 4.01 and 4.02) that permits any Loan Party, any equity holder of the Parent or any of their respective Affiliates to purchase Loans on a non-pro rata basis, become an eligible assignee pursuant to Section 12.07 and/or make offers to make optional prepayments on a non-pro rata basis shall require the prior written consent of the Required Lenders rather than the prior written consent of each Lender directly affected thereby;

(iii)    any Guaranty, Security Agreement, collateral access agreement, landlord waiver or other agreement or document purporting to create or perfect a security interest in any of the Collateral (a "Collateral Document") may be amended, waived or otherwise modified with the consent of the applicable Agent and the applicable Loan Party without the need to obtain the consent of any Lender or any other Person if such amendment, modification, supplement or waiver is delivered in order (A) to comply with local Requirements of Law (including foreign law or regulatory requirements) or advice of local counsel, (B) to cure any ambiguity, inconsistency, omission, mistake or defect or (C) to cause such Collateral Document to be consistent with this Agreement and the other Loan Documents, and if the Administrative Agent and the Administrative Borrower shall have jointly identified an ambiguity, inconsistency, omission, mistake or defect, in each case, in any provision of any Loan Document (other than a Collateral Document), then the Administrative Agent and the Administrative Borrower shall be permitted to amend such provision; any amendment, waiver or modification pursuant to this paragraph shall become effective without any further action or consent of any other party to any Loan Document if the

128

same is not objected to in writing by the Required Lenders within five (5) Business Days following receipt of notice thereof;

(iv)     no consent of any Loan Party shall be required to change any order of priority set forth in Section 2.05(d) and Section 4.03; and

(v)     [reserved]; and

(vi)     no Defaulting Lender, Loan Party, equity holder of the Parent or any of their respective Affiliates that is a Lender shall have any right to approve or disapprove any amendment, waiver or consent under the Loan Documents and any Loans held by such Person for purposes hereof shall be automatically deemed to be voted pro rata according to the Loans of all other Lenders in the aggregate (other than such Defaulting Lender, Loan Party, equity holder of the Parent or Affiliate).

(c)     [Reserved].

(d)     [Reserved].

Section 12.03  No Waiver; Remedies, Etc.  No failure on the part of any Agent or any Lender to exercise, and no delay in exercising, any right hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right under any Loan Document preclude any other or further exercise thereof or the exercise of any other right.  The rights and remedies of the Agents and the Lenders provided herein and in the other Loan Documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law.  The rights of the Agents and the Lenders under any Loan Document against any party thereto are not conditional or contingent on any attempt by the Agents and the Lenders to exercise any of their rights under any other Loan Document against such party or against any other Person.

Section 12.04  Expenses; Taxes; Attorneys' Fees.  The Borrowers will pay on demand, all costs and expenses incurred by or on behalf of each Agent (and, in the case of clauses (b) through (m) below, each Lender), regardless of whether the transactions contemplated hereby are consummated, including, without limitation, reasonable fees, costs, client charges and expenses of counsel for each Agent (and, in the case of clauses (b) through (m) below, each Lender), accounting, due diligence, periodic field audits, physical counts, valuations, investigations, searches and filings, monitoring of assets, appraisals of Collateral, the rating of the Loans, title searches and reviewing environmental assessments, miscellaneous disbursements, examination, travel, lodging and meals, arising from or relating to:  (a) the negotiation, preparation, execution, delivery, performance and administration of this Agreement and the other Loan Documents (including, without limitation, the preparation of any additional Loan Documents pursuant to Section 7.01(b) or the review of any of the agreements, instruments and documents referred to in Section 7.01(f)), (b) any requested amendments, supplements, waivers, modifications or consents to this Agreement or the other Loan Documents whether or not such documents become effective or are given, (c) the preservation, protection and enforcement of the Agents' or any of the Lenders' rights under this Agreement or the other Loan Documents, (d) the defense of any claim or action asserted or brought against any Agent or any Lender by any Person that arises

from or relates to this Agreement, any other Loan Document, the Agents' or the Lenders' claims against any Loan Party, or any and all matters in connection therewith, (e) the commencement or defense of, or intervention in, any court proceeding arising from or related to this Agreement or any other Loan Document, (f) the filing of any petition, complaint, answer, motion or other pleading by any Agent or any Lender, or the taking of any action in respect of the Collateral or other security, in connection with this Agreement or any other Loan Document, (g) the protection, collection, lease, sale, taking possession of or liquidation of, any Collateral or other security in connection with this Agreement or any other Loan Document, (h) any attempt to enforce any Lien or security interest in any Collateral or other security in connection with this Agreement or any other Loan Document, (i) any attempt to collect from any Loan Party, (j) any Environmental Claim, Environmental Liability or Remedial Action arising from or in connection with the past, present or future operations of, or any property currently, formerly or in the future owned, leased or operated by, any Loan Party, any of its Subsidiaries or any predecessor in interest, (k) any Environmental Lien, (l) the rating of the Loans by one or more rating agencies in connection with any Lender's Securitization, or (m) the receipt by any Agent or any Lender of any advice from professionals with respect to any of the foregoing.  Without limitation of the foregoing or any other provision of any Loan Document:  (x) the Borrowers agree to pay all broker fees that may become due in connection with the transactions contemplated by this Agreement and the other Loan Documents and (y) if the Borrowers fail to perform any covenant or agreement contained herein or in any other Loan Document, any Agent may itself perform or cause performance of such covenant or agreement, and the expenses of such Agent incurred in connection therewith shall be reimbursed on demand by the Borrowers.  The obligations of the Borrowers under this Section 12.04 shall survive the resignation or replacement of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of the Loans and all other Obligations payable hereunder and under any other Loan Document, and the termination of this Agreement or any other Loan Document.

