**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

---------------------------------------------------------- x

In re:                                                          :        Chapter 11
                                                                :
DOCUDATA SOLUTIONS, L.C., *et al.*,                             :        Case No. 25-90023 (CML)
                                                                :
           Debtors.[1]                       :        (Joint Administration Requested)
                                                                :

---------------------------------------------------------- x

**DECLARATION OF RANDALL S. EISENBERG**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Randall S. Eisenberg, declare as follows under the penalty of perjury:

1.      I am the Chief Restructuring Officer of certain parent entities included as debtors and debtors in possession in the caption above (collectively, the "***Debtors***" and, together with their subsidiaries and certain of their non-Debtor affiliates, the "***Company***").[2]  Prior to becoming Chief Restructuring Officer (which occurred contemporaneously with the filing of the Chapter 11 Cases (defined below)), I advised the Debtors in my capacity as a Partner and Managing Director at AlixPartners LLP ("***AlixPartners***") which maintains its principal office at 909 3rd Avenue, New York, NY 10022 and has other offices located throughout the world.  Since December 28, 2024, AlixPartners has served as restructuring consultant and financial advisor to the Debtors.

2.      I have held the position of Partner and Managing Director at AlixPartners since January 2013 where, among other current responsibilities, I serve on the Management Committee within the Americas for the Turnaround and Restructuring Services practice.

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/DocuDataSolutions.  The Debtors' mailing address for the purposes of these cases is 2701 E. Grauwyler Road, Irving, TX 75061 USA.

[2]     For the avoidance of doubt, non-Debtor XBP Europe Holdings, Inc. and its subsidiaries ("***XBP Europe***") are excluded from the definition of the Company.

3.      I hold a Bachelor of Science degree in Business Administration from the University of the Pacific and a Master's in Management from Northwestern University's Kellogg Graduate School of Management.  I am a Certified Turnaround Professional, a Certified Public Accountant, and a Fellow in both the American College of Bankruptcy and the International Insolvency Institute.  During the course of my career, I have served as the President and Chairman of the Turnaround Management Association and the Association of Certified Turnaround Professionals, the latter of which was merged into the Turnaround Management Association.

4.      I have worked in the turnaround and restructuring field for more than 30 years, and have been involved with over 100 turnaround and restructuring matters. Prior to joining AlixPartners in January 2013, I was a Senior Managing Director in FTI Consulting, Inc.'s ("*FTI*") Corporate Finance/Restructuring segment, where I was a member of its leadership team during most of the approximately 10 years after FTI acquired the practice from PriceWaterhouseCoopers, LLP in 2002.  At the time of the acquisition, I held the title of Partner at PriceWaterhouseCoopers.

5.      AlixPartners is one of the largest and most experienced turnaround practices in the United States and has a wealth of experience providing advisory and interim management services for companies undergoing transformations, turnarounds, and restructurings.  Its clients include companies, creditors, corporate parents and financial sponsors, as well as acquirers of underperforming businesses.

6.      AlixPartners was engaged by the Debtors as financial advisor in late December 2024 to assist the Debtors with efforts to de-lever their balance sheet.  More specifically, AlixPartners was engaged to assist in various activities including, but not limited to:  (a) cash forecasting and managing liquidity; (b) negotiating with creditors; (c) developing a business plan;

and (d) planning for a potential chapter 11 filing. I have been involved with and directed others from AlixPartners in the preparation for these Chapter 11 Cases (as defined below).

7.      I am authorized to submit this declaration (the "***Declaration***") on behalf of the Debtors.  As a result of my experience with the Debtors, I am familiar with the Debtors' businesses, financial matters, operating results, business plan, liquidity profile, and restructuring process including creditor negotiations.

8.      Except as otherwise indicated, all statements set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' management team, employees, and other advisors, my review of relevant documents, and/or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  Any references to the Bankruptcy Code (as defined below), the chapter 11 process, and related legal matters herein reflect my understanding of such matters based on the explanations provided by Debtors' counsel.  If called to testify, I would testify competently to the facts set forth in this Declaration.

9.      On the date hereof (the "***Petition Date***"), the Debtors filed voluntary petitions (the "***Petitions***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Court***") commencing cases (the "***Chapter 11 Cases***") for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "***Bankruptcy Code***").  I submit this Declaration in support of the Debtors' Petitions and the "first-day" motions and applications that are being filed with the Court concurrently herewith (collectively, the "***First Day Pleadings***").

10.      The Company operates a highly integrated global services business, operating in multiple countries with over 11,000 employees servicing approximately 1,550 customers.  Given the nature of its business, its customers and their arrangements with the Company, and the

international scope of its operations, the Debtors and their lenders are rightly concerned that an extended stay chapter 11 is likely to result in significant disruption, potential business degradation, and loss of market share, revenue, and enterprise value, all of which would not easily be regained following emergence, if ever.  Accordingly, through exhaustive negotiations spanning the past two months, the Debtors and their lenders are anticipating a rapid resolution of these Chapter 11 Cases, setting up the Debtors for success on a post-reorganized basis.

11.     Members of an ad hoc group of holders of the Debtors' April 2026 Notes (defined below) holding, in aggregate, approximately 73.7% of unaffiliated bonds (the "***Ad Hoc April 2026 Group***") have agreed to provide postpetition financing to the Debtors in the amount of $80 million of new money (the "***DIP Facility***").  Upon emergence, the DIP Facility will roll into an exit facility, totaling $245 million, comprised of the DIP Facility, plus $60 million in additional new money, certain fees, and April 2026 Notes that were rolled up into the DIP Facility (the "***Exit Facility***").

12.     In connection with the entry into the DIP Facility, the Debtors reached an agreement with the Ad Hoc April 2026 Group on a non-binding term sheet (the "***Restructuring Term Sheet***") that contemplates an expedited "prearranged" chapter 11 plan that will be filed shortly after the commencement of the cases implementing the terms of the Restructuring Term Sheet. The Restructuring Term Sheet also enjoys the support of entities affiliated with the Debtors holding, in aggregate, approximately 30.7% of April 2026 Notes (the "***Affiliated Bondholders***"). Accordingly, in total, the Restructuring Term Sheet has the support of holders of over 81.7%, in aggregate, of outstanding April 2026 Notes.

13.     Pursuant to the Restructuring Term Sheet, the Debtors, the Ad Hoc April 2026 Group, and the Affiliated Bondholders will have ten (10) business days from the Petition Date to

reach agreement on the terms of a restructuring support agreement and plan of reorganization that will implement the transactions contemplated by the Restructuring Term Sheet, subject to a further ten (10) business-day extension.  Accordingly, in the days following the commencement of the Chapter 11 Cases, the Debtors intend to enter into a restructuring support agreement and file a chapter 11 plan of reorganization consistent with the Restructuring Term Sheet, along with a corresponding disclosure statement and motion for approval of the disclosure statement and associated solicitation procedures.

14.     The Debtors seek the relief set forth in the First Day Pleadings to minimize any adverse effects from the commencement of the Chapter 11 Cases on their businesses.  I have reviewed the Debtors' Petitions and the First Day Pleadings, or have otherwise had their contents explained to me by counsel and the Debtors' other advisors, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' businesses and to successfully maximize the value of the Debtors' estates for the benefit of all parties in interest.

15.     To familiarize this Court with the Debtors, their businesses, the circumstances leading to the commencement of the Chapter 11 Cases, the objectives of the Chapter 11 Cases, and the relief the Debtors are seeking in the First Day Pleadings, this Declaration is organized as follows:

- **Part I** provides an overview of the Company's business operations, corporate structure, history, and prepetition indebtedness.

- **Part II** describes the circumstances leading to the commencement of the Chapter 11 Cases.

- **Part III** summarizes the terms of the Debtors' proposed restructuring and the Debtors' objectives for the Chapter 11 Cases.

- **Part IV** lists the First Day Pleadings and the relief requested therein.

## I.     COMPANY BACKGROUND

### A.     The Company's Corporate Structure

16.     As reflected in the organizational chart attached hereto as **Exhibit A-1** (the "***Company Organizational Chart***"), non-Debtor Exela Technologies, Inc. ("***Exela***" or "***Parent***")—a corporation incorporated under the laws of the state of Delaware—directly or indirectly owns and controls a large, worldwide enterprise comprised of approximately 134 entities.  As set forth on the organizational chart attached hereto as **Exhibit A-2** (the "***Debtors Organizational Chart***"), the Debtors in these Chapter 11 Cases are sixty (60) entities within the Company's larger corporate structure.  An alphabetical listing of all the Debtors is attached hereto as **Exhibit B**.  The fifty-seven (57) domestic Debtors are organized under the laws of the following states:  Delaware, Texas, Florida, Iowa, Minnesota, South Carolina, Nevada, New Jersey, and Pennsylvania.  The three (3) foreign Debtors are Canadian entities organized under the laws of Ontario and Nova Scotia.[3]

### B.     The Company's History

17.     The Parent, formerly known as Quinpario Acquisition Corp. 2 ("***Quinpario***"), was originally formed as a special purpose acquisition company on July 15, 2014, and completed an initial public offering on January 22, 2015.  Following the strategic combination of SourceHOV Holdings, Inc. ("***SourceHOV***"), a leading global transaction processing company, and Novitex Holding, Inc. ("***Novitex***"), a cloud-based document outsourcing and onsite staffing company, pursuant to a business combination agreement dated February 21, 2017 (the "***Novitex Business***

---

[3]     Debtors Novitex Enterprise Solutions Canada, Inc. and BancTec (Canada), Inc. are formed under Ontario law and Debtor SourceHOV Canada Company is formed under Nova Scotia law.

