**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

---------------------------------------------------------- x
                             :

In re:                              :     Chapter 11
                             :

DOCUDATA SOLUTIONS, L.C., *et al.*,    :     Case No. 25-90023 (CML)
                             :

          Debtors.[1]             :     (Joint Administration Requested)
                             :
---------------------------------------------------------- x

**DECLARATION OF STEPHEN SPITZER
IN SUPPORT OF (A) THE DEBTORS' DIP FINANCING MOTION AND
(B) THE DEBTORS' SECURITIZATION PROGRAM MOTION**

I, Stephen Spitzer, declare under the penalty of perjury:

1. I am the Deputy Chief Restructuring Officer of certain parent entities included as debtors and debtors in possession in the caption above (collectively, the "***Debtors***" and together with their subsidiaries and certain of their non-Debtor affiliates, the "***Company***")[2] Prior to becoming Deputy Chief Restructuring Officer (which occurred contemporaneously with the filing of the Chapter 11 Cases (defined below)), I advised the Debtors in my capacity as a Managing Director at AlixPartners LLP ("***AlixPartners***") which maintains its principal office at 909 3rd Avenue, New York, NY 10022 and maintains other offices throughout the world.  AlixPartners is the proposed financial advisor to the Debtors in the above-captioned chapter 11 cases (the "***Chapter 11 Cases***").

2. I submit this Declaration in support of (a) the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing,*

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/DocuDataSolutions. The Debtors' mailing address for the purposes of these cases is 2701 E. Grauwyler Road, Irving, TX 75061 USA.

[2]   For the avoidance of doubt, non-Debtor XBP Europe Holdings, Inc. and its subsidiaries are excluded from the definition of the Company.

*(II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief*, filed contemporaneously herewith (the "**DIP Motion**") and (b) the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Certain Debtors to Continue Selling Receivables and Related Rights Pursuant to the Securitization Program, (II) Modifying the Automatic Stay, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief*, filed contemporaneously herewith (the "**Securitization Program Motion**").[3]

3.      Unless otherwise indicated, all facts set forth in this Declaration are based upon (a) my personal knowledge or opinion based on my experience and expertise, (b) information I received from the Debtors, other members of the AlixPartners team, or the Debtors' other advisors, or (c) my review of relevant documents.   I am not being specifically compensated for this testimony other than through the proposed compensation that AlixPartners receives in its capacity as an advisor to the Debtors.   I am over the age of 18 years and am authorized to submit this declaration on behalf of the Debtors.   If I were called to testify, I would testify competently to the facts set forth below.

## I.      BACKGROUND AND QUALIFICATIONS

4.      I received my B.A. in economics from the University of Pennsylvania.   I have more than 20 years of corporate finance, advisory and restructuring experience.   In 2011, I obtained a Certified Insolvency and Restructuring Advisor designation.   Since joining AlixPartners in 2007, I have provided restructuring advice to companies, creditors, shareholders, and other interested parties on restructuring transactions both in chapter 11 and on an out-of-court basis.   I have been involved in a number of chapter 11 cases filed in the Southern District of Texas, including Lonestar

---

[3]     Capitalized terms used but not defined herein have the meanings ascribed to them in the DIP Motion or the Securitization Program Motion, as applicable.

Resources, Inc., Bruin E&P Partners, LLC, ConvergeOne Holdings, RobertShaw US Holdings, and Avaya, Inc. and more broadly involved in the chapter 11 cases of Hexion, Inc., Momentive Performance Materials, Inc., Sungevity, Inc., VER, Inc., and VIP Cinema Holdings, Inc.

5.      The Debtors retained AlixPartners on December 28, 2024 to provide advice and assistance in connection with the evaluation and implementation of strategic alternatives. AlixPartners has worked with the Debtors on a number of fronts, including cash forecasting and liquidity management, financial forecasting, business plan development, and general bankruptcy filing preparations.   Since AlixPartners' retention, I have worked closely with the Debtors' management team and other advisors to evaluate the Debtors' liquidity and cash needs in the event of a chapter 11 filing.  As a result of my work with the Debtors and my understanding of the Debtors' financial history and business operations, as well as my experience and training in the reorganization of financially distressed companies, I am competent to testify to the statements made herein.

## II.     THE DEBTORS' CRITICAL NEED FOR THE DIP FACILITY, THE POSTPETITION SECURITIZATION PROGRAM, AND ACCESS TO CASH COLLATERAL

6.      The Debtors' business is cash intensive, with significant daily and weekly costs required to satisfy obligations to, among others, employees, printers, paper providers, postage costs, third-party service providers, landlords, technology vendors, and common carriers.

