IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

------------------------------------------------------------ x
In re: : Chapter 11
 :
DOCUDATA SOLUTIONS, L.C., *et al.*,[1] : Case No. 25-90023 (CML)
 :
       Debtors. : (Jointly Administered)
 :
------------------------------------------------------------ x

**DEBTORS' MOTION FOR ENTRY OF
AN ORDER (A) AUTHORIZING ENTRY INTO AND
PERFORMANCE UNDER THE SETTLEMENT AGREEMENT
WITH THE IBML PARTIES, (B) AUTHORIZING ASSUMPTION
OF EXECUTORY CONTRACTS AND (C) GRANTING RELATED RELIEF**

> **If you object to the relief requested, you must respond in writing. Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within twenty-one days from the date this motion was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within twenty-one days from the date this motion was filed. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

The above-captioned debtors and debtors in possession (collectively, the "***Debtors***") respectfully state the following in support of this motion (the "***Motion***"):

**RELIEF REQUESTED**

1. As set forth below, the IBML Parties (defined below) are critical contract counterparties for the Debtors' business. However, certain disputes have arisen between the Debtors and the IBML Parties regarding alleged unpaid claims under the operative contracts between the parties. The Debtors and the IBML Parties, working in good faith, have reached a

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/DocuDataSolutions. The Debtors' mailing address for the purposes of these cases is 2701 E. Grauwyler Road, Irving, TX 75061 USA.

resolution and proposed settlement of those disputes. Under the settlement, the Debtors agreed to designate the IBML Parties as critical vendors, pay certain of their claims pursuant to the authority granted by the Court at the first day hearing, and assume certain contracts between the Debtors and the IBML Parties. The IBML Parties, in turn, agreed to waive all other claims they have asserted against the Debtors' estates and provide a 50% discount on maintenance services under the agreements for the next 6 months. The Debtors believe that this settlement agreement will provide valuable benefits to the Debtors' estates by resolving all disputes between the Debtors and key business partners while providing certainty of ongoing essential services at significantly reduced rates for the duration of these cases.

2. Accordingly, the Debtors seek entry of an order, substantially in the form attached hereto (the "***Proposed Order***"), (a) authorizing the Debtors to enter into and perform under the Settlement, Release and Critical Vendor Agreement attached to the Proposed Order as **Exhibit A** (the "***Settlement Agreement***"), by and among Debtor BancTec, Inc., Debtor BancTec (Canada), Inc., Debtor BancTec (Puerto Rico) Inc. (collectively, the "***Debtor Sellers***"), Debtor Exela Technologies BPA, LLC ("***BPA***" and, together with the Debtor Sellers, the "***Debtor Parties***"), Imaging Business Machines, LLC ("***IBML US Buyer***"), Intelligent Business Machines Canada Corporation ("***IBML Canada Buyer***" and, together with IBML US Buyer, the "***IBML Buyers***"), ACAS LLC ("***ACAS***"), and Ares Capital Corporation ("***ARCC***" and, together with the IBML Buyers and ACAS, the "***IBML Parties***" and, the IBML Parties together with the Debtor Parties, the "***Parties***"); (b) authorizing the assumption of the Maintenance Agreement and the Reseller Agreement (each, as defined below)[2]; and (c) granting related relief.

---

[2] Given their commercially sensitive nature, copies of the Assumed Agreements have not been publicly filed but will be provided to the U.S. Trustee or the Court upon request.

**JURISDICTION AND VENUE**

3. The United States Bankruptcy Court for the Southern District of Texas (the "***Court***") has jurisdiction to consider this Motion under 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b), and this Court may enter a final order consistent with Article III of the United States Constitution. Venue is proper under 28 U.S.C. §§ 1408 and 1409.

4. The bases for the relief requested herein are sections 105(a) and 365 of title 11 of the Bankruptcy Code (the "***Bankruptcy Code***"), rules 6006 and 9019 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "***Bankruptcy Local Rules***"), and the Procedures for Complex Chapter 11 Cases in the Southern District of Texas (the "***Complex Case Procedures***").

