```
 1                  UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF TEXAS
 2                       HOUSTON DIVISION

 3    DOCUDATA SOLUTIONS L.C.,      )  CASE NO: 25-90023
      et al.,                       )
 4                                  )  Houston, Texas
                                    )
 5                Debtor.           )  Wednesday, April 9, 2025
                                    )
 6                                  )  1:00 p.m. to 2:39 p.m.
      ------------------------------)
 7

 8                              TRIAL

 9         BEFORE THE HONORABLE CHRISTOPHER LOPEZ
               UNITED STATES BANKRUPTCY JUDGE
10

11    APPEARANCES:

12    For Debtor:          ALEXANDER WELCH
                           HUGH MURTAGH
13                         RAY SCHROCK
                           Latham & Watkins
14                         1271 Avenue of the Americas
                           New York, NY 10020
15
                           TIMOTHY ALVIN DAVIDSON, II
16                         PHILIP M. GUFFY
                           Hunton Andrews Kurth LLP
17                         600 Travis Street, Suite 4200
                           Houston, TX 77002
18
      For CCUR Holding:    MARK CURTIS TAYLOR
19                         MORRIS DEAN WEISS
                           401 Congress Avenue, Suite 2100
20                         Austin, TX 78701

21    For HoldCo Asset     DANIEL BROWN
      Management:          JOHN MELKO
22                         Foley & Lardner
                           1000 Louisiana Street, Suite 2000
23                         Houston, TX 77002

24

25
```

```
 1    For the Committee:        CHARLES R. GIBBS
                                McDermott Will & Emery
 2                              Texas Tower
                                845 Texas Avenue, Suite 4000
 3                              Houston, TX 77002

 4    For the DIP Lenders       MATTHEW M. ROOSE
      and Ad Hoc Group:         MICHAEL ARDELJAN
 5                              Ropes & Gray LLP
                                1211 Avenue of the Americas
 6                              New York, NY 10036

 7    Court Reporter:           YESENIA LILA

 8    Courtroom Deputy:         YESENIA LILA

 9    Transcribed by:           Veritext Legal Solutions
                                330 Old Country Road, Suite 300
10                              Mineola, NY 11501
                                Tel: 800-727-6396
11

12

13    Proceedings recorded by electronic sound recording;
      Transcript produced by transcription service.
14

15

16

17

18

19

20

21

22

23

24

25
```

```
1              HOUSTON, TEXAS; WEDNESDAY, APRIL 9, 2025; 1:00 PM
2                          (Call to Order)
3         THE COURT:  I'll call DocuData Solutions, Case
4    Number 25-90023.  This is Judge Lopez.  Today is April 9th.
5    It is 1:00 p.m.  Why don't I take appearances in the
6    courtroom.  And if you wish to make an appearance here on
7    the video, please hit five-star and I will unmute your line.
8    Good afternoon.
9         MR. WELCH:  Good afternoon, Your Honor.  Alexander
10   Welch, Latham & Watkins, proposed counsel for the Debtor.
11   Also with me in the courtroom is my partner, Hugh Murtagh.
12   Also in the courtroom, Mr. Davidson, and Mr. Guffy from
13   Hunton Andrews Kurth and Mr. Schrock is also available by
14   Zoom.
15        THE COURT:  Okay.  Good afternoon.  Good
16   afternoon.
17        MR. TAYLOR:  Good afternoon, Your Honor.  Mark
18   Taylor with Kane Russell Coleman Logan along with my
19   partner, Morriss Weiss, who is on the line.  Here for CCUR
20   Holdings.  We were the original movant on the matters before
21   the Court today.
22        THE COURT:  Good afternoon.
23        MR. BROWN:  Hello, Your Honor.  Daniel Brown on
24   behalf of Holdco Asset Management, one of the other movants.
25        THE COURT:  Okay.  Good afternoon.
```

1          Okay, let's see.  Good afternoon.

2          MR. MELKO:  Good afternoon, Your Honor.  John

3     Melko, also on behalf of Holdco Asset Management.  That's

4     probably the least you're going to hear from me.

5          THE COURT:  Good afternoon, Mr. Melko.

6          MR. MELKO:  And we did not -- there's at least

7     five of us who have (indiscernible) ties on.  We did not

8     coordinate that.

9          THE COURT:  Good afternoon.  There's a 214 number.

10         MR. GIBBS:  Good afternoon, Your Honor.  This is

11    Chuck Gibbs with McDermott Will & Emery, proposed co-counsel

12    for the Committee.  With me virtually are colleagues of mine

13    from McDermott as well as folks from Brown Rudnik, who may

14    introduce themselves depending on whether the Court needs to

15    hear from them.  We are here on the second motion that's set

16    at 1:30.

17         THE COURT: Got it.  Okay.  Here's a 914 number.

18         MR. ROOSE:  Good afternoon, Your Honor.  Matthew

19    Roose from Ropes & Gray on behalf of certain of the DIP

20    lenders and the Ad Hoc Group comprised of Gates Capital

21    Management and Avenue Capital.

22         THE COURT:  Okay.  And here's a 212 number.

23         MR. SCHROCK:  Hello, Judge.  This is Ray Schrock

24    with Latham, as Mr. Welch already (indiscernible).  Thank

25    you.

1          THE COURT:  Okay.  Anyone else wish to make an

2   appearance, please hit five-star and I will unmute your

3   line.

4          Here's a 646 number.  You may be on mute, sir.

5          MR. ARDELJAN:  Sorry, that was my phone.  Good

6   afternoon, Your Honor.  Michael Ardeljan of Ropes & Gray,

7   also on behalf of the Ad Hoc Group alongside Mr. Roose.

8          THE COURT:  Okay.  Let's see.  Counsel, you filed

9   the motion.  You get to go first.

10          MR. TAYLOR:  Thank you, Your Honor.  Appreciate

11   it.  Again, Mark Taylor with Kane Russell here on behalf of

12   CCUR Holdings.  Your Honor, I think a couple of initial

13   matters.

14          A couple of exhibits were filed in connection with

15   our motion and I know that the Debtors have filed exhibits

16   as well.  I think our 1, 2, 3, and 4 are the first two --

17          THE COURT:  Before we talk exhibits, why don't we

18   just talk about where we are?

19          MR. TAYLOR:  Certainly, Your Honor.  I didn't want

20   to go into any evidence without giving those for the

21   Court first.

22          THE COURT:  Oh no.

23          MR. TAYLOR:  So, here's where we are, Your Honor.

24          THE COURT:  You're only here on discovery

25   disputes.  There won't be any evidence.  I'll just tell you

1    what we're doing.

2            MR. TAYLOR:  That will make it a lot easier, Your

3    Honor.

4            THE COURT:  That's the fun of coming.

5            MR. TAYLOR:  Yes, Your Honor.

6            THE COURT:  Just tell me where you think we are

7    and then I'll turn it over and Mr. Welch can tell me what

8    his side is and I'll pick something.

9            MR. WELCH:  If okay, Your Honor, given that this

10   was our first hearing back before you since the first day, I

11   was going to offer a status generally on where we are for

12   the stakeholders.  If you prefer to forego that or postpone

13   it --

14           THE COURT:  No, but I don't want you getting into

15   the motions.

16           MR. WELCH:  I don't intend to.

17           THE COURT:  Yeah.  10,000-foot level kind of

18   telling me where we are.

19           MR. WELCH:  Mr. Murtagh is here to argue the

20   motion, Your Honor.

21           THE COURT:  Oh, even better.  Okay.  No, I'm good

22   with that.  Let's just start with kind of just brief general

23   overview, lay of the land, and then we'll kind of get into

24   the fun stuff.  Okay.

25           MR. WELCH:  Appreciate it, Your Honor.  So, as I

1    said, Your Honor, given this is the first time back before

2    you, we did want to give a short update to stakeholders.

3              THE COURT:  I appreciate it.

4              MR. WELCH:  I know many may be listening in and

5    waiting for an update.  It has been a little while since we

6    were before the Court.

7              Your Honor, I can give an update on business

8    operations and time process more generally.  As you know the

9    Debtors filed these Chapter 11 cases with the term sheet for

10   a pre-arranged plan, which is incorporated by reference in

11   the DIP financing along with a milestone requiring us to

12   reach an acceptable RSA by that date.  That milestone is

13   currently set for the 14th by agreement, which is the same

14   as the scheduled final DIP hearing.

15             But, Judge, turning to the Debtors themselves.  We

16   have a multinational service business here with more than

17   10,000 employees directly and indirectly employed by the

18   Debtors with historical revenues north of $800 million.

19             And as Your Honor has no doubt seen, markets are

20   roiled.  Our primary focus has been and remains preserving

21   these jobs, preserving the going concern and really all

22   value (indiscernible) goes with a going concern.  And as I

23   said, this is also not the time -- while I won't argue the

24   motion, this is not also the time to argue the DIP motion.

25   But to put it bluntly, Your Honor, there have been

1   significant inter-lender issues that have kept negotiations

2   at a standstill for several weeks.  But we have been

3   pressing forward, seeking to achieve a workable RSA.  And we

4   hope we will be able to do so ahead of the DIP hearing and

5   the milestone.  The parties, as you know, negotiated, and

6   agreed a DIP funding precisely on the basis and timeline for

7   a pre-arranged plan contemplated on the term sheet, and

8   that's what we're focused on trying to achieve.  And,

9   frankly, we'll do that with anyone who is willing to

10  negotiate that with us constructively.

11          But at the time of the first day hearing, we were

12  encouraged with the progress we made.  But standing here

13  today from the Debtor's perspective, we still remain

14  cautiously optimistic that the parties will work in good

15  faith to progress the Debtor's reorganization and the terms

16  sheet we believe remains actionable with some enhancements

17  that we are seeking to negotiate with the parties, we can

18  negotiate, which we think will benefit unsecured creditors,

19  other stakeholders and will inure to the benefit of the

20  Debtor's estates.  But we're not there yet.  But I think I

21  can be optimistic about the better outcome that it will

22  achieve for unsecured creditors.  And certainly, better

23  that's already contemplated in the term sheet.

24          We don't want to waste the good work that the

25  Debtors, the employees, and the advisors have achieved

1    today.  And I'll talk about that in a moment and I'll give

2    Your Honor an update.  Because beyond plan negotiations, we

3    have been busy stabilizing the business, going about the

4    business of these Chapter 11 cases.  The Debtor's business

5    is performing and we believe stable at the moment.  But we

6    need the incremental liquidity negotiated by the DIP.

7            But, Judge, so it's clear -- and I know you

8    haven't seen us, but we have been busy.  We have -- through

9    the Essential Vendors Motion, we have resolved claims from

10   over 140 vendors at a claim value of $10.2 million, versus

11   the four weeks of the DIP budget operating cashflows were

12   favorable by $4.6 million and total cashflows were favorable

13   to budget by 4.4.

14           We can report January and February EBITDA was in

15   line with the company's forecast.  Per our DIP

16   securitization program motions we have now paid down the

17   out-of-compliance amounts to PNC.  And that program is now

18   working in the ordinary course, giving the Debtors the

19   negotiated and needed liquidity under those programs.

20           We've entered into a settlement agreement with a

21   key vendor that provides critical scanner and maintenance

22   services to the company's customers.  The company's core

23   customers have been working with us and the company and

24   remain positive on the company's progress.  But of course,

25   all eyes are on the upcoming DIP hearing and the

1    announcement of a plan.  And I know many of them may be

2    listening today or at least waiting for an update on status.

