## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

------------------------------------------------------------- x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| DOCUDATA SOLUTIONS, L.C., *et al.*, | : | Case No. 25-90023 (CML) |
|  | : |  |
| Debtors.[1] | : | (Jointly Administered) |
|  | : |  |

------------------------------------------------------------- x

### DISCLOSURE STATEMENT FOR JOINT
### PLAN OF REORGANIZATION OF DOCUDATA SOLUTIONS, L.C.
### AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**HUNTON ANDREWS KURTH LLP**
Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Ashley L. Harper (Texas Bar No. 24065272)
Philip M. Guffy (Texas Bar No. 24113705)
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone:  (713) 220-4200
Email:  taddavidson@hunton.com
    ashleyharper@hunton.com
    pguffy@hunton.com

**LATHAM & WATKINS LLP**
Ray C. Schrock (NY Bar No. 4860631)
Alexander W. Welch (NY Bar No. 5624861)
Hugh K. Murtagh (NY Bar No. 5002498)
Adam S. Ravin (NY Bar No. 4079190)
Jonathan J. Weichselbaum (NY Bar No. 5676143)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email:   ray.schrock@lw.com
    alex.welch@lw.com
    hugh.murtagh@lw.com
    adam.ravin@lw.com
    jon.weichselbaum@lw.com

*Co-Counsel for the Debtors and Debtors in Possession*

Dated:  May 7, 2025

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/DocuDataSolutions.  The Debtors' mailing address for the purposes of these cases is 2701 E. Grauwyler Road, Irving, TX 75061 USA.

> THIS DISCLOSURE STATEMENT (THIS "*DISCLOSURE STATEMENT*") IS NOT A SOLICITATION OF VOTES ON THE PLAN. ACCEPTANCES AND REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT REMAINS SUBJECT TO MATERIAL REVISION AND HAS NOT, AS OF THE DATE HEREOF, BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(A) OF THE BANKRUPTCY CODE.  THE DEBTORS HAVE SOUGHT ORDERS OF THE BANKRUPTCY COURT APPROVING THIS DISCLOSURE STATEMENT AS CONTAINING "ADEQUATE INFORMATION," AND APPROVING THE SOLICITATION OF VOTES AS BEING IN COMPLIANCE WITH SECTIONS 1125 AND 1126(B) OF THE BANKRUPTCY CODE, AND CONFIRMING THE PLAN.

THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

<div align="center">

**Solicitation of Votes**
**on the Plan of Reorganization of**

**DOCUDATA SOLUTIONS, L.C., ET AL.**

**from the holders of outstanding**

**APRIL 2026 NOTES CLAIMS**

**CONVENIENCE CLAIMS**

**JULY 2026 NOTES CLAIMS**

**GENERAL UNSECURED CLAIMS**

</div>

> <div align="center">THE VOTING DEADLINE IS 4:00 P.M. (PREVAILING CENTRAL TIME) ON [JUNE 11], 2025 (UNLESS THE DEBTORS EXTEND THE VOTING DEADLINE).</div>
>
> FOR YOUR VOTE TO BE COUNTED, YOU MUST RETURN YOUR PROPERLY COMPLETED BALLOT TO THE SOLICITATION AGENT, OMNI AGENT SOLUTIONS, INC., SO THAT YOUR BALLOT IS <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT BEFORE THE VOTING DEADLINE.
>
> THE BALLOTS CONTAIN DETAILED VOTING INSTRUCTIONS AND SET FORTH, AMONG OTHER THINGS, THE DEADLINES, PROCEDURES, AND INSTRUCTIONS FOR VOTING TO ACCEPT OR REJECT THE PLAN, AND THE APPLICABLE STANDARDS FOR TABULATING BALLOTS.

## RECOMMENDATION BY THE DEBTORS AND RELATED SUPPORT

**The Debtors believe the Plan is in the best interests of their creditors and other stakeholders.  All creditors entitled to vote on the Plan are urged to vote in favor of the Plan.**

**The board of directors or managers, or members, as applicable, of each of the Debtors have unanimously approved the transactions contemplated by the Plan and recommend that all creditors whose votes are being solicited submit Ballots to accept the Plan.**

**Subject to the terms and conditions of the Plan Support Agreement and the Sub-Group DIP Lenders Settlement, Holders of over 80% of the aggregate principal amount outstanding of April 2026 Notes Claims have already agreed to vote in favor of, or otherwise support, the Plan.**

**Each of the Debtors therefore strongly recommends that all Holders of Claims entitled to vote on the Plan submit Ballots to <u>ACCEPT</u> the Plan so as to be actually received by the Solicitation Agent before the Voting Deadline (*i.e.*, [June 11], 2025 at 4:00 p.m. (prevailing Central Time)) in accordance with the instructions set forth below and in the Ballots.**

### Committee's Support of the Plan

**Following extensive negotiations, the Committee supports the Plan and recommends that all Holders of General Unsecured Claims, Convenience Claims, and July 2026 Notes Claims vote in favor of the Plan in order to maximize recovery for their claims.  The reasons underlying the Committee's support for the Plan are more fully set forth in the letter from the Committee included in the Solicitation  Packages, but the Committee believes the Plan provides the best and most certain opportunity for recovery for Holders of General Unsecured Claims, Convenience Claims, and July 2026 Notes Claims.**

## IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT FOR YOU TO READ

DocuData Solutions, L.C. and certain of its affiliates,[2] as debtors and debtors-in-possession (collectively, the "***Debtors***") in the above-captioned chapter 11 cases (the "***Chapter 11 Cases***"), are providing you with the information in this Disclosure Statement because you may be a creditor of the Debtors and may be entitled to vote on the *Joint Plan of Reorganization of DocuData Solutions, L.C. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (including all exhibits and schedules thereto, and as may be amended, modified, or supplemented from time to time, the "***Plan***").  A draft of the Plan is attached hereto as <u>**Exhibit A**</u>.  All capitalized terms used but not otherwise defined herein have the definitions given to them in the Plan.  To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the Plan are inconsistent, the definition included in the Plan will control and govern.

**ALL CREDITORS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN <u>SECTION IX</u> BELOW AND THE PLAN ATTACHED**

---

[2]     An alphabetical listing of all the Debtors is attached hereto as <u>**Exhibit G**</u>.

HERETO AS <u>EXHIBIT A</u> BEFORE SUBMITTING BALLOTS IN RESPONSE TO SOLICITATION OF THE PLAN.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE, AND VOTING CREDITORS SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE VOTING ON THE PLAN.

THE ISSUANCE AND DISTRIBUTION UNDER THE PLAN OF PLAN SECURITIES TO HOLDERS OF ALLOWED APRIL 2026 NOTES CLAIMS AND ALLOWED JULY 2026 NOTES CLAIMS (IF THEY VOTE IN FAVOR OF THE PLAN IN SUFFICIENT NUMBERS TO CARRY THE CLASS) WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*") AND ANY OTHER APPLICABLE SECURITIES LAWS PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE. THE ISSUANCE AND DISTRIBUTION UNDER THE PLAN OF ROLLOVER EXIT NOTES IS BEING MADE IN RELIANCE ON SECTION 4(a)(2) OF THE SECURITIES ACT (AND SIMILAR EXEMPTIONS UNDER STATE SECURITIES LAWS) AND WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND ANY OTHER APPLICABLE SECURITIES LAWS PURSUANT THERETO (AND SIMILAR EXEMPTIONS UNDER STATE SECURITIES LAWS) OR OTHER AVAILABLE EXEMPTIONS UNDER THE SECURITIES ACT.

THE DEBTORS WILL RELY ON SECTION 1145(a) OF THE BANKRUPTCY CODE AND SECTION 4(a)(2) OF THE SECURITIES ACT (AND SIMILAR EXEMPTIONS UNDER STATE SECURITIES LAWS) TO EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND STATE SECURITIES LAWS ANY OFFERS OF PLAN SECURITIES AND ROLLOVER EXIT NOTES, RESPECTIVELY, THAT MAY BE DEEMED TO BE MADE AFTER THE PETITION DATE, INCLUDING IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.

THE PLAN SECURITIES AND ROLLOVER EXIT NOTES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "*SEC*") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY. THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE, SECTION 4(A)(2) OF THE SECURITIES ACT OR ANY OTHER APPLICABLE SECURITIES LAWS, SHALL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS PROVIDED HEREIN.

THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE OR TO MAKE ANY REPRESENTATION IN CONNECTION WITH THE PLAN OR THIS DISCLOSURE STATEMENT, AND HOLDERS OF CLAIMS AND INTERESTS UNDER THE PLAN SHOULD NOT CONSTRUE THE CONTENT OF THIS DISCLOSURE STATEMENT AS PROVIDING LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.

**THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.**

**ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.**

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 4:00 P.M. (PREVAILING CENTRAL TIME) ON [JUNE 11], 2025, UNLESS EXTENDED BY THE DEBTORS (THE "*VOTING DEADLINE*"). ALL BALLOTS AND RELEASE OPT-OUT FORMS MUST BE SUBMITTED BY THE VOTING DEADLINE.**

**To be counted, your ballot ("*Ballot*") must be properly completed and returned to the Solicitation Agent, Omni Agent Solutions, Inc. (the "*Solicitation Agent*"), in accordance with the voting instructions on such Ballot and <u>actually received</u> by the Solicitation Agent, via regular mail, overnight courier, or personal delivery at the appropriate address, via email (where applicable), or via the Solicitation Agent's online voting portal, by the Voting Deadline. Please review the instructions set forth on your Ballot for further guidance on the appropriate method(s) of submission.**

A summary of the voting instructions is set forth in <u>Section I.E</u> of this Disclosure Statement. More detailed instructions are also contained in the Ballots distributed to the creditors entitled to vote on the Plan.

This Disclosure Statement, the Plan, the Plan Supplement, and any attachments, exhibits, supplements, and annexes hereto or thereto are the only documents to be used in connection with the solicitation of votes on the Plan, and also may not be relied upon for any purpose other than to determine how to vote on the Plan (except with respect to any Plan Supplement documents that may be relied upon for purposes other than to determine how to vote on the Plan). Neither the Bankruptcy Court nor the Debtors have authorized any person to give any information or to make any representation in connection with the Plan or the solicitation of acceptances of the Plan other than as contained in this Disclosure Statement, the Plan Supplement, and any attachments, exhibits, supplements, and annexes attached hereto or thereto. If given or made, such information or representation may not be relied upon as having been authorized by the Bankruptcy Court or the Debtors. The delivery of this Disclosure Statement will not under any circumstances represent that the information herein is correct as of any time after the date hereof.

This Disclosure Statement will not constitute an offer to sell, or solicitation of an offer to buy, nor will there be any distribution of, any of the securities described herein until the Effective Date of the Plan.

The summaries of the Plan and other documents contained in this Disclosure Statement are qualified in their entirety by reference to the Plan itself, the exhibits thereto that will be included in the Plan Supplement, and documents described therein as filed before the conditional approval of this Disclosure Statement or subsequently as part of the Plan Supplement. In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, or between the Plan Supplement and the Plan, the terms of the Plan will control. Except as otherwise indicated herein or in the Plan, the Debtors will propose to file all Plan Supplement documents with the Bankruptcy Court and make them available for review at the Debtors' document website located online at https://omniagentsolutions.com/DocuDataSolutions no later than seven (7) days before the Objection Deadline (as defined in the Solicitation Procedures Order (as defined below)). The Debtors intend to propose the Objection Deadline to be [June 11], 2025 at 4:00 p.m. (prevailing Central Time).

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan. The Debtors reserve the right to modify the Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, subject to the terms of the Plan. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there can be no assurance that the statements contained herein will be correct at any time after this date. The information contained in this Disclosure Statement, including the information regarding the history, businesses, and operations of the Debtors, the financial information regarding the Debtors, and the liquidation analysis relating to the Debtors, is included for purposes of soliciting acceptances of the Plan, but, as to contested matters and adversary proceedings, is not to be construed as an admission or stipulation, but rather as a statement made in settlement negotiations as part of the Debtors' attempt to settle and resolve claims and controversies pursuant to the Plan. This Disclosure Statement will not be admissible in any non-bankruptcy proceeding, nor will it be construed to be conclusive advice on the tax, securities, or other legal effects of the Plan as to Holders of Claims against, or Interests in, either the Debtors or the Reorganized Debtors. Unless specifically noted, the financial information contained in this Disclosure Statement and in its exhibits has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles in the United States.

The effectiveness of the Plan is subject to material conditions precedent. *See* Section V.G below and Article VIII of the Plan. There is no assurance that these conditions will be satisfied or waived.

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims against, and Interests in, the Debtors (including, without limitation, those Holders who do not submit Ballots to accept or reject the Plan or who are not entitled to vote on the Plan) will be bound by the terms of the Plan and the transactions contemplated thereby.

## IMPORTANT NOTICES REGARDING
## RELEASES BY AND FOR HOLDERS OF CLAIMS AND INTERESTS

**If you are a Holder of a Claim or Interest, you may be deemed to grant the Third-Party Release under the Plan. Specifically, pursuant to Article IX.C of the Plan, each Holder of a Claim or Interest is deemed to grant the Third-Party Release, to the maximum extent otherwise permitted by law, if: (a) such Holder is entitled to vote to accept or reject the Plan and (i) votes to accept the Plan and does not elect to opt-out of the Third-Party Release, (ii) abstains from voting on the Plan and does not elect to opt out of the Third-Party Release, or (iii) votes to reject the Plan but does not elect to opt out of the Third-Party Release; or (b) such Holder is a Holder of a Claim or Interest in a Class that is presumed to accept or reject the Plan and does not timely opt out of providing the Third-Party Release. The Third-Party Release is discussed further in Section V.H of this Disclosure Statement. Instructions for opting out of the Third-Party Release are set forth in the Solicitation Package (as defined below) distributed in connection with this Disclosure Statement.**

## FORWARD-LOOKING STATEMENTS

This Disclosure Statement contains forward-looking statements based primarily on the current expectations of the Debtors and projections about future events and financial trends affecting the financial condition of the Debtors' businesses and assets. The words "believe," "may," "estimate," "continue," "anticipate," "intend," "expect," and similar expressions identify these forward-looking statements. These forward-looking statements are subject to a number of risks, uncertainties, and assumptions, including those described below in Section IX. In light of these risks and uncertainties, the forward-looking events and circumstances discussed in this Disclosure Statement may not occur, and actual results could differ materially from those anticipated in the forward-looking statements. The Debtors do not undertake any

obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events, or otherwise.

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 and not necessarily in accordance with federal or state securities laws or other non-bankruptcy laws.  This Disclosure Statement has not been approved or disapproved by the SEC, any state securities commission or any securities exchange or association nor has the SEC, any state securities commission or any securities exchange or association passed upon the accuracy or adequacy of the statements contained herein.  Any representation to the contrary is a criminal offense.

## <u>QUESTIONS AND ADDITIONAL INFORMATION</u>

If you would like to obtain copies of this Disclosure Statement, the Plan, the Plan Supplement, or any of the documents attached hereto or thereto or referenced herein or therein, or have questions about the solicitation and voting process or the Chapter 11 Cases generally, please contact the Solicitation Agent by visiting the Debtors' restructuring website at https://omniagentsolutions.com/DocuDataSolutions.

*[Remainder of page left intentionally blank]*

**TABLE OF CONTENTS**

**Page**

I. EXECUTIVE SUMMARY ...................................................................................................1

    A.     Purpose and Effect of the Plan..............................................................................2
    B.     Classification and Treatment of Claims and Interests under the Plan ...................5
    C.     Filing of the Plan Supplement..............................................................................8
    D.     Solicitation Procedures ........................................................................................8
    E.     Voting Procedures..............................................................................................13
    F.     Confirmation of the Plan....................................................................................17
    G.     The Plan Releases ..............................................................................................19
    H.     Issuance of Plan Securities.................................................................................19
    I.      Consummation of the Plan..................................................................................19
    J.     Risk Factors ......................................................................................................20

II. BACKGROUND TO THE CHAPTER 11 CASES.............................................................20

    A.     The Debtors' Corporate Structure.......................................................................20
    B.     The Company's History......................................................................................20
    C.     The Company's Business Operations and Revenue .............................................20
    D.     The Debtors' Prepetition Capital Structure.........................................................24
    E.     Unsecured Debt..................................................................................................28
    F.     Securitization and Other Receivables Financing Arrangements ..........................28

III. EVENTS PRECEDING COMMENCEMENT OF THE CHAPTER 11 CASES..................32

    A.     Challenges Leading to the Commencement of the Chapter 11 Cases ..................32
    B.     Negotiations with Stakeholders ..........................................................................34

IV. OVERVIEW OF CHAPTER 11 CASES ..........................................................................35

    A.     Commencement of Chapter 11 Cases .................................................................35
    B.     First Day Relief..................................................................................................35
    C.     Approval of the Postpetition Securitization Programs.........................................36
    D.     Retention Applications for Debtors' Professionals and Related Relief.................36
    E.     Establishment of Claims Bar Dates; Filing of Schedules ....................................37
    F.     The Official Committee of Unsecured Creditors.................................................37
    G.     Dispute Regarding Approval of Final DIP Financing .........................................38
    H.     The Committee Settlement ..................................................................................39
    I.      Entry of the Final DIP Order ..............................................................................39
    J.     The Amended Plan Support Agreement ..............................................................39
    K.     The Investigation ...............................................................................................40
    L.     Exclusivity.........................................................................................................41
    M.    Timetable for the Chapter 11 Cases ...................................................................41

V. SUMMARY OF THE PLAN..................................................................................41

    A.    Classification and Treatment of Claims and Interests under the Plan ..................42
    B.    Acceptance or Rejection of the Plan; Effect of Rejection of the Plan..................43
    C.    Means of Implementation of the Plan.................................................................45
    D.    Treatment of Executory Contracts and Unexpired Leases; Employee
         Benefits; and Insurance Policies .......................................................................53
    E.    Provisions Governing Distributions....................................................................57
    F.    Procedures for Resolving Disputed, Contingent, and Unliquidated Claims
         or Interests.......................................................................................................60
    G.    Conditions Precedent to the Occurrence of the Effective Date ...........................61
    H.    Discharge, Release, Injunction, and Related Provisions.....................................63

VI. CAPITAL STRUCTURE AND CORPORATE GOVERNANCE OF
    REORGANIZED DEBTORS.........................................................................69

    A.    Summary of Capital Structure of Reorganized Debtors .......................................69
    B.    Corporate Governance and Management of the Reorganized Debtors ................74

VII. CONFIRMATION OF THE PLAN .................................................................78

    A.    Confirmation Hearing .......................................................................................78
    B.    Confirmation .....................................................................................................79
    C.    Classification of Claims and Interests................................................................83
    D.    Consummation ..................................................................................................83
    E.    Exemption from Certain Taxes and Fees............................................................84
    F.    Modification of Plan .........................................................................................84
    G.    Effect of Confirmation on Modifications ...........................................................84
    H.    Revocation of Plan; Reservation of Rights If Effective Date Does Not
         Occur................................................................................................................84
    I.    Post-Confirmation Jurisdiction of the Bankruptcy Court ...................................85

VIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
    PLAN ............................................................................................................87

    A.    Continuation of Chapter 11 Cases .....................................................................87
    B.    Liquidation under Chapter 7 ..............................................................................88
    C.    Dismissal of Chapter 11 Cases. .........................................................................88

IX. RISK FACTORS TO CONSIDER BEFORE VOTING ......................................88

    A.    Certain Bankruptcy Law Considerations ...........................................................88
    B.    Risks Relating to the Capital Structure of the Reorganized Debtors....................92
    C.    Risks Relating to New Parent's Business Operations...........................................96
    D.    Risks Related to the Plan Securities..................................................................105
    E.    Additional Factors...........................................................................................108

X. SECURITIES LAW MATTERS ........................................................................................109

    A.    Issuance of 1145 Securities.................................................................................109
    B.    Subsequent Transfers of 1145 Securities ..........................................................110
    C.    Issuance of Private Placement Securities...........................................................110

XI. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .............112

XII. CONCLUSION AND RECOMMENDATION .................................................................113

## **EXHIBITS**

EXHIBIT A  Plan

EXHIBIT B  Plan Support Agreement

EXHIBIT C  Financial Projections

EXHIBIT D  Liquidation Analysis

EXHIBIT E  Valuation Analysis

EXHIBIT F-1  Company Organizational Chart

EXHIBIT F-2  Debtors' Organizational Chart

EXHIBIT F-3  Debtors' Facilities

EXHIBIT G  Listing of Debtors

EXHIBIT H  Allocation of New Parent Interests

---

**THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.**

---

# I.
# <u>EXECUTIVE SUMMARY</u>

The Debtors in the Chapter 11 Cases commenced in the Bankruptcy Court (each as defined below) submit this Disclosure Statement, pursuant to section 1125 of the Bankruptcy Code, in connection with the solicitation of votes on the Plan.  A copy of the Plan is attached hereto as **<u>Exhibit A</u>**.

Before soliciting votes on a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires debtors to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance or rejection of such plan of reorganization.  This Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.

The Debtors are commencing this solicitation to implement a comprehensive consensual restructuring (the "***Restructuring***") that will reduce their funded debt obligations from approximately $1.383 billion to approximately $367 million upon emergence.  The Restructuring is supported by the overwhelming majority of the Debtors' capital structure.  Much of that support is set forth in the amended and restated plan support agreement dated as of April 24, 2025 [Docket No. 396] (the "***Plan Support Agreement***") attached hereto as **<u>Exhibit B</u>**, and the Sub-Group DIP Lenders Settlement related to the DIP Facility (which comprises approximately $80 million in "new money" loans plus approximately $105 million of prepetition Notes Obligations of the DIP Lenders "rolled-up" into the DIP Facility, which will ultimately convert to committed exit financing or otherwise be satisfied on the Effective Date).  Pursuant to the terms of the Plan Support Agreement, the Consenting Creditor Ad Hoc Group and the Consenting ETI Parties have already agreed to vote in favor of and otherwise support confirmation of the Plan.  Furthermore, pursuant to the terms of the Sub-Group DIP Lenders Settlement, the Sub-Group DIP Lenders have agreed to support and vote in favor of the Plan, resulting in the Plan enjoying the support of holders of over 80% of the outstanding principal amount of the Debtors' 11.5% secured notes due 2026.  Additionally, by virtue of a global and comprehensive settlement reached with the Committee, the terms of which are set forth in the *Notice of Settlement Term Sheet with Official Committee of Unsecured Creditors* [ Docket No. 368], the Committee has agreed to support the Plan.  The Restructuring will enhance the Debtors' long-term growth prospects and competitive position and will provide the Debtors with the flexibility to invest in and grow their businesses while saving more than 11,000 jobs globally.

The Debtors filed voluntary petitions for relief and commenced cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "***Bankruptcy Court***") on March 3, 2025 (the "***Petition Date***").  Since the commencement of the Chapter 11 Cases, the Debtors have operated their businesses in the ordinary course.

This Executive Summary is being provided as an overview of the material items addressed in this Disclosure Statement and the Plan, which is qualified by reference to the entire Disclosure Statement and by the actual terms of the Plan (and including all exhibits attached hereto and to the Plan) and should not be relied upon for a comprehensive discussion of this Disclosure Statement or the Plan.

This Disclosure Statement includes, without limitation, information about:

- the Debtors' prepetition operating and financial history;

- the events leading up to the commencement of the Chapter 11 Cases;

- the events that have occurred during the pendency of the Chapter 11 Cases;

- the solicitation procedures for voting on the Plan;

- the Confirmation process and the voting procedures that Holders of Claims who are entitled to vote on the Plan must follow for their votes to be counted;

- the terms and provisions of the Plan, certain effects of Confirmation of the Plan, and the manner in which distributions will be made under the Plan;

- certain risk factors relating to the Debtors, the Reorganized Debtors, and Confirmation of the Plan; and

- the proposed organization, operations, and financing of the Reorganized Debtors if the Plan is confirmed and becomes effective.

## A. **Purpose and Effect of the Plan**

### 1. **Plan of Reorganization under Chapter 11 of the Bankruptcy Code**

The Debtors are reorganizing pursuant to chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code. As a result, the confirmation of the Plan means that the Reorganized Debtors will continue to operate their businesses going forward and does not mean that the Debtors will be liquidated or forced to go out of business.

A bankruptcy court's confirmation of a plan binds the debtor, any entity acquiring property under the plan, any holder of a claim or equity interest in the debtor, and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code to the terms and conditions of the confirmed plan, whether or not such entity voted on the particular plan or affirmatively voted to reject the plan.

### 2. **Restructurings under the Plan**

The Plan contemplates the following Restructuring and treatment of Claims:[3]

- Restructuring Generally. The Plan provides for the equitization of all Allowed July 2026 Notes Claims and Allowed April 2026 Notes Claims (collectively, "***Allowed Notes Claims***") through a series of steps resulting in the Holders of Allowed Notes Claims receiving their Pro Rata Shares of a portion of the equity of the Debtors' publicly-traded affiliate, XBP Europe Holdings, Inc. ("***XBP***").[4] Subject to the Definitive Documents and as will be described in more detail in the Restructuring Steps Exhibit to be filed with the Plan Supplement, these steps will result in XBP becoming the ultimate parent of Debtors Exela Technologies BPA, LLC, and Neon Acquisition, LLC (and their respective subsidiaries), with the holders of Allowed Notes Claims exchanging their entitlements to equity in those Debtors for newly-issued equity in XBP pursuant to an agreed-upon exchange ratio (the "***XBP Transaction***"). In addition, Debtor XCV-EMEA, LLC will

---

[3]   The following summary is subject in all respects to the Plan itself.

[4]   As reflected on the Company Organizational Chart attached hereto as **<u>Exhibit F-1</u>**, one of the Debtor's affiliates is XBP. The Debtors' parent, Exela Technologies, Inc. indirectly owns 21,802,364 shares of common stock of XBP, representing approximately 60.7% of the outstanding capital stock of XBP as of the date hereof. XBP's stock is publicly traded on The Nasdaq Stock Market ("***NASDAQ***") with the ticker symbol "XBP."

cause the equity it owns in XBP (as its current indirect parent) to be distributed to the holders of Allowed Notes Claims, in light of XCV-EMEA's guarantee of certain Notes Obligations. Certain backstop and funding fees notionally payable in the equity of the Debtors will also be satisfied with newly-issued XBP equity (the equity to be issued pursuant to the Plan other than the equity to be distributed by XCV-EMEA is referred to herein and in the Plan as the "***Exchanged New Parent Interests***"). Holders of Allowed General Unsecured Claims will receive cash consideration through either pro rata participation in the General Unsecured Claims cash recovery or election to participate in the Convenience Class recovery, all as described herein. All other Claims are either unimpaired or receive no recovery, as set forth herein.

- <u>DIP Financing</u>. The Chapter 11 Cases are being financed by $185 million in post-petition loans and advances to the Debtors, comprising $80 million of New Money Loans and $105 million of Roll-Up Loans (the "***DIP Facility***"), with backstop participation and funding of the DIP Facility pursuant to the Interim DIP Order open to all April 2026 Noteholders, and participation in the funding of the DIP Facility pursuant to the Final DIP Order open to all April 2026 Noteholders and July 2026 Noteholders, on the terms and conditions set forth in the Final DIP Order and DIP Documents.

- <u>Exit Financing</u>:

    - On the Effective Date, the Reorganized Debtors will enter into the Exit Facility (as defined in the Plan Support Agreement) on the terms set forth in the Plan Term Sheet and Exit Facility Documents (each as defined in the Plan Support Agreement), pursuant to which all DIP Obligations shall be converted into Rollover Exit Notes on a cashless basis, except as otherwise provided for a portion of the Sub-Group DIP Lenders' DIP Obligations, as detailed herein.

    - On the Effective Date, the Reorganized Debtors will also enter into a supplemental exit facility to replace or refinance the Debtors' senior secured prepetition term loan facility dated as of July 11, 2023 (the "***Blue Torch Facility***"), with either (a) the New Blue Torch Facility or (b) the Gates Exit Facility; *provided that* if the Debtors enter into the Gates Exit Facility, the Blue Torch Facility, including any related guarantees, will be repaid with the proceeds of the Gates Exit Facility.

    - On the Effective Date, XBP will provide the XBP Funding in an amount of $18 million; in the event the XBP Funding fails to become committed by the deadline for objections established by the Court to confirmation of the Plan or fails to occur on or prior to the Effective Date, and if the Consenting ETI Parties do not instead provide XBP Alternative Funding in the same amount, the Consenting ETI Parties' equity will be reduced as described below.

    - On the Effective Date, the Consenting ETI Parties shall be bound by a commitment to pay (a) the first $15 million of Transaction Tax Liability and (b) any Transaction Tax Liability in excess of $25 million, with any amounts of the Transaction Tax Liability between $15 million and $25 million the obligation of the Reorganized Debtors.

    - Securitization Program: The Reorganized Debtors will continue or replace their existing securitization programs.

3

- <u>Recoveries</u>:

  o    Each Holder of an Allowed April 2026 Notes Claim shall receive either (i) if such Holder is not ETI or an ETI Holder, its Noteholder Pro Rata Share of the Non-ETI Equity Distribution (72.5% of Exchanged New Parent Interests issued in exchange for Allowed Notes Claims, subject to reduction by the July 2026 Notes recovery and dilution by all premiums and backstop fees payable in equity), or (ii) if such Holder is ETI or an ETI Holder, its ETI Pro Rata Share of the ETI Equity Distribution (27.5% of Exchanged New Parent Interests issued in exchange for Allowed Notes Claims, subject to reduction by the July 2026 Notes recovery and dilution by all premiums and backstop fees payable in equity) and the New Parent Warrants; *provided that* the ETI Equity Distribution will be reduced from 27.5% to 12.5% in the event the XBP Funding is not timely committed or funded and is not replaced by the XBP Alternative Funding, in which case the 15% shall be reallocated to Non-ETI Equity Distribution;

  o    Pursuant and subject to the terms of the Committee Settlement, each Holder of an Allowed July 2026 Notes Claims shall receive its Pro Rata Share of a percentage of all Exchanged New Parent Interests issued in exchange for Notes Claims sufficient to ensure Holders of Allowed July 2026 Notes Claims receive the same percentage recovery on their Claims as Non-ETI Holders of Allowed April 2026 Notes Claims;

  o    The estimated allocation of New Parent Interests, post-XBP Transaction is described in **Exhibit H**;

  o    Pursuant and subject to the terms of the Committee Settlement, Holders of Allowed General Unsecured Claims shall receive their Pro Rata Share of the Unsecured Cash Pool, with such amount being paid out according to a schedule as set forth in the Plan;

  o    Pursuant and subject to the terms of the Committee Settlement, Allowed General Unsecured Convenience Class Claims of an amount equal to or less than $25,000 shall be paid in cash from the proceeds of the Exit Facility in an amount equal to no less than 70% of their Allowed General Unsecured Convenience Class Claim amount; *provided that* Holders of Allowed General Unsecured Claims of an amount greater than $25,000 may elect to convert their claims to Allowed General Unsecured Convenience Class Claims by reducing the amount of their Allowed General Unsecured Claim to $25,000; and

  o    Other Secured Claims and Prepetition Term Loan Claims are Unimpaired; Intercompany Claims are either reinstated, converted to equity, or otherwise set off, settled, distributed, contributed, cancelled, or released, in each case, in accordance with the Plan; Intercompany Interests will be reinstated for administrative convenience; all Subordinated Claims will be cancelled, released, discharged, and extinguished, and Holders of Subordinated Claims will not receive any distribution on account of such Subordinated Claims; Existing BPA Interests will be canceled, released, discharged, and extinguished; and Other Existing Equity Interests shall be either (i) treated in accordance with the Definitive Documents or (ii) canceled, released, discharged, and extinguished, and shall be of no further force or effect.

With respect to implementing the Restructuring Transactions under the Plan, the Debtors intend to disclose the precise steps to be taken in the Plan Supplement and will make those transactions public with sufficient time for all voting creditors to consider them before the Voting Deadline.

**B.**     **Classification and Treatment of Claims and Interests under the Plan**

The following table provides a summary of the classification and treatment of Claims and Interests and the potential distributions to Holders of Allowed Claims under the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE, INCLUDING BASED ON THE LIQUIDATION OF CLAIMS CURRENTLY ASSERTED AS UNLIQUIDATED.   FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN AND THE RISK FACTORS DESCRIBED IN SECTION IX BELOW. THIS TABLE IS INTENDED FOR ILLUSTRATIVE PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR A REVIEW OF THE PLAN AND DISCLOSURE STATEMENT IN THEIR ENTIRETY.  FOR CERTAIN CLASSES OF CLAIMS, THE ACTUAL AMOUNT OF ALLOWED CLAIMS COULD BE MATERIALLY DIFFERENT THAN THE ESTIMATED AMOUNTS SHOWN IN THE TABLE BELOW.**

| SUMMARY OF EXPECTED RECOVERIES | | | |
|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/ Interest | Projected Recovery Under the Plan |
| 1 | Other Secured Claims<br><br>Estimated Amount (as of February 28, 2025): $13.5 million | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim, at the option of the applicable Debtor shall, on the Effective Date, (i) be paid in full in Cash, (ii) receive the collateral securing its Allowed Other Secured Claim including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, (iii) Reinstatement of its Allowed Other Secured Claim, or (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | 100% |
| 2 | Prepetition Term Loan Claims<br><br>Estimated Principal Amount (as of February 28, 2025): $38.5 million | Except to the extent that a Holder of an Allowed Prepetition Term Loan Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Prepetition Term Loan Claim, each Holder of an Allowed Prepetition Term Loan Claim on the Effective Date shall be paid in full in Cash. | 100% |

## SUMMARY OF EXPECTED RECOVERIES

| Class | Claim/Equity Interest | Treatment of Claim/ Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 3 | April 2026 Notes Claims<br><br>Estimated Principal Amount and Outstanding Interest (as of February 28, 2025): $1.214 billion | Except to the extent that a Holder of an April 2026 Notes Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed April 2026 Notes Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in accordance with the Definitive Documents and in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed April 2026 Notes Claim, either:  (i) if such Holder is a Non-ETI Holder, its Noteholder Pro Rata Share of the Non-ETI Equity Distribution; or (ii) if such Holder is ETI or an ETI Holder, its ETI Pro Rata Share of the ETI Equity Distribution. | 38% |
| 4 | Convenience Claims | Except to the extent that a Holder of an Allowed Convenience Claim agrees to a less favorable treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date or as soon as reasonably practicable thereafter, Cash in an amount equal to no less than 70% of such Allowed Convenience Claim amount pursuant to the Committee Settlement; *provided*, that to the extent that a Holder of an Allowed Convenience Claim against a Debtor holds any joint and several liability Claims, guaranty Claims, or other similar Claims against any other Debtors arising from or relating to the same obligations or liability as such Convenience Claim, such Holder shall only be entitled to a distribution on one Convenience Claim against the Debtors in full and final satisfaction of all such Claims. | 70-100% |
| 5 | July 2026 Notes Claims<br><br>Estimated Principal Amount and Outstanding Interest (as of February 28, 2025): $25.67 million | Except to the extent that a Holder of a July 2026 Notes Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed July 2026 Notes Claim shall receive, in full and final satisfaction, settlement, release, and discharge and in exchange for such Allowed July 2026 Notes Claim, and as a carve out of the collateral (or value of such collateral) securing the April 2026 Notes Claims, its Pro Rata Share of the July 2026 Noteholder Equity Distribution. | 40%[5] |

---

[5]    Recovery percentage will match recovery percentage for Non-ETI Holders of April 2026 Notes Claims.

| | | SUMMARY OF EXPECTED RECOVERIES | |
|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/ Interest | Projected Recovery Under the Plan |
| 6 | General Unsecured Claims<br><br>Estimated Amount (as of February 28, 2025): $19.58 million (inclusive of Non-Priority Tax Claims) | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date, as a carve out of collateral (or the value of such collateral) securing the April 2026 Notes Claims, its Pro Rata share of the Unsecured Cash Pool, with such amount being paid out over the following schedule: (i) 1/3 paid within nine (9) months of the Effective Date; (ii) 1/3 paid within eighteen (18) months of the Effective Date; and (iii) 1/3 paid within twenty-seven (27) months of the Effective Date. Holders of Allowed General Unsecured Claims shall be entitled to interest (which interest shall be treated for all purposes as an incremental distribution on account of such Allowed General Unsecured Claim) on unpaid portions of such Holder's Pro Rata share of the Unsecured Cash Pool, accruing at 4% per annum, paid in-kind, commencing on the Effective Date, and such payment obligations shall be secured by collateral reasonably acceptable to the Debtors, the Required Consenting Creditors, and the Committee. | 35-45% |
| 7 | Subordinated Claims<br><br>Expected Amount: N/A | On the Plan Effective Date, all Section 510(b) Claims shall be cancelled, released, discharged, and extinguished and shall be of no further force or effect, and Holders of Section 510(b) Claims shall not receive any distribution on account of such Section 510(b) Claims. | N/A |
| 8 | Intercompany Claims<br><br>Expected Amount: Unliquidated | On or as soon as reasonably practicable after the Effective Date, all Intercompany Claims will be adjusted, Reinstated, or discharged, as determined by the Debtors or the Reorganized Debtors with the reasonable consent of the Required Consenting Creditors, or as provided in the Definitive Documents. | N/A |
| 9 | Intercompany Interests<br><br>Expected Amount: Unliquidated | On or as soon as reasonably practicable after the Effective Date, all Intercompany Interests will be adjusted, Reinstated, or discharged as determined by the Debtors or the Reorganized Debtors with the reasonable consent of the Required Consenting Creditors, or as provided in the Definitive Documents. | N/A |

**SUMMARY OF EXPECTED RECOVERIES**

| Class | Claim/Equity Interest | Treatment of Claim/ Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 10 | Existing BPA Equity Interests<br><br>Expected Amount: N/A | On the Plan Effective Date, Holders of Existing BPA Equity Interests are not entitled to receive a recovery or distribution on account of such Existing BPA Equity Interests.  On the Plan Effective Date, Existing BPA Equity Interests shall, subject to the Definitive Documents, be canceled, released, discharged, and extinguished, and shall be of no further force or effect. | 0% |
| 11 | Other Existing Interests<br><br>Expected Amount: N/A | On the Plan Effective Date, Holders of Other Existing Equity Interests are not entitled to receive a recovery or distribution on account of such Other Existing Equity Interests. On the Plan Effective Date, Other Existing Equity Interests shall be either (i) treated in accordance with the Definitive Documents or (ii) canceled, released, discharged, and extinguished, and shall be of no further force or effect. | 0% |

**C.**     **Filing of the Plan Supplement**

The Debtors propose to file the Plan Supplement at least seven (7) days before the deadline to object to confirmation of the Plan.  The Debtors will transmit a copy of the Plan Supplement to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) counsel to the DIP Agent; (c) counsel to the Ad Hoc Group; (d) counsel to the Consenting ETI Parties; (e) counsel to the DIP Lenders, including counsel to the Sub-Group DIP Lenders; (f) counsel to the Indenture Trustees; (g) counsel to the Securitization Program Agent; (h) the creditors listed on the Debtors' consolidated list of thirty (30) creditors holding the largest unsecured claims; (i) the United States Attorney for the Southern District of Texas; (j) the Internal Revenue Service; (k) the Securities and Exchange Commission; (l) the state attorneys general for states in which the Debtors conduct business; (m) Holders of Claims entitled to vote on the Plan; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002.

The Plan Supplement will include all exhibits and Plan schedules that were not already filed or sent to parties entitled to vote on the Plan in connection with solicitation, as exhibits to the Plan or this Disclosure Statement, all of which are incorporated by reference into, and are an integral part of, the Plan, as all of the same may be amended, supplemented, or modified from time to time.

**D.**     **Solicitation Procedures**

**1.**     **The Solicitation and Voting Procedures**

On [ ● ], the Bankruptcy Court entered an order [Docket No. [ ● ]] (the "***Solicitation Procedures Order***") that, among other things:

  a)   conditionally approved this Disclosure Statement;

  b)   scheduled a hearing on [June 18], 2025 at [ ● ] (Central Time) to approve this Disclosure Statement on a final basis and consider confirmation of the Plan (the "***Confirmation Hearing***");

c)  established 4:00 p.m. (Central Time) on June 11, 2025 as the deadline for (i) filing objections to the final approval of the Disclosure Statement and confirmation of the Plan (the "***Objection Deadline***") and (ii) voting on the Plan (the "***Voting Deadline***");

d)  approved the form of notice of the Confirmation Hearing, the Voting Deadline, and the Objection Deadline (the "***Combined Notice***");

e)  approved the procedures by which the Debtors shall solicit votes on the Plan and the Solicitation Packages, including the forms of ballots to vote on the Plan (the "***Ballots***");

f)  approved the form and manner of the notices to be delivered to Holders in Non-Voting Classes (the "***Notice of Non-Voting Status***"), the form of the accompanying release opt-out form (the "***Release Opt-Out Form***"), and the notice to be delivered to any counterparties to executory contracts and unexpired leases (the "***Contract/Lease Party Notice***");

g)  approved the timing and manner of delivery and publication (as applicable) of the Combined Notice, the Notice of Non-Voting Status, and the Release Opt-Out Form;

h)  approved the procedures by which the Debtors shall assume and/or assign executory contracts and unexpired leases; and

i)  granted related relief.

The discussion of the procedures below is a summary of the solicitation and voting process.  Detailed voting instructions will be provided with each Ballot.

> **PLEASE REFER TO THE INSTRUCTIONS ACCOMPANYING THE BALLOTS FOR MORE INFORMATION REGARDING VOTING REQUIREMENTS TO ENSURE THAT YOUR BALLOT IS PROPERLY AND TIMELY SUBMITTED SO THAT YOUR VOTE MAY BE COUNTED.**

### 2.   The Solicitation Agent

The Debtors have engaged Omni Agent Solutions, Inc. to, among other things, act as the Solicitation Agent (as described below).

Specifically, the Solicitation Agent will assist the Debtors with: (a) mailing notices related to solicitation and confirmation of the Plan; (b) mailing Solicitation Packages (as described below); (c) soliciting votes on the Plan; (d) receiving, tabulating, and reporting on Ballots cast for or against the Plan by Holders of Claims against the Debtors; (e) responding to inquiries from creditors and stakeholders relating to the Plan, this Disclosure Statement, the Ballots, and matters related thereto, including, without limitation, the procedures and requirements for voting to accept or reject the Plan and objecting to the Plan; and (f) if necessary, contacting creditors and interest holders regarding the Plan and, as to the classes entitled to vote on the plan, their Ballots.

### 3. <u>Holders of Claims Entitled to Vote on the Plan</u>

Under the Bankruptcy Code, only holders of claims or equity interests in "impaired" classes are entitled to vote on a plan.  Under section 1124 of the Bankruptcy Code, a class of claims or equity interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or equity interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or equity interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or equity interest as it existed before the default.

If, however, the holder of an impaired claim or equity interest will not receive or retain any distribution under the plan on account of such claim or equity interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and equity interests do not actually vote on the plan.  If a claim or equity interest is not impaired by the plan, the Bankruptcy Code conclusively presumes the holder of such claim or equity interest to have accepted the plan and, accordingly, holders of such claims and equity interests are not entitled to vote on the plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan with respect to a class of claims, acceptance by creditors that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims in such class held by creditors that cast ballots for acceptance or rejection of the plan  The following table provides a summary of the status and voting rights of each Class (and, therefore, of each Holder of a Claim or Interest within such Class) under the Plan:

## SUMMARY OF STATUS AND VOTING RIGHTS

| Class | Claim/Equity Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Prepetition Term Loan Claims | Unimpaired | Presumed to Accept |
| *3* | *April 2026 Notes Claims* | *Impaired* | *Entitled to Vote* |
| *4* | *Convenience Claims* | *Impaired* | *Entitled to Vote* |
| *5* | *July 2026 Notes Claims* | *Impaired* | *Entitled to Vote* |
| *6* | *General Unsecured Claims* | *Impaired* | *Entitled to Vote* |
| 7 | Subordinated Claims | Impaired | Deemed to Reject |
| 8 | Intercompany Claims | Unimpaired or Impaired | Presumed to Accept or Deemed to Reject |
| 9 | Intercompany Interests | Unimpaired or Impaired | Presumed to Accept or Deemed to Reject |
| 10 | Existing BPA Equity Interests | Impaired | Deemed to Reject |
| 11 | Other Existing Equity Interests | Impaired | Deemed to Reject |

Based on the foregoing, the Debtors are soliciting votes to accept the Plan from Holders of Claims in Class 3 (April 2026 Notes Claims), Class 4 (Convenience Claims), Class 5 (July 2026 Notes Claims), and Class 6 (General Unsecured Claims) (together, the "***Voting Classes***"), because Holders of Claims in the Voting Classes are Impaired under the Plan and have the right to vote to accept or reject the Plan.  For purposes of determining acceptance and rejection of the Plan, votes from such Classes will be tabulated on a Debtor-by-Debtor basis.

The Debtors are not soliciting votes on the Plan from (a) Holders of Claims in Classes 1 and 2 because, in each case, such parties are conclusively presumed to have accepted the Plan; (b) Holders of Claims and Interests, as applicable, in Classes 7, 10, and 11, because such parties are conclusively deemed to have rejected the Plan; and (c) Holders of Claims and Interests in Classes 8 and 9 because such parties are conclusively presumed to have accepted the Plan or conclusively deemed to have rejected the Plan (Classes 1, 2, 7, 10, and 11 collectively, the "***Non-Voting Classes***").  In lieu of a Solicitation Package, certain of the Non-Voting Classes (Classes 1, 2, 7, 10, and 11) will receive the Notice of Non-Voting Status. Notwithstanding their non-voting status, Holders of Claims or Interests, as applicable, in such Non-Voting Classes will also receive a Release Opt-Out Form solely for the purposes of opting out of the Third-Party Release.  Because the Intercompany Claims in Class 8 and Intercompany Interests in Class 9 are all held by the Debtors or affiliates of the Debtors, the Debtors, through the Solicitation Procedures Order, have obtained a waiver of any requirement to serve the Holders of Claims and Interests in Classes 8 and 9 with Solicitation Packages or any other type of notice, including a Notice of Non-Voting Status, in connection with solicitation.

11

4. **The Voting Record Date**

The voting record date (the "***Voting Record Date***") with respect to all Claims in the Voting Classes is May 8, 2025. The Voting Record Date is the date as of which it was determined which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan.

5. **Contents of the Solicitation Package**

The following documents and materials will collectively constitute the "***Solicitation Package***" with respect to Holders of Claims in the Voting Classes (in flash drive or paper format):

- this Disclosure Statement;
- the Plan;
- the exhibits to this Disclosure Statement, including:
  - o the Plan Support Agreement;
  - o the Debtors' financial projections;
  - o the Debtors' liquidation analysis; and
  - o the Debtors' valuation analysis.
- a Ballot and voting instructions;
- a letter from the Committee recommending that Holders of Claims in Class 4, Class 5, and Class 6 vote in favor of the Plan; and
- if applicable, a pre-addressed, postage pre-paid return envelope.

The Holders of Claims and Interests in the Non-Voting Classes (other than Holders of Intercompany Claims and Intercompany Interests) will also receive the Notice of Non-Voting Status. Finally, Holders of Claims and Interests in the Non-Voting Classes (other than Holders of Intercompany Claims and Intercompany Interests) will also receive a Release Opt-Out Form solely for the purposes of opting out of the Third-Party Release.

6. **Distribution of the Solicitation Package to Holders of Claims Entitled to Vote on the Plan**

With the assistance of the Solicitation Agent, the Debtors are distributing Solicitation Packages to the Holders of Claims in the Voting Classes (or their Nominees). The Debtors submit that the timing of such distribution will provide such Holders of Claims with adequate time within which to review the materials required to allow such parties to make informed decisions with respect to voting on the Plan in accordance with Bankruptcy Rules 3017(d) and 2002(b).

7. **Additional Distribution of Solicitation Documents**

Parties may request (and obtain at the Debtors' expense) a copy of this Disclosure Statement (and any exhibits thereto, including the Plan) by: (a) calling the Solicitation Agent at (888) 788-6341 (U.S. / Canada, toll-free) or (747) 293-0001 (International, toll); (b) messaging the Solicitation Agent at https://omniagentsolutions.com/DocuDataSolutions; or (c) visiting the Debtors' restructuring website at https://omniagentsolutions.com/DocuDataSolutions. Parties may also obtain any documents filed in the Chapter 11 Cases for a fee via PACER at http://www.txs.uscourts.gov.

All Holders of Claims are advised to read the instructions on their Ballots, as applicable, and any notices they receive from the Debtors.

**E.**    **Voting Procedures**

Holders of Claims entitled to vote on the Plan (each, a "***Voting Holder***") are advised to read the instructions on their Ballots, which set forth in greater detail the voting instructions summarized herein.

**1.    The Voting Deadline**

**4:00 p.m. prevailing Central Time on [June 11], 2025** is the Voting Deadline, subject to further extension by the Debtors.  The Voting Deadline is the date by which all Ballots and Release Opt-Out Forms, as applicable, must be properly executed, completed, and delivered to the Solicitation Agent in order to be counted as votes to accept or reject the Plan (or as a valid opt-out of the Third-Party Release).

**2.    Ballots**

The Debtors will provide the following Ballots to Holders of Claims in the Voting Classes:

| Class | Claim | Ballot |
|---|---|---|
| 3 | April 2026 Notes Claims | • Form of Beneficial Holder Ballot for Class 3 (April 2026 Notes Claims)<br>• Form of Master Ballot for Class 3 (April 2026 Notes Claims) |
| 4 | Convenience Claims | • Form of Ballot for Class 4 (Convenience Claims) and Class 6 (General Unsecured Claims) |
| 5 | July 2026 Notes Claims | • Form of Beneficial Holder Ballot for Class 5 (July 2026 Notes Claims)<br>• Form of Master Ballot for Class 5 (July 2026 Notes Claims) |
| 6 | General Unsecured Claims | • Form of Ballot for Class 4 (Convenience Claims) and Class 6 (General Unsecured Claims) |

To be counted as a vote to accept or reject the Plan, votes must be submitted on the Ballots.

**3.    Voting Procedures with Respect to Holders of Notes Claims**

**a.    Beneficial Holders**

Record Holders of April 2026 Notes Claims and July 2026 Notes Claims (collectively, the "***Notes Claims***") may include brokers, dealers, commercial banks, trust companies, or other agent nominees ("***Nominees***"). If such entities do not hold Notes Claims for their own account, they must provide copies of the Solicitation Package to their customers that are the Voting Holders thereof as of the Voting Record Date.  Any Voting Holder of Notes Claims who has not received a Ballot should contact his, her, or its Nominee or the Solicitation Agent.

A Holder entitled to vote on the Plan who holds Notes Claims as a record holder in its own name should vote on the Plan by completing and signing the applicable Beneficial Holder Ballot and returning it directly to the Solicitation Agent on or before the Voting Deadline using the enclosed self-addressed, postage paid envelope.

A Voting Holder holding Notes Claims in "street name" through a Nominee may vote on the Plan by one of the following two (2) methods (as selected by such Holder's Nominee):

- Completing and signing the enclosed Beneficial Holder Ballot. Holders of Notes Claims should return the Beneficial Holder Ballot to his, her, or its Nominee as promptly as possible, in the envelope provided or as otherwise in accordance with the instructions provided by Nominee, and in sufficient time to allow such Nominee to process his, her, or its instructions and return a completed Master Ballot to the Solicitation Agent by the Voting Deadline. If no self-addressed, postage-paid envelope was enclosed for this purpose, Holders should contact the Solicitation Agent for instructions; or

- Completing the pre-validated Beneficial Holder Ballot (as described below) provided to the applicable Holder by his, her, or its Nominee. Voting Holders should return the pre-validated Beneficial Holder Ballot to the Solicitation Agent by the Voting Deadline using the return envelope provided in the Solicitation Package.

Any Beneficial Holder Ballot returned to a Nominee by a Voting Holder will not be counted for purposes of acceptance or rejection of the Plan until such Nominee properly completes and delivers to the Solicitation Agent that Beneficial Holder Ballot (properly validated) or a Master Ballot casting the vote of such Holder.

If any Voting Holder owns Notes Claims through more than one (1) Nominee, such Holder may receive multiple mailings containing the Beneficial Holder Ballots. The Voting Holder should execute a separate Beneficial Holder Ballot for each block of Notes Claims that it holds through any particular Nominee and return each Beneficial Holder Ballot to the respective Nominee in the return envelope provided therewith. Voting Holders who execute multiple Beneficial Holder Ballots with respect to Notes Claims held through more than one (1) Nominee must indicate on each Beneficial Holder Ballot the names of all such other Nominees and the additional amounts of such Notes Claims so held and voted.

### b.   *Nominees*

A Nominee that, on the Voting Record Date, is the record Holder of Notes Claims for one (1) or more Voting Holders may obtain the votes of Voting Holders of such Notes Claims, consistent with customary practices for obtaining the votes of securities held in "street name," in one of the following two ways:

#### i.   Pre-Validated Ballots

The Nominee may "pre-validate" a Beneficial Holder Ballot by signing the Beneficial Holder Ballot and including their DTC participant number; indicating the account number of the Beneficial Holder and the principal amount of the applicable Claims held by the Nominee for such Beneficial Holder accompanied by a medallion guarantee stamp certifying the Beneficial Holder's position as of the Voting Record Date; and then forwarding the Beneficial Holder Ballot together with this Disclosure Statement, and preaddressed, postage-paid return envelope addressed to, and provided by, the Solicitation Agent, and other materials requested to be forwarded, to the Voting Holder for voting. The Beneficial Holder then completes the remaining information requested on the Beneficial Holder Ballot and returns the Beneficial Holder Ballot directly to the Solicitation Agent so that it is <u>ACTUALLY RECEIVED</u> by the Solicitation Agent on or before the Voting Deadline. A list of the Voting Holders to whom "pre-validated" Beneficial Holder Ballots

were delivered should be maintained by Nominees for inspection for at least one (1) year from the Voting Deadline.

        ii.    <u>Master Ballots</u>

If the Nominee elects not to pre-validate Beneficial Holder Ballots, the Nominee may obtain the votes of Voting Holders by forwarding to the Voting Holders the unsigned Beneficial Holder Ballots, together with this Disclosure Statement, a pre-addressed, postage-paid return envelope provided by, and addressed to, the Nominee, and other materials requested to be forwarded.  Each such Voting Holder must then indicate his, her, or its vote on the Beneficial Holder Ballot, complete the information requested on the Beneficial Holder Ballot, review the certifications contained on the Beneficial Holder Ballot, execute the Beneficial Holder Ballot, and return the Beneficial Holder Ballot to the Nominee.  After collecting the Beneficial Holder Ballots, the Nominee should, in turn, complete a Master Ballot compiling the votes and other information from the Beneficial Holder Ballots, execute the Master Ballot, and deliver the Master Ballot to the Solicitation Agent so that it is <u>ACTUALLY RECEIVED</u> by the Solicitation Agent on or before the Voting Deadline.  All Beneficial Holder Ballots returned by Voting Holders should either be forwarded to the Solicitation Agent (along with the Master Ballot) or retained by Nominees for inspection for at least one (1) year from the Voting Deadline.

EACH NOMINEE SHOULD ADVISE ITS VOTING HOLDERS TO RETURN THEIR BENEFICIAL HOLDER BALLOTS TO THE NOMINEE BY A DATE CALCULATED BY THE NOMINEE TO ALLOW IT TO PREPARE AND RETURN THE MASTER BALLOT TO THE SOLICITATION AGENT SO THAT IT IS ACTUALLY RECEIVED BY THE SOLICITATION AGENT ON OR BEFORE THE VOTING DEADLINE.  FOR THE AVOIDANCE OF DOUBT, NOMINEES MAY RETURN MASTER BALLOTS VIA EMAIL TO **DOCUDATASOLUTIONSBALLOTS@OMNIAGNT.COM** WITH A REFERENCE TO "DOCUDATA MASTER BALLOTS" IN THE SUBJECT LINE.

Tabulation of Pre-Validated Beneficial Holder Ballots and Master Ballots:

- Votes cast by a Voting Holder on a pre-validated Beneficial Holder Ballot or on a Master Ballot through a Nominee will be applied against the positions held by such entities in the applicable security as of the Voting Record Date, as evidenced by the record and depository listings.  Votes submitted by a Nominee, pursuant to the Master Ballots or pre-validated Beneficial Holder Ballots, will not be counted in excess of the amount of such securities held by such Nominee.

- To the extent that conflicting votes or "over votes" are submitted by a Nominee, the Solicitation Agent, in good faith, will attempt to reconcile discrepancies with the Nominee.

- To the extent that any over votes are not reconcilable prior to the preparation of the vote certification, the Solicitation Agent will apply the votes to accept and to reject the Plan in the same proportion as the votes to accept and reject the Plan submitted on the Master Ballots or pre-validated Beneficial Holder Ballots that contained the over vote, but only to the extent of the Nominee's position in the applicable security as of the Voting Record Date.

- For the purposes of tabulating votes, each Voting Holder will be deemed to have voted the principal amount relating to such security, although the Solicitation Agent may adjust such principal amount to reflect the applicable claim amount, including prepetition interest.

- A single Nominee may complete and deliver to the Solicitation Agent multiple Master Ballots.  Votes reflected on multiple Master Ballots shall be counted except to the extent that they are duplicative of other Master Ballots.  If two or more Master Ballots are inconsistent, the last properly

completed Master Ballot received prior to the Voting Deadline shall, to the extent of such inconsistency, supersede any prior Master Ballot.

4. **Voting Procedures with Respect to Holders of Convenience Claims and General Unsecured Claims**

Voting Holders of Convenience Claims and General Unsecured Claims should provide all of the information requested on their Ballots, and should complete and submit their Ballots in accordance with the instructions set forth therein, such that it is <u>actually received</u> by the Solicitation Agent by the Voting Deadline.

Holders of General Unsecured Claims in an amount greater than $25,000 in the aggregate may elect to convert their claims to a Convenience Claim on their Ballots by reducing the amount of their General Unsecured Claim to $25,000 and receive the treatment provided for such Convenience Claims under the Plan.

5. **Miscellaneous**

All Ballots must be signed by the record Holder of the Claim or by a person who has the power and authority to vote on behalf of the record Holder of the Claim on such date.  If you return more than one (1) Ballot voting different Claims, the Ballots are not voted in the same manner, and you do not correct this before the Voting Deadline, those Ballots will not be counted.  An otherwise properly executed Ballot (other than a Master Ballot) that attempts to partially accept and partially reject the Plan will likewise not be counted.  If you cast more than one (1) Ballot voting the same Claim(s) before the Voting Deadline, the last valid Ballot received on or before the applicable Voting Deadline will be deemed to reflect your intent, and thus, to supersede any prior Ballot.  If you cast Ballots received by the Solicitation Agent on the same day, but which are voted inconsistently, such Ballots will not be counted.

The Ballots provided to Holders of Claims in the Voting Classes will reflect the principal amount of such Holder's Claim(s); however, when tabulating votes, the Solicitation Agent may adjust the amount of such Holder's Claim(s) by multiplying the principal amount by a factor that reflects all amounts accrued between the Voting Record Date and the Petition Date, including, without limitation, interest.

Except as provided below, unless the Ballot is timely submitted to the Solicitation Agent before the Voting Deadline, together with any other documents required by such Ballot, the Debtors may reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

All pleadings and notices relating to the Chapter 11 Cases that are filed with the Bankruptcy Court (including notices of the date and time of hearings, and the Plan Supplement, once filed), will be made available for review on the case information website of the Solicitation Agent: https://omniagentsolutions.com/DocuDataSolutions.  The Debtors reserve the right to modify, amend, supplement, restate, or withdraw the Plan Supplement after it is filed.  The Debtors will file and make available on the Solicitation Agent's website site any modified, amended, supplemented or restated Plan Supplement as promptly as possible.

6. **Fiduciaries and Other Representatives**

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested, must submit proper evidence satisfactory to the Debtors of authority to so act. Authorized signatories should submit a separate Ballot of each Voting Holder for whom they are voting.

7.    **Change of Vote**

Any party who has previously submitted to the Solicitation Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Solicitation Agent prior to the Voting Deadline a subsequent, properly completed, valid Ballot for acceptance or rejection of the Plan; *provided*, *however*, that the Debtors have discretion on whether to accept any such changed Ballot after the Voting Deadline.

8.    **Waivers of Defects, Irregularities, etc.**

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Solicitation Agent and/or the Debtors, which determination will be final and binding.  The Debtors reserve the right to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful.  The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of their creditors.  The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines.  Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

9.    **Further Information, Additional Copies**

If you have any questions or require further information about the voting procedures for voting your Claims or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents, please contact the Solicitation Agent.

F.    **Confirmation of the Plan**

1.    **The Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties.  Pursuant to the Solicitation Procedures Order, the Bankruptcy Court has scheduled the Confirmation Hearing for [June 18], 2025.  Notice of the Confirmation Hearing has been provided to all known creditors and equity holders or their Representatives.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket of the Chapter 11 Cases.

2.    **The Deadline and Procedures for Objecting to Confirmation of the Plan**

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Pursuant to the Solicitation Procedures Order, the Bankruptcy Court established [June 11], 2025 at 4:00 p.m. (prevailing Central Time) as the Objection Deadline.  Pursuant to the terms of the Solicitation Procedures Order, any objection to confirmation of the Plan must be in writing, must conform to the

Bankruptcy Rules and the Bankruptcy Local Rules for the Southern District of Texas (the "***Bankruptcy Local Rules***"), must set forth the name of the objector, the nature and amount of the Claims and/or Interests held or asserted by the objector against the Debtors' Estates or properties, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order (the "***Notice Parties***"):

a)  DocuData Solutions, L.C., 2701 E. Grauwyler Road, Irving, TX 75061, Attn:  Suresh Yannamani (suresh.yannamani@exelatech.com); Matt Brown (matt.brown@exelatech.com);

b)  co-counsel to the Debtors, (i) Latham & Watkins LLP, 1271 Avenue of the Americas, New York, NY 10020, Attn: Ray C. Schrock (ray.schrock@lw.com); Alexander W. Welch (alex.welch@lw.com); Hugh Murtagh (hugh.murtagh@lw.com); Adam Ravin (adam.ravin@lw.com); Jonathan Weichselbaum (jon.weichselbaum@lw.com); and (ii) Hunton Andrews Kurth LLP, 600 Travis, Suite 4200, Houston, Texas 77002, Attn: Tad Davidson (taddavidson@hunton.com), Ashley Harper (ashleyharper@hunton.com), and Philip Guffy (pguffy@hunton.com);

c)  counsel to the Ad Hoc Group, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036, Attn: Matthew M. Roose (matthew.roose@ropesgray.com) and Eric Sherman (eric.sherman@ropesgray.com); 191 N Wacker Dr., 32nd Floor, Chicago, IL 60606, Attn: Ryan Preston Dahl (ryan.dahl@ropesgray.com) and Eric P. Schriesheim (eric.schriesheim@ropesgray.com);

d)  the U.S. Trustee, 515 Rusk Street, Suite 3516, Houston, TX 77002, Attn: Jana Whitworth (jana.whitworth@usdoj.gov) and Andrew Jimenez (andrew.jimenez@usdoj.gov);

e)  proposed co-counsel to the Committee; (i) Brown Rudnick LLP, Seven Times Square, 47th Floor, New York, NY 10036, Attn: Robert J. Stark (rstark@brownrudnick.com) and Bennett S. Silverberg (bsilverberg@brownrudnick.com); and (ii) McDermott Will & Emery LLP, 2501 North Harwood Street, Suite 1900 Dallas, TX 75201-1664, Attn: Charles R. Gibbs (crgibbs@mwe.com) and Marcus Helt (mhelt@mwe.com);

f)  counsel to the Consenting ETI Parties, Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006, Attn: Sean A. O'Neal (soneal@cgsh.com); Luke A. Barefoot (lbarefoot@cgsh.com); David Z. Schwartz (dschwartz@cgsh.com); and Brad Lenox (blenox@cgsh.com); and

g)  counsel to the Sub-Group DIP Lenders, Williams Barber Morel Ltd., 233 Wacker Drive, Suite 6800, Chicago, IL, 60606 Attn: Daniel R. Brown (drb@williamsbarbermorel.com); Jenner & Block LLP, 353 N. Clark Street, Chicago, IL 60654, Attn: Catherine Steege (csteege@jenner.com); and Kane Russell Coleman Logan PC, 401 Congress Avenue, Suite 2100, Austin, Texas 78701, Attn: Mark Taylor (mtaylor@krcl.com).

**CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**3.  Effect of Confirmation of the Plan**

Article IX of the Plan contains certain provisions relating to (a) the compromise and settlement of Claims, (b) the release of the Released Parties by the Debtors and certain other Releasing Parties, and

(c) exculpation of the (i) the Debtors; (ii) the Disinterested Director; and (iii) the Committee and each member of the Committee.  It is important to read such provisions carefully so that you understand the implications of these provisions with respect to your Claim such that you may cast your vote accordingly.

> **THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (A) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (B) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES, OR (C) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.**

## G.    The Plan Releases

The Plan contains the Third-Party Release, which will bind certain holders of Claims and Interests.  The Debtors believe these provisions comply fully with applicable law.  The following summary of those provisions is subject in all respects to the Plan itself.

**Article IX.C of the Plan provides that the Releasing Parties will be deemed to have released the Released Parties from Claims and Causes of Action relating to the Debtors and the Restructuring and Chapter 11 Cases, among other things**.  The Released Parties include, among others, the Debtors, the Reorganized Debtors, the Non-Debtor Affiliates and the Consenting ETI Parties, each of their current and former directors, officers, and proxyholders, the parties to the Plan Support Agreement, each Agent, Holders of Claims and Interests that do not opt out of the Third-Party Release, and the respective advisors and Representatives of each of the foregoing parties.

The Released Parties also would be released from any Claims and Causes of Action held by the Estates under the Plan.

All Holders of Claims and Interests are advised to read Article IX of the Plan, which sets forth in greater detail the information disclosed in this Section I.G of this Disclosure Statement.  Under the Plan, as currently drafted, the decision of any Holder of a Claim to opt out of the Releases does not affect the amount of distribution such Holder of a Claim will receive under the Plan.  Specifically, the recovery a Holder of a Claim will receive, as contemplated under the Plan as currently drafted, will be the same whether such Holder opts out or not; however, in the event a Holder of a Claim opts out of the Releases, such Holder will not be granted a release from the Releasing Parties under the Plan.

## H.    Issuance of Plan Securities

Plan Securities.  On the Effective Date, New Parent shall issue the Plan Securities pursuant to the Plan and the New Organizational Documents.  New Parent intends that the Exchanged New Parent Interests will be listed on the national stock exchange on which the New Parent Interests are then listed, and will use its commercially reasonable efforts to effectuate the same.

## I.    Consummation of the Plan

It will be a condition to confirmation of the Plan that all provisions, terms, and conditions of the Plan are approved in the Confirmation Order unless otherwise satisfied or waived pursuant to the provisions of Article VIII of the Plan.  Following confirmation, the Plan will be consummated on the Effective Date.

**J.      Risk Factors**

Before deciding whether and how to vote on the Plan, each Holder of a Claim in the Voting Classes should consider carefully all of the information in this Disclosure Statement, including the Risk Factors described in <u>Section IX</u> hereof ("*Risk Factors to Consider Before Voting*").

<div align="center">

**II.**
**BACKGROUND TO THE CHAPTER 11 CASES**

</div>

**A.      The Debtors' Corporate Structure**

As reflected in the organizational chart attached hereto as **Exhibit F-1** (the "***Company Organizational Chart***"), non-Debtor Exela Technologies, Inc. ("***Exela***")—a corporation incorporated under the laws of the state of Delaware—directly or indirectly owns and controls a large, worldwide enterprise comprised of approximately 134 entities.  As set forth on the organizational chart attached hereto as **Exhibit F-2** (the "***Debtors Organizational Chart***"), the Debtors in these Chapter 11 Cases are sixty (60) entities within the Company's larger corporate structure.  An alphabetical listing of all the Debtors is attached hereto as **Exhibit G**.  The fifty-seven (57) domestic Debtors are organized under the laws of the following states: Delaware, Texas, Florida, Iowa, Minnesota, South Carolina, Nevada, New Jersey, and Pennsylvania.  The three (3) foreign Debtors are Canadian entities organized under the laws of Ontario and Nova Scotia.[6]

**B.      The Company's History**

Exela, formerly known as Quinpario Acquisition Corp. 2 ("***Quinpario***"), was originally formed as a special purpose acquisition company on July 15, 2014, and completed an initial public offering on January 22, 2015.  Following the closing of the strategic combination of SourceHOV Holdings, Inc. ("***SourceHOV***"), a leading global transaction processing company, and Novitex Holding, Inc. ("***Novitex***"), a cloud-based document outsourcing and onsite staffing company, pursuant to a business combination agreement dated February 21, 2017 (the "***Novitex Business Combination***"), Quinpario was renamed as "Exela Technologies, Inc." and began trading under the ticker symbol "XELA" on NASDAQ on July 13, 2017.  In November 2023, ETI effectuated the merger of its European operations into CF Acquisition Corp. VIII, forming a separate public company, XBP.  The Debtors consist of SourceHOV, Novitex, and their respective subsidiaries along with the acquisition and financing vehicles that participated in the Novitex Business Combination (collectively referred to as the "***Company***" or the Debtors, below).

**C.      The Company's Business Operations and Revenue**

The Company is a global leader in business process automation and uses its international reach and proprietary technology to provide high-quality payments processing and digital transformation solutions to its clients throughout the Americas and Asia that improve efficiency and reduce operating costs.  Specifically, the Company combines data and user-friendly software and platforms which, together with the services offered by its employees, enable customers to improve the efficiency of their operations.  The Company has adopted a global delivery model and hosts solutions in its data centers, on the cloud, or directly from customers' premises.  The Company's location-agnostic solutions, coupled with its flexible hosting capabilities and global work force, enables the Company to provide its services across numerous industries, including banking, healthcare, insurance, and manufacturing.

---

[6]   Debtors Novitex Enterprise Solutions Canada, Inc. and BancTec (Canada), Inc. are formed under Ontario law and Debtor SourceHOV Canada Company is formed under Nova Scotia law.

The Company has served over 60% of the Fortune® 100 companies.  For the calendar year 2024, the Company generated approximately $856 million in revenue from over 1,550 global customers.  The Company provides mission critical services to some of the leading global banks, healthcare insurers, and global brands.  Such services include, without limitation, finance and accounting solutions and services, payment technologies and services, healthcare payer and revenue cycle management, along with hyper automation and 'work from anywhere' solutions, enterprise information management, integrated communications and marketing automation solutions, and digital solutions for enterprise customers.

## 1.  Operating Segments

The Company's business is comprised of three reportable segments:

### a.  Information and Transaction Processing Solutions ("ITPS").

ITPS is the Company's largest segment and includes a wide range of solutions and services for customers primarily in the financial services, commercial, public sectors, and legal industries.  The ITPS segment accounted for approximately 64.1% (or $548.7 million) of 2024 revenue.

### b.  Healthcare Solutions ("HS").

The HS segment includes the Company's outsourcing business that specializes in the healthcare provider and payer markets.  In calendar year 2024, the HS segment generated approximately 27.1% (or $231.9 million) of revenue.  Among other services, the HS segment processes approximately 900,000 claims a day, reducing patient claim denials, and alleviating system bottlenecks in the healthcare payments space.

### c.  Legal & Loss Prevention Services ("LLPS").

The Company's LLPS segment provides services in connection with class action settlement administration, claims adjudication, labor, employment, and other legal matters.  In fiscal year 2024, the LLPS segment generated approximately 8.8% (or $75.3 million) of revenue.

## 2.  Product Offerings

The Company derives its revenue from the following services and solutions:  (a) Finance & Accounting Solutions; (b) Payment Technologies and Services; (c) Healthcare Payers and Revenue Cycle Management; (d) Work from Anywhere Solutions; (e) Enterprise Information Management; (f) Integrated Communications and Marketing Automation Solutions; and (g) Digital Solutions for Enterprise Customers.

### a.  Finance & Accounting ("F&A") Solutions

The Company offers a comprehensive suite of F&A solutions.  For example, the Company's exchange for bills and payments platform (the "*Platform*"), enables billers, consumers, and businesses to communicate and transact on one platform that can connect to any customer system without significant capital investment. The Platform provides the critical billing components that integrate with the Company's related solution suites and covers entire lifecycles for both Procure-to-Pay solutions ("*P2P*") and Order-to-Cash solutions ("*O2C*"), the components of which are designed to complement the customer's other existing automated solutions.  The Platform is a user-friendly and highly adaptable platform exchange, and includes services such as secure messaging that allows billers, consumers, and businesses to effectively communicate and transact.

Both the O2C and P2P solution suites are components of the Platform.  The O2C solutions help clients automate the customer order fulfillment process.  This process includes delivering customer orders, preparing invoices, and managing accounts receivable collection.  O2C solutions consolidate incoming payments and enhance clients' treasury management functions.  Specifically, to maximize sales efficiencies, clients can leverage integrated receivables dashboards, multi-channel bill presentment and payment system, reconciliation services, exceptions and disputes management platform, aging analytics, collections management, and targeted engagement services.  These capabilities significantly increase the accuracy of payment posting for clients and lower payment processing time.

P2P solutions, in turn, automate the clients' goods-procurement process.  The process begins when a purchase order is entered on the P2P platform and, once approved, the purchase order moves to procurement where bids are solicited from an existing supplier network.  After a bid is approved, the P2P platform records the receipt of the goods and then processes the transaction.  In certain cases, the Company's employees process an order, once approved, the purchase is manually recorded in the customer's system for payment.  The Company's P2P platform then generates a payment file that is formatted to relevant bank requirements so that payment can be efficiently processed.  Ultimately, the P2P platform provides a complete solution for customers' procurement needs.

### b.  *Payment Technologies and Services.*

In addition to solutions and services that can be used across industries, the Company has also developed industry-specific solutions to meet selected client's needs.  For example, the Company's financial solutions provide, among other services, payment, lending, and information management services.  In addition to checks and credit cards, the Company handles other payment channels such as the automated clearing house (ACH).  The Company performs such services on behalf of its client or its clients' banks, and manages both business-to-business and business-to-consumer transactions.

Through its extensive experience in payment management, the Company has also developed proprietary integrated receivables-processing technology, which consolidates transactions across disparate payment channels into a single payment platform connected to the Platform's network.  The Company plans to offer this technology as a branded or private label solution to banking customers.

### d.  *Healthcare Payers and Revenue Cycle Management.*

The Company has also developed specific offerings for the healthcare industry.  The Company bundles core solutions with a suite of healthcare payer (insurer) and healthcare provider-specific services such as end-to-end revenue cycle management ("***RCM***"), including revenue integrity solutions, enrollments and credentialing, claims processing, adjudication, and payment operations.  These services generate value for clients in the healthcare industry by simplifying complex healthcare transactions that require multiple layers of validation, supporting document digitization, and reconciliation.

Additionally, PCH Global is the Company's cloud-based claims processing platform, which streamlines claims submission and payment process making it easier for healthcare providers and payers to manage claims timely, cost efficiently and to comply with regulations.  PCH Global processes approximately 900,000 claims a day, reduces claim denials, and helps alleviate system bottlenecks in the healthcare payments space.

### e.  *Work From Anywhere Services.*

The Company has developed three solutions that track the advancements in cognitive automation and support work from all locations whether it be onsite, offsite, or hybrid.  *First*, the Company's robotic process automation solution, EON™, leverages intelligent automation to make clients' businesses more productive.  Specifically, EON™ empowers clients to create task-specific bots to take over repetitive, rule-based

assignments.  *Second*, ExelaBEATS™ provides a collaborative project management software that allows working groups to manage their workflow and collaborate.  Team members can create their own workflow or select from existing ExelaBEATS™ workflows to effectively manage their projects and monitor the status of tasks in real time.  *Third*, DrySign™ enables a digital signature platform that helps digitize both internal and external sign-off processes.  Ultimately, the Company leverages automated tools and customized solutions to enhance its clients' operations and efficiency.

### f.   Enterprise Information Management ("EIM").

The Company provides EIM solutions to help clients organize, process and store large amounts of data in cloud-enabled proprietary platforms.  The EIM systems process and host billions of critical records for a variety of businesses across a number of industries.

### g.   Integrated Communications and Marketing Automation Solutions.

The Company also has comprehensive multi-channel integrated communications solutions to help clients reach their end-customers and other businesses effectively.  For example, the Company's Marketing Execution Services ("*XME*") is a marketing platform that enables clients to execute a complete end-to-end marketing strategy.  XME™ features a Digital Storefront that allows users to improve brand control and deliver a polished e-commerce experience to their end-customers.  It also supports omni-channel communication options such as direct mail, email, landing pages, web banners, social sharing, and call center tracking, with analytics reporting and data visualization available as needed.  In addition, the Company's business critical print and mail and strategic sourcing services enable clients to optimize their business communications.

### h.   Digital Solutions for Enterprise Customers.

The Company also offers several digital solutions to enterprise clients.  For example, the digital mailroom ("*DMR*") solutions leverage proprietary technology to process a significant number of daily mail collection tasks.  Once mail is received, the DMR platform processes it and routes it to the appropriate person at an organization, where it appears as an item in the DMR inbox, further enabling 'work from anywhere'.  The Company offers DMR for enterprise wide deployment from captive mailrooms in client locations to businesses where there is no dedicated mailroom.

### 3.   The Company's Facilities and Employees

The Company maintains its headquarters in Irving, Texas, with members of its management team also based in Troy, Michigan, and Santa Monica, California.   As to the Debtors themselves, the Debtors maintain numerous facilities as set forth in **Exhibit F-3**.

The Company has approximately 11,000 employees across five (5) countries.[7]  Of those, approximately 4,700 are employed by the Debtors as of the Petition Date.  In terms of the global workforce of the Company, almost half of the Company's global workforce is based in the Americas (with most employees based in the U.S., and additional employees in Canada and Mexico) and the balance is based in India and the Philippines.

---

[7]   The Debtors' employees are distributed geographically as follows:  (1) U.S. (4,139); (2) Canada (282); (3) Mexico (241).

D.     **The Debtors' Prepetition Capital Structure**

As of the Petition Date, the Debtors had approximately $1.383 billion of funded secured and unsecured debt obligations. The Debtors' prepetition funded secured and unsecured debt obligations are summarized in the below table:

| Debt | Relevant Parties | Maturity | Outstanding Amount[8] |
|---|---|---|---|
| **Senior Secured Term Loan (Blue Torch Facility)** | • **Borrower:** Exela Intermediate<br>• **Borrower:** Exela Finance | July 11, 2026 | $38,500,000 (principal only) |
| **April 2026 Notes** | • **Issuer:** Exela Intermediate<br>• **Co-Issuer:** Exela Finance | April 15, 2026 | $1,319,106,629 (inclusive of principal and outstanding interest, of which approximately $383,984,010 is held by certain Exela affiliates)[9] |
| **July 2026 Notes[10]** | • **Issuer:** Exela Intermediate<br>• **Co-Issuer:** Exela Finance | July 15, 2026 | $25,666,358 (inclusive of principal and outstanding interest, of which $1,211 is held by certain Exela affiliates) |
| | | | **$1,383,272,987** |

1.     **Funded Secured and Unsecured Debt**

       a.     *The Blue Torch Facility*

On July 11, 2023, Debtor Exela Intermediate LLC ("***Exela Intermediate***") and Debtor Exela Finance, Inc. ("***Exela Finance***"), entered into that certain financing agreement (the "***Blue Torch Financing Agreement***") with Blue Torch Credit Opportunities Fund III LP, Blue Torch Credit Opportunities Unlevered Fund III LP, BTC Holdings SBAF Fund LLC, BTC Holdings KRS Fund LLC, and BTC Holdings SBAF Fund-B LLC, as lenders (collectively, the "***Blue Torch Lenders***"), and Blue Torch Finance LLC (the "***Blue Torch Facility Agent***"), as administrative and collateral agent. Pursuant to the Blue Torch Financing Agreement, the Blue Torch Lenders agreed to extend a $40 million term loan to the Debtors (the

---

[8]     Amounts are as of the Petition Date. Such balances may differ from the figures listed in the DTC based register due to certain differences with DTC accounting conventions.

[9]     The amount of April 2026 Notes held by certain Exela affiliates is exclusive of the $6 million of such notes sold to external holders in January 2025.

[10]     As discussed below, the July 2026 Notes were originally secured obligations of the Company but pursuant to the terms of the Supplemental Indenture (defined below), all collateral securing the July 2026 Notes pursuant to the Security Agreement was released and, accordingly, the July 2026 Notes are no longer secured obligations of the Company.

"**Senior Secured Term Loan**").  As of the Petition Date, the principal amount outstanding under the Blue Torch Financing Agreement is approximately $38.5 million.

Pursuant to that certain pledge and security agreement dated as of July 11, 2023 (the "**Blue Torch Pledge and Security Agreement**"), the obligations arising pursuant to the Blue Torch Financing Agreement are secured by security interests in all or substantially all personal property and fixtures of the grantors thereunder.[11]

### b.   April 2026 Notes

On July 11, 2023, Debtors Exela Intermediate and Exela Finance (together, the "**Issuers**"), certain guarantors thereunder,[12] and U.S. Bank Trust Company, National Association, as indenture trustee (the "**April 2026 Notes Trustee**"), executed an indenture (the "**April 2026 Notes Indenture**")[13] pursuant to which the Issuers issued approximately $1.082 billion aggregate principal amount of 11.5% first-priority senior secured notes due April 15, 2026 (the "**April 2026 Notes**"), of which approximately $314 million were issued to affiliates of the Debtors, which includes April 2026 Notes issued (a) as consideration in the discounted exchange (the "**2023 Exchange**") of $956.0 million aggregate principal amount of the July 2026 Notes (defined below), (b) as consideration for the private exchange of certain term loans (none of which remain outstanding), (c) in exchange for certain secured notes held by affiliates of the Debtors (none of which remain outstanding), and (d) to certain Exela affiliates in satisfaction of prior cash payments made by such Exela affiliates to or on behalf of the Issuers.

The interest on the April 2026 Notes has historically been partly paid in kind, subject to the terms of the April 2026 Notes Indenture.  As a result of the foregoing PIK Interest and the issuance of additional April 2026 Notes from time to time in accordance with the April 2026 Notes Indenture, the outstanding principal amount as of the Petition Date is approximately $1.231 billion.  Certain Exela affiliates hold approximately $384 million in principal amount of the April 2026 Notes.[14]

The Issuers' obligations under the April 2026 Notes (the "**April 2026 Notes Obligations**") are secured by the terms of the "Security Documents" as defined in the April 2026 Notes Indenture.  Under the Security Documents, the April 2026 Notes Obligations are first priority senior secured obligations of the Issuers and the guarantors thereunder.  Specifically, the obligations are secured by security interests in substantially all of the existing and future assets of the Issuers and the grantors thereunder.

### c.   Intercreditor Agreement

The respective rights of the April 2026 Notes Trustee, First-Priority Collateral Agent, and the Blue Torch Facility Agent (collectively, the "**Intercreditor Agreement Parties**") with respect to their shared collateral are governed by that certain intercreditor agreement, dated as of July 11, 2023, by and among the Intercreditor Agreement Parties, the Issuers and certain guarantors thereunder (as may be amended from time to time, the "**Intercreditor Agreement**").  The Intercreditor Agreement governs, among other items, the lien priorities and subordination of the relevant collateral as well as the enforcement rights of each Intercreditor Agreement Party.  Notably, the Intercreditor Agreement also governs the respective rights of

---

[11]   The guarantors thereunder are comprised of all Debtor entities, except for Exela Intermediate and Exela Finance.

[12]   The guarantors thereunder are comprised of each of the Debtors, except for Exela Finance, Exela Intermediate, Debtor Exela Technologies BPA, LLC, Debtor SIG-GP, L.L.C., and Services Integration Group, L.P.

[13]   Wilmington Savings Fund Society, FSB served as collateral agent (the "**First-Priority Collateral Agent**") for the First-Priority Secured Parties (as defined therein).

[14]   The Exela affiliate holders of April 2026 Notes include GP 3XCV LLC and XCV-STS LLC.

the Intercreditor Agreement Parties in connection with insolvency proceedings, including post-petition financing.

### d.   July 2026 Notes (Unsecured)[15]

On December 9, 2021, the Issuers, certain guarantors thereunder,[16] and U.S. Bank National Association, as trustee (the "***July 2026 Notes Trustee***"), entered into that certain indenture (the "***July 2026 Notes Indenture***")[17] pursuant to which the Issuers issued certain 11.5% first-priority senior secured notes due July 15, 2026, (the "***July 2026 Notes***").[18]

The Issuers' obligations under the July 2026 Notes (the "***July 2026 Notes Obligations***") were secured by that certain collateral agency and security agreement (as further amended, supplemented, modified, extended, renewed, restated, refunded or refinanced from time to time, the "***Security Agreement***") dated as of July 12, 2017 and any additional relevant security agreements, pledge agreements, collateral assignments and mortgages (together with the Security Agreement, the "***Security Documents***").[19]   Prior to the 2023 Exchange, the Security Documents (subject to the conditions thereof) provided that the July 2026 Notes Obligations were secured by security interests in, and liens upon, all or substantially all assets of, among other parties, Exela Finance and Exela Intermediate.

As of January 1, 2023, the aggregate principal amount of the Company's indebtedness under the July 2026 Notes was approximately $1.278 billion (inclusive of amounts held by certain affiliates).   However, following the 2023 Exchange and certain periodic debt repurchases by the Company, only approximately $24 million in aggregate principal amount remained outstanding under the July 2026 Notes as of the Petition Date (of which certain non-Debtor affiliates hold approximately $1,211.00).[20]   Further, on July 11, 2023, the Issuers, April 2026 Notes Trustee (as successor to the July 2026 Notes Trustee), and Wilmington Savings Fund Society, FSB, as collateral agent executed a seventh supplemental indenture (the "***Supplemental Indenture***") to govern the July 2026 Notes.   The Supplemental Indenture eliminated substantially all restrictive covenants and certain events of default, including those relating to covenant or warranty breaches, cross-acceleration rights, certain insolvency events and judgments, contained in the July 2026 Notes Indenture and the July 2026 Notes.   Notably, all collateral securing the July 2026 Notes pursuant to the Security Agreement was released under the Supplemental Indenture.   Accordingly, the July 2026 Notes are no longer secured obligations.

On March 3, 2025, U.S. Bank Trust Company, National Association (as the successor in interest to the July 2026 Notes Trustee) sent a letter to the Debtors (the "***Default Letter***"), advising that an event of default had

---

[15]   Certain Debtors are party to a *Pari First Lien Intercreditor Agreement* (the "***Pari Intercreditor***") dated as of July 12, 2017.   While the Pari Intercreditor has not been terminated, there are no outstanding debt obligations underlying this agreement.

[16]   The guarantors thereunder are comprised of substantially the same guarantors as those entities that guarantee April 2026 Notes except for entities formed after December 2021.

[17]   Wilmington Savings Fund Society, FSB served as collateral agent (the "***First Priority Collateral Agent***") for the First Priority Secured Parties (as defined therein).

[18]   Interest on the July 2026 Notes is payable on January 15 and July 15 of each year.

[19]   The Security Agreement was initially executed in connection with the 10.000% First Priority Senior Secured Notes due 2023 issued on July 12, 2017 (the "***Old Notes***").

[20]   The non-Debtor affiliate holders of the July 2026 Notes include GP3XCV LLC, GP 2XCV LLC, and XCV STS LLC.

occurred under the July 2026 Notes Indenture.  The Issuers reserve all rights with respect to the Default Letter.

## 2.  **Tax Liabilities**

As a result of the late payment of certain Q4 2023 payroll tax obligations, Automatic Data Processing, Inc. ("***ADP***") suspended the payroll processing services it had historically provided to the Debtors, leaving the Debtors without access to certain payroll data and making the filing of federal, state, and local quarterly tax returns impracticable.  Challenges related to determining the amounts that were due and the process to remit, as well as the subsequent liquidity constraints that the Debtors were facing, led to the failure of certain of the Debtors (the "***Debtor Payroll Entities***")[21] to timely remit certain amounts to federal, state, and local taxing authorities.  Such amounts included (a) federal "trust fund taxes" (which are owed by the employee but held by an employer "in trust" for the government), (b) federal non-trust fund payroll taxes (which are owed directly by the employer to the government, including employer contributions to Social Security), and (c) state and local payroll taxes.  As of the Petition Date, these payroll-related tax obligations are asserted in the amount of approximately $34.9 million (inclusive of $2.1 million in interest and $9.9 million in failure-to-file and other penalties) (collectively, the "***Payroll Tax Obligations***").

Separately, Exela, like many other companies, enrolled in CARES Act-related deferral programs that allowed the Debtors to defer a portion of Social Security taxes (FICA) for the fiscal years 2020 through 2023.  As of the end of fiscal year 2023, the Debtor Payroll Entities had approximately $14 million in outstanding CARES Act-related taxes, but the Debtors subsequently paid approximately $5.7 million of this liability.  As of the Petition Date, these CARES Act payroll-related tax obligations are asserted in the amount of approximately $7.3 million (the interest on unpaid deferred Social Security is approximately $2 million, while the penalty on unpaid deferred Social Security is approximately $1.9 million) (the "***CARES Tax Obligations***").

In addition, as of the Petition Date, certain of the Debtors (the "***Debtor Sales Tax Entities***") owed a total asserted amount of approximately $2,671,303 to certain state taxing authorities on account of sales taxes (collectively, the "***Sales Tax Obligations***").[22]  Separately, Debtor Pangea Acquisitions Inc. owed a total asserted amount of approximately $96,632 to certain state taxing authorities (collectively, the "***Franchise Tax Obligations***").  And, certain of the Debtors (the "***Debtor Property Tax Entities***") owed a total asserted amount of approximately $954,238 to certain state taxing authorities on account of property taxes (collectively, the "***Property Tax Obligations***").[23]

Lastly, as of the Petition Date, Debtor Novitex Enterprise Solutions Canada, Inc owed a total asserted amount of approximately $1,564,472 to Canadian taxing authorities on account of sales tax and audit assessments (collectively, the "***Canadian Tax Obligations***" and, together with the Payroll Tax Obligations, the Sales Tax Obligations, the Franchise Tax Obligations, the Property Tax Obligations, and CARES Tax Obligations, the "***Outstanding Tax Obligations***").

---

[21]  The Debtor Payroll Entities include the following Debtor entities:  SOURCECORP BPS Inc.; Banc Tec Inc,; Economic Research Services Inc.; HOV Services Inc.; HOVG LLC; J & B Software Inc.; Managed Care Professionals LLC; Novitex Government Solutions LLC; Regulus Group LLC; Regulus Integrate Solutions Inc.; Rust Consulting Inc.; Sourcecorp Management Inc.; SourceHOV Healthcare Inc.; United Information Services Inc.; and Exela Enterprise Solutions Inc.

[22]  The Debtor Sales Tax Entities include the following Debtor entities:  Exela Enterprise Solutions, Inc.; United Information Services, Inc.; and BancTec, Inc.

[23]  The Debtors Property Tax Entities include the following Debtor entities:  BancTec, Inc.; SourceHOV LLC; Novitex Holdings, Inc.; and TransCentra, Inc.

Although the Debtors dispute portions of the Outstanding Tax Obligations deemed owed (and reserve all rights with respect to same), the Debtors acknowledge that certain amounts are owed on account of such obligations as of the Petition Date.  The Debtors recognize that, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless the applicable taxing authority agrees to less favorable treatment, the Debtors will need to either (i) pay those Outstanding Tax Obligations afforded priority treatment under the Bankruptcy Code in full in cash or (ii) pay such amounts over a period not more than five (5) years after the Petition Date to achieve confirmation of a plan of reorganization.

As set forth in the Plan, the Debtors have included an appendix to the Plan on which they have scheduled the Outstanding Tax Obligations.  Specifically, the Debtors are proposing to Allow $42,308,560.81 in aggregate Outstanding Tax Obligations as Priority Tax Claims under the Plan.  The Debtors are treating the remaining Outstanding Tax Obligations, approximately $8 million in the aggregate, as General Unsecured Claims given that these amounts are attributable to penalties imposed by the applicable taxing authority and, accordingly, are not entitled to priority status under Section 507(a)(8) of the Bankruptcy Code.  *See* Appendix A of the Plan for the Allowed Priority Tax Claims.

## E.     Unsecured Debt

In addition to their secured and unsecured funded debt, the Debtors have customary, ordinary-course unsecured debt, including amounts owed to trade vendors and landlords.  The Company routinely incurs fixed, liquidated, and undisputed payment obligations in the ordinary course of business to various third-party providers of goods and services.  As of the Petition Date, the Debtors estimate that approximately $41 million (excluding intercompany amounts but including estimated accruals) of trade debt is outstanding. Certain of these claims are entitled to statutory priority, including under section 503(b)(9) of the Bankruptcy Code.  The Company also has certain lease obligations.  The Debtors estimate that an average of approximately $1.6 million accrues on account of lease and occupancy-related expenses each month.

## F.     Securitization and Other Receivables Financing Arrangements

The Company maintains three trade receivables financing arrangements: the ER3 Securitization Program (as defined below), the Second Lien Note (as defined below) and the BR Exar AR Facility (as defined below) (collectively, the "***Receivables Facilities***").  The workings of the Receivables Facilities is described in greater detail in the Securitization Motion[24] and the Cash Management Motion.[25]  The following chart sets forth the obligations outstanding under the Receivables Facilities as of the Petition Date:

| Facilities | Relevant Parties | Maturity | Outstanding Principal |
|---|---|---|---|
| ER3 Securitization Program | • **Originators:** *Following Debtor entities*: BancTec, Inc.; Economic Research Services, Inc.; Exela Enterprise Solutions, | June 17, 2025 | $94,300,000[26] |

---

[24]   "***Securitization Motion***" means the *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing  Certain Debtors to Continue Selling, Contributing and Servicing Receivables and Related Rights Pursuant to the Securitization Program, (II) Modifying the Automatic Stay, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* [Docket No. 9].

[25]   "***Cash Management Motion***" means the *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Existing Cash Management System, (B) Maintain Existing Business Forms and Intercompany Arrangements, and (C) Continue Intercompany Transactions and (II) Granting Related Relief* [Docket No. 10].

[26]   As of the Petition Date.

| Facilities | Relevant Parties | Maturity | Outstanding Principal |
|---|---|---|---|
| | Inc.; HOV Enterprise Services, Inc.; HOV Services, Inc.; HOV Services, LLC; J & B Software, Inc.; Novitex Government Solutions, LLC; Regulus Group LLC; Regulus Group II LLC; Regulus Integrated Solutions LLC; SOURCECORP BPS Inc.; SOURCECORP Management, Inc.; SourceHOV Healthcare, Inc; and United Information Services, Inc.<br>• **Seller:** Non-Debtor Exela Receivables 3, LLC<br>• **Pledgor:** Non-Debtor Exela Receivables 3 Holdco LLC | | |
| Second Lien Note | • **Borrower:** Non-Debtor Exela Receivables 3 Holdco, LLC | June 17, 2025 | $22,625,000 |
| BR Exar Accounts Receivable Facility | • **Originators**: Debtor Novitex Enterprise Solutions Canada, Inc., Debtor Rust Consulting, Inc., Debtor HOVG LLC, Debtor BancTec (Canada) Inc., and Debtor SourceHOV Canada Company<br>• **Seller:** Non-Debtor Exela BR SPV LLC | - | $9,981,630 |
| | | | **$126,925,000** |

1.  **The ER3 Securitization Program**

On June 17, 2022, non-Debtor Exela Receivables 3, LLC ("***Receivables 3***"), as seller, and non-Debtor Exela Receivables 3 Holdco, LLC ("***Receivables 3 Holdco***," and together with Receivables 3, the "***SPEs***"), as pledgor, Parent, as initial servicer, PNC Bank, National Association ("***PNC***"), as administrative agent for the benefit of the secured parties (the "***ER3 Securitization Secured Parties***") and as letters of credit bank, PNC Capital Markets LLC, as structuring agent, and PNC, as purchasers, entered into that certain amended and restated receivables purchase agreement, dated as of June 17, 2022 (as further amended, supplemented, modified, extended, renewed, restated, refunded or refinanced from time to time, the "***ER3 Receivables Purchase Agreement***"). The ER3 Receivables Purchase Agreement extended the term of an existing $150 million securitization facility among the SPEs (*i.e.*, Receivables 3 and Receivables 3 Holdco), as borrower and pledgor, respectively, and a certain group of lenders to allow the SPEs to sell and finance receivables until June 17, 2025. The ER3 Receivables Purchase Agreement was further amended on February 27, 2023 in connection with the Second Lien Note (defined below) to, among other objectives, permit the addition of subordinated debt funded by B. Riley Commercial Capital, LLC. The ER3 Receivables Purchase Agreement was then again further amended and restated on March 6, 2025, to ensure continued access to liquidity upon the filing of, and throughout the pendency of, the Chapter 11 Cases. The purchase and financing facility contemplated by the ER3 Receivables Purchase Agreement and the related transaction documents (the "***ER3 Securitization Program***") was authorized by the Bankruptcy Court on an interim and final basis, as described in greater detail below.

Each SPE is a non-Debtor structured as a special-purpose, bankruptcy-remote entity created for the purpose of facilitating the ER3 Securitization Program. As noted, certain Debtor entities (the "***ER3 Securitization Originators***") transfer their receivables on an ongoing basis at fair market value to the SPEs to create and maintain the "Capital Coverage Amounts" (substantially equivalent to a borrowing base) for the ER3 Securitization Program, with the proceeds of those sales to the SPEs funding in part the Debtors', and the larger Company's, liquidity.[27]

The main transaction documents for the ER3 Securitization Program consist of (1) the ER3 Receivables Purchase Agreement, (2) the Second Amended and Restated First Tier Purchase and Sale Agreement, dated as of March 5, 2025, among Parent, as initial servicer, the ER3 Securitization Originators, as sellers, and Receivables 3 HoldCo, as buyer (as further amended, supplemented, modified, extended, renewed, restated, refunded or refinanced from time to time, the "***ER3 First Tier Purchase Agreement***"), (3) the Amended and Restated Second Tier Purchase and Sale Agreement, dated as of June 17, 2022, among Parent, as initial servicer, Receivables 3 HoldCo, as seller, and Receivables 3, as buyer (as further amended, supplemented, modified, extended, renewed, restated, refunded or refinanced from time to time, the "***ER3 Second Tier Purchase Agreement***"), (4) the Amended and Restated Pledge and Guaranty Agreement, dated as of June 17, 2022, by the Receivables 3 Holdco in favor of PNC, as administrative agent for the benefit of the secured parties and the other beneficiaries set forth therein (as further amended, supplemented, modified, extended, renewed, restated, refunded or refinanced from time to time, the "***ER3 Holdco Equity Pledge Agreement***"), (5) the Amended and Restated Performance Guaranty, dated as of June 17, 2022, by Exela, as performance guarantor, in favor of PNC, as administrative agent (as further amended, supplemented, modified, extended, renewed, restated, refunded or refinanced from time to time, the "***ER3 Performance Guaranty***"), collectively, the "***PNC Facility Transaction Documents***"), and (6) the Amended and Restated Sub-Servicing Agreement, dated as of June 17, 2022, by Exela, as initial Servicer, and each of the ER3 Securitization Originators, as sub-servicers (as further amended, supplemented, modified, extended, renewed, restated, refunded, or refinanced from time to time, the "***ER3 Sub-Servicing Agreement***") (together with the other Transaction Documents (as defined in the ER3 Receivables Purchase Agreement), collectively, the "***ER3 Securitization Transaction Documents***").

Under the ER3 Securitization Program, (a) Receivables 3 Holdco purchases and receives as capital contributions receivables and related assets from the ER3 Securitization Originators pursuant to the ER3 First Tier Purchase Agreement, (b) Receivables 3 purchases and receives as capital contributions, such receivables and related assets from Receivables 3 Holdco (consisting of all the receivables transferred to the Pledgor pursuant to the ER3 First Tier Purchase Agreement) pursuant to the ER3 Second Tier Purchase Agreement, (c) Receivables 3 may request that the purchasers make payments of Capital (as defined in the ER3 Receivables Purchase Agreement but substantially similar to the outstanding principal of a loan if the transactions under the ER3 Receivables Purchase Agreement were structured as loans, rather than purchases) to Receivables 3 from time to time, secured by, among other things, the receivables and all other property owned by Receivables 3, pursuant to the terms set forth in the ER3 Receivables Purchase Agreement and the other ER3 Securitization Transaction Documents, (d) Exela, as Servicer, agrees to perform certain servicing duties with respect to the receivables, (e) each ER3 Securitization Originator, as sub-servicers under the ER3 Sub-Servicing Agreement, agrees to perform such duties of the Servicer with respect to the receivables originated by such ER3 Securitization Originator, and (f) Exela, as performance guarantor under the ER3 Performance Guaranty, guarantees the performance of the obligations of the ER3 Securitization Originators and Exela, as servicer, or any replacement servicer, under the ER3 Securitization

---

[27]   The ER3 Securitization Originators include the following Debtor entities: BancTec, Inc.; Economic Research Services, Inc.; Exela Enterprise Solutions, Inc.; HOV Enterprise Services, Inc.; HOV Services, Inc.; HOV Services, LLC; J & B Software, Inc.; Novitex Government Solutions, LLC; Regulus Group LLC; Regulus Group II LLC; Regulus Integrated Solutions LLC; SOURCECORP BPS Inc.; SOURCECORP Management, Inc.; SourceHOV Healthcare, Inc; and United Information Services, Inc.

Transaction Documents to which they are a party.  The obligations of Receivables 3 under the ER3 Receivables Purchase Agreement (the "***ER3 Securitization Program Obligations***") are guaranteed by Receivables 3 Holdco, which guarantee is secured by the ER3 Holdco Equity Pledge Agreement.  Pursuant to the ER3 Holdco Equity Pledge Agreement, Receivables 3 Holdco, as guarantor, has provided collateral primarily consisting of a pledge of its equity in Receivables 3.

As set forth in greater detail in the Securitization Motion, PNC has agreed to maintain the ER3 Securitization Program, and to continue to provide the Debtors with the liquidity arising therefrom, during the pendency of the Chapter 11 Cases.  As set forth in greater detail below, the Securitization Motion has been approved on an interim and final basis. [Docket Nos. 59 and 303].

### 2. Second Lien Note

On February 27, 2023, Receivables 3 Holdco entered into a Secured Promissory Note (the "***Second Lien Note***") with B. Riley Commercial Capital, LLC, which was later assigned to BRF Finance Co., LLC ("***B. Riley***").  Pursuant to the Second Lien Note, B. Riley agreed to lend up to $35 million to Receivables 3 Holdco secured by a second lien pledge of Receivables 3 Holdco's equity interests in Receivables 3.  The Second Lien Note has a maturity date of June 17, 2025, and bears an interest rate of one-month Term SOFR plus 7.5%.

As of February 2025, approximately $22.6 million remained outstanding under the Second Lien Note.

The relative rights and priorities of PNC, B. Riley, and the ER3 Securitization Secured Parties (collectively, the "***Subordination Agreement Parties***") are governed by that certain amended and restated subordination and intercreditor agreement, dated as of August 18, 2023, by and among PNC, B. Riley, Receivables 3 Holdco, Receivables 3, and  Exela (as may be amended from time to time, the "***ER3/2L Note Subordination Agreement***").  The ER3/2L Note Subordination Agreement governs, among other things, subordinated debt payment restrictions, subordination of liens and security interest, as well as the Subordination Agreement Parties' rights in liquidation, dissolution, or bankruptcy.  Under the ER3/2L Note Subordination Agreement, B. Riley in general is prohibited from taking actions to enforce its security interest prior to payment in full of the ER3 Securitization Program Obligations.  In addition, PNC, as administrative agent, and the ER3 Securitization Secured Parties agree not to agree to certain amendments to the ER3 Securitization Transaction Documents without the consent of B. Riley.

### 3. BR Exar Accounts Receivable Facility

On February 12, 2024, certain affiliates of the Company, including Debtor Novitex Enterprise Solutions Canada, Inc., Debtor Rust Consulting, Inc., Debtor HOVG LLC, Debtor BancTec (Canada) Inc., and Debtor SourceHOV Canada Company, as originators (the "***BR Exar Originators***"), and non-Debtor Exela BR SPV LLC, as seller (the "***BR Exar Seller***"), entered into a receivables purchase agreement with BR Exar, LLC ("***BREL***"), an affiliate of B. Riley (as subsequently amended on February 29, 2024, March 29, 2024, March 31, 2024, April 24, 2024, May 24, 2024 and June 25, 2024, July 29, 2024, August 13, 2024, August 30, 2024 September 27, 2024, October 30, 2024, November 26, 2024, December 30, 2024, January 23, 2025, and February 14, 2025, the "***BR Exar AR Facility***").

In turn, the BR Exar Originators, agreed to sell certain existing accounts receivable and all future receivables to BREL until such time as BREL will have collected approximately $65 million, net of any costs or expenses.  As of February 14, 2025 there is approximately $10 million outstanding under the BR Exar AR Facility

The obligations under the BR Exar AR Facility (the "***BR Exar Obligations***") are secured by that certain pledge agreement dated as of February 27, 2023 (the "***Pledge Agreement***").  Under the Pledge Agreement, the BR Exar Originators and BR Exar Seller provided a pledge and assignment of the bank account(s)

established for the purpose of receiving payments and other monies and proceeds collected with respect to purchased receivables to BREL as collateral security for the BR Exar Obligations.

## III.
## EVENTS PRECEDING
## COMMENCEMENT OF THE CHAPTER 11 CASES

### A.      Challenges Leading to the Commencement of the Chapter 11 Cases

As noted herein, the Company is one of the leading providers of business process automation solutions and services to banks and financial institutions, healthcare payers and providers, and various other industries, and is highly respected by its customers.  Indeed, the Company has won many awards from industry research organizations including the following recognitions, Strong Performer in the Forrester Wave™: Task-Centric Automation Software (Q4 2024), Emerging Solution Winner in the FAO Hackett Value Matrix™, and Major Contender in the Everest Group's PEAK Matrix® for Revenue Cycle Management Operations.

The Company, however, operates in a highly competitive, fragmented, and rapidly evolving industry. Specifically, the Company competes with national, regional, and large multinational companies within the broader information and payment technology industry.  Competitors also can emerge from adjacent industries or locations where the costs of operations are significantly lower.  As a result, the Company faces continual pricing pressures and competition for market share.  To keep pace with this competition and position themselves to continue to address the needs of their customers, the Company invested significant resources to develop innovative solutions and services.

These investments in innovation and the deployment of strategies to compete for new customers are extremely costly, especially when competing against well capitalized competitors.  Those factors coupled with additional challenges such as the (a) decline of the Novitex business; (b) ratings downgrade; (c) impact of COVID-19; and (d) network outage have impacted the Debtors' operations and caused the Debtors to become unsustainably leveraged.

### 1.      The Decline of the Novitex Business

The debt structure put in place to facilitate the Novitex Business Combination required a certain level of performance to service.  The Novitex business model, however, could not meet the necessary level because it had a lower degree of customer retention than originally anticipated.  The Company has invested in the Novitex Business Combination with the goal of deploying SourceHOV's technology to expand Novitex's service offerings but also make it more embedded among its customers, thereby strengthening revenue predictability.  Ultimately, the Company was unable to realize this goal, which meant that a significant part of the business had a lower degree of predictability, and given its size, adversely affected the entire Company.

### 2.      The Ratings Downgrade

The underperformance of the Novitex business had a cascading effect on other parts of the Company. Specifically, in 2019, both Moody's and Standard and Poor's downgraded the debt rating for Exela Intermediate and Exela Finance (the "***Downgrade***").  The Downgrade further exacerbated the Company's difficulties by reducing Exela's share value and limiting Exela's ability to use such shares to raise financing. As a result, any new debt financing became more expensive and complex.  Furthermore, in response to the Company's financial struggles, suppliers began imposing onerous terms, and customers started to withhold work mandates in some cases.

### 3.   The Impact of COVID-19

COVID-19 significantly disrupted the Company's business and operations.  In a short period of time, the Company had to transition much of its workforce to remote work, which at the time totaled approximately 22,000 employees.  This meant that the Company's management focused its efforts to ensure continuous operations and mission critical delivery while navigating ongoing pandemic-related disruptions in the marketplace.  In the U.S., many of the Company's solutions and services were deemed essential services, and therefore, employees were allowed to work at the Company's facilities.  The impact of COVID-19 was disruptive from an operational perspective as it disrupted onsite business processes which required more cost and complexity for the Company to continue meeting customer needs, and brought additional challenges.  For example, healthcare payers (insurers) and providers completely stopped certain services, such as dental work, elective surgeries, and similar categories.  This impact lasted for approximately two years.

### 4.   The Network Outage

In late June 2022, the Company experienced a network security incident (the "***Incident***") impacting certain parts of its operational and IT systems.  The Company immediately isolated the impact by taking large parts of its network offline as a precaution.  This precaution disrupted services to certain customers.  The Company also hired leading cyber forensic and defense firms, along with advisors, to remediate the Incident.  Ultimately, however, the Incident resulted in loss of revenue, profits, and the accrual of costs.  Exela has filed a business interruption claim against a group of insurers in the amount of $44.7 million, of which approximately $20 million remains unpaid.

As a result of the aforementioned challenges, and consistent with the Company's goal to remain a market leader, the Debtors have incurred approximately $1.383 billion of secured and unsecured funded debt, which has rerouted a significant amount of the cash flow generated from operations in order to service such indebtedness.  Additionally, these liquidity challenges have deprived the Debtors from making necessary investments, thus exacerbating the problems the Debtors face.

The Company's management team recognized that this high degree of leverage and the attendant negative impact it was having on the operations of the business, the ability to invest in technology, and future business operations was unsustainable in the long-term.  Accordingly, in late 2019, the Company undertook a series of initiatives and transactions aimed at improving its capital structure and extending its liquidity.  Specifically, beginning on November 12, 2019, Exela's Board of Directors (the "***Board***") announced a strategic initiative (the "***Initiative***") to reduce the Company's indebtedness and improve liquidity.  The Initiative aimed to improve liquidity by $125 to $150 million and reduce debt by $150 to $200 million in the subsequent two years.  Additionally, and as discussed above, the Company executed the 2023 Exchange in effort to reduce the overall debt burden on the Debtors.  Lastly, under the April 2026 Notes Indenture, Exela Intermediate was required to retain at least one independent director selected by a majority of the holders of the April 2026 Notes on terms and pursuant to documentation acceptable to such holders on its board of directors at all times following the issue date.  In accordance with this condition, on October 1, 2023, Exela Intermediate appointed such an independent director to its board of directors.

The Company's financial difficulties, however, persisted and ultimately resulted in the delisting of Exela's publicly traded securities from NASDAQ in late 2024.  Exela was previously subject to, among other standards, NASDAQ Listing Rule 5550(b)(2) ("***Rule 5550(b)(2)***"), which required Exela to maintain a market value of listed securities ("***MVLS***") of at least $35 million.  On November 13, 2023, Exela received an anticipated notice from NASDAQ, noting that it was in violation of Rule 5550(b)(2) because the MVLS had been below $35 million for the prior thirty (30) consecutive business days.  Thereafter, on November 6, 2024, Exela received another notification from NASDAQ, stating that its securities would be delisted from NASDAQ.  On November 8, 2024, trading of Exela's securities on NASDAQ was suspended (the

"*NASDAQ Suspension*").  On January 7, 2025, Exela notified stockholders and NASDAQ that it intended to voluntarily delist from NASDAQ by filing Form 25 with the Securities and Exchange Commission (the "*SEC*"), and subsequently filed Form 25 on January 17, 2025.  As of the NASDAQ Suspension, Exela's common stock and Series B Preferred Stock have been trading on the OTC Pink under the ticker symbols "XELA" and "XELAP," and this is currently the only trading market for Exela's securities.  In addition, on January 27, 2025, Exela filed Form 15 with the SEC to deregister its securities under the Securities Exchange Act of 1934.[28]

## B.  Negotiations with Stakeholders

Starting in early 2025, the Debtors began to explore options to refinance their existing debt through various capital markets transactions.  However, as a result of the Company's debt burden and the significant market headwinds, the Debtors determined that such short-term opportunities were not feasible.  Instead, the Debtors and their advisors decided that a comprehensive financial restructuring was necessary to align the capital structure with the long-term goals of the business.

In early 2025, the Company began exploring restructuring paths with certain of holders of April 2026 Notes (the "*Prepetition Ad Hoc Group*") represented by Ropes & Gray LLP (as counsel).[29]  On January 15, 2025, the Debtors entered into the grace period under the April 2026 Notes and the July 2026 Notes relating to the payment of interest thereunder.  On February 14, 2025, and in connection with the ongoing discussions, the Prepetition Ad Hoc Group, the Issuers, and the April 2026 Notes Trustee entered into that certain *First Supplemental Indenture* (the "*April 2026 Supplemental Indenture*"), which amended the April 2026 Notes Indenture to provide for a sixty (60)-day grace period for any missed interest payment (extending the thirty (30)-day grace period) under the April 2026 Notes.  The Debtors determined not to pay the interest under the July 2026 Notes.

The Debtors and the Prepetition Ad Hoc Group had several discussions and exchanged restructuring proposals in the weeks leading up to the Petition Date.  Following the Debtors' entry into the April 2026 Supplemental Indenture, the hard-fought negotiations between the Debtors and the Prepetition Ad Hoc Group accelerated.  Ultimately, on March 3, 2025, the parties were able to reach a deal in principle.  The terms of the deal are memorialized in the non-binding restructuring term sheet annexed as Exhibit D to the DIP Credit Agreement (the "*Restructuring Term Sheet*").

In February 2025, the Debtors and PNC, represented by Mayer Brown LLP (as counsel), had constructive negotiations, and exchanged term sheets leading up to the Petition Date.  To date, PNC remains supportive of these Chapter 11 Cases.

---

[28]   Accordingly, the Parent no longer has an obligation to file periodic and current reports with the SEC.

[29]   The Prepetition Ad Hoc Group consisted of Gates Capital Management, Inc., Avenue Capital Group, Anchorage Capital Advisors, L.P., BofA Securities, Inc., HoldCo Asset Management LP, CCUR Holdings, Inc., and OSP, LLC.  Following the Petition Date, the Prepetition Ad Hoc Group membership changed, resulting in the current members of the Consenting Creditor Ad Hoc Group (*see* Docket No. 331) and the Sub-Group DIP Lenders comprising the membership of such groups.

## IV.
## OVERVIEW OF CHAPTER 11 CASES

### A.      Commencement of Chapter 11 Cases

On March 3, 2025, each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

### B.      First Day Relief

On the Petition Date, the Debtors filed multiple motions and applications seeking various relief from the Bankruptcy Court and authorizing the Debtors to maintain their operations in the ordinary course as well as several procedural motions (collectively, the "*First Day Motions*").[30]  The relief sought in the First Day Motions was aimed at ensuring a seamless transition between the Debtors' prepetition and postpetition business operations, facilitating a smooth chapter 11 process, and minimizing disruptions to the Debtors' businesses.  On March 4, 2025, the Bankruptcy Court entered various orders authorizing the relief requested in the First Day Motions, including, among other things, authorizing the Debtors to:

- Jointly administer the Chapter 11 Cases [Docket No. 45];

- Retain Omni Agent Solutions, Inc. as claims, noticing, and solicitation agent [Docket No. 52];

- File a consolidated list of creditors and modify certain notice and identification requirements [Docket No. 56];

- Extend the deadline by which the Debtors are required to file their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs [Docket No. 57];

- On an interim [Docket No. 58] and final basis [Docket No. 397], obtain postpetition financing and use of cash collateral (as further described below) and modifying the automatic stay;

- On an interim [Docket No. 60] and final basis [Docket No. 307], continue the use of the Debtors' cash management system, bank accounts, and business forms;

- Continue the Debtors' customer programs and honor related obligations to customers [Docket No. 61];

- Continue paying prepetition workforce obligations and certain related claims [Docket No. 62];

- On an interim [Docket No. 63] and final basis [Docket No. 276], pay certain essential and critical vendors and claimants;

- Continue insurance policies and insurance programs [Docket No. 64];

---

[30]   A complete list of the First Day Motions is set forth on the *Amended Agenda of Debtors for Matters Set For Hearing on March 4, 2025* [Docket No. 46].   Copies of the First Day Motions are available on https://omniagentsolutions.com/DocuDataSolutions

- Establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service [Docket No. 65];

- Pay certain prepetition taxes and fees [Docket No. 66]; and

- Establish procedures relating to the certain transfers of interests in the Debtors and claims of certain worthless stock deductions [Docket No. 67].

The Debtors also filed various other motions that are common to chapter 11 cases of similar size and complexity to these Chapter 11 Cases.

## C.     Approval of the Postpetition Securitization Programs

On the Petition Date, the Debtors filed the Securitization Motion [Docket No. 9].  Pursuant to the Securitization Motion, the Debtors sought entry of an order authorizing, among other things, the applicable Debtors to enter into and/or otherwise perform (or continue to perform) under all amendments, restatements, supplements, instruments and agreements entered into in connection with the ER3 Securitization Program and the Rust Securitization Program (each as defined the Securitization Motion).

On March 4, 2025, the Bankruptcy Court granted the relief requested in the Securitization Motion on an interim basis [Docket No. 59] (the "***Interim Securitization Order***").  Concurrently therewith, certain of the Debtors entered into and/or otherwise performed (or continued to perform) under the Postpetition Securitization Programs in accordance with the Interim Securitization Order.  On April 14, 2025, the Bankruptcy Court granted the relief requested in the Securitization Motion on a final basis [Docket No. 303] (the "***Final Securitization Order***").

During the Chapter 11 Cases, the Debtors engaged with BREL, an affiliate of B. Riley Securities, Inc. (the "***Rust RPA Buyer***"), which is the buyer under the Rust Securitization Program, regarding an increase of the BR Exar AR Facility's purchase limit to provide additional liquidity to the Debtors until entry of the Final DIP Order.  Specifically, the Debtors and the Rust RPA Buyer had reached agreement regarding an amendment of the BR Exar AR Facility (the "***Incremental Rust RPA Amendment***") that would provide for an additional purchase of accounts receivable in the amount of approximately $6.35 million, immediately providing the Debtors approximately $5 million in additional liquidity.

On April 17, 2025, the Debtors filed the *Emergency Motion of Debtors for an Order (I) Confirming Compliance with Final Postpetition Securitization Order and in the Alternative, Waiving Certain Notice Requirements and (II) Granting Related Relief* [Docket No. 340] (the "***Securitization Program Comfort Motion***").  Pursuant to the Securitization Program Comfort Motion, the Debtors sought entry of an order (i) confirming that the Incremental Rust RPA Amendment would be effective upon execution and complied with the provisions of the Final Securitization Order (including Paragraph 25 thereof); or (ii) in the alternative, waiving any notice requirements that would delay effectiveness of the Incremental Rust RPA Amendment.  On April 17, 2025, the Bankruptcy Court granted the relief requested in the Securitization Program Comfort Motion on a final basis [Docket No. 349].  Concurrently, certain of the Debtors entered into the Incremental Rust RPA Amendment.

## D.     Retention Applications for Debtors' Professionals and Related Relief

Shortly after the Petition Date, the Debtors filed various applications regarding the retention of professionals that would provide services to the estates during the Chapter 11 Cases (the "***Debtors' Professionals***"), as is common in chapter 11 cases of similar size and complexity, including, without limitation:

- An application for entry of an order authorizing the retention of Latham & Watkins LLP as bankruptcy co-counsel [Docket No. 143], which the Bankruptcy Court approved through an order entered on April 11, 2025 [Docket No. 288];

- An application for entry of an order authorizing the retention of Hunton Andrews Kurth LLP as bankruptcy co-counsel [Docket No. 145], which the Bankruptcy Court approved through an order entered on April 11, 2025 [Docket No. 289]; and

- An application for entry of an order authorizing (i) the retention of AP Services, LLC as financial and restructuring advisors and (ii) the designation of Randall S. Eisenberg as Chief Restructuring Officer and Stephen Spitzer as Deputy Chief Restructuring Officer [Docket No. 146], which the Bankruptcy Court approved through an order entered on April 17, 2025 [Docket No. 348].

In addition, the Debtors filed a motion for entry of an order establishing procedures for the interim compensation and reimbursement of expenses of retained professionals including the Debtors' Professionals [Docket No. 147], which the Bankruptcy Court approved through entry of an order on April 14, 2025 [Docket No. 306]. The Debtors filed a separate motion seeking authorization for the Estates to employ professionals used in the ordinary course of business [Docket No. 148], which the Bankruptcy Court approved through entry of an order on April 14, 2025 [Docket No. 304].

E.    **Establishment of Claims Bar Dates; Filing of Schedules**

On April 8, 2025, the Debtors filed a motion for entry of an order establishing bar dates for the filing of Proofs of Claim related to certain prepetition Claims [Docket No. 252], which the Bankruptcy Court approved through an order entered on May 1, 2025 [Docket No. 434] (the "***Bar Date Order***"). The Bar Date Order established (i) June 6, 2025, at 5:00 p.m. (prevailing Central Time) as the deadline for any entity to file a proof of claim based on a prepetition claim against any Debtor and (ii) September 2, 2025 at 5:00 p.m. (prevailing Central Time) as the deadline for any governmental unit to file a proof of claim against an Debtor.

The Debtors filed their schedules of assets and liabilities, schedules of current income and current expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "***Schedules***") with the Bankruptcy Court pursuant to section 521 of the Bankruptcy Code on May 6, 2025 [Docket Nos. 445-581].

F.    **The Official Committee of Unsecured Creditors**

On March 19, 2025, the U.S. Trustee appointed the Official Committee of Unsecured Creditors (the "***Committee***") [Docket No. 139], which was subsequently reconstituted on March 24, 2025. The Committee is composed of (1) CSC Delaware Trust Company, (2) Alpine Global Management, LLC, (3) Phoenix Investment Adviser LLC, (4) Rocket Software, Inc., (5) Konica Minolta Business Solutions, USA, (6) AFLAC, and (7) Opex.

The Committee has filed applications to retain McDermott Will & Emery LLP [Docket No. 390] and Brown Rudnick LLP [Docket No. 393] as bankruptcy co-counsel and FTI Consulting, Inc. [Docket No. 391] as financial advisor. These retention applications are pending as of the date that the Debtors commenced the solicitation of votes on the Plan.

**G.**     **Dispute Regarding Approval of Final DIP Financing**

On the Petition Date, the Debtors filed the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 5] (the "**DIP Motion**").  Through the DIP Motion, the Debtors requested authority to, among other things, obtain postpetition financing comprising a superpriority priming term loan facility in an aggregate principal amount of not less than $185 million under that certain *Superpriority Priming Debtor-in-Possession Financing Agreement* dated March 4, 2025 (the "**DIP Credit Agreement**"). As noted above, the Bankruptcy Court entered the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 58] (the "**Interim DIP Order**") on a fully consensual interim basis on March 4, 2025. The Interim DIP Order, among other things, set April 4, 2025 as the date of the hearing (as adjourned from time to time, the "**Final DIP Hearing**") at which the Bankruptcy Court would consider entry of a final order approving the DIP Motion.

After entry of the Interim DIP Order, the Debtors encountered several disputes with a subset of the lenders under the DIP Facility (the "**Sub-Group DIP Lenders**").  As part of the disputes among the Debtors and the Sub-Group DIP Lenders, each of the parties sought discovery, including depositions and document requests. After the Bankruptcy Court held hearings on certain discovery disputes, the Court held the discovery was moot and instead encouraged all parties to focus on attempting to reach a solution to the issues preventing entry of the proposed Final DIP Order on a consensual basis.

As discussed above, in order to continue funding the Chapter 11 Cases in the interim period before a settlement with the DIP Lenders could be finalized, the Debtors reached an agreement with the Rust RPA Buyer, regarding an increase of the BR Exar AR Facility purchase limit.  The Debtors then sought approval of the Incremental Rust RPA Amendment to provide an additional $5 million in liquidity to the Debtors [Docket No. 340], which the Court approved on April 17, 2025 [Docket No. 349].

During this period, the Debtors spent significant time and resources attempting to broker a resolution of the dispute between the DIP Lenders and, as part of such efforts, the Debtors and the Debtors' other stakeholders presented the Sub-Group DIP Lenders with material modifications to the Restructuring Term Sheet and engaged in hard fought negotiations with the Sub-Group DIP Lenders over the terms under which such lenders would support the Plan and the Debtors' efforts to reorganize.

Ultimately, on April 23, 2025, shortly following the commencement of the continued Final DIP Hearing, the Sub-Group DIP Lenders agreed on the terms of a global settlement resolving all disputes among the parties (the "**Sub-Group DIP Lenders Settlement**").  The Sub-Group DIP Lenders Settlement is a crucial component of the Plan and enabled the Debtors to obtain much needed funding under the DIP Facility and paved the way for a consensual confirmation process.

The terms of the Sub-Group DIP Lenders Settlement, which was read into the record at the Final DIP Hearing and incorporated into the Final DIP Order (as defined below), are:

- The New Money Loans authorized by the Final DIP Order shall be initially funded by Avenue and Gates; *provided*, that all Holders of April 2026 Notes Claims or July 2026 Notes Claims are entitled to fund their Pro Rata share of the New Money Loans;

- All DIP Lenders are required to roll their DIP Claims into the Rollover Exit Facility;

38

- The Sub-Group DIP Lenders shall be entitled to convert $6 million of Allowed DIP Claims held as of the Effective Date into debt under the Supplemental Exit Facility (as defined in the Plan), which debt shall be *pari passu* with the other debt under the Supplemental Exit Facility or incorporated into such facility on the same terms with customary sacred rights;

- DIP Claims held by the Sub-Group DIP Lenders as of the Effective Date shall be cancelled Pro Rata in an aggregate amount of $4 million;

- The Debtors shall reimburse up to $500,000 Restructuring Fees and Expenses incurred in the aggregate by the advisors to the Sub-Group DIP Lenders; and

- The Sub-Group DIP Lenders agree not to object or vote to reject the Plan and to pursue the Restructuring Transactions consistent with the Plan Support Agreement.

**H.      The Committee Settlement**

In addition, in the lead up to the Final DIP Hearing, the Debtors reached a global and comprehensive settlement with the Committee, the terms of which are set forth in the *Notice of Settlement Term Sheet with Official Committee of Unsecured Creditors* [Docket No. 368] (the "***Committee Settlement***").

**I.      Entry of the Final DIP Order**

The terms of the Committee Settlement and the Sub-Group DIP Lenders Settlement, were incorporated into the Bankruptcy Court's *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* (the "***Final DIP Order***") [Docket No. 397] entered on April 24, 2025.

**J.      The Amended Plan Support Agreement**

As noted herein, prior to the Petition Date, the Debtors and their key creditor constituents agreed on the terms of the non-binding Restructuring Term Sheet.  Pursuant to the terms of the DIP Credit Agreement, the Debtors were required, as a condition to further funding under the DIP Facility, to execute a restructuring support agreement with the Ad Hoc Group and other parties that was predicated on the terms contained in the Restructuring Term Sheet within 10 Business Days of the Petition Date (subject to further extensions in accordance with the terms of the DIP Credit Agreement) (as extended from time to time, the "***RSA Milestone***"). Immediately upon commencing the Chapter 11 Cases, the Debtors sought to negotiate with their applicable stakeholders to be able to comply with the RSA Milestone.  Notwithstanding the Debtors' good faith efforts, it became apparent that certain parties did not intend to enter into a restructuring support agreement that memorialized the terms set forth in the Restructuring Term Sheet by the original RSA Milestone. Those issues were at the center of the dispute involving the DIP Facility described above in Section IV.F.  In light of those disputes, the original RSA Milestone was extended several times by agreement of the requisite parties.

After weeks of hard fought negotiations, the Debtors entered into the initial plan support agreement with the Consenting Creditor Ad Hoc Group and the Consenting ETI Parties.  *See* [Docket No. 334].  Thereafter, the Debtors amended the plan support agreement, *see* [Docket No. 374], and ultimately, on April 24, 2025, the Debtors, the Consenting Ad Hoc Group, and the Consenting ETI Parties entered into the Plan Support Agreement, which incorporates the terms of the Sub-Group DIP Lenders Settlement and the Committee Settlement, and sets a clear path for the Debtors to reorganize and emerge from Chapter 11.  The term sheet

annexed to the Plan Support Agreement contained the material terms of the Plan. Pursuant to the terms of the consensual Final DIP Order, the entry into the Plan Support Agreement satisfies the RSA Milestone.

Pursuant to the Plan Support Agreement, the Debtors, and the Consenting Stakeholders, including, Exela and Par Chadha, in his capacity as Chairman of the Board of Exela, agreed to participate in, and support the Restructuring Transactions and to negotiate in good faith to consummate such transactions. In addition, the parties expressly agreed not to object to, or otherwise impede, any of the transactions contemplated by the Plan Support Agreement (including the Plan Term Sheet, which is reflected in the Plan).

Furthermore, the Plan Support Agreement requires the parties to "use commercially reasonable efforts to cooperate with and assist the Debtors' efforts to obtain, as applicable, any and all federal, state, local, and foreign governmental, regulatory, and/or third-party approvals as may be reasonably requested by the Debtors." and not to "directly or indirectly object to, delay, impede, or take any other action (including by directing or encouraging any other Entity to take any action) to interfere with acceptance, implementation, or consummation of the Restructuring Transactions…" Each of the parties' entry into the Plan Support Agreement was a critical component of the overall deal struck by the parties and crucial to the Debtors obtaining comfort that the transactions thereunder could reasonably be consummated as part of the transactions implicated thereunder.

While neither the Committee nor the Sub-Group DIP Lenders are party to the Plan Support Agreement, pursuant to the terms of the Committee Settlement and the Sub-Group DIP Lenders Settlement, the Committee and Sub-Group DIP Lenders, respectively, have agreed to support the Plan. The Plan Support Agreement includes certain milestones (the "***PSA Milestones***"), including:

- No later than seven (7) business days following the Agreement Effective Date, the Debtors shall have filed the Plan, the Disclosure Statement, the Disclosure Statement Motion (as defined in the Plan Support Agreement);

- No later than thirty-five (35) days after the filing of the Disclosure Statement Motion, the Bankruptcy Court shall have entered the Disclosure Statement Order;

- No later than three (3) Business Days after the Bankruptcy Court's entry of the Disclosure Statement Order, (a) the notice of the Confirmation Hearing shall be mailed to all parties in interest, (b) the Solicitation Materials and notice of the Confirmation Hearing shall be posted on the Debtors' restructuring website, and (c) the Solicitation Materials shall be mailed to the holders of April 2026 Notes Claims, holders of July 2026 Notes Claims, and holders of Other Unsecured Claims;

- Subject to the Bankruptcy Court's availability, no later than fifty (50) days following the Bankruptcy Court's entry of the Disclosure Statement Order, the Bankruptcy Court shall have held the Confirmation Hearing and entered the Confirmation Order; and

- No later than fourteen (14) days after the entry of the Confirmation Order, the Plan Effective Date shall have occurred.

## K.     The Investigation

In connection with the commencement of the Chapter 11 Cases, the Board empowered and authorized its independent director, Alan Carr (the "***Independent Director***") to investigate potential claims that the Debtors might hold against its directors, officers, employees, lenders, stockholders, or advisors, review any proposed releases including, most notably, the releases proposed to be given under the Plan, and make a

recommendation to the Board in connection therewith.  The Independent Director has been assisted and advised throughout this investigation (the "***Investigation***") by Latham & Watkins LLP ("***Latham***") and APS Services ("***APS***").  The Investigation is focused on numerous types of claims, including, without limitation, the following: potential fraudulent conveyances; preferences; negligence, corporate mismanagement, or waste; and breaches of fiduciary duty.

### L.    Exclusivity

Section 1121(b) of the Bankruptcy Code provides for a period of 120 days after the commencement of a chapter 11 case during which time a debtor has the exclusive right to file a chapter 11 plan (the "***Exclusive Plan Period***").  In addition, section 1121(c)(3) of the Bankruptcy Code provides that if a debtor files a plan within the Exclusive Plan Period, it has a period of 180 days after commencement of the chapter 11 case to obtain acceptances of such plan, before the expiration of which no other party in interest may file a plan (the "***Exclusive Solicitation Period***," and together with the Exclusive Plan Period, the "***Exclusive Periods***").  Pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend the Exclusive Periods. The Exclusive Plan Period currently expires on July 1, 2025 and the Exclusive Solicitation Period runs through August 30, 2025, both are subject to extension upon order of the Bankruptcy Court.

### M.    Timetable for the Chapter 11 Cases

In accordance with the Plan Support Agreement, the Debtors have agreed to proceed with the implementation of the Plan through the Chapter 11 Cases.  Among the PSA Milestones is the requirement that the Bankruptcy Court enter the order confirming the Plan no later than fifty (50) days following the Bankruptcy Court's entry of the Disclosure Statement Order.  The Plan Support Agreement also requires that the Effective Date occur no later than fourteen (14) days following the entry of the Confirmation Order.  Although the Debtors will request that the Bankruptcy Court approve a timetable consistent with the Plan Support Agreement, there can be no assurance that the Effective Date will occur on such timetable.

<div align="center">

V.
**SUMMARY OF THE PLAN**

</div>

**THE TERMS OF THE PLAN, A COPY OF WHICH IS ATTACHED AS <u>EXHIBIT A</u> TO THIS DISCLOSURE STATEMENT, ARE INCORPORATED BY REFERENCE HEREIN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERENCED THEREIN, WHICH ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN).**

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN.  HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS AND OTHER INTERESTED PARTIES ARE URGED TO READ THE PLAN AND THE EXHIBITS THERETO IN THEIR ENTIRETY SO THAT THEY MAY MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.**

**A.**     <u>**Classification and Treatment of Claims and Interests under the Plan**</u>

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor.  The provisions of Article III of the Plan govern Claims against and Interests in the Debtors.  Except for the Claims addressed in Article II of the Plan (or as otherwise set forth therein), all Claims and Interests are placed in Classes for each of the applicable Debtors.  For all purposes under the Plan, each Class will exist for each of the Debtors; *provided*, that any Class that is vacant as to a particular Debtor will be treated in accordance with Article III.G of the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, DIP Claims, Priority Tax Claims, Claims for the Premiums and Fees, Postpetition Securitization Programs Claims, and Other Priority Claims as described in Article II of the Plan.

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or an Interest is in a particular Class only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

**Summary of Classification and Treatment of Claims and Interests**

| Class | Claim | Status | Voting Rights |
|:---:|:---:|:---:|:---:|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Prepetition Term Loan Claims | Unimpaired | Presumed to Accept |
| *3* | *April 2026 Notes Claims* | *Impaired* | *Entitled to Vote* |
| *4* | *Convenience Claims* | *Impaired* | *Entitled to Vote* |
| *5* | *July 2026 Notes Claims* | *Impaired* | *Entitled to Vote* |
| *6* | *General Unsecured Claims* | *Impaired* | *Entitled to Vote* |
| 7 | Subordinated Claims | Impaired | Deemed to Reject |
| 8 | Intercompany Claims | Unimpaired or Impaired | Presumed to Accept or Deemed to Reject |
| 9 | Intercompany Interests | Unimpaired or Impaired | Presumed to Accept or Deemed to Reject |
| 10 | Existing BPA Equity Interests | Impaired | Deemed to Reject |
| 11 | Other Existing Equity Interests | Impaired | Deemed to Reject |

### B.    Acceptance or Rejection of the Plan; Effect of Rejection of the Plan

#### 1.    Presumed Acceptance of Plan

Claims in Classes 1 and 2 are Unimpaired under the Plan and their Holders are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Classes 1 and 2 are not entitled to vote on the Plan and the votes of such Holders shall not be solicited. Notwithstanding their non-voting status, Holders of such Claims shall receive a Release Opt-Out Form solely for purposes of providing such Holders with the opportunity to opt out of the Third-Party Release.

#### 2.    Voting Classes

Claims in Classes 3, 4, 5, and 6 are Impaired under the Plan, and the Holders of Allowed Claims in such Classes are entitled to vote to accept or reject the Plan, including by acting through a voting Representative. For purposes of determining acceptance and rejection of the Plan, votes shall be tabulated on a Debtor-by-Debtor basis.

Pursuant to section 1126(c) of the Bankruptcy Code, an impaired class of claims shall have accepted the plan if (a) the holders, including holders acting through a voting representative, of at least two-thirds (2/3) in amount of claims actually voting in such class have voted to accept the plan and (b) the holders, including holders acting through a voting representative, of more than one-half (1/2) in number of claims actually

voting in such class have voted to accept the plan.  Holders of Claims in the Voting Classes (or, if applicable, the voting Representatives of such Holders) shall receive Ballots containing detailed voting instructions. For the avoidance of doubt, each Claim in the Classes entitled to vote to accept or reject the Plan that is not Allowed pursuant to the Plan, and in each case, is wholly contingent, unliquidated, or Disputed, in each case, shall be accorded one (1) vote and valued at one dollar ($1.00) for voting purposes only, and not for purposes of allowance or distribution.

3.   **Deemed Rejection of the Plan**

Claims and Interests in Classes 7, 10, and 11 are Impaired and will receive no distribution under the Plan and are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Claims and Interests in Classes 7, 10, and 11 are not entitled to vote on the Plan and the votes of such Holders shall not be solicited.  Notwithstanding their non-voting status, Holders of such Claims and Interests shall receive a Release Opt-Out Form solely for purposes of providing such Holders the opportunity to opt out of the Third-Party Release.

4.   **Presumed Acceptance of the Plan or Deemed Rejection of the Plan**

Claims and Interests in Classes 8 and 9 are either (a) Unimpaired and, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or (b) Impaired and shall receive no distributions under the Plan and, therefore, deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Claims and Interests in Classes 8 and 9 are not entitled to vote on the Plan and votes of such Holders shall not be solicited.

5.   **Confirmation Pursuant to Section 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims entitled to vote (i.e., Classes 3, 4, 5, or 6).  The Debtors shall seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article XI of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and Bankruptcy Rules.

6.   **Subordinated Claims**

The allowance, classification, and treatment of all Allowed Claims and Interests, and the respective distributions and treatments under the Plan, shall take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 509 or 510 of the Bankruptcy Code, or otherwise; *provided*, that notwithstanding the foregoing, such Allowed Claims or Interests and their respective treatments set forth herein shall not be subject to setoff, demand, recharacterization, turnover, disgorgement, avoidance, or other similar rights of recovery asserted by any Person.  Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided herein, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination rights relating thereto.  The Debtors or Reorganized Debtors, as applicable, reserve the right to seek a ruling from the Bankruptcy Court determining whether any Claim should be subordinated pursuant to section 510(b) of the Bankruptcy Code and treated under the Plan as a Class 7 Subordinated Claim.

7. **Special Provision Governing Unimpaired Claims**

Except as otherwise provided herein, nothing under the Plan shall affect or limit the Debtors' or the Reorganized Debtors' rights and defenses (whether legal or equitable) in respect of any Unimpaired Claims, including, all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

8. **Vacant and Abstaining Classes**

Any Class of Claims or Interests that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.  Moreover, any Class of Claims that is occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018, but as to which no vote is cast, shall be deemed to accept the Plan pursuant to section 1129(a)(8) of the Bankruptcy Code.

9. **Controversy Concerning Impairment**

If a controversy arises as to whether any Claim or Interest (or any Class of Claims or Interests) is Impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date, absent consensual resolution of such controversy consistent with the Plan Support Agreement among the Debtors and the complaining Entity or Entities.

10. **Intercompany Interests and Intercompany Claims**

Other than with respect to any April 2026 Notes Claim or July 2026 Notes Claim held by ETI or an ETI Holder, to the extent Intercompany Interests and Intercompany Claims are Reinstated under the Plan, distributions on account of such Intercompany Interests and Intercompany Claims are not being received by Holders of such Intercompany Interests or Intercompany Interests on account of their Intercompany Interests or Intercompany Claims, but for the purposes of administrative convenience and to maintain the Debtors' (and their Affiliates') corporate structure, for the ultimate benefit of the Holders of New Parent Interests, to preserve ordinary course intercompany operations, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

C. **Means of Implementation of the Plan**

Article IV of the Plan governs and describes the means of implementation of the Plan.

Article IV.A ("*General Settlement of Claims and Interests*") of the Plan provides that, in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan will constitute a set of integrated, good-faith compromises and settlements of all Claims, Interests, Causes of Action, and controversies resolved pursuant to the Plan and the Plan will be deemed a motion to approve the good-faith compromises and settlements of all Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of such compromises and settlements under Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such integrated compromises or settlements are in the best interests of the Debtors, the Estates, and Holders of Claims and Interests, and are fair, equitable, and reasonable.  Subject to <u>Article VI</u>, distributions made to Holders of Allowed Claims in any Class are

intended to be and will be final and indefeasible and will not be subject to avoidance, turnover, or recovery by any other Person.

Article IV.B ("**Restructuring Transactions**") of the Plan provides that, without limiting any rights and remedies of the Debtors or Reorganized Debtors under the Plan or applicable law, the entry of the Confirmation Order will constitute authorization for the Debtors and the Reorganized Debtors, as applicable, to take, or to cause to be taken, all actions necessary or appropriate to consummate and implement the provisions of any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan before, on, and after the Effective Date, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, conversion, elections, or dissolution containing terms that are consistent with the terms of the Plan, the Plan Support Agreement, the Restructuring Steps Exhibit, the XBP Transaction Documents, the Plan Supplement, the Exit Facilities, the Exit Securitization Programs Documents, and the other Definitive Documents and that satisfy the applicable requirements of applicable state law and such other terms to which the applicable Entities may agree, including, for the avoidance of doubt, in connection with the Restructuring Transactions; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of the Plan, the Plan Support Agreement, the Restructuring Steps Exhibit, the XBP Transaction Documents, the Plan Supplement, the Exit Facilities, the Exit Securitization Programs Documents, and the other Definitive Documents and having such other terms to which the applicable Entities may agree, including, for the avoidance of doubt, in connection with the Restructuring Transactions; (3) the execution, delivery, and filing, if applicable, of the New Organizational Documents, the XBP Transaction Documents, the Exit Facilities Documents, the Registration Rights Agreement, the New Parent Warrants Agreement, and the Exit Securitization Programs; (4) the filing of appropriate elections or certificates or articles of conversion, formation, incorporation, merger, consolidation, or dissolution with the appropriate governmental authorities pursuant to applicable state law; (5) all other actions that the Debtors, the Reorganized Debtors and/or the applicable Entities reasonably determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law or foreign law in connection with such transactions; and (6) such actions as may be necessary or appropriate to effectuate a corporate restructuring of their respective businesses and to otherwise simplify the overall corporate structure of the Reorganized Debtors.

Consistent with the foregoing, the Restructuring Transactions shall include: (i) cancellation of existing agreements and Existing BPA Equity Interests, Other Existing Equity Interests and certain Intercompany Interests in accordance with Article III.B of the Plan, as more particularly described in Article IV.G of the Plan; (ii) entry into and performance under the Exit Facilities and Exit Facilities Documents, as more particularly described in Article IV.I of the Plan; (iii) entry into and performance under the Exit Securitization Programs and Exit Securitization Programs Documents, as more particularly described in Article IV.I of the Plan; (iv) issuance of Plan Securities, as more particularly described in Article IV.K of the Plan; (v) issuance and effectiveness of the New Organizational Documents, as more particularly described in Article IV.M of the Plan; (vi) consummation of the BTC Transaction, as more particularly described in the Restructuring Steps Exhibit; and (vii) the XBP Transaction, more particularly described in the Restructuring Steps Exhibit.

The Plan further provides that, the Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions (including the BTC Transaction and the XBP Transaction, and any other transaction described in, approved by, contemplated by, or necessary to effectuate the Plan).

Subject to BTC and XBP's satisfaction with the definitive documentation with respect to the Restructuring Transactions including, the XBP Transaction Documents, the Governance Term Sheet, the Registration Rights Agreement, and the New Organizational Documents, each of BTC and XBP agrees to engage in the Restructuring Transactions, as applicable, to issue or distribute, as applicable, the Plan Securities and to perform any other obligation under the Plan and the Definitive Documents and in accordance with the Restructuring Steps Exhibit, in each case contemplated hereunder and thereunder to be performed by it.  In connection therewith, each of BTC and XBP will submit to the jurisdiction of the Bankruptcy Court in respect of such agreements and obligations and acknowledge that it is a participant in the Plan.

Article IV.C ("***Committee Settlement***") of the Plan incorporates the Committee Settlement, a compromise and settlement of numerous issues and disputes between and among (a) the Debtors and the Consenting Stakeholders; and (b) the Committee, designed to achieve a reasonable and effective resolution of certain Claims and issues in connection with the Chapter 11 Cases.  Except as expressly set forth in the plan or the Confirmation Order, the Committee Settlement constitutes a settlement of all potential issues and Claims between and among (a) the Debtors and the Consenting Stakeholders; and (b) the Committee.  The key terms of the Committee Settlement include:

- The inclusion of the July 2026 Noteholder Equity Distribution, subject to the terms of the Committee Settlement;

- Payment of Allowed Convenience Claims in Cash in an amount equal to no less than 70% of such Allowed Convenience Claims;

- Establishment of the Unsecured Cash Pool;

- All fees for professionals retained by the Committee will be capped at $2.75 million, less amounts paid to the July 2026 Notes Indenture Trustee under the July 2026 Notes Indenture, plus amounts allocated by agreement between the Debtors and the Committee from (a) the Unsecured Cash Pool or (b) funds otherwise allocable to increase the Convenience Claims recoveries;

- The Required Consenting Creditors, the Debtors and Committee will work in good faith to agree on an appropriate and cost-effective Claims reconciliation process including a potential engagement of a Claims Ombudsman;

- Upon the Effective Date, the Debtors and their Estates will waive preference claims against Holders of General Unsecured Claims;

- In consideration for the settlement contemplated by the Committee Settlement and as more fully set out in the Plan, the Committee will support the Plan and recommend to its constituents that they vote to accept the Plan and will support the relief and treatment (including such releases as agreed and granted by the Debtors and other supporting parties) provided for in the Plan and the other Definitive Documents;

- April 2026 Notes Deficiency Claims will be waived and will not recover from the Unsecured Cash Pool; and

- Resolution of all objections raised by the Committee in the Chapter 11 Cases.

Article IV.F ("***Vesting of Assets in the Reorganized Debtors Free and Clear of Liens and Claims***") of the Plan provides that, except as otherwise expressly provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated in the Plan pursuant to sections 1123(a)(5),

1123(b)(3), 1141(b) and (c), and other applicable provisions of the Bankruptcy Code, on and after the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan will vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, other encumbrances or interests, except for those Liens, Claims, charges, or other encumbrances arising from or related to the Exit Facilities Documents and the Exit Securitization Programs Documents.  In addition, all rights, benefits, and protections provided to any of the Debtors pursuant to the Plan, the Plan Supplement, or the Confirmation Order including the release, exculpation, and injunction provisions provided in <u>Article IX</u> of the Plan, shall vest in each respective Reorganized Debtor unless expressly provided otherwise by the Plan or the Confirmation Order.  On and after the Effective Date, the Reorganized Debtors may (1) operate their respective businesses, (2) use, acquire, and dispose of their respective property, and (3) prosecute, compromise or settle any Claims, Interests, or Causes of Action, in each case without notice to, supervision of, or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, including for the avoidance of doubt any restrictions on the use, acquisition, sale, lease, or disposal of property under section 363 of the Bankruptcy Code.  Anything in the Plan to the contrary notwithstanding, the Unimpaired Claims against a Debtor will remain the obligations solely of such Debtor or such Reorganized Debtor and will not become obligations of any other Debtor or Reorganized Debtor by virtue of the Plan, the Chapter 11 Cases, or otherwise.

Article IV.G ("*Cancellation of Existing Agreements, Existing BPA Equity Interests, and Certain Intercompany Interests*") of the Plan provides that, on the Effective Date, except with respect to the Exit Facilities Documents and the Exit Securitization Programs Documents, or to the extent otherwise provided in the Plan, the XBP Transaction Documents, the Confirmation Order, or any other Definitive Document, all notes, bonds, indentures, credit agreements, certificates, securities, purchase rights, options, warrants, calls, puts, awards, commitments, obligations, registration rights, preemptive rights, rights of first refusal, rights of first offer, co-sale rights, investor rights, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any existing indebtedness or obligations of or ownership interest in the Debtors or giving rise to any rights, commitments or obligations relating to Claims against or Interests in the Debtors will be deemed canceled and surrendered, and the obligations of the Debtors or the Reorganized Debtors, as applicable, and any Non-Debtor Affiliates thereunder or in any way related thereto will be deemed satisfied in full, released, and discharged and the obligations of the Debtors pursuant, relating, or pertaining to any agreements, notes, bonds, indentures, credit agreements, certificates, securities, purchase rights, options, warrants, calls, puts, awards, commitments, registration rights, preemptive rights, rights of first refusal, rights of first offer, co-sale rights, investor rights, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any existing indebtedness or obligations of or ownership interest in the Debtors or giving rise to any rights or obligations relating to Claims against or Interests in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated or assumed pursuant to the Plan, if any) will be released and discharged; *provided*, that, notwithstanding such cancellation, satisfaction, release, and discharge, anything to the contrary contained in the Plan, the XBP Transaction Documents, the Confirmation Order, or any such document or instrument that governs the rights, claims, or remedies of the Holder of a Claim or Interest will continue in effect solely for purposes of: (1) enabling the Holder of such Claim or Interest to receive distributions on account of such Claim or Interest under the Plan; (2) allowing and preserving the rights of the DIP Agent, the April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the Exit Financing Facilities Agents, and the Securitization Programs Agents, as applicable, to make distributions as specified under the Plan on account of Allowed Claims, as applicable, including allowing the April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Exit Financing Facilities Agents, and the Securitization Programs Agents, as applicable, to submit invoices for any amount and enforce any obligation owed to them under the Plan to the extent authorized or allowed by the applicable documents; (3) permitting the

Reorganized Debtors and any other Distribution Agent, as applicable, to make distributions on account of applicable Claims and Interests, as applicable; (4) preserving the DIP Agent's, the April 2026 Notes Indenture Trustee's, the July 2026 Notes Indenture Trustee's, the April 2026 Notes Collateral Agent's, the Exit Financing Facilities Agents', and the Securitization Programs Agents', as applicable, rights, if any, to compensation and indemnification as against any money or property distributable to the Holders of April 2026 Notes Claims, July 2026 Notes Claims, DIP Claims, and Postpetition Securitization Programs Claims, as applicable, including permitting the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Exit Financing Facilities Agents, and the Securitization Programs Agents, as applicable, to maintain, enforce, and exercise any priority of payment or charging liens against such distributions each pursuant and subject to the terms of the April 2026 Notes Indenture, the July 2026 Notes Indenture, the DIP Credit Agreement, and Postpetition Securitization Programs Documents, as applicable, as in effect on or immediately before the Effective Date; (5) preserving all rights, remedies, indemnities, powers, and protections, including rights of enforcement, of the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Exit Financing Facilities Agents, and the Securitization Programs Agents, as applicable, against any person other than a Released Party (which Released Parties include the Debtors, Reorganized Debtors, and Non-Debtor Affiliates), and any exculpations of the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Exit Financing Facilities Agents, and the Securitization Programs Agents, as applicable; *provided*, that the April 2026 Notes Indenture Trustee, April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Exit Financing Facilities Agents, and the Securitization Programs Agents will remain entitled to indemnification or contribution from the Holders of April 2026 Notes Claims, July 2026 Notes Claims, DIP Claims, and Postpetition Securitization Programs Claims, each pursuant and subject to the terms of the April 2026 Notes Indenture, the July 2026 Notes Indenture, the DIP Credit Agreement, and Postpetition Securitization Programs Documents, as applicable, as in effect on the Effective Date; (6) permitting the April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Exit Financing Facilities Agents, and the Securitization Programs Agents, as applicable, to enforce any obligation (if any) owed to them under the Plan; (7) permitting the April 2026 Notes Indenture Trustee the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee the DIP Agent, the Exit Financing Facilities Agents, and the Securitization Programs Agents to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court; and (8) permitting the April 2026 Notes Indenture Trustee, April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Exit Financing Facilities Agents, and the Securitization Programs Agents to perform any functions that are necessary to effectuate the foregoing; *provided*, *further*, that nothing in Article IV of the Plan will affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or (except as set forth in (5) above) the Releases of the Released Parties pursuant to Article IX of the Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable, except as expressly provided for in the Plan.  For the avoidance of doubt, nothing in Article IV of the Plan will cause the Reorganized Debtors' obligations under the Exit Facilities Documents and the Exit Securitization Programs Documents to be deemed satisfied in full, released, or discharged; *provided*, *further*, that notwithstanding this sentence, the April 2026 Notes Claims, July 2026 Notes Claims, DIP Claims, and Postpetition Securitization Programs Claims will be deemed satisfied in full, released, and discharged on the Effective Date.  In furtherance of the foregoing, as of the Effective Date, Holders of April 2026 Notes Claims, July 2026 Notes Claim, DIP Claims, and Postpetition Securitization Programs Claims will be deemed to have released any such Claims against the Reorganized Debtors under the April 2026 Notes Indenture, the July 2026 Notes Indenture, the DIP Documents, and the Postpetition Securitization Programs Documents, as applicable, and are enjoined from pursuing any such claims against any of the Reorganized Debtors in respect of such April 2026 Notes Claims, July 2026 Notes Claims, DIP Claims, and Postpetition Securitization Programs Claims.

The Plan further provides that, on the Effective Date, the April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Securitization

Programs Agents and each of their respective directors, officers, employees, agents, Affiliates, controlling persons, and legal and financial advisors will be automatically and fully released and discharged from any further responsibility under the April 2026 Notes Indenture, the July 2026 Notes Indenture, the DIP Credit Agreement, the Prepetition Securitization Programs Documents, and the Postpetition Securitization Programs Documents, as applicable.  The April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Securitization Programs Agents, and each of their respective directors, officers, employees, agents, Affiliates, controlling persons, and legal and financial advisors will be discharged and will have no further obligation or liability in respect of the April 2026 Notes Indenture, the July 2026 Notes Indenture, the DIP Credit Agreement, the Prepetition Securitization Programs Documents, and the Postpetition Securitization Programs Documents, as applicable, except as provided in the Plan and the Confirmation Order, and after the performance by the April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Securitization Programs Agents, and their Representatives and professionals of any obligations and duties required under or related to the Plan or the Confirmation Order, the April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Securitization Programs Agents, and each of their respective directors, officers, employees, agents, Affiliates, controlling persons, and legal and financial advisors will be relieved of and released from any obligations and duties arising thereunder.  The fees, expenses, and costs of the April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Securitization Programs Agents, including fees, expenses, and costs of each of their respective professionals incurred after the Effective Date in connection with the April 2026 Notes Indenture, the July 2026 Notes Indenture Trustee, the DIP Credit Agreement, or the Prepetition Securitization Programs Documents, as applicable, and reasonable and documented fees, costs, and expenses associated with effectuating distributions pursuant to the Plan, including the fees and expenses of counsel, if any, shall be paid in accordance with the terms of the Plan and the applicable Definitive Documents.

Article IV.H ("*Sources for Plan Distributions and Transfers of Funds Among Debtors*") of the Plan provides that the Debtors will fund Cash distributions under the Plan with Cash on hand, including Cash from operations, and the proceeds of the DIP Facility, Exit Facilities, and the Exit Securitization Programs. The Debtors will make non-Cash distributions as required under the Plan in the form of Exit Debt and Plan Securities.  Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors in accordance with Article VI of the Plan.  Subject to any applicable limitations set forth in any post-Effective Date agreement, the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth in the Plan, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

The Plan further provides that, from and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date agreement (including the New Organizational Documents, the Exit Facilities Documents, and the Exit Securitization Programs Documents), will have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing in accordance with, and subject to, applicable law.

Article IV.O ("*Release of Liens and Claims*") of the Plan provides that, to the fullest extent provided under section 1141(c) and other applicable provisions of the Bankruptcy Code, except as otherwise provided in the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article VI of the Plan, all Liens, Claims, mortgages, deeds of trust, or other security interests against the assets or property of the Debtors or the Estates will be fully released, canceled, terminated, extinguished, and discharged, in each case without further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order, or rule or the vote, consent,

authorization, or approval of any Person or Entity; *provided*, that (1) the Liens granted to the DIP Agent pursuant to the DIP Credit Agreement and (2) any and all Liens or security securing the Debtor's obligations under the Insurance Contracts, which, for avoidance of doubt, includes grants of security interests in escrow accounts, deposit accounts, Cash Collateral, and letters of credit issued for the benefit of Insurers, will remain in full force and effect solely to the extent provided for in the Plan. The filing of the Confirmation Order with any federal, state, or local agency or department will constitute good and sufficient evidence of, but will not be required to effect, the termination of such Liens, Claims, and other Interests to the extent provided in the immediately preceding sentence. Any Person or Entity holding such Liens, Claims, or Interests will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction, and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors.

Article IV.P ("*Exemption from Certain Taxes and Fees*") of the Plan provides that, to the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any issuance, transfer or exchange (whether from a Debtor to a Reorganized Debtor or to any other Person) under, pursuant to, in contemplation of, or in connection with the Plan (including the Restructuring Transactions), including pursuant to (1) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtors, the Reorganized Debtors, or any of their Affiliates, including the Exit Debt, the Plan Securities, or related instruments or documentation, (2) the maintenance, creation, modification, consolidation, termination, refinancing, or recording of any mortgage, Lien, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (3) the making, assignment, or recording of any lease or sublease, (4) the grant of collateral security for any or all of the Exit Debt or other indebtedness, or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Restructuring Transactions), will not be subject to any document tax, recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate U.S. federal, state or local governmental officials, agents, or filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, will comply with the requirements of section 1146(a) of the Bankruptcy Code, and shall forego the collection of any such tax, fee or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, fee or governmental assessment.

Article IV.R ("*Preservation of Causes of Action*") of the Plan provides that in accordance with section 1123(b) of the Bankruptcy Code, but subject to the Releases and exculpation set forth in Articles IV.Q and IX of the Plan, all Causes of Action that a Debtor may hold against any Entity will vest in the applicable Reorganized Debtor on the Effective Date, including each Cause of Action set forth in the Schedule of Retained Causes of Action included in the Plan Supplement. Thereafter, the Reorganized Debtors will have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, whether arising before or after the Petition Date, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or this Disclosure Statement to any specific Cause of Action as any indication that the Debtors or the Reorganized Debtors will not pursue any or all available Causes of Action. Pursuant to the Plan, the Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan**, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches, will apply to any Cause of Action upon, after, or as a

consequence of the Confirmation or the occurrence of the Effective Date. In addition, the Debtors and the Reorganized Debtors expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any of the Debtors are a plaintiff, defendant, or an interested party, against any Person or Entity, including the plaintiffs or co-defendants in such lawsuits. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to Article IV.R of the Plan include any Claim or Cause of Action released or exculpated under the Plan (including by the Debtors).

Article IV.T ("*Claims Ombudsman*") of the Plan provides that on the Effective Date, the Debtors shall appoint a Claims Ombudsman, pursuant to an agreement on reasonable terms (the "*Claims Ombudsman Agreement*") reasonably acceptable to the Debtors, the Consenting ETI Parties, and Required Consenting Creditors, with rights and duties that include (a) certain rights with respect to the reconciliation, allowance, and settlement of Claims by or on behalf of (and in consultation with) the Reorganized Debtors, (b) consultation rights with respect to distributions to the Holders of Convenience Claims and General Unsecured Claims, and (c) such other matters as may be agreed upon between the Debtors, the Committee, and the Reorganized Debtors (as applicable). The Claims Ombudsman, on behalf of the Holders of General Unsecured Claims, shall be the deemed secured party in respect of, and shall have the exclusive authority to take any action to enforce the security interest in, the GUC Payment Obligations Collateral.

The Plan further provides that, subject to the terms of the Claims Ombudsman Agreement, the Claims Ombudsman (a) shall be entitled to a reasonable fee (the "*Claims Ombudsman Fee*"), the terms, amount, and structure of which shall be set forth in the Claims Ombudsman Agreement, (b) may employ, with the prior written consent of the Debtors or the Reorganized Debtors, but without further order of the Bankruptcy Court, professionals (the "*Claims Ombudsman Professionals*") to assist in carrying out the duties described above, and (c) shall have standing to appear before and be heard by the Bankruptcy Court and other courts of competent jurisdiction in connection with each of the foregoing duties, rights, and authorities. The Claims Ombudsman Fee and the reasonable and documented fees and expenses incurred by the Claims Ombudsman Professionals (the "*Claims Ombudsman Professionals Fees*") shall be expenses of the Reorganized Debtors; *provided*, that the Claims Ombudsman Fee and the Claims Ombudsman Professionals Fees shall be in all respects subject to (a) budget satisfactory to the Reorganized Debtors and the Required Consenting Creditors and/or (b) a cap set forth in the Claims Ombudsman Agreement in each case satisfactory to the Reorganized Debtors and the Required Consenting Creditors. The Claims Ombudsman shall be a fiduciary to Holders of Convenience Claims and General Unsecured Claims. The Claims Ombudsman and the Claims Ombudsman Professionals, each in their capacities as such, shall be exculpated, except for fraud, bad faith, willful misconduct, or gross negligence.

Article IV.U ("*Effectuating Documents; Further Transactions*") of the Plan provides that before, on, and after the Effective Date, the Debtors, the Reorganized Debtors, and the directors, managers, officers, authorized persons, and members of the boards of directors or managers and directors or managers of the foregoing, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, notes, instruments, certificates, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and provisions of the Plan, the XBP Transaction Documents, the New Organizational Documents, the Exit Facilities Documents, the Restructuring Transactions, and any Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant to the Plan.

Article IV.V ("*Authority of the Debtors*") of the Plan provides that, effective on the Confirmation Date, the Debtors and the Reorganized Debtors will be empowered and authorized to take or cause to be taken, before the Effective Date, all actions necessary or appropriate to achieve the Effective Date and enable the Reorganized Debtors to implement effectively the provisions of the Plan, the XBP Transaction Documents, the Confirmation Order, the Definitive Documents, and the Restructuring Transactions.

Article IV.W ("***No Substantive Consolidation***") of the Plan provides that the Plan is being proposed as a joint chapter 11 plan of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan for each Debtor.   The Plan further provides that the Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

Article IV.X ("***Continuing Effectiveness of Final Orders***") of the Plan provides that authorization granted to the Debtors under any prior Final Order entered by the Bankruptcy Court will continue in effect after the Effective Date, and that the Debtors or the Reorganized Debtors may pay or otherwise satisfy any Claim to the extent permitted by, and subject to, the applicable Final Order without regard to the treatment that would otherwise be applicable to such Claim under the Plan.

Article IV.Y ("***Modifications to Executory Contracts and Unexpired Leases***") of the Plan provides that the Debtors are authorized to enter into, and perform under, amendments or modifications of any Executory Contracts or Unexpired Leases with the counterparty to such Executory Contract or Unexpired Lease and pay any amounts due as a result of such amendment or modification.

## D.      Treatment of Executory Contracts and Unexpired Leases; Employee Benefits; and Insurance Policies

Article V of the Plan governs the treatment of the Debtors' Executory Contracts and Unexpired Leases, among other things.

Article V.A ("***Assumption of Executory Contracts and Unexpired Leases***") of the Plan provides that, on the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors will be assumed by the Debtors in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts and Unexpired Leases that:

(i)      have been assumed or rejected by the Debtors by prior order of the Bankruptcy Court;

(ii)      are the subject of a motion to reject Filed by the Debtors pending on the Effective Date;

(iii)      are identified as rejected Executory Contracts and Unexpired Leases by the Debtors, subject to the consent of the Required Consenting Creditors, on the Rejected Executory Contract/Unexpired Lease List, to be Filed in the Plan Supplement, which Plan Supplement may be amended by the Debtors, subject to the consent of the Required Consenting Creditors, to add or remove Executory Contracts and Unexpired Leases by Filing with the Bankruptcy Court an amended Plan Supplement and serving it on the affected non-Debtor contract parties prior to the Effective Date;

(iv)      are Related Parties Contracts that are not included on the Assumed Related Parties Contracts List, subject to the consent of the Required Consenting Creditors; or

(v)      are rejected or terminated pursuant to the terms of the Plan.

The Plan provides that, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned (as applicable) pursuant to the Plan or any prior order of the Bankruptcy Court (including any "change of control" provision) prohibits, restricts or conditions, or purports to prohibit, restrict or condition, or is modified, breached or terminated, or deemed modified, breached or terminated by, (i) the commencement of these Chapter 11 Cases or the insolvency or financial condition of any Debtor at any time before the closing of its respective Chapter 11 Case, (ii) any Debtor's or any Reorganized Debtor's assumption or assumption and assignment (as applicable) of such Executory Contract or

Unexpired Lease or (iii) the Confirmation or consummation of the Plan, then such provision will be deemed modified such that the transactions contemplated by the Plan will not entitle the non-Debtor party thereto to modify or terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights or remedies with respect thereto, and any required consent under any such contract or lease will be deemed satisfied by the Confirmation of the Plan.

In addition, each Executory Contract and Unexpired Lease assumed and/or assigned pursuant to the Plan will revest in and be fully enforceable by the applicable Reorganized Debtor or the applicable assignee in accordance with its terms and conditions, except as modified by the provisions of the Plan, any order of the Bankruptcy Court approving its assumption and/or assignment, or applicable law.

The Plan further provides that, the inclusion or exclusion of a contract or lease on any schedule or exhibit will not constitute an admission by any Debtor that such contract or lease is an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder.

Article V.B ("*Cure of Defaults; Assignment of Executory Contracts and Unexpired Leases*") of the Plan provides that any defaults under each Executory Contract and Unexpired Lease to be assumed, or assumed and assigned, pursuant to the Plan will be satisfied, pursuant to and to the extent required by section 365(b)(1) of the Bankruptcy Code, by payment of the applicable Cure Claim.

The Plan further provides that in the event of an assumption, or an assumption and assignment, of an Executory Contract or Unexpired Lease under the Plan, at least twenty-one (21) days prior to the deadline to object to the Plan, the Debtors will File and serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption, or proposed assumption and assignment, which will: (a) list the applicable Cure Claim, if any; (b) if applicable, identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for Filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court.

The Plan further provides that any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption, or proposed assumption and assignment under the Plan, or any related Cure Claim, must be Filed, served, and actually received by the Debtors prior to the deadline to object to the Plan (notwithstanding anything in the schedules or a Proof of Claim to the contrary).  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, or proposed assumption and assignment, or Cure Claim will be deemed to have consented to such matters and will be deemed to have forever released and waived any objection to such proposed assumption, proposed assumption and assignment, and Cure Claim.  The Plan provides that the Confirmation Order will constitute an order of the Bankruptcy Court approving each proposed assumption, or proposed assumption and assignment, of Executory Contracts and Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

The Plan further provides that in the event of a dispute regarding (a) the amount of any Cure Claim, (b) the ability of any Debtor or assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or assumed and assigned or (c) any other matter pertaining to assumption or assignment, the applicable cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order resolving the dispute and approving such assumption, or assumption and assignment; provided, however, that following the resolution of any such dispute, the Debtors or the Reorganized Debtors, as applicable, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming or assuming and assigning it.  Pursuant to the Plan, the Debtors or the Reorganized Debtors, as applicable, will be authorized to effect such rejection by Filing a written notice of rejection with the Bankruptcy Court and serving such notice on the applicable counterparty within ten (10) days of the entry of such Final Order.

Pursuant to the terms of the Plan, subject to any Disputed Cure Claims, assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan will result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assumption and assignment, in each case as provided in section 365 of the Bankruptcy Code.  Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned by Final Order will be deemed disallowed and expunged (subject to any Disputed Cure Claims), without further notice to or action, order, or approval of the Bankruptcy Court.

With respect to any Executory Contract or Unexpired Lease assumed and assigned pursuant to the Plan, upon and as of the Effective Date, the applicable assignee will be deemed to be substituted as a party thereto for the applicable Debtor party to such assigned Executory Contract or Unexpired Lease and, accordingly, the Debtors and the Reorganized Debtors will be relieved, pursuant to and to the extent set forth in section 365(k) of the Bankruptcy Code, from any further liability under such assigned Executory Contract or Unexpired Lease.

Article V.C ("**Rejection of Executory Contracts and Unexpired Leases**") of the Plan provides that the Debtors reserve the right at any time prior to the Effective Date, except as otherwise specifically provided in the Plan, to seek to reject any Executory Contract or Unexpired Lease and to File a motion requesting authorization for the rejection of any such contract or lease.  Pursuant to the Plan, all Executory Contracts and Unexpired Leases listed on the Rejected Executory Contract/Unexpired Lease List will be deemed rejected as of the Effective Date.  Further, the Confirmation Order will constitute an order of the Bankruptcy Court approving the rejections described in Article V of the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise will not constitute a termination of any preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.

Article V.D ("**Claims on Account of the Rejection of Executory Contracts or Unexpired Leases**") of the Plan provides that all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after service of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.

The Plan further provides that any Person or Entity that is required to File a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so will be forever barred, estopped and enjoined from asserting such Claim, and such Claim will not be enforceable, against the Debtors, the Reorganized Debtors or the Estates, and the Debtors, the Reorganized Debtors, and their Estates and their respective assets and property will be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan.  Further, all such Claims will, as of the Effective Date, be subject to the permanent injunction set forth in Article IX.F of the Plan.

Article V.E ("**Contracts and Leases Entered into After the Petition Date**") of the Plan provides that contracts and leases entered into after the Petition Date by any Debtor may be performed by the applicable Debtor or Reorganized Debtor in the ordinary course of business without further approval of the Bankruptcy Court.

Article V.F ("*Reservation of Rights*") of the Plan provides that nothing contained in the Plan will constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or Reorganized Debtors, as applicable, will have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.  If there is a dispute regarding a Debtor's or Reorganized Debtor's liability under an assumed Executory Contract or Unexpired Lease, the Reorganized Debtors will be authorized to move to have such dispute heard by the Bankruptcy Court pursuant to Article X of the Plan.

Article V.H ("*Other Insurance Contracts*") of the Plan provides that, on the Effective Date, each of the Debtors' Insurance Contracts in existence as of the Effective Date will be Reinstated and continued in accordance with their terms and, to the extent applicable, will be deemed assumed by the applicable Reorganized Debtor pursuant to section 365 of the Bankruptcy Code and Article V of the Plan.  Nothing in the Plan will affect, impair, or prejudice the rights of the insurance carriers, the insureds, or the Reorganized Debtors under the Insurance Contracts in any manner, and such insurance carriers, the insureds, and Reorganized Debtors will retain all rights and defenses under such Insurance Contracts.  The Insurance Contracts will apply to and be enforceable by and against the insureds and the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors, as existed before the Effective Date.

Article V.J ("*Employee Compensation and Benefits*") of the Plan concerns the Debtors' Compensation and Benefit Programs and the Debtors' Workers' Compensation Contracts.

Article V.J.1 provides that, subject to the provisions of the Plan, all Compensation and Benefits Programs (other than awards of stock options, restricted stock, restricted stock units, and other equity awards, equity or equity-based incentive plans, employee stock purchase plans, and any other agreements or awards, or provisions set forth in any Compensation and Benefits Programs or Assumed Employee Agreements that provide for rights to acquire Interests and any agreement or plan whose value is related to Interests or other ownership interests of the Debtors, which, in each case, will not constitute or be deemed to constitute Executory Contracts and will be deemed terminated on the Effective Date) will be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.  All Proofs of Claim Filed for amounts due under any Compensation and Benefits Program will be considered satisfied by the applicable agreement and/or program and agreement to assume and cure in the ordinary course as provided in the Plan.  All collective bargaining agreements to which any Debtor is a party, and all Compensation and Benefits Programs which are maintained pursuant to such collective bargaining agreements or to which contributions are made or benefits provided pursuant to a current or past collective bargaining agreement, will be deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code and the Reorganized Debtors reserve all of their rights under such agreements.  For the avoidance of doubt, the Debtors and Reorganized Debtors, as applicable, will honor all their obligations under section 1114 of the Bankruptcy Code.

The Plan further provides that none of the Restructuring Transactions, or any assumption of Compensation and Benefits Programs pursuant to the terms in the Plan will be deemed to trigger any applicable change of control, vesting, termination, acceleration, or similar provisions therein; *provided*, that the Assumed Employee Agreements will be assumed and governed by the terms thereof.  Subject to the preceding sentence, no counterparty will have rights under a Compensation and Benefits Program assumed pursuant to the Plan other than those applicable immediately before such assumption.

Article V.J.2 provides that, as of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors will continue to honor their obligations under: (a) all applicable state workers' compensation laws; and (b) the Workers' Compensation Contracts.  All Proofs of Claims Filed by the Debtors' current or former employees on account of workers' compensation will be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court based upon the treatment provided for in the Plan; *provided*, that nothing in the Plan will limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non bankruptcy law with respect to the Workers' Compensation Contracts; *provided, further*, that nothing in the Plan will be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable non-bankruptcy law and/or the Workers' Compensation Contracts.

## E.    **Provisions Governing Distributions**

Article VI of the Plan sets forth the mechanics by which Plan distributions will be made.

Article VI.D.1 ("***Delivery of Distributions – Record Date for Distributions***") of the Plan provides that on the Distribution Record Date, the Claims Register will be closed and any party responsible for making distributions will instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.  The Distribution Record Date will not apply to distributions in respect of Securities deposited with DTC, the Holders of which will receive distributions, if any, in accordance with the customary exchange procedures of DTC or the Plan. For the avoidance of doubt, in connection with a distribution through the facilities of DTC (if any), DTC will be considered a single Holder for purposes of distributions.

Article VI.D.2 ("***Delivery of Distributions – Delivery of Distributions in General***") of the Plan provides that, except as otherwise provided in the Plan, the Distribution Agent will make distributions to Holders of Allowed Claims as of the Distribution Record Date, or, if applicable, to such Holder's designee, as appropriate: (a) at the address for each such Holder as indicated on the Debtors' records as of the Distribution Record Date; (b) to the signatory set forth on any Proof of Claim Filed by such Holder or other Representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have not been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the applicable Distribution Agent, as appropriate, after the date of any related Proof of Claim; or (d) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf; *provided*, that the manner of such distributions will be determined at the discretion of the Reorganized Debtors and, solely with respect to distributions to be made to Holders of April 2026 Notes Claims, the Required Consenting Creditors and the Consenting ETI Parties (acting reasonably).

The Plan provides that all distributions to Holders of DIP Claims will be made to the DIP Agent or the Exit Financing Facilities Agents, as applicable, and the DIP Agent or the Exit Financing Facilities Agents will be, and will act as, the Distribution Agent with respect to the DIP Claims in accordance with the terms and conditions of the Plan and the applicable debt documents.

The Plan further provides that all distributions to Holders of Postpetition Securitization Programs Claims will be made to the Securitization Program Agents and the Securitization Program Agents will be, and will act as, the Distribution Agent with respect to the Postpetition Securitization Programs Claims in accordance with the terms and conditions of the Plan and the applicable debt documents.

The Plan further provides that all distributions to Holders of April 2026 Notes Claims and July 2026 Notes Claims shall be made to the respective Indenture Trustees, and the respective Indenture Trustees shall be, and shall act as, the Distribution Agents with respect to the April 2026 Notes Claims and the July 2026

Notes Claims, respectively, in accordance with the terms and conditions of the Plan and the applicable debt documents.  With respect to any distributions of Plan Securities, to the extent the distribution procedures set forth in the Plan conflict with those contemplated under the XBP Transaction Documents, the procedures under the XBP Transaction Documents shall control unless XBP and the Debtors (or the Reorganized Debtors) consent otherwise, such consent not to be unreasonably withheld or delayed, including after taking into account the advice provided by the Distribution Agent.  As applicable, the Indenture Trustees may transfer or direct the transfer of such distributions directly through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with the respective Holders of such Claims to the extent consistent with the customary practices of DTC.  Notwithstanding anything to the contrary in the Plan, such distributions will be subject in all respects to any rights of the Indenture Trustees to assert a charging lien against such distributions.  All distributions to be made to Holders of April 2026 Notes Claims and July 2026 Notes Claims through DTC will be made eligible for distributions through the facilities of DTC and, for the avoidance of doubt, under no circumstances will the Indenture Trustees be responsible for making or required to make any distribution under the Plan to Holders of April 2026 Notes Claims and July 2026 Notes Claims if such distribution is not eligible to be distributed through the facilities of DTC.

Article VI.D.3 ("*Delivery of Distributions – Minimum Distributions*") of the Plan provides that, notwithstanding any provision in the Plan to the contrary, no Distribution Agent will be required to make distributions or payments of less than $100 (whether in Cash or otherwise) with respect to Impaired Claims. No fractional shares of Plan Securities will be distributed and no Cash will be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of Plan Securities that is not a whole number, the actual distribution of shares of Plan Securities will be rounded as follows: (a) fractions of one-half (½) or greater will be rounded to the next higher whole number and (b) fractions of less than one-half (½) will be rounded to the next lower whole number with no further payment therefore.  The total number of authorized shares of Plan Securities to be distributed under the Plan will be adjusted as necessary to account for the foregoing rounding.  For distribution purposes (including rounding), DTC will be treated as a single Holder.

Article VI.D.4 ("*Delivery of Distributions – Undeliverable Distributions*") of the Plan provides that, in the event that any distribution to any Holder of Allowed Claims is returned as undeliverable, no distribution to such Holder will be made unless and until the Distribution Agent has determined the then-current address of such Holder, at which time such distribution will be made to such Holder without interest; *provided*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one (1) year from the Effective Date.  After such date, all unclaimed property or interests in property will revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder of Claims to such property or interest in property will be discharged and forever barred.

Article VI.K.1 ("*Claims Paid or Payable by Third Parties – Claims Paid by Third Parties*") of the Plan provides that a Claim will be correspondingly reduced, and the applicable portion of such Claim will be disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives a payment on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder will, within fourteen (14) days of receipt thereof, repay or return the distribution to the Reorganized Debtors to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution will result in the Holder owing the Reorganized Debtors annualized interest at the

Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

Article VI.K.2 ("***Claims Paid or Payable by Third Parties – Claims Payable by Insurers***") of the Plan provides that no distributions under the Plan will be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Contracts until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Contract.  To the extent that one or more of the Insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such Insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

Article VI.K.3 ("***Claims Paid or Payable by Third Parties – Insurance Contracts***") of the Plan provides that, except as otherwise provided in the Plan, distributions to Holders of Allowed Claims will be in accordance with the provisions of any applicable Insurance Contract.  Notwithstanding anything to the contrary in the Plan, nothing contained in the Plan will constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including Insurers, under any Insurance Contracts or applicable indemnity, nor will anything contained in the Plan constitute or be deemed a waiver by such Insurers of any defenses, including coverage defenses, held by such Insurers.

Finally, as set forth more fully in the Plan, Article VI of the Plan provides, among other things, that (a) to the extent applicable, the Reorganized Debtors will comply with all tax withholding and reporting requirements, and all distributions pursuant to the Plan will be subject to such requirements (VI.E); (b) except as otherwise provided in the Plan, Insurance Contracts will continue to be applicable as set forth in greater detail in the Plan (VI.F); (c) except as otherwise required by law, distributions with respect to an Allowed Claim will be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any (VI.G); (d) unless otherwise specifically provided for in the Plan, any other Definitive Document, the Confirmation Order, or any other Final Order of the Bankruptcy Court, or required by applicable bankruptcy law (including as required pursuant to section 506(b) or section 511 of the Bankruptcy Code), postpetition interest will not accrue or be paid on any Claims and no Holder of a Claim or Interest will be entitled to interest accruing on or after the Petition Date on any Claim (VI.H); and (e) payments of Cash made pursuant to the Plan will be in United States dollars and will be made, at the option of the Debtors or the Reorganized Debtors (as applicable), by checks drawn on, or wire transfer from, a domestic bank selected by the Debtors or the Reorganized Debtors. Cash payments to foreign creditors may be made, at the option of the Debtors or the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction (VI.I); and except as otherwise provided in the Plan, each Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code) or applicable bankruptcy or non-bankruptcy law, or as may be agreed by the Holder of an Allowed Claim, may set off or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature that the applicable Debtor or Reorganized Debtor may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised, settled, or assigned on or prior to the Effective Date (whether pursuant to the Plan, a Final Order or otherwise); *provided*, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan will constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action (VI.J).

**F.**     **Procedures for Resolving Disputed, Contingent, and Unliquidated Claims or Interests**

As noted in Section IV.D of this Disclosure Statement, the Bar Date Order established (i) June 6, 2025, at 5:00 p.m. (prevailing Central Time) as the deadline for any entity to file a proof of claim based on a prepetition claim against any Debtor and (ii) September 2, 2025 at 5:00 p.m. (prevailing Central Time) as the deadline for any governmental unit to file a proof of claim against an Debtor.

Article VII.A ("*Allowance and Disallowance of Claims*") of the Plan provides that, after the Effective Date, and except as otherwise provided in the Plan, the Reorganized Debtors will have and will retain any and all available rights and defenses that the Debtors had with respect to any Claim immediately before the Effective Date, including the right to assert any objection to Claims based on the limitations imposed by section 502 of the Bankruptcy Code.  The Debtors and the Reorganized Debtors may, but are not required to, contest the amount and validity of any Disputed Claim or contingent or unliquidated Claim in the ordinary course of business in the manner and venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced.

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code will be disallowed if: (1) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (2) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

Article VII.B ("*Claims Administration Responsibilities*") of the Plan provides that except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors will have the sole authority: (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court; *provided*, that the procedures governing the items set forth in the foregoing clauses (1) through (3) will be subject to the reasonable consent of the Required Consenting Creditors and the Consenting ETI Parties, after consultation with the Claims Ombudsman.  For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, each Reorganized Debtor will have and retain any and all rights and defenses such Debtor had immediately before the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to the Plan.

Article VII.C ("*Adjustments to Claims or Interests Without Objection*") of the Plan provides that any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

Article VII.D ("*No Distributions Pending Allowance*") of the Plan provides that if any portion of a Claim is Disputed, no payment or distribution provided hereunder will be made on account of such Claim unless and until such Claim becomes an Allowed Claim; provided that if only a portion of a Claim is Disputed, such Claim will be deemed Allowed in the amount not Disputed and payment or distribution will be made on account of such undisputed amount.

Article VII.E ("***Distributions After Allowance***") of the Plan provides that to the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) will be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan and the XBP Transaction Documents. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors will provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan and the XBP Transaction Documents as of the Effective Date, without any postpetition interest to be paid on account of such Claim.

## G.    Conditions Precedent to the Occurrence of the Effective Date

Article VIII of the Plan sets forth the conditions precedent to the Effective Date, and related matters. The conditions precedent set forth at Article VIII.A of the Plan ("***Conditions Precedent to the Occurrence of the Effective Date***") include:

1.    the Bankruptcy Court shall have entered the Final DIP Order and the Final Securitization Order;

2.    XBP shall have agreed to take all necessary actions in furtherance of the Restructuring Transactions including execution of Definitive Documents to which XBP is a party, which shall be in form and substance reasonably acceptable to XBP, the Debtors, and the Required Consenting Creditors;

3.    the XBP Transaction shall have occurred and been consummated;

4.    the Plan Support Agreement shall not have been terminated as to the Required Consenting Creditors or the Consenting ETI Parties and shall be in full force and effect;

5.    the ETI Funding Obligations shall be in full force and effect;

6.    the transactions contemplated by the Restructuring Steps Exhibit shall have been consummated;

7.    each of the New Parent Warrants Agreement and the XBP Transaction Documents shall be on terms and conditions reasonably acceptable to the Required Consenting Creditors, the Consenting ETI Parties, and XBP;

8.    Executory Contracts and Unexpired Leases shall either have been assumed, assumed and assigned, or rejected;

9.    the Plan shall contain the Releases;

10.    the Bankruptcy Court shall have entered the Confirmation Order in form and substance materially consistent with and subject to the consent rights set forth in the Plan Support Agreement;

11.    the Exit Facilities Documents shall have been executed (or deemed executed) and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the Debtors, and the Required Consenting Creditors), other than such conditions that relate to the effectiveness of the Plan and related transactions;

12.     the Exit Securitization Programs Documents shall have been executed (or deemed executed) and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the applicable Debtors and the Securitization Programs Parties), other than such conditions that relate to the effectiveness of the Plan and related transactions;

13.     the XBP Funding or the XBP Alternative Funding has occurred or will occur simultaneously with the Effective Date;

14.     the Debtors, the Required Consenting Creditors, and the Committee shall have reached agreement with respect to the GUC Payment Obligations Collateral such that, as of the Effective Date, the Claims Ombudsman shall be in a position to properly perfect the security interest in the GUC Payment Obligations Collateral;

15.     the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements, and exhibits to the Plan shall be consistent with the Plan Support Agreement and otherwise approved by the parties thereto consistent with their respective consent and approval rights as set forth in the Plan Support Agreement, and shall have been Filed in a manner consistent with the Plan Support Agreement;

16.     all Restructuring Fees and Expenses shall have been paid in full in Cash;

17.     the Definitive Documents shall (i) be materially consistent with the Plan Support Agreement and otherwise approved by the Required Consenting Creditors, the Consenting ETI Parties, and the Debtors consistent with their respective consent and approval rights as set forth in the Plan Support Agreement; (ii) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties; and (iii) be adopted on terms materially consistent with the Plan Support Agreement and the Plan Term Sheet;

18.     the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, actions, documents, and other agreements that are necessary to implement and effectuate the Plan and each of the other Restructuring Transactions; and the Debtors shall have paid in full all professional fees and expenses of the Retained Professionals that require the Bankruptcy Court's approval or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Professional Fee Escrow Account pending the Bankruptcy Court's approval of such fees and expenses; and

19.     the Debtors shall have paid in full all professional fees and expenses of the Retained Professionals that require the Bankruptcy Court's approval or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Professional Fee Escrow Account pending the Bankruptcy Court's approval of such fees and expenses.

Article VIII.C ("**_Waiver of Conditions_**") of the Plan provides that, except as otherwise provided in the Plan, all actions required to be taken on the Effective Date will take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  Each of the conditions precedent of the Plan may be waived in writing by the Debtors with the prior written consent of any party expressly given a consent right in the Plan or in the Plan Support Agreement with respect to the condition to be waived; _provided_, that (a) waiver of the conditions precedent in Article VIII.A.19 of the Plan shall require the consent of the affected Retained Professionals; (b) waiver of the

condition precedent in Article VIII.A.14 shall require the consent of the Committee (such consent not to be unreasonably withheld); and (c) waiver of the conditions precedent in Article VIII.A.2, 3, 5, 6, 7, 8, 9, 10, 11, 12, 13, 15, 16, 17, and 18 shall require the consent of the Required Consenting Creditors and the Consenting ETI Parties (such consent not to be unreasonably withheld). If the Plan is confirmed for fewer than all of the Debtors as provided for in the Plan, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur.

The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(c) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

Article VIII.D ("*Effect of Non-Occurrence of Conditions to the Effective Date*") of the Plan addresses the effect of non-occurrence of the Effective Date. It provides that if the Confirmation of the Plan or the Effective Date does not occur with respect to one or more of the Debtors on or before the termination of the Plan Support Agreement, then the Plan will, with respect to such applicable Debtor or Debtors, be null and void in all respects and nothing contained in the Plan or this Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders, or any other Person or Entity; (3) constitute an allowance of any Claim or Interest; or (4) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Person or Entity in any respect.

Article VIII.E ("*Substantial Consummation*") of the Plan provides that "Substantial consummation" of the Plan, as defined in section 1102(2) of the Bankruptcy Code, will be deemed to occur on the Effective Date upon the filing of the Notice of Effective Date.

## H.      Discharge, Release, Injunction, and Related Provisions

Article IX of the Plan addresses releases, injunctions, exculpatory provisions and related provisions as follows: *Discharge of Claims and Termination of Interests* (IX.A); *Releases by the Debtors* (IX.B); *Releases by Holders of Claims and Interests* (IX.C); *Exculpation* (IX.D); *Permanent Injunction* (IX.E); and *SEC Reservation of Rights* (IX.E).

**Article IX.C of the Plan contains a Third-Party Release by all Releasing Parties. Pursuant to Article IX.C of the Plan, the following are the Releasing Parties: (a) each Debtor; (b) each Reorganized Debtor; (c) each Non-Debtor Affiliate; (d) each of the Debtors' and Non-Debtor Affiliates' current and former directors and officers; (e) XBP; (f) each Consenting Stakeholder; (g) the Committee and each of its members in such capacity; (h) Blue Torch; (i) the April 2026 Notes Indenture Trustee; (j) the July 2026 Notes Indenture Trustee; (k) the April 2026 Notes Collateral Agent; (l) the DIP Agent; (m) each DIP Lender; (n) the DIP Backstop Commitment Parties; (o) the Exit Financing Facility Agents; (p) each lender under the Exit Facilities; (q) the Securitization Programs Parties; (r) each Holder of a Claim in a Voting Class that does not affirmatively elect to "opt out" of the Third-Party Release as provided on its respective ballot; (s) each Holder of a Claim or Interest in a Non-Voting Class that does not affirmatively elect to "opt out" of the Third-Party Release as provided on its respective Release Opt-Out Form; and (t) each Related Party of each Entity in clauses (a) through (s), solely to the extent such Related Party (I) would be obligated to grant a release under principles of agency if it were so directed by the Entity in the foregoing clauses (a) through (s) to whom they are related or (II) may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity in clause (a) through (s); *provided*, that, any Holder of a Claim or Interest that timely objects to the Third-Party Release, either through (i) a formal objection Filed on the docket of the Chapter 11 Cases or (ii) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11**

**Cases or via electronic mail, as applicable, before the Confirmation Hearing, will not be a "Releasing Party.**

1. **Definitions Relating to Releases**

The following definitions are important to understanding the scope of the releases being given under the Plan:

"***Exculpated Party***" means, collectively:  (a) the Debtors; (b) the Disinterested Director; and (c) the Committee and each member of the Committee.

"***Released Parties***" means, collectively, each of, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each Non-Debtor Affiliate; (d) each of the Debtors' and Non-Debtor Affiliates' current and former directors and officers; (e) XBP; (f) each Consenting Stakeholder; (g) the Committee and each of its members in such capacity; (h) Blue Torch; (i) the April 2026 Notes Indenture Trustee; (j) the July 2026 Notes Indenture Trustee; (k) the April 2026 Notes Collateral Agent; (l) the DIP Agent; (m) each DIP Lender; (n) the DIP Backstop Commitment Parties; (o) the Exit Financing Facility Agents; (p) each lender under the Exit Facilities; (q) the Securitization Programs Parties; (r) each Holder of a Claim in a Voting Class that does not affirmatively elect to "opt out" of the Third-Party Release as provided on its respective ballot; (s) each Holder of a Claim or Interest in a Non-Voting Class that does not affirmatively elect to "opt out" of the Third-Party Release as provided on its respective Release Opt-Out Form; and (t) each Related Party of each Entity in clauses (a) through (s); *provided*, that any Holder of a Claim or Interest that timely objects to the Third-Party Release, either through (i) a formal objection Filed on the docket of the Chapter 11 Cases or (ii) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or via electronic mail, as applicable, before the Confirmation Hearing, shall not be a "Released Party."

"***Releasing Parties***" means, collectively, each of, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each Non-Debtor Affiliate; (d) each of the Debtors' and Non-Debtor Affiliates' current and former directors and officers; (e) XBP; (f) each Consenting Stakeholder; (g) the Committee and each of its members in such capacity; (h) Blue Torch; (i) the April 2026 Notes Indenture Trustee; (j) the July 2026 Notes Indenture Trustee; (k) the April 2026 Notes Collateral Agent; (l) the DIP Agent; (m) each DIP Lender; (n) the DIP Backstop Commitment Parties; (o) the Exit Financing Facility Agents; (p) each lender under the Exit Facilities; (q) the Securitization Programs Parties; (r) each Holder of a Claim in a Voting Class that does not affirmatively elect to "opt out" of the Third-Party Release as provided on its respective ballot; (s) each Holder of a Claim or Interest in a Non-Voting Class that does not affirmatively elect to "opt out" of the Third-Party Release as provided on its respective Release Opt-Out Form; and (t) each Related Party of each Entity in clauses (a) through (s), solely to the extent such Related Party (I) would be obligated to grant a release under principles of agency if it were so directed by the Entity in the foregoing clauses (a) through (a) to whom they are related or (II) may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity in clause (a) through (s); *provided*, that, any Holder of a Claim or Interest that timely objects to the Third-Party Release, either through (i) a formal objection Filed on the docket of the Chapter 11 Cases or (ii) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or via electronic mail, as applicable, before the Confirmation Hearing, shall not be a "Releasing Party."

64

2. **Releases, Exculpation and Injunction**

    *a.* ***Releases by the Debtors (IX.B)***

**To the fullest extent permitted by applicable law and approved by the Bankruptcy Court, and except as otherwise expressly set forth in the Plan, the XBP Transaction Documents, or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, as of the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Debtor, Reorganized Debtor, and the Estates, in each case on behalf of itself and its respective successors, assigns, and Representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, has and is deemed to have, forever and unconditionally released, and absolved each Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Debtors, the Estates, or the Reorganized Debtors that such Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, including (1) the management, ownership, or operation of the Debtors, the Non-Debtor Affiliates, or the Consenting ETI Parties, (2) the purchase, sale, or rescission of any Security of the Debtors, the Non-Debtor Affiliates, or the Consenting ETI Parties, (3) the subject matter of, or the transactions, events, circumstances, acts or omissions giving rise to, any Claim or Interest that is treated in the Restructuring Transactions, including the negotiation, formulation, or preparation of the Restructuring Transactions, (4) the business or contractual arrangements between any Debtor or Non-Debtor Affiliate or Consenting ETI Party and any other Entity (including Consenting Stakeholders), (5) the Debtors', Non-Debtor Affiliates', and the Consenting ETI Parties' in- or out-of-court restructuring efforts, (6) intercompany transactions, (7) the formulation, preparation, dissemination, negotiation, Filing, or consummation of the Plan, the XBP Transaction Documents, this Disclosure Statement, the Plan Support Agreement, the Definitive Documents, the Prepetition Term Loan Documents, the April 2026 Notes Documents, the July 2026 Notes Documents, the DIP Documents, the Exit Facilities Documents, the Prepetition Securitization Programs Documents, the Postpetition Securitization Programs Documents, the Exit Securitization Programs Documents (and any financing permitted thereunder), the New Organizational Documents, the Chapter 11 Cases, the BTC Transaction, the Committee Settlement, the Sub-Group DIP Lenders Settlement, or any Restructuring Transaction, (8) any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the XBP Transaction Documents, this Disclosure Statement, the Plan Support Agreement, the Definitive Documents, the Prepetition Term Loan Documents, the April 2026 Notes Documents, the July 2026 Notes Documents, the DIP Documents, the Exit Facilities Documents, the Prepetition Securitization Programs Documents, the Postpetition Securitization Programs Documents, the Exit Securitization Programs Documents (and any financing permitted thereunder), the Chapter 11 Cases, the pursuit of Confirmation of the Plan, the administration and implementation of the Plan, the BTC Transaction, the Committee Settlement, the Sub-Group DIP Lenders Settlement, or the Restructuring Transactions, including the issuance or distribution of Securities pursuant to the Plan and the XBP Transaction Documents, (9) the distribution, including any disbursements made by a Distribution Agent, of property under the Plan, the XBP Transaction Documents, or any other related agreement, or (10) any other act or omission, transaction, agreement, event, or other occurrence related to any of the foregoing and taking place on or before the Effective Date; *provided*, that the Debtors do not release Claims or Causes of Action (1) that are of a commercial nature and arise in the ordinary course of business, such as accounts receivable and accounts payable on account of goods being sold and services being performed; (2) arising under an Executory Contract or Unexpired Lease that is assumed by the Debtors; or (3) arising out of, or related to, any act or omission of a Released Party that is determined by Final**

Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud (but not, for the avoidance of doubt, fraudulent transfers), gross negligence, or willful misconduct). Notwithstanding anything to the contrary in the foregoing, the Releases set forth above do not release (1) any obligations of any Person or Entity under the Plan, the XBP Transaction Documents, the Confirmation Order, any other Definitive Document, any Restructuring Transaction, any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, the XBP Transaction Documents, or any agreement, Claim, or obligation arising or assumed under the Plan or the XBP Transaction Documents or (2) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by each of the Released Parties, including the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan and the XBP Transaction Documents; (2) a good-faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

### b.    *Releases by Holders of Claims or Interests (IX.C)*

To the fullest extent permitted by applicable law and approved by the Bankruptcy Court, and except as otherwise expressly set forth in the Plan, the XBP Transaction Documents, or the Confirmation Order, as of the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and Representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, has and is deemed to have, forever and unconditionally, released, and absolved each Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Debtors, the Estates, or the Reorganized Debtors that such Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, including (1) the management, ownership, or operation of the Debtors, the Non-Debtor Affiliates, or the Consenting ETI Parties, (2) the purchase, sale, or rescission of any Security of the Debtors, the Non-Debtor Affiliates, or the Consenting ETI Parties, (3) the subject matter of, or the transactions, events, circumstances, acts or omissions giving rise to, any Claim or Interest that is treated in the Restructuring Transactions, including the negotiation, formulation, or preparation of the Restructuring Transactions, (4) the business or contractual arrangements between any Debtor, Non-Debtor Affiliate, or Consenting ETI Party and any other Entity (including Consenting Stakeholders), (5) the Debtors', Non-Debtor Affiliates', and Consenting ETI Parties' in- or out-of-court restructuring efforts, (6) intercompany transactions, (7) the formulation, preparation, dissemination, negotiation, Filing, or consummation of the Plan, the XBP Transaction Documents, this Disclosure Statement, the Plan Support Agreement, the Definitive Documents, the Prepetition Term Loan Documents, the April 2026 Notes Documents, the July 2026 Notes Documents, the DIP Documents, the Exit Facilities Documents, the Prepetition Securitization Programs Documents, the

Postpetition Securitization Programs Documents, the Exit Securitization Programs Documents (and any financing permitted thereunder), the New Organizational Documents, the Chapter 11 Cases, the BTC Transaction, the Committee Settlement, the Sub-Group DIP Lenders Settlement, or any Restructuring Transaction, (8) any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the XBP Transaction Documents, this Disclosure Statement, the Plan Support Agreement, the Definitive Documents, the Prepetition Term Loan Documents, the April 2026 Notes Documents, the July 2026 Notes Documents, the DIP Documents, the Exit Facilities Documents, the Prepetition Securitization Programs Documents, the Postpetition Securitization Programs Documents, the Exit Securitization Programs Documents (and any financing permitted thereunder), the Chapter 11 Cases, the pursuit of Confirmation of the Plan, the administration and implementation of the Plan, the BTC Transaction, the Committee Settlement, the Sub-Group DIP Lenders Settlement, or the Restructuring Transactions, including the issuance or distribution of Securities pursuant to the Plan and the XBP Transaction Documents, (9) the distribution, including any disbursements made by a Distribution Agent, of property under the Plan, the XBP Transaction Documents, or any other related agreement, or (10) any other act, or omission, transaction, agreement, event, or other occurrence relating to any of the foregoing and taking place on or before the Effective Date; *provided*, that the Releasing Parties do not release Claims or Causes of Action (1) arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud (but not, for the avoidance of doubt, fraudulent transfers), gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud, gross negligence, or willful misconduct) or (2) against a Released Party arising from any obligations owed to the Releasing Party that are wholly unrelated to the Debtors or the Reorganized Debtors.  Notwithstanding anything to the contrary in the foregoing, the Releases set forth above do not release (1) any obligations of any Person or Entity under the Plan, the XBP Transaction Documents, the Confirmation Order, any other Definitive Document, any Restructuring Transaction, any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, the XBP Transaction Documents, or any agreement, Claim, or obligation arising or assumed under the Plan or the XBP Transaction Documents or (2) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) given and made after due notice and opportunity for hearing; and (3) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

### c.  *Exculpation (IX.D)*

Effective as of the Effective Date, to the fullest extent permitted by law, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any Claims or Causes of Action for any act taken or omitted to be taken between the Petition Date and the Effective Date in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or consummation (as applicable) of the Plan, the XBP Transaction Documents, the Plan Support Agreement, and this Disclosure Statement including any disbursements made by a Distribution Agent in connection with the Plan, the XBP Transaction Documents, this Disclosure Statement, the Definitive Documents, the Plan Supplement, the Prepetition Term Loan Documents, the April 2026 Notes Documents, the July 2026 Notes Documents, the DIP Documents, the Exit Facilities Documents, the Prepetition Securitization Programs

Documents, the Postpetition Securitization Programs Documents, the Exit Securitization Programs Documents (and any financing permitted thereunder), the New Organizational Documents, the BTC Transaction, the Committee Settlement, the Sub-Group DIP Lenders Settlement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the XBP Transaction Documents, or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of this Disclosure Statement or Confirmation or consummation of the Plan and the XBP Transaction Documents; *provided*, that the foregoing provisions of this exculpation shall not operate to waive or release: (1) any Claims or Causes of Action arising from willful misconduct, actual fraud (but not, for the avoidance of doubt, fraudulent transfers), or gross negligence of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (2) the rights of any Person or Entity to enforce the Plan, the XBP Transaction Documents, and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with the Plan and the XBP Transaction Documents or assumed pursuant to the Plan, the XBP Transaction Documents, or Final Order of the Bankruptcy Court; *provided*, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions, or inactions.

The Exculpated Parties have, and upon consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity.  For the avoidance of doubt and notwithstanding anything else in the Plan, the foregoing exculpation shall be limited to Persons that served as Estate fiduciaries during the Chapter 11 Cases.

### d.   Permanent Injunction (IX.E)

Except as otherwise expressly provided in the Plan Support Agreement, the Plan or the Confirmation Order, from and after the Effective Date, all Persons and Entities are, to the fullest extent provided under Section 524 and other applicable provisions of the Bankruptcy Code, permanently enjoined from (1) commencing or continuing, in any manner or in any place, any suit, action or other proceeding of any kind; (2) enforcing, attaching, collecting, or recovering in any manner or means any judgment, award, decree, or order; (3) creating, perfecting, or enforcing any Lien or encumbrance; (4) asserting a right of setoff or subrogation of any kind; or (5) commencing or continuing in any manner any action or other proceeding of any kind, in each case on account of or with respect to any Claim, demand, liability, obligation, debt, right, Cause of Action, Interest, or remedy released or to be released, exculpated or to be exculpated, settled or to be settled, or discharged or to be discharged pursuant to the Plan or the Confirmation Order against any Person or Entity so released, discharged, or exculpated (or the property or estate of any Person or Entity so released, discharged, or exculpated).  All injunctions or stays provided for in the Chapter 11 Cases under Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

No Person or Entity may commence or pursue a Claim or Cause of Action, as applicable, of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with,

relating to, or arising out of a Claim or Cause of Action, as applicable, subject to Article IX of the Plan, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action, as applicable, represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action, as applicable, against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party, as applicable; *provided*, that, the foregoing shall only apply to Claims or Causes of Action brought against a Released Party if the Person or Entity bringing such Claim or Cause of Action is a Releasing Party.  At the hearing for the Bankruptcy Court to determine whether such Claim or Cause of Action represents a colorable Claim of any kind, the Bankruptcy Court may, or shall if any Debtor, Reorganized Debtor, Exculpated Party, Released Party, or other party in interest requests by motion (oral motion being sufficient), direct that such Person or Entity seeking to commence or pursue such Claim or Cause of Action File a proposed complaint with the Bankruptcy Court embodying such Claim or Cause of Action, such complaint satisfying the applicable Rules of Federal Procedure, including Rule 8 and Rule 9 (as applicable), which the Bankruptcy Court shall assess before making a determination.  For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any Claims or Causes of Action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending.  The Bankruptcy Court reserves jurisdiction to adjudicate any such claims to the maximum extent provided by the law.

## VI.
## CAPITAL STRUCTURE AND CORPORATE GOVERNANCE OF REORGANIZED DEBTORS

### A.      Summary of Capital Structure of Reorganized Debtors

#### 1.      Post-Emergence Capital Structure

The following table summarizes the capital structure of the Reorganized Debtors, including the post-Effective Date financing arrangements the Reorganized Debtors expect to enter into to fund their obligations under the Plan and provide for, among other things, their post-Effective Date working capital needs.  This summary of the Reorganized Debtors' capital structure is qualified in its entirety by reference to the Plan and the relevant Definitive Documents.

| Instrument | Description |
|---|---|
| Rollover Exit Facility | $180.1 million |
| ER3 Securitization Program[*] | $77.0 million |
| Blue Torch Facility or Gates Exit Facility | $40 million |
| B Riley 2nd Lien AR3 Facility[*] | $21.6 million |
| XBP Funding | $18.0 million |
| Incremental Exit Facility A[31] | $6.0 million |
| Incremental Exit Facility B[32] | $6.0 million |
| BR Exar AR Facility[*] | $5.0 million |
| **Subtotal** | **$353.7 million** |
| | |
| Capital Leases and Other | $13.5 million |
| **Total Debt** | **$367.2 million** |

## 2.   Exit Financing Facilities and Exit Facilities Documents

Article IV.I ("***Exit Financing Facilities and Exit Facilities Documents***") of the Plan provides that, to the extent required and subject to the occurrence of the Effective Date, Confirmation of the Plan shall be deemed to constitute approval by the Bankruptcy Court of the Exit Facilities Documents (including all transactions contemplated thereby, such as any supplementation or syndication of the Exit Debt, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the incurrence of Liens securing the Exit Facilities and the payment of all fees, payments, indemnities, and expenses associated therewith) and, subject to the occurrence of the Effective Date, authorization for the applicable Reorganized Debtors to enter into and perform their

---

[*]   As discussed herein at Section II.F, the ER3 Securitization Facility, Second Lien Note, and BR Exar Accounts Receivables Facility are off-balance-sheet facilities. The Debtors anticipate that, in connection with possible refinancing or replacement of these Postpetition Securitization Programs, the Debtors or Reorganized Debtors, as applicable, may conclude that it is in the best interests of the Reorganized Debtors to replace one or more of these facilities with on-balance-sheet debt facilities. Inclusion of the Postpetition Securitization Programs in the capital structure of the Reorganized Debtors is illustrative. The Debtors and Reorganized Debtors reserve all rights with respect to these programs and their inclusion within the Reorganized Debtors' capital structure herein is not an admission that such programs are or will be an obligation of the Debtors or Reorganized Debtors, respectively. In particular, the Second Lien Note is a term obligation and does not provide ongoing liquidity to the Debtors; however, the Second Lien Note is secured by a pledge of the equity and assets of Exela Receivables 3 LLC. As with the other Postpetition Securitization Programs, the Debtors or Reorganized Debtors, as applicable, may conclude that it is (or is not) in the best interests of the Reorganized Debtors to address the Second Lien Note as a balance-sheet obligation of the Reorganized Debtors. While the Debtors' Financial Projections illustratively assume repayment of the Second Lien Note over a period of two years after the Effective Date, treatment of the Second Lien Note remains subject to negotiation.

[31]   The "***Incremental Exit Facility A***" reflects $6 million into which $6 million of Allowed DIP Claims held by the Sub-Group DIP Lenders shall be rolled on the Effective Date, which debt shall be *pari passu* with the other debt under the Supplemental Exit Facility or incorporated into such facility on the same terms with customary sacred rights.

[32]   The "***Incremental Exit Facility B***" is a potential $6 million incremental exit facility which may be raised based on existing arrangements with the Company.

obligations under the Exit Facilities Documents and such other documents as may be reasonably required or appropriate, subject to any consent or approval rights under the Definitive Documents. On or around the Effective Date, the Reorganized Debtors shall execute and deliver the Exit Facilities Documents, and shall execute, deliver, file, record, and issue any other related notes, guarantees, security documents, instruments, or agreements in connection therewith, in each case, without (a) further notice to the Bankruptcy Court, or (b) further act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity.

The Plan further provides that on the Effective Date, the Exit Facilities Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Exit Facilities Documents are being extended, and shall be deemed to have been extended, and all related payments made in connection therewith shall have been made, in each case, in good faith, for legitimate business purposes, for reasonably equivalent value, as an inducement to the applicable lenders to extend credit under the Exit Facilities, are reasonable, shall not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the Liens and security interests to be granted, carried forward, continued, amended, extended, and/or reaffirmed under the Exit Facilities Documents shall: (1) be continuing, legal, binding, and enforceable Liens on, and security interests in, the collateral granted in accordance with the terms of the applicable Exit Facilities Documents; (2) be granted, carried forward, continued, amended, extended, reaffirmed, and deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted thereunder; and (3) not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and shall thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### 3.  Exit Securitization Programs and Exit Securitization Programs Documents

Article IV.J ("*Exit Securitization Programs and Exit Securitization Programs Documents*") of the Plan provides that, to the extent required and subject to the occurrence of the Effective Date, Confirmation of the Plan shall be deemed to constitute approval by the Bankruptcy Court of the Exit Securitization Programs Documents (including all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the incurrence of Liens securing the Exit Securitization Programs and the payment of all fees, payments, indemnities, and expenses associated therewith) and, subject to the occurrence of the Effective Date, authorization for the applicable Reorganized Debtors to enter into and perform their obligations under the Exit Securitization Programs Documents and such other documents as may be reasonably required or appropriate, subject to any consent or approval rights under the Definitive Documents. On or around the Effective Date, the Reorganized Debtors shall execute and deliver the Exit Securitization Programs Documents, and shall execute, deliver, file, record, and issue any other related notes, guarantees, security documents, instruments, or agreements in connection therewith, in each case, without (a) further notice to

71

the Bankruptcy Court, or (b) further act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity.

On the Effective Date, the Exit Securitization Programs Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the Exit Securitization Programs Documents are being extended, and shall be deemed to have been extended, and all related payments made in connection therewith shall have been made, in each case, in good faith, for legitimate business purposes, for reasonably equivalent value, as an inducement to the applicable lenders to extend credit under the Exit Securitization Programs, are reasonable, shall not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.  On the Effective Date, all of the Liens and security interests to be granted, carried forward, continued, amended, extended, and/or reaffirmed under the Exit Securitization Programs Documents shall: (1) be continuing, legal, binding, and enforceable Liens on, and security interests in, the collateral granted in accordance with the terms of the applicable Exit Securitization Programs Documents; (2) be granted, carried forward, continued, amended, extended, reaffirmed, and deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted thereunder; and (3) not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non bankruptcy law.  The Reorganized Debtors and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and shall thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

## 4. Issuance of Plan Securities

Article IV.K ("*Issuance of Plan Securities*") of the Plan provides that, on the Effective Date, (a) New Parent shall issue or reserve for issuance and deliver the Plan Securities in accordance with the terms of the Plan, the Restructuring Steps Exhibit, and the New Organizational Documents; *provided*, that New Parent Interests issued to the Consenting ETI Parties on the Effective Date shall be Blocked ETI Shares, as described in greater detail in Article IV.N of the Plan, and (b) BPA, XCV-EMEA, and BTC, as applicable and/or their respective designee(s), shall effectuate the BTC Transaction in accordance with the terms of the Plan and the Restructuring Steps Exhibit.

The issuance and delivery of the Plan Securities is authorized without the need for further corporate or other action or any consent or approval of any national securities exchange upon which the Plan Securities may be listed on or immediately following the Effective Date.  All of the Plan Securities issuable under the Plan, the XBP Transaction Documents, the Restructuring Steps Exhibit, and the Confirmation Order shall, when so issued be duly authorized, validly issued, fully paid, and non-assessable.  The issuance and delivery of the Plan Securities in accordance and connection with the Plan, the Restructuring Steps Exhibit, the XBP Transaction Documents, and the Confirmation Order are authorized without the need for any further limited liability company or corporate action and without any further action by any Holder of a Claim or Interest, except, in the case of New Parent Interests, BTC Distribution Shares, and New Parent Warrants, as may be

required under applicable stock exchange rules on which the Securities of XBP or New Parent are then listed.

Any Holder of an Allowed April 2026 Notes Claim, Allowed July 2026 Notes Claim, and Holder of a Claim on account of Premiums and Fees may designate that all or a portion of such Holder's share of the Plan Securities to be distributed as part of the treatment of such Allowed April 2026 Notes Claim, July 2026 Notes Claim, or Claim on account of Premiums and Fees be registered in the name of, and delivered to, its designee by delivering notice thereof to counsel to the Debtors and to the Notice and Claims Agent at least five (5) Business Days prior to the Effective Date.  Any such designee must be an "accredited investor" as such term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

On the Effective Date, the New Parent, BPA, XCV-EMEA, and BTC, as applicable and/or their respective designee(s), which may include the Distribution Agent, shall issue and/or distribute, as applicable, Plan Securities (excluding, for the avoidance of doubt, New Parent Interests issuable on account of the New Parent Warrants) to the Holders of Allowed April 2026 Notes Claims, Allowed July 2026 Notes Claims, and Claims on account of the Premiums and Fees pursuant to the Plan and the Restructuring Steps Exhibit (including the XBP Transaction and the BTC Transaction).

The Plan further provides each distribution, issuance, and conversion referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan and the XBP Transaction Documents, applicable to such distribution, issuance, or conversion and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

### a.   Listing / Transfer of Plan Securities (IV.K.1)

On the Effective Date, New Parent shall issue the Plan Securities pursuant to the Plan and the New Organizational Documents.  New Parent intends that the Exchanged New Parent Interests will be listed on the national stock exchange on which the New Parent Interests are then listed, and will use its commercially reasonable efforts to effectuate the same.  Distributions of the Plan Securities (other than the New Parent Warrants, which shall be delivered in certificated form or book-entry form on the books and records of the applicable issuer or its transfer agent) shall be delivered via  book-entry transfer by the Distribution Agent through the facilities of DTC.  Upon the Effective Date, after giving effect to the Restructuring Transactions, the New Parent Interests shall be that number of shares or membership interests as may be designated in the New Organizational Documents.

On and after the Effective Date, transfers of Plan Securities shall be made in accordance with applicable United States law, United States securities laws (as applicable), and the New Organizational Documents.

### 5.   Exemption from Registration Requirements

Article IV.L ("***Exemption from Registration Requirements***") of the Plan provides that no registration statement shall be filed under the Securities Act, or pursuant to any state securities laws, with respect to the offer, issuance and distribution of the Plan Securities or the Rollover Exit Notes under the Plan (including in respect of the Premiums and Fees), the XBP Transaction Documents, the Restructuring Steps Exhibit, the Confirmation Order and the New Parent Warrants Agreement.

The offering, sale, issuance, and distribution of the Plan Securities (including in respect of the Premiums and Fees and, if applicable, the issuance of New Parent Interests upon exercise of the New Parent Warrants) in exchange for Claims pursuant to Article II, Article III and other provisions of the Plan, the Confirmation Order, the DIP Backstop Commitment Letter, and the XBP Transaction Documents shall be exempt from,

among other things, the registration requirements of Section 5 of the Securities Act and any other applicable United States, state, or local law requiring registration for the offer or sale of a security pursuant to section 1145(a) of the Bankruptcy Code.  Any and all such Plan Securities (including New Parent Interests issuable upon the exercise of New Parent Warrants) issued pursuant to Section 1145(a) of the Bankruptcy Code may be resold without registration under the Securities Act by the recipients thereof pursuant to the exemption provided by Section 4(a)(1) of the Securities Act, unless the holder (i) is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code, (ii) is an "affiliate" of New Parent, as applicable (as defined in rule 144(a)(1) in the Securities Act), or (iii) has been such an "affiliate" within ninety (90) days of such transfer, in each case subject to (1) compliance with any applicable state or foreign securities laws, if any, and any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Securities; (2) the restrictions, if any, on the transferability of such Securities in the Organizational Documents of the issuer of, or in agreements or instruments applicable to holders of, such Securities; and (3) any other applicable regulatory approval.

The offering, sale, issuance, and distribution of the Rollover Exit Notes is being made in reliance upon Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder and on equivalent state law registration exemptions or, solely to the extent such exemptions are not available, other available exemptions from registration under the Securities Act.  Any recipients of the Plan Securities that are Affiliates of New Parent, and any Entity receiving Rollover Exit Notes under the Plan or acquiring New Parent Interests or Rollover Exit Notes on account of the ETI Funding Obligations or the XBP Alternative Funding, will receive restricted Plan Securities or Rollover Exit Notes, as applicable, that may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144A, Regulation S, and/or Rule 144 of the Securities Act, subject to, in each case, the transfer provisions, if any, and other applicable provisions set forth in the Organizational Documents of the applicable issuers.

The Reorganized Debtors and New Parent need not provide any further evidence other than the Plan and the Confirmation Order with respect to the treatment of the Plan Securities or Rollover Exit Notes under applicable securities laws.

Notwithstanding anything to the contrary in the Plan, no Person or Entity (including, for the avoidance of doubt, DTC) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the Plan Securities and Rollover Exit Notes are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.  All such Persons and Entities including DTC shall be required to accept and conclusively rely upon the Plan or the Confirmation Order in lieu of a legal opinion regarding whether the Plan Securities and Rollover Exit Notes are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.  Notwithstanding any policies, practices, or procedures of DTC, DTC and any participants and intermediaries shall fully cooperate and take all actions to facilitate any and all transactions necessary or appropriate for implementation of the Plan or other contemplated thereby, including any and all distributions pursuant to the Plan.

## B.    Corporate Governance and Management of the Reorganized Debtors

### 1.    Debtors' Organizational Matters

Article IV.E ("**_Corporate Existence_**") of the Plan provides that, except as otherwise provided in the Plan, the Plan Support Agreement, the Restructuring Steps Exhibit, or the XBP Transaction Documents, each Debtor, as a Reorganized Debtor, shall continue to exist after the Effective Date as a separate corporate

Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each Debtor is incorporated or formed and pursuant to the respective memorandum and articles of association, certificate of incorporation and bylaws (or other formation documents) in effect before the Effective Date, except to the extent such memorandum and articles of association, certificate of incorporation and bylaws (or other formation documents) are amended by the Plan, the BTC Transaction, the XBP Transaction Documents, the Debtors, or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law), without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable law.

On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may, without the need for approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, take such action as permitted by applicable law, and such Reorganized Debtor's Organizational Documents, as such Reorganized Debtor may determine is reasonable and appropriate (including in connection with the BTC Transaction or the XBP Transaction), including, causing: (a) a Reorganized Debtor to be merged into another Reorganized Debtor or an Affiliate of a Reorganized Debtor; (b) a Reorganized Debtor to be dissolved; (c) the conversion of a Reorganized Debtor from one entity type to another entity type; (d) the legal name of a Reorganized Debtor to be changed; (e) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter; or (f) the reincorporation of a Reorganized Debtor under the law of jurisdictions other than the law under which the applicable Debtor currently is incorporated.

Article V.I ("**_Indemnification Provisions and Reimbursement Obligations_**") of the Plan provides that, on and as of the Effective Date, and except as prohibited by applicable law, the Indemnification Provisions shall be deemed rejected as of the Effective Date.

The Plan also provides that, the New Organizational Documents shall provide to the fullest extent provided by law for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to the Debtors' and the Reorganized Debtors' post-Effective Date directors, officers, equity holders, managers, members, employees, accountants, investment bankers, attorneys, other professionals, agents of the Debtors, and such directors', officers', equity holders', managers', members', and employees' respective Affiliates (each of the foregoing solely in their capacity as such) at least to the same extent as the Indemnification Provisions, against any Claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted.

The Plan further provides that prior to the Effective Date, the Debtors shall fund and purchase "tail coverage" for the Debtors' former and pre-Effective Date directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals, solely in their capacities as such for the Debtors.

Article IV.M of the Plan ("**_New Organizational Documents_**") of the Plan provides that, subject to Article IV.E of the Plan, the Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and provisions of the Plan, the Plan Support Agreement, and the Restructuring Steps Exhibit, including the Restructuring Transactions and the XBP Transaction Documents.  Without limiting the generality of the foregoing, as of the Effective Date, each of the Reorganized Debtors shall be governed by the New Organizational Documents applicable to it.  On the Effective Date, the Organizational Documents of each of the Reorganized Debtors will be deemed

to be modified to prohibit the issuance of non-voting equity Securities, solely to the extent required under section 1123(a)(6) of the Bankruptcy Code.  On or immediately before the Effective Date, each Reorganized Debtor shall file its applicable New Organizational Documents, if any, with the applicable Secretary of State and/or other applicable authorities in its jurisdiction of incorporation or formation in accordance with applicable laws of its jurisdiction of incorporation or formation, to the extent required for such New Organizational Documents to become effective.

Article IV.S ("*Corporate Action*") of the Plan provides that each of the Debtors, New Parent, and the other Reorganized Debtors may take any and all actions to execute, deliver, File or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the provisions of the Plan, the XBP Transaction Documents, and the transactions set forth in the Restructuring Steps Exhibit, and without further notice to or order of the Bankruptcy Court, any act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of New Parent, the Debtors, or the other Reorganized Debtors or by any other Person (except for those expressly required pursuant hereto or by the Definitive Documents).

Upon the Effective Date, all actions contemplated by the Plan, the XBP Transaction Documents, and the Restructuring Steps Exhibit shall be deemed authorized, approved, and, to the extent taken before the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, or officers of New Parent, the Debtors, the other Reorganized Debtors, or any other Entity (except for those expressly required pursuant to the Plan or the Definitive Documents), including: (1) assumption and rejection (as applicable) of Executory Contracts and Unexpired Leases; (2) selection of the directors, managers, and officers for each of the Reorganized Debtors; (3) the execution of the New Organizational Documents and the Exit Facilities Documents; (4) the issuance and delivery of the Plan Securities; (5) the incurrence of the Exit Facilities; (6) the Exit Securitization Programs; (7) the XBP Transaction; (8) the BTC Transaction; (9) implementation of the Restructuring Transactions; (10) entry into and performance of the Registration Rights Agreement; (11) appointment of the Claims Ombudsman; and (12) all other acts or actions contemplated, or reasonably necessary or appropriate to promptly consummate the transactions contemplated by the Plan and the XBP Transaction Documents (whether occurring before, on, or after the Effective Date).  All matters provided for in the Plan and the XBP Transaction Documents involving the company structure of the Debtors, and any company action required by the Debtors in connection therewith, shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, authorized persons, or officers of the Debtors, the Reorganized Debtors, or otherwise.

Before, on, and after the Effective Date, the appropriate officers, directors, managers, or authorized persons of the Debtors, the Reorganized Debtors, or any direct or indirect subsidiaries of the Reorganized Debtors (including any president, vice-president, chief executive officer, treasurer, general counsel, secretary, or chief financial officer thereof) shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, memoranda and articles of association, certificates of incorporation, certificates of formation, bylaws, operating agreements, other organization documents, and instruments contemplated by the Plan and the XBP Transaction Documents (or necessary or desirable to effect the transactions contemplated by the Plan and the XBP Transaction Documents) in the name of and on behalf of the applicable Debtors or applicable Reorganized Debtors, including the (1) New Organizational Documents, (2) Exit Facilities Documents, (3) Exit Securitization Programs Documents, (4) XBP Transaction Documents, (5) the New Parent Warrants Agreement, and (6) all other agreements, documents, securities, and instruments relating to or contemplated by the foregoing.  Before or on the Effective Date, each of the Debtors and Reorganized Debtors is authorized, with the consent of the Required Consenting Creditors and the Consenting ETI Parties, to change its name or corporate form and to take such other action as required to effectuate a change of name or corporate form in the jurisdiction of incorporation of the applicable Debtor

or Reorganized Debtor.  To the extent the Debtors change their names or corporate form before the closing of the Chapter 11 Cases, the Debtors shall change the case captions accordingly.

The authorizations, approvals and directives contemplated by <u>Article IV</u> of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### 2.  New Board

Article IV.Q ("***New Board***") of the Plan provides that, as of the Effective Date, all directors, managers, and other members of existing boards or governance bodies of the Debtors, as applicable, shall cease to hold office or have any authority from and after such time to the extent not previously included in the roster of the New Board.

The New Board shall consist of seven (7) directors, consisting of (a) New Parent's Chief Executive Officer, (b) two (2) members selected by the Consenting ETI Parties, and (c) four (4) members selected by the Consenting Creditors (other than the Consenting ETI Parties and Holders of July 2026 Notes); provided, that if the ETI Penalty occurs, the New Board shall instead consist of (x) New Parent's Chief Executive Officer, (y) one (1) member selected by the Consenting ETI Parties, and (z) five (5) members selected by the Consenting Creditors (other than the Consenting ETI Parties and Holders of July 2026 Notes Claims). The membership of the New Board must comply with the independence requirements for listing on the Nasdaq ISE Exchange.

The New Board's maintenance of office and/or replacement shall be in accordance with the New Organizational Documents of New Parent.

### 3.  Directors and Officers Insurance Policies

Article V.G ("***Directors and Officers Insurance Policies***") of the Plan provides that on the Effective Date the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Insurance Policies (including any "tail coverage" and all agreements, documents, or instruments related thereto) in effect before the Effective Date pursuant to sections 105 and 365(a) of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court.  Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Insurance Policies, and each such indemnity obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.  The Debtors and, after the Effective Date, the Reorganized Debtors shall retain the ability to supplement such D&O Insurance Policies as the Debtors or Reorganized Debtors, as applicable, may deem necessary.  For the avoidance of doubt, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Insurance Policies.

In addition, on or after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Insurance Policies (including any "tail policy" and all agreements, documents, or instruments related thereto) in effect on or before the Effective Date, with respect to conduct occurring prior thereto, and all current and former directors, officers, and managers of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policies for the full term of such policies regardless of whether such current and former directors, officers, and managers remain in such positions after the Effective Date, all in accordance with and subject in all respects to the terms and conditions of the D&O Insurance Policies, which shall not be altered.

# VII.
## CONFIRMATION OF THE PLAN

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation are that a plan is (A) accepted by all impaired classes of claims and interests entitled to vote or, if rejected or deemed rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class; (B) in the "best interests" of the holders of claims and interests impaired under the plan; and (C) feasible.

### A.      Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties. Pursuant to the Solicitation Procedures Order, the Confirmation Hearing has been set for [June 18], 2025 at [ ● ]. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued confirmation hearing, or pursuant to a notice filed on the docket of the Chapter 11 Cases.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Bankruptcy Local Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtors' Estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, together with proof of service thereof, and served upon all of the below parties.

| Debtors | Counsel to the Debtors |
|---|---|
| DocuData Solutions, L.C.<br>2701 E. Grauwyler Road,<br>Irving, TX 75061<br>Attn:  Suresh Yannamani, Matt Brown<br>Email:  suresh.yannamani@exelatech.com<br>          matt.brown@exelatech.com | Hunton Andrews Kurth LLP<br>600 Travis Street, Suite 4200<br>Attn: Timothy A. ("Tad") Davidson II; Ashley L. Harper; Philip M. Guffy<br>taddavidson@hunton.com<br>ashleyharper@hunton.com<br>pguffy@hunton.com<br><br>and<br><br>Latham & Watkins LLP<br>1271 Avenue of the Americas<br>New York, NY 10020<br>Attn: Ray C. Schrock, Alexander W. Welch, Hugh Murtagh, Adam Ravin, Jonathan Weichselbaum<br>ray.schrock@lw.com<br>alex.welch@lw.com<br>hugh.murtagh@lw.com<br>adam.ravin@lw.com<br>jon.weichselbaum@lw.com |

| Proposed Co-Counsel to the Committee | Counsel to the Consenting Creditor Ad Hoc Group |
|---|---|
| Brown Rudnick LLP<br>Seven Times Square, 47th Floor<br>New York, NY 10036,<br>Attn: Robert J. Stark, Bennett S. Silverberg<br>Email: rstark@brownrudnick.com<br>bsilverberg@brownrudnick.com<br><br>McDermott Will & Emery LLP<br>2501 North Harwood Street, Suite 1900<br>Dallas, TX 75201-1664<br>Attn : Charles R. Gibbs, Marcus Helt<br>Email : crgibbs@mwe.com<br>mhelt@mwe.com | Ropes & Gray LLP<br>1211 Avenue of the Americas<br>New York, NY US 10036-8704<br>Attn: Matthew Roose, Sam Badawi<br>matthew.roose@ropesgray.com<br>sam.Badawi@ropesgray.com<br><br>and<br><br>Ropes & Gray LLP<br>191 N. Wacker Drive<br>Chicago, IL 60606<br>Attn : Eric P. Schriesheim<br>Email : eric.schriesheim@ropesgray.com |
| **Counsel to the Sub-Group DIP Lenders** | **Counsel to the Consenting ETI Entities** |
| Williams Barber Morel Ltd.<br>233 Wacker Drive, Suite 6800<br>Chicago, IL, 60606<br>Attn: Daniel R. Brown<br>Email: drb@williamsbarbermorel.com<br><br>Jenner & Block LLP<br>353 N. Clark Street<br>Chicago, IL 60654<br>Attn: Catherine Steege<br>Email: csteege@jenner.com<br><br>Kane Russell Coleman Logan PC,<br>401 Congress Avenue, Suite 2100<br>Austin, Texas 78701<br>Attn: Mark Taylor<br>Email: mtaylor@krcl.com | Cleary Gottlieb Steen & Hamilton LLP<br>One Liberty Plaza<br>New York, NY 10006<br>Attn: Sean A. O'Neal, Luke A. Barefoot, David Z. Schwartz, Brad Lenox<br>Email:  soneal@cgsh.com<br>lbarefoot@cgsh.com<br>dschwartz@cgsh.com<br>blenox@cgsh.com |
| **United States Trustee** | |
| Office of the United States Trustee for the Southern District of Texas<br>515 Rusk Street, Suite 3516<br>Houston, TX 77002<br>Attn: Jana Whitworth, Andrew Jimenez<br>Email:  jana.whitworth@usdoj.gov<br>Andrew.jimenez@usdoj.gov | |

B.    **Confirmation**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied with respect to the Plan.

## 1. __Confirmation Requirements__

Confirmation of a chapter 11 plan under section 1129(a) of the Bankruptcy Code requires, among other things, that:

- the plan complies with the applicable provisions of the Bankruptcy Code;

- the proponent of the plan has complied with the applicable provisions of the Bankruptcy Code;

- the plan has been proposed in good faith and not by any means forbidden by law;

- any plan payment made or to be made by the proponent under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the bankruptcy court as reasonable;

- the proponent has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan.  The appointment to, or continuance in, such office by such individual must be consistent with the interests of creditors and equity security holders and with public policy and the proponent must have disclosed the identity of any insider that the reorganized debtor will employ or retain, and the nature of any compensation for such insider;

- with respect to each impaired class of claims or interests, either each holder of a claim or interest of such class has accepted the plan, or will receive or retain under the plan, on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code;

- subject to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code, each class of claims or interests has either accepted the plan or is not impaired under the plan;

- except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expenses and priority claims will be paid in full on the effective date (except that holders of priority tax claims may receive deferred Cash payments of a value, as of the effective date of the plan, equal to the allowed amounts of such claims and that holders of priority tax claims may receive on account of such claims deferred Cash payments, over a period not exceeding five (5) years after the date of assessment of such claims, of a value, as of the effective date, equal to the allowed amount of such claims);

- if a class of claims is impaired, at least one (1) impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class; and

- confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

The Debtors believe that:

- the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code;

- the Debtors, as the proponents of the Plan, have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and

- the Plan has been proposed in good faith.

Set forth below is a summary of certain relevant statutory confirmation requirements.

### a. Acceptance

Claims in Classes 3, 4, 5, and 6 are Impaired under the Plan, and Holders thereof are entitled to vote to accept or reject the Plan; Claims in Classes 1 and 2 are Unimpaired, and therefore Holders thereof are conclusively presumed to accept the Plan; Claims and Interests in Classes 7, 10, and 11, respectively, are Impaired and will receive no distribution under the Plan, and therefore Holders thereof are conclusively deemed to reject the Plan; and Claims in Classes 8 and 9 will either be Unimpaired or Impaired, and Holders thereof will receive no distributions and will be conclusively presumed to accept or deemed to reject the Plan, as applicable.

With respect to any Class of Claims or Interests that rejects (or is deemed to reject) the Plan, the Debtors will be required to demonstrate that the Plan satisfies the requirements for nonconsensual confirmation under section 1129(b) of the Bankruptcy Code (which are discussed immediately below).  While the Debtors believe the Plan satisfies such requirements with respect to all Classes of Claims and Interests that may reject the Plan, there can be no assurance that the Bankruptcy Court will determine that the Plan meets such requirements.  The Debtors also will seek confirmation of the Plan over the objection of any individual holders of Claims who are members of an accepting Class.

### b. Unfair Discrimination and Fair and Equitable Test

To obtain nonconsensual confirmation of a chapter 11 plan, it must be demonstrated to the Bankruptcy Court that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired, non-accepting class.  The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable" for, respectively, secured creditors, unsecured creditors and holders of equity interests.  In general, section 1129(b) of the Bankruptcy Code permits confirmation notwithstanding non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before a junior class may receive anything under the plan.

A chapter 11 plan does not "discriminate unfairly" with respect to a non-accepting class if the value of the Cash and/or securities to be distributed to the non-accepting class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are similar to those of the non-accepting class.  The Debtors believe the Plan will not discriminate unfairly against any non-accepting Class.

### c. Feasibility; Financial Projections

The Bankruptcy Code permits a plan to be confirmed only if confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the debtor or any successor to the debtor, unless such liquidation or reorganization is proposed in the plan.  For purposes of determining whether the

Plan meets this requirement, the Debtors have analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their business. Under the terms of the Plan, the Allowed Claims potentially being paid in whole or in part in Cash are the Other Secured Claims, Convenience Claims, and General Unsecured Claims.

In connection with developing the Plan, the Debtors have prepared detailed financial projections (the "***Financial Projections***") set forth in **Exhibit C** hereto, which demonstrate, among other things, the financial feasibility of the Plan. The Financial Projections indicate, on a *pro forma* basis, that the projected level of Cash flow is sufficient to satisfy all of the Reorganized Debtors' future debt and debt-related interest costs, capital expenditure, and other obligations during this period. Accordingly, the Debtors believe that confirmation of the Plan is not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors.

**THE FINANCIAL PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, WERE REASONABLE WHEN PREPARED IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED. THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS. THE PROJECTIONS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED BELOW UNDER SECTION IX. IN LIGHT OF THESE RISKS AND UNCERTAINTIES, ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FINANCIAL PROJECTIONS**.

The Debtors prepared the Financial Projections based upon certain assumptions that they believe to be reasonable under the circumstances. The Financial Projections have not been examined or compiled by independent accountants. Moreover, such information has not been prepared in accordance with accounting principles generally accepted in the United States ("***GAAP***"). The Debtors make no representation as to the accuracy of the Financial Projections or their ability to achieve the projected results. Many of the assumptions on which the Financial Projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the actual financial results. Therefore, the actual results achieved may vary from the projected results, and the variations may be material. All Holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with their evaluation of the Plan.

## 2. **Best Interests Test**

The "best interests" test requires that the Bankruptcy Court find either:

- that all members of each impaired class have accepted the plan; or

- that each holder of an allowed claim or interest in each impaired class of claims or interests will receive or retain under the plan on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

To determine what the holders of Claims and Interests in each impaired Class would receive if the Debtors were liquidated under chapter 7 on the Effective Date, the Bankruptcy Court must determine the dollar amount that would have been generated from the liquidation of the Debtors' assets and properties in a liquidation under chapter 7 of the Bankruptcy Code.

To determine if the Plan is in the best interests of each impaired Class, the present value of the distributions from the proceeds of a liquidation of the Debtors' assets and properties, after subtracting the amounts due to secured and priority creditors, must be compared with the value of the property offered to each such Class of Claims under the Plan.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors, the Debtors have determined that confirmation of the Plan will provide each Holder of an Allowed Claim with a recovery that is not less than such Holder would have received pursuant to the liquidation of the Debtors under chapter 7.

Moreover, the Debtors believe that the value of distributions to each Class of Allowed Claims in a chapter 7 case would be materially less than the value of distributions under the Plan, and any distribution in a chapter 7 case would not occur as expeditiously as contemplated by the Plan.

The Debtors, with the assistance of their financial advisor, AlixPartners, LLP have prepared a liquidation analysis that summarizes the Debtors' best estimate of recoveries by Holders of Claims and Interests in the event of liquidation commencing on or around June 30, 2025 (the "***Liquidation Analysis***"), which is set forth in **Exhibit D** hereto.  The Liquidation Analysis provides:  (a) a summary of the liquidation values of the Debtors' assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtors' estates; and (b) the expected recoveries of Holders of Claims and Interests under the Plan.

The Liquidation Analysis contains a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management.  The Liquidation Analysis also is based on assumptions with regard to liquidation decisions that are subject to change and significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management.  Accordingly, the values reflected might not be realized.  All Holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Liquidation Analysis is based in connection with their evaluation of the Plan.

## C.     Classification of Claims and Interests

The Debtors believe that the Plan complies with the classification requirements of the Bankruptcy Code, which require that a chapter 11 plan place each claim and interest into a class with other claims or interests that are "substantially similar."

## D.     Consummation

The Plan will be consummated on the Effective Date.  The Effective Date will occur on the first Business Day on which the conditions precedent to the effectiveness of the Plan (*see* Section V.G hereof and Article VIII of the Plan) have been satisfied or waived pursuant to the Plan.  The Plan is to be implemented pursuant to its terms, consistent with the provisions of the Bankruptcy Code.

E.      **Exemption from Certain Taxes and Fees**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan (including the Restructuring Transactions) pursuant to (1) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtors or the Reorganized Debtors, (2) the creation, modification, consolidation, termination, refinancing, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (3) the making, assignment, or recording of any lease or sublease, (4) the grant of collateral security for any or all of the Exit Facilities or other indebtedness, or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Restructuring Transactions), will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials, agents, or filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, must comply with the requirements of section 1146(a) of the Bankruptcy Code, will forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, fee or governmental assessment.

F.      **Modification of Plan**

Subject to the terms of the Plan Support Agreement and the limitations contained in the Plan, the Debtors or Reorganized Debtors reserve the right to, following consultation with the Committee, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Plan Support Agreement:  (1) amend or modify the Plan before the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; (2) amend or modify the Plan after the entry of the Confirmation Order in accordance with section 1127(b) of the Bankruptcy Code and the Plan Support Agreement upon order of the Bankruptcy Court; and (3) remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan upon order of the Bankruptcy Court.

G.      **Effect of Confirmation on Modifications**

Entry of the Confirmation Order will mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

H.      **Revocation of Plan; Reservation of Rights If Effective Date Does Not Occur**

Subject to the conditions to the Effective Date, the Debtors reserve the right, subject to the terms of the Plan Support Agreement, to revoke or withdraw the Plan before the entry of the Confirmation Order and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if entry of the Confirmation Order or the Effective Date does not occur, or if the Plan Support Agreement terminates in accordance with its terms before the Effective Date, then (1) the Plan will be null and void in all respects, (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be deemed null and void, and (3) nothing contained in the Plan will:  (a) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtor or any other Entity; (b) prejudice in any manner the

rights of the Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity; *provided*, that any Restructuring Fees and Expenses that have been paid as of the date of revocation or withdrawal of the Plan will remain paid and will not be subject to disgorgement or repayment without further order of the Bankruptcy Court.

## I.      Post-Confirmation Jurisdiction of the Bankruptcy Court

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, except to the extent set forth in the Plan or under applicable federal law, the Bankruptcy Court shall retain on and after the Effective Date jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

    i.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

    ii.     decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Retained Professionals authorized pursuant to the Bankruptcy Code or the Plan;

    iii.    resolve any matters related to: (1) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party with respect to which a Debtor may be liable and to hear, determine, and, if necessary, adjudicate, any Disputed Cure Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (2) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (3) the Reorganized Debtors seeking to amend, modify, or supplement, after the Effective Date, any Executory Contracts and Unexpired Leases to be assumed or rejected; and (4) any dispute regarding whether a contract or lease is or was executory or expired;

    iv.    ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and the Confirmation Order;

    v.     adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

    vi.    adjudicate, decide, or resolve any and all matters related to Causes of Action;

    vii.   adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

    viii.  resolve any cases, controversies, suits, or disputes that may arise in connection with any Claims, including Claim objections, allowance, disallowance, estimation, and distribution;

    ix.    enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan, the Confirmation Order, and all contracts, instruments, releases, and other agreements or documents created in connection with the

Plan, the Confirmation Order, or this Disclosure Statement, including the Plan Support Agreement;

x. enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

xi. resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan, the Confirmation Order, or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or the Confirmation Order, or any Entity's rights arising from or obligations incurred in connection with the Plan or the Confirmation Order;

xii. issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan or the Confirmation Order;

xiii. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

xiv. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid;

xv. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

xvi. determine any other matters that may arise in connection with or relate to the Plan, this Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan, the Confirmation Order, or this Disclosure Statement;

xvii. enter an order or final decree concluding or closing the Chapter 11 Cases;

xviii. adjudicate any and all disputes arising from or relating to distributions to Holders of Claims and Interests under the Plan;

xix. consider any modification of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

xx. determine requests for payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

xxi. hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

xxii. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

xxiii.    hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

xxiv.    hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the releases, injunctions, and exculpations provided under Article IX of the Plan;

xxv.    resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, this Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

xxvi.    enforce all orders previously entered by the Bankruptcy Court; and

xxvii.    hear any other matter not inconsistent with the Bankruptcy Code, the Plan, or the Confirmation Order.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in Article X of the Plan, the provisions of Article X of the Plan shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Notwithstanding anything to the contrary in the Plan: (1) the Bankruptcy Court's jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose before the Effective Date, including any Claims based in whole or in part on any conduct of the Debtors occurring on or before the Effective Date, shall be non-exclusive; (2) any dispute arising under or in connection with the Exit Facilities Documents and the Exit Securitization Programs Documents, and shall be dealt with in accordance with the provisions of the applicable document; and (3) as of the Effective Date, the Exit Facilities Documents and the Exit Securitization Programs Documents shall be governed by the jurisdictional provisions therein.

## VIII.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors have determined that the Plan is the best alternative available for their successful emergence from chapter 11. If the Plan is not confirmed and consummated, the alternatives to the Plan are: (A) continuation of the Chapter 11 Cases, which could lead to the filing of an alternative plan of reorganization and/or a sale of substantially all of the Debtors' assets; (B) a liquidation under chapter 7 of the Bankruptcy Code; or (C) dismissal of the Chapter 11 Cases, leaving Holders of Claims and Interests to pursue available non-bankruptcy remedies. These alternatives to the Plan are not likely to benefit Holders of Claims and Interests.

### A.    Continuation of Chapter 11 Cases

If the Plan is not confirmed, the Debtors (or, if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan or to sell all or substantially all of the Debtors' assets outside of a plan. Such a scenario might entail a reorganization and continuation of the Debtors' business or an orderly liquidation of their assets; in either case, the Debtors

expect that recoveries to their stakeholders would be diminished relative to the recoveries available under the Plan.

**B.        Liquidation under Chapter 7**

If no plan can be confirmed, then the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code.  The effect a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests is set forth in the Liquidation Analysis set forth in **Exhibit D** hereto.

As demonstrated in the Liquidation Analysis, the Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of, among other things, the delay resulting from the conversion of the Chapter 11 Cases to cases under chapter 7, the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals, and the loss in value attributable to an expeditious liquidation of the Debtors' assets as required by chapter 7.

**C.        Dismissal of Chapter 11 Cases.**

If the Chapter 11 Cases are dismissed, Holders of Claims or Interests would be free to pursue non-bankruptcy remedies in their attempts to satisfy Claims against or Interests in the Debtors.  However, in that event, each Holder of Claims or Interests would be faced with the costs and difficulties of attempting to recover on an individual basis.  Accordingly, the Debtors believe that the Plan will enable all creditors to realize the greatest possible recovery on their respective Claims with the least delay.

IX.
**RISK FACTORS TO CONSIDER BEFORE VOTING**

**BEFORE VOTING TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS ENTITLED TO VOTE SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW, IN ADDITION TO THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, TOGETHER WITH ANY ATTACHMENTS, EXHIBITS, OR DOCUMENTS INCORPORATED BY REFERENCE HERETO.  THE FACTORS BELOW SHOULD NOT BE REGARDED AS THE ONLY RISKS ASSOCIATED WITH THE PLAN OR ITS IMPLEMENTATION.**

**A.        Certain Bankruptcy Law Considerations**

      **1.        Risk of Non-Confirmation of Plan**

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modification to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes.  Moreover, the Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan, and even if the Voting Classes voted in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejects (or is deemed to reject) the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan.  If the Plan is not confirmed, it is unclear what distributions Holders of Claims and Interests ultimately would receive with respect to their Claims and Interests in a subsequent plan of reorganization or otherwise.

## 2.  **Non-Consensual Confirmation**

If any impaired class of claims or interests does not accept or is deemed not to accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  Should any Class vote to reject the Plan, then these requirements must be satisfied with respect to such rejecting Classes.  The Debtors believe that the Plan satisfies these requirements, but there can be no assurance that the Bankruptcy Court will reach the same conclusion and confirm the Plan on a non-consensual basis.

## 3.  **Financial Projections**

The Debtors have prepared financial projections on a consolidated basis with respect to the Reorganized Debtors based on certain assumptions as set forth in **Exhibit C** hereto.  The projections have not been compiled, audited, or examined by independent accountants, and neither the Debtors nor their advisors make any representations or warranties regarding the accuracy of the projections or the ability to achieve forecasted results.

Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond the control of the Debtors or Reorganized Debtors, including the timing, confirmation, and consummation of the Plan, consumer demands for the Reorganized Debtors' products, macroeconomic, political and other events that may affect the Reorganized Debtors' ability to maintain adequate amounts and array of inventory, inflation, and other unanticipated market and economic conditions.  Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results.  Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, and the assumptions underlying the projections may be inaccurate in material respects.

## 4.  **Risks Related to Parties in Interest Objecting to the Debtors' Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other clams or interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that a party in interest will not object or that the Bankruptcy Court will approve the classifications.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek (a) to modify the Plan to provide for whatever classification might be required for Confirmation and (b) to use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member.  Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan.  There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification.  Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to

this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member.

5.    **Risks Related to Possible Objections to the Plan**

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan.  Although the Debtors believe that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

6.    **Releases, Injunctions, and Exculpation Provisions May Not Be Approved**

Article IX of the Plan provides for certain releases, injunctions, and exculpations for claims and Causes of Action that may otherwise be asserted against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan may be subject to objection by parties in interest and may not be approved.  If the releases and exculpations are not approved, certain parties may not be considered Releasing Parties, Released Parties, or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

7.    **Risk of Non-Occurrence of Effective Date**

Although the Debtors believe that the Effective Date will occur on the timeline envisaged by the Plan Support Agreement, there can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article VIII of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all Holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

8.    **Risks of Termination of the Plan Support Agreement**

The Plan Support Agreement contains certain provisions that give the parties thereto the ability to terminate such agreement upon the occurrence or non-occurrence of certain events, including failure to achieve certain milestones in these Chapter 11 Cases.  Termination of the Plan Support Agreement could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the Debtors' relationships with vendors, suppliers, employees, and customers.

9.    **Funding Obligations of Exela or Other Parties May Not be Obtained**

The Debtors' ability to incur indebtedness under the Exit Facilities and/or Exela's failure to fund the Exela Funding Obligations are subject to several contingencies, such financing arrangements may not become available to the Reorganized Debtors, and the Reorganized Debtors may be unable to remain in compliance with the terms of such financing agreements.

The Debtors may not be able to raise the Exit Facilities or secure the ETI Funding Obligations on the terms set forth in the Plan Support Agreement or at all. There is no assurance that the Debtors will be able to raise the full amount of the Exit Facilities. In addition, the Debtors' ability to incur the Exit Facilities or receive the funding pursuant to the ETI Funding Obligations will be subject to the satisfaction of certain conditions precedent. The definitive documentation for the Exit Facilities, if any, will include various conditions to closing, and the Debtors cannot give assurances that they will be able to meet or otherwise obtain waivers to such conditions. If the Debtors cannot satisfy such conditions precedent, if such conditions precedent are

not otherwise waived, or if the Debtors are unable to raise the Exit Facilities, the Plan Effective Date could be significantly delayed or may not occur, or the Debtors' ability to consummate the Plan could otherwise be materially and adversely affected.

Furthermore, the terms of the definitive documentation for the Exit Facilities, if any, remain subject to ongoing negotiation, and certain material terms thereof have yet to be agreed. If the Debtors cannot obtain sufficiently favorable terms for the Exit Facilities, the Debtors' ability to consummate the Plan could be materially and adversely affected.

Lastly, while Exela has committed to funding the ETI Funding Obligations, circumstances beyond the control of the Debtors could result in such funding not being made.  If Exela does not honor the ETI Funding Obligations, the Debtors' ability to consummate the Plan could be materially and adversely affected.

### 10. **XBP May Not Agree to the XBP Transaction or Splits**

As of the date hereof, negotiations are ongoing regarding the final terms of the XBP Transaction and such terms remain subject to final agreement.  As of the date hereof, there is no firm commitment with respect to the final terms of such transaction.  The ultimate decision regarding such transaction may have an impact on recoveries for creditors.  Further, in the event XBP does not consummate the transactions to which it is a party, the Debtors' ability to consummate the Plan could be materially and adversely affected and the Plan Support Agreement may be terminated.

### 11. **Conversion into Chapter 7 Cases**

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of Holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.

### 12. **Risks of Non-Dischargeability of Claims**

Certain creditors may have taken or may take the position their claims are non-dischargeable.  Such creditors may make such allegations at any time, notwithstanding the existence of deadlines established by the Bankruptcy Rules or applicable Bankruptcy Court order, entry of the Confirmation Order, or the occurrence of the Effective Date.  Such assertions of non-dischargeability could result in denial of Confirmation, changes to the Plan, or, if asserted after occurrence of the Effective Date, the Reorganized Debtors being required to honor such claims.

### 13. **Amendment of Plan Prior to Confirmation by Debtors**

The Debtors, subject to the terms and conditions of the Plan and the terms of the Plan Support Agreement, reserve the right to modify the terms and conditions of the Plan or waive any conditions thereto if and to the extent necessary or desirable for Confirmation.  The potential impact of any such amendment or waiver on Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes.

### 14. **Pending and Future Litigation**

The Debtors are involved in various litigation, claims, and other proceedings, including proceedings relating to the conduct of our business and employee relations, which so long as they remain unresolved represent a legal issue and potential Claims for monetary damages.  Additionally, there is a risk of future

litigation.  Pending litigation or future litigation could result in a material judgment against the Debtors or the Reorganized Debtors.  Such litigation, and any judgment in connection therewith, could have a material negative effect on the Debtors or the Reorganized Debtors.

### 15. DCD Claims

Prior to the Petition Date, the Debtors' DMR service allowed for an entirely paperless, digital mail service.  As part of the DMR service, the Debtors also provided a check cashing service called Direct Cash Deposit ("**DCD**").  Under the DCD service, customers could electronically cash checks with the funds deposited into one of the Debtors' bank accounts at Bank of Texas and then credited to the customer.

In Q3 2024, the Debtors became aware that certain bad actors were using the DCD service for fraudulent purposes.  Specifically, the bad actors deposited checks issued by the United States Treasury (primarily for tax refunds) made payable to third-party payees.  However, instead of disbursing the funds to the third-party payees, the bad actors kept the funds for themselves.  This resulted in the third-party payees filing claims with the United States for the funds they never received.  The IRS, in turn, reclaimed funds from the Bank of Texas, who then sought to debit Debtor accounts for the same amounts.  As a result, the Debtors' accounts were debited twice for all reclaimed amounts.  As of May 5, 2025, there are no pending reclamation demands of which the Debtors are aware that are not already satisfied or able to be satisfied from previously allocated funds.

Upon discovering the fraud, the Debtors immediately discontinued the DCD service and froze all transactions.  However, a review of the DCD records identified approximately 29 additional suspicious transactions initiated by the same bad actors.  The Debtors estimate that this fraud perpetrated upon them could potentially result in the IRS reclaiming additional funds from the Bank of Texas, who may make claims against the Debtors' estates, up to approximately $9 million.  The Debtors reserve all rights as to the nature, amount, and validity of any such claims.  In addition, the Debtors are working with the FBI to investigate the transactions and the bad actors.  However, there can be no assurance that these investigations will bear fruit.

### B.    Risks Relating to the Capital Structure of the Reorganized Debtors

#### 1.   Variances from Financial Projections

The Financial Projections set forth in **Exhibit C** hereto reflect numerous assumptions, which involve significant levels of judgment and estimation concerning the anticipated future performance of the Reorganized Debtors, as well as assumptions with respect to the prevailing market, economic, political and competitive conditions, which are beyond the control of the Reorganized Debtors, and which may not materialize.  Any significant differences in actual future results versus estimates used to prepare the Financial Projections, such as lower sales, lower pricing, asset impairments, technological changes, litigation, workforce disruptions, negative publicity or competition could result in significant differences from the Financial Projections.  The Debtors believe that the assumptions underlying the Financial Projections are reasonable.  However, unanticipated events and circumstances occurring subsequent to the preparation of the Financial Projections may affect the Debtors' and the Reorganized Debtors' ability to initiate the endeavors, execute on the strategic initiatives and meet the financial benchmarks contemplated by the Plan.  Therefore, the actual results achieved throughout the period covered by the Financial Projections necessarily will vary from the projected results, and these variations may be material and adverse.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements,

including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("**_Reorganizations_**"), in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends. The Financial Projections contained in **Exhibit C** hereto do not currently reflect the impact of fresh start accounting, which may have a material impact on the Financial Projections.

## 2. Leverage

Although the Reorganized Debtors will have less indebtedness than the Debtors, the Reorganized Debtors will still have a significant amount of secured indebtedness. On the Effective Date, after giving effect to the transactions contemplated by the Plan, the Reorganized Debtors will have approximately $367 million in secured funded indebtedness.

The degree to which the Reorganized Debtors will be leveraged could have important consequences, placing the Reorganized Debtors at a competitive disadvantage to other, less leveraged competitors, because, among other things: it could affect the Reorganized Debtors' ability to satisfy their obligations under their indebtedness following the Effective Date; a portion of the Reorganized Debtors' cash flow from operations will be used for debt service under the Plan and therefore will be unavailable to support operations or for working capital, capital expenditures, expansion, acquisitions or general corporate or other purposes; the Reorganized Debtors' ability to refinance their then-existing debt, obtain additional debt financing or equity financing, or pursue mergers, acquisitions and asset sales, on terms acceptable to them or at all, may be limited and their costs of borrowing may be increased; as a result of their significant indebtedness, the Reorganized Debtors may be more vulnerable to economic downturns and their ability to withstand competitive pressures may be limited; and the Reorganized Debtors' operational flexibility in planning for, or reacting to, changes, opportunities and challenges in their businesses, including changes in the market sector in which they compete, changes in their business and strategic opportunities, and adverse developments in their operations, may be severely limited.

## 3. Ability to Service Debt

Although the Reorganized Debtors will have less indebtedness than the Debtors, the Reorganized Debtors will still have significant interest expense and principal repayment obligations. The Reorganized Debtors' ability to make payments on and to refinance their debt will depend on their future financial and operating performance and their ability to generate cash in the future. This, to a certain extent, is subject to general economic, business, financial, competitive, legislative, regulatory and other factors that are beyond the control of the Reorganized Debtors.

Although the Debtors believe the Plan is feasible, there can be no assurance that the Reorganized Debtors will be able to generate sufficient cash flow from operations or that sufficient future borrowings will be available to pay off the Reorganized Debtors' debt obligations. The Reorganized Debtors may need to refinance all or a portion of their debt on or before maturity; however, there can be no assurance that the Reorganized Debtors will be able to refinance any of their debt on commercially reasonable terms or at all.

If the Reorganized Debtors' cash flows and capital resources are insufficient to fund their debt service obligations and other cash requirements, the Reorganized Debtors could face substantial liquidity problems and could be forced to reduce or delay investments and capital expenditures or to sell assets or operations, seek additional capital or restructure or refinance their indebtedness and settlement obligations. The Reorganized Debtors may not be able to effect any such alternative measures, if necessary, on commercially

reasonable terms or at all and, even if successful, such alternative actions may not allow the Reorganized Debtors to meet their scheduled debt service obligations and settlement obligations. The agreements governing the Reorganized Debtors' indebtedness at emergence are expected to (a) have terms and conditions that restrict their ability to dispose of assets and the use of proceeds from any such dispositions and (b) restrict their ability to raise debt capital.

The Reorganized Debtors' inability to generate sufficient cash flows to satisfy their debt obligations, or to refinance their indebtedness on commercially reasonable terms or at all, would materially and adversely affect their financial position and results of operations.

If the Reorganized Debtors cannot make scheduled payments on their debt, an event of default may result. An event of default may allow the creditors to accelerate the related debt as well as any other debt to which a cross-acceleration or cross-default provision applies. If the Reorganized Debtors are unable to repay amounts outstanding under their financing agreements when due, the lenders thereunder could, subject to the terms of the financing agreements, seek to foreclose on the collateral that is pledged to secure the indebtedness outstanding under such facility.

**4.   Obligations Under Exit Facilities Documents**

The Reorganized Debtors' obligations under the Exit Facilities Documents are expected to be secured by liens on substantially all of the assets of the Reorganized Debtors (subject to certain exclusions set forth therein). If the Reorganized Debtors become insolvent or are liquidated, or if there is a default under certain financing agreements, including, but not limited to, the Exit Facilities Documents, and payment on any obligation thereunder is accelerated, the lenders under and holders of the Exit Facilities would be entitled, subject to the applicable intercreditor agreements and other applicable credit documents, to exercise the remedies available to a secured lender under applicable law, including foreclosure on the collateral that is pledged to secure the indebtedness thereunder, and they would have a claim on the assets securing the obligations under the applicable facility that would be superior to any claim of the holders of unsecured debt.

**5.   Restrictive Covenants**

The financing agreements governing the Reorganized Debtors' indebtedness are expected to contain various covenants that may limit the discretion of the Reorganized Debtors' management by restricting the Reorganized Debtors' ability to, among other things, incur additional indebtedness, incur liens, pay dividends or make certain restricted payments, make investments, consummate certain asset sales, enter into certain transactions with affiliates, merge, consolidate and sell or dispose of all or substantially all of their assets. As a result of these covenants, the Reorganized Debtors will be limited in the manner in which they conduct their business and may be unable to engage in favorable business activities or finance future operations or capital needs.

Any failure to comply with the restrictions of the financing agreements may result in an event of default. An event of default may allow the creditors to accelerate the related debt as well as any other debt to which a cross-acceleration or cross-default provision applies. If the Reorganized Debtors are unable to repay amounts outstanding under their financing agreements when due, the lenders thereunder could, subject to the terms of the financing agreements, seek to foreclose on the collateral that is pledged to secure the indebtedness outstanding under such facility.

As a result of these restrictions, the Reorganized Debtors may be limited in how they conduct their business, unable to raise additional debt or equity financing to operate during general economic or business

downturns, unable to respond to changing circumstances or to pursue business strategies and unable to compete effectively, execute their growth strategy or take advantage of new business opportunities.

**6.   Additional Financing**

The Reorganized Debtors may be able to incur substantial additional indebtedness in the future. Although agreements governing the Reorganized Debtors' indebtedness are expected to restrict the incurrence of additional indebtedness, these restrictions are and will be subject to a number of qualifications and exceptions and the additional indebtedness incurred in compliance with these restrictions could be substantial. If new debt is added to the Reorganized Debtors' current debt levels, the related risks that the Debtors now face could intensify.

Moreover, the Reorganized Debtors may need to seek additional financing for general corporate purposes. For example, they may need funds to make acquisitions or for capital expenditures needed to remain competitive in their market sector. The Reorganized Debtors may be unable to obtain any desired additional financing on terms that are favorable or acceptable to them, including as a result of their debt levels or if there is a decline in the demand for their products or in the solvency of their customers, vendors or suppliers or other significantly unfavorable changes in economic conditions occur. Depending on market conditions, adequate funds may not be available to the Reorganized Debtors on acceptable terms or at all, and they may be unable to fund expansion, successfully develop or enhance products, or respond to competitive pressures, any of which could have a material adverse effect on the Reorganized Debtors' competitive position, business, financial condition, results of operations, and cash flows.

**7.   The Reorganized Debtors and Their Affiliates May Incur a Material Amount of U.S. Federal, State and Local Income Taxes as a Result of the Chapter 11 Transactions**

The consummation of the Restructuring Transactions and other transactions undertaken during or in connection with the Chapter 11 Cases (the "***Chapter 11 Transactions***") is expected to give rise to the recognition of a substantial amount of income or gain by the affiliated group of corporations that files a consolidated U.S. federal income tax return with ETI as the common parent ("***ETI Group***"), of which the Debtors are (or were) members or entities disregarded as separate from a member of such group. In addition, the consummation of the Chapter 11 Transactions is expected to result in (or resulted in) the disaffiliation of the ETI Group for U.S. federal income tax purposes, in which certain deferred intercompany items existing as of the date of such transactions generally will be (or were) accelerated into taxable income, gain, deduction or loss. The Debtors have not yet determined to what extent, if any, the ETI Group will be permitted to take into account such deductions or losses to offset the income or gain recognized by the ETI Group. Moreover, the ETI Group does not possess a significant amount of carryforwards of net operating losses and has limited other tax attributes, and the Debtors currently do not expect the ETI Group to generate significant amounts of losses in the current taxable year that could otherwise be used to offset the income or gain recognized by the ETI Group. Accordingly, the U.S. federal, state and local cash tax costs arising in the Chapter 11 Transactions could be material.

Furthermore, the U.S. federal income tax liability arising in connection with the consummation of the Chapter 11 Transactions generally will be a liability of the ETI Group, and each member of the ETI Group (including U.S. subsidiaries of New Parent that are classified as corporations for U.S. federal income tax purposes) will be jointly and severally liable for any such taxes that arose during its period of membership in the ETI Group. No assurances can be given that the Debtors will have sufficient liquidity to satisfy any resulting current or future cash tax costs.

See Article IV., clause N. of the Plan for a discussion of certain arrangements and other matters relating to the funding of the Transaction Tax Liability.

C.     <u>Risks Relating to New Parent's Business Operations</u>

**AFTER CONSUMMATION OF THE RESTRUCTURING TRANSACTIONS, NEW PARENT WILL BE COMPRISED OF, AMONG OTHER THINGS, THE DEBTORS' EXISTING BUSINESSES AND THE EXISTING BUSINESSES OF XBP.  THE FOLLOWING PROVIDES A SUMMARY OF CERTAIN OF THE RISKS ASSOCIATED WITH THE DEBTORS' BUSINESSES AND XBP'S BUSINESSES.  THE RISK FACTORS SET FORTH BELOW DISCUSS RISKS ATTENDANT TO THE BUSINESSES OF NEW PARENT ON THAT BASIS, *I.E.*, AS A COMBINATION OF THE DEBTORS' BUSINESSES AND XBP'S BUSINESSES PRIOR TO THE RESTRUCTURING TRANSACTION PURSUANT TO THE PLAN.  HOWEVER, THIS SECTION IS NOT INTENDED TO BE EXHAUSTIVE.  FOR A FURTHER LIST OF RISK FACTORS CONCERNING THE BUSINESSES OF XBP ON A STANDALONE BASIS, REFER TO XBP'S PREVIOUSLY-FILED ANNUAL REPORT ON FORM 10-K FOR THE FISCAL YEAR ENDED DECEMBER 31, 2024 AND SUBSEQUENT QUARTERLY REPORTS ON FORM 10-Q.  FOR A FURTHER LIST OF RISK FACTORS GENERALLY APPLICABLE TO THE BUSINESSES OF THE DEBTORS AND XBP, REFER TO EXELA'S HISTORICAL ANNUAL REPORTS ON FORM 10-K (LAST FILED APRIL 3, 2024) AND QUARTERLY REPORTS ON FORM 10-Q (LAST FILED NOVEMBER 14, 2024).**

1.     <u>Certain of the New Parent's Contracts May Be Subject to Termination Rights, Audits, and/or Investigations</u>

Many of New Parent' customer contracts may be terminated by the New Parent's customers without cause and without any fee or penalty, with only limited notice.  New Parent may not be able to replace a customer that elects to terminate or fails to renew its contract with them.

In addition, a portion of New Parent's revenues is derived from contracts with the U.S. federal and state governments and their agencies and from contracts with foreign governments and their agencies.  Government entities typically finance projects through appropriated funds.  The public procurement environment is unpredictable and this could adversely affect New Parent's ability to perform work under new and existing contracts, including as a result of New Parent's business being diverted to a small or disadvantaged or minority-owned business pursuant to set-aside programs.

Moreover, government contracts are generally subject to a right to conduct audits and investigations by government agencies.  If the government finds that it was inappropriately charged any costs to a contract, the costs are not reimbursable or, if already reimbursed, the cost must be refunded to the government.  Additionally, New Parent may be subject to various civil and criminal penalties and administrative sanctions, which may include termination of contracts, forfeiture of profits, suspension of payments, fines and suspensions or debarment from doing business with the government.  Further, the negative publicity that could arise from any such penalties, sanctions or findings in such audits or investigations could have an adverse effect on New Parent's reputation in the industry and reduce New Parent's ability to compete for new contracts and could materially adversely affect New Parent's results of operations and financial condition.

2.     <u>New Parent May Not Be Able to Offset Increased Costs with Increased Fees Under Long-Term Contracts</u>

The pricing and other terms of New Parent's customer contracts, particularly New Parent's long-term contract center agreements, are based on estimates and assumptions New Parent makes at the time New Parent enters into those contracts.  These estimates reflect New Parent's best judgments regarding the nature of the engagement and New Parent's expected costs to provide the contracted services and could differ

from actual results.  Not all New Parent's larger long-term contracts allow for escalation of fees as New Parent's cost of operations increase and those that allow for such escalations do not always allow increases at rates comparable to increases that New Parent experiences.  Where New Parent cannot negotiate long-term contract terms that provide for fee adjustments to reflect increases in its cost of service delivery, New Parent's business, financial conditions, and results of operation would be materially impacted.

**3.  New Parent's Business Process Automation Solutions Often Require Long Selling Cycles and Long Implementation Periods**

New Parent often faces long selling cycles to secure new contracts for its business process automation solutions. If New Parent is successful in obtaining an engagement, the selling cycle can be followed by a long implementation period.  Delays in internal approvals, technology implementations, or customer decisions can prolong these cycles.  Even if New Parent succeeds in developing a relationship with a potential customer and begin to discuss the services in detail, the potential customer may choose a competitor or decide to retain the work in-house prior to the time a contract is signed.  Additionally, New Parent may not begin receiving revenue until after the implementation period and New Parent's solution is fully operational, leading to upfront expenses without immediate profits.  These extended cycles can strain finances, especially when hiring new staff before revenue collection.  New Parent's inability to obtain contractual commitments after a selling cycle, maintain contractual commitments after the implementation period or limit expenses prior to the receipt of corresponding revenue may have a material adverse effect on New Parent's business, results of operation and financial condition.

**4.  New Parent Faces Significant Competition from U.S.-Based and Non-U.S.-Based Companies and from Customers Who May Elect to Perform Services In-House**

New Parent's industry is highly competitive, fragmented and subject to rapid change.  New Parent competes primarily against local, national, regional and large multi-national information and payment technology companies, including focused BPO companies based in offshore locations, BPO divisions of information technology companies located in India, other BPO and BPA and consulting services and digital transformation solution providers and the in-house capabilities of New Parent's customers and potential customers.  These competitors may include entrants from adjacent industries or entrants in geographic locations with lower costs than those in which New Parent operates.

Some of New Parent's competitors have stronger financial, marketing and technological capabilities, larger customer bases, and better brand recognition.  Expansion of customers' global delivery centers or strategic partnership with larger firms may increase competition.  Further, New Parent expects competition to intensify in the future as more companies enter New Parent's markets and customers consolidate the services they require among fewer vendors.  Increased competition, New Parent's inability to compete successfully against competitors, pricing pressures or loss of market share could result in reduced operating margins which could adversely affect New Parent's business, results of operations and financial condition.

**5.  New Parent's Industry is Characterized by Rapid Technological Change and Failure to Address Rapid Technological Change Could Adversely Affect New Parent's Results of Operations and Financial Condition**

The process of developing new services and solutions is inherently complex and uncertain, requiring accurate anticipation of customer needs and emerging trends.  It requires that New Parent make long-term investments and commit significant resources before knowing whether these investments will eventually result in services that achieve customer acceptance and generate the revenues required to provide desired returns. If New Parent fails to accurately anticipate and meet its customers' needs through the development of new technologies and service offerings or if New Parent's new services are not widely accepted, New

Parent could lose market share and customers to its competitors and that could materially adversely affect New Parent's results of operations and financial condition.

More specifically, the business process solutions industry is characterized by rapid technological change, evolving industry standards and changing customer preferences.  The success of New Parent's business depends, in part, upon New Parent's ability to develop technology and solutions that keep pace with changes in New Parent's industry and the industries of its customers.  Although New Parent has made, and will continue to make, significant investments in the research, design and development of new technology and platforms-driven solutions, New Parent may not be successful in addressing these changes on a timely basis or in marketing the changes New Parent implements.  In addition, products or technologies developed by others may render New Parent's services uncompetitive or obsolete.  Failure to address these developments could have a material adverse effect on New Parent's business, results of operations and financial condition.

In addition, existing and potential customers are actively shifting their businesses away from paper-based environments to electronic environments with reduced needs for physical document management and processing.  This shift may result in decreased demand for the physical document management services New Parent provides such that New Parent's business and revenues may become more reliant on technology-based services in electronic environments, which are typically provided at lower prices compared to physical document management services.  Though New Parent has solutions for customers seeking to make these types of transitions, a significant shift by New Parent's customers away from physical documents to non-paper based technologies, whether now existing or developed in the future, could adversely affect New Parent's business, results of operation and financial condition.

Also, some of the large international companies in the industry have significant financial resources and compete with New Parent to provide document processing services and/or business process services.  New Parent competes primarily on the basis of technology, performance, price, quality, reliability, brand, distribution and customer service and support.  New Parent's success in future performance is largely dependent upon New Parent's ability to compete successfully, to promptly and effectively react to changing technologies and customer expectations and to expand into additional market segments.  To remain competitive, New Parent must develop services and applications; periodically enhance its existing offerings; remain cost efficient; and attract and retain key personnel and management.  If New Parent is unable to compete successfully, New Parent could lose market share and important customers to its competitors and that could materially adversely affect New Parent's results of operations and financial condition.

### 6. **New Parent Often Relies on Third-Party Hardware and Software**

Although New Parent developed its platform-driven solutions internally, New Parent relies, in some cases, on third-party hardware and software in connection with its service offerings which New Parent either purchases or leases from third-party vendors.  While New Parent is able to select from various competing hardware and software applications, detecting design defects or software errors is challenging due to complexity and unique specifications.  Any errors or defects in third-party hardware or software incorporated into New Parent's service offerings, may result in a delay or loss of revenue, diversion of resources, damage to New Parent's reputation, or potential claims against New Parent.

Further, this hardware and software may not continue to be available on commercially reasonable terms or at all.  Any loss of the right to use any of this hardware or software, or any increases in the price charged by third-party vendors, could negatively affect New Parent's business until equivalent technology is either developed by New Parent or, if available, is identified, obtained and integrated on commercially reasonable terms.  Further, changing hardware vendors or software licensors could detract from management's ability

to focus on the ongoing operations of New Parent's business or could cause delays in the operations of New Parent's business.

**7.  New Parent's Ability to Deliver Its Services Depends on the Infrastructure of the Internet**

The Internet's infrastructure comprises many different networks and services that are highly fragmented and distributed by design.  This infrastructure is run by a series of independent third-party organizations that work together to provide the infrastructure and supporting services of the Internet.  The Internet has experienced a variety of outages and other delays as a result of damages to portions of its infrastructure, denial-of-service attacks or related cyber incidents, and it could face outages and delays in the future, potentially reducing the availability of the Internet to New Parent or its customers for delivery of New Parent's Internet-based services.  Any resulting interruptions in New Parent's services or the ability of its customers to access New Parent's services could result in a loss of potential or existing customers and harm New Parent's business.  Additionally, regulatory actions in certain countries may limit access to the Internet or change the legal protections available to businesses that depend on the Internet for the delivery of its services, which would negatively impact access to New Parent's services, increase New Parent's risk or add liabilities, impede New Parent's growth, productivity and operational effectiveness, result in the loss of potential or existing customers and harm New Parent's business.

**8.  Some of New Parent's Work Involves Greater Risk Than Other Types of Claim Processing or Document Management Engagements**

New Parent provides certain business process solutions for customers that, for financial, legal or other reasons, may present higher risks compared to other types of claims processing or document management engagements.  Examples of higher risk engagements include class action and other legal distributions involving significant sums of money, economic analysis and expert testimony in high stakes legal mailers, and engagements where New Parent receives or processes sensitive data, including personal consumer or private health information.

While New Parent attempts to identify higher risk engagements and customers and mitigate its exposure by taking certain preventive measures and, where necessary, turning down certain engagements, these efforts may be ineffective and an actual or alleged error or omission on New Parent's part, the part of New Parent's customer or other third parties or possible fraudulent activity in one or more of these higher-risk engagements could result in the diversion of management resources, damage to New Parent's reputation, increased service costs or impaired market acceptance of New Parent's services, any of which could negatively impact New Parent's business and financial condition.

**9.  New Parent's Business Could Be Materially and Adversely Affected If They Do Not Protect Its Intellectual Property or Its Services Are Found to Infringe on the Intellectual Property of Others**

New Parent's success depends in part on certain methodologies and practices New Parent utilizes in developing and implementing applications and other proprietary intellectual property rights.  In order to protect such rights, New Parent relies upon a combination of nondisclosure and other contractual arrangements, as well as trade secret, copyright, trademark and patent laws.  New Parent also generally enters into confidentiality agreements with its employees, customers and potential customers and limit access to and distribution of New Parent's proprietary information.  There can be no assurance that the laws, rules, regulations and treaties in effect in the U.S., India and the other jurisdictions in which New Parent operates and the contractual and other protective measures New Parent takes are adequate to protect them from misappropriation or unauthorized use of its intellectual property, or that such laws will not change.  There can be no assurance that the resources invested by New Parent to protect its intellectual

99

property will be sufficient or that its intellectual property portfolio will adequately deter misappropriation or improper use of New Parent's technology, and its intellectual property rights may not prevent competitors from independently developing or selling products and services similar to or duplicative of New Parent's.  New Parent may not be able to detect unauthorized use and take appropriate steps to enforce its rights, and any such steps may be costly and unsuccessful.  Infringement by others of New Parent's intellectual property, including the costs of enforcing its intellectual property rights, may have a material adverse effect on New Parent's business, results of operations and financial condition.  New Parent could also face competition in some countries where they have not invested in an intellectual property portfolio. If New Parent is not able to protect its intellectual property, the value of New Parent's brand and other intangible assets may be diminished, and its business may be adversely affected.  Further, although New Parent believes that it is not infringing on the intellectual property rights of others, claims may nonetheless be successfully asserted against New Parent in the future, and New Parent may be the target of enforcement of patents or other intellectual property by third parties, including aggressive and opportunistic enforcement claims by non-practicing entities.  Regardless of the merit of such claims, responding to infringement claims can be expensive and time-consuming.  If New Parent is found to infringe any third-party rights, New Parent could be required to pay substantial damages or New Parent could be enjoined from offering some of its products and services.  The costs of defending any such claims could be significant, and any successful claim may require New Parent to modify its services.  The value of, or New Parent's ability to use, its intellectual property may also be negatively impacted by dependencies on third parties, such as New Parent's ability to obtain or renew on reasonable terms licenses that New Parent needs in the future, or New Parent's ability to secure or retain ownership or rights to use data in certain software analytics or services offerings.  Any such circumstances may have a material adverse effect on New Parent's business, results of operations and financial condition.

### 10.  New Parent's Revenues Are Highly Dependent on a Limited Number of Industries.

A substantial portion of the New Parent's revenues are derived from three specific industry based segments: ITPS, HS, and LLPS.  New Parent's success largely depends on continued demand for its services from customers in these segments, and a downturn or reversal of the demand for business process solutions in any of these segments, or the introduction of regulations that restrict or discourage companies from engaging the New Parent's services, could materially adversely affect New Parent's business, financial condition and results of operations.  For example, consolidation in any of these industries or combinations or mergers, particularly involving New Parent's customers, may decrease the potential number of customers for New Parent's services.  New Parent has been affected by the worsening of economic conditions and significant consolidation in the financial services industry and continuation of this trend may negatively affect New Parent's revenues and profitability.

### 11.  New Parent Derives Significant Revenue From Commercial and Government Contracts

Many of the contracts New Parent is awarded through competitive bidding procedures are extremely complex and require the investment of significant resources in order to prepare accurate bids and proposals. Competitive bidding imposes substantial costs and presents a number of risks that may adversely affect New Parent's financial position, including: (i) the substantial cost and managerial time and effort that New Parent spends to prepare bids and proposals for contracts that may or may not be awarded to New Parent; (ii) the need to estimate accurately the resources and costs that will be required to implement and service any contracts New Parent is awarded, sometimes in advance of the final determination of its full scope and design; (iii) the expense and delay that may arise if New Parent's competitors protest or challenge awards made to New Parent pursuant to competitive bidding and the risk that such protests or challenges could result in the requirement to resubmit bids and in the termination, reduction or modification of the awarded contracts, or may eventually lead to litigation; and (iv) the opportunity cost of not bidding on and winning other contracts New Parent might otherwise pursue.

**12. New Parent's Profitability Depends On New Parent's Ability to Obtain Adequate Pricing for Its Services**

New Parent's success depends on New Parent's ability to obtain adequate pricing for its services. Depending on competitive market factors, future prices New Parent obtains for its services may decline from previous levels. If New Parent is unable to obtain adequate pricing for its services, it could materially adversely affect New Parent's results of operations and financial condition. In addition, New Parent's contracts are increasingly requiring tighter timelines for implementation as well as more stringent service level metrics. This makes the bidding process for new contracts much more difficult and requires New Parent to adequately consider these requirements in the pricing of New Parent's services.

New Parent, from time to time, engages in restructuring actions to reduce New Parent's cost structure. If New Parent is unable to continue to maintain its cost base at or below the current level and maintain process and systems changes resulting from prior restructuring actions or to realize the expected cost reductions in the ongoing strategic transformation program, it could materially adversely affect New Parent's results of operations and financial condition. In addition, in order to meet the service requirements of New Parent's customers, which often includes 24/7 service, and to optimize New Parent's employee cost base, including New Parent's back-office support, New Parent often locates its delivery service and back-office support centers in lower-cost locations, including several developing countries. Concentrating New Parent's centers in these locations presents a number of operational risks, many of which are beyond New Parent's control, including the risks of political instability, natural disasters, safety and security risks, labor disruptions, excessive employee turnover and rising labor rates.

New Parent's ability to sustain and improve profit margins is dependent on a number of factors, including New Parent's ability to continue to improve the cost efficiency of New Parent's operations through such programs as robotic process automation, to absorb the level of pricing pressures on New Parent's services through cost improvements and to successfully complete information technology initiatives. If any of these factors adversely materialize or if New Parent is unable to achieve and maintain productivity improvements through restructuring actions or information technology initiatives, New Parent's ability to offset labor cost inflation and competitive price pressures would be impaired, each of which could materially adversely affect New Parent's results of operations and financial condition.

**13. Defects or Disruptions in New Parent's Services Could Diminish Demand for New Parent's Services**

Since New Parent's customers use New Parent's services for important aspects of its business, any errors, defects, disruptions in service or other performance problems could hurt New Parent's reputation and may damage New Parent's customers' businesses. As a result, customers could elect to not renew New Parent's services or delay or withhold payment to New Parent. New Parent could also lose future sales or customers may make warranty or other claims against New Parent, which could result in an increase in New Parent's allowance for expected credit losses, an increase in collection cycles for accounts receivable or the expense and risk of litigation.

**14. New Parent is Subject to Regular Customer and Third-Party Security Reviews**

Many of New Parent's customer contracts require that New Parent maintain certains physical and/or information security standards, and, in certain cases, New Parent permits a customer to audit New Parent's compliance with these contractual standards. Any failure to meet such standards or pass such audits may have a material adverse impact on New Parent's business. Further, customers from time to time may require stricter physical and/or information security than they negotiated in their contracts and may condition continued volumes and business on the satisfaction of such additional requirements. Some of these

requirements may be expensive to implement or maintain and may not be factored into New Parent's contract pricing.  Further, on an annual basis New Parent obtains third-party audits of certain of New Parent's locations in accordance with Statement on Standards for Attestation Engagements No. I6 (SSAE 16) put forth by the Auditing Standards Board (ASB) of the American Institute of Certified Public Accountants (AICPA).  SSAE 16 is the current standard for reporting on controls at service organizations, and many of New Parent's customers expect that New Parent will perform an annual SSAE 16 audit, and report to them the results.  Negative findings in such an audit and/or the failure to adequately remediate in a timely fashion such negative findings may cause customers to terminate their contracts or otherwise have a material adverse effect on New Parent's reputation, results of operation and financial condition.

## 15. Cybersecurity Issues, Vulnerabilities, and Criminal Activity Could Result in a Data Breach

New Parent collects and retain large volumes of internal and customer data, including personally identifiable information and other sensitive data both physically and electronically, for business purposes, and New Parent's various information technology systems enter, process, summarize and report such data. New Parent also maintains personally identifiable information about New Parent's employees. Safeguarding customer, employee and New Parent's own data is a key priority for New Parent, and New Parent's customers and employees have come to rely on New Parent for the protection of its information. Despite New Parent's efforts to protect sensitive, confidential or personal data or information, New Parent can provide no assurances that its security measures designed to protect New Parent's customers' and New Parent's customers' customers' data will always be effective.   New Parent's services and underlying infrastructure may in the future be materially breached or compromised as a result of the following:

- third-party attempts to fraudulently induce New Parent's employees, partners or customers to disclose sensitive information such as usernames, passwords or other information to gain access to New Parent's customers' data or IT systems, or New Parent's data or New Parent's IT systems;

- efforts by individuals or groups of hackers and sophisticated organizations, such as state-sponsored organizations or nation-states, to launch coordinated attacks, including ransomware, destructive malware and distributed denial-of-service attacks;

- third-party attempts to abuse New Parent's marketing, advertising, messaging or social products and functionalities to impersonate persons or organizations and disseminate information that is false, misleading or malicious;

- cyberattacks on New Parent's internally built infrastructure on which many of New Parent's service offerings operate, or on third-party cloud-computing platform providers;

- vulnerabilities resulting from enhancements and updates to New Parent's existing service offerings;

- vulnerabilities in the products or components across the broad ecosystem that New Parent's services operate in conjunction with and are dependent on;

- vulnerabilities existing within new technologies and infrastructures;

- attacks on, or vulnerabilities in, the many different underlying networks and services that power the Internet that New Parent's products depend on, most of which are not under New Parent's control or the control of New Parent's vendors, partners or customers; and

- employee or contractor errors or intentional acts that compromise New Parent's security systems.

These risks are mitigated, to the extent possible, by enhanced processes and internal security controls. However, New Parent's ability to mitigate these risks may be impacted by the following:

- frequent changes to, and growth in complexity of, the techniques used to breach, obtain

unauthorized access to, or sabotage IT systems and infrastructure, which are generally not recognized until launched against a target, and could result in New Parent's being unable to anticipate or implement adequate measures to prevent such techniques;

• the continued evolution of New Parent's internal IT systems as New Parent early adopts new technologies and new ways of sharing data and communicating internally and with partners and customers, which increases the complexity of New Parent's IT systems;

• authorization by New Parent's customers to third-party technology providers to access its customer data, which may lead to New Parent's customers' inability to protect its data that is stored on New Parent's servers; and

• New Parent's limited control over its customers or third-party technology providers, or the processing of data by third-party technology providers, which may not allow New Parent to maintain the integrity or security of such transmissions or processing.

Yet, New Parent remains vulnerable to such threats. A security breach or incident could result in unauthorized parties obtaining access to, or the denial of authorized access to, New Parent's IT systems or data, or New Parent's customers' systems or data, including intellectual property and proprietary, sensitive or other confidential information. A security breach could also result in a loss of confidence in the security of New Parent's services, damage New Parent's reputation, negatively impact New Parent's future sales, disrupt New Parent's business and lead to increases in insurance premiums and legal, regulatory and financial exposure and liability. As an example, in June 2022 the Debtors experienced a network outage which required them, among other things, to incur costs to respond to the incident and to limit access to their applications and services by their employees and customers. The Debtors believe the June 2022 network outage caused some of their customers to reduce volumes, look for alternate vendors and consider other providers for new requirements resulting in claims against the Debtors and lost revenue. Finally, the detection, prevention and remediation of known or potential security vulnerabilities, including those arising from third-party hardware or software, may result in additional financial burdens due to additional direct and indirect costs, such as additional infrastructure capacity spending to mitigate any system degradation and the reallocation of resources from development activities.

## 16. The Use or Capabilities of AI in New Parent's Offerings May Result in Increased Costs, Reputational Harm and Liability

New Parent is increasingly building AI into many of New Parent's offerings. As with many innovations, AI presents additional risks and challenges that could affect New Parent's business. If New Parent enables or offer solutions that draw controversy due to its perceived or actual impact on human rights, privacy, employment, or in other social contexts, New Parent may experience reputational harm, competitive harm or legal liability. Data practices by New Parent or others that result in controversy could also impair the acceptance of AI solutions. This in turn could undermine the decisions, predictions or analysis AI applications produce, subjecting New Parent to competitive harm, legal liability or reputational harm. The rapid evolution of AI will require the application of resources to develop, test and maintain New Parent's products and services to help ensure that AI is implemented ethically in order to minimize unintended, harmful impact.

Uncertainty around new and emerging AI applications such as generative AI content creation may require additional investment in the development of proprietary datasets, machine learning models and systems to test for accuracy, bias and other variables, which are often complex, may be costly and could impact New Parent's profit margin as New Parent decides to further expand generative AI into its product offerings.

17. **Currency Fluctuations Could Have a Material Adverse Effect on New Parent's Results of Operations**

The functional currencies of New Parent's businesses outside of the U.S. are the local currencies. Changes in exchange rates between these foreign currencies and the U.S. Dollar will affect the recorded levels of New Parent's assets, liabilities, net sales, cost of goods sold and operating margins and could result in exchange gains or losses. The primary foreign currencies to which New Parent has exposure are the European Union Euro, Swedish Krona, British Pound Sterling, Canadian Dollar and Indian rupees. Exchange rates between these currencies and the U.S. Dollar in recent years have fluctuated significantly and may do so in the future. New Parent's operating results and profitability may be affected by any volatility in currency exchange rates and New Parent's ability to manage effectively currency transaction and translation risks. To the extent the U.S. Dollar strengthens against foreign currencies, New Parent's foreign revenues and profits will be reduced when converted into and reported in U.S. Dollars.

18. **Fluctuations in the Costs of Raw Materials May Adversely Impact New Parent's Results of Operations**

Purchases of paper, ink, energy and other raw materials represent a large portion of New Parent's costs. Increases in the costs of these inputs may increase New Parent's costs and they may not be able to pass these costs on to customers through higher prices. In addition, New Parent may not be able to resell waste paper and other print-related by-products or may be adversely impacted by decreases in the prices for these by-products. Increases in the cost of materials may adversely impact customers' demand for New Parent's printing and printing-related services.

19. **Sales Tax Laws in the U.S. May Change**

New Parent's U.S. subsidiaries collect and remit sales tax in states in which the subsidiaries have physical presence or in which New Parent believes sufficient nexus exists which obligates New Parent to collect sales tax. Other states may, from time to time, claim that New Parent has state-related activities constituting physical nexus to require such collection. Additionally, many other states seek to impose sales tax collection or reporting obligations on companies that sell goods to customers in their state, or directly to the state and its political subdivisions, regardless of physical presence. Such efforts by states have increased recently, as states seek to raise revenues without increasing the income tax burden on residents. New Parent cannot predict whether the nature or level of contacts New Parent has with a particular state will be deemed enough to require New Parent to collect sales tax in that state nor can New Parent be assured that Congress or individual states will not approve legislation authorizing states to impose tax collection or reporting obligations on New Parent's activities. A successful assertion by one or more states that New Parent should collect sales tax could result in substantial tax liabilities related to past sales and would result in considerable administrative burdens and costs for New Parent.

20. **If the New Parent Fails to Maintain an Effective System of Disclosure Controls and Internal Control Over Financial Reporting, New Parent's Ability to Produce Financial Statements or Comply with Applicable Regulations Could Be Impaired**

As a public company, New Parent is subject to the reporting requirements of the Exchange Act, the Sarbanes-Oxley Act of 2002, as amended (the "***Sarbanes-Oxley Act***"), and the listing standards of the Nasdaq. New Parent expects that the requirements of these rules and regulations will continue to increase its legal, accounting and financial compliance costs, make some activities more difficult, time consuming and costly, and place significant strain on its personnel, systems and resources. The Sarbanes-Oxley Act requires, among other things, that New Parent maintains effective disclosure controls and procedures and internal control over financial reporting. New Parent is continuing to develop and refine its disclosure

controls and other procedures that are designed to ensure that information required to be disclosed by them in the reports that they will file with the SEC is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms, and that information required to be disclosed in reports under the Exchange Act is accumulated and communicated to its principal executive and financial officers. In order to maintain and improve the effectiveness of its disclosure controls and procedures and internal control over financial reporting, New Parent has expended, and anticipate that they will continue to expend, significant resources, including accounting-related costs and significant management oversight.

New Parent's current controls and any new controls that New Parent develops may become inadequate because of changes in conditions in New Parent's business. Further, deficiencies in New Parent's disclosure controls or New Parent's internal control over financial reporting may be discovered in the future. Any failure to develop or maintain effective controls, or any difficulties encountered in its implementation or improvement could harm New Parent's operating results or cause New Parent to fail to meet its reporting obligations and may result in a restatement of the New Parent's financial statements for prior periods. Any failure to implement and maintain effective internal control over financial reporting could adversely affect the results of management evaluations of New Parent's internal control over financial reporting that New Parent is required to include in its periodic reports that New Parent files with the SEC. Ineffective disclosure controls and procedures and internal control over financial reporting could also cause investors to lose confidence in the New Parent's reported financial and other information, which would likely have a negative effect on the trading price of New Parent's Common Stock. In addition, if New Parent is unable to meet these requirements, New Parent may not be able to remain listed on the Nasdaq.

Management assessed the effectiveness of the Debtors' internal control over financial reporting as of December 31, 2023 and based on its assessment, the Debtors' management, including the Debtors' Executive Chairman and Interim Chief Financial Officer, has concluded that the Debtors' internal control over financial reporting was not effective as of December 31, 2023 due to material weaknesses in the Debtors' internal control over financial reporting.

Any failure to maintain effective disclosure controls and internal control over financial reporting could have a material and adverse effect on the New Parent's business and operating results and cause a decline in the price of the New Parent's Common Stock.

**D.      Risks Related to the Plan Securities**

**AFTER CONSUMMATION OF THE RESTRUCTURING TRANSACTIONS, NEW PARENT WILL BE COMPRISED OF, AMONG OTHER THINGS, THE DEBTORS' EXISTING BUSINESSES AND THE EXISTING BUSINESSES OF XBP. ACCORDINGLY, THE VALUE OF THE PLAN SECURITIES, INCLUDING THE NEW PARENT INTERESTS WILL DEPEND ON, AMONG OTHER THINGS, THE PERFORMANCE OF THE DEBTORS' AND XBP'S BUSINESSES UNDER COMMON OWNERSHIP. THE FOLLOWING PROVIDES A SUMMARY OF CERTAIN OF THE RISKS ASSOCIATED WITH THE PLAN SECURITIES.  THE RISK FACTORS SET FORTH BELOW DISCUSS RISKS ATTENDANT TO THE PLAN SECURITIES AS SECURITIES IN NEW PARENT ON SUCH BASIS. THIS SECTION IS NOT INTENDED TO BE EXHAUSTIVE.**

**1.      New Parent's ability to achieve continued and sustained profitability is uncertain**

New Parent's profitability depends on, among other things, its ability to generate revenue in excess of its expenses. However, New Parent has significant and continuing fixed costs and expenses, which it may not be able to reduce adequately to sustain such profitability if its revenue continues to decrease, or if revenue does not increase commensurately with an increase in costs. In addition, New Parent may encounter

unforeseen expenses, difficulties, complications, delays and other unknown events that may cause its costs to exceed its expectations.

New Parent's revenues have declined over the last few years due to, among other things, the COVID-19 pandemic, a loss of clients, the completion of certain one-off projects, currency fluctuation exposure, the transition of XBP's clients to lower revenue but higher margin systems and platforms, and changes of clients' technology that has resulted in fewer transactions that fall under the contractual arrangements with New Parent. In addition, one of New Parent's top 10 clients ended its contract with New Parent in April 2023. Contracts with several other large clients are up for renewal. Although these contracts are expected to be renewed, there can be no assurances that they will be renewed on favorable terms or at all.

Further, New Parent's revenues may be adversely affected by many factors, including but not limited to a future pandemic; a potential recession in Europe; the inability to attract new clients to use its services; a failure by existing clients to renew their contracts or use additional services (or a decision by existing clients to cease or reduce using New Parent's services); the lengthening of its sales cycles and implementation periods; changes in its client mix; failure of clients to pay invoices on a timely basis or at all; a failure in the performance of New Parent's solutions or internal controls that adversely affects its reputation or results in loss of business; the loss of market share to existing or new competitors; the failure to enter or succeed in new markets; regional or global economic conditions or regulations affecting perceived need for or value of New Parent's services; or New Parent's inability to develop new offerings, expand its offerings or drive adoption of its new offerings on a timely basis and thus potentially not meeting evolving market needs.

New Parent's future profitability also may be impacted by non-cash charges and potential impairment of goodwill, which will negatively affect its reported financial results. Even if it achieves profitability on an annual basis, New Parent may not be able to achieve profitability on a quarterly basis. New Parent may incur significant losses in the future for a number of reasons, including those described elsewhere herein. Any inability of New Parent to achieve continued and sustained profitability may adversely impact its financial position and may require New Parent to seek additional financing.

**2.   New Parent may need to raise debt or equity financing, which it may be unable to do on favorable terms or at all.  In addition, New Parent must obtain the consent of certain shareholders prior to any additional issuances of equity**

New Parent may be unable to generate continued and sustained profitability or may incur significant losses in the future. As a result, New Parent may need to raise additional capital through debt and/or equity financing at some point in the future. Any debt agreements New Parent enters into at such time may include financial or operational covenants which may constrain its ability to operate its business, and any inability to satisfy covenants contained in any debt agreements may require prepayment and/or refinancing of such debt. New Parent may also be unable to raise debt and/or equity financing at an attractive price or on attractive terms or at all.

The limited public float of New Parent may also adversely affect its ability to raise debt and/or equity financing on attractive terms or at all.

**3.   Potential Dilution**

The ownership percentage represented by the Plan Securities distributed under the Plan as of the Effective Date will be subject to dilution.  In the future, similar to all companies, additional equity financings or other equity issuances by New Parent could adversely affect the value of the Plan Securities.  The amount and dilutive effect of any of the foregoing could be material.

    4. **Interests Subordinated to the New Parent's Indebtedness**

In any subsequent liquidation, dissolution, or winding up of New Parent, the Plan Securities would rank below all debt claims against New Parent.  As a result, holders of the Plan Securities will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of New Parent until after all applicable holders of debt have been paid in full.

    5. **Estimated Valuations of Plan Securities Are Not Intended to Represent Potential Market Values**

The Debtors' estimated recoveries set forth in this Disclosure Statement are not intended to represent the market value of New Parent's securities.  The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including, among others:  (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; (d) the Debtors' ability to maintain adequate liquidity to fund operations; (e) the assumption that capital and equity markets remain consistent with current conditions; and (f) the Debtors' ability to maintain critical existing customer relationships.

    6. **Dividends**

New Parent may not pay any dividends on the Plan Securities.  In such circumstances, the success of an investment in the Plan Securities will depend entirely upon any future appreciation in the value of the Plan Securities.  There is, however, no guarantee that the Plan Securities will appreciate in value or even maintain its initial value.

    7. **Restrictions on Ability to Resell Plan Securities and Rollover Exit Notes**

Plan Securities issued to an entity that is deemed to be an "underwriter" under section 1145(b) of the Bankruptcy Code, as well as the Rollover Exit Notes, will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration or an applicable exemption from registration under the Securities Act and other applicable law. In addition, and subject to the foregoing, while the Plan Securities issued pursuant to section 1145(a) of the Bankruptcy Code may generally be resold by the holder thereof without registration under the Securities Act, such securities will not be freely tradable if, at the time of transfer, the holder thereof is an "affiliate" of New Parent as defined in Rule 144(a)(1) under the Securities Act or had been such an "affiliate" within 90 days of such transfer. Such affiliate holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.  Even if a trading market develops for the Plan Securities or Rollover Exit Notes, such holders should be aware that they may be required to bear the financial risk of an investment in the Plan Securities for an indefinite period of time.  For further discussion, see <u>Section X</u> ("***Securities Law Matters***") of this Disclosure Statement.

    8. **Market Price for Plan Securities May Be Highly Volatile**

Although the Plan Securities will be listed on NASDAQ for trading, there can be no assurance a trading market is maintained, and the Rollover Exit Notes are a new issue of securities for which there is currently no trading market.  Even if such a market were to exist, the market price for the Plan Securities and Rollover Exit Notes may be highly volatile and could be subject to wide fluctuations and could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors,

including, without limitation, prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, New Parent.

In addition, the trading volume of the Plan Securities and Rollover Exit Notes may fluctuate and cause significant price variations to occur. Volatility in the market price or trading volume of the Plan Securities or Rollover Exit Notes may prevent investors from being able to sell at or above the price they paid to acquire shares of the Plan Securities or Rollover Exit Notes, or at all. Accordingly, holders of these securities may bear certain risks associated with holding securities for an indefinite period of time.

E.    **Additional Factors**

1.    **The Debtors Could Withdraw the Plan**

Subject to, and without prejudice to, the rights of any party in interest, the Plan may be revoked or withdrawn by the Debtors before the Confirmation Date.

2.    **The Debtors Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. Additionally, the Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

3.    **No Representations Outside This Disclosure Statement Are Authorized**

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

4.    **No Legal or Tax Advice Is Provided by This Disclosure Statement**

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult its own legal counsel and accountant as to legal, tax, and other matters concerning its Claim or Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

5.    **No Admission Made**

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or holders of Claims or Interests. Additionally, nothing contained herein constitutes any corporate approval necessary to effectuate any of the actions contemplated by the Plan, including but not limited to, approvals required by the board of directors for XBP.

# X.
## SECURITIES LAW MATTERS

The Debtors believe that any offers of Plan Securities and Rollover Exit Notes that may be deemed to be made in connection with the solicitation of votes on the Plan, will be exempt from the registration requirements of the Securities Act pursuant to Section 1145 of the Bankruptcy Code or Section 4(a)(2) of the Securities Act (or another available exemption under the Securities Act), as applicable.

## A.    Issuance of 1145 Securities

The Plan provides for the offer, issuance, sale or distribution of shares of Plan Securities to Holders of Allowed April 2026 Notes Claims and Allowed July 2026 Notes Claims (if they vote in favor of the plan in sufficient numbers to carry the class) and to Holders of Administrative Claims on account of the Premiums and Fees.  The Debtors believe that the offer, issuance, sale or distribution by New Parent of Plan Securities, as distributions, among others, on the Allowed April 2026 Notes Claims, Allowed Juley 2026 Notes Claims and Administrative Claims on account of the Premiums and Fees (as applicable) (collectively, the "*1145 Securities*") will be exempt from registration under section 5 of the Securities Act and under any state or local laws requiring registration for offer or sale of a security pursuant to section 1145(a) of the Bankruptcy Code, except with respect to an entity that is an underwriter as defined in section 1145(b) of the Bankruptcy Code (see below).

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state or local securities laws if three principal requirements are satisfied:  (a) the securities must be offered and sold under a plan of reorganization and must be securities issued by the debtor, an affiliate participating in a joint plan with the debtor, or a successor to the debtor under the plan; (b) the securities must be in exchange for a claim against, an interest in, or a claim for an administrative expense in the case concerning, the debtor or such affiliate; and (c) the securities must be issued entirely in exchange for such a claim or interest, or "principally" in exchange for such claim or interest and "partly" for cash or property.

The issuance of the Plan Securities under the Plan on account of April 2026 Notes Claims, July 2026 Notes Claims and Administrative Claims on account of the Premiums and Fees satisfies the requirements of section 1145(a)(1) of the Bankruptcy Code.

The exemptions of section 1145(a)(1) do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer":  (a) purchases a claim against, an interest in, or a claim for an administrative expense against the debtor with a view to distributing any security received in exchange for such claim or interest ("accumulators"); (b) offers to sell securities offered or sold under a plan for the holders of such securities ("distributors"); (c) offers to buy securities offered or sold under a plan from the holders of such securities, if the offer to buy is (i) with a view to distributing such securities and (ii) under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an "issuer" (as defined in section 2(a)(11) of the Securities Act) with respect to the securities.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code includes Persons directly or indirectly controlling, controlled by or under direct or indirect common control with the issuer.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and

policies of a person, whether through the ownership of voting securities, by contract or otherwise.  Such Persons are referred to as "affiliates" of the issuer.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be an issuer for these purposes and therefore an underwriter.  In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who receives ten percent or more of a class of securities of a reorganized debtor may be presumed to be in a relationship of "control" with the reorganized debtor and, therefore, an underwriter, although the staff of the SEC has not taken a position on this view.

**B.**     **Subsequent Transfers of 1145 Securities**

Section 1145(c) of the Bankruptcy Code provides that securities issued pursuant to section 1145(a) are deemed to have been issued in a public offering.  In general, therefore, these securities may be resold without registration under the Securities Act or other federal or state securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is (i) an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code, (ii) is an "affiliate" of the issuer (as defined in rule 144(a)(1) in the Securities Act), or (iii) has been such an "affiliate" within ninety (90) days of such transfer.  In addition, such section 1145 exempt securities may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

To the extent that Persons who receive 1145 Securities pursuant to the Plan are deemed to be underwriters, resales by such Persons of 1145 Securities would not be exempted from registration under the Securities Act or other applicable laws by reason of section 1145 of the Bankruptcy Code and section 4(a)(1) of the Securities Act.  However, Persons deemed to be underwriters may be permitted to resell such 1145 Securities without registration pursuant to the limited safe harbor resale provisions of Rule 144 promulgated under the Securities Act or another available exemption under the Securities Act.

Generally, Rule 144 of the Securities Act permits the public sale of securities if certain conditions are met, including a required holding period, certain current public information regarding the issuer being available, and compliance with applicable volume, manner of sale and notice requirements.  The staff of the SEC has taken the position that Persons who are deemed to be underwriters solely because they are affiliates of a reorganized debtor are not subject to the holding period requirements of Rule 144.  Accordingly, affiliates of New Parent that receive 1145 Securities under the Plan may resell those securities following the Effective Date in reliance on Rule 144, subject to certain current public information regarding the issuer being available, and compliance with the applicable volume, manner of sale and notice requirements.

Whether or not any particular Person would be deemed to be an "underwriter" with respect to the 1145 Securities or any other security to be issued pursuant to the Plan depends upon various facts and circumstances applicable to that Person.  Accordingly, the Debtors express no view as to whether any particular Person receiving 1145 Securities or any other securities under the Plan would be considered an "underwriter" under section 1145(b) of the Bankruptcy Code with respect to such securities, or whether such Person may freely resell such securities or the circumstances under which they may resell such securities.

**C.**     **Issuance of Private Placement Securities**

The Rollover Notes, and any Plan Securities issued to an Entity that is an "underwriter" with respect to such Plan Securities, as that term is defined in section 1145(b) of the Bankruptcy Code (collectively, the "***Private Placement Securities***"), shall be issued in reliance upon Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder and on equivalent state law registration exemptions or, solely

to the extent such exemptions are not available, other available exemptions from registration under the Securities Act.

 Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving a public offering are exempt from registration under Section 5 of the Securities Act.  Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under the Securities Act.

The Private Placement Securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act.

Rule 144 provides a limited safe harbor for the public resale of restricted securities if certain conditions are met.  These conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer.  Rule 144 defines an affiliate of the issuer as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."

A non-affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") and who has not been an affiliate of the issuer during the 90 days preceding such sale may resell restricted securities after a one-year holding period whether or not there is current public information regarding the issuer.

An affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act may resell restricted securities after the one-year holding period if at the time of the sale certain current public information regarding the issuer is available. An affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144.

*Legends*.  To the extent certificated or issued by way of direct registration on the records of the issuer's transfer agent, certificates evidencing Private Placement Securities, will bear a legend substantially in the form below (and, in the case of the Rollover Exit Notes, may bear additional legends customary for debt securities issued pursuant to Section 4(a)(2) under the Securities Act):

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON THE EFFECTIVE DATE, HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

New Parent reserves the right to reasonably require certification, legal opinions or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of any such securities.  New Parent also reserves the right to stop the transfer of any such securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. All persons who receive such securities will be deemed to acknowledge and agree that they will not offer, sell or otherwise transfer any such securities except in accordance with an exemption from registration, including under Rule 144 under the Securities Act, if and when available, or pursuant to an effective registration statement.

In any case, recipients of securities issued under the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE, SECTION 4(A)(2) UNDER THE SECURITIES ACT, AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.

The Reorganized Debtors intend to cause the Plan Securities (other than the New Parent Warrants), and the Rollover Exit Notes to be eligible for book-entry treatment under the facilities of the Depository Trust Company ("**DTC**").  Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) will be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan under applicable securities laws, including, for the avoidance of doubt, whether the Plan Securities and the Rollover Exit Notes are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

## XI.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The Debtors expect to provide a discussion of certain material U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain Holders of Claims following the filing of the Plan Supplement and the Restructuring Steps Exhibit.  The steps of the Restructuring Transactions remain subject to ongoing analysis and, as noted above, the Plan provides for the commitment of funds to satisfy any Transaction Tax Liability resulting therefrom.

XII.
## CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all stakeholders and urge the Holders of Claims in the Voting Classes to vote in favor thereof.

Respectfully submitted, as of the date first set forth above,

**DocuData Solutions, L.C. (on behalf of itself and all other Debtors)**

By:     */s/ Randall S. Eisenberg*
Name:   Randall S. Eisenberg
Title:    Chief Restructuring Officer of Exela Technologies BPA, LLC, Exela Intermediate LLC, Exela Finance Inc., XCV-EMEA, LLC, and Neon Acquisition, LLC

**EXHIBIT A**

**Plan**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

-------------------------------------------------------------- x
:
In re:                                                        :     Chapter 11
:
DOCUDATA SOLUTIONS, L.C., *et al.*,                           :     Case No. 25-90023 (CML)
:
Debtors.[1]                                                   :     (Jointly Administered)
:
-------------------------------------------------------------- x

**JOINT PLAN OF REORGANIZATION OF DOCUDATA SOLUTIONS, L.C. AND**
**ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**HUNTON ANDREWS KURTH LLP**
Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Ashley L. Harper (Texas Bar No. 24065272)
Philip M. Guffy (Texas Bar No. 24113705)
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone: (713) 220-4200
Email:   taddavidson@hunton.com
         ashleyharper@hunton.com
         pguffy@hunton.com

**LATHAM & WATKINS LLP**
Ray C. Schrock (NY Bar No. 4860631)
Alexander W. Welch (NY Bar No. 5624861)
Hugh Murtagh (NY Bar No. 5002498)
Adam S. Ravin (NY Bar No. 4079190)
Jonathan J. Weichselbaum (NY Bar No. 5676143)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email:   ray.schrock@lw.com
         alex.welch@lw.com
         hugh.murtagh@lw.com
         adam.ravin@lw.com
         jon.weichselbaum@lw.com

*Co-Counsel for the Debtors and*
*Debtors in Possession*

Dated:   May 7, 2025
         Houston, Texas

**THIS PLAN REMAINS SUBJECT TO MATERIAL REVISION AND HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THIS PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS PLAN IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**
.

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/DocuDataSolutions.  The Debtors' mailing address for the purposes of these cases is 2701 E. Grauwyler Road, Irving, TX 75061 USA.

# TABLE OF CONTENTS

Article I. DEFINED TERMS AND RULES OF INTERPRETATION.................................................1
    A.      Defined Terms ...................................................................................................1
    B.      Rules of Interpretation ....................................................................................24
    C.      Consent Rights .................................................................................................25
    D.      Appendices and Plan Supplement ...................................................................26
    E.      Deemed Acts ....................................................................................................26

Article II. ADMINISTRATIVE CLAIMS, DIP CLAIMS, PRIORITY TAX CLAIMS, OTHER
    PRIORITY CLAIMS, AND UNITED STATES TRUSTEE STATUTORY FEES ...................26
    A.      Administrative Claims .....................................................................................26
    B.      DIP Claims ......................................................................................................28
    C.      Premiums and Fees ..........................................................................................28
    D.      Postpetition Securitization Programs Claims ..................................................28
    E.      Priority Tax Claims .........................................................................................28
    F.      Other Priority Claims ......................................................................................29
    G.      United States Trustee Statutory Fees ..............................................................29
    H.      Restructuring Fees and Expenses ....................................................................29
    I.      Post-Effective Date Fees and Expenses ..........................................................29

Article III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS......................30
    A.      Classification of Claims and Interests .............................................................30
    B.      Treatment of Claims and Interests ..................................................................31
    C.      Acceptance or Rejection of this Plan ..............................................................35
    D.      Confirmation Pursuant to Section 1129(a)(10) and 1129(b) of the Bankruptcy Code ..................36
    E.      Subordinated Claims ........................................................................................36
    F.      Special Provision Governing Unimpaired Claims ..........................................36
    G.      Vacant and Abstaining Classes .......................................................................36
    H.      Controversy Concerning Impairment ..............................................................37
    I.      Intercompany Interests and Intercompany Claims ..........................................37

Article IV. MEANS FOR IMPLEMENTATION OF THIS PLAN ...................................................37
    A.      General Settlement of Claims and Interests ....................................................37
    B.      Restructuring Transactions ..............................................................................37
    C.      Committee Settlement ......................................................................................38
    D.      Sub-Group DIP Lenders Settlement ...............................................................39
    E.      Corporate Existence .........................................................................................40
    F.      Vesting of Assets in the Reorganized Debtors Free and Clear of Liens and Claims .....................40
    G.      Cancellation of Existing Agreements, Existing BPA Equity Interests, Other Existing
             Equity Interests, and Certain Intercompany Interests......................................41
    H.      Sources for Plan Distributions and Transfers of Funds Among Debtors .........43
    I.      Exit Financing Facilities and Exit Facilities Documents ................................43
    J.      Exit Securitization Programs and Exit Securitization Programs Documents ...44
    K.      Issuance of Securities .......................................................................................45
    L.      Exemption from Registration Requirements....................................................46
    M.      New Organizational Documents ......................................................................47
    N.      ETI Funding Obligations; Blocked ETI Shares ..............................................48
    O.      Release of Liens and Claims ...........................................................................48
    P.      Exemption from Certain Taxes and Fees .........................................................49
    Q.      New Board ........................................................................................................49
    R.      Preservation of Causes of Action ....................................................................50
    S.      Corporate Action..............................................................................................50
    T.      Claims Ombudsman .........................................................................................51

|   |   |   |
|---|---|---|
| U. | Effectuating Documents; Further Transactions | 52 |
| V. | Authority of the Debtors | 52 |
| W. | No Substantive Consolidation | 52 |
| X. | Continuing Effectiveness of Final Orders | 52 |
| Y. | Modifications to Executory Contracts and Unexpired Leases | 52 |

Article V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES;
EMPLOYEE BENEFITS; AND INSURANCE POLICIES ............................................. 53

| A. | Assumption of Executory Contracts and Unexpired Leases | 53 |
| B. | Cure of Defaults; Assignment of Executory Contracts and Unexpired Leases | 53 |
| C. | Rejection of Executory Contracts and Unexpired Leases | 55 |
| D. | Claims on Account of the Rejection of Executory Contracts or Unexpired Leases | 55 |
| E. | Contracts and Leases Entered into After the Petition Date | 55 |
| F. | Reservation of Rights | 55 |
| G. | Directors and Officers Insurance Policies | 55 |
| H. | Other Insurance Contracts | 56 |
| I. | Indemnification Provisions and Reimbursement Obligations | 56 |
| J. | Employee Compensation and Benefits | 57 |

Article VI. PROVISIONS GOVERNING DISTRIBUTIONS ............................................. 57

| A. | Timing and Calculation of Amounts to Be Distributed | 57 |
| B. | Special Rules for Distributions to Holders of Disputed Claims | 58 |
| C. | Rights and Powers of Distribution Agent | 58 |
| D. | Delivery of Distributions | 58 |
| E. | Compliance with Tax Requirements; Allocations | 60 |
| F. | Applicability of Insurance Contracts | 61 |
| G. | Allocation of Distributions Between Principal and Interest | 61 |
| H. | No Postpetition Interest on Claims | 62 |
| I. | Means of Cash Payment | 62 |
| J. | Setoffs and Recoupment | 62 |
| K. | Claims Paid or Payable by Third Parties | 62 |

Article VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
DISPUTED CLAIMS ............................................. 63

| A. | Allowance and Disallowance of Claims | 63 |
| B. | Claims Administration Responsibilities | 63 |
| C. | Adjustment to Claims or Interests without Objection | 64 |
| D. | No Distributions Pending Allowance | 64 |
| E. | Distributions After Allowance | 64 |

Article VIII. CONDITIONS PRECEDENT TO THE OCURRENCE OF THE EFFECTIVE DATE ....... 64

| A. | Conditions Precedent to the Occurrence of the Effective Date | 64 |
| B. | Timing of Conditions Precedent | 66 |
| C. | Waiver of Conditions | 66 |
| D. | Effect of Non-Occurrence of Conditions to the Effective Date | 66 |
| E. | Substantial Consummation | 66 |

Article IX. DISCHARGE, RELEASE, INJUNCTION, AND RELATED PROVISIONS .................. 67

| A. | Discharge of Claims and Termination of Interests | 67 |
| **B.** | **Releases by the Debtors** | 67 |
| **C.** | **Releases by Holders of Claims and Interests** | 69 |
| **D.** | **Exculpation** | 70 |
| **E.** | **Permanent Injunction** | 71 |
| **F.** | **SEC Reservation of Rights** | 72 |

Article X. RETENTION OF JURISDICTION ............................................. 72

2

Article XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN ................................................74
    A.     Modification of Plan ........................................................................................................75
    B.     Effect of Confirmation on Modifications ........................................................................75
    C.     Revocation of Plan; Reservation of Rights if Effective Date Does Not Occur .............75

Article XII. MISCELLANEOUS PROVISIONS ..............................................................................................75
    A.     Immediate Binding Effect ...............................................................................................75
    B.     Additional Documents .....................................................................................................76
    C.     Payment of United States Trustee Statutory Fees ...........................................................76
    D.     Statutory Committee ........................................................................................................76
    E.     Reservation of Rights ......................................................................................................76
    F.     Successors and Assigns ...................................................................................................77
    G.     No Successor Liability .....................................................................................................77
    H.     Service of Documents ......................................................................................................77
    I.     Term of Injunctions or Stays ..........................................................................................78
    J.     Entire Agreement .............................................................................................................78
    K.     Governing Law .................................................................................................................78
    L.     Exhibits ............................................................................................................................79
    M.     Nonseverability of Plan Provisions upon Confirmation .................................................79
    N.     Closing of Chapter 11 Cases ...........................................................................................79
    O.     Conflicts ...........................................................................................................................79
    P.     No Strict Construction .....................................................................................................79
    Q.     Section 1125(e) Good Faith Compliance ........................................................................80
    R.     2002 Notice Parties .........................................................................................................80

**JOINT PLAN OF REORGANIZATION OF DOCUDATA SOLUTIONS, L.C. AND
ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

DocuData Solutions, L.C. and each of the other debtors and debtors-in-possession in the above-captioned cases (collectively, the "***Debtors***") propose this Plan (as defined herein) for the treatment and resolution of the outstanding Claims against, and Interests in, the Debtors.  Capitalized terms used in this Plan and not otherwise defined have the meanings ascribed to such terms in <u>Article I.A</u>.

Although proposed jointly for administrative purposes, this Plan constitutes a separate Plan for each Debtor for the treatment and resolution of outstanding Claims and Interests herein pursuant to the Bankruptcy Code.  The Debtors seek to consummate the Restructuring Transactions on the Effective Date of this Plan.  Each Debtor is a proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.  The classifications of Claims and Interests set forth in <u>Article III</u> shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable.  This Plan does not contemplate substantive consolidation of any of the Debtors.

This Plan shall be deemed a motion to approve the good-faith compromises and settlements of all Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, including the Committee Settlement and the Sub-Group DIP Lenders Settlement.

Reference is made to the Disclosure Statement for a discussion of the Debtors' history, businesses, results of operations, historical financial information, projections, and future operations, as well as a summary and analysis of this Plan and certain related matters, including distributions to be made under this Plan.  There also are other agreements and documents, which shall be Filed with the Bankruptcy Court, that are referenced in this Plan, the Plan Supplement, or the Disclosure Statement as exhibits and schedules.  All such exhibits and schedules are incorporated into and are a part of this Plan as if set forth in full herein.  Subject to certain restrictions and requirements set forth in 11 U.S.C. § 1127, Fed. R. Bankr. P. 3019, and the terms and conditions set forth in the Plan Support Agreement and this Plan, the Debtors reserve the right to alter, amend, modify, revoke, or withdraw this Plan before its substantial consummation.

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THIS PLAN ARE
ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR
ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.**

**Article I.
DEFINED TERMS AND RULES OF INTERPRETATION**

A.    *Defined Terms*

The following terms shall have the following meanings when used in capitalized form herein:

1.    "***Administrative Claim***" means a Claim for costs and expenses of administration under sections 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Professional Fee Claims, to the extent Allowed by the Bankruptcy Court; (c) all fees and charges assessed against the Estates under chapter 123 of title 28 United States Code, 28 U.S.C. §§ 1911-1930; (d) Cure Claims; (e) Restructuring Fees and Expenses, in accordance with the Plan Support Agreement or the DIP Orders, as applicable; and (f) the Premiums and Fees; *provided*, that the foregoing clauses (a) through (f) shall not be interpreted as enlarging the scope of sections 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code.  For the purposes of treatment and distributions under this Plan, if the Plan Support Agreement remains effective, the DIP Claims shall be subject to <u>Article II.B</u>.

2.        "*Affiliate*" means, with respect to any Entity, all Entities that would fall within the definition of an "affiliate" as such term is defined in section 101(2) of the Bankruptcy Code.  With respect to any Entity that is not a Debtor, the term "Affiliate" shall apply to such Entity as if the Entity were a Debtor.

3.        "*Allowed*" means with respect to any Claim or Interest (or any portion thereof): (a) any Claim or Interest that has been listed by the Debtors in their Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not "disputed" or "contingent," and with respect to which no contrary Proof of Claim or proof of Interest has been timely Filed as to which no objection or request for estimation has been Filed on or before the Claims Objection Deadline or the expiration of such other applicable period fixed by the Bankruptcy Court; (b) any Claim or Interest that is evidenced by a Proof of Claim or proof of Interest Filed by the applicable Claims Bar Date as to which no objection or request for estimation has been Filed on or before the Claims Objection Deadline or the expiration of such other applicable period fixed by the Bankruptcy Court; (c) any Claim of Interest as to which any objection has been settled, waived, withdrawn, or denied by a Final Order; (d) any Claim or Interest that is allowed (i) by a Final Order, (ii) by an agreement between the Holder of such Claim or Interest and the Debtors prior to the Effective Date, or the Reorganized Debtors on or after the Effective Date or (iii) pursuant to the terms of this Plan; or (e) any General Administrative Claim that is evidenced by a request for payment Filed on or before the General Administrative Claims Bar Date and to which no objection has been Filed on or before the General Administrative Claims Objection Deadline or as to which any objection has been settled, waived, withdrawn, or denied by a Final Order; *provided*, that, Holders of General Administrative Claims that arise in the ordinary course of the Debtors' businesses during the Chapter 11 Cases shall not be required to File a request for payment and the Debtors and the Holders of such General Administrative Claims shall retain all rights and defenses in connection with such General Administrative Claims.  Notwithstanding the foregoing: (x) any Claim or Interest that is expressly disallowed pursuant to this Plan shall not be Allowed unless otherwise ordered by the Bankruptcy Court; (y) unless otherwise specified in this Plan, the Allowed amount of Claims shall be subject to and shall not exceed the limitations under or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable; and (z) the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are reinstated or otherwise Unimpaired pursuant to this Plan.  "Allow," "Allows," and "Allowing" shall have correlative meanings.

4.        "*April 2026 Notes*" means Exela Intermediate LLC's and Exela Finance Inc.'s 11.500% First-Priority Senior Secured Notes due 2026 issued pursuant to the April 2026 Notes Indenture.

5.        "*April 2026 Notes Claim*" means any Claim on account of, arising under, derived from, or based on the April 2026 Notes Indenture, including any Claim for principal amounts outstanding, accrued and unpaid interest (including any compounding), fees, expenses, costs, indemnification, and other amounts arising under, derived from, related to, or based on the April 2026 Notes Documents.

6.        "*April 2026 Notes Collateral Agent*" means Wilmington Savings Fund Society, FSB, solely in its capacity as collateral agent under or in connection with the April 2026 Notes Documents or, as applicable, any successors, assignees, or delegees thereof.

7.        "*April 2026 Notes Deficiency Claim*" means, to the extent that any April 2026 Notes Claim is undersecured, a General Unsecured Claim equal to the difference in value between the full amount of such April 2026 Notes Claim and the value of the collateral securing such April 2026 Notes Claim.

8.        "*April 2026 Notes Documents*" means the April 2026 Notes Indenture together with all other related documents, instruments, and agreements, in each case as supplemented, amended, restated, or otherwise modified from time to time.

9.      "*April 2026 Notes Indenture*" means that certain indenture governing the April 2026 Notes dated as of July 11, 2023, among Exela Intermediate LLC, Exela Finance Inc., the guarantors and affiliated guarantors party thereto, and U.S. Bank Trust Company, National Association, as trustee.

10.      "*April 2026 Notes Indenture Trustee*" means U.S. Bank Trust Company, National Association solely in its capacity as trustee under or in connection with the April 2026 Notes Documents or, as applicable, any successors, assignees, or delegees thereof.

11.      "*Assumed Employee Agreements*" means all existing employment agreements between the Debtors and employees of the Debtors as of the Petition Date (other than awards of stock options, restricted stock, restricted stock units, and other equity awards, equity or equity-based incentive plans, employee stock purchase plans, and any other agreements or awards).

12.      "*Assumed Related Parties Contracts List*" means the list of Related Parties Contracts (including any amendments or modifications thereto) that shall be assumed pursuant to this Plan, which list shall be Filed with the Plan Supplement.

13.      "*Avenue*" means Avenue Capital Group on behalf of its Affiliates, subsidiaries, and certain managed funds and accounts.

14.      "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or similar actions or remedies that may be brought by or on behalf of the Debtors or the Estates under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies arising under chapter 5 and section 724(a) of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws, fraudulent conveyance laws, or other similar related laws, in each case whether or not litigation to prosecute such Claim(s) and Cause(s) of Action was commenced prior to the Effective Date.

15.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Cases.

16.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division, or such other court having jurisdiction over the Chapter 11 Cases.

17.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, the Federal Rules of Civil Procedure, as applicable to the Chapter 11 Cases or any proceedings therein, and the general, local, and chambers rules of the Bankruptcy Court, in each case as amended from time to time and as applicable to the Chapter 11 Cases.

18.      "*Blocked ETI Shares*" has the meaning set forth in Article IV.N.

19.      "*Blocked ETI Shares Documentation*" has the meaning set forth in Article IV.N.

20.      "*Blue Torch*" means Blue Torch Finance LLC, in its capacity as administrative agent and collateral agent under the Prepetition Term Loan Financing Agreement or, as applicable, any successors, assignees, or delegees thereof.

21.      "*Blue Torch Advisors*" means (a) Paul Hastings LLP as legal advisor and (b) any other professionals or advisors retained by Blue Torch with the prior written consent of the Debtors (not to be unreasonably withheld).

22.    "***Blue Torch Super Senior Exit Facility***" means any financing agreement the Reorganized Debtors enter into with Blue Torch Finance, LLC, if any.

23.    "***BPA***" means Debtor Exela Technologies BPA, LLC.

24.    "***BTC***" means BTC International Holdings, Inc..

25.    "***BTC Distribution Shares***" means all of the Interests of XBP held by BTC as of March 25, 2025.

26.    "***BTC Transaction***" means, as set forth in the Restructuring Steps Exhibit, a series of stock transfers, combinations, contributions, mergers, and/or transactions involving both Debtors and non-Debtor Entities whereby the BTC Distribution Shares are contributed, distributed, or cancelled and reissued Pro Rata to the Holders of Exchanged New Parent Interests (after giving effect to the Exchanged Equity Dilution) as of the Effective Date.  For the avoidance of doubt, except with respect to resales by an Entity that is an "Underwriter" under section 1145(b) of the Bankruptcy Code, the BTC Distribution Shares are intended to be exempt from registration as provided by section 1145(a) of the Bankruptcy Code.

27.    "***Business Day***" means any day, other than a Saturday, Sunday, or "legal holiday" (as that term is defined in Bankruptcy Rule 9006(a)), on which commercial banks are open for commercial business with the public in New York City, New York.

28.    "***Cash***" means the legal tender of the United States of America or the equivalent thereof.

29.    "***Cash Collateral***" has the meaning set forth in section 363(a) of the Bankruptcy Code.

30.    "***Causes of Action***" means any action, Claim, cross-claim, third-party claim, cause of action, controversy, dispute demand, right, Lien, indemnity, contribution, interest, guaranty, suit, obligation, liability, lost, debt, fee or expense, damage, judgment, account, defense, offset, power, privilege, proceeding, franchise, remedy, and license of any kind or character whatsoever, whether known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, as applicable, in contract or in tort, in law (whether local, state, or federal U.S. or non-U.S. law) or in equity, or pursuant to any other theory of local, state, or federal U.S. or non-U.S. law.  For the avoidance of doubt, "Causes of Action" include: (a) any right of setoff, counterclaim, or recoupment; (b) any Claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, actual or constructive fraudulent transfer or fraudulent conveyance or voidable transaction or similar law, violation of local, state, or federal or non-U.S. law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code or similar local, state, or federal U.S. or non-U.S. law; (d) any Claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any Avoidance Actions relating to or arising from any state or foreign law pertaining to any Avoidance Action, including preferential transfer, actual or constructive fraudulent transfer, fraudulent conveyance, or similar Claim; (f) the right to object to or otherwise contest Claims or Interests; and  (g) any "lender liability" or equitable subordination Claims or defenses.

31.    "***Chapter 11 Cases***" means (a) when used with reference to a particular Debtor, the voluntary case Filed for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the jointly administered chapter 11 cases for all of the Debtors.

32.     "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code.  Except where otherwise provided in context, "Claim" refers to such a claim against any of the Debtors.

33.     "*Claims Bar Date*" means the applicable deadline by which Proofs of Claim must be Filed under the Claims Bar Date Order.

34.     "*Claims Bar Date Order*" means the *Order (I) Establishing (A) Bar Dates and (B) Related Procedure for Filing Proofs of Claim, (II) Approving the Form and Manner of Notice Thereof and (III) Granting Related Relief* [Docket No. 434].

35.     "*Claims Objection Deadline*" means the date that is ninety (90) days after the Effective Date, which date may be extended pursuant to an order of the Bankruptcy Court upon a motion Filed by the Reorganized Debtors.

36.     "*Claims Ombudsman*" means the individual selected by the Committee and appointed by the Debtors in accordance with Article IV.T of this Plan.

37.     "*Claims Register*" means the official register of Claims and Interests maintained by the Notice and Claims Agent.

38.     "*Class*" means a category of Claims or Interests as set forth in Article III pursuant to section 1122(a) of the Bankruptcy Code.

39.     "*Committee*" means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the United States Trustee.

40.     "*Committee Professional Fees and Indenture Trustee Fees*" means the reasonable and documented fees, costs, and out-of-pocket expenses of the Committee Professionals, subject to a cap of $2,750,000.00 *less* amounts paid to the July 2026 Notes Indenture Trustee, *plus* amounts allocated by agreement between the Debtors and the Committee from (a) the Unsecured Cash Pool or (b) funds otherwise allocable to increase the Convenience Claim recoveries.

41.     "*Committee Professionals*" means (a) McDermott Will & Emery LLP; (b) Brown Rudnick LLP; and (c) FTI Consulting, Inc.

42.     "*Committee Settlement*" means the settlement reached among the Debtors, the Committee, and the Consenting Stakeholders pursuant to rule 9019 of the Bankruptcy Rules, the terms of which are set forth in Article IV.C and embodied in this Plan.

43.     "*Compensation and Benefits Programs*" means all employment, confidentiality, and non-competition agreements, bonus, gainshare, and incentive programs (other than awards of equity interests, stock options, restricted stock, restricted stock units, warrants, rights, convertible, exercisable, or exchangeable securities, stock appreciation rights, phantom stock rights, redemption rights, profits interests, equity-based awards, or contractual rights to purchase or acquire equity interest at any time and all rights arising with respect thereto), vacation, holiday pay, severance, retirement, savings, supplemental retirement, executive retirement, pension, deferred compensation, medical, dental, vision, life and disability insurance, flexible spending account, and other health and welfare benefit plans, employee expense reimbursement, and other compensation and benefit obligations of the Debtors, and all amendments and modifications thereto, applicable to the Debtors' employees, former employees, retirees, and non-employee directors and the employees, former employees, and retirees of their subsidiaries.

44.  "*Confirmation*" means the entry of the Confirmation Order or any Final Order Confirming this Plan entered by the Bankruptcy Court on the docket of the Chapter 11 Cases.

45.  "*Confirmation Date*" means the date on which Confirmation occurs.

46.  "*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court regarding Confirmation of this Plan pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code.

47.  "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, as such order may be amended, supplemented, or modified from time to time.

48.  "*Consenting Creditor Ad Hoc Group*" means that certain ad hoc group of Holders of outstanding April 2026 Notes Claims that are represented by the Consenting Creditor Ad Hoc Group Advisors.

49.  "*Consenting Creditor Ad Hoc Group Advisors*" means Ropes & Gray LLP, SOLIC Capital Advisors, LLC and such other professional advisors as are retained by the Consenting Creditor Ad Hoc Group with the prior written consent of the Debtors.

50.  "*Consenting Creditors*" means Holders of certain of the outstanding April 2026 Notes Claims or July 2026 Notes Claims that have executed and delivered counterpart signature pages to the Plan Support Agreement, or signature pages to a Joinder or Transfer Agreement (as applicable), to counsel to the Debtors, counsel to the Consenting Creditors, and counsel to the Consenting ETI Parties, in their capacities as parties to the Plan Support Agreement.

51.  "*Consenting ETI Parties*" means, collectively, ETI, GP 3XCV LLC, XCV-STS, LLC, and any of their respective successors and assigns in their capacities as Holders of April 2026 Notes Claims.

52.  "*Consenting ETI Party Advisors*" means (a) Cleary Gottlieb Steen & Hamilton LLP as legal advisor and (b) any other professionals or advisors retained by the Consenting ETI Parties with the prior written consent of the Debtors (not to be unreasonably withheld).

53.  "*Consenting Stakeholders*" means, collectively, the Consenting Creditors, the Consenting ETI Parties, and the Individual Owners.

54.  "*Convenience Claim*" means any Claim that would otherwise be a General Unsecured Claim that is (a) Allowed in the amount of $25,000 or less or (b) irrevocably reduced (and liquidated, if applicable) to $25,000 at the election of the Holder of an Allowed General Unsecured Claim evidenced on the election form timely and validly submitted by such Holder; *provided*, that a General Unsecured Claim may not be subdivided into multiple Claims of $25,000 or less for purposes of receiving treatment as a Convenience Claim; *provided*, *further*, that to the extent that a Holder of a Convenience Claim against a Debtor holds any joint and several liability claims, guaranty claims, or other similar claims against any other Debtors arising from or relating to the same obligations or liability as such Convenience Claim, such Holder shall only be entitled to a distribution on one Convenience Claim against the Debtors in full and final satisfaction of all such Claims.

55.  "*Cure Claim*" means any and all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be

agreed upon by the parties under an Executory Contract or Unexpired Lease) that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

56.     "***D&O Insurance Policies***" means, collectively, all insurance policies (including any "tail coverage" and all agreements, documents, or instruments related thereto) issued at any time to, or providing coverage to, any of the Debtors or any of the Debtors' current or former directors, members, managers, or officers for alleged "Wrongful Acts" (as defined in the D&O Insurance Policies), or similarly defined triggering acts, in their capacity as such.

57.     "***Debtor Release***" means the releases set forth in Article IX.B.

58.     "***Debtors***" has the meaning set forth in the preamble to this Plan.

59.     "***Definitive Documents***" means all of the definitive documents necessary to implement the Restructuring Transactions set forth in Section 3.01 of the Plan Support Agreement or the transactions set forth on the Restructuring Steps Exhibit and, in each case, any amendments, modifications, and supplements thereto and any related notes, certificates, agreements, documents, and instruments (as applicable), including: (a) this Plan and all documentation necessary to consummate this Plan, including the Plan Supplement, the Disclosure Statement, the Solicitation Procedures Motion, the Solicitation Procedures Order, the Solicitation Materials, and the Confirmation Order (including any exhibits or supplements Filed with respect to each of the foregoing); (b) the DIP Documents; (c) the Exit Facilities Documents; (d) the Exit Securitization Programs Documents; (e) the New Organizational Documents; (f) the Restructuring Steps Exhibit; (g) the Registration Rights Agreement; (h) the XBP Transaction Documents; (i) the New Parent Warrants Agreement; (j) the Rejected Executory Contract/Unexpired Lease List; (k) the Schedule of Retained Causes of Action; (l) the Assumed Related Parties Contracts List; (m) the Blocked ETI Shares Documentation; and (n) all other customary documents delivered in connection with transactions of this type (including any and all material documents, Bankruptcy Court or other judicial or regulatory orders, amendments, supplements, pleadings (including the First Day Pleadings and all orders sought pursuant thereto), motions, Filings, exhibits, schedules, appendices, or modifications to any of the foregoing and any related notes, certificates, agreements, and instruments (as applicable) necessary to implement the Restructuring Transactions).

60.     "***DIP Agent***" means Ankura Trust Company, LLC, as the collateral agent and administrative agent under the DIP Credit Agreement or, as applicable, any successors, assignees, or delegees thereof.

61.     "***DIP Backstop Commitment Letter***" means that certain Senior Secured Superpriority Priming Debtor-in-Possession and Exit Financing DIP Backstop Commitment Letter, dated as of March 3, 2025, among the DIP Backstop Commitment Parties, Exela Finance, Inc. and Exela Intermediate LLC.

62.     "***DIP Backstop Commitment Parties***" means the DIP Backstop Commitment Parties as defined in the DIP Backstop Commitment Letter.

63.     "***DIP Backstop Premium***" means (a) to the extent the Effective Date occurs prior to the maturity or earlier acceleration or other date on which all amounts under the DIP Facility become due and payable, 5.00% of each of (i) the Exchanged New Parent Interests issued and outstanding on the Effective Date, to be issued to the DIP Backstop Commitment Parties in accordance with the DIP Backstop Commitment Letter on the Effective Date and (ii) the BTC Distribution Shares or (b) to the extent the DIP Facility matures, is accelerated, or all amounts thereunder become due and payable, prior to the Effective Date, $4,000,000 payable in Cash to the DIP Backstop Commitment Parties, in each case in accordance with the DIP Backstop Commitment Letter.

7

64.    "*DIP Claim*" means any Claim arising from, under, or in connection with the DIP Credit Agreement or any other DIP Documents, including Claims for the aggregate outstanding principal amount of, plus unpaid interest on, the DIP Obligations, and all fees, and other expenses related thereto and arising and payable under the DIP Facility.

65.    "*DIP Credit Agreement*" means that certain Superpriority Priming Debtor-in-Possession Financing Agreement by and among the Debtors, the DIP Agent, and the DIP Lenders, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof.

66.    "*DIP Documents*" means the "Loan Documents" as defined in the DIP Credit Agreement, in each case as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof prior to the Effective Date.

67.    "*DIP Facility*" means the debtor-in-possession term loan credit facility provided by the DIP Lenders under the DIP Credit Agreement.

68.    "*DIP Lenders*" means the lenders with respect to the DIP Facility.

69.    "*DIP Obligations*" means all obligations arising under the DIP Documents, including the New Money Loans and Roll-Up Loans.

70.    "*DIP Orders*" means, together, the Interim DIP Order and Final DIP Order.

71.    "*Disclosure Statement*" means the disclosure statement for this Plan, including all exhibits and schedules thereto, as amended, supplemented, or modified from time to time, that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable law.

72.    "*Disinterested Director*" means Alan Carr, a disinterested director of Exela Intermediate LLC.

73.    "*Disputed*" means, with respect to any Claim or Interest, except as otherwise provided herein, a Claim or Interest that is not yet Allowed, but has not yet been disallowed pursuant to this Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court or other court of competent jurisdiction.

74.    "*Distribution Agent*" means the Reorganized Debtors or any party designated by the Debtors or the Reorganized Debtors to serve as distribution agent under this Plan, or, as applicable, any successors, assignees, or delegees thereof.

75.    "*Distribution Agent Agreement*" means any applicable agreement setting forth the powers, obligations, and compensation of a Distribution Agent.

76.    "*Distribution Record Date*" means, other than with respect to publicly held securities, the date for determining which Holders of Claims are eligible to receive distributions under this Plan on account of Allowed Claims, which date shall be the Confirmation Date or such other date agreed to by the Debtors, the Required Consenting Creditors and the Consenting ETI Parties, subject to Article VIII.

77.    "*DTC*" means the Depository Trust Company or any successor thereto.

78.     "***Effective Date***" means the date on which all conditions specified in <u>Article VIII.A</u> have been (a) satisfied or (b) waived pursuant to <u>Article VIII.C</u>.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

79.     "***Entity***" means an entity as defined in section 101(15) of the Bankruptcy Code.

80.     "***ER3 Securitization Program***" means that certain securitization program governed by various documents, including that certain *Amended and Restated Receivables Purchase Agreement*, dated as of June 17, 2022 (as amended, modified, or supplemented from time to time), by and among non-Debtor Receivables 3, as seller, ETI, as initial servicer, PNC Bank, National Association, as administrative agent, PNC Capital Markets, LLC, as structuring agent, and the purchasers party thereto.

81.     "***Estate***" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

82.     "***ETI***" means Exela Technologies, Inc.

83.     "***ETI Equity Distribution***" means (a) the ETI Split Percentage of the Exchanged New Parent Interests, *plus* (b) the New Parent Warrants, *plus* (c) the ETI Split Percentage of the BTC Distribution Shares.

84.     "***ETI Funding Obligations***" means, collectively, the Initial ETI Funding Obligations and the Subsequent ETI Funding Obligation.

85.     "***ETI Holders***" means the Consenting ETI Parties, other than ETI, and any of their respective successors and assigns with respect to the April 2026 Notes Claims.

86.     "***ETI Penalty***" means, in the event that neither (a) both (i) a commitment for the XBP Funding Requirement is obtained on or prior to the deadline to object to entry of the Confirmation Order (as it may be extended or adjourned) and (ii) the XBP Funding has occurred on or prior to the Effective Date, nor (b) the XBP Alternative Funding has occurred on or prior to the Effective Date, then the ETI Split Percentage shall be reduced by 15% and the Non-ETI Split Percentage shall be increased by 15%.  For example, in the event the ETI Penalty is triggered, assuming no Exchanged Equity Dilution, the ETI Split Percentage would be decreased from 27.5% to 12.5%, and the Non-ETI Split Percentage would be increased from 72.5% to 87.5%.

87.     "***ETI Pro Rata Share***" means, with respect to the ETI Equity Distribution on account of an Allowed Claim, the ratio (expressed in a percentage) that the amount of such Allowed Claim bears to the aggregate amount of all Allowed Claims in its Class that are held by ETI or ETI Holders.

88.     "***ETI Split Percentage***" means, subject to the Exchanged Equity Dilution, 27.5%, subject to (a) Pro Rata reduction (along with the Non-ETI Split Percentage) by the July 2026 Noteholder Split Percentage and (b)  reduction on account of the ETI Penalty (if any).

89.     "***Exchanged Equity Dilution***" means, with respect to Exchanged New Parent Interests, dilution on account of the Premiums and Fees and the New Parent Warrants; *provided*, that for the avoidance of doubt, with respect to distributions of Exchanged New Parent Interests and BTC Distribution Shares contemplated to occur on the Effective Date, no dilutive effect will be given on the Effective Date on account of the New Parent Warrants and any New Parent Interests issuable upon the exercise thereof.

90. "*Exchanged New Parent Interests*" means New Parent Interests, in the aggregate, equal to the value of the sum of (a) 100% of the Intermediate Interests; (b) NEON Acquisition, LLC; and (c) Reaktr, LLC as set forth on Exhibit H to the Disclosure Statement.

91. "*Exculpated Parties*" means, collectively:  (a) the Debtors; (b) the Disinterested Director; and (c) the Committee and each member of the Committee.

92. "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code, other than an Unexpired Lease.

93. "*Existing BPA Equity Interest*" means any Interest in BPA, all of which are 100% owned by ETI.

94. "*Exit Debt*" means (a) the Rollover Exit Notes and (b) the indebtedness issued under the Supplemental Exit Facility.

95. "*Exit Facilities*" means, collectively, the Rollover Exit Facility and the Supplemental Exit Facility.

96. "*Exit Facilities Documents*" means, collectively, the Rollover Exit Facility Documents and the Supplemental Exit Facility Documents.

97. "*Exit Financing Facilities Agents*" means the administrative agents and collateral agents or the indenture trustees and collateral agents, as applicable, pursuant to the Exit Facilities.

98. "*Exit Securitization Programs*" means (a) one or more Postpetition Securitization Programs amended, extended or otherwise modified if and to the extent agreed in writing by the parties to the Postpetition Securitization Programs and/or (b) other alternative exit financing (if any) to refinance all or a portion of the Postpetition Securitization Programs.

99. "*Exit Securitization Programs Documents*" means the agreements, guarantee, security agreements, deed of trust, mortgage, control agreements, instruments, and other documents to be delivered or entered into in connection with the Exit Securitization Programs.

100. "*Federal Judgment Rate*" means the federal judgment interest rate in effect pursuant to 28 U.S.C. § 1961 as of the Petition Date, compounded annually.

101. "*File*" or "*Filed*" or "*Filing*" means file, filed, or filing, respectively, with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

102. "*Final DIP Order*" means the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 397].

103. "*Final Order*" means an order entered by the Bankruptcy Court or other court of competent jurisdiction: (a) that has not been reversed, stayed, modified, amended, or revoked, and as to which (i) any right to appeal or seek leave to appeal, certiorari, review, reargument, stay, or rehearing has been waived or (ii) the time to appeal or seek leave to appeal, certiorari, review, reargument, stay, or rehearing has expired and no appeal, motion for leave to appeal, or petition for certiorari, review, reargument, stay, or

rehearing is pending or (b) as to which an appeal has been taken, a motion for leave to appeal, or petition for certiorari, review, reargument, stay, or rehearing has been filed and (i) such appeal, motion for leave to appeal or petition for certiorari, review, reargument, stay, or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which leave to appeal, certiorari, review, reargument, stay, or rehearing was sought and (ii) the time to appeal (in the event leave is granted) further or seek leave to appeal, certiorari, further review, reargument, stay, or rehearing has expired and no such appeal, motion for leave to appeal, or petition for certiorari, further review, reargument, stay, or rehearing is pending; *provided*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not preclude such order from being a Final Order.

104.    "***Final Securitization Order***" means the *Final Order (I) Authorizing Certain Debtors to Continue Selling, Contributing, and Servicing Receivables and Related Assets Pursuant to the Securitization Program, (II) Modifying the Automatic Stay, and (III) Granting Related Relief* [Docket No. 303].

105.    "***First Day Pleadings***" means any petition, motion, application, or proposed order Filed at the commencement of the Chapter 11 Cases.

106.    "***Gates***" means Gates Capital Management, Inc on behalf of its Affiliates, subsidiaries, and certain managed funds and accounts.

107.    "***Gates Backstop Commitment***" means a commitment by Gates to backstop the funding of the remaining 49.99% of Cash under the Gates Exit Facility required to repay the Prepetition Term Loan Facility, subject to a Pro Rata, dollar-for-dollar reduction to the extent the Projected Emergence Liquidity exceeds $35,000,000 and such excess Cash is used to pay down the Prepetition Term Loan Facility.

108.    "***Gates Backstop Premium***" means, in exchange for the Gates Funding Commitment and Gates Backstop Commitment, a fee equal to 4% of each of (a) the Exchanged New Parent Interests and (b) the BTC Distribution Shares, which fee shall be payable to Gates on the Effective Date.

109.    "***Gates Exit Facility***" means the exit financing facility to be provided on the terms and conditions set forth in the term sheet Filed at Docket No. 401-1, consisting of the Gates Backstop Commitment and the Gates Funding Commitment, and which shall also consist of (a) $6,000,000 to repay DIP Claims of Sub-Group DIP Lenders under the Interim DIP Order and (b) an uncommitted $10,000,000 incremental facility as provided for under the Prepetition Term Loan Facility.

110.    "***Gates Funding Commitment***" means a commitment by Gates to fund 50.01% of the Cash under the Gates Exit Facility required to repay the Prepetition Term Loan Facility, subject to a Pro Rata, dollar-for-dollar reduction to the extent the Projected Emergence Liquidity exceeds $35,000,000 and such excess Cash is used to pay down the Prepetition Term Loan Facility.

111.    "***General Administrative Claim***" means any Administrative Claim, other than a Professional Fee Claim, a Claim for Restructuring Fees and Expenses (in accordance with the Plan Support Agreement or the DIP Orders, as applicable), a DIP Claim, a Postpetition Securitization Claim, a Claim for the Premiums and Fees, or a Claim for fees and charges assessed against the Estates under chapter 123 of title 28 United States Code, 28 U.S.C. §§ 1911-1930.

112.    "***General Administrative Claims Bar Date***" means the Business Day that is thirty (30) days after the Effective Date, or such other date as approved by Final Order of the Bankruptcy Court, which shall be the deadline to File requests for payment of General Administrative Claims.

113.    "*General Administrative Claims Objection Deadline*" means the Business Day that is 60 days after the Effective Date; *provided* that the General Administrative Claims Objection Deadline may be extended pursuant to an order of the Bankruptcy Court upon a motion Filed by the Reorganized Debtors after notice and a hearing.

114.    "*General Unsecured Claim*" means a prepetition Claim that is not secured by a Lien on property in which one of the Debtors' Estates has an interest that is not: (a) a Convenience Claim; (b) an Intercompany Claim; (c) an Other Priority Claim; (d) a Priority Tax Claim; (e) a July 2026 Notes Claim; or (f) a Subordinated Claim; *provided*, that pursuant to the Committee Settlement, the April 2026 Notes Deficiency Claims, if any, shall be waived and obtain no recovery on account of such April 2026 Notes Deficiency Claims.

115.    "*Governance Term Sheet*" means the term sheet setting forth the preliminary material terms in respect of the corporate governance of New Parent, including all exhibits and schedules thereto, as it may be altered, amended, modified, or supplemented from time to time.

116.    "*Governmental Unit*" means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

117.    "*Holder*" means any Entity that is the record or beneficial owner of any Claim or Interest, including any nominees, investment managers, investment advisors, sub-advisors, or managers of funds or discretionary accounts that hold, or trustees of trusts that hold, any Claim or Interest.

118.    "*Impaired*" means, with respect to any Claim or Interest, a Claim or Interest that is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

119.    "*Indemnification Provisions*" means each of the Debtors' indemnification provisions in effect as of the Petition Date, whether in the Debtors' memoranda and articles of association, bylaws, limited liability company agreements, operating agreements, certificates of incorporation, certificates of formation, other formation documents, board resolutions, management or indemnification agreements, employment contracts, or otherwise providing a basis for any obligation of a Debtor to indemnify, defend, reimburse, or limit the liability of, or to advance fees and expenses to, any of the Debtors' current and former directors, officers, equity holders, managers, members, employees, accountants, investment bankers, attorneys, and other professionals of the Debtors, and each of the foregoing solely in their capacity as such.

120.    "*Indenture Trustees*" means, collectively, the April 2026 Notes Indenture Trustee and the July 2026 Notes Indenture Trustee.

121.    "*Independent Tax Advisor*" means Ernst & Young.

122.    "*Individual Owners*" means, collectively, Par Chadha (in his capacity as chairman of the board of directors of ETI), GP 2XCV LLC, and General Pacific, LLC.

123.    "*Initial ETI Funding Obligation*" means the first $15,000,000 owed by the Debtors or Reorganized Debtors in connection with the Transaction Tax Liability.  Payment of the Initial ETI Funding Obligation may be in the form of the purchase for Cash of $15,000,000 of Rollover Exit Notes or the purchase of New Parent Interests for $15,000,000 in Cash at Plan Equity Value.

124.    "*Insurance Contracts*" means (a) any and all insurance policies issued at any time to, or that otherwise may provide or may have provided coverage to, any of the Debtors, regardless of whether

the insurance policies were issued to a Debtor or to a Debtor's prior Affiliates, subsidiaries, or parents or otherwise, or to any of their predecessors, successors, or assigns; (b) any and all agreements, documents, surety bonds, or other instruments relating thereto, including any and all agreements with a third party administrator for claims handling, risk control or related services, any and all D&O Insurance Policies, and any and all Workers' Compensation Contracts; and (c) any and all collateral documents and security agreements securing the Debtor's obligations under the insurance policies, including escrow accounts, deposit accounts, Cash Collateral, and letters of credit.  For the avoidance of doubt, Insurance Contracts include any insurance policies issued at any time to the Debtors' prior Affiliates, subsidiaries, and parents or otherwise, or to any of their predecessors, successors, or assigns, under which Debtors had, have, or may have any rights solely to the extent of the Debtors' rights thereunder.

125. "*Insurer*" means any company or other Entity that issued or entered into an Insurance Contract (including any third-party administrator) and any respective predecessors and/or Affiliates thereof.

126. "*Intercompany Claim*" means any Claim against any of the Debtors held by another Debtor.

127. "*Intercompany Interest*" means any Interest in one Debtor held by another Debtor.

128. "*Interest*" means any equity security within the meaning of section 101(16) of the Bankruptcy Code including, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, membership interests, and any other equity, ownership, or profits interests in any Debtor, and options, warrants, rights, stock appreciation rights, phantom units, incentives, commitments, calls, redemption rights, repurchase rights, or other securities or arrangements to acquire or subscribe for, or which are convertible into, or exercisable or exchangeable for, the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, membership interests, or any other equity, ownership, or profits interests in any Debtor or its Affiliates and subsidiaries (in each case whether or not arising under or in connection with any employment agreement).

129. "*Interim DIP Order*" means the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 58].

130. "*Interim Securitization Order*" means the *Interim Order (I) Authorizing Certain Debtors to Continue Selling, Contributing, and Servicing Receivables and Related Assets Pursuant to the Securitization Program, (II) Modifying the Automatic Stay, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* [Docket No. 59].

131. "*Intermediate Interests*" means the new equity Interests in Exela Technologies BPA, LLC after cancellation of all Existing BPA Equity Interests and prior to the consummation of the XBP Transaction.

132. "*Joinder*" means a joinder to the Plan Support Agreement, substantially in the form attached as Exhibit B thereto, providing, among other things, that such Person signatory thereto is bound by the terms of the Plan Support Agreement to the extent provided therein.

133. "*July 2026 Noteholder Split Percentage*" means the percentage that, when applied to the July 2026 Noteholders Equity Distribution, results in each Holder of an Allowed July 2026 Notes Claim receiving the same percentage recovery as is received by each Non-ETI Holder of an Allowed April 2026 Notes Claim, including as a result of the Exchanged Equity Dilution.

134.    "***July 2026 Noteholders Equity Distribution***" means (a) the July 2026 Noteholder Split Percentage of the Exchanged New Parent Interests *plus* (b) the July 2026 Noteholder Split Percentage of the BTC Distribution Shares.

135.    "***July 2026 Notes***" means Exela Intermediate LLC's and Exela Finance Inc.'s 11.500% First-Priority Senior Secured Notes due 2026 issued pursuant to the July 2026 Notes Indenture.

136.    "***July 2026 Notes Claim***" means any Claim on account of, arising under, derived from, or based on the July 2026 Notes Indenture, including any Claim for principal amounts outstanding, accrued and unpaid interest (including any compounding), fees, expenses, costs, indemnification, and other amounts arising under, derived from, related to, or based on the July 2026 Notes Documents.

137.    "***July 2026 Notes Documents***" means the July 2026 Notes Indenture together with all other related documents, instruments, and agreements, in each case as supplemented, amended, restated, or otherwise modified from time to time.

138.    "***July 2026 Notes Indenture***" means that certain indenture governing the July 2026 Notes dated as of December 9, 2021, among Exela Intermediate LLC, Exela Finance Inc., the guarantors and affiliated guarantors party thereto and U.S. Bank, National Association, as trustee.

139.    "***July 2026 Notes Indenture Trustee***" means CSC Delaware Trust Company, solely in its capacity as trustee under or in connection with the July 2026 Notes Documents or, as applicable, any successors, assignees, or delegees thereof.

140.    "***Lien***" means a lien as defined in section 101(37) of the Bankruptcy Code.

141.    "***Nasdaq ISE Exchange***" means the Nasdaq International Securities Exchange.

142.    "***New Board***" means the initial directors or managers, as applicable, of New Parent (following consummation of the XBP Transaction) selected in accordance with Article IV.Q of this Plan, whose identities shall be set forth as part of the Plan Supplement.

143.    "***New Money Loans***" has the meaning set forth in Section 2.01(a) of the DIP Credit Agreement.

144.    "***New Organizational Documents***" means the new Organizational Documents of the Reorganized Debtors (including the New Parent Warrants Agreement), after giving effect to the Restructuring Transactions, as applicable, including any shareholders agreement, limited liability company agreement, or similar document.

145.    "***New Parent***" means XBP (or such other Entity described in the Restructuring Steps Exhibit as the ultimate direct and indirect parent of the Reorganized Debtors) after the consummation of all transactions set forth in the Restructuring Steps Exhibit, including, and as applicable, the issuance of the Intermediate Interests and exchange thereof for Exchanged New Parent Interests (subject to the Exchanged Equity Dilution as set forth in this Plan) pursuant to the formula(s) set forth in the Restructuring Steps Exhibit, including the BTC Transaction and the XBP Transaction.

146.    "***New Parent Interests***" means the common equity of New Parent, whether (a) previously issued and outstanding prior to the consummation of the Restructuring Transactions or (b) authorized and issued pursuant to this Plan, the New Organizational Documents (including upon exercise of the New Parent Warrants, as applicable), including any authorized but unissued units, shares, or other equity interests, after

14

the consummation of all transactions set forth in the Restructuring Steps Exhibit, including, and as applicable, the issuance of the Intermediate Interests and exchange thereof for Exchanged New Parent Interests (subject to the Exchanged Equity Dilution as set forth in this Plan) pursuant to the formula(s) set forth in the Restructuring Steps Exhibit, including the BTC Transaction and the XBP Transaction.

147.    "***New Parent Shareholder Rights Plan***" means a shareholder rights plan for New Parent.

148.    "***New Parent Warrants***" means warrants to be issued on the terms set forth in the New Parent Warrants Agreement and exercisable (a) for an amount of New Parent Interests equal to seven-and-one-half percent (7.5%) of the Exchanged New Parent Interests issued and outstanding on the Effective Date after giving effect to the Exchanged Equity Dilution and (b) on a "cash" or "cashless basis" within five (5) years of the Effective Date at an equity value of the Plan Equity Value.

149.    "***New Parent Warrants Agreement***" means the form of warrant agreement governing the New Parent Warrants.

150.    "***Non-Debtor Affiliates***" means the Debtors' Affiliates that are not Debtors.

151.    "***Non-ETI Equity Distribution***" means (a) the Non-ETI Split Percentage of the Exchanged New Parent Interests *plus* (b) the Non-ETI Split Percentage of the BTC Distribution Shares.

152.    "***Non-ETI Holder***" means a Holder of an April 2026 Notes Claim that is not ETI or an ETI Holder.

153.    "***Non-ETI Split Percentage***" means, subject to the Exchanged Equity Dilution, 72.5%, subject to (a) Pro Rata reduction (along with the ETI Split Percentage) by the July 2026 Noteholder Split Percentage and (b) increase on account of the ETI Penalty (if any).

154.    "***Non-Priority Tax Claim***" means any Claim of a Governmental Unit that is not a Priority Tax Claim.

155.    "***Non-Tax Unsecured Cash Pool Target Recovery***" means the percentage recovery that Holders of Allowed General Unsecured Claims would receive under this Plan if (a) the amount of the Unsecured Cash Pool were $4.75 million less any amounts paid to reimburse Committee Professional Fees and Indenture Trustee Fees in accordance with the Committee Settlement; and (b)  Non-Priority Tax Claims were excluded from the calculation of the amount of aggregate Allowed General Unsecured Claims.

156.    "***Non-Voting Classes***" means, collectively, Classes 1, 2, 7, 8, 9, 10, and 11.

157.    "***Noteholder Pro Rata Share***" means, with respect to the Non-ETI Equity Distribution on account of an Allowed Claim, the ratio (expressed in a percentage) that the amount of such Allowed Claim bears to the aggregate amount of all Allowed Claims in its Class that are held by Non-ETI Holders.

158.    "***Notice and Claims Agent***" means Omni Agent Solutions, Inc., in its capacity as noticing, claims, and solicitation agent for the Debtors, pursuant to an order of the Bankruptcy Court.

159.    "***Notice of Effective Date***" means the notice announcing the occurrence of the Effective Date, to be Filed by the Debtors with the Bankruptcy Court on the Effective Date.

160.    "***Notice of Revised Allocation Exhibit***" means, if any, a revised form of Exhibit H to the Disclosure Statement, included in the Plan Supplement, setting forth a revised allocation of New Parent Interests.

161.    "***Organizational Documents***" means, with respect to any Person other than a natural person, the organizational and governance documents for each such Person including limited liability company agreements, operating agreements, certificates of incorporation, certificates of formation, certificates of limited partnership, articles of organization (or equivalent organizational documents), warrants agreements, certificates of designation for preferred stock or other forms of preferred equity, by-laws, partnership agreements, operating agreements, limited liability company agreements, shareholders' agreements, members' agreement, or equivalent governing documents.

162.    "***Other Existing Equity Interest***" means any Interest in Debtor Neon Acquisition, LLC or Debtor XCV-EMEA.  For the avoidance of doubt, Other Existing Equity Interests do not include Intercompany Interests.

163.    "***Other Priority Claim***" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

164.    "***Other Secured Claim***" means any Secured Claim other than a DIP Claim, a Postpetition Securitization Programs Claim, or an April 2026 Notes Claim.

165.    "***Person***" means a person as defined in section 101(41) of the Bankruptcy Code.

166.    "***Petition Date***" means March 3, 2025.

167.    "***Plan***" means this joint plan of reorganization under chapter 11 of the Bankruptcy Code, as it may be altered, amended, modified, or supplemented from time to time in accordance with the terms of the Bankruptcy Code, the Bankruptcy Rules, or the terms hereof, as the case may be, and the Plan Supplement, which is incorporated herein by reference, including all exhibits and schedules hereto and thereto.

168.    "***Plan Equity Value***" means the per-unit or per-share value of the New Parent Interests as of the Effective Date, as set forth in the Disclosure Statement and as agreed pursuant to the settlements entered into and incorporated in the Plan.

169.    "***Plan Securities***" means, collectively, the Exchanged New Parent Interests, the Intermediate Interests, the BTC Distribution Shares, and the New Parent Warrants.

170.    "***Plan Supplement***" means one or more supplemental appendices to this Plan, which shall include, among other things, draft forms of documents (or terms sheets thereof), schedules, and exhibits to this Plan, as may be amended, modified, or supplemented from time to time on or before the Effective Date, including the following documents: (a) the New Organizational Documents; (b) the Exit Facilities Documents; (c) the New Parent Warrants Agreement; (d) XBP Transaction Documents; (e) to the extent known and determined, a document disclosing the identity of the members of the directors and officers of the Reorganized Debtors; (f) the Rejected Executory Contract/Unexpired Lease List; (g) a Schedule of Retained Causes of Action; (h) the Governance Term Sheet; (i) the Exit Securitization Programs Documents; (j) the Restructuring Steps Exhibit; (k) the Registration Rights Agreement; (l) the New Parent Shareholder Rights Plan; (m) the Assumed Related Parties Contracts List; (n) the Blocked ETI Shares Documentation; (o) the Notice of Revised Allocation Exhibit; and (p) such other documents as may be specified in this Plan.

171.    "**Plan Supplement Filing Date**" means the date on which the initial Plan Supplement is Filed with the Bankruptcy Court, which shall be at least five (5) Business Days before the deadline to File objections to Confirmation.

172.    "**Plan Support Agreement**" means that certain Plan Support Agreement, dated as of April 24, 2025, by and among the Debtors, the Consenting Creditors, the Consenting ETI Parties, and the Individual Owners (as amended, supplemented, or modified from time to time, including all exhibits, attachments, and appendices incorporated therein), attached as Exhibit B to the Disclosure Statement.

173.    "**Plan Term Sheet**" means that certain Plan Term Sheet attached as Exhibit A to the Plan Support Agreement.

174.    "**Postpetition Securitization Programs**" means, collectively, the Prepetition Securitization Programs, as continued on a postpetition basis and otherwise in accordance with the Plan Support Agreement and the Securitization Orders.

175.    "**Postpetition Securitization Programs Claim**" means any Administrative Claim on account of the Securitization Program Obligations (as defined in the Final Securitization Order).

176.    "**Postpetition Securitization Programs Documents**" means the documents governing the Postpetition Securitization Programs in accordance with the terms thereof and the Securitization Orders, as applicable, prior to the Effective Date.

177.    "**Premiums and Fees**" means the DIP Backstop Premium, the Gates Backstop Premium, and the XBP Alternative Funding Fee (if any).

178.    "**Prepetition Securitization Programs**" means, collectively, in each case as of the Petition Date, (a) the ER3 Securitization Program; (b) the securitization facility governed by that certain Secured Promissory Note, dated as of February 27, 2023, between non-Debtor Receivables 3 Holdco, LLC and BRF Finance Co., LLC (as assignee of B. Riley Commercial Capital, LLC); and (c) the Rust Securitization Program.

179.    "**Prepetition Securitization Programs Documents**" means the documents governing the Prepetition Securitization Programs.

180.    "**Prepetition Term Loan Claim**" means any Claim on account of, arising under, derived from, or based on the Prepetition Term Loan Financing Agreement, including any Claim for principal amounts outstanding, accrued and unpaid interest (including any compounding), fees, expenses, costs, indemnification, and other amounts arising under, derived from, related to, or based on the Prepetition Term Loan Documents.

181.    "**Prepetition Term Loan Documents**" means the Prepetition Term Loan Financing Agreement together with all other related documents, instruments, and agreements in respect of the Prepetition Term Loans, in each case, as amended, restated, amended and restated, modified, or supplemented from time to time in accordance with the terms thereof.

182.    "**Prepetition Term Loan Facility**" means the financing facility provided under the Prepetition Term Loan Documents.

183.    "**Prepetition Term Loan Financing Agreement**" means that certain Financing Agreement, dated as of July 11, 2023, as may be amended and restated, modified, or supplemented from time to time in accordance with the terms thereof, by and among Exela Intermediate LLC and Exela Finance Inc., as

borrowers, the guarantors and affiliated guarantors party thereto, the lenders party thereto from time to time, and Blue Torch Finance LLC, as collateral agent and administrative agent.

184.     "***Prepetition Term Loans***" means the senior secured first-lien term loans issued pursuant to the Prepetition Term Loan Financing Agreement.

185.     "***Priority Tax Claim***" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

186.     "***Pro Rata***" means, as applicable, (a) the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class or (b) a proportionate allocation.

187.     "***Professional Fee Claim***" means a Claim by a Retained Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code (subject to any applicable agreements by such Retained Professional with respect thereto).

188.     "***Professional Fee Escrow Account***" means a segregated interest-bearing account funded by the Debtors with Cash no later than two (2) Business Days before the anticipated Effective Date in an amount equal to the Professional Fee Escrow Amount.

189.     "***Professional Fee Escrow Amount***" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses the Retained Professionals have incurred or shall incur in rendering services in connection with the Chapter 11 Cases before and as of the Effective Date, which shall be estimated pursuant to the method set forth in Article II.A.2.

190.     "***Projected Emergence Liquidity***" means the projected, unrestricted Cash on hand of the Debtors or Reorganized Debtors on the Effective Date (as determined in good faith by the Debtors' Chief Restructuring Officer).

191.     "***Proof of Claim***" means a proof of Claim Filed against any Debtor in the Chapter 11 Cases.

192.     "***Registration Rights Agreement***" means a registration rights agreement with respect to New Parent Interests in the form attached to the Plan Supplement and in accordance with the Plan Support Agreement, granting registration rights to all recipients of New Parent Interests (including the BTC Distribution Shares) under this Plan.

193.     "***Reinstatement***" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code. "Reinstated" shall have a correlative meaning.

194.     "***Rejected Executory Contract/Unexpired Lease List***" means the list of Executory Contracts and/or Unexpired Leases (including any amendments or modifications thereto), if any, that shall be rejected pursuant to this Plan, which shall be Filed with the Plan Supplement.

195.     "***Related Parties***" means, with respect to an Entity, each of, and in each case in its capacity as such, such Entity's current and former Affiliates, and such Entity's and such Affiliates' current and former members, directors, managers, officers, proxyholders, control persons, investment committee members, special committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds (including any beneficial holders for the account of whom such funds are

18

managed), predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, Representatives, investment managers, and other professionals and advisors, each in their capacity as such, and any such Person's or Entity's respective heirs, executors, estates, and nominees.

196. "***Related Parties Contracts***" means Executory Contracts or Unexpired Leases (in each case, including any amendments or modifications thereto) with the Debtors' Related Parties. For the avoidance of doubt, Related Parties Contracts do not include the Prepetition Securitization Programs Documents or the Postpetition Securitization Programs Documents.

197. "***Release Opt-Out Form***" means the form to be provided to Holders (other than Debtors) of Claims and Interests in Non-Voting Classes through which such Holders may elect to affirmatively opt out of the Third-Party Release.

198. "***Released Parties***" means, collectively, each of, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each Non-Debtor Affiliate; (d) each of the Debtors' and Non-Debtor Affiliates' current and former directors and officers; (e) XBP; (f) each Consenting Stakeholder; (g) the Committee and each of its members in such capacity; (h) Blue Torch; (i) the April 2026 Notes Indenture Trustee; (j) the July 2026 Notes Indenture Trustee; (k) the April 2026 Notes Collateral Agent; (l) the DIP Agent; (m) each DIP Lender; (n) the DIP Backstop Commitment Parties; (o) the Exit Financing Facility Agents; (p) each lender under the Exit Facilities; (q) the Securitization Programs Parties; (r) each Holder of a Claim in a Voting Class that does not affirmatively elect to "opt out" of the Third-Party Release as provided on its respective ballot; (s) each Holder of a Claim or Interest in a Non-Voting Class that does not affirmatively elect to "opt out" of the Third-Party Release as provided on its respective Release Opt-Out Form; and (t) each Related Party of each Entity in clauses (a) through (s); *provided*, that any Holder of a Claim or Interest that timely objects to the Third-Party Release, either through (i) a formal objection Filed on the docket of the Chapter 11 Cases or (ii) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or via electronic mail, as applicable, before the Confirmation Hearing, shall not be a "Released Party."

199. "***Releases***" means, collectively, the Debtor Release and the Third-Party Release as set forth in Article IX.

200. "***Releasing Parties***" means, collectively, each of, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each Non-Debtor Affiliate; (d) each of the Debtors', and Non-Debtor Affiliates' current and former directors and officers; (e) XBP; (f) each Consenting Stakeholder; (g) the Committee and each of its members in such capacity; (h) Blue Torch; (i) the April 2026 Notes Indenture Trustee; (j) the July 2026 Notes Indenture Trustee; (k) the April 2026 Notes Collateral Agent; (l) the DIP Agent; (m) each DIP Lender; (n) the DIP Backstop Commitment Parties; (o) the Exit Financing Facility Agents; (p) each lender under the Exit Facilities; (q) the Securitization Programs Parties; (r) each Holder of a Claim in a Voting Class that does not affirmatively elect to "opt out" of the Third-Party Release as provided on its respective ballot; (s) each Holder of a Claim or Interest in a Non-Voting Class that does not affirmatively elect to "opt out" of the Third-Party Release as provided on its respective Release Opt-Out Form; and (t) each Related Party of each Entity in clauses (a) through (s), solely to the extent such Related Party (I) would be obligated to grant a release under principles of agency if it were so directed by the Entity in the foregoing clauses (a) through (s) to whom they are related or (II) may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity in clause (a) through (s); *provided*, that, any Holder of a Claim or Interest that timely objects to the Third-Party Release, either

through (i) a formal objection Filed on the docket of the Chapter 11 Cases or (ii) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or via electronic mail, as applicable, before the Confirmation Hearing, shall not be a "Releasing Party."

201.     "***Reorganized Debtors***" means, the Debtors, or any successors thereto, by merger consolidation, or otherwise, on or after the Effective Date, including New Parent.

202.     "***Representatives***" means, with respect to any Person, such Person's Affiliates and its and their directors, officers, members, partners, managers, employees, agents, investment bankers, attorneys, accountants, advisors, investment advisors, investors, managed accounts or funds, management companies, fund advisors, advisory board members, professionals, and other representatives, in each case, solely in their capacities as such.

203.     "***Required Consenting Creditors***" has the meaning set forth in the Plan Support Agreement.

204.     "***Restructuring Fees and Expenses***" means the reasonable and documented fees, costs, and out-of-pocket expenses of (a) the Consenting Creditor Ad Hoc Group Advisors, the DIP Agent, the Blue Torch Advisors, the Consenting ETI Party Advisors, the advisors to the Sub-Group DIP Lenders (subject to a cap of $500,000 in the aggregate), and XBP (subject to a cap of $1,000,000 and in the event (x) the Plan Support Agreement terminates or (y) the Effective Date does not otherwise occur, payable solely to the extent that neither of the foregoing is the result of XBP's action or inaction) incurred in accordance with and payable under the terms of the Plan Support Agreement or the DIP Documents, as applicable; (b) the advisors and counterparties to the Securitization Programs Parties incurred in accordance with the Postpetition Securitization Program Documents; and (c) the July 2026 Notes Indenture Trustee in accordance with the Committee Settlement and the Plan Support Agreement.  For the avoidance of doubt, the foregoing parties shall not be required to provide the Debtors with attorney or financial advisor time entries.

205.     "***Restructuring Steps Exhibit***" means the document setting forth the sequence of certain Restructuring Transactions, which shall be included in the Plan Supplement.

206.     "***Restructuring Transactions***" means the transactions described in <u>Article IV.B</u> and/or set forth in the Restructuring Steps Exhibit, including, for the avoidance of doubt, the XBP Transaction, the BTC Transaction and the transfer by the Consenting ETI Parties of any other material assets and businesses to the extent set forth in the Plan Support Agreement.

207.     "***Retained Professional***" means an Entity: (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and/or 1103 of the Bankruptcy Code and to be compensated for services rendered before the Effective Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to sections 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

208.     "***Roll-Up Loans***" has the meaning set forth in Section 2.01(b) of the DIP Credit Agreement.

209.     "***Rollover Exit Facility***" means the facility or indenture under which the Rollover Exit Notes shall be issued pursuant to the Rollover Exit Facility Documents, to be provided on the terms and conditions set forth in the Rollover Exit Facility Term Sheet.

210.    "***Rollover Exit Facility Documents***" means, collectively, all agreements, documents, and instruments delivered or entered into in connection with the Rollover Exit Facility (including any guaranty agreements, pledge and collateral agreements, intercreditor agreements, and other security documents).

211.    "***Rollover Exit Facility Term Sheet***" means that certain term sheet that sets forth the principal terms of the Rollover Exit Facility, Filed at Docket No. 401-1.

212.    "***Rollover Exit Notes***" means 5-year senior secured notes in an aggregate outstanding principal amount equal to (a) the DIP Claims outstanding on the Effective Date, which shall be funded on a cashless basis by rolling over such DIP Claims; *provided*, that pursuant to the Sub-Group DIP Lender Settlement, such aggregate amount shall be less (i) $6,000,000 of Allowed DIP Claims held by the Sub-Group DIP Lenders as of the Effective Date, which shall be converted into debt under the Supplemental Exit Facility and (ii) $4,000,000 of DIP Claims held as of the Effective Date by the Sub-Group DIP Lenders which shall be cancelled Pro Rata on the Effective Date; (b) an additional amount funded in Cash on account of any XBP Alternative Funding or any ETI Funding Obligations made in the form of Rollover Exit Notes in accordance with the terms hereof; and (c) an additional amount funded in Cash, if any, on account of the uncommitted $10,000,000 incremental facility under the Rollover Exit Notes.

213.    "***Rust Securitization Program***" means that certain securitization program governed by that certain Receivables Purchase Agreement, dated as of February 12, 2024, among Rust Consulting, Inc., BancTec (Canada) Inc., Novitex Enterprise Solutions Canada, Inc. / Solutions D'Enterprise Novitex Canada, Inc., HOVG, LLC, and SOURCEHOV CANADA COMPANY, as originators, EXELA BR SPV, LLC, as seller, and BR EXAR, LLC, in its capacity as buyer, as amended restated, amended and restated, supplemented, or otherwise modified from time to time, and related agreements and documents.

214.    "***Schedule of Retained Causes of Action***" means the schedule of Causes of Action of the Debtors that are not released, waived, or transferred pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time, which shall be included in the Plan Supplement.

215.    "***SEC***" means the United States Securities and Exchange Commission.

216.    "***Secured Claim***" means a Claim: (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) otherwise Allowed pursuant to this Plan or order of the Bankruptcy Court as a Secured Claim.

217.    "***Securities***" means any instruments that qualify as a "security" under Section 2(a)(1) of the Securities Act.

218.    "***Securities Act***" means the Securities Act of 1933, as now in effect or hereafter amended, or any regulations promulgated thereunder.

219.    "***Securitization Orders***" means, collectively, the Interim Securitization Order and the Final Securitization Order.

220.    "***Securitization Programs Agents***" means the administrative agents under the applicable Prepetition Securitization Programs Documents or the Postpetition Securitization Programs Documents or, as applicable, any successors, assignees, or delegees thereof.

221.    "*Securitization Programs Parties*" means, collectively, the Securitization Programs Agents and each investor or purchaser under the applicable Prepetition Securitization Programs Documents and Postpetition Securitization Programs Documents.

222.    "*Solicitation Materials*" means any documents, forms, ballots, notices, and other materials provided in connection with the solicitation of votes on this Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code.

223.    "*Solicitation Procedures Motion*" means the *Emergency Motion of Debtors for Entry of Order (I) Conditionally Approving the Disclosure Statement; (II) Scheduling Combined Hearing to Consider (A) Final Approval of Disclosure Statement, (B) Approval of Solicitation Procedures and Forms of Ballots, and (C) Confirmation of Plan; (III) Establishing an Objection Deadline to Object to Disclosure Statement and Plan; (IV) Approving the Form and Manner of Notice of Combined Hearing and Objection Deadline; (V) Approving Procedures for Assumption of Contracts and Leases and Form and Manner of Cure Notice; and (VI) Granting Related Relief* [Docket No. 439].

224.    "*Solicitation Procedures Order*" means an order of the Bankruptcy Court granting the relief requested in the Solicitation Procedures Motion.

225.    "*Sub-Group DIP Lenders*" means collectively, HoldCo Asset Management LP, CCUR Holdings, Inc. and OSP, LLC, each on behalf of their Affiliates, subsidiaries and certain managed funds and accounts.

226.    "*Sub-Group DIP Lenders Settlement*" means the settlement reached among the Debtors, the Sub-Group DIP Lenders, and the Consenting Stakeholders and approved as part of the entry of the Final DIP Order, the terms of which are set forth in <u>Article IV.D</u> and embodied in this Plan.

227.    "*Subordinated Claim*" means any Claim against the Debtors that is subject to subordination under section 509(c), section 510(b), or section 510(c) of the Bankruptcy Code, including any Claim for reimbursement, indemnification, or contribution (except indemnification or reimbursement Claims assumed hereunder).  For the avoidance of doubt, Subordinated Claim includes any Claim arising out of or related to any agreement for the purchase or sale of securities of the Debtors or any of its Affiliates or any agreements related or ancillary to such agreement for the purchase or sale of securities of the Debtors or any of its Affiliates.

228.    "*Subsequent ETI Funding Obligation*" means the amount of any Transaction Tax Liability in excess of $25,000,000.  Payment of the Subsequent ETI Funding Obligation may be in the form of the purchase for Cash of Rollover Exit Notes or the purchase of New Parent Interests for Cash at Plan Equity Value.

229.    "*Supplemental Exit Facility*" means either the Gates Exit Facility or, solely to the extent consented to by Blue Torch, the Blue Torch Super Senior Exit Facility, which shall be disclosed in the Plan Supplement.

230.    "*Supplemental Exit Facility Documents*" means, collectively, all agreements, documents, and instruments delivered or entered into in connection with the Supplemental Exit Facility (including any guaranty agreements, pledge and collateral agreements, intercreditor agreements, and other security documents).

231.    "*Third-Party Release*" means the releases given by the Releasing Parties to the Released Parties in <u>Article IX.C</u>.

232.    "***Transaction Tax Liability***" means any federal, state, or local tax liability arising or resulting from or being triggered by (a) the Restructuring Transactions occurring under this Plan, (b) the steps taken under the Definitive Documents or pursuant to the Restructuring Steps Exhibit, and/or (c) the Governance Changes,[1] including any related or similar transactions, in each case, as determined by the Independent Tax Advisor; *provided*, that for the avoidance of doubt, any tax directly resulting from the cancellation or reduction of Intercompany Claims under this Plan shall not be included in Transaction Tax Liability, and Transaction Tax Liability shall be determined without regard to any impact from such cancellation or reduction.  The Debtors and the Reorganized Debtors, as applicable, and the Consenting ETI Parties shall cooperate in good faith with the Independent Tax Advisor to assist with its determination of the Transaction Tax Liability and prompt preparation and filing of all applicable tax returns.

233.    "***Transfer Agreement***" means the transfer agreement, substantially in the form attached as Exhibit C to the Plan Support Agreement, providing, among other things, that a transferee is bound to the terms of the Plan Support Agreement.

234.    "***Unexpired Lease***" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

235.    "***Unimpaired***" means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

236.    "***United States***" means the United States of America, its agencies, departments, or agents.

237.    "***United States Trustee***" means the Office of the United States Trustee for the Southern District of Texas.

238.    "***United States Trustee Statutory Fees***" means all fees due under 28 U.S.C § 1930(a)(6).

239.    "***Unsecured Cash Pool***" means Cash in the amount that is the sum of (a) $4.75 million less any amounts paid to reimburse Committee Professional Fees and Indenture Trustee Fees in accordance with the Committee Settlement and (b) such additional amount that results in each Holder of an Allowed General Unsecured Claim (including, for the avoidance of doubt, Allowed Non-Priority Tax Claims) receiving a percentage recovery equal to the Non-Tax Unsecured Cash Pool Target Recovery; *provided*, that such additional amounts required under the foregoing clause (b) shall not result in a more than 90% recovery on account of each Allowed General Unsecured Claim (including, for the avoidance of doubt, Allowed Non-Priority Tax Claims).

240.    "***Voting Classes***" means, collectively, Classes 3, 4, 5 and 6.

241.    "***Workers' Compensation Contracts***" means the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation Insurance Contracts.

242.    "***XBP***" means XBP Europe Holdings, Inc..

---

[1]    "***Governance Changes***" has the meaning ascribed to such term in the *ETI Entities' Statement and Reservation of Rights Regarding the Motion of the Debtors for Interim and Final Orders (I) Authorizing The Debtors to Obtain Postpetition Financing, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 168].

243.    "***XBP Alternative Funding***" means the provision of the XBP Funding Requirement by the Consenting ETI Parties, including, by the purchase in exchange for $18,000,000 Cash of (a) Rollover Exit Notes or (b) New Parent Interests at Plan Equity Value on the Effective Date.

244.    "***XBP Alternative Funding Fee***" means a fee equal to 1.4% of each of (a) the Exchanged New Parent Interests and (b) the BTC Distribution Shares, which fee shall be issued to the Consenting ETI Parties on the Effective Date in the event the XBP Alternative Funding occurs and the full amount of the XBP Alternative Funding is funded by the Consenting ETI Parties.

245.    "***XBP Funding***" means the funding of the Debtors or Reorganized Debtors of $18,000,000 by XBP on the Effective Date through a borrowing under and in accordance with its existing debt facility (whether under an accordion or otherwise).

246.    "***XBP Funding Requirement***" means the Debtors or Reorganized Debtors receiving $18,000,000 in Cash either (a) directly from XBP pursuant to the XBP Funding or (b) on account of the XBP Alternative Funding.

247.    "***XBP Transaction***" means, as set forth in the Restructuring Steps Exhibit, a series of stock transfers, sales, acquisitions, consolidations, combinations, contributions, mergers, amalgamations, and/or transactions involving both Debtors and non-Debtor Entities whereby New Parent becomes the ultimate corporate parent of the Reorganized Debtors.

248.    "***XBP Transaction Documents***" means all contracts, agreements, and documents necessary to effectuate the XBP Transaction.

249.    "***XCV-EMEA***" means XCV-EMEA, LLC.

B.    *Rules of Interpretation*

1.    For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference herein to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented; (d) any reference to any Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (e) unless otherwise specified, all references herein to "Articles" are references to Articles of this Plan; (f) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document created or entered into in connection with this Plan, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with, applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (h) unless otherwise specified, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (i) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (j) any reference to directors or board of directors includes managers, managing members or any similar governing body, as the context requires, and references to "shareholders," "directors," and/or "officers" shall also include "members" and/or

"managers," as applicable, as such terms are defined under the applicable limited liability company laws; (k) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interests," "Holders of Interests," "Disputed Interests," and the like, as applicable; (l) captions and headings to Articles and subdivisions thereof are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (m) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (n) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (o) unless otherwise specified, all references to statutes, regulations, orders, rules of courts, and the like shall mean as in effect on the Effective Date and as applicable to the Chapter 11 Cases; (p) any effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of this Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall control; (q) references to docket numbers are references to the docket numbers of documents Filed in the Chapter 11 Cases under the Bankruptcy Court's CM/ECF system; and (r) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail.

2.     Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to this Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Unless otherwise specified herein, any references to the "Effective Date" shall mean the Effective Date or as soon as reasonably practicable thereafter.

3.     All references in this Plan to monetary figures refer to currency of the United States, unless otherwise expressly provided.

4.     Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to the "Debtors" or to the "Reorganized Debtors" mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

C.     *Consent Rights*

Notwithstanding anything to the contrary in this Plan, the Confirmation Order, or the Disclosure Statement, any and all consent, consultation, and approval rights set forth in the Plan Support Agreement, including rights and limitations with respect to the form and substance of any Definitive Document (including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents) shall be incorporated herein by this reference (including to the applicable definitions in Article I.A) and fully enforceable as if stated in full herein.  In case of a conflict with respect to consent, consultation, or approval rights between the Plan Support Agreement, on the one hand, and this Plan, on the other hand, the former shall control and govern. For the avoidance of doubt, and notwithstanding anything to the contrary set forth herein or in the Plan Support Agreement, such consent rights shall not apply to any amendments, restatements, supplements, or other modifications of the Postpetition Securitization Programs Documents, and any consent, waivers, or other deviations under or from any Postpetition Securitization Programs Documents that are delivered, or entered into, after the consummation of this Plan.

D.      *Appendices and Plan Supplement*

The Plan Supplement and appendices to this Plan are incorporated into this Plan by reference and are a part of this Plan as if set forth in full herein.  The documents contained in the exhibits and Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

E.      *Deemed Acts*

Whenever an act or event is expressed under this Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred by virtue of this Plan and/or Confirmation Order without any further act by any party.

<div align="center">

**Article II.**
**ADMINISTRATIVE CLAIMS, DIP CLAIMS, PRIORITY TAX CLAIMS,**
**OTHER PRIORITY CLAIMS, AND UNITED STATES TRUSTEE STATUTORY FEES**

</div>

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Priority Tax Claims, and Other Priority Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

A.      *Administrative Claims*

1.      <u>General Administrative Claims</u>

Subject to the terms of the Confirmation Order, and the provisions of sections 328, 330(a), and 331 of the Bankruptcy Code, except to the extent that a Holder of an Allowed General Administrative Claim and the applicable Debtor(s) or Reorganized Debtor(s), as applicable, agree to less favorable treatment with respect to such Allowed General Administrative Claim, each Holder of an Allowed General Administrative Claim shall receive, in full and final satisfaction of its General Administrative Claim, an amount in Cash equal to the unpaid amount of such Allowed General Administrative Claim in accordance with the following: (a) if such General Administrative Claim is Allowed on or before the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter or, if not then due, when such Allowed General Administrative Claim is due or as soon as reasonably practicable thereafter; (b) if such General Administrative Claim is Allowed after the Effective Date, on the date such General Administrative Claim is Allowed or as soon as reasonably practicable thereafter or, if not then due, when such Allowed General Administrative Claim is due or as soon as reasonably practicable thereafter; (c) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as the case may be; or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court; *provided*, that Allowed General Administrative Claims that arise in the ordinary course of the Debtors' businesses during the Chapter 11 Cases shall be paid by such applicable Debtor or Reorganized Debtor in full in Cash in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice without further notice to or order of the Bankruptcy Court.  Nothing in the foregoing or otherwise in this Plan shall prejudice the Debtors' or the Reorganized Debtors' rights and defenses regarding any asserted General Administrative Claim.

Except as otherwise provided in this Plan and section 503(b)(1)(D) of the Bankruptcy Code, unless previously Filed or paid, requests for payment of General Administrative Claims must be Filed and served on the Debtors or Reorganized Debtors, as applicable, pursuant to the procedures specified herein, in the Confirmation Order, the Notice of Effective Date, or any other order entered by the Court (as applicable) no later than the General Administrative Claims Bar Date; *provided*, that the foregoing shall not apply to either (a) the Holders of Claims under section 503(b)(1)(D) of the Bankruptcy Code or (b) the Bankruptcy Court or U.S. Trustee as Holders of General Administrative Claims.  Holders of General Administrative Claims that are required to File and serve a request for payment of such General Administrative Claims that

<div align="center">26</div>

do not File and serve such request by the General Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such General Administrative Claims against the Debtors and their respective Estates and property or the Reorganized Debtors, and such General Administrative Claims shall be deemed satisfied as of the Effective Date.  All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article IX.E hereof.  Nothing in this Article II.A shall limit, alter, or impair the terms and conditions of the Claims Bar Date Order with respect to the Claims Bar Date for Filing administrative expense Claims arising under section 503(b)(9) of the Bankruptcy Code.

   2. <u>Professional Fee Claims</u>

    a. *Professional Fee Applications*

   All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred before the Effective Date must be Filed no later than forty-five (45) days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders.  Subject to any applicable agreements by the Retained Professionals with respect to Professional Fee Claims, the Reorganized Debtors shall pay Professional Fee Claims owing to the Retained Professionals in Cash in the amount the Bankruptcy Court Allows from funds held in the Professional Fee Escrow Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; *provided*, that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.  To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the Allowed amount of Professional Fee Claims owing to the Retained Professionals, the Reorganized Debtors shall promptly pay such amounts upon entry of the order approving such Professional Fee Claims.

    b. *Professional Fee Escrow Account*

   No later than the anticipated Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Retained Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full in Cash pursuant to one or more Final Orders of the Bankruptcy Court.  No Liens, Claims, or Interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way.  No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors or the Reorganized Debtors.  When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full in Cash pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall be remitted to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity being required.

    c. *Professional Fee Escrow Amount*

   Five (5) days before the anticipated Effective Date, each Retained Professional shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the anticipated Effective Date.  For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Retained Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court, and such Retained Professionals are not bound to any extent by the estimates.  If a Retained Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such

Retained Professional.  The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; *provided*, that the Reorganized Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

For the avoidance of doubt, the terms of this Article II.A.2.c shall not apply to the parties entitled to receive the Restructuring Fees and Expenses, which are authorized to be paid in accordance with the Confirmation Order, this Plan, engagement and/or fee letters with the Debtors, the Plan Support Agreement, the DIP Documents, the Exit Securitization Programs Documents, the Plan Term Sheet, the Committee Settlement and the Exit Facilities Documents (as applicable).

B.      *DIP Claims*

Notwithstanding anything to the contrary herein, in exchange for full and final satisfaction, settlement, release, and discharge of DIP Claims, each Holder of an Allowed DIP Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed DIP Claim, an equal amount of Rollover Exit Notes under the Rollover Exit Facility; *provided*, that (a) for the Allowed DIP Claims of the Sub-Group DIP Lenders:  (i) $4,000,000 of such DIP Claims held as of the Effective Date shall be cancelled Pro Rata among the Sub-Group DIP Lenders and receive no distribution, (ii) $6,000,000 of such DIP Claims held as of the Effective Date shall receive, Pro Rata amongst the Sub-Group DIP Lenders, $6,000,000 of notes (or equivalent) under the applicable Supplemental Exit Facility, and (iii) the remainder shall receive Rollover Exit Notes.  The Rollover Exit Notes are expected to be delivered via DTC.

C.      *Premiums and Fees*

On the Effective Date, each of the Premiums and Fees shall be paid, to the extent due and payable, in accordance with the terms of this Plan.

D.      *Postpetition Securitization Programs Claims*

All Postpetition Securitization Programs Claims shall be Allowed Claims.  Except to the extent that a Holder of an Allowed Postpetition Securitization Programs Claim agrees to less favorable treatment, any such Claims against the Debtors arising under the Postpetition Securitization Programs shall be paid in full in Cash.

On the Effective Date, all reasonable and documented fees and out-of-pocket expenses incurred by the advisors to the parties to the Postpetition Securitization Programs shall be paid in full in Cash in accordance with the Securitization Orders.

E.      *Priority Tax Claims*

Priority Tax Claims shall be Allowed in an aggregate amount of no greater than as set forth on **Appendix A** to this Plan by the applicable taxing authority and corresponding Allowed amount.  Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor(s) against which such Allowed Priority Tax Claim is asserted agree to a less favorable treatment, or such Allowed Priority Tax Claim has already been paid during the Chapter 11 Cases, on account of such Priority Tax Claim, in exchange for full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code in the form of five (5) equal payments over five (5) years.  Nothing in the foregoing or otherwise in this Plan shall prejudice the Debtors' or the Reorganized Debtors' rights and defenses regarding any asserted Priority Tax Claim.

F.    *Other Priority Claims*

Except to the extent that a Holder of an Allowed Other Priority Claim and the Debtor(s) against which such Allowed Other Priority Claim is asserted agree to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and the discharge of each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim due and payable on or before the Effective Date shall receive, as soon as reasonably practicable after the Effective Date, on account of such Claim: (1) Cash in an amount equal to the amount of such Allowed Other Priority Claim; or (2) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code such that its Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.  To the extent any Allowed Other Priority Claim is not due and owing on or before the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors (or the Reorganized Debtors, as applicable) and such Holder, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.  Nothing in the foregoing or otherwise in this Plan shall prejudice the Debtors' or the Reorganized Debtors' rights and defenses regarding any asserted Other Priority Claim.

G.    *United States Trustee Statutory Fees*

The Debtors and the Reorganized Debtors, as applicable, shall pay all United States Trustee Statutory Fees, for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

H.    *Restructuring Fees and Expenses*

The Restructuring Fees and Expenses incurred, or estimated to be incurred, up to and including the Effective Date (or, with respect to necessary post-Effective Date activities, after the Effective Date), shall be paid in full in Cash on the Effective Date in accordance with, and subject to, the terms of the Plan Support Agreement, the DIP Orders, or the Securitization Orders, as applicable (unless otherwise provided in any other order of the Bankruptcy Court), without any requirement to File a fee application with the Bankruptcy Court or without any requirement for Bankruptcy Court or United States Trustee review or approval (unless otherwise provided in any other order of the Bankruptcy Court), and without notice and a hearing pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise.  All Restructuring Fees and Expenses to be paid on the Effective Date shall be estimated before and as of the Effective Date and such estimates shall be delivered to the Debtors at least five (5) days before the anticipated Effective Date; *provided*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Fees and Expenses.  On the Effective Date, or as soon as practicable thereafter, final invoices for all Restructuring Fees and Expenses incurred before and as of the Effective Date shall be submitted to the Debtors.  In addition, the Debtors and the Reorganized Debtors, as applicable, shall continue to pay, when due and payable in the ordinary course, pre-Effective Date Restructuring Fees and Expenses related to this Plan and the implementation, consummation, and defense of this Plan and the Restructuring Transactions, incurred before the Effective Date, in accordance with any engagement and/or fee letters with the Debtors, the Plan Support Agreement, the DIP Documents, the Exit Facilities Documents, the Plan Term Sheet, the Committee Settlement, and the Exit Securitization Programs Documents (as applicable).

I.    *Post-Effective Date Fees and Expenses*

Except as otherwise specifically provided in this Plan, from and after the Effective Date, each Reorganized Debtor shall in the ordinary course of business pay (subject to the receipt of an invoice) in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by such Debtor or Reorganized Debtor (as applicable) after the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court.  Upon the Effective Date, any requirement that Retained Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or

compensation for services rendered after such date shall terminate, and each Debtor or Reorganized Debtor (as applicable) may employ and pay any Retained Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

## Article III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests*

This Plan constitutes a separate chapter 11 plan of reorganization for each Debtor.  The provisions of this Article III govern Claims against and Interests in the Debtors.  Except for the Claims addressed in Article II (or as otherwise set forth herein), all Claims and Interests are placed in Classes for each of the applicable Debtors.  For all purposes under this Plan, each Class shall exist for each of the Debtors; *provided*, that any Class that is vacant as to a particular Debtor shall be treated in accordance with Article III.G.   In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, DIP Claims, Priority Tax Claims, Claims for the Premiums and Fees, and Other Priority Claims as described in Article II.

A Claim or Interest is placed in a particular Class only to the extent that such Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  To the extent applicable, a Claim or Interest is placed in a particular Class for all purposes, including voting, Confirmation and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code.  However, a Claim or Interest is placed in a particular Class for the purpose of receiving distributions (if any) under this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest and has not been paid, released or otherwise settled prior to the Effective Date.

**Summary of Classification and Treatment of Claims and Interests**

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | No (Presumed to Accept) |
| 2 | Prepetition Term Loan Claims | Unimpaired | No (Presumed to Accept) |
| *3* | *April 2026 Notes Claims* | *Impaired* | *Yes* |
| *4* | *Convenience Claims* | *Impaired* | *Yes* |
| *5* | *July 2026 Notes Claims* | *Impaired* | *Yes* |
| *6* | *General Unsecured Claims* | *Impaired* | *Yes* |
| 7 | Subordinated Claims | Impaired | No (Deemed to Reject) |
| 8 | Intercompany Claims | Impaired / Unimpaired | No (Presumed to Accept / Deemed to Reject) |
| 9 | Intercompany Interests | Impaired / Unimpaired | No (Presumed to Accept / Deemed to Reject) |

30

| 10 | Existing BPA Equity Interests | Impaired | No (Deemed to Reject) |
| 11 | Other Existing Equity Interests | Impaired | No (Deemed to Reject) |

B.    *Treatment of Claims and Interests*

    1.    <u>*Class 1 — Other Secured Claims*</u>

        a.    *Classification*: Class 1 consists of all Other Secured Claims.

        b.    *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim, at the option of the applicable Debtor shall, on the Effective Date, (i) be paid in full in Cash, (ii) receive the collateral securing its Allowed Other Secured Claim including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, (iii) Reinstatement of its Allowed Other Secured Claim, or (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

        c.    *Voting*: Class 1 is Unimpaired, and Holders of Other Secured Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Other Secured Claims are not entitled to vote to accept or reject this Plan.  Holders of Other Secured Claims shall be provided a Release Opt-Out Form solely for purposes of affirmatively opting out of the Third-Party Release.

    2.    <u>*Class 2 – Prepetition Term Loan Claims*</u>

        a.    *Classification*: Class 2 consists of all Prepetition Term Loan Claims.

        b.    *Allowance*: Prepetition Term Loan Claims shall be deemed Allowed in the aggregate principal amount of $38,500,000, plus accrued and unpaid interest at the default rate accruing after the Petition Date, plus all accrued and unpaid interest as of the Petition Date, plus fees, reimbursement obligations, premiums, and other obligations due and owing under the Prepetition Term Loan Financing Agreement.

        c.    *Treatment*: Except to the extent that a Holder of an Allowed Prepetition Term Loan Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Prepetition Term Loan Claim, each Holder of an Allowed Prepetition Term Loan Claim on the Effective Date shall be paid in full in Cash.

        d.    *Voting*: Class 2 is Unimpaired, and Holders of Prepetition Term Loan Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Prepetition Term Loan Claims are not entitled to vote to accept or reject this Plan.  Holders of Prepetition Term Loan Claims shall be provided a Release Opt-Out Form solely for purposes of affirmatively opting out of the Third-Party Release.

3.     _Class 3 — April 2026 Notes Claims_

    a.    _Classification_: Class 3 consists of all April 2026 Notes Claims.

    b.    _Allowance_: April 2026 Notes Claims shall be deemed Allowed in the aggregate amount of $1,214,106,629.

    c.    _Treatment_: Except to the extent that a Holder of an April 2026 Notes Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed April 2026 Notes Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in accordance with the Definitive Documents and in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed April 2026 Notes Claim, either:

        (i)    if such Holder is a Non-ETI Holder, its Noteholder Pro Rata Share of the Non-ETI Equity Distribution; or

        (ii)    if such Holder is ETI or an ETI Holder, its ETI Pro Rata Share of the ETI Equity Distribution.

    d.    _Voting_: Class 3 is Impaired, and Holders of April 2026 Notes Claims are entitled to vote to accept or reject this Plan.

4.     _Class 4 — Convenience Claims_

    a.    _Classification_: Class 4 consists of all Convenience Claims.

    b.    _Treatment_: Except to the extent that a Holder of an Allowed Convenience Claim agrees to a less favorable treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date or as soon as reasonably practicable thereafter, Cash in an amount equal to no less than 70% of such Allowed Convenience Claim amount pursuant to the Committee Settlement; _provided_, that to the extent that a Holder of an Allowed Convenience Claim against a Debtor holds any joint and several liability Claims, guaranty Claims, or other similar Claims against any other Debtors arising from or relating to the same obligations or liability as such Convenience Claim, such Holder shall only be entitled to a distribution on one Convenience Claim against the Debtors in full and final satisfaction of all such Claims.

    c.    _Voting_: Class 4 is Impaired, and Holders of Convenience Claims are entitled to vote to accept or reject this Plan.

5.     _Class 5 — July 2026 Notes Claims_

    a.    _Classification_: Class 5 consists of all July 2026 Notes Claims.

    b.    _Allowance_: July 2026 Notes Claims shall be deemed Allowed in the aggregate amount of $25,666,358.

    c.    _Treatment_: Except to the extent that a Holder of a July 2026 Notes Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed July 2026 Notes Claim shall receive, in full and final satisfaction, settlement, release, and discharge and in exchange for such Allowed July 2026 Notes Claim, and as a

carve out of the collateral (or value of such collateral) securing the April 2026 Notes Claims, its Pro Rata share of the July 2026 Noteholder Equity Distribution.

    d.    *Voting*: Class 5 is Impaired, and Holders of July 2026 Notes Claims are entitled to vote to accept or reject this Plan.

6.    <u>*Class 6 — General Unsecured Claims*</u>

    a.    *Classification*: Class 6 consists of all General Unsecured Claims.

    b.    *Treatment*: Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date, as a carve out of collateral (or the value of such collateral) securing the April 2026 Notes Claims, its Pro Rata share of the Unsecured Cash Pool, with such amount being paid out over the following schedule:  (i) 1/3 paid within nine (9) months of the Effective Date; (ii) 1/3 paid within eighteen (18) months of the Effective Date; and (iii) 1/3 paid within twenty-seven (27) months of the Effective Date.  Holders of Allowed General Unsecured Claims shall be entitled to interest (which interest shall be treated for all purposes as an incremental distribution on account of such Allowed General Unsecured Claim) on unpaid portions of such Holder's Pro Rata share of the Unsecured Cash Pool, accruing at 4% per annum, paid in-kind, commencing on the Effective Date, and such payment obligations shall be secured by collateral reasonably acceptable to the Debtors, the Required Consenting Creditors, and the Committee (the "***GUC Payment Obligations Collateral***").

    c.    *Voting*: Class 6 is Impaired and Holders of General Unsecured Claims are entitled to vote to accept or reject this Plan.

7.    <u>*Class 7 — Subordinated Claims*</u>

    a.    *Classification*: Class 7 consists of all Subordinated Claims.

    b.    *Treatment*: On the Effective Date, each Subordinated Claim shall be cancelled, released and extinguished, and each Holder of a Subordinated Claim shall not receive or retain any distribution, property, or other value on account of its Subordinated Claim.

    c.    *Voting*: Class 7 is Impaired and not receiving any distribution under this Plan, and Holders of Subordinated Claims are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Subordinated Claims are not entitled to vote to accept or reject this Plan.  Holders of Subordinated Claims shall be provided a Release Opt-Out Form solely for purposes of affirmatively opting out of the Third-Party Release.

8.    <u>*Class 8 — Intercompany Claims*</u>

    a.    *Classification*: Class 8 consists of all Intercompany Claims.

    b.    *Treatment*: On or as soon as reasonably practicable after the Effective Date, all Intercompany Claims will be adjusted, Reinstated, or discharged, as determined by the Debtors or the Reorganized Debtors with the reasonable consent of the

Required Consenting Creditors and the Consenting ETI Parties, as applicable, or as provided in the Restructuring Steps Exhibit.

c.  *Voting*: Class 8 is either (i) Unimpaired, in which case Holders of Allowed Intercompany Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, or (ii) Impaired, and not receiving any distribution under this Plan, in which case Holders of Allowed Intercompany Claims are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, in each case, Holders of Allowed Intercompany Claims are not entitled to vote to accept or reject this Plan.

9.  *Class 9 — Intercompany Interests*

a.  *Classification*: Class 9 consists of all Intercompany Interests.

b.  *Treatment*: On or as soon as reasonably practicable after the Effective Date, all Intercompany Interests will be adjusted, Reinstated, or discharged as determined by the Debtors or the Reorganized Debtors with the reasonable consent of the Required Consenting Creditors and the Consenting ETI Parties, as applicable, or as provided in the Restructuring Steps Exhibit; *provided,* that Subordinated Claims will be cancelled, released, or extinguished pursuant to Article III.B.7.

c.  *Voting*: Class 9 is either (i) Unimpaired, in which case Holders of Allowed Intercompany Interests are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, or (ii) Impaired, and not receiving any distribution under this Plan, in which case Holders of Allowed Intercompany Interests are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, in each case, Holders of Allowed Intercompany Interests are not entitled to vote to accept or reject this Plan.

10.  *Class 10 — Existing BPA Equity Interests*

a.  *Classification*: Class 10 consists of all Existing BPA Equity Interests.

b.  *Treatment*: Holders of Existing BPA Equity Interests are not entitled to receive a recovery or distribution on account of such Existing BPA Equity Interests.  On the Effective Date, Existing BPA Equity Interests shall, subject to the Restructuring Steps Exhibit, be canceled, released, discharged, and extinguished, and shall be of no further force or effect.

c.  *Voting*: Class 10 is Impaired and not receiving any distribution under this Plan, and Holders of Existing BPA Equity Interests are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Existing BPA Equity Interests are not entitled to vote to accept or reject this Plan. Holders of Existing BPA Equity Interests shall be provided a Release Opt-Out Form solely for purposes of affirmatively opting out of the Third-Party Release.

11.  *Class 11 — Other Existing Equity Interests*

a.  *Classification*: Class 11 consists of all Other Existing Equity Interests.

b.  *Treatment*: Holders of Other Existing Equity Interests are not entitled to receive a recovery or distribution on account of such Other Existing Equity Interests.  On

34

the Effective Date, Other Existing Equity Interests shall be either (i) treated in accordance with the Restructuring Steps Exhibit or (ii) canceled, released, discharged, and extinguished, and shall be of no further force or effect.

c.   *Voting*: Class 11 is Impaired and not receiving any distribution under this Plan, and Holders of Other Existing Equity Interests are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Other Existing Equity Interests are not entitled to vote to accept or reject this Plan.  Holders of Other Existing Equity Interests shall be provided a Release Opt-Out Form solely for purposes of affirmatively opting out of the Third-Party Release.

C.   *Acceptance or Rejection of this Plan*

1.   Presumed Acceptance of this Plan

Claims in Classes 1 and 2 are Unimpaired under this Plan and their Holders are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Class 1 and 2 are not entitled to vote on this Plan and the votes of such Holders shall not be solicited.  Notwithstanding their non-voting status, Holders of such Claims shall receive a Release Opt-Out Form solely for purposes of providing such Holders with the opportunity to opt out of the Third-Party Release.

2.   Voting Class

Claims in Classes 3, 4, 5 and 6 are Impaired under this Plan and the Holders of Allowed Claims in such Class are entitled to vote to accept or reject this Plan, including by acting through a voting Representative.  For purposes of determining acceptance and rejection of this Plan, votes shall be tabulated on a Debtor-by-Debtor basis.

Pursuant to section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted this Plan if (a) the Holders, including Holders acting through a voting Representative, of at least two-thirds (2/3) in amount of Claims actually voting in such Class have voted to accept this Plan and (b) the Holders, including Holders acting through a voting Representative, of more than one-half (1/2) in number of Claims actually voting in such Class have voted to accept this Plan.  Holders of Claims in Classes 3, 4, 5 and 6 (or, if applicable, the voting Representatives of such Holders) shall receive ballots containing detailed voting instructions.  For the avoidance of doubt, each Claim in the Class entitled to vote to accept or reject this Plan that is not Allowed pursuant to this Plan, and in each case, is wholly contingent, unliquidated, or Disputed, in each case, shall be accorded one (1) vote and valued at one dollar ($1.00) for voting purposes only, and not for purposes of allowance or distribution.

3.   Deemed Rejection of this Plan

Claims and Interests in Classes 7, 10, and 11 are Impaired and will receive no distribution under this Plan and are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Claims and Interests in Classes 7, 10 and 11 are not entitled to vote on this Plan and the votes of such Holders shall not be solicited.  Notwithstanding their non-voting status, Holders of such Claims shall receive a Release Opt-Out Form solely for purposes of providing such Holders with the opportunity to opt out of the Third-Party Release.

4.   Presumed Acceptance of this Plan or Deemed Rejection of this Plan

Claims and Interests in Classes 8 and 9 are either (a) Unimpaired and, therefore, conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, or (b) Impaired

and shall receive no distributions under this Plan and, therefore, deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Claims and Interests in Classes 8 and 9 are not entitled to vote on this Plan and votes of such Holders shall not be solicited.

D.      *Confirmation Pursuant to Section 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by an Impaired Class of Claims entitled to vote (*i.e.*, Class 3, 4, 5, or 6).  The Debtors shall seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify this Plan in accordance with <u>Article XI</u> to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and Bankruptcy Rules.

E.      *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Interests, and the respective distributions and treatments under this Plan, shall take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 509 or 510 of the Bankruptcy Code, or otherwise; *provided*, that notwithstanding the foregoing, such Allowed Claims or Interests and their respective treatments set forth herein shall not be subject to setoff, demand, recharacterization, turnover, disgorgement, avoidance, or other similar rights of recovery asserted by any Person.  Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided herein, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination rights relating thereto.  The Debtors or Reorganized Debtors, as applicable, reserve the right to seek a ruling from the Bankruptcy Court determining whether any Claim should be subordinated pursuant to section 510(b) of the Bankruptcy Code and treated under this Plan as a Class 7 Subordinated Claim.

F.      *Special Provision Governing Unimpaired Claims*

Except as otherwise provided herein, nothing under this Plan shall affect or limit the Debtors' or the Reorganized Debtors' rights and defenses (whether legal or equitable) in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

G.      *Vacant and Abstaining Classes*

Any Class of Claims or Interests that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.  Moreover, any Class of Claims that is occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018, but as to which no vote is cast, shall be deemed to accept this Plan pursuant to section 1129(a)(8) of the Bankruptcy Code.

H.      *Controversy Concerning Impairment*

If a controversy arises as to whether any Claim or Interest (or any Class of Claims or Interests) is Impaired under this Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date, absent consensual resolution of such controversy consistent with the Plan Support Agreement among the Debtors and the complaining Entity or Entities.

I.      *Intercompany Interests and Intercompany Claims*

Other than with respect to any April 2026 Notes Claim or July 2026 Notes Claim held by ETI or an ETI Holder, to the extent Intercompany Interests and Intercompany Claims are Reinstated under this Plan, distributions on account of such Intercompany Interests and Intercompany Claims are not being received by Holders of such Intercompany Interests or Intercompany Interests on account of their Intercompany Interests or Intercompany Claims, but for the purposes of administrative convenience and to maintain the Debtors' (and their Affiliates') corporate structure, for the ultimate benefit of the Holders of New Parent Interests, to preserve ordinary course intercompany operations, and in exchange for the Debtors' and Reorganized Debtors' agreement under this Plan to make certain distributions to the Holders of Allowed Claims.

.

### Article IV.
### MEANS FOR IMPLEMENTATION OF THIS PLAN

A.      *General Settlement of Claims and Interests*

In consideration for the classification, distributions, releases, and other benefits provided under this Plan, on the Effective Date, the provisions of this Plan shall constitute a set of integrated, good-faith compromises and settlements of all Claims, Interests, Causes of Action, and controversies resolved pursuant to this Plan and this Plan shall be deemed a motion to approve the good-faith compromises and settlements of all Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromises and settlements under Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such integrated compromises or settlements are in the best interests of the Debtors, the Estates, and Holders of Claims and Interests, and are fair, equitable, and reasonable.  Subject to Article VI, distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final and indefeasible and shall not be subject to avoidance, turnover, or recovery by any other Person.  Notwithstanding the foregoing or similar provisions of this Plan with respect to settlements, such settlements are approved as among the parties to such settlement or similar agreements thereto, and the treatment of all Claims and Interests is approved pursuant to Confirmation by satisfying the requirement of section 1129 of the Bankruptcy Code.

B.      *Restructuring Transactions*

Without limiting any rights and remedies of the Debtors or Reorganized Debtors under this Plan or applicable law, the entry of the Confirmation Order shall constitute authorization for the Debtors and the Reorganized Debtors, as applicable, to take, or to cause to be taken, all actions necessary or appropriate to consummate and implement the provisions of any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan before, on, and after the Effective Date, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, conversion, elections, or dissolution containing terms that are consistent with the terms of this Plan, the Plan Support Agreement, the Restructuring Steps Exhibit, the XBP Transaction Documents, the Plan Supplement, the Exit Facilities, the Exit Securitization Programs Documents, and the other Definitive

Documents and that satisfy the applicable requirements of applicable state law and such other terms to which the applicable Entities may agree, including, for the avoidance of doubt, in connection with the XBP Transaction and the BTC Transaction; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of this Plan, the Plan Support Agreement, the Restructuring Steps Exhibit, the XBP Transaction Documents, the Plan Supplement, the Exit Facilities, the Exit Securitization Programs Documents, and the other Definitive Documents and having such other terms to which the applicable Entities may agree, including, for the avoidance of doubt, in connection with the XBP Transaction or the BTC Transaction; (3) the execution, delivery, and filing, if applicable, of the New Organizational Documents, the XBP Transaction Documents, the Exit Facilities Documents, the Registration Rights Agreement, the New Parent Warrants Agreement, and the Exit Securitization Programs; (4) the filing of appropriate elections or certificates or articles of conversion, formation, incorporation, merger, consolidation, or dissolution with the appropriate governmental authorities pursuant to applicable state law; (5) all other actions that the Debtors, the Reorganized Debtors and/or the applicable Entities reasonably determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law or foreign law in connection with such transactions; and (6) such actions as may be necessary or appropriate to effectuate a corporate restructuring of their respective businesses and to otherwise simplify the overall corporate structure of the Reorganized Debtors.

Consistent with the foregoing, the Restructuring Transactions shall include: (i) cancellation of existing agreements and Existing BPA Equity Interests, Other Existing Equity Interests and certain Intercompany Interests in accordance with Article III.B, as more particularly described in Article IV.G; (ii) entry into and performance under the Exit Facilities and Exit Facilities Documents, as more particularly described in Article IV.I; (iii) entry into and performance under the Exit Securitization Programs and Exit Securitization Programs Documents, as more particularly described in Article IV.J; (iv) issuance of Plan Securities, as more particularly described in Article IV.K; (v) issuance and effectiveness of New Organizational Documents, as more particularly described in Article IV.M; (vi) consummation of the BTC Transaction, as more particularly described in the Restructuring Steps Exhibit; and (vii) the XBP Transaction, as more particularly described in the Restructuring Steps Exhibit.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions (including the BTC Transaction, the XBP Transaction, and any other transaction described in, approved by, contemplated by, or necessary to effectuate this Plan).

Subject to BTC's and XBP's satisfaction with the definitive documentation with respect to the Restructuring Transactions, including the XBP Transaction Documents, the Governance Term Sheet, the Registration Rights Agreement, and the New Organizational Documents, each of BTC and XBP agrees to engage in the Restructuring Transactions, as applicable, to issue or distribute, as applicable, the Plan Securities and to perform any other obligation under this Plan and the Definitive Documents and in accordance with the Restructuring Steps Exhibit, in each case contemplated hereunder and thereunder to be performed by it.  In connection therewith, each of BTC and XBP will submit to the jurisdiction of the Bankruptcy Court in respect of such agreements and obligations and acknowledge that it is a participant in this Plan.

C.      *Committee Settlement*

This Plan incorporates the Committee Settlement, a compromise and settlement of numerous issues and disputes between and among (a) the Debtors and the Consenting Stakeholders; and (b) the Committee, designed to achieve a reasonable and effective resolution of certain Claims and issues in connection with the Chapter 11 Cases.  Except as expressly set forth herein or the Confirmation Order, the Committee

Settlement constitutes a settlement of all potential issues and Claims between and among (a) the Debtors and the Consenting Stakeholders; and (b) the Committee.  The key terms of the Committee Settlement include:

- The inclusion in the Plan of the July 2026 Noteholder Equity Distribution, subject to the terms of the Committee Settlement;

- Payment of Allowed Convenience Claims in Cash in an amount equal to no less than 70% of such Allowed Convenience Claims;

- Establishment of the Unsecured Cash Pool;

- All fees for professionals retained by the Committee shall be capped (the "*Committee Professional Fee Cap*") at $2.75 million, less amounts paid to the July 2026 Notes Indenture Trustee under the July 2026 Notes Indenture, plus amounts allocated by agreement between the Debtors and the Committee from (a) the Unsecured Cash Pool or (b) funds otherwise allocable to increase the Convenience Claims recoveries;

- The Required Consenting Creditors, the Debtors and the Committee shall work in good faith to agree on an appropriate and cost-effective Claims reconciliation process including a potential engagement of a Claims Ombudsman;

- Upon the Effective Date, the Debtors and their Estates shall waive preference claims held against Holders of General Unsecured Claims;

- In consideration for the settlement contemplated by the Committee Settlement, the Committee shall support the Plan and recommend to its constituents that they vote to accept the Plan and shall support the relief and treatment (including such releases as agreed and granted by the Debtors and other supporting parties) provided for in the Plan and the other Definitive Documents;

- April 2026 Notes Deficiency Claims shall be waived and shall not recover from the Unsecured Cash Pool; and

- Resolution of all objections raised by the Committee in the Chapter 11 Cases.

D.    *Sub-Group DIP Lenders Settlement*

This Plan incorporates the agreement reached in connection with the Sub-Group DIP Lenders Settlement that was approved as part of the entry of the Final DIP Order, among (a) the Debtors and the Consenting Stakeholders; and (b) the Sub-Group DIP Lenders, which settlement is designed to achieve a reasonable and effective resolution of such issues and disputes.  Except as expressly set forth herein or in the Confirmation Order, the Sub-Group DIP Lenders Settlement constitutes a settlement of all potential issues and Claims between and among (a) the Debtors and the Consenting Stakeholders; and (b) the Sub-Group DIP Lenders.  Pursuant to the Sub-Group DIP Lenders Settlement:

- The New Money Loans authorized by the Final DIP Order shall be initially funded by Avenue and Gates; *provided*, that all Holders of April 2026 Notes Claims or July 2026 Notes Claims are entitled to fund their Pro Rata share of the New Money Loans;

- All DIP Lenders shall be required to roll their DIP Claims into the Rollover Exit Facility, subject to the other terms of the Sub-Group DIP Lenders Settlement;

- The Sub-Group DIP Lenders shall be entitled to convert $6,000,000 of Allowed DIP Claims held as of the Effective Date into debt under the Supplemental Exit Facility, which debt shall be *pari passu* with the other debt under the Supplemental Exit Facility or incorporated into such facility on the same terms with customary sacred rights;

- DIP Claims held by the Sub-Group DIP Lenders as of the Effective Date shall be cancelled Pro Rata in an aggregate amount of $4,000,000;

- The Debtors shall reimburse up to $500,000 of Restructuring Fees and Expenses incurred in the aggregate by the advisors to the Sub-Group DIP Lenders; and

- The Sub-Group DIP Lenders agree not to object or vote to reject this Plan and to pursue the Restructuring Transactions consistent with the Plan Support Agreement.

E.      *Corporate Existence*

Except as otherwise provided in this Plan, the Plan Support Agreement, the Restructuring Steps Exhibit, or the XBP Transaction Documents, each Debtor, as a Reorganized Debtor, shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each Debtor is incorporated or formed and pursuant to the respective memorandum and articles of association, certificate of incorporation and bylaws (or other formation documents) in effect before the Effective Date, except to the extent such memorandum and articles of association, certificate of incorporation and bylaws (or other formation documents) are amended by this Plan, the BTC Transaction, the XBP Transaction Documents, the Debtors, or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to this Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law), without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable law.

On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may, without the need for approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, take such action as permitted by applicable law, and such Reorganized Debtor's Organizational Documents, as such Reorganized Debtor may determine is reasonable and appropriate (including in connection with the BTC Transaction or the XBP Transaction), including causing: (a) a Reorganized Debtor to be merged into another Reorganized Debtor or an Affiliate of a Reorganized Debtor; (b) a Reorganized Debtor to be dissolved; (c) the conversion of a Reorganized Debtor from one entity type to another entity type; (d) the legal name of a Reorganized Debtor to be changed; (e) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter; or (f) the reincorporation of a Reorganized Debtor under the law of jurisdictions other than the law under which the applicable Debtor currently is incorporated.

F.      *Vesting of Assets in the Reorganized Debtors Free and Clear of Liens and Claims*

Except as otherwise expressly provided in this Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein pursuant to sections 1123(a)(5), 1123(b)(3), 1141(b) and (c), and other applicable provisions of the Bankruptcy Code, on and after the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to this Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, other encumbrances or interests, except for those Liens, Claims, charges, or other encumbrances arising from or related to the Exit Facilities Documents and the Exit Securitization Programs Documents. In addition, all

40

rights, benefits, and protections provided to any of the Debtors pursuant to the Plan, the Plan Supplement, or the Confirmation Order including the release, exculpation, and injunction provisions provided in Article IX of this Plan, shall vest in each respective Reorganized Debtor unless expressly provided otherwise by this Plan or the Confirmation Order.  On and after the Effective Date, the Reorganized Debtors may (1) operate their respective businesses, (2) use, acquire, and dispose of their respective property, and (3) prosecute, compromise or settle any Claims, Interests, or Causes of Action, in each case without notice to, supervision of, or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, including for the avoidance of doubt any restrictions on the use, acquisition, sale, lease, or disposal of property under section 363 of the Bankruptcy Code.  Anything in this Plan to the contrary notwithstanding, the Unimpaired Claims against a Debtor shall remain the obligations solely of such Debtor or such Reorganized Debtor and shall not become obligations of any other Debtor or Reorganized Debtor by virtue of this Plan, the Chapter 11 Cases, or otherwise.

G.      *Cancellation of Existing Agreements, Existing BPA Equity Interests, Other Existing Equity Interests, and Certain Intercompany Interests.*

        On the Effective Date, except with respect to the Exit Facilities Documents and the Exit Securitization Programs Documents, or to the extent otherwise provided in this Plan, the XBP Transaction Documents, the Confirmation Order, or any other Definitive Document, all notes, bonds, indentures, credit agreements, certificates, securities, purchase rights, options, warrants, calls, puts, awards, commitments, obligations, registration rights, preemptive rights, rights of first refusal, rights of first offer, co-sale rights, investor rights, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any existing indebtedness or obligations of or ownership interest in the Debtors or giving rise to any rights, commitments, or obligations relating to Claims against or Interests in the Debtors shall be deemed canceled and surrendered, and the obligations of the Debtors or the Reorganized Debtors, as applicable, and any Non-Debtor Affiliates thereunder or in any way related thereto shall be deemed satisfied in full, released, and discharged and the obligations of the Debtors pursuant, relating, or pertaining to any agreements, notes, bonds, indentures, credit agreements, certificates, securities, purchase rights, options, warrants, calls, puts, awards, commitments, registration rights, preemptive rights, rights of first refusal, rights of first offer, co-sale rights, investor rights, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any existing indebtedness or obligations of or ownership interest in the Debtors or giving rise to any rights or obligations relating to Claims against or Interests in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated or assumed pursuant to this Plan, if any) shall be released and discharged; *provided*, that, notwithstanding such cancellation, satisfaction, release, and discharge, anything to the contrary contained in this Plan, the XBP Transaction Documents, the Confirmation Order, or any such document or instrument that governs the rights, claims, or remedies of the Holder of a Claim or Interest shall continue in effect solely for purposes of: (1) enabling the Holder of such Claim or Interest to receive distributions on account of such Claim or Interest under this Plan as provided herein; (2) allowing and preserving the rights of the DIP Agent, the April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the Exit Financing Facilities Agents, and the Securitization Programs Agents, as applicable, to make distributions as specified under this Plan on account of Allowed Claims, as applicable, including allowing the April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Exit Financing Facilities Agents, and the Securitization Programs Agents, as applicable, to submit invoices for any amount and enforce any obligation owed to them under this Plan to the extent authorized or allowed by the applicable documents; (3) permitting the Reorganized Debtors and any other Distribution Agent, as applicable, to make distributions on account of applicable Claims and Interests, as applicable; (4) preserving the DIP Agent's, the April 2026 Notes Indenture Trustee's, the July 2026 Notes Indenture Trustee's, the April 2026 Notes Collateral Agent's, the Exit Financing Facilities Agents', and the

Securitization Programs Agents', as applicable, rights, if any, to compensation and indemnification as against any money or property distributable to the Holders of April 2026 Notes Claims, July 2026 Notes Claims, DIP Claims, and Postpetition Securitization Programs Claims, as applicable, including permitting the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Exit Financing Facilities Agents, and the Securitization Programs Agents, as applicable, to maintain, enforce, and exercise any priority of payment or charging liens against such distributions each pursuant and subject to the terms of the April 2026 Notes Indenture, July 2026 Notes Indenture, DIP Credit Agreement, and Postpetition Securitization Programs Documents, as applicable, as in effect on or immediately before the Effective Date; (5) preserving all rights, remedies, indemnities, powers, and protections, including rights of enforcement, of the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Exit Financing Facilities Agents, and the Securitization Programs Agents, as applicable, against any person other than a Released Party (which Released Parties include the Debtors, Reorganized Debtors, and Non-Debtor Affiliates), and any exculpations of the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Exit Financing Facilities Agents, and the Securitization Programs Agents, as applicable; *provided*, that the April 2026 Notes Indenture Trustee, April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Exit Financing Facilities Agents, and the Securitization Programs Agents shall remain entitled to indemnification or contribution from the Holders of April 2026 Notes Claims, July 2026 Notes Claims, DIP Claims, and Postpetition Securitization Programs Claims, each pursuant and subject to the terms of the April 2026 Notes Indenture, July 2026 Notes Indenture, DIP Credit Agreement, and Postpetition Securitization Programs Documents, as applicable, as in effect on the Effective Date; (6) permitting the April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Exit Financing Facilities Agents, and the Securitization Programs Agents, as applicable, to enforce any obligation (if any) owed to them under this Plan; (7) permitting the April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee the DIP Agent, the Exit Financing Facilities Agents, and the Securitization Programs Agents to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court; and (8) permitting the April 2026 Notes Indenture Trustee, April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Exit Financing Facilities Agents, and the Securitization Programs Agents to perform any functions that are necessary to effectuate the foregoing; *provided*, *further*, that nothing in this <u>Article IV</u> shall affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or this Plan, or (except as set forth in (5) above) the Releases of the Released Parties pursuant to <u>Article IX</u>, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable, except as expressly provided for in this Plan.  For the avoidance of doubt, nothing in this <u>Article IV</u> shall cause the Reorganized Debtors' obligations under the Exit Facilities Documents and the Exit Securitization Programs Documents to be deemed satisfied in full, released, or discharged; *provided*, *further*, that notwithstanding this sentence, the April 2026 Notes Claims, July 2026 Notes Claims, DIP Claims, and Postpetition Securitization Programs Claims shall be deemed satisfied in full, released, and discharged on the Effective Date.  In furtherance of the foregoing, as of the Effective Date, Holders of April 2026 Notes Claims, July 2026 Notes Claims, DIP Claims, and Postpetition Securitization Programs Claims shall be deemed to have released any such Claims against the Reorganized Debtors under the April 2026 Notes Indenture, the July 2026 Notes Indenture, the DIP Documents, and the Postpetition Securitization Programs Documents, and are enjoined from pursuing any such claims against any of the Reorganized Debtors in respect of such April 2026 Notes Claims, July 2026 Notes Claims, DIP Claims, and Postpetition Securitization Programs Claims.

Except as otherwise provided in this Plan or the Confirmation Order, on the Effective Date, the April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Securitization Programs Agents and each of their respective directors, officers, employees, agents, Affiliates, controlling persons, and legal and financial advisors shall be automatically and fully released and discharged from any further responsibility under the April 2026 Notes Indenture, the July 2026 Notes Indenture, the DIP Credit Agreement, the Prepetition Securitization Programs Documents,

and the Postpetition Securitization Programs Documents, as applicable. The April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Securitization Programs Agents, and each of their respective directors, officers, employees, agents, Affiliates, controlling persons, and legal and financial advisors shall be discharged and shall have no further obligation or liability in respect of the April 2026 Notes Indenture, the July 2026 Notes Indenture, the DIP Credit Agreement, the Prepetition Securitization Programs Documents, and the Postpetition Securitization Programs Documents, as applicable, except as provided in this Plan and the Confirmation Order, and after the performance by the April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Securitization Programs Agents, and their Representatives and professionals of any obligations and duties required under or related to this Plan or the Confirmation Order, the April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Securitization Programs Agents, and each of their respective directors, officers, employees, agents, Affiliates, controlling persons, and legal and financial advisors shall be relieved of and released from any obligations and duties arising thereunder. The fees, expenses, and costs of the April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, and the Securitization Programs Agents, including fees, expenses, and costs of each of their respective professionals incurred after the Effective Date in connection with the April 2026 Notes Indenture, the July 2026 Notes Indenture Trustee, the DIP Credit Agreement, or the Prepetition Securitization Programs Documents, as applicable, and reasonable and documented fees, costs, and expenses associated with effectuating distributions pursuant to this Plan, including the fees and expenses of counsel, if any, shall be paid in accordance with the terms of this Plan and the applicable Definitive Documents.

H.      *Sources for Plan Distributions and Transfers of Funds Among Debtors*

The Debtors shall fund Cash distributions under this Plan with Cash on hand, including Cash from operations, and the proceeds of the DIP Facility, Exit Facilities, and the Exit Securitization Programs. The Debtors shall make non-Cash distributions as required under this Plan in the form of Exit Debt and Plan Securities. Cash payments to be made pursuant to this Plan shall be made by the Reorganized Debtors in accordance with Article VI. Subject to any applicable limitations set forth in any post-Effective Date agreement, the Reorganized Debtors shall be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under this Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers shall be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and shall not violate the terms of this Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date agreement (including the New Organizational Documents, the Exit Facilities Documents, and the Exit Securitization Programs Documents), shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing in accordance with, and subject to, applicable law.

I.      *Exit Financing Facilities and Exit Facilities Documents*

To the extent required and subject to the occurrence of the Effective Date, Confirmation of this Plan shall be deemed to constitute approval by the Bankruptcy Court of the Exit Facilities Documents (including all transactions contemplated thereby, such as any supplementation or syndication of the Exit Debt, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the incurrence of Liens securing the Exit Facilities and the payment of all fees, payments, indemnities, and expenses associated therewith) and, subject to the occurrence of the Effective Date, authorization for the applicable Reorganized Debtors to enter into and perform their obligations under the Exit Facilities Documents and such other documents as may be

reasonably required or appropriate, subject to any consent or approval rights under the Definitive Documents.  On or around the Effective Date, the Reorganized Debtors shall execute and deliver the Exit Facilities Documents, and shall execute, deliver, file, record, and issue any other related notes, guarantees, security documents, instruments, or agreements in connection therewith, in each case, without (a) further notice to the Bankruptcy Court, or (b) further act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity.

On the Effective Date, the Exit Facilities Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the Exit Facilities Documents are being extended, and shall be deemed to have been extended, and all related payments made in connection therewith shall have been made, in each case, in good faith, for legitimate business purposes, for reasonably equivalent value, as an inducement to the applicable lenders to extend credit under the Exit Facilities, are reasonable, shall not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.  On the Effective Date, all of the Liens and security interests to be granted, carried forward, continued, amended, extended, and/or reaffirmed under the Exit Facilities Documents shall: (1) be continuing, legal, binding, and enforceable Liens on, and security interests in, the collateral granted in accordance with the terms of the applicable Exit Facilities Documents; (2) be granted, carried forward, continued, amended, extended, reaffirmed, and deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted thereunder; and (3) not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and shall thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

J.      *Exit Securitization Programs and Exit Securitization Programs Documents*

To the extent required and subject to the occurrence of the Effective Date, Confirmation of this Plan shall be deemed to constitute approval by the Bankruptcy Court of the Exit Securitization Programs Documents (including all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the incurrence of Liens securing the Exit Securitization Programs and the payment of all fees, payments, indemnities, and expenses associated therewith) and, subject to the occurrence of the Effective Date, authorization for the applicable Reorganized Debtors to enter into and perform their obligations under the Exit Securitization Programs Documents and such other documents as may be reasonably required or appropriate, subject to any consent or approval rights under the Definitive Documents.  On or around the Effective Date, the Reorganized Debtors shall execute and deliver the Exit Securitization Programs Documents, and shall execute, deliver, file, record, and issue any other related notes, guarantees, security documents, instruments, or agreements in connection therewith, in each case, without (a) further notice to the Bankruptcy Court, or (b) further act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity.

On the Effective Date, the Exit Securitization Programs Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Exit Securitization Programs Documents are being extended, and shall be deemed to have been extended, and all related payments made in connection therewith shall have been made, in each case, in good faith, for legitimate business purposes, for reasonably equivalent value, as an inducement to the applicable lenders to extend credit under the Exit Securitization Programs, are reasonable, shall not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.  On the Effective Date, all of the Liens and security interests to be granted, carried forward, continued, amended, extended, and/or reaffirmed under the Exit Securitization Programs Documents shall: (1) be continuing, legal, binding, and enforceable Liens on, and security interests in, the collateral granted in accordance with the terms of the applicable Exit Securitization Programs Documents; (2) be granted, carried forward, continued, amended, extended, reaffirmed, and deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted thereunder; and (3) not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and shall thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

K.     *Issuance of Securities*

On the Effective Date, (a) New Parent shall issue or reserve for issuance and deliver the Plan Securities in accordance with the terms of this Plan, the Restructuring Steps Exhibit, and the New Organizational Documents; *provided*, that New Parent Interests issued to the Consenting ETI Parties on the Effective Date shall be Blocked ETI Shares, as described in greater detail in Article IV.N, and (b) BPA, XCV-EMEA, and BTC, as applicable and/or their respective designee(s), shall effectuate the BTC Transaction in accordance with the terms of this Plan and the Restructuring Steps Exhibit.

The issuance and delivery of the Plan Securities is authorized without the need for further corporate or other action or any consent or approval of any national securities exchange upon which the Plan Securities may be listed on or immediately following the Effective Date.  All of the Plan Securities issuable under this Plan, the XBP Transaction Documents, the Restructuring Steps Exhibit, and the Confirmation Order shall, when so issued be duly authorized, validly issued, fully paid, and non-assessable.  The issuance and delivery of the Plan Securities in accordance and connection with this Plan, the Restructuring Steps Exhibit, the XBP Transaction Documents, and the Confirmation Order are authorized without the need for any further limited liability company or corporate action and without any further action by any Holder of a Claim or Interest, except, in the case of New Parent Interests, BTC Distribution Shares, and New Parent Warrants, as may be required under applicable stock exchange rules on which the Securities of XBP or New Parent are then listed.

Any Holder of an Allowed April 2026 Notes Claim, Allowed July 2026 Notes Claim, and Holder of a Claim on account of Premiums and Fees may designate that all or a portion of such Holder's share of the Plan Securities to be distributed as part of the treatment of such Allowed April 2026 Notes Claim, July

2026 Notes Claim, or Claim on account of Premiums and Fees be registered in the name of, and delivered to, its designee by delivering notice thereof to counsel to the Debtors and to the Notice and Claims Agent at least five (5) Business Days prior to the Effective Date.  Any such designee must be an "accredited investor" as such term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

On the Effective Date, the New Parent, BPA, XCV-EMEA, and BTC, as applicable and/or their respective designee(s), which may include the Distribution Agent, shall issue and/or distribute, as applicable, Plan Securities (excluding, for the avoidance of doubt, New Parent Interests issuable on account of the New Parent Warrants) to the Holders of Allowed April 2026 Notes Claims, Allowed July 2026 Notes Claims, and Claims on account of the Premiums and Fees pursuant to this Plan and the Restructuring Steps Exhibit (including the XBP Transaction and the BTC Transaction).

Each distribution, issuance, and conversion referred to in <u>Article VI</u> hereof shall be governed by the terms and conditions set forth in this Plan and the XBP Transaction Documents, applicable to such distribution, issuance, or conversion and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

1.      <u>Listing / Transfer of Plan Securities</u>

On the Effective Date, New Parent shall issue the Plan Securities pursuant to this Plan and the New Organizational Documents.  New Parent intends that the Exchanged New Parent Interests will be listed on the national stock exchange on which the New Parent Interests are then listed and will use its commercially reasonable efforts to effectuate the same.  Distributions of the Plan Securities (other than the New Parent Warrants, which shall be delivered in certificated form or book-entry form on the books and records of the applicable issuer or its transfer agent) shall be delivered via book-entry transfer by the Distribution Agent through the facilities of DTC.  Upon the Effective Date, after giving effect to the Restructuring Transactions, the New Parent Interests shall be that number of shares or membership interests as may be designated in the New Organizational Documents.

On and after the Effective Date, transfers of Plan Securities shall be made in accordance with applicable United States law, United States securities laws (as applicable), and the New Organizational Documents.

L.      *Exemption from Registration Requirements*

No registration statement shall be filed under the Securities Act, or pursuant to any state securities laws, with respect to the offer, issuance and distribution of the Plan Securities or the Rollover Exit Notes under this Plan (including in respect of the Premiums and Fees), the XBP Transaction Documents, the Restructuring Steps Exhibit, the Confirmation Order and the New Parent Warrants Agreement.

The offering, sale, issuance, and distribution of the Plan Securities (including in respect of the Premiums and Fees and, if applicable, the issuance of New Parent Interests upon exercise of the New Parent Warrants) in exchange for Claims pursuant to <u>Article II</u>, <u>Article III</u> and other provisions of this Plan, the Confirmation Order, the DIP Backstop Commitment Letter, and the XBP Transaction Documents shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable United States, state, or local law requiring registration for the offer or sale of a security pursuant to section 1145(a) of the Bankruptcy Code.  Any and all such Plan Securities (including New Parent Interests issuable upon the exercise of New Parent Warrants) issued pursuant to Section 1145(a) of the Bankruptcy Code may be resold without registration under the Securities Act by the recipients thereof pursuant to the exemption provided by Section 4(a)(1) of the Securities Act, unless the holder (i) is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy

Code, (ii) is an "affiliate" of New Parent, as applicable (as defined in rule 144(a)(1) in the Securities Act), or (iii) has been such an "affiliate" within ninety (90) days of such transfer, in each case subject to (1) compliance with any applicable state or foreign securities laws, if any, and any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Securities; (2) the restrictions, if any, on the transferability of such Securities in the Organizational Documents of the issuer of, or in agreements or instruments applicable to holders of, such Securities; and (3) any other applicable regulatory approval.

The offering, sale, issuance, and distribution of the Rollover Exit Notes is being made in reliance upon Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder and on equivalent state law registration exemptions or, solely to the extent such exemptions are not available, other available exemptions from registration under the Securities Act. Any recipients of the Plan Securities that are Affiliates of New Parent, and any Entity receiving Rollover Exit Notes under this Plan or acquiring New Parent Interests or Rollover Exit Notes on account of the ETI Funding Obligations or the XBP Alternative Funding, will receive restricted Plan Securities or Rollover Exit Notes, as applicable, that may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144A, Regulation S, and/or Rule 144 of the Securities Act, subject to, in each case, the transfer provisions, if any, and other applicable provisions set forth in the Organizational Documents of the applicable issuers.

The Reorganized Debtors and New Parent need not provide any further evidence other than this Plan and the Confirmation Order with respect to the treatment of the Plan Securities or Rollover Exit Notes under applicable securities laws.

Notwithstanding anything to the contrary in this Plan, no Person or Entity (including, for the avoidance of doubt, DTC) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by this Plan, including, for the avoidance of doubt, whether the Plan Securities and Rollover Exit Notes are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. All such Persons and Entities including DTC shall be required to accept and conclusively rely upon this Plan or the Confirmation Order in lieu of a legal opinion regarding whether the Plan Securities and Rollover Exit Notes are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. Notwithstanding any policies, practices, or procedures of DTC, DTC and any participants and intermediaries shall fully cooperate and take all actions to facilitate any and all transactions necessary or appropriate for implementation of this Plan or other contemplated thereby, including any and all distributions pursuant to this Plan.

M.      *New Organizational Documents*

Subject to Article IV.E, the Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and provisions of this Plan, the Plan Support Agreement, and the Restructuring Steps Exhibit, including the BTC Transaction and the XBP Transaction Documents. Without limiting the generality of the foregoing, as of the Effective Date, each of the Reorganized Debtors shall be governed by the New Organizational Documents applicable to it. On the Effective Date, the Organizational Documents of each of the Reorganized Debtors will be deemed to be modified to prohibit the issuance of non-voting equity Securities, solely to the extent required under section 1123(a)(6) of the Bankruptcy Code. On or immediately before the Effective Date, each Reorganized Debtor shall file its applicable New Organizational Documents, if any, with the applicable Secretary of State and/or other applicable authorities in its jurisdiction of incorporation or formation in accordance with applicable laws of its jurisdiction of incorporation or formation, to the extent required for such New Organizational Documents to become effective.

N.      *ETI Funding Obligations; Blocked ETI Shares*

The Consenting ETI Parties shall provide the Reorganized Debtors a commitment to pay the ETI Funding Obligations.  Payment of the ETI Funding Obligations may be in the form of the purchase by one or more of the Consenting ETI Parties for Cash of (a) Rollover Exit Notes or, (b)  New Parent Interests at Plan Equity Value.

Any settlement of the Transaction Tax Liability that occurs prior to the Effective Date shall require the consent of the Required Consenting Creditors (such consent not to be unreasonably withheld), and after the Effective Date, shall require the consent of the New Board (such consent not to be unreasonably withheld).  For the avoidance of doubt, any amounts of the Transaction Tax Liability between $15,000,000 and $25,000,000 shall be the obligation of the Reorganized Debtors and the Reorganized Debtors shall pay any such amounts promptly when due.

On the Effective Date all New Parent Interests received by the Consenting ETI Parties pursuant to the Plan (collectively, the "**Blocked ETI Shares**") shall be deposited or placed in one or more segregated accounts or given to a collateral agent pursuant to documentation in form and substance reasonably satisfactory to the Debtors, the Consenting ETI Parties, and the Required Consenting Creditors (the "**Blocked ETI Shares Documentation**"), *provided*, that such documentation shall permit the Consenting ETI Parties to sell such Blocked ETI Shares so long as the proceeds are applied to the ETI Funding Obligation.  The Blocked ETI Shares Documentation shall provide that if the Consenting ETI Parties fail to pay the ETI Funding Obligations when due (as determined by the Independent Tax Advisor), the Reorganized Debtors shall be permitted, and the Consenting ETI Parties shall consent to, the Reorganized Debtors' directing the sale of the Blocked ETI Shares to satisfy the ETI Funding Obligations (inclusive of any reasonable fees and expenses incurred by the Reorganized Debtors in connection with the sale of the Blocked ETI Shares).

The Blocked ETI Shares Documentation shall provide that (a) following payment of the Initial ETI Funding Obligation through purchase of Rollover Exit Notes for Cash, 50% of the Blocked ETI Shares shall be released and (b) following payment of the Initial ETI Funding Obligation through the purchase of New Parent Interests for Cash at the Plan Equity Value on the Effective Date, 90% of the Blocked ETI Shares shall be released.  The Blocked ETI Shares Documentation shall also provide that upon (x) payment in full of the Transaction Tax Liability (as such Transaction Tax Liability is determined by the Independent Tax Advisor) and satisfaction of the ETI Funding Obligations or (y) the funding in Cash of an amount equal to the ETI Funding Obligations estimated by the Independent Tax Advisor into a segregated or collateral deposit account subject to documentation in form and substance reasonably satisfactory to the Debtors, the Consenting ETI Parties, and the Required Consenting Creditors, all remaining Blocked ETI Shares shall be released.  For the avoidance of doubt, the Blocked ETI Shares shall be entitled to the benefits of the Registration Rights Agreement.

O.      *Release of Liens and Claims*

To the fullest extent provided under section 1141(c) and other applicable provisions of the Bankruptcy Code, except as otherwise provided in this Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document entered into or delivered in connection with this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article VI, all Liens, Claims, mortgages, deeds of trust, or other security interests against the assets or property of the Debtors or the Estates shall be fully released, canceled, terminated, extinguished, and discharged, in each case without further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity; *provided*, that (1) the Liens granted to the DIP Agent pursuant to the DIP Credit Agreement and (2) any and all Liens or security securing the Debtor's obligations under the Insurance Contracts, which, for avoidance of doubt,

includes grants of security interests in escrow accounts, deposit accounts, Cash Collateral, and letters of credit issued for the benefit of Insurers, shall remain in full force and effect solely to the extent provided for in this Plan.  The filing of the Confirmation Order with any federal, state, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens, Claims, and other Interests to the extent provided in the immediately preceding sentence.  Any Person or Entity holding such Liens, Claims, or Interests shall, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction, and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors.

P.      *Exemption from Certain Taxes and Fees*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any issuance, transfer or exchange (whether from a Debtor to a Reorganized Debtor or to any other Person) under, pursuant to, in contemplation of, or in connection with this Plan (including the BTC Transaction, the XBP Transaction and the other Restructuring Transactions), including pursuant to (1) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtors, the Reorganized Debtors, or any of their Affiliates, including the Exit Debt, the Plan Securities, or related instruments or documentation, (2) the maintenance, creation, modification, consolidation, termination, refinancing, or recording of any mortgage, Lien, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (3) the making, assignment, or recording of any lease or sublease, (4) the grant of collateral security for any or all of the Exit Debt or other indebtedness, or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan (including the BTC Transaction, the XBP Transaction and the other Restructuring Transactions), shall not be subject to any document tax, recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate U.S. federal, state or local governmental officials, agents, or filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, and shall forego the collection of any such tax, fee or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, fee or governmental assessment.

Q.      *New Board*

As of the Effective Date, except as set forth in this <u>Article IV.Q</u>, all directors, managers, and other members of existing boards or governance bodies of the Debtors, as applicable, shall cease to hold office or have any authority from and after such time to the extent not previously included in the roster of the New Board.

The New Board shall consist of seven (7) directors, consisting of (a) New Parent's Chief Executive Officer, (b) two (2) members selected by the Consenting ETI Parties, and (c) four (4) members selected by the Consenting Creditors (other than the Consenting ETI Parties and Holders of July 2026 Notes); *provided*, that if the ETI Penalty occurs, the New Board shall instead consist of (x) New Parent's Chief Executive Officer, (y) one (1) member selected by the Consenting ETI Parties, and (z) five (5) members selected by the Consenting Creditors (other than the Consenting ETI Parties and Holders of July 2026 Notes Claims). The membership of the New Board must comply with the independence requirements for listing on the Nasdaq ISE Exchange.

The New Board's maintenance of office and/or replacement shall be in accordance with the New Organizational Documents of New Parent.

R.     *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to the Releases and exculpation set forth in this section and in <u>Article IX</u> below, all Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor on the Effective Date, including each Cause of Action set forth in the Schedule of Retained Causes of Action included in the Plan Supplement. Thereafter, the Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, whether arising before or after the Petition Date, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  **No Entity may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any specific Cause of Action as any indication that the Debtors or the Reorganized Debtors shall not pursue any or all available Causes of Action.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in this Plan**, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches, shall apply to any Cause of Action upon, after, or as a consequence of the Confirmation or the occurrence of the Effective Date.  In addition, the Debtors and the Reorganized Debtors expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any of the Debtors are a plaintiff, defendant, or an interested party, against any Person or Entity, including the plaintiffs or co-defendants in such lawsuits.  For the avoidance of doubt, in no instance shall any Cause of Action preserved pursuant to this <u>Article IV.R</u> include any Claim or Cause of Action released or exculpated under this Plan (including by the Debtors).

S.     *Corporate Action*

Each of the Debtors, New Parent, and the other Reorganized Debtors may take any and all actions to execute, deliver, File or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the provisions of this Plan, the XBP Transaction Documents, and the transactions set forth in the Restructuring Steps Exhibit, and without further notice to or order of the Bankruptcy Court, any act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of New Parent, the Debtors, or the other Reorganized Debtors or by any other Person (except for those expressly required pursuant hereto or by the Definitive Documents).

Upon the Effective Date, all actions contemplated by this Plan, the XBP Transaction Documents, and the Restructuring Steps Exhibit shall be deemed authorized, approved, and, to the extent taken before the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, or officers of New Parent, the Debtors, the other Reorganized Debtors, or any other Entity (except for those expressly required pursuant to this Plan or the Definitive Documents), including: (1) assumption and rejection (as applicable) of Executory Contracts and Unexpired Leases; (2) selection of the directors, managers, and officers for each of the Reorganized Debtors; (3) the execution of the New Organizational Documents and the Exit Facilities Documents; (4) the issuance and delivery of the Plan Securities; (5) the incurrence of the Exit Facilities; (6) the Exit Securitization Programs; (7) the XBP Transaction; (8) the BTC Transaction; (9) implementation of the Restructuring Transactions; (10) entry into and performance of the Registration Rights Agreement; (11) appointment of the Claims Ombudsman; and (12) all other acts or actions contemplated, or reasonably necessary or appropriate to promptly consummate the transactions contemplated by this Plan and the XBP Transaction Documents (whether occurring before,

on, or after the Effective Date). All matters provided for in this Plan and the XBP Transaction Documents involving the company structure of the Debtors, and any company action required by the Debtors in connection therewith, shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, authorized persons, or officers of the Debtors, the Reorganized Debtors, or otherwise.

Before, on, and after the Effective Date, the appropriate officers, directors, managers, or authorized persons of the Debtors, the Reorganized Debtors, or any direct or indirect subsidiaries of the Reorganized Debtors (including any president, vice-president, chief executive officer, treasurer, general counsel, secretary, or chief financial officer thereof) shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, memoranda and articles of association, certificates of incorporation, certificates of formation, bylaws, operating agreements, other organization documents, and instruments contemplated by this Plan and the XBP Transaction Documents (or necessary or desirable to effect the transactions contemplated by this Plan and the XBP Transaction Documents) in the name of and on behalf of the applicable Debtors or applicable Reorganized Debtors, including the (1) New Organizational Documents, (2) Exit Facilities Documents, (3) Exit Securitization Programs Documents, (4) XBP Transaction Documents, (5) the New Parent Warrants Agreement, and (6) all other agreements, documents, securities, and instruments relating to or contemplated by the foregoing. Before or on the Effective Date, each of the Debtors and Reorganized Debtors is authorized, with the consent of the Required Consenting Creditors and the Consenting ETI Parties, to change its name or corporate form and to take such other action as required to effectuate a change of name or corporate form in the jurisdiction of incorporation of the applicable Debtor or Reorganized Debtor. To the extent the Debtors change their names or corporate form before the closing of the Chapter 11 Cases, the Debtors shall change the case captions accordingly.

The authorizations, approvals and directives contemplated by this Article IV.S shall be effective notwithstanding any requirements under non-bankruptcy law.

T.    *Claims Ombudsman*

Subject to entering into an agreement on reasonable terms (the "***Claims Ombudsman Agreement***") reasonably acceptable to the Debtors, the Committee, the Consenting ETI Parties, and the Required Consenting Creditors, on the Effective Date or as soon as reasonably practicable thereafter, the Debtors shall appoint a Claims Ombudsman, with duties that include (a) certain rights with respect to the reconciliation, allowance, and settlement of Claims by or on behalf of (and in consultation with) the Reorganized Debtors, (b) consultation rights with respect to distributions to the Holders of Convenience Claims and General Unsecured Claims, and (c) such other matters as may be agreed upon between the Debtors, the Committee, and the Reorganized Debtors (as applicable). The Claims Ombudsman shall, on behalf of the Holders of General Unsecured Claims, be the deemed secured party in respect of, and shall have the exclusive authority to take any action to enforce the security interest in, the GUC Payment Obligations Collateral.

Subject to the terms of the Claims Ombudsman Agreement, the Claims Ombudsman (a) shall be entitled to a reasonable fee (the "***Claims Ombudsman Fee***"), the terms, amount, and structure of which shall be set forth in the Claims Ombudsman Agreement, (b) may employ, with the prior written consent of the Debtors or the Reorganized Debtors, but without further order of the Bankruptcy Court, professionals (the "***Claims Ombudsman Professionals***") to assist in carrying out the duties described above and (c) shall have standing to appear before and be heard by the Bankruptcy Court and other courts of competent jurisdiction in connection with each of the foregoing duties, rights, and authorities. The Claims Ombudsman Fee and the reasonable and documented fees and expenses incurred by the Claims Ombudsman Professionals (the "***Claims Ombudsman Professionals Fees***") shall be expenses of the Reorganized Debtors; *provided*, that the Claims Ombudsman Fee and the Claims Ombudsman Professionals Fees shall be in all respects subject to (a) a budget satisfactory to the Reorganized Debtors

and the Required Consenting Creditors and/or (b) a cap set forth in the Claims Ombudsman Agreement in each case satisfactory to the Reorganized Debtors and the Required Consenting Creditors. The Claims Ombudsman shall be a fiduciary to Holders of Convenience Claims and General Unsecured Claims. The Claims Ombudsman and the Claims Ombudsman Professionals, each in their capacities as such, shall be exculpated, except for fraud, bad faith, willful misconduct, or gross negligence.

U.      *Effectuating Documents; Further Transactions*

Before, on, and after the Effective Date, the Debtors, the Reorganized Debtors, and the directors, managers, officers, authorized persons, and members of the boards of directors or managers and directors or managers of the foregoing, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, notes, instruments, certificates, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and provisions of this Plan, the XBP Transaction Documents, the New Organizational Documents, the Exit Facilities Documents, the BTC Transaction, and any Securities issued pursuant to this Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant to this Plan.

V.      *Authority of the Debtors*

Effective on the Confirmation Date, the Debtors and the Reorganized Debtors shall be empowered and authorized to take or cause to be taken, before the Effective Date, all actions necessary or appropriate to achieve the Effective Date and enable the Reorganized Debtors to implement effectively the provisions of this Plan, the XBP Transaction Documents, the Confirmation Order, the Definitive Documents, and the Restructuring Transactions.

W.      *No Substantive Consolidation*

This Plan is being proposed as a joint chapter 11 plan of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan for each Debtor. This Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in this Plan.

X.      *Continuing Effectiveness of Final Orders*

Payment authorization granted to the Debtors under any prior Final Order entered by the Bankruptcy Court shall continue in effect after the Effective Date. Accordingly, the Debtors or the Reorganized Debtors may pay or otherwise satisfy any Claim to the extent permitted by, and subject to, the applicable Final Order without regard to the treatment that would otherwise be applicable to such Claim under this Plan.

Y.      *Modifications to Executory Contracts and Unexpired Leases*

The Debtors are authorized to enter into, and perform under, amendments or modifications of any Executory Contracts or Unexpired Leases with the counterparty to such Executory Contract or Unexpired Lease and pay any amounts due as a result of such amendment or modification.

**Article V.**
**TREATMENT OF EXECUTORY CONTRACTS**
**AND UNEXPIRED LEASES; EMPLOYEE BENEFITS; AND INSURANCE POLICIES**

A.      *Assumption of Executory Contracts and Unexpired Leases*

On the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors will be assumed by the Debtors in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts and Unexpired Leases that:

(i)      have been assumed or rejected by the Debtors by prior order of the Bankruptcy Court;

(ii)      are the subject of a motion to reject Filed by the Debtors pending on the Effective Date;

(iii)      are identified as rejected Executory Contracts and Unexpired Leases by the Debtors, subject to the consent of the Required Consenting Creditors, on the Rejected Executory Contract/Unexpired Lease List, to be Filed in the Plan Supplement, which Plan Supplement may be amended by the Debtors, subject to the consent of the Required Consenting Creditors, to add or remove Executory Contracts and Unexpired Leases by Filing with the Bankruptcy Court an amended Plan Supplement and serving it on the affected non-Debtor contract parties prior to the Effective Date;

(iv)      are Related Parties Contracts that are not included on the Assumed Related Parties Contracts List, subject to the consent of the Required Consenting Creditors; or

(v)      are rejected or terminated pursuant to the terms of this Plan.

To the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned (as applicable) pursuant to this Plan or any prior order of the Bankruptcy Court (including any "change of control" provision) prohibits, restricts or conditions, or purports to prohibit, restrict or condition, or is modified, breached or terminated, or deemed modified, breached or terminated by, (i) the commencement of these Chapter 11 Cases or the insolvency or financial condition of any Debtor at any time before the closing of its respective Chapter 11 Case, (ii) any Debtor's or any Reorganized Debtor's assumption or assumption and assignment (as applicable) of such Executory Contract or Unexpired Lease or (iii) the Confirmation or consummation of this Plan, then such provision shall be deemed modified such that the transactions contemplated by this Plan shall not entitle the non-Debtor party thereto to modify or terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights or remedies with respect thereto, and any required consent under any such contract or lease shall be deemed satisfied by the Confirmation of this Plan.

Each Executory Contract and Unexpired Lease assumed and/or assigned pursuant to this Plan shall revest in and be fully enforceable by the applicable Reorganized Debtor or the applicable assignee in accordance with its terms and conditions, except as modified by the provisions of this Plan, any order of the Bankruptcy Court approving its assumption and/or assignment, or applicable law.

The inclusion or exclusion of a contract or lease on any schedule or exhibit shall not constitute an admission by any Debtor that such contract or lease is an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder.

B.      *Cure of Defaults; Assignment of Executory Contracts and Unexpired Leases*

Any defaults under each Executory Contract and Unexpired Lease to be assumed, or assumed and assigned, pursuant to this Plan shall be satisfied, pursuant to and to the extent required by section 365(b)(1) of the Bankruptcy Code, by payment of the applicable Cure Claim.

In the event of an assumption, or an assumption and assignment, of an Executory Contract or Unexpired Lease under this Plan, at least twenty-one (21) days prior to the deadline to object to this Plan, the Debtors shall File and serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption, or proposed assumption and assignment, which will: (a) list the applicable Cure Claim, if any; (b) if applicable, identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for Filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption, or proposed assumption and assignment under this Plan, or any related Cure Claim, must be Filed, served, and actually received by the Debtors prior to the deadline to object to this Plan (notwithstanding anything in the schedules or a Proof of Claim to the contrary).  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, or proposed assumption and assignment, or Cure Claim will be deemed to have consented to such matters and will be deemed to have forever released and waived any objection to such proposed assumption, proposed assumption and assignment, and Cure Claim.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving each proposed assumption, or proposed assumption and assignment, of Executory Contracts and Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

In the event of a dispute regarding (a) the amount of any Cure Claim, (b) the ability of any Debtor or assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or assumed and assigned or (c) any other matter pertaining to assumption or assignment, the applicable cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving such assumption, or assumption and assignment; provided, however, that following the resolution of any such dispute, the Debtors or the Reorganized Debtors, as applicable, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming or assuming and assigning it.  The Debtors or the Reorganized Debtors, as applicable, shall be authorized to effect such rejection by Filing a written notice of rejection with the Bankruptcy Court and serving such notice on the applicable counterparty within ten (10) days of the entry of such Final Order.

Subject to any Disputed Cure Claims, assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to this Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assumption and assignment, in each case as provided in section 365 of the Bankruptcy Code.  Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned by Final Order shall be deemed disallowed and expunged (subject to any Disputed Cure Claims), without further notice to or action, order, or approval of the Bankruptcy Court.

With respect to any Executory Contract or Unexpired Lease assumed and assigned pursuant to this Plan, upon and as of the Effective Date, the applicable assignee shall be deemed to be substituted as a party thereto for the applicable Debtor party to such assigned Executory Contract or Unexpired Lease and, accordingly, the Debtors and the Reorganized Debtors shall be relieved, pursuant to and to the extent set forth in section 365(k) of the Bankruptcy Code, from any further liability under such assigned Executory Contract or Unexpired Lease.

C.      *Rejection of Executory Contracts and Unexpired Leases*

The Debtors reserve the right at any time prior to the Effective Date, except as otherwise specifically provided herein, to seek to reject any Executory Contract or Unexpired Lease and to File a motion requesting authorization for the rejection of any such contract or lease.  All Executory Contracts and Unexpired Leases listed on the Rejected Executory Contract/Unexpired Lease List shall be deemed rejected as of the Effective Date.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejections described in this Article V pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  Rejection of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall not constitute a termination of any preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.

D.      *Claims on Account of the Rejection of Executory Contracts or Unexpired Leases*

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to this Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after service of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.

Any Person or Entity that is required to File a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against the Debtors, the Reorganized Debtors or the Estates, and the Debtors, the Reorganized Debtors, and their Estates and their respective assets and property shall be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein.  All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article IX.F.

E.      *Contracts and Leases Entered into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor may be performed by the applicable Debtor or Reorganized Debtor in the ordinary course of business without further approval of the Bankruptcy Court.

F.      *Reservation of Rights*

Nothing contained in this Plan shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.  If there is a dispute regarding a Debtor's or Reorganized Debtor's liability under an assumed Executory Contract or Unexpired Lease, the Reorganized Debtors shall be authorized to move to have such dispute heard by the Bankruptcy Court pursuant to Article X.

G.      *Directors and Officers Insurance Policies*

On the Effective Date the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Insurance Policies (including any "tail coverage" and all agreements, documents, or instruments related thereto) in effect before the Effective Date pursuant to sections 105 and 365(a) of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court.  Confirmation of this Plan shall not discharge, impair, or otherwise modify any indemnity obligations

assumed by the foregoing assumption of the D&O Insurance Policies, and each such indemnity obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under this Plan as to which no Proof of Claim need be Filed.  The Debtors and, after the Effective Date, the Reorganized Debtors shall retain the ability to supplement such D&O Insurance Policies as the Debtors or Reorganized Debtors, as applicable, may deem necessary.  For the avoidance of doubt, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Insurance Policies.

In addition, on or after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Insurance Policies (including any "tail policy" and all agreements, documents, or instruments related thereto) in effect on or before the Effective Date, with respect to conduct occurring prior thereto, and all current and former directors, officers, and managers of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policies for the full term of such policies regardless of whether such current and former directors, officers, and managers remain in such positions after the Effective Date, all in accordance with and subject in all respects to the terms and conditions of the D&O Insurance Policies, which shall not be altered.

H.     *Other Insurance Contracts*

On the Effective Date, each of the Debtors' Insurance Contracts in existence as of the Effective Date shall be Reinstated and continued in accordance with their terms and, to the extent applicable, shall be deemed assumed by the applicable Reorganized Debtor pursuant to section 365 of the Bankruptcy Code and Article V.  Nothing in this Plan shall affect, impair, or prejudice the rights of the insurance carriers, the insureds, or the Reorganized Debtors under the Insurance Contracts in any manner, and such insurance carriers, the insureds, and Reorganized Debtors shall retain all rights and defenses under such Insurance Contracts.  The Insurance Contracts shall apply to and be enforceable by and against the insureds and the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors, as existed before the Effective Date.

I.     *Indemnification Provisions and Reimbursement Obligations*

On and as of the Effective Date, and except as prohibited by applicable law, the Indemnification Provisions shall be deemed rejected as of the Effective Date.

The New Organizational Documents shall provide to the fullest extent provided by law for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to the Debtors' and the Reorganized Debtors' post-Effective Date directors, officers, equity holders, managers, members, employees, accountants, investment bankers, attorneys, other professionals, agents of the Debtors, and such directors', officers', equity holders', managers', members', and employees' respective Affiliates (each of the foregoing solely in their capacity as such) at least to the same extent as the Indemnification Provisions, against any Claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted.

Prior to the Effective Date, the Debtors shall fund and purchase appropriate D&O insurance and "tail coverage" for the Debtors' directors, officers, managers, and employees, solely in their capacities as such for the Debtors.

J.    *Employee Compensation and Benefits*

    1.    <u>Compensation and Benefits Programs</u>

Subject to the provisions of this Plan, all Compensation and Benefits Programs (other than awards of stock options, restricted stock, restricted stock units, and other equity awards, equity or equity-based incentive plans, employee stock purchase plans, and any other agreements or awards, or provisions set forth in any Compensation and Benefits Programs or Assumed Employee Agreements that provide for rights to acquire Interests and any agreement or plan whose value is related to Interests or other ownership interests of the Debtors, which, in each case, shall not constitute or be deemed to constitute Executory Contracts and shall be deemed terminated on the Effective Date) shall be treated as Executory Contracts under this Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.  All Proofs of Claim Filed for amounts due under any Compensation and Benefits Program shall be considered satisfied by the applicable agreement and/or program and agreement to assume and cure in the ordinary course as provided in this Plan.  All collective bargaining agreements to which any Debtor is a party, and all Compensation and Benefits Programs which are maintained pursuant to such collective bargaining agreements or to which contributions are made or benefits provided pursuant to a current or past collective bargaining agreement, shall be deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code and the Reorganized Debtors reserve all of their rights under such agreements.  For the avoidance of doubt, the Debtors and Reorganized Debtors, as applicable, shall honor all their obligations under section 1114 of the Bankruptcy Code.

None of the Restructuring Transactions, or any assumption of Compensation and Benefits Programs pursuant to the terms herein shall be deemed to trigger any applicable change of control, vesting, termination, acceleration, or similar provisions therein; *provided*, that the Assumed Employee Agreements shall be assumed and governed by the terms thereof.  Subject to the preceding sentence, no counterparty shall have rights under a Compensation and Benefits Program assumed pursuant to this Plan other than those applicable immediately before such assumption.

    2.    <u>Workers' Compensation Programs</u>

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (a) all applicable state workers' compensation laws; and (b) the Workers' Compensation Contracts.  All Proofs of Claims Filed by the Debtors' current or former employees on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court based upon the treatment provided for herein; *provided*, that nothing in this Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to the Workers' Compensation Contracts; *provided*, *further*, that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable non-bankruptcy law and/or the Workers' Compensation Contracts.

<div align="center">

**Article VI.**
**PROVISIONS GOVERNING DISTRIBUTIONS**

</div>

A.    *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in this Plan, on the Effective Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of the distributions that this Plan provides for Allowed Claims in the applicable Class; *provided*, that any Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business

during the Chapter 11 Cases or assumed by the Debtors before the Effective Date shall be paid or performed in the ordinary course of business.

If any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day and shall be deemed to have been completed as of the required date.

If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in <u>Articles VI</u> and <u>VII</u>.  Except as otherwise provided herein, Holders of Claims shall not be entitled to postpetition interest, dividends, or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.      *Special Rules for Distributions to Holders of Disputed Claims*

Except as otherwise agreed by the relevant parties: (1) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (2) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or such Claims or Interests have been Allowed or expunged.

C.      *Rights and Powers of Distribution Agent*

1.      <u>Powers of the Distribution Agent</u>

The Distribution Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan and the XBP Transaction Documents; (b) make all distributions contemplated hereby and by the XBP Transaction Documents; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, the XBP Transaction Documents, the Distribution Agent Agreement, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

2.      <u>Expenses Incurred on or After the Effective Date and Indemnification</u>

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date, and any reasonable compensation and expense reimbursement claims, made by the Distribution Agent shall be addressed paid in accordance with the applicable Distribution Agent Agreement.

D.      *Delivery of Distributions*

1.      <u>Record Date for Distributions</u>

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.  The Distribution Record Date shall not apply to distributions in respect of Securities deposited with DTC, the Holders of which shall receive distributions, if any, in accordance with the customary exchange procedures of DTC or this Plan. For the avoidance of doubt, in connection with a distribution through the facilities of DTC (if any), DTC shall be considered a single Holder for purposes of distributions.

2.     <u>Delivery of Distributions in General</u>

Except as otherwise provided herein, the Distribution Agent shall make distributions to Holders of Allowed Claims as of the Distribution Record Date, or, if applicable, to such Holder's designee, as appropriate: (a) at the address for each such Holder as indicated on the Debtors' records as of the Distribution Record Date; (b) to the signatory set forth on any Proof of Claim Filed by such Holder or other Representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have not been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the applicable Distribution Agent, as appropriate, after the date of any related Proof of Claim; or (d) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf; *provided*, that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors and, solely with respect to distributions to be made to Holders of April 2026 Notes Claims, the Required Consenting Creditors and the Consenting ETI Parties (acting reasonably).

All distributions to Holders of DIP Claims shall be made to the DIP Agent or the Exit Financing Facilities Agents, as applicable, and the DIP Agent or the Exit Financing Facilities Agents shall be, and shall act as, the Distribution Agent with respect to the DIP Claims in accordance with the terms and conditions of this Plan and the applicable debt documents.

All distributions to Holders of Postpetition Securitization Programs Claims shall be made to the Securitization Programs Agents and the Securitization Programs Agents shall be, and shall act as, the Distribution Agent with respect to the Postpetition Securitization Programs Claims in accordance with the terms and conditions of this Plan and the applicable debt documents.

All distributions to Holders of April 2026 Notes Claims and July 2026 Notes Claims shall be made to the respective Indenture Trustees, and the respective Indenture Trustees shall be, and shall act as, the Distribution Agents with respect to the April 2026 Notes Claims and the July 2026 Notes Claims, respectively, in accordance with the terms and conditions of this Plan and the applicable debt documents. With respect to any distributions of Plan Securities, to the extent the distribution procedures set forth herein conflict with those contemplated under the XBP Transaction Documents, the procedures under the XBP Transaction Documents shall control unless XBP and the Debtors (or the Reorganized Debtors) consent otherwise, such consent not to be unreasonably withheld or delayed, including after taking into account the advice provided by the Distribution Agent.  As applicable, the Indenture Trustees may transfer or direct the transfer of such distributions directly through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with the respective Holders of such Claims to the extent consistent with the customary practices of DTC.  Notwithstanding anything to the contrary herein, such distributions shall be subject in all respect to any rights of the Indenture Trustees to assert a charging lien against such distributions.  All distributions to be made to April 2026 Notes Claims and July 2026 Notes Claims through DTC shall be made eligible for distributions through the facilities of DTC and, for the avoidance of doubt, under no circumstances will the Indenture Trustees be responsible for making or required to make any distribution under the Plan to Holders of April 2026 Notes Claims and July 2026 Notes Claims if such distribution is not eligible to be distributed through the facilities of DTC.

3.     <u>Minimum Distributions</u>

Notwithstanding any provision in this Plan to the contrary, no Distribution Agent shall be required to make distributions or payments of less than $100 (whether in Cash or otherwise) with respect to Impaired Claims.  No fractional shares of Plan Securities shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to this Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of Plan Securities that is not a whole number,

the actual distribution of shares of Plan Securities shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefore.  The total number of authorized shares of Plan Securities to be distributed under this Plan shall be adjusted as necessary to account for the foregoing rounding.  For distribution purposes (including rounding), DTC shall be treated as a single Holder.

4.      Undeliverable Distributions

In the event that any distribution to any Holder of Allowed Claims is returned as undeliverable, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one (1) year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder of Claims to such property or interest in property shall be discharged and forever barred.

E.      *Compliance with Tax Requirements; Allocations*

In connection with this Plan, the XBP Transaction Documents, the Restructuring Steps Exhibit, and all distributions hereunder or thereunder, the Reorganized Debtors and any other applicable Distribution Agent (including for purposes of this Article VI, the Debtors) shall comply with all applicable withholding and reporting requirements imposed by any Governmental Unit, and all distributions hereunder and under all related agreements shall be subject to any such withholding and reporting requirements.  Notwithstanding any provision in this Plan to the contrary, the Reorganized Debtors and any other applicable Distribution Agent shall have the right, but not the obligation, to take any and all actions that may be necessary or appropriate to comply with such applicable withholding and reporting requirements, including (a) withholding distributions and amounts therefrom pending receipt of information necessary to facilitate such distributions, including properly executed withholding certification forms, and (b) in the case of a non-Cash distribution that is subject to withholding, withholding an appropriate portion of such property and either liquidating such withheld property to generate sufficient funds to pay applicable withholding taxes (or reimburse the distributing party for any advance payment of the withholding tax) or pay the withholding tax using its own funds and retain such withheld property.  Notwithstanding any provision in this Plan to the contrary, each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution, in each case, imposed on such Holder.  Any amounts withheld or reallocated pursuant to this Article VI.E shall be treated as if distributed to the Holder of the Allowed Claim.

Any Person or Entity entitled to receive any property as an issuance or distribution under or in connection with this Plan shall, upon request of New Parent, the other Reorganized Debtors, or any other applicable Distribution Agent, deliver to the applicable Reorganized Debtor or any other applicable Distribution Agent, or such other Person designated by the Reorganized Debtors or the Distribution Agent, a valid properly completed and duly executed IRS Form W-9 or, if the payee is a foreign Person or Entity for U.S. federal income tax purpose, an applicable IRS Form W-8 (together with all attachments), or any other forms or documents reasonably requested by a Reorganized Debtor or Distribution Agent to reduce or eliminate any withholding required by any Governmental Unit.

The Reorganized Debtors reserve the right to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, Liens, and encumbrances.

F.      *Applicability of Insurance Contracts*

Notwithstanding anything to the contrary in this Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order (including any provision that purports to be preemptory or supervening or confers Bankruptcy Court jurisdiction):

1.      on and after the Effective Date, all Insurance Contracts (a) are found to be and shall be treated as, Executory Contracts under this Plan and shall be assumed pursuant to sections 105 and 365 of the Bankruptcy Code by the applicable Debtor, and/or (b) shall vest in the Reorganized Debtors and ride through and continue in full force and effect in accordance with their respective terms in either case such that the Reorganized Debtors shall become and remain jointly and severally liable in full for, and shall satisfy, any premiums, deductibles, self-insured retentions, and/or any other amounts or obligations arising in any way out of the receipt of payment from an Insurer in respect of the Insurance Contracts and as to which no Proof of Claim or Administrative Claim need be Filed; and

2.      solely with respect to Insurance Contracts, which, for avoidance of doubt, includes any and all collateral or security securing the Debtor's obligations under the insurance policies, including escrow accounts, deposit accounts, Cash Collateral, and letters of credit, the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in this Plan, if and to the extent applicable, shall be deemed lifted without further order of this Bankruptcy Court, solely to permit (a) claimants with valid workers' compensation claims or direct action claims against Insurers under applicable non-bankruptcy law to proceed with their claims; (b) Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (i) workers' compensation claims, (ii) claims where a claimant asserts a direct claim against an Insurer under applicable non-bankruptcy law, or an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay or the injunctions set forth in this Plan to proceed with its claim, and (iii) all costs in relation to each of the foregoing; and (c) the Insurers to collect from any or all of the collateral or security provided by or on behalf of the Debtors (or the Reorganized Debtors) at any time and to hold the proceeds thereof as security for the obligations of the Debtors (or the Reorganized Debtors) and/or apply such proceeds to the obligations of the Debtors (or the Reorganized Debtors) under the applicable Insurance Contracts, in such order as the applicable Insurer may determine.

Nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including Insurers under any Insurance Contracts, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any rights or defenses, including coverage defenses, held by such Insurers under the Insurance Contracts and/or applicable non-bankruptcy law.

G.      *Allocation of Distributions Between Principal and Interest*

Except as otherwise required by law (as reasonably determined by the Reorganized Debtors), distributions with respect to an Allowed Claim shall be allocated for United States federal (and applicable state and local) income tax purposes first to the principal portion of such Allowed Claim and, thereafter, to the remaining portion of such Allowed Claim, if any.

H.      *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in this Plan, any other Definitive Document, the Confirmation Order, the DIP Orders, or any other Final Order of the Bankruptcy Court, or required by applicable bankruptcy law (including as required pursuant to section 506(b) or section 511 of the Bankruptcy Code), postpetition interest shall not accrue or be paid on any Claims and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any Claim.

I.      *Means of Cash Payment*

Payments of Cash made pursuant to this Plan shall be in United States dollars and shall be made, at the option of the Debtors or the Reorganized Debtors (as applicable), by checks drawn on, or wire transfer from, a domestic bank selected by the Debtors or the Reorganized Debtors.  Cash payments to foreign creditors may be made, at the option of the Debtors or the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

J.      *Setoffs and Recoupment*

Except as otherwise provided herein, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable bankruptcy or non-bankruptcy law, or as may be agreed to by the Holder of an Allowed Claim, may set off or recoup against any Allowed Claim and the distributions to be made pursuant to this Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature that the applicable Debtor or Reorganized Debtor may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised, settled, or assigned on or before the Effective Date (whether pursuant to this Plan, a Final Order or otherwise); *provided*, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to this Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action.

Notwithstanding anything to the contrary herein, nothing in this Plan or the Confirmation Order shall modify the rights, if any, of any counterparty to a rejected Executory Contract or Unexpired Lease to assert any right of setoff or recoupment that such party may have under applicable bankruptcy law or non-bankruptcy law, including the (1) ability, if any, of such parties to setoff or recoup a security deposit held pursuant to the terms of their rejected Unexpired Lease(s) with the Debtors, or any successors to the Debtors, under this Plan, (2) assertion of rights of setoff or recoupment, if any, in connection with Claims reconciliation, or (3) assertion of setoff or recoupment as a defense, if any, to any Claim or action by the Debtors, the Reorganized Debtors, or any successors of the Debtors.

K.      *Claims Paid or Payable by Third Parties*

1.      <u>Claims Paid by Third Parties</u>

A Claim shall be correspondingly reduced, and the applicable portion of such Claim shall be disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives a payment on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the Reorganized Debtors to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Claim as of the date of any such distribution under this Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Reorganized Debtors annualized interest at the

62

Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

        2.      <u>Claims Payable by Insurers</u>

No distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Contracts until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Contract.  To the extent that one or more of the Insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such Insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

        3.      <u>Insurance Contracts</u>

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Contract.  Notwithstanding anything to the contrary herein, nothing contained in this Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including Insurers, under any Insurance Contracts or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any defenses, including coverage defenses, held by such Insurers.

## Article VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.      *Allowance and Disallowance of Claims*

After the Effective Date, and except as otherwise provided in this Plan, the Reorganized Debtors shall have and shall retain any and all available rights and defenses that the Debtors had with respect to any Claim immediately before the Effective Date, including the right to assert any objection to Claims based on the limitations imposed by section 502 of the Bankruptcy Code.  The Debtors and the Reorganized Debtors may, but are not required to, contest the amount and validity of any Disputed Claim or contingent or unliquidated Claim in the ordinary course of business in the manner and venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced.

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (1) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (2) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

B.      *Claims Administration Responsibilities*

Except as otherwise specifically provided in this Plan, after the Effective Date, the Reorganized Debtors shall have the authority: (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect

any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court; *provided*, that the procedures governing the items set forth in the foregoing clauses (1) through (3) shall be subject to the reasonable consent of the Required Consenting Creditors and the Consenting ETI Parties, after consultation with the Claims Ombudsman.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately before the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to this Plan.

C.      *Adjustment to Claims or Interests without Objection*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

D.      *No Distributions Pending Allowance*

If any portion of a Claim is Disputed, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Claim becomes an Allowed Claim; provided that if only a portion of a Claim is Disputed, such Claim shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

E.      *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan and the XBP Transaction Documents.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under this Plan and the XBP Transaction Documents as of the Effective Date, without any postpetition interest to be paid on account of such Claim.

## Article VIII.
## CONDITIONS PRECEDENT TO THE OCURRENCE OF THE EFFECTIVE DATE

A.      *Conditions Precedent to the Occurrence of the Effective Date*

The following are conditions precedent to the occurrence of the Effective Date that must be satisfied or waived pursuant to the provisions of <u>Article VIII.C</u>:

1.   the Bankruptcy Court shall have entered the Final DIP Order and the Final Securitization Order;

2.   XBP shall have agreed to take all necessary actions in furtherance of the Restructuring Transactions including execution of Definitive Documents to which XBP is a party, which shall be in form and substance reasonably acceptable to XBP, the Debtors, and the Required Consenting Creditors.

3.   the XBP Transaction shall have occurred and been consummated;

4.   the Plan Support Agreement shall not have been terminated as to the Required Consenting Creditors or the Consenting ETI Parties and shall be in full force and effect;

5.   the ETI Funding Obligations shall be in full force and effect;

6.  the transactions contemplated by the Restructuring Steps Exhibit shall have been consummated;

7.  each of the New Parent Warrants Agreement and the XBP Transaction Documents shall be on terms and conditions reasonably acceptable to the Required Consenting Creditors, the Consenting ETI Parties, and XBP;

8.  Executory Contracts and Unexpired Leases shall either have been assumed, assumed and assigned, or rejected;

9.  the Plan shall contain the Releases;

10.  the Bankruptcy Court shall have entered the Confirmation Order in form and substance materially consistent with and subject to the consent rights set forth in the Plan Support Agreement;

11.  the Exit Facilities Documents shall have been executed (or deemed executed) and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the Debtors, and the Required Consenting Creditors), other than such conditions that relate to the effectiveness of this Plan and related transactions;

12.  the Exit Securitization Programs Documents shall have been executed (or deemed executed) and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the applicable Debtors and the Securitization Programs Parties), other than such conditions that relate to the effectiveness of this Plan and related transactions;

13.  the XBP Funding or the XBP Alternative Funding has occurred or will occur simultaneously with the Effective Date;

14.  the Debtors, the Required Consenting Creditors, and the Committee shall have reached agreement with respect to the GUC Payment Obligations Collateral such that, as of the Effective Date, the Claims Ombudsman shall be in a position to properly perfect the security interest in the GUC Payment Obligations Collateral;

15.  the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements, and exhibits to the Plan shall be consistent with the Plan Support Agreement and otherwise approved by the parties thereto consistent with their respective consent and approval rights as set forth in the Plan Support Agreement, and shall have been Filed in a manner consistent with the Plan Support Agreement;

16.  all Restructuring Fees and Expenses shall have been paid in full in Cash;

17.  the Definitive Documents shall (i) be materially consistent with the Plan Support Agreement and otherwise approved by the Required Consenting Creditors, the Consenting ETI Parties, and the Debtors consistent with their respective consent and approval rights as set forth in the Plan Support Agreement; (ii) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties; and (iii) be adopted on terms materially consistent with the Plan Support Agreement and the Plan Term Sheet;

18.  the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, actions, documents, and other agreements that are necessary to implement and effectuate the Plan and each of the other Restructuring Transactions; and the Debtors shall have paid in full all professional fees and expenses of the Retained Professionals that require the Bankruptcy Court's approval or amounts sufficient

to pay such fees and expenses after the Effective Date shall have been placed in the Professional Fee Escrow Account pending the Bankruptcy Court's approval of such fees and expenses; and

19. the Debtors shall have paid in full all professional fees and expenses of the Retained Professionals that require the Bankruptcy Court's approval or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Professional Fee Escrow Account pending the Bankruptcy Court's approval of such fees and expenses.

B.      *Timing of Conditions Precedent*

Notwithstanding when a condition precedent to the Effective Date occurs, for the purposes of this Plan, such condition precedent shall be deemed to have occurred simultaneously upon the completion of the conditions precedent to the Effective Date; provided, that to the extent a condition precedent (the "***Prerequisite Condition***") may be required to occur prior to another condition precedent (a "***Subsequent Condition***") then, for purposes of this Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to the applicable Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

C.      *Waiver of Conditions*

Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  Each of the conditions precedent of this Plan may be waived in writing by the Debtors with the prior written consent of any party expressly given a consent right hereunder or in the Plan Support Agreement with respect to the condition to be waived; *provided*, that (a) waiver of the conditions precedent in Article VIII.A.19 shall require the consent of the affected Retained Professionals; (b) waiver of the condition precedent in Article VIII.A.14 shall require the consent of the Committee (such consent not to be unreasonably withheld); and (c) waiver of the conditions precedent in Article VIII.A, 2, 3, 5, 6, 7, 8, 9, 10, 11, 12, 13, 15, 16, 17, and 18 shall require the consent of the Required Consenting Creditors and the Consenting ETI Parties (such consent not to be unreasonably withheld).  If this Plan is confirmed for fewer than all of the Debtors as provided for in this Plan, only the conditions applicable to the Debtor or Debtors for which this Plan is confirmed must be satisfied or waived for the Effective Date to occur.

The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(c) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

D.      *Effect of Non-Occurrence of Conditions to the Effective Date*

If the Confirmation of this Plan or the Effective Date does not occur with respect to one or more of the Debtors on or before the termination of the Plan Support Agreement, then this Plan shall, with respect to such applicable Debtor or Debtors, be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders, or any other Person or Entity; (3) constitute an allowance of any Claim or Interest; or (4) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Person or Entity in any respect.

E.      *Substantial Consummation*

"Substantial consummation" of this Plan, as defined in section 1102(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date upon the Filing of the Notice of Effective Date.

## Article IX.
## DISCHARGE, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.     *Discharge of Claims and Termination of Interests*

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in this Plan, the XBP Transaction Documents, the Confirmation Order, the Definitive Documents, or in any contract, instrument, or other agreement or document created or entered into, the distributions, rights, and treatment that are provided in this Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, demands against, Liens on, obligations of, rights against, and Interests in, the Debtors, the Reorganized Debtors, the Estates, or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted this Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to this Plan and the Committee Settlement, the provisions of this Plan shall constitute a good-faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest including all controversies among the Debtors, the Consenting Stakeholders, the Committee, the Sub-Group DIP Lenders, and all other Holders of Claims against the Debtors, including (a) Claims, Interests and controversies relating to the settlements embodied in the Committee Settlement and the Sub-Group DIP Lenders Settlement, each of which is integrated with, and non-severable from, the provisions of this Plan and the global comprise and settlement embodied herein, and (b) in connection with the Committee Settlement, the distribution to which Holders of Claims in Classes 4, 5, and 6 are entitled, and in connection with the Sub-Group DIP Lenders Settlement, the distributions and treatment to which the Sub-Group DIP Lenders are entitled.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, the Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of this Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against the Debtors and the Estates and Causes of Action against other Entities.

B.     *Releases by the Debtors*

**To the fullest extent permitted by applicable law and approved by the Bankruptcy Court, and except as otherwise expressly set forth in this Plan, the XBP Transaction Documents, or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, as of the Effective Date,**

in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Debtor, Reorganized Debtor, and the Estates, in each case on behalf of itself and its respective successors, assigns, and Representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, has and is deemed to have, forever and unconditionally released, and absolved each Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Debtors, the Estates, or the Reorganized Debtors that such Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, including (1) the management, ownership, or operation of the Debtors, the Non-Debtor Affiliates, or the Consenting ETI Parties, (2) the purchase, sale, or rescission of any Security of the Debtors, the Non-Debtor Affiliates, or the Consenting ETI Parties, (3) the subject matter of, or the transactions, events, circumstances, acts or omissions giving rise to, any Claim or Interest that is treated in the Restructuring Transactions, including the negotiation, formulation, or preparation of the Restructuring Transactions, (4) the business or contractual arrangements between any Debtor or Non-Debtor Affiliate or Consenting ETI Party and any other Entity (including Consenting Stakeholders), (5) the Debtors', Non-Debtor Affiliates', and the Consenting ETI Parties' in- or out-of-court restructuring efforts, (6) intercompany transactions, (7) the formulation, preparation, dissemination, negotiation, Filing, or consummation of this Plan, the XBP Transaction Documents, the Disclosure Statement, the Plan Support Agreement, the Definitive Documents, the Prepetition Term Loan Documents, the April 2026 Notes Documents, the July 2026 Notes Documents, the DIP Documents, the Exit Facilities Documents, the Prepetition Securitization Programs Documents, the Postpetition Securitization Programs Documents, the Exit Securitization Programs Documents (and any financing permitted thereunder), the New Organizational Documents, the Chapter 11 Cases, the BTC Transaction, the Committee Settlement, the Sub-Group DIP Lenders Settlement, or any Restructuring Transaction, (8) any contract, instrument, release, or other agreement or document created or entered into in connection with this Plan, the XBP Transaction Documents, the Disclosure Statement, the Plan Support Agreement, the Definitive Documents, the Prepetition Term Loan Documents, the April 2026 Notes Documents, the July 2026 Notes Documents, the DIP Documents, the Exit Facilities Documents, the Prepetition Securitization Programs Documents, the Postpetition Securitization Programs Documents, the Exit Securitization Programs Documents (and any financing permitted thereunder), the Chapter 11 Cases, the pursuit of Confirmation of this Plan, the administration and implementation of this Plan, the BTC Transaction, the Committee Settlement, the Sub-Group DIP Lenders Settlement, or the Restructuring Transactions, including the issuance or distribution of Securities pursuant to this Plan and the XBP Transaction Documents, (9) the distribution, including any disbursements made by a Distribution Agent, of property under this Plan, the XBP Transaction Documents, or any other related agreement, or (10) any other act or omission, transaction, agreement, event, or other occurrence related to any of the foregoing and taking place on or before the Effective Date; *provided*, that the Debtors do not release Claims or Causes of Action (1) that are of a commercial nature and arise in the ordinary course of business, such as accounts receivable and accounts payable on account of goods being sold and services being performed; (2) arising under an Executory Contract or Unexpired Lease that is assumed by the Debtors; or (3) arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud (but not, for the avoidance of doubt, fraudulent transfers), gross negligence, or willful misconduct). Notwithstanding anything to the contrary in the foregoing, the Releases set forth above do not release (1) any obligations of any Person or Entity under this Plan, the XBP Transaction Documents, the Confirmation Order, any other Definitive Document, any Restructuring Transaction, any document,

instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan, the XBP Transaction Documents, or any agreement, Claim, or obligation arising or assumed under this Plan or the XBP Transaction Documents or (2) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by each of the Released Parties, including the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing this Plan and the XBP Transaction Documents; (2) a good-faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

C.    *Releases by Holders of Claims and Interests*

To the fullest extent permitted by applicable law and approved by the Bankruptcy Court, and except as otherwise expressly set forth in this Plan, the XBP Transaction Documents, or the Confirmation Order, as of the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and Representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, has and is deemed to have, forever and unconditionally, released, and absolved each Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Debtors, the Estates, or the Reorganized Debtors that such Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, including (1) the management, ownership, or operation of the Debtors, the Non-Debtor Affiliates, or the Consenting ETI Parties, (2) the purchase, sale, or rescission of any Security of the Debtors, the Non-Debtor Affiliates, or the Consenting ETI Parties, (3) the subject matter of, or the transactions, events, circumstances, acts or omissions giving rise to, any Claim or Interest that is treated in the Restructuring Transactions, including the negotiation, formulation, or preparation of the Restructuring Transactions, (4) the business or contractual arrangements between any Debtor, Non-Debtor Affiliate, or Consenting ETI Party and any other Entity (including Consenting Stakeholders), (5) the Debtors', Non-Debtor Affiliates', and Consenting ETI Parties' in- or out-of-court restructuring efforts, (6) intercompany transactions, (7) the formulation, preparation, dissemination, negotiation, Filing, or consummation of this Plan, the XBP Transaction Documents, the Disclosure Statement, the Plan Support Agreement, the Definitive Documents, the Prepetition Term Loan Documents, the April 2026 Notes Documents, the July 2026 Notes Documents, the DIP Documents, the Exit Facilities Documents, the Prepetition Securitization Programs Documents, the Postpetition Securitization Programs Documents, the Exit Securitization Programs Documents (and any financing permitted thereunder), the New Organizational Documents, the Chapter 11 Cases, the BTC Transaction, the Committee Settlement, the Sub-Group DIP Lenders Settlement, or any Restructuring Transaction, (8) any contract, instrument, release, or other agreement or document created or entered into in connection with this Plan, the XBP Transaction Documents, the Disclosure Statement, the Plan Support Agreement, the Definitive Documents, the Prepetition Term Loan Documents, the April 2026 Notes Documents, the July 2026 Notes Documents, the DIP Documents,

the Exit Facilities Documents, the Prepetition Securitization Programs Documents, the Postpetition Securitization Programs Documents, the Exit Securitization Programs Documents (and any financing permitted thereunder), the Chapter 11 Cases, the pursuit of Confirmation of this Plan, the administration and implementation of this Plan, the BTC Transaction, the Committee Settlement, the Sub-Group DIP Lenders Settlement, or the Restructuring Transactions, including the issuance or distribution of Securities pursuant to this Plan and the XBP Transaction Documents, (9) the distribution, including any disbursements made by a Distribution Agent, of property under this Plan, the XBP Transaction Documents, or any other related agreement, or (10) any other act or omission, transaction, agreement, event, or other occurrence relating to any of the foregoing and taking place on or before the Effective Date; *provided*, that the Releasing Parties do not release Claims or Causes of Action (1) arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud (but not, for the avoidance of doubt, fraudulent transfers), gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud, gross negligence, or willful misconduct) or (2) against a Released Party arising from any obligations owed to the Releasing Party that are wholly unrelated to the Debtors or the Reorganized Debtors.  Notwithstanding anything to the contrary in the foregoing, the Releases set forth above do not release (1) any obligations of any Person or Entity under this Plan, the XBP Transaction Documents, the Confirmation Order, any other Definitive Document, any Restructuring Transaction, any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan, the XBP Transaction Documents, or any agreement, Claim, or obligation arising or assumed under this Plan or the XBP Transaction Documents or (2) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) given and made after due notice and opportunity for hearing; and (3) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

D.      *Exculpation*

Effective as of the Effective Date, to the fullest extent permitted by law, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any Claims or Causes of Action for any act taken or omitted to be taken between the Petition Date and the Effective Date in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or consummation (as applicable) of this Plan, the XBP Transaction Documents, the Plan Support Agreement, and the Disclosure Statement including any disbursements made by a Distribution Agent in connection with this Plan, the XBP Transaction Documents, the Disclosure Statement, the Definitive Documents, the Plan Supplement, the Prepetition Term Loan Documents, the April 2026 Notes Documents, the July 2026 Notes Documents, the DIP Documents, the Exit Facilities Documents, the Prepetition Securitization Programs Documents, the Postpetition Securitization Programs Documents, the Exit Securitization Programs Documents (and any financing permitted thereunder), the New Organizational Documents, the BTC Transaction, the Committee Settlement, the Sub-Group DIP Lenders Settlement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with this Plan, the XBP Transaction Documents, or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or

consummation of this Plan and the XBP Transaction Documents; *provided*, that the foregoing provisions of this exculpation shall not operate to waive or release: (1) any Claims or Causes of Action arising from willful misconduct, actual fraud (but not, for the avoidance of doubt, fraudulent transfers), or gross negligence of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (2) the rights of any Person or Entity to enforce this Plan, the XBP Transaction Documents, and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with this Plan and the XBP Transaction Documents or assumed pursuant to this Plan, the XBP Transaction Documents, or Final Order of the Bankruptcy Court; *provided*, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions, or inactions.

The Exculpated Parties have, and upon consummation of this Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to this Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan.

The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity.  For the avoidance of doubt and notwithstanding anything else herein, the foregoing exculpation shall be limited to Persons that served as Estate fiduciaries during the Chapter 11 Cases.

E.      *Permanent Injunction*

Except as otherwise expressly provided in the Plan Support Agreement, this Plan or the Confirmation Order, from and after the Effective Date, all Persons and Entities are, to the fullest extent provided under Section 524 and other applicable provisions of the Bankruptcy Code, permanently enjoined from (1) commencing or continuing, in any manner or in any place, any suit, action or other proceeding of any kind; (2) enforcing, attaching, collecting, or recovering in any manner or means any judgment, award, decree, or order; (3) creating, perfecting, or enforcing any Lien or encumbrance; (4) asserting a right of setoff or subrogation of any kind; or (5) commencing or continuing in any manner any action or other proceeding of any kind, in each case on account of or with respect to any Claim, demand, liability, obligation, debt, right, Cause of Action, Interest, or remedy released or to be released, exculpated or to be exculpated, settled or to be settled, or discharged or to be discharged pursuant to this Plan or the Confirmation Order against any Person or Entity so released, discharged, or exculpated (or the property or estate of any Person or Entity so released, discharged, or exculpated).  All injunctions or stays provided for in the Chapter 11 Cases under Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

No Person or Entity may commence or pursue a Claim or Cause of Action, as applicable, of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action, as applicable, subject to **Article IX** hereof, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action, as applicable, represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action, as applicable, against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party, as applicable; *provided*, that the foregoing shall only apply to Claims or Causes of Action brought

against a Released Party is such Person or Entity bringing such Claim or Cause of Action is a Releasing Party.  At the hearing for the Bankruptcy Court to determine whether such Claim or Cause of Action represents a colorable Claim of any kind, the Bankruptcy Court may, or shall if any Debtor, Reorganized Debtor, Exculpated Party, Released Party, or other party in interest requests by motion (oral motion being sufficient), direct that such Person or Entity seeking to commence or pursue such Claim or Cause of Action File a proposed complaint with the Bankruptcy Court embodying such Claim or Cause of Action, such complaint satisfying the applicable Rules of Federal Procedure, including Rule 8 and Rule 9 (as applicable), which the Bankruptcy Court shall assess before making a determination.  For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any Claims or Causes of Action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending.  The Bankruptcy Court reserves jurisdiction to adjudicate any such claims to the maximum extent provided by the law.

**F.**     *SEC Reservation of Rights*

Notwithstanding any language to the contrary in the Disclosure Statement, Plan and/or Confirmation Order, no provision shall (i) preclude the SEC from enforcing its police or regulatory powers or (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, Causes of Action, proceedings or investigations against any non-Debtor Person or non-Debtor Entity in any forum.

**Article X.**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, except to the extent set forth herein or under applicable federal law, the Bankruptcy Court shall retain on and after the Effective Date jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and this Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

A.     allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

B.     decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Retained Professionals authorized pursuant to the Bankruptcy Code or this Plan;

C.     resolve any matters related to: (1) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party with respect to which a Debtor may be liable and to hear, determine, and, if necessary, adjudicate, any Disputed Cure Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (2) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (3) the Reorganized Debtors seeking to amend, modify, or supplement, after the Effective Date, any Executory Contracts and Unexpired Leases to be assumed or rejected; and (4) any dispute regarding whether a contract or lease is or was executory or expired;

D.     ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan and the Confirmation Order;

E.      adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

F.      adjudicate, decide, or resolve any and all matters related to Causes of Action;

G.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

H.      resolve any cases, controversies, suits, or disputes that may arise in connection with any Claims, including Claim objections, allowance, disallowance, estimation, and distribution;

I.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of this Plan, the Confirmation Order, and all contracts, instruments, releases, and other agreements or documents created in connection with this Plan, the Confirmation Order, or the Disclosure Statement, including the Plan Support Agreement;

J.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

K.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the interpretation or enforcement of this Plan, the Confirmation Order, or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to this Plan or the Confirmation Order, or any Entity's rights arising from or obligations incurred in connection with this Plan or the Confirmation Order;

L.      issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of this Plan or the Confirmation Order;

M.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in this Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

N.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid;

O.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

P.      determine any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with this Plan, the Confirmation Order, or the Disclosure Statement;

Q.      enter an order or final decree concluding or closing the Chapter 11 Cases;

R.      adjudicate any and all disputes arising from or relating to distributions to Holders of Claims and Interests under this Plan;

S.      consider any modification of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

T.      determine requests for payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

U.      hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan;

V.      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

W.      hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

X.      hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the releases, injunctions, and exculpations provided under Article IX;

Y.      resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

Z.      enforce all orders previously entered by the Bankruptcy Court; and

AA.     hear any other matter not inconsistent with the Bankruptcy Code, this Plan, or the Confirmation Order.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Article X, the provisions of this Article X shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Notwithstanding anything to the contrary in this Plan: (1) the Bankruptcy Court's jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose before the Effective Date, including any Claims based in whole or in part on any conduct of the Debtors occurring on or before the Effective Date, shall be non-exclusive; (2) any dispute arising under or in connection with the Exit Facilities Documents and the Exit Securitization Programs Documents, and shall be dealt with in accordance with the provisions of the applicable document; and (3) as of the Effective Date, the Exit Facilities Documents and the Exit Securitization Programs Documents shall be governed by the jurisdictional provisions therein.

## Article XI.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN

A.      *Modification of Plan*

Subject to the limitations contained in this Plan, the Debtors or Reorganized Debtors reserve the right to, following consultation with the Committee but without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court, in accordance with the Bankruptcy Code and the Bankruptcy Rules: (1) amend or modify this Plan before the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; (2) amend or modify this Plan after the entry of the Confirmation Order in accordance with section 1127(b) of the Bankruptcy Code upon order of the Bankruptcy Court; and (3) remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan upon order of the Bankruptcy Court. In addition, after the Confirmation Date, so long as such action does not adversely affect the treatment of Holders of Allowed Claims pursuant to this Plan, the Debtors may make appropriate technical adjustments, remedy any defect or omission or reconcile any inconsistencies in this Plan, the Plan Supplement and/or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of this Plan, and any Holder of a Claim that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented. For the avoidance of doubt, the Postpetition Securitization Programs Documents shall not be modified without the consent of the Securitization Programs Parties as required therein. Any amendment to Article III.B.2 or any amendment that otherwise adversely affects the Holders of Prepetition Term Loan Claims shall be subject to the reasonable consent of Blue Torch.

B.      *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to this Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.      *Revocation of Plan; Reservation of Rights if Effective Date Does Not Occur*

Subject to the occurrence of the Effective Date, the Debtors reserve the right to revoke or withdraw this Plan before the entry of the Confirmation Order and to File subsequent plans of reorganization. If the Debtors revoke or withdraw this Plan, or if entry of the Confirmation Order or the Effective Date does not occur, or if the Plan Support Agreement terminates in accordance with its terms before the Effective Date, then: (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount of any Claim or Interest or Class of Claims or Interests), assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases effected by this Plan, and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors or any other Entity.

## Article XII.
## MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect*

Notwithstanding Bankruptcy Rules 3020(e), 6004(g), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan and the documents and instruments contained in the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims and Interests (irrespective of whether Holders of such Claims or Interests are deemed to have accepted this Plan), all Entities that are parties to or are subject

to the settlements, compromises, releases, discharges, and injunctions described in this Plan, each Entity acquiring property under this Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases, and notwithstanding whether or not such Person or Entity (1) shall receive or retain any property, or interest in property, under this Plan, (2) has Filed a Proof of Claim in the Chapter 11 Cases (if applicable) or (3) failed to vote to accept or reject this Plan, affirmatively voted to reject this Plan, or is conclusively presumed to reject this Plan.  The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rule 3020(e) and 7062.

B.      *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.  The Debtors or Reorganized Debtors, as applicable, and all Holders of Claims and Interests receiving distributions pursuant to this Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.

C.      *Payment of United States Trustee Statutory Fees*

All United States Trustee Statutory Fees due and payable to the United States Trustee before the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, any and all United States Trustee Statutory Fees shall be paid to the United States Trustee when due and payable.  The Debtors shall File all monthly operating reports due before the Effective Date when they become due, using UST Form 11-MOR.  After the Effective Date, the Reorganized Debtors shall each File with the Bankruptcy Court separate UST Form 11-PCR reports when they become due, until the earliest of the Debtors' or Reorganized Debtors' case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. The United States Trustee shall not be required to File a request for an Administrative Claim for United States Trustee Statutory Fees, and shall not be treated as providing any release under this Plan.

D.      *Statutory Committee*

On the Effective Date, the current and former members of the Committee, and their respective officers, employees, counsel, advisors and agents, will be released from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases and the Committee will dissolve; provided, however, that following the Effective Date, the Committee will continue in existence and have standing and a right to be heard for the following limited purposes: (a) pursuing Claims and final fee applications Filed pursuant to sections 330 and 331 of the Bankruptcy Code; and (b) any appeals of the Confirmation Order related to the Committee Settlement, and the Reorganized Debtors shall be responsible for the reasonable and documented post-Effective Date fees and expenses incurred by the advisors to the Committee solely with respect to these limited matters; *provided*, that such fees and expenses shall be subject to the Committee Professional Fee Cap.  Following the completion of the Committee's remaining duties set forth above, the Committee will be dissolved, and the retention or employment of the Committee's respective attorneys, accountants and other agents will terminate without further notice to, or action by, any Entity.

E.      *Reservation of Rights*

This Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  None of the Filing of this Plan, any statement or provision contained in this Plan, or the taking of any action by any Debtor with respect to this Plan, the Disclosure Statement, or the Plan

Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests before the Effective Date.

F.    *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, Representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.    *No Successor Liability*

Except as otherwise expressly provided in this Plan and the Confirmation Order, each of the Reorganized Debtors (1) is not, and shall not be deemed to assume, agree to perform, pay, or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other Person relating to or arising out of the operations or the assets of the Debtors on or before the Effective Date, (2) is not, and shall not be, a successor to the Debtors by reason of any theory of law or equity or responsible for the knowledge or conduct of any Debtor before the Effective Date, and (3) shall not have any successor or transferee liability of any kind or character.

H.    *Service of Documents*

After the Effective Date, any pleading, notice, or other document required by this Plan to be served on or delivered to the Reorganized Debtors shall also be served on:

| Debtors | Counsel to the Debtors |
| --- | --- |
| DocuData Solutions, L.C.<br>2701 E. Grauwyler Road<br>Irving, TX 75061 USA<br>Attn: Randall S. Eisenberg; Stephen Spitzer<br>reisenberg@alixpartners.com<br>sspitzer@alixpartners.com | Hunton Andrews Kurth LLP<br>600 Travis Street, Suite 4200<br>Houston, TX 77002<br>Attn: Timothy A. ("Tad") Davidson II; Ashley L. Harper; Philip M. Guffy<br>taddavidson@hunton.com<br>ashleyharper@hunton.com<br>pguffy@hunton.com<br><br>and<br><br>Latham & Watkins LLP<br>1271 Avenue of the Americas<br>New York, NY 10020<br>Attn: Ray C. Schrock; Alexander W. Welch; Hugh Murtagh; Adam Ravin; Jonathan Weichselbaum<br>ray.schrock@lw.com<br>alex.welch@lw.com<br>hugh.murtagh@lw.com<br>adam.ravin@lw.com<br>jon.weichselbaum@lw.com |

| United States Trustee | Counsel to the Consenting Creditor Ad Hoc Group |
|---|---|
| Office of the United States Trustee for the Southern District of Texas Trustee 515 Rusk Street, Suite 3516 Houston, TX 77002 Attn: Jana Whitworth Jana.Whitworth@usdoj.gov | Ropes & Gray LLP 1211 Avenue of the Americas New York, NY US 10036-8704 Attn: Matthew Roose; Sam Badawi ryan.dahl@ropesgray.com matthew.roose@ropesgray.com sam.badawi@ropesgray.com and Ropes & Gray LLP 191 N. Wacker Drive Chicago, IL 60606 Attn: Eric P. Schriesheim eric.schriesheim@ropesgray.com |
| **Counsel to the Consenting ETI Parties** | **Counsel to the Committee** |
| Cleary Gottlieb Steen & Hamilton LLP One Liberty Plaza New York, NY 10006 Attn: Sean A. O'Neal, Kara A. Hailey soneal@cgsh.com khailey@cgsh.com | Brown Rudnick LLP Seven Times Square, 47th Floor New York, NY 10036 Attn: Robert J. Stark and McDermott Will & Emery LLP 2501 North Harwood Street, Suite 1900 Dallas, TX 75201-1664 Attn: Charles R. Gibbs |

I.      *Term of Injunctions or Stays*

Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

J.      *Entire Agreement*

On the Effective Date, this Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

K.      *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of this Plan, the Plan Supplement, and any agreements, documents, instruments, or contracts executed or entered into in connection with this Plan (except as otherwise set forth in those

agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided*, that corporate governance matters relating to Debtors or Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the jurisdiction of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

L.      *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of this Plan as if set forth in full in this Plan.  Except as otherwise provided in this Plan, such exhibits and documents included in the Plan Supplement shall initially be Filed with the Bankruptcy Court on or before the Plan Supplement Filing Date.  After the exhibits and documents are Filed, copies of such exhibits and documents shall have been available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://omniagentsolutions.com/DocuDataSolutions or the Bankruptcy Court's website at www.txs.uscourts.gov.  To the extent any exhibit or document is inconsistent with the terms of this Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of this Plan shall control.

M.      *Nonseverability of Plan Provisions upon Confirmation*

If, before Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to this Plan and may not be deleted or modified without the consent of the Debtors; and (3) nonseverable and mutually dependent.

N.      *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

O.      *Conflicts*

To the extent that any provision of the Plan Support Agreement, the Disclosure Statement, or any order entered before Confirmation (for avoidance of doubt, not including the Confirmation Order) referenced in this Plan (or any exhibits, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of this Plan, this Plan shall govern and control.  To the extent that any provision of this Plan conflicts with or is in any way inconsistent with any provision of the Confirmation Order, the Confirmation Order shall govern and control.

P.      *No Strict Construction*

This Plan is the product of extensive discussions and negotiations between and among, *inter alia*, the Debtors, the Consenting Creditor Ad Hoc Group, the Consenting ETI Parties, XBP and their respective professionals.  Each of the foregoing was represented by counsel of its choice who either participated in the formulation and documentation of, or was afforded the opportunity to review and provide comments on,

this Plan and the Disclosure Statement, the exhibits and schedules thereto, and the other agreements and documents ancillary or related thereto. Accordingly, unless explicitly indicated otherwise, the general rule of contract construction known as "contra proferentem" or other rule of strict construction shall not apply to the construction or interpretation of any provision of this Plan and the Disclosure Statement, the exhibits and schedules thereto, and the other agreements and documents ancillary or related thereto. Notwithstanding anything to the contrary contained in this Plan or in the Disclosure Statement, in the case of any conflict or inconsistency between this Plan and the Restructuring Steps Exhibit, the Restructuring Steps Exhibit shall govern and control.

Q.      *Section 1125(e) Good Faith Compliance*

The Debtors, the Reorganized Debtors, the Consenting Creditor Ad Hoc Group, the Consenting ETI Parties, and each of their respective current and former officers, directors, members (including *ex officio* members), managers, employees, partners, advisors, attorneys, professionals, accountants, investment bankers, investment advisors, actuaries, Affiliates, financial advisors, consultants, agents, and other Representatives of each of the foregoing Entities (whether current or former, in each case in his, her or its capacity as such) have, and upon Confirmation shall be deemed to have, solicited votes on this Plan from the Voting Class in compliance with the applicable provisions of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with the solicitation, and acted in "good faith" under section 1125(e) of the Bankruptcy Code; and therefore, no such parties, individuals, or the Debtors or the Reorganized Debtors shall have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on this Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under this Plan.

R.      *2002 Notice Parties*

After the Effective Date, the Debtors and the Reorganized Debtors, as applicable, are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed a renewed request after the Confirmation Hearing to receive documents pursuant to Bankruptcy Rule 2002.

Respectfully submitted, as of the date first set forth above,

> **DocuData Solutions, L.C.**
> **(on behalf of itself and all other Debtors)**
>
> By:     _/s/ Randall S. Eisenberg_
> Name:   Randall S. Eisenberg
> Title:  Chief Restructuring Officer of Exela Technologies
>         BPA, LLC, Exela Intermediate LLC, Exela Finance
>         Inc., XCV-EMEA, LLC, and Neon Acquisition, LLC

**Appendix A**

**Allowed Priority Tax Claims**

The total amount of Allowed Priority Tax Claims is **$42,308,560.81**.  The following recoveries are set forth for purposes of allocating Allowed Priority Tax Claims to the applicable Debtors.

| Taxing Authority | Debtor(s) | Allowed Amount |
|---|---|---|
| Alabama Dept of Revenue | SourceHOV Healthcare, Inc. | $28,049.45 |
| Alabama Dept of Revenue | SOURCECORP Management, Inc. | $5,100.69 |
| Alabama Dept of Revenue | Exela Enterprise Solutions, Inc. | $3,791.43 |
| Alabama Dept of Revenue | SOURCECORP BPS Inc. | $3,758.45 |
| Alabama Dept of Revenue | Regulus Group LLC | $1,971.68 |
| Alabama Dept of Revenue | BancTec, Inc. and Subsidiaries | $1,769.52 |
| Alabama-Birmingham Tax Commissioner | Exela Enterprise Solutions, Inc. | $111.39 |
| Alaska Dept of Revenue | SourceHOV Healthcare, Inc. | $80.02 |
| Arizona Dept of Revenue | Regulus Group LLC | $33,424.69 |
| Arizona Dept of Revenue | Exela Enterprise Solutions, Inc. | $23,582.57 |
| Arizona Dept of Revenue | Novitex Government Solutions, LLC | $21,241.32 |
| Arizona Dept of Revenue | United Information Services, Inc | $7,160.29 |
| Arizona Dept of Revenue | SourceHOV Healthcare, Inc. | $5,378.64 |
| Arizona Dept of Revenue | BancTec, Inc. and Subsidiaries | $2,342.31 |
| Arizona Dept of Revenue | J & B Software, Inc. | $1,859.41 |
| Arizona Dept of Revenue | HOV Services, Inc. | $3.69 |
| Arkansas Dept of Revenue | BancTec, Inc. and Subsidiaries | $731.86 |
| Arkansas Dept of Revenue | SourceHOV Healthcare, Inc. | $182.67 |
| California Dept of Revenue | SOURCECORP BPS Inc. | $152,456.94 |
| California Dept of Revenue | SOURCECORP Management, Inc. | $80,007.49 |
| California Dept of Revenue | SourceHOV Healthcare, Inc. | $66,804.03 |
| California Dept of Revenue | Regulus Integrated Solutions LLC | $24,243.47 |
| California Dept of Revenue | Regulus Group LLC | $14,008.71 |
| California Dept of Revenue | United Information Services, Inc | $5,381.71 |
| California Dept of Revenue | Novitex Government Solutions, LLC | $4,922.92 |
| California Dept of Revenue | Exela Enterprise Solutions, Inc. | $3,838.31 |
| California Dept of Revenue | Rust Consulting, Inc. | $389.04 |
| Colorado Dept of Revenue | SOURCECORP BPS Inc. | $27,683.54 |
| Colorado Dept of Revenue | SourceHOV Healthcare, Inc. | $8,600.69 |
| Colorado Dept of Revenue | SOURCECORP Management, Inc. | $7,570.90 |
| Colorado Dept of Revenue | Rust Consulting, Inc. | $5,596.58 |
| Colorado Dept of Revenue | Exela Enterprise Solutions, Inc. | $4,584.77 |
| Colorado Dept of Revenue | BancTec, Inc. and Subsidiaries | $749.42 |
| Connecticut Dept of Revenue | United Information Services, Inc | $365,483.69 |
| Connecticut Dept of Revenue | Exela Enterprise Solutions, Inc. | $40,702.53 |
| Connecticut Dept of Revenue | SOURCECORP Management, Inc. | $18,526.69 |
| Connecticut Dept of Revenue | SOURCECORP BPS Inc. | $15,485.67 |

| Taxing Authority | Debtor(s) | Allowed Amount |
|---|---|---|
| Connecticut Dept of Revenue | SourceHOV Healthcare, Inc. | $12,206.93 |
| Delaware Dept of Revenue | Exela Enterprise Solutions, Inc. | $1,340.01 |
| Delaware Dept of Revenue | SourceHOV Healthcare, Inc. | $580.43 |
| Detroit City-Michigan Tax Commissioner | SOURCECORP BPS Inc. | $1,026.26 |
| Detroit City-Michigan Tax Commissioner | Novitex Government Solutions, LLC | $285.50 |
| District of Columbia Dept of Revenue | Novitex Government Solutions, LLC | $75,055.41 |
| District of Columbia Dept of Revenue | Exela Enterprise Solutions, Inc. | $9,080.71 |
| District of Columbia Dept of Revenue | SOURCECORP BPS Inc. | $4,160.16 |
| District of Columbia Dept of Revenue | Rust Consulting, Inc. | $95.15 |
| Florida Dept of Revenue | Exela Enterprise Solutions, Inc. | $2,205.52 |
| Florida Dept of Revenue | Novitex Government Solutions, LLC | $1,452.03 |
| Florida Dept of Revenue | United Information Services, Inc | $923.83 |
| Florida Dept of Revenue | SourceHOV Healthcare, Inc. | $498.39 |
| Florida Dept of Revenue | HOVG, LLC | $50.00 |
| Florida Dept of Revenue | Rust Consulting, Inc. | $25.00 |
| Florida Dept of Revenue | SOURCECORP BPS Inc. | $1.24 |
| Georgia Dept of Revenue | SOURCECORP BPS Inc. | $142,360.35 |
| Georgia Dept of Revenue | SourceHOV Healthcare, Inc. | $39,476.01 |
| Georgia Dept of Revenue | Exela Enterprise Solutions, Inc. | $27,444.23 |
| Georgia Dept of Revenue | United Information Services, Inc | $14,689.72 |
| Georgia Dept of Revenue | Regulus Group LLC | $7,431.29 |
| Georgia Dept of Revenue | HOVG, LLC | $5,229.89 |
| Georgia Dept of Revenue | J & B Software, Inc. | $4,521.57 |
| Georgia Dept of Revenue | SOURCECORP Management, Inc. | $4,254.41 |
| Georgia Dept of Revenue | BancTec, Inc. and Subsidiaries | $1,329.42 |
| Georgia Dept of Revenue | Novitex Government Solutions, LLC | $488.48 |
| Georgia Dept of Revenue | HOV Services, Inc. | $450.78 |
| Hawaii Dept of Revenue | SourceHOV Healthcare, Inc. | $4,776.62 |
| Idaho Dept of Revenue | Novitex Government Solutions, LLC | $1,316.61 |
| Idaho Dept of Revenue | Exela Enterprise Solutions, Inc. | $340.16 |
| Idaho Dept of Revenue | SourceHOV Healthcare, Inc. | $200.69 |
| Illinois Dept of Revenue | SOURCECORP BPS Inc. | $122,494.60 |
| Illinois Dept of Revenue | Exela Enterprise Solutions, Inc. | $61,110.34 |
| Illinois Dept of Revenue | BancTec, Inc. and Subsidiaries | $47,966.83 |
| Illinois Dept of Revenue | Regulus Group LLC | $39,884.68 |
| Illinois Dept of Revenue | SOURCECORP Management, Inc. | $22,063.50 |
| Illinois Dept of Revenue | SourceHOV Healthcare, Inc. | $18,611.67 |
| Illinois Dept of Revenue | J & B Software, Inc. | $2,314.80 |
| Illinois Dept of Revenue | Regulus Integrated Solutions LLC | $1,890.43 |
| Illinois Dept of Revenue | Managed Care Professionals, LLC | $964.18 |
| Illinois Dept of Revenue | United Information Services, Inc | $461.00 |
| Illinois Dept of Revenue | HOV Services, Inc. | $245.40 |
| Indiana Dept of Revenue | SourceHOV Healthcare, Inc. | $24,752.95 |
| Indiana Dept of Revenue | SOURCECORP BPS Inc. | $3,422.62 |
| Indiana Dept of Revenue | United Information Services, Inc | $2,392.86 |

| Taxing Authority | Debtor(s) | Allowed Amount |
|---|---|---|
| Indiana Dept of Revenue | Regulus Group LLC | $1,832.47 |
| Iowa Dept of Revenue | United Information Services, Inc | $103,994.79 |
| Iowa Dept of Revenue | Regulus Integrated Solutions LLC | $52,530.44 |
| Iowa Dept of Revenue | SourceHOV Healthcare, Inc. | $19,983.72 |
| Iowa Dept of Revenue | SOURCECORP Management, Inc. | $14,982.18 |
| Iowa Dept of Revenue | Exela Enterprise Solutions, Inc. | $7,808.80 |
| Iowa Dept of Revenue | SOURCECORP BPS Inc. | $2,419.71 |
| Iowa Dept of Revenue | Rust Consulting, Inc. | $1,617.82 |
| Iowa Dept of Revenue | Regulus Group LLC | $840.02 |
| Kansas Dept of Revenue | SOURCECORP BPS Inc. | $4,286.32 |
| Kansas Dept of Revenue | SourceCorp Management, Inc. | $68.98 |
| Kansas Dept of Revenue | Exela Enterprise Solutions, Inc. | $3.32 |
| Kentucky Dept of Revenue | SOURCECORP BPS Inc. | $826,454.49 |
| Kentucky Dept of Revenue | Regulus Group LLC | $114,172.38 |
| Kentucky Dept of Revenue | SourceHOV Healthcare, Inc. | $25,038.47 |
| Kentucky Dept of Revenue | United Information Services, Inc | $2,725.06 |
| Kentucky Dept of Revenue | Exela Enterprise Solutions, Inc. | $1,679.52 |
| Kentucky Dept of Revenue | BancTec, Inc. and Subsidiaries | $1,088.70 |
| Kentucky Dept of Revenue | HOV Services, Inc. | $60.00 |
| Kentucky-Clay County Tax Commissioner | Regulus Group LLC | $179.39 |
| Kentucky-Jackson County Tax Commissioner | Regulus Group LLC | $628.07 |
| Kentucky-Jefferson County Tax Commissioner | Regulus Group LLC | $4,776.25 |
| Kentucky-Laurel County Tax Commissioner | SOURCECORP BPS Inc. | $134,298.24 |
| Kentucky-Laurel County Tax Commissioner | Regulus Group LLC | $1,005.17 |
| Kentucky-Louisville City Tax Commissioner | Regulus Group LLC | $44,879.64 |
| Kentucky-Louisville City Tax Commissioner | SOURCECORP BPS Inc. | $616.52 |
| Kentucky-Louisville City Tax Commissioner | Exela Enterprise Solutions, Inc. | $432.12 |
| Kentucky-Mt Vernon City Tax Commissioner | SOURCECORP BPS Inc. | $87,692.87 |
| Louisiana Dept of Revenue | Exela Enterprise Solutions, Inc. | $14,486.60 |
| Louisiana Dept of Revenue | SourceHOV Healthcare, Inc. | $4,588.58 |
| Louisiana Dept of Revenue | BancTec, Inc. and Subsidiaries | $2,105.24 |
| Louisiana Dept of Revenue | SOURCECORP BPS Inc. | $1,631.25 |
| Louisiana Dept of Revenue | SOURCECORP Management, Inc. | $1,065.21 |
| Maine Dept of Revenue | SourceHOV Healthcare, Inc. | $2,910.94 |
| Maine Dept of Revenue | Exela Enterprise Solutions, Inc. | $1,843.56 |
| Maine Dept of Revenue | SOURCECORP BPS Inc. | $661.03 |

| Taxing Authority | Debtor(s) | Allowed Amount |
|---|---|---|
| Maryland Dept of Revenue | Novitex Government Solutions, LLC | $99,462.54 |
| Maryland Dept of Revenue | Exela Enterprise Solutions, Inc. | $68,010.89 |
| Maryland Dept of Revenue | SOURCECORP BPS Inc. | $11,216.58 |
| Maryland Dept of Revenue | SourceHOV Healthcare, Inc. | $3,781.44 |
| Massachusetts Dept of Revenue | Exela Enterprise Solutions, Inc. | $83,338.78 |
| Massachusetts Dept of Revenue | HOVG, LLC | $37,176.55 |
| Massachusetts Dept of Revenue | Regulus Group LLC | $14,883.06 |
| Massachusetts Dept of Revenue | SOURCECORP BPS Inc. | $8,105.03 |
| Massachusetts Dept of Revenue | United Information Services, Inc | $2,204.04 |
| Massachusetts Dept of Revenue | SOURCECORP Management, Inc. | $1,586.35 |
| Massachusetts Dept of Revenue | SourceHOV Healthcare, Inc. | $565.26 |
| Michigan Dept of Revenue | United Information Services, Inc | $147,982.96 |
| Michigan Dept of Revenue | SOURCECORP BPS Inc. | $128,154.37 |
| Michigan Dept of Revenue | Exela Enterprise Solutions, Inc. | $62,771.24 |
| Michigan Dept of Revenue | SOURCECORP Management, Inc. | $25,517.09 |
| Michigan Dept of Revenue | SourceHOV Healthcare, Inc. | $21,060.20 |
| Michigan Dept of Revenue | Regulus Group LLC | $5,594.89 |
| Michigan Dept of Revenue | BancTec, Inc. and Subsidiaries | $5,497.13 |
| Michigan Dept of Revenue | Novitex Government Solutions, LLC | $4,104.28 |
| Michigan Dept of Revenue | HOV Services, Inc. | $64.23 |
| Michigan-Detroit City Tax Commissioner | United Information Services, Inc | $15,314.06 |
| Michigan-Detroit City Tax Commissioner | Exela Enterprise Solutions, Inc. | $12,301.37 |
| Michigan-Detroit City Tax Commissioner | SOURCECORP BPS Inc. | $5,283.89 |
| Michigan-Detroit City Tax Commissioner | Novitex Government Solutions, LLC | $1,377.41 |
| Michigan-Detroit City Tax Commissioner | HOV Services, Inc. | $579.52 |
| Michigan-Detroit City Tax Commissioner | SOURCECORP BPS Inc. | $513.35 |
| Minnesota Dept of Revenue | Rust Consulting, Inc. | $190,699.86 |
| Minnesota Dept of Revenue | Exela Enterprise Solutions, Inc. | $10,946.56 |
| Minnesota Dept of Revenue | SourceHOV Healthcare, Inc. | $4,765.11 |
| Minnesota Dept of Revenue | SOURCECORP BPS Inc. | $3,110.30 |
| Minnesota Dept of Revenue | J & B Software, Inc. | $402.00 |
| Minnesota Dept of Revenue | HOV Services, Inc. | $260.54 |
| Mississippi Dept of Revenue | SourceHOV Healthcare, Inc. | $2,836.86 |
| Mississippi Dept of Revenue | Exela Enterprise Solutions, Inc. | $535.52 |
| Missouri Dept of Revenue | Managed Care Professionals, LLC | $41,022.65 |
| Missouri Dept of Revenue | SourceHOV Healthcare, Inc. | $19,823.57 |
| Missouri Dept of Revenue | Exela Enterprise Solutions, Inc. | $5,870.03 |
| Missouri Dept of Revenue | SOURCECORP BPS Inc. | $1,412.47 |
| Missouri Dept of Revenue | SOURCECORP Management, Inc. | $300.00 |
| Missouri-Kansas City Tax Commissioner | Exela Enterprise Solutions, Inc. | $208.46 |
| Missouri-St Louis Tax Commissioner | Exela Enterprise Solutions, Inc. | $2,839.92 |
| Missouri-St Louis Tax Commissioner | Managed Care Professionals, LLC | $10.09 |
| Montana Dept of Revenue | Economic Research Services, Inc. | $3,437.00 |
| Montana Dept of Revenue | SourceHOV Healthcare, Inc. | $2,203.80 |
| Nebraska Dept of Revenue | SourceHOV Healthcare, Inc. | $493.79 |

| Taxing Authority | Debtor(s) | Allowed Amount |
|---|---|---|
| Nevada Dept of Revenue | Exela Enterprise Solutions, Inc. | $5,469.48 |
| Nevada Dept of Revenue | SOURCECORP BPS Inc. | $3,482.61 |
| Nevada Dept of Revenue | SourceHOV Healthcare, Inc. | $730.80 |
| Nevada Dept of Revenue | Rust Consulting, Inc. | $426.84 |
| New Hampshire Dept of Revenue | SOURCECORP BPS Inc. | $299.90 |
| New Hampshire Dept of Revenue | SourceHOV Healthcare, Inc. | $257.94 |
| New Hampshire Dept of Revenue | BancTec, Inc. and Subsidiaries | $208.63 |
| New Hampshire Dept of Revenue | SOURCECORP Management, Inc. | $50.00 |
| New Jersey Dept of Revenue | BancTec, Inc. and Subsidiaries | $9,540.48 |
| New Jersey Dept of Revenue | Regulus Group LLC | $3,819.80 |
| New Jersey Dept of Revenue | Exela Enterprise Solutions, Inc. | $423.42 |
| New Mexico Dept of Revenue | SourceHOV Healthcare, Inc. | $6,260.71 |
| New Mexico Dept of Revenue | Exela Enterprise Solutions, Inc. | $45.00 |
| New York Dept of Revenue | Exela Enterprise Solutions, Inc. | $374,576.92 |
| New York Dept of Revenue | SOURCECORP BPS Inc. | $47,777.00 |
| New York Dept of Revenue | SOURCECORP Management, Inc. | $28,582.04 |
| New York Dept of Revenue | SourceHOV Healthcare, Inc. | $13,072.15 |
| New York Dept of Revenue | United Information Services, Inc | $7,889.20 |
| New York Dept of Revenue | HOV Services, Inc. | $29.52 |
| New York Dept of Revenue | BancTec, Inc. and Subsidiaries | $14.76 |
| North Carolina Dept of Revenue | SourceHOV Healthcare, Inc. | $35,007.15 |
| North Carolina Dept of Revenue | Regulus Integrated Solutions LLC | $5,374.17 |
| North Carolina Dept of Revenue | Rust Consulting, Inc. | $2,978.46 |
| North Carolina Dept of Revenue | BancTec, Inc. and Subsidiaries | $1,181.97 |
| North Carolina Dept of Revenue | SOURCECORP Management, Inc. | $294.51 |
| North Carolina Dept of Revenue | Exela Enterprise Solutions, Inc. | $241.80 |
| North Dakota Dept of Revenue | SourceHOV Healthcare, Inc. | $828.25 |
| North Dakota Dept of Revenue | Exela Enterprise Solutions, Inc. | $5.00 |
| Ohio Dept of Revenue | SourceHOV Healthcare, Inc. | $7,301.95 |
| Ohio Dept of Revenue | BancTec, Inc. and Subsidiaries | $4,032.72 |
| Ohio Dept of Revenue | United Information Services, Inc | $815.83 |
| Ohio Dept of Revenue | Exela Enterprise Solutions, Inc. | $442.04 |
| Ohio Local-Ohio Tax Commissioner | SOURCECORP BPS Inc. | $2,972.54 |
| Ohio Local-Ohio Tax Commissioner | Exela Enterprise Solutions, Inc. | $1,010.98 |
| Ohio Local-Ohio Tax Commissioner | Exela Enterprise Solutions, Inc. | $721.79 |
| Ohio Local-Ohio Tax Commissioner | SourceHOV Healthcare, Inc. | $308.24 |
| Oklahoma Dept of Revenue | SourceHOV Healthcare, Inc. | $9,034.02 |
| Oklahoma Dept of Revenue | Exela Enterprise Solutions, Inc. | $6,067.14 |
| Oklahoma Dept of Revenue | SOURCECORP Management, Inc. | $1,937.94 |
| Oregon Dept of Revenue | Economic Research Services, Inc. | $39,915.64 |
| Oregon Dept of Revenue | SourceHOV Healthcare, Inc. | $7,784.08 |
| Pennsylvania Dept of Revenue | Exela Enterprise Solutions, Inc. | $16,729.32 |
| Pennsylvania Dept of Revenue | SourceHOV Healthcare, Inc. | $9,149.60 |
| Pennsylvania Dept of Revenue | Regulus Group LLC | $7,902.06 |
| Pennsylvania Dept of Revenue | Rust Consulting, Inc. | $2,789.50 |

| Taxing Authority | Debtor(s) | Allowed Amount |
|---|---|---|
| Pennsylvania Dept of Revenue | BancTec, Inc. and Subsidiaries | $2,007.30 |
| Pennsylvania-Butler Town Dept of Revenue | SourceHOV Healthcare, Inc. | $695.22 |
| Pennsylvania-City of Philadelphia Tax Commissioner | Exela Enterprise Solutions, Inc. | $14,002.09 |
| Pennsylvania-City of Philadelphia Tax Commissioner | J & B Software, Inc. | $2,354.00 |
| Pennsylvania-City of Philadelphia Tax Commissioner | Regulus Group LLC | $1,973.00 |
| Pennsylvania-City of Pittsburgh LST Tax Commissioner | Exela Enterprise Solutions, Inc. | $43.54 |
| Pennsylvania-City of Pittsburgh Tax Commissioner | Exela Enterprise Solutions, Inc. | $3,349.24 |
| Pennsylvania-City of Pittsburgh Tax Commissioner | SourceHOV Healthcare, Inc. | $1,449.65 |
| Pennsylvania-East Lampeter Tax Commissioner | SourceHOV Healthcare, Inc. | $464.11 |
| Pennsylvania-Penn Town LST Tax Commissioner | Regulus Group LLC | $50.00 |
| Puerto Rico Dept of Revenue | Exela Enterprise Solutions, Inc. | $12,621.35 |
| Rhode Island Dept of Revenue | Exela Enterprise Solutions, Inc. | $8,057.91 |
| South Carolina Dept of Revenue | SourceHOV Healthcare, Inc. | $227,627.63 |
| South Carolina Dept of Revenue | SOURCECORP BPS Inc. | $16,689.61 |
| South Carolina Dept of Revenue | Exela Enterprise Solutions, Inc. | $15,182.14 |
| South Carolina Dept of Revenue | United Information Services, Inc | $2,579.96 |
| South Carolina Dept of Revenue | Regulus Group LLC | $1,293.36 |
| South Carolina Dept of Revenue | SOURCECORP Management, Inc. | $873.58 |
| South Carolina Dept of Revenue | BancTec, Inc. and Subsidiaries | $774.09 |
| South Dakota Dept of Revenue | SOURCECORP BPS Inc. | $25.00 |
| Tennessee Dept of Revenue | SourceHOV Healthcare, Inc. | $1,330.00 |
| Tennessee Dept of Revenue | United Information Services, Inc | $378.00 |
| Tennessee Dept of Revenue | BancTec, Inc. and Subsidiaries | $327.22 |
| Tennessee Dept of Revenue | Exela Enterprise Solutions, Inc. | $5.25 |
| Texas Dept of Revenue | SOURCECORP Management, Inc. | $15,594.35 |
| Texas Dept of Revenue | SOURCECORP BPS Inc. | $4,912.32 |
| Texas Dept of Revenue | Exela Enterprise Solutions, Inc. | $1,957.44 |
| Texas Dept of Revenue | SourceHOV Healthcare, Inc. | $1,611.27 |
| Texas Dept of Revenue | Regulus Group LLC | $1,565.29 |
| Texas Dept of Revenue | BancTec, Inc. and Subsidiaries | $917.51 |
| Texas Dept of Revenue | Regulus Integrated Solutions LLC | $30.00 |
| Texas Dept of Revenue | Rust Consulting, Inc. | $30.00 |
| US Dept of Treasury | Exela Enterprise Solutions, Inc. | $2,723,794.00 |

| Taxing Authority | Debtor(s) | Allowed Amount |
|---|---|---|
| US Dept of Treasury | SOURCECORP BPS Inc, Exela Enterprise Solutions, Inc, SourceHOV Healthcare, Inc, United Information Services, Inc., Regulus Group LLC, Rust Consulting, Inc, SOURCECORP Management, Inc., BancTec, Inc and Subsidiaries, Novitex Government Solutions, LLC, Economic Research Services, Inc, Regulus Integrated Solutions LLC, J & B Software, Inc, Managed Care Professionals, LLC, HOVG, LLC, and HOV Services, Inc. | $11,177,796.00 |
| US Dept of Treasury | SOURCECORP BPS Inc. | $5,793,035.73 |
| US Dept of Treasury | Exela Enterprise Solutions, Inc. | $3,913,681.17 |
| US Dept of Treasury | SourceHOV Healthcare, Inc. | $2,820,017.64 |
| US Dept of Treasury | UNITED INFORMATION SERVICES, INC. | $2,289,201.01 |
| US Dept of Treasury | Regulus Group LLC | $1,652,555.83 |
| US Dept of Treasury | Rust Consulting, Inc. | $1,543,259.55 |
| US Dept of Treasury | SOURCECORP Management, Inc. | $1,472,611.97 |
| US Dept of Treasury | BANC TEC INC AND SUBSIDIARIES | $1,072,592.52 |
| US Dept of Treasury | NOVITEX GOVERNMENT SOLUTIONS, LLC | $772,418.29 |
| US Dept of Treasury | Economic Research Services, Inc. | $641,638.10 |
| US Dept of Treasury | Regulus Integrated Solutions LLC | $461,135.41 |
| US Dept of Treasury | J & B Software, Inc. | $318,485.98 |
| US Dept of Treasury | MANAGED CARE PROFESSIONALS LLC | $87,170.13 |
| US Dept of Treasury | HOVG, LLC | $68,029.14 |
| US Dept of Treasury | HOV SERVICES, INC. | $28,927.30 |
| Utah Dept of Revenue | Exela Enterprise Solutions Inc. | $51,178.31 |
| Utah Dept of Revenue | SOURCECORP BPS Inc. | $11,471.81 |
| Utah Dept of Revenue | SourceHOV Healthcare, Inc. | $3,591.54 |
| Utah Dept of Revenue | SOURCECORP Management, Inc. | $2,678.10 |
| Utah Dept of Revenue | BancTec, Inc. and Subsidiaries | $2,606.38 |
| Utah Dept of Revenue | HOV Services, Inc. | $85.22 |
| Vermont Dept of Revenue | SourceHOV Healthcare, Inc. | $50.00 |
| Virginia Dept of Revenue | Novitex Government Solutions, LLC | $55,064.74 |
| Virginia Dept of Revenue | Exela Enterprise Solutions, Inc. | $44,587.38 |
| Virginia Dept of Revenue | J & B Software, Inc. | $6,841.58 |
| Virginia Dept of Revenue | SourceHOV Healthcare, Inc. | $5,731.59 |
| Virginia Dept of Revenue | SOURCECORP BPS Inc. | $5,403.40 |
| Virginia Dept of Revenue | Economic Research Services, Inc. | $5,185.75 |
| Virginia Dept of Revenue | BancTec, Inc. and Subsidiaries | $1,553.11 |
| Virginia Dept of Revenue | Rust Consulting, Inc. | $186.97 |

| Taxing Authority | Debtor(s) | Allowed Amount |
|---|---|---|
| Virginia Dept of Revenue | SOURCECORP Management, Inc. | $30.00 |
| Virginia Dept of Revenue | Regulus Group LLC | $20.00 |
| West Virginia Dept of Revenue | SourceHOV Healthcare, Inc. | $4,751.00 |
| West Virginia Dept of Revenue | Exela Enterprise Solutions, Inc. | $2,842.92 |
| West Virginia Dept of Revenue | BancTec, Inc. and Subsidiaries | $125.33 |
| Wisconsin Dept of Revenue | SourceHOV Healthcare, Inc. | $15,689.20 |
| Wisconsin Dept of Revenue | SOURCECORP BPS Inc. | $909.00 |
| Wyoming Dept of Revenue | Exela Enterprise Solutions, Inc. | $609.65 |
| | **TOTAL** | **$42,308,560.81** |

**EXHIBIT B**

**Plan Support Agreement**

THIS PLAN SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER, ACCEPTANCE OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS PLAN SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

THIS PLAN SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT IN ALL RESPECTS TO THE COMPLETION OF DEFINITIVE DOCUMENTS REFLECTING THE TERMS AND CONDITIONS SET FORTH HEREIN. THE CLOSING OF ANY SUCH TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS, IN EACH CASE, SUBJECT TO THE TERMS HEREOF.

## *AMENDED AND RESTATED PLAN SUPPORT AGREEMENT*

This AMENDED AND RESTATED PLAN SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 16.02, as amended, restated, supplemented, or otherwise modified from time to time, this "**Agreement**") is made and entered into as of April 24, 2025 (the "**Execution Date**"), by and among the following parties (each of the following, a "**Party**" and collectively, the "**Parties**"):

1. Each of the entities listed on Schedule 1 hereto (collectively, the "**Debtors**");

2. Exela Technologies, Inc. ("**ETI**"), GP 3XCV LLC and XCV-STS, LLC, each of which is a subsidiary of ETI and any of their respective successors and assigns with respect to April 2026 Notes Claims (collectively, the "**Consenting ETI Parties**");

3. Par Chadha, in his capacity as Chairman of the board of directors of ETI, GP 2XCV LLC and General Pacific, LLC (together, the "**Individual Owner**"); and

4. the undersigned holders or beneficial holders (including, for the avoidance of doubt, any Consenting Stakeholder) of, or nominees, investment advisors, sub-advisors, or managers of discretionary accounts or funds that hold or beneficially hold, April 2026 Notes Claims or July 2026 Notes Claims (as defined below) that have executed and delivered counterpart signature pages to this Agreement (in each case solely in their capacity as such), together with each April 2026 Noteholder and July 2026 Noteholder (as defined below) that executes and delivers a Joinder or Transfer Agreement to counsel to the Debtors, counsel to the Consenting Creditors, and counsel to the Consenting ETI Parties (collectively, the "**Consenting Creditors**"

and together with the Individual Owner, and the Consenting ETI Parties, the "**Consenting Stakeholders**").

*RECITALS*

**WHEREAS**, each of the Parties party hereto previously entered into a Plan Support Agreement, dated as of April 16, 2025;

**WHEREAS**, each of the Parties to the Plan Support Agreement desire to enter into this Agreement;

**WHEREAS**, the Debtors and the Consenting Stakeholders have in good faith and at arms' length negotiated certain restructuring and recapitalization transactions with respect to the Debtors' capital structure on the terms set forth in this Agreement and on the terms set forth in the term sheet attached hereto as **Exhibit A** (the "**Plan Term Sheet**" and, such transactions as described in this Agreement, the Plan Term Sheet, and the Restructuring Steps Exhibit (as defined below), and related transactions or steps to be taken in connection therewith, the "**Restructuring Transactions**");

**WHEREAS**, the Debtors intend to implement the Restructuring Transactions, including through the Debtors' voluntary cases under chapter 11 of title 11 of the United States Code, §§ 101-1532, as amended (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") (the cases commenced, captioned *In re DocuData Solutions, L.C.*, Case No. 25-90023 (CML), the "**Chapter 11 Cases**");

**WHEREAS**, on the date hereof: (a) the Debtors, and (b) the Consenting Stakeholders have agreed to the Plan Term Sheet, which sets forth the principal economic terms of the Restructuring Transactions that shall be consummated in accordance with the terms of a chapter 11 plan of reorganization (the "**Plan**") and upon the execution of final documents containing terms consistent in all material respects with those set forth in the Plan Term Sheet, the Plan, and such other terms as agreed to by the Parties;

**WHEREAS**, the Parties have agreed to support the Restructuring Transactions subject to and in accordance with the terms of this Agreement and desire to work together to complete the negotiation of the terms of the documents and the completion of each of the actions necessary or desirable to effectuate the Restructuring Transactions in accordance with the Restructuring Steps Exhibit; and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Plan Term Sheet;

**NOW, THEREFORE**, in consideration of the covenants, representations, warranties, and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**     *Definitions and Interpretation.*

    1.01.   <u>Definitions</u>.  The following terms shall have the following definitions:

"**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such entity was a debtor in a case under the Bankruptcy Code.

"**Agreement Effective Date**" means the date on which the conditions set forth in <u>Section 2</u> have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with <u>Section 16.02</u> (including the Plan Term Sheet and all exhibits, annexes, supplements, and schedules attached thereto).

"**Alternative Restructuring Transaction**" means any written or oral plan, inquiry, proposal, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, share issuance, consent solicitation, exchange offer, tender offer, recapitalization, chapter 11 plan of reorganization or liquidation, share exchange, business combination, joint venture, debt incurrence (including without limitation, any new-money financing, debtor in possession financing, or exit financing), that, in each case, is not expressly contemplated by this Agreement or the Restructuring Steps Exhibit, or similar transaction involving any one or more Debtors, or any Affiliates of the Debtors, or the debt, equity, or other interests in any one or more Debtors or any Affiliates of the Debtors or any portion of the Debtors and their Affiliates and/or their assets or their Affiliates' assets that is an alternative to one or more of the Restructuring Transactions.

"**April 2026 Noteholder**" means a holder of, or investment advisor, sub-advisor, or manager of discretionary accounts or funds that beneficially hold, April 2026 Notes Claims.

"**April 2026 Notes Claims**" means all claims held by holders of the April 2026 Notes derived from, based upon, or secured by the April 2026 Notes Indenture which April 2026 Notes have $1,252,267,105 in principal outstanding as of the date of this Agreement, plus all fees, expenses, costs, and other charges arising under or related to the April 2026 Notes.

"**April 2026 Notes Indenture**" means that certain Indenture, dated as of July 11, 2023, among Exela Intermediate, as issuer, Exela Finance, as co-issuer, and Wilmington Trust, National Association, as Trustee.

"**April 2026 Notes**" means the 11.5% First-Priority Senior Secured Notes due 2026 issued under the April 2026 Notes Indenture.

"**Bankruptcy Code**" has the meaning set forth in the recitals to this Agreement.

"**Bankruptcy Court**" has the meaning set forth in the recitals to this Agreement.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Causes of Action**" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Equity Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any avoidance actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims/Interests**" means any Claim against, or Equity Interest in, a Debtor, including, without limitation the April 2026 Notes Claims and the July 2026 Notes Claims.

"**Company Releasing Party**" means each of the Debtors, and, to the maximum extent permitted by law, each of the Debtors, on behalf of their respective Affiliates and Related Parties.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information, in connection with any proposed Restructuring Transactions.

"**Confirmation Hearing**" means the hearing(s) held by the Bankruptcy Court to consider confirmation of the Plan.

"**Confirmation Order**" means the order entered by the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"**Consenting Creditor Ad Hoc Group Advisors**" means, collectively, (a) Ropes & Gray LLP as legal advisor, (b) SOLIC Capital Advisors, LLC as investment banker, (c) any other

professionals or advisors retained by the Consenting Creditor Ad Hoc Group with the prior written consent of the Debtors (not to be unreasonably withheld).

"**Consenting Creditor Ad Hoc Group**" means certain of the Consenting Creditors that are members of an ad hoc group represented by the Consenting Creditor Ad Hoc Group Advisors.

"**Consenting Creditors**" has the meaning set forth in the preamble to this Agreement.

"**Consenting ETI Parties**" has the meaning set forth in the preamble to this Agreement.

"**Consenting ETI Party Advisors**" means (a) Cleary Gottlieb Steen and Hamilton LLP as legal advisor and (b) any other professionals or advisors retained by the Consenting ETI Parties with the prior written consent of the Debtors (not to be unreasonably withheld).

"**CROs**" means (i) Randall S. Eisenberg as Chief Restructuring Officer and (ii) Steve Spitzer as Deputy Chief Restructuring Officer, in each case, of Exela Technologies BPA, LLC, Exela Intermediate LLC, Exela Finance Inc., XCV-EMEA, LLC, and Neon Acquisition, LLC.

"**Debtors**" has the meaning set forth in the recitals to this Agreement.

"**Definitive Documents**" means the documents listed in <u>Section 3.01</u>.

"**DIP Claims**" means claims arising on account of the DIP Obligations.

"**DIP Documents**" means any documents governing the DIP Facility that are entered into in accordance with the Plan Term Sheet, the Plan, the DIP Loan Agreement, the DIP Term Sheet, the DIP Budget, the DIP Orders, and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

"**DIP Facility**" has the meaning set forth in the Interim DIP Order.

"**DIP Lenders**" has the meaning set forth in the Interim DIP Order.

"**DIP Loan Agreement**" means the credit agreement with respect to the DIP Facility, as may be amended, supplemented, or otherwise modified from time to time.

"**DIP Obligations**" has the meaning set forth in the Interim DIP Order.

"**DIP Orders**" means, collectively, the Interim DIP Order and Final DIP Order.

"**Disclosable Economic Interest**" shall have the meaning set forth in Bankruptcy Rule 2019.

"**Disclosure Statement Motion**" means the motion filed with the Bankruptcy Court seeking, among other things, approval of the Disclosure Statement and Solicitation Materials and scheduling the Confirmation Hearing.

"**Disclosure Statement Order**" means the order entered by the Bankruptcy Court approving the adequacy of the Disclosure Statement and Solicitation Materials pursuant to sections 1125, 1126(b), and 1145 of the Bankruptcy Code.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan, including all exhibits and schedules thereto, as amended, restated, amended and restated, supplemented, or modified from time to time, that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable law.

"**Disinterested Director**" means Alan Carr, a disinterested director of Exela Intermediate, LLC.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (in each case whether or not arising under or in connection with any employment agreement).

"**Exela Intermediate**" means Exela Intermediate, LLC, a Delaware limited liability company.

"**Exela Finance**" means Exela Finance Inc., a Delaware corporation.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Exit Facility Documents**" means any documents governing the Exit Facility that are entered into in accordance with this Agreement, the Plan Term Sheet, the Plan, and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements or modifications of any of the foregoing) related to or executed in connection therewith.

"**Exit Facility**" means the secured notes indenture providing for secured notes on the terms and conditions set forth in the Plan Term Sheet and the Exit Facility Documents.

"**Final DIP Order**" means the final order of the Bankruptcy Court setting forth the terms of the Debtors' consensual use of cash collateral and authorizing the Debtors' entry into the DIP Facility.

"**Insolvency Proceeding**" means any corporate action or case or petition seeking bankruptcy, including a chapter 11 proceeding under the Bankruptcy Code, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief under any

federal, state, or foreign bankruptcy, insolvency, administrative receivership, or similar law now or hereafter in effect with respect to any of the Debtors or their Affiliates.

"**Interim DIP Order**" means the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Case No. 25-90023 (CML), Docket No. 58].

"**Joinder**" means an executed form of the joinder agreement providing, among other things, that a joinder party is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit B**.

"**July 2026 Noteholder**" means a holder of, or investment advisor, sub-advisor, or manager of discretionary accounts or funds that beneficially hold, July 2026 Notes Claims.

"**July 2026 Notes Claims**" means all claims held by holders of the July 2026 Notes derived from, based upon, or secured by the July 2026 Notes Indenture which July 2026 Notes have $23,953,211 in principal outstanding as of the date of this Agreement, plus all fees, expenses, costs, and other charges arising under or related to the July 2026 Notes.

"**July 2026 Notes Indenture**" means that certain Indenture, dated as of December 9, 2021, among Exela Intermediate, as issuer, Exela Finance, as co-issuer, and U.S. Bank National Association, as Trustee.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Milestone**" has the meaning set forth in Schedule 2 of this Agreement.

"**New Organizational Documents**" shall have the meaning set forth in the Plan.

"**Outside Date**" means the Final Maturity Date as defined in the DIP Loan Agreement.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 9.01.

"**Petition Date**" means March 3, 2025.

"**Plan Effective Date**" means the occurrence of the effective date of the Plan according to its terms.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court, as

may be amended, restated, amended and restated, modified, or supplemented from time to time on or prior to the Plan Effective Date.

"**Plan**" has the meaning set forth in the recitals to this Agreement.

"**Prepetition Facilities**" means, collectively, the April 2026 Notes Indenture and the July 2026 Notes Indenture.

"**Public Disclosure**" has the meaning set forth in Section 16.22 of this Agreement.

"**Qualified Marketmaker Joinder Date**" has the meaning set forth in Section 9.05 of this Agreement.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Related Party**" shall have the meaning set forth in the Plan.

"**Releases**" means the releases contained in the Plan in accordance with the terms of the Plan Term Sheet.

"**Reorganized Company**" means Exela Technologies BPA, LLC, or any successors thereto, by merger, consolidation, or otherwise, on or after the Plan Effective Date, along with its Affiliates and subsidiaries.

"**Reorganized Debtors**" mean collectively, each of the Debtors and any successors thereto, by merger, consolidation, or otherwise, as reorganized on or after the Plan Effective Date, in accordance with the Plan.

"**Reorganized Equity**" means the common equity interests in the Reorganized Company.

"**Required Consenting Creditors**" means, at any time, Consenting Creditors holding at least 50.01% of the aggregate principal amount of April 2026 Notes Claims (calculated including any April 2026 Notes Claims that are Roll-Up Loans) that are held by all Consenting Creditors; provided that this calculation shall exclude all April 2026 Notes Claims (including any April 2026 Notes Claims that are Roll-Up Loans) that are held by the Sub-Group DIP Lenders in the numerator and the denominator.

"**Restructuring Expenses**" means the reasonable and documented fees, costs, and out-of-pocket expenses of the Consenting Creditor Ad Hoc Group Advisors, the Consenting ETI Party Advisors, the advisors to the Sub-Group DIP Lenders subject to a cap of $500,000 in the aggregate, and XBP, subject to a cap of $1,000,000 (solely in the event (a) the Agreement terminates or (b) the Plan Effective Date does not other occur; provided, in each case, that either of the foregoing was not the result of XBP's action or inaction), which are incurred (a) in connection with the

negotiation, formulation, preparation, execution, delivery, implementation, consummation, and/or enforcement of this Agreement, including the Plan Term Sheet, the Plan, the Disclosure Statement, the DIP Orders, and/or any of the other Definitive Documents, and/or the transactions contemplated hereby or thereby, and/or any amendments, waivers, consents, supplements, or other modifications to any of the foregoing and, to the extent applicable, including for the avoidance of doubt, all annexes and exhibits attached to any of the foregoing documents, (b)(i) consistent with any engagement letters or fee reimbursement letters entered into between the Debtors on the one hand, and the Consenting Creditor Ad Hoc Group Advisors on the other hand (as supplemented and/or modified by this Agreement), in each case, including any monthly fees, success fees, transaction fees, or similar fees contemplated thereby and earned thereunder, and/or (ii) as provided in the DIP Orders and the DIP Documents and/or the Confirmation Order. For the avoidance of doubt, the Consenting Creditor Ad Hoc Group Advisors, the advisors to the Sub-Group DIP Lenders and the Consenting ETI Party Advisors shall not be required to provide the Debtors with attorney or financial advisor time entries.

"**Restructuring Steps Exhibit**" means the exhibit filed as part of the Plan Supplement setting forth the steps and transactions to be taken to effectuate the Restructuring Transactions.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Roll-Up Loans**" has the meaning set forth in the Interim DIP Order.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of Regulation D under the Securities Act.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Solicitation Materials**" means the Disclosure Statement and all documents, forms, ballots, and other materials provided in connection with the solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code.

"**Sub-Group DIP Lenders**" means collectively, HoldCo Asset Management LP, CCUR Holdings, Inc. and OSP, LLC, each on behalf of their affiliates, subsidiaries and certain managed funds and accounts.

"**Tax Code**" means the Internal Revenue Code of 1986 (as amended).

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 13.01, 13.02, 13.03, 13.04, or 13.05.

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit C**.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other transactions), including of any interest (including the granting of any proxies, depositing into a voting trust, entering into a voting agreement, or similar transactions).

"**Trustee**" means any indenture trustee, collateral trustee, or other trustee or similar entity under the April 2026 Notes and the July 2026 Notes.

1.02.    Interpretation.  For purposes of this Agreement:

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)    unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)    unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time, in each case, in accordance with this Agreement, including, without limitation, Section 14; provided that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)    unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)    the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)    captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)    references to "shareholders," "directors," or "officers" shall also include "members" or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)    the use of "include" or "including" is without limitation, whether stated or not;

(j)    the phrase "counsel to the Consenting Creditors" refers in this Agreement to counsel specified in Section 16.11 other than counsel to the Debtors or the other Debtors and counsel to the Consenting ETI Parties;

(k)    unless otherwise specified herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein; and

(l)     the word "or" shall not be exclusive.

**Section 2.**    ***Effectiveness of this Agreement.***  This Agreement shall become effective and binding upon each of the Parties on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)     each Debtor shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties;

(b)     the Individual Owner, and the Consenting ETI Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties;

(c)     holders of at least two-thirds of the aggregate outstanding principal amount of April 2026 Notes shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties;

(d)     the Bankruptcy Court shall have entered the Final DIP Order; and

(e)     counsel to the Debtors shall have given notice to counsel to the Consenting Creditors and counsel to the Consenting ETI Parties in the manner set forth in <u>Section 16.11</u> hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this <u>Section 2</u> have occurred.

**Section 3.**    ***Definitive Documents.***

3.01.   The definitive documents and agreements related to or otherwise utilized to implement, effectuate, or govern the Restructuring Transactions shall consist of the following: (a) the New Organizational Documents; (b) the Exit Facility Documents; (c) the Plan Term Sheet, the Plan, and the Plan Supplement; (d) the Disclosure Statement, the Disclosure Statement Order, and other Solicitation Materials; (e) the Confirmation Order; (f) the DIP Documents and the DIP Orders; (g) any material pleadings and motions (and all documents in connection therewith and all orders pursuant thereto) filed by the Debtors in the Chapter 11 Cases; (h) the merger agreement (the "**<u>XBP Merger Agreement</u>**"), pursuant to which, among other things, Exela Technologies BPA, LLC will become a wholly-owned subsidiary of XBP Europe Holdings, Inc. (such merger, the "**<u>XBP Merger</u>**"), and all related documents, agreements and filings; (i) the Restructuring Steps Exhibit; (j) any employee or executive retention, incentive, or similar plan or proposal; (k) the Rejected Executory Contract/Unexpired Lease List (as will be defined in the Plan); (l) any and all other deeds, agreements, filings, notifications, pleadings, orders, certificates, letters, instruments or other documents reasonably necessary or desirable to consummate and document the Restructuring Transactions contemplated by this Agreement or the Plan Term Sheet (including any exhibits, supplements, amendments, modifications, or supplements from time to time); and (m) any amendments, supplements, exhibits, schedules, appendices, or modifications to any of the foregoing in (a) – (k) and any related notes, certificates, agreements, and instruments (as applicable) (collectively, the "**<u>Definitive Documents</u>**").

3.02.   The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date (a) remain subject to negotiation and completion, (b) shall be consistent in all material respects with and shall contain, the material terms and conditions set forth in this

Agreement and the Plan Term Sheet, and (c) shall otherwise be in a form and substance reasonably acceptable to the Debtors and the Required Consenting Creditors (including any amendment, modification, supplement, or waiver of any terms thereof), provided, however, that the Reorganized BPA Warrants and XBP Warrants (each as defined in the Plan Term Sheet), the Plan, and the Confirmation Order, shall each also be in form and substance reasonably acceptable to the Consenting ETI Parties. Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 14. Further, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date shall otherwise be in form and substance reasonably acceptable to the Debtors and the Required Consenting Creditors, provided, however, that the Reorganized BPA Warrants and XBP Warrants (each as defined in the Plan Term Sheet), the Plan, and the Confirmation Order, shall each also be in form and substance reasonably acceptable to the Consenting ETI Parties. Notwithstanding the foregoing, any amendment, modification, supplement, or waiver of the terms of any Definitive Document that disproportionately adversely affects the economic interests of any Consenting ETI Party shall require the consent of the affected Consenting ETI Party.

**Section 4.** *[Reserved]*

**Section 5.** *Commitments of the Consenting Stakeholders.*

    5.01. <u>General Commitments, Forbearances, and Waivers</u>.

    (a) During the Agreement Effective Period, in each case, without creating any obligation to incur any out-of-pocket costs that are not Restructuring Expenses payable under this Agreement by the applicable Debtors or provide anything in the nature of an indemnity or otherwise, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests and those of its controlled Affiliates on the terms and subject to the conditions of this Agreement and the Plan Term Sheet and to the extent permitted by Law, to:

    (i) support the Restructuring Transactions (including, without limitation, the XBP Merger) on the terms and subject to the conditions of this Agreement and the Plan Term Sheet and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

    (ii) subject to the Bankruptcy Court's approval of the Disclosure Statement and its actual and timely receipt of the Solicitation Materials and the ballot, validly and timely submit, and not withdraw (including causing its nominee or custodian, if applicable, on behalf of itself and the accounts, funds, or affiliates for which it is acting as investment advisor, sub-advisor, or manager to validly and timely deliver and not withdraw), any consents, waivers, proxies, signature pages, tenders, instructions or directions to agents, ballots, and/or other means of voting or participating in the Restructuring Transactions with respect to all of its Company Claims/Interests

now owned or hereafter acquired by such Consenting Stakeholder (or for which such Consenting Stakeholder serves as the nominee, investment manager, or advisor for holders thereof);

(iii)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended or revoked) any vote or election referred to in the immediately preceding clause (i) or (ii);

(iv)    use commercially reasonable efforts to cooperate with and assist the Debtors' efforts to obtain, as applicable, any and all federal, state, local, and foreign governmental, regulatory, and/or third-party approvals as may be reasonably requested by the Debtors, including providing any information reasonably requested by the Debtors in connection therewith;

(v)    oppose any party or person from taking any actions contemplated in <u>Section 5.02(b)</u>;

(vi)    to the extent not prohibited by applicable Law, as soon as reasonably practicable, promptly notify the Debtors in writing of any material governmental or third-party complaints, litigations, investigations, or hearings (or written communications indicating that the same may be contemplated or threatened) of which such Consenting Stakeholder has knowledge of with respect to the Restructuring Transactions;

(vii)    upon reasonable request by Debtors or their advisors, as soon as reasonably practicable, promptly provide the aggregate principal amount of each Consenting Stakeholder's Company Claims/Interests, on an issuance-by-issuance basis as of the date of such request;

(viii)    use commercially reasonable efforts to, (1) as applicable, cooperate with the Debtors' efforts to support, defend, and seek Bankruptcy Court approval of the DIP Orders and adequate protections obligations contained therein on both an interim and final basis, and (2) give any notice, order, instruction, or direction to the Trustee reasonably necessary to give effect to the Restructuring Transactions, and solely to the extent that any April 2026 Noteholder or July 2026 Noteholder is not a Consenting Stakeholder, as applicable, to issue a notice or letter (email being sufficient) recommending such April 2026 Noteholder or July 2026 Noteholder to vote in favor of the Plan; and

(ix)    negotiate in good faith and execute and implement the Definitive Documents and any other required agreements to effectuate the Restructuring Transactions that are consistent with this Agreement to which it is required to be a party.

(b)    During the Agreement Effective Period, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests, that it shall not directly or indirectly:

(i)    object to, delay, impede, or take any other action (including by directing or encouraging any other Entity to take any action) to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)    propose, file, seek, solicit, support, or vote for any Alternative Restructuring Transaction;

(iii)    file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan Term Sheet;

(iv)    initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions contemplated herein against the Debtors or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(v)    exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any of Claims against or Equity Interests in the Debtors; or

(vi)    object to, delay, impede, or take any other action (including by directing or encouraging any other Entity to take any action) to interfere with the Debtors' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code.

5.02.    <u>Commitments with Respect to Chapter 11 Cases</u>.

(a)    During the Agreement Effective Period, each Consenting Stakeholder that is entitled to vote to accept or reject the Plan pursuant to its terms agrees that it shall, subject to receipt by such Consenting Stakeholder of the Solicitation Materials:

(i)    vote each of its Company Claims/Interests to accept the Plan by timely delivering its duly executed and completed ballot accepting the Plan following the commencement of the solicitation of the Plan;

(ii)    not elect to opt out of the Releases set forth in the Plan;

(iii)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above, <u>provided</u>, <u>however</u>, that such votes or elections shall be immediately revoked and deemed void *ab initio* upon the occurrence of a Termination Date described in <u>Section 13</u> with respect to such Consenting Stakeholder in circumstances where such Consenting Stakeholder is not in breach of this Agreement at the time of such termination;

(iv)    not object to, join in any objection to, delay, impede, or take any other action (including by directing or encouraging any other Entity to take any action) to interfere with any pleading or document filed by the Debtors that is consistent with this Agreement, including any motion seeking approval of the DIP Orders and DIP Facility; and

(v)    without creating any obligation to incur any out-of-pocket costs that are not Restructuring Expenses payable under this Agreement by the applicable Debtors or provide anything in the nature of an indemnity or otherwise, use commercially reasonable efforts to support the Debtors in opposing any motion filed with the Bankruptcy Court by any party seeking the entry of an order (A) directing the appointment of a trustee or an examiner with enlarged powers relating to the operation of the Debtors' business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code, (B) converting any of

the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases.

(b)     During the Agreement Effective Period, each Consenting Stakeholder, in respect of each of its Company Claims/Interests, will support, and will not directly or indirectly object to, delay, impede, or take any other action (including by directing or encouraging any other Entity to take any action) to interfere with any motion or other pleading or document filed by a Debtor in the Bankruptcy Court that is consistent with this Agreement.

**Section 6.     *Provisions Regarding the Consenting Stakeholders' Commitments.***

Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder, the Debtors, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee) or their respective advisors, counsel or other representatives, in each case, subject to the terms of any Confidentiality Agreements; (b) impair or waive the rights of any Consenting Stakeholder to assert or raise any objection not prohibited by this Agreement in connection with the Restructuring Transactions; (c) prevent any Consenting Stakeholder from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; (d) limit the rights of a Consenting Stakeholder under the Chapter 11 Cases, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, so long as the exercise of any such right is not inconsistent with such Consenting Stakeholder's obligations hereunder; (e) limit the ability of a Consenting Stakeholder to purchase, sell, or enter into any transactions regarding the Company Claims/Interests, subject to Section 9 of this Agreement; (f) constitute a waiver or amendment of any term or provision of the April 2026 Notes Indenture, any attendant debt documents, or any intercreditor agreement; (g) constitute a termination or release of any liens on, or security interests in, any of the assets or properties of the Debtors that secure the obligations under the April 2026 Notes Indenture other than in accordance with the Plan; (h) require any Consenting Stakeholder to incur, assume, become liable in respect of, or suffer to exist any obligation to incur any out-of-pocket costs or other obligations or liabilities that are not Restructuring Expenses payable under this Agreement by the applicable Debtors; (i) subject to any notice provisions hereunder, prevent a Consenting Stakeholder from taking any action that is required to comply with applicable Law; (j) prevent a Consenting Stakeholder from taking any action that is otherwise consistent with this Agreement or the Plan Term Sheet; (k) if applicable, obligate a non-breaching Consenting Stakeholder to deliver a vote to support a Plan (or any other Restructuring Transactions) or prohibit a non-breaching Consenting Stakeholder from withdrawing such vote, in each case, from and after the Termination Date (other than a Termination Date as a result of the occurrence of the Plan Effective Date); provided that upon the withdrawal of any such vote after the Termination Date subject to Section 13.05 (other than a Termination Date as a result of the occurrence of the Plan Effective Date), such vote shall be deemed void *ab initio* and such Consenting Stakeholder shall have the opportunity to change its vote; or (l) require any Consenting Stakeholder to take any action which is prohibited by applicable Law or to waive or forego the benefit of any applicable legal or professional privilege.

**Section 7.     *[Reserved]***

**Section 8.**     *Commitments of the Debtors.*

8.01.    <u>Affirmative Commitments</u>.  Except as set forth in <u>Section 10</u>, during the Agreement Effective Period, the Debtors agree to:

(a)    support and take all reasonable steps necessary and desirable to consummate the Restructuring Transactions (including, without limitation, the XBP Merger) in accordance with this Agreement;

(b)    the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take commercially reasonable steps necessary and desirable to address any such impediment with the consent of the Required Consenting Creditors;

(c)    obtain any and all required regulatory and third-party approvals for the Restructuring Transactions;

(d)    negotiate in good faith and to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement and the Plan Term Sheet;

(e)    use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent and to the extent the Debtors receive any Joinders or Transfer Agreements, notify counsel to the Consenting Creditors and counsel to the Consenting ETI Parties of such Joinders or Transfer Agreements via email as set forth in <u>Section 16.11</u>;

(f)    continue ordinary course practices to maintain their good standing under the laws of the state or other jurisdiction in which they are incorporated or organized, except to the extent that any failure to maintain such Debtor's good standing arises solely from the filing of the Chapter 11 Cases;

(g)    use commercially reasonable efforts to obtain Exit Securitization Programs (as defined in the Plan) on economic terms for the Debtors that are superior to those of the Prepetition Securitization Programs (as defined in the Plan) and the Postpetition Securitization Programs (as defined in the Plan) or, in the alternative, to obtain alternative exit financing on superior economic terms to refinance the Prepetition Securitization Programs and the Postpetition Securitization Programs in connection with the Plan;

(h)    consult with the Consenting Stakeholders in formulating the tax structures and resolving any legacy tax obligations of the consolidated group with respect to the transactions contemplated in the Plan Term Sheet and the Restructuring Steps Exhibit (including, without limitation, the Neon Transaction (as defined in the Plan Term Sheet), the BTC Transaction (as defined in the Plan Term Sheet), the XBP Merger and the other Restructuring Transactions in a manner acceptable to the Required Consenting Creditors and the Consenting ETI Parties, in each case acting reasonably;

(i)        except as otherwise expressly set forth in this Agreement, operate their businesses and operations in the ordinary course in a manner that is consistent with this Agreement and consistent with the Debtors' past practice, and preserve intact the Debtors' business organization and relationships with third parties (including, without limitation, suppliers, customers, and governmental and regulatory authorities and employees); and

(j)        subject to any confidentiality obligations (i) provide to the Consenting Creditor Ad Hoc Group Advisors and the Consenting ETI Party Advisors a copy of any written Alternative Restructuring Transaction (and, in the case of a verbal proposal, a written summary thereof) within one (1) Business Day of delivery to the board of directors, board of managers, or similar governing body of the Debtors of such proposal and, in any event, three (3) Business Days after the Debtors' or their advisors' receipt of such proposal; provided that, the Debtors will make commercially reasonable efforts to share any proposal for an Alternative Restructuring Transaction, including seeking any necessary waivers or modifications of any confidentiality provisions.

8.02.    Additional Provisions Regarding Debtors' Commitments.

(a)        Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require the Disinterested Director, after consulting with outside counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 8.02 shall not be deemed to constitute a breach of this Agreement; provided that the foregoing shall not impede any Party's termination rights as set forth in Section 13 of this Agreement.  The Debtors shall promptly notify each of the Consenting Stakeholders of any such determination within one (1) Business Day following such determination.

(b)        Notwithstanding anything to the contrary in this Agreement (but subject to Section 8.02), each Debtor and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to: (a) consider any unsolicited Alternative Restructuring Transaction; (b) provide access to non-public information concerning any Debtor to any Entity that (x) has submitted an unsolicited proposal with respect to an Alternative Restructuring Transaction and (y) has entered into a reasonable and customary Confidentiality Agreement or a reasonable and customary nondisclosure agreement with the Debtor; provided that, to the extent practicable, the Debtors shall provide notice to the Consenting Stakeholders within one (1) day of providing access to such non-public information; (c) maintain or continue discussions or negotiations with respect to any Alternative Restructuring Transactions if such person or entity, acting in good faith and after consulting with outside counsel, determines that the failure to take such action would be inconsistent with its fiduciary duties or applicable Law; provided that, to the extent practicable, the Debtors shall provide notice to the Consenting Stakeholders within one (1) day of taking such action; and (d) enter into or continue discussions or negotiations with holders of Claims against or Equity Interests in a Debtor (including any Consenting Stakeholder), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions; provided that, to the extent practicable, the Debtors shall provide notice to the Consenting Stakeholders within one (1) day of providing access to such non-public information.

17

(c)     Nothing in this Agreement shall: (a) impair or waive the rights of any Debtor to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; (b) prevent any Debtor from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; or (c) require any Debtor to take any action which is prohibited by applicable Law or to waive or forego the benefit of any applicable legal or professional privilege.

**Section 9.**     *Transfer of Interests and Securities.*  During the Agreement Effective Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)     in the case of any Company Claims/Interests, the authorized transferee is: (i) a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act), (ii) an institutional "accredited investor" (as described in the Rules), (iii) not a "U.S. person" (as defined in Rule 902(k) of Regulation S under the Securities Act), and is acquiring such Company Claims/Interests in an offshore transaction in compliance with Rule 904 of Regulation S under the Securities Act and not participating on behalf of, or on account of, a "U.S. person," or (iv) a Consenting Stakeholder or an Affiliate thereof; and

(b)     either (i) the transferee executes and delivers to applicable counsel to the Debtors, before the effectiveness of the proposed Transfer, a Transfer Agreement or (ii) the transferee is a Consenting Stakeholder and the transferee provides written notice of such Transfer (including the amount and type of Company Claim/Interest Transferred) to applicable counsel to the Debtors at or before the time of the proposed Transfer, but in no event later than five (5) Business Days after such acquisition; provided, however, that the Consenting ETI Parties shall not be permitted to transfer any April 2026 Notes absent the consent of the Required Consenting Creditors.

9.02.    Upon compliance with the requirements of Section 9.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.  Any Transfer in violation of Section 9.01 shall be void *ab initio*.

9.03.    This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests; provided, however, that (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Debtors, counsel to the Consenting Creditors or counsel to the Consenting ETI Parties) and (b) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to applicable counsel to the Debtors, the Consenting Creditor Ad Hoc Group Advisors and the Consenting ETI Parties as soon as practicable, but in any event within five (5) Business Days of such acquisition; provided, further, that any April 2026 Notes acquired by the Individual Owner after the Agreement Effective Date in excess of $10,000,000 shall receive its respective portion of the ETI Equity Distribution (as defined in the Plan Term Sheet).

9.04. This <u>Section 9</u> shall not impose any obligation on any Debtor to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests. Notwithstanding anything to the contrary herein, to the extent a Debtor and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

9.05. Notwithstanding <u>Section 9.01</u>, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (i) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within ten (10) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (ii) the transferee otherwise is a Permitted Transferee under <u>Section 9.01</u>; and (iii) the Transfer otherwise is a Permitted Transfer under <u>Section 9.01</u>. To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee. Notwithstanding the foregoing, if, at the time of the proposed Transfer of such Company Claims/Interests to the Qualified Marketmaker, such Company Claims/Interests (x) may be voted on (1) the Plan or (2) any Alternative Restructuring Transaction, the proposed transferor-Consenting Stakeholder must first vote such Company Claims/Interests in accordance with the requirements of <u>Section 5.01(a)(i)</u>, or (y)(i) have not yet been and may not yet be voted on (1) the Plan or (2) any Alternative Restructuring Transaction and (ii) such Qualified Marketmaker does not Transfer such Company Claims/Interests to a subsequent transferee prior to the fifth (5th) Business Day before the expiration of the voting deadline (such date, the "**Qualified Marketmaker Joinder Date**"), then such Qualified Marketmaker shall be required to (and the transfer documentation to the Qualified Marketmaker shall have provided that it shall), on the first (1st) Business Day immediately following the Qualified Marketmaker Joinder Date, become a Consenting Stakeholder with respect to such Company Claims/Interests in accordance with the terms hereof (<u>provided</u> that the Qualified Marketmaker shall automatically, and without further notice or action, no longer be a Consenting Stakeholder with respect to such Company Claims/Interests at such time that the transferee of such Company Claims/Interests becomes a Consenting Stakeholder with respect to such Company Claims/Interests).

9.06. Notwithstanding anything to the contrary in this <u>Section 9</u>, the restrictions on Transfer set forth in this <u>Section 9</u> shall not apply to the grant of any liens or encumbrances (i) on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests, or (ii) in favor of any lender, noteholder, agent, or trustee to secure obligations under indebtedness issued or held by a managed fund or account, including any collateralized loan obligation or collateralized debt obligation.

**Section 10.** *Representations and Warranties of Consenting Stakeholders.* Each Consenting

Stakeholder severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement, a Joinder, or a Transfer Agreement and as of the Plan Effective Date: it is the beneficial or record owner (which shall be deemed to include any unsettled trades) of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not (nor are any investment funds, accounts, and other investment vehicles managed by it) the beneficial or record owner of any Company Claims/Interests other than those reflected in, such Consenting Stakeholder's signature page to this Agreement, a Joinder, or a Transfer Agreement, as applicable, (as may be updated pursuant to Section 9) or as held in its capacity as a Qualified Marketmaker;

(b)      it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)      such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would materially and adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)      it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law;

(e)      solely with respect to holders of Company Claims/Interests, (i) it is (A) a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act), (B) an institutional "accredited investor" (as described in the Rules), or (C) not a "U.S. person" (as defined in Rule 902(k) of Regulation S under the Securities Act) and (ii) although none of the Parties intends that this Agreement should constitute, and they each believe it does not constitute, an offering of securities, such holder represents, warrants, and acknowledges that (1) it has been furnished with all materials it considers relevant to making an investment decision with respect to any securities acquired by it in connection with the Restructuring Transactions, (2) it has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its prospective investment in such securities, and the ability to bear the economic risks of its prospective investment and can afford the complete loss of such investment, and acknowledges that such investment involves a high degree of risk, (3) any securities acquired by the Consenting Stakeholders in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act, and (4) it understands that any securities contemplated by this Agreement and any Definitive Document have not been, and are not contemplated to be, registered under the Securities Act, and may not be resold without registration under the Securities Act or pursuant to an exemption from the registration requirements under the Securities Act.

**Section 11.**    *[Reserved]*

**Section 12.**    ***Mutual Representations, Warranties, and Covenants.***  Each of the Consenting Stakeholders, severally and not jointly, and each of the Debtors, jointly and severally subject to any necessary Bankruptcy Court approval, as and to the extent applicable, hereby represents,

warrants, and covenants to each other, as of the date such Party executed and delivered this Agreement: (i) other than with respect to Par Chadha (in his capacity as Chairman of the board of directors of ETI), it is validly existing and in good standing under the Laws of the state of its organization or incorporation, and (ii) this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)     except as expressly provided in this Agreement, the XBP Merger Agreement, the Plan and the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)     the entry into and performance by it of the transactions contemplated by this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)     except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)     except as expressly provided in this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

## Section 13.    *Termination Events.*

13.01.    <u>Generally</u>.

(a)     This Agreement will automatically and immediately terminate upon the earlier of (i) the Plan Effective Date and (ii) the Outside Date (as to all Parties) without any further required action or notice.  For the avoidance of doubt, the Debtors' obligations (or the obligations of their successors in interest) to promptly pay in full and in cash all earned and accrued Restructuring Expenses through and including the Plan Effective Date and to continue to pay such amounts as they come due in accordance with the applicable engagement letters and/or fee arrangements shall survive termination of this Agreement on account of <u>Section 13.05</u>.

(b)     This Agreement will terminate three (3) Business Days following the receipt of written notice, delivered in accordance with <u>Section 16.11</u> hereof, to the other Parties (as applicable) from (i) the Required Consenting Creditors (which for the avoidance of doubt, may be delivered by counsel to the Consenting Creditors on behalf of any or all entities constituting the Consenting Creditors) at any time after the occurrence of any Consenting Creditor Termination Event (as defined below), (ii) the Debtors (which for the avoidance of doubt, may be delivered by counsel to the Debtors on behalf of any or all entities constituting the Debtors) at any time after the occurrence of any Debtor Termination Event (as defined below), or (iii) the Consenting ETI Parties (which for the avoidance of doubt, may be delivered by counsel to the Consenting ETI

Parties on behalf of any or all entities constituting the Consenting ETI Parties), who may only terminate this Agreement as to themselves, at any time after the occurrence of any Consenting ETI Party Termination Event (as defined below). No Party may terminate this Agreement based on a Consenting Creditor Termination Event, Debtor Termination Event, or Consenting ETI Party Termination Event, as applicable, caused by such Party's failure to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure to perform or comply arises as a result of another Party's prior failure to perform or comply in all material respects with the terms and conditions of this Agreement).

(c)     Each of the dates and time periods in this <u>Section 13</u> may be extended by mutual agreement (which may be evidenced by email confirmation, including from respective counsel) among the Debtors, the Required Consenting Creditors, and the Consenting ETI Parties, as applicable.

13.02.  <u>Consenting Creditor Termination Events</u>.  This Agreement may be terminated, upon three (3) Business Days written notice, with respect to the Consenting Creditors by the Required Consenting Creditors by the delivery to the Debtors of a written notice in accordance with <u>Section 16.11</u> hereof upon the occurrence of the following events (collectively, the "**<u>Consenting Creditor Termination Events</u>**"):

(a)     the Debtors or the Consenting ETI Parties terminate this Agreement;

(b)     any Debtor or any Consenting Stakeholder (other than the terminating Consenting Creditors) objects to, delays, impedes, or takes any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(c)     any Debtor or any Consenting Stakeholder (other than the terminating Consenting Creditors) takes any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, and consummation of the Restructuring Transactions described in this Agreement, the Definitive Documents, or the Plan Term Sheet;

(d)     unless caused by actions or omissions of the terminating Consenting Creditors, the failure of the Restructuring Transactions to have been consummated by the Outside Date;

(e)     the failure by the Debtors to consult with and obtain the approval of the Required Consenting Creditors (such approval not to be unreasonably withheld) with respect to the settlement of any priority tax claims that the Debtors are or will be subject to;

(f)     the Debtors modify, amend, supplement, waive or execute the Definitive Documents in a manner that is inconsistent with this Agreement in any respect;

(g)     the breach by any Debtor, any Consenting Stakeholder, or any Affiliates of the foregoing of any of the representations, warranties, or covenants of any Debtor, any Consenting Stakeholder, or any Affiliates of the foregoing, as applicable, set forth in this Agreement that remains uncured for three (3) Business Days after such terminating Consenting Creditors transmit a written notice in accordance with <u>Section 16.11</u> hereof detailing any such breach;

(h)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) days after such terminating Consenting Creditors transmit a written notice in accordance with Section 16.11 hereof detailing any such issuance; provided that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(i)    any Debtor, any Consenting Stakeholder, or any of its Affiliates of the foregoing (i) publicly announces, or states in writing to any of the Consenting Creditors or other holders of Company Claims/Interests (including but not limited to Section 8.01(j) hereof), its intention not to support or pursue the Restructuring Transactions; or (ii) exercises any right pursuant to Section 9 that constitutes a breach pursuant to this Agreement; and (iii) breaches any of the covenants, agreements, or obligations, as applicable, set forth in Section 5 and Section 8;

(j)    the Disinterested Director, acting in good faith and after consulting with outside counsel, determines (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law, or (ii) in the exercise of its fiduciary duties, to enter into an Alternative Restructuring Transaction;

(k)    the failure to meet a Milestone, which has not been waived or extended in a manner consistent with this Agreement, unless such failure is the result of any act, omission, or delay on the part of a terminating Consenting Creditor in violation of its obligations under this Agreement;

(l)    the Bankruptcy Court enters an order denying confirmation of the Plan and such order shall not have been reversed, vacated, or stayed within fourteen (14) days of entry;

(m)    (i) the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Debtor seeking an order that is not stayed, vacated, or withdrawn fourteen (14) days from entry, or (ii) the filing of a motion or application in the Bankruptcy Court by any Debtor that has not been withdrawn five (5) days after filing, in each case without the prior written consent of the Required Consenting Creditor, (1) converting one or more of the Chapter 11 Cases of a Debtor to a case under chapter 7 of the Bankruptcy Code, (2) appointing an examiner under section 1106(b) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Debtor, (3) rejecting this Agreement, (4) dismissing one or more of the Chapter 11 Cases of a Debtor, or (5) invalidating, disallowing, subordinating (other than in connection with a DIP Facility), or limiting the enforceability, priority, or validity of any of the Company Claims or Interests held by any of the Consenting Creditors;

(n)    upon the commencement of an involuntary Insolvency Proceeding against any of the Debtors (or any of their Affiliates) or the filing for other similar relief in respect of the Debtors or their debts, or of a substantial part of their assets, under any federal, state or foreign bankruptcy, insolvency, administrative, receivership or similar Law now or hereafter in effect and such involuntary proceeding is not dismissed within a period of thirty (30) days after the filing thereof;

(o)    any Debtor, any Consenting Stakeholder, or other Consenting Creditor files any motion or pleading with the Bankruptcy Court that is inconsistent with this Agreement and such

motion has not been withdrawn or amended within three (3) Business Days of receipt by the Debtors of written notice (email being sufficient) from the Consenting Creditors that such motion or pleading is inconsistent with this Agreement;

(p) any Debtor, any Consenting Stakeholder, or other Consenting Creditor files or directly supports another party in filing any motion, application, adversary proceeding, or other pleading challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of any Claims of the Consenting Creditors arising under any of the Prepetition Facilities and such filing is not withdrawn or the Debtor does not withdraw its support of such filing after five (5) Business Days of a written request from the Required Consenting Creditors;

(q) the Bankruptcy Court enters an order terminating the Debtors' exclusive right to file a chapter 11 plan or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(r) the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code), except as such relief is related to the entry of a DIP Order, with regard to any asset (other than with respect to insurance proceeds) of the Debtors and such order adversely affects any Debtor's ability to operate its business in the ordinary course or to consummate the Restructuring Transactions and such order is not reversed or stayed after fourteen (14) days from the Bankruptcy Court's entry;

(s) (i) the Debtors fail to support, defend, or seek Bankruptcy Court approval of the DIP Orders pursuant to the terms and conditions of this Agreement and the DIP Orders or (ii) except as permitted by Section 10 hereof, without the prior written consent of the Required Consenting Creditors, the Debtors enter into any contract with respect to debtor-in-possession financing, cash collateral usage, exit financing, and/or other financing arrangements;

(t) this Agreement or any Definitive Document is amended, waived, or modified in any manner that is inconsistent with the terms of this Agreement unless (i) such amendment, waiver, or modification has been approved in writing by the Required Consenting Creditor or (ii) such amendment, waiver, or modification is annulled, deemed invalid, or otherwise modified such that it is consistent with the terms of this Agreement within three (3) Business Days from its purported effectiveness;

(u) (i) a Debtor files a motion or application seeking an order (without the prior written consent of the Required Consenting Creditors) vacating or modifying the DIP Orders, (ii) any of the DIP Orders are reversed, stayed, dismissed, vacated, reconsidered, modified, or amended in a manner that is inconsistent with the terms of this Agreement without the consent of the Required Consenting Creditors, (iii) a motion for reconsideration, reargument, or rehearing with respect to any such order has been filed and the Debtors have failed to timely object to such motion, or (iv) the Bankruptcy Court enters any order authorizing the use of postpetition financing that is not in the form consistent with the DIP Order or otherwise acceptable to the Required Consenting Creditors;

(v) occurrence of an "Event of Default" under (and as defined in) the DIP Orders or the DIP Documents;

(w)     the Bankruptcy Court enters an order invalidating, disallowing, subordinating, recharacterizing, or limiting, as applicable, any of the Company Claims/Interests of any of the Required Consenting Creditors and such order is not reversed or stayed after fourteen (14) days from the Bankruptcy Court's entry;

(x)     breach in any material respect by one or more of the Consenting Creditors of any provision set forth in this Agreement that remains uncured for a period of five (5) Business Days after the receipt by the Consenting Creditors of notice of such breach; provided, however, that so long as, as applicable, the non-breaching Consenting Creditors continue to hold or control at least two-thirds of then outstanding principal amount of April 2026 Notes such termination shall be effective only with respect to such breaching Consenting Creditor;

(y)     any Debtor revokes the Restructuring Transactions without the prior consent of the Required Consenting Creditors, including the withdrawal of the Plan, as applicable, or support therefor, or publicly announces its intention to take any such act;

(z)     the Debtors, directly or indirectly, terminate or release (i) any obligors or guarantors of their obligations under the Prepetition Facilities or (ii) any of the liens on, security interests in, or guarantees of any of the assets of the Debtors that secure the obligations under the Prepetition Facilities, in each case without the prior written consent of the Required Consenting Creditors;

(aa)     failure of the Debtors to pay any and all Restructuring Expenses of the Consenting Creditor Ad Hoc Group, as and when required under this Agreement or the DIP Orders and such Restructuring Expenses have not been paid within three (3) Business Days of receipt by the Debtors of written notice;

(bb)     any Debtor (or any of its Affiliates) settles any (i) material claims or causes of action brought by or against any Debtor (or any Affiliate or subsidiary) (including, without limitation, any claims asserted by a governmental entity) or (ii) claims or causes of action brought by or against any Debtor (or any Affiliate or subsidiary) involving any Debtor (or any Affiliate or subsidiary), in each case without the prior written consent of the Required Consenting Creditors;

(cc)     any Debtor (or any of its Affiliates) sells any material assets (including, without limitation, any intellectual property) in a transaction or a series of transactions outside the ordinary course of business without the prior written consent of the Required Consenting Creditors; provided that the foregoing shall not apply to asset sales by ER3 Holdco or ER3 pursuant to the Postpetition Securitization Programs in accordance with the Postpetition Securitization Programs Order (as defined in the Plan);

(dd)     any Consenting Stakeholder (solely with respect to (i)) or Debtor (i) takes any action with respect to the disposition, treatment, or dissolution of any Debtor (including any foreign or domestic subsidiaries or Affiliates, except for ER3 Holdco or ER3 taking such actions pursuant to the Postpetition Securitization Programs in accordance with the Postpetition Securitization Programs Order, whether or not such Entities are Filing Entities or signatories to this Agreement), except as permitted by Section 3 hereof or (ii) amends or changes any of their respective existing organizational documents, in each case, without the prior written consent (email being sufficient) of the Required Consenting Creditors;

(ee) any Debtor (or any of its Affiliates), except in accordance with the Restructuring Transactions, incurs any indebtedness or guarantees any indebtedness of another entity without the prior written consent of the Required Consenting Creditors; provided that the foregoing shall not apply to indebtedness incurred by ER3 Holdco or ER3 pursuant to the Postpetition Securitization Programs in accordance with the Postpetition Securitization Programs Order;

(ff) the failure of the Debtors to pay in full and in cash all Restructuring Expenses and continue to pay such amounts as they come due, and otherwise in accordance with the applicable engagement letters and/or fee arrangements of the Consenting Creditor Ad Hoc Group Advisors (and not terminate such engagement letters and/or fee arrangements or seek to reject them in the Chapter 11 Cases); provided that (i) all accrued and unpaid Restructuring Expenses (including Restructuring Expenses incurred following the Petition Date) as of the Plan Effective Date including any estimate of such Restructuring Expenses, shall be paid by the Debtors on the Plan Effective Date and (ii) in the event a Termination Date occurs with respect to the Debtors, the Debtors shall remain obligated to pay all Restructuring Expenses accrued and unpaid as of and up to such Termination Date in accordance with the applicable engagement letters and/or fee arrangements;

(gg) subject to Section 9, the failure by the Debtors to actively and timely oppose and object to the efforts of any person seeking in any manner to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions (including, if applicable, the Debtors' timely filing of objections or written responses in the Chapter 11 Cases) to the extent such opposition or objection is necessary or desirable to facilitate implementation of the Restructuring Transactions in consultation with the Required Consenting Creditors;

(hh) the failure of the Debtors to provide timely responses to all reasonable diligence requests sent to the Debtors by and through the Consenting Creditor Ad Hoc Group Advisors and the Consenting ETI Party Advisors on a continuing and rolling basis during the Agreement Effective Period, including but not limited to, (i) updates regarding the material business and financial (including liquidity) performance of the Debtors, (ii) the status of obtaining any necessary or desirable authorizations from each Required Consenting Creditor, any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body, exchange, or third-party, and (iii) the general status and progress of the Restructuring Transactions, including progress in relation to the documentation and negotiations of the Definitive Documents;

(ii) the failure of the Debtors to consult with and obtain the consent of the Required Consenting Creditors (such consent not to be unreasonably withheld) as to which executory contracts or unexpired leases are to be assumed or rejected, if any;

(jj) the failure of the Debtors to use commercially reasonable efforts to inform the Consenting Creditor Ad Hoc Group Advisors in writing (email being sufficient) after becoming aware (and in any event within twenty-four (24) hours after becoming so aware) of: (i) any event or circumstance that has occurred, or that is likely to occur, that would permit any Party to terminate, or that would result in the termination of, this Agreement; (ii) any matter or circumstance that is, or is likely to be, an impediment to the implementation or consummation of the Restructuring Transactions; (iii) the threat or commencement of any involuntary Insolvency

Proceeding, lawsuit, investigation, hearing, or enforcement action from or by any person or entity in respect of any Debtor; (iv) a breach of this Agreement by any Party; or (v) any representation or statement made by them under this Agreement which is or proves to have been incorrect or misleading in any respect when made; or

(kk)    the breach in any material respect by any Debtor or any Consenting Stakeholder of any of the representations, warranties, covenants, or other obligations of the Consenting Creditors set forth in this Agreement, which breach has not been cured (if curable) within five (5) Business Days of written notice from the Required Consenting Creditors and/or the Debtors; provided, that the Required Consenting Creditors shall not have the right to terminate this Agreement if the non-breaching Consenting Creditors still constitute holders of two-thirds or more of the April 2026 Notes.

13.03.    Debtor Termination Events.  Any Debtor may terminate this Agreement as to all Parties (other than pursuant to Section 13.02) upon prior written notice to all Parties in accordance with Section 16.11 hereof upon the occurrence of any of the following events (collectively, the "**Debtor Termination Events**"):

(a)    with respect to the applicable Consenting Creditor only, the breach by any such Consenting Creditor, or any Affiliates of the foregoing of any of the representations, warranties, or covenants of any such Consenting Creditor or any Affiliates of the foregoing, as applicable, set forth in this Agreement that remains uncured for five (5) Business Days after the Debtors transmit a written notice in accordance with Section 16.11 hereof detailing any such breach;

(b)    the Disinterested Director, acting in good faith and after consulting with outside counsel, determines (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Transaction;

(c)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Debtor transmits a written notice in accordance with Section 16.11 hereof detailing any such issuance;

(d)    if any Consenting Creditor (i) publicly announces their intention not to support the Restructuring Transaction or (ii) validly terminates this Agreement as to themselves pursuant to Section 13, in which case the Debtors can terminate only with respect to such Consenting Creditor, this Agreement shall otherwise remain in full force and effect with respect to each non-terminating or non-breaching Consenting Creditor;

(e)    the Bankruptcy Court enters an order denying confirmation of the Plan and such order shall not have been reversed, vacated, or stayed within fourteen (14) days of entry;

(f)    the entry of an order by the Bankruptcy Court or the filing of a motion or application by any Consenting Creditor, (i) converting one or more of the Chapter 11 Cases of a Debtor to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with enlarged powers relating to the operation of the Debtors' business (powers beyond those set forth in section

27

1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Debtor, (iii) rejecting this Agreement, or (iv) dismissing one or more of the Chapter 11 Cases of any Debtor;

(g)     upon the commencement of an involuntary Insolvency Proceeding against any of the Debtors or the filing for other similar relief in respect of the Debtors or their debts, or of a substantial part of their assets, under any federal, state, or foreign bankruptcy, insolvency, administrative, receivership, or similar Law now or hereafter in effect and such involuntary proceeding is not dismissed within thirty (30) days after the filing thereof;

(h)     any Consenting Creditor files any motion or pleading with the Bankruptcy Court that is inconsistent with this Agreement and such motion has not been withdrawn or amended within three (3) Business Days of receipt by such Consenting Creditor of written notice from the Debtor that such motion or pleading is inconsistent with this Agreement; provided, however, that so long as, as applicable, the non-breaching Consenting Creditors continue to hold or control at least two-thirds of then outstanding principal amount of April 2026 Notes, such termination shall be effective only with respect to such breaching Consenting Creditor;

(i)     this Agreement or any Definitive Document is amended, waived, or modified in any manner that is inconsistent with the terms of this Agreement unless (i) such amendment, waiver, or modification has been approved in writing by the Debtors or (ii) such amendment, waiver, or modification is annulled, deemed invalid, or otherwise modified such that it is consistent with the terms of this Agreement within three (3) Business Days from its purported effectiveness;

(j)     breach in any material respect by one or more of the Consenting Creditors of any provision set forth in this Agreement that remains uncured for a period of five (5) Business Days after the receipt by the Consenting Creditors of notice of such breach;

(k)     any Consenting Creditor revokes the Restructuring Transactions without the prior consent of the other Parties hereto, including withdrawing support of the Plan, or publicly announces its intention to take any such act; provided, however, that so long as, as applicable, the non-breaching Consenting Creditors continue to hold or control at least two-thirds of then outstanding principal amount of April 2026 Notes, such termination shall be effective only with respect to such breaching Consenting Creditor; or

(l)     the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code), except as such relief is related to the entry of a DIP Order, with regard to any asset (other than with respect to insurance proceeds) of the Debtors and such order materially and adversely affects any Debtor's ability to operate its business in the ordinary course or to consummate the Restructuring Transactions.

13.04.   Consenting ETI Party Termination Events.  This Agreement may be terminated, upon three (3) Business Days written notice, with respect to the Consenting ETI Parties by the delivery to the Debtors and Consenting Creditors of a written notice in accordance with Section 16.11 hereof upon the occurrence of the following events (collectively, the "**Consenting ETI Party Termination Events**"):

(a)     unless caused by the actions or omissions of the terminating Consenting ETI Parties, the failure of the Restructuring Transactions to have been consummated by the earlier of (i) the Outside Date, and (ii) August 7, 2025;

(b)     the Debtors or Consenting Creditors terminate this Agreement;

(c)     any Debtor or other Consenting Stakeholder revokes the Restructuring Transactions without the prior consent of the Consenting ETI Parties, including the withdrawal of the Plan, as applicable, or support therefor, or publicly announces its intention to take any such act;

(d)     the breach by the other Consenting Stakeholders, any Debtor, or any Affiliates of the foregoing of any of the representations, warranties, or covenants of the other Consenting Stakeholders, any Debtor or any Affiliates of the foregoing, as applicable, set forth in this Agreement that remains uncured for three (3) Business Days after such terminating Consenting ETI Party transmits a written notice in accordance with Section 16.11 hereof detailing any such breach;

(e)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Consenting ETI Party transmits a written notice in accordance with Section 16.11 hereof detailing any such issuance;

(f)     the Disinterested Director, acting in good faith and after consulting with outside counsel, determines (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law, or (ii) in the exercise of its fiduciary duties, to enter into an Alternative Restructuring Transaction;

(g)     the failure of the Debtors to give prompt notice (email being sufficient) to the Consenting ETI Party Advisors within twenty-four (24) hours of the Disinterested Director making the determination (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law, or (ii) in the exercise of its fiduciary duties, to enter into an Alternative Restructuring Transaction;

(h)     this Agreement or any Definitive Document is amended, waived, or modified in any manner that is inconsistent with the terms of this Agreement unless (i) such amendment, waiver, or modification has been approved in writing by the Consenting ETI Parties or (ii) such amendment, waiver, or modification is annulled, deemed invalid, or otherwise modified such that it is consistent with the terms of this Agreement within three (3) Business Days from its purported effectiveness;

(i)     the failure of the Debtors to use commercially reasonable efforts to inform the Consenting ETI Party Advisors in writing (email being sufficient) after becoming aware (and in any event within twenty-four (24) hours after becoming so aware) of: (i) any event or circumstance that has occurred, or that is likely to occur, that would permit any Party to terminate, or that would result in the termination of, this Agreement; (ii) any matter or circumstance that is, or is likely to be, an impediment to the implementation or consummation of the Restructuring Transactions; (iii)

the threat or commencement of any involuntary Insolvency Proceeding, lawsuit, investigation, hearing, or enforcement action from or by any person or entity in respect of any Debtor; (iv) a breach of this Agreement by any Party; or (v) any representation or statement made by them under this Agreement which is or proves to have been incorrect or misleading in any respect when made;

(j)     the public announcement by the Debtors of their intention not to support the Restructuring Transactions;

(k)     the Bankruptcy Court enters an order denying confirmation of the Plan and such order shall not have been reversed, vacated, or stayed within fourteen (14) days of entry;

(l)     the failure by the Debtors to consult with the Consenting ETI Parties with respect to the settlement of any priority tax claims that the Debtors are or will be subject to;

(m)     the occurrence of an "Event of Default" under (and as defined in) the DIP Orders or the DIP Documents;

(n)     (i) the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Debtor seeking an order that is not stayed, vacated, or withdrawn fourteen (14) days from entry, or (ii) the filing of a motion or application in the Bankruptcy Court by any Debtor that has not been withdrawn five (5) days after filing, in each case without the prior written consent of the Consenting ETI Parties, (1) converting one or more of the Chapter 11 Cases of the Debtors to a case under chapter 7 of the Bankruptcy Code, (2) appointing an examiner or a trustee in one or more of the Chapter 11 Cases of Debtors, (3) rejecting this Agreement, (4) dismissing one or more of the Chapter 11 Cases of the Debtors, or (5) invalidating, disallowing, subordinating (other than in connection with a DIP Facility), or limiting the enforceability, priority, or validity of any of the Company Claims or Interests held by any of the Consenting ETI Parties;

(o)     any Debtor, Consenting Creditor or Consenting Stakeholder (aside from the Consenting ETI Parties) files or directly supports another party in filing any motion, application, adversary proceeding, or other pleading challenging the validity, enforceability, perfection or priority of, or seeking avoidance or subordination of any Company Claims or Interests held by any of the Consenting ETI Parties arising under any of the Prepetition Facilities and such filing is not withdrawn or the Debtors do not withdraw their support of such filing after five (5) Business Days of a written request from the Consenting ETI Parties;

(p)     the failure of the Debtors to pay in full and in cash all Restructuring Expenses of the Consenting ETI Parties on the Plan Effective Date; provided that all such accrued and unpaid Restructuring Expenses (including such Restructuring Expenses incurred following the Petition Date) as of the Plan Effective Date including any estimate of such Restructuring Expenses shall only be paid by the Debtors on the Plan Effective Date;

(q)     any court of competent jurisdiction has entered a final, non-appealable judgment or order declaring this Agreement to be unenforceable; and

(r)     so long as the Consenting ETI Parties do not file or support such actions, the Bankruptcy Court or a court of competent jurisdiction enters an order (i) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (ii) dismissing the Chapter 11 Cases,

or (iii) appointing a trustee for the Chapter 11 Cases, which order in each case has not been reversed, stayed, or vacated by the later of (a) the date on which the Confirmation Order is entered and (b) five (5) Business Days after the Consenting Stakeholders provide written notice to the other Parties that such order is materially inconsistent with this Agreement.

13.05.  Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among the following: (a) the Required Consenting Creditors; (b) the Consenting ETI Parties; and (c) each Debtor.

13.06.  Effect of Termination.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action; provided that in no event shall any such termination relieve a Party from (i) liability for its breach or non-performance of its obligations hereunder prior to the date of such termination, notwithstanding any termination of this Agreement by any other Party, and (ii) obligations under this Agreement which expressly survive any such termination.  The right to terminate this Agreement pursuant to Sections 13.01, 13.02, 13.03, 13.04, or 13.05 (other than pursuant to Section 13.03(b)) shall not be available to any Party whose failure to fulfill any material obligation under this Agreement has been the cause of, or resulted in, the occurrence of a termination event.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by the applicable Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; provided, however, that any Consenting Creditor or any Consenting ETI Party withdrawing or changing its vote pursuant to this Section 13.06 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, file notice of such withdrawal or change with the Bankruptcy Court, and, solely to the extent such Consenting Creditor or Consenting ETI Party, as applicable, is withdrawing its vote to accept the Plan or changing its vote from accepting the Plan to rejecting the Plan, the Debtors shall consent to any attempt by such Consenting Creditor or Consenting ETI Party, as applicable, to change or withdraw such vote (or cause such vote to be changed or withdrawn) at such time.  Nothing in this Agreement shall be construed as prohibiting a Debtor or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Debtor or the ability of any Debtor to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Creditor, and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Debtor or Consenting Stakeholder.  No purported termination of this Agreement shall be effective under this Section 13.06 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 13.01(a),

Section 13.03(b), or Section 13.03(e).  Nothing in this Section 13.06 shall restrict any Debtor's right to terminate this Agreement in accordance with Section 13.03(b).

**Section 14.**     *Amendments and Waivers.*

(a)     This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 14; provided, that, notwithstanding anything to the contrary herein, this Section 14 may not be modified, amended, or supplemented in any manner except with the prior written consent of the Debtors and the Required Consenting Creditors.

(b)     Any proposed modification, amendment, waiver, or supplement that does not comply with this Section 14 shall be ineffective and void *ab initio*.

(c)     This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived in writing by: (a) each Debtor, and (b) the Required Consenting Creditors; provided that any modification, amendment, or supplement that adversely affects the economic interest of any Consenting Stakeholder shall require the consent of each affected Consenting Stakeholder.

(d)     At any time prior to the Termination Date, the Debtors, the Required Consenting Creditors, and the Consenting ETI Parties, to the extent legally permitted, may (i) extend the time for the performance of any of the obligations of any other Party, (ii) waive any inaccuracies in the representations and warranties made to such Party contained herein or in any document delivered pursuant hereto, and (iii) waive compliance with any of the agreements, covenants or conditions for the benefit of such Party contained herein.

(e)     The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power, or remedy by such Party preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 15.**     *Mutual Releases.* Each Consenting Stakeholder agrees to support the inclusion of a release in the Plan in substantially the form to be set forth in the Plan.

15.02.  Certain Limitations on Releases.  For the avoidance of doubt, except as provided for in the Plan, nothing in this Agreement and the Releases contained in this Section 15 shall or shall be deemed to result in the waiving or limiting by (a) the Debtors, or any officer, director, member of any governing body, or employee thereof, of (i) any indemnification against any Debtor, any of their insurance carriers, or any other Entity, (ii) any rights as beneficiaries of any insurance policies, (iii) wages, salaries, compensation, or benefits, (iv) intercompany claims, or (v) any Interest held by a Debtor; (b) the Consenting Creditors, the Consenting ETI Parties or the Trustee of any Claims or "Obligations" under and as defined in the 2026 April Notes Indenture, or any other financing document (except as may be expressly amended or modified by the Plan,

or any other financing document under and as defined therein pursuant to the terms of this Agreement or the Plan or the consent of the Required Consenting Creditors (solely with respect to the April 2026 Notes Indenture and related documents)); and (c) any Party or other Entity of any post-Agreement Effective Date obligations under this Agreement or post-Plan Effective Date obligations under the Plan, the Confirmation Order, the Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claim or obligation arising under the Plan; and (d) any Affiliates or Related Parties of any Consenting Stakeholder (including any separate branch, trading desk, fund and/or business group of a Consenting Stakeholder) of such Affiliate's or Related Party's Company Claims or Causes of Action, unless such Affiliate or Related Party has itself signed this Agreement.

## Section 16.     *Miscellaneous.*

16.01.  <u>Acknowledgement</u>.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, or other applicable Law.

16.02.  <u>Exhibits Incorporated by Reference; Conflicts</u>.   Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules.  In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

16.03.  <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

16.04.  <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

16.05.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:   (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient

forum or does not have jurisdiction over any Party hereto; <u>provided that</u>, prior to the commencement of the Chapter 11 Cases, each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement in a court of competent jurisdiction located in New York, New York.

16.06.  <u>TRIAL BY JURY WAIVER</u>.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

16.07.  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.  The words "execution," "execute," "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by us, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity, or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

16.08.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Debtors and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Debtors and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

16.09.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and, except as set forth in Section 9 of this Agreement, the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

16.10.  <u>Relationship Among the Parties.</u>  It is understood and agreed that no Party to this Agreement has any duty of trust or confidence in any form with any other Party, and, except as provided in this Agreement, there are no agreements, commitments, or undertakings between or among them.  In this regard, it is understood and agreed that any Party to this Agreement may trade in Company Claims/Interests without the consent of the Debtors, as the case may be, or any other Party, subject to applicable securities laws, the terms of any applicable Confidentiality Agreement or non-disclosure agreement, and the terms of this Agreement; <u>provided that</u> no Party shall have

any responsibility for any such trading by any other Party by virtue of this Agreement. No prior history, pattern, or practice of sharing confidence among or between the Parties shall in any way affect or negate this understanding and agreement.

16.11. <u>Notices</u>. All notices hereunder shall be deemed given if in writing and delivered, by email, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)  if to the Debtors, to:

Exela Intermediate, LLC
2701 East Grauwyler Road
Irving, TX 75061
Attn:  Secretary
Phone: 1-844-935-2832
Email: legalnotices@exelatech.com

with copies to:

Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020-1300
Attn:  Ray Schrock
        Alexander Welch
        Hugh Murtagh
Email: ray.schrock@lw.com
        alex.welch@lw.com
        hugh.murtagh@lw.com

(b)  if to a Consenting ETI Party, to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Attn: Sean A. O'Neal
        Kara A. Hailey
Email: soneal@cgsh.com
        Khailey@cgsh.com

(c)  if to a Consenting Creditor (other than a Consenting ETI Party), to:

Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036-8704
Attn:  Ryan Preston Dahl
        Matthew Roose
        Eric Sherman
Email: Ryan.Dahl@ropesgray.com

35

Matthew.Roose@ropesgray.com
Eric.Sherman@ropesgray.com

-and-

Ropes & Gray LLP
191 North Wacker Drive
Chicago, IL 60606
Attn: Eric Schriesheim
Email: Eric.Schriesheim@ropesgray.com

Any notice given by delivery, mail, or courier shall be effective when received.

16.12. <u>Independent Due Diligence and Decision Making</u>. Each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Debtors. Each Consenting Stakeholder acknowledges and agrees that it is not relying on any representation or warranties other than as set forth in this Agreement.

16.13. <u>Enforceability of Agreement</u>. Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required; <u>provided</u> <u>that</u> nothing herein shall prejudice any Party's rights to argue that the exercise of termination rights was not proper under the terms of this Agreement.

16.14. <u>Waiver</u>. If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

16.15. <u>Several, Not Joint, Claims</u>. Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

16.16. <u>Severability and Construction</u>. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

16.17. <u>Remedies Cumulative; Specific Performance; Damages</u>.

(a)     All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

(b)     It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

(c)     Notwithstanding anything to the contrary in this Agreement, none of the Parties or any of their respective successors or assigns shall make a claim against, or seek to recover from, any other Party or the successors, assigns, affiliates, directors, officers, employees, counsel, representatives, agents, or attorneys-in-fact of any of them for any special, indirect, consequential, exemplary, or punitive damages or damages for lost profits in respect of any claim for breach of contract or any other theory of liability arising out of or related to this Agreement.

16.18.  <u>Capacities of Consenting Creditors</u>.  Each Consenting Creditor has entered into this Agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.  In addition, the Parties understand that the Consenting Creditors are engaged in a wide range of financial services and businesses.  In furtherance of the foregoing, the Parties acknowledge and agree that, (i) any Affiliates or Related Parties of any Consenting Creditor (including any separate branch of a Consenting Creditor) shall not be deemed to be a Consenting Creditor themselves, unless such Affiliate or Related Party has itself signed this Agreement, (ii) to the extent a Consenting Creditor indicates on its signature page hereto that it is executing this Agreement on behalf of specific trading desk(s), funds, and/or business group(s) of the Consenting Creditor the obligations set forth in this Agreement shall only apply to such trading desk(s), fund(s), and/or business group(s) and shall not apply to any other trading desk, fund, or business group of the Consenting Creditor so long as they are not acting at the direction or for the benefit of such Consenting Creditor or such Consenting Creditor's investment in the Debtors, and (iii) this Agreement does not cover any other Company Claims/Interests other than the Company Claims/Interests that are now owned or subsequently acquired by the Consenting Creditors; <u>provided</u>, <u>that</u>, the foregoing shall not diminish or otherwise affect the obligations and liability therefor of any legal entity that (i) executes this Agreement or (ii) on whose behalf this Agreement is executed by a Consenting Creditor.

16.19.  <u>Survival</u>.  Notwithstanding (i) any Transfer of any Company Claims/Interests in accordance with this Agreement or (ii) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 8.02, Section 14, and any defined terms needed for the interpretation of any such Sections, and the Confidentiality Agreements shall survive such Transfer or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.  For the avoidance of doubt, the Parties

acknowledge and agree that if this Agreement is terminated, <u>Section 12</u> shall survive such termination, and any and all Releases as approved by the Bankruptcy Court shall remain in full force and effect as of the Plan Effective Date. For the avoidance of doubt, the Debtors' obligations (or the obligations of their successors in interest) to promptly pay in full and in cash all earned and accrued Restructuring Expenses through and including the Plan Effective Date and to continue to pay such amounts as they come due in accordance with the April 2026 Notes Indenture and the applicable engagement letters and/or fee arrangements shall survive termination of this Agreement (subject to the terms of the fee arrangements).

16.20. <u>Email Consents</u>. Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to <u>Section 3.02</u>, <u>Section 14</u>, or otherwise, including a written approval by the Debtors, the Consenting ETI Parties or the Required Consenting Creditors, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including email) between each such counsel without representations or warranties of any kind on behalf of such counsel.

16.21. <u>Representation by Counsel</u>. Each Party acknowledges that it has had an opportunity to receive information from the Debtors and that it has been, or is part of a group that has been, or has had an opportunity to be, represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

16.22. <u>Public Disclosure</u>. Other than to the extent required by applicable Law and regulation or by any governmental or regulatory authority, no Party shall disclose to any person (including for the avoidance of doubt, any other Consenting Stakeholder), other than legal, accounting, financial, and other advisors to the Debtors (who are under obligations of confidentiality to the Debtors with respect to such disclosure, and whose compliance with such obligations the Debtors shall be responsible for), the principal amount or percentage of the Company Claims/Interests held by any Consenting Stakeholder or any of its respective subsidiaries (including, for the avoidance of doubt, any Company Claims/Interests acquired pursuant to any Transfer) or the signature page of such Consenting Stakeholder; <u>provided</u>, <u>however</u>, that the Debtors shall be permitted to disclose at any time the aggregate principal amount of, and aggregate percentage of, any class of the Company Claims/Interests held by the Consenting Stakeholders collectively. Notwithstanding the foregoing, the Consenting Stakeholders hereby consent to the disclosure of the execution, terms, and contents of this Agreement by the Debtors in the Definitive Documents to the extent required by Law or regulation; <u>provided</u>, <u>however</u>, that (i) if any of the Debtors determine that it is required to attach a copy of this Agreement, Joinder, or Transfer Agreement to any Definitive Documents or any other filing or similar document relating to the transactions contemplated hereby, to the extent permissible under applicable Law, it will redact any reference to or concerning a specific Consenting Stakeholder's holdings of Company Claims/Interests and such Consenting Stakeholder's signature page and (ii) if disclosure of additional information of any Consenting Stakeholder is required by applicable Law, advance notice of the intent to disclose, if permitted by applicable Law, shall be given by the disclosing Party to each Consenting Stakeholder (who shall have the right to seek a protective order prior to disclosure). The Debtors further agree that such information shall be redacted from "closing sets"

or other representations of the fully executed Agreement, Joinder, or Transfer Agreement. The Debtors shall deliver drafts to the Consenting Creditor Ad Hoc Group Advisors and the Consenting ETI Party Advisors of any press releases and public documents that constitute disclosure of the existence or terms of this Agreement, the Plan Term Sheet, the Restructuring Transactions, or any amendment thereof to the general public (each, a "**Public Disclosure**") at least twenty-four (24) hours before making any such disclosure or, if twenty-four (24) hours is not feasible pursuant to applicable law, then such amount of time feasible pursuant to such applicable law, and such Public Disclosure shall be acceptable to the Consenting Stakeholders. Except as required by law, the Debtors shall avoid making any public disclosure that would disclose either: (a) the holdings of any Consenting Stakeholder (including on the signature pages of the Consenting Stakeholder, which shall not be publicly disclosed or filed) or (b) the identity of any Consenting Stakeholder, in each case without the prior written consent of such Consenting Stakeholder or a final order of a court of competent jurisdiction; provided, however, that notwithstanding anything to the contrary in this Section 16.22, (x) if any disclosure pursuant to this Section 16.22 is required by law, and to the extent not otherwise prohibited by law, the Debtors shall afford the relevant Consenting Stakeholders an opportunity to review and comment in advance of such disclosure, and such Debtors shall take all measures to limit such disclosure and (y) the Debtors shall not be required to keep confidential the aggregate holdings of all Consenting Stakeholders, and each Consenting Stakeholder hereby consents to the disclosure of the execution of this Agreement by the Debtors, and the terms and contents hereof, to the Agents, as applicable, and in any filings required by applicable law or regulation or the rules of any applicable stock exchange or regulatory body.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

**EXELA TECHNOLOGIES BPA, LLC, NEON ACQUISITION, LLC, EXELA INTERMEDIATE LLC, EXELA FINANCE INC., AND XCV-EMEA, LLC, ON BEHALF OF THEMSELVES AND THEIR DEBTOR AFFILIATES.**

By: _____

Name: Randall Eisenberg
Chief Restructuring Officer

**GATES CAPITAL MANAGEMENT, INC.**

Name: Jeffrey L. Gates
Title: Managing Partner

Address:

1177 Ave. of the Americas, 46th Floor
New York, NY 10036

E-mail address(es):

jgates@gatescap.com



AVENUE GLOBAL OPPORTUNITIES MASTER FUND LP
By: Avenue Global Opportunities GenPar Holdings Ltd,
*its general partner*



X

Name: Sonia Gardner
Title: Director


Address:

Avenue Capital Group
Attn: Weikai Lang
11 West 42nd Street, 9th Floor
New York, NY 10036


E-mail address(es): avenueoperations@avenuecapital.com

*Consenting Creditor Signature Page to the Plan Support Agreement*

AVENUE GLOBAL DISLOCATION OPPORTUNITIES FUND, L.P.
By: Avenue Global Dislocation Opportunities GenPar, LLC,
*its general partner,*
By: GL Global Dislocation Opportunities Partners, LLC,
*its managing member*



X

Name: Sonia Gardner
Title: Member

Address:

Avenue Capital Group
Attn: Weikai Lang
11 West 42nd Street, 9th Floor
New York, NY 10036

E-mail address(es): avenueoperations@avenuecapital.com



*Consenting Creditor Signature Page to the Plan Support Agreement*

AVENUE RP OPPORTUNITIES FUND, L.P.
By: Avenue RP Opportunities Fund GenPar, LLC,
*its general partner,*
By: GL RP Partners, LLC,
*its managing member*



**X**

Name: Sonia Gardner
Title: Member

Address:

Avenue Capital Group
Attn: Weikai Lang
11 West 42nd Street, 9th Floor
New York, NY 10036

E-mail address(es): avenueoperations@avenuecapital.com



*Consenting Creditor Signature Page to the Plan Support Agreement*

**EXELA TECHNOLOGIES, INC.**



_____

Name: Par Chadha

Title: Chairman


Address: 2701 E. Grauwyler Rd. Irving, TX

E-mail address(es): pchadha@hgmfund.com

**GP 3XCV LLC**

_____

Name: Par Chadha

Title: Manager

Address: 2701 E. Grauwyler Rd. Irving, TX

E-mail address(es): pchadha@hgmfund.com

_Consenting ETI Party Signature Page to the Plan Support Agreement_

**XCV-STS, LLC**

_____
Name: Par Chadha
Title: Manager


Address: 2701 E. Grauwyler Rd. Irving, TX

E-mail address(es): pchadha@hgmfund.com

**PAR CHADHA (IN HIS CAPACITY AS CHAIRMAN OF THE BOARD OF DIRECTORS OF EXELA TECHNOLOGIES, INC.)**



Name: Par Chadha
Title: Chairman of the board of directors of Exela Technologies, Inc.


Address: 2701 E. Grauwyler Rd. Irving, TX

E-mail address(es): pchadha@hgmfund.com

**GP 2XCV LLC**



_____
Name: Par Chadha
Title: Manager


Address: 2701 E. Grauwyler Rd. Irving, TX

E-mail address(es): pchadha@hgmfund.com

**GENERAL PACIFIC, LLC**



_____
Name: Par Chadha
Title: Manager


Address: 8550 West Desert Inn Road, Suite 102-452 Las Vegas NV 89117

E-mail address(es): pchadha@hgmfund.com

**EXHIBIT A**

**Plan Term Sheet**

## DOCUDATA SOLUTIONS, L.C., *et al.*
## PLAN TERM SHEET

THIS AMENDED TERM SHEET (THIS "*PLAN TERM SHEET*")[1] SETS FORTH THE PRINCIPAL TERMS OF THE RESTRUCTURING TRANSACTIONS AND CERTAIN RELATED TRANSACTIONS CONCERNING THE DEBTORS AGREED TO BY THE DEBTORS, THE DIP LENDERS, EXELA TECHNOLOGIES, INC. (AND CERTAIN OF ITS AFFILIATES), AND THE OTHER PARTIES SIGNATORY TO THE PLAN SUPPORT AGREEMENT (AS DEFINED BELOW). THIS PLAN TERM SHEET DOES NOT CONTAIN A COMPLETE LIST OF ALL TERMS AND CONDITIONS OF THE POTENTIAL TRANSACTIONS DESCRIBED HEREIN. THE RESTRUCTURING TRANSACTIONS SHALL BE CONSUMMATED THROUGH A PLAN OF REORGANIZATION IN THE CHAPTER 11 CASES.

WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THIS PLAN TERM SHEET AND THE UNDERTAKINGS CONTEMPLATED HEREIN ARE SUBJECT IN ALL RESPECTS TO THE NEGOTIATION, EXECUTION, AND DELIVERY OF DEFINITIVE DOCUMENTATION.

THE REGULATORY, TAX, ACCOUNTING, AND OTHER LEGAL AND FINANCIAL MATTERS AND EFFECTS RELATED TO THE RESTRUCTURING TRANSACTIONS OR ANY RELATED RESTRUCTURING OR SIMILAR TRANSACTION HAVE NOT BEEN FULLY EVALUATED AND ANY SUCH EVALUATION MAY AFFECT THE TERMS AND STRUCTURE OF ANY RESTRUCTURING TRANSACTIONS OR RELATED TRANSACTIONS.

THIS PLAN TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES, LOANS, OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN, IT BEING UNDERSTOOD THAT SUCH AN OFFER OR SOLICITATION, IF ANY, WILL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE LAW, INCLUDING THE BANKRUPTCY CODE.

---

[1] Capitalized terms used herein but not defined shall have the meanings given to such terms in, as applicable, the Plan Support Agreement or DIP Credit Agreement (each as defined herein).

| **Plan Term Sheet** |
| --- |
| **Restructuring Overview** |

| Restructuring Overview | The Restructuring Transactions (as defined herein) shall be implemented pursuant to definitive documents (the "***Definitive Documents***") acceptable to the Required Consenting Creditors and the Consenting ETI Parties, and reasonably acceptable to the Official Committee of Unsecured Creditors (the "***Committee***"), through confirmation of a chapter 11 plan (the "***Plan***") in cases commenced by the Debtors under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, *et seq.* (as amended, the "***Bankruptcy Code***") pending in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***" and such cases, the "***Chapter 11 Cases***"). |
| --- | --- |
| | The Restructuring Transactions shall be subject to the Definitive Documents (which shall be in form and substance reasonably acceptable to the Required Consenting Creditors), and the terms of the plan support agreement to which this term sheet is attached as **Exhibit A** (including the exhibits thereto, as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Plan Support Agreement***"). The restructuring transactions (the "***Restructuring Transactions***") will provide for, among other things: |
| | (i)   That the Chapter 11 Cases will be financed by $185,000,000 in post-petition loans and advances to the Borrowers, comprised of $80,000,000 of New Money Loans and $105,000,000 of Roll-Up Loans (the "***DIP Facility***"), with backstop participation and funding of the DIP Facility pursuant to the Interim DIP Order open to all April 2026 Noteholders, and participation in the funding of the DIP Facility pursuant to the Final DIP Order open to all April 2026 Noteholders and July 2026 Noteholders, on the terms and conditions set forth herein and in the Definitive Documentation. |
| | (ii)   The Reorganized Debtors will enter into the Exit Facility (as defined below) and one or more on balance sheet or off balance sheet securitization facilities secured by substantially all of the Debtors' receivables. |
| | (iii)   The Reorganized Debtors will enter into either (a) the Amended Blue Torch Facility (as defined below) or (b) the Gates Exit Facility (as defined below); *provided that* if it is the Gates Exit Facility, the Blue Torch Facility, including any related guarantees, will be repaid with the proceeds of the Gates Exit Facility. |
| | (iv)   Subject to the Definitive Documents or such other structure and documentation as is reasonably acceptable to the Debtors, the Consenting ETI Parties, and the Consenting Creditors, Exela Technologies, Inc. will cause 100% of the equity interests of NEON Acquisition, LLC, and any other material assets and businesses of the Debtors and their Affiliates, including Reaktr.ai, to be contributed to Exela Intermediate LLC ("***Exela Intermediate***"), pursuant to which NEON Acquisition, LLC, a Delaware limited liability company, |

Exela Enterprise Solutions, Inc. (f/k/a Novitex Solutions, Inc.), a Delaware corporation, Novitex Enterprise Solutions Canada, Inc., a Canadian corporation (the "***Neon Transaction***"), and Reaktr.ai (the "***Reaktr.ai Transaction***") will become wholly owned subsidiaries of Exela Intermediate ("***Exela Intermediate***").

(v)   Subject to the Definitive Documents in addition to the Neon Transaction, XCV-EMEA, BTC Int'l Holdings, Inc. ("***BTC***"), XBP Europe Holdings Inc. ("***XBP***") and Exela Intermediate shall effectuate a series of transactions, the form, manner and timing of which shall be satisfactory to the Required Consenting Creditors, XBP, and the other parties thereto, each in their respective sole discretion, which transactions are ultimately intended to result in the contribution, distribution, or cancellation and reissuance of the equity interests in XBP held by BTC pro rata to the holders of Reorganized BPA Equity as of the Plan Effective Date (such precursor distribution of Reorganized BPA Equity as described further below), which contribution, distribution or issuance, as applicable, is intended to qualify, to the extent available, for the exemption from registration provided by Section 1145(a) of the Bankruptcy Code (such transactions, collectively, the "***BTC Transaction***").

(vi)  The July 2026 Notes and the April 2026 Notes, including any related guarantees, will be discharged and cancelled on the terms set forth herein.

(vii) Stakeholder recoveries as set forth in the "Treatment of Claims and Interests" section herein.

(viii) The existing membership interests in BPA will be cancelled on the terms set forth herein.

(ix)  Subject to the Definitive Documents, BPA will issue (a) new equity interests ("***Reorganized BPA Equity***") to the April 2026 Noteholders such that the Consenting ETI Parties receive 27.50% (the "***ETI Equity Distribution***") and the Non-ETI Holders receive 72.50% (the "***Noteholder Equity Distribution***") of such Reorganized BPA Equity (the "BPA Equity Distribution"), in each case subject to dilution by the backstop commitment premium (the "***DIP Backstop Premium***") relating to the DIP Facility (consisting of 5% of the Reorganized BPA Equity outstanding on the Plan Effective Date), the Gates Backstop Premium, and the Reorganized BPA Warrants (defined below) and subject to the July 2026 Noteholder Distribution provided for herein and (b) five year warrants for 7.5% of Reorganized BPA Equity (on a fully-diluted basis as of the Plan Effective Date) with a strike price reflective of the Plan value of Reorganized BPA (the "***Reorganized BPA Warrants***") to the Consenting ETI Parties, all on the terms set forth herein; provided that, the reasonable consent of the Consenting ETI Parties is required with respect to the Reorganized BPA Warrants

<table>
<tr>
<td></td>
<td>definitive documentation or any modifications to the BPA Equity Distribution.</td>
</tr>
<tr>
<td></td>
<td>(x)   Subject to the Definitive Documents, in connection with the restructuring and as a condition precedent to the Effective Date, XBP shall purchase 100% of the Reorganized BPA Equity by issuing its common stock to holders of the Reorganized BPA Equity pro rata for such holders' ownership of Reorganized BPA Equity (the "**XBP Merger**"), and shall issue replacement 5-year warrants for XBP common stock (the "**XBP Warrants**") to holders of Reorganized BPA Warrants in exchange therefor, reflective of the Reorganized BPA Warrants' proportionate ownership interest in BPA and otherwise upon the same terms thereof, all on terms acceptable to the Required Consenting Creditors, XBP and the Debtors pursuant to a mutually acceptable merger agreement or such other structure and documentation as is reasonably acceptable to the Debtors, the Consenting ETI Parties, and the Consenting Creditors (the "**XBP Merger Agreement**").</td>
</tr>
<tr>
<td></td>
<td>(xi)   All shares of XBP to be distributed, issued or otherwise transferred to holders of Reorganized BPA Equity in connection with the BTC Transaction and the XBP Merger shall not be subject to any lock-up or similar holdback in connection with such distribution or issuance, and shall be entitled to customary registration rights acceptable to the Required Consenting Creditors, in their respective sole discretion, including shelf registration rights (to be effected contemporaneously with or promptly after the Plan Effective Date), demand registration rights, and piggyback registration rights.</td>
</tr>
<tr>
<td>**Debt to Be Restructured**</td>
<td>All claims held by holders of Exela Intermediate's and Exela Finance's 11.500% First-Priority Senior Secured Notes due 2026 (the "**April 2026 Notes**" and such holders, the "**April 2026 Noteholders**") derived from, based upon, or secured by the Indenture ("**April 2026 Notes Indenture**"), dated as of July 11, 2023, among Exela Intermediate, Exela Finance, the guarantors and affiliated guarantors party thereto and U.S. Bank Trust Company, National Association, as trustee, which April 2026 Notes have $1,252,267,105 in principal outstanding as of the date of this Plan Term Sheet, plus all fees, expenses, costs, and other charges arising under or related to the April 2026 Notes (the "**April 2026 Notes Claims**").

All claims held by holders of Exela Intermediate's and Exela Finance, LLC's ("**Exela Finance**") 11.500% First-Priority Senior Secured Notes due 2026 (the "**July 2026 Notes**" and such holders, the "**July 2026 Noteholders**") derived from, based upon, or secured by the Indenture ("**July 2026 Notes Indenture**"), dated as of December 19, 2021, among Exela Intermediate, Exela Finance, the guarantors and affiliated guarantors party thereto and U.S. Bank Trust Company, National Association, as trustee, which July 2026 Notes have $23,953,211 in principal outstanding as of the date of this Plan Term Sheet, plus all fees, expenses, costs, and other charges arising under or related to the July 2026 Notes (the "**July 2026 Notes Claims**"). As a result of a prior exchange offer, the July 2026 Notes</td>
</tr>
</table>

| | |
|---|---|
| | Claims are unsecured. |
| | All claims held by the lenders party to the Financing Agreement, dated as of July 11, 2023 (the "***Financing Agreement***"), among Exela Intermediate, Exela Finance, the guarantors and affiliated guarantors party thereto, the lenders listed in Schedule 1.01(A) to the Financing Agreement, as lenders (such lenders, collectively, "***Blue Torch***"), and Blue Torch Finance LLC, as administrative agent, which Financing Agreement has $38,500,000 of principal outstanding as of the date of this Plan Term Sheet (the "***Blue Torch Facility***"), plus all fees, expenses, costs, and other charges arising under or related to the Financing Agreement (the "***Blue Torch Claims***"). |
| **DIP Facility** | The Debtors shall seek, and the Consenting Creditors and the Consenting ETI Parties shall support, entry of a Final DIP Order approving the DIP Facility on a final basis and approving a final draw of $30,000,000 in New Money Loans and a roll-up of April 2026 Notes on a 1:1 ratio thereto, and otherwise substantially in the form of the Final DIP Order attached hereto. |
| **Exit Facility** | On the Plan Effective Date, subject to the treatment of the DIP Claims of the Sub-Group DIP Lenders as set forth below in the DIP Claims Treatment section, the DIP Loans shall roll into an exit facility (the "***Exit Facility***") in the form of 5 year senior secured notes (the "***Exit Notes***") pursuant to exit financing documentation (such documents governing the Exit Facility, the "***Exit Facility Documents***") which shall be in all material respects acceptable to the Debtors, and the Required Consenting Creditors; *provided that* the Exit Facility shall include the following terms, provided further that such terms shall not be amended in a manner more economically favorable to the Exit Facility lenders without the consent of the Debtors, the Consenting ETI Parties and the Required Consenting Creditors: <br><br> • Call Protection: None. <br><br> • Operating Covenants: Customary for high yield bonds with LM protections for JCrew, Chewy, Double-DIP, Envision, Serta and anti-layering. <br><br> • Financial Covenants: None. <br><br> • Interest Rate: 12% payable in cash (with 2% default rate). <br><br> • Maturity: 5 years. <br><br> • Amortization: None. <br><br> • Accordion: $10,000,000 uncommitted accordion facility within the Exit Notes. |
| **ETI Funding Obligation** | The Consenting ETI Parties shall provide a commitment to pay (A) the first $15,000,000 (the "***Initial ETI Funding Obligation***") owed by the Debtors or Reorganized Debtors in connection with any federal, state or local tax liability arising or resulting from or being triggered by (1) the transactions occurring under the Plan, (2) the steps taken under the Definitive |

Documents and/or (3) the Governance Changes[2] including any related or similar transactions, in each case as determined by independent tax advisors Ernst & Young for the purpose of determining applicable federal, state or local tax liability (such advisor the "***Independent Tax Advisor***," and such liability the "***Transaction Tax Liability***") and (B) any Transaction Tax Liability in excess of $25,000,000 (the "***Subsequent ETI Funding Obligation,***" and together with the Initial ETI Funding Obligation, the "***ETI Funding Obligation***"). Any settlement of the Transaction Tax Liability prior to the Plan Effective Date shall require the consent of the Required Consenting Creditors (such consent not to be unreasonably withheld), and after the Plan Effective Date, shall require the consent of the Board of the Reorganized Debtors (such consent not to be unreasonably withheld). For the avoidance of doubt, any amounts of the Transaction Tax Liability between $15,000,000 and $25,000,000 shall be the obligation of the Reorganized Debtors.

Payment of the ETI Funding Obligation may be in the form of the purchase for cash of $15,000,000 of Exit Notes or, subject to agreement between the Consenting ETI Parties, the Company and the Required Consenting Creditors on plan equity value (the "***Plan Equity Value***"), the purchase of equity for $15,000,000 in cash at Plan Equity Value.

At the Effective Date all New Common Stock received by the relevant Consenting ETI Parties pursuant to the Plan shall be deposited or placed in a segregated account or given to a collateral agent pursuant to documentation in form and substance reasonably satisfactory to the Debtors and the Required Consenting Creditors ("***Restricted ETI Shares***"), *provided that* such documentation shall permit the relevant Consenting ETI Parties to sell such shares so long as the proceeds are applied to the ETI Funding Obligation. The documentation shall provide that if the Consenting ETI Parties fail to pay the ETI Funding Obligation when due (as determined by the Independent Tax Advisor), the Reorganized Debtors shall be permitted, and the Consenting ETI Parties shall consent to, the Reorganized Debtors directing the sale of the ETI Restricted Shares to satisfy the ETI Funding Obligation (inclusive of any fees and expenses incurred by the Reorganized Debtors in connection with the sale of the Restricted ETI Shares).

Following payment of the Initial ETI Funding Obligation through purchase of Exit Notes, 50% of the Restricted ETI Shares shall be released; *provided that* if the Initial ETI Funding Obligation is satisfied through an equity investment at Plan Equity Value on the Effective Date, then 90% of the Restricted ETI Shares shall be released following payment of the Initial ETI Funding Obligation. Upon payment in full of the Transaction Tax Liability (as such Transaction Tax Liability is determined by the Independent Tax Advisor) and satisfaction of the ETI Funding Obligations, the Restricted ETI Shares shall be released.

---

[2] As defined in the *ETI Entities' Statement and Reservation of Rights Regarding the Motion of the Debtors for Interim and Final Orders (I) Authorizing The Debtors to Obtain Postpetition Financing, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [D.I. 168].

| | |
|---|---|
| **XBP Revolver Commitment** | As a condition to closing, XBP will borrow under and in accordance with its existing facility (whether through accordion or otherwise) for an incremental $18,000,000 (the "***XBP Funding***"). XBP shall make available the XBP Funding to the Reorganized Debtors (the "***XBP Funding Distribution***") on the Effective Date in accordance with the applicable loan documentation. If either (a) a commitment for the XBP Funding is not obtained prior to the confirmation objection deadline (as it may be extended or adjourned) or (b) the XBP Funding Distribution has not occurred on or prior to the Effective Date, the ETI Equity Distribution shall be reduced to 12.5% with the other 15% increasing the Noteholder Equity Distribution to 87.5% (the "***ETI Penalty***"). |
| | As an alternative to the XBP Funding, the Consenting ETI Parties can fund the XBP Funding (the "***XBP Alternative Funding***"), including by purchasing, for cash, $18,000,000 of (a) Exit Notes on the Effective Date or (b) Reorganized BPA Equity at Plan Equity Value. If the Consenting ETI Parties exercise the XBP Alternative Funding, no ETI Penalty shall occur and the Consenting ETI Parties shall be entitled to a fee that is equal to 1.4% of New Common Stock of the Reorganized BPA Equity, *provided that* the Consenting ETI Parties shall only be entitled to a fee if the Consenting ETI Parties fund the entire $18,000,000 of the XBP Alternative Funding. |
| **Gates Backstop Commitment; Gates Exit Facility** | Gates shall provide the Debtors with a Backstop Commitment with respect to repayment of the Blue Torch Facility (the "***BT Replacement Facility***"), for which Gates' Backstop Commitment shall be in the amount of $40,000,000, and which BT Replacement Facility shall also consist of (i) $6,000,000 to repay the DIP Claims of the Sub-Group DIP Lenders under the Interim Order and (ii) an uncommitted $10,000,000 incremental facility as provided for in the existing Blue Torch Facility, on the following terms: |
| | • <u>Funding Commitment</u>: Commitment to fund 50.01% of cash required to repay the Blue Torch Facility on the same terms as such facility, except as expressly provided below; |
| | • <u>Backstop Commitment</u>: Remaining funding of 49.99% of cash required to repay Blue Torch Facility open to all April 2026 Noteholders and July 2026 Noteholders and backstopped by Gates; |
| | • <u>Backstop Fee</u>: In exchange for the Funding Commitment and Backstop Commitment, Gates shall be paid a fee equal to 4% of New Common Stock of the Reorganized BPA Equity (the "***Gates Backstop Premium***"); |
| | • <u>Call Protection</u>: 102, 101, 100; |
| | • <u>Maturity</u>: 3 years; |
| | • <u>Amortization</u>: None; |
| | • <u>Required Lenders</u>: Majority of outstanding loans; |

<table>
<tr><td></td><td>

- <u>Other terms</u>: consistent with the Blue Torch Facility (including interest rate and fees) which interest shall be paid in cash; *provided that* the intercreditor agreement to be amended such that no senior financing (including DIP financing) is permitted; and

- <u>Seniority</u>: Senior to the exit notes.

In the event that projected unrestricted cash on hand at the Effective Date (as determined in good faith by the CRO) exceeds $35,000,000 then the Funding Commitment and Backstop Commitment shall be reduced pro rata dollar for dollar and the Debtors' excess cash shall be used to pay down any portion of the Blue Torch Facility otherwise to be funded by the Funding Commitment and Backstop Commitment.

</td></tr>
</table>

| Treatment of Claims and Interests |
|---|

Each Holder of an allowed Claim or Interest, as applicable, shall receive the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's allowed Claim or Interest.

| Type of Claim | Treatment | Impairment/ Voting |
|---|---|---|
| **Securitization Program Superpriority Claims** | On the Plan Effective Date, except to the extent that a Holder of a superpriority administrative expense claim arising from the Debtors' securitization programs agrees to less favorable treatment, such claim, if any, shall be paid in full in cash in accordance with the terms of the documents governing the relevant securitization facility. | N/A |
| **Administrative Claims** | Except to the extent that a Holder of an Allowed Administrative Claim and the Debtor against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, each Holder of an Allowed Administrative Claim shall receive, in full satisfaction of its Claim, payment in full in cash. | N/A |
| **DIP Claims** | Notwithstanding anything to the contrary in the Plan, in exchange for full and final satisfaction, settlement, release, and discharge of such Allowed DIP Claims, each Holder of such an Allowed DIP Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed DIP Claims, an equal amount of Exit Notes under the Exit Financing Facility; provided, that, (i) the DIP Claims of the Sub-Group DIP Lenders under the Interim Order shall receive, pro rata amongst the Sub-Group DIP Lenders, $6,000,000 of notes under the BT Replacement Facility and $25,931,859.45 of Exit Notes and (ii) the DIP Claims of the Sub-Group DIP Lenders under the Final DIP Order, if any, shall receive Exit Notes and the Sub-Group DIP Lenders expressly agree to this treatment. | N/A |

| | | |
|---|---|---|
| **Priority Tax Claims** | Priority Tax Claims shall be Allowed in an aggregate amount of no greater than as set out in the schedule to the Plan by applicable taxing authority and corresponding Allowed amount.  Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code in the form of five (5) equal payments over five (5) years. | N/A |
| **Other Secured Claims** | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim shall receive, at the option of the applicable Debtor or Reorganized Debtor and with the reasonable consent of the Required Consenting Creditors either:<br><br>(i)  payment in full in cash of its Allowed Other Secured Claim;<br><br>(ii)  the collateral securing its Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;<br><br>(iii)  reinstatement of its Allowed Other Secured Claim; or<br><br>(iv)  such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | Unimpaired / Presumed to Accept |
| **Priority Non-Tax Claims** | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | Unimpaired / Presumed to Accept |
| **Prepetition Term Loan Claims** | On the Plan Effective Date, in full and final satisfaction, settlement, release, and discharge of such Claims, the Prepetition Term Loan Claims shall be paid in full in cash. | Unimpaired / Presumed to Accept |
| **April 2026 Notes Claims** | On the Plan Effective Date, each Holder of an Allowed April 2026 Notes Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed April 2026 Notes Claim, either (i) if such Holder is not ETI or an ETI Holder, its Noteholder Pro Rata Share of the Noteholder Equity Distribution or (ii) if such Holder is ETI or an ETI Holder, its ETI Pro Rata Share of the ETI Equity | Impaired / Entitled to Vote |

| | | |
|---|---|---|
| | Distribution, in each case, in accordance with the Definitive Documents and subject to dilution by the DIP Backstop Premium, the Gates Backstop Premium, and the Reorganized BPA Warrants and subject to the July 2026 Noteholder Distribution; *provided that* as part of the Restructuring Transactions, substantially contemporaneously therewith and in connection with the XBP Merger, all Holders of April 2026 Notes Claims (together with holders of Reorganized BPA Equity on account of the DIP Backstop Premium, and Gates Backstop Premium) shall, pursuant to the Definitive Documents, (x) transfer their New Parent Interests to XBP in exchange for their respective XBP Merger Pro Rata Share of newly issued Post-Merger XBP Stock and (y) exchange their Reorganized BPA Warrants for XBP Warrants. | |
| **General Unsecured Convenience Class Claims** | On the Plan Effective Date, in full and final satisfaction, settlement, release, and discharge of such Claims, General Unsecured Convenience Class Claims of an amount less than $25,000 shall be paid in cash from the proceeds of the Exit Facility in an amount equal to no less than 70% of their Allowed General Unsecured Convenience Class Claim amount. | Unimpaired / Presumed to Accept |
| **July 2026 Notes Claims** | On the Plan Effective Date, in full and final satisfaction, settlement, release, and discharge of such Claims, each Holder of an Allowed July 2026 Notes Claims shall receive, as a carve out of collateral (or the value of such collateral) securing the April 2026 Notes Claims, a percentage of the Reorganized BPA Equity equal (A) to their pro rata holdings of April 2026 Notes Claims and July 2026 Notes Claims (calculated with the numerator being the outstanding July 2026 Notes Claims and the denominator being the April 2026 Notes Claims plus the July 2026 Notes Claims less any Roll-Up Loans) divided by (B) an amount equal to one (1) minus (i) the Noteholder Equity Distribution (i.e., 72.5%) minus the "Non-ETI April 26 Noteholders Pro Rata Holdings of the April 2026 Notes" divided (ii) by the Noteholder Equity Distribution (i.e., 72.5%) (the "*July 2026 Noteholder Distribution*"); *provided that* as part of the Restructuring Transactions, substantially contemporaneously therewith and in connection with the XBP Merger, all Holders of July 2026 Notes Claims shall, pursuant to the Definitive Documents, transfer their New Parent Interests to XBP in exchange for their respective XBP Merger Pro Rata Share of newly issued Post-Merger XBP Stock. <br><br> The July 2026 Noteholder Distribution shall reduce pro rata the Noteholder Equity Distribution and the ETI Equity Distribution. The Noteholder Equity Distribution, ETI Equity Distribution, and July 2026 Noteholder Distribution shall be subject to dilution from the DIP Backstop Premium and the Gates Backstop Premium. <br><br> "Non-ETI April 2026 Noteholders Pro Rata Holdings of the April 2026 Notes" means April 2026 Notes Claims not beneficially | Impaired / Entitled to Vote |

| | owned by Consenting ETI Parties divided by all April 2026 Notes Claims, in both cases deducting the Roll-Up Loans. The respective financial advisors for the Debtors, the Required Consenting Creditors and the Creditors' Committee have agreed on an excel spreadsheet for purposes of effectuating the above calculation. | |
|---|---|---|
| **General Unsecured Claims** | On the Plan Effective Date, in full and final satisfaction, settlement, release, and discharge of such Claims, Holders of Allowed General Unsecured Claims shall receive, as a carve out of collateral (or the value of such collateral) securing the April 2026 Notes Claims, their Pro Rata Share of the Unsecured Cash Pool, which each Allowed General Unsecured Claim being paid out over the following schedule (collectively the "***GUC Payment Obligations***"):<br><br>• 1/3 of such Allowed General Unsecured Claims paid within 9 months of the Plan Effective Date;<br><br>• 1/3 of such Allowed General Unsecured Claims paid within 18 months of the Plan Effective Date; and<br><br>• 1/3 of such Allowed General Unsecured Claims, paid within 27 months of the Plan Effective Date.<br><br>Holders of Allowed General Unsecured Claims shall be entitled to interest on such GUC Payment Obligations, with interest accruing at 4% per annum, paid in-kind, commencing on the Plan Effective Date. The GUC Payment Obligations shall be secured by collateral reasonably acceptable to the Debtors, the Required Consenting Creditors, and the Committee. | Impaired / Entitled to Vote |
| **Intercompany Claims** | On or as soon as reasonably practicable after the Effective Date, all Intercompany Claims will be adjusted, Reinstated, or discharged, as determined by the Debtors or the Reorganized Debtors with the reasonable consent of the Required Consenting Creditors, or as provided in the Definitive Documents. | Impaired / Deemed to Reject or Unimpaired / Presumed to Accept |
| **Intercompany Interests** | On or as soon as reasonably practicable after the Effective Date, all Intercompany Interests will be adjusted, Reinstated, or discharged as determined by the Debtors or the Reorganized Debtors with the reasonable consent of the Required Consenting Creditors, or as provided in the Definitive Documents. | Unimpaired / Presumed to Accept |
| **Section 510(b) Claims** | On the Plan Effective Date, all Section 510(b) Claims shall be cancelled, released, discharged, and extinguished and shall be of no further force or effect, and holders of Section 510(b) Claims shall not receive any distribution on account of such Section 510(b) Claims. | Impaired / Deemed to Reject |

| Existing BPA Equity Interests | On the Plan Effective Date, Holders of Existing BPA Equity Interests are not entitled to receive a recovery or distribution on account of such Existing BPA Equity Interests. On the Plan Effective Date, Existing BPA Equity Interests shall, subject to the Definitive Documents, be canceled, released, discharged, and extinguished, and shall be of no further force or effect. | Impaired / Deemed to Reject |
|---|---|---|
| Other Existing Equity Interests | On the Plan Effective Date, Holders of Other Existing Equity Interests are not entitled to receive a recovery or distribution on account of such Other Existing Equity Interests. On the Plan Effective Date, Other Existing Equity Interests shall be either (i) treated in accordance with the Definitive Documents or (ii) canceled, released, discharged, and extinguished, and shall be of no further force or effect. | Impaired / Deemed to Reject |

| **Additional Terms** | | |
|---|---|---|
| **Committee Settlement** | Pursuant to the terms of the settlement reached with the Committee (the "*Committee Settlement*") pursuant to rule 9019 of the Bankruptcy Rules, the following additional terms shall be incorporated into the Plan: <ul><li>Committee Professional Fees and Indenture Trustee Fees. All fees for professionals retained by the Committee shall be capped at $2.75 million, *less* amounts paid to the July 2026 Indenture Trustee, *plus* amounts allocated by agreement between the Debtors and the Committee from (a) the Unsecured Cash Pool or (b) funds otherwise allocable to increase the Convenience Class Treatment.</li><li>Claims Reconciliation. The Required Consenting Creditors, Debtors and Committee shall work in good faith to agree on an appropriate and cost effective claims reconciliation process including, but not limited to, a potential engagement of a claims ombudsman.</li><li>Preference Claims. Upon the Effective Date, the Debtors and their estates shall waive preference claims against Holders of General Unsecured Claims.</li><li>Plan Support. In consideration for the settlement contemplated by the Committee Settlement and as more fully set out in the Plan, the Committee shall support the Plan and recommend to its constituents that they vote to accept the Plan and shall support the relief and treatment (including such releases as agreed and granted by the Debtors and other supporting parties) provided for in the Plan and the other Definitive Documents.</li><li>April 2026 Notes Deficiency Claims. April 2026 Notes Deficiency Claims shall be waived and shall not recover from the Unsecured Cash Pool.</li></ul> | |
| **Definitive Documents** | This Plan Term Sheet does not include a description of all the terms, conditions, and other provisions that will be contained in the Definitive Documents, which shall be as set forth in the applicable term sheets and otherwise subject to the consent rights set forth in the Plan Support Agreement. | |

| Organizational Documents and Governance | Debtors: |
|---|---|
| | • Randall Eisenberg and Steven Spitzer of AlixPartners shall remain CRO and Deputy CRO, respectively. |
| | • Alan Carr shall continue to serve as the disinterested director of Debtor Exela Intermediate during the Chapter 11 Cases. |
| | Reorganized Debtors: Any documentation evidencing the corporate governance for the Reorganized Debtors, including charters, bylaws, limited liability company agreements, shareholder agreements and any other customary organizational documents shall be consistent with the Plan Support Agreement and acceptable to the Required Consenting Creditors. |
| Shareholder Rights Plan | XBP shall agree to a shareholder rights plan triggered at no lower than 27.5% and no higher than 30% ownership threshold, whereby a holder (combined with affiliates and related parties) cannot cross ownership threshold unless same offer is made to all holders. |
| New Board of Directors of Reorganized BPA and MergerCo | Seven members, including (a) the CEO, (b) two members selected by the Consenting ETI Parties, and (c) four members selected by the Consenting Creditors (other than the Consenting ETI Parties and holders of July 2026 Notes); *provided that*, if the ETI Penalty occurs, the board shall be (a) the CEO, (b) one member selected by the Consenting ETI Parties, and (c) five members selected by the Consenting Creditors (other than the Consenting ETI Parties and holders of July 2026 Notes Claims). |
| | All members of the new Board shall be up for election in accordance with the terms of the Reorganized Debtors' new organizational documents and the Board must meet the listing requirements for independence. |
| Releases | Customary estate and third-party releases (subject to opt-out), subject to the Debtors' investigation into estate claims and causes of action, which investigation shall be completed no later than the Confirmation Hearing. |
| Exculpation | The Plan shall provide for customary exculpation provisions in favor of released parties to the extent permitted under applicable law. |
| Indemnification | The Plan shall provide for the funding of a standalone insurance policy for the Debtors and a "tail" insurance policy for the Debtors' current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals, solely in their capacities as such for the Debtors. All other indemnification agreements shall be rejected and not assumed under the Plan. |
| Tax Matters | The Restructuring Transactions shall be structured in a tax-efficient manner to the Reorganized Debtors and the tax structure shall be subject to the reasonable consent of the Required Consenting Creditors, the Consenting ETI Parties, and the Debtors. |
| Executory Contracts | All contracts of the Debtors shall be assumed except (a) contracts set forth on a rejection schedule to be filed with the Plan Supplement and (b) related party |

| | |
|---|---|
| | contracts unless such related party contracts are expressly assumed on a schedule to be filed with the Plan Supplement. The Required Consenting Creditors shall have consent rights over the rejection schedule and the related party contracts schedule and may designate contracts for such schedules. |
| **Exit Securitization Programs** | Debtors shall use commercially reasonable efforts to enter into one or more securitization programs, either on balance sheet or off balance sheet, in each case secured by a first lien on substantially all receivables, that consist of economic terms superior to those of the Prepetition Securitization Programs and the Postpetition Securitization Programs (subject to reasonable modifications made in connection with such facilities becoming a post-emergence facilities) or other alternative exit financing (if any) to refinance or replace the Postpetition Securitization Programs, as applicable, *provided that*, any such alternative exit financing shall also be on economic terms superior to those of the Prepetition Securitization Programs and the Postpetition Securitization Programs. |
| **Plan Supplement** | All documents included in the Plan Supplement shall be in form and substance acceptable to the Required Consenting Creditors and shall be filed no later than seven (7) days prior to the Confirmation Hearing and, as provided in the Plan Support Agreement, the Consenting ETI Parties. |
| **Restructuring Expenses** | The Debtors shall pay the reasonable and documented fees and expenses of (i) Ropes & Gray LLP as counsel to, and SOLIC Capital Advisors, LLC as financial advisor to, the Consenting Creditor Ad Hoc Group; (ii) as provided for in the Plan Support Agreement, Cleary Gottlieb Steen & Hamilton LLP as counsel to the Consenting ETI Parties; (iii) as provided for in the Plan Support Agreement, XBP; and (iv) advisors to the Sub-Group DIP Lenders in an amount not to exceed $500,000 in the aggregate. On the Plan Effective Date, all reasonable and documented fees and out-of-pocket expenses incurred by the advisors to the counterparties to the Debtors' securitization program facilities shall be paid in full in cash in accordance with the terms of the documents governing the relevant securitization facility. |
| | In addition, as set forth herein and in the Committee Settlement, the Debtors shall, subject to the terms and conditions of the Committee Settlement, pay the reasonable and documented fees and expenses of the Committee's professionals and the trustee under the July 2026 Indenture. |
| **Milestones** | The Restructuring Transactions shall be effectuated in accordance with the Milestones set forth in the Plan Support Agreement. |
| **Modifications to Restructuring Steps** | The parties shall work together in good faith to consider any modifications, which modifications shall be reasonably satisfactory to the Debtors and the Required Consenting Creditors and the Consenting ETI Parties in all respects, to implement the structure in a tax-efficient and cost-effective manner to the parties. |

| | |
|---|---|
| **Conditions Precedent to the Plan Effective Date** | It shall be a condition to the Plan Effective Date that the following conditions shall have been satisfied or waived (in accordance with customary waiver provisions to be contained in the Plan): |

> (i) XBP shall have agreed to take all necessary actions in furtherance of the Restructuring Transactions including, without limitation, execution of Definitive Documents to which XBP is a party, which shall be in form and substance reasonably acceptable to XBP.
>
> (ii) The XBP Merger (or other combination with XBP) shall have occurred and been consummated.
>
> (iii) The Plan Support Agreement shall not have been terminated as to the Required Consenting Creditors or the Consenting ETI Parties and shall be in full force and effect;
>
> (iv) The Bankruptcy Court shall have entered the Final DIP Order;
>
> (v) The ETI Funding Obligation shall be in full force and effect;
>
> (vi) The transactions contemplated by the Restructuring Transactions Exhibit shall have been consummated;
>
> (vii) The Plan shall contain the Releases;
>
> (viii) The Bankruptcy Court shall have entered the Confirmation Order in form and substance materially consistent with and subject to the consent rights set forth in the Plan Support Agreement;
>
> (ix) The Exit Facility Documents shall have been executed (or deemed executed) and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the Debtors, and the Required Consenting Creditors), other than such conditions that relate to the effectiveness of the Plan and related transactions;
>
> (x) The XBP Funding or the XBP Alternative Funding has occurred or will occur simultaneously with the Plan Effective Date;
>
> (xi) The final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements, and exhibits to the Plan shall be consistent with the Plan Support Agreement and otherwise approved by the parties thereto consistent with their respective consent and approval rights to be set forth in the Plan Support Agreement, and shall have been filed in a manner consistent with the Plan Support Agreement;
>
> (xii) All Restructuring Expenses shall have been paid in full in cash;

| | |
|---|---|
| | (xiii) The Definitive Documents shall (i) be materially consistent with the Plan Support Agreement and otherwise approved by the Required Consenting Creditors, the Consenting ETI Parties, and the Debtors consistent with their respective consent and approval rights to be set forth in the Plan Support Agreement, (ii) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties, and (iii) shall be adopted on terms materially consistent with the Plan Support Agreement and this Plan Term Sheet; and |
| | (xiv) The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, actions, documents, and other agreements that are necessary to implement and effectuate the Plan and each of the other Restructuring Transactions. |

| Certain Definitions | |
|---|---|
| Allowed | With respect to any Claim or Interest, a Claim or an Interest expressly allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable.  For the avoidance of doubt, (a) there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan, and (b) the Debtors (with the consent of the Required Consenting Creditors, which shall not be unreasonably withheld, delayed, or conditioned), may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable nonbankruptcy law; *provided, however* that the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are reinstated or otherwise unimpaired pursuant to the Plan. |
| Amended Blue Torch Facility | Any financing agreement the Reorganized Debtors enter into with Blue Torch. |
| April 2026 Notes Deficiency Claims | To the extent that any April 2026 Notes Claims are undersecured, an unsecured Claim equal to the difference in value between the full amount of such April 2026 Notes Claim and the value of the collateral securing such April 2026 Notes Claims. |
| Confirmation Date | The date upon which the Bankruptcy Court confirms the Plan pursuant to section 1129 of the Bankruptcy Code. |
| Consenting Creditors | Holders or beneficial holders of, or nominees, investment advisors, sub-advisors, or managers of discretionary accounts or funds that hold or beneficially hold, April 2026 Notes Claims that have executed and delivered counterpart signature pages to the Plan Support Agreement. |
| Consenting ETI Parties | ETI and ETI Holders. |

| | |
|---|---|
| **Consenting Stakeholders** | Collectively, the Consenting Creditors and Consenting ETI Parties. |
| **Definitive Document** | The definitive documents and agreements related to or otherwise utilized to implement, effectuate, or govern the Restructuring Transactions, to be set forth in the Plan Support Agreement. |
| **DIP Lenders** | Means collectively, (a) each financial institution and other persons listed on Schedule 1.01(A) to the DIP Credit Agreement as having Commitments and (b) each financial institution or other person that becomes a party to the DIP Credit Agreement pursuant to an Election Joinder or Assignment and Assumption that shall hold Commitments or New Money Loans, other than, in each case, any such financial institution or person that has ceased to be a party to the DIP Credit Agreement pursuant to an Assignment and Assumption. |
| **ETI** | Exela Technologies, Inc. |
| **ETI Holders** | Collectively, GP 3XCV LLC and XCV-STS LLC, each of which is a non-Debtor Affiliate subsidiary of ETI and any of their respective successors and assigns with respect to April 2026 Notes Claims. |
| **ETI Pro Rata Share** | With respect to the ETI Equity Distribution on account of an Allowed Claim, the ratio (expressed in a percentage) that the amount of such Allowed Claim bears to the aggregate amount of all Allowed April 2026 Notes Claims that are held by ETI or the ETI Holders; for the avoidance of doubt, any modifications to the ETI Pro Rata Share shall require the consent of the Consenting ETI Parties. |
| **Existing BPA Equity Interests** | All equity interests of Exela Technologies BPA, LLC, which are 100% owned by ETI. |
| **Exit Notes** | The notes under the Exit Facility. |
| **General Unsecured Claims** | Any Claim that is not: (a) a DIP Claim; (b) an Administrative Claim; (c) an April 2026 Notes Claim; (d) a July 2026 Notes Claim; (e) an Intercompany Claim; (f) an Other Priority Claim; (g) an Other Secured Claim; (h) a Priority Tax Claim; or (i) a Section 510(b) Claim. For the avoidance of doubt, General Unsecured Claims shall not include April 2026 Notes Deficiency Claims. |
| **Holder** | A Person or an Entity holding a Claim against, or an Interest in, any Debtor, as applicable. |
| **Impaired** | With respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code. |
| **Intercompany Claims** | Any Claim against a Debtor held by another Debtor. |
| **Intercompany Interests** | Any Interest in a Debtor held by another Debtor. |

| **Non-ETI Holder** | A holder of April 2026 Notes that is not ETI or an ETI Holder. |
|---|---|
| **Pro Rata Share** | Except as provided herein, Pro Rata Share means, with respect to any Distribution on account of an Allowed Claim, a distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the aggregate amount of all Allowed Claims in its Class. |
| **Other Priority Claims** | Any Claim, other than an Administrative Claim, a Priority Tax Claim, or a DIP Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code. |
| **Other Secured Claims** | Any Secured Claim against the Debtors, other than the DIP Claims, Blue Torch Facility Claims, April 2026 Notes Claims, or July 2026 Notes Claims. |
| **Plan Effective Date** | The date that is the first business day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the occurrence of the Plan Effective Date set forth in the Plan have been satisfied or waived in accordance with the terms of the Plan. |
| **Required Consenting Creditors** | Consenting Stakeholders holding at least 50.01% of the aggregate principal amount of April 2026 Notes Claims that are held by all Consenting Stakeholders. |
| **Rollover Exit Notes** | Senior secured notes in an aggregate outstanding principal amount equal to the Obligations outstanding on the Plan Effective Date, which Exit Notes shall be funded on a cashless basis by rolling over such outstanding Obligations (as defined in Exhibit 2.14 to the DIP Credit Agreement). |
| **Section 510(b) Claims** | Any Claim against any Debtor: (a) arising from the rescission of a purchase or sale of an equity security as defined in section 101(17) of the Bankruptcy Code (including the Employee Partnership Sale Units) of any Debtor or an Affiliate of any Debtor; (b) for damages arising from the purchase or sale of such an equity security made to the Debtors prior to the Petition Date; (c) for reimbursement or contribution allowed under section 502(e) of the Bankruptcy Code on account of such a Claim; and (d) any other claim determined to be subordinated under section 510(b) of the Bankruptcy Code. |
| **Unimpaired** | With respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code. |
| **Unsecured Cash Pool** | Cash in the amount of $4.75 million less any amounts paid to reimburse Committee Professional Fees and Indenture Trustee Fees in accordance with the Committee Settlement. |

## EXHIBIT B

## Joinder

The undersigned hereby acknowledges that it has reviewed and understands the Plan Support Agreement dated as of [●] (as amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**Agreement**"), by and among the Debtors (as defined in the Agreement) and the Consenting Stakeholders (as defined in the Agreement) and agrees to be bound as a Consenting Stakeholder by the terms and conditions thereof binding the on the Consenting Stakeholders. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement, a copy of which is attached hereto as Annex I.

The undersigned hereby makes the representations and warranties of the Consenting Stakeholders set forth in Section 10 of the Agreement to the Debtors, effective as of the date hereof.

This Joinder Agreement shall be governed by the governing law set forth in the Agreement.

Date: [●], 202[●]


[CONSENTING STAKEHOLDER]

[●]
By: [●]

By: _____
           Name:

Title:

## EXHIBIT C

### Provision for Transfer Agreement

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Plan Support Agreement, dated as of [●], 2025 (the "**Agreement**"),[1] by and among the Debtors and the Consenting Stakeholders, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Stakeholder" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____

Name:
Title:
Address:
E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| April 2026 Notes | |
| July 2026 Notes | |
| Equity Interests | |
| Other Disclosable Economic Interests in relation to the Debtors (including participation interests, hedges, swaps, and derivatives) | |

---

[1]  Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.

## SCHEDULE 1

### Debtors

| Entity Name |
| --- |
| BancTec (Canada), Inc. |
| BancTec (Puerto Rico), Inc. |
| BancTec Group LLC |
| BancTec Intermediate Holding, Inc. |
| BancTec, Inc. |
| BTC Ventures, Inc. |
| Charter Lason, Inc. |
| CorpSource Holdings, LLC |
| Deliverex, LLC |
| DFG2 Holdings, LLC |
| DFG2, LLC |
| DocuData Solutions, L.C. |
| Economic Research Services, Inc. |
| Exela Enterprise Solutions, Inc. |
| Exela Finance Inc. |
| Exela Intermediate LLC |
| Exela RE LLC |
| Exela Technologies BPA, LLC |
| Exela XBP, LLC |
| FTS Parent Inc. |
| HOV Enterprise Services, Inc. |
| HOV Services, Inc. |
| HOV Services, LLC |
| HOVG, LLC |
| J & B Software, Inc. |
| Kinsella Media LLC |
| Lason International, Inc. |
| Managed Care Professionals, LLC |
| Meridian Consulting Group, LLC |
| Neon Acquisition, LLC |
| Novitex Enterprise Solutions Canada, Inc. |
| Novitex Government Solutions, LLC |
| Novitex Holdings, Inc. |
| Novitex Intermediate, LLC |
| Pangea Acquisitions Inc. |
| Plexus Global Finance, LLC |
| RC4 Capital, LLC |
| Recognition Mexico Holding Inc. |
| Regulus America LLC |
| Regulus Group II LLC |

| Entity Name |
|---|
| Regulus Group LLC |
| Regulus Holding Inc. |
| Regulus Integrated Solutions LLC |
| Regulus West LLC |
| Rust Consulting, Inc. |
| Rustic Canyon III, LLC |
| Services Integration Group, L.P. |
| SIG-GP, L.L.C. |
| SOURCECORP BPS Inc. |
| SOURCECORP Legal Inc. |
| SOURCECORP Management, Inc. |
| SOURCECORP, Incorporated |
| SourceHOV Canada Company |
| SourceHOV Healthcare, Inc. |
| SourceHOV Holdings, Inc. |
| SourceHOV LLC |
| TRAC Holdings, LLC |
| TransCentra, Inc. |
| United Information Services, Inc. |
| XCV-EMEA, LLC |

## SCHEDULE 2

### Milestones

The following Milestones shall apply to this Agreement unless extended or waived in writing (email being sufficient) by the Required Consenting Creditors (each of the following, a "**Milestone**" and collectively, the "**Milestones**"); provided that if any such Milestone falls on a date which is not a Business Day, such Milestone shall be automatically extended to the first Business Day thereafter:

1. Plan and Disclosure Statement Filing: no later than seven (7) business days following the Agreement Effective Date, the Debtors shall have filed the Plan, the Disclosure Statement, the Disclosure Statement Motion;

2. Disclosure Statement Order: no later than thirty-five (35) days after the filing of the Disclosure Statement Motion, the Bankruptcy Court shall have entered the Disclosure Statement Order;

3. Postpetition Solicitation: no later than three (3) Business Days after the Bankruptcy Court's entry of the Disclosure Statement Order, (a) the notice of the Confirmation Hearing shall be mailed to all parties in interest, (b) the Solicitation Materials and notice of the Confirmation Hearing shall be posted on the Debtors' restructuring website, and (c) the Solicitation Materials shall be mailed to the holders of April 2026 Notes Claims, holders of July 2026 Notes Claims, and holders of Other Unsecured Claims (as will be defined in the Plan);

4. Confirmation Hearing: subject to the Bankruptcy Court's availability, no later than fifty 50) days following the Bankruptcy Court's entry of the Disclosure Statement Order, the Bankruptcy Court shall have held the Confirmation Hearing and entered the Confirmation Order; and

5. Effective Date: no later than fourteen (14) days after the entry of the Confirmation Order, the Plan Effective Date shall have occurred.

## EXHIBIT C

**Financial Projections**

## FINANCIAL PROJECTIONS

### Introduction[1]

The Debtors[2] believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor thereto under the Plan. In connection with the development of the Plan and for the purposes of determining whether the Plan would meet this feasibility standard, the Debtors analyzed their ability to satisfy their post-Effective Date financial obligations while maintaining sufficient liquidity and capital resources to support the Debtors operations.

In connection with the Disclosure Statement, the Debtors' management team ("**Management**") prepared financial projections for the period between July through December 2025 and for fiscal years 2026 through 2028 (the "**Financial Projections**") for the Debtors and their non-debtor subsidiaries. The Financial Projections were prepared by Management and are based on several assumptions made by Management with respect to the potential future performance of the Reorganized Debtors' operations, assuming the consummation of the Plan.

These projections do not incorporate XBP Europe Holdings Inc., which will acquire the Debtors contemporaneously with or subsequent to the Effective Date of the Plan. The Debtors believe that XBP Europe Holdings Inc. will enhance the liquidity profile of the Debtors.

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or the Financial Projections to Holders of Claims or Interests or other parties in interest going forward, or to include such information in documents required to be filed with the SEC or otherwise make such information public.

Management prepared the Financial Projections based on information available to them, including information derived from public sources that have not been independently verified. No representations or warranties, expressed or implied, are provided in relation to fairness, accuracy, correctness, completeness, or reliability of the information, opinions, or conclusions expressed herein.

### Accounting Policies and Disclaimer

THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE SEC OR THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION. THE FINANCIAL PROJECTIONS DO NOT REFLECT THE FORMAL IMPLEMENTATION OF REORGANIZATION ACCOUNTING PURSUANT TO FINANCIAL ACCOUNTING STANDARDS BOARD ACCOUNTING STANDARDS CODIFICATION TOPIC 852, REORGANIZATIONS ("**ASC 852**") OR THE IMPACT SUCH IMPLEMENTATION MAY HAVE ON DIRECT OR PASS-THROUGH TAX LIABILITIES. MANAGEMENT CONTINUES TO

---

[1]   Capitalized terms used but not defined herein have the meanings ascribed to them in the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of DocuData Solutions, L.C., and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (the "**Disclosure Statement**"), to which this exhibit is attached, or in the *Joint Prepackaged Chapter 11 Plan of Reorganization of DocuData Solutions, L.C., and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (as may be amended, supplemented, or otherwise modified from time to time, and including all exhibits and supplements thereto, the "**Plan**"), as applicable.

[2]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/DocuDataSolutions. The Debtors' mailing address for the purposes of these cases is 2701 E. Grauwyler Road, Irving, TX 75061 USA.

EVALUATE THE COMBINED COMPANY CARRYFORWARD TAX BASIS UPON EMERGENCE. OVERALL, THE IMPLEMENTATION OF ASC 852 IS NOT ANTICIPATED TO HAVE A MATERIAL IMPACT ON THE UNDERLYING ECONOMICS OF THE PLAN. THE FINANCIAL PROJECTIONS HAVE NOT BEEN AUDITED OR REVIEWED BY AN INDEPENDENT PUBLIC ACCOUNTING FIRM. ALTHOUGH MANAGEMENT HAS PREPARED THE FINANCIAL PROJECTIONS IN GOOD FAITH AND BELIEVES THE ASSUMPTIONS TO BE REASONABLE, IT IS IMPORTANT TO NOTE THAT THE DEBTORS OR THE REORGANIZED DEBTORS CAN PROVIDE NO ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED. AS DESCRIBED IN DETAIL IN THE DISCLOSURE STATEMENT, A VARIETY OF RISK FACTORS COULD AFFECT THE REORGANIZED DEBTORS' FINANCIAL RESULTS AND MUST BE CONSIDERED. ACCORDINGLY, THE FINANCIAL PROJECTIONS SHOULD BE REVIEWED IN CONJUNCTION WITH THE DISCLOSURE STATEMENT, THE RISK FACTORS SET FORTH THEREIN, AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES.

**Principal Assumptions for the Financial Projections**

The Financial Projections are based upon, and assume the successful implementation of, the Debtors' Plan. The Financial Projections reflect numerous assumptions regarding the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors or their advisors. In addition, the assumptions do not take into account the uncertainty and disruption of business that may accompany a restructuring pursuant to the Bankruptcy Code.

Therefore, although the Financial Projections are necessarily presented with numerical specificity, the actual results achieved during the Projection Period will likely vary from the projected results. These variations may be material. Accordingly, no definitive representation can be or is being made with respect to the accuracy of the Financial Projections or the ability of the Debtors to achieve the projected results of operations.

In deciding whether to vote to accept or reject the Plan, Holders of Claims entitled to vote to accept or reject the Plan must make their own determinations as to the reasonableness of such assumptions and the reliability of the Financial Projections.

Moreover, the Financial Projections were prepared solely in connection with the restructuring pursuant to the Plan.

**Safe Harbor Under the Private Securities Litigation Reform Act of 1995**

The Financial Projections contain certain statements which constitute "forward-looking statements" within the meaning of the Securities Act and the Exchange Act. Forward-looking statements in the Financial Projections include the intent, belief, or current expectations of the Debtors and Management with respect to the timing of, completion of, and scope of the current restructuring, Plan, bank financing, and debt and equity market conditions and the Debtors' future liquidity, as well as the assumptions upon which such statements are based.

While the Debtors believe that their intentions, beliefs, and expectations reflected in the forward-looking statements are based upon reasonable assumptions within the bounds of their knowledge of their business and operations, parties in interest are cautioned that any such forward-looking statements are not guarantees

2

of future performance. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by the forward-looking statements.

The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and the Plan in their entirety as well as the notes and assumptions set forth below.

The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond Management's control. Although Management believes these assumptions are reasonable under the circumstances, such assumptions are subject to significant uncertainties, including, but not limited to:

    a) the willingness of customers to invest in the technology and services provided by the Debtors, and in a manner consistent with such customers' past practices;
    b) the impact of general macroeconomic conditions and adoption of new technology to support operations;
    c) the Debtors' ability to execute on their technology roadmap and to expand their service offerings;
    d) the ability to implement operational improvements and organization structures contemplated in the forecast;
    e) the Debtors' ability to retain key staff and attract key employees;
    f) the impact of the Chapter 11 Cases on customers' purchasing behavior;
    g) the Debtors' ability to offset increased costs with increased fees under long-term contracts; and
    h) the Debtors' ability to maintain customers which have termination rights and/or investigation rights within their agreements.

Additional details regarding these uncertainties are described in the Disclosure Statement. Should one or more of the risks or uncertainties referenced in the Disclosure Statement occur, or should underlying assumptions prove incorrect, actual results and plans could differ materially from those expressed in the Financial Projections. Further, new factors could cause actual results to differ materially from those described in the Financial Projections, and it is not possible to predict all such factors, or to the extent to which any such factor or combination of factors may cause actual results to differ from those contained in the Financial Projections. The Financial Projections herein are not, and must not be viewed as, a representation of fact, prediction or guaranty of the Reorganized Debtors' future performance.

In preparation of the Financial Projections, the Debtors considered the current competitive environment, historical operating/production performance and operating costs. The Financial Projections should be read in conjunction with the significant assumptions, qualifications, and notes set forth herein.

The Financial Projections may not be comparable to historical financials found in the Debtor's public disclosures and may contain financial metrics which do not conform to GAAP. The Financial Projections do not reflect all of the adjustments necessary to fully implement Fresh Start accounting pursuant to Accounting Standards Certification 852-10, as issued by the Financial Accounting Standards Board.

The Financial Projections assume an Effective Date of the Plan on or around June 30, 2025, and includes the operations of the following entities and their subsidiaries: Exela Technologies BPA, LLC and Neon Acquisition, LLC and their operating subsidiaries.  For avoidance of doubt, the Financial Projections do not take into account the operations of XBP Europe Holdings Inc.

**Business Overview**

Exela Technologies BPA, LLC, Neon Acquisition LLC and their Debtor and non-Debtor Subsidiaries (combined, the "**Company**" or "**Exela**") are collectively a global provider of transaction processing solutions, enterprise information management, document management and digital business process services. The Company provides mission-critical information and transaction processing solutions services to clients across three major industry verticals: (1) Information & Transaction Processing, (2) Healthcare Solutions, and (3) Legal and Loss Prevention Services. The Company manages information and document driven business processes and offers solutions and services to fulfill specialized knowledge-based processing and consulting requirements, enabling clients to concentrate on their core competencies. Through its outsourcing and technology solutions, the Company enables businesses to streamline their internal and external communications and workflows.

With decades of expertise, Exela has served many of the world's largest enterprises, including over 60% of the Fortune® 100, in mission-critical environments across multiple industries such as banking, healthcare, insurance, and manufacturing. The Company also has significant public sector clients who rely on the Company to provide processing and outsourcing services to support their operations.

Exela's solutions and services touch multiple elements within a customer's organization. Utilizing a global delivery model, Exela primarily hosts solutions in its data centers, on the cloud, or directly on customers' premises. As of March 2025, Exela had approximately 11,000 employees servicing approximately 1,550 customers.

Exela's solutions are location-agnostic, and the combination of its hybrid hosted solutions and global workforce in the Americas, EMEA, and Asia offers meaningful differentiation to the industries it serves and the services it provides.

The Company is organized around three major verticals based on a combination of specialized product and service offerings and industry focused solutions.

The Company consists of the following three segments:

1. *Information & Transaction Processing Solutions ("ITPS").* ITPS provides industry-specific solutions for banking and financial services, including lending solutions for mortgages and auto loans, and banking solutions for clearing, anti-money laundering, sanctions, and interbank cross-border settlement; property and casualty insurance solutions for origination, enrollments, claims processing, and benefits administration communications; public sector solutions for income tax processing, benefits administration, and record management; multi-industry solutions for payment processing and reconciliation, integrated receivables and payables management, document logistics and location services, records management and electronic storage of data, documents; and software, hardware, professional services and maintenance related to information and transaction processing automation, among others.

2. *Healthcare Solutions ("HS").* HS offerings include revenue cycle solutions, integrated accounts payable and accounts receivable, and information management for both the healthcare payer and provider markets. Payer service offerings include claims processing, claims adjudication and auditing services, enrollment processing and policy management, and scheduling and prescription management. Provider service offerings include medical coding and insurance claim generation, underpayment audit and recovery, and medical records management.

4

**3.** *Legal and Loss Prevention Services ("LLPS").* LLPS solutions include processing of legal claims for class action and mass action settlement administrations, involving project management support, notification and outreach to claimants, collection, analysis and distribution of settlement funds. Additionally, LLPS provides data and analytical services in the context of litigation consulting, economic and statistical analysis, expert witness services, and revenue recovery services for delinquent accounts receivable.

**NON-GAAP FINANCIAL PROJECTIONS**

The Projected Non-GAAP Pro Forma Consolidated Balance Sheet as of the Emergence Date set forth below presents (a) the projected consolidated financial position of Exela as of July 1, 2025, prior to the consummation of the transactions contemplated in the Plan; (b) the pro forma adjustments to such projected consolidated financial position required to reflect the Restructuring Transactions; (c) proxy adjustments for fresh start implementation; and (d) the pro forma projected consolidated financial position of Exela as of the assumed Emergence Date, after giving effect to the Restructuring Transactions. The table below reflects the anticipated effects of the Restructuring Transactions.

### Projected Non-GAAP Pro Forma Balance Sheet
### (UNAUDITED)

### (USD$ in Millions)

| | | Pre-Emergence July 1, 2025 | | Plan Settlement | | New Debt | | Fresh-Start Adjustments | | Proforma July 1, 2025 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | |
| Cash and Cash Equivalents | $ | 10 | $ | (12) | $ | 31 | $ | - | $ | 28 |
| Restricted Cash | | 51 | | – | | – | | – | | 51 |
| Accounts Receivable | | 45 | | – | | 97 | | – | | 142 |
| Inventories | | 8 | | – | | – | | – | | 8 |
| Prepaid Expenses | | 26 | | – | | – | | – | | 26 |
| **Total Current Assets** | $ | 140 | $ | (12) | $ | 128 | $ | - | $ | 255 |
| | | | | | | | | | | |
| Property, Plant And Equipment, Net | $ | 46 | $ | - | $ | - | $ | - | $ | 46 |
| Goodwill | | 156 | | – | | – | | 456 | | 612 |
| Intangible Assets, Net | | 117 | | – | | – | | – | | 117 |
| Other Non-current Assets | | 43 | | – | | – | | – | | 43 |
| | | | | | | | | | | |
| **Total Assets** | $ | 501 | $ | (12) | $ | 128 | $ | 456 | $ | 1,073 |
| | | | | | | | | | | |
| **Liabilities and Shareholders' Equity** | | | | | | | | | | |
| Accounts Payables | $ | 28 | $ | (12) | $ | - | $ | - | $ | 16 |
| Accrued Liabilities | | 105 | | (50) | | – | | – | | 55 |
| Accrued Interest | | 120 | | (114) | | (5) | | – | | 0 |
| Customer Deposits | | 30 | | – | | – | | – | | 30 |
| Deferred Revenue | | 11 | | – | | – | | – | | 11 |
| Other Current Liabilities | | 86 | | – | | – | | – | | 86 |
| **Total Current Liabilities** | $ | 380 | $ | (176) | $ | (5) | $ | - | $ | 198 |
| | | | | | | | | | | |
| Debtor-in-Possession Financing | $ | 185 | $ | (4) | $ | (181) | $ | - | $ | - |
| Long-term Debt | | 1,287 | | (1,212) | | 293 | | – | | 367 |
| Other Long-term Liabilities | | 55 | | – | | – | | – | | 55 |
| Priority Tax and GUC Claims | | – | | 45 | | – | | – | | 45 |
| **Total Liabilities** | $ | 1,907 | $ | (1,348) | $ | 107 | $ | - | $ | 666 |
| | | | | | | | | | | |
| **Total Shareholders' Equity** | | (1,406) | | 1,335 | | 21 | | 456 | | 407 |
| | | | | | | | | | | |
| **Total Liabilities & Shareholders' Equity** | $ | 501 | $ | (12) | $ | 128 | $ | 456 | $ | 1,073 |

- The pre-emergence balance sheet is as of July 1, 2025, and prior to the execution of the transactions contemplated in the Plan.

- Plan Settlement reflects the impact to the balance sheet of the plan, including the conversion of the April 2026 and July 2026 notes into equity, extinguishment of accrued interest, the impairment of certain unsecured liabilities, and the impact of the receivables related to the off-balance sheet securitization facility being brought back on the balance sheet through a new ABL facility.

- New Debt reflects the impact of the following: roll of the DIP loan (including PIK fees) into a new exit facility, the impact of the off-balance sheet securitization facility being brought back on balance sheet as an asset-based loan, XBP Funding, Gates Exit Facility, Incremental Exit Facility A, Incremental Exit Facility B, B Riley 2nd Lien AR3 Facility, and Rust Receivables Securitization.

- Fresh-Start Adjustments reflects a simplified fresh-start accounting approach to adjust the carrying value of total Goodwill for the difference between reorganization value and the projected book value of identifiable assets at the Emergence Date.

The Projected Non-GAAP Pro Forma Income Statement set forth below presents the projected consolidated results of operations of Exela for the period commencing July 1, 2025, through December 31, 2025, after giving effect to the Restructuring Transactions to occur on the Emergence Date, and for the calendar years ending 2026, 2027 and 2028.

**Projected Non-GAAP Pro Forma Income Statement**
**(UNAUDITED)**

**(USD$ in Millions)**

|  | *Jul. 1 - Dec. 31,* 2025 | | Calandar Year Ending December 31, 2026 | | 2027 | | 2028 |
|---|---|---|---|---|---|---|---|
| Revenue | $ | 403 | $ | 869 | $ | 891 | $ | 922 |
| Cost of Revenue |  | (308) |  | (674) |  | (686) |  | (708) |
| **Gross Profit** | $ | 95 | $ | 196 | $ | 205 | $ | 214 |
| Selling, General and Administrative Expenses | $ | (53) | $ | (118) | $ | (118) | $ | (117) |
| Depreciation and Amortization |  | (24) |  | (44) |  | (43) |  | (33) |
| **Operating Profit** | $ | 18 | $ | 33 | $ | 44 | $ | 64 |
| Interest Expense | $ | (22) | $ | (41) | $ | (40) | $ | (40) |
| Other Income/(Expense) |  | 0 |  | 1 |  | 1 |  | 1 |
| **Earnings Before Taxes** | $ | (4) | $ | (7) | $ | 5 | $ | 24 |
| Income Tax (Expense)/Benefit | $ | (4) | $ | (31) | $ | (6) | $ | (8) |
| **Net Income / (Loss)** | $ | (8) | $ | (37) | $ | (1) | $ | 16 |
| **Add-Backs for EBITDA** |  |  |  |  |  |  |  |
| Add: Tax Expense | $ | 4 | $ | 31 | $ | 6 | $ | 8 |
| Add: Interest Expense |  | 22 |  | 41 |  | 40 |  | 40 |
| Add: Depreciation and Amortization |  | 24 |  | 44 |  | 43 |  | 33 |
| **EBITDA** | $ | 43 | $ | 78 | $ | 88 | $ | 98 |

- **Revenue:** Exela's material sources of revenue are derived from contracts with customers, primarily relating to the provision of business and transaction processing services within each of the Company's segments. Additionally, certain pass-through costs, such as postage, are included in Exela's revenue. Revenues are generated across three revenue segments: Information & Transaction Processing Solutions ("**ITPS**"), Healthcare Solutions ("**HS**") and Legal and Loss Prevention Services ("**LLPS**"). ITPS represents 67.9%, HS represents 27.3% and LLPS represents 4.9% of revenues in FY 2025. The Company does not have any significant extended payment terms, and revenue is typically recognized either at the delivery of the services, or over time in accordance with the contractual terms.

- **Cost of Revenue:** Consists of equipment and supplies held for resale, personnel and related costs to service customer contracts, insurance premiums, supplies, facilities, equipment rental/maintenance cost, and postage/delivery costs.

- **Selling, General and Administrative Expenses (SG&A):** Includes administrative employee related costs, travel and expenses, marketing, facility cost, research and development and other operating expenses. Costs are recognized as they are incurred. Includes certain overhead costs previously incurred by the parent company on behalf of the debtors.

- **Depreciation and Amortization:** Reflects the anticipated depreciation and amortization of the Company's physical and intangible assets such as intellectual property, based on current net book values. Depreciation and amortization do not reflect the adjustments necessary to implement fresh-start accounting on the Emergence Date pursuant to ASC 852-10, including but not limited to detailed asset valuations and reassessment of the useful lives of amortizable assets.

- **Interest Expense:** The post-emergence period consists of cash interest expense and fees on the following post-emergence capital structure. See balance sheet assumptions for listing of debt at emergence.

- **Tax:** Forecasted cash taxes are estimated based on a tax rate of 35% against projected income. Transaction Tax Liability of $25 million is anticipated to be paid in 2026, with $10 million from the balance sheet and $15 million from an affiliate (the "**Initial ETI Funding Obligation**").

The Projected Non-GAAP Pro Forma Balance Sheet set forth below presents the projected consolidated financial position of Exela as of July 1, 2025, through December 31, 2025, after giving effect to the Restructuring Transactions to occur on the Emergence Date, and for the fiscal years ending 2026, 2027 and 2028.

**Projected Non-GAAP Pro Forma Balance Sheet**

**(UNAUDITED)**

**(USD$ in Millions)**

| | | December 31, | | |
|---|---|---|---|---|
| | **2025** | **2026** | **2027** | **2028** |
| **Assets** | | | | |
| Cash and Cash Equivalents | $ 45 | $ 28 | $ 48 | $ 80 |
| Restricted Cash | 51 | 51 | 51 | 51 |
| Accounts Receivable | 131 | 144 | 146 | 151 |
| Inventories | 7 | 8 | 8 | 9 |
| Prepaid Expenses | 28 | 29 | 29 | 30 |
| **Total Current Assets** | $ 262 | $ 260 | $ 283 | $ 322 |
| | | | | |
| Property, Plant And Equipment, Net | $ 42 | $ 39 | $ 37 | $ 36 |
| Goodwill | 612 | 612 | 612 | 612 |
| Intangible Assets, Net | 101 | 69 | 36 | 13 |
| Other Non-current Assets | 43 | 43 | 43 | 43 |
| **Total Assets** | $ 1,060 | $ 1,022 | $ 1,011 | $ 1,026 |
| | | | | |
| **Liabilities and Shareholders' Equity** | | | | |
| Accounts Payables | $ 14 | $ 19 | $ 20 | $ 21 |
| Accrued Liabilities | 61 | 63 | 65 | 67 |
| Customer Deposits | 33 | 34 | 35 | 36 |
| Deferred Revenue | 12 | 12 | 12 | 13 |
| Other Current Liabilities | 86 | 86 | 86 | 86 |
| **Total Current Liabilities** | $ 205 | $ 213 | $ 217 | $ 223 |
| | | | | |
| Long-term Debt | $ 360 | $ 363 | $ 360 | $ 360 |
| Other Long-term Liabilities | 55 | 55 | 55 | 55 |
| Priority Tax and GUC Claims | 39 | 28 | 19 | 11 |
| **Total Liabilities** | $ 660 | $ 660 | $ 651 | $ 649 |
| | | | | |
| **Total Shareholders' Equity** | 399 | 362 | 361 | 376 |
| | | | | |
| **Total Liabilities & Shareholders' Equity** | $ 1,060 | $ 1,022 | $ 1,011 | $ 1,026 |

- **Cash and Cash Equivalents:** Includes cash deposited with financial institutions and liquid investments acquired with maturity dates equal to or less than three months. All bank deposits and money market accounts are considered cash.

- **Restricted Cash**: Restricted cash is the carrying amount of cash and cash equivalents which are restricted under contract or otherwise as to withdrawal or usage. These include deposits held as compensating balances against obligation for claim payments and customer funds for use for specific obligations such as postage or under agreements entered into with others.

**Accounts Receivable (AR):** Accounts receivable is based on Exela's sales forecasts and billing practices for its different types of services and products. Invoiced amounts are anticipated to be collected based on historical days sales outstanding. Accounts receivable also includes certain amounts for unbilled revenue, which relate to projects that have not yet hit an invoicing milestone for billing to the customer. Certain receivables serve as collateral to a new Asset Based Loan facility which replaces an off-balance sheet securitization facility. DSO are anticipated to be 65 days for billed and unbilled combined.

- **Inventories:** Primarily includes heavy-duty scanners and related parts, toner, paper stock, envelopes and postage supplies. Inventories are projected based on historical levels of days inventory outstanding. Average days of inventory outstanding is 5 days.

- **Prepaid Expenses:** Expenses paid before they are incurred such as prepaid insurance, prepaid maintenance, prepaid postage and deposits. Amounts are expensed when incurred.

- **Property, Plant and Equipment (PPE)**: PPE consists of software, computers, buildings and production facilities, equipment, furniture and fixtures, and leasehold improvements. Capital expenditures are based on currently anticipated maintenance and business support needs and are subject to changes based on requirements. Equipment subject to financing leases are also included in PPE.

- **Goodwill:** For purposes of these Projections, the Debtors used a simplified fresh-start accounting approach and adjusted the carrying values of total Goodwill and Other Intangible Assets for the difference between reorganization value and the projected book value of identifiable assets at the Emergence Date. The adjusted carrying values do not reflect the full adjustments necessary to implement fresh-start accounting on the Emergence Date pursuant to ASC 852-10, including but not limited to detailed asset valuations and reassessment of the useful lives of amortizable assets.

- **Intangible Assets:** Consists of customer relationships, trade names, developed technology, capitalized software costs, and outsourced contract costs.  These expenses are amortized based on the expected life of the asset.

- **Other Non-current Assets:** Primarily includes deferred tax assets, refundable deposits and operating leases.

- **Accounts Payable:** Consists of accruals and recorded invoices for goods and services. Average DPO post emergence is estimated to be 30 days.

- **Accrued Liabilities:** Primarily includes accrued taxes, accrued lease exit obligations, accrued professional fees, accrued legal reserve, accrued compensation and accrued transaction costs.

- **Customer deposits:** Consists primarily of amounts received from customers in advance for postage or other services. These advanced postage deposits are used to cover the costs associated with postage, with the corresponding postage revenue being recognized as services are performed. Deposits are offset against cost as postage expense is incurred.

- **Deferred revenue:** Related to payments received in advance of performance under a contract. A significant portion of this balance relates to maintenance contracts or other service contracts where payments are received for implementation activities and are used in fulfilling the related performance obligations.

- **Other Current Liabilities:** Current portion of finance lease, current portion of operating lease, and long-term debt.

- **Long-term debt:** Exela's post-emergence capital structure consists of a $180 million Rollover Exit Notes (includes $5 million PIK fees), $18 million XBP Funding, $40 million Gates Exit Facility, $6 million Incremental Exit Facility A, $6 million Incremental Exit Facility B, $22 million B Riley 2nd Lien AR3 Facility, $5 million Rust Receivables Securitization, $13 million Capital Leases, and $77 million ABL Facility. $15 million Initial ETI Funding Obligation used to pay the Transaction Tax Liability anticipated in 2026. Key terms include:
    - *Rollover Exit Notes*: (a) 5-year tenor; and (b) 12.0% cash interest rate
    - *XBP Funding*: (a) evergreen revolver; and (b) 12.0% cash interest rate
    - *Gates Exit Facility*: (a) 3-year tenor; (b) SOFR + .26161% + 11.39% cash interest rate; and (c) assumed replaced by new facility at maturity in 2028 with similar terms
    - *Incremental Exit Facility A*: (a) 3-year tenor; (b) SOFR + .26161% + 11.39% cash interest rate
    - *Incremental Exit Facility B*: (a) 3-year tenor; (b) SOFR + .26161% + 11.39% cash interest rate
    - *B Riley 2nd Lien AR3 Facility:* (a) paid down $1 million per month for 5 months through the sale of receivables to the Rust Receivables Securitization and then amortized monthly until repaid; and (b) 11.5% cash interest rate
    - *Rust Receivables Securitization*: (a) refreshes for 5 months amortized monthly from emergence until repaid in April 2026; (b) 10% markup on receivables; and (c) $2.5 million fee paid over 5 months post-emergence
    - *ABL Facility*: (a) evergreen revolver; and (b) 8.2% cash interest rate
    - *Initial ETI Funding Obligation:* (a) 12.0% cash interest rate

- **Other long-term liabilities:** Primarily includes finance lease liabilities, pension liabilities, deferred income tax liabilities, long-term income tax liabilities, and operating lease liabilities.

- **Priority Tax and GUC Claims:** Includes $37 million Priority Tax Claims and $7.95 million GUC Payment Obligations paid down during the forecast period.

12

The Projected Non-GAAP Pro Forma Cash Flow Statement set forth below presents the projected cash flows of Exela commencing as of July 1, 2025 through December 31, 2025, after giving effect to the Restructuring Transactions to occur on the Emergence Date, and for the fiscal years ending 2026, 2027 and 2028.

**Projected Non-GAAP Pro Forma Cash Flow Statement**
**(UNAUDITED)**

**(USD$ in Millions)**

| | | *Jul. 1 - Dec. 31,* 2025 | Calandar Year Ending December 31, 2026 | 2027 | 2028 |
|---|---|---|---|---|---|
| **Cash Flows from Operating Activities:** | | | | | |
| Net (loss) income | $ | (8) $ | (37) $ | (1) $ | 16 |
| Add: Tax Expense | | 4 | 31 | 6 | 8 |
| Add: Interest Expense | | 22 | 41 | 40 | 40 |
| Add: Depreciation and Amortization | | 24 | 44 | 43 | 33 |
| Working Capital | | 17 | (6) | 1 | (0) |
| Cash Interest | | (22) | (41) | (40) | (40) |
| Cash Taxes | | (4) | (6) | (6) | (8) |
| **Cash Flow from Operations** | $ | 33 $ | 25 $ | 42 $ | 49 |
| | | | | | |
| **Cash Flows from Investing Activities:** | | | | | |
| Capital Expenditures | | (4) | (9) | (9) | (9) |
| **Net Cash from Investing Activities** | $ | (4) $ | (9) $ | (9) $ | (9) |
| | | | | | |
| **Cash Flows from Financing / Settlement Activities:** | | | | | |
| Debt Issued (Repaid) | | (7) | 3 | (4) | – |
| Transaction Tax Liability | | – | (25) | – | – |
| Priority Tax and GUC Claims | | (6) | (11) | (9) | (7) |
| **Net Cash from Financing Activities** | $ | (13) $ | (33) $ | (13) $ | (7) |
| | | | | | |
| **Net Increase / (Decrease) in Cash & Cash Equivalents** | $ | 17 $ | (17) $ | 20 $ | 32 |
| | | | | | |
| **Beginning Cash Balance** | | 28 | 45 | 28 | 48 |
| **Ending Cash Balance** | $ | 45 $ | 28 $ | 48 $ | 80 |

- **Change in Working Capital:** Driven by changes in accounts receivable, accounts payable, inventory, deferred revenue, contract assets/costs, prepaid expenses, accrued compensation, and customer deposits. A minimal level of working capital recapture post emergence is contemplated.

- **Transaction Tax Liability**: Assumes Transaction Tax Liability as defined in the Plan in the amount of $25 million in 2026. Paid from $10 million from the balance sheet and $15 million from an affiliate (the "Initial ETI Funding Obligation").

- **Priority Tax and GUC Claims:** Driven by paydown of Priority Tax Claims and payment of GUC Payment Obligations.

- **Capital Expenditures:** Reflected at 1.0% of total revenue during post-emergence period.

- **Debt Issued (Repaid):** Consist of amortization of the B Riley 2nd Lien AR3 Facility and Rust Receivables Securitization. Also includes an additional $10 million borrowing in 2025 from the ABL Facility from the addition of certain receivables into the borrowing base.

13

- **Cash Taxes:** Cash taxes based upon estimated federal income taxes equivalent to the estimated expense rate of 35%.

**<u>EXHIBIT D</u>**

**Liquidation Analysis**

# LIQUIDATION ANALYSIS[1]

Under the "best interests" of creditors test (the "***Best Interests Test***") set forth in section 1129(a)(7) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as may be amended from time to time, the "***Bankruptcy Code***"), a court may not confirm a plan of reorganization unless the plan provides each holder of a claim or interest who does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. *See* 11 U.S.C. § 1129(a)(7). Accordingly, to demonstrate that the Debtors' Plan of Reorganization (the "***Plan***") satisfies the Best Interests Test, the Debtors, with the assistance of their advisors, have prepared this hypothetical liquidation analysis (this "***Liquidation Analysis***") presenting recoveries that may be obtained by Holders of Claims and Interests upon a disposition of the Debtors' assets in a hypothetical chapter 7 liquidation as an alternative to recoveries provided under the Plan.

This Liquidation Analysis presents information based on, among other information, the Debtors' books and records and good-faith estimates regarding asset recoveries and Claims resulting from a hypothetical liquidation under chapter 7 of the Bankruptcy Code. The determination of the proceeds from the hypothetical liquidation of assets involves the use of estimates and assumptions. Although the Debtors consider the estimates and assumptions underlying this Liquidation Analysis to be reasonable under the circumstances, such estimates and assumptions are subject to business, economic, competitive, political, and regulatory uncertainties and contingencies beyond the Debtors' control. Accordingly, the forecasted results set forth by this Liquidation Analysis may not be realized if the Debtors were liquidated. Actual results in such a case could vary from those presented herein, which could result in distributions to members of applicable Classes of Claims that differ from those set forth in this Liquidation Analysis.

This Liquidation Analysis indicates an estimated range of recovery values that may be realized by the Classes of Claims upon disposition of the Debtors' assets pursuant to a chapter 7 liquidation, as an alternative to the Plan. As illustrated by this Liquidation Analysis, Impaired Classes under the Plan would receive less recovery in a chapter 7 liquidation than they would under the Plan. Further, no Holder of a Claim or Interest would receive or retain property under the Plan of a value that is less than such Holder would receive in a chapter 7 liquidation scenario as illustrated by this Liquidation Analysis. Therefore, the Debtors believe that the Plan satisfies the Best Interests Test as set forth in section 1129(a)(7) of the Bankruptcy Code.

The Debtors have prepared this Liquidation Analysis in connection with the Plan and Disclosure Statement pursuant to chapter 11 of the Bankruptcy Code. This Liquidation Analysis provides a range of estimated recoveries, based upon a hypothetical liquidation of the Debtors[2] and their non-Debtor subsidiaries and affiliates, if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code. This Liquidation Analysis has been prepared assuming that the Debtors' conversion to chapter 7 liquidation would commence on June 30, 2025 (the "***Conversion Date***") and a chapter 7 trustee (the "***Trustee***") would be appointed to convert all of the Debtors' and the non-Debtor subsidiaries' and affiliates' assets into Cash, including the equity of XBP Europe Holdings Inc ("***XBP***") indirectly held by XCV EMEA, LLC.  This Liquidation Analysis assumes the immediate shutdown of all operations where

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the *Disclosure Statement for the Joint Plan of Reorganization of DocuData Solutions, L.C. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy* (the "**Disclosure Statement**"), to which this exhibit is attached, or in the *Joint Prepackaged Chapter 11 Plan of Reorganization of DocuData Solutions L.C., and its Debtor Affiliates Under Chapter 11 of the Bankruptcy* (as may be amended, supplemented, or otherwise modified from time to time, and including all exhibits and supplements thereto, the "**Plan**"), as applicable.

[2] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/DocuDataSolutions. The Debtors' mailing address for the purposes of these cases is 2701 E. Grauwyler Road, Irving, TX 75061 USA.

the customers do not require support to transition their business, or in some circumstances the customers self-fund the costs of their transition, creating no additional liabilities for the Debtors. Unless otherwise indicated, this Liquidation Analysis is based on net book values of assets and liabilities as of December 31, 2024, which is assumed to be a proxy for the book value of the assets as of the Conversion Date. Note the financials underlying this Liquidation Analysis are unaudited.

In this hypothetical scenario, the Trustee would satisfy Claims through proceeds generated from the disposition of the assets of the Debtors after ceasing operations, including equity interests of the non-Debtor entities. This Liquidation Analysis assumes that the amount of proceeds available from the liquidation of the assets, *plus* any Cash held as of the Conversion Date, *plus* proceeds from the sale of XBP's equity indirectly held by XCV EMEA, LLC, *less* the cost of disposition, including wind down costs, Trustee fees and other Trustee Professional fees (the "***Liquidation Expenses***") attributable to the disposition of such assets (the "***Net Proceeds Available for Distribution to Creditors***") would be distributed in accordance with sections 726 and 1129 of the Bankruptcy Code.

**This Liquidation Analysis is a hypothetical exercise that has been prepared for the sole purpose of presenting a reasonable good-faith estimate of the proceeds that would be realized if the Debtors were liquidated in accordance with chapter 7 of the Bankruptcy Code. This Liquidation Analysis is not intended and should not be used for any other purpose. This Liquidation Analysis does not purport to be a valuation of the Debtors' assets in the context of a holistic reorganization, and there may be a difference between this Liquidation Analysis and the values that may be realized, or Claims generated in an actual liquidation. This Liquidation Analysis should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and the Plan in their entirety as well as the assumptions set forth below. Nothing contained in this Liquidation Analysis is intended to be, or constitutes, a concession, admission, or Allowance of any claim by the Debtors. The actual amount or priority of Allowed Claims in the Chapter 11 Cases could differ from the estimated amounts set forth and used in this Liquidation Analysis. The Debtors reserve all rights to supplement, modify, or amend the analysis set forth herein.**

**NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OF THE ESTIMATES AND ASSUMPTIONS CONTAINED HEREIN OR THAT THE ACTUAL RESULTS OF A LIQUIDATION OF THE DEBTORS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES OR PROJECTED RESULTS SET FORTH HEREIN. THE ACTUAL LIQUIDATION VALUE OF THE DEBTORS IS SPECULATIVE AND RESULTS COULD VARY MATERIALLY FROM ESTIMATES PROVIDED HEREIN.**

**METHODOLOGY AND RELATED KEY ASSUMPTIONS**

This Liquidation Analysis assumes that proceeds available to creditors would be distributed in accordance with sections 726 and 1129 of the Bankruptcy Code. Proceeds available for satisfaction of Claims would consist of the proceeds resulting from the disposition of the Debtors' assets and properties, including XBP's equity indirectly held by XCV EMEA, LLC, as well as unrestricted cash held by the Debtors as of the Conversion Date. Asset value from non-Debtor entities would first be available to pay the Claims at those entities, including intercompany claims, as well as recovery to certain Holders of Claims against the Debtors through the Debtors' equity ownership of these entities, to the extent available. The Debtors prepared this Liquidation Analysis and reviewed recoveries on a legal entity basis.

This Liquidation Analysis assumes: (a) sale of substantially all of the Debtors' assets within 90 to 120 days post-conversion; (b) that non-Debtor entities, excluding XBP and its subsidiaries, will wind-down and liquidate in conjunction with the Debtors' liquidation; (c) the equity of XBP held indirectly by XCV EMEA, LLC will be sold; (d) the ER3 Securitization Program and Second Lien Note (collectively the "Receivables Facilities") will recover from collections of invoices sold or transferred to Exela Receivables

3; and (e) available proceeds from the liquidation, if any, will be first used to repay the DIP Facility Claims in respect of new-money loans ("***New Money DIP Facility Claims***"). Remaining proceeds after the repayment of the New Money DIP Facility Claims would be used to repay (i) first, the Prepetition Term Loan Facility (ii) second, any roll-up portion of the DIP Facility Claims ("***Roll-Up DIP Facility Claims***"), and (iii) third, the April 2026 Notes Claims (collectively the "Secured Claims") in accordance with their relative priorities under applicable intercreditor agreements. Any proceeds remaining after payment to the Secured Claims will go to satisfy Administrative, Priority and General Unsecured Claims ("***GUCs***"), in accordance with their relative priorities under applicable law. The Liquidation Analysis assumes the continuation and cooperation of certain accounting, treasury, tax, information technology, and other corporate services necessary to wind-down the estates. The Liquidation Analysis also assumes the Trustee has unrestricted access to Cash and proceeds from asset sales held by Debtors and any non-Debtor entities, and the Trustee is able to repatriate these proceeds from jurisdictions outside the US.

This Liquidation Analysis does not include estimates for: (a) the tax consequences, either foreign or domestic, that may be triggered upon the liquidation and sale of assets; (b) social costs or other government-imposed impediments arising from the sale or liquidation of non-U.S. assets; (c) damages as a result of breach or rejection of obligations incurred and leases and executory contracts assumed or entered into; or (d) recoveries resulting from any potential preference, fraudulent transfer or other litigation or avoidance actions. If any of these claims or costs were to materialize, recoveries to creditors will be impacted.

## ASSET RECOVERY

The Debtors' personnel would assist in collecting receivables, monetizing prepaids and helping to recover on certain assets of the Debtors. The Debtors would likely need to hire a third-party liquidator to assist in the sale of its inventory and equipment, and those costs are factored into the recovery amounts.

1. ***Cash and Cash Equivalents*** includes Cash held in the Debtors' domestic and foreign bank accounts and is unrestricted. Agreements related to specific Debtor bank accounts will determine the priority of recovery.

2. ***Accounts Receivables*** have substantially been sold to a bankruptcy remote legal entity, Exela Receivables 3 Holdco, LLC, which will facilitate the recovery for the Receivables Facilities. Accounts Receivables pledged as well as the outstanding balance for PNC and B. Reilly have been updated to reflect March month-end balances, which factors the impact of the post-filing paydown. An estimated recovery of 73% to 80% of the Accounts Receivables is consistent with the historical advance rates reflected in the Receivables Facilities, and results in full recovery for the ER3 Securitization Program and partial recovery for the Second Lien Note. Additionally, it is assumed that the BR Exar facility is fully repaid by the Conversion Date, and therefore certain Accounts Receivables previously pledged to that facility would remain assets of the Debtors and would result in proceeds available for the recovery of the New Money DIP Facility Loans.

   The estimated recoveries used in this Liquidation Analysis take into consideration the inevitable difficulty of collections during a liquidation process, primarily driven by the Debtors' liquidation creating damages to the customer's operations, and related concessions that might be required to facilitate the collection of certain receivables. Collections of trade receivables during a liquidation could be significantly compromised as customers attempt to set off outstanding amounts against alleged damage and breach of contract Claims, which could reduce recoveries.

3. ***Inventory*** includes supplies, equipment for resale, parts and work in progress ("***WIP***"). The recovery rates are determined for each inventory category.

(a) Supplies include paper, packaging materials, envelopes, and other supplies related to the delivery of the Company's printed mail. Recoveries for supplies are estimated at 5% to 10% of net book value. Recoveries are typically di minimis due to the specific nature of the supplies and an inability to be used by third parties.

(b) Equipment for resale includes printers, servers, scanners and other equipment used by the Debtors' customers. Equipment would typically be liquidated through the Debtors' existing customer base. Recoveries for equipment for resale are estimated to be 20% to 30% of net book value.

(c) Other inventory includes work-in-progress inventory, parts, and other equipment not for resale. Estimated recovery for all other inventory is 0% of net book value to account for inventory obsolescence and the fact that such parts are specific to the Debtors' equipment.

The average estimated blended recovery rate for Inventory is 4% to 8% of net book value.

4. **Prepaid Assets** includes prepaid rent, prepaid insurance, deposits and all other prepaid assets. The recovery rates are determined for each prepaid asset category.

(a) Estimated recoveries for prepaid rent are 30% to 50% of net book value, based on the Debtors' ability to exit those facilities after completing the wind-down to recover on deposits.

(b) Estimated recovery for prepaid insurance is 0% of net book value. These amounts include deposits which cover the first months of the policy and will have been used by the conversion date. The remainder of the policy life is financed.

(c) Estimated recoveries for deposits, which is collateral held to cover workers compensation policies, are 25% to 50% of net book value, due to certain policies being overfunded versus current employment levels.

(d) Estimated recovery for all other prepaid assets is 5% of net book value

The average estimated blended recovery rate for Prepaid Assets is 9% to 13% of net book value.

5. **Other Current Assets** includes current deferred tax assets and income tax refund receivables, which have substantially no recovery value.

6. **Property and Equipment** include several categories summarized below. The recovery rates are determined for each Property and Equipment category.

(a) Computer equipment include office computers, servers and other equipment. Recoveries for computer equipment are estimated to be 5% to 10% of net book value, due to high market saturation for this type of equipment.

(b) Machinery and equipment include scanners and other production equipment for mail, forklifts and other warehouse equipment for storage and distribution. Recoveries for machinery and equipment are estimated to be 15% to 25% of net book value. There would be de-installation costs as well as technological obsolescence from the liquidation of these assets.

(c) Vehicles include trucks, cars and other light vehicles owned by the company. Recoveries for vehicles are estimated to be 50% to 75% of net book value.

4

314 of 335

    (d)  Furniture and fixture include desks, chairs, and other office equipment, as well as the improvements to office space. Fixtures would have no recoverable value due to the costs of de-installation.  Furniture and other office equipment would have a low recovery value due to the high saturation of the market for this equipment. Recoveries for office furniture and fixtures are estimated to be 5% to 10% of net book value.

    (e)  Recoveries for land, buildings and production facilities are estimated to be 100% of net book value.

    (f)  Leasehold improvements include modifications to buildings and other construction. Recoveries for leasehold improvements are estimated to be 1% to 3% of net book value due to the costs of de-installation.

    (g)  Recoveries for other fixed assets are estimated to be 5% of net book value.

    (h)  Estimated recovery for categories not mentioned above is 0%; these include capital leases, purchased software, telecom equipment, internally developed software and construction in progress. No recovery is estimated since competitors likely have similar software and telecom equipment.

The average estimated blended recovery rate for Property and Equipment is 10% to 13% of net book value.

7.  ***Goodwill*** is an intangible asset that is estimated to have no value in a liquidation scenario.

8.  ***Intangible Assets*** include several categories summarized below.

    (a)  Estimated recoveries for internally developed software and developed technology are 15% to 20% of net book value. The internally developed software and developed technology are customized and the recoveries factor potential transfer costs to customers.

    (b)  Estimated recoveries for trade name are 40% to 81% of net book value.

    (c)  Estimated recovery for categories not mentioned above is 0%; these include customer relationships, costs of contracts and purchased software. Customer relationships and cost of contracts represent potential value specific to the Debtors as a going concern.

The average estimated blended recovery rate for Intangible Assets is 3% to 5% of net book value.

9.  ***Other Assets*** include several categories summarized below.

    (a)  Estimated recoveries for refundable deposits, which is collateral held to cover workers compensation policies, are 25% to 50% of net book value.

    (b)  Estimated recovery for other assets is 0%; these include long-term deferred income taxes, debt acquisition costs and misc. other non-current assets.

The average estimated blended recovery rate for Other Assets is 9% to 18% of net book value.

10.  ***Intercompany Receivables*** include intercompany transactions both between Debtors and with non-Debtor entities. Recoveries on intercompany transactions are based on the obligor entity's ability to satisfy its obligation, following the absolute priority rule. The

intercompany claims are treated *pari passu* to other unsecured claims.

11. ***Investments in Subsidiaries*** includes any value available for distribution to parent entities after satisfying all creditors at the respective subsidiary legal entity. Any distribution to multiple parent entities is based on their percentage equity ownership. Non-Debtor entities may generate a distribution to their parent entities after satisfying all creditors, including intercompany payables, at the respective non-Debtor entity; however, any value is anticipated to be di minimis.

12. ***Equity Interests in XBP Europe Holdings Inc***. are assumed to be sold as a going concern and value of proceeds is based on a 30-day average market capitalization. Debtor XCV-EMEA's indirect ownership of 60.70% of the outstanding shares was used to calculate the recovery value.

## CHAPTER 7 LIQUIDATION EXPENSES

The conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code will result in additional costs to the Debtors, including compensation of the Trustee, as well as their retained counsel and other Professionals, to oversee the wind-down of the Debtors' and non-debtor entities' estates (excluding XBP Europe Holdings Inc. and its subsidiaries). The chapter 7 costs include the following:

1. ***Chapter 7 Trustee Fees*** include fees associated with the appointment of a chapter 7 trustee in accordance with section 326 of the Bankruptcy Code, which provides for statutory Trustee fees of 3% for liquidation proceeds in excess of $1,000,000. The 3% is applied to total liquidation proceeds excluding recoveries related to Cash on hand, intercompany receivables and equity in subsidiaries.

2. ***Chapter 7 Trustee Professional Fees*** include the cost of financial advisors, attorneys, and other Professionals retained by the Trustee in connection with the wind-down (e.g., claims reconciliation, legal fees, tax and accounting fees, etc.). The Professional fees are estimated as 2% of total liquidation proceeds excluding recoveries from intercompany receivables and equity in subsidiaries.

3. ***Wind-Down Costs*** includes retention costs and expenses associated with the wind-down of the Debtor and non-Debtor entities. To maximize recoveries on remaining assets, minimize the amount of Claims, and generally ensure an orderly liquidation, the Trustee will need to retain a number of individuals currently employed by the Debtors and non-Debtor entities. These individuals will primarily be responsible for operating and maintaining the assets, collecting outstanding receivables, facilitating the liquidation of the assets, providing historical knowledge and insight to the Trustee regarding the complex businesses and the Chapter 11 Cases, and concluding the administrative wind-down of the businesses after the disposition of the assets.

   (a) Wind-down costs primarily consist of reduced general and administrative costs required to operate the assets during the wind-down process. The estimated wind-down costs are based on estimating payroll for approximately 20 employees to maintain books and records, collect accounts receivables, and perform essential finance and administrative tasks along with a few months of rent and other expenses.

   (b) Other costs that could arise from wind-down such as customer transition expenses are assumed to be paid by the customers.

   (c) Wind-down costs are not expected to be material as we are assuming an immediate

6

shut-down of business operations.

Total wind-down costs are estimated to be approximately $0.9 to $1.2 million.

## DISTRIBUTION OF PROCEEDS TO SECURED CLAIMS

This Liquidation Analysis assumes that proceeds will be distributed following the absolute priority rule provided in section 1129(b)(2) and in accordance with section 726 of the Bankruptcy Code, and no distributions will be made to Holders of equity interests until all creditors are satisfied in full.

For the purpose of this analysis, the Debtors Net Proceeds Available for Distribution to Creditors would first be used to satisfy the New Money DIP Facility Claims. Any remaining value would be distributed to the Prepetition Term Loan Facility followed by the Roll-Up DIP Claims, followed by the April 2026 Notes Claims.

1. ***New Money DIP Facility Loans*** have a funded balance of $80 million at the Conversion Date

2. ***Prepetition Term Loan Facility*** includes $39 million principal outstanding

3. ***Roll-Up DIP Facility Loans*** have a funded balance of $105 million at the Conversion Date

4. ***April 2026 Notes Claims*** includes $1,214 million principal outstanding, after the effect of the Rolled-Up DIP Facility Loans

Since the New Money DIP Facility Claims are not satisfied in full, the Prepetition Term Loan Facility, Roll-Up DIP Facility Claims and April 2026 Notes Claims do not receive any recovery in the Liquidation Analysis.

## DISTRIBUTION OF PROCEEDS TO ADMINISTRATIVE, PRIORITY & GENERAL UNSECURED CLAIMS

Claims consist of all administrative, priority and general unsecured claims arising prior to or subsequent to the Petition Date. Estimates of such Claims are based on the Debtors' books and records.

Below are the various categories of Claims, described according to their Classes under the Plan, that would all be *pari passu* as Administrative, Priority & General Unsecured Claims in chapter 7.

1. ***Administrative Claims*** consist of post-petition trade claims, compensation and benefits, and other accrued expenses.

2. ***Priority Claims*** consist of pre-petition accrued compensation and other priority tax claims

3. ***General Unsecured Claims*** consist of estimated pre-petition trade and non-trade unsecured claims such as accounts payables, accrued expenses, customer deposits, income taxes and other long-term liabilities.

4. ***July 2026 Notes*** include $26 million outstanding

5. ***Deficiency Claims*** include the Prepetition Term Loan Facility, April 2026 Notes and residual estimated amount of the BRCC Second Lien AR Note.

Administrative, Priority & General Unsecured Claims do not receive any recovery in the Liquidation Analysis.

## DISTRIBUTION OF PROCEEDS TO SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS

Subordinated Unsecured & Equity Claims do not receive any recovery in the Liquidation Analysis

**Exhibit A**

**Liquidation Analysis Debtor Entities**

($ in 000s)

*I. CALCULATION OF NET ESTIMATED PROCEEDS AVAILABLE FOR DISTRIBUTION*

| | Balances | Debtor Entities | | | |
| --- | --- | --- | --- | --- | --- |
| | | Estimated Range of Recovery | | Entities Recovery | |
| | | Low | High | Low | High |
| RECOVERIES FROM STATEMENT OF ASSETS | | | | | |
| Cash and Cash Equivalents | $    7,561 | 100% | 100% | $    7,561 | $    7,561 |
| Accounts Receivables | 11,250 | 73% | 80% | 8,213 | 9,000 |
| Inventory | 6,748 | 4% | 8% | 286 | 571 |
| Prepaid Assets | 18,099 | 9% | 13% | 1,552 | 2,390 |
| Other Current Assets | - | n.m. | n.m. | - | - |
| Property and Equipment, Net | 36,544 | 10% | 13% | 3,684 | 4,843 |
| Goodwill | - | n.m. | n.m. | - | - |
| Intangible Assets | 132,843 | 3% | 5% | 3,447 | 6,021 |
| Other Assets | 38,191 | 9% | 18% | 3,359 | 6,719 |
| Intercompany Receivables | 7,053,576 | 0% | 0% | 5,880 | 6,236 |
| Investment in Subsidiaries | 268,757 | 0% | 0% | 70 | 70 |
| **Total Assets and Gross Recovery** | **$ 7,573,570** | 0% | 1% | **$   34,052** | **$   43,411** |
| (+) Equity Interests in XBP | | | | $   21,683 | $   21,683 |
| **Gross Proceeds Available for Distribution** | | | | **$   55,734** | **$   65,094** |
| CHAPTER 7 LIQUIDATION EXPENSE | | | | | |
| Chapter 7 Trustee Fees | | | | $       813 | $    1,100 |
| Chapter 7 Trustee Professional Fees | | | | 742 | 933 |
| Wind-Down Costs | | | | 1,164 | 873 |
| **Total Chapter 7 Liquidation Expense** | | | | **2,719** | **2,906** |
| **Net Proceeds Available for Distribution** | | | | **$   53,015** | **$   62,188** |
| **Net Proceeds Available from Collection of Accounts Receivable to Satisfy Securitizations** | **$   93,700** | 73% | 80% | **$   68,401** | **$   74,960** |

*II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS*

| | Estimated Allowed Claims | | Estimated Recovery % | | Estimated Recovery $ | |
| --- | --- | --- | --- | --- | --- | --- |
| | Low | High | Low | High | Low | High |
| **Net Proceeds Available for Distribution** | | | | | $   53,015 | $   62,188 |
| New Money DIP Facility Loans | | | | | | |
| New Money DIP Facility Loans | $   80,000 | $   80,000 | 66% | 78% | $   53,015 | $   62,188 |
| **Total New Money DIP Facility Loans Claims and Distributions** | **$   80,000** | **$   80,000** | 66% | 78% | **$   53,015** | **$   62,188** |
| **Net Proceeds Available for Distribution to Secured Claims** | | | | | **$           -** | **$           -** |
| Securitization Claims | | | | | | |
| ER3 Securitization Program | $   66,800 | $   66,800 | 100% | 100% | $   66,800 | $   66,800 |
| Second Lien Note | 22,625 | 22,625 | 7% | 36% | 1,601 | 8,160 |
| **Total Securitization Claims and Distributions** | **$   89,425** | **$   89,425** | 76% | 84% | **$   68,401** | **$   74,960** |
| **Net Proceeds Available for Distribution to Secured Claims** | | | | | **$           -** | **$           -** |
| Secured Claims | | | | | | |
| Prepetition Term Loan Facility | $   38,500 | $   38,500 | 0% | 0% | $           - | $           - |
| Roll-Up DIP Facility Loans | 105,000 | 105,000 | 0% | 0% | - | - |
| April 2026 Notes Claims | 1,214,107 | 1,214,107 | 0% | 0% | - | - |
| **Total Secured Claims and Distributions** | **$ 1,357,607** | **$ 1,357,607** | 0% | 0% | **$           -** | **$           -** |
| **Net Proceeds Available for Distribution to Administrative, Priority and General Unsecured Claims** | | | | | **$           -** | **$           -** |
| Administrative, Priority and General Unsecured Claims | | | | | | |
| Administrative, Priority and General Unsecured Claims | $ 1,676,938 | $ 1,670,379 | 0% | 0% | $           - | $           - |
| **Total Administrative, Priority and General Unsecured Claims and Distributions** | **$ 1,676,938** | **$ 1,670,379** | 0% | 0% | **$           -** | **$           -** |
| **Net Proceeds Available for Distribution to Subordinated & Equity Claims** | | | | | **$           -** | **$           -** |

# EXHIBIT E

## Valuation Analysis

## EXHIBIT E

### Valuation Analysis

THE VALUATION INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN.  THIS VALUATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION AS REQUIRED BY SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS OR ANY OF THEIR AFFILIATES.

Solely for purposes of the Plan and the Disclosure Statement,[1] Houlihan Lokey Capital, Inc. ("*Houlihan Lokey*"), as financial advisor to the Debtors, has estimated a potential range of total enterprise value ("***Total Enterprise Value***") on a going-concern basis and pro forma for the transactions contemplated by the Plan.

In preparing the estimates set forth below, Houlihan Lokey has relied upon the accuracy, completeness, and fairness of financial and other information furnished by the Debtors.  Houlihan Lokey did not attempt to independently audit or verify such information, nor did it perform an independent appraisal of the assets or liabilities of the Reorganized Debtors.  Houlihan Lokey did not conduct an independent investigation into any of the legal or accounting matters affecting the Reorganized Debtors, and therefore makes no representation as to their potential impact on the Total Enterprise Value.

The valuation information set forth in this section represents a valuation of the Reorganized Debtors based on the application of standard valuation techniques.  The estimated values set forth in this section:

- do not purport to constitute an appraisal of the assets of the Reorganized Debtors;
- do not constitute an opinion on the terms and provisions or fairness from a financial point of view to any person of the consideration to be received by such person under the Plan;
- do not constitute a recommendation to any holder of Allowed Claims or Interests as to how such person should vote or otherwise act with respect to the Plan; and
- do not necessarily reflect the actual market value that might be realized through a sale or liquidation of the Reorganized Debtors.

In conducting its analysis, Houlihan Lokey, among other things:  (a) reviewed certain publicly available business and financial information relating to the Debtors and the business process and facility management industries that Houlihan Lokey deemed relevant; (b) reviewed certain internal information relating to the business, earnings, cash flow, capital expenditures, assets, liabilities, and prospects of the Reorganized Debtors, including the Financial Projections, furnished to Houlihan Lokey by the Debtors; (c) conducted discussions with representatives of the Debtors concerning the matters described in clauses (a) and (b) of this paragraph, as well as their views concerning the Debtors' and Reorganized Debtors' business and prospects before and after giving effect to the Plan; (d) reviewed publicly available financial and stock market data for certain other companies in lines of business that Houlihan Lokey deemed relevant; (e) reviewed the financial terms of certain transactions that Houlihan Lokey deemed relevant; and (f) conducted such other financial studies and analyses and took into account such other information as Houlihan Lokey deemed appropriate.

---

[1]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Disclosure Statement to which this Valuation Analysis is attached.

The estimated values set forth herein assume that the Reorganized Debtors will achieve their Financial Projections in all material respects.  Houlihan Lokey has relied on the Debtors' representation that the Financial Projections:

- have been prepared in good faith;
- are based on fully disclosed assumptions, which, in light of the circumstances under which they were made, are reasonable;
- reflect the Debtors' best currently available estimates; and
- reflect the good faith judgments of the Debtors.

Houlihan Lokey does not offer an opinion as to the attainability of the Financial Projections.  As disclosed in the Disclosure Statement, the future results of the Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors and Houlihan Lokey, and consequently are inherently difficult to project.  This analysis contemplates facts and conditions known and existing as of May 5, 2025.  Events and conditions subsequent to this date, including updated Financial Projections, as well as other factors, could have a substantial effect upon the Total Enterprise Value.  Among other things, failure to consummate the Plan in a timely manner may have a materially negative effect on the Total Enterprise Value.  For purposes of this valuation, Houlihan Lokey has assumed that no material changes that would affect value will occur between May 5, 2025 and the assumed Effective Date projected for purposes of this valuation of June 30, 2025.

In preparing its valuation, Houlihan Lokey performed a variety of financial analyses and considered a variety of factors.  The following is a brief summary of the material financial analyses considered by Houlihan Lokey, which consisted of (a) a comparable public company analysis, (b) a precedent transactions analysis, and (c) a discounted cash flow analysis.

This summary does not purport to be a complete description of the analyses performed and factors considered by Houlihan Lokey.  The preparation of a valuation analysis is a complex analytical process involving various judgmental determinations as to the most appropriate and relevant methods of financial analysis and the application of those methods to particular facts and circumstances, and such analyses and judgments are not readily susceptible to summary description.  The following valuation analysis must be considered as a whole and selecting just one methodology or portions of the analysis could create misleading or incomplete conclusions as to enterprise value.

## Valuation Methodology

The valuation analysis for the Reorganized Debtors utilized a sum-of-the-parts approach that considered each of Exela Technologies BPA, LLC ("BPA") and Neon Acquisition, LLC ("Neon") on a standalone basis and estimated an enterprise value range for each entity. Collectively, the estimated enterprise value ranges of BPA and Neon comprise the Total Enterprise Value range of the Reorganized Debtors. The Total Enterprise Value of the Reorganized Debtors was estimated by primarily relying upon three generally accepted valuation techniques: (i) Comparable Company Analysis, and (ii) Precedent Transactions Analysis, and (iii) Discounted Cash Flow ("**DCF**") analysis. The estimated enterprise value ranges of BPA and Neon reflect market data as of May 5, 2025.

### a.   Comparable Company Analysis

The comparable company analysis estimates the value of a company based on a relative comparison with other publicly traded companies with similar operating and financial characteristics.  A group of publicly traded companies was selected based on similar business and financial characteristics to the Reorganized Debtors.  Such characteristics include, but are not limited to, similarity in business and business risks, growth prospects, distribution channels, target demographics, market presence, size, and scale of operations.  The selection of appropriate

comparable companies is often difficult and relies on certain qualitative judgements, as is the case here.  The enterprise value for each selected public company is determined by examining the trading prices for the equity securities of such company in the public markets and adding the outstanding net debt for such company.  Such enterprise values are typically expressed as multiples of various measures of financial and operating statistics, most commonly EBITDA, including projected levels of EBITDA.  Multiples and representative EBITDA levels for the most recently completed 12-month period for which financial information has been made public and projected calendar year 2025 were used.  The Total Enterprise Value of the Reorganized Debtors is calculated by applying these relevant selected multiples to the Reorganized Debtors' historical financials and Financial Projections.

**b.      Precedent Transactions Analysis**

The precedent transactions analysis involves identifying and examining public merger and acquisition transactions that involved companies whose business and operating characteristics are generally similar to the Reorganized Debtors, although no selected company is either identical or directly comparable to the Reorganized Debtors.  From a review of this group, Houlihan Lokey then developed a range of valuation multiples to apply to the Reorganized Debtors' historical financials to derive a range of implied enterprise values for the Reorganized Debtors' operations.

**c.      Discounted Cash Flow Analysis**

The discounted cash flow analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business.  Houlihan Lokey's discounted cash flow analysis used the Financial Projections and their implied after-tax cash flows through December 31, 2028.  These cash flows were then discounted at a range of estimated weighted average costs of capital, which was determined by reference to, among other things, the capital structure of selected companies that are similar to the Debtors in certain respects and the estimated cost of equity and cost of debt of selected publicly traded companies that are similar to the Debtors in certain respects.  Houlihan Lokey's discounted cash flow analysis also included an estimate of the value of the Reorganized Debtors for the period beyond December 31, 2028, known as the terminal value.  The terminal value was calculated using the Gordon Growth Method, applying a perpetual growth rate to the free cash flow in the final year of the projection period. This value was then discounted back to April 30, 2025. The growth rate was informed by the long-term growth prospects of the Reorganized Debtors, as well as industry trends and economic conditions.  The discounted cash flow analysis involves complex considerations and judgments concerning appropriate terminal values and discount rates.

<u>**Estimated Total Enterprise Value**</u>

As a result of the analysis described herein, Houlihan Lokey estimated the enterprise value range of BPA to be between approximately $504 million and $591 million, with a midpoint of $548 million. Furthermore, Houlihan Lokey estimated the enterprise value of Neon to be between approximately $178 million and $209 million, with a midpoint of $193 million. Consequently, Houlihan Lokey estimates the Total Enterprise Value of the Reorganized Debtors to be between approximately $682 million and $800 million, with a midpoint of $741 million.

The estimate of the Total Enterprise Value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein depending on the results of the Debtors' operations or changes in the financial markets.  Additionally, these estimates of value represent hypothetical enterprise values of the Reorganized Debtors as the continuing operator of their businesses and assets, and do not purport to reflect or constitute appraisals, liquidation values or estimates

of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein.  Such estimates were developed solely for purposes of formulation and negotiation of the Plan and analysis of implied relative recoveries to creditors thereunder.  The value of an operating business such as the Debtors' business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such businesses.

Houlihan Lokey's estimated valuation range of the Reorganized Debtors does not constitute a recommendation to any Holder of Allowed Claims or Interests as to how such person should vote or otherwise act with respect to the Plan.  The estimated value of the Reorganized Debtors set forth herein does not constitute an opinion as to the fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan. Because valuation estimates are inherently subject to uncertainties, none of the Debtors, the Reorganized Debtors, Houlihan Lokey, nor any other person assumes responsibility for their accuracy or any differences between the estimated valuation ranges herein and any actual outcome.

**EXHIBIT F-1**

**Company Organizational Chart**

# Company Organizational Chart

*As of the Petition Date*

Entity Legend:

- Debtor-Borrower, Issuer or Co-Issuer under the Blue Torch Facility, July 2026 Notes, or April 2026 Notes
- Debtor-Guarantors of April 2026 Notes
- Debtor-Guarantors of July 2026 Notes
- Debtor-Guarantors of Blue Torch Facility
- Debtor-Originators under PNC AR Facility
- Debtor- Originators under the BR Exar AR Facility



**<u>EXHIBIT F-2</u>**

**Debtors' Organizational Chart**

# Debtors Organizational Chart[1]

*As of the Petition Date*



Entity Legend:

- Borrower, Issuer or Co-Issuer under the Blue Torch Facility, July 2026 Notes, or April 2026 Notes
- Guarantors of April 2026 Notes
- Guarantors of July 2026 Notes
- Guarantors of Blue Torch Facility
- Originators under the PNC AR Facility
- Originators under the BR Exar AR Facility

1   This organizational chart sets forth only those entities within Company's corporate structure which commenced cases under Chapter 11 in March 2025.  The Company's full corporate structure is set forth in Exhibit F-1.

**<u>EXHIBIT F-3</u>**

**Debtors' Facilities**

| Address | City | State | Status |
|---|---|---|---|
| 1 Cabot Rd. | MEDFORD | MA | Lease |
| 16 International Dr. | EAST GRANBY | CT | Lease |
| 365 W Passaic St (Suite 187) | ROCHELLE PARK | NJ | Lease |
| 2037 South 4130 West (Goldman) | SALT LAKE CITY | UT | Lease |
| 2410 W. Ruthrauff Rd., Suite 110-J | TUCSON | AZ | Lease |
| 135 West Central Blvd. | ORLANDO | FL | Lease |
| 6400 N. Davis Highway | PENSACOLA | FL | Lease |
| 2540 Executive Center Circle West (Suite 103) | TALLAHASSEE | FL | Lease |
| 2813 Industrial Plaza Dr. | TALLAHASSEE | FL | Lease |
| 11764 Marco Beach Dr. | JACKSONVILLE | FL | Lease |
| 4901 Tower Ct. | TALLAHASSEE | AL | Lease |
| 6945 Northpark Blvd. | CHARLOTTE | NC | Lease |
| 100 Executive Center Dr. A11 | COLUMBIA | SC | Lease |
| 2701 E Grauwyler Rd. B1, B2, B3 | IRVING | TX | Lease |
| 5820 W. Cypress St. | TAMPA | FL | Lease |
| 20500 Belshaw Ave. | CARSON | CA | Lease |
| 307 23rd St. Ext. | SHARPSBURG | PA | Lease |
| 40 N Main St. | DAYTON | OH | Lease |
| 6330 S. Sandhill Rd. | LAS VEGAS | NV | Lease |
| 6716 Grade Ln. | LOUISVILLE | KY | Lease |
| 102 London Shopping Center | LONDON | KY | Lease |
| 8220 (A-F) Alpine Ave. | SACRAMENTO | CA | Lease |
| 26-34 Wall St. | BINGHAMTON | NY | Lease |
| 201 South Lyndale Ave. | FARIBAULT | MN | Lease |
| 3800 & 3840 Kilroy Airport Way | LONG BEACH | CA | Lease |
| 365 W Passaic St. (Suites 120, 185, 255 and 260) | ROCHELLE PARK | NJ | Lease |
| 4868 Highway 85 | FOREST PARK | GA | Lease |
| 10365 Railroad Dr. | EL PASO | TX | Lease |
| 601 W 26th St. | NEW YORK | NY | Lease |
| 2300 Brookstone Centre Pkwy. | COLUMBUS | GA | Lease |
| 100 Executive Center Dr. Lexicode, Suite 101 | COLUMBIA | SC | Lease |
| 124 Bermondsey Rd. | NORTH YORK | ONTARIO, CANADA | Lease |
| 510 E Township Line Rd. | BLUE BELL | PA | Lease |
| 1735 E 14 Mile Rd. | TROY | MI | Lease |
| 4537 & 4553 NW 112 St. | URBANDALE | IA | Lease |
| 1000 S. Perimeter Rd. | RANTOUL | IL | Lease |
| 9128 East Hampton Dr. | CAPITOL HEIGHTS | MD | Lease |
| 183 Plaza Dr. | WILDWOOD | MO | Lease |
| 4036 and 4050 South 500 West | SALT LAKE CITY | UT | Lease |

| | | | |
|---|---|---|---|
| 1155 Robert-Bourassa Boulevard | MONTREAL | QUEBEC, CANADA | Lease |
| 2480 Dunwin Dr. | MISSISSAUGA | ONTARIO, CANADA | Lease |
| 3137 E Elwood St. | PHOENIX | AZ | Lease |
| 758 Rainbow Rd. | WINDSOR | CT | Lease |
| 410 University Ave. | WESTWOOD | MA | Lease |
| 920 Second Ave South | MINNEAPOLIS | MN | Lease |
| 9495 Southwest 72nd St. | MIAMI | FL | Lease |
| 4101 Oakesdale Avenue SW | RENTON | WA | Lease |
| 606 South US Highway 31 | GEORGIANA | AL | Owned |
| 1250 W 14 Mile Rd. | TROY | MI | Owned |

**<u>EXHIBIT G</u>**

**Listing of Debtors**

| Entity Name | Federal Employee Identification Number (EIN) |
|---|---|
| BancTec (Canada), Inc. | N/A |
| BancTec (Puerto Rico), Inc. | 66-0393420 |
| BancTec Group LLC | 30-0809103 |
| BancTec Intermediate Holding, Inc. | 14-1857751 |
| BancTec, Inc. | 75-1559633 |
| BTC Ventures, Inc. | 32-0040859 |
| Charter Lason, Inc. | 41-2137542 |
| CorpSource Holdings, LLC | N/A |
| Deliverex, LLC | 51-0370088 |
| DFG2 Holdings, LLC | 37-1703603 |
| DFG2, LLC | 38-3888322 |
| DocuData Solutions, L.C. | 75-2926166 |
| Economic Research Services, Inc. | 58-1454192 |
| Exela Enterprise Solutions, Inc. | 13-3587073 |
| Exela Finance Inc. | 82-1893089 |
| Exela Intermediate LLC | 82-1884342 |
| Exela RE LLC | 23-2981757 |
| Exela Technologies BPA, LLC | 82-1880314 |
| Exela XBP, LLC | 84-5080737 |
| FTS Parent Inc. | 47-4616206 |
| HOV Enterprise Services, Inc. | 22-3520617 |
| HOV Services, Inc. | 38-3384800 |
| HOV Services, LLC | 26-0839966 |
| HOVG, LLC | 77-0611900 |
| J & B Software, Inc. | 23-2327305 |
| Kinsella Media LLC | 52-2301194 |
| Lason International, Inc. | 38-3402450 |
| Managed Care Professionals, LLC | 81-1143386 |
| Meridian Consulting Group, LLC | 59-3770509 |
| Neon Acquisition, LLC | 80-0947559 |
| Novitex Enterprise Solutions Canada, Inc. | N/A |
| Novitex Government Solutions, LLC | 30-0193564 |
| Novitex Holdings, Inc. | 38-3914247 |
| Novitex Intermediate, LLC | 80-0947386 |
| Pangea Acquisitions Inc. | 46-4861356 |
| Plexus Global Finance, LLC | 61-1694576 |
| RC4 Capital, LLC | 80-0868892 |
| Recognition Mexico Holding Inc. | 30-0994449 |
| Regulus America LLC | 22-2974594 |
| Regulus Group II LLC | 26-4545318 |

| Entity Name | Federal Employee Identification Number (EIN) |
|---|---|
| Regulus Group LLC | 23-2847269 |
| Regulus Holding Inc. | 26-3714081 |
| Regulus Integrated Solutions LLC | 52-2277055 |
| Regulus West LLC | 23-2866282 |
| Rust Consulting, Inc. | 41-1813634 |
| Rustic Canyon III, LLC | N/A |
| Services Integration Group, L.P. | 76-0531355 |
| SIG-GP, L.L.C. | N/A |
| SOURCECORP BPS Inc. | 51-0370086 |
| SOURCECORP Legal Inc. | 58-2482419 |
| SOURCECORP Management, Inc. | 75-2912986 |
| SOURCECORP, Incorporated | 75-2560895 |
| SourceHOV Canada Company | N/A |
| SourceHOV Healthcare, Inc. | 57-0835087 |
| SourceHOV Holdings, Inc. | 68-0683138 |
| SourceHOV LLC | 26-2270219 |
| TRAC Holdings, LLC | 20-5736962 |
| TransCentra, Inc. | 32-0345387 |
| United Information Services, Inc. | 42-1446157 |
| XCV-EMEA, LLC | 88-3869335 |

2

# **EXHIBIT H**

**Allocation of New Parent Interests**

Allocation of New Parent Interests

| Plan Settlement Values: | |
|---|---|
| "Exchanged New Parent Interests" | $407,000,000 |
| XBP Europe Holdings, Inc. | $178,700,000 |
| "Plan Equity Value" | $585,700,000 |

| | % Ownership of New Parent Interests, Post-Transaction | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Base Case | | | Consenting ETI Parties Fund XBP Funding Requirement | | | No XBP or ETI Funding | | |
| | Exchanged New Parent Interests | BTC Distribution Shares* | Ending Allocation of New Parent Interests | Exchanged New Parent Interests | BTC Distribution Shares* | Ending Allocation of New Parent Interests | Exchanged New Parent Interests | BTC Distribution Shares* | Ending Allocation of New Parent Interests |
| Existing XBP Public Holders | | | 12.0% | | | 12.0% | | | 12.0% |
| April 2026 Notes - ETI | 17.0% | 4.5% | 21.5% | 16.7% | 4.5% | 21.2% | 7.7% | 2.1% | 9.7% |
| April 2026 Notes - Non-ETI | 44.8% | 12.0% | 56.8% | 44.1% | 11.8% | 55.9% | 53.9% | 14.4% | 68.2% |
| July 2026 Notes | 1.4% | 0.4% | 1.8% | 1.4% | 0.4% | 1.7% | 1.7% | 0.4% | 2.1% |
| DIP Backstop | 3.5% | 0.9% | 4.4% | 3.5% | 0.9% | 4.4% | 3.5% | 0.9% | 4.4% |
| XBP Alternative Funding Fee** | 0.0% | 0.0% | 0.0% | 1.0% | 0.3% | 1.2% | 0.0% | 0.0% | 0.0% |
| Gates Backstop | 2.8% | 0.7% | 3.5% | 2.8% | 0.7% | 3.5% | 2.8% | 0.7% | 3.5% |
| TOTAL | 69.5% | 18.5% | 100.0% | 69.5% | 18.5% | 100.0% | 69.5% | 18.5% | 100.0% |

| | $ Ownership of New Parent Interests, Post-Transaction in $ millions | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Base Case | | | Consenting ETI Parties Fund XBP Funding Requirement | | | No XBP or ETI Funding | | |
| | Exchanged New Parent Interests | BTC Distribution Shares* | Ending Allocation of New Parent Interests | Exchanged New Parent Interests | BTC Distribution Shares* | Ending Allocation of New Parent Interests | Exchanged New Parent Interests | BTC Distribution Shares* | Ending Allocation of New Parent Interests |
| Existing XBP Public Holders | | | $70.23 | | | $70.23 | | | $70.23 |
| April 2026 Notes - ETI | 99.62 | 26.55 | 126.16 | 98.08 | 26.14 | 124.22 | 45.07 | 12.01 | 57.08 |
| April 2026 Notes - Non-ETI | 262.62 | 69.99 | 332.62 | 258.58 | 68.92 | 327.50 | 315.49 | 84.08 | 399.57 |
| July 2026 Notes | 8.13 | 2.17 | 10.30 | 8.01 | 2.13 | 10.14 | 9.81 | 2.62 | 12.43 |
| DIP Backstop | 20.35 | 5.42 | 25.77 | 20.35 | 5.42 | 25.77 | 20.35 | 5.42 | 25.77 |
| XBP Alternative Funding Fee** | 0.00 | 0.00 | 0.00 | 5.70 | 1.52 | 7.22 | 0.00 | 0.00 | 0.00 |
| Gates Backstop | 16.28 | 4.34 | 20.62 | 16.28 | 4.34 | 20.62 | 16.28 | 4.34 | 20.62 |
| TOTAL | $407.00 | $108.47 | $585.70 | $407.00 | $108.47 | $585.70 | $407.00 | $108.47 | $585.70 |

*"BTC Distribution Shares" calculated on basis of 60.7% ownership of existing equity of XBP Europe Holdings, Inc., pre-transaction.
**If applicable.