Section 12.05  <u>Right of Set-off</u>.  Upon the occurrence and during the continuance of any Event of Default, any Agent or any Lender may, and is hereby authorized to, at any time and from time to time, without notice to any Loan Party (any such notice being expressly waived by the Loan Parties) and to the fullest extent permitted by law, set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other Indebtedness at any time owing by such Agent or such Lender or any of their respective Affiliates to or for the credit or the account of any Loan Party against any and all obligations of the Loan Parties either now or hereafter existing under any Loan Document, irrespective of whether or not such Agent or such Lender shall have made any demand hereunder or thereunder and although such obligations may be contingent or unmatured; <u>provided</u>, that in the event that any Defaulting Lender shall exercise any such right of set-off, (a) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 4.04 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Agents and the Lenders, and (b) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of set-off.  Each Agent and each Lender agrees to notify the Administrative Agent and such Loan Party in writing promptly after any such set-off and application made by such Agent or such Lender or any of their respective Affiliates <u>provided</u> that the failure to give such notice shall not affect the validity of such set-off and application.  The rights of the Agents and the Lenders under this Section

130

12.05 are in addition to the other rights and remedies (including other rights of set-off) which the Agents and the Lenders may have under this Agreement or any other Loan Documents of law or otherwise.

Section 12.06  <u>Severability</u>.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 12.07  <u>Assignments and Participations</u>.

(a)      This Agreement and the other Loan Documents shall be binding upon and inure to the benefit of each Loan Party and each Agent and each Lender and their respective successors and assigns; <u>provided</u>, <u>however</u>, that none of the Loan Parties may assign or transfer any of its rights hereunder or under the other Loan Documents without the prior written consent of each Agent and each Lender and any such assignment without the Agents' and Lenders' prior written consent shall be null and void.

(b)      Subject to the conditions set forth in clause (c) below, each Lender may assign to one or more other lenders or other entities all or a portion of its rights and obligations under this Agreement with respect to all or a portion of its Commitment and any Loans made by it with the written consent of the Administrative Agent;

<u>provided</u>, <u>however</u>, that no written consent of the Administrative Agent shall be required in connection with any assignment by a Lender to a Lender, an Affiliate of such Lender or a Related Fund of such Lender.

(c)      Assignments shall be subject to the following additional conditions:

(i)      Each such assignment shall be in an amount which is at least $5,000,000 or a multiple of $1,000,000 in excess thereof (or the remainder of such Lender's Commitment) (except such minimum amount shall not apply to an assignment by a Lender to (A) a Lender, an Affiliate of such Lender or a Related Fund of such Lender or (B) a group of new Lenders, each of whom is an Affiliate or Related Fund of each other to the extent the aggregate amount to be assigned to all such new Lenders is at least $5,000,000 or a multiple of $1,000,000 in excess thereof);

(ii)      The parties to each such assignment shall execute and deliver to the Administrative Agent for its acceptance, an Assignment and Acceptance, and such parties shall deliver to the Administrative Agent, for the benefit of the Administrative Agent, a processing and recordation fee of $3,500 (which may be waived by the Administrative Agent in its sole discretion), and if such assignee is not a Lender, such assignee shall deliver to the Administrative Agent, a completed Administrative Questionnaire, all tax forms required under Section 2.09 and all documentation and other information that each Agent reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering or terrorist financing rules and regulations, including the USA PATRIOT Act; and

(iii)     No such assignment shall be made to (A) any Loan Party, any equity holder of the Parent or any of their respective Affiliates or (B) any Defaulting Lender or any of its Affiliates, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (B).

(d)     Upon such execution, delivery and acceptance, from and after the effective date specified in each Assignment and Acceptance and recordation on the Register, which effective date shall be at least 3 Business Days after the delivery thereof to the Administrative Agent (or such shorter period as shall be agreed to by the Administrative Agent and the parties to such assignment), (A) the assignee thereunder shall become a "Lender" hereunder and, in addition to the rights and obligations hereunder held by it immediately prior to such effective date, have the rights and obligations hereunder that have been assigned to it pursuant to such Assignment and Acceptance and (B) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto).

(e)     By executing and delivering an Assignment and Acceptance, the assigning Lender and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows:  (i) other than as provided in such Assignment and Acceptance, the assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or any other Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Loan Document furnished pursuant hereto; (ii) the assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Loan Party or any of its Subsidiaries or the performance or observance by any Loan Party of any of its obligations under this Agreement or any other Loan Document furnished pursuant hereto; (iii) such assignee confirms that it has received a copy of this Agreement and the other Loan Documents, together with such other documents and information it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon the assigning Lender, any Agent or any Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Loan Documents; (v) such assignee appoints and authorizes the Agents to take such action as agents on its behalf and to exercise such powers under this Agreement and the other Loan Documents as are delegated to the Agents by the terms hereof and thereof, together with such powers as are reasonably incidental hereto and thereto; and (vi) such assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement and the other Loan Documents are required to be performed by it as a Lender.

(f)     The Administrative Agent shall, acting for this purpose as a non-fiduciary agent of the Borrowers solely for tax purposes, maintain, or cause to be maintained at one of its offices, a copy of each Assignment and Acceptance delivered to and accepted by it and a register (the "Register") for the recordation of the names and addresses of the Lenders and the Commitments of, and the principal amount of the Loans (and stated interest thereon) owing to each

Lender from time to time.  The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrowers, the Agents and the Lenders shall treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Administrative Borrower and any Lender (solely with respect to its own outstanding Obligations) at any reasonable time and from time to time upon reasonable prior written notice.