*Combination*"),[4] Parent was renamed as "Exela Technologies, Inc." and began trading under the ticker symbol "XELA" on The Nasdaq Stock Market ("*NASDAQ*") on July 13, 2017.[5]

### C.  The Company's Business Operations and Revenue

#### 1.  *Overview of the Company's Business*

18.     The Company is a global leader in business process automation and uses its international reach and proprietary technology to provide high-quality payments processing and digital transformation solutions to its clients throughout the Americas and Asia that improve efficiency and reduce operating costs.  The Company has served over 60% of the Fortune® 100 companies.  For the calendar year 2024, the Company generated approximately $856 million in revenue from over 1,550 global customers.  The Company provides mission-critical services to some of the leading global banks and financial institutions, healthcare payers and providers, and global brands.  Such services include, without limitation, finance and accounting solutions and services, payment technologies and services, healthcare payer and revenue cycle management, along with hyper automation and 'work from anywhere' solutions, enterprise information management, integrated communications and marketing automation solutions, and digital solutions for enterprise customers.

19.     Specifically, the Company combines data and user-friendly software and platforms which, together with the services offered by its employees, enable customers to improve the efficiency of their operations.  The Company has adopted a global delivery model and hosts solutions in its data centers, in the cloud, or directly from customers' premises.  The Company's

---

[4]     The Novitex Business Combination closed in closed in July 2017.

[5]     As reflected on the Company Organizational Chart attached hereto as Exhibit B-1, one of Exela's indirect subsidiaries is XBP Europe Holdings, Inc. ("*XBP Europe*").  Exela indirectly owns approximately 71.8% of the outstanding capital stock of XBP Europe.  XBP Europe's stock is publicly traded on NASDAQ with the ticker symbol "XBP."

location-agnostic solutions, coupled with its flexible hosting capabilities and global work force, enables the Company to provide its services across numerous industries in both the public and private sectors, including banking, healthcare, insurance, and manufacturing.

### a.      Operating Segments

20.      The Company operates its business in three primary segments

- ***Information and Transaction Processing Solutions ("ITPS").***  ITPS is the Company's largest segment and includes a wide range of solutions and services for customers primarily in the financial services, commercial, and public sectors, and legal industries.  The ITPS segment accounted for approximately 64.1% (or $548.7 million) of 2024 revenue.

- ***Healthcare Solutions ("HS").***  The HS segment includes the Company's outsourcing business that specializes in the healthcare provider and payer markets. In calendar year 2024, the HS segment generated approximately 27.1% (or $231.9 million) of revenue   Among other services, the HS segment  processes approximately 900,000 claims a day, reducing patient claim denials, and alleviating system bottlenecks in the healthcare payments space.

- ***Legal & Loss Prevention Services ("LLPS").***  The Company's LLPS segment provides services in connection with class action settlement administration, claims adjudication, labor, and other legal matters.  In calendar year 2024, the LLPS segment generated approximately 8.8% (or $75.3 million) of revenue.

### b.      Product Offerings

21.      The Company derives its revenue from the following services and solutions: (a) Finance & Accounting Solutions; (b) Payment Technologies and Services; (c) Healthcare Payers and Revenue Cycle Management; (d) Work from Anywhere Solutions; (e) Enterprise Information Management; (f) Integrated Communications and Marketing Automation Solutions; and (g) Digital Solutions for Enterprise Customers.

22.      ***Finance & Accounting ("F&A") Solutions.***  The Company offers a comprehensive suite of F&A solutions.  For example, the Company's exchange for bills and payments platform, also known as 'XBP' ("***XBP***"), enables billers, consumers, and businesses to communicate and transact on one platform that can connect to any customer system without

significant capital investment.  XBP provides the critical billing components that integrate with the Company's related solution suites and covers entire lifecycles for both Procure-to-Pay solutions ("**P2P**") and Order-to-Cash solutions ("**O2C**"), the components of which are designed to complement the customer's other existing automated solutions.  The XBP platform is a user-friendly and highly adaptable platform exchange, and includes services such as secure messaging that allows billers, consumers, and businesses to effectively communicate and transact.

23.     Both the O2C and P2P solution suites are components of the XBP platform.  The O2C solutions help clients automate the customer order fulfillment process.  This process includes delivering customer orders, preparing invoices, and managing accounts receivable collection. O2C solutions consolidate incoming payments and enhance clients' treasury management functions.  Specifically, to maximize sales efficiencies, clients can leverage integrated receivables dashboards, multi-channel bill presentment and payment system, reconciliation services, exceptions and disputes management platform, aging analytics, collections management, and targeted engagement services.  These capabilities significantly increase the accuracy of payment posting for clients and lower payment processing time.

24.     P2P solutions, in turn, automate the clients' goods-procurement process.  The process begins when a purchase order is entered on the P2P platform and, once approved, the purchase order moves to procurement where bids are solicited from an existing supplier network. After a bid is approved, the P2P platform records the receipt of the goods and then processes the transaction.  In certain cases, the Company's employees process an order, once approved, the purchase is manually recorded in the customer's system for payment.  The Company's P2P platform then generates a payment file that is formatted to relevant bank requirements so that payment can be efficiently processed.  Ultimately, the P2P platform provides a complete solution

for customers' procurement needs.

25.     ***Payment Technologies and Services.***  In addition to solutions and services that can be used across industries, the Company has also developed industry-specific solutions to meet selected client's needs.  For example, the Company's financial solutions provide, among other services, payment, lending, and information management services.  In addition to checks and credit cards, the Company handles other payment channels such as the automated clearing house (ACH).  The Company performs such services on behalf of its client or its clients' banks, and manages both business-to-business and business-to-consumer transactions.

26.     Through its extensive experience in payment management, the Company has also developed proprietary integrated receivables-processing technology, which consolidates transactions across disparate payment channels into a single payment platform connected to the XBP network.  The Company plans to offer this technology as a branded or private label solution to banking customers.

27.     ***Healthcare Payers and Revenue Cycle Management.***  The Company has also developed specific offerings for the healthcare industry.  The Company bundles core solutions with a suite of healthcare payer (insurer) and healthcare provider-specific services such as end-to-end revenue cycle management ("***RCM***"), including revenue integrity solutions, enrollments and credentialing, claims processing, adjudication, and payment operations.  These services generate value for clients in the healthcare industry by simplifying complex healthcare transactions that require multiple layers of validation, supporting document digitization, and reconciliation.

28.     Additionally, PCH Global is the Company's cloud-based claims processing platform, which streamlines claims submission and payment process making it easier for healthcare providers and payers to manage claims timely, cost efficiently and to comply with

regulations.  PCH Global processes approximately 900,000 claims a day, reduces claim denials, and helps alleviate system bottlenecks in the healthcare payments space.

29.     ***Work From Anywhere Services.***  The Company has developed three solutions that track the advancements in cognitive automation and support work from all locations whether it be onsite, offsite, or hybrid.  *First*, the Company's robotic process automation solution, EON™, leverages intelligent automation to make clients' businesses more productive.  Specifically, EON™ empowers clients to create task-specific bots to take over repetitive, rule-based assignments.  *Second*, ExelaBEATS™ provides a collaborative project management software that allows working groups to manage their workflow and collaborate.  Team members can create their own workflow or select from existing ExelaBEATS™ workflows to effectively manage their projects and monitor the status of tasks in real time.  *Third*, DrySign™ enables a digital signature platform that helps digitize both internal and external sign-off processes.  Ultimately, the Company leverages automated tools and customized solutions to enhance its clients' operations and efficiency.

30.     ***Enterprise Information Management ("EIM").***  The Company provides EIM solutions to help clients organize, process and store large amounts of data in cloud-enabled proprietary platforms.  The EIM systems process and host billions of critical records for a variety of businesses across a number of industries.

31.     ***Integrated Communications and Marketing Automation Solutions.***  The Company also has comprehensive multi-channel integrated communications solutions to help clients reach their end-customers and other businesses effectively.  For example, the Company's Marketing Execution Services ("***XME***") is a marketing platform that enables clients to execute a complete end-to-end marketing strategy.  XME™ features a Digital Storefront that allows users to

improve brand control and deliver a polished e-commerce experience to their end-customers.  It also supports omni-channel communication options such as direct mail, email, landing pages, web banners, social sharing, and call center tracking, with analytics reporting and data visualization available as needed.  In addition, the Company's business critical print and mail and strategic sourcing services enable clients to optimize their business communications.

32.     ***Digital Solutions for Enterprise Customers***.  The Company also offers several digital solutions to enterprise clients.  For example, the digital mailroom ("***DMR***") solutions leverage proprietary technology to process a significant number of daily mail collection tasks.  Once mail is received, the DMR platform processes it and routes it to the appropriate person at an organization, where it appears as an item in the DMR inbox, further enabling 'work from anywhere'.  The Company offers DMR for enterprise wide deployment from captive mailrooms in client locations to businesses where there is no dedicated mailroom.