7.      Together with the Debtors' management team, and through negotiations with the DIP Lenders, my team, with my oversight, developed the DIP Budget attached hereto as Exhibit 1.  The DIP Budget contains typical line items for each category of receipts and disbursements, such as cash received from sales to the securitization facility, payment of employee payroll and payroll taxes and payments to third party suppliers, during the first 13 weeks of the Chapter 11 Cases.   The DIP Budget reflects the Debtors' best views of all reasonable, necessary, and

foreseeable expenses expected to be incurred in connection with the operation of the Debtors' business and administration of the Chapter 11 Cases, including restructuring costs for the period in the DIP Budget.

8.     The ability of the Debtors to satisfy their ongoing business expenses when due and the Debtors commitments to their customers is essential to the Debtors' continued operation of their business during the pendency of these Chapter 11 Cases.  However, a majority of the Debtors' accounts receivable have been sold in accordance with the Prepetition Securitization Program, and the Debtors will incur significant working capital expenses in order to generate and collect new receivables from its operations.  Accordingly, absent the continued access to the Securitization Program, the Debtors will have no access to cash to fund operations.  Additionally, the Debtors are currently out of formula for the Prepetition Securitization Program, and the Debtors will require additional financing to support the business while the facility pays itself down through the collection of receivables during these cases.  As of the Petition Date, the Debtors' total cash balance is approximately $0.1 million.  Without additional postpetition financing in the amounts set forth in the DIP Budget, current and anticipated liquidity in the form of Cash Collateral is wholly insufficient to cover the Debtors' operating expenses, including making outstanding payments to vendors, and other costs of administering these cases.  Thus, I do not believe it would be prudent, or even possible, for the Debtors to rely solely on Cash Collateral to fund their operations and the costs of these Chapter 11 Cases.

9.     In order to avoid immediate and irreparable harm to the Debtors and the value of their estates, the Debtors need immediate access, not only to Cash Collateral, but also to both (a) liquidity provided through the Postpetition Securitization Program and (b) the DIP Facility, which includes $80 million of postpetition "new money" financing of which $50 million will be provided

on an interim basis and $30 million will be provided on a final basis.  Specifically, without access to *both* the DIP Facility and the Postpetition Securitization Program at this critical stage, the Debtors would be unable to pay employees, vendors, or other critical operating expenses in the coming weeks, which would result in a value-destructive interruption to their business and, simultaneously, eliminate their best  chance for consummating a comprehensive restructuring.

10.     Importantly, the continuation of the Prepetition Securitization Program on a postpetition basis (through the Postpetition Securitization Program, the terms of which are explained further below) is absolutely critical for the Debtors to maintain sufficient liquidity during these cases.   Absent the agreement among the Debtors, their non-Debtor subsidiary, Exela Receivables 3, LLC ("***ER3***"), Exela Receivables 3 Holdco, LLC ("***ER3 Holdco***"), PNC Bank, National Association, as administrative agent under the Receivables Purchase Agreement defined below (in such capacity, the "***Securitization Program Agent***"), and the purchasers party thereto to continue the Prepetition Securitization Program, I understand that the chapter 11 filing would constitute an event of termination under the Prepetition Securitization Program, which would effectively shut off an essential source of liquidity for the Debtors.  Upon an event of termination, I understand that the Securitization Program Agent would be able to enforce its security interest in the Receivables (as defined in the Securitization Program Motion) and direct all collections on such Receivables to the satisfaction of the outstanding and subsequently accrued obligations under the Prepetition Securitization Program.  Thus, the Debtors would not be able to access the daily cash collections on Receivables that are typically an essential component of their liquidity until

the Prepetition Securitization Program is repaid in full.[4]   Continuation of the Prepetition Securitization Program will avoid such an immediate adverse impact on the Debtors' liquidity.

11.    Moreover, the Postpetition Securitization Program contemplates the continuation of available financing thereunder in an amount of $110 million and the continuation of the program is supported by the DIP Lenders and parties to the Restructuring Support Agreement.

12.    While access to the Postpetition Securitization Program is a critical component to ensuring the Debtors have sufficient liquidity during these Chapter 11 Cases, it alone is insufficient to satisfy all of the Debtors' postpetition financing needs, including the Debtors' financing needs during the interim period.  Indeed, in addition to the Postpetition Securitization Program and Cash Collateral, the Debtors also need immediate access to the DIP Facility for a variety of reasons, including:

- The Debtors need to maintain minimum liquidity of $15 million to mitigate the risks associated with volatility in their cash flows due to weekly (and intra-week) swings in cash due to production of materials for customers that the Debtors regularly experience given the nature of their business, and unforeseeable short-term disruptions that can occur from time-to-time. The Debtors began these cases with approximately $0.1 million of cash on hand, which is meaningfully less than their regular operating liquidity target.