**BACKGROUND**

5. On March 3, 2025 (the "***Petition Date***"), the Debtors filed voluntary petitions in the Court commencing cases for relief under chapter 11 of the Bankruptcy Code (the "***Chapter 11 Cases***"). The Debtors continue to manage and operate their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.

6. On March 19, 2025, the Office of the United States Trustee for the Southern District of Texas (the "***U.S. Trustee***") appointed the Creditors' Committee [Docket No. 139]. On March 24, 2025, the U.S. Trustee filed a notice of reconstitution of the Creditors' Committee [Docket No. 153]. No request for the appointment of a trustee or an examiner has been made in the Chapter 11 Cases.

7. The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the *Declaration of Randall S. Eisenberg in Support of Chapter 11 Petitions and*

3

*First Day Motions* [Docket No. 6] (the "***First Day Declaration***"), which was filed with this Court on the Petition Date and is fully incorporated herein by reference.[3]

## IBML TRANSACTION AND RELATIONSHIP

8. In June 2023, the IBML Buyers closed on the acquisition of the Debtors' former high-volume scanner, software, and maintenance businesses pursuant to the Asset Purchase Agreement, dated as of June 8, 2023 (the "***Purchase Agreement***" and, such transaction, the "***Transaction***"). On June 8, 2023, the Parties entered into several related agreements in connection with the Transaction, including a Contingent Consideration Letter Agreement (the "***Contingent Consideration Agreement***"), an Equipment Maintenance Agreement (the "***Maintenance Agreement***"), a Reseller Agreement (North America) (the "***Reseller Agreement***"), and a Reseller Agreement (EMEA) (the "***EMEA Reseller Agreement***" and, together with the Purchase Agreement, the Contingent Consideration Agreement, the Maintenance Agreement, and the Reseller Agreement, the "***Transaction Agreements***"). Following the Transaction, the Transaction Agreements governed the Debtors' ongoing business relationship with the IBML Parties, including with respect to the Debtors' scanner resale business. The IBML Parties continue to be sole-source suppliers and maintenance service providers for the Debtors, including the Debtors' high volume scanners and the Debtors' scanner resale business. These businesses are essential to the Debtors' go forward operations.

9. The IBML Parties assert that (a) they delivered notice of termination of the Maintenance Agreement prepetition and (b) they have retained a right to enforce said termination, or to terminate said agreement post-emergence, in the event no satisfactory settlement occurs. The Parties agreed to toll the shutdown of services to permit settlement discussions.

---

[3] Capitalized terms used but not defined herein have the meanings given to them in the First Day Declaration.

4

10. The Debtors' relationship with the IBML Parties is critical to the success of the Debtors' business, as the IBML Parties are the exclusive supplier of high-volume scanners and related maintenance services to the Debtors. In addition, without the maintenance services provided by the IBML Parties, the Debtors would be unable to meet their contractual obligations to purchasers of the Debtors' scanners, which would jeopardize the viability of the Debtors' payment and document processing operations and scanner resale business.

11. Accordingly, pursuant to the *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Trade Claims in the Ordinary Course of Business; (II) Confirming Administrative Expense Priority of Undisputed and Outstanding Prepetition Orders; (III) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (IV) Granting Related Relief* [Docket No. 63], the Debtors designated IBML US Buyer as a critical vendor.

## THE IBML CLAIMS AND SETTLEMENT AGREEMENT

12. Since the closing of the Transaction, and prior to the Petition Date, the IBML Parties asserted certain claims against the Debtor Parties.

13. *First*, on December 5, 2024, the IBML Parties delivered a claim notice to the Debtor Sellers seeking indemnification for over $9 million of claims under the Purchase Agreement (the "**Indemnity Claims**").

14. *Second*, the IBML Parties further asserted that BPA failed to pay amounts for maintenance charges of approximately $630,811.58 purportedly owed under the Maintenance Agreement, covering the period from December 1, 2024, to May 31, 2025, to IBML US Buyer (collectively, the "**Maintenance Claims**").