3              We've met with the UCC advisors and provided

4    extensive diligence documents to them.  They are apprised of

5    our situation and we have been available to answer

6    questions.  And we hope to meet with the Committee and its

7    members in the coming weeks after we get past this chapter.

8              We have negotiated and resolved comments to the

9    final orders for cash management and the essential vendors

10   motion which will be submitted under certification of

11   counsel shortly.  We've filed a motion to set the bar date

12   and we are also well into the Debtor's investigation by

13   independent director Allan Carr into antecedent and related

14   party transactions which may or may not be included in the

15   Chapter 11 plan negotiation or settlement.  And that will

16   ultimately be determined by the outcome of that

17   investigation.

18             So, Judge, clearly progress is being made.  And

19   we've put valuable dollars we have received to date to work

20   and we don't intend to waste this opportunity, but we are

21   going to need some help.  But we did want to make sure we

22   gave folks the outcome and that the outcome had positive

23   news in it because we do think the Debtors are performing

24   well and performing up to their obligations.  But we are

25   facing headwinds.

1          But with that, Your Honor, unless you have any

2      questions of me, I'll pass the podium to the main

3   appearance of the day.

4          THE COURT:  Thank you very much.  I very much

5   appreciate it.

6          MR. TAYLOR:  Again, Your Honor, Mark Taylor on

7   behalf of CCUR Holdings.

8          Your Honor, the reason we're here today is because

9   the Debtors on their own created a crisis.  They declared

10   that my client was a defaulted lender along with two other

11   lenders.  They served discovery on a Saturday and demanded a

12   return within seven days, and that led us here today.  And

13   interestingly, there never was any default.  And I'll talk

14   about that momentarily.  They don't call us defaulting

15   lenders anymore.  In the last pleading we're now reneging

16   lenders.  Which I checked the DIP credit agreement.  It's

17   not a defined term.  So, I have no idea what that means.

18          But it really kind of folds into what's happened

19   in this case.  And what's happening is the Debtors are

20   trying to extract and exert leverage by sending this

21   discovery and trying to do everything on an expedited basis

22   and trying to force us into their version of an RSA that

23   simply doesn't make sense for us.  Because we're not willing

24   to simply sign what they put in front of us, they've turned

25   this into warfare.

1              But let's talk about what's happening.  Your

2    Honor, I've got literally just eight slides to put before

3    the Court.  This is not a 40-slide deck that I want to show

4    the Court, but I think it sets a stage.  Let me...

5              THE COURT:  Sure.  How do you intend to -- which

6    tech do you intend to use?

7              MR. TAYLOR:  I can do either one.  I can do HDMI

8    or I have GoToMeeting pulled up here.

9              THE COURT:  I can pull you up.  Hold on a second.

10             MR. MURTAGH:  Your Honor, for the Debtors, we

11   haven't seen this presentation.  We don't have any advance

12   notice of it.  I don't necessarily object to it, but I'd

13   like to take a minute to look at it to make sure it doesn't

14   disclose anything confidential.

15             THE COURT:  No, I think that's fair.  That's fair.

16   I'll wait.

17             MR. TAYLOR:  I was very careful not to put

18   confidential information in.

19             THE COURT:  In the meantime, I'll give you --

20   don't put anything up, but I'll just give you the...

21             MR. TAYLOR:  If I can put the cover slide up, Your

22   Honor.

23             THE COURT:  Okay.

24             MR. TAYLOR:  Make sure that we're working.

25             THE COURT:  Okay, thank you.

1              MR. TAYLOR:  I should be showing up.  Hopefully

2      it's --

3              THE COURT:  Yeah.  I'm just making you a presenter

4      and we'll just...

5              MR. MURTAGH:  No objection, Your Honor.

6              THE COURT:  Okay.  Thank you.  Counsel, you may

7      proceed.  You should be the presenter.

8              MR. TAYLOR:  I am.  It's asking me to go into

9      systems preferences to grant permissions.  So...

10             THE COURT:  Let me take it back and then give it

11     to you again.

12             MR. TAYLOR:  Okay.  If not, Your Honor, we can

13     just go in through HDMI.  We'll do it locally.

14             THE COURT:  Well, I want to just see if we can do

15     this because I know there are folks on video as well.  Let

16     me see if this works.

17             It's asking you to reboot and all that stuff?

18             Just in the interim if you have an electronic

19     version, maybe you can just send it to the folks at Latham

20     and then they can circulate it around.

21             MR. TAYLOR:  So, I'm showing that it's -- yeah,

22     I'll try again because it's actually showing on GoToMeeting

23     that it has access to the screen.  It's not going to let me

24     do it.  It's showing that it has access to the screen on

25     GoToMeeting, but it's not sharing.

```
 1              THE COURT:  Okay.  Do you think you can just email

 2    a copy to someone at Latham and then -- or (indiscernible)

 3    Kurth and then you all can circulate it to the folks and

 4    maybe we can get it to Mr. Gibbs and company.

 5              MR. TAYLOR:  Yes, Your Honor.

 6              THE COURT:  Just want to make sure the UCC counsel

 7    has it as well.

 8              MR. TAYLOR:  Now, I'm sending it to -- well,

 9    here...

10              THE COURT:  There's a 202 number and I suspect

11    that's Ms. Whitmer.

12              MS. WHITMER:  That was me.  I was just hanging

13    out.  I just want to make sure I can get copies of whatever

14    is shared with either counsel if that's okay.

15              THE COURT:  Absolutely.

16              MS. WHITMER:  Thank you.

17              THE COURT:  I got the in-court nod that you're --

18    they'll get it to you.

19              MS. WHITMER:  Thank you, Judge.

20              MR. TAYLOR:  We can try one other thing

21    (indiscernible).

22              THE COURT:  Okay.  The anticipation is killing me.

23              MR. TAYLOR:  Let's try this.  Let's see if it will

24    share from here.

25              THE COURT:  All right.  (indiscernible) marked
```

1   twice (indiscernible).  All right.

2          MR. TAYLOR:  So, Your Honor, just a short

3   timeline.  The DIP financing order in this case was entered

4   on March 4th.  And immediately thereafter the negotiations

5   began that had already started prepetition regarding the

6   RSA.  Unfortunately, on March 28th, the Debtor's counsel

7   sent a letter declaring that we are defaulting lenders.

8   That's Exhibit 3 in our book.  It's sealed.  I'm going to

9   refer to three portions from that that don't reveal any

10  confidential information.  But we would ask that Exhibit 3

11  be admitted simply so I can show some passages from that

12  letter.

13          THE COURT:  The defaulting letter?

14          MR. TAYLOR:  Yes, Your Honor.

15          THE COURT:  Any objection to...

16          MR. TAYLOR:  It's the Debtor's exhibits.

17          MR. WELCH:  No, Your Honor.

18          THE COURT:  Okay.

19          MR. TAYLOR:  The next day, on March 29th, is when

20  the Debtor served the discovery.  And of course that's

21  referenced in our motion.  It was a request for production

22  along with five deposition notices demanding the documents

23  be produced within seven days and that the witnesses appear

24  for a deposition sometime that following week.  So, within

25  five business days, which we believe was not only improper,

1    it's not a proper procedure under rules and was not a proper

2    procedure really for two reasons, Your Honor.  One is there

3    really is no contested matter before the Court.  This is an

4    agreed order.  It would turn into a contested matter if they

5    filed a motion to enforce or an adversary proceeding or

6    something like that.  That's not before the Court.  All

7    that's before the Court right now is an agreed order with an

8    allegation that we're defaulting lenders.

9         And so, without a contested matter or an adversary

10   proceeding before the Court, the federal rules as

11   incorporated through the bankruptcy rules simply don't

12   apply.  You can't issue discovery.  Even if you were going

13   to allow them to issue discovery, it's improper to do it on

14   seven days' notice or on five days' notice for a deposition.

15        We're entitled to 30 days without an order

16   shortening the time period to respond to a request for

17   production.  They simply imposed a seven-day requirement in

18   this case which was improper.

19        But let's look at what they said in the letter,

20   which I think is important.  Here's the default, the alleged

21   default.  If you look at the first sentence.

22        THE COURT:  I'm just going to make it a little

23   bigger.

24        MR. TAYLOR:  The first paragraph.  Basically, they

25   say that you have acted bad and you've refused or have an

1   inability to participate constructively and in good faith

2   with the rest of the Ad Hoc Group.

3          Further down in the letter they say that this

4   constitutes an anticipatory breach.  And if you go to the

5   next slide, they say we think that you might be in a

6   position where we're going to try to cause a default under

7   the DIP credit facility by failing to grant waivers and

8   censor amendments.

9          Importantly, the fact that they think a default

10  might occur is not a default.  And it's not in the

11  definition of defaulting lender.  If you look at the next

12  slide, which is the definition of defaulting lender, a

13  defaulting lender essentially is one who don't fund.  That

14  hasn't happened in this case.  Every penny that was to be

15  funded to this point has been funded.  Their thought that it

16  might not be funded at a later date does not create a

17  default.  And we have certain rights on whether or not we're

18  going to need to fund based upon what happens in the case.

19  And let's look at what the credit agreement says about who

20  can declare a default.

21          It says that in the provisions relating to

22  disinterested director, it says the disinterested director

23  shall be the sole director of Exela Intermediate in all

24  decisions related to the Chapter 11 cases and the loan

25  documents shall be voted on only by the disinterested

1    director.  That's Alan Carr.

2           We've tried to get access to Mr. Carr and have not

3    been able to get access to Mr. Carr to discuss this with

4    him.  We don't know if he's declared a default.  We don't

5    know if anything's happened on behalf of the Debtor on

6    account of the independent director in this case.

7           So, the complaint here, Your Honor, is that we are

8    not participating -- as you notice from the default letter -

9    - that we're not participating in the process to lead to an

10   RSA, which has been the allegation in this case.  Again, the

11   conduct of the Debtor in this case is -- and the actions of

12   the Debtor in this case and the belief of the Debtor in this

13   case apparently is that we have to sign whatever RSA they

14   put in front of us whether we like it or not.  That's simply

15   not the case.

16          Here are the provisions relating to the

17   Restructuring Support Agreement.  The Restructuring Support

18   Agreement as defined in a credit agreement is a

19   restructuring support agreement among the debtors, required

20   lenders, and certain additional stakeholders in a form

21   acceptable to the required lenders and those holding more

22   than 67 percent of the prepetition April 26th notes.

23   Required lenders is defined as at least three lenders, which

24   are not affiliates, holding more than 67.1 percent of the

25   aggregate principal amount of the outstanding loans provided

1    that at least one of those has to be either my client, CCUR,

2    Holdco, or OSP.  And the consent, Your Honor, in the DIP

3    credit agreement, Section 12.12, says that we have the right

4    to consent and we have the right to consent to any provision

5    that's required under the DIP credit agreement.  And that

6    consent may be withheld or denied in the lender's sole

7    discretion with our without any reason and without being

8    subject to question or challenge on the grounds that such

9    action was not taken in good faith.  That's exactly what

10   we're saying in this case, is that we're not negotiating in

11   good faith.  That provision in Section 12.12 says we can

12   accept or reject an RSA in our sole discretion and they

13   can't say that we've been acting in bad faith in this case.

14   And in fact, we haven't, Your Honor.  Here's what's going on

15   in the RSA.