(g)     Upon receipt by the Administrative Agent of a completed Assignment and Acceptance, and subject to any consent required from the Administrative Agent pursuant to Section 12.07(b) (which consent of the applicable Agent must be evidenced by the Administrative Agent's execution of an acceptance to such Assignment and Acceptance), the Administrative Agent shall accept such assignment, record the information contained therein in the Register (as adjusted to reflect any principal payments on or amounts capitalized and added to the principal balance of the Loans and/or Commitment reductions made subsequent to the effective date of the applicable assignment, as confirmed in writing by the corresponding assignor and assignee in conjunction with delivery of the assignment to the Administrative Agent).

(h)     A Loan (and the registered note, if any, evidencing the same) may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register (and each registered note shall expressly so provide).  Any assignment or sale of all or part of such Loan (and the registered note, if any, evidencing the same) may be effected only by registration of such assignment or sale on the Register, together with the surrender of the registered note, if any, evidencing the same duly endorsed by (or accompanied by a written instrument of assignment or sale duly executed by) the holder of such registered note, whereupon, at the request of the designated assignee(s) or transferee(s) to the Administrative Borrower, one or more new registered notes in the same aggregate principal amount shall be issued to the designated assignee(s) or transferee(s).

(i)     If any Lender sells participations in a Loan, such Lender shall, acting for this purpose as a non-fiduciary agent on behalf of the Borrowers, maintain, or cause to be maintained, a register, on which it enters the name of all participants in the Loans held by it and the principal amount (and stated interest thereon) of the portion of the Registered Loan that is the subject of the participation (the "Participant Register").  A Loan (and the registered note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the Participant Register (and each registered note shall expressly so provide).  Any participation of such Loan (and the registered note, if any, evidencing the same) may be effected only by the registration of such participation on the Participant Register.  The Participant Register shall be available for inspection by the Administrative Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(j)     Any Foreign Lender who purchases or is assigned or participates in any portion of such Loan shall comply with Section 2.09(d).

(k)     Each Lender may sell participations to one or more banks or other entities in or to all or a portion of its rights and obligations under this Agreement and the other Loan Documents (including, without limitation, all or a portion of its Commitments and the Loans made by it); provided, that (i) such Lender's obligations under this Agreement (including without

limitation, its Commitments hereunder) and the other Loan Documents shall remain unchanged; (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and the Borrowers, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Loan Documents; and (iii) a participant shall not be entitled to require such Lender to take or omit to take any action hereunder except (A) action directly effecting an extension of the maturity dates or decrease in the principal amount of the Loans, (B) action directly effecting an extension of the due dates or a decrease in the rate of interest payable on the Loans or the fees payable to such Lender under this Agreement, or (C) actions directly effecting a release of all or a substantial portion of the Collateral or any Loan Party (except as set forth in Section 10.08 of this Agreement or any other Loan Document).   The Loan Parties agree that each participant shall be entitled to the benefits of Section 2.09 and Section 2.10 of this Agreement with respect to its participation in any portion of the Commitments and the Loans as if it was a Lender.

(l)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or loans made to, or other indebtedness issued by, such Lender pursuant to a securitization transaction (including any structured warehouse credit facility, collateralized loan obligation transaction or similar facility or transaction, and including any further securitization of the indebtedness or equity issued under such a transaction) (a "Securitization"); provided, that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.  The Loan Parties shall cooperate with such Lender and its Affiliates to effect a Securitization, including, without limitation, by providing such information as may be reasonably requested by such Lender in connection with the rating of its Loans or any Securitization.

Section 12.08  Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement by telecopier or electronic mail shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by telecopier or electronic mail also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.  The foregoing shall apply to each other Loan Document *mutatis mutandis*.

Section 12.09  Governing Law.  EXCEPT TO THE EXTENT SUPERSEDED BY THE BANKRUPTCY CODE, THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK.

Section 12.10  Consent to Jurisdiction; Service of Process and Venue.

(a)      ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT MAY BE BROUGHT IN THE BANKRUPTCY COURT, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH LOAN PARTY HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURT.  EACH LOAN PARTY HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS AND IN ANY SUCH ACTION OR PROCEEDING BY ANY MEANS PERMITTED BY APPLICABLE LAW, INCLUDING, WITHOUT LIMITATION, BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE ADMINISTRATIVE BORROWER AT ITS ADDRESS FOR NOTICES AS SET FORTH IN SECTION 12.01, SUCH SERVICE TO BECOME EFFECTIVE 10 DAYS AFTER SUCH MAILING.  THE LOAN PARTIES AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE AGENTS AND THE LENDERS TO SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY LOAN PARTY IN ANY OTHER JURISDICTION.  EACH LOAN PARTY HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  TO THE EXTENT THAT ANY LOAN PARTY HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH LOAN PARTY HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

(b)      Each Loan Party irrevocably and unconditionally agrees that it will not commence any action or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against any Agent, any Lender or any Related Party of the foregoing in any way relating to this Agreement or any other Loan Document or the transactions relating hereto or thereto, in any forum other than the Bankruptcy Court, and any appellate court from any thereof.

(c)      [Reserved].