## 2.     *The Company's Facilities and Employees*

33.     The Company maintains its headquarters in Irving, Texas, with members of its management team also based in Troy, Michigan, and Santa Monica, California.  As to the Debtors themselves, the Debtors maintain numerous facilities as set forth in **Exhibit C**.

34.     The Company has approximately 11,000 employees across five (5) countries.  Of those, approximately 4,700 are employed by the Debtors as of the Petition Date.[6]  In terms of the global workforce of the Company, almost half of the Company's global workforce is based in the Americas (with most employees based in the U.S., and additional employees in Canada and Mexico), and the balance is based in India and the Philippines.

---

[6]     The Debtors' employees are distributed geographically as follows:  (1) U.S. (4, 139); (2) Canada (282); (3) Mexico (241).

**D.      The Debtors' Prepetition Capital Structure**

      **1.      *Funded Secured and Unsecured Debt***

35.      As set forth in the following table, as of the Petition Date, the Debtors have approximately $1.315 billion of secured and unsecured funded debt obligations.

| Debt | Relevant Parties | Maturity Date | Outstanding Principal Amount[7] |
|---|---|---|---|
| Senior Secured Term Loan (Blue Torch Facility) | • **Borrower:** Exela Intermediate<br>• **Borrower:** Exela Finance | July 11, 2026 | $38,500,000 |
| April 2026 Notes | • **Issuer:** Exela Intermediate<br>• **Co-Issuer:** Exela Finance | April 15, 2026 | $1,252,267,105 (of which approximately $383,984,010 is held by certain non-Debtor affiliates)[8] |
| July 2026 Notes[9] | • **Issuer:** Exela Intermediate<br>• **Co-Issuer:** Exela Finance | July 15, 2026 | $23,953,211 (of which $1,211 is held by certain non-Debtor affiliates) |
| | | | **$1,314,720,316** |

      **a.      Senior Secured Term Loan** (the "***Blue Torch Facility***")

36.      On July 11, 2023, Debtor Exela Intermediate LLC ("***Exela Intermediate***") and Debtor Exela Finance, Inc. ("***Exela Finance***"), entered into that certain financing agreement (the "***Blue Torch Financing Agreement***") with Blue Torch Credit Opportunities Fund III LP, Blue Torch Credit Opportunities Unlevered Fund III LP, BTC Holdings SBAF Fund LLC, BTC Holdings KRS Fund LLC, and  BTC Holdings SBAF Fund-B LLC, as lenders (collectively, the

---

[7]    The Outstanding Principal Amounts listed herein exclude the unpaid accrued interest under each debt facility.  In addition, such balances may differ from the figures listed in the DTC-based register due to certain differences with DTC accounting conventions.

[8]    The amount of April 2026 Notes held by certain non-Debtor affiliates is exclusive of the $6 million of such notes sold to external holders in January 2025.

[9]    As discussed below, the July 2026 Notes were originally secured obligations of the Company but pursuant to the terms of the Supplemental Indenture (defined below), all collateral securing the July 2026 Notes pursuant to the Security Agreement was released and, accordingly, the July 2026 Notes are no longer secured obligations of the Company.

"*Blue Torch Lenders*"), and Blue Torch Finance LLC (the "*Blue Torch Facility Agent*"), as administrative and collateral agent.  Pursuant to the Blue Torch Financing Agreement, the Blue Torch Lenders agreed to extend a $40 million term loan to the Debtors (the "*Senior Secured Term Loan*").  As of the Petition Date, the principal amount outstanding under the Blue Torch Financing Agreement is approximately $38.5 million.

37.     Pursuant to that certain pledge and security agreement dated as of July 11, 2023 (the "*Blue Torch Pledge and Security Agreement*"), the obligations arising pursuant to the Blue Torch Financing Agreement are secured by security interests in all or substantially all personal property and fixtures of the grantors thereunder.[10]

### b.     April 2026 Notes

38.     On July 11, 2023, Debtors Exela Intermediate and Exela Finance (together, the "*Issuers*"), certain guarantors thereunder,[11] and U.S. Bank Trust Company, National Association, as indenture trustee (the "*April 2026 Notes Trustee*"), executed an indenture (the "*April 2026 Notes Indenture*")[12] pursuant to which the Issuers issued approximately $1.082 billion aggregate principal amount of 11.5% first-priority senior secured notes due April 15, 2026 (the "*April 2026 Notes*"), of which approximately $314 million were issued to affiliates of the Debtors, which includes April 2026 Notes issued (a) as consideration in the discounted exchange (the "*2023 Exchange*") of $956.0 million aggregate principal amount of the July 2026 Notes (defined below), (b) as consideration for the private exchange of certain term loans (none of which remain outstanding), (c) in exchange for certain secured notes held by affiliates of the Debtors (none of

---

[10]   The guarantors thereunder are comprised of all Debtor entities, except for Exela Intermediate and Exela Finance.

[11]   The guarantors thereunder are comprised of each of the Debtors, except for Exela Finance, Exela Intermediate, Debtor Exela Technologies BPA, LLC, Debtor SIG-GP, L.L.C., and Services Integration Group, L.P.

[12]   Wilmington Savings Fund Society, FSB served as collateral agent (the "*First-Priority Collateral Agent*") for the First-Priority Secured Parties (as defined therein).

which remain outstanding), and (d) to certain non-Debtor affiliates in satisfaction of prior cash payments made by such non-Debtor affiliates to or on behalf of the Issuers.

39.     The interest on the April 2026 Notes has historically been partly paid in kind, subject to the terms of the April 2026 Notes Indenture.  As a result of the foregoing PIK Interest and the issuance of additional April 2026 Notes from time to time in accordance with the April 2026 Notes Indenture, the outstanding principal amount as of the Petition Date is approximately $1.252 billion.  Certain non-Debtor affiliates of the Debtors hold approximately $384 million in principal amount of the April 2026 Notes.[13]

40.     The Issuers' obligations under the April 2026 Notes (the "**April 2026 Notes Obligations**") are secured by the terms of the "Security Documents" as defined in the April 2026 Notes Indenture.  Under the Security Documents, the April 2026 Notes Obligations are first priority senior secured obligations of the Issuers and the guarantors thereunder.  Specifically, the obligations are secured by security interests in substantially all of the existing and future assets of the Issuers and the grantors thereunder.

### c.     Intercreditor Agreement[14]

41.     The respective rights of the April 2026 Notes Trustee, First-Priority Collateral Agent, and the Blue Torch Facility Agent (collectively, the "**Intercreditor Agreement Parties**") with respect to their shared collateral are governed by that certain intercreditor agreement, dated as of July 11, 2023, by and between the Intercreditor Agreement Parties, the Issuers, and certain guarantors thereunder (as may be amended from time to time, the "**Intercreditor Agreement**").

---

[13]     The non-Debtor affiliate holders of April 2026 Notes include GP 3XCV LLC and XCV-STS LLC.

[14]     Certain Debtors are party to a *Pari First Lien Intercreditor Agreement* (the "***Pari Intercreditor***") dated as of July 12, 2017.  While the Pari Intercreditor has not been terminated, there are no outstanding debt obligations underlying this agreement.

The Intercreditor Agreement governs, among other items, the lien priorities and subordination of the relevant collateral as well as the enforcement rights of each Intercreditor Agreement Party. Notably, the Intercreditor Agreement also governs the respective rights of the Intercreditor Agreement Parties in connection with insolvency proceedings, including post-petition financing.

### d.       The July 2026 Notes (Unsecured)

42.       On December 9, 2021, the Issuers, certain guarantors thereunder[15], and U.S. Bank National Association, as trustee (the "***July 2026 Notes Trustee***"), entered into that certain indenture (the "***July 2026 Notes Indenture***")[16] pursuant to which the Issuers issued certain 11.5% first-priority senior secured notes due July 15, 2026,  (the "***July 2026 Notes***").[17]

43.       The Issuers' obligations under the July 2026 Notes (the "***July 2026 Notes Obligations***") were secured by that certain collateral agency and security agreement (as further amended, supplemented, modified, extended, renewed, restated, refunded or refinanced from time to time, the "***Security Agreement***") dated as of July 12, 2017 and any additional relevant security agreements, pledge agreements, collateral assignments and mortgages (together with the Security Agreement, the "***Security Documents***").[18]  Prior to the 2023 Exchange, the Security Documents (subject to the conditions thereof) provided that the July 2026 Notes Obligations were secured by security interests in, and liens upon, all or substantially all assets of, among other parties, Exela Finance and Exela Intermediate.

---

[15]   The guarantors thereunder are comprised of by substantially the same guarantors as the April 2026 Notes except for entities formed after December 2021.

[16]   Wilmington Savings Fund Society, FSB served as collateral agent (the "***First-Priority Collateral Agent***") for the First-Priority Secured Parties (as defined therein).

[17]   Interest on the July 2026 Notes is payable on January 15 and July 15 of each year.

[18]   The Security Agreement was initially executed in connection with the 10.000% First-Priority Senior Secured Notes due 2023 issued on July 12, 2017 (the "***Old Notes***").