- Additionally, in my experience, the volatility and unpredictability of a particular company's cash flows generally increases in the weeks immediately following the Petition Date, particularly if the Debtors' customers and vendors lack confidence in the Debtors' financial wherewithal to successfully navigate the chapter 11 process and to have sufficient liquidity to satisfy their day-to-day operating needs. While the potential for these variances was accounted for in the permitted variances under the DIP Facility, they are not expressly assumed to occur in the projected receipts and disbursements, and the Debtors' liquidity must be sufficient to absorb the variances that may reasonably be experienced during the pendency of these cases.  Immediate access to substantial new liquidity sends a positive message to the market and appeases trade creditors, minimizing potential business disruption and changes in terms. The DIP Budget assumes that the market, customers, and

---

[4]   The mechanics of the Prepetition Securitization Program are further described in the Securitization Program Motion.

6

trade creditors have the comfort of the projected interim financing; without it the debtors cash needs could be even higher than anticipated.

- Finally, while the relief sought in the Securitization Program Motion (if granted) will allow the Debtors to continue the Securitization Program for the first three weeks of these cases, the Debtors are required to pay down amounts owed to PNC under the Securitization Program to bring it back into formula, before gaining the full benefits of the program.  Accordingly, the Debtors will not be receiving the full liquidity under the Securitization Program at the outset of these cases and need the proceeds of the DIP Facility to fund the operations of the business.

13. The Debtors require immediate access to the DIP Facility and the use of Cash Collateral to account for these contingencies, and fund the anticipated expenses of their operations and these Chapter 11 Cases.

14. If this Court grants the Debtors access to the Postpetition Securitization Program and the DIP Facility (including the use of Cash Collateral), they are expected to have adequate liquidity for the anticipated duration of the Chapter 11 Cases, which will permit the Debtors to make critical payments that are essential for the continued management, operation, and preservation of their business.  Approval of the Postpetition Securitization Program and the DIP Facility will send a strong and essential signal to the Debtors' employees, customers, and vendors that the Debtors will have the financing necessary to maintain their operations and meet their financial commitments throughout the course of the Chapter 11 Cases.  As a result, I believe that entry into the Postpetition Securitization Program and the DIP Facility are in the best interests of the Debtors' estates and reflect a sound exercise of the Debtors' business judgment.

## III.   THE DEBTORS' EFFORTS TO SECURE POST-PETITION FINANCING

15. When the Debtors, in consultation with their advisors, determined that commencing the Chapter 11 Cases was the most likely path for the Debtors, the Debtors, with the assistance of AlixPartners, assessed the market for postpetition financing options based on the Debtors' assessment of their liquidity needs.  Specifically, in early 2025, the Debtors, with the assistance of

7

AlixPartners, reached out to 6 potential financing sources, including existing noteholders and third parties.  While the Debtors received term sheets from three of these parties, except for the DIP Lenders, none of term sheets represented an actionable postpetition financing proposal.  Among other things, the parties that responded with financing proposals generally expressed an unwillingness to lend on a junior basis, provide the level of liquidity necessary to fund the Debtors' operations, and/or engage in a priming fight with the Debtors' prepetition noteholders, which likely would be necessary as the Debtors believe that they have few, if any, unencumbered assets which could otherwise be used to secure any such postpetition financing.  Additionally, during discussions with the advisors to the Debtors' prepetition noteholders about the Debtors' financing needs in the weeks leading up to the Chapter 11 Cases, the prepetition noteholders indicated that they would not consent to the Debtors' incurrence of financing by any other party having priming or *pari passu* liens on the collateral securing the obligations to them.

16.     Given the foregoing, the Debtors, in consultation with AlixPartners and their other advisors, focused on addressing the Debtors' liquidity needs through two means: (a) postpetition financing provided by the Debtors' prepetition noteholders and term loan lender and (b) the continuation of the Securitization Program during the Chapter 11 Cases.  Ultimately, however, the Debtors' prepetition term loan lender was unable to provide financing given the terms of the intercreditor agreement governing the rights between the term loan lender and April 2026 Noteholders and the Debtors were forced to look elsewhere.  Ultimately, the Debtors' only viable option was to negotiate potential debtor-in-possession financing with the prepetition noteholders.  Specifically, as noted in the Motions, with the assistance of their advisors, while negotiating the terms of the DIP Facility with certain of their prepetition noteholders, the Debtors also negotiated certain amendments to the Prepetition Securitization Program and related documents (the

"*Securitization Program Amendments*"), which are effectively designed to continue the Securitization Program postpetition (the DIP Facility and the Securitization Program, collectively, the "*Financings*").