5

15. *Third*, the IBML Parties asserted that (a) BPA did not pay IBML US Buyer $412,534.49 owed under the Reseller Agreement for products sold to Southern California Gas Company, as per a statement of work dated October 15, 2024 (the "***Reseller Purchase Amounts***") and (b) BPA failed to pay $39,409.76 for parts and consumables owed under the same agreement (together with the Reseller Purchase Amounts, the "***Reseller Claims***," and the Reseller Claims, together with the Indemnity Claims and the Maintenance Claims, the "***IBML Claims***").

16. Prior to the Petition Date, the Parties negotiated in good faith to reach an agreement that would settle the IBML Claims and govern the Parties' ongoing business relationship. These negotiations continued after the Petition Date, and on March 19, 2025, the Parties reached an agreement in principle, which is embodied in the Settlement Agreement (which remains subject to this Court's approval).

17. The terms of the Settlement Agreement are straightforward, and the key terms summarized below.[4]

   (a) Upon execution, BPA made a payment of $451,944.25 to IBML US Buyer pursuant to the authority granted the Debtors under the *Interim Order (I) Authorizing the Debtors to Pay Certain Prepetition Trade Claims in the Ordinary Course of Business; (II) Confirming Administrative Expense Priority of Undisputed and Outstanding Prepetition Orders; (III) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (IV) Granting Related Relief* [Docket No. 63] (the "***Interim Essential Vendor Order***"); and in return, IBML US Buyer deemed the Reseller Claims fully satisfied; and IBML US Buyer agreed to continue to provide maintenance services to BPA pursuant to the Maintenance Agreement notwithstanding disputes over termination rights;

   (b) Provided that Court approval of the Settlement Agreement is obtained no later than May 2, 2025,[5] (a) the Maintenance Claims shall be deemed to have been satisfied, (b) BPA will receive a 50% discount for maintenance charges due under the Maintenance Agreement for the 6-month period beginning June 1, 2025, and (c) the

---

[4] Defined terms used in this paragraph, but not otherwise defined herein, shall have the meanings ascribed to them in the Settlement Agreement.

[5] After execution of the Settlement Agreement, the Parties mutually agreed to extend the deadline to obtain Bankruptcy approval to May 2, 2025.

6

        Indemnity Claims shall be deemed resolved and the Debtor Sellers shall not be required to make any cash payment to the IBML Buyers to satisfy the Indemnity Claim;

(c)     The Contingent Consideration Agreement, which entitles Debtor BancTec, Inc. to remuneration under certain circumstances if ACAS or ARCC sell the scanner business to a third party for enhanced value, will be immediately terminated in all respects and shall have no further force or effect, unless a direct or indirect sale (as defined therein) is consummated prior to February 28, 2026; and

(d)     The Parties shall grant the mutual releases set forth in section 2 of the Settlement Agreement.

18.     The Settlement Agreement is in the best interests of the Debtors and their creditors. The Settlement Agreement resolves disputes as to the entitlement of the IBML Parties to terminate the relevant agreements and/or to cease performing, which, if permitted, would substantially impair the Debtors' ability to perform for their own customers, imperiling the Debtors' ongoing payment and document processing operations and scanner business. The Settlement Agreement also resolves for no consideration the Indemnity Claims and Maintenance Claims, eliminating substantial amounts from the pool of general unsecured claims, while ensuring continuation of maintenance services at a substantial discount at this critical time for the Debtors. Relatedly, the Settlement Agreement provides a framework for an ongoing, post-effective date relationship between the Parties. In addition, the Settlement Agreement allows the Debtors to avoid incurring legal expenses associated with potential litigation of the IBML Claims, the outcome of which litigation would be uncertain.

19.     In connection with the Parties' negotiations and the Settlement Agreement, the Parties have agreed that the Debtors shall assume the Assumed Agreements (together with any amendments, schedules, supplements, and work orders thereunder). Subject to approval of the Settlement Agreement, the benefits of which are described above, the Debtors view the Assumed Contracts as beneficial to their estates and essential for the continuation of the Debtors' profitable

and ongoing payment and document processing operations and scanner business. Accordingly, the Debtors submit assumption of the Assumed Contracts on the favorable terms of the Settlement Agreement is a sound exercise of their business judgment.