16          The problem is we haven't been presented an RSA

17   that makes sense.  And we haven't been presented an RSA that

18   would lead us to believe that funding this further and going

19   down the path that everyone wants to go down makes economic

20   sense for anyone.  And without going into the confidential

21   information, the numbers we've seen have changed.  It looks

22   like there's too little cashflow.  The exit financing

23   requirements have gone up and we don't see that there's any

24   commitment from anyone to provide the exit financing at this

25   point or to provide the additional level of DIP funding that

1   the Debtor is going to be requiring and requesting from this

2   Court.

3           So, in that case, why would we sign an RSA that

4   proposes more funding requirements than what we signed up

5   for or more funding requirements than we thought were going

6   to be the case before we got into it or before we agreed to

7   these terms.  And part of the problem we're having, Your

8   Honor, is we're no longer getting access to information in

9   real time.

10          As part of our negotiations over the last week, we

11   asked for access to AlixPartners.  AlixPartners responded

12   and said they would be available to meet with our client or

13   to discuss with them.  And then there have been crickets.

14   We've asked to be able to talk to AlixPartners.  We sent out

15   a request for a meeting with them or a discussion and

16   received no response.  That makes it very difficult for us

17   to engage in the type of due diligence that's necessary to

18   get to a restructuring support agreement.

19          Fundamentally, Your Honor, my client wants this

20   case to be successful.  We want it to move forward.  We're

21   not going to do it under an RSA that simply doesn't make

22   sense.

23          We offered on both a prepetition and a

24   postpetition basis to look at a 363-sale process that the

25   Debtors have strongly resisted.  We still believe that's a

1    viable alternative.  But we're certainly willing to move

2    forward with a restructuring if we can get to the point

3    where it makes sense.

4            And the last thing I want to point out, Your

5    Honor, is that I don't think we need to decide this today,

6    but I don't want someone arguing that we've waived this

7    argument.  Paragraph 36 of the interim DIP order provides

8    specifically that you can't use money from the DIP facility,

9    the DIP collateral, the prepetition collateral, the carveout

10   or any cash collateral to directly or indirectly finance any

11   way any adversary action, suit, arbitration proceeding,

12   application motion, or other litigation of any type or the

13   investigation and preparation of any of the foregoing that

14   could be adverse to the interest of any or all of the DIP

15   agent or the DIP lenders.  And so, I don't know exactly what

16   they plan to do in this case, but we don't want them arguing

17   later that we've waived our rights under this agreement.

18           So where are we today, Your Honor?  Here's what we

19   think ought to happen.  There is no default at this point.

20   The discovery they've sent out should not go forward.  They

21   need to either withdraw it or it needs to be stricken.  If

22   there is a default down the road or they can allege that

23   we're a defaulting lender or they file a contested matter or

24   an adversary proceeding, they can reissue the discovery.

25   What they've offered to do at this point is to postpone the

1    existing discovery, which is improperly and improvidently

2    issued in the first place.  But in return for that, they

3    want us to agree to waive any good faith protections in the

4    final DIP order in this case, which simply doesn't make

5    sense and is not acceptable.

6           The path that ought to occur is not expedited

7    discovery today or expedited discovery tomorrow.  It ought

8    to be if there's a contested matter or an adversary

9    proceeding filed, they can issue discovery and we can talk

10   about it in connection with that proceeding, but not

11   something that might happen in the future that we should be

12   responding to today.

13          The other thing we'd mention to the Court, Your

14   Honor, is we had suggested to the Debtors that the parties

15   need to engage in a mediation and had suggested Judge Isgur

16   is available.  We're still willing to do that.  We'd like to

17   do that.  Our concern is we're marching towards a path for

18   the Debtor where there's no consensus and no resolution that

19   could lead to a conversion of this case to Chapter 7.

20   That's not in anyone's best interest.  So, we'd like to get

21   the other to sit across a table and talk to them.  I'm not

22   sure if that can occur given the animosity at this point

23   without an intermediary to assist us in that process.  So,

24   we're willing, ready, and able to get a mediation if the

25   Court orders us to do that.

1          But again today, Your Honor, we simply don't think

2     this discovery should go forward and ask the Court to strike

3     the discovery request they've been propounding.  Thank you.

4          THE COURT:  Thank you.

5          MR. BROWN:  Good afternoon, Your Honor.  Daniel

6     Brown on behalf of HoldCo Asset Management.  Just as a

7     housekeeping matter, I am going to be getting into some

8     facts that I think are pretty relevant to the dispute here.

9     They implicate confidential information that the Debtor has

10    shared with us.  Prior to the beginning of the hearing, I

11    raised the issue with Debtor's counsel and they agreed that

12    so long as I'm not showing any documents that I can proceed

13    to discuss those facts.  So, I just wanted to note that for

14    the record.

15         MR. MURTAGH:  Your Honor, Hugh Murtagh from the

16    Debtors, or proposed counsel for the Debtors, Latham &

17    Watkins.  That doesn't accurately reflect the prior

18    discussion.  The prior discussion was that Mr. Brown

19    intended to quote certain numbers that he believes are

20    relevant or accurate as to the Debtor's liabilities.  We

21    asked where they were coming from.  He didn't disclose where

22    they were coming from.  Anything that he states on the

23    record that's just from his head is not a fact, it's just

24    attorneys speaking.  I can't say that's confidential, but I

25    also can't agree it's a fact.

```
 1              THE COURT:  I think that's fair.

 2              MR. BROWN:  So, I want to set the stage and

 3    provide a little bit more background than Mr. Taylor just

 4    did so that Your Honor understands sort of the provenance of

 5    this dispute.

 6              So, the DIP lenders here provided a $50 million

 7    DIP loan when the company was unable to make payroll, but on

 8    very little diligence.  We had our first meeting with the

 9    company in late January and the company filed a little more

10    than a month later.  It is a pretty complex case, so we had

11    very little time to do diligence on a lot of complexity.

12    That's a risky loan to make.  So, because of the short

13    timeframe and the lack of opportunity for more sufficient

14    diligence, the minority lenders here protected themselves.

15    They bargained for and obtained certain protections under

16    the DIP agreement than Mr. Taylor has summarized.  I'll

17    summarize them once again.

18              First, they made the indicative RSA completely

19    non-binding.  Second, they made it clear that they could not

20    be accused of bad faith or other malfeasance if they did not

21    ultimately support the RSA and the decision of whether to

22    support the RSA was in their discretion as set forth in

23    Section 12.12 of the DIP agreement.

24              Lastly, they created a requirement that the RSA

25    milestone could only be reached if at least one of the
```

1   minority lenders supported an RSA, whether it was the

2   indicative RSA attached to the DIP agreement or some other

3   RSA that garnered sufficient support.

4         If the Debtors could not get at least one of the

5   minority lenders on board with an RSA by the deadline, the

6   Debtors would trigger an event of default under the DIP

7   agreement and all of the DIP lenders would be excused from

8   providing any further funding, including the second tranche

9   of the $30 million for the DIP loan.  This was the deal.

10        The majority lenders could have done the whole DIP

11  themselves, but they and the Debtors wanted our money.

12  There was no side deal of any kind, express or implied, that

13  the minority lenders would support the indicative RSA or any

14  other RSA.  And that's made clear by the integration clause

15  set forth in the DIP agreement in Section 12.22.

16        As it turns out, the minority lenders were right

17  to bargain for this flexibility.  After the petition date,

18  they learned about a number of issues that made the

19  indicative RSA and related plan unworkable and unconfirmable

20  from their perspective.  I'll provide three highlights.

21        First, when the Debtor filed bankruptcy, they

22  certified that the exit financing need was less than $60

23  million, and this figure was explicit in the backstop

24  commitment letter approved by the Court.

25        To be clear, as of right now, the Debtors have no

1    committed exit financing at any level of funding.  And

2    without committed exit financing, we believe a plan cannot

3    be confirmed.

4         And since the petition date, facts have emerged

5    which makes it clear to us that the exit financing needs

6    vastly exceeds $60 million as set forth in the draft RSA.

7    The minority lenders believe the real need is at a minimum

8    $98 million and likely much higher.  Without sufficient

9    committed exit financing, the minority lenders believe a

10   plan cannot be confirmed.  They have shared this analysis

11   with the Debtors and have not received a response.

12        Second, under the draft RSA, the Debtors are

13   covering more than $70 million of administrative and

14   priority unsecured tax claims that were not properly

15   represented to the DIP lenders prepetition.  $25 million of

16   that tax liability is what's called a deconsolidation tax,

17   which the Debtors said would be due in 2026 if at all.  It's

18   now clear that this is going to be an administrative tax

19   claim in the bankruptcy likely due to the IRS in September

20   and cash must be set aside for the payment of this tax on

21   the effective date.

22        $45 million of this 70 are payroll taxes.

23   Prepetition the Debtors asserted around $15 million of these

24   payroll taxes were fiduciary claims that the directors and

25   officers could be on the hook for and would be paid on the

1    effective date.

2             THE COURT:  Tell me why that's relevant to what

3    I'm thinking about today.

4             MR. BROWN:  Because, Your Honor, I think --

5             THE COURT:  Any of this stuff, tell me why -- how

6    does it relate to whether I grant discovery or not before

7    the 14th?

8             MR. BROWN:  Because we have a before and after

9    that sort of sets the stage for why this dispute arose in

10   the first instance.

11            THE COURT:  I've got it.  People disagree about

12   the numbers and the funding.

13            MR. BROWN:  Yes, Your Honor.

14            THE COURT:  I've got that.

15            MR. BROWN:  And now they're pursuing discovery

16   because they believe that we're engaging in bad faith

17   because these issues were represented differently before the

18   petition date than they are after the petition date.  And

19   so, we're trying to work through these issues.  We're being

20   accused of bad faith and anticipatory breach, and we think

21   it's important that the Court understands the context here.

22            THE COURT:  Okay.  Now, I got it.  I get the

23   issues.

24            MR. BROWN:  If I could continue.  There are a

25   couple more that haven't yet been raised.

1          THE COURT:  I don't think we need to get into the

2     specifics.  Because in other words, they're going to stand

3     up and say that's not true and there's no witnesses and no

4     documents and no evidence.  But I've got it.  You all think

5     that this is not going to -- they don't have committed

6     financing and you're not bound to sign anything that they

7     put in front of you.  I get those two points.  And I got

8     that there's no contested matter here because we're just

9     getting to the 14th and we're going to have to figure

10    something out.

11         MR. BROWN:  Well, there's a couple of other points

12    that I would like to raise that have not otherwise been

13    talked about if Your Honor would indulge me.

14         THE COURT:  Okay.

15         MR. BROWN:  So, in connection with the tax

16    liabilities, a related issue.  So, prepetition it was not

17    clear that the non-debtor parent, Exela Technologies Inc, or

18    ETI, was jointly and severally liable for the approximately

19    $70 million of taxes that we were just discussing.

20         THE COURT:  You're sticking to your script.  I

21    want you to see where I'm going.  I got it.  There's a lot

22    of stuff going on.  I don't know if you -- I've got it, now

23    there's disputes with the parent.  Let's just take it at the

24    10,000-foot level.  In other words, the facts -- I don't

25    know if I should believe anything you're saying, but I've

1    got they're going to dispute it.  But I've got it, you have

2    real concerns and you're getting jammed on five days -- you

3    got jammed with discovery -- you got served with discovery

4    five days ago.

5              MR. BROWN:  Yes, Your Honor.

6              THE COURT:  Yeah.

7              MR. BROWN:  And we believe that these disputes are

8    pretty necessary to --

9              THE COURT:  And based on an anticipatory breach.

10             MR. BROWN:  As they allege.  And we believe that

11   all of these disputes are pretty relevant to the upcoming

12   bid hearing.  And we're actually fine with proceeding with

13   discovery, Your Honor, so long as we're also able to take

14   discovery both for the purposes of defending ourselves and

15   of bring certain facts to light that we think are important

16   in connection with this DIP.