Section 12.11  <u>Waiver of Jury Trial, Etc</u>.  EACH LOAN PARTY, EACH AGENT AND EACH LENDER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, OR UNDER ANY AMENDMENT, WAIVER, CONSENT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT DELIVERED OR WHICH IN THE FUTURE MAY BE DELIVERED IN

CONNECTION THEREWITH, OR ARISING FROM ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION, PROCEEDINGS OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.  EACH LOAN PARTY CERTIFIES THAT NO OFFICER, REPRESENTATIVE, AGENT OR ATTORNEY OF ANY AGENT OR ANY LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT ANY AGENT OR ANY LENDER WOULD NOT, IN THE EVENT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM, SEEK TO ENFORCE THE FOREGOING WAIVERS.  EACH LOAN PARTY HEREBY ACKNOWLEDGES THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE AGENTS AND THE LENDERS ENTERING INTO THIS AGREEMENT.

Section 12.12  <u>Consent by the Agents and Lenders</u>.  Except as otherwise expressly set forth herein to the contrary or in any other Loan Document, if the consent, approval, satisfaction, determination, judgment, acceptance or similar action (an "Action") of any Agent or any Lender shall be permitted or required pursuant to any provision hereof or any provision of any other agreement to which any Loan Party is a party and to which any Agent or any Lender has succeeded thereto, such Action shall be required to be in writing and may be withheld or denied by such Agent or such Lender, in its sole discretion, with or without any reason, and without being subject to question or challenge on the grounds that such Action was not taken in good faith.

Section 12.13  <u>No Party Deemed Drafter</u>.  Each of the parties hereto agrees that no party hereto shall be deemed to be the drafter of this Agreement.

Section 12.14  <u>Reinstatement; Certain Payments</u>.  If any claim is ever made upon any Secured Party for repayment or recovery of any amount or amounts received by such Secured Party in payment or on account of any of the Obligations, such Secured Party shall give prompt notice of such claim to the Administrative Agent and the Administrative Borrower, and if such Secured Party repays all or part of such amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over such Secured Party or any of its property, or (ii) any good faith settlement or compromise of any such claim effected by such Secured Party with any such claimant, then and in such event each Loan Party agrees that (A) any such judgment, decree, order, settlement or compromise shall be binding upon it notwithstanding the cancellation of any Indebtedness hereunder or under the other Loan Documents or the termination of this Agreement or the other Loan Documents, and (B) it shall be and remain liable to such Secured Party hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by such Secured Party.

Section 12.15  <u>Indemnification; Limitation of Liability for Certain Damages</u>.

(a)    In addition to each Loan Party's other Obligations under this Agreement, each Loan Party agrees to, jointly and severally, defend, protect, indemnify and hold harmless each Secured Party and all of their respective Related Parties (collectively called the "<u>Indemnitees</u>") from and against any and all losses, damages, liabilities, actions, suits, judgments, obligations, penalties, fees, claims, reasonable costs and expenses (including, without limitation, reasonable attorneys' fees, costs and expenses) incurred by such Indemnitees, whether prior to or from and after the Effective Date, whether direct, indirect or consequential, as a result of or arising from or relating to or in connection with any of the following:  (i) the negotiation, preparation, execution,

136

performance, delivery, administration or enforcement of this Agreement, any other Loan Document, of any Environmental Claim or any other document executed in connection with the transactions contemplated by the Loan Documents, (ii) any Agent's or any Lender's furnishing of funds to the Borrowers under this Agreement or the other Loan Documents, including, without limitation, the management of any such Loans or the Borrowers' use of the proceeds thereof, (iii) any matter relating to the financing transactions contemplated by this Agreement or the other Loan Documents or by any document executed in connection with the transactions contemplated by this Agreement or the other Loan Documents, or (iv) any claim, including any environmental litigation, investigation or proceeding relating to or arising out of any of the foregoing, whether or not any Indemnitee is a party thereto (collectively, the "Indemnified Matters"); provided, however, that the Loan Parties shall not have any obligation to any Indemnitee under this subsection (a) for any Indemnified Matter caused by the gross negligence or willful misconduct of such Indemnitee, as determined by a final non-appealable judgment of a court of competent jurisdiction.

(b)     To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section 12.15 may be unenforceable because it is violative of any law or public policy, each Loan Party shall, jointly and severally, contribute the maximum portion which it is permitted to pay and satisfy under applicable law, to the payment and satisfaction of all Indemnified Matters incurred by the Indemnitees.

(c)     No Loan Party shall assert, and each Loan Party hereby waives, any claim against the Indemnitees, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and each Loan Party hereby waives, releases and agrees not to sue upon any such claim or seek any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(d)     The indemnities and waivers set forth in this Section 12.15 shall survive the resignation or replacement of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of the Loans and all other Obligations payable hereunder and under any other Loan Document, and the termination of this Agreement or any other Loan Document.

Section 12.16   Records.  The unpaid principal of and interest on the Loans, the interest rate or rates applicable to such unpaid principal and interest, the duration of such applicability, the Commitments, and the accrued and unpaid fees payable pursuant to Section 2.06 hereof, shall at all times be ascertained from the records of the Agents, which shall be conclusive and binding absent manifest error.

Section 12.17   Binding Effect.  This Agreement shall become effective when it shall have been executed by each Loan Party, each Agent and each Lender and when the conditions precedent set forth in Section 5.01 hereof have been satisfied or waived in writing by the Agents and the Required Lenders, and thereafter shall be binding upon and inure to the benefit of each

Loan Party, each Agent and each Lender, and their respective successors and assigns, except that the Loan Parties shall not have the right to assign their rights hereunder or any interest herein without the prior written consent of each Agent and each Lender, and any assignment by any Lender shall be governed by Section 12.07 hereof.