44.     As of January 1, 2023, the aggregate principal amount of the Company's indebtedness under the July 2026 Notes was approximately $1.278 billion (inclusive of amounts held by certain affiliates).  However, following the 2023 Exchange and certain periodic debt repurchases by the Company, only approximately $24 million in aggregate principal amount remained outstanding under the July 2026 Notes as of the Petition Date (of which certain non-Debtor affiliates hold approximately $1,211.00).[19]  Further, on July 11, 2023, the Issuers, April 2026 Notes Trustee (as successor to the July 2026 Notes Trustee), and Wilmington Savings Fund Society, FSB, as collateral agent executed a seventh supplemental indenture (the "*Supplemental Indenture*") to govern the July 2026 Notes.  The Supplemental Indenture eliminated substantially all restrictive covenants and certain events of default, including those relating to covenant or warranty breaches, cross-acceleration rights, certain insolvency events and judgments, contained in the July 2026 Notes Indenture and the July 2026 Notes.  Notably, all collateral securing the July 2026 Notes pursuant to the Security Agreement was released under the Supplemental Indenture. Accordingly, the July 2026 Notes are no longer secured obligations.

45.     On March 3, 2025, U.S. Bank Trust Company, National Association (as the successor in interest to the July 2026 Notes Trustee) sent a letter to the Debtors (the "*Default Letter*"), advising that an event of default had occurred under the July 2026 Notes Indenture.  The Issuers reserve all rights with respect to the Default Letter.

### 2.     *Tax Liabilities*

46.     As a result of the late payment of certain Q4 2023 payroll tax obligations, Automatic Data Processing, Inc. ("*ADP*") suspended the payroll processing services it had

---

[19]    The non-Debtor affiliate holders of the July 2026 Notes include GP 3XCV LLC, GP 2XCV LLC, and XCV-STS LLC.

historically provided to the Debtors, leaving the Debtors without access to certain payroll data and making the filing of federal, state, and local quarterly tax returns impracticable.  Challenges related to determining the amounts that were due and the process to remit, as well as the subsequent liquidity constraints that the Debtors were facing, led to the failure of certain of the Debtors (the "**Debtor Payroll Entities**")[20] to timely remit certain amounts to federal, state, and local taxing authorities.  Such amounts included (a) federal "trust fund taxes" (which are owed by the employee but held by an employer "in trust" for the government), (b) federal non-trust fund payroll taxes (which are owed directly by the employer to the government, including employer contributions to Social Security), and (c) state and local payroll taxes.  As of the Petition Date, these payroll-related tax obligations are asserted in the amount of approximately $34.9 million (inclusive of $2.1 million in interest and $9.9 million in failure-to-file and other penalties) (collectively, the "**Payroll Tax Obligations**").

47.     Separately, Exela, like many other companies, enrolled in CARES Act-related deferral programs that allowed the Debtors to defer a portion of Social Security taxes (FICA) for the fiscal years 2020 through 2023.  As of the end of fiscal year 2023, the Debtor Payroll Entities had approximately $14 million in outstanding CARES Act-related taxes, but the Debtors subsequently paid approximately $5.7 million of this liability.  As of the Petition Date, these CARES Act payroll-related tax obligations are asserted in the amount of approximately $7.3 million (the interest on unpaid deferred Social Security is approximately $2 million, while the

---

[20]   The Debtor Payroll Entities include the following Debtor entities:  SOURCECORP BPS Inc.; Banc Tec Inc,; Economic Research Services Inc.; HOV Services Inc.; HOVG LLC; J & B Software Inc.; Managed Care Professionals LLC; Novitex Government Solutions LLC; Regulus Group LLC; Regulus Integrate Solutions Inc.; Rust Consulting Inc.; Sourcecorp Management Inc.; SourceHOV Healthcare Inc.; United Information Services Inc.; and Exela Enterprise Solutions Inc.

penalty on unpaid deferred Social Security is approximately $1.9 million) (the "***CARES Tax Obligations***").

48.     In addition, as of the Petition Date, certain of the Debtors (the "***Debtor Sales Tax Entities***") owed a total asserted amount of approximately $2,671,303 to certain state taxing authorities on account of sales taxes (collectively, the "***Sales Tax Obligations***").[21]   Separately, Debtor Pangea Acquisitions Inc. owed a total asserted amount of approximately $96,632 to certain state taxing authorities (collectively, the "***Franchise Tax Obligations***").   And, certain of the Debtors (the "***Debtor Property Tax Entities***") owed a total asserted amount of approximately $954,238 to certain state taxing authorities on account of property taxes (collectively, the "***Property Tax Obligations***").[22]

49.     Lastly, as of the Petition Date, Debtor Novitex Enterprise Solutions Canada, Inc owed a total asserted amount of approximately $1,564,472 to Canadian taxing authorities on account of sales tax and audit assessments (collectively, the "***Canadian Tax Obligations***" and, together with the Payroll Tax Obligations, the Sales Tax Obligations, the Franchise Tax Obligations, the Property Tax Obligations, and CARES Tax Obligations, the "***Outstanding Tax Obligations***").

50.     Although the Debtors dispute portions of the Outstanding Tax Obligations deemed owed (and reserve all rights with respect to same), the Debtors acknowledge that certain amounts are owed on account of such obligations as of the Petition Date.   The Debtors recognize that, pursuant to Section 1129(a)(9)(C) of the Bankruptcy Code, unless the applicable taxing authority

---

[21]   The Debtor Sales Tax Entities include the following Debtor entities:  Exela Enterprise Solutions, Inc.; United Information Services, Inc.; and BancTec, Inc.

[22]   The Debtors Property Tax Entities include the following Debtor entities:  BancTec, Inc.; SourceHOV LLC; Novitex Holdings, Inc.; and TransCentra, Inc.

agrees to less favorable treatment, the Debtors will need to either (i) pay those Outstanding Tax Obligations afforded priority treatment under the Bankruptcy Code in full in cash or (ii) pay such amounts over a period not more than five (5) years after the Petition Date to achieve confirmation of a plan of reorganization.

### 3.   *Unsecured Debt*

51.     In addition to their secured and unsecured funded debt, the Debtors have customary, ordinary-course unsecured debt, including amounts owed to trade vendors and landlords.  The Company routinely incurs fixed, liquidated, and undisputed payment obligations in the ordinary course of business to various third-party providers of goods and services.  As of the Petition Date, the Debtors estimate that approximately $41 million (excluding intercompany amounts but including estimated accruals) of trade debt is outstanding.  Certain of these claims are entitled to statutory priority, including under section 503(b)(9) of the Bankruptcy Code.  The Company also has certain lease obligations.  The Debtors estimate that an average of approximately $1.6 million accrues on account of lease and occupancy-related expenses each month.

### E.     Securitization and Other Receivables Financing Arrangements

52.     The Company maintains three trade receivables financing arrangements: the PNC AR Facility (as defined below), the Second Lien Note (as defined below) and the BR Exar AR Facility (as defined below) (collectively, the "***Receivables Facilities***").  The workings of the Receivables Facilities, and their proposed treatment during and as a result of these Chapter 11 Cases, is described in greater detail in the Securitization Motion[23] and the Cash Management

---

[23]   "***Securitization Motion***" means *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Certain Debtors to Continue Selling, Contributing and Servicing Receivables and Related Rights Pursuant to the Securitization Program, (II) Modifying the Automatic Stay, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief.*

Motion.[24]   The following chart sets forth the obligations outstanding under the Receivables Facilities as of the Petition Date:

| Facilities | Relevant Parties | Maturity | Outstanding Principal |
|---|---|---|---|
| PNC AR Facility | • **Originators:** *Following Debtor entities***:** BancTec, Inc.; Economic Research Services, Inc.; Exela Enterprise Solutions, Inc.; HOV Enterprise Services, Inc.; HOV Services, Inc.; HOV Services, LLC; J & B Software, Inc.; Novitex Government Solutions, LLC; Regulus Group LLC; Regulus Group II LLC; Regulus Integrated Solutions LLC; SOURCECORP BPS Inc.; SOURCECORP Management, Inc.; SourceHOV Healthcare, Inc; and United Information Services, Inc.<br>• **Seller:** Non-Debtor Exela Receivables 3, LLC<br>• **Pledgor:** Non-Debtor Exela Receivables 3 Holdco LLC | June 17, 2025 | $94,300,000 |
| Second Lien Note | • **Borrower:** Non-Debtor Exela Receivables 3 Holdco, LLC | June 17, 2025 | $22,625,000 |
| BR Exar Accounts Receivable Facility | • **Originators**: Debtor Novitex Enterprise Solutions Canada, Inc., Debtor Rust Consulting, Inc., Debtor HOVG LLC, Debtor BancTec (Canada) Inc., and Debtor SourceHOV Canada Company<br>• **Seller:** Non-Debtor Exela BR SPV LLC | - | $9,981,630 |
| | | | **$126,925,000** |

### 1.    *The PNC Accounts Receivable Facility*

53.    On June 17, 2022, non-Debtor Exela Receivables 3 LLC ("***Receivables 3***"), as seller, and non-Debtor Exela Receivables 3 Holdco, LLC ("***Receivables 3 Holdco***," and together with Receivables 3, the "***SPEs***"), as pledgor, Parent, as initial servicer, PNC Bank, National Association ("***PNC***"), as administrative agent for the benefit of the secured parties (the "***PNC Securitization Secured Parties***") and as letters of credit bank, PNC Capital Markets LLC, as