## IV.     THE MATERIAL TERMS OF THE PROPOSED FINANCINGS

### A.     The DIP Facility

17.     Pursuant to the DIP Facility, the Debtors seek authority to obtain postpetition financing which consists of (A) a new money term loan facility in the aggregate original principal amount of up to $80 million (the "*DIP New Money Loans*") and (B) subject to entry of the DIP Orders, the conversion of up to $105 million of April 2026 Notes into DIP term loans (the "*Roll-Up Loans*").[5]

18.     In connection with the DIP Facility, the Debtors have agreed, subject to Court approval, to pay interest and certain fees to the DIP Lenders.  Specifically, the Debtors have agreed to pay an interest rate of 12% which is PIK.  Additionally, in connection with a backstop agreement with the parties guaranteeing that the facility will be fully funded, the Debtors have agreed to a fee equal to 5% of the new equity in the reorganized Debtors. The proposed DIP Facility also contains certain milestones that the Debtors must meet throughout the Chapter 11 Cases.

### B.     The Securitization Program

19.     As part of the Securitization Program, certain of the Debtors sell and contribute their accounts receivable to ER3 Holdco in exchange for cash and equity capital in ER3 Holdco. In turn, ER3 Holdco sells and contributes those accounts receivable to ER3 in exchange for cash and equity capital in ER3.  ER3 obtains cash to pay the purchase price for those accounts receivable from the proceeds of investments made by third-party purchasers (PNC Bank, National

---

[5]     As noted in the DIP Motion, the Debtors are also seeking authority to use Cash Collateral of the prepetition noteholders as provided in the proposed DIP Orders.

Association is currently the sole purchaser) pursuant to that certain Receivables Purchase Agreement entered into by and among ER3, as seller, non-debtor Exela Technologies, Inc, as initial servicer, PNC Bank, National Association, as a purchaser, the other purchasers from time to time party thereto, and the Securitization Program Agent (the "**Receivables Purchase Agreement**").  As referenced above, without the Securitization Program Amendments among the Debtors, ER3 Holdco, ER3, the Securitization Program Agent and the purchasers under the Receivables Purchase Agreement, the commencement of the Chapter 11 Cases would have triggered an event of termination under the Receivables Purchase Agreement.

20.     As noted in the Securitization Program Motion, in exchange for the continuation of the Securitization Program for the duration of the Chapter 11 Cases, the Debtors and their non-debtor affiliates, Exela Technologies, Inc., ER3 and ER3 Holdco have agreed to, among other things, a facility limit of $110 million under the Securitization Program, extension of the Securitization Program's tenor to December 31, 2025 (from June 17, 2025), certain transaction fees, additional covenants, representations, and warranties, and modifications to the required reserves, amortization and event of termination provisions during the Chapter 11 Cases.   In addition, I understand that the Securitization Program Amendments contemplate a conversion of the terms of the Securitization Program into a post-emergence receivables facility.

21.     Since February 2024, in exchange for immediate liquidity, (a) the Rust Originators have continuously sold or contributed certain ordinary-course trade receivables to Rust RPA Seller and (b) Rust RPA Seller subsequently sold or pledged those receivables to Rust RPA Buyer, in each case pursuant to the Rust Securitization Transaction Documents.  The Rust Securitization Program has repeatedly provided critical funding to the Debtors on short notice and in exigent circumstances, including a $1,475,000 advance on the eve of the Petition Date.

## V.     THE ROLL-UP LOANS CONSTITUTED A REQUIRED TERM OF THE PROPOSED DIP FACILITY

22.     Based on my involvement in negotiations and discussions with advisors to the DIP Lenders, I understand that the DIP Lenders would not have provided the proposed DIP Facility absent the Roll-Up Loans, which would have left the Debtors with limited or, more likely, no options to maximize value for its stakeholders.  Generally speaking, roll-up loans to refinance prepetition debt, such as those provided under the proposed DIP Facility, are a common feature of debtor-in-possession financing agreements.  Inclusion of the amounts due under the Prepetition Notes in the Roll-Up Loans were an essential inducement of the DIP Lenders' willingness to backstop and provide $80 million in DIP New Money Loans to the Debtors postpetition and a DIP facility sufficiently large enough to fund the Debtors' chapter 11 cases.

23.     Based on my involvement, I believe that the roll-up of the Roll-Up Loans is ultimately fair, reasonable, and a necessary inducement for the DIP Lenders to agree to enter into the proposed DIP Facility on these terms, and in a sufficient amount, and consent to the use of Cash Collateral, each of which is essential to the viability of the Chapter 11 Cases and the Debtors' ultimate successful restructuring  process.

## VI.     THE PROPOSED FINANCINGS ARE THE BEST POSTPETITION FINANCING ARRANGEMENTS PRESENTLY AVAILABLE TO THE DEBTORS

24.     Based on my experience with debtor-in-possession financing transactions, my review of fees and rates in comparable financings, as well as my involvement in the efforts to secure postpetition financing for the Debtors, I believe that the proposed Financings, taken as a whole, are the best presently available financing options available to the Debtors under the facts and circumstances of the Chapter 11 Cases.