## BASIS FOR RELIEF

**I.   SETTLEMENTS ARE FAVORED IN BANKRUPTCY, AND A DEBTORS' BUSINESS JUDGMENT IS GIVEN SIGNIFICANT DEFERENCE.**

20.   Bankruptcy Rule 9019(a) provides, in relevant part:

> On motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee . . . and indenture trustee as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019(a). "To minimize litigation and expedite the administration of a bankruptcy estate, compromises are favored in bankruptcy." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (internal quotations omitted) (citing 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)). Settlements are considered a "desirable and wise method[] of bringing to a close proceedings otherwise lengthy, complicated, and costly." *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980) (citations omitted) (decided under the Bankruptcy Act).

21.   Pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may, after appropriate notice and a hearing, approve a compromise or settlement so long as the proposed settlement is fair, reasonable, and in the best interest of the estate. *See In re Age Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015). Ultimately, approval of a compromise is within the "sound discretion" of the bankruptcy court. *United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 298 (5th Cir. 1984); *see also Jackson Brewing Co.*, 624 F.2d at 602–03 (same).

22. Generally, the role of the bankruptcy court is not to decide the issues in dispute when evaluating a settlement. *Watts v. Williams*, 154 B.R. 56, 59 (S.D. Tex. 1993). Instead, the court should determine whether the settlement as a whole is fair and equitable. *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).

23. "Great judicial deference is given to the [debtor's] exercise of business judgment." *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Grp., Ltd.)*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005) (citation omitted). "As long as [the decision] appears to enhance a debtor's estate, court approval of a debtor-in-possession's decision . . . should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code." *Richmond Leasing Co.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (citation omitted).

II. **THE SETTLEMENT AGREEMENT SATISFIES THE THREE-FACTOR TEST COURTS IN THE FIFTH CIRCUIT EMPLOY TO ANALYZE PROPOSED SETTLEMENTS.**

24. The Fifth Circuit has established the following three-factor balancing test under which bankruptcy courts are to analyze the reasonableness of proposed settlements: (a) "[t]he probability of success in [litigating the claim subject to settlement,] with due consideration for the uncertainty in fact and law; (b) [t]he complexity and likely duration of litigation and any attendant expense, inconvenience, and delay; and (c) [a]ll other factors bearing on the wisdom of the compromise." *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir.1997); *Jackson Brewing,* 624 F.2d at 602.

25. Under the rubric of the third factor referenced above, the Fifth Circuit has specified two additional factors that bear on the decision to approve a proposed settlement. **First**, the court should consider "the paramount interest of creditors with proper deference to their reasonable

9

views." *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995); *see also Age Ref. Inc.*, 801 F.3d at 540 (noting the *Foster Mortgage* factors). **Second**, the court should consider the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age Ref. Inc.*, 801 F.3d at 540; *Foster Mortg. Corp.*, 68 F.3d at 918 (citations omitted).

26. All of the foregoing factors favor approval of the Settlement Agreement. First, resolution of the IBML Parties' claims in the absence of settlement is uncertain. Those claims include claims for alleged non-payment under two separate agreements, an indemnity demand under a third agreement, and the assertion that the IBML Parties are entitled to cease performance. Resolution of these claims involves disputed issues of fact and law, including the effect, if any, of the IBML Parties' alleged prepetition delivery of notice of termination. While the Debtors are confident that they would prevail, the likelihood of summary resolution is low, and the outcome is not a foregone conclusion. Moreover, the Debtors require ongoing services from IBML Parties both during the Chapter 11 Cases and after.