17             So, there's one more item that I would like to

18   raise before the Court if the Court would indulge me.

19             THE COURT:  Okay.

20             MR. BROWN:  So, in a fairly shocking move

21   postpetition, ETI disaffiliated from the Debtors by

22   transferring their voting rights in the Debtors to a third

23   party.  Also, they could vote their piece of the secured

24   bonds, approximately 30 percent, and create an impaired

25   consenting class.  We think this is an abuse of the

1    bankruptcy process, but it also may qualify as a change of

2    control under the DIP agreement which is worrisome.  Because

3    a change of control would be an event of default under the

4    DIP agreement.  We've raised this issue with the Debtors,

5    but we've yet to receive a satisfactory answer and we're

6    hoping it can be resolved.

7          So, at the end of the day, what we're trying to do

8    here is reach a resolution.  And I would echo Mr. Taylor's

9    remarks that the mediation before Judge Isgur is probably

10   the best path forward because we're just not seeing eye-to-

11   eye.  And if we can't see eye-to-eye, this case is headed

12   for destruction, and I don't think it's in anyone's best

13   interest.

14         I'll leave it at that, Your Honor.  Thank you.

15         THE COURT:  Okay.  Let me just ask if there's any

16   other lender that wishes to be heard before I turn it over

17   to the Debtor.  Okay.  Mr. Murtagh.

18         MR. MURTAGH:  Good afternoon again, Your Honor.

19   It's Hugh Murtagh from Latham & Watkins, proposed counsel

20   for the Debtor and debtors-in-possession.  Your Honor, based

21   on the colloquy you had with Mr. Brown, I would take your

22   guidance on how much detail you would like me to go into.

23         THE COURT:  You can tell me that you disagree.

24   And kind of going into numbers about funding agreements, I'm

25   not sure what to do with that other than two parties

1    disagree as to what it is.

2            MR. MURTAGH:  Understood, Your Honor.  And we do

3    disagree with that.  Separately, I do have evidence that

4    would make a record as to the commitments that existed on

5    the petition date and the course of the parties' dealings

6    between that date and this which I think is relevant to

7    substantiate the concerns that the debtors have.

8            THE COURT:  Just tell me about what you understand

9    that -- I guess what I'm trying to understand is you want

10   discovery.  Is it in connection with the DIP?

11           MR. MURTAGH:  It is, Your Honor.

12           THE COURT:  Are they signatories to the DIP credit

13   agreement?

14           MR. MURTAGH:  Yes, Your Honor.

15           THE COURT:  You think they've breached the DIP

16   credit agreement?  What's the purpose of the discovery?

17   Maye I can just kind of get it -- in other words, they're

18   not objecting to the DIP, right?  So, we don't -- tell me

19   what you think --

20           MR. MURTAGH:  Correct.

21           THE COURT:  Is it in connection with the final DIP

22   hearing or is there another hearing coming?  That's what I'm

23   trying to really hone into, is are we going to show up on

24   the 14th -- they don't have to sign it, and I've got it

25   there could be disputes about that.  But if they breached

1   it, then what's the remedy for the DIP?  What am I taking up

2   on the 14th one way or the other?  Let's assume they

3   breached it, let's assume they didn't.

4          MR. MURTAGH:  Understood.  I appreciate the point,

5   Your Honor.

6          So to boil it down in a nutshell, based on the

7   conduct which we can get into or not, the Debtor's concern

8   is that the movants, which are two of Holdco, CCUR, and OSP,

9   from the moment they signed the credit agreement and the

10  commitment letter had an intention to use their blocking

11  rights to refuse to enter into an RSA that did not throw

12  away the plan of reorganization that was predicate for the

13  filing and instead pivot to the 363 sale that they've always

14  wanted.  And these parties have no intention and have

15  demonstrated no intention of negotiating the deal that was

16  set up for the plan of reorganization and will use their

17  blocking rights to prevent the RSA from getting executed,

18  which prevents the RSA milestone from being achieved, which

19  grants them an excuse not to fund the commitment on the

20  14th.

21         And there are a couple of issues that go directly

22  to the DIP, right?  One, Your Honor, is a general issue.  I

23  take your point that strictly Your Honor probably could

24  enter the final DIP order without concluding that they are

25  in breach or not or without knowing that they will fund or

1    not and we would have our remedies or not if they breached

2    and did not fund after Your Honor entered the order.  I

3    would think we all want to know, even if that's strictly

4    true, whether this Court is being asked to enter -- approve

5    a DIP on a final basis that we all know somebody is not

6    actually going to fund because it leads to severe

7    consequences for the rest of the case.  That's one point.

8             The second point, Your Honor, is that the final

9    DIP order, much like the interim order --

10            THE COURT:  But how can I sign it if they're not

11   agreeing to -- unless somebody else puts up money I suspect,

12   someone covers the shortfall.  In other words, if they're

13   not going to fund, I don't know if I could approve that DIP

14   on the 14th.  That would be like the first question I asked

15   on the 14th, who is really going to commit to the money.

16            MR. MURTAGH:  Well, that would be a sufficient

17   answer why we need the discovery, Your Honor.

18            THE COURT:  To determine whether they're going to

19   fund or not?

20            MR. MURTAGH:  To determine whether they're going

21   to fund or whether their refusal to fund is going to be

22   based on a predetermined course of conduct to use the RSA

23   milestone breach which they will have procured as

24   justification for not funding.

25            THE COURT:  Is there a provision in the DIP credit

1   agreement that will be -- I'm just thinking about -- we're

2   only about six days away.  Is there a provision in the DIP

3   credit agreement that -- or is it just kind of a -- in other

4   words, what will they have breached?  Is it a -- is there

5   like a provision that says they've got to operate in good

6   faith or negotiate in good faith or they can refuse to fund?

7   I'm just trying to -- I'm more thinking out loud now as I

8   prepare for the hearing.

9           MR. MURTAGH:  Two things, Your Honor.  Two things.

10  First, as counsel I think alluded to, the DIP credit

11  agreement defines what is a defaulting lender.  And a

12  defaulting lender is someone who fails to fund when the

13  circumstances for funding are met.  And if that person is

14  defaulting, that person loses its vote.  So, its vote would

15  no longer count for, among other things, a determination

16  whether the RSA milestone is achieved.

17          So, if they are defaulting or have anticipatorily

18  defaulted under their requirements to not be defaulting

19  lenders, then we would not need their vote to achieve the

20  RSA milestone.  So that's one, Your Honor.

21          The second, Your Honor, is they signed a DIP and

22  exit commitment letter.  They are individually committed to

23  their pro rata share not only of the $80 million new money

24  DIP, but also the $60 million exit facility.  I'm scratching

25  my head when counsel says there's no commitments to the

1    exit.  Movants are committed to the exit.  They signed the

2    commitment letter.  Nobody has told them that we need more.

3    Nobody has excused them from that commitment.  It's not just

4    the DIP; it's also the commitment letter.  They're

5    absolutely bound to fund the DIP and the exit unless there's

6    a valid default.

7            THE COURT:  Okay.

8            MR. MURTAGH:  And the other point I was going to

9    make, Your Honor, with regard to the order is even passing

10   all of that, and something counsel alluded to, is our final

11   order is set up much like the interim order to rely upon a

12   finding of good faith of the lenders.  And the finding of

13   good faith the lenders entitles them to substantial

14   protections including indemnification.  And we are not in a

15   position to request that finding or extend those benefits to

16   these lenders without understanding whether we can confirm

17   that they've acted in good faith or whether they've acted in

18   bad faith.  But that goes directly to the language of a DIP

19   order and what we're asking Your Honor to grant in the

20   order.  Even if Your Honor could sign it as a technical

21   matter without knowing if they're going to fund, we have a

22   problem with the construct of the order.

23           THE COURT:  So, what exactly do you want in the

24   next few days from these lenders?  I'm kind of just going

25   through discovery here.  Right?  Looking at just your

1   request for production, right?  All documents related to the

2   Chapter 11 proceedings.  You know you're not going to get

3   that.  All documents concerning related to the DIP.  I'm not

4   sure you're going to get that.  But three sounds interesting

5   to me, too.  All documents including the negotiation

6   regarding the size of the funding obligations, the decisions

7   to fund, the size of an exit facility.  But how do we --

8   when do these documents have to be turned over and then how

9   do you then get to -- there's a hearing on the 14th.  Like

10   realistically tell me what I'm being asked to do today.

11         MR. MURTAGH:  Well, here's what I think -- again,

12   I'll answer it in two ways.  Here's what I think --

13         THE COURT:  And let me just say -- I ought to just

14   say this as well.  And I apologize, Counsel.  I asked you a

15   question and now I'm starting to talk.

16         I don't order anyone -- I never order anyone to

17   mediate.  I don't do that because I don't know if people are

18   going to be committed to then calling and then showing up

19   and -- or if they did it because the judge told them to go

20   do it and so people put on a song and dance and then they

21   don't really -- they have no interest in doing it.  If

22   they're interested in doing it, they don't need my

23   permission to do it.  I always encourage people to talk,

24   yes.  But five days out if people want to do it, everybody's

25   got Isgur's number.  You can reach out to him.  I don't know

1    if he's available or not.  I have no idea.  But I always

2    encourage people to talk, but I don't force people to do it.

3    So anyway, that's -- I meant to make that point.

4              But go ahead, Counsel.

5              MR. MURTAGH:  So, Your Honor, I think there's two

6    possibilities.  The first is a compromise that we offered to

7    counsel which they were not interested in at the time -- but

8    views may evolve -- which is we don't need to take this

9    discovery today and may not need to take it at all if we get

10   to the final DIP hearing, the DIP order is approved, and

11   they fund.  The problem is solved, Your Honor, if they

12   commit to funding, if the order is approved, and they do

13   fund.  If they don't, obviously we have a problem.  And we

14   believe we have claims and we're going to need the discovery

15   immediately.

16             THE COURT:  How much time are we giving them to

17   actually produce all documents and communications related to

18   the DIP?  Let's just use that one.  Or all documents

19   relating to a potential sale of assets by the debtors under

20   Section 363 of the Bankruptcy Code.  How do I give someone

21   17 days to -- or not really 17 days, 10 days to then turn it

22   around.  And then you may turn around and ask for a

23   deposition in connection with it.

24             I'm just thinking from a realistic standpoint,

25   what is it that they can -- that I can say, look, we're

1    going to have a hearing on the 14th, I need to know the

2    answer to these three or four things.

3            MR. MURTAGH:  Understood.  We are where we are

4    now, which is a number of days prior to the hearing.  And

5    the truth is no discovery has been done or nothing has been

6    produced and I would suspect nothing has been prepared.

7            THE COURT:  I have no problem telling you all to

8    work on Saturday and Sunday because -- but the hearing is on

9    Monday.  And I'm just -- and today is Wednesday.  So, I'm

10   just trying to figure out what realistically what one can

11   do.  Because I suspect you're --

12           MR. MURTAGH:  Right.

13           THE COURT:  What I'm not doing, unless -- the 14th

14   is a real date.

15           MR. MURTAGH:  Right.

16           THE COURT:  And I'm going to hold parties to the

17   14th and we'll figure out where we are on the 14th.  But I'm

18   not pushing the 14th.  So, the question is realistically

19   what can we do between now.