           Section 12.18  <u>Highest Lawful Rate</u>.  It is the intention of the parties hereto that each Agent and each Lender shall conform strictly to usury laws applicable to it.  Accordingly, if the transactions contemplated hereby or by any other Loan Document would be usurious as to any Agent or any Lender under laws applicable to it (including the laws of the United States of America and the State of New York or any other jurisdiction whose laws may be mandatorily applicable to such Agent or such Lender notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to the contrary in this Agreement or any other Loan Document or any agreement entered into in connection with or as security for the Obligations, it is agreed as follows:  (i) the aggregate of all consideration which constitutes interest under law applicable to any Agent or any Lender that is contracted for, taken, reserved, charged or received by such Agent or such Lender under this Agreement or any other Loan Document or agreements or otherwise in connection with the Obligations shall under no circumstances exceed the maximum amount allowed by such applicable law, any excess shall be canceled automatically and if theretofore paid shall be credited by such Agent or such Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Agent (solely if such Agent is holding such excess) or such Lender, as applicable, to the Borrowers); and (ii) in the event that the maturity of the Obligations is accelerated by reason of any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to any Agent or any Lender may never include more than the maximum amount allowed by such applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall, subject to the last sentence of this Section 12.18, be canceled automatically by such Agent or such Lender, as applicable, as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by such Agent or such Lender, as applicable, on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Agent (solely if such Agent is holding such excess) or such Lender to the Borrowers).  All sums paid or agreed to be paid to any Agent or any Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by law applicable to such Agent or such Lender, be amortized, prorated, allocated and spread throughout the full term of the Loans until payment in full so that the rate or amount of interest on account of any Loans hereunder does not exceed the maximum amount allowed by such applicable law.  If at any time and from time to time (x) the amount of interest payable to any Agent or any Lender on any date shall be computed at the Highest Lawful Rate applicable to such Agent or such Lender pursuant to this Section 12.18 and (y) in respect of any subsequent interest computation period the amount of interest otherwise payable to such Agent or such Lender would be less than the amount of interest payable to such Agent or such Lender computed at the Highest Lawful Rate applicable to such Agent or such Lender, then the amount of interest payable to such Agent or such Lender in respect of such subsequent interest computation period shall continue to be computed at the Highest Lawful Rate applicable to such Agent or such Lender until the total amount of interest payable to such Agent or such Lender shall equal the total amount of interest which would have been payable to such Agent or such Lender if the total amount of interest had been computed without giving effect to this Section 12.18.

For purposes of this Section 12.18, the term "applicable law" shall mean that law in effect from time to time and applicable to the loan transaction between the Borrowers, on the one hand, and the Agents and the Lenders, on the other, that lawfully permits the charging and collection of the highest permissible, lawful non-usurious rate of interest on such loan transaction and this Agreement, including laws of the State of New York and, to the extent controlling, laws of the United States of America

The right to accelerate the maturity of the Obligations does not include the right to accelerate any interest that has not accrued as of the date of acceleration.

Section 12.19  <u>Confidentiality</u>.  Each Agent and each Lender agrees (on behalf of itself and its Related Parties) to use reasonable precautions to keep confidential, in accordance with its customary procedures for handling confidential information of this nature and in accordance with safe and sound practices of comparable commercial finance companies, any non-public information supplied to it by the Loan Parties pursuant to this Agreement or the other Loan Documents which is identified in writing by the Loan Parties as being confidential at the time the same is delivered to such Person (and which at the time is not, and does not thereafter become, publicly available or available to such Person from another source not known to be subject to a confidentiality obligation to such Person not to disclose such information); <u>provided</u>, that nothing herein shall limit the disclosure by any Agent or any Lender of any such information (i) to its Affiliates, its Related Parties or the Related Parties of any Person described in clause (ii) or (iii) below) (it being understood that the Persons to whom such disclosure is made either will be informed of the confidential nature of such information and instructed to keep such information confidential in accordance with this Section 12.19 or is subject to other customary confidentiality obligations); (ii) to any other party hereto; (iii) to any assignee or participant (or prospective assignee or participant) or any party to a Securitization, so long as such assignee or participant (or prospective assignee or participant) or party to a Securitization agrees, in writing, to be bound by or is otherwise subject to customary confidentiality obligations (including, without limitation, confidentiality provisions similar in substance to this Section 12.19); (iv) to the extent required by any Requirement of Law or judicial process or as otherwise requested by any Governmental Authority; (v) to the National Association of Insurance Commissioners or any similar organization, any examiner, auditor or accountant or any nationally recognized Rating Agency; (vi) in connection with any litigation to which any Agent or any Lender is a party; (vii) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder; (viii) to any other Person if such information is general portfolio information that does not identify the Loan Parties, or (ix) with the consent of the Administrative Borrower. In addition, the Agents and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry and service providers to any Agent or any Lender in connection with the administration of this Agreement, the other Loan Documents and the Commitments.