---

[24]    "***Cash Management Motion***" means the *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Existing Cash Management System, (B) Maintain Existing Business Forms and Intercompany Arrangements, and (C) Continue Intercompany Transactions and (II) Granting Related Relief.*

structuring agent, and PNC, as purchasers, entered into that certain amended and restated receivables purchase agreement, dated as of June 17, 2022 (as further amended, supplemented, modified, extended, renewed, restated, refunded or refinanced from time to time, the "***PNC Receivables Purchase Agreement***").  The PNC Receivables Purchase Agreement extended the term of an existing $150 million securitization facility among the SPEs (*i.e.*, Receivables 3 and Receivables 3 Holdco), as borrower, and a certain group of lenders to allow the SPEs to sell and finance receivables until December 31, 2025 (the "***PNC AR Facility***").  Each SPE is a non-Debtor structured as a special-purpose, bankruptcy-remote entity created for the purpose of facilitating the PNC AR Facility.  As noted, certain Debtor entities (the "***PNC Securitization Originators***") transfer their receivables on an ongoing basis at fair market value to the SPEs to create and maintain the "Capital Coverage Amounts" (substantially equivalent to a borrowing base) for the PNC AR Facility, with the proceeds of those sales to the SPEs funding in part the Debtors', and the larger Company's, liquidity.[25]  The PNC Receivables Purchase Agreement was further amended on February 27, 2023 in connection with the Second Lien Note (defined below) to, among other objectives, permit the addition of subordinated debt by B. Riley Commercial Capital, LLC.

54.    The main transaction documents for the PNC AR Facility consist of (1) the PNC Receivables Purchase Agreement, (2) the Amended and Restated First Tier Purchase and Sale Agreement, dated as of June 17, 2022, among Parent, as initial servicer, the  PNC Securitization Originators, as sellers, and Receivables 3 HoldCo, as buyer (as further amended, supplemented,

---

[25]    The PNC Securitization Originators include the following Debtor entities:  BancTec, Inc.; Economic Research Services, Inc.; Exela Enterprise Solutions, Inc.; HOV Enterprise Services, Inc.; HOV Services, Inc.; HOV Services, LLC; J & B Software, Inc.; Novitex Government Solutions, LLC; Regulus Group LLC; Regulus Group II LLC; Regulus Integrated Solutions LLC; SOURCECORP BPS Inc.; SOURCECORP Management, Inc.; SourceHOV Healthcare, Inc; and United Information Services, Inc.

modified, extended, renewed, restated, refunded or refinanced from time to time, the "***PNC First Tier Purchase Agreement***"), (3) the Amended and Restated Second Tier Purchase and Sale Agreement, dated as of June 17, 2022, among Parent, as initial servicer, Receivables 3 HoldCo, as seller, and Receivables 3, as buyer (as further amended, supplemented, modified, extended, renewed, restated, refunded or refinanced from time to time, the "***PNC Second Tier Purchase Agreement***"), (4) the Amended and Restated Pledge and Guaranty Agreement, dated as of June 17, 2022, by the Receivables 3 Holdco in favor of PNC, as administrative agent for the benefit of the secured parties and the other beneficiaries set forth therein (as further amended, supplemented, modified, extended, renewed, restated, refunded or refinanced from time to time, the "***PNC Equity Pledge Agreement***"), (5) the Amended and Restated Performance Guaranty, dated as of June 17, 2022, by Parent, as performance guarantor, in favor of PNC, as administrative agent (as further amended, supplemented, modified, extended, renewed, restated, refunded or refinanced from time to time, the "***PNC Performance Guaranty***") (together with the other Transaction Documents (as defined in the PNC Receivables Purchase Agreement), collectively, the "***PNC Facility Transaction Documents***"), and (6) the Amended and Restated Sub-Servicing Agreement, dated as of June 17, 2022, by Parent, as initial Servicer, and each of the PNC Securitization Originators, as sub-servicers (as further amended, supplemented, modified, extended, renewed, restated, refunded or refinanced from time to time, the "***PNC Sub-Servicing Agreement***").

55.     Under the PNC AR Facility, (a) the Receivables 3 Holdco purchases and receives as capital contributions receivables from the PNC Securitization Originators pursuant to the PNC First Tier Purchase Agreement, (b) Receivables 3 purchases and receives as capital contributions, such receivables from Receivables 3 Holdco (consisting of all the receivables transferred to the Pledgor pursuant to the PNC First Tier Purchase Agreement) pursuant to the PNC Second Tier

Purchase Agreement, (c) Receivables 3 may request that the purchasers make payments of Capital (as defined in the PNC Receivables Purchase Agreement but substantially similar to the outstanding principal of a loan in the transactions under the PNC Receivables Purchase Agreement were structured as loans) to Receivables 3 from time to time, secured by, among other things, the receivables and all other property owned by Receivables 3, pursuant to the terms set forth in the PNC Receivables Purchase Agreement and the other PNC Transaction Documents, (d) Parent, as Servicer, agrees to perform certain servicing duties with respect to the receivables, (e) each PNC Securitization Originator, as sub-servicers under the PNC Sub-Servicing Agreement, agrees to perform such duties of the Servicer with respect to the receivables originated by such PNC Securitization Originator, and (f) Parent, as performance guarantor under the PNC Performance Guaranty, guarantees the performance of the obligations of the PNC Securitization Originators and Parent, as servicer, or any replacement servicer, under the PNC Transaction Documents to which they are a party.  The obligations under the PNC Receivables Purchase Agreement (the "***PNC Securitization Obligations***") are guaranteed by Receivables 3 Holdco, which guarantee is secured by the PNC Equity Pledge Agreement.  Pursuant to the PNC Equity Pledge Agreement, Receivables 3 Holdco, as guarantor, has provided collateral primarily consisting of a pledge of its equity in Receivables 3.

56.    As set forth in greater detail in the Securitization Motion, PNC has agreed to maintain the PNC AR Facility, and to continue to provide the Debtors with the liquidity arising therefrom, subject to the terms and conditions set forth in the motion and accompanying proposed order.

## 2.    *Second Lien Note*

57.    On February 27, 2023, Receivables 3 Holdco entered into a Secured Promissory Note (the "***Second Lien Note***") with B. Riley Commercial Capital, LLC, which was later assigned

to BRF Finance Co., LLC ("**B. Riley**").  Pursuant to the Second Lien Note, B. Riley agreed to lend up to $35 million to Receivables 3 Holdco secured by a second lien pledge of Receivables 3 Holdco's equity interests in Receivables 3.  The Second Lien Note has a maturity date of June 17, 2025, and bears an interest rate of one-month Term SOFR plus 7.5%.

58.     As of February 2025, approximately $22.6 million remained outstanding under the Second Lien Note.

59.     The relative rights and priorities of PNC, B. Riley, and the PNC Securitization Secured Parties (collectively, the "**Subordination Agreement Parties**") are governed by that certain subordination and intercreditor agreement, dated as of February 27, 2023, by and between the Subordination Agreement Parties, Receivables 3 Holdco, Receivables 3, and Parent (as may be amended from time to time, the "**PNC/2L Note Subordination  Agreement**").  The PNC/2L Note Subordination Agreement governs, among other things, subordinated debt payment restrictions, subordination of liens and security interest, as well as the Subordination Agreement Parties' rights in liquidation, dissolution, or bankruptcy.  Under the PNC/2L Note Subordination Agreement, B. Riley in general is prohibited from taking actions to enforce its security interest prior to payment in full of the PNC Securitization Obligations.  In addition, PNC, as administrative agent, and the PNC Securitization Secured Parties agree not to permit certain amendments to the PNC Transaction Documents without the consent of B. Riley.

### 3.     *BR Exar Accounts Receivable Facility*

60.     On February 12, 2024, certain affiliates of the Company, including Debtor Novitex Enterprise Solutions Canada, Inc., Debtor Rust Consulting, Inc., Debtor HOVG LLC, Debtor BancTec (Canada) Inc., and Debtor SourceHOV Canada Company, as originators (the "**BR Exar Originators**"), and non-Debtor Exela BR SPV LLC, as seller (the "**BR Exar Seller**"), entered into a receivables purchase agreement with BR Exar, LLC ("**BREL**"), an affiliate of B. Riley (as

subsequently amended on February 29, 2024, March 29, 2024, March 31, 2024, April 24, 2024, May 24, 2024 and June 25, 2024, July 29, 2024, August 13, 2024, August 30, 2024 September 27, 2024, October 30, 2024, November 26, 2024, December 30, 2024, January 23, 2025, and February 14, 2025 the "***BR Exar AR Facility***").

61.     In turn, the BR Exar Originators, agreed to sell certain existing accounts receivable and all future receivables to BREL until such time as BREL will have collected approximately $65 million, net of any costs or expenses.  As of February 14, 2025, there is approximately $10 million outstanding under the BR Exar AR Facility.

62.     The obligations under the BR Exar AR Facility (the "***BR Exar Obligations***") are secured by that certain pledge agreement dated as of February 27, 2023 (the "***Pledge Agreement***"). Under the Pledge Agreement, the BR Exar Originators and BR Exar Seller provided a pledge and assignment of the bank account(s) established for the purpose of receiving payments and other monies and proceeds collected with respect to purchased receivables to BREL as collateral security for the BR Exar Obligations.