25.     *First*, the proposed Financings are expected to provide the Debtors with access to the amount of capital that the Debtors, in consultation with their advisors, believe is necessary to effectively and efficiently administer the Chapter 11 Cases.

26.     *Second*, the Debtors, with the assistance of AlixPartners, solicited other sources of postpetition financing to determine whether the Debtors could obtain other postpetition financing arrangements on better terms.  However, none of the other financing sources contacted provided an actionable postpetition financing proposals.  The proposals received contained fees that were substantially higher than what the Debtors would pay under the DIP Facility, or were for amounts that were insufficient to fund these Chapter 11 cases.  In addition, none of these parties contacted were willing to provide any financing on a junior basis and none of the parties were willing to engage in any priming fight with the Debtors' prepetition noteholders.  Notably, the prepetition noteholders' advisors expressly advised the Debtors and their advisors that they were not willing to consent to the Debtors' incurrence of financing by any other party having priming or *pari passu* liens on the collateral securing the obligations to the prepetition noteholders.

27.     *Third*, I believe that the principal economic terms proposed under the DIP Facility and the Securitization Program, as amended by the Securitization Program Amendments, such as the contemplated fees and interest rate, and the Financings, on the whole, are customary and usual for financings of these types and, moreover, the blended cost of capital of the Financings, viewed on a combined basis, are, in the aggregate, generally consistent with the cost of debtor-in-possession financings in comparable circumstances.

28.     For the DIP Facility, AlixPartners reviewed 67 cases filed in the Southern District of Texas over the last three years that had term loan facilities as part of their DIP financing.  These facilities contained fees associated with them that are typical for financings in chapter 11, including

upfront or commitment fees, exit fees, and backstop fees.  Average upfront or commitment fees were 3.5%, average exit fees were 3.5%, and average backstop fees were 6.8%. Many of the DIP facilities contained more than one of these fees, with the average overall fee paid equal to 7.7%, with these amounts typically paid in cash.

29.     The proposed DIP Facility, however, includes only a Backstop Fee, which is payable with 5% of the equity in newly Reorganized Debtors post emergence.  The structure of this fee is highly beneficial to the Debtors.  First, it has no cash impact to the Debtors during the Chapter 11 Cases.  Second, it has value only upon the successful completion of the contemplated restructuring transaction.

30.     The DIP Facility also has an interest rate of 12%.  Comparable DIP term loan facilities had a mixture of rates both fixed and based on SOFR or base rate.  The average rate across the facilities was 12.4%, indicating that the proposed DIP Facility is consistent with other facilities in this jurisdiction.  Additionally, the proposed DIP Facility interest is payable-in-kind (PIKed), reducing the overall cash cost for the case.

31.     The DIP Facility also has a one-to-one roll-up of pre-petition debt to new money provided.  Based on our review of cases over the last three years, of the chapter 11 cases filed in the Southern District of Texas that had a term loan DIP in the last three years, 54% of them had a debt roll-up in the agreement.  Of the agreements with roll-ups, the average size of pre-petition debt rolled-up versus new money provided was 1.71 to 1.  Therefore, I believe the Debtors' proposed roll-up of $105 million in pre-petition debt is in line with prior DIP facilities approved in this District.

32.     Additionally, with respect to the DIP Facility, the Debtors were able to obtain certain concessions that improved the terms of the proposed DIP Facility over the course of

negotiations.  For example, as compared to the initial proposed terms, which included: (a) 3% upfront fee, (b) 5% exit fee, (c) 5% cash backstop fee, and (d) 3% backstop fee paid in equity, the DIP Facility only contains a 5% Backstop Fee, whereby each DIP Backstop Party shall receive its pro rata share of 5.00% of the equity interests of the reorganized Debtors.  Through negotiations, the Debtors were able to get many of these fees removed, providing better economics for the Debtors.

33.     AlixPartners also review revolving cash flow and factoring facilities for cases filed in the Southern District of Texas during the last three years.  Many of these facilities contained fees for fronting, commitment to the new facility and exit.  For commitment and fronting fees, on average the fees equaled 2% of the facility size, and exit fees equaled 2.5% of the facility size.  Based on this information, I believe the fees contained within the Securitization Program are reasonable.

34.     *Fourth*, based on discussions in which I participated, the case milestones contained in the DIP Facility were required by the prepetition noteholders, who deemed such milestones an integral component of the DIP Facility.  I also believe, based on my experience, that such milestones are customary and usual for restructurings under similar circumstances.