27. Second, in light of the above, litigation of the Parties' disputes would be time-consuming, expensive, distracting, and disruptive. In the absence of the Settlement Agreement, the Parties would likely be forced to litigate not only the IBML Parties' purported termination rights, but also their entitlement to payment for postpetition services (which the IBML Parties will provide at a substantial discount under the Settlement Agreement), and ultimately the validity and amount of their asserted prepetition claims. These disputes would, as noted, involve disputed issues of fact as well as of law, likely requiring discovery, evidentiary development, and a "mini-trial" on the issue of termination alone. In the meantime, the future of the Parties' business

relationship, and the Debtors' ability to perform for their own customers, would remain uncertain at best.

28. Third, given the risks and costs associated with continuing the Parties' disputes, and the substantial benefits of resolving those disputes through the Settlement Agreement, the Settlement Agreement is a prudent compromise. The Settlement Agreement delivers comprehensive resolution of disputes, the promise of continued performance on discounted terms, elimination of substantial prepetition claims, and maintains the Debtors' entitlement to contingent consideration for a period of approximately one year. Conversely, the cash cost of the settlement— the aforementioned essential vendor disbursement—has already been made without impact on the Debtors' existing essential vendor disbursement cap. Finally, the Settlement Agreement not only fair and reasonable, it is also the product of hard-fought, good faith, and arms' length negotiations.

## III. THE ASSUMPTION OF THE ASSUMED AGREEMENTS IS A PROPER EXERCISE OF BUSINESS JUDGMENT.

29. Section 365(a) of the Bankruptcy Code provides that a debtor in possession "may assume or reject any executory contract or unexpired lease of the debtor" subject to the court's approval. 11 U.S.C. § 365(a). Courts in the Fifth Circuit and elsewhere authorize a debtor to assume an executory contract where the debtor appropriately exercises its "business judgment" to conclude that the assumption of the contract or lease would benefit the estates. *See Century Indem. Co. v. Nat'l Gypsum Co. Settlement Trust (In re Nat'l Gypsum Co.)*, 208 F.3d 498, 505 (5th Cir. 2000); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp (In re Sharon Steel Corp.)*, 872 F.2d 36, 39-40 (3d Cir. 1989); *Richmond Leas. Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1308 (5th Cir. 1985) ("It is well established that the question whether a lease should be rejected is one of business judgment") (internal quotations and citations omitted). The business judgment rule is a highly deferential standard. If the debtor's business judgment has been reasonably exercised and

the Debtor can demonstrate "some articulated business justification," a court should approve the assumption or rejection of an executory contract, as established by the Second Circuit and adopted by the Fifth Circuit. *See Inst'l Creds. of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070) (2d Cir. 1983). *See, e.g., Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1658 (2019) ("The bankruptcy court will generally approve that choice [to assume or reject], under the deferential 'business judgment' rule."); *see also Richmond Leas. Co. v. Capital Bank, N.A.*, 762 F.2d at 1309; *In re Idearc Inc.*, 423 B.R. 138, 162 (Bankr. N.D. Tex. 2009) ("In the absence of a showing of bad faith or an abuse of business discretion, the debtor's business judgment will not be altered."), *aff'd*, 662 F.3d 315 (5th Cir. 2011). Under the business judgment rule, a debtor's decision to assume or reject an executory contract or unexpired lease should be "accepted by courts unless it is shown that the [debtor's] decision was one taken in bad faith or in gross abuse of the [debtor's] retained business discretion." *In re Idearc*, 423 B.R. at 162 (citing *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985)); *see also In re Pisces Energy, LLC*, Case Nos. 09-36591, 09-36593, 2009 WL 7227880, at *6 (Bankr. S.D. Tex. Dec. 21, 2009); *In re Pilgrim's Pride Corp.*, 403 B.R. 413, 422 (Bankr. N.D. Tex. 2009).

30.     Here, the Debtors believe that the assumption of the Assumed Agreements is a sound exercise of their business judgment and is in the best interests of their estates. The Debtors, in consultation with their advisors, have reviewed the terms of the Assumed Agreements and

negotiated the Settlement Agreement with an eye towards maximizing value. The Assumed Agreements, as modified by the Settlement Agreement, will benefit the Debtors' estates, as they will allow the Debtors to continue ongoing business operations and generate profit. Furthermore, assumption of the Assumed Agreements will not be burdensome for the Debtors' estates, as any cure amounts that would otherwise be owed were reduced by the Parties pursuant to the Settlement Agreement. For these reasons, the Debtors submit that the assumption of the Assumed Agreements should be approved as a sound exercise of business judgement.