20           MR. MURTAGH:  So, Your Honor, we can reissue the

21   discovery on a narrower basis to focus on the agreements

22   among these parties there if any, their intention when they

23   signed it, their willingness to negotiate, why they refused

24   to negotiate, things that I imagine can be done on a

25   relatively tailored basis.  We can excise what Your Honor

1    identified as the broader ones, get down to something that

2    is if not easy, at least workable.  And I expect we would

3    hope to have a deposition, at least 30(b)(6), of the movants

4    made available.  If we couldn't, we would at least, Your

5    Honor, get substantial benefit from the documents and be

6    able to argue from the documents.  That shouldn't be

7    impossible between now and the 14th.

8         THE COURT:  But now you're asking me to move the

9    14th.  Because that's going to be hard to produce documents.

10   I tell them on Wednesday.  So, by Sunday you get documents,

11   right?  And then you're going to go find the 30(b)(6)

12   witness.  I think that's a little too tight.  So, tell me

13   what can be realistically done.  It seems to me that we show

14   up on the 14th and if we don't have a DIP hearing, then

15   maybe someone has breached their agreement one way or the

16   other.  I'm not saying you did or you didn't.  But that

17   could prompt a really expedited hearing in front of me to

18   then figure stuff out if learn something that...

19        MR. MURTAGH:  Right.  Well, Your Honor, if -- and

20   I don't mean to get ahead of Your Honor.  If your conclusion

21   at least tentatively is that based on the discussion we're

22   having is some amount of this discovery may be appropriate,

23   I could take -- ask for five minutes to confer with my co-

24   counsel and with movants to see if there's something that we

25   could all agree would be within the art of the possible in

1      the time we have left.

2           MR. TAYLOR:  If I may respond just on one aspect,

3      Your Honor.

4           THE COURT:  I'm going to give you an opportunity

5      to respond.  I don't know if the Committee has any thoughts.

6      And I know that we're -- I'm not requiring the Committee to

7      speak.  I'm just -- what I don't want to do is make a bunch

8      of decisions and then the Committee wanted an opportunity to

9      address the Court.  That was really the -- I don't know if

10     they do or they don't.  It's more just the opportunity, Mr.

11     Gibbs, not a requirement.  I didn't want to put you on the

12     spot, but I just wanted to kind of open the door to see

13     before I get any responses from Movant.

14          MR. GIBBS:  Understood, Your Honor.  Thanks for

15     the opportunity.  A couple of points.

16          One, we're in violent agreement with the Debtor

17     that there is a contested matter already by the filing of

18     the DIP, and our position is consistent with that and you'll

19     hear that in a minute when you get to our discovery dispute.

20     Notwithstanding what Your Honor said just a second ago that

21     the 14th is a real date, I would ask only that Your Honor

22     wait to hear me before you stay consistent on that position.

23     Because -- not to bury the lead, but one of the things I'll

24     ask you to consider is moving the hearing date by a grand

25     total of 48 hours, something in that nature, to resolve the

1   problem that we find ourselves because of the inability to

2   get the communications that we have sought.  But I'll hold

3   that to when you're ready to hear from me.

4          THE COURT:  Okay.  Counsel?

5          MR. TAYLOR:  Just very briefly, Your Honor.  The

6   discovery is about a hypothetical.  That's really what we're

7   talking about, that something might occur.  Even if we're

8   the most horrible people in the world and everything they

9   say about us is true, getting that discovery doesn't change

10  what's going to happen with respect to our decision on the

11  DIP.  If they think that we're violating an agreement and

12  they think we've breached by not funding, they get to sue us

13  later.  Getting that discovery ahead of the hearing on

14  Monday does nothing for anyone because under no

15  circumstances can they actually force us to fund if that

16  determination is made.  They can only sue us later for what

17  they claim is a breach of contract or some other tortious

18  conduct.

19          So, the discovery is a red herring.  They don't

20  need it for the hearing on Monday.  They need it if they

21  decide they're going to sue is, which isn't going to be

22  known until we don't fund if we don't fund.  It's a waste of

23  money and time for everybody to do this before the hearing

24  until we see what happens because nothing we're going to get

25  is going to change the decisions that my clients are going

1    to make.

2              THE COURT:  Mr. Gibbs, tell me what discovery you

3    think you're looking for.  Just kind of in light of our

4    discussions and what's going on now.  And I'm just thinking

5    of the -- I'm not saying I'm going to grant it or not grant

6    it.  I'm just thinking about what's realistic between now

7    and then.

8              MR. GIBBS:  The simple discovery dispute, Your

9    Honor, that you'll hear from us about concerns the email

10   communications that have -- they exist between

11   representatives of the Debtor and representatives of the

12   proposed DIP lenders regarding the terms of the -- and the

13   entering into and negotiation of the DIP as well as the

14   restructuring term sheet, which is referred to in the DIP

15   and which is -- has been entered into prepetition by the

16   Debtor and the proposed DIP lenders.  So that is the

17   universe of the fight right now.  We received pursuant to a

18   discovery we properly served about 200 documents that were

19   by the Debtor's own description off-the-shelf documents.  We

20   agreed to take those first in the interest of cooperating to

21   try to not be before you today.

22              But what we have asked for and we initially

23   thought they were preparing, which was somewhat unusual, was

24   the self-selection from email boxes they chose to look into

25   to retrieve email communications that they believed were

1    relevant.  And then after that set of agreements, they

2    changed their position and said we are not entitled to any

3    email communications regarding the negotiation we're

4    entering into of the DIP loan.  And we disagree with that.

5    We think we're entitled to it.  We think we've properly and

6    timely asked for them.  We think if they didn't agree to

7    give them to us, they needed to file motions to quash or

8    other appropriate relief, none of which has happened.  They

9    needed to have given it to us in writing prior to Monday

10   night in a statement indicating that they had an

11   understanding that they didn't have to produce those

12   communications, again, which they didn't do.  So, we believe

13   we are entitled to them.  We believe that they exist,

14   they're already under their control and can easily be

15   provided.  And we wanted them prior to the depositions of

16   the two witnesses they're going to propound, one of which

17   had to go forward today without our ability to ask questions

18   about communications that we know exist and think we should

19   have gotten.  The other one is set for tomorrow.  So,

20   there's workarounds around those issues that will allow us

21   to proceed with the discovery properly to be ready to

22   advocate for our position at the final DIP hearing.  And it

23   will involve working on the weekends, which all of us are

24   way too familiar with.  But we can be ready.  We think it's

25   properly and in everybody's best interest to push the DIP

1   hearing out a couple of days to give us the opportunity to

2   complete that discovery and present our case more

3   appropriately to the Court.

4            And when you get to us, I'll tell you what our

5   general concerns are regarding the DIP.  But that's not for

6   today.  Just to give you a little frame of reference.

7   Because I'm hopeful you haven't had the time yet to read our

8   objection to the DIP.  But I know you will before the

9   hearing.

10           THE COURT:  What's your response, Mr. Murtagh?

11           MR. MURTAGH:  Your Honor, we generally --

12           THE COURT:  Yeah.  Go ahead.  I'll give you a full

13   floor.

14           MR. MURTAGH:  Good news is I don't think we have

15   any fundamental dispute with the UCC about its discovery.  I

16   think it sounds like -- and I was not the primary

17   negotiator.  My partner, Betsy Marks, who is on the line

18   could provide me with detail.  There is at least a

19   misunderstanding about what was agreed to be produced in

20   response to our fees that they sent us.  And our

21   understanding was that they were not looking at this time

22   for ESI.  Theirs is that they were looking for at least some

23   -- at least a self-directed pull of documents.  If the

24   request is that we undertake that sort of self-selection as

25   a bridge, I think we can probably do that by Monday, Your

1    Honor.  I don't know if we need until Wednesday.  I think

2    the dispute with the UCC is in the nature of

3    misunderstanding.

4         THE COURT:  So, what do you think is the -- what

5    do you think we can -- what do you think can realistically

6    get done before Monday?

7         MR. MURTAGH:  Well, if the UCC's position is that

8    what they want is what --

9         THE COURT:  Well, just on everything.  And I

10   apologize.  I should have said --

11        MR. MURTAGH:  Sorry, Your Honor.  So, I think we

12   can -- do not a hundred percent quote me on whether it's

13   Monday or Tuesday.  I don't even know what availability the

14   Court has.  But I believe that by Monday with regard to the

15   UCC we could give them that self-directed pull that I think

16   is what they're asking for.  But obviously I'll let them

17   speak for themselves if they're looking for something

18   different.

19        With regard to movants, Your Honor, they will have

20   to tell us if it's absolutely impossible, although to get --

21   to respond timely to what I undertake will be a more

22   narrowly-tailored set of requests that we will get out this

23   afternoon and produce a witness for us to have -- it doesn't

24   need to be a full-day deposition, but to have a deposition

25   to be prepared for Monday, I understand that's a lot to do

1    for us and for them, Your Honor.  But at this point, this

2    discovery has been pending since the 28th.  It's not two

3    days or five days or seven days anymore.  I don't know if

4    they've done anything to prepare for the eventuality that

5    they would have to produce.  But we'd have to hear from them

6    on that.

7              THE COURT:  Counsel?

8              MR. BROWN:  Yes, Your Honor.

9              THE COURT:  Apologize.  I should have given you

10   the opportunity.  I apologize.

11             MR. BROWN:  No problem, Your Honor.  One thing

12   that I do want to propose, we put it in our brief, but I

13   think it merits raising -- I can't speak for the other

14   minority lenders, but as to Holdco, we stand ready to fund

15   and we are comfortable putting the money into escrow,

16   especially if that will sort of facilitate the DIP hearing

17   going forward as Your Honor requires.  And then the issue of

18   whether there's an event of default that would excuse the

19   funding obligation could be a matter put over for another

20   day, especially if there are other DIP lenders who are

21   prepared to place their money with the Debtor and now in

22   escrow.

23             As far as discovery goes, I think that we can

24   probably work through documents.  We did engage in document

25   pulls and searches after we received the discovery.  And we

1   can work with the Debtors to try to produce documents.  I

2   think depositions is a lot more difficult.  For example,

3   there's a deposition of the Debtor's CRO happening tomorrow.

4   I'm going to need to participate in that.  And that leaves

5   us one business day before the hearing.  And they're seeking

6   multiple depositions in that one business day.

7          We can work on Saturday or Sunday.  I think

8   witnesses --

9          THE COURT:  I do.

10         MR. BROWN:  -- could potentially even provide

11  testimony on Saturday or Sunday.  But it is -- practically

12  it is quite difficult.

13         THE COURT:  So, I'm speaking at the 10,000-foot

14  level here.  But kind of taking all of this in, it feels

15  like to me having a much more targeted scope of discovery

16  really going to whether someone has -- I'm not saying they

17  did or didn't and its obligations that the debtor -- excuse

18  me, that the lender, minority lenders were required to do

19  under either the interim order or related agreements that

20  were approved and whether that in some way or another

21  affects the ability of the Debtor in connection with the

22  final DIP hearing.

23         In other words, the answer can't -- unless you

24  can't tell me otherwise, if there's a trigger in the

25  agreement that says it forces someone to do X, then I would

1   need to know that.  If not -- but I do think having one

2   hearing where we kind of air this all out.  And if I don't

3   approve the DIP, it's going to be really clear why I did or

4   I didn't.  Either the text says it says what it says or

5   we're not going to have a bunch of other hearings related to

6   this.  I don't know where this goes.