Section 12.20  <u>Platform; Borrower Materials.</u>

(a)     Each Loan Party hereby acknowledges that (a) the Administrative Agent may make available to the Lenders communications, documents, materials or information provided by or on behalf of any Loan Party hereunder (collectively, "<u>Borrower Materials</u>") by posting the

139

Borrower Materials on IntraLinks or another similar electronic system (the "Platform"), and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive information of a type that would constitute material non-public information with respect to the Borrowers or their securities) (each, a "Public Lender"). The Borrowers hereby agree that they will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (a) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, means that the word "PUBLIC" shall appear prominently on the first page thereof, (b) by marking Borrower Materials "PUBLIC," the Borrowers shall be deemed to have authorized the Administrative Agent and the Lenders to treat the Borrower Materials as either publicly available information or not material information (although it may be sensitive and proprietary) with respect to the Borrowers or their securities for purposes of United States federal and state securities laws, (c) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Investor"; and (d) the Administrative Agent shall be entitled to treat the Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Investor." Notwithstanding the foregoing, the following Borrower Materials may be posted on that portion of the Platform designated for Public Lenders unless the Borrowers notify the Administrative Agent promptly in writing that any such document contains material non-public information: (1) the Loan Documents, and (2) notification of changes in the terms of the Loans.

(b)     Each of the Lenders and the Loan Parties acknowledges and agrees that the distribution of material through an electronic medium is not necessarily secure, that no Agent is not responsible for approving or vetting the representatives or contacts of any Lender that are added to the Platform, and that there are confidentiality and other risks associated with such distribution. Each of the Lenders and the Loan Parties hereby approves distribution of the Borrower Materials through the Platform and understands and assumes the risks of such distribution.

(c)     Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including United States Federal and state securities laws, to make reference to Borrower Materials that are not made available through the "Public Investor" portion of the Platform and that may contain information of a type that would constitute material non-public information with respect to the Borrowers or their securities for purposes of United States Federal or state securities laws. In the event that any Public Lender has elected for itself to not access any information disclosed through the Platform or otherwise, such Public Lender acknowledges that (i) the Agents and other Lenders may have access to such information and (ii) neither the Borrowers nor the Agents or other Lender with access to such information shall have (x) any responsibility for such Public Lender's decision to limit the scope of information it has obtained in connection with this Agreement and the other Loan Documents or (y) any duty to disclose such information to such electing Lender or to use such information on behalf of such electing Lender, and shall not be liable for the failure to so disclose or use such information.

(d)     Each Lender agrees that notice to it (as provided in the next sentence) specifying that Borrower Materials have been posted to the Platform shall constitute effective delivery of the Borrower Materials to such Lender for purposes of the Loan Documents.  Each Lender agrees (i) to notify the Administrative Agent in writing (which could be in the form of electronic communication) from time to time of such Lender's email address to which the foregoing notice may be sent by electronic transmission and (ii) that the foregoing notice may be sent to such email address.

(e)     Each of the Lenders and the Loan Parties agrees that each Agent may, but (except as may be required by applicable law) shall not be obligated to, store the Borrower Materials on the Platform in accordance with such Agent's generally applicable document retention procedures and policies.

(f)     THE PLATFORM AND THE BORROWER MATERIALS ARE PROVIDED "AS IS" AND "AS AVAILABLE".  THE AGENTS AND THEIR RELATED PARTIES DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS IN THE PLATFORM OR THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT OR ANY OF ITS RELATED PARTIES IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall any Agent or its Related Parties have any liability to any Loan Party, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of any Loan Party's or any Agent's transmission of Borrower Materials through the internet or the Platform.

(g)     Nothing herein shall prejudice the right of any Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

Section 12.21  Public Disclosure.  Each Loan Party agrees that neither it nor any of its Affiliates will now or in the future issue any press release or other public disclosure using the name of an Agent, any Lender or any of their respective Affiliates or referring to this Agreement or any other Loan Document without the prior written consent of such Agent or such Lender, except to the extent that such Loan Party or such Affiliate is required to do so under applicable law (in which event, such Loan Party or such Affiliate will consult with such Agent or such Lender before issuing such press release or other public disclosure).  Each Loan Party hereby authorizes each Agent and each Lender, after consultation with the Borrowers, to advertise the closing of the transactions contemplated by this Agreement, and to make appropriate announcements of the financial arrangements entered into among the parties hereto, as such Agent or such Lender shall deem appropriate, including, without limitation, on a home page or similar place for dissemination of information on the Internet or worldwide web, or in announcements commonly known as tombstones, in such trade publications, business journals, newspapers of general circulation and to such selected parties as such Agent or such Lender shall deem appropriate.

Section 12.22 <u>Integration</u>.   This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

Section 12.23 <u>USA PATRIOT Act</u>.  Each Agent and each Lender that is subject to the requirements of the USA PATRIOT Act hereby notifies the Borrowers that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the entities composing the Borrowers, which information includes the name and address of each such entity and other information that will allow such Agent and such Lender to identify the entities composing the Borrowers in accordance with the USA PATRIOT Act.  Each Loan Party agrees to take such action and execute, acknowledge and deliver at its sole cost and expense, such instruments and documents as any Agent or any Lender may reasonably require from time to time in order to enable such Agent or such Lender to comply with the USA PATRIOT Act.