## II.     EVENTS PRECEDING COMMENCEMENT OF CHAPTER 11 CASES

### A.     Challenges Leading to the Chapter 11 Cases

63.     As noted above, the Company is one of the leading providers of business process automation solutions and services to banks and financial institutions, healthcare payers and providers, and various other industries, and is highly respected by its customers.  Indeed, the Company has won many awards from industry research organizations including the following recognitions, Strong Performer in the Forrester Wave™: Task-Centric Automation Software (Q4 2024), Emerging Solution Winner in the FAO Hackett Value Matrix™, and Major Contender in the Everest Group's PEAK Matrix® for Revenue Cycle Management Operations.

64.     The Company, however, operates in a highly competitive, fragmented, and rapidly evolving industry.   Specifically, the Company competes with national, regional, and large multinational companies within the broader information and payment technology industry. Competitors also can emerge from adjacent industries or locations where the costs of operations are significantly lower.   As a result, the Company faces continual pricing pressures and competition for market share.   To keep pace with this competition and position themselves to continue to address the needs of their customers, the Company invested significant resources to develop innovative solutions and services.

65.     These investments in innovation and the deployment of strategies to compete for new customers are extremely costly, especially when competing against well capitalized competitors.   Those factors coupled with additional challenges such as the (a) decline of the Novitex business; (b) ratings downgrade; (c) impact of COVID-19; and (d) network outage have impacted the Debtors' operations and caused the Debtors to become unsustainably leveraged.

66.     ***The Decline of the Novitex Business.***   The Company began experiencing challenges shortly after the closing of the Novitex Business Combination in 2017.   Specifically, the debt structure put in place to facilitate the transaction required a certain level of performance to service.   The Novitex business model, however, could not meet the necessary level because it had a lower degree of customer retention than originally anticipated.   The Company has invested in the Novitex Business Combination with the goal of deploying SourceHOV's technology to expand Novitex's service offerings but also make it more embedded among its customers, thereby strengthening revenue predictability.   Ultimately, the Company was unable to realize this goal, which meant that a significant part of the business had a lower degree of predictability, and given its size, adversely affected the entire Company.

67.    ***The Ratings Downgrade.***  The underperformance of the Novitex business had a cascading effect on other parts of the Company.  Specifically, in 2019, both Moody's and Standard and Poor's downgraded the debt rating for Exela Intermediate and Exela Finance (the "***Downgrade***").  The Downgrade further exacerbated the Company's difficulties by reducing the Parent's share value and limiting the Parent's ability to use such shares to raise financing.  As a result, any new debt financing became more expensive and complex.  Furthermore, in response to the Company's financial struggles, suppliers began imposing onerous terms, and customers started to withhold work mandates in some cases.

68.    ***The Impact of COVID-19.***  COVID-19 significantly disrupted the Company's business and operations.  In a short period of time, the Company had to transition much of its workforce to remote work, which at the time totaled approximately 22,000 employees.  This meant that the Company's management focused its efforts to ensure continuous operations and mission critical delivery while navigating ongoing pandemic-related disruptions in the marketplace.  In the U.S., many of the Company's solutions and services were deemed essential services, and therefore, employees were allowed to work at the Company's facilities.  The impact of COVID-19 was disruptive from an operational perspective as it disrupted onsite business processes which required more cost and complexity for the Company to continue meeting customer needs, and brought additional challenges.  For example, healthcare payers (insurers) and providers completely stopped certain services, such as dental work, elective surgeries, and similar categories.  This impact lasted for approximately two years.

69.    ***The Network Outage.***  In late June 2022, the Company experienced a network security incident (the "***Incident***") impacting certain parts of its operational and IT systems.  The Company immediately isolated the impact by taking large parts of its network offline as a

precaution.  This precaution disrupted services to certain customers.  The Company also hired leading cyber forensic and defense firms, along with advisors, to remediate the Incident. Ultimately, however, the Incident resulted in loss of revenue, profits, and the accrual of costs.  The Parent has filed a business interruption claim against a group of insurers in the amount of $44.7 million , of which approximately $20 million remains unpaid.

70.     As a result of the aforementioned challenges, and consistent with the Company's goal to remain a market leader, the Debtors have incurred approximately $1.315 billion of secured and unsecured funded debt, which has rerouted a significant amount of the cash flow generated from operations in order to service such indebtedness.  Additionally, these liquidity challenges have deprived the Debtors from making necessary investments, thus exacerbating the problems the Debtors face.

71.     The Company's management team recognized that this high degree of leverage and the attendant negative impact it was having on the operations of the business, the ability to invest in technology, and future business operations was unsustainable in the long-term.  Accordingly, in late 2019, the Company undertook a series of initiatives and transactions aimed at improving its capital structure and extending its liquidity.  Specifically, beginning on November 12, 2019, the Parent's Board of Directors (the "***Board***") announced a strategic initiative (the "***Initiative***") to reduce the Company's indebtedness and improve liquidity.  The Initiative aimed to improve liquidity by $125 to $150 million and reduce debt by $150 to $200 million in the subsequent two years.  Additionally, and as discussed above, the Company executed the 2023 Exchange in effort to reduce the overall debt burden on the Debtors.  Lastly, under the April 2026 Notes Indenture, Exela Intermediate was required to retain at least one independent director selected by a majority of the holders of the April 2026 Notes on terms and pursuant to documentation acceptable to such

holders on its board of directors at all times following the issue date.  In accordance with this condition, on October 1, 2023, Exela Intermediate appointed such an independent director to its board of directors.

72.     The Company's financial difficulties, however, persisted and ultimately resulted in the delisting of Parent's publicly traded securities from NASDAQ in late 2024.  The Parent was previously subject to, among other standards, NASDAQ Listing Rule 5550(b)(2) ("***Rule 5550(b)(2)***"), which required the Parent to maintain a market value of listed securities ("***MVLS***") of at least $35 million.  On November 13, 2023, the Parent received an anticipated notice from NASDAQ, noting that it was in violation of Rule 5550(b)(2) because the MVLS had been below $35 million for the prior thirty (30) consecutive business days.  Thereafter, on November 6, 2024, the Parent received another notification from NASDAQ, stating that its securities would be delisted from NASDAQ.  On November 8, 2024, trading of the Parent's securities on NASDAQ was suspended (the "***NASDAQ Suspension***").   On January 7, 2025, the Parent notified stockholders and NASDAQ that it intended to voluntarily delist from NASDAQ by filing Form 25 with the Securities and Exchange Commission (the "***SEC***"), and subsequently filed Form 25 on January 17, 2025.  As of the NASDAQ Suspension, the Parent's common stock and Series B Preferred Stock have been trading on the OTC Pink under the ticker symbols "XELA" and "XELAP," and this is currently the only trading market for the Parent's securities.  In addition, on January 27, 2025, the Parent filed Form 15 with the SEC to deregister its securities under the Securities Exchange Act of 1934.[26]

73.     Additionally, beginning in August 2024, the PNC AR Facility became over-advanced which required monthly paydowns to eliminate any capital coverage deficit and further

---

[26]    Accordingly, the Parent no longer has an obligation to file periodic and current reports with the SEC.

constrained the Debtors' liquidity position.  In February 2025, the Debtors and PNC, represented by Mayer Brown LLP (as counsel), have had constructive negotiations, and exchanged term sheets leading up to the Petition Date.  To date, PNC remains supportive of these Chapter 11 Cases.

**B.     Restructuring Negotiations with Stakeholders**

74.     Starting in early 2025, the Debtors began to explore options to refinance their existing debt through various capital markets transactions.  However, as a result of the Company's debt burden and the significant market headwinds, the Debtors determined that such short-term opportunities were not feasible.  Instead, the Debtors and their advisors decided that a comprehensive financial restructuring was necessary to align the capital structure with the long-term goals of the business.

75.     In early 2025, the Company began exploring restructuring paths with the Ad Hoc April 2026 Group represented by Ropes & Gray LLP (as counsel).  On January 15, 2025, the Debtors entered into the grace period under the April 2026 Notes and the July 2026 Notes relating to the payment of interest thereunder.  On February 14, 2025, and in connection with the ongoing discussions, the Ad Hoc April 2026 Group, the Issuers, and the April 2026 Notes Trustee entered into that certain *First Supplemental Indenture* (the "***April 2026 Supplemental Indenture***"), which amended the April 2026 Notes Indenture to provide for a sixty (60)-day grace period for any missed interest payment (extending the thirty (30)-day grace period) under the April 2026 Notes. The Debtors determined not to pay the interest under the July 2026 Notes.

76.     The Debtors and the Ad Hoc April 2026 Group had several discussions and exchanged restructuring proposals in the weeks leading up to the Petition Date.  Following the Debtors' entry into the April 2026 Supplemental Indenture, the hard-fought negotiations between the Debtors and the Ad Hoc April 2026 Group accelerated.  Ultimately, on March 3, 2025, the

parties were able to reach a deal in principle.  The terms of the deal are memorialized in the non-binding Restructuring Term Sheet annexed to the DIP Motion and set forth below.