## VII.   THE PROPOSED FINANCINGS WERE NEGOTIATED AT ARMS' LENGTH AND IN GOOD FAITH

35.     Negotiations around the proposed terms of the DIP Facility and Securitization Program, including the interest rates and fees, took place over the course of five weeks.  In my view, based on the discussions I observed and in which I participated, and my experience negotiating other financings, these negotiations were conducted at arm's length.  All parties were separately represented by sophisticated counsel, and at all times engaged in a good faith negotiations that ultimately culminated in the proposed Financings.

## VIII.   THE TRANSFER OF RECEIVABLES CONSTITUTES A TRUE SALE

36.     Based on the structure of the Securitization Program and the intent of the parties as evidenced in the Securitization Transactions Documents as set forth in greater detail below, I understand that the transfers of Receivables[6] and Related Assets[7] by the Originators to ER3 Holdco under First Tier PSA are true sales and true contributions and that the Receivables and Related Assets transferred under the First Tier PSA, and the proceeds thereof, are not property of any Debtor's estate.

37.     The First Tier PSA expressly lays out the intent of the parties. It states, among other things, that "each [party] intend[s] the transactions hereunder to constitute absolute and irrevocable true sales or true contributions or absolute assignments of Receivables and the Related Assets by each Originator to [ER3 Holdco] providing [ER3 Holdco] with the full risks and benefits of ownership of the Receivables and Related Assets…." First Tier PSA, § 2.05.  This intention is also expressly reflected in the preamble of the First Tier PSA. In addition, under the First Tier PSA, each Originator has represented and warranted that the First Tier PSA "constitutes an absolute and irrevocable valid sale, transfer and assignment or contribution, as applicable, of the Receivables

---

[6]   "Receivables" shall have the meaning as in the RPA, which includes "any account receivable or other right to payment from a Person, whether constituting an account, chattel paper, payment intangible, instrument or a general intangible, in each case, including the right to payment of any interest, finance charges, fees and other payment obligations of such Person with respect thereto; provided, however, that Excluded Receivables shall not constitute Receivables."

[7]   "Related Assets" shall have the meaning as in the First Tier PSA, which includes "all (a) all rights to, but not any obligations under, all Related Security with respect to the Receivables, (b) all Records (but excluding any obligations or liabilities under the Contracts), (c) all Collections in respect of, and other proceeds of, the Receivables or any other Related Security, (d) all rights, claims, causes of actions and remedies of any Originator under any [Securitization Transaction Documents] and any other rights or assets pledged or otherwise Conveyed to [ER3 Holdco] hereunder and (e) all products and proceeds of any of the foregoing. For the avoidance of doubt, the 'Related Assets' shall include any and all rights of an Originator (but none of the obligations of such Originator) under each Contract pursuant to which a Receivable arises and all of such rights shall be Conveyed to Buyer hereunder and upon such Conveyance the Originator shall have no continuing right, title or interest in such Contract."

originated by such Originator and the Related Assets to Buyer free and clear of any Adverse Claim." First Tier PSA, § 4.02(a).

38.     In addition, the Originators have no rights under the Securitization Transaction Documents to repossess any Receivables or Related Assets, which is consistent with the Debtors' understanding that this is a true sale of the Receivables and Related Assets from the Originators to the ER3 Holdco.  In addition, ER3 Holdco does not have any obligation to account for, replace, substitute or return any of the Receivables or Related Assets or the collections and charges from them to the Originators if such collections exceed the consideration for the Receivables and Related Assets.  Subject to the terms of the Securitization Transaction Documents, ER3 Holdco has the sole right to retain any gains or profits from buying, selling, operating or holding its Receivables and Related Assets.  It also has the sole risk and responsibility for any losses or damages from such activities.[8]

39.     In sum, the First Tier PSA makes clear that ER3 Holdco holds the full risks and benefits of owning the Receivables and Related Assets, such that the Receivables and Related Assets are not part of any Originator's estate if such Originator files for bankruptcy.

40.     This intent of the parties (each of which are sophisticated legal entities), as set forth in the First Tier PSA, is further evidenced by the conduct of the parties, including (a) all Obligors making all payments directly to "Collection Accounts," which are accounts maintained by ER3 (which is ER3 Holdco's assignee with respect to all Receivables and Related Assets) and (b) each Originator maintaining books and records that reflect sales of the Receivables and Related Assets pursuant to the First Tier PSA.

---

[8]     The First Tier PSA has some limited recourse for ER3 Holdco against the Originators (*e.g.*, for customary dilutive actions, such as customer rebates and credits and returned goods) through certain "deemed collection" provisions and indemnities, but those provisions and indemnities do not cover credit-losses on the Receivables and are not unconditional guarantees of either the value of the Sold Assets or any obligations of ER3 Holdco.