## IV.   THE IBLM PARTIES HAVE ADEQUATE ASSURANCE OF PERFORMANCE.

31.   Pursuant to section 365(b)(1)(A) of the Bankruptcy Code, a debtor may not assume an executory contract or unexpired lease unless, at the time of assumption, the debtor cures or provides adequate assurance that the debtor will promptly cure any existing default. *See* 11 U.S.C. § 365(b)(1)(A); *see also In re Liljeberg Enters., Inc.*, 304 F.3d 410, 444 (5th Cir. 2002) (holding that the debtor must provide adequate assurance that it will cure the default amount). Further, pursuant to section 365(b)(1)(C) of the Bankruptcy Code, if a default is outstanding, a debtor seeking to assume an executory contract or unexpired lease must provide adequate assurance of future performance under such contract or lease.

32.   The Debtors submit that the IBML Parties have received adequate assurance of performance. The Settlement Agreement and the payments made thereunder by the Debtors serve to cure any outstanding defaults under the Assumed Agreements. Moreover, the IBML Parties have consented to the assumption of the Assumed Agreements as part of the Settlement Agreement, without any further requests for adequate assurance. Accordingly, the Debtors submit that they have substantially satisfied any outstanding material obligations under the Assumed Agreements (subject to Court approval of the Settlement Agreement), and that no further assurance of performance should be required as a condition to assuming the Assumed Agreements.

## NOTICE

33. Notice of the Motion will be given to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) counsel to the DIP Agent; (c) counsel to the Ad Hoc Group; (d) counsel to the Prepetition Indenture Trustee; (e) counsel to the administrative agent under the ER3 Securitization Program; (f) counsel to B. Riley; (g) the creditors listed on the Debtors' consolidated list of thirty (30) creditors holding the largest unsecured claims; (h) counsel to the IBML Parties; (i) counsel to the Creditors' Committee; (j) the United States Attorney for the Southern District of Texas; (k) the Internal Revenue Service; (l) the Securities and Exchange Commission; (m) the state attorneys general for states in which the Debtors conduct business; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, under the circumstances, no other or further notice is required.

34. A copy of the Motion is available on (a) the Court's website, at www.txs.uscourts.gov, and (b) the website maintained by the Debtors' claims and noticing agent, Omni Agent Solutions, Inc., at https://omniagentsolutions.com/DocuDataSolutions.

WHEREFORE, the Debtors request that the Court enter the Proposed Order, granting the relief requested in this Motion, and granting such other and further relief as is appropriate under the circumstances.

Signed April 6, 2025
Houston, Texas

Respectfully Submitted,

*/s/ Timothy A. ("Tad") Davidson II*
Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Ashley L. Harper (Texas Bar No. 24065272)
Philip M. Guffy (Texas Bar No. 24113705)
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone: (713) 220-4200
Email: taddavidson@hunton.com
ashleyharper@hunton.com
pguffy@hunton.com

- and –

**LATHAM & WATKINS LLP**
Ray C. Schrock (NY Bar No. 4860631)
Alexander W. Welch (NY Bar No. 5624861)
Hugh Murtagh (NY Bar No. 5002498)
Adam S. Ravin (NY Bar No. 4079190)
Jonathan J. Weichselbaum (NY Bar No. 5676143)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email: ray.schrock@lw.com
alex.welch@lw.com
hugh.murtagh@lw.com
adam.ravin@lw.com
jon.weichselbaum@lw.com

*Proposed Counsel for the Debtors and Debtors in Possession*

**CERTIFICATE OF SERVICE**

      I certify that on April 6, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                          */s/  Timothy A. ("Tad") Davidson II*
                                          Timothy A. ("Tad") Davidson II