7           Monday does feel tight to me if that's what's

8   going to -- if that's what you're asking for.  I think this

9   discovery is broad.  And you've got stuff in here about, you

10  know, the RSAs and communications about the RSAs or related

11  to plan confirmation issues.  That stuff seems really,

12  really, really -- that's going to -- that starts to sound

13  like a May hearing -- a Wednesday hearing starts to sound

14  like very targeted towards this final DIP hearing.  But

15  you'd have to get -- in terms of witnesses and all that

16  stuff, I couldn't even get into that because I wouldn't know

17  what was going on.  But I don't want to hold multiple

18  hearings on this.  I think one hearing.  And it sounds like

19  you can work out your issues with the Debtor.  I do think if

20  you feel like someone is violating the existing credit

21  agreement or it's going to, I just need to know about this.

22  Because I don't have to rule on the final DIP hearing

23  without it.

24           So, I think the discovery can be really, really

25  limited.  But it's going to have to be laser-focused on

1    final DIP and approval of the final DIP.  If what you're

2    alleging is something else, then I think procedurally I

3    think you're going to have to get something in front of me

4    that resolves those other issues if that's where this is

5    going.  Because I can either approve a final DIP or not

6    approve a final DIP.  That's kind of the request.  And so, I

7    can say yes or no, but I can't do anything procedurally.

8    That's the ask.  And it's either up or down on that.  But I

9    would need to know why I'm saying yes or no.  And I get that

10   you get to put on your case, but I don't think the discovery

11   -- I think it's probably a little too broad if you're going

12   to kind of go for it on the 31st and ask for this on a few

13   days.  But stuff related to the final DIP, I do think you

14   can do some super-targeted stuff and we'll just show up and

15   see what we've got.  But I think the 16th is probably the

16   better date if that's what we're going to do.

17           What I unartfully said, Mr. Gibbs, is I think

18   sometimes judges push dates without realizing if you pull

19   one string, you tug and you blow up a bunch of stuff

20   unnecessarily.  But I feel if the debtor is asking to go --

21   ask for some targeted stuff and they're going to send some

22   targeted stuff out and they think they can get you something

23   by Monday on your stuff, then I think it's impossible to go

24   forward on Monday.  So, I would need -- and again, I know

25   that there's other parties involved, other lenders.  And

1    everybody is going to have to agree.  And I don't want to be

2    the one saying we're going to move it.  But just if that's

3    what you're asking, then Wednesday does feel like the date.

4    Not because Mr. Gibbs proposed it, just because I don't have

5    anything on that day.  That's the -- that was the logic.

6    I'm not giving you that much credit, Mr. Gibbs.  It's just

7    it happens that I have no hearings on that day.  But I think

8    it's probably the closest day.  Then we get into, you know,

9    kind of Easter-related holidays and all that stuff where

10   people disappear around those days.  And so Wednesday, if

11   somebody is going to do something next week, that's the

12   date.  But I don't want to jam.

13          And I don't know what you're proposing.  But if

14   it's, hey, I don't think you're operating in good faith

15   under the docs, I don't think you're operating in good faith

16   under the DIP and that's what the DIP says, DIP credit

17   agreement, DIP order, yeah, I think that's probably --

18   because I need to know if it's up or down on the DIP.

19          MR. WELCH:  If I may, Your Honor.

20          THE COURT:  Yes.

21          MR. WELCH:  Alexander Welch, Latham, for the

22   record, Your Honor.  I only took to the podium because,

23   precisely as Your Honor was pointing out, pull one string

24   and another string may come out.  We certainly appreciate,

25   Your Honor, the issues you're identifying.  And I think from

1    the Debtor's perspective we more or less agree.  I think the

2    issues from our perspective are practical in some respects.

3              First, the liquidity needs of the Debtors are

4    real.  That said, it took the time to confer with our CRO.

5    Wednesday is doable.  Not much beyond then in terms of that.

6    However, Your Honor, on that point, as I noted in my

7    opening, the milestone is set for the 14th.  And there is an

8    RSA Milestone and there is a final DIP milestone.

9              THE COURT:  No, no, no.  I know.  I'm aware of it.

10   Yeah.  No, no, I'm aware of it.

11             MR. WELCH:  And that would need to be moved to

12   meet the hearing on the Wednesday as well for that to be

13   acceptable.

14             THE COURT:  It seems to me that I think you want

15   to go forward on Monday, you can.  I just don't know what I

16   can do on Monday -- and I'm just being honest.  You know,

17   because I know you've got to confer with folks and do all

18   this stuff.  If it's Wednesday, I can give it -- I'll be

19   prepared to give an answer up or down on Wednesday whether

20   the -- you know.  But you all are going to have to let me

21   know what you're going to what to do if what you're asking

22   for is a hearing on Monday.

23             MR. WELCH:  Well, I would put it we're a little

24   bit in others' hands.  We can go ahead on Wednesday if the

25   parties agree that the milestones under the DIP order are

1    moved to Wednesday.  If that is going to continue to be held

2    over the Debtors for Monday, then Wednesday may be a moot

3    issue.

4         THE COURT:  I think that's right.  I'm willing to

5    hang around and figure out if folks need time or you all can

6    let me know.  But I think Monday is going to be hard for me

7    to -- I think Monday in light of everything is going to be

8    hard for me to kind of provide a final answer in light of --

9    or where we go.  It's going to be hard for me to approve

10   discovery if Monday is going to be the answer.

11        MR. BROWN:  Your Honor, if I may.  As to the

12   minority lenders, I think that all of our clients are

13   watching this quite closely and I think we could probably

14   provide an answer on the extension of the RSA milestone.

15   The only other issue that I want to raise before the Debtor

16   is they are accusing our side of anticipatory breach, bad

17   faith.  You know, we believe that there are event of default

18   issues.  And so, I think the discovery would need to go both

19   ways so that Your Honor gets the full picture.

20        THE COURT:  No, no, I think that's fine.  In other

21   words, let's have a targeted hearing where whatever can come

22   out on that day comes out and I can -- I want to hear from

23   both sides.  I don't -- you know, I want to hear -- and

24   let's study the agreement.  And everybody knows me, we're

25   going to start with pulling out the credit agreement and

1    we're going to just see where we go.  And we'll start with

2    the order, and then we'll take evidence based on that.

3            You all will let me know if Wednesday.  But I've

4    got it.  It's going to be targeted, but targeted both ways

5    where -- I've got it, you have a right to defend yourself

6    and you have a right to allege, by the way.  I'm not bound

7    by any of this.  And there's already a default under the

8    agreement and the section acts as this is what it does and,

9    you know, I'm either bound by this and I never have to agree

10   to this and -- and I've got it.  I think that's fair.  And

11   this isn't intended to jam any party.  It's more to create a

12   more robust evidentiary hearing that the Court could rule

13   on.

14           MR. BROWN:  And then I don't know if the escrow

15   solution sort of provides a little bit of a release valve or

16   not, Your Honor.  Counsel for CCUR did tell me that their

17   client also stands ready to fund.  He didn't say anything

18   about an escrow or not.  I don't want to misrepresent that.

19   But it does work as the Holdco, especially if these event of

20   default issues are complex.  It's kind of enough up for the

21   DIP hearing.  If the DIP gets approved, it's a question of

22   whether the contingencies to funding have been met or not.

23           THE COURT:  Right.  Because it just seems that

24   you're either going to have to -- if I approve a DIP, the

25   question is do I approve it -- can I approve the DIP over

1    someone who doesn't want to be a part of the DIP, right?

2    And that's going to be in question.  The credit agreement --

3    because in other words, let's just say one of the minority

4    lenders or all three of them say I don't want to be a part

5    of this and you can't force me to sign it, then I've got to

6    deal with that legal issue.  But maybe there are alternate

7    scenarios that the Debtor comes up with before that date.

8         In other words, I don't know what version of the

9    final DIP someone is going to ask me to sign.  What I do

10   know is I want to have a good record one way or the other.

11   Because -- and I know that I've got to be prepared to rule.

12   Whatever day we pick, be prepared to rule on that day.  So,

13   I'm not taking anything under advisement.  You're going to

14   get an answer that day but, you know, we'll be ready.

15        MR. BROWN:  And just to be clear, Your Honor, I

16   think all of the minority lenders do want to be a part of

17   the DIP.  It's just that the conditions to funding have to

18   be met.

19        THE COURT:  No, I've got it.  And what I would say

20   to the parties is these decisions are best left in your own

21   hands.  I am either -- and left to me -- but I'll make the

22   call on that day.  And I don't know what the answer will be.

23   I think it would be premature and unfair to rule how I would

24   rule.  And a lot of things happen between now and the 14th

25   or the 16th or whatever day we pick.  And so, I'm just going

 1   to -- I don't want to put my thumb on the scale one way or

 2   the other.  But I do know and I do encourage the parties

 3   while they are engaged in potential discovery disputes and

 4   potential contested matter, I think someone ought to have a

 5   side room where they're also talking about -- see if there's

 6   a way to bridge the gap between you all and not just go into

 7   full litigation mode.  I think that would be -- because

 8   again, I think everyone knows this business, knows what

 9   needs to get done, knows the liquidity issues, knows the --

10   you all know this a lot better than I do.  But I will rule

11   on the legal issues if that's where it's left.  So, you all

12   tell me what you want me to do.

13        MR. WELCH:  Understood.  Mr. Davidson suggested

14   perhaps something that might save Your Honor having to wait

15   around is that if we could take the hearing on the

16   Wednesday, we'll keep the hearing on the Monday.  And we can

17   confirm from the Debtor's perspective whether or not we have

18   the needed extensions of the milestones to move it to

19   Wednesday, in which case we --

20        THE COURT:  By when?  When would I know?

21        MR. WELCH:  Today, shortly.  I have feelers out.

22   These gentlemen here can answer for...

23        THE COURT:  I won't jam you.  But, you know, we

24   could start at 10:00 a.m. and I will just keep -- this is

25   not an encouragement.  I'm just keeping the block open

1    because of the -- I don't know what time people may work and

2    -- but I could just block starting at 10:00 a.m. on

3    Wednesday and just keep it open so if 1:00 works better or

4    10:00 works better just in terms of time.  But we can -- I

5    can just block that -- you'll have the entire block.  I

6    won't do anything.  And someone will let me know if the 16th

7    is possible.  But I still think you ought to get out what

8    you're going to get out.

9            MR. WELCH:  Appreciate it.

10           THE COURT:  Okay.

11           MR. BROWN:  The only concern I have, Your Honor,

12   right now is agreeing to agree on the scope of discovery and

13   what's appropriate and what's not.  I fear that that --

14   we'll be right back in the same place.

15           THE COURT:  We may be.  I'll be here tomorrow.  If

16   we've got to do it on the phone, we'll do it on the phone.

17   But -- and I assure you if the discovery goes out tomorrow -

18   - yeah, I will -- and parties think this is just -- don't

19   leave it to me because I will just say what the scope of

20   discovery is and it will be what it is and it will be a two-

21   minute hearing.  It needs to be laser-targeted and it has to

22   be focused on the final DIP.  And if there's a final DIP

23   hearing and whether parties have -- and your defenses to the

24   final DIP.  In other words, whether you're bound by this,

25   whether you are good faith and things of that nature, I

1    think it's -- let's just see where this goes.

2         MR. TAYLOR:  Can we get a stipulation from Counsel

3    or an order from the Court either withdrawing or striking

4    the existing discovery request?  Because that's really what

5    we're here on.  What the Court is suggesting I think is a

6    new set of discovery.  So, I don't want to be having to

7    respond to the old set of discovery.

8         THE COURT:  No, no.  You won't have to respond to

9    this.  What I'm asking for is if we go forward on Wednesday,

10   let's just have it more targeted and --

11        MR. MURTAGH:  Understood.  I mean, if it's

12   resolved by my stipulating to that resolution, so

13   stipulated.  I think Holdco had also propounded they've got

14   existing discovery out to us that needs to be reframed.  So,

15   we're both agreeing we're going to send out something new

16   and we're going to make sure that it is realistic.