Section 12.24 <u>Judgment Currency</u>.  This is an international financial transaction in which the specification of a currency and payment in New York is of the essence.  Dollars shall be the currency of account in the case of all payments pursuant to or arising under this Agreement or under any other Loan Document, and all such payments shall be made to the Administrative Agent's Accounts in New York in immediately available funds.  To the fullest extent permitted by applicable law, the obligations of each Loan Party to the Secured Parties under this Agreement and under the other Loan Documents shall not be discharged by any amount paid in any other currency or in a place other than to the Administrative Agent's Accounts in New York to the extent that the amount so paid after conversion under this Agreement and transfer to New York does not yield the amount of Dollars in New York due under this Agreement and under the other Loan Documents.  If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder in Dollars into another currency (the "<u>Other Currency</u>"), to the fullest extent permitted by applicable law, the rate of exchange used shall be that at which the Administrative Agent could, in accordance with normal procedures, purchase Dollars with the Other Currency on the Business Day preceding that on which final judgment is given.  The obligation of each Loan Party in respect of any such sum due from it to the Secured Parties hereunder shall, notwithstanding any judgment in such Other Currency, be discharged only to the extent that, on the Business Day immediately following the date on which the Administrative Agent receives any sum adjudged to be so due in the Other Currency, the Administrative Agent may, in accordance with normal banking procedures, purchase Dollars with the Other Currency.  If the Dollars so purchased are less than the sum originally due to the Secured Parties in Dollars, each Loan Party agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Secured Parties against such loss, and if the Dollars so purchased exceed the sum originally due to the Secured Parties in Dollars, the Secured Parties agrees to remit to the Loan Parties such excess.

Section 12.25 <u>Waiver of Immunity</u>.  To the extent that any Loan Party has or hereafter may acquire (or may be attributed, whether or not claimed) any immunity (sovereign or otherwise) from any legal action, suit or proceeding, from jurisdiction of any court or from set-off or any legal process (whether service of process or notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) with respect to itself or any of its property, such Loan Party hereby irrevocably waives and agrees not to plead or

142

claim, to the fullest extent permitted by law, such immunity in respect of (a) its obligations under the Loan Documents, (b) any legal proceedings to enforce such obligations and (c) any legal proceedings to enforce any judgment rendered in any proceedings to enforce such obligations. Each Loan Party hereby agrees that the waivers set forth in this Section 12.25 shall be to the fullest extent permitted under the Foreign Sovereign Immunities Act and are intended to be irrevocable for purposes of the Foreign Sovereign Immunities Act.

Section 12.26  English Language.  This Agreement and each other Loan Document have been negotiated and executed in English.  All certificates, reports, notices and other documents and communications given or delivered by any party hereto pursuant to this Agreement or any other Loan Document shall be in English or, if not in English, accompanied by a certified English translation thereof.  The English version of any such document shall control the meaning of the matters set forth herein.

Section 12.27  Conflicts.  The parties hereto hereby agree that, notwithstanding in this Agreement or any other Loan Document to the contrary, in the event of any conflict between the any of the terms of this Agreement or any other Loan Document and any DIP Order, the terms of such DIP Order shall govern and control.

Section 12.28  Restructuring Term Sheet.  Attached hereto as Exhibit D is the indicative restructuring term sheet (the "Restructuring Term Sheet").  The Restructuring Term Sheet is intended for discussion purposes only and is non-binding and the proposals contained therein are subject to, among other things, the negotiation, documentation and execution of definitive documentation.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**BORROWERS:**
**EXELA INTERMEDIATE LLC**

By:_____
Name:
Title:


**EXELA FINANCE INC.**

By:_____
Name:
Title:

**GUARANTORS[2]:**

**EXELA TECHNOLOGIES BPA, LLC**

By:_____
Name:
Title:

**SOURCEHOV HOLDINGS, INC.**

By:_____
Name:
Title:

**SORCEHOV LLC**

By:_____
Name:
Title:

---

[2] Guarantors to be confirmed.

**CORPSOURCE HOLDINGS, LLC**

By:_____
Name:
Title:

**SOURCECORP, INCORPORATED**

By:_____
Name:
Title:

**SOURCECORP BPS INC.**

By:_____
Name:
Title:

**DELIVEREX, LLC**

By:_____
Name:
Title:

**UNITED INFORMATION SERVICES, INC.**

By:_____
Name:
Title:

**ECONOMIC RESEARCH SERVICES, INC.**

By:_____
Name:
Title:

**SOURCECORP LEGAL INC.**

By:_____

[SIGNATURE PAGE TO SUPERPRIORITY PRIMING DEBTOR-IN-POSSESSION FINANCING AGREEMENT]

Name:
Title:

**RUST CONSULTING, INC.**


By:_____
Name:
Title:

**SOURCEHOV HEALTHCARE, INC.**


By:_____
Name:
Title:

**KINSELLA MEDIA LLC**


By:_____
Name:
Title:

**HOV SERVICES, LLC**


By:_____
Name:
Title:

**HOV ENTERPRISE SERVICES, INC.**


By:_____
Name:
Title:


**MERIDIAN CONSULTING GROUP, LLC**


By:_____
Name:
Title:

[SIGNATURE PAGE TO SUPERPRIORITY PRIMING DEBTOR-IN-POSSESSION FINANCING AGREEMENT]

**RUSTIC CANYON III, LLC**

By:_____
Name:
Title:

**HOV SERVICES, INC.**

By:_____
Name:
Title:

**CHARTER LASON, INC.**

By:_____
Name:
Title:

**LASON INTERNATIONAL, INC.**

By:_____
Name:
Title:

**SOURCECORP MANAGEMENT, INC.**

By:_____
Name:
Title:

**PANGEA ACQUSITIONS, INC.**

By:_____
Name:
Title:

**BANCTEC GROUP LLC**

By:_____

Name:
Title:

**BANCTEC, INC.**


By:_____
Name:
Title:

**BANCTEC (PUERTO RICO), INC.**


By:_____
Name:
Title:

**DOCUDATA SOLUTIONS, L.C.**


By:_____
Name:
Title:

**BTC VENTURES, INC.**


By:_____
Name:
Title:




**RECOGNITION MEXICO HOLDINGS INC.**


By:_____
Name:
Title:

**BANCTEC INTERMEDIATE HOLDINGS, INC.**


By:_____
Name:
Title:

**RC4 CAPITAL, LLC**

By:_____
Name:
Title:

**DFG2 HOLDINGS, LLC**

By:_____
Name:
Title:

**DFG2, LLC**

By:_____
Name:
Title:

**PLEXUS GLOBAL FINANCE, LLC**

By:_____
Name:
Title:

**HOVG, LLC**

By:_____
Name:
Title:

**TRAC HOLDINGS, LLC**

By:_____
Name:
Title:

**MANAGED CARE PROFESSIONALS, LLC**

By:_____

Name:
Title:

**FTS PARENT, INC.**


By:_____
Name:
Title:

**TRANSCENTRA, INC.**


By:_____
Name:
Title:

**J & B SOFTWARE, INC.**


By:_____
Name:
Title:




**REGULUS HOLDING INC.**


By:_____
Name:
Title:

**REGULUS GROUP LLC**


By:_____
Name:
Title:

**REGULUS GROUP II LLC**


By:_____
Name:
Title:

**REGULUS AMERICA LLC**

By: _____
Name:
Title:

**REGULUS INTERGRATED SOLUTIONS LLC**

By: _____
Name:
Title:

**EXELA RE LLC**

By: _____
Name:
Title:

**REGULUS WEST LLC**

By: _____
Name:
Title:

**NOVITEX HOLDINGS, INC.**

By: _____
Name:
Title:

**NOVITEX INTERMEDIATE, LLC**

By: _____
Name:
Title:

**NOVITEX GOVERNMENT SOLUTIONS, LLC**

By: _____

[SIGNATURE PAGE TO SUPERPRIORITY PRIMING DEBTOR-IN-POSSESSION FINANCING AGREEMENT]

Name:
Title:

**EXELA XBP, LLC**

By:_____
Name:
Title:

**BANCTEC (CANADA), INC.**

By:_____
Name:
Title:

**SOURCEHOV CANADA COMPANY**

By:_____
Name:
Title:

**AFFILIATED GUARANTORS:**

**XCV-EMEA, LLC**

By:_____
Name:
Title:

**NEON ACQUISITION, LLC**

By:_____
Name:
Title:

**NOVITEX ENTERPRISE SOLUTIONS CANADA, INC.**

By:_____
Name:
Title:


**EXELA ENTERPRISE SOLUTIONS, INC.**


By:_____
Name:
Title:


**SERVICES INTEGRATION GROUP, L.P.**


By:_____
Name:
Title:


**SIG-GP L.L.C.**


By:_____
Name:
Title:

[SIGNATURE PAGE TO SUPERPRIORITY PRIMING DEBTOR-IN-POSSESSION FINANCING AGREEMENT]

<u>COLLATERAL AGENT AND</u>
<u>ADMINISTRATIVE AGENT</u>:

ANKURA TRUST COMPANY, LLC

By: _____

     Name:
     Title:

<u>LENDERS</u>:

By: _____
      Name:
      Title:

[SIGNATURE PAGE TO SUPERPRIORITY PRIMING DEBTOR-IN-POSSESSION FINANCING AGREEMENT]

**Schedule 1.01(A)**

**Lenders and Lenders' Commitments and Roll-Up Loans**

| Lender | Commitment | Roll-Up Loans |
|---|---|---|
| [●] | $[●] | $[●] |
| [●] | $[●] | $[●] |
| [●] | $[●] | $[●] |
| [●] | $[●] | $[●] |
| [●] | $[●] | $[●] |
| **Total** | $[●] | $[●] |

**<u>EXHIBIT B</u>**

**Exhibit B**
**(in descending order of priority)**

| Priority | Prepetition Collateral Constituting "Shared Collateral" under the Prepetition Intercreditor Agreement | Prepetition Notes Collateral not Constituting Shared Collateral (if any) | Prepetition Term Loan Collateral not Constituting Shared Collateral (if any) | Prepetition Unencumbered Property | Superpriority Claims |
|---|---|---|---|---|---|
| *First* | Carve Out and Prior Liens | Carve Out and Prior Liens | Carve Out and Prior Liens | Carve Out | Carve Out |
| *Second* | February 28 Funding Liens | February 28 Funding Liens | February 28 Funding Liens | February 28 Funding Liens | February 28 Funding Superpriority Claims |
| *Third* | DIP Liens securing New Money Loans | DIP Liens securing New Money Loans | Prepetition Term Loan Adequate Protection Liens | DIP Liens securing New Money Loans | DIP Superpriority Claims in respect of New Money Loans and Securitization Program Superpriority Claims |
| *Fourth* | Prepetition Term Loan Adequate Protection Liens | Prepetition Term Loan Adequate Protection Liens | Prepetition Term Loan Liens | Prepetition Term Loan Adequate Protection Liens | Prepetition Term Loan 507(b) Claims |
| *Fifth* | Prepetition Term Loan Liens | DIP Liens securing Roll-Up Loans | DIP Liens | DIP Liens securing Roll-Up Loans | DIP Superpriority Claims in respect of Roll-Up Loans |
| *Sixth* | DIP Liens securing Roll-Up Loans | April 2026 Notes Adequate Protection Liens | April 2026 Notes Adequate Protection Liens | April 2026 Notes Adequate Protection Liens | April 2026 Notes 507(b) Claims |
| *Seventh* | April 2026 Notes Adequate Protection Liens | April 2026 Notes Liens | N/A | N/A | N/A |
| *Eighth* | April 2026 Notes Liens | N/A | N/A | N/A | |