## III.    ANTICIPATED PATH FORWARD

### A.    Generally

77.    As noted above, the Debtors have reached an agreement with the Ad Hoc April 2026 Group on the Restructuring Term Sheet that contemplates a chapter 11 plan that will be filed shortly after the commencement of the cases implementing the terms of the Restructuring Term Sheet.  The Ad Hoc April 2026 Group has agreed to finance the Chapter 11 Cases through a "new money" postpetition senior secured DIP Facility in an aggregate principal amount of approximately $80 million (plus approximately $105 million of April 2026 Note Obligations to be "rolled-up" into the facility).  Additionally, the Restructuring Term Sheet provides for among other among other things:

(i)    the entry by the Reorganized Debtors into the Exit Term Loan Facility (as defined therein), the proceeds of which will be used, among other things, to repay the DIP Facility in full;

(ii)    subject to the Restructuring Steps Exhibit (as defined therein), Exela will cause 100% of the equity interests of NEON Acquisition, LLC to be contributed to Exela Intermediate, pursuant to which NEON Acquisition, LLC, a Delaware limited liability company, Exela Enterprise Solutions, Inc. (f/k/a Novitex Solutions, Inc.), a Delaware corporation, and Novitex Enterprise Solutions Canada, Inc., a Canadian corporation, will become wholly owned subsidiaries of Exela Intermediate (the "***Neon Transaction***");

(iii)    in addition to the Neon Transaction, Debtor XCV-EMEA, non-Debtor BTC Int'l Holdings, Inc. ("***BTC***"), non-Debtor XBP Europe Holdings Inc. ("***XBP Europe***") and Debtor Exela Intermediate shall effectuate a series of transactions, which transactions are ultimately intended to result in the contribution, distribution, or cancellation and reissuance of the equity interests in XBP Europe held by BTC to the April 2026 Noteholders such that affiliated Holders receive 25% and non-affiliated Holders receive 75% of such reissued XBP Europe equity interests on the Plan Effective Date, which contribution, distribution or issuance, as applicable, is intended to qualify, to the extent available, for the exemption from registration provided by Section 1145(a) of the Bankruptcy Code (such transactions, collectively, the "***BTC Transaction***");

(iv)   the July 2026 Notes and the April 2026 Notes, including any related guarantees, will be discharged and cancelled on the terms set forth herein;

(v)   the Blue Torch Facility, including any related guarantees, will be repaid in full and in cash with the proceeds of the Exit Facility;

(vi)   the existing membership interests in Debtor Exela Technologies BPA, LLC ("**BPA**") will be cancelled;

(vii)   BPA will issue new equity interests ("**Reorganized BPA Equity**") to the April 2026 Noteholders such that affiliated Holders receive 25% and non-affiliated Holders receive 75% of such Reorganized BPA Equity, and will issue warrants for 7.5% of Reorganized BPA Equity (on a fully-diluted basis) with a strike price equal to Reorganized BPA Equity with an aggregate value equal to the Plan value of Reorganized BPA to the affiliate Holders (the "**Reorganized BPA Warrants**"); and

(viii)   subject to the Restructuring Steps Exhibit, in connection with the restructuring, XBP Europe shall purchase 100% of the Reorganized BPA Equity by issuing its common stock to holders of the Reorganized BPA Equity pro rata for such holders' ownership of Reorganized BPA Equity, and shall issue 5-year warrants for XBP Europe common stock (the "**XBP Europe Warrants**") to holders of Reorganized BPA Warrants in exchange therefor, all on terms acceptable to the Required Consenting Creditors and the Debtors pursuant to a mutually acceptable merger agreement agreed to by XBP Europe (the "**XBP Merger Agreement**") (the "**XBP Merger**").

**B.   Debtors' Need for Access to the DIP Facility**[27]

78.   Based on my review of the Debtors' actual and projected cash flows and underlying books and records, and in connection with discussions with the Debtors' advisors, I believe it is vital that the Debtors obtain immediate approval of the DIP Facility to ensure that the Debtors have immediate access to the interim new money financing and access to cash collateral necessary to continue operations and administer these Chapter 11 Cases.  Without immediate access to the proceeds of the proposed DIP Facility and use of cash collateral, the Debtors will lack sufficient liquidity to maintain their business operations after the Petition Date.

---

[27]   Capitalized terms in this <u>Section III.B.</u> shall have the meanings ascribed to them in the DIP Motion (defined below).

79.     Indeed, as detailed in the DIP Motion,[28] the Debtors anticipate having negative cash flow during the Chapter 11 Cases, and the liquidity provided by the DIP Facility is critical to, among other reasons, (a) provide operating liquidity across Debtor entities and meet the Debtors' working capital needs, and (b) bring the PNC AR Facility into compliance.

80.     Furthermore, without the DIP Facility, the Debtors' lenders would be unwilling to agree to the Debtors' use of their Cash Collateral and would not agree to the priming of their prepetition liens that would otherwise be necessary to obtain postpetition financing.  Without access to Cash Collateral or the incremental liquidity provided by the DIP Facility, the Debtors would face severe, immediate, and irreparable harm.

81.     As discussed above, on the effective date of the Plan, the Reorganized Debtors will incur a secured Exit Facility.  The DIP Facility and Exit Term Loan Facility will work together to provide long-term financing for the Debtors' continued operations at the outset of the Chapter 11 Cases and supply the reorganized Debtors with runway to operate post-emergence.

82.     Accordingly, I believe that the Debtors' access to the DIP Facility is both necessary and will provide sufficient liquidity to achieve the Debtors' value-maximizing goals and should therefore be approved.

## IV.     FACTS SUPPORTING RELIEF SOUGHT IN FIRST DAY PLEADINGS[29]

83.     In furtherance of their objective of preserving value for all stakeholders, the Debtors have filed the following First Day Pleadings and related orders (the "***Proposed Orders***")

---

[28]  "***DIP Motion***" means *Emergency Motion of Debtors for Interim and Final Orders  (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the  Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Related Relief.*

[29]  Unless otherwise defined herein, all capitalized terms in this <u>Part IV</u> shall have the meanings ascribed to them in the applicable First Day Pleadings.

contemporaneously herewith, and have therein requested that the Court consider entering the Proposed Orders granting the relief sought in First Day Pleadings.  For the avoidance of doubt, as to those First Day Pleadings that seek authorization to pay prepetition obligations, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations that are the subject of the First Day Pleadings.  The First Day Pleadings include:

A.   **Administrative and Procedural Pleadings**

    i.   *Emergency Motion of Debtors for Entry of an Order Directing Joint Administration of Chapter 11 Cases*

    ii.   *Emergency Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to File a Consolidated Creditor Matrix and List of the 30 Largest Unsecured Creditors; (II) Authorizing the Debtors to Redact Certain Personally Identifiable Information; (III) Approving the Form and Manner of Notice of Commencement; and (IV) Granting Related Relief*

    iii.   *Emergency Ex Parte Application for Entry of an Order Authorizing the Employment and Retention of Omni Agent Solutions, Inc. As Claims, Noticing, and Solicitation Agent*

    iv.   *Emergency Motion of Debtors for Entry of an Order (I) Extending the Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and 2015.3 Reports; and (II) Granting Related Relief*

B.   **Business Operation Motions**

    i.   *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Establishing Notification Procedures and Approving Restrictions on (A) Certain Transfers of Interests in the Debtors and (B) Claims of Certain Worthless Stock Deductions, and (II) Granting Related Relief*

    ii.   *Emergency Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to (A) Pay Certain Employee Compensation and Benefits and (B) Maintain and Continue Such Benefits and Other Employee-Related Programs; (II) Granting Relief from Automatic Stay With Respect to Workers' Compensation Claims; and (III) Granting Related Relief*

    iii.   *Emergency Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief*

    iv.   *Emergency Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Insurance Program Obligations, (B) Maintain the Insurance Policies Postpetition, (C) Maintain the Bonding Program, and (D) Maintain Postpetition Financing of Insurance Premiums, and (E) Honor Letters of Credit, and (II) Granting Related Relief*

v.   *Emergency Motion of Debtors for Entry of an Order (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, (II) Approving the Debtors' Proposed Form of Adequate Assurance of Payment to Utilities, (III) Establishing Procedures for Resolving Requests for Additional Adequate Assurance, and (IV) Granting Related Relief*

vi.   *Emergency Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to (A) Honor Prepetition Obligations to Customers and (B) Continue Customer Programs and (II) Granting Related Relief*

vii.   *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Existing Cash Management System, (B) Maintain Existing Business Forms, and (C) Continue Intercompany Agreements and Transactions, and (II) Granting Related Relief*

viii.   *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Trade Claims in the Ordinary Course of Business; (II) Confirming Administrative Expense Priority of Undisputed and Outstanding Prepetition Orders; (III) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (IV) Granting Related Relief*

**C.   DIP Motion**

i.   *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief*

**D.   Securitization Motion**

i.   *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Certain Debtors to Continue Selling, Contributing and Servicing Receivables and Related Rights Pursuant to the Securitization Program, (II) Modifying the Automatic Stay, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief*

84.   I have reviewed each of the First Day Pleadings, Proposed Orders, and exhibits thereto, or have otherwise had their contents explained to me, and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.  Moreover, I believe that the relief sought in each of the First Day Pleadings: (a) is vital to enabling the Debtors to make the transition to, and operate in, chapter 11 with minimal disruption to their businesses, and without loss of productivity or value; (b) is necessary to preserve valuable relationships with customers,

trade vendors, landlords, and other creditors; and (c) constitutes a critical element in the Debtors'

ability to successfully maximize value for the benefit of their estates and a prudent exercise of the