## IX.   ER3 HOLDCO AND ER3 CORPORATE SEPARATENESS

41.   Further, I understand that ER3 Holdco and ER3 are entities that are distinct and separate from the Debtors, as they conduct independent business activities, maintain distinct record keeping and management, and institute proper safeguards to avoid comingling of property or accounts.

42.   ER3 Holdco is a Delaware limited liability company whose business activities are limited to those set forth in its limited liability operating agreement or as otherwise permitted by the laws of the State of Delaware.  Specifically, ER3 Holdco's operating agreement provides for the following:

> (a) limiting ER3 Holdco's business and activities solely to (i) entry into the First Tier PSA, RPA, and the other Securitization Transaction Documents, and (ii) the purchase of the Receivables and Related Assets pursuant to the First Tier PSA;

> (b) requiring ER3 Holdco to, at all times, (i) maintain its own books and records, separate from those of any affiliate; (ii) hold itself out as a separate legal entity; (iii) ensure that its property is not commingled with the property of its affiliates; (iv) pay for its assets using its own accounts rather than the accounts of the Debtors; (v) otherwise conduct and report the financial and business affairs, as well as the specific assets and liabilities, of ER3 Holdco so as to be readily distinguishable from those of its affiliates; and (v) maintain an arm's-length relationship with any affiliate;

> (c) requiring it to be managed by, or under the direction of, its manager;

> (d) detailing qualifications for independent managers to the extent that there is any Obligation (*i.e.*, any outstanding indebtedness or liability of ER3 Holdco or its affiliates) that requires such roles by independent managers;

> (e) requiring written consent of its manager and its independent managers for it to take any Material Action (which is defined in the relevant operating agreement of ER3 Holdco to refer to, among other things, the filing of a bankruptcy petition, appointing a receiver, causing insolvency, effectuating payment moratoriums, and initiating a consolidation or merger or asset sale); and

(f) authorizing any independent manager to continue the Company without dissolution, in the event that all then-current members of ER3 Holdco cease to be members.

43.     Similarly, the operating agreement of ER3, the buyer of the Receivables and Related Assets pursuant to the Second Tier PSA, contains provisions such as restricting its business and activities to only those permitted in the Securitization Transaction Documents (including the Second Tier PSA) and purchasing Receivables and Related Assets pursuant to the Second Tier PSA, maintaining its separateness from its affiliates, maintaining at least one independent manager, requiring the written consent of an independent manager for any "Material Action"[9], and providing for the continuation of ER3 by an independent manager in case of a loss of all members.

44.     Upon information and belief, ER3 Holdco and ER3 both have carried on their respective businesses in accordance with their corporate governance formalities (as set forth above) in all material respects.  They also each operate as a special purpose entity and in a manner that preserves their corporate separateness from the business and affairs of their respective member or members, as applicable, or any affiliate thereof.   In addition to the separateness provisions contained in ER3 Holdco's and ER3's respective organizational documents, ER3 Holdco's and ER3's corporate separateness is further evidenced by (a) the procedures ER3 Holdco and ER3 are required to follow regarding their respective separateness; (b) the reasonable reliance of the Purchasers and the Administrative Agent upon ER3 Holdco's and ER3's separateness from the Debtors as evidenced by the Securitization Transaction Documents and ER3 Holdco's and ER3's organizational documents; and (c) the absence of reasonable reliance on the part of the Debtors' creditors, current or future, upon the assets of ER3 Holdco and ER3, to satisfy the obligations of the Debtors.

---

[9]     This term has a substantially similar meaning as the term defined in the operating agreement of ER3 Holdco.

45.     As such, I understand that ER3 Holdco and ER3 have operated and maintained their legal status as independent, separate and distinct entities, at all times up until the date of this Declaration.

## CONCLUSION

46.     In sum, for the reasons stated above, and based on my experience with debtor-in-possession financing transactions as well as my participation and involvement in the solicitation of postpetition financing alternatives for the Debtors, I believe that the proposed Financings, taken together as a whole, offer the best presently available financing options for the Debtors under the facts and circumstances of the Chapter 11 Cases.  Additionally, I believe that the principal economic terms proposed under the Securitization Program, as amended by the Securitization Program Amendments, and the DIP Facility, such as the contemplated fees and interest rate, on the whole, are customary and usual for financings of these types and, moreover, the blended cost of capital of the Financings, viewed on a combined basis, are, in the aggregate, generally consistent with terms of DIP financings in comparable circumstances

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


Dated:  March 3, 2025
New York, New York                                    */s/Stephen Spitzer*_____
                                                      Stephen Spitzer
                                                      Managing Director
                                                      AlixPartners LLP