17        MR. TAYLOR:  And the old discovery is withdrawn.

18   Is that right?

19        THE COURT:  Or shall not be enforced, yes.  We can

20   -- yeah.

21        MR. BROWN:  And then one other point, Your Honor.

22   I think Counsel for the remaining Ad Hoc Committee

23   representatives Avenue and Gates Capital.  We've also

24   propounded discovery on them.  They're other DIP lenders.

25   We think it's all related.  So, I think it's sort of share

1    and share alike with respect to all discovery.

2             THE COURT:  I think that's right.  I think that's

3    right.  Just fair.  No one gets jammed by the existing stuff

4    out there.  Everybody kind of gets targeted.

5             Mr. Gibbs, it sounds like the Committee -- I'm

6    going to ask that you just -- it sounds like this could get

7    resolved by Monday one way or the other.  But if not -- or

8    not resolved, but you can get what you're going to get by

9    Monday.  But if there's any issues, I'll be around for the

10   next few days and you all can -- we can just have a hearing

11   on it.

12            MR. GIBBS:  Your Honor, if I could, let me -- I'm

13   not sure if you were planning to have this colloquy and

14   discussion resolve both matters that are on your docket

15   today.  I don't want to resolve this and separately argue

16   ours.

17            THE COURT:  No, no, no.  I'm hoping it does,

18   because I'm hearing that what may be a conversation, and

19   then you'll get what you get on Monday and everybody's

20   rights are reserved in connection with Wednesday, a hearing

21   on Wednesday.

22            MR. GIBBS:  If I could, Your Honor, let me offer

23   the following comments.  One, I think you're familiar --

24   I've been in front of you on a number of matters on behalf

25   of committees for a number of years.  This is the first and

1    hopefully only discovery dispute I've had to bring to you.

2    But we are currently scheduled to take Mr. Eisenberg's

3    deposition tomorrow.  We had to take Mr. Spitzer's today

4    without the benefit of email communications between the

5    parties to the DIP loan and the restructuring term sheet

6    that forms the basis of and is the underpinning for the DIP

7    loan.

8          I would like, and I would ask Your Honor to

9    consider and the Debtor to consider hopefully, Your Honor,

10    an order that Mr. Eisenberg's deposition move from tomorrow

11    to Monday and ask the Debtor to provide the documents that

12    they were saying they didn't have to produce that we've

13    asked for by Sunday so that we have the benefit of those

14    communications for purposes of examining the witness prior

15    to Wednesday's hearing.  I can't take any credit for the

16    Wednesday suggestion.  The broken clock is right twice a

17    day.  I just know that we needed a couple of extra days and

18    didn't think Monday worked.  I think Your Honor is thinking

19    the same thing.

20          So, we're okay with preparing to go forward with

21    our objection.  And I just want the Court to know that what

22    we're looking for are the email communications between the

23    parties.  And we hope that they wouldn't say, well, that's

24    only with respect to the DIP loan.  Because the request is

25    for the DIP loan and the terms of the restructuring term

 1    sheet that formed the basis of the DIP loan.  It -- require

 2    the milestones that govern the DIP loan.  So, it's not a

 3    huge additional amount of communications, it's just a

 4    slightly broader description of the communications what

 5    we're looking for.  And if we get them Sunday when we have

 6    the ability to depose Mr. Eisenberg Monday rather than

 7    tomorrow without the benefit of those documents, it would

 8    save the need for a recall.  And then hopefully we can

 9    resolve whether or not we need to ask any further questions

10    of Mr. Spitzer, whose deposition concluded I think while

11    this hearing was going on.  So that --

12             THE COURT:  Mr. Murtagh, what are your thoughts?

13             MR. GIBBS:  I'm sorry, sir?

14             THE COURT:  Oh, no.  I was asking Mr. Murtagh what

15    his thoughts were.  It is clear to me that you all need to

16    all get in a room.  And I know I don't force people, but it

17    is clear that you all -- the burn on this -- and I'm not

18    really sure -- I think when you -- me looking at the company

19    and what the company -- understanding the company's

20    liquidity needs in which everyone knows better, it is just

21    clear that you all need to get in a room and figure all this

22    out.  The burn rate is just going to be -- it's already

23    there.  And I think someone has got to work through these

24    logjams and really kind of get there.  Because you're not

25    there, but you're walking down a line that once it slips,

1    it's hard to get back up.  But go ahead.

2          MR. MURTAGH:  I fully appreciate and agree with

3    that, Your Honor.  So, a few things to respond to.

4          First, with regard -- and I think these are all on

5    the margins time-saving responses or money-saving responses.

6    Mr. Spitzer's deposition appears to have just gone on for

7    five or six hours.  Whatever documents that the UCC had was

8    clearly a sufficient set to take almost the full allotted

9    time under the rules.  So, I don't think there's going to be

10   any need to bring him back.

11         For Mr. Eisenberg -- and Mr. Gibbs can say he

12   disagrees with that and we'll go from there.  But Mr.

13   Spitzer was deposed substantially all day on the basis of

14   the hundreds of documents we already produced.

15         Mr. Eisenberg is available on Monday instead of

16   tomorrow and will sit on Monday.  If the deposition that the

17   movants have in mind of the Debtors is of Mr. Eisenberg,

18   then that would probably make some sense to have him sit for

19   everybody on one day.  I don't know if that's what movants

20   have in mind.  But that would be efficient anyway.

21         THE COURT:  Well, I can tell everyone he's not

22   going to sit two different times.  We're going to pick one

23   time if we're going to do this on one day.  Eisenberg will

24   go one time and everybody will get their questions out on

25   Eisenberg.

1                MR. MURTAGH:  Understood, Your Honor.  And then

2      with regard to the documents, I do think it's realist ice

3      that we can get Mr. Gibbs -- but what had been discussed

4      among the parties, which was for lack of a better word a

5      self-directed pull of emails.  If upon seeing those Mr.

6      Gibbs believes that they are grossly insufficient and you

7      must have been pulling punches, we can talk about it.  But

8      we're not going to do that, Your Honor.

9                THE COURT:  No, appreciate it.  Counsel?

10               MR. BROWN:  Yes, Your Honor.  Just to respond to

11     what the Committee was saying.  The Debtor's discovery

12     requests at least to the minority lenders were fairly

13     focused on the DIP for the most part.  But then it sort of

14     expanded on some of them.  The Committee's goes back for

15     years.  And I think when we're talking about a final DIP and

16     an up or down approval to dig all the way into what I

17     believe is a four-and-a-half-year relationship with respect

18     to these minority lenders being secured bondholders and

19     working through the Debtors.  Because all of that sort of

20     led up to these negotiations including the RSA and related

21     term sheets.  So, I do think just having heard what Mr.

22     Gibbs had to say already that doesn't sound very targeted

23     towards a final DIP.

24               THE COURT:  I know.  But Mr. Gibbs has heard what

25     I said earlier.  And I think he knows that if we're going to

1    push this back for two days to give folks a full and fair

2    opportunity, then it's just got to be realistic as to what

3    can kind of get done over the next few days and going back

4    to -- no one is going back to 2021 in three days.

5           MR. BROWN:  Understood, Your Honor.  And then on

6    the Debtor's side, there's also Mr. Carr, who is the

7    independent director, who our understanding is that he is

8    the sole decisionmaker postpetition with respect to all of

9    these issues.  So, we think his deposition will be pretty

10   critical.  I'm sure the Committee agrees.  And then there's

11   Mr. Chadha, the CEO, who our understanding is prepetition

12   was the one making substantially all of these decisions.

13   So, we think that would be pretty critical as well.

14          THE COURT:  Why do you need Mr. Chadha if Carr is

15   making all of the decisions in connection with a

16   postpetition DIP?

17          MR. BROWN:  Well, it goes to some of the issues

18   that I raised before with respect to Mr. Chadha's

19   relationship with ETI.

20          THE COURT:  You don't have me sold on that one,

21   but we'll see where that goes.

22          What else do we need to talk about?

23          MR. MURTAGH:  Just with regard to --

24          THE COURT:  It seems to me that for -- you're

25   asking for what Lopez needs is I need to hear from Eisenberg

1    and Carr.  Or at least understand what the independent

2    director did.  And if someone has to say this is in the best

3    interest of the estate, and then folks can talk.  And then

4    if you have -- in terms of the Debtor establishing its own

5    duty under 364 to say I need money and there's someone who

6    kind of did some independent research on this and then --

7    then if there's -- the stuff with the minority lenders, I

8    don't know who that is.  I'm just talking about just in

9    terms of base establishing what you need.  Maybe Carr can

10   give you both, maybe -- but someone's going to have to say

11   that the decision was made to approve this and we think this

12   is in the best interest of the estate.  Just something that

13   provides the evidence for 364.

14          So, I don't know if that's Carr and Eisenberg or

15   just Eisenberg.  But you all are going to figure that out in

16   terms of their side.  But I don't think you need for my

17   purposes to go knee deep in prepetition relationships in

18   connection with a DIP unless the insider is providing a DIP.

19   And if we're having those issues, then maybe.  But it

20   doesn't sound -- to me this sounds like whether the minority

21   lenders are going to fund or not and whether they are

22   required to do so or not.  So, let's just have that fight

23   and let's see what happens.

24          MR. MURTAGH:  Understood, Your Honor.  With regard

25   to the point, you just made, I think the answer is it's Mr.

1    Eisenberg.  He was a declarant in support of the first day.

2    And they've already -- the UCC anyways already had Mr.

3    Spitzer, who was the DIP declarant.  I don't know that --

4         THE COURT:  I don't need to hear from -- in other

5    words, you'll know what you need for 364 and who is going to

6    be there.  But it's one of those two, right?

7         MR. MURTAGH:  Correct, Your Honor.  Well, I would

8    say one of the three.  Mr. Spitzer is the deputy CRO.  But

9    it's a variety of the same things.

10        THE COURT:  Fair point.  No, no.  And these folks

11   have already been deposed, right?  The answer may already be

12   there.  But in terms of the Debtor, I don't -- in other

13   words, this -- I don't know if -- it seems to me that the

14   issues are going to be fairly targeted unless we start

15   learning about other stuff one way or the other in terms of

16   what you think or what they think.

17        What I am going to want to know is by Monday --

18   yeah.  Because if we do this on Wednesday, on Monday you're

19   going to have to file kind of a witness and exhibit list.

20   And that will give me a sense of whether you all are going

21   to be here until 8:00 at night or 1:00 in the afternoon.

22   But we're going to have to finish that day for sure.

23        MR. BROWN:  Your Honor, I guess from our

24   perspective just based on the colloquy today and the

25   comments from the bench, it would seem that laser-targeted

1   on the final DIP and then also laser-targeted on the

2   existence of events of default is what seems to be -- those

3   two issues seem to be related, and inextricably so.

4        THE COURT:  I think that's right.  Look, and I do

5   think if there are some minor RSA issues that are related to

6   the milestones as to how the milestones got -- because

7   they're in the DIP, right?  So, I think that's fair game.

8        MR. TAYLOR:  With respect to a Monday deadline for

9   witness and exhibit list, given the compression of time, I'd

10  suggest the Court consider moving the new deadline to 5:00

11  that day.

12       THE COURT:  Oh no, no, no.  I just said Monday.

13       MR. TAYLOR:  Okay.  Well -- okay.

14       THE COURT:  I just said Monday.  So, I don't want

15  to jam anyone about what makes the most sense and where

16  things are going.  Just Monday is good enough for me.