Debtors' business judgment.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  March 3, 2025

<div style="text-align: center; margin-left: 40%;">

*/s/ Randall S. Eisenberg*
Randall S. Eisenberg
Chief Restructuring Officer

</div>

## **Exhibit A-1**

**Company Organizational Chart**

# Company Organizational Chart

*As of the Petition Date*

Entity Legend:

- Debtor-Borrower, Issuer or Co-Issuer under the Blue Torch Facility, July 2026 Notes, or April 2026 Notes
- Debtor-Guarantors of April 2026 Notes
- Debtor-Guarantors of July 2026 Notes
- Debtor-Guarantors of Blue Torch Facility
- Debtor-Originators under PNC AR Facility
- Debtor- Originators under the BR Exar AR Facility



**<u>Exhibit A-2</u>**

**Debtors Organizational Chart**

# Debtors Organizational Chart[1]

## *As of the Petition Date*



Entity Legend:

- Borrower, Issuer or Co-Issuer under the Blue Torch Facility, July 2026 Notes, or April 2026 Notes
- Guarantors of April 2026 Notes
- Guarantors of July 2026 Notes
- Guarantors of Blue Torch Facility
- Originators under the PNC AR Facility
- Originators under the BR Exar AR Facility

1   This organizational chart sets forth only those entities within Company's corporate structure which commenced cases under Chapter 11 in March 2025. The Company's full corporate structure is set forth in Exhibit A-1.

**Exhibit B**

**List of Debtors**

| Entity Name | Federal Employee Identification Number (EIN) |
|---|---|
| BancTec (Canada), Inc. | N/A |
| BancTec (Puerto Rico), Inc. | 66-0393420 |
| BancTec Group LLC | 30-0809103 |
| BancTec Intermediate Holding, Inc. | 14-1857751 |
| BancTec, Inc. | 75-1559633 |
| BTC Ventures, Inc. | 32-0040859 |
| Charter Lason, Inc. | 41-2137542 |
| CorpSource Holdings, LLC | N/A |
| Deliverex, LLC | 51-0370088 |
| DFG2 Holdings, LLC | 37-1703603 |
| DFG2, LLC | 38-3888322 |
| DocuData Solutions, L.C. | 75-2926166 |
| Economic Research Services, Inc. | 58-1454192 |
| Exela Enterprise Solutions, Inc. | 13-3587073 |
| Exela Finance Inc. | 82-1893089 |
| Exela Intermediate LLC | 82-1884342 |
| Exela RE LLC | 23-2981757 |
| Exela Technologies BPA, LLC | 82-1880314 |
| Exela XBP, LLC | 84-5080737 |
| FTS Parent Inc. | 47-4616206 |
| HOV Enterprise Services, Inc. | 22-3520617 |
| HOV Services, Inc. | 38-3384800 |
| HOV Services, LLC | 26-0839966 |
| HOVG, LLC | 77-0611900 |
| J & B Software, Inc. | 23-2327305 |
| Kinsella Media LLC | 52-2301194 |
| Lason International, Inc. | 38-3402450 |
| Managed Care Professionals, LLC | 81-1143386 |
| Meridian Consulting Group, LLC | 59-3770509 |
| Neon Acquisition, LLC | 80-0947559 |
| Novitex Enterprise Solutions Canada, Inc. | N/A |
| Novitex Government Solutions, LLC | 30-0193564 |
| Novitex Holdings, Inc. | 38-3914247 |
| Novitex Intermediate, LLC | 80-0947386 |
| Pangea Acquisitions Inc. | 46-4861356 |
| Plexus Global Finance, LLC | 61-1694576 |
| RC4 Capital, LLC | 80-0868892 |
| Recognition Mexico Holding Inc. | 30-0994449 |
| Regulus America LLC | 22-2974594 |
| Regulus Group II LLC | 26-4545318 |

| Entity Name | Federal Employee Identification Number (EIN) |
|---|---|
| Regulus Group LLC | 23-2847269 |
| Regulus Holding Inc. | 26-3714081 |
| Regulus Integrated Solutions LLC | 52-2277055 |
| Regulus West LLC | 23-2866282 |
| Rust Consulting, Inc. | 41-1813634 |
| Rustic Canyon III, LLC | N/A |
| Services Integration Group, L.P. | 76-0531355 |
| SIG-GP, L.L.C. | N/A |
| SOURCECORP BPS Inc. | 51-0370086 |
| SOURCECORP Legal Inc. | 58-2482419 |
| SOURCECORP Management, Inc. | 75-2912986 |
| SOURCECORP, Incorporated | 75-2560895 |
| SourceHOV Canada Company | N/A |
| SourceHOV Healthcare, Inc. | 57-0835087 |
| SourceHOV Holdings, Inc. | 68-0683138 |
| SourceHOV LLC | 26-2270219 |
| TRAC Holdings, LLC | 20-5736962 |
| TransCentra, Inc. | 32-0345387 |
| United Information Services, Inc. | 42-1446157 |
| XCV-EMEA, LLC | 88-3869335 |

**Exhibit C**

**Debtors' Facilities**

| Address | City | State | Status |
|---|---|---|---|
| 1 Cabot Rd. | MEDFORD | MA | Lease |
| 16 International Dr. | EAST GRANBY | CT | Lease |
| 365 W Passaic St (Suite 187) | ROCHELLE PARK | NJ | Lease |
| 2037 South 4130 West (Goldman) | SALT LAKE CITY | UT | Lease |
| 2410 W. Ruthrauff Rd., Suite 110-J | TUCSON | AZ | Lease |
| 135 West Central Blvd. | ORLANDO | FL | Lease |
| 6400 N. Davis Highway | PENSACOLA | FL | Lease |
| 2540 Executive Center Circle West (Suite 103) | TALLAHASSEE | FL | Lease |
| 2813 Industrial Plaza Dr. | TALLAHASSEE | FL | Lease |
| 11764 Marco Beach Dr. | JACKSONVILLE | FL | Lease |
| 4901 Tower Ct. | TALLAHASSEE | AL | Lease |
| 6945 Northpark Blvd. | CHARLOTTE | NC | Lease |
| 100 Executive Center Dr. A11 | COLUMBIA | SC | Lease |
| 2701 E Grauwyler Rd. B1, B2, B3 | IRVING | TX | Lease |
| 5820 W. Cypress St. | TAMPA | FL | Lease |
| 20500 Belshaw Ave. | CARSON | CA | Lease |
| 307 23rd St. Ext. | SHARPSBURG | PA | Lease |
| 40 N Main St. | DAYTON | OH | Lease |
| 6330 S. Sandhill Rd. | LAS VEGAS | NV | Lease |
| 6716 Grade Ln. | LOUISVILLE | KY | Lease |
| 102 London Shopping Center | LONDON | KY | Lease |
| 8220 (A-F) Alpine Ave. | SACRAMENTO | CA | Lease |
| 26-34 Wall St. | BINGHAMTON | NY | Lease |
| 201 South Lyndale Ave. | FARIBAULT | MN | Lease |
| 3800 & 3840 Kilroy Airport Way | LONG BEACH | CA | Lease |
| 365 W Passaic St. (Suites 120, 185, 255 and 260) | ROCHELLE PARK | NJ | Lease |
| 4868 Highway 85 | FOREST PARK | GA | Lease |
| 10365 Railroad Dr. | EL PASO | TX | Lease |
| 601 W 26th St. | NEW YORK | NY | Lease |
| 2300 Brookstone Centre Pkwy. | COLUMBUS | GA | Lease |
| 100 Executive Center Dr. Lexicode, Suite 101 | COLUMBIA | SC | Lease |
| 124 Bermondsey Rd. | NORTH YORK | ONTARIO, CANADA | Lease |
| 510 E Township Line Rd. | BLUE BELL | PA | Lease |
| 1735 E 14 Mile Rd. | TROY | MI | Lease |
| 4537 & 4553 NW 112 St. | URBANDALE | IA | Lease |
| 1000 S. Perimeter Rd. | RANTOUL | IL | Lease |
| 9128 East Hampton Dr. | CAPITOL HEIGHTS | MD | Lease |
| 183 Plaza Dr. | WILDWOOD | MO | Lease |
| 4036 and 4050 South 500 West | SALT LAKE CITY | UT | Lease |

1

| 1155 Robert-Bourassa Boulevard | MONTREAL | QUEBEC, CANADA | Lease |
|---|---|---|---|
| 2480 Dunwin Dr. | MISSISSAUGA | ONTARIO, CANADA | Lease |
| 3137 E Elwood St. | PHOENIX | AZ | Lease |
| 758 Rainbow Rd. | WINDSOR | CT | Lease |
| 410 University Ave. | WESTWOOD | MA | Lease |
| 920 Second Ave South | MINNEAPOLIS | MN | Lease |
| 9495 Southwest 72nd St. | MIAMI | FL | Lease |
| 4101 Oakesdale Avenue SW | RENTON | WA | Lease |
| 606 South US Highway 31 | GEORGIANA | AL | Owned |
| 1250 W 14 Mile Rd. | TROY | MI | Owned |