**Exhibit 1**

**DIP Budget**

**DocuData Solutions, et al**
**Initial Budget**

($ in thousands)

| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | 13 Wk Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week #:** | | | | | | | | | | | | | | |
| **Week Ending:** | 3/7 | 3/14 | 3/21 | 3/28 | 4/4 | 4/11 | 4/18 | 4/25 | 5/2 | 5/9 | 5/16 | 5/23 | 5/30 | 5/30 |
| **Actual / Forecast:** | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| **Receipts** | | | | | | | | | | | | | | |
| Receipts | $0 | $12,237 | $15,988 | $14,082 | $16,664 | $16,835 | $11,154 | $9,220 | $14,942 | $17,278 | $12,131 | $17,387 | $17,447 | $175,366 |
| **Total Receipts, Net** | - | 12,237 | 15,988 | 14,082 | 16,664 | 16,835 | 11,154 | 9,220 | 15,342 | 18,278 | 13,131 | 16,387 | 16,447 | 175,766 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Accounts Payable - Post Petition | (2,297) | (2,256) | (2,213) | (2,213) | (2,170) | (2,646) | (2,539) | (2,539) | (2,431) | (3,573) | (2,978) | (2,978) | (2,382) | (33,215) |
| Postage | (3,432) | (3,042) | (3,042) | (4,042) | (4,023) | (4,018) | (4,018) | (4,018) | (4,018) | (4,018) | (4,018) | (2,682) | (2,682) | (47,051) |
| Payroll & Benefits | (5,697) | (7,104) | (3,863) | (5,708) | (5,338) | (5,363) | (3,609) | (5,391) | (3,608) | (6,975) | (3,545) | (5,299) | (3,102) | (64,600) |
| Taxes | (1,434) | (1,327) | (1,572) | (1,149) | (2,298) | (1,600) | (966) | (541) | (384) | (314) | (324) | (314) | (236) | (12,458) |
| Foreign Operations | (2,359) | (1,670) | (707) | (125) | (3,135) | (461) | (1,041) | (152) | (3,143) | (933) | (969) | (271) | (3,519) | (18,484) |
| Other Disbursements | (848) | (1,627) | (595) | (470) | (1,271) | (1,202) | (590) | (290) | (910) | (1,202) | (290) | (290) | (470) | (10,054) |
| **Total Operating Disbursements** | (16,066) | (17,025) | (11,992) | (13,706) | (18,235) | (15,290) | (12,763) | (12,931) | (14,495) | (17,015) | (12,123) | (11,833) | (12,390) | (185,864) |
| **OPERATING CASH FLOW** | (16,066) | (4,788) | 3,996 | 376 | (1,571) | 1,545 | (1,609) | (3,710) | 848 | 1,263 | 1,007 | 4,554 | 4,056 | (10,098) |
| **Non-Operating Cash Flows** | | | | | | | | | | | | | | |
| Vendor Payments - Pre Petition | - | - | (1,754) | (1,754) | (1,754) | (1,754) | (1,754) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (14,769) |
| Interest and Financing Fees | (8,578) | - | - | (548) | (272) | - | - | - | (685) | (272) | - | - | (548) | (10,904) |
| Bankruptcy Related Payments | - | (350) | - | - | - | - | - | - | (500) | - | - | - | - | (850) |
| Professional Fees (Restructuring) | (1,125) | (1,125) | (1,125) | (2,775) | (875) | (2,675) | (875) | (2,525) | (580) | (580) | (1,900) | (580) | (2,230) | (18,970) |
| **Total Non-Operating Cash Flows** | (9,703) | (1,475) | (2,879) | (5,077) | (2,901) | (4,429) | (2,629) | (3,525) | (2,765) | (1,852) | (2,900) | (1,580) | (3,778) | (45,493) |
| **NET CASH FLOW** | ($25,769) | ($6,263) | $1,118 | ($4,701) | ($4,472) | ($2,884) | ($4,238) | ($7,235) | ($1,918) | ($589) | ($1,893) | $2,974 | $278 | ($55,591) |
| **Beginning Cash** | $100 | $24,331 | $18,068 | $19,186 | $44,485 | $40,013 | $37,130 | $32,892 | $25,657 | $23,739 | $23,150 | $21,257 | $24,231 | $100 |
| Net Cash Flow | (25,769) | (6,263) | 1,118 | (4,701) | (4,472) | (2,884) | (4,238) | (7,235) | (1,918) | (589) | (1,893) | 2,974 | 278 | (55,591) |
| DIP Funding / (Repayment) | 50,000 | - | - | 30,000 | - | - | - | - | - | - | - | - | - | 80,000 |
| **Ending Cash** | $24,331 | $18,068 | $19,186 | $44,485 | $40,013 | $37,130 | $32,892 | $25,657 | $23,739 | $23,150 | $21,257 | $24,231 | $24,509 | $24,509 |

Receipts / Disbursements / Non-Operating / Liquidity