17       MR. TAYLOR:  Right.  Thank you.

18       THE COURT:  Oh, and not the noon stuff.  I got

19  what you mean.  Not -- no.  Just Monday.  I think you all

20  just need to let me know if -- well, the question then

21  becomes if we start on Wednesday at noon, that's something.

22  If it's not Wednesday, you all are going to tell me today.

23  If that's the case, then I may call a status conference on

24  Friday just to understand what Monday looks like.  And so,

25  we can just have a hearing on -- just as a status

1      conference.  If it's Wednesday, I know it's coming.  But if

2      it's Monday, then I need to know what the world looks like

3      on Monday.  But it can be telephonic or by video.  No one

4      has to come in.

5           MR. BROWN:  The only other issue I wanted to

6      raise, Your Honor, is in light of the sort of final DIP and

7      events of default, I think with that being the scope, laser-

8      focused and narrow on essentially these two issues,

9      especially because of Mr. Carr's position as the independent

10     director and sole decisionmaker, I do think that his

11     deposition would be pretty vital.  And the Court sort of

12     suggested that maybe Eisenberg would be enough.  I just want

13     to put --

14          THE COURT:  No, let me just say I don't -- I know

15     it's one of them, right?  In other words, the Debtor has the

16     burden.  And so, the Debtor is going to have to put someone

17     forward to satisfy 364.  I mean, that was my backdoor way or

18     saying Debtor, you're still going to have to put on your

19     evidence.

20          MR. BROWN:  Well, just in terms of exploring the

21     fact issues related to potential events of default, you

22     know, I think because Mr. Carr is in the position to --

23     again, the sole decision is on how all the DIP stuff is

24     going to work postpetition, that I think a deposition of him

25     is going to be pretty vital, just as vital as Mr. Eisenberg.

1    And that's something that we would want to accomplish as

2    quickly as possible.  Ideally before Monday as we sort of

3    get into a very tight thing on Wednesday.

4            THE COURT:  That's going to be tight.  That's

5    going to be tight.  I just think realistically that's going

6    to be tight.  I don't know.  If you've got the LCRO and --

7    and we're talking about DIP financing and -- it's the

8    Debtor's burden.  That's why I'm thinking -- the Debtor is

9    going to have to put on their burden.  Because all I'm doing

10   is approving a DIP or not approving a DIP.  It's just that

11   laser-focused on it.  And I'm not -- that's the ask, right?

12   To enter an order approving this funding.  But you all are

13   going to have to tell me who is funding, who is required to

14   fund, who is obligated to fund.  And if there's something

15   else, I can't enter it in connection with the DIP order, but

16   you all are going to have to tell me if this goes anywhere

17   else.  But I think that's kind of what one does with a

18   breach if there is a breach, I think is the question legally

19   in connection with a DIP motion.

20           MR. MURTAGH:  If I understand Your Honor correctly

21   -- I'm sorry, I thank Your Honor for engaging with us and

22   figuring this out.  And I'm sorry to take the Court's time

23   with this.

24           THE COURT:  No, no, no.  I want you to take as

25   much time because I...

1          MR. MURTAGH:  What I hear Your Honor saying is

2     it's the Debtor's burden here to make the facts showing the

3     need for the DIP hearing.  So, whoever the Debtors are going

4     to bring for that is who movants are going to depose.

5          THE COURT:  They've already -- yeah.

6          MR. MURTAGH:  And they've already deposed --

7          THE COURT:  Yeah.  I suspect you -- a couple days

8     ago I suspect you're going to get Eisenberg -- I suspect

9     that's who is coming.  Eisenberg on Monday and then you're

10    going forward on Wednesday, right?

11         MR. MURTAGH:  I think that's probably right.  Mr.

12    Eisenberg for the world on Monday.  Yes, Your Honor.

13         THE COURT:  I think that's -- and the Debtor gets

14    to put on their case, right?  So, I think that's what it is.

15    And so, I think that's where this goes.  I just think it's

16    got to be one of those folks.  It's got to be someone who

17    believes that this is in the best interest of the estate and

18    under 364 and you believe you can do this.  And we'll see

19    where this goes.  We'll see where it goes.

20         MR. MURTAGH:  Understood.

21         MR. BROWN:  I would just add, Your Honor, that the

22    existence of defense of defaults, we do believe that Mr.

23    Carr is going to be vital to that.  And it is their burden,

24    but it sounds like it's their burden to demonstrate that

25    there has been no event of default, which means that I think

1      it puts Mr. Carr squarely at issue.

2              THE COURT:  I guess what I'm saying is they're

3      going to have to go prove it, right?  So, they get to put on

4      their case.  And whether they proved it or not, I don't -- I

5      can't tell the Debtor who to bring.  And I stay out of that

6      business.  But it's their burden.

7              MR. BROWN:  I just don't want any party-in-

8      interest to be hamstrung with respect to the scope of the

9      evidence because Mr. Carr wasn't made available.

10             THE COURT:  No, that will be part of the

11     evidentiary record I guess is what I'm saying.  I don't want

12     to say any more.  I just leave it there in terms of -- the

13     document speaks for itself and the document says what it

14     says.  And we'll just take it one step at a time.  I don't

15     want to lose sight because I know there's a lot going on.

16     But I don't want to lose sight that I'm just ruling on a

17     final DIP.  And that's going to be my focus, is on the

18     relief requested because that's what I'm being asked to do.

19             I think you also hear me saying I got it; there's

20     a lot of moving parts here.  And I think everyone would be

21     well served to at least limit the number of moving parts

22     that are moving.  And we'll see where we are.  But you all

23     let me know.

24             When do you think -- in terms of letting me know,

25     how do you want to do that?  How do you want to let me know

1    what you all are going to do?

2          MR. MURTAGH:  With regard to timing or

3    specifically how we're going to --

4          THE COURT:  I mean for the Wednesday whether --

5    whether, you know, whether Wednesday is realistic or not.

6          MR. WELCH:  Your Honor, for the record, Alexander

7    Welch, Lathan.  We are waiting I think for a confirmation

8    from one lender.  Assuming we have confirmation from those

9    that represent -- well, actually two lenders.  I apologize.

10          MR. TAYLOR:  I'm going to step out as soon as

11    we're done and talk with my client.

12          THE COURT:  No, no, no.  Just in terms of just

13    letting me know.  I mean, you can let my case manager know

14    if Wednesday is realistic.  But I guess we will proceed as

15    if Wednesday -- I'm not going to put it in the notes.  You

16    know, but if -- not going to -- you know you've got

17    Wednesday at 10:00.  I don't want to kind of put it in the

18    notes and then have to retract it.  But you've got Wednesday

19    starting at 10:00 a.m.  And we'll go until we're done.  If

20    Wednesday doesn't go, then let my case manager know and

21    we'll set a status conference on Friday and then we'll see

22    what the world looks like.

23          MR. WELCH:  My expectation is just that, Your

24    Honor.  We'll either file a notice today confirming it's

25    moved to Wednesday or we'll be contacting your chambers

1   about status conference.

2          THE COURT:  Okay.  Yeah, that's all I need.  But

3   once you file it, let my case manager -- just shoot her an

4   email just so I know that's something that's hit the docket

5   one way or the other.  And any time is fine.

6          MR. BROWN:  Your Honor, I'm wondering if it makes

7   sense just to hold the status conference for Friday because

8   of all these moving parts.  We're obviously going to be

9   doing a lot of talking in between now and then.

10          THE COURT:  Because I would encourage you all to

11   come back.  So let me know.  No, no, seriously.  Just let me

12   know.  I'm around on Friday.  And if we need to do something

13   quickly, we will.  I've got the -- I am here on Friday and I

14   -- the morning is a little tight, but after 11:00 I'm pretty

15   open.  So, I can -- if I'm around.  And it's just -- you all

16   just let me know.  But if we need to have the status

17   conference, the status conference will be I think 1:00 at

18   the same time if we have to have it.  1:00 Central.

19          So, I don't want to schedule one just quite yet.

20   But I will hold that 1:00 time slot open if something --

21   there's another update that comes up that everybody agrees

22   that I should know about, we can have that time.  But as of

23   right now I only want to use it -- I'd rather keep everyone

24   focused and not meeting in front of me and preparing for

25   meetings in front of me and focusing on what you've got to

1      do and getting to work on that.  Seeing everyone on

2      Wednesday and seeing where that goes.  If not, then we'll

3      see each other at 1:00 to talk about what Monday looks like.

4      Other than that, I want everybody working and focusing on

5      what you need to do.  And if anything comes up, you all just

6      let me know.  But I'll check the docket.

7              MR. GIBBS:  Your Honor, could I be heard on just

8      what I would consider to be housekeeping?

9              THE COURT:  Yeah.

10             MR. GIBBS:  I understood Mr. Murtagh to say that

11     he didn't think we'd have the need to take any further

12     depositions of Mr. Spitzer.  I hope he's right.  I just

13     didn't want my silence to be (indiscernible).  I presume

14     that we are in agreement with that.  I think reasonable

15     people here can get that resolved.  I just wanted the Court

16     to know that we do need to see the documents we've asked for

17     before we made that final call with respect to Mr. Spitzer.

18             I would like the Debtor to tell us and the Court

19     when on Sunday we're going to get the communications that

20     we've asked for if we're going to need to have those and

21     review them in time to depose Mr. Spitzer -- I mean Mr.

22     Eisenberg about some of those documents in addition to the

23     other topics we intend to depose them on on Monday.

24             And lastly, Mr. Murtagh had indicated that they

25     would self-direct what searches they're doing in order to

1    avoid any potential need to come back and take any time from

2    the Court.  We'd just let Mr. Murtagh know we'll provide you

3    custodian and keywords you can -- and hopefully the parties

4    that are closer to that can get it all resolved --

5              MR. MURTAGH:  Mr. Gibbs --

6              THE COURT:  My gut is that you all are going to

7    get on -- Ms. Marks is going to get on a call with the other

8    folks and you all are going to figure all that out.  And

9    then if there's anything that breaks down then -- but I've

10   got it.

11             MR. MURDAUGH:  It's going to break down based on

12   what Mr. Gibbs just said.  What he's describing is this

13   traditional ESI pull where you go and pull accounts, load

14   them to Relativity, run custodian terms.  There's no way

15   that's getting done by Sunday.  Mr. Gibbs, your client needs

16   to be realistic about what's achievable.  When I said a

17   self-directed pull, it was not a traditional ESI pull.

18   You're going to need to be -- I don't know if you can state

19   on the phone what it is you have in mind.

20             THE COURT:  No, no, no.  That is the opposite.

21   What I am saying is on -- you all are going to make me hold

22   a status conference on Friday at 1:00.  I'm not doing it.

23   You all get on the phone and figure this out.  If not, I

24   will tell you what you will do and we'll have a hearing on

25   Monday.  But Friday at 1:00 you all get on a -- well, I'll

1    met Ms. Marks -- just have a productive conversation with

2    the Committee.  You all figure this out.  If you leave it in

3    my hands, I will just make decisions.  And I assure you -- I

4    guess only one -- I don't know who will like it.  But it

5    will be a decision and we'll go from there.

6              All right, folks.  Thank you.

7              (Whereupon these proceedings were concluded at

8    2:39 PM)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  C E R T I F I C A T I O N

 2

 3          I, Sonya Ledanski Hyde, certified that the foregoing

 4     transcript is a true and accurate record of the proceedings.

 5

 6

 7

 8     Sonya Ledanski Hyde

 9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  April 14, 2025
```