## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

```
------------------------------------------------------------ x
                                                             :
In re:                                                       :   Chapter 11
                                                             :
DOCUDATA SOLUTIONS, L.C., et al.,                            :   Case No. 25-90023 (CML)
                                                             :
                    Debtors.[1]                              :   (Jointly Administered)
                                                             :
------------------------------------------------------------ x
```

### DISCLOSURE STATEMENT FOR JOINT
### PLAN OF REORGANIZATION OF DOCUDATA SOLUTIONS, L.C.
### AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**HUNTON ANDREWS KURTH LLP**
Timothy A. ("Tad") Davidson II (Texas Bar
No. 24012503)
Ashley L. Harper (Texas Bar No. 24065272)
Philip M. Guffy (Texas Bar No. 24113705)
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone:  (713) 220-4200
Email:  taddavidson@hunton.com
         ashleyharper@hunton.com
         pguffy@hunton.com

**LATHAM & WATKINS LLP**
Ray C. Schrock (NY Bar No. 4860631)
Alexander W. Welch (NY Bar No. 5624861)
Hugh K. Murtagh (NY Bar No. 5002498)
Adam S. Ravin (NY Bar No. 4079190)
Jonathan J. Weichselbaum (NY Bar No.
5676143)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email:   ray.schrock@lw.com
         alex.welch@lw.com
         hugh.murtagh@lw.com
         adam.ravin@lw.com
         jon.weichselbaum@lw.com

*Co-Counsel for the Debtors and Debtors in Possession*

Dated:  May 37, 2025

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors'
claims and noticing agent at https://omniagentsolutions.com/DocuDataSolutions.  The Debtors' mailing address
for the purposes of these cases is 2701 E. Grauwyler Road, Irving, TX 75061 USA.

THIS DISCLOSURE STATEMENT (THIS "*DISCLOSURE STATEMENT*") IS NOT A SOLICITATION OF VOTES ON THE PLAN. ACCEPTANCES AND REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT REMAINS SUBJECT TO MATERIAL REVISION AND HAS NOT, AS OF THE DATE HEREOF, BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(A) OF THE BANKRUPTCY CODE. THE DEBTORS HAVE SOUGHT ORDERS OF THE BANKRUPTCY COURT APPROVING THIS DISCLOSURE STATEMENT AS CONTAINING "ADEQUATE INFORMATION," AND APPROVING THE SOLICITATION OF VOTES AS BEING IN COMPLIANCE WITH SECTIONS 1125 AND 1126(B) OF THE BANKRUPTCY CODE, AND CONFIRMING THE PLAN.

THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

**Solicitation of Votes
on the Plan of Reorganization of**

**DOCUDATA SOLUTIONS, L.C., ET AL.**

**from the holders of outstanding**

**APRIL 2026 NOTES CLAIMS**

**CONVENIENCE CLAIMS**

**JULY 2026 NOTES CLAIMS**

**GENERAL UNSECURED CLAIMS**

**THE VOTING DEADLINE IS 4:00 P.M. (PREVAILING CENTRAL TIME) ON [JUNE 11], 2025 (UNLESS THE DEBTORS EXTEND THE VOTING DEADLINE).**

**FOR YOUR VOTE TO BE COUNTED, YOU MUST RETURN YOUR PROPERLY COMPLETED BALLOT TO THE SOLICITATION AGENT, OMNI AGENT SOLUTIONS, INC., SO THAT YOUR BALLOT IS <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT BEFORE THE VOTING DEADLINE.**

**THE BALLOTS CONTAIN DETAILED VOTING INSTRUCTIONS AND SET FORTH, AMONG OTHER THINGS, THE DEADLINES, PROCEDURES, AND INSTRUCTIONS FOR VOTING TO ACCEPT OR REJECT THE PLAN, AND THE APPLICABLE STANDARDS FOR TABULATING BALLOTS.**

**RECOMMENDATION BY THE DEBTORS AND RELATED SUPPORT**

The Debtors believe the Plan is in the best interests of their creditors and other stakeholders.  All creditors entitled to vote on the Plan are urged to vote in favor of the Plan.

The board of directors or managers, or members, as applicable, of each of the Debtors have unanimously approved the transactions contemplated by the Plan and recommend that all creditors whose votes are being solicited submit Ballots to accept the Plan.

Subject to the terms and conditions of the Plan Support Agreement and the Sub-Group DIP Lenders Settlement, Holders of over 80% of the aggregate principal amount outstanding of April 2026 Notes Claims have already agreed to vote in favor of, or otherwise support, the Plan.

Each of the Debtors therefore strongly recommends that all Holders of Claims entitled to vote on the Plan submit Ballots to __ACCEPT__ the Plan so as to be actually received by the Solicitation Agent before the Voting Deadline (*i.e.*, [-●--June 11], 2025 at 4:00 p.m. (prevailing Central Time)) in accordance with the instructions set forth below and in the Ballots.

**Committee's Support of the Plan**

Following extensive negotiations, the Committee supports the Plan and recommends that all Holders of General Unsecured Claims, Convenience Claims, and July 2026 Notes Claims vote in favor of the Plan in order to maximize recovery for their claims.  ├The reasons underlying the Committee's support for the Plan are more fully set forth in the letter from the Committee included in the Solicitation  Packages, but the Committee believes the Plan provides the best and most certain opportunity for recovery for Holders of General Unsecured Claims, Convenience Claims, and July 2026 Notes Claims.├

---

**IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT FOR YOU TO READ**

DocuData Solutions, L.C. and certain of its affiliates,[2] as debtors and debtors-in-possession (collectively, the "***Debtors***") in the above-captioned chapter 11 cases (the "***Chapter 11 Cases***"), are providing you with the information in this Disclosure Statement because you may be a creditor of the Debtors and may be entitled to vote on the *Joint Plan of Reorganization of DocuData Solutions, L.C. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (including all exhibits and schedules thereto, and as may be amended, modified, or supplemented from time to time, the "***Plan***").  A draft of the Plan is attached hereto as __Exhibit A__.  All capitalized terms used but not otherwise defined herein have the definitions given to them in the Plan.  To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the Plan are inconsistent, the definition included in the Plan will control and govern.

**ALL CREDITORS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN __SECTION IX__ BELOW AND THE PLAN ATTACHED**

---

[2]    An alphabetical listing of all the Debtors is attached hereto as __Exhibit G__.

HERETO AS **EXHIBIT A** BEFORE SUBMITTING BALLOTS IN RESPONSE TO SOLICITATION OF THE PLAN.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE, AND VOTING CREDITORS SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE VOTING ON THE PLAN.

THE ISSUANCE AND DISTRIBUTION UNDER THE PLAN OF PLAN SECURITIES TO HOLDERS OF ALLOWED APRIL 2026 NOTES CLAIMS AND ALLOWED JULY 2026 NOTES CLAIMS (IF THEY VOTE IN FAVOR OF THE PLAN IN SUFFICIENT NUMBERS TO CARRY THE CLASS) WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*") AND ANY OTHER APPLICABLE SECURITIES LAWS PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE. THE ISSUANCE AND DISTRIBUTION UNDER THE PLAN OF ROLLOVER EXIT NOTES IS BEING MADE IN RELIANCE ON SECTION 4(a)(2) OF THE SECURITIES ACT (AND SIMILAR EXEMPTIONS UNDER STATE SECURITIES LAWS) AND WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND ANY OTHER APPLICABLE SECURITIES LAWS PURSUANT THERETO (AND SIMILAR EXEMPTIONS UNDER STATE SECURITIES LAWS) OR OTHER AVAILABLE EXEMPTIONS UNDER THE SECURITIES ACT.

THE DEBTORS WILL RELY ON SECTION 1145(a) OF THE BANKRUPTCY CODE AND SECTION 4(a)(2) OF THE SECURITIES ACT (AND SIMILAR EXEMPTIONS UNDER STATE SECURITIES LAWS) TO EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND STATE SECURITIES LAWS ANY OFFERS OF PLAN SECURITIES AND ROLLOVER EXIT NOTES, RESPECTIVELY, THAT MAY BE DEEMED TO BE MADE AFTER THE PETITION DATE, INCLUDING IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.

THE PLAN SECURITIES AND ROLLOVER EXIT NOTES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "*SEC*") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY.    THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE, SECTION 4(A)(2) OF THE SECURITIES ACT OR ANY OTHER APPLICABLE SECURITIES LAWS, SHALL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS PROVIDED HEREIN.

THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE OR TO MAKE ANY REPRESENTATION IN CONNECTION WITH THE PLAN OR THIS DISCLOSURE STATEMENT, AND HOLDERS OF CLAIMS AND INTERESTS UNDER THE PLAN SHOULD NOT CONSTRUE THE CONTENT OF THIS DISCLOSURE STATEMENT AS PROVIDING LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.    THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.

**THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.**

**ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.**

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 4:00 P.M. (PREVAILING CENTRAL TIME) ON [●JUNE 11], 2025, UNLESS EXTENDED BY THE DEBTORS (THE "*VOTING DEADLINE*").  ALL BALLOTS AND RELEASE OPT-OUT FORMS MUST BE SUBMITTED BY THE VOTING DEADLINE.**

**To be counted, your ballot ("*Ballot*") must be properly completed and returned to the Solicitation Agent, Omni Agent Solutions, Inc. (the "*Solicitation Agent*"), in accordance with the voting instructions on such Ballot and <u>actually received</u> by the Solicitation Agent, via regular mail, overnight courier, or personal delivery at the appropriate address, via email (where applicable), or via the Solicitation Agent's online voting portal, by the Voting Deadline.  Please review the instructions set forth on your Ballot for further guidance on the appropriate method(s) of submission.**

A summary of the voting instructions is set forth in <u>Section I.E</u> of this Disclosure Statement.  More detailed instructions are also contained in the Ballots distributed to the creditors entitled to vote on the Plan.

This Disclosure Statement, the Plan, the Plan Supplement, and any attachments, exhibits, supplements, and annexes hereto or thereto are the only documents to be used in connection with the solicitation of votes on the Plan, and also may not be relied upon for any purpose other than to determine how to vote on the Plan (except with respect to any Plan Supplement documents that may be relied upon for purposes other than to determine how to vote on the Plan).  Neither the Bankruptcy Court nor the Debtors have authorized any person to give any information or to make any representation in connection with the Plan or the solicitation of acceptances of the Plan other than as contained in this Disclosure Statement, the Plan Supplement, and any attachments, exhibits, supplements, and annexes attached hereto or thereto.  If given or made, such information or representation may not be relied upon as having been authorized by the Bankruptcy Court or the Debtors.  The delivery of this Disclosure Statement will not under any circumstances represent that the information herein is correct as of any time after the date hereof.

This Disclosure Statement will not constitute an offer to sell, or solicitation of an offer to buy, nor will there be any distribution of, any of the securities described herein until the Effective Date of the Plan.

The summaries of the Plan and other documents contained in this Disclosure Statement are qualified in their entirety by reference to the Plan itself, the exhibits thereto that will be included in the Plan Supplement, and documents described therein as filed before the conditional approval of this Disclosure Statement or subsequently as part of the Plan Supplement.  In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, or between the Plan Supplement and the Plan, the terms of the Plan will control.  Except as otherwise indicated herein or in the Plan, the Debtors will propose to file all Plan Supplement documents with the Bankruptcy Court and make them available for review at the Debtors' document website located online at https://omniagentsolutions.com/DocuDataSolutions no later than seven (7) days before the Objection

Deadline (as defined in the Solicitation Procedures Order (as defined below)).  The Debtors intend to propose the Objection Deadline to be [June 11], 2025 at 4:00 p.m. (prevailing Central Time).

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan.  The Debtors reserve the right to modify the Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, subject to the terms of the Plan.  The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there can be no assurance that the statements contained herein will be correct at any time after this date.  The information contained in this Disclosure Statement, including the information regarding the history, businesses, and operations of the Debtors, the financial information regarding the Debtors, and the liquidation analysis relating to the Debtors, is included for purposes of soliciting acceptances of the Plan, but, as to contested matters and adversary proceedings, is not to be construed as an admission or stipulation, but rather as a statement made in settlement negotiations as part of the Debtors' attempt to settle and resolve claims and controversies pursuant to the Plan.  This Disclosure Statement will not be admissible in any non-bankruptcy proceeding, nor will it be construed to be conclusive advice on the tax, securities, or other legal effects of the Plan as to Holders of Claims against, or Interests in, either the Debtors or the Reorganized Debtors.  Unless specifically noted, the financial information contained in this Disclosure Statement and in its exhibits has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles in the United States.

The effectiveness of the Plan is subject to material conditions precedent.  *See* Section V.G below and Article VIII of the Plan.  There is no assurance that these conditions will be satisfied or waived.

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims against, and Interests in, the Debtors (including, without limitation, those Holders who do not submit Ballots to accept or reject the Plan or who are not entitled to vote on the Plan) will be bound by the terms of the Plan and the transactions contemplated thereby.

## IMPORTANT NOTICES REGARDING
## RELEASES BY AND FOR HOLDERS OF CLAIMS AND INTERESTS

**If you are a Holder of a Claim or Interest, you may be deemed to grant the Third-Party Release under the Plan.  Specifically, pursuant to Article IX.C of the Plan, each Holder of a Claim or Interest is deemed to grant the Third-Party Release, to the maximum extent otherwise permitted by law, if:  (a) such Holder is entitled to vote to accept or reject the Plan and (i) votes to accept the Plan and does not elect to opt-out of the Third-Party Release, (ii) abstains from voting on the Plan and does not elect to opt out of the Third-Party Release, or (iii) votes to reject the Plan but does not elect to opt out of the Third-Party Release; or (b) such Holder is a Holder of a Claim or Interest in a Class that is presumed to accept or reject the Plan and does not timely opt out of providing the Third-Party Release.  The Third-Party Release is discussed further in Section V.H of this Disclosure Statement.  Instructions for opting out of the Third-Party Release are set forth in the Solicitation Package (as defined below) distributed in connection with this Disclosure Statement.**

## FORWARD-LOOKING STATEMENTS

This Disclosure Statement contains forward-looking statements based primarily on the current expectations of the Debtors and projections about future events and financial trends affecting the financial condition of the Debtors' businesses and assets.  The words "believe," "may," "estimate," "continue," "anticipate," "intend," "expect," and similar expressions identify these forward-looking statements.  These forward-looking statements are subject to a number of risks, uncertainties, and assumptions, including those described below in Section IX.  In light of these risks and uncertainties, the

forward-looking events and circumstances discussed in this Disclosure Statement may not occur, and actual results could differ materially from those anticipated in the forward-looking statements. The Debtors do not undertake any obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events, or otherwise.

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 and not necessarily in accordance with federal or state securities laws or other non-bankruptcy laws. This Disclosure Statement has not been approved or disapproved by the SEC, any state securities commission or any securities exchange or association nor has the SEC, any state securities commission or any securities exchange or association passed upon the accuracy or adequacy of the statements contained herein. Any representation to the contrary is a criminal offense.

## QUESTIONS AND ADDITIONAL INFORMATION

If you would like to obtain copies of this Disclosure Statement, the Plan, the Plan Supplement, or any of the documents attached hereto or thereto or referenced herein or therein, or have questions about the solicitation and voting process or the Chapter 11 Cases generally, please contact the Solicitation Agent by visiting the Debtors' restructuring website at https://omniagentsolutions.com/DocuDataSolutions.

*[Remainder of page left intentionally blank]*

**TABLE OF CONTENTS**

**Page**

I. EXECUTIVE SUMMARY ................................................................................ 1

    A.    Purpose and Effect of the Plan ............................................................. 2
    B.    Classification and Treatment of Claims and Interests under the Plan ......... 5
    C.    Filing of the Plan Supplement ............................................................. 8
    D.    Solicitation Procedures ....................................................................... 8
    E.    Voting Procedures ............................................................................. ~~12~~13
    F.    Confirmation of the Plan ..................................................................... ~~16~~17
    G.    The Plan Releases ............................................................................. ~~18~~19
    H.    Issuance of Plan Securities ................................................................. ~~18~~19
    I.    Consummation of the Plan ................................................................. 19
    J.    Risk Factors ..................................................................................... ~~19~~20

II. BACKGROUND TO THE CHAPTER 11 CASES .......................................... ~~19~~20

    A.    The Debtors' Corporate Structure ........................................................ ~~19~~20
    B.    The Company's History ...................................................................... ~~19~~20
    C.    The Company's Business Operations and Revenue .............................. ~~19~~20
    D.    The Debtors' Prepetition Capital Structure .......................................... ~~23~~24
    E.    Unsecured Debt ................................................................................. ~~27~~28
    F.    Securitization and Other Receivables Financing Arrangements .............. ~~27~~28

III. EVENTS PRECEDING COMMENCEMENT OF THE CHAPTER 11 CASES ...... ~~31~~32

    A.    Challenges Leading to the Commencement of the Chapter 11 Cases ...... ~~31~~32
    B.    Negotiations with Stakeholders ........................................................... ~~33~~34

IV. OVERVIEW OF CHAPTER 11 CASES ..................................................... ~~34~~35

    A.    Commencement of Chapter 11 Cases ................................................... ~~34~~35
    B.    First Day Relief ................................................................................. ~~34~~35
    C.    Approval of the Postpetition Securitization Programs ............................ ~~35~~36
    D.    Retention Applications for Debtors' Professionals and Related Relief ...... 36
    E.    Establishment of Claims Bar Dates; Filing of Schedules ...................... ~~36~~37
    F.    The Official Committee of Unsecured Creditors .................................. ~~36~~37
    G.    Dispute Regarding Approval of Final DIP Financing ............................ ~~37~~38
    H.    The Committee Settlement ................................................................. ~~38~~39
    I.    Entry of the Final DIP Order ............................................................. ~~38~~39
    J.    The Amended Plan Support Agreement ............................................... ~~38~~39
    K.    The Investigation ............................................................................. 40
    L.    Exclusivity ....................................................................................... ~~40~~41
    M.    Timetable for the Chapter 11 Cases ................................................... ~~40~~41

i

V. SUMMARY OF THE PLAN ......................................................................................... ~~40~~41

    A.    Classification and Treatment of Claims and Interests under the Plan ..................... ~~41~~42
    B.    Acceptance or Rejection of the Plan; Effect of Rejection of the Plan ..................... ~~42~~43
    C.    Means of Implementation of the Plan ........................................................................ ~~44~~45
    D.    Treatment of Executory Contracts and Unexpired Leases; Employee
          Benefits; and Insurance Policies ............................................................................... ~~52~~53
    E.    Provisions Governing Distributions ........................................................................... ~~56~~57
    F.    Procedures for Resolving Disputed, Contingent, and Unliquidated Claims
          or Interests ................................................................................................................. ~~59~~60
    G.    Conditions Precedent to the Occurrence of the Effective Date ............................... ~~60~~61
    H.    Discharge, Release, Injunction, and Related Provisions .......................................... ~~62~~63

VI. CAPITAL STRUCTURE AND CORPORATE GOVERNANCE OF
    REORGANIZED DEBTORS ...................................................................................... ~~68~~69

    A.    Summary of Capital Structure of Reorganized Debtors ........................................... ~~68~~69
    B.    Corporate Governance and Management of the Reorganized Debtors ..................... ~~73~~74

VII. CONFIRMATION OF THE PLAN ............................................................................. ~~76~~77

    A.    Confirmation Hearing ................................................................................................ ~~76~~78
    B.    Confirmation ............................................................................................................. ~~78~~79
    C.    Classification of Claims and Interests ...................................................................... ~~82~~83
    D.    Consummation .......................................................................................................... ~~82~~83
    E.    Exemption from Certain Taxes and Fees .................................................................. ~~83~~84
    F.    Modification of Plan ................................................................................................. ~~83~~84
    G.    Effect of Confirmation on Modifications .................................................................. ~~83~~84
    H.    Revocation of Plan; Reservation of Rights If Effective Date Does Not
          Occur ........................................................................................................................ ~~83~~84
    I.    Post-Confirmation Jurisdiction of the Bankruptcy Court ........................................ ~~84~~85

VIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
    PLAN ......................................................................................................................... ~~86~~87

    A.    Continuation of Chapter 11 Cases ............................................................................ ~~86~~87
    B.    Liquidation under Chapter 7 ..................................................................................... ~~87~~88
    C.    Dismissal of Chapter 11 Cases. ................................................................................ ~~87~~88

IX. RISK FACTORS TO CONSIDER BEFORE VOTING ................................................ ~~87~~88

    A.    Certain Bankruptcy Law Considerations .................................................................. ~~87~~88
    B.    Risks Relating to the Capital Structure of the Reorganized Debtors ....................... ~~91~~92
    C.    Risks Relating to New Parent's Business Operations ............................................... ~~94~~96
    D.    Risks Related to the Plan Securities .......................................................................... ~~104~~105
    E.    Additional Factors ..................................................................................................... ~~106~~108

X. SECURITIES LAW MATTERS .................................................................... ~~107~~109

     A.     Issuance of 1145 Securities ......................................................... ~~107~~109
     B.     Subsequent Transfers of 1145 Securities ...................................... ~~108~~110
     C.     Issuance of Private Placement Securities ...................................... ~~109~~110

XI. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ... ~~111~~112

XII. CONCLUSION AND RECOMMENDATION ............................................ ~~112~~113

**EXHIBITS**

EXHIBIT A  Plan

EXHIBIT B  Plan Support Agreement

EXHIBIT C  Financial Projections

EXHIBIT D  Liquidation Analysis

EXHIBIT E  Valuation Analysis

EXHIBIT F-1  Company Organizational Chart

EXHIBIT F-2  Debtors' Organizational Chart

EXHIBIT F-3  Debtors' Facilities

EXHIBIT G  Listing of Debtors

EXHIBIT H  ~~Percentage Ownership of Intermediate~~Allocation of New Parent
         Interests

---

**THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.**

---

# I.
# EXECUTIVE SUMMARY

The Debtors in the Chapter 11 Cases commenced in the Bankruptcy Court (each as defined below) submit this Disclosure Statement, pursuant to section 1125 of the Bankruptcy Code, in connection with the solicitation of votes on the Plan.  A copy of the Plan is attached hereto as **Exhibit A**.

Before soliciting votes on a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires debtors to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance or rejection of such plan of reorganization.  This Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.

The Debtors are commencing this solicitation to implement a comprehensive consensual restructuring (the "**Restructuring**") that will reduce their funded debt obligations from approximately $~~1.321~~**1.383** billion to approximately $~~351~~**367** million upon emergence.  The Restructuring is supported by the overwhelming majority of the Debtors' capital structure.  Much of that support is set forth in the amended and restated plan support agreement dated as of April 24, 2025 [Docket No. 396] (the "**Plan Support Agreement**") attached hereto as **Exhibit B**, and the Sub-Group DIP Lenders Settlement related to the DIP Facility (which comprises approximately $80 million in "new money" loans plus approximately $105 million of prepetition Notes Obligations of the DIP Lenders "rolled-up" into the DIP Facility, which will ultimately convert to committed exit financing or otherwise be satisfied on the Effective Date).  Pursuant to the terms of the Plan Support Agreement, the Consenting Creditor Ad Hoc Group and the Consenting ETI Parties have already agreed to vote in favor of and otherwise support confirmation of the Plan.  Furthermore, pursuant to the terms of the Sub-Group DIP Lenders Settlement, the Sub-Group DIP Lenders have agreed to support and vote in favor of the Plan, resulting in the Plan enjoying the support of holders of over 80% of the outstanding principal amount of the Debtors' 11.5% secured notes due 2026.  Additionally, by virtue of a global and comprehensive settlement reached with the Committee, the terms of which are set forth in the *Notice of Settlement Term Sheet with Official Committee of Unsecured Creditors* [ Docket No. 368], the Committee has agreed to support the Plan. The Restructuring will enhance the Debtors' long-term growth prospects and competitive position and will provide the Debtors with the flexibility to invest in and grow their businesses while saving more than 11,000 jobs globally.

The Debtors filed voluntary petitions for relief and commenced cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**") on March 3, 2025 (the "**Petition Date**").  Since the commencement of the Chapter 11 Cases, the Debtors have operated their businesses in the ordinary course.

This Executive Summary is being provided as an overview of the material items addressed in this Disclosure Statement and the Plan, which is qualified by reference to the entire Disclosure Statement and by the actual terms of the Plan (and including all exhibits attached hereto and to the Plan) and should not be relied upon for a comprehensive discussion of this Disclosure Statement or the Plan.

This Disclosure Statement includes, without limitation, information about:

- the Debtors' prepetition operating and financial history;

- the events leading up to the commencement of the Chapter 11 Cases;

1

- the events that have occurred during the pendency of the Chapter 11 Cases;

- the solicitation procedures for voting on the Plan;

- the Confirmation process and the voting procedures that Holders of Claims who are entitled to vote on the Plan must follow for their votes to be counted;

- the terms and provisions of the Plan, certain effects of Confirmation of the Plan, and the manner in which distributions will be made under the Plan;

- certain risk factors relating to the Debtors, the Reorganized Debtors, and Confirmation of the Plan; and

- the proposed organization, operations, and financing of the Reorganized Debtors if the Plan is confirmed and becomes effective.

## A.   Purpose and Effect of the Plan

### 1.   Plan of Reorganization under Chapter 11 of the Bankruptcy Code

The Debtors are reorganizing pursuant to chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code.  As a result, the confirmation of the Plan means that the Reorganized Debtors will continue to operate their businesses going forward and does not mean that the Debtors will be liquidated or forced to go out of business.

A bankruptcy court's confirmation of a plan binds the debtor, any entity acquiring property under the plan, any holder of a claim or equity interest in the debtor, and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code to the terms and conditions of the confirmed plan, whether or not such entity voted on the particular plan or affirmatively voted to reject the plan.

### 2.   Restructurings under the Plan

The Plan contemplates the following Restructuring and treatment of Claims:[3]

- Restructuring Generally.  The Plan provides for the equitization of all Allowed July 2026 Notes Claims and Allowed April 2026 Notes Claims (collectively, "**Allowed Notes Claims**") through a series of steps resulting in the Holders of Allowed Notes Claims receiving their Pro Rata Shares of a portion of the equity of the Debtors' publicly-traded affiliate, XBP Europe Holdings, Inc. ("**XBP**").[4]  Subject to the Definitive Documents and as will be described in more detail in the Restructuring Steps Exhibit to be filed with the Plan Supplement, these steps will result in XBP becoming the ultimate parent of Debtors Exela Technologies BPA, LLC, and Neon Acquisition, LLC (and their respective subsidiaries), with the holders of Allowed Notes Claims exchanging their entitlements to

---

[3]   The following summary is subject in all respects to the Plan itself.

[4]   As reflected on the Company Organizational Chart attached hereto as **Exhibit F-1**, one of the Debtor's affiliates is XBP.  The Debtors' parent, Exela Technologies, Inc. indirectly owns 21,802,364 shares of common stock of XBP, representing approximately 60.7% of the outstanding capital stock of XBP as of the date hereof.  XBP's stock is publicly traded on The Nasdaq Stock Market ("**NASDAQ**") with the ticker symbol "XBP."

equity in those Debtors for newly-issued equity in XBP pursuant to an agreed-upon exchange ratio (the "***XBP Transaction***").  In addition, Debtor XCV-EMEA, LLC will cause the equity it owns in XBP (as its current indirect parent) to be distributed to the holders of Allowed Notes Claims, in light of XCV-EMEA's guarantee of certain Notes Obligations.  Certain backstop and funding fees notionally payable in the equity of the Debtors will also be satisfied with newly-issued XBP equity (the equity to be issued pursuant to the Plan other than the equity to be distributed by XCV-EMEA is referred to herein and in the Plan as the "***Exchanged New Parent Interests***").  Holders of Allowed General Unsecured Claims will receive cash consideration through either pro rata participation in the General Unsecured Claims cash recovery or election to participate in the Convenience Class recovery, all as described herein.  All other Claims are either unimpaired or receive no recovery, as set forth herein.

- <u>DIP Financing</u>.  The Chapter 11 Cases are being financed by $185 million in post-petition loans and advances to the Debtors, comprising $80 million of New Money Loans and $105 million of Roll-Up Loans (the "***DIP Facility***"), with backstop participation and funding of the DIP Facility pursuant to the Interim DIP Order open to all April 2026 Noteholders, and participation in the funding of the DIP Facility pursuant to the Final DIP Order open to all April 2026 Noteholders and July 2026 Noteholders, on the terms and conditions set forth in the Final DIP Order and DIP Documents.

- <u>Exit Financing</u>:

    - On the Effective Date, the Reorganized Debtors will enter into the Exit Facility (as defined in the Plan Support Agreement) on the terms set forth in the Plan Term Sheet and Exit Facility Documents (each as defined in the Plan Support Agreement), pursuant to which all DIP Obligations shall be converted into Rollover Exit Notes on a cashless basis, except as otherwise provided for a portion of the Sub-Group DIP Lenders' DIP Obligations, as detailed herein.

    - On the Effective Date, the Reorganized Debtors will also enter into a supplemental exit facility to replace or refinance the Debtors' senior secured prepetition term loan facility dated as of July 11, 2023 (the "***Blue Torch Facility***"), with either (a) the New Blue Torch Facility or (b) the Gates Exit Facility; *provided that* if the Debtors enter into the Gates Exit Facility, the Blue Torch Facility, including any related guarantees, will be repaid with the proceeds of the Gates Exit Facility.

    - On the Effective Date, XBP will provide the XBP Funding in an amount of $18 million; in the event the XBP Funding fails to become committed by the deadline for objections established by the Court to confirmation of the Plan or fails to occur on or prior to the Effective Date, and if the Consenting ETI Parties do not instead provide XBP Alternative Funding in the same amount, the Consenting ETI Parties' equity will be reduced as described below.

    - On the Effective Date, the Consenting ETI Parties shall be bound by a commitment to pay (a) the first $15 million of Transaction Tax Liability and (b) any Transaction Tax Liability in excess of $25 million, with any amounts of the Transaction Tax Liability between $15 million and $25 million the obligation of the Reorganized Debtors.

- Securitization Program: The Reorganized Debtors will continue or replace their existing securitization programs.

- Recoveries:

  o   Each Holder of an Allowed April 2026 Notes Claim shall receive either (i) if such Holder is not ETI or an ETI Holder, its Noteholder Pro Rata Share of the Non-ETI Equity Distribution (72.5% of Exchanged New Parent Interests issued in exchange for Allowed Notes Claims, subject to reduction by the July 2026 Notes recovery and dilution by all premiums and backstop fees payable in equity), or (ii) if such Holder is ETI or an ETI Holder, its ETI Pro Rata Share of the ETI Equity Distribution (27.5% of Exchanged New Parent Interests issued in exchange for Allowed Notes Claims, subject to reduction by the July 2026 Notes recovery and dilution by all premiums and backstop fees payable in equity) and the New Parent Warrants; *provided that* the ETI Equity Distribution will be reduced from 27.5% to 12.5% in the event the XBP Funding is not timely committed or funded and is not replaced by the XBP Alternative Funding, in which case the 15% shall be reallocated to Non-ETI Equity Distribution;

  o   Pursuant and subject to the terms of the Committee Settlement, each Holder of an Allowed July 2026 Notes Claims shall receive its Pro Rata Share of a percentage of all Exchanged New Parent Interests issued in exchange for Notes Claims sufficient to ensure Holders of Allowed July 2026 Notes Claims receive the same percentage recovery on their Claims as Non-ETI Holders of Allowed April 2026 Notes Claims;

  o   The estimated ~~percentage ownership of Intermediate~~**allocation of New Parent** Interests**, post-XBP Transaction** is described in **Exhibit H**;

  o   Pursuant and subject to the terms of the Committee Settlement, Holders of Allowed General Unsecured Claims shall receive their Pro Rata Share of the Unsecured Cash Pool, with such amount being paid out according to a schedule as set forth in the Plan;

  o   Pursuant and subject to the terms of the Committee Settlement, Allowed General Unsecured Convenience Class Claims of an amount equal to or less than $25,000 shall be paid in cash from the proceeds of the Exit Facility in an amount equal to no less than 70% of their Allowed General Unsecured Convenience Class Claim amount; *provided that* Holders of Allowed General Unsecured Claims of an amount greater than $25,000 may elect to convert their claims to Allowed General Unsecured Convenience Class Claims by reducing the amount of their Allowed General Unsecured Claim to $25,000; and

  o   Other Secured Claims and Prepetition Term Loan Claims are Unimpaired; Intercompany Claims are either reinstated, converted to equity, or otherwise set off, settled, distributed, contributed, cancelled, or released, in each case, in accordance with the Plan; Intercompany Interests will be reinstated for administrative convenience; all Subordinated Claims will be cancelled, released, discharged, and extinguished, and Holders of Subordinated Claims will not receive any distribution on account of such Subordinated Claims; Existing BPA Interests will be canceled, released, discharged, and extinguished; and Other

Existing Equity Interests shall be either (i) treated in accordance with the Definitive Documents or (ii) canceled, released, discharged, and extinguished, and shall be of no further force or effect.

With respect to implementing the Restructuring Transactions under the Plan, the Debtors intend to disclose the precise steps to be taken in the Plan Supplement and will make those transactions public with sufficient time for all voting creditors to consider them before the Voting Deadline.

**B.**     **Classification and Treatment of Claims and Interests under the Plan**

The following table provides a summary of the classification and treatment of Claims and Interests and the potential distributions to Holders of Allowed Claims under the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE, INCLUDING BASED ON THE LIQUIDATION OF CLAIMS CURRENTLY ASSERTED AS UNLIQUIDATED. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN AND THE RISK FACTORS DESCRIBED IN SECTION IX BELOW. THIS TABLE IS INTENDED FOR ILLUSTRATIVE PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR A REVIEW OF THE PLAN AND DISCLOSURE STATEMENT IN THEIR ENTIRETY. FOR CERTAIN CLASSES OF CLAIMS, THE ACTUAL AMOUNT OF ALLOWED CLAIMS COULD BE MATERIALLY DIFFERENT THAN THE ESTIMATED AMOUNTS SHOWN IN THE TABLE BELOW.**

| SUMMARY OF EXPECTED RECOVERIES[5] | | | |
|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/ Interest** | **Projected Recovery Under the Plan** |
| 1 | Other Secured Claims<br><br>Estimated Amount (as of February 28, 2025): $[$15.2~~13.5~~ million] | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim, at the option of the applicable Debtor shall, on the Effective Date, (i) be paid in full in Cash, (ii) receive the collateral securing its Allowed Other Secured Claim including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, (iii) Reinstatement of its Allowed Other Secured Claim, or (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | [100%] |
| 2 | Prepetition Term Loan Claims | Except to the extent that a Holder of an Allowed Prepetition Term Loan Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Prepetition Term Loan Claim, each Holder of an Allowed Prepetition Term Loan | [100%] |

---

[5] [NTD: To be updated.]

| Class | Claim/Equity Interest | Treatment of Claim/ Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| colspan="4" | **SUMMARY OF EXPECTED RECOVERIES[5]** |
| | Estimated **Principal** Amount (as of February 28, 2025): $~~[~~38.5 million~~]~~ | Claim on the Effective Date shall be paid in full in Cash. | |
| 3 | April 2026 Notes Claims<br><br>~~Expected~~**Estimated** Principal Amount **and Outstanding Interest** (as of February 28, 2025): $~~[1.252~~**1.214** billion~~]~~ | Except to the extent that a Holder of an April 2026 Notes Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed April 2026 Notes Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in accordance with the Definitive Documents and in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed April 2026 Notes Claim, either: (i) if such Holder is a Non-ETI Holder, its Noteholder Pro Rata Share of the Non-ETI Equity Distribution; or (ii) if such Holder is ETI or an ETI Holder, its ETI Pro Rata Share of the ETI Equity Distribution. | ~~[~~**38**% |
| 4 | Convenience Claims | Except to the extent that a Holder of an Allowed Convenience Claim agrees to a less favorable treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date or as soon as reasonably practicable thereafter, Cash in an amount equal to no less than 70% of such Allowed Convenience Claim amount pursuant to the Committee Settlement; *provided*, that to the extent that a Holder of an Allowed Convenience Claim against a Debtor holds any joint and several liability Claims, guaranty Claims, or other similar Claims against any other Debtors arising from or relating to the same obligations or liability as such Convenience Claim, such Holder shall only be entitled to a distribution on one Convenience Claim against the Debtors in full and final satisfaction of all such Claims. | ~~[~~70-100~~]~~% |
| 5 | July 2026 Notes Claims<br><br>Estimated **Principal** Amount **and Outstanding Interest** (as of February 28, 2025): $~~[23.95~~**25.67** million~~]~~ | Except to the extent that a Holder of a July 2026 Notes Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed July 2026 Notes Claim shall receive, in full and final satisfaction, settlement, release, and discharge and in exchange for such Allowed July 2026 Notes Claim, and as a carve out of the collateral (or value of such collateral) securing the April 2026 Notes Claims, its Pro Rata Share of the July 2026 Noteholder Equity Distribution. | ~~[~~**40**%[65] |

---

[65]   Recovery percentage will match recovery percentage for Non-ETI Holders of April 2026 Notes Claims.

| | | SUMMARY OF EXPECTED RECOVERIES[5] | |
|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/ Interest | Projected Recovery Under the Plan |
| 6 | General Unsecured Claims<br><br>Estimated Amount (as of February 28, 2025): $[11.7]19.58 million] (inclusive of Non-Priority Tax Claims) | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date, as a carve out of collateral (or the value of such collateral) securing the April 2026 Notes Claims, its Pro Rata share of the Unsecured Cash Pool, with such amount being paid out over the following schedule: (i) 1/3 paid within nine (9) months of the Effective Date; (ii) 1/3 paid within eighteen (18) months of the Effective Date; and (iii) 1/3 paid within twenty-seven (27) months of the Effective Date. Holders of Allowed General Unsecured Claims shall be entitled to interest (which interest shall be treated for all purposes as an incremental distribution on account of such Allowed General Unsecured Claim) on unpaid portions of such Holder's Pro Rata share of the Unsecured Cash Pool, accruing at 4% per annum, paid in-kind, commencing on the Effective Date, and such payment obligations shall be secured by collateral reasonably acceptable to the Debtors, the Required Consenting Creditors, and the Committee. | [40.6]35-45% |
| 7 | Subordinated Claims<br><br>Expected Amount: N/A | On the Plan Effective Date, all Section 510(b) Claims shall be cancelled, released, discharged, and extinguished and shall be of no further force or effect, and Holders of Section 510(b) Claims shall not receive any distribution on account of such Section 510(b) Claims. | N/A |
| 8 | Intercompany Claims<br><br>Expected Amount: Unliquidated | On or as soon as reasonably practicable after the Effective Date, all Intercompany Claims will be adjusted, Reinstated, or discharged, as determined by the Debtors or the Reorganized Debtors with the reasonable consent of the Required Consenting Creditors, or as provided in the Definitive Documents. | N/A |
| 9 | Intercompany Interests<br><br>Expected Amount: Unliquidated | On or as soon as reasonably practicable after the Effective Date, all Intercompany Interests will be adjusted, Reinstated, or discharged as determined by the Debtors or the Reorganized Debtors with the reasonable consent of the Required Consenting Creditors, or as provided in the Definitive Documents. | N/A |

| SUMMARY OF EXPECTED RECOVERIES[5] | | | |
|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/ Interest | Projected Recovery Under the Plan |
| 10 | Existing BPA Equity Interests<br><br>Expected Amount: N/A | On the Plan Effective Date, Holders of Existing BPA Equity Interests are not entitled to receive a recovery or distribution on account of such Existing BPA Equity Interests.  On the Plan Effective Date, Existing BPA Equity Interests shall, subject to the Definitive Documents, be canceled, released, discharged, and extinguished, and shall be of no further force or effect. | 0% |
| 11 | Other Existing Interests<br><br>Expected Amount: N/A | On the Plan Effective Date, Holders of Other Existing Equity<br>Interests are not entitled to receive a recovery or distribution on account of such Other Existing Equity Interests. On the Plan Effective Date, Other Existing Equity Interests shall be either (i) treated in accordance with the Definitive Documents or (ii) canceled, released, discharged, and extinguished, and shall be of no further force or effect. | 0% |

## C.      Filing of the Plan Supplement

The Debtors propose to file the Plan Supplement at least seven (7) days before the deadline to object to confirmation of the Plan.  The Debtors will transmit a copy of the Plan Supplement to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) counsel to the DIP Agent; (c) counsel to the Ad Hoc Group; (d) counsel to the Consenting ETI Parties; (e) counsel to the DIP Lenders, including counsel to the Sub-Group DIP Lenders; (f) counsel to the Indenture Trustees; (g) counsel to the Securitization Program Agent; (h) the creditors listed on the Debtors' consolidated list of thirty (30) creditors holding the largest unsecured claims; (i) the United States Attorney for the Southern District of Texas; (j) the Internal Revenue Service; (k) the Securities and Exchange Commission; (l) the state attorneys general for states in which the Debtors conduct business; (m) Holders of Claims entitled to vote on the Plan; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002.

The Plan Supplement will include all exhibits and Plan schedules that were not already filed or sent to parties entitled to vote on the Plan in connection with solicitation, as exhibits to the Plan or this Disclosure Statement, all of which are incorporated by reference into, and are an integral part of, the Plan, as all of the same may be amended, supplemented, or modified from time to time.

## D.      Solicitation Procedures

### 1.      The Solicitation and Voting Procedures

On [ ● ], the Bankruptcy Court entered an order [Docket No. [ ● ]] (the "***Solicitation Procedures Order***") that, among other things:

  a)   conditionally approved this Disclosure Statement;

  b)   scheduled a hearing on [June 18], 2025 at [ ● ] (Central Time) to approve this Disclosure Statement on a final basis and consider confirmation of the Plan (the "***Confirmation Hearing***");

    c)    established 4:00 p.m. (Central Time) on June 11, 2025 as the deadline for (i) filing objections to the final approval of the Disclosure Statement and confirmation of the Plan (the "***Objection Deadline***") and (ii) voting on the Plan (the "***Voting Deadline***");

    d)    approved the form of notice of the Confirmation Hearing, the Voting Deadline, and the Objection Deadline (the "***Combined Notice***");

    e)    approved the procedures by which the Debtors shall solicit votes on the Plan and the Solicitation Packages, including the forms of ballots to vote on the Plan (the "***Ballots***");

    f)    approved the form and manner of the notices to be delivered to Holders in Non-Voting Classes (the "***Notice of Non-Voting Status***"), the form of the accompanying release opt-out form (the "***Release Opt-Out Form***"), and the notice to be delivered to any counterparties to executory contracts and unexpired leases (the "***Contract/Lease Party Notice***");

    g)    approved the timing and manner of delivery and publication (as applicable) of the Combined Notice, the Notice of Non-Voting Status, and the Release Opt-Out Form;

    h)    approved the procedures by which the Debtors shall assume and/or assign executory contracts and unexpired leases; and

    i)    granted related relief.

The discussion of the procedures below is a summary of the solicitation and voting process. Detailed voting instructions will be provided with each Ballot.

---

**PLEASE REFER TO THE INSTRUCTIONS ACCOMPANYING THE BALLOTS FOR MORE INFORMATION REGARDING VOTING REQUIREMENTS TO ENSURE THAT YOUR BALLOT IS PROPERLY AND TIMELY SUBMITTED SO THAT YOUR VOTE MAY BE COUNTED.**

---

    **2.**   **The Solicitation Agent**

The Debtors have engaged Omni Agent Solutions, Inc. to, among other things, act as the Solicitation Agent (as described below).

Specifically, the Solicitation Agent will assist the Debtors with: (a) mailing notices related to solicitation and confirmation of the Plan; (b) mailing Solicitation Packages (as described below); (c) soliciting votes on the Plan; (d) receiving, tabulating, and reporting on Ballots cast for or against the Plan by Holders of Claims against the Debtors; (e) responding to inquiries from creditors and stakeholders relating to the Plan, this Disclosure Statement, the Ballots, and matters related thereto, including, without limitation, the procedures and requirements for voting to accept or reject the Plan and objecting to the Plan; and (f) if necessary, contacting creditors and interest holders regarding the Plan and, as to the classes entitled to vote on the plan, their Ballots.

### 3. __Holders of Claims Entitled to Vote on the Plan__

Under the Bankruptcy Code, only holders of claims or equity interests in "impaired" classes are entitled to vote on a plan.  Under section 1124 of the Bankruptcy Code, a class of claims or equity interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or equity interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or equity interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or equity interest as it existed before the default.

If, however, the holder of an impaired claim or equity interest will not receive or retain any distribution under the plan on account of such claim or equity interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and equity interests do not actually vote on the plan.  If a claim or equity interest is not impaired by the plan, the Bankruptcy Code conclusively presumes the holder of such claim or equity interest to have accepted the plan and, accordingly, holders of such claims and equity interests are not entitled to vote on the plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan with respect to a class of claims, acceptance by creditors that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims in such class held by creditors that cast ballots for acceptance or rejection of the plan.  The following table provides a summary of the status and voting rights of each Class (and, therefore, of each Holder of a Claim or Interest within such Class) under the Plan:

### SUMMARY OF STATUS AND VOTING RIGHTS

| Class | Claim/Equity Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Prepetition Term Loan Claims | Unimpaired | Presumed to Accept |
| *3* | *April 2026 Notes Claims* | *Impaired* | *Entitled to Vote* |
| *4* | *Convenience Claims* | *Impaired* | *Entitled to Vote* |
| *5* | *July 2026 Notes Claims* | *Impaired* | *Entitled to Vote* |
| *6* | *General Unsecured Claims* | *Impaired* | *Entitled to Vote* |
| 7 | Subordinated Claims | Impaired | Deemed to Reject |
| 8 | Intercompany Claims | Unimpaired or Impaired | Presumed to Accept or Deemed to Reject |
| 9 | Intercompany Interests | Unimpaired or Impaired | Presumed to Accept or Deemed to Reject |
| 10 | Existing BPA Equity Interests | Impaired | Deemed to Reject |

| 11 | Other Existing Equity Interests | Impaired | Deemed to Reject |

Based on the foregoing, the Debtors are soliciting votes to accept the Plan from Holders of Claims in Class 3 (April 2026 Notes Claims), Class 4 (Convenience Claims), Class 5 (July 2026 Notes Claims), and Class 6 (General Unsecured Claims) (together, the "***Voting Classes***"), because Holders of Claims in the Voting Classes are Impaired under the Plan and have the right to vote to accept or reject the Plan. For purposes of determining acceptance and rejection of the Plan, votes from such Classes will be tabulated on a Debtor-by-Debtor basis.

The Debtors are not soliciting votes on the Plan from (a) Holders of Claims in Classes 1 and 2 because, in each case, such parties are conclusively presumed to have accepted the Plan; (b) Holders of Claims and Interests, as applicable, in Classes 7, 10, and 11, because such parties are conclusively deemed to have rejected the Plan; and (c) Holders of Claims and Interests in Classes 8 and 9 because such parties are conclusively presumed to have accepted the Plan or conclusively deemed to have rejected the Plan (Classes 1, 2, 7, 10, and 11 collectively, the "***Non-Voting Classes***").  In lieu of a Solicitation Package, certain of the Non-Voting Classes (Classes 1, 2, 7, 10, and 11) will receive the Notice of Non-Voting Status.  Notwithstanding their non-voting status, Holders of Claims or Interests, as applicable, in such Non-Voting Classes will also receive a Release Opt-Out Form solely for the purposes of opting out of the Third-Party Release.  Because the Intercompany Claims in Class 8 and Intercompany Interests in Class 9 are all held by the Debtors or affiliates of the Debtors, the Debtors, through the Solicitation Procedures Order, have obtained a waiver of any requirement to serve the Holders of Claims and Interests in Classes 8 and 9 with Solicitation Packages or any other type of notice, including a Notice of Non-Voting Status, in connection with solicitation.

### 4. The Voting Record Date

The voting record date (the "***Voting Record Date***") with respect to all Claims in the Voting Classes is May 8, 2025.  The Voting Record Date is the date as of which it was determined which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan.

### 5. Contents of the Solicitation Package

The following documents and materials will collectively constitute the "***Solicitation Package***" with respect to Holders of Claims in the Voting Classes (in flash drive or paper format):

- this Disclosure Statement;
- the Plan;
- the exhibits to this Disclosure Statement, including:
  - the Plan Support Agreement;
  - the Debtors' financial projections;
  - the Debtors' liquidation analysis; and
  - the Debtors' valuation analysis.
- a Ballot and voting instructions;
- a letter from the Committee recommending that Holders of Claims in Class 4, Class 5, and Class 6 vote in favor of the Plan; and
- if applicable, a pre-addressed, postage pre-paid return envelope.

The Holders of Claims and Interests in the Non-Voting Classes (other than Holders of Intercompany Claims and Intercompany Interests) will also receive the Notice of Non-Voting Status.  Finally, Holders of Claims and Interests in the Non-Voting Classes (other than Holders of Intercompany Claims and

Intercompany Interests) will also receive a Release Opt-Out Form solely for the purposes of opting out of the Third-Party Release.

**6.  Distribution of the Solicitation Package to Holders of Claims Entitled to Vote on the Plan**

With the assistance of the Solicitation Agent, the Debtors are distributing Solicitation Packages to the Holders of Claims in the Voting Classes (or their Nominees).  The Debtors submit that the timing of such distribution will provide such Holders of Claims with adequate time within which to review the materials required to allow such parties to make informed decisions with respect to voting on the Plan in accordance with Bankruptcy Rules 3017(d) and 2002(b).

**7.  Additional Distribution of Solicitation Documents**

Parties may request (and obtain at the Debtors' expense) a copy of this Disclosure Statement (and any exhibits thereto, including the Plan) by:  (a) calling the Solicitation Agent at (888) 788-6341 (U.S. / Canada, toll-free) or (747) 293-0001 (International, toll); (b) messaging the Solicitation Agent at https://omniagentsolutions.com/DocuDataSolutions; or (c) visiting the Debtors' restructuring website at https://omniagentsolutions.com/DocuDataSolutions. Parties may also obtain any documents filed in the Chapter 11 Cases for a fee via PACER at http://www.txs.uscourts.gov.

All Holders of Claims are advised to read the instructions on their Ballots, as applicable, and any notices they receive from the Debtors.

**E.  Voting Procedures**

Holders of Claims entitled to vote on the Plan (each, a "***Voting Holder***") are advised to read the instructions on their Ballots, which set forth in greater detail the voting instructions summarized herein.

**1.  The Voting Deadline**

**4:00 p.m. prevailing Central Time on [June 11], 2025** is the Voting Deadline, subject to further extension by the Debtors.  The Voting Deadline is the date by which all Ballots and Release Opt-Out Forms, as applicable, must be properly executed, completed, and delivered to the Solicitation Agent in order to be counted as votes to accept or reject the Plan (or as a valid opt-out of the Third-Party Release).

**2.  Ballots**

The Debtors will provide the following Ballots to Holders of Claims in the Voting Classes:

| Class | Claim | Ballot |
|---|---|---|
| 3 | April 2026 Notes Claims | • Form of Beneficial Holder Ballot for Class 3 (April 2026 Notes Claims) <br><br> • Form of Master Ballot for Class 3 (April 2026 Notes Claims) |
| 4 | Convenience Claims | • Form of Ballot for Class 4 (Convenience Claims) and Class 6 (General Unsecured Claims) |

| 5 | July 2026 Notes Claims | • Form of Beneficial Holder Ballot for Class 5 (July 2026 Notes Claims)<br><br>• Form of Master Ballot for Class 5 (July 2026 Notes Claims) |
| 6 | General Unsecured Claims | • Form of Ballot for Class 4 (Convenience Claims) and Class 6 (General Unsecured Claims) |

To be counted as a vote to accept or reject the Plan, votes must be submitted on the Ballots.

### 3. **Voting Procedures with Respect to Holders of Notes Claims**

#### a. *Beneficial Holders*

Record Holders of April 2026 Notes Claims and July 2026 Notes Claims (collectively, the "***Notes Claims***") may include brokers, dealers, commercial banks, trust companies, or other agent nominees ("***Nominees***").  If such entities do not hold Notes Claims for their own account, they must provide copies of the Solicitation Package to their customers that are the Voting Holders thereof as of the Voting Record Date.  Any Voting Holder of Notes Claims who has not received a Ballot should contact his, her, or its Nominee or the Solicitation Agent.

A Holder entitled to vote on the Plan who holds Notes Claims as a record holder in its own name should vote on the Plan by completing and signing the applicable Beneficial Holder Ballot and returning it directly to the Solicitation Agent on or before the Voting Deadline using the enclosed self-addressed, postage paid envelope.

A Voting Holder holding Notes Claims in "street name" through a Nominee may vote on the Plan by one of the following two (2) methods (as selected by such Holder's Nominee):

- Completing and signing the enclosed Beneficial Holder Ballot.  Holders of Notes Claims should return the Beneficial Holder Ballot to his, her, or its Nominee as promptly as possible, in the envelope provided or as otherwise in accordance with the instructions provided by  Nominee, and in sufficient time to allow such Nominee to process his, her, or its instructions and return a completed Master Ballot to the Solicitation Agent by the Voting Deadline.  If no self-addressed, postage-paid envelope was enclosed for this purpose, Holders should contact the Solicitation Agent for instructions; or

- Completing the pre-validated Beneficial Holder Ballot (as described below) provided to the applicable Holder by his, her, or its Nominee.  Voting Holders should return the pre-validated Beneficial Holder Ballot to the Solicitation Agent by the Voting Deadline using the return envelope provided in the Solicitation Package.

Any Beneficial Holder Ballot returned to a Nominee by a Voting Holder will not be counted for purposes of acceptance or rejection of the Plan until such Nominee properly completes and delivers to the Solicitation Agent that Beneficial Holder Ballot (properly validated) or a Master Ballot casting the vote of such Holder.

If any Voting Holder owns Notes Claims through more than one (1) Nominee, such Holder may receive multiple mailings containing the Beneficial Holder Ballots.  The Voting Holder should execute a separate Beneficial Holder Ballot for each block of Notes Claims that it holds through any particular Nominee and return each Beneficial Holder Ballot to the respective Nominee in the return envelope provided

therewith.  Voting Holders who execute multiple Beneficial Holder Ballots with respect to Notes Claims held through more than one (1) Nominee must indicate on each Beneficial Holder Ballot the names of all such other Nominees and the additional amounts of such Notes Claims so held and voted.

### b.  Nominees

A Nominee that, on the Voting Record Date, is the record Holder of Notes Claims for one (1) or more Voting Holders may obtain the votes of Voting Holders of such Notes Claims, consistent with customary practices for obtaining the votes of securities held in "street name," in one of the following two ways:

    i.    <u>Pre-Validated Ballots</u>

The Nominee may "pre-validate" a Beneficial Holder Ballot by signing the Beneficial Holder Ballot and including their DTC participant number; indicating the account number of the Beneficial Holder and the principal amount of the applicable Claims held by the Nominee for such Beneficial Holder accompanied by a medallion guarantee stamp certifying the Beneficial Holder's position as of the Voting Record Date; and then forwarding the Beneficial Holder Ballot together with this Disclosure Statement, and preaddressed, postage-paid return envelope addressed to, and provided by, the Solicitation Agent, and other materials requested to be forwarded, to the Voting Holder for voting.  The Beneficial Holder then completes the remaining information requested on the Beneficial Holder Ballot and returns the Beneficial Holder Ballot directly to the Solicitation Agent so that it is <u>ACTUALLY RECEIVED</u> by the Solicitation Agent on or before the Voting Deadline.  A list of the Voting Holders to whom "pre-validated" Beneficial Holder Ballots were delivered should be maintained by Nominees for inspection for at least one (1) year from the Voting Deadline.

    ii.    <u>Master Ballots</u>

If the Nominee elects not to pre-validate Beneficial Holder Ballots, the Nominee may obtain the votes of Voting Holders by forwarding to the Voting Holders the unsigned Beneficial Holder Ballots, together with this Disclosure Statement, a pre-addressed, postage-paid return envelope provided by, and addressed to, the Nominee, and other materials requested to be forwarded.  Each such Voting Holder must then indicate his, her, or its vote on the Beneficial Holder Ballot, complete the information requested on the Beneficial Holder Ballot, review the certifications contained on the Beneficial Holder Ballot, execute the Beneficial Holder Ballot, and return the Beneficial Holder Ballot to the Nominee.  After collecting the Beneficial Holder Ballots, the Nominee should, in turn, complete a Master Ballot compiling the votes and other information from the Beneficial Holder Ballots, execute the Master Ballot, and deliver the Master Ballot to the Solicitation Agent so that it is <u>ACTUALLY RECEIVED</u> by the Solicitation Agent on or before the Voting Deadline.  All Beneficial Holder Ballots returned by Voting Holders should either be forwarded to the Solicitation Agent (along with the Master Ballot) or retained by Nominees for inspection for at least one (1) year from the Voting Deadline.

EACH NOMINEE SHOULD ADVISE ITS VOTING HOLDERS TO RETURN THEIR BENEFICIAL HOLDER BALLOTS TO THE NOMINEE BY A DATE CALCULATED BY THE NOMINEE TO ALLOW IT TO PREPARE AND RETURN THE MASTER BALLOT TO THE SOLICITATION AGENT SO THAT IT IS ACTUALLY RECEIVED BY THE SOLICITATION AGENT ON OR BEFORE THE VOTING DEADLINE.  FOR THE AVOIDANCE OF DOUBT, NOMINEES MAY RETURN MASTER BALLOTS VIA EMAIL TO **DOCUDATASOLUTIONSBALLOTS@OMNIAGNT.COM** WITH A REFERENCE TO "DOCUDATA MASTER BALLOTS" IN THE SUBJECT LINE.

Tabulation of Pre-Validated Beneficial Holder Ballots and Master Ballots:

- Votes cast by a Voting Holder on a pre-validated Beneficial Holder Ballot or on a Master Ballot through a Nominee will be applied against the positions held by such entities in the applicable security as of the Voting Record Date, as evidenced by the record and depository listings. Votes submitted by a Nominee, pursuant to the Master Ballots or pre-validated Beneficial Holder Ballots, will not be counted in excess of the amount of such securities held by such Nominee.

- To the extent that conflicting votes or "over votes" are submitted by a Nominee, the Solicitation Agent, in good faith, will attempt to reconcile discrepancies with the Nominee.

- To the extent that any over votes are not reconcilable prior to the preparation of the vote certification, the Solicitation Agent will apply the votes to accept and to reject the Plan in the same proportion as the votes to accept and reject the Plan submitted on the Master Ballots or pre-validated Beneficial Holder Ballots that contained the over vote, but only to the extent of the Nominee's position in the applicable security as of the Voting Record Date.

- For the purposes of tabulating votes, each Voting Holder will be deemed to have voted the principal amount relating to such security, although the Solicitation Agent may adjust such principal amount to reflect the applicable claim amount, including prepetition interest.

- A single Nominee may complete and deliver to the Solicitation Agent multiple Master Ballots. Votes reflected on multiple Master Ballots shall be counted except to the extent that they are duplicative of other Master Ballots. If two or more Master Ballots are inconsistent, the last properly completed Master Ballot received prior to the Voting Deadline shall, to the extent of such inconsistency, supersede any prior Master Ballot.

4. **Voting Procedures with Respect to Holders of Convenience Claims and General Unsecured Claims**

Voting Holders of Convenience Claims and General Unsecured Claims should provide all of the information requested on their Ballots, and should complete and submit their Ballots in accordance with the instructions set forth therein, such that it is <u>actually received</u> by the Solicitation Agent by the Voting Deadline.

Holders of General Unsecured Claims in an amount greater than $25,000 in the aggregate may elect to convert their claims to a Convenience Claim on their Ballots by reducing the amount of their General Unsecured Claim to $25,000 and receive the treatment provided for such Convenience Claims under the Plan.

5. **Miscellaneous**

All Ballots must be signed by the record Holder of the Claim or by a person who has the power and authority to vote on behalf of the record Holder of the Claim on such date. If you return more than one (1) Ballot voting different Claims, the Ballots are not voted in the same manner, and you do not correct this before the Voting Deadline, those Ballots will not be counted. An otherwise properly executed Ballot (other than a Master Ballot) that attempts to partially accept and partially reject the Plan will likewise not be counted. If you cast more than one (1) Ballot voting the same Claim(s) before the Voting Deadline, the last valid Ballot received on or before the applicable Voting Deadline will be deemed to reflect your intent, and thus, to supersede any prior Ballot. If you cast Ballots received by the Solicitation Agent on the same day, but which are voted inconsistently, such Ballots will not be counted.

The Ballots provided to Holders of Claims in the Voting Classes will reflect the principal amount of such Holder's Claim(s); however, when tabulating votes, the Solicitation Agent may adjust the amount of such Holder's Claim(s) by multiplying the principal amount by a factor that reflects all amounts accrued between the Voting Record Date and the Petition Date, including, without limitation, interest.

Except as provided below, unless the Ballot is timely submitted to the Solicitation Agent before the Voting Deadline, together with any other documents required by such Ballot, the Debtors may reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

All pleadings and notices relating to the Chapter 11 Cases that are filed with the Bankruptcy Court (including notices of the date and time of hearings, and the Plan Supplement, once filed), will be made available for review on the case information website of the Solicitation Agent: https://omniagentsolutions.com/DocuDataSolutions. The Debtors reserve the right to modify, amend, supplement, restate, or withdraw the Plan Supplement after it is filed. The Debtors will file and make available on the Solicitation Agent's website site any modified, amended, supplemented or restated Plan Supplement as promptly as possible.

### 6.   Fiduciaries and Other Representatives

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested, must submit proper evidence satisfactory to the Debtors of authority to so act. Authorized signatories should submit a separate Ballot of each Voting Holder for whom they are voting.

### 7.   Change of Vote

Any party who has previously submitted to the Solicitation Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Solicitation Agent prior to the Voting Deadline a subsequent, properly completed, valid Ballot for acceptance or rejection of the Plan; *provided*, *however*, that the Debtors have discretion on whether to accept any such changed Ballot after the Voting Deadline.

### 8.   Waivers of Defects, Irregularities, etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Solicitation Agent and/or the Debtors, which determination will be final and binding. The Debtors reserve the right to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful. The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of their creditors. The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

9.   **Further Information, Additional Copies**

If you have any questions or require further information about the voting procedures for voting your Claims or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents, please contact the Solicitation Agent.

F.   **Confirmation of the Plan**

1.   **The Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties.  Pursuant to the Solicitation Procedures Order, the Bankruptcy Court has scheduled the Confirmation Hearing for [June 18], 2025.  Notice of the Confirmation Hearing has been provided to all known creditors and equity holders or their Representatives.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket of the Chapter 11 Cases.

2.   **The Deadline and Procedures for Objecting to Confirmation of the Plan**

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Pursuant to the Solicitation Procedures Order, the Bankruptcy Court established [June 11], 2025 at 4:00 p.m. (prevailing Central Time) as the Objection Deadline.  Pursuant to the terms of the Solicitation Procedures Order, any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Bankruptcy Local Rules for the Southern District of Texas (the "***Bankruptcy Local Rules***"), must set forth the name of the objector, the nature and amount of the Claims and/or Interests held or asserted by the objector against the Debtors' Estates or properties, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order (the "***Notice Parties***"):

a)   DocuData Solutions, L.C., 2701 E. Grauwyler Road, Irving, TX 75061, Attn:  Suresh Yannamani (suresh.yannamani@exelatech.com); Matt Brown (matt.brown@exelatech.com);

b)   co-counsel to the Debtors, (i) Latham & Watkins LLP, 1271 Avenue of the Americas, New York, NY 10020, Attn: Ray C. Schrock (ray.schrock@lw.com); Alexander W. Welch (alex.welch@lw.com); Hugh Murtagh (hugh.murtagh@lw.com); Adam Ravin (adam.ravin@lw.com); Jonathan Weichselbaum (jon.weichselbaum@lw.com); and (ii) Hunton Andrews Kurth LLP, 600 Travis, Suite 4200, Houston, Texas 77002, Attn: Tad Davidson (taddavidson@hunton.com), Ashley Harper (ashleyharper@hunton.com), and Philip Guffy (pguffy@hunton.com);

c)   counsel to the Ad Hoc Group, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036, Attn: Matthew M. Roose (matthew.roose@ropesgray.com) and Eric Sherman (eric.sherman@ropesgray.com); 191 N Wacker Dr., 32nd Floor, Chicago, IL 60606, Attn: Ryan Preston Dahl (ryan.dahl@ropesgray.com) and Eric P. Schriesheim (eric.schriesheim@ropesgray.com);

d)  the U.S. Trustee, 515 Rusk Street, Suite 3516, Houston, TX 77002, Attn: Jana Whitworth (jana.whitworth@usdoj.gov) and Andrew Jimenez (andrew.jimenez@usdoj.gov);

e)  proposed co-counsel to the Committee; (i) Brown Rudnick LLP, Seven Times Square, 47th Floor, New York, NY 10036, Attn: Robert J. Stark (rstark@brownrudnick.com) and Bennett S. Silverberg (bsilverberg@brownrudnick.com); and (ii) McDermott Will & Emery LLP, 2501 North Harwood Street, Suite 1900 Dallas, TX 75201-1664, Attn: Charles R. Gibbs (crgibbs@mwe.com) and Marcus Helt (mhelt@mwe.com);

f)  counsel to the Consenting ETI Parties, Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006, Attn: Sean A. O'Neal (soneal@cgsh.com); Luke A. Barefoot (lbarefoot@cgsh.com); David Z. Schwartz (dschwartz@cgsh.com); and Brad Lenox (blenox@cgsh.com); and

g)  counsel to the Sub-Group DIP Lenders, Williams Barber Morel Ltd., 233 Wacker Drive, Suite 6800, Chicago, IL, 60606 Attn: Daniel R. Brown (drb@williamsbarbermorel.com); Jenner & Block LLP, 353 N. Clark Street, Chicago, IL 60654, Attn: Catherine Steege (csteege@jenner.com); and Kane Russell Coleman Logan PC, 401 Congress Avenue, Suite 2100, Austin, Texas 78701, Attn: Mark Taylor (mtaylor@krcl.com).

**CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

3.  **Effect of Confirmation of the Plan**

Article IX of the Plan contains certain provisions relating to (a) the compromise and settlement of Claims, (b) the release of the Released Parties by the Debtors and certain other Releasing Parties, and (c) exculpation of the (i) the Debtors; (ii) the Disinterested Director; and (iii) the Committee and each member of the Committee.  It is important to read such provisions carefully so that you understand the implications of these provisions with respect to your Claim such that you may cast your vote accordingly.

> **THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (A) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (B) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES, OR (C) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.**

**G.    The Plan Releases**

The Plan contains the Third-Party Release, which will bind certain holders of Claims and Interests.  The Debtors believe these provisions comply fully with applicable law.  The following summary of those provisions is subject in all respects to the Plan itself.

**Article IX.C of the Plan provides that the Releasing Parties will be deemed to have released the Released Parties from Claims and Causes of Action relating to the Debtors and the Restructuring and Chapter 11 Cases, among other things.**  The Released Parties include, among others, the Debtors, the Reorganized Debtors, the Non-Debtor Affiliates and the Consenting ETI Parties, each of their current and former directors, officers, and proxyholders, the parties to the Plan Support Agreement, each Agent,

Holders of Claims and Interests that do not opt out of the Third-Party Release, and the respective advisors and Representatives of each of the foregoing parties.

The Released Parties also would be released from any Claims and Causes of Action held by the Estates under the Plan.

All Holders of Claims and Interests are advised to read Article IX of the Plan, which sets forth in greater detail the information disclosed in this Section I.G of this Disclosure Statement.  Under the Plan, as currently drafted, the decision of any Holder of a Claim to opt out of the Releases does not affect the amount of distribution such Holder of a Claim will receive under the Plan.  Specifically, the recovery a Holder of a Claim will receive, as contemplated under the Plan as currently drafted, will be the same whether such Holder opts out or not; however, in the event a Holder of a Claim opts out of the Releases, such Holder will not be granted a release from the Releasing Parties under the Plan.

**H.    Issuance of Plan Securities**

Plan Securities.  On the Effective Date, New Parent shall issue the Plan Securities pursuant to the Plan and the New Organizational Documents.  New Parent intends that the Exchanged New Parent Interests will be listed on the national stock exchange on which the New Parent Interests are then listed, and will use its commercially reasonable efforts to effectuate the same.

**I.    Consummation of the Plan**

~~It will be a condition to confirmation of the Plan that all provisions, terms, and conditions of the Plan are approved in the Confirmation Order unless otherwise satisfied or waived pursuant to the provisions of Article [VIII] of the Plan.  Following confirmation, the Plan will be consummated on the Effective Date.~~**It will be a condition to confirmation of the Plan that all provisions, terms, and conditions of the Plan are approved in the Confirmation Order unless otherwise satisfied or waived pursuant to the provisions of Article VIII of the Plan.  Following confirmation, the Plan will be consummated on the Effective Date.**

**J.    Risk Factors**

Before deciding whether and how to vote on the Plan, each Holder of a Claim in the Voting Classes should consider carefully all of the information in this Disclosure Statement, including the Risk Factors described in Section IX hereof ("*Risk Factors to Consider Before Voting*").

**II.**
**BACKGROUND TO THE CHAPTER 11 CASES**

**A.    The Debtors' Corporate Structure**

As reflected in the organizational chart attached hereto as **Exhibit F-1** (the "*Company Organizational Chart*"), non-Debtor Exela Technologies, Inc. ("*Exela*")—a corporation incorporated under the laws of the state of Delaware—directly or indirectly owns and controls a large, worldwide enterprise comprised of approximately 134 entities.  As set forth on the organizational chart attached hereto as **Exhibit F-2** (the "*Debtors Organizational Chart*"), the Debtors in these Chapter 11 Cases are sixty (60) entities within the Company's larger corporate structure.  An alphabetical listing of all the Debtors is attached hereto as **Exhibit G**.  The fifty-seven (57) domestic Debtors are organized under the laws of the following states:  Delaware, Texas, Florida, Iowa, Minnesota, South Carolina, Nevada, New Jersey, and

Pennsylvania.  The three (3) foreign Debtors are Canadian entities organized under the laws of Ontario and Nova Scotia.[76]

## B.    The Company's History

Exela, formerly known as Quinpario Acquisition Corp. 2 ("*Quinpario*"), was originally formed as a special purpose acquisition company on July 15, 2014, and completed an initial public offering on January 22, 2015.  Following the closing of the strategic combination of SourceHOV Holdings, Inc. ("*SourceHOV*"), a leading global transaction processing company, and Novitex Holding, Inc. ("*Novitex*"), a cloud-based document outsourcing and onsite staffing company, pursuant to a business combination agreement dated February 21, 2017 (the "*Novitex Business Combination*"), Quinpario was renamed as "Exela Technologies, Inc." and began trading under the ticker symbol "XELA" on NASDAQ on July 13, 2017.  In November 2023, ETI effectuated the merger of its European operations into CF Acquisition Corp. VIII, forming a separate public company, XBP.  The Debtors consist of SourceHOV, Novitex, and their respective subsidiaries along with the acquisition and financing vehicles that participated in the Novitex Business Combination (collectively referred to as the "*Company*" or the Debtors, below).

## C.    The Company's Business Operations and Revenue

The Company is a global leader in business process automation and uses its international reach and proprietary technology to provide high-quality payments processing and digital transformation solutions to its clients throughout the Americas and Asia that improve efficiency and reduce operating costs.  Specifically, the Company combines data and user-friendly software and platforms which, together with the services offered by its employees, enable customers to improve the efficiency of their operations.  The Company has adopted a global delivery model and hosts solutions in its data centers, on the cloud, or directly from customers' premises.  The Company's location-agnostic solutions, coupled with its flexible hosting capabilities and global work force, enables the Company to provide its services across numerous industries, including banking, healthcare, insurance, and manufacturing.

The Company has served over 60% of the Fortune® 100 companies.  For the calendar year 2024, the Company generated approximately $856 million in revenue from over 1,550 global customers.  The Company provides mission critical services to some of the leading global banks, healthcare insurers, and global brands.  Such services include, without limitation, finance and accounting solutions and services, payment technologies and services, healthcare payer and revenue cycle management, along with hyper automation and 'work from anywhere' solutions, enterprise information management, integrated communications and marketing automation solutions, and digital solutions for enterprise customers.

### 1.    Operating Segments

The Company's business is comprised of three reportable segments:

---

[76]    Debtors Novitex Enterprise Solutions Canada, Inc. and BancTec (Canada), Inc. are formed under Ontario law and Debtor SourceHOV Canada Company is formed under Nova Scotia law.

### a.  *Information and Transaction Processing Solutions ("ITPS").*

ITPS is the Company's largest segment and includes a wide range of solutions and services for customers primarily in the financial services, commercial, public sectors, and legal industries.  The ITPS segment accounted for approximately 64.1% (or $548.7 million) of 2024 revenue.

### b.  *Healthcare Solutions ("HS").*

The HS segment includes the Company's outsourcing business that specializes in the healthcare provider and payer markets.  In calendar year 2024, the HS segment generated approximately 27.1% (or $231.9 million) of revenue.  Among other services, the HS segment processes approximately 900,000 claims a day, reducing patient claim denials, and alleviating system bottlenecks in the healthcare payments space.

### c.  *Legal & Loss Prevention Services ("LLPS").*

The Company's LLPS segment provides services in connection with class action settlement administration, claims adjudication, labor, employment, and other legal matters.  In fiscal year 2024, the LLPS segment generated approximately 8.8% (or $75.3 million) of revenue.

## 2.  Product Offerings

The Company derives its revenue from the following services and solutions:  (a) Finance & Accounting Solutions;  (b) Payment Technologies and Services;  (c) Healthcare Payers and Revenue Cycle Management;  (d) Work from Anywhere Solutions;  (e) Enterprise Information Management; (f) Integrated Communications and Marketing Automation Solutions; and (g) Digital Solutions for Enterprise Customers.

### a.  *Finance & Accounting ("F&A") Solutions*

The Company offers a comprehensive suite of F&A solutions.  For example, the Company's exchange for bills and payments platform (the "***Platform***"), enables billers, consumers, and businesses to communicate and transact on one platform that can connect to any customer system without significant capital investment.  The Platform provides the critical billing components that integrate with the Company's related solution suites and covers entire lifecycles for both Procure-to-Pay solutions ("***P2P***") and Order-to-Cash solutions ("***O2C***"), the components of which are designed to complement the customer's other existing automated solutions.  The Platform is a user-friendly and highly adaptable platform exchange, and includes services such as secure messaging that allows billers, consumers, and businesses to effectively communicate and transact.

Both the O2C and P2P solution suites are components of the Platform.  The O2C solutions help clients automate the customer order fulfillment process.  This process includes delivering customer orders, preparing invoices, and managing accounts receivable collection.  O2C solutions consolidate incoming payments and enhance clients' treasury management functions.  Specifically, to maximize sales efficiencies, clients can leverage integrated receivables dashboards, multi-channel bill presentment and payment system, reconciliation services, exceptions and disputes management platform, aging analytics, collections management, and targeted engagement services.  These capabilities significantly increase the accuracy of payment posting for clients and lower payment processing time.

P2P solutions, in turn, automate the clients' goods-procurement process.  The process begins when a purchase order is entered on the P2P platform and, once approved, the purchase order moves to procurement where bids are solicited from an existing supplier network.  After a bid is approved, the P2P

platform records the receipt of the goods and then processes the transaction.  In certain cases, the Company's employees process an order, once approved, the purchase is manually recorded in the customer's system for payment.  The Company's P2P platform then generates a payment file that is formatted to relevant bank requirements so that payment can be efficiently processed.  Ultimately, the P2P platform provides a complete solution for customers' procurement needs.

### b.   Payment Technologies and Services.

In addition to solutions and services that can be used across industries, the Company has also developed industry-specific solutions to meet selected client's needs.  For example, the Company's financial solutions provide, among other services, payment, lending, and information management services.  In addition to checks and credit cards, the Company handles other payment channels such as the automated clearing house (ACH).  The Company performs such services on behalf of its client or its clients' banks, and manages both business-to-business and business-to-consumer transactions.

Through its extensive experience in payment management, the Company has also developed proprietary integrated receivables-processing technology, which consolidates transactions across disparate payment channels into a single payment platform connected to the Platform's network.  The Company plans to offer this technology as a branded or private label solution to banking customers.

### d.   Healthcare Payers and Revenue Cycle Management.

The Company has also developed specific offerings for the healthcare industry.  The Company bundles core solutions with a suite of healthcare payer (insurer) and healthcare provider-specific services such as end-to-end revenue cycle management ("*RCM*"), including revenue integrity solutions, enrollments and credentialing, claims processing, adjudication, and payment operations.  These services generate value for clients in the healthcare industry by simplifying complex healthcare transactions that require multiple layers of validation, supporting document digitization, and reconciliation.

Additionally, PCH Global is the Company's cloud-based claims processing platform, which streamlines claims submission and payment process making it easier for healthcare providers and payers to manage claims timely, cost efficiently and to comply with regulations.  PCH Global processes approximately 900,000 claims a day, reduces claim denials, and helps alleviate system bottlenecks in the healthcare payments space.

### e.   Work From Anywhere Services.

The Company has developed three solutions that track the advancements in cognitive automation and support work from all locations whether it be onsite, offsite, or hybrid.  *First*, the Company's robotic process automation solution, EON™, leverages intelligent automation to make clients' businesses more productive.  Specifically, EON™ empowers clients to create task-specific bots to take over repetitive, rule-based assignments.  *Second*, ExelaBEATS™ provides a collaborative project management software that allows working groups to manage their workflow and collaborate.  Team members can create their own workflow or select from existing ExelaBEATS™ workflows to effectively manage their projects and monitor the status of tasks in real time.  *Third*, DrySign™ enables a digital signature platform that helps digitize both internal and external sign-off processes.  Ultimately, the Company leverages automated tools and customized solutions to enhance its clients' operations and efficiency.

### f.   Enterprise Information Management ("EIM").

The Company provides EIM solutions to help clients organize, process and store large amounts of data in cloud-enabled proprietary platforms.  The EIM systems process and host billions of critical records for a variety of businesses across a number of industries.

### g.   Integrated Communications and Marketing Automation Solutions.

The Company also has comprehensive multi-channel integrated communications solutions to help clients reach their end-customers and other businesses effectively.  For example, the Company's Marketing Execution Services ("*XME*") is a marketing platform that enables clients to execute a complete end-to-end marketing strategy.  XME™ features a Digital Storefront that allows users to improve brand control and deliver a polished e-commerce experience to their end-customers.  It also supports omni-channel communication options such as direct mail, email, landing pages, web banners, social sharing, and call center tracking, with analytics reporting and data visualization available as needed.  In addition, the Company's business critical print and mail and strategic sourcing services enable clients to optimize their business communications.

### h.   Digital Solutions for Enterprise Customers.

The Company also offers several digital solutions to enterprise clients.  For example, the digital mailroom ("*DMR*") solutions leverage proprietary technology to process a significant number of daily mail collection tasks.  Once mail is received, the DMR platform processes it and routes it to the appropriate person at an organization, where it appears as an item in the DMR inbox, further enabling 'work from anywhere'.  The Company offers DMR for enterprise wide deployment from captive mailrooms in client locations to businesses where there is no dedicated mailroom.

### 3.   The Company's Facilities and Employees

The Company maintains its headquarters in Irving, Texas, with members of its management team also based in Troy, Michigan, and Santa Monica, California.   As to the Debtors themselves, the Debtors maintain numerous facilities as set forth in **Exhibit F-3**.

The Company has approximately 11,000 employees across five (5) countries.[87]  Of those, approximately 4,700 are employed by the Debtors as of the Petition Date.  In terms of the global workforce of the Company, almost half of the Company's global workforce is based in the Americas (with most employees based in the U.S., and additional employees in Canada and Mexico) and the balance is based in India and the Philippines.

### D.   The Debtors' Prepetition Capital Structure

~~As of Petition Date, the Debtors had approximately $1.315 billion of funded secured and unsecured debt obligations.  The Debtors' prepetition funded secured and unsecured debt obligations are summarized in the below table:~~**As of the Petition Date, the Debtors had approximately $1.383 billion of funded secured and unsecured debt obligations.  The Debtors' prepetition funded secured and unsecured debt obligations are summarized in the below table:**

| Debt | Relevant Parties | Maturity | ~~Outstanding~~ |
|---|---|---|---|

---

[87]   The Debtors' employees are distributed geographically as follows:  (1) U.S. (4,139); (2) Canada (282); (3) Mexico (241).

| | | | ~~Principal Amount[9]~~**Outstanding Amount[8]** |
|---|---|---|---|
| **Senior Secured Term Loan (Blue Torch Facility)** | • **Borrower:** Exela Intermediate<br>• **Borrower:** Exela Finance | July 11, 2026 | ~~$38,500,000~~**$38,500,000 (principal only)** |
| **April 2026 Notes** | • **Issuer:** Exela Intermediate<br>• **Co-Issuer:** Exela Finance | April 15, 2026 | ~~$1,252,267,105~~**$1,319,106,629** ~~(of which approximately $383,984,010 is held by certain Exela affiliates)[10]~~**(inclusive of principal and outstanding interest, of which approximately $383,984,010 is held by certain Exela affiliates)[9]** |
| **July 2026 Notes**~~[11]~~**[10]** | • **Issuer:** Exela Intermediate<br>• **Co-Issuer:** Exela Finance | July 15, 2026 | ~~$23,953,211 (of which $1,211 is held by certain Exela affiliates)~~**$25,666,358 (inclusive of principal and outstanding interest, of which $1,211 is held by certain Exela affiliates)** |
| | | | ~~$1,314,720,316~~**$1,383,272,987** |

---

[9]  ~~The Outstanding Principal Amounts listed herein exclude the unpaid accrued interest under each debt facility. In addition, such balances may differ from the figures listed in the DTC based register due to certain differences with DTC accounting conventions.~~

[8]  **Amounts are as of the Petition Date. Such balances may differ from the figures listed in the DTC based register due to certain differences with DTC accounting conventions.**

[10]  ~~The amount of April 2026 Notes held by certain Exela affiliates is exclusive of the $6 million of such notes sold to external holders in January 2025.~~

[9]  **The amount of April 2026 Notes held by certain Exela affiliates is exclusive of the $6 million of such notes sold to external holders in January 2025.**

[11][10]  As discussed below, the July 2026 Notes were originally secured obligations of the Company but pursuant to the terms of the Supplemental Indenture (defined below), all collateral securing the July 2026 Notes pursuant to the Security Agreement was released and, accordingly, the July 2026 Notes are no longer secured obligations of the Company.

## 1. Funded Secured and Unsecured Debt

### a. The Blue Torch Facility

On July 11, 2023, Debtor Exela Intermediate LLC ("**Exela Intermediate**") and Debtor Exela Finance, Inc. ("**Exela Finance**"), entered into that certain financing agreement (the "**Blue Torch Financing Agreement**") with Blue Torch Credit Opportunities Fund III LP, Blue Torch Credit Opportunities Unlevered Fund III LP, BTC Holdings SBAF Fund LLC, BTC Holdings KRS Fund LLC, and  BTC Holdings SBAF Fund-B LLC, as lenders (collectively, the "**Blue Torch Lenders**"), and Blue Torch Finance LLC (the "**Blue Torch Facility Agent**"), as administrative and collateral agent.  Pursuant to the Blue Torch Financing Agreement, the Blue Torch Lenders agreed to extend a $40 million term loan to the Debtors (the "**Senior Secured Term Loan**").  As of the Petition Date, the principal amount outstanding under the Blue Torch Financing Agreement is approximately $38.5 million.

Pursuant to that certain pledge and security agreement dated as of July 11, 2023 (the "**Blue Torch Pledge and Security Agreement**"), the obligations arising pursuant to the Blue Torch Financing Agreement are secured by security interests in all or substantially all personal property and fixtures of the grantors thereunder.[~~12~~11]

### b. April 2026 Notes

On July 11, 2023, Debtors Exela Intermediate and Exela Finance (together, the "**Issuers**"), certain guarantors thereunder,[~~13~~12] and U.S. Bank Trust Company, National Association, as indenture trustee (the "**April 2026 Notes Trustee**"), executed an indenture (the "**April 2026 Notes Indenture**")[~~14~~13] pursuant to which the Issuers issued approximately $1.082 billion aggregate principal amount of 11.5% first-priority senior secured notes due April 15, 2026 (the "**April 2026 Notes**"), of which approximately $314 million were issued to affiliates of the Debtors, which includes April 2026 Notes issued (a) as consideration in the discounted exchange (the "**2023 Exchange**") of $956.0 million aggregate principal amount of the July 2026 Notes (defined below), (b) as consideration for the private exchange of certain term loans (none of which remain outstanding), (c) in exchange for certain secured notes held by affiliates of the Debtors (none of which remain outstanding), and (d) to certain Exela affiliates in satisfaction of prior cash payments made by such Exela affiliates to or on behalf of the Issuers.

~~The interest on the April 2026 Notes has historically been partly paid in kind, subject to the terms of the April 2026 Notes Indenture.  As a result of the foregoing PIK Interest and the issuance of additional April 2026 Notes from time to time in accordance with the April 2026 Notes Indenture, the outstanding principal amount as of the Petition Date is approximately $1.252 billion.  Certain Exela affiliates hold approximately $384 million in principal amount of the April 2026 Notes.[15]~~ The interest on the April 2026 Notes has historically been partly paid in kind, subject to the terms of the April 2026 Notes Indenture.  As a result of the foregoing PIK Interest and the issuance of additional April 2026 Notes from time to time in accordance with the April 2026 Notes Indenture,

---

[~~12~~11]  The guarantors thereunder are comprised of all Debtor entities, except for Exela Intermediate and Exela Finance.

[~~13~~12]  The guarantors thereunder are comprised of each of the Debtors, except for Exela Finance, Exela Intermediate, Debtor Exela Technologies BPA, LLC, Debtor SIG-GP, L.L.C., and Services Integration Group, L.P.

[~~14~~13]  Wilmington Savings Fund Society, FSB served as collateral agent (the "**First-Priority Collateral Agent**") for the First-Priority Secured Parties (as defined therein).

[~~15~~]  ~~The Exela affiliate holders of April 2026 Notes include GP 3XCV LLC and XCV STS LLC.~~

**the outstanding principal amount as of the Petition Date is approximately $1.231 billion.  Certain Exela affiliates hold approximately $384 million in principal amount of the April 2026 Notes.**[14]

The Issuers' obligations under the April 2026 Notes (the "*April 2026 Notes Obligations*") are secured by the terms of the "Security Documents" as defined in the April 2026 Notes Indenture.  Under the Security Documents, the April 2026 Notes Obligations are first priority senior secured obligations of the Issuers and the guarantors thereunder.  Specifically, the obligations are secured by security interests in substantially all of the existing and future assets of the Issuers and the grantors thereunder.

### c.   Intercreditor Agreement

The respective rights of the April 2026 Notes Trustee, First-Priority Collateral Agent, and the Blue Torch Facility Agent (collectively, the "*Intercreditor Agreement Parties*") with respect to their shared collateral are governed by that certain intercreditor agreement, dated as of July 11, 2023, by and among the Intercreditor Agreement Parties, the Issuers and certain guarantors thereunder (as may be amended from time to time, the "*Intercreditor Agreement*").  The Intercreditor Agreement governs, among other items, the lien priorities and subordination of the relevant collateral as well as the enforcement rights of each Intercreditor Agreement Party.  Notably, the Intercreditor Agreement also governs the respective rights of the Intercreditor Agreement Parties in connection with insolvency proceedings, including post-petition financing.

### d.   July 2026 Notes (Unsecured)[15]

On December 9, 2021, the Issuers, certain guarantors thereunder,[16] and U.S. Bank National Association, as trustee (the "*July 2026 Notes Trustee*"), entered into that certain indenture (the "*July 2026 Notes Indenture*")[17] pursuant to which the Issuers issued certain 11.5% first-priority senior secured notes due July 15, 2026, (the "*July 2026 Notes*").[18]

The Issuers' obligations under the July 2026 Notes (the "*July 2026 Notes Obligations*") were secured by that certain collateral agency and security agreement (as further amended, supplemented, modified, extended, renewed, restated, refunded or refinanced from time to time, the "*Security Agreement*") dated as of July 12, 2017 and any additional relevant security agreements, pledge agreements, collateral assignments and mortgages (together with the Security Agreement, the "*Security Documents*").[19]  Prior to the 2023 Exchange, the Security Documents (subject to the conditions thereof) provided that the July 2026 Notes Obligations were secured by security interests in, and liens upon, all or substantially all assets of, among other parties, Exela Finance and Exela Intermediate.

---

[14]   **The Exela affiliate holders of April 2026 Notes include GP 3XCV LLC and XCV-STS LLC.**

[15]   Certain Debtors are party to a *Pari First Lien Intercreditor Agreement* (the "*Pari Intercreditor*") dated as of July 12, 2017.  While the Pari Intercreditor has not been terminated, there are no outstanding debt obligations underlying this agreement.

[16]   The guarantors thereunder are comprised of substantially the same guarantors as those entities that guarantee April 2026 Notes except for entities formed after December 2021.

[17]   Wilmington Savings Fund Society, FSB served as collateral agent (the "*First Priority Collateral Agent*") for the First Priority Secured Parties (as defined therein).

[18]   Interest on the July 2026 Notes is payable on January 15 and July 15 of each year.

[19]   The Security Agreement was initially executed in connection with the 10.000% First Priority Senior Secured Notes due 2023 issued on July 12, 2017 (the "*Old Notes*").

As of January 1, 2023, the aggregate principal amount of the Company's indebtedness under the July 2026 Notes was approximately $1.278 billion (inclusive of amounts held by certain affiliates). However, following the 2023 Exchange and certain periodic debt repurchases by the Company, only approximately $24 million in aggregate principal amount remained outstanding under the July 2026 Notes as of the Petition Date (of which certain non-Debtor affiliates hold approximately $1,211.00).[20] Further, on July 11, 2023, the Issuers, April 2026 Notes Trustee (as successor to the July 2026 Notes Trustee), and Wilmington Savings Fund Society, FSB, as collateral agent executed a seventh supplemental indenture (the "*Supplemental Indenture*") to govern the July 2026 Notes. The Supplemental Indenture eliminated substantially all restrictive covenants and certain events of default, including those relating to covenant or warranty breaches, cross-acceleration rights, certain insolvency events and judgments, contained in the July 2026 Notes Indenture and the July 2026 Notes. Notably, all collateral securing the July 2026 Notes pursuant to the Security Agreement was released under the Supplemental Indenture. Accordingly, the July 2026 Notes are no longer secured obligations.

On March 3, 2025, U.S. Bank Trust Company, National Association (as the successor in interest to the July 2026 Notes Trustee) sent a letter to the Debtors (the "*Default Letter*"), advising that an event of default had occurred under the July 2026 Notes Indenture. The Issuers reserve all rights with respect to the Default Letter.

### 2. Tax Liabilities

As a result of the late payment of certain Q4 2023 payroll tax obligations, Automatic Data Processing, Inc. ("*ADP*") suspended the payroll processing services it had historically provided to the Debtors, leaving the Debtors without access to certain payroll data and making the filing of federal, state, and local quarterly tax returns impracticable. Challenges related to determining the amounts that were due and the process to remit, as well as the subsequent liquidity constraints that the Debtors were facing, led to the failure of certain of the Debtors (the "*Debtor Payroll Entities*")[21] to timely remit certain amounts to federal, state, and local taxing authorities. Such amounts included (a) federal "trust fund taxes" (which are owed by the employee but held by an employer "in trust" for the government), (b) federal non-trust fund payroll taxes (which are owed directly by the employer to the government, including employer contributions to Social Security), and (c) state and local payroll taxes. As of the Petition Date, these payroll-related tax obligations are asserted in the amount of approximately $34.9 million (inclusive of $2.1 million in interest and $9.9 million in failure-to-file and other penalties) (collectively, the "*Payroll Tax Obligations*").

Separately, Exela, like many other companies, enrolled in CARES Act-related deferral programs that allowed the Debtors to defer a portion of Social Security taxes (FICA) for the fiscal years 2020 through 2023. As of the end of fiscal year 2023, the Debtor Payroll Entities had approximately $14 million in outstanding CARES Act-related taxes, but the Debtors subsequently paid approximately $5.7 million of this liability. As of the Petition Date, these CARES Act payroll-related tax obligations are asserted in the amount of approximately $7.3 million (the interest on unpaid deferred Social Security is approximately

---

[20] The non-Debtor affiliate holders of the July 2026 Notes include GP3XCV LLC, GP 2XCV LLC, and XCV STS LLC.

[21] The Debtor Payroll Entities include the following Debtor entities: SOURCECORP BPS Inc.; Banc Tec Inc,; Economic Research Services Inc.; HOV Services Inc.; HOVG LLC; J & B Software Inc.; Managed Care Professionals LLC; Novitex Government Solutions LLC; Regulus Group LLC; Regulus Integrate Solutions Inc.; Rust Consulting Inc.; Sourcecorp Management Inc.; SourceHOV Healthcare Inc.; United Information Services Inc.; and Exela Enterprise Solutions Inc.

$2 million, while the penalty on unpaid deferred Social Security is approximately $1.9 million) (the "**CARES Tax Obligations**").

In addition, as of the Petition Date, certain of the Debtors (the "**Debtor Sales Tax Entities**") owed a total asserted amount of approximately $2,671,303 to certain state taxing authorities on account of sales taxes (collectively, the "**Sales Tax Obligations**").[2322]  Separately, Debtor Pangea Acquisitions Inc. owed a total asserted amount of approximately $96,632 to certain state taxing authorities (collectively, the "**Franchise Tax Obligations**").   And, certain of the Debtors (the "**Debtor Property Tax Entities**") owed a total asserted amount of approximately $954,238 to certain state taxing authorities on account of property taxes (collectively, the "**Property Tax Obligations**").[2423]

Lastly, as of the Petition Date, Debtor Novitex Enterprise Solutions Canada, Inc owed a total asserted amount of approximately $1,564,472 to Canadian taxing authorities on account of sales tax and audit assessments (collectively, the "**Canadian Tax Obligations**" and, together with the Payroll Tax Obligations, the Sales Tax Obligations, the Franchise Tax Obligations, the Property Tax Obligations, and CARES Tax Obligations, the "**Outstanding Tax Obligations**").

Although the Debtors dispute portions of the Outstanding Tax Obligations deemed owed (and reserve all rights with respect to same), the Debtors acknowledge that certain amounts are owed on account of such obligations as of the Petition Date.  The Debtors recognize that, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless the applicable taxing authority agrees to less favorable treatment, the Debtors will need to either (i) pay those Outstanding Tax Obligations afforded priority treatment under the Bankruptcy Code in full in cash or (ii) pay such amounts over a period not more than five (5) years after the Petition Date to achieve confirmation of a plan of reorganization.

~~As set forth in the Plan, the Debtors have included an appendix to the Plan on which they have scheduled the Outstanding Tax Obligations.  Specifically, the Debtors are proposing to Allow $[●] in aggregate Outstanding Tax Obligations as Priority Tax Claims under the Plan.  The Debtors are treating the remaining Outstanding Tax Obligations, approximately $[●] in the aggregate, as General Unsecured Claims given that these amounts are attributable to penalties imposed by the applicable taxing authority and, accordingly, are not entitled to priority status under Section 507(a)(8) of the Bankruptcy Code.  See Appendix A of the Plan for the Allowed Priority Tax Claims.~~

**As set forth in the Plan, the Debtors have included an appendix to the Plan on which they have scheduled the Outstanding Tax Obligations.  Specifically, the Debtors are proposing to Allow $42,308,560.81 in aggregate Outstanding Tax Obligations as Priority Tax Claims under the Plan. The Debtors are treating the remaining Outstanding Tax Obligations, approximately $8 million in the aggregate, as General Unsecured Claims given that these amounts are attributable to penalties imposed by the applicable taxing authority and, accordingly, are not entitled to priority status under Section 507(a)(8) of the Bankruptcy Code.  See Appendix A of the Plan for the Allowed Priority Tax Claims.**

### E.    Unsecured Debt

In addition to their secured and unsecured funded debt, the Debtors have customary, ordinary-course unsecured debt, including amounts owed to trade vendors and landlords.  The Company routinely incurs

---

[2322]  The Debtor Sales Tax Entities include the following Debtor entities:  Exela Enterprise Solutions, Inc.; United Information Services, Inc.; and BancTec, Inc.

[2423]  The Debtors Property Tax Entities include the following Debtor entities:  BancTec, Inc.; SourceHOV LLC; Novitex Holdings, Inc.; and TransCentra, Inc.

fixed, liquidated, and undisputed payment obligations in the ordinary course of business to various third-party providers of goods and services.  As of the Petition Date, the Debtors estimate that approximately $41 million (excluding intercompany amounts but including estimated accruals) of trade debt is outstanding.  Certain of these claims are entitled to statutory priority, including under section 503(b)(9) of the Bankruptcy Code.  The Company also has certain lease obligations.  The Debtors estimate that an average of approximately $1.6 million accrues on account of lease and occupancy-related expenses each month.

**F.    Securitization and Other Receivables Financing Arrangements**

The Company maintains three trade receivables financing arrangements: the ER3 Securitization Program (as defined below), the Second Lien Note (as defined below) and the BR Exar AR Facility (as defined below) (collectively, the "***Receivables Facilities***").  The workings of the Receivables Facilities is described in greater detail in the Securitization Motion[~~24~~25] and the Cash Management Motion.[~~26~~25]  The following chart sets forth the obligations outstanding under the Receivables Facilities as of the Petition Date:

| Facilities | Relevant Parties | Maturity | Outstanding Principal |
|---|---|---|---|
| ER3 Securitization Program | • **Originators:** *Following Debtor entities***:** BancTec, Inc.; Economic Research Services, Inc.; Exela Enterprise Solutions, Inc.; HOV Enterprise Services, Inc.; HOV Services, Inc.; HOV Services, LLC; J & B Software, Inc.; Novitex Government Solutions, LLC; Regulus Group LLC; Regulus Group II LLC; | June 17, 2025 | ~~$89,949,471[27]~~**$94,3 00,000[26]** |

[~~24~~25] "***Securitization Motion***" means the *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing  Certain Debtors to Continue Selling, Contributing and Servicing Receivables and Related Rights Pursuant to the Securitization Program, (II) Modifying the Automatic Stay, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* [Docket No. 9].

[~~26~~25] "***Cash Management Motion***" means the *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Existing Cash Management System, (B) Maintain Existing Business Forms and Intercompany Arrangements, and (C) Continue Intercompany Transactions and (II) Granting Related Relief* [Docket No. 10].

[~~27~~] ~~As of the Petition Date.~~

[26] **As of the Petition Date.**

| Facilities | Relevant Parties | Maturity | Outstanding Principal |
|---|---|---|---|
| | Regulus Integrated Solutions LLC; SOURCECORP BPS Inc.; SOURCECORP Management, Inc.; SourceHOV Healthcare, Inc; and United Information Services, Inc.<br>● **Seller:** Non-Debtor Exela Receivables 3, LLC<br>● **Pledgor:** Non-Debtor Exela Receivables 3 Holdco LLC | | |
| Second Lien Note | ● **Borrower:** Non-Debtor Exela Receivables 3 Holdco, LLC | June 17, 2025 | $22,625,000 |
| BR Exar Accounts Receivable Facility | ● **Originators:** Debtor Novitex Enterprise Solutions Canada, Inc., Debtor Rust Consulting, Inc., Debtor HOVG LLC, Debtor BancTec (Canada) Inc., and Debtor SourceHOV Canada Company<br>● **Seller:** Non-Debtor Exela BR SPV LLC | - | $9,981,630 |
| | | | **$126,925,000** |

## 1.   The ER3 Securitization Program

On June 17, 2022, non-Debtor Exela Receivables 3, LLC ("***Receivables 3***"), as seller, and non-Debtor Exela Receivables 3 Holdco, LLC ("***Receivables 3 Holdco***," and together with Receivables 3, the "***SPEs***"), as pledgor, Parent, as initial servicer, PNC Bank, National Association ("***PNC***"), as administrative agent for the benefit of the secured parties (the "***ER3 Securitization Secured Parties***") and as letters of credit bank, PNC Capital Markets LLC, as structuring agent, and PNC, as purchasers, entered into that certain amended and restated receivables purchase agreement, dated as of June 17, 2022 (as further amended, supplemented, modified, extended, renewed, restated, refunded or refinanced from time to time, the "***ER3 Receivables Purchase Agreement***").  The ER3 Receivables Purchase Agreement extended the term of an existing $150 million securitization facility among the SPEs (*i.e.*, Receivables 3 and Receivables 3 Holdco), as borrower and pledgor, respectively, and a certain group of lenders to allow the SPEs to sell and finance receivables until June 17, 2025. The ER3 Receivables Purchase Agreement was further amended on February 27, 2023 in connection with the Second Lien Note (defined below) to, among other objectives, permit the addition of subordinated debt funded by B. Riley Commercial Capital, LLC.  The ER3 Receivables Purchase Agreement was then again further amended and restated on March 6, 2025, to ensure continued access to liquidity upon the filing of, and throughout the pendency of, the Chapter 11 Cases.  The purchase and financing facility contemplated by the ER3 Receivables Purchase Agreement and the related transaction documents (the "***ER3 Securitization Program***") was authorized by the Bankruptcy Court on an interim and final basis, as described in greater detail below.

Each SPE is a non-Debtor structured as a special-purpose, bankruptcy-remote entity created for the purpose of facilitating the ER3 Securitization Program.  As noted, certain Debtor entities (the "***ER3 Securitization Originators***") transfer their receivables on an ongoing basis at fair market value to the SPEs to create and maintain the "Capital Coverage Amounts" (substantially equivalent to a borrowing

base) for the ER3 Securitization Program, with the proceeds of those sales to the SPEs funding in part the Debtors', and the larger Company's, liquidity.[2827]

The main transaction documents for the ER3 Securitization Program consist of (1) the ER3 Receivables Purchase Agreement, (2) the Second Amended and Restated First Tier Purchase and Sale Agreement, dated as of March 5, 2025, among Parent, as initial servicer, the  ER3 Securitization Originators, as sellers, and Receivables 3 HoldCo, as buyer (as further amended, supplemented, modified, extended, renewed, restated, refunded or refinanced from time to time, the "***ER3 First Tier Purchase Agreement***"), (3) the Amended and Restated Second Tier Purchase and Sale Agreement, dated as of June 17, 2022, among Parent, as initial servicer, Receivables 3 HoldCo, as seller, and Receivables 3, as buyer (as further amended, supplemented, modified, extended, renewed, restated, refunded or refinanced from time to time, the "***ER3 Second Tier Purchase Agreement***"), (4) the Amended and Restated Pledge and Guaranty Agreement, dated as of June 17, 2022, by the Receivables 3 Holdco in favor of PNC, as administrative agent for the benefit of the secured parties and the other beneficiaries set forth therein (as further amended, supplemented, modified, extended, renewed, restated, refunded or refinanced from time to time, the "***ER3 Holdco Equity Pledge Agreement***"), (5) the Amended and Restated Performance Guaranty, dated as of June 17, 2022, by  Exela, as performance guarantor, in favor of PNC, as administrative agent (as further amended, supplemented, modified, extended, renewed, restated, refunded or refinanced from time to time, the "***ER3 Performance Guaranty***"), collectively, the "***PNC Facility Transaction Documents***"), and (6) the Amended and Restated Sub-Servicing Agreement, dated as of June 17, 2022, by  Exela, as initial Servicer, and each of the ER3 Securitization Originators, as sub-servicers (as further amended, supplemented, modified, extended, renewed, restated, refunded, or refinanced from time to time, the "***ER3 Sub-Servicing Agreement***") (together with the other Transaction Documents (as defined in the ER3 Receivables Purchase Agreement), collectively, the "***ER3 Securitization Transaction Documents***").

Under the ER3 Securitization Program, (a) Receivables 3 Holdco purchases and receives as capital contributions receivables and related assets from the ER3 Securitization Originators pursuant to the ER3 First Tier Purchase Agreement, (b) Receivables 3 purchases and receives as capital contributions, such receivables and related assets from Receivables 3 Holdco (consisting of all the receivables transferred to the Pledgor pursuant to the ER3 First Tier Purchase Agreement) pursuant to the ER3 Second Tier Purchase Agreement, (c) Receivables 3 may request that the purchasers make payments of Capital (as defined in the ER3 Receivables Purchase Agreement but substantially similar to the outstanding principal of a loan if the transactions under the ER3 Receivables Purchase Agreement were structured as loans, rather than purchases) to Receivables 3 from time to time, secured by, among other things, the receivables and all other property owned by Receivables 3, pursuant to the terms set forth in the ER3 Receivables Purchase Agreement and the other ER3 Securitization Transaction Documents, (d) Exela, as Servicer, agrees to perform certain servicing duties with respect to the receivables, (e) each ER3 Securitization Originator, as sub-servicers under the ER3 Sub-Servicing Agreement, agrees to perform such duties of the Servicer with respect to the receivables originated  by such ER3 Securitization Originator, and (f)  Exela, as performance guarantor under the ER3 Performance Guaranty, guarantees the performance of the obligations of the ER3 Securitization Originators and  Exela, as servicer, or any replacement servicer, under the ER3 Securitization Transaction Documents to which they are a party. The obligations of Receivables 3 under the ER3 Receivables Purchase Agreement (the "***ER3 Securitization Program Obligations***") are guaranteed by Receivables 3 Holdco, which guarantee is

---

[2827] The ER3 Securitization Originators include the following Debtor entities:  BancTec, Inc.; Economic Research Services, Inc.; Exela Enterprise Solutions, Inc.; HOV Enterprise Services, Inc.; HOV Services, Inc.; HOV Services, LLC; J & B Software, Inc.; Novitex Government Solutions, LLC; Regulus Group LLC; Regulus Group II LLC; Regulus Integrated Solutions LLC; SOURCECORP BPS Inc.; SOURCECORP Management, Inc.; SourceHOV Healthcare, Inc; and United Information Services, Inc.

secured by the ER3 Holdco Equity Pledge Agreement.  Pursuant to the ER3 Holdco Equity Pledge Agreement, Receivables 3 Holdco, as guarantor, has provided collateral primarily consisting of a pledge of its equity in Receivables 3.

As set forth in greater detail in the Securitization Motion, PNC has agreed to maintain the ER3 Securitization Program, and to continue to provide the Debtors with the liquidity arising therefrom, during the pendency of the Chapter 11 Cases.  As set forth in greater detail below, the Securitization Motion has been approved on an interim and final basis. [Docket Nos. 59 and 303].

### 2. Second Lien Note

On February 27, 2023, Receivables 3 Holdco entered into a Secured Promissory Note (the "**Second Lien Note**") with B. Riley Commercial Capital, LLC, which was later assigned to BRF Finance Co., LLC ("**B. Riley**").  Pursuant to the Second Lien Note, B. Riley agreed to lend up to $35 million to Receivables 3 Holdco secured by a second lien pledge of Receivables 3 Holdco's equity interests in Receivables 3.  The Second Lien Note has a maturity date of June 17, 2025, and bears an interest rate of one-month Term SOFR plus 7.5%.

As of February 2025, approximately $22.6 million remained outstanding under the Second Lien Note.

The relative rights and priorities of PNC, B. Riley, and the ER3 Securitization Secured Parties (collectively, the "**Subordination Agreement Parties**") are governed by that certain amended and restated subordination and intercreditor agreement, dated as of August 18, 2023, by and among PNC, B. Riley, Receivables 3 Holdco, Receivables 3, and  Exela (as may be amended from time to time, the "**ER3/2L Note Subordination Agreement**").  The ER3/2L Note Subordination Agreement governs, among other things, subordinated debt payment restrictions, subordination of liens and security interest, as well as the Subordination Agreement Parties' rights in liquidation, dissolution, or bankruptcy.  Under the ER3/2L Note Subordination Agreement, B. Riley in general is prohibited from taking actions to enforce its security interest prior to payment in full of the ER3 Securitization Program Obligations.  In addition, PNC, as administrative agent, and the ER3 Securitization Secured Parties agree not to agree to certain amendments to the ER3 Securitization Transaction Documents without the consent of B. Riley.

### 3. BR Exar Accounts Receivable Facility

On February 12, 2024, certain affiliates of the Company, including Debtor Novitex Enterprise Solutions Canada, Inc., Debtor Rust Consulting, Inc., Debtor HOVG LLC, Debtor BancTec (Canada) Inc., and Debtor SourceHOV Canada Company, as originators (the "**BR Exar Originators**"), and non-Debtor Exela BR SPV LLC, as seller (the "**BR Exar Seller**"), entered into a receivables purchase agreement with BR Exar, LLC ("**BREL**"), an affiliate of B. Riley (as subsequently amended on February 29, 2024, March 29, 2024, March 31, 2024, April 24, 2024, May 24, 2024 and June 25, 2024, July 29, 2024, August 13, 2024, August 30, 2024 September 27, 2024, October 30, 2024, November 26, 2024, December 30, 2024, January 23, 2025, and February 14, 2025, the "**BR Exar AR Facility**").

In turn, the BR Exar Originators, agreed to sell certain existing accounts receivable and all future receivables to BREL until such time as BREL will have collected approximately $65 million, net of any costs or expenses.  As of February 14, 2025 there is approximately $10 million outstanding under the BR Exar AR Facility

The obligations under the BR Exar AR Facility (the "**BR Exar Obligations**") are secured by that certain pledge agreement dated as of February 27, 2023 (the "**Pledge Agreement**").  Under the Pledge Agreement, the BR Exar Originators and BR Exar Seller provided a pledge and assignment of the bank account(s) established for the purpose of receiving payments and other monies and proceeds collected with respect to purchased receivables to BREL as collateral security for the BR Exar Obligations.

# III.
# EVENTS PRECEDING
# COMMENCEMENT OF THE CHAPTER 11 CASES

## A.      Challenges Leading to the Commencement of the Chapter 11 Cases

As noted herein, the Company is one of the leading providers of business process automation solutions and services to banks and financial institutions, healthcare payers and providers, and various other industries, and is highly respected by its customers.  Indeed, the Company has won many awards from industry research organizations including the following recognitions, Strong Performer in the Forrester Wave™: Task-Centric Automation Software (Q4 2024), Emerging Solution Winner in the FAO Hackett Value Matrix™, and Major Contender in the Everest Group's PEAK Matrix® for Revenue Cycle Management Operations.

The Company, however, operates in a highly competitive, fragmented, and rapidly evolving industry.  Specifically, the Company competes with national, regional, and large multinational companies within the broader information and payment technology industry.  Competitors also can emerge from adjacent industries or locations where the costs of operations are significantly lower.  As a result, the Company faces continual pricing pressures and competition for market share.  To keep pace with this competition and position themselves to continue to address the needs of their customers, the Company invested significant resources to develop innovative solutions and services.

These investments in innovation and the deployment of strategies to compete for new customers are extremely costly, especially when competing against well capitalized competitors.  Those factors coupled with additional challenges such as the (a) decline of the Novitex business; (b) ratings downgrade; (c) impact of COVID-19; and (d) network outage have impacted the Debtors' operations and caused the Debtors to become unsustainably leveraged.

### 1.      The Decline of the Novitex Business

The debt structure put in place to facilitate the Novitex Business Combination required a certain level of performance to service.  The Novitex business model, however, could not meet the necessary level because it had a lower degree of customer retention than originally anticipated.  The Company has invested in the Novitex Business Combination with the goal of deploying SourceHOV's technology to expand Novitex's service offerings but also make it more embedded among its customers, thereby strengthening revenue predictability.  Ultimately, the Company was unable to realize this goal, which meant that a significant part of the business had a lower degree of predictability, and given its size, adversely affected the entire Company.

### 2.      The Ratings Downgrade

The underperformance of the Novitex business had a cascading effect on other parts of the Company.  Specifically, in 2019, both Moody's and Standard and Poor's downgraded the debt rating for Exela Intermediate and Exela Finance (the "***Downgrade***").  The Downgrade further exacerbated the Company's difficulties by reducing Exela's share value and limiting Exela's ability to use such shares to raise financing.  As a result, any new debt financing became more expensive and complex.  Furthermore, in response to the Company's financial struggles, suppliers began imposing onerous terms, and customers started to withhold work mandates in some cases.

33

### 3.  The Impact of COVID-19

COVID-19 significantly disrupted the Company's business and operations.  In a short period of time, the Company had to transition much of its workforce to remote work, which at the time totaled approximately 22,000 employees.  This meant that the Company's management focused its efforts to ensure continuous operations and mission critical delivery while navigating ongoing pandemic-related disruptions in the marketplace.  In the U.S., many of the Company's solutions and services were deemed essential services, and therefore, employees were allowed to work at the Company's facilities.  The impact of COVID-19 was disruptive from an operational perspective as it disrupted onsite business processes which required more cost and complexity for the Company to continue meeting customer needs, and brought additional challenges.  For example, healthcare payers (insurers) and providers completely stopped certain services, such as dental work, elective surgeries, and similar categories.  This impact lasted for approximately two years.

### 4.  The Network Outage

In late June 2022, the Company experienced a network security incident (the "***Incident***") impacting certain parts of its operational and IT systems.  The Company immediately isolated the impact by taking large parts of its network offline as a precaution.  This precaution disrupted services to certain customers.  The Company also hired leading cyber forensic and defense firms, along with advisors, to remediate the Incident.  Ultimately, however, the Incident resulted in loss of revenue, profits, and the accrual of costs.  Exela has filed a business interruption claim against a group of insurers in the amount of $44.7 million, of which approximately $20 million remains unpaid.

~~As a result of the aforementioned challenges, and consistent with the Company's goal to remain a market leader, the Debtors have incurred approximately $1.315 billion of secured and unsecured funded debt, which has rerouted a significant amount of the cash flow generated from operations in order to service such indebtedness.  Additionally, these liquidity challenges have deprived the Debtors from making necessary investments, thus exacerbating the problems the Debtors face.~~**As a result of the aforementioned challenges, and consistent with the Company's goal to remain a market leader, the Debtors have incurred approximately $1.383 billion of secured and unsecured funded debt, which has rerouted a significant amount of the cash flow generated from operations in order to service such indebtedness.  Additionally, these liquidity challenges have deprived the Debtors from making necessary investments, thus exacerbating the problems the Debtors face.**

The Company's management team recognized that this high degree of leverage and the attendant negative impact it was having on the operations of the business, the ability to invest in technology, and future business operations was unsustainable in the long-term.  Accordingly, in late 2019, the Company undertook a series of initiatives and transactions aimed at improving its capital structure and extending its liquidity.  Specifically, beginning on November 12, 2019, Exela's Board of Directors (the "***Board***") announced a strategic initiative (the "***Initiative***") to reduce the Company's indebtedness and improve liquidity.  The Initiative aimed to improve liquidity by $125 to $150 million and reduce debt by $150 to $200 million in the subsequent two years.  Additionally, and as discussed above, the Company executed the 2023 Exchange in effort to reduce the overall debt burden on the Debtors.  Lastly, under the April 2026 Notes Indenture, Exela Intermediate was required to retain at least one independent director selected by a majority of the holders of the April 2026 Notes on terms and pursuant to documentation acceptable to such holders on its board of directors at all times following the issue date.  In accordance with this condition, on October 1, 2023, Exela Intermediate appointed such an independent director to its board of directors.

The Company's financial difficulties, however, persisted and ultimately resulted in the delisting of Exela's publicly traded securities from NASDAQ in late 2024. Exela was previously subject to, among other standards, NASDAQ Listing Rule 5550(b)(2) ("**Rule 5550(b)(2)**"), which required Exela to maintain a market value of listed securities ("**MVLS**") of at least $35 million. On November 13, 2023, Exela received an anticipated notice from NASDAQ, noting that it was in violation of Rule 5550(b)(2) because the MVLS had been below $35 million for the prior thirty (30) consecutive business days. Thereafter, on November 6, 2024, Exela received another notification from NASDAQ, stating that its securities would be delisted from NASDAQ. On November 8, 2024, trading of Exela's securities on NASDAQ was suspended (the "**NASDAQ Suspension**"). On January 7, 2025, Exela notified stockholders and NASDAQ that it intended to voluntarily delist from NASDAQ by filing Form 25 with the Securities and Exchange Commission (the "**SEC**"), and subsequently filed Form 25 on January 17, 2025. As of the NASDAQ Suspension, Exela's common stock and Series B Preferred Stock have been trading on the OTC Pink under the ticker symbols "XELA" and "XELAP," and this is currently the only trading market for Exela's securities. In addition, on January 27, 2025, Exela filed Form 15 with the SEC to deregister its securities under the Securities Exchange Act of 1934.[29][28]

B.      **Negotiations with Stakeholders**

Starting in early 2025, the Debtors began to explore options to refinance their existing debt through various capital markets transactions. However, as a result of the Company's debt burden and the significant market headwinds, the Debtors determined that such short-term opportunities were not feasible. Instead, the Debtors and their advisors decided that a comprehensive financial restructuring was necessary to align the capital structure with the long-term goals of the business.

In early 2025, the Company began exploring restructuring paths with certain of holders of April 2026 Notes (the "**Prepetition Ad Hoc Group**") represented by Ropes & Gray LLP (as counsel).[30][29] On January 15, 2025, the Debtors entered into the grace period under the April 2026 Notes and the July 2026 Notes relating to the payment of interest thereunder. On February 14, 2025, and in connection with the ongoing discussions, the Prepetition Ad Hoc Group, the Issuers, and the April 2026 Notes Trustee entered into that certain *First Supplemental Indenture* (the "**April 2026 Supplemental Indenture**"), which amended the April 2026 Notes Indenture to provide for a sixty (60)-day grace period for any missed interest payment (extending the thirty (30)-day grace period) under the April 2026 Notes. The Debtors determined not to pay the interest under the July 2026 Notes.

The Debtors and the Prepetition Ad Hoc Group had several discussions and exchanged restructuring proposals in the weeks leading up to the Petition Date. Following the Debtors' entry into the April 2026 Supplemental Indenture, the hard-fought negotiations between the Debtors and the Prepetition Ad Hoc Group accelerated. Ultimately, on March 3, 2025, the parties were able to reach a deal in principle. The terms of the deal are memorialized in the non-binding restructuring term sheet annexed as Exhibit D to the DIP Credit Agreement (the "**Restructuring Term Sheet**").

---

[29][28]   Accordingly, the Parent no longer has an obligation to file periodic and current reports with the SEC.

[30][29]   The Prepetition Ad Hoc Group consisted of Gates Capital Management, Inc., Avenue Capital Group, Anchorage Capital Advisors, L.P., BofA Securities, Inc., HoldCo Asset Management LP, CCUR Holdings, Inc., and OSP, LLC. Following the Petition Date, the Prepetition Ad Hoc Group membership changed, resulting in the current members of the Consenting Creditor Ad Hoc Group (*see* Docket No. 331) and the Sub-Group DIP Lenders comprising the membership of such groups.

In February 2025, the Debtors and PNC, represented by Mayer Brown LLP (as counsel), had constructive negotiations, and exchanged term sheets leading up to the Petition Date.  To date, PNC remains supportive of these Chapter 11 Cases.

## IV.
## OVERVIEW OF CHAPTER 11 CASES

### A.  Commencement of Chapter 11 Cases

On March 3, 2025, each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

### B.  First Day Relief

On the Petition Date, the Debtors filed multiple motions and applications seeking various relief from the Bankruptcy Court and authorizing the Debtors to maintain their operations in the ordinary course as well as several procedural motions (collectively, the "*First Day Motions*").[30]  The relief sought in the First Day Motions was aimed at ensuring a seamless transition between the Debtors' prepetition and postpetition business operations, facilitating a smooth chapter 11 process, and minimizing disruptions to the Debtors' businesses.  On March 4, 2025, the Bankruptcy Court entered various orders authorizing the relief requested in the First Day Motions, including, among other things, authorizing the Debtors to:

- Jointly administer the Chapter 11 Cases [Docket No. 45];

- Retain Omni Agent Solutions, Inc. as claims, noticing, and solicitation agent [Docket No. 52];

- File a consolidated list of creditors and modify certain notice and identification requirements [Docket No. 56];

- Extend the deadline by which the Debtors are required to file their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs [Docket No. 57];

- On an interim [Docket No. 58] and final basis [Docket No. 397], obtain postpetition financing and use of cash collateral (as further described below) and modifying the automatic stay;

- On an interim [Docket No. 60] and final basis [Docket No. 307], continue the use of the Debtors' cash management system, bank accounts, and business forms;

- Continue the Debtors' customer programs and honor related obligations to customers [Docket No. 61];

- Continue paying prepetition workforce obligations and certain related claims [Docket No. 62];

---

[30] A complete list of the First Day Motions is set forth on the *Amended Agenda of Debtors for Matters Set For Hearing on March 4, 2025* [Docket No. 46].  Copies of the First Day Motions are available on https://omniagentsolutions.com/DocuDataSolutions

- On an interim [Docket No. 63] and final basis [Docket No. 276], pay certain essential and critical vendors and claimants;

- Continue insurance policies and insurance programs [Docket No. 64];

- Establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service [Docket No. 65];

- Pay certain prepetition taxes and fees [Docket No. 66]; and

- Establish procedures relating to the certain transfers of interests in the Debtors and claims of certain worthless stock deductions [Docket No. 67].

The Debtors also filed various other motions that are common to chapter 11 cases of similar size and complexity to these Chapter 11 Cases.

### C.      Approval of the Postpetition Securitization Programs

On the Petition Date, the Debtors filed the Securitization Motion [Docket No. 9].  Pursuant to the Securitization Motion, the Debtors sought entry of an order authorizing, among other things, the applicable Debtors to enter into and/or otherwise perform (or continue to perform) under all amendments, restatements, supplements, instruments and agreements entered into in connection with the ER3 Securitization Program and the Rust Securitization Program (each as defined the Securitization Motion).

On March 4, 2025, the Bankruptcy Court granted the relief requested in the Securitization Motion on an interim basis [Docket No. 59] (the "***Interim Securitization Order***").  Concurrently therewith, certain of the Debtors entered into and/or otherwise performed (or continued to perform) under the Postpetition Securitization Programs in accordance with the Interim Securitization Order.  On April 14, 2025, the Bankruptcy Court granted the relief requested in the Securitization Motion on a final basis [Docket No. 303] (the "***Final Securitization Order***").

During the Chapter 11 Cases, the Debtors engaged with BREL, an affiliate of B. Riley Securities, Inc. (the "***Rust RPA Buyer***"), which is the buyer under the Rust Securitization Program, regarding an increase of the BR Exar AR Facility's purchase limit to provide additional liquidity to the Debtors until entry of the Final DIP Order.  Specifically, the Debtors and the Rust RPA Buyer had reached agreement regarding an amendment of the BR Exar AR Facility (the "***Incremental Rust RPA Amendment***") that would provide for an additional purchase of accounts receivable in the amount of approximately $6.35 million, immediately providing the Debtors approximately $5 million in additional liquidity.

On April 17, 2025, the Debtors filed the *Emergency Motion of Debtors for an Order (I) Confirming Compliance with Final Postpetition Securitization Order and in the Alternative, Waiving Certain Notice Requirements and (II) Granting Related Relief* [Docket No. 340] (the "***Securitization Program Comfort Motion***").  Pursuant to the Securitization Program Comfort Motion, the Debtors sought entry of an order (i) confirming that the Incremental Rust RPA Amendment would be effective upon execution and complied with the provisions of the Final Securitization Order (including Paragraph 25 thereof); or (ii) in the alternative, waiving any notice requirements that would delay effectiveness of the Incremental Rust RPA Amendment.  On April 17, 2025, the Bankruptcy Court granted the relief requested in the Securitization Program Comfort Motion on a final basis [Docket No. 349].  Concurrently, certain of the Debtors entered into the Incremental Rust RPA Amendment.

### D.    Retention Applications for Debtors' Professionals and Related Relief

Shortly after the Petition Date, the Debtors filed various applications regarding the retention of professionals that would provide services to the estates during the Chapter 11 Cases (the "***Debtors' Professionals***"), as is common in chapter 11 cases of similar size and complexity, including, without limitation:

- An application for entry of an order authorizing the retention of Latham & Watkins LLP as bankruptcy co-counsel [Docket No. 143], which the Bankruptcy Court approved through an order entered on April 11, 2025 [Docket No. 288];

- An application for entry of an order authorizing the retention of Hunton Andrews Kurth LLP as bankruptcy co-counsel [Docket No. 145], which the Bankruptcy Court approved through an order entered on April 11, 2025 [Docket No. 289]; and

- An application for entry of an order authorizing (i) the retention of AP Services, LLC as financial and restructuring advisors and (ii) the designation of Randall S. Eisenberg as Chief Restructuring Officer and Stephen Spitzer as Deputy Chief Restructuring Officer [Docket No. 146], which the Bankruptcy Court approved through an order entered on April 17, 2025 [Docket No. 348].

In addition, the Debtors filed a motion for entry of an order establishing procedures for the interim compensation and reimbursement of expenses of retained professionals including the Debtors' Professionals [Docket No. 147], which the Bankruptcy Court approved through entry of an order on April 14, 2025 [Docket No. 306].  The Debtors filed a separate motion seeking authorization for the Estates to employ professionals used in the ordinary course of business [Docket No. 148], which the Bankruptcy Court approved through entry of an order on April 14, 2025 [Docket No. 304].

### E.    Establishment of Claims Bar Dates; Filing of Schedules

On April 8, 2025, the Debtors filed a motion for entry of an order establishing bar dates for the filing of Proofs of Claim related to certain prepetition Claims [Docket No. 252], which the Bankruptcy Court approved through an order entered on May 1, 2025 [Docket No. 434] (the "***Bar Date Order***").  The Bar Date Order established (i) June 6, 2025, at 5:00 p.m. (prevailing Central Time) as the deadline for any entity to file a proof of claim based on a prepetition claim against any Debtor and (ii) September 2, 2025 at 5:00 p.m. (prevailing Central Time) as the deadline for any governmental unit to file a proof of claim against an Debtor.

~~The Debtors filed their schedules of assets and liabilities, schedules of current income and current expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "*Schedules*") with the Bankruptcy Court pursuant to section 521 of the Bankruptcy Code on May 6, 2025 [Docket Nos. [●] [ [●] ]].~~

**The Debtors filed their schedules of assets and liabilities, schedules of current income and current expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "*Schedules*") with the Bankruptcy Court pursuant to section 521 of the Bankruptcy Code on May 6, 2025 [Docket Nos. 445-581].**

### F.      The Official Committee of Unsecured Creditors

On March 19, 2025, the U.S. Trustee appointed the Official Committee of Unsecured Creditors (the "***Committee***") [Docket No. 139], which was subsequently reconstituted on March 24, 2025. The Committee is composed of (1) CSC Delaware Trust Company, (2) Alpine Global Management, LLC, (3) Phoenix Investment Adviser LLC, (4) Rocket Software, Inc., (5) Konica Minolta Business Solutions, USA, (6) AFLAC, and (7) Opex.

The Committee has filed applications to retain McDermott Will & Emery LLP [Docket No. 390] and Brown Rudnick LLP [Docket No. 393] as bankruptcy co-counsel and FTI Consulting, Inc. [Docket No. 391] as financial advisor.  These retention applications are pending as of the date that the Debtors commenced the solicitation of votes on the Plan.

### G.      Dispute Regarding Approval of Final DIP Financing

On the Petition Date, the Debtors filed the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 5] (the "***DIP Motion***").  Through the DIP Motion, the Debtors requested authority to, among other things, obtain postpetition financing comprising a superpriority priming term loan facility in an aggregate principal amount of not less than $185 million under that certain *Superpriority Priming Debtor-in-Possession Financing Agreement* dated March 4, 2025 (the "***DIP Credit Agreement***").  As noted above, the Bankruptcy Court entered the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 58] (the "***Interim DIP Order***") on a fully consensual interim basis on March 4, 2025.  The Interim DIP Order, among other things, set April 4, 2025 as the date of the hearing (as adjourned from time to time, the "***Final DIP Hearing***") at which the Bankruptcy Court would consider entry of a final order approving the DIP Motion.

After entry of the Interim DIP Order, the Debtors encountered several disputes with a subset of the lenders under the DIP Facility (the "***Sub-Group DIP Lenders***").  As part of the disputes among the Debtors and the Sub-Group DIP Lenders, each of the parties sought discovery, including depositions and document requests. After the Bankruptcy Court held hearings on certain discovery disputes, the Court held the discovery was moot and instead encouraged all parties to focus on attempting to reach a solution to the issues preventing entry of the proposed Final DIP Order on a consensual basis.

As discussed above, in order to continue funding the Chapter 11 Cases in the interim period before a settlement with the DIP Lenders could be finalized, the Debtors reached an agreement with the Rust RPA Buyer, regarding an increase of the BR Exar AR Facility purchase limit.  The Debtors then sought approval of the Incremental Rust RPA Amendment to provide an additional $5 million in liquidity to the Debtors [Docket No. 340], which the Court approved on April 17, 2025 [Docket No. 349].

During this period, the Debtors spent significant time and resources attempting to broker a resolution of the dispute between the DIP Lenders and, as part of such efforts, the Debtors and the Debtors' other stakeholders presented the Sub-Group DIP Lenders with material modifications to the Restructuring Term Sheet and engaged in hard fought negotiations with the Sub-Group DIP Lenders over the terms under which such lenders would support the Plan and the Debtors' efforts to reorganize.

Ultimately, on April 23, 2025, shortly following the commencement of the continued Final DIP Hearing, the Sub-Group DIP Lenders agreed on the terms of a global settlement resolving all disputes among the parties (the "**Sub-Group DIP Lenders Settlement**"). The Sub-Group DIP Lenders Settlement is a crucial component of the Plan and enabled the Debtors to obtain much needed funding under the DIP Facility and paved the way for a consensual confirmation process.

The terms of the Sub-Group DIP Lenders Settlement, which was read into the record at the Final DIP Hearing and incorporated into the Final DIP Order (as defined below), are:

- The New Money Loans authorized by the Final DIP Order shall be initially funded by Avenue and Gates; *provided*, that all Holders of April 2026 Notes Claims or July 2026 Notes Claims are entitled to fund their Pro Rata share of the New Money Loans;

- All DIP Lenders are required to roll their DIP Claims into the Rollover Exit Facility;

- ~~The Sub-Group DIP Lenders shall be entitled to convert $6 million of Allowed DIP Claims held as of the Effective Date into debt under the Supplemental Exit Facility, which debt shall be *pari passu* with the other debt under the Supplemental Exit Facility or incorporated into such facility on the same terms with customary sacred rights;~~**The Sub-Group DIP Lenders shall be entitled to convert $6 million of Allowed DIP Claims held as of the Effective Date into debt under the Supplemental Exit Facility (as defined in the Plan), which debt shall be *pari passu* with the other debt under the Supplemental Exit Facility or incorporated into such facility on the same terms with customary sacred rights;**

- DIP Claims held by the Sub-Group DIP Lenders as of the Effective Date shall be cancelled Pro Rata in an aggregate amount of $4 million;

- The Debtors shall reimburse up to $500,000 Restructuring Fees and Expenses incurred in the aggregate by the advisors to the Sub-Group DIP Lenders; and

- The Sub-Group DIP Lenders agree not to object or vote to reject the Plan and to pursue the Restructuring Transactions consistent with the Plan Support Agreement.

**H.     The Committee Settlement**

In addition, in the lead up to the Final DIP Hearing, the Debtors reached a global and comprehensive settlement with the Committee, the terms of which are set forth in the *Notice of Settlement Term Sheet with Official Committee of Unsecured Creditors* [Docket No. 368] (the "**Committee Settlement**").

**I.     Entry of the Final DIP Order**

The terms of the Committee Settlement and the Sub-Group DIP Lenders Settlement, were incorporated into the Bankruptcy Court's *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* (the "**Final DIP Order**") [Docket No. 397] entered on April 24, 2025.

**J.     The Amended Plan Support Agreement**

As noted herein, prior to the Petition Date, the Debtors and their key creditor constituents agreed on the terms of the non-binding Restructuring Term Sheet. Pursuant to the terms of the DIP Credit Agreement,

the Debtors were required, as a condition to further funding under the DIP Facility, to execute a restructuring support agreement with the Ad Hoc Group and other parties that was predicated on the terms contained in the Restructuring Term Sheet within 10 Business Days of the Petition Date (subject to further extensions in accordance with the terms of the DIP Credit Agreement) (as extended from time to time, the "*RSA Milestone*"). Immediately upon commencing the Chapter 11 Cases, the Debtors sought to negotiate with their applicable stakeholders to be able to comply with the RSA Milestone. Notwithstanding the Debtors' good faith efforts, it became apparent that certain parties did not intend to enter into a restructuring support agreement that memorialized the terms set forth in the Restructuring Term Sheet by the original RSA Milestone. Those issues were at the center of the dispute involving the DIP Facility described above in Section IV.F.  In light of those disputes, the original RSA Milestone was extended several times by agreement of the requisite parties.

After weeks of hard fought negotiations, the Debtors entered into the initial plan support agreement with the Consenting Creditor Ad Hoc Group and the Consenting ETI Parties.  *See* [Docket No. 334]. Thereafter, the Debtors amended the plan support agreement, *see* [Docket No. 374], and ultimately, on April 24, 2025, the Debtors, the Consenting Ad Hoc Group, and the Consenting ETI Parties entered into the Plan Support Agreement, which incorporates the terms of the Sub-Group DIP Lenders Settlement and the Committee Settlement, and sets a clear path for the Debtors to reorganize and emerge from Chapter 11.  The term sheet annexed to the Plan Support Agreement contained the material terms of the Plan. Pursuant to the terms of the consensual Final DIP Order, the entry into the Plan Support Agreement satisfies the RSA Milestone.

Pursuant to the Plan Support Agreement, the Debtors, and the Consenting Stakeholders, including, Exela and Par Chadha, in his capacity as Chairman of the Board of Exela, agreed to participate in, and support the Restructuring Transactions and to negotiate in good faith to consummate such transactions.  In addition, the parties expressly agreed not to object to, or otherwise impede, any of the transactions contemplated by the Plan Support Agreement (including the Plan Term Sheet, which is reflected in the Plan).

Furthermore, the Plan Support Agreement requires the parties to "use commercially reasonable efforts to cooperate with and assist the Debtors' efforts to obtain, as applicable, any and all federal, state, local, and foreign governmental, regulatory, and/or third-party approvals as may be reasonably requested by the Debtors." and not to "directly or indirectly object to, delay, impede, or take any other action (including by directing or encouraging any other Entity to take any action) to interfere with acceptance, implementation, or consummation of the Restructuring Transactions…"  Each of the parties' entry into the Plan Support Agreement was a critical component of the overall deal struck by the parties and crucial to the Debtors obtaining comfort that the transactions thereunder could reasonably be consummated as part of the transactions implicated thereunder.

While neither the Committee nor the Sub-Group DIP Lenders are party to the Plan Support Agreement, pursuant to the terms of the Committee Settlement and the Sub-Group DIP Lenders Settlement, the Committee and Sub-Group DIP Lenders, respectively, have agreed to support the Plan.  The Plan Support Agreement includes certain milestones (the "*PSA Milestones*"), including:

- No later than seven (7) business days following the Agreement Effective Date, the Debtors shall have filed the Plan, the Disclosure Statement, the Disclosure Statement Motion (as defined in the Plan Support Agreement);

- No later than thirty-five (35) days after the filing of the Disclosure Statement Motion, the Bankruptcy Court shall have entered the Disclosure Statement Order;

- No later than three (3) Business Days after the Bankruptcy Court's entry of the Disclosure Statement Order, (a) the notice of the Confirmation Hearing shall be mailed to all parties in interest, (b) the Solicitation Materials and notice of the Confirmation Hearing shall be posted on the Debtors' restructuring website, and (c) the Solicitation Materials shall be mailed to the holders of April 2026 Notes Claims, holders of July 2026 Notes Claims, and holders of Other Unsecured Claims;

- Subject to the Bankruptcy Court's availability, no later than fifty (50) days following the Bankruptcy Court's entry of the Disclosure Statement Order, the Bankruptcy Court shall have held the Confirmation Hearing and entered the Confirmation Order; and

- No later than fourteen (14) days after the entry of the Confirmation Order, the Plan Effective Date shall have occurred.

## K. <u>The Investigation</u>

In connection with the commencement of the Chapter 11 Cases, the Board empowered and authorized its independent director, Alan Carr (the "***Independent Director***") to investigate potential claims that the Debtors might hold against its directors, officers, employees, lenders, stockholders, or advisors, review any proposed releases including, most notably, the releases proposed to be given under the Plan, and make a recommendation to the Board in connection therewith. The Independent Director has been assisted and advised throughout this investigation (the "***Investigation***") by Latham & Watkins LLP ("***Latham***") and APS Services ("***APS***"). The Investigation is focused on numerous types of claims, including, without limitation, the following: potential fraudulent conveyances; preferences; negligence, corporate mismanagement, or waste; and breaches of fiduciary duty.

## L. <u>Exclusivity</u>

Section 1121(b) of the Bankruptcy Code provides for a period of 120 days after the commencement of a chapter 11 case during which time a debtor has the exclusive right to file a chapter 11 plan (the "***Exclusive Plan Period***"). In addition, section 1121(c)(3) of the Bankruptcy Code provides that if a debtor files a plan within the Exclusive Plan Period, it has a period of 180 days after commencement of the chapter 11 case to obtain acceptances of such plan, before the expiration of which no other party in interest may file a plan (the "***Exclusive Solicitation Period***," and together with the Exclusive Plan Period, the "***Exclusive Periods***"). Pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend the Exclusive Periods. The Exclusive Plan Period currently expires on July 1, 2025 and the Exclusive Solicitation Period runs through August 30, 2025, both are subject to extension upon order of the Bankruptcy Court.

## M. <u>Timetable for the Chapter 11 Cases</u>

In accordance with the Plan Support Agreement, the Debtors have agreed to proceed with the implementation of the Plan through the Chapter 11 Cases. Among the PSA Milestones is the requirement that the Bankruptcy Court enter the order confirming the Plan no later than fifty (50) days following the Bankruptcy Court's entry of the Disclosure Statement Order. The Plan Support Agreement also requires that the Effective Date occur no later than fourteen (14) days following the entry of the Confirmation Order. Although the Debtors will request that the Bankruptcy Court approve a timetable consistent with the Plan Support Agreement, there can be no assurance that the Effective Date will occur on such timetable.

# V.
# SUMMARY OF THE PLAN

**THE TERMS OF THE PLAN, A COPY OF WHICH IS ATTACHED AS <u>EXHIBIT A</u> TO THIS DISCLOSURE STATEMENT, ARE INCORPORATED BY REFERENCE HEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERENCED THEREIN, WHICH ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN).**

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN. HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS AND OTHER INTERESTED PARTIES ARE URGED TO READ THE PLAN AND THE EXHIBITS THERETO IN THEIR ENTIRETY SO THAT THEY MAY MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.**

## A.     Classification and Treatment of Claims and Interests under the Plan

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor. The provisions of Article III of the Plan govern Claims against and Interests in the Debtors. Except for the Claims addressed in Article II of the Plan (or as otherwise set forth therein), all Claims and Interests are placed in Classes for each of the applicable Debtors. For all purposes under the Plan, each Class will exist for each of the Debtors; *provided*, that any Class that is vacant as to a particular Debtor will be treated in accordance with Article III.G of the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, DIP Claims, Priority Tax Claims, Claims for the Premiums and Fees, Postpetition Securitization Programs Claims, and Other Priority Claims as described in Article II of the Plan.

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or an Interest is in a particular Class only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

### Summary of Classification and Treatment of Claims and Interests

| Class | Claim | Status | Voting Rights |
|:---:|:---:|:---:|:---:|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Prepetition Term Loan Claims | Unimpaired | Presumed to Accept |

| *3* | *April 2026 Notes Claims* | *Impaired* | *Entitled to Vote* |
|---|---|---|---|
| *4* | *Convenience Claims* | *Impaired* | *Entitled to Vote* |
| *5* | *July 2026 Notes Claims* | *Impaired* | *Entitled to Vote* |
| *6* | *General Unsecured Claims* | *Impaired* | *Entitled to Vote* |
| 7 | Subordinated Claims | Impaired | Deemed to Reject |
| 8 | Intercompany Claims | Unimpaired or Impaired | Presumed to Accept or Deemed to Reject |
| 9 | Intercompany Interests | Unimpaired or Impaired | Presumed to Accept or Deemed to Reject |
| 10 | Existing BPA Equity Interests | Impaired | Deemed to Reject |
| 11 | Other Existing Equity Interests | Impaired | Deemed to Reject |

**B.**   **Acceptance or Rejection of the Plan; Effect of Rejection of the Plan**

    **1.**   **Presumed Acceptance of Plan**

Claims in Classes 1 and 2 are Unimpaired under the Plan and their Holders are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Classes 1 and 2 are not entitled to vote on the Plan and the votes of such Holders shall not be solicited.  Notwithstanding their non-voting status, Holders of such Claims shall receive a Release Opt-Out Form solely for purposes of providing such Holders with the opportunity to opt out of the Third-Party Release.

## 2.  Voting Classes

Claims in Classes 3, 4, 5, and 6 are Impaired under the Plan, and the Holders of Allowed Claims in such Classes are entitled to vote to accept or reject the Plan, including by acting through a voting Representative.  For purposes of determining acceptance and rejection of the Plan, votes shall be tabulated on a Debtor-by-Debtor basis.

Pursuant to section 1126(c) of the Bankruptcy Code, an impaired class of claims shall have accepted the plan if (a) the holders, including holders acting through a voting representative, of at least two-thirds (2/3) in amount of claims actually voting in such class have voted to accept the plan and (b) the holders, including holders acting through a voting representative, of more than one-half (1/2) in number of claims actually voting in such class have voted to accept the plan.  Holders of Claims in the Voting Classes (or, if applicable, the voting Representatives of such Holders) shall receive Ballots containing detailed voting instructions.  For the avoidance of doubt, each Claim in the Classes entitled to vote to accept or reject the Plan that is not Allowed pursuant to the Plan, and in each case, is wholly contingent, unliquidated, or Disputed, in each case, shall be accorded one (1) vote and valued at one dollar ($1.00) for voting purposes only, and not for purposes of allowance or distribution.

## 3.  Deemed Rejection of the Plan

Claims and Interests in Classes 7, 10, and 11 are Impaired and will receive no distribution under the Plan and are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Claims and Interests in Classes 7, 10, and 11 are not entitled to vote on the Plan and the votes of such Holders shall not be solicited.  Notwithstanding their non-voting status, Holders of such Claims and Interests shall receive a Release Opt-Out Form solely for purposes of providing such Holders the opportunity to opt out of the Third-Party Release.

## 4.  Presumed Acceptance of the Plan or Deemed Rejection of the Plan

Claims and Interests in Classes 8 and 9 are either (a) Unimpaired and, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or (b) Impaired and shall receive no distributions under the Plan and, therefore, deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Claims and Interests in Classes 8 and 9 are not entitled to vote on the Plan and votes of such Holders shall not be solicited.

## 5.  Confirmation Pursuant to Section 1129(a)(10) and 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims entitled to vote (i.e., Classes 3, 4, 5, or 6).  The Debtors shall seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article XI of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and Bankruptcy Rules.

## 6.  Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Interests, and the respective distributions and treatments under the Plan, shall take into account and conform to the relative priority

and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 509 or 510 of the Bankruptcy Code, or otherwise; *provided*, that notwithstanding the foregoing, such Allowed Claims or Interests and their respective treatments set forth herein shall not be subject to setoff, demand, recharacterization, turnover, disgorgement, avoidance, or other similar rights of recovery asserted by any Person.  Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided herein, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination rights relating thereto.  The Debtors or Reorganized Debtors, as applicable, reserve the right to seek a ruling from the Bankruptcy Court determining whether any Claim should be subordinated pursuant to section 510(b) of the Bankruptcy Code and treated under the Plan as a Class 7 Subordinated Claim.

    **7.**   **Special Provision Governing Unimpaired Claims**

Except as otherwise provided herein, nothing under the Plan shall affect or limit the Debtors' or Reorganized Debtors' rights and defenses (whether legal or equitable) in respect of any Unimpaired Claims, including, all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

    **8.**   **Vacant and Abstaining Classes**

Any Class of Claims or Interests that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.  Moreover, any Class of Claims that is occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018, but as to which no vote is cast, shall be deemed to accept the Plan pursuant to section 1129(a)(8) of the Bankruptcy Code.

    **9.**   **Controversy Concerning Impairment**

If a controversy arises as to whether any Claim or Interest (or any Class of Claims or Interests) is Impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date, absent consensual resolution of such controversy consistent with the Plan Support Agreement among the Debtors and the complaining Entity or Entities.

    **10.**   **Intercompany Interests and Intercompany Claims**

Other than with respect to any April 2026 Notes Claim or July 2026 Notes Claim held by ETI or an ETI Holder, to the extent Intercompany Interests and Intercompany Claims are Reinstated under the Plan, distributions on account of such Intercompany Interests and Intercompany Claims are not being received by Holders of such Intercompany Interests or Intercompany Interests on account of their Intercompany Interests or Intercompany Claims, but for the purposes of administrative convenience and to maintain the Debtors' (and their Affiliates') corporate structure, for the ultimate benefit of the Holders of New Parent Interests, to preserve ordinary course intercompany operations, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

**C.      Means of Implementation of the Plan**

Article IV of the Plan governs and describes the means of implementation of the Plan.

Article IV.A ("***General Settlement of Claims and Interests***") of the Plan provides that, in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan will constitute a set of integrated, good-faith compromises and settlements of all Claims, Interests, Causes of Action, and controversies resolved pursuant to the Plan and the Plan will be deemed a motion to approve the good-faith compromises and settlements of all Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of such compromises and settlements under Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such integrated compromises or settlements are in the best interests of the Debtors, the Estates, and Holders of Claims and Interests, and are fair, equitable, and reasonable. Subject to Article VI, distributions made to Holders of Allowed Claims in any Class are intended to be and will be final and indefeasible and will not be subject to avoidance, turnover, or recovery by any other Person.

Article IV.B ("***Restructuring Transactions***") of the Plan provides that, without limiting any rights and remedies of the Debtors or Reorganized Debtors under the Plan or applicable law, the entry of the Confirmation Order will constitute authorization for the Debtors and the Reorganized Debtors, as applicable, to take, or to cause to be taken, all actions necessary or appropriate to consummate and implement the provisions of any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan before, on, and after the Effective Date, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, conversion, elections, or dissolution containing terms that are consistent with the terms of the Plan, the Plan Support Agreement, the Restructuring Steps Exhibit, the XBP Transaction Documents, the Plan Supplement, the Exit Facilities, the Exit Securitization Programs Documents, and the other Definitive Documents and that satisfy the applicable requirements of applicable state law and such other terms to which the applicable Entities may agree, including, for the avoidance of doubt, in connection with the Restructuring Transactions; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of the Plan, the Plan Support Agreement, the Restructuring Steps Exhibit, the XBP Transaction Documents, the Plan Supplement, the Exit Facilities, the Exit Securitization Programs Documents, and the other Definitive Documents and having such other terms to which the applicable Entities may agree, including, for the avoidance of doubt, in connection with the Restructuring Transactions; (3) the execution, delivery, and filing, if applicable, of the New Organizational Documents, the XBP Transaction Documents, the Exit Facilities Documents, the Registration Rights Agreement, the New Parent Warrants Agreement, and the Exit Securitization Programs; (4) the filing of appropriate elections or certificates or articles of conversion, formation, incorporation, merger, consolidation, or dissolution with the appropriate governmental authorities pursuant to applicable state law; (5) all other actions that the Debtors, the Reorganized Debtors and/or the applicable Entities reasonably determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law or foreign law in connection with such transactions; and (6) such actions as may be necessary or appropriate to effectuate a corporate restructuring of their respective businesses and to otherwise simplify the overall corporate structure of the Reorganized Debtors.

Consistent with the foregoing, the Restructuring Transactions shall include: (i) cancellation of existing agreements and Existing BPA Equity Interests, Other Existing Equity Interests and certain Intercompany Interests in accordance with Article III.B of the Plan, as more particularly described in Article IV.G of

the Plan; (ii) entry into and performance under the Exit Facilities and Exit Facilities Documents, as more particularly described in <u>Article IV.I</u> of the Plan; (iii) entry into and performance under the Exit Securitization Programs and Exit Securitization Programs Documents, as more particularly described in <u>Article IV.I</u> of the Plan; (iv) issuance of Plan Securities, as more particularly described in <u>Article IV.K</u> of the Plan; (v) issuance and effectiveness of the New Organizational Documents, as more particularly described in <u>Article IV.M</u> of the Plan; (vi) consummation of the BTC Transaction, as more particularly described in the Restructuring Steps Exhibit; and (vii) the XBP Transaction, more particularly described in the Restructuring Steps Exhibit.

The Plan further provides that, the Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions (including the BTC Transaction and the XBP Transaction, and any other transaction described in, approved by, contemplated by, or necessary to effectuate the Plan).

Subject to BTC and XBP's satisfaction with the definitive documentation with respect to the Restructuring Transactions including, the XBP Transaction Documents, the Governance Term Sheet, the Registration Rights Agreement, and the New Organizational Documents, each of BTC and XBP agrees to engage in the Restructuring Transactions, as applicable, to issue or distribute, as applicable, the Plan Securities and to perform any other obligation under the Plan and the Definitive Documents and in accordance with the Restructuring Steps Exhibit, in each case contemplated hereunder and thereunder to be performed by it.  In connection therewith, each of BTC and XBP will submit to the jurisdiction of the Bankruptcy Court in respect of such agreements and obligations and acknowledge that it is a participant in the Plan.

Article IV.C ("**_Committee Settlement_**") of the Plan incorporates the Committee Settlement, a compromise and settlement of numerous issues and disputes between and among (a) the Debtors and the Consenting Stakeholders; and (b) the Committee, designed to achieve a reasonable and effective resolution of certain Claims and issues in connection with the Chapter 11 Cases.  Except as expressly set forth in the plan or the Confirmation Order, the Committee Settlement constitutes a settlement of all potential issues and Claims between and among (a) the Debtors and the Consenting Stakeholders; and (b) the Committee.  The key terms of the Committee Settlement include:

- The inclusion of the July 2026 Noteholder Equity Distribution, subject to the terms of the Committee Settlement;

- Payment of Allowed Convenience Claims in Cash in an amount equal to no less than 70% of such Allowed Convenience Claims;

- Establishment of the Unsecured Cash Pool;

- All fees for professionals retained by the Committee will be capped at $2.75 million, less amounts paid to the July 2026 Notes Indenture Trustee under the July 2026 Notes Indenture, plus amounts allocated by agreement between the Debtors and the Committee from (a) the Unsecured Cash Pool or (b) funds otherwise allocable to increase the Convenience Claims recoveries;

- The Required Consenting Creditors, the Debtors and Committee will work in good faith to agree on an appropriate and cost-effective Claims reconciliation process including a potential engagement of a Claims Ombudsman;

- Upon the Effective Date, the Debtors and their Estates will waive preference claims against Holders of General Unsecured Claims;

- In consideration for the settlement contemplated by the Committee Settlement and as more fully set out in the Plan, the Committee will support the Plan and recommend to its constituents that they vote to accept the Plan and will support the relief and treatment (including such releases as agreed and granted by the Debtors and other supporting parties) provided for in the Plan and the other Definitive Documents;

- April 2026 Notes Deficiency Claims will be waived and will not recover from the Unsecured Cash Pool; and

- Resolution of all objections raised by the Committee in the Chapter 11 Cases.

Article IV.F ("***Vesting of Assets in the Reorganized Debtors Free and Clear of Liens and Claims***") of the Plan provides that, except as otherwise expressly provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated in the Plan pursuant to sections 1123(a)(5), 1123(b)(3), 1141(b) and (c), and other applicable provisions of the Bankruptcy Code, on and after the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan will vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, other encumbrances or interests, except for those Liens, Claims, charges, or other encumbrances arising from or related to the Exit Facilities Documents and the Exit Securitization Programs Documents.  In addition, all rights, benefits, and protections provided to any of the Debtors pursuant to the Plan, the Plan Supplement, or the Confirmation Order including the release, exculpation, and injunction provisions provided in Article IX of the Plan, shall vest in each respective Reorganized Debtor unless expressly provided otherwise by the Plan or the Confirmation Order.  On and after the Effective Date, the Reorganized Debtors may (1) operate their respective businesses, (2) use, acquire, and dispose of their respective property, and (3) prosecute, compromise or settle any Claims, Interests, or Causes of Action, in each case without notice to, supervision of, or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, including for the avoidance of doubt any restrictions on the use, acquisition, sale, lease, or disposal of property under section 363 of the Bankruptcy Code.  Anything in the Plan to the contrary notwithstanding, the Unimpaired Claims against a Debtor will remain the obligations solely of such Debtor or such Reorganized Debtor and will not become obligations of any other Debtor or Reorganized Debtor by virtue of the Plan, the Chapter 11 Cases, or otherwise.

Article IV.G ("***Cancellation of Existing Agreements, Existing BPA Equity Interests, and Certain Intercompany Interests***") of the Plan provides that, on the Effective Date, except with respect to the Exit Facilities Documents and the Exit Securitization Programs Documents, or to the extent otherwise provided in the Plan, the XBP Transaction Documents, the Confirmation Order, or any other Definitive Document, all notes, bonds, indentures, credit agreements, certificates, securities, purchase rights, options, warrants, calls, puts, awards, commitments, obligations, registration rights, preemptive rights, rights of first refusal, rights of first offer, co-sale rights, investor rights, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any existing indebtedness or obligations of or ownership interest in the Debtors or giving rise to any rights, commitments or obligations relating to Claims against or Interests in the Debtors will be deemed canceled and surrendered, and the obligations of the Debtors or the Reorganized Debtors, as applicable, and any Non-Debtor Affiliates thereunder or in any way related thereto will be deemed satisfied in full, released, and discharged and the obligations of the Debtors pursuant, relating, or pertaining to any agreements, notes, bonds, indentures, credit agreements, certificates, securities, purchase rights, options, warrants, calls, puts, awards, commitments, registration

rights, preemptive rights, rights of first refusal, rights of first offer, co-sale rights, investor rights, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any existing indebtedness or obligations of or ownership interest in the Debtors or giving rise to any rights or obligations relating to Claims against or Interests in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated or assumed pursuant to the Plan, if any) will be released and discharged; *provided*, that, notwithstanding such cancellation, satisfaction, release, and discharge, anything to the contrary contained in the Plan, the XBP Transaction Documents, the Confirmation Order, or any such document or instrument that governs the rights, claims, or remedies of the Holder of a Claim or Interest will continue in effect solely for purposes of: (1) enabling the Holder of such Claim or Interest to receive distributions on account of such Claim or Interest under the Plan; (2) allowing and preserving the rights of the DIP Agent, the April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the Exit Financing Facilities Agents, and the Securitization Programs Agents, as applicable, to make distributions as specified under the Plan on account of Allowed Claims, as applicable, including allowing the April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Exit Financing Facilities Agents, and the Securitization Programs Agents, as applicable, to submit invoices for any amount and enforce any obligation owed to them under the Plan to the extent authorized or allowed by the applicable documents; (3) permitting the Reorganized Debtors and any other Distribution Agent, as applicable, to make distributions on account of applicable Claims and Interests, as applicable; (4) preserving the DIP Agent's, the April 2026 Notes Indenture Trustee's, the July 2026 Notes Indenture Trustee's, the April 2026 Notes Collateral Agent's, the Exit Financing Facilities Agents', and the Securitization Programs Agents', as applicable, rights, if any, to compensation and indemnification as against any money or property distributable to the Holders of April 2026 Notes Claims, July 2026 Notes Claims, DIP Claims, and Postpetition Securitization Programs Claims, as applicable, including permitting the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Exit Financing Facilities Agents, and the Securitization Programs Agents, as applicable, to maintain, enforce, and exercise any priority of payment or charging liens against such distributions each pursuant and subject to the terms of the April 2026 Notes Indenture, the July 2026 Notes Indenture, the DIP Credit Agreement, and Postpetition Securitization Programs Documents, as applicable, as in effect on or immediately before the Effective Date; (5) preserving all rights, remedies, indemnities, powers, and protections, including rights of enforcement, of the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Exit Financing Facilities Agents, and the Securitization Programs Agents, as applicable, against any person other than a Released Party (which Released Parties include the Debtors, Reorganized Debtors, and Non-Debtor Affiliates), and any exculpations of the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Exit Financing Facilities Agents, and the Securitization Programs Agents, as applicable; *provided*, that the April 2026 Notes Indenture Trustee, April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Exit Financing Facilities Agents, and the Securitization Programs Agents will remain entitled to indemnification or contribution from the Holders of April 2026 Notes Claims, July 2026 Notes Claims, DIP Claims, and Postpetition Securitization Programs Claims, each pursuant and subject to the terms of the April 2026 Notes Indenture, the July 2026 Notes Indenture, the DIP Credit Agreement, and Postpetition Securitization Programs Documents, as applicable, as in effect on the Effective Date; (6) permitting the April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Exit Financing Facilities Agents, and the Securitization Programs Agents, as applicable, to enforce any obligation (if any) owed to them under the Plan; (7) permitting the April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee the DIP Agent, the Exit Financing Facilities Agents, and the Securitization Programs Agents to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court; and (8) permitting the April 2026 Notes Indenture Trustee, April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Exit

Financing Facilities Agents, and the Securitization Programs Agents to perform any functions that are necessary to effectuate the foregoing; *provided*, *further*, that nothing in Article IV of the Plan will affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or (except as set forth in (5) above) the Releases of the Released Parties pursuant to Article IX of the Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable, except as expressly provided for in the Plan.  For the avoidance of doubt, nothing in Article IV of the Plan will cause the Reorganized Debtors' obligations under the Exit Facilities Documents and the Exit Securitization Programs Documents to be deemed satisfied in full, released, or discharged; *provided, further*, that notwithstanding this sentence, the April 2026 Notes Claims, July 2026 Notes Claims, DIP Claims, and Postpetition Securitization Programs Claims will be deemed satisfied in full, released, and discharged on the Effective Date.  In furtherance of the foregoing, as of the Effective Date, Holders of April 2026 Notes Claims, July 2026 Notes Claim, DIP Claims, and Postpetition Securitization Programs Claims will be deemed to have released any such Claims against the Reorganized Debtors under the April 2026 Notes Indenture, the July 2026 Notes Indenture, the DIP Documents, and the Postpetition Securitization Programs Documents, as applicable, and are enjoined from pursuing any such claims against any of the Reorganized Debtors in respect of such April 2026 Notes Claims, July 2026 Notes Claims, DIP Claims, and Postpetition Securitization Programs Claims.

The Plan further provides that, on the Effective Date, the April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Securitization Programs Agents and each of their respective directors, officers, employees, agents, Affiliates, controlling persons, and legal and financial advisors will be automatically and fully released and discharged from any further responsibility under the April 2026 Notes Indenture, the July 2026 Notes Indenture, the DIP Credit Agreement, the Prepetition Securitization Programs Documents, and the Postpetition Securitization Programs Documents, as applicable.  The April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Securitization Programs Agents, and each of their respective directors, officers, employees, agents, Affiliates, controlling persons, and legal and financial advisors will be discharged and will have no further obligation or liability in respect of the April 2026 Notes Indenture, the July 2026 Notes Indenture, the DIP Credit Agreement, the Prepetition Securitization Programs Documents, and the Postpetition Securitization Programs Documents, as applicable, except as provided in the Plan and the Confirmation Order, and after the performance by the April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Securitization Programs Agents, and their Representatives and professionals of any obligations and duties required under or related to the Plan or the Confirmation Order, the April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Securitization Programs Agents, and each of their respective directors, officers, employees, agents, Affiliates, controlling persons, and legal and financial advisors will be relieved of and released from any obligations and duties arising thereunder.  The fees, expenses, and costs of the April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Securitization Programs Agents, including fees, expenses, and costs of each of their respective professionals incurred after the Effective Date in connection with the April 2026 Notes Indenture, the July 2026 Notes Indenture Trustee, the DIP Credit Agreement, or the Prepetition Securitization Programs Documents, as applicable, and reasonable and documented fees, costs, and expenses associated with effectuating distributions pursuant to the Plan, including the fees and expenses of counsel, if any, shall be paid in accordance with the terms of the Plan and the applicable Definitive Documents.

Article IV.H ("***Sources for Plan Distributions and Transfers of Funds Among Debtors***") of the Plan provides that the Debtors will fund Cash distributions under the Plan with Cash on hand, including Cash from operations, and the proceeds of the DIP Facility, Exit Facilities, and the Exit Securitization Programs.  The Debtors will make non-Cash distributions as required under the Plan in the form of Exit Debt and Plan Securities.  Cash payments to be made pursuant to the Plan will be made by the

Reorganized Debtors in accordance with Article VI of the Plan.  Subject to any applicable limitations set forth in any post-Effective Date agreement, the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth in the Plan, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

The Plan further provides that, from and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date agreement (including the New Organizational Documents, the Exit Facilities Documents, and the Exit Securitization Programs Documents), will have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing in accordance with, and subject to, applicable law.

Article IV.O ("***Release of Liens and Claims***") of the Plan provides that, to the fullest extent provided under section 1141(c) and other applicable provisions of the Bankruptcy Code, except as otherwise provided in the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article VI of the Plan, all Liens, Claims, mortgages, deeds of trust, or other security interests against the assets or property of the Debtors or the Estates will be fully released, canceled, terminated, extinguished, and discharged, in each case without further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity; *provided*, that (1) the Liens granted to the DIP Agent pursuant to the DIP Credit Agreement and (2) any and all Liens or security securing the Debtor's obligations under the Insurance Contracts, which, for avoidance of doubt, includes grants of security interests in escrow accounts, deposit accounts, Cash Collateral, and letters of credit issued for the benefit of Insurers, will remain in full force and effect solely to the extent provided for in the Plan. The filing of the Confirmation Order with any federal, state, or local agency or department will constitute good and sufficient evidence of, but will not be required to effect, the termination of such Liens, Claims, and other Interests to the extent provided in the immediately preceding sentence.  Any Person or Entity holding such Liens, Claims, or Interests will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction, and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors.

Article IV.P ("***Exemption from Certain Taxes and Fees***") of the Plan provides that, to the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any issuance, transfer or exchange (whether from a Debtor to a Reorganized Debtor or to any other Person) under, pursuant to, in contemplation of, or in connection with the Plan (including the Restructuring Transactions), including pursuant to (1) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtors, the Reorganized Debtors, or any of their Affiliates, including the Exit Debt, the Plan Securities, or related instruments or documentation, (2) the maintenance, creation, modification, consolidation, termination, refinancing, or recording of any mortgage, Lien, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (3) the making, assignment, or recording of any lease or sublease, (4) the grant of collateral security for any or all of the Exit Debt or other indebtedness, or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Restructuring Transactions), will not be subject to any document tax, recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate U.S. federal, state or local governmental officials, agents, or filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, will comply with the requirements of

section 1146(a) of the Bankruptcy Code, and shall forego the collection of any such tax, fee or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, fee or governmental assessment.

Article IV.R ("*Preservation of Causes of Action*") of the Plan provides that in accordance with section 1123(b) of the Bankruptcy Code, but subject to the Releases and exculpation set forth in Articles IV.Q and IX of the Plan, all Causes of Action that a Debtor may hold against any Entity will vest in the applicable Reorganized Debtor on the Effective Date, including each Cause of Action set forth in the Schedule of Retained Causes of Action included in the Plan Supplement.  Thereafter, the Reorganized Debtors will have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, whether arising before or after the Petition Date, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or this Disclosure Statement to any specific Cause of Action as any indication that the Debtors or the Reorganized Debtors will not pursue any or all available Causes of Action.  Pursuant to the Plan, the Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan**, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches, will apply to any Cause of Action upon, after, or as a consequence of the Confirmation or the occurrence of the Effective Date.  In addition, the Debtors and the Reorganized Debtors expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any of the Debtors are a plaintiff, defendant, or an interested party, against any Person or Entity, including the plaintiffs or co-defendants in such lawsuits.  For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to Article IV.R of the Plan include any Claim or Cause of Action released or exculpated under the Plan (including by the Debtors).

Article IV.T ("*Claims Ombudsman*") of the Plan provides that on the Effective Date, the Debtors shall appoint a Claims Ombudsman, pursuant to an agreement on reasonable terms (the "*Claims Ombudsman Agreement*") reasonably acceptable to the Debtors, the Consenting ETI Parties, and Required Consenting Creditors, with rights and duties that include (a) certain rights with respect to the reconciliation, allowance, and settlement of Claims by or on behalf of (and in consultation with) the Reorganized Debtors, (b) consultation rights with respect to distributions to the Holders of Convenience Claims and General Unsecured Claims, and (c) such other matters as may be agreed upon between the Debtors, the Committee, and the Reorganized Debtors (as applicable).  The Claims Ombudsman, on behalf of the Holders of General Unsecured Claims, shall be the deemed secured party in respect of, and shall have the exclusive authority to take any action to enforce the security interest in, the GUC Payment Obligations Collateral.

The Plan further provides that, subject to the terms of the Claims Ombudsman Agreement, the Claims Ombudsman (a) shall be entitled to a reasonable fee (the "*Claims Ombudsman Fee*"), the terms, amount, and structure of which shall be set forth in the Claims Ombudsman Agreement, (b) may employ, with the prior written consent of the Debtors or the Reorganized Debtors, but without further order of the Bankruptcy Court, professionals (the "*Claims Ombudsman Professionals*") to assist in carrying out the duties described above, and (c) shall have standing to appear before and be heard by the Bankruptcy Court and other courts of competent jurisdiction in connection with each of the foregoing duties, rights, and authorities.  The Claims Ombudsman Fee and the reasonable and documented fees and expenses incurred by the Claims Ombudsman Professionals (the "*Claims Ombudsman Professionals Fees*") shall be expenses of the Reorganized Debtors; *provided*, that the Claims Ombudsman Fee and the Claims Ombudsman Professionals Fees shall be in all respects subject to (a) budget satisfactory to the

Reorganized Debtors and the Required Consenting Creditors and/or (b) a cap set forth in the Claims Ombudsman Agreement in each case satisfactory to the Reorganized Debtors and the Required Consenting Creditors. The Claims Ombudsman shall be a fiduciary to Holders of Convenience Claims and General Unsecured Claims. The Claims Ombudsman and the Claims Ombudsman Professionals, each in their capacities as such, shall be exculpated, except for fraud, bad faith, willful misconduct, or gross negligence.

Article IV.U ("***Effectuating Documents; Further Transactions***") of the Plan provides that before, on, and after the Effective Date, the Debtors, the Reorganized Debtors, and the directors, managers, officers, authorized persons, and members of the boards of directors or managers and directors or managers of the foregoing, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, notes, instruments, certificates, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and provisions of the Plan, the XBP Transaction Documents, the New Organizational Documents, the Exit Facilities Documents, the Restructuring Transactions, and any Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant to the Plan.

Article IV.V ("***Authority of the Debtors***") of the Plan provides that, effective on the Confirmation Date, the Debtors and the Reorganized Debtors will be empowered and authorized to take or cause to be taken, before the Effective Date, all actions necessary or appropriate to achieve the Effective Date and enable the Reorganized Debtors to implement effectively the provisions of the Plan, the XBP Transaction Documents, the Confirmation Order, the Definitive Documents, and the Restructuring Transactions.

Article IV.W ("***No Substantive Consolidation***") of the Plan provides that the Plan is being proposed as a joint chapter 11 plan of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan for each Debtor. The Plan further provides that the Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

Article IV.X ("***Continuing Effectiveness of Final Orders***") of the Plan provides that authorization granted to the Debtors under any prior Final Order entered by the Bankruptcy Court will continue in effect after the Effective Date, and that the Debtors or the Reorganized Debtors may pay or otherwise satisfy any Claim to the extent permitted by, and subject to, the applicable Final Order without regard to the treatment that would otherwise be applicable to such Claim under the Plan.

Article IV.Y ("***Modifications to Executory Contracts and Unexpired Leases***") of the Plan provides that the Debtors are authorized to enter into, and perform under, amendments or modifications of any Executory Contracts or Unexpired Leases with the counterparty to such Executory Contract or Unexpired Lease and pay any amounts due as a result of such amendment or modification.

## D. Treatment of Executory Contracts and Unexpired Leases; Employee Benefits; and Insurance Policies

Article V of the Plan governs the treatment of the Debtors' Executory Contracts and Unexpired Leases, among other things.

Article V.A ("***Assumption of Executory Contracts and Unexpired Leases***") of the Plan provides that, on the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors will be assumed by the Debtors in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts and Unexpired Leases that:

(i)     have been assumed or rejected by the Debtors by prior order of the Bankruptcy Court;

(ii)    are the subject of a motion to reject Filed by the Debtors pending on the Effective Date;

(iii)   are identified as rejected Executory Contracts and Unexpired Leases by the Debtors, subject to the consent of the Required Consenting Creditors, on the Rejected Executory Contract/Unexpired Lease List, to be Filed in the Plan Supplement, which Plan Supplement may be amended by the Debtors, subject to the consent of the Required Consenting Creditors, to add or remove Executory Contracts and Unexpired Leases by Filing with the Bankruptcy Court an amended Plan Supplement and serving it on the affected non-Debtor contract parties prior to the Effective Date;

(iv)    are Related Parties Contracts that are not included on the Assumed Related Parties Contracts List, subject to the consent of the Required Consenting Creditors; or

(v)     are rejected or terminated pursuant to the terms of the Plan.

The Plan provides that, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned (as applicable) pursuant to the Plan or any prior order of the Bankruptcy Court (including any "change of control" provision) prohibits, restricts or conditions, or purports to prohibit, restrict or condition, or is modified, breached or terminated, or deemed modified, breached or terminated by, (i) the commencement of these Chapter 11 Cases or the insolvency or financial condition of any Debtor at any time before the closing of its respective Chapter 11 Case, (ii) any Debtor's or any Reorganized Debtor's assumption or assumption and assignment (as applicable) of such Executory Contract or Unexpired Lease or (iii) the Confirmation or consummation of the Plan, then such provision will be deemed modified such that the transactions contemplated by the Plan will not entitle the non-Debtor party thereto to modify or terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights or remedies with respect thereto, and any required consent under any such contract or lease will be deemed satisfied by the Confirmation of the Plan.

In addition, each Executory Contract and Unexpired Lease assumed and/or assigned pursuant to the Plan will revest in and be fully enforceable by the applicable Reorganized Debtor or the applicable assignee in accordance with its terms and conditions, except as modified by the provisions of the Plan, any order of the Bankruptcy Court approving its assumption and/or assignment, or applicable law.

The Plan further provides that, the inclusion or exclusion of a contract or lease on any schedule or exhibit will not constitute an admission by any Debtor that such contract or lease is an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder.

Article V.B ("***Cure of Defaults; Assignment of Executory Contracts and Unexpired Leases***") of the Plan provides that any defaults under each Executory Contract and Unexpired Lease to be assumed, or assumed and assigned, pursuant to the Plan will be satisfied, pursuant to and to the extent required by section 365(b)(1) of the Bankruptcy Code, by payment of the applicable Cure Claim.

The Plan further provides that in the event of an assumption, or an assumption and assignment, of an Executory Contract or Unexpired Lease under the Plan, at least twenty-one (21) days prior to the deadline to object to the Plan, the Debtors will File and serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption, or proposed assumption and assignment, which will: (a) list the applicable Cure Claim, if any; (b) if applicable, identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for Filing

objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court.

The Plan further provides that any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption, or proposed assumption and assignment under the Plan, or any related Cure Claim, must be Filed, served, and actually received by the Debtors prior to the deadline to object to the Plan (notwithstanding anything in the schedules or a Proof of Claim to the contrary).  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, or proposed assumption and assignment, or Cure Claim will be deemed to have consented to such matters and will be deemed to have forever released and waived any objection to such proposed assumption, proposed assumption and assignment, and Cure Claim.  The Plan provides that the Confirmation Order will constitute an order of the Bankruptcy Court approving each proposed assumption, or proposed assumption and assignment, of Executory Contracts and Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

The Plan further provides that in the event of a dispute regarding (a) the amount of any Cure Claim, (b) the ability of any Debtor or assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or assumed and assigned or (c) any other matter pertaining to assumption or assignment, the applicable cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order resolving the dispute and approving such assumption, or assumption and assignment; provided, however, that following the resolution of any such dispute, the Debtors or the Reorganized Debtors, as applicable, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming or assuming and assigning it.  Pursuant to the Plan, the Debtors or the Reorganized Debtors, as applicable, will be authorized to effect such rejection by Filing a written notice of rejection with the Bankruptcy Court and serving such notice on the applicable counterparty within ten (10) days of the entry of such Final Order.

Pursuant to the terms of the Plan, subject to any Disputed Cure Claims, assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan will result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assumption and assignment, in each case as provided in section 365 of the Bankruptcy Code.  Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned by Final Order will be deemed disallowed and expunged (subject to any Disputed Cure Claims), without further notice to or action, order, or approval of the Bankruptcy Court.

With respect to any Executory Contract or Unexpired Lease assumed and assigned pursuant to the Plan, upon and as of the Effective Date, the applicable assignee will be deemed to be substituted as a party thereto for the applicable Debtor party to such assigned Executory Contract or Unexpired Lease and, accordingly, the Debtors and the Reorganized Debtors will be relieved, pursuant to and to the extent set forth in section 365(k) of the Bankruptcy Code, from any further liability under such assigned Executory Contract or Unexpired Lease.

Article V.C ("*Rejection of Executory Contracts and Unexpired Leases*") of the Plan provides that the Debtors reserve the right at any time prior to the Effective Date, except as otherwise specifically provided in the Plan, to seek to reject any Executory Contract or Unexpired Lease and to File a motion requesting authorization for the rejection of any such contract or lease.  Pursuant to the Plan, all Executory Contracts and Unexpired Leases listed on the Rejected Executory Contract/Unexpired Lease

List will be deemed rejected as of the Effective Date.  Further, the Confirmation Order will constitute an order of the Bankruptcy Court approving the rejections described in Article V of the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise will not constitute a termination of any preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.

Article V.D ("***Claims on Account of the Rejection of Executory Contracts or Unexpired Leases***") of the Plan provides that all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after service of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.

The Plan further provides that any Person or Entity that is required to File a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so will be forever barred, estopped and enjoined from asserting such Claim, and such Claim will not be enforceable, against the Debtors, the Reorganized Debtors or the Estates, and the Debtors, the Reorganized Debtors, and their Estates and their respective assets and property will be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan.  Further, all such Claims will, as of the Effective Date, be subject to the permanent injunction set forth in Article IX.F of the Plan.

Article V.E ("***Contracts and Leases Entered into After the Petition Date***") of the Plan provides that contracts and leases entered into after the Petition Date by any Debtor may be performed by the applicable Debtor or Reorganized Debtor in the ordinary course of business without further approval of the Bankruptcy Court.

Article V.F ("***Reservation of Rights***") of the Plan provides that nothing contained in the Plan will constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or Reorganized Debtors, as applicable, will have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.  If there is a dispute regarding a Debtor's or Reorganized Debtor's liability under an assumed Executory Contract or Unexpired Lease, the Reorganized Debtors will be authorized to move to have such dispute heard by the Bankruptcy Court pursuant to Article X of the Plan.

Article V.H ("***Other Insurance Contracts***") of the Plan provides that, on the Effective Date, each of the Debtors' Insurance Contracts in existence as of the Effective Date will be Reinstated and continued in accordance with their terms and, to the extent applicable, will be deemed assumed by the applicable Reorganized Debtor pursuant to section 365 of the Bankruptcy Code and Article V of the Plan.  Nothing in the Plan will affect, impair, or prejudice the rights of the insurance carriers, the insureds, or the Reorganized Debtors under the Insurance Contracts in any manner, and such insurance carriers, the insureds, and Reorganized Debtors will retain all rights and defenses under such Insurance Contracts.  The Insurance Contracts will apply to and be enforceable by and against the insureds and the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors, as existed before the Effective Date.

Article V.J ("***Employee Compensation and Benefits***") of the Plan concerns the Debtors' Compensation and Benefit Programs and the Debtors' Workers' Compensation Contracts.

Article V.J.1 provides that, subject to the provisions of the Plan, all Compensation and Benefits Programs (other than awards of stock options, restricted stock, restricted stock units, and other equity awards, equity or equity-based incentive plans, employee stock purchase plans, and any other agreements or awards, or provisions set forth in any Compensation and Benefits Programs or Assumed Employee Agreements that provide for rights to acquire Interests and any agreement or plan whose value is related to Interests or other ownership interests of the Debtors, which, in each case, will not constitute or be deemed to constitute Executory Contracts and will be deemed terminated on the Effective Date) will be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code. All Proofs of Claim Filed for amounts due under any Compensation and Benefits Program will be considered satisfied by the applicable agreement and/or program and agreement to assume and cure in the ordinary course as provided in the Plan. All collective bargaining agreements to which any Debtor is a party, and all Compensation and Benefits Programs which are maintained pursuant to such collective bargaining agreements or to which contributions are made or benefits provided pursuant to a current or past collective bargaining agreement, will be deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code and the Reorganized Debtors reserve all of their rights under such agreements. For the avoidance of doubt, the Debtors and Reorganized Debtors, as applicable, will honor all their obligations under section 1114 of the Bankruptcy Code.

The Plan further provides that none of the Restructuring Transactions, or any assumption of Compensation and Benefits Programs pursuant to the terms in the Plan will be deemed to trigger any applicable change of control, vesting, termination, acceleration, or similar provisions therein; *provided*, that the Assumed Employee Agreements will be assumed and governed by the terms thereof. Subject to the preceding sentence, no counterparty will have rights under a Compensation and Benefits Program assumed pursuant to the Plan other than those applicable immediately before such assumption.

Article V.J.2 provides that, as of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors will continue to honor their obligations under: (a) all applicable state workers' compensation laws; and (b) the Workers' Compensation Contracts. All Proofs of Claims Filed by the Debtors' current or former employees on account of workers' compensation will be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court based upon the treatment provided for in the Plan; *provided*, that nothing in the Plan will limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non bankruptcy law with respect to the Workers' Compensation Contracts; *provided, further*, that nothing in the Plan will be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable non-bankruptcy law and/or the Workers' Compensation Contracts.

## E.    Provisions Governing Distributions

Article VI of the Plan sets forth the mechanics by which Plan distributions will be made.

Article VI.D.1 ("***Delivery of Distributions – Record Date for Distributions***") of the Plan provides that on the Distribution Record Date, the Claims Register will be closed and any party responsible for making distributions will instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date. The Distribution Record Date will not apply to distributions in respect of Securities deposited with DTC, the Holders of which will receive distributions, if any, in accordance with the customary exchange procedures of DTC or the Plan. For the avoidance of doubt, in connection with a distribution through the facilities of DTC (if any), DTC will be considered a single Holder for purposes of distributions.

Article VI.D.2 ("***Delivery of Distributions – Delivery of Distributions in General***") of the Plan provides that, except as otherwise provided in the Plan, the Distribution Agent will make distributions to Holders of Allowed Claims as of the Distribution Record Date, or, if applicable, to such Holder's designee, as appropriate: (a) at the address for each such Holder as indicated on the Debtors' records as of the Distribution Record Date; (b) to the signatory set forth on any Proof of Claim Filed by such Holder or other Representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have not been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the applicable Distribution Agent, as appropriate, after the date of any related Proof of Claim; or (d) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf; *provided*, that the manner of such distributions will be determined at the discretion of the Reorganized Debtors and, solely with respect to distributions to be made to Holders of April 2026 Notes Claims, the Required Consenting Creditors and the Consenting ETI Parties (acting reasonably).

The Plan provides that all distributions to Holders of DIP Claims will be made to the DIP Agent or the Exit Financing Facilities Agents, as applicable, and the DIP Agent or the Exit Financing Facilities Agents will be, and will act as, the Distribution Agent with respect to the DIP Claims in accordance with the terms and conditions of the Plan and the applicable debt documents.

The Plan further provides that all distributions to Holders of Postpetition Securitization Programs Claims will be made to the Securitization Program Agents and the Securitization Program Agents will be, and will act as, the Distribution Agent with respect to the Postpetition Securitization Programs Claims in accordance with the terms and conditions of the Plan and the applicable debt documents.

The Plan further provides that all distributions to Holders of April 2026 Notes Claims and July 2026 Notes Claims shall be made to the respective Indenture Trustees, and the respective Indenture Trustees shall be, and shall act as, the Distribution Agents with respect to the April 2026 Notes Claims and the July 2026 Notes Claims, respectively, in accordance with the terms and conditions of the Plan and the applicable debt documents.  With respect to any distributions of Plan Securities, to the extent the distribution procedures set forth in the Plan conflict with those contemplated under the XBP Transaction Documents, the procedures under the XBP Transaction Documents shall control unless XBP and the Debtors (or the Reorganized Debtors) consent otherwise, such consent not to be unreasonably withheld or delayed, including after taking into account the advice provided by the Distribution Agent.  As applicable, the Indenture Trustees may transfer or direct the transfer of such distributions directly through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with the respective Holders of such Claims to the extent consistent with the customary practices of DTC.  Notwithstanding anything to the contrary in the Plan, such distributions will be subject in all respects to any rights of the Indenture Trustees to assert a charging lien against such distributions.  All distributions to be made to Holders of April 2026 Notes Claims and July 2026 Notes Claims through DTC will be made eligible for distributions through the facilities of DTC and, for the avoidance of doubt, under no circumstances will the Indenture Trustees be responsible for making or required to make any distribution under the Plan to Holders of April 2026 Notes Claims and July 2026 Notes Claims if such distribution is not eligible to be distributed through the facilities of DTC.

Article VI.D.3 ("***Delivery of Distributions – Minimum Distributions***") of the Plan provides that, notwithstanding any provision in the Plan to the contrary, no Distribution Agent will be required to make distributions or payments of less than $100 (whether in Cash or otherwise) with respect to Impaired Claims.  No fractional shares of Plan Securities will be distributed and no Cash will be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of Plan Securities that is not a whole

number, the actual distribution of shares of Plan Securities will be rounded as follows: (a) fractions of one-half (½) or greater will be rounded to the next higher whole number and (b) fractions of less than one-half (½) will be rounded to the next lower whole number with no further payment therefore.  The total number of authorized shares of Plan Securities to be distributed under the Plan will be adjusted as necessary to account for the foregoing rounding.  For distribution purposes (including rounding), DTC will be treated as a single Holder.

Article VI.D.4 ("***Delivery of Distributions – Undeliverable Distributions***") of the Plan provides that, in the event that any distribution to any Holder of Allowed Claims is returned as undeliverable, no distribution to such Holder will be made unless and until the Distribution Agent has determined the then-current address of such Holder, at which time such distribution will be made to such Holder without interest; *provided*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one (1) year from the Effective Date.  After such date, all unclaimed property or interests in property will revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder of Claims to such property or interest in property will be discharged and forever barred.

Article VI.K.1 ("***Claims Paid or Payable by Third Parties – Claims Paid by Third Parties***") of the Plan provides that a Claim will be correspondingly reduced, and the applicable portion of such Claim will be disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives a payment on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder will, within fourteen (14) days of receipt thereof, repay or return the distribution to the Reorganized Debtors to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution will result in the Holder owing the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

Article VI.K.2 ("***Claims Paid or Payable by Third Parties – Claims Payable by Insurers***") of the Plan provides that no distributions under the Plan will be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Contracts until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Contract.  To the extent that one or more of the Insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such Insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

Article VI.K.3 ("***Claims Paid or Payable by Third Parties – Insurance Contracts***") of the Plan provides that, except as otherwise provided in the Plan, distributions to Holders of Allowed Claims will be in accordance with the provisions of any applicable Insurance Contract.  Notwithstanding anything to the contrary in the Plan, nothing contained in the Plan will constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including Insurers, under any Insurance Contracts or applicable indemnity, nor will anything contained in the Plan constitute or be deemed a waiver by such Insurers of any defenses, including coverage defenses, held by such Insurers.

Finally, as set forth more fully in the Plan, Article VI of the Plan provides, among other things, that (a) to the extent applicable, the Reorganized Debtors will comply with all tax withholding and reporting requirements, and all distributions pursuant to the Plan will be subject to such requirements (VI.E); (b) except as otherwise provided in the Plan, Insurance Contracts will continue to be applicable as set forth in greater detail in the Plan (VI.F); (c) except as otherwise required by law, distributions with respect to an Allowed Claim will be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any (VI.G); (d) unless otherwise specifically provided for in the Plan, any other Definitive Document, the Confirmation Order, or any other Final Order of the Bankruptcy Court, or required by applicable bankruptcy law (including as required pursuant to section 506(b) or section 511 of the Bankruptcy Code), postpetition interest will not accrue or be paid on any Claims and no Holder of a Claim or Interest will be entitled to interest accruing on or after the Petition Date on any Claim (VI.H); and (e) payments of Cash made pursuant to the Plan will be in United States dollars and will be made, at the option of the Debtors or the Reorganized Debtors (as applicable), by checks drawn on, or wire transfer from, a domestic bank selected by the Debtors or the Reorganized Debtors.  Cash payments to foreign creditors may be made, at the option of the Debtors or the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction (VI.I); and except as otherwise provided in the Plan, each Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code) or applicable bankruptcy or non-bankruptcy law, or as may be agreed by the Holder of an Allowed Claim, may set off or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature that the applicable Debtor or Reorganized Debtor may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised, settled, or assigned on or prior to the Effective Date (whether pursuant to the Plan, a Final Order or otherwise); *provided*, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim pursuant to the Plan will constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action (VI.J).

## F.     Procedures for Resolving Disputed, Contingent, and Unliquidated Claims or Interests

As noted in Section IV.D of this Disclosure Statement, the Bar Date Order established (i) June 6, 2025, at 5:00 p.m. (prevailing Central Time) as the deadline for any entity to file a proof of claim based on a prepetition claim against any Debtor and (ii) September 2, 2025 at 5:00 p.m. (prevailing Central Time) as the deadline for any governmental unit to file a proof of claim against an Debtor.

Article VII.A ("***Allowance and Disallowance of Claims***") of the Plan provides that, after the Effective Date, and except as otherwise provided in the Plan, the Reorganized Debtors will have and will retain any and all available rights and defenses that the Debtors had with respect to any Claim immediately before the Effective Date, including the right to assert any objection to Claims based on the limitations imposed by section 502 of the Bankruptcy Code.  The Debtors and the Reorganized Debtors may, but are not required to, contest the amount and validity of any Disputed Claim or contingent or unliquidated Claim in the ordinary course of business in the manner and venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced.

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code will be disallowed if: (1) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the

aforementioned sections of the Bankruptcy Code; and (2) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

Article VII.B ("***Claims Administration Responsibilities***") of the Plan provides that except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors will have the sole authority: (1) File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court; *provided*, that the procedures governing the items set forth in the foregoing clauses (1) through (3) will be subject to the reasonable consent of the Required Consenting Creditors and the Consenting ETI Parties, after consultation with the Claims Ombudsman.  For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, each Reorganized Debtor will have and retain any and all rights and defenses such Debtor had immediately before the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to the Plan.

Article VII.C ("***Adjustments to Claims or Interests Without Objection***") of the Plan provides that any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

Article VII.D ("***No Distributions Pending Allowance***") of the Plan provides that if any portion of a Claim is Disputed, no payment or distribution provided hereunder will be made on account of such Claim unless and until such Claim becomes an Allowed Claim; provided that if only a portion of a Claim is Disputed, such Claim will be deemed Allowed in the amount not Disputed and payment or distribution will be made on account of such undisputed amount.

Article VII.E ("***Distributions After Allowance***") of the Plan provides that to the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) will be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan and the XBP Transaction Documents.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors will provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan and the XBP Transaction Documents as of the Effective Date, without any postpetition interest to be paid on account of such Claim.

## G.      Conditions Precedent to the Occurrence of the Effective Date

Article VIII of the Plan sets forth the conditions precedent to the Effective Date, and related matters.  The conditions precedent set forth at Article VIII.A of the Plan ("***Conditions Precedent to the Occurrence of the Effective Date***") include:

1.      the Bankruptcy Court shall have entered the Final DIP Order and the Final Securitization Order;

2.      XBP shall have agreed to take all necessary actions in furtherance of the Restructuring Transactions including execution of Definitive Documents to which XBP is a party, which shall be in form and substance reasonably acceptable to XBP, the Debtors, and the Required Consenting Creditors;

3.      the XBP Transaction shall have occurred and been consummated;

4.      the Plan Support Agreement shall not have been terminated as to the Required Consenting Creditors or the Consenting ETI Parties and shall be in full force and effect;

5.      the ETI Funding Obligations shall be in full force and effect;

6.      the transactions contemplated by the Restructuring Steps Exhibit shall have been consummated;

7.      each of the New Parent Warrants Agreement and the XBP Transaction Documents shall be on terms and conditions reasonably acceptable to the Required Consenting Creditors, the Consenting ETI Parties, and XBP;

8.      Executory Contracts and Unexpired Leases shall either have been assumed, assumed and assigned, or rejected;

9.      the Plan shall contain the Releases;

10.     the Bankruptcy Court shall have entered the Confirmation Order in form and substance materially consistent with and subject to the consent rights set forth in the Plan Support Agreement;

11.     the Exit Facilities Documents shall have been executed (or deemed executed) and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the Debtors, and the Required Consenting Creditors), other than such conditions that relate to the effectiveness of the Plan and related transactions;

12.     the Exit Securitization Programs Documents shall have been executed (or deemed executed) and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the applicable Debtors and the Securitization Programs Parties), other than such conditions that relate to the effectiveness of the Plan and related transactions;

13.     the XBP Funding or the XBP Alternative Funding has occurred or will occur simultaneously with the Effective Date;

14.     the Debtors, the Required Consenting Creditors, and the Committee shall have reached agreement with respect to the GUC Payment Obligations Collateral such that, as of the Effective Date, the Claims Ombudsman shall be in a position to properly perfect the security interest in the GUC Payment Obligations Collateral;

15.     the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements, and exhibits to the Plan shall be consistent with the Plan Support Agreement and otherwise approved by the parties thereto consistent with their respective consent and approval rights as set forth in the Plan Support Agreement, and shall have been Filed in a manner consistent with the Plan Support Agreement;

16.     all Restructuring Fees and Expenses shall have been paid in full in Cash;

17. the Definitive Documents shall (i) be materially consistent with the Plan Support Agreement and otherwise approved by the Required Consenting Creditors, the Consenting ETI Parties, and the Debtors consistent with their respective consent and approval rights as set forth in the Plan Support Agreement; (ii) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties; and (iii) be adopted on terms materially consistent with the Plan Support Agreement and the Plan Term Sheet;

18. the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, actions, documents, and other agreements that are necessary to implement and effectuate the Plan and each of the other Restructuring Transactions; and the Debtors shall have paid in full all professional fees and expenses of the Retained Professionals that require the Bankruptcy Court's approval or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Professional Fee Escrow Account pending the Bankruptcy Court's approval of such fees and expenses; and

19. the Debtors shall have paid in full all professional fees and expenses of the Retained Professionals that require the Bankruptcy Court's approval or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Professional Fee Escrow Account pending the Bankruptcy Court's approval of such fees and expenses.

Article VIII.C ("**Waiver of Conditions**") of the Plan provides that, except as otherwise provided in the Plan, all actions required to be taken on the Effective Date will take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  Each of the conditions precedent of the Plan may be waived in writing by the Debtors with the prior written consent of any party expressly given a consent right in the Plan or in the Plan Support Agreement with respect to the condition to be waived; *provided*, that (a) waiver of the conditions precedent in Article VIII.A.19 of the Plan shall require the consent of the affected Retained Professionals; (b) waiver of the condition precedent in Article VIII.A.14 shall require the consent of the Committee (such consent not to be unreasonably withheld); and (c) waiver of the conditions precedent in Article VIII.A.2, 3, 5, 6, 7, 8, 9, 10, 11, 12, 13, 15, 16, 17, and 18 shall require the consent of the Required Consenting Creditors and the Consenting ETI Parties (such consent not to be unreasonably withheld).  If the Plan is confirmed for fewer than all of the Debtors as provided for in the Plan, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur.

The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(c) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

Article VIII.D ("**Effect of Non-Occurrence of Conditions to the Effective Date**") of the Plan addresses the effect of non-occurrence of the Effective Date.  It provides that if the Confirmation of the Plan or the Effective Date does not occur with respect to one or more of the Debtors on or before the termination of the Plan Support Agreement, then the Plan will, with respect to such applicable Debtor or Debtors, be null and void in all respects and nothing contained in the Plan or this Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders, or any other Person or Entity; (3) constitute an

allowance of any Claim or Interest; or (4) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Person or Entity in any respect.

Article VIII.E ("***Substantial Consummation***") of the Plan provides that "Substantial consummation" of the Plan, as defined in section 1102(2) of the Bankruptcy Code, will be deemed to occur on the Effective Date upon the filing of the Notice of Effective Date.

## H.    Discharge, Release, Injunction, and Related Provisions

Article IX of the Plan addresses releases, injunctions, exculpatory provisions and related provisions as follows: *Discharge of Claims and Termination of Interests* (IX.A); *Releases by the Debtors* (IX.B); *Releases by Holders of Claims and Interests* (IX.C); *Exculpation* (IX.D); *Permanent Injunction* (IX.E); and *SEC Reservation of Rights* (IX.E).

**Article IX.C of the Plan contains a Third-Party Release by all Releasing Parties.  Pursuant to Article IX.C of the Plan, the following are the Releasing Parties:   (a) each Debtor; (b) each Reorganized Debtor; (c) each Non-Debtor Affiliate; (d) each of the Debtors' and Non-Debtor Affiliates' current and former directors and officers; (e) XBP; (f) each Consenting Stakeholder; (g) the Committee and each of its members in such capacity; (h) Blue Torch; (i) the April 2026 Notes Indenture Trustee; (j) the July 2026 Notes Indenture Trustee; (k) the April 2026 Notes Collateral Agent; (l) the DIP Agent; (m) each DIP Lender; (n) the DIP Backstop Commitment Parties; (o) the Exit Financing Facility Agents; (p) each lender under the Exit Facilities; (q) the Securitization Programs Parties; (r) each Holder of a Claim in a Voting Class that does not affirmatively elect to "opt out" of the Third-Party Release as provided on its respective ballot; (s) each Holder of a Claim or Interest in a Non-Voting Class that does not affirmatively elect to "opt out" of the Third-Party Release as provided on its respective Release Opt-Out Form; and (t) each Related Party of each Entity in clauses (a) through (s), solely to the extent such Related Party (I) would be obligated to grant a release under principles of agency if it were so directed by the Entity in the foregoing clauses (a) through (s) to whom they are related or (II) may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity in clause (a) through (s); *provided*, that, any Holder of a Claim or Interest that timely objects to the Third-Party Release, either through (i) a formal objection Filed on the docket of the Chapter 11 Cases or (ii) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or via electronic mail, as applicable, before the Confirmation Hearing, will not be a "Releasing Party.**

### 1.    Definitions Relating to Releases

The following definitions are important to understanding the scope of the releases being given under the Plan:

"***Exculpated Party***" means, collectively:  (a) the Debtors; (b) the Disinterested Director; and (c) the Committee and each member of the Committee.

"***Released Parties***" means, collectively, each of, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each Non-Debtor Affiliate; (d) each of the Debtors' and Non-Debtor Affiliates' current and former directors and officers; (e) XBP; (f) each Consenting Stakeholder; (g) the Committee and each of its members in such capacity; (h) Blue Torch; (i) the April 2026 Notes Indenture Trustee; (j) the July 2026 Notes Indenture Trustee; (k) the April 2026 Notes Collateral Agent; (l) the DIP Agent; (m) each DIP Lender; (n) the DIP Backstop Commitment Parties; (o) the Exit Financing Facility Agents; (p) each lender under the Exit Facilities; (q) the Securitization

Programs Parties; (r) each Holder of a Claim in a Voting Class that does not affirmatively elect to "opt out" of the Third-Party Release as provided on its respective ballot; (s) each Holder of a Claim or Interest in a Non-Voting Class that does not affirmatively elect to "opt out" of the Third-Party Release as provided on its respective Release Opt-Out Form; and (t) each Related Party of each Entity in clauses (a) through (s); *provided*, that any Holder of a Claim or Interest that timely objects to the Third-Party Release, either through (i) a formal objection Filed on the docket of the Chapter 11 Cases or (ii) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or via electronic mail, as applicable, before the Confirmation Hearing, shall not be a "Released Party."

"***Releasing Parties***" means, collectively, each of, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each Non-Debtor Affiliate; (d) each of the Debtors' and Non-Debtor Affiliates' current and former directors and officers; (e) XBP; (f) each Consenting Stakeholder; (g) the Committee and each of its members in such capacity; (h) Blue Torch; (i) the April 2026 Notes Indenture Trustee; (j) the July 2026 Notes Indenture Trustee; (k) the April 2026 Notes Collateral Agent; (l) the DIP Agent; (m) each DIP Lender; (n) the DIP Backstop Commitment Parties; (o) the Exit Financing Facility Agents; (p) each lender under the Exit Facilities; (q) the Securitization Programs Parties; (r) each Holder of a Claim in a Voting Class that does not affirmatively elect to "opt out" of the Third-Party Release as provided on its respective ballot; (s) each Holder of a Claim or Interest in a Non-Voting Class that does not affirmatively elect to "opt out" of the Third-Party Release as provided on its respective Release Opt-Out Form; and (t) each Related Party of each Entity in clauses (a) through (s), solely to the extent such Related Party (I) would be obligated to grant a release under principles of agency if it were so directed by the Entity in the foregoing clauses (a) through (a) to whom they are related or (II) may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity in clause (a) through (s); *provided*, that, any Holder of a Claim or Interest that timely objects to the Third-Party Release, either through (i) a formal objection Filed on the docket of the Chapter 11 Cases or (ii) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or via electronic mail, as applicable, before the Confirmation Hearing, shall not be a "Releasing Party."

2. **Releases, Exculpation and Injunction**

   a. *Releases by the Debtors (IX.B)*

**To the fullest extent permitted by applicable law and approved by the Bankruptcy Court, and except as otherwise expressly set forth in the Plan, the XBP Transaction Documents, or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, as of the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Debtor, Reorganized Debtor, and the Estates, in each case on behalf of itself and its respective successors, assigns, and Representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, has and is deemed to have, forever and unconditionally released, and absolved each Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Debtors, the Estates, or the Reorganized Debtors that such Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, including (1) the management, ownership, or operation of the Debtors, the Non-Debtor Affiliates, or the Consenting ETI Parties, (2) the purchase, sale, or rescission of any Security of the Debtors, the Non-Debtor Affiliates, or the Consenting ETI Parties, (3) the subject**

matter of, or the transactions, events, circumstances, acts or omissions giving rise to, any Claim or Interest that is treated in the Restructuring Transactions, including the negotiation, formulation, or preparation of the Restructuring Transactions, (4) the business or contractual arrangements between any Debtor or Non-Debtor Affiliate or Consenting ETI Party and any other Entity (including Consenting Stakeholders), (5) the Debtors', Non-Debtor Affiliates', and the Consenting ETI Parties' in- or out-of-court restructuring efforts, (6) intercompany transactions, (7) the formulation, preparation, dissemination, negotiation, Filing, or consummation of the Plan, the XBP Transaction Documents, this Disclosure Statement, the Plan Support Agreement, the Definitive Documents, the Prepetition Term Loan Documents, the April 2026 Notes Documents, the July 2026 Notes Documents, the DIP Documents, the Exit Facilities Documents, the Prepetition Securitization Programs Documents, the Postpetition Securitization Programs Documents, the Exit Securitization Programs Documents (and any financing permitted thereunder), the New Organizational Documents, the Chapter 11 Cases, the BTC Transaction, the Committee Settlement, the Sub-Group DIP Lenders Settlement, or any Restructuring Transaction, (8) any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the XBP Transaction Documents, this Disclosure Statement, the Plan Support Agreement, the Definitive Documents, the Prepetition Term Loan Documents, the April 2026 Notes Documents, the July 2026 Notes Documents, the DIP Documents, the Exit Facilities Documents, the Prepetition Securitization Programs Documents, the Postpetition Securitization Programs Documents, the Exit Securitization Programs Documents (and any financing permitted thereunder), the Chapter 11 Cases, the pursuit of Confirmation of the Plan, the administration and implementation of the Plan, the BTC Transaction, the Committee Settlement, the Sub-Group DIP Lenders Settlement, or the Restructuring Transactions, including the issuance or distribution of Securities pursuant to the Plan and the XBP Transaction Documents, (9) the distribution, including any disbursements made by a Distribution Agent, of property under the Plan, the XBP Transaction Documents, or any other related agreement, or (10) any other act or omission, transaction, agreement, event, or other occurrence related to any of the foregoing and taking place on or before the Effective Date; *provided*, that the Debtors do not release Claims or Causes of Action (1) that are of a commercial nature and arise in the ordinary course of business, such as accounts receivable and accounts payable on account of goods being sold and services being performed; (2) arising under an Executory Contract or Unexpired Lease that is assumed by the Debtors; or (3) arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud (but not, for the avoidance of doubt, fraudulent transfers), gross negligence, or willful misconduct). Notwithstanding anything to the contrary in the foregoing, the Releases set forth above do not release (1) any obligations of any Person or Entity under the Plan, the XBP Transaction Documents, the Confirmation Order, any other Definitive Document, any Restructuring Transaction, any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, the XBP Transaction Documents, or any agreement, Claim, or obligation arising or assumed under the Plan or the XBP Transaction Documents or (2) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by each of the Released Parties, including the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan and the XBP Transaction

Documents; (2) a good-faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

### b. *Releases by Holders of Claims or Interests (IX.C)*

To the fullest extent permitted by applicable law and approved by the Bankruptcy Court, and except as otherwise expressly set forth in the Plan, the XBP Transaction Documents, or the Confirmation Order, as of the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and Representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, has and is deemed to have, forever and unconditionally, released, and absolved each Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Debtors, the Estates, or the Reorganized Debtors that such Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, including (1) the management, ownership, or operation of the Debtors, the Non-Debtor Affiliates, or the Consenting ETI Parties, (2) the purchase, sale, or rescission of any Security of the Debtors, the Non-Debtor Affiliates, or the Consenting ETI Parties, (3) the subject matter of, or the transactions, events, circumstances, acts or omissions giving rise to, any Claim or Interest that is treated in the Restructuring Transactions, including the negotiation, formulation, or preparation of the Restructuring Transactions, (4) the business or contractual arrangements between any Debtor, Non-Debtor Affiliate, or Consenting ETI Party and any other Entity (including Consenting Stakeholders), (5) the Debtors', Non-Debtor Affiliates', and Consenting ETI Parties' in- or out-of-court restructuring efforts, (6) intercompany transactions, (7) the formulation, preparation, dissemination, negotiation, Filing, or consummation of the Plan, the XBP Transaction Documents, this Disclosure Statement, the Plan Support Agreement, the Definitive Documents, the Prepetition Term Loan Documents, the April 2026 Notes Documents, the July 2026 Notes Documents, the DIP Documents, the Exit Facilities Documents, the Prepetition Securitization Programs Documents, the Postpetition Securitization Programs Documents, the Exit Securitization Programs Documents (and any financing permitted thereunder), the New Organizational Documents, the Chapter 11 Cases, the BTC Transaction, the Committee Settlement, the Sub-Group DIP Lenders Settlement, or any Restructuring Transaction, (8) any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the XBP Transaction Documents, this Disclosure Statement, the Plan Support Agreement, the Definitive Documents, the Prepetition Term Loan Documents, the April 2026 Notes Documents, the July 2026 Notes Documents, the DIP Documents, the Exit Facilities Documents, the Prepetition Securitization Programs Documents, the Postpetition Securitization Programs Documents, the Exit Securitization Programs Documents (and any financing permitted thereunder), the Chapter 11 Cases, the pursuit of Confirmation of the Plan, the administration and implementation of the Plan, the BTC Transaction, the Committee Settlement, the Sub-Group DIP Lenders Settlement, or the Restructuring Transactions, including the issuance or distribution of Securities pursuant to the Plan and the XBP Transaction Documents, (9) the distribution, including any disbursements made by a Distribution Agent, of property under the Plan, the XBP Transaction Documents, or any other related agreement, or (10) any other act, or omission, transaction, agreement, event, or other occurrence relating to any of the foregoing and taking place on or before the Effective Date; *provided*, that the Releasing Parties do not release Claims or

Causes of Action (1) arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud (but not, for the avoidance of doubt, fraudulent transfers), gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud, gross negligence, or willful misconduct) or (2) against a Released Party arising from any obligations owed to the Releasing Party that are wholly unrelated to the Debtors or the Reorganized Debtors. Notwithstanding anything to the contrary in the foregoing, the Releases set forth above do not release (1) any obligations of any Person or Entity under the Plan, the XBP Transaction Documents, the Confirmation Order, any other Definitive Document, any Restructuring Transaction, any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, the XBP Transaction Documents, or any agreement, Claim, or obligation arising or assumed under the Plan or the XBP Transaction Documents or (2) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) given and made after due notice and opportunity for hearing; and (3) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

### c.  Exculpation (IX.D)

Effective as of the Effective Date, to the fullest extent permitted by law, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any Claims or Causes of Action for any act taken or omitted to be taken between the Petition Date and the Effective Date in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or consummation (as applicable) of the Plan, the XBP Transaction Documents, the Plan Support Agreement, and this Disclosure Statement including any disbursements made by a Distribution Agent in connection with the Plan, the XBP Transaction Documents, this Disclosure Statement, the Definitive Documents, the Plan Supplement, the Prepetition Term Loan Documents, the April 2026 Notes Documents, the July 2026 Notes Documents, the DIP Documents, the Exit Facilities Documents, the Prepetition Securitization Programs Documents, the Postpetition Securitization Programs Documents, the Exit Securitization Programs Documents (and any financing permitted thereunder), the New Organizational Documents, the BTC Transaction, the Committee Settlement, the Sub-Group DIP Lenders Settlement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the XBP Transaction Documents, or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of this Disclosure Statement or Confirmation or consummation of the Plan and the XBP Transaction Documents; *provided*, that the foregoing provisions of this exculpation shall not operate to waive or release: (1) any Claims or Causes of Action arising from willful misconduct, actual fraud (but not, for the avoidance of doubt, fraudulent transfers), or gross negligence of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (2) the rights of any Person or Entity to enforce the Plan, the XBP Transaction Documents, and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with the Plan and the XBP Transaction Documents or assumed pursuant to the Plan, the XBP Transaction Documents, or Final Order of the Bankruptcy Court;

*provided*, **further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions, or inactions.**

**The Exculpated Parties have, and upon consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

**The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity.  For the avoidance of doubt and notwithstanding anything else in the Plan, the foregoing exculpation shall be limited to Persons that served as Estate fiduciaries during the Chapter 11 Cases.**

### d.   *Permanent Injunction (IX.E)*

**Except as otherwise expressly provided in the Plan Support Agreement, the Plan or the Confirmation Order, from and after the Effective Date, all Persons and Entities are, to the fullest extent provided under Section 524 and other applicable provisions of the Bankruptcy Code, permanently enjoined from (1) commencing or continuing, in any manner or in any place, any suit, action or other proceeding of any kind; (2) enforcing, attaching, collecting, or recovering in any manner or means any judgment, award, decree, or order; (3) creating, perfecting, or enforcing any Lien or encumbrance; (4) asserting a right of setoff or subrogation of any kind; or (5) commencing or continuing in any manner any action or other proceeding of any kind, in each case on account of or with respect to any Claim, demand, liability, obligation, debt, right, Cause of Action, Interest, or remedy released or to be released, exculpated or to be exculpated, settled or to be settled, or discharged or to be discharged pursuant to the Plan or the Confirmation Order against any Person or Entity so released, discharged, or exculpated (or the property or estate of any Person or Entity so released, discharged, or exculpated).  All injunctions or stays provided for in the Chapter 11 Cases under Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.**

**No Person or Entity may commence or pursue a Claim or Cause of Action, as applicable, of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action, as applicable, subject to Article IX of the Plan, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action, as applicable, represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action, as applicable, against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party, as applicable; *provided*, that, the foregoing shall only apply to Claims or Causes of Action brought against a Released Party if the Person or Entity bringing such Claim or Cause of Action is a Releasing Party.  At the hearing for the Bankruptcy Court to determine whether such Claim or Cause of Action represents a colorable Claim of any kind, the Bankruptcy Court may, or shall if any Debtor, Reorganized Debtor, Exculpated Party, Released Party, or other party in interest requests by motion (oral motion being sufficient), direct that such Person or Entity seeking to commence or pursue such Claim or Cause of Action File a proposed complaint with the Bankruptcy Court embodying such Claim or Cause of Action, such complaint satisfying the applicable Rules of Federal Procedure, including Rule 8 and Rule 9 (as applicable), which the Bankruptcy Court shall assess before making a determination.  For the avoidance of doubt, any**

party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any Claims or Causes of Action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending.  The Bankruptcy Court reserves jurisdiction to adjudicate any such claims to the maximum extent provided by the law.

## VI.
## CAPITAL STRUCTURE AND CORPORATE GOVERNANCE OF REORGANIZED DEBTORS

**A.      Summary of Capital Structure of Reorganized Debtors**

**1.      Post-Emergence Capital Structure**

The following table summarizes the capital structure of the Reorganized Debtors, including the post-Effective Date financing arrangements the Reorganized Debtors expect to enter into to fund their obligations under the Plan and provide for, among other things, their post-Effective Date working capital needs.  This summary of the Reorganized Debtors' capital structure is qualified in its entirety by reference to the Plan and the relevant Definitive Documents.

| Instrument | Description |
|---|---|
| Rollover Exit Facility | $180.1 million |
| ER3 Securitization Program* | $77.0 million |
| Blue Torch Facility or Gates Exit Facility | $40 million |
| ~~Supplemental Exit Facility~~ B Riley 2nd Lien AR3 Facility* | ~~$6 million~~ $21.6 million |
| ~~Rollover Exit Facility~~ | ~~180.1 million~~ |
| ~~ER3 Securitization Program*~~ | ~~$77 million~~ |
| ~~BR Exar AR Facility*~~ | |

\* As discussed herein at Section II.F, the ER3 Securitization Facility, Second Lien Note, and BR Exar Accounts Receivables Facility are off-balance-sheet facilities.  The Debtors anticipate that, in connection with possible refinancing or replacement of these Postpetition Securitization Programs, the Debtors or Reorganized Debtors, as applicable, may conclude that it is in the best interests of the Reorganized Debtors to replace one or more of these facilities with on-balance-sheet debt facilities.  Inclusion of the Postpetition Securitization Programs in the capital structure of the Reorganized Debtors is illustrative.  The Debtors and Reorganized Debtors reserve all rights with respect to these programs and their inclusion within the Reorganized Debtors' capital structure herein is not an admission that such programs are or will be an obligation of the Debtors or Reorganized Debtors, respectively.  In particular, the Second Lien Note is a term obligation and does not provide ongoing liquidity to the Debtors; however, the Second Lien Note is secured by a pledge of the equity and assets of Exela Receivables 3 LLC.  As with the other Postpetition Securitization Programs, the Debtors or Reorganized Debtors, as applicable, may conclude that it is (or is not) in the best interests of the Reorganized Debtors to address the Second Lien Note as a balance-sheet obligation of the Reorganized Debtors.  While the Debtors' Financial Projections illustratively assume repayment of the Second Lien Note over a period of two years after the Effective Date, treatment of the Second Lien Note remains subject to negotiation.

~~\* As discussed herein at Section II.F, the ER3 Securitization Facility, Second Lien Note, and BR Exar Accounts Receivables Facility are off-balance-sheet facilities.  The Debtors anticipate that, in connection~~

|  | ~~$10 million~~ |
|---|---|
| ~~B Riley 2nd Lien AR3 Facility*~~XBP Funding | ~~$22.6 million~~$18.0 million |
| Incremental Exit Facility A[31] | $6.0 million |
| Incremental Exit Facility B[32] | $6.0 million |
| BR Exar AR Facility* | $5.0 million |
| Subtotal | $353.7 million |
|  |  |
| Capital Leases and Other | ~~$15 million~~$13.5 million |
| Total Debt | $367.2 million |

### 2. Exit Financing Facilities and Exit Facilities Documents

Article IV.I ("*Exit Financing Facilities and Exit Facilities Documents*") of the Plan provides that, to the extent required and subject to the occurrence of the Effective Date, Confirmation of the Plan shall be deemed to constitute approval by the Bankruptcy Court of the Exit Facilities Documents (including all transactions contemplated thereby, such as any supplementation or syndication of the Exit Debt, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the incurrence of Liens securing the Exit Facilities and the payment of all fees, payments, indemnities, and expenses associated therewith) and, subject to the occurrence of the Effective Date, authorization for the applicable Reorganized Debtors to enter into and perform their obligations under the Exit Facilities Documents and such other documents as may be reasonably required or appropriate, subject to any consent or approval rights under the Definitive Documents.  On or around the Effective Date, the Reorganized Debtors shall execute and deliver the Exit Facilities Documents, and shall execute, deliver, file, record, and issue any other related notes, guarantees, security documents, instruments, or agreements in connection therewith, in each case, without (a) further notice to the Bankruptcy Court, or (b) further act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity.

---

~~Accounts Receivables Facility are off-balance-sheet facilities.  The Debtors anticipate that, in connection with possible refinancing or replacement of these Postpetition Securitization Programs, the Debtors or Reorganized Debtors, as applicable, may conclude that it is in the best interests of the Reorganized Debtors to replace one or more of these facilities with on-balance-sheet debt facilities.  Inclusion of the Postpetition Securitization Programs in the capital structure of the Reorganized Debtors is illustrative. The Debtors and Reorganized Debtors reserve all rights with respect to these programs and their inclusion within the Reorganized Debtors' capital structure herein is not an admission that such programs are or will be an obligation of the Debtors or Reorganized Debtors, respectively.  In particular, the Second Lien Note is a term obligation and does not provide ongoing liquidity to the Debtors; however, the Second Lien Note is secured by a pledge of the equity and assets of Exela Receivables 3 LLC.  As with the other Postpetition Securitization Programs, the Debtors or Reorganized Debtors, as applicable, may conclude that it is (or is not) in the best interests of the Reorganized Debtors to address the Second Lien Note as a balance-sheet obligation of the Reorganized Debtors.  While the Debtors have scheduled out an amortization of the Second Lien Note, this remains subject to further negotiation.~~

[31]  The "*Incremental Exit Facility A*" reflects $6 million into which $6 million of Allowed DIP Claims held by the Sub-Group DIP Lenders shall be rolled on the Effective Date, which debt shall be *pari passu* with the other debt under the Supplemental Exit Facility or incorporated into such facility on the same terms with customary sacred rights.

[32]  The "*Incremental Exit Facility B*" is a potential $6 million incremental exit facility which may be raised based on existing arrangements with the Company.

The Plan further provides that on the Effective Date, the Exit Facilities Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the Exit Facilities Documents are being extended, and shall be deemed to have been extended, and all related payments made in connection therewith shall have been made, in each case, in good faith, for legitimate business purposes, for reasonably equivalent value, as an inducement to the applicable lenders to extend credit under the Exit Facilities, are reasonable, shall not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.  On the Effective Date, all of the Liens and security interests to be granted, carried forward, continued, amended, extended, and/or reaffirmed under the Exit Facilities Documents shall: (1) be continuing, legal, binding, and enforceable Liens on, and security interests in, the collateral granted in accordance with the terms of the applicable Exit Facilities Documents; (2) be granted, carried forward, continued, amended, extended, reaffirmed, and deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted thereunder; and (3) not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and shall thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### 3.  <u>Exit Securitization Programs and Exit Securitization Programs Documents</u>

Article IV.J ("***Exit Securitization Programs and Exit Securitization Programs Documents***") of the Plan provides that, to the extent required and subject to the occurrence of the Effective Date, Confirmation of the Plan shall be deemed to constitute approval by the Bankruptcy Court of the Exit Securitization Programs Documents (including all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the incurrence of Liens securing the Exit Securitization Programs and the payment of all fees, payments, indemnities, and expenses associated therewith) and, subject to the occurrence of the Effective Date, authorization for the applicable Reorganized Debtors to enter into and perform their obligations under the Exit Securitization Programs Documents and such other documents as may be reasonably required or appropriate, subject to any consent or approval rights under the Definitive Documents.  On or around the Effective Date, the Reorganized Debtors shall execute and deliver the Exit Securitization Programs Documents, and shall execute, deliver, file, record, and issue any other related notes, guarantees, security documents, instruments, or agreements in connection therewith, in each case, without (a) further notice to the Bankruptcy Court, or (b) further act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity.

On the Effective Date, the Exit Securitization Programs Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the Exit Securitization Programs Documents are being extended, and shall be deemed to have been extended, and all related payments made in connection therewith shall have been made, in each case, in good faith, for legitimate business purposes, for

reasonably equivalent value, as an inducement to the applicable lenders to extend credit under the Exit Securitization Programs, are reasonable, shall not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the Liens and security interests to be granted, carried forward, continued, amended, extended, and/or reaffirmed under the Exit Securitization Programs Documents shall: (1) be continuing, legal, binding, and enforceable Liens on, and security interests in, the collateral granted in accordance with the terms of the applicable Exit Securitization Programs Documents; (2) be granted, carried forward, continued, amended, extended, reaffirmed, and deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted thereunder; and (3) not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non bankruptcy law. The Reorganized Debtors and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and shall thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### 4. Issuance of Plan Securities

Article IV.K ("*Issuance of Plan Securities*") of the Plan provides that, on the Effective Date, (a) New Parent shall issue or reserve for issuance and deliver the Plan Securities in accordance with the terms of the Plan, the Restructuring Steps Exhibit, and the New Organizational Documents; *provided*, that New Parent Interests issued to the Consenting ETI Parties on the Effective Date shall be Blocked ETI Shares, as described in greater detail in Article IV.N of the Plan, and (b) BPA, XCV-EMEA, and BTC, as applicable and/or their respective designee(s), shall effectuate the BTC Transaction in accordance with the terms of the Plan and the Restructuring Steps Exhibit.

The issuance and delivery of the Plan Securities is authorized without the need for further corporate or other action or any consent or approval of any national securities exchange upon which the Plan Securities may be listed on or immediately following the Effective Date. All of the Plan Securities issuable under the Plan, the XBP Transaction Documents, the Restructuring Steps Exhibit, and the Confirmation Order shall, when so issued be duly authorized, validly issued, fully paid, and non-assessable. The issuance and delivery of the Plan Securities in accordance and connection with the Plan, the Restructuring Steps Exhibit, the XBP Transaction Documents, and the Confirmation Order are authorized without the need for any further limited liability company or corporate action and without any further action by any Holder of a Claim or Interest, except, in the case of New Parent Interests, BTC Distribution Shares, and New Parent Warrants, as may be required under applicable stock exchange rules on which the Securities of XBP or New Parent are then listed.

Any Holder of an Allowed April 2026 Notes Claim, Allowed July 2026 Notes Claim, and Holder of a Claim on account of Premiums and Fees may designate that all or a portion of such Holder's share of the Plan Securities to be distributed as part of the treatment of such Allowed April 2026 Notes Claim, July 2026 Notes Claim, or Claim on account of Premiums and Fees be registered in the name of, and delivered to, its designee by delivering notice thereof to counsel to the Debtors and to the Notice and Claims Agent

at least five (5) Business Days prior to the Effective Date.  Any such designee must be an "accredited investor" as such term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

On the Effective Date, the New Parent, BPA, XCV-EMEA, and BTC, as applicable and/or their respective designee(s), which may include the Distribution Agent, shall issue and/or distribute, as applicable, Plan Securities (excluding, for the avoidance of doubt, New Parent Interests issuable on account of the New Parent Warrants) to the Holders of Allowed April 2026 Notes Claims, Allowed July 2026 Notes Claims, and Claims on account of the Premiums and Fees pursuant to the Plan and the Restructuring Steps Exhibit (including the XBP Transaction and the BTC Transaction).

The Plan further provides each distribution, issuance, and conversion referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan and the XBP Transaction Documents, applicable to such distribution, issuance, or conversion and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

### a.  Listing / Transfer of Plan Securities (IV.K.1)

On the Effective Date, New Parent shall issue the Plan Securities pursuant to the Plan and the New Organizational Documents.  New Parent intends that the Exchanged New Parent Interests will be listed on the national stock exchange on which the New Parent Interests are then listed, and will use its commercially reasonable efforts to effectuate the same.  Distributions of the Plan Securities (other than the New Parent Warrants, which shall be delivered in certificated form or book-entry form on the books and records of the applicable issuer or its transfer agent) shall be delivered via  book-entry transfer by the Distribution Agent through the facilities of DTC.  Upon the Effective Date, after giving effect to the Restructuring Transactions, the New Parent Interests shall be that number of shares or membership interests as may be designated in the New Organizational Documents.

On and after the Effective Date, transfers of Plan Securities shall be made in accordance with applicable United States law, United States securities laws (as applicable), and the New Organizational Documents.

### 5.  Exemption from Registration Requirements

Article IV.L ("*Exemption from Registration Requirements*") of the Plan provides that no registration statement shall be filed under the Securities Act, or pursuant to any state securities laws, with respect to the offer, issuance and distribution of the Plan Securities or the Rollover Exit Notes under the Plan (including in respect of the Premiums and Fees), the XBP Transaction Documents, the Restructuring Steps Exhibit, the Confirmation Order and the New Parent Warrants Agreement.

The offering, sale, issuance, and distribution of the Plan Securities (including in respect of the Premiums and Fees and, if applicable, the issuance of New Parent Interests upon exercise of the New Parent Warrants) in exchange for Claims pursuant to Article II, Article III and other provisions of the Plan, the Confirmation Order, the DIP Backstop Commitment Letter, and the XBP Transaction Documents shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable United States, state, or local law requiring registration for the offer or sale of a security pursuant to section 1145(a) of the Bankruptcy Code.  Any and all such Plan Securities (including New Parent Interests issuable upon the exercise of New Parent Warrants) issued pursuant to Section 1145(a) of the Bankruptcy Code may be resold without registration under the Securities Act by the recipients thereof pursuant to the exemption provided by Section 4(a)(1) of the Securities Act, unless the holder (i) is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code, (ii) is an "affiliate" of New Parent, as applicable (as defined in rule 144(a)(1) in

the Securities Act), or (iii) has been such an "affiliate" within ninety (90) days of such transfer, in each case subject to (1) compliance with any applicable state or foreign securities laws, if any, and any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Securities; (2) the restrictions, if any, on the transferability of such Securities in the Organizational Documents of the issuer of, or in agreements or instruments applicable to holders of, such Securities; and (3) any other applicable regulatory approval.

The offering, sale, issuance, and distribution of the Rollover Exit Notes is being made in reliance upon Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder and on equivalent state law registration exemptions or, solely to the extent such exemptions are not available, other available exemptions from registration under the Securities Act. Any recipients of the Plan Securities that are Affiliates of New Parent, and any Entity receiving Rollover Exit Notes under the Plan or acquiring New Parent Interests or Rollover Exit Notes on account of the ETI Funding Obligations or the XBP Alternative Funding, will receive restricted Plan Securities or Rollover Exit Notes, as applicable, that may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144A, Regulation S, and/or Rule 144 of the Securities Act, subject to, in each case, the transfer provisions, if any, and other applicable provisions set forth in the Organizational Documents of the applicable issuers.

The Reorganized Debtors and New Parent need not provide any further evidence other than the Plan and the Confirmation Order with respect to the treatment of the Plan Securities or Rollover Exit Notes under applicable securities laws.

Notwithstanding anything to the contrary in the Plan, no Person or Entity (including, for the avoidance of doubt, DTC) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the Plan Securities and Rollover Exit Notes are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. All such Persons and Entities including DTC shall be required to accept and conclusively rely upon the Plan or the Confirmation Order in lieu of a legal opinion regarding whether the Plan Securities and Rollover Exit Notes are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. Notwithstanding any policies, practices, or procedures of DTC, DTC and any participants and intermediaries shall fully cooperate and take all actions to facilitate any and all transactions necessary or appropriate for implementation of the Plan or other contemplated thereby, including any and all distributions pursuant to the Plan.

## B.   Corporate Governance and Management of the Reorganized Debtors

### 1.   Debtors' Organizational Matters

Article IV.E ("**Corporate Existence**") of the Plan provides that, except as otherwise provided in the Plan, the Plan Support Agreement, the Restructuring Steps Exhibit, or the XBP Transaction Documents, each Debtor, as a Reorganized Debtor, shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each Debtor is incorporated or formed and pursuant to the respective memorandum and articles of association, certificate of incorporation and bylaws (or other formation documents) in effect before the Effective Date, except to the extent such memorandum and articles of association, certificate of incorporation and bylaws (or other formation documents) are amended by the Plan, the BTC Transaction, the XBP Transaction Documents, the Debtors, or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to

the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law), without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable law.

On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may, without the need for approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, take such action as permitted by applicable law, and such Reorganized Debtor's Organizational Documents, as such Reorganized Debtor may determine is reasonable and appropriate (including in connection with the BTC Transaction or the XBP Transaction), including, causing: (a) a Reorganized Debtor to be merged into another Reorganized Debtor or an Affiliate of a Reorganized Debtor; (b) a Reorganized Debtor to be dissolved; (c) the conversion of a Reorganized Debtor from one entity type to another entity type; (d) the legal name of a Reorganized Debtor to be changed; (e) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter; or (f) the reincorporation of a Reorganized Debtor under the law of jurisdictions other than the law under which the applicable Debtor currently is incorporated.

Article V.I ("***Indemnification Provisions and Reimbursement Obligations***") of the Plan provides that, on and as of the Effective Date, and except as prohibited by applicable law, the Indemnification Provisions shall be deemed rejected as of the Effective Date.

The Plan also provides that, the New Organizational Documents shall provide to the fullest extent provided by law for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to the Debtors' and the Reorganized Debtors' post-Effective Date directors, officers, equity holders, managers, members, employees, accountants, investment bankers, attorneys, other professionals, agents of the Debtors, and such directors', officers', equity holders', managers', members', and employees' respective Affiliates (each of the foregoing solely in their capacity as such) at least to the same extent as the Indemnification Provisions, against any Claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted.

The Plan further provides that prior to the Effective Date, the Debtors shall fund and purchase "tail coverage" for the Debtors' former and pre-Effective Date directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals, solely in their capacities as such for the Debtors.

Article IV.M of the Plan ("***New Organizational Documents***") of the Plan provides that, subject to Article IV.E of the Plan, the Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and provisions of the Plan, the Plan Support Agreement, and the Restructuring Steps Exhibit, including the Restructuring Transactions and the XBP Transaction Documents.  Without limiting the generality of the foregoing, as of the Effective Date, each of the Reorganized Debtors shall be governed by the New Organizational Documents applicable to it.  On the Effective Date, the Organizational Documents of each of the Reorganized Debtors will be deemed to be modified to prohibit the issuance of non-voting equity Securities, solely to the extent required under section 1123(a)(6) of the Bankruptcy Code.  On or immediately before the Effective Date, each Reorganized Debtor shall file its applicable New Organizational Documents, if any, with the applicable Secretary of State and/or other applicable authorities in its jurisdiction of incorporation or formation in accordance with applicable laws of its jurisdiction of incorporation or formation, to the extent required for such New Organizational Documents to become effective.

Article IV.S ("***Corporate Action***") of the Plan provides that each of the Debtors, New Parent, and the other Reorganized Debtors may take any and all actions to execute, deliver, File or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the provisions of the Plan, the XBP Transaction Documents, and the transactions set forth in the Restructuring Steps Exhibit, and without further notice to or order of the Bankruptcy Court, any act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of New Parent, the Debtors, or the other Reorganized Debtors or by any other Person (except for those expressly required pursuant hereto or by the Definitive Documents).

Upon the Effective Date, all actions contemplated by the Plan, the XBP Transaction Documents, and the Restructuring Steps Exhibit shall be deemed authorized, approved, and, to the extent taken before the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, or officers of New Parent, the Debtors, the other Reorganized Debtors, or any other Entity (except for those expressly required pursuant to the Plan or the Definitive Documents), including: (1) assumption and rejection (as applicable) of Executory Contracts and Unexpired Leases; (2) selection of the directors, managers, and officers for each of the Reorganized Debtors; (3) the execution of the New Organizational Documents and the Exit Facilities Documents; (4) the issuance and delivery of the Plan Securities; (5) the incurrence of the Exit Facilities; (6) the Exit Securitization Programs; (7) the XBP Transaction; (8) the BTC Transaction; (9) implementation of the Restructuring Transactions; (10) entry into and performance of the Registration Rights Agreement; (11) appointment of the Claims Ombudsman; and (12) all other acts or actions contemplated, or reasonably necessary or appropriate to promptly consummate the transactions contemplated by the Plan and the XBP Transaction Documents (whether occurring before, on, or after the Effective Date). All matters provided for in the Plan and the XBP Transaction Documents involving the company structure of the Debtors, and any company action required by the Debtors in connection therewith, shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, authorized persons, or officers of the Debtors, the Reorganized Debtors, or otherwise.

Before, on, and after the Effective Date, the appropriate officers, directors, managers, or authorized persons of the Debtors, the Reorganized Debtors, or any direct or indirect subsidiaries of the Reorganized Debtors (including any president, vice-president, chief executive officer, treasurer, general counsel, secretary, or chief financial officer thereof) shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, memoranda and articles of association, certificates of incorporation, certificates of formation, bylaws, operating agreements, other organization documents, and instruments contemplated by the Plan and the XBP Transaction Documents (or necessary or desirable to effect the transactions contemplated by the Plan and the XBP Transaction Documents) in the name of and on behalf of the applicable Debtors or applicable Reorganized Debtors, including the (1) New Organizational Documents, (2) Exit Facilities Documents, (3) Exit Securitization Programs Documents, (4) XBP Transaction Documents, (5) the New Parent Warrants Agreement, and (6) all other agreements, documents, securities, and instruments relating to or contemplated by the foregoing. Before or on the Effective Date, each of the Debtors and Reorganized Debtors is authorized, with the consent of the Required Consenting Creditors and the Consenting ETI Parties, to change its name or corporate form and to take such other action as required to effectuate a change of name or corporate form in the jurisdiction of incorporation of the applicable Debtor or Reorganized Debtor. To the extent the Debtors change their names or corporate form before the closing of the Chapter 11 Cases, the Debtors shall change the case captions accordingly.

The authorizations, approvals and directives contemplated by <u>Article IV</u> of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

## 2. New Board

Article IV.Q ("***New Board***") of the Plan provides that, as of the Effective Date, all directors, managers, and other members of existing boards or governance bodies of the Debtors, as applicable, shall cease to hold office or have any authority from and after such time to the extent not previously included in the roster of the New Board.

The New Board shall consist of seven (7) directors, consisting of (a) New Parent's Chief Executive Officer, (b) two (2) members selected by the Consenting ETI Parties, and (c) four (4) members selected by the Consenting Creditors (other than the Consenting ETI Parties and Holders of July 2026 Notes); provided, that if the ETI Penalty occurs, the New Board shall instead consist of (x) New Parent's Chief Executive Officer, (y) one (1) member selected by the Consenting ETI Parties, and (z) five (5) members selected by the Consenting Creditors (other than the Consenting ETI Parties and Holders of July 2026 Notes Claims). The membership of the New Board must comply with the independence requirements for listing on the Nasdaq ISE Exchange.

The New Board's maintenance of office and/or replacement shall be in accordance with the New Organizational Documents of New Parent.

## 3. Directors and Officers Insurance Policies

Article V.G ("***Directors and Officers Insurance Policies***") of the Plan provides that on the Effective Date the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Insurance Policies (including any "tail coverage" and all agreements, documents, or instruments related thereto) in effect before the Effective Date pursuant to sections 105 and 365(a) of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court. Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Insurance Policies, and each such indemnity obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed. The Debtors and, after the Effective Date, the Reorganized Debtors shall retain the ability to supplement such D&O Insurance Policies as the Debtors or Reorganized Debtors, as applicable, may deem necessary. For the avoidance of doubt, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Insurance Policies.

In addition, on or after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Insurance Policies (including any "tail policy" and all agreements, documents, or instruments related thereto) in effect on or before the Effective Date, with respect to conduct occurring prior thereto, and all current and former directors, officers, and managers of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policies for the full term of such policies regardless of whether such current and former directors, officers, and managers remain in such positions after the Effective Date, all in accordance with and subject in all respects to the terms and conditions of the D&O Insurance Policies, which shall not be altered.

## VII.
## CONFIRMATION OF THE PLAN

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation are that a plan is (A) accepted by

all impaired classes of claims and interests entitled to vote or, if rejected or deemed rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class; (B) in the "best interests" of the holders of claims and interests impaired under the plan; and (C) feasible.

## A.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties.  Pursuant to the Solicitation Procedures Order, the Confirmation Hearing has been set for [June 18], 2025 at [ ● ].  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued confirmation hearing, or pursuant to a notice filed on the docket of the Chapter 11 Cases.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Bankruptcy Local Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtors' Estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, together with proof of service thereof, and served upon all of the below parties.

| **Debtors** | **Counsel to the Debtors** |
|---|---|
| DocuData Solutions, L.C.<br>2701 E. Grauwyler Road,<br>Irving, TX 75061<br>Attn:  Suresh Yannamani, Matt Brown<br>Email:  suresh.yannamani@exelatech.com<br>         matt.brown@exelatech.com | Hunton Andrews Kurth LLP<br>600 Travis Street, Suite 4200<br>Attn: Timothy A. ("Tad") Davidson II; Ashley L. Harper; Philip M. Guffy<br>taddavidson@hunton.com<br>ashleyharper@hunton.com<br>pguffy@hunton.com<br><br>and<br><br>Latham & Watkins LLP<br>1271 Avenue of the Americas<br>New York, NY 10020<br>Attn: Ray C. Schrock, Alexander W. Welch, Hugh Murtagh, Adam Ravin, Jonathan Weichselbaum<br>ray.schrock@lw.com<br>alex.welch@lw.com<br>hugh.murtagh@lw.com<br>adam.ravin@lw.com<br>jon.weichselbaum@lw.com |
| **Proposed Co-Counsel to the Committee** | **Counsel to the Consenting Creditor Ad Hoc Group** |

| Brown Rudnick LLP | Ropes & Gray LLP |
|---|---|
| Seven Times Square, 47th Floor | 1211 Avenue of the Americas |
| New York, NY 10036, | New York, NY US 10036-8704 |
| Attn: Robert J. Stark, Bennett S. Silverberg | Attn: Matthew Roose, Sam Badawi |
| Email: rstark@brownrudnick.com | matthew.roose@ropesgray.com |
| bsilverberg@brownrudnick.com | sam.Badawi@ropesgray.com |
| | |
| McDermott Will & Emery LLP | and |
| 2501 North Harwood Street, Suite 1900 | |
| Dallas, TX 75201-1664 | Ropes & Gray LLP |
| Attn : Charles R. Gibbs, Marcus Helt | 191 N. Wacker Drive |
| Email : crgibbs@mwe.com | Chicago, IL 60606 |
| mhelt@mwe.com | Attn : Eric P. Schriesheim |
| | Email : eric.schriesheim@ropesgray.com |
| **Counsel to the Sub-Group DIP Lenders** | **Counsel to the Consenting ETI Entities** |
| Williams Barber Morel Ltd. | Cleary Gottlieb Steen & Hamilton LLP |
| 233 Wacker Drive, Suite 6800 | One Liberty Plaza |
| Chicago, IL, 60606 | New York, NY 10006 |
| Attn: Daniel R. Brown | Attn: Sean A. O'Neal, Luke A. Barefoot, David Z. |
| Email: drb@williamsbarbermorel.com | Schwartz, Brad Lenox |
| | Email:  soneal@cgsh.com |
| Jenner & Block LLP | lbarefoot@cgsh.com |
| 353 N. Clark Street | dschwartz@cgsh.com |
| Chicago, IL 60654 | blenox@cgsh.com |
| Attn: Catherine Steege | |
| Email: csteege@jenner.com | |
| | |
| Kane Russell Coleman Logan PC, | |
| 401 Congress Avenue, Suite 2100 | |
| Austin, Texas 78701 | |
| Attn: Mark Taylor | |
| Email: mtaylor@krcl.com | |
| **United States Trustee** | |
| Office of the United States Trustee for the Southern District of Texas | |
| 515 Rusk Street, Suite 3516 | |
| Houston, TX 77002 | |
| Attn: Jana Whitworth, Andrew Jimenez | |
| Email:  jana.whitworth@usdoj.gov | |
| Andrew.jimenez@usdoj.gov | |

## B.    Confirmation

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied with respect to the Plan.

### 1.    Confirmation Requirements

Confirmation of a chapter 11 plan under section 1129(a) of the Bankruptcy Code requires, among other things, that:

- the plan complies with the applicable provisions of the Bankruptcy Code;

- the proponent of the plan has complied with the applicable provisions of the Bankruptcy Code;

- the plan has been proposed in good faith and not by any means forbidden by law;

- any plan payment made or to be made by the proponent under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the bankruptcy court as reasonable;

- the proponent has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan.  The appointment to, or continuance in, such office by such individual must be consistent with the interests of creditors and equity security holders and with public policy and the proponent must have disclosed the identity of any insider that the reorganized debtor will employ or retain, and the nature of any compensation for such insider;

- with respect to each impaired class of claims or interests, either each holder of a claim or interest of such class has accepted the plan, or will receive or retain under the plan, on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code;

- subject to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code, each class of claims or interests has either accepted the plan or is not impaired under the plan;

- except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expenses and priority claims will be paid in full on the effective date (except that holders of priority tax claims may receive deferred Cash payments of a value, as of the effective date of the plan, equal to the allowed amounts of such claims and that holders of priority tax claims may receive on account of such claims deferred Cash payments, over a period not exceeding five (5) years after the date of assessment of such claims, of a value, as of the effective date, equal to the allowed amount of such claims);

- if a class of claims is impaired, at least one (1) impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class; and

- confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

The Debtors believe that:

- the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code;

- the Debtors, as the proponents of the Plan, have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and

- the Plan has been proposed in good faith.

Set forth below is a summary of certain relevant statutory confirmation requirements.

### a. Acceptance

Claims in Classes 3, 4, 5, and 6 are Impaired under the Plan, and Holders thereof are entitled to vote to accept or reject the Plan; Claims in Classes 1 and 2 are Unimpaired, and therefore Holders thereof are conclusively presumed to accept the Plan; Claims and Interests in Classes 7, 10, and 11, respectively, are Impaired and will receive no distribution under the Plan, and therefore Holders thereof are conclusively deemed to reject the Plan; and Claims in Classes 8 and 9 will either be Unimpaired or Impaired, and Holders thereof will receive no distributions and will be conclusively presumed to accept or deemed to reject the Plan, as applicable.

With respect to any Class of Claims or Interests that rejects (or is deemed to reject) the Plan, the Debtors will be required to demonstrate that the Plan satisfies the requirements for nonconsensual confirmation under section 1129(b) of the Bankruptcy Code (which are discussed immediately below). While the Debtors believe the Plan satisfies such requirements with respect to all Classes of Claims and Interests that may reject the Plan, there can be no assurance that the Bankruptcy Court will determine that the Plan meets such requirements. The Debtors also will seek confirmation of the Plan over the objection of any individual holders of Claims who are members of an accepting Class.

### b. Unfair Discrimination and Fair and Equitable Test

To obtain nonconsensual confirmation of a chapter 11 plan, it must be demonstrated to the Bankruptcy Court that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired, non-accepting class. The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable" for, respectively, secured creditors, unsecured creditors and holders of equity interests. In general, section 1129(b) of the Bankruptcy Code permits confirmation notwithstanding non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before a junior class may receive anything under the plan.

A chapter 11 plan does not "discriminate unfairly" with respect to a non-accepting class if the value of the Cash and/or securities to be distributed to the non-accepting class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are similar to those of the non-accepting class. The Debtors believe the Plan will not discriminate unfairly against any non-accepting Class.

### c. Feasibility; Financial Projections

The Bankruptcy Code permits a plan to be confirmed only if confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the debtor or any successor to the debtor, unless such liquidation or reorganization is proposed in the plan. For purposes of determining whether

the Plan meets this requirement, the Debtors have analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their business.  Under the terms of the Plan, the Allowed Claims potentially being paid in whole or in part in Cash are the Other Secured Claims, Convenience Claims, and General Unsecured Claims.

In connection with developing the Plan, the Debtors have prepared detailed financial projections (the "***Financial Projections***") set forth in **Exhibit C** hereto, which demonstrate, among other things, the financial feasibility of the Plan.  The Financial Projections indicate, on a *pro forma* basis, that the projected level of Cash flow is sufficient to satisfy all of the Reorganized Debtors' future debt and debt-related interest costs, capital expenditure, and other obligations during this period.  Accordingly, the Debtors believe that confirmation of the Plan is not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors.

**THE FINANCIAL PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN.  WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, WERE REASONABLE WHEN PREPARED IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED.  THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS.  THE PROJECTIONS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED BELOW UNDER SECTION IX.  IN LIGHT OF THESE RISKS AND UNCERTAINTIES, ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FINANCIAL PROJECTIONS**.

The Debtors prepared the Financial Projections based upon certain assumptions that they believe to be reasonable under the circumstances.  The Financial Projections have not been examined or compiled by independent accountants.  Moreover, such information has not been prepared in accordance with accounting principles generally accepted in the United States ("***GAAP***").  The Debtors make no representation as to the accuracy of the Financial Projections or their ability to achieve the projected results.  Many of the assumptions on which the Financial Projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management.  Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the actual financial results.  Therefore, the actual results achieved may vary from the projected results, and the variations may be material.  All Holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with their evaluation of the Plan.

## 2.  **Best Interests Test**

The "best interests" test requires that the Bankruptcy Court find either:

- that all members of each impaired class have accepted the plan; or

- that each holder of an allowed claim or interest in each impaired class of claims or interests will receive or retain under the plan on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

To determine what the holders of Claims and Interests in each impaired Class would receive if the Debtors were liquidated under chapter 7 on the Effective Date, the Bankruptcy Court must determine the dollar amount that would have been generated from the liquidation of the Debtors' assets and properties in a liquidation under chapter 7 of the Bankruptcy Code.

To determine if the Plan is in the best interests of each impaired Class, the present value of the distributions from the proceeds of a liquidation of the Debtors' assets and properties, after subtracting the amounts due to secured and priority creditors, must be compared with the value of the property offered to each such Class of Claims under the Plan.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors, the Debtors have determined that confirmation of the Plan will provide each Holder of an Allowed Claim with a recovery that is not less than such Holder would have received pursuant to the liquidation of the Debtors under chapter 7.

Moreover, the Debtors believe that the value of distributions to each Class of Allowed Claims in a chapter 7 case would be materially less than the value of distributions under the Plan, and any distribution in a chapter 7 case would not occur as expeditiously as contemplated by the Plan.

~~The Debtors, with the assistance of their financial advisor, AlixPartners, LLP have prepared a liquidation analysis that summarizes the Debtors' best estimate of recoveries by Holders of Claims and Interests in the event of liquidation commencing on or around [●], 2025 (the "*Liquidation Analysis*"), which is set forth in Exhibit D hereto. The Liquidation Analysis provides: (a) a summary of the liquidation values of the Debtors' assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtors' estates; and (b) the expected recoveries of Holders of Claims and Interests under the Plan.~~ **The Debtors, with the assistance of their financial advisor, AlixPartners, LLP have prepared a liquidation analysis that summarizes the Debtors' best estimate of recoveries by Holders of Claims and Interests in the event of liquidation commencing on or around June 30, 2025 (the "*Liquidation Analysis*"), which is set forth in Exhibit D hereto. The Liquidation Analysis provides: (a) a summary of the liquidation values of the Debtors' assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtors' estates; and (b) the expected recoveries of Holders of Claims and Interests under the Plan.**

The Liquidation Analysis contains a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. The Liquidation Analysis also is based on assumptions with regard to liquidation decisions that are subject to change and significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. Accordingly, the values reflected might not be realized. All Holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Liquidation Analysis is based in connection with their evaluation of the Plan.

## C.     Classification of Claims and Interests

The Debtors believe that the Plan complies with the classification requirements of the Bankruptcy Code, which require that a chapter 11 plan place each claim and interest into a class with other claims or interests that are "substantially similar."

**D.      Consummation**

The Plan will be consummated on the Effective Date.  The Effective Date will occur on the first Business Day on which the conditions precedent to the effectiveness of the Plan (*see* Section V.G hereof and Article VIII of the Plan) have been satisfied or waived pursuant to the Plan.  The Plan is to be implemented pursuant to its terms, consistent with the provisions of the Bankruptcy Code.

**E.      Exemption from Certain Taxes and Fees**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan (including the Restructuring Transactions) pursuant to (1) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtors or the Reorganized Debtors, (2) the creation, modification, consolidation, termination, refinancing, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (3) the making, assignment, or recording of any lease or sublease, (4) the grant of collateral security for any or all of the Exit Facilities or other indebtedness, or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Restructuring Transactions), will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials, agents, or filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, must comply with the requirements of section 1146(a) of the Bankruptcy Code, will forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, fee or governmental assessment.

**F.      Modification of Plan**

Subject to the terms of the Plan Support Agreement and the limitations contained in the Plan, the Debtors or Reorganized Debtors reserve the right to, following consultation with the Committee, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Plan Support Agreement:  (1) amend or modify the Plan before the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; (2) amend or modify the Plan after the entry of the Confirmation Order in accordance with section 1127(b) of the Bankruptcy Code and the Plan Support Agreement upon order of the Bankruptcy Court; and (3) remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan upon order of the Bankruptcy Court.

**G.      Effect of Confirmation on Modifications**

Entry of the Confirmation Order will mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

**H.      Revocation of Plan; Reservation of Rights If Effective Date Does Not Occur**

Subject to the conditions to the Effective Date, the Debtors reserve the right, subject to the terms of the Plan Support Agreement, to revoke or withdraw the Plan before the entry of the Confirmation Order and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if entry of the Confirmation Order or the Effective Date does not occur, or if the Plan Support Agreement terminates in accordance with its terms before the Effective Date, then (1) the Plan will be null and void in all respects, (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be deemed null and void, and (3) nothing contained in the Plan will:  (a) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity; *provided*, that any Restructuring Fees and Expenses that have been paid as of the date of revocation or withdrawal of the Plan will remain paid and will not be subject to disgorgement or repayment without further order of the Bankruptcy Court.

**I.      Post-Confirmation Jurisdiction of the Bankruptcy Court**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, except to the extent set forth in the Plan or under applicable federal law, the Bankruptcy Court shall retain on and after the Effective Date jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

    i.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

    ii.     decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Retained Professionals authorized pursuant to the Bankruptcy Code or the Plan;

    iii.    resolve any matters related to: (1) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party with respect to which a Debtor may be liable and to hear, determine, and, if necessary, adjudicate, any Disputed Cure Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (2) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (3) the Reorganized Debtors seeking to amend, modify, or supplement, after the Effective Date, any Executory Contracts and Unexpired Leases to be assumed or rejected; and (4) any dispute regarding whether a contract or lease is or was executory or expired;

    iv.    ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and the Confirmation Order;

    v.     adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

vi. adjudicate, decide, or resolve any and all matters related to Causes of Action;

vii. adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

viii. resolve any cases, controversies, suits, or disputes that may arise in connection with any Claims, including Claim objections, allowance, disallowance, estimation, and distribution;

ix. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan, the Confirmation Order, and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Confirmation Order, or this Disclosure Statement, including the Plan Support Agreement;

x. enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

xi. resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan, the Confirmation Order, or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or the Confirmation Order, or any Entity's rights arising from or obligations incurred in connection with the Plan or the Confirmation Order;

xii. issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan or the Confirmation Order;

xiii. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

xiv. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid;

xv. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

xvi. determine any other matters that may arise in connection with or relate to the Plan, this Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan, the Confirmation Order, or this Disclosure Statement;

xvii. enter an order or final decree concluding or closing the Chapter 11 Cases;

xviii. adjudicate any and all disputes arising from or relating to distributions to Holders of Claims and Interests under the Plan;

| | |
|---|---|
| xix. | consider any modification of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order; |
| xx. | determine requests for payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code; |
| xxi. | hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan; |
| xxii. | hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code; |
| xxiii. | hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date; |
| xxiv. | hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the releases, injunctions, and exculpations provided under Article IX of the Plan; |
| xxv. | resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, this Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose; |
| xxvi. | enforce all orders previously entered by the Bankruptcy Court; and |
| xxvii. | hear any other matter not inconsistent with the Bankruptcy Code, the Plan, or the Confirmation Order. |

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in Article X of the Plan, the provisions of Article X of the Plan shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Notwithstanding anything to the contrary in the Plan: (1) the Bankruptcy Court's jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose before the Effective Date, including any Claims based in whole or in part on any conduct of the Debtors occurring on or before the Effective Date, shall be non-exclusive; (2) any dispute arising under or in connection with the Exit Facilities Documents and the Exit Securitization Programs Documents, and shall be dealt with in accordance with the provisions of the applicable document; and (3) as of the Effective Date, the Exit Facilities Documents and the Exit Securitization Programs Documents shall be governed by the jurisdictional provisions therein.

## VIII.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors have determined that the Plan is the best alternative available for their successful emergence from chapter 11.  If the Plan is not confirmed and consummated, the alternatives to the Plan are: (A) continuation of the Chapter 11 Cases, which could lead to the filing of an alternative plan of reorganization and/or a sale of substantially all of the Debtors' assets; (B) a liquidation under chapter 7 of the Bankruptcy Code; or (C) dismissal of the Chapter 11 Cases, leaving Holders of Claims and Interests to pursue available non-bankruptcy remedies.  These alternatives to the Plan are not likely to benefit Holders of Claims and Interests.

### A.       Continuation of Chapter 11 Cases

If the Plan is not confirmed, the Debtors (or, if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan or to sell all or substantially all of the Debtors' assets outside of a plan.  Such a scenario might entail a reorganization and continuation of the Debtors' business or an orderly liquidation of their assets; in either case, the Debtors expect that recoveries to their stakeholders would be diminished relative to the recoveries available under the Plan.

### B.       Liquidation under Chapter 7

If no plan can be confirmed, then the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code. The effect a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests is set forth in the Liquidation Analysis set forth in **Exhibit D** hereto.

As demonstrated in the Liquidation Analysis, the Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of, among other things, the delay resulting from the conversion of the Chapter 11 Cases to cases under chapter 7, the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals, and the loss in value attributable to an expeditious liquidation of the Debtors' assets as required by chapter 7.

### C.       Dismissal of Chapter 11 Cases.

If the Chapter 11 Cases are dismissed, Holders of Claims or Interests would be free to pursue non-bankruptcy remedies in their attempts to satisfy Claims against or Interests in the Debtors.  However, in that event, each Holder of Claims or Interests would be faced with the costs and difficulties of attempting to recover on an individual basis.  Accordingly, the Debtors believe that the Plan will enable all creditors to realize the greatest possible recovery on their respective Claims with the least delay.

## IX.
## RISK FACTORS TO CONSIDER BEFORE VOTING

**BEFORE VOTING TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS ENTITLED TO VOTE SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW, IN ADDITION TO THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, TOGETHER WITH ANY ATTACHMENTS, EXHIBITS, OR DOCUMENTS INCORPORATED BY REFERENCE HERETO.  THE FACTORS BELOW**

**SHOULD NOT BE REGARDED AS THE ONLY RISKS ASSOCIATED WITH THE PLAN OR ITS IMPLEMENTATION.**

A.    **Certain Bankruptcy Law Considerations**

1.    **Risk of Non-Confirmation of Plan**

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modification to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes.  Moreover, the Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan, and even if the Voting Classes voted in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejects (or is deemed to reject) the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan.  If the Plan is not confirmed, it is unclear what distributions Holders of Claims and Interests ultimately would receive with respect to their Claims and Interests in a subsequent plan of reorganization or otherwise.

2.    **Non-Consensual Confirmation**

If any impaired class of claims or interests does not accept or is deemed not to accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  Should any Class vote to reject the Plan, then these requirements must be satisfied with respect to such rejecting Classes.  The Debtors believe that the Plan satisfies these requirements, but there can be no assurance that the Bankruptcy Court will reach the same conclusion and confirm the Plan on a non-consensual basis.

3.    **Financial Projections**

The Debtors have prepared financial projections on a consolidated basis with respect to the Reorganized Debtors based on certain assumptions as set forth in **Exhibit C** hereto.  The projections have not been compiled, audited, or examined by independent accountants, and neither the Debtors nor their advisors make any representations or warranties regarding the accuracy of the projections or the ability to achieve forecasted results.

Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond the control of the Debtors or Reorganized Debtors, including the timing, confirmation, and consummation of the Plan, consumer demands for the Reorganized Debtors' products, macroeconomic, political and other events that may affect the Reorganized Debtors' ability to maintain adequate amounts and array of inventory, inflation, and other unanticipated market and economic conditions.  Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results.  Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, and the assumptions underlying the projections may be inaccurate in material respects.

4. **Risks Related to Parties in Interest Objecting to the Debtors' Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other clams or interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that a party in interest will not object or that the Bankruptcy Court will approve the classifications.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek (a) to modify the Plan to provide for whatever classification might be required for Confirmation and (b) to use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member.

5. **Risks Related to Possible Objections to the Plan**

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan. Although the Debtors believe that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

6. **Releases, Injunctions, and Exculpation Provisions May Not Be Approved**

Article IX of the Plan provides for certain releases, injunctions, and exculpations for claims and Causes of Action that may otherwise be asserted against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan may be subject to objection by parties in interest and may not be approved. If the releases and exculpations are not approved, certain parties may not be considered Releasing Parties, Released Parties, or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

7. **Risk of Non-Occurrence of Effective Date**

Although the Debtors believe that the Effective Date will occur on the timeline envisaged by the Plan Support Agreement, there can be no assurance as to the timing of the Effective Date. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article VIII of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all Holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

### 8. Risks of Termination of the Plan Support Agreement

The Plan Support Agreement contains certain provisions that give the parties thereto the ability to terminate such agreement upon the occurrence or non-occurrence of certain events, including failure to achieve certain milestones in these Chapter 11 Cases.  Termination of the Plan Support Agreement could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the Debtors' relationships with vendors, suppliers, employees, and customers.

### 9. Funding Obligations of Exela or Other Parties May Not be Obtained

The Debtors' ability to incur indebtedness under the Exit Facilities and/or Exela's failure to fund the Exela Funding Obligations are subject to several contingencies, such financing arrangements may not become available to the Reorganized Debtors, and the Reorganized Debtors may be unable to remain in compliance with the terms of such financing agreements.

The Debtors may not be able to raise the Exit Facilities or secure the ETI Funding Obligations on the terms set forth in the Plan Support Agreement or at all. There is no assurance that the Debtors will be able to raise the full amount of the Exit Facilities. In addition, the Debtors' ability to incur the Exit Facilities or receive the funding pursuant to the ETI Funding Obligations will be subject to the satisfaction of certain conditions precedent. The definitive documentation for the Exit Facilities, if any, will include various conditions to closing, and the Debtors cannot give assurances that they will be able to meet or otherwise obtain waivers to such conditions. If the Debtors cannot satisfy such conditions precedent, if such conditions precedent are not otherwise waived, or if the Debtors are unable to raise the Exit Facilities, the Plan Effective Date could be significantly delayed or may not occur, or the Debtors' ability to consummate the Plan could otherwise be materially and adversely affected.

Furthermore, the terms of the definitive documentation for the Exit Facilities, if any, remain subject to ongoing negotiation, and certain material terms thereof have yet to be agreed. If the Debtors cannot obtain sufficiently favorable terms for the Exit Facilities, the Debtors' ability to consummate the Plan could be materially and adversely affected.

Lastly, while Exela has committed to funding the ETI Funding Obligations, circumstances beyond the control of the Debtors could result in such funding not being made.  If Exela does not honor the ETI Funding Obligations, the Debtors' ability to consummate the Plan could be materially and adversely affected.

### 10. XBP May Not Agree to the XBP Transaction or Splits

As of the date hereof, negotiations are ongoing regarding the final terms of the XBP Transaction and such terms remain subject to final agreement.  As of the date hereof, there is no firm commitment with respect to the final terms of such transaction.  The ultimate decision regarding such transaction may have an impact on recoveries for creditors.  Further, in the event XBP does not consummate the transactions to which it is a party, the Debtors' ability to consummate the Plan could be materially and adversely affected and the Plan Support Agreement may be terminated.

### 11. Conversion into Chapter 7 Cases

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of Holders of Claims and Interests, the Chapter 11 Cases may be converted to cases

under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.

**12. Risks of Non-Dischargeability of Claims**

Certain creditors may have taken or may take the position their claims are non-dischargeable.  Such creditors may make such allegations at any time, notwithstanding the existence of deadlines established by the Bankruptcy Rules or applicable Bankruptcy Court order, entry of the Confirmation Order, or the occurrence of the Effective Date.  Such assertions of non-dischargeability could result in denial of Confirmation, changes to the Plan, or, if asserted after occurrence of the Effective Date, the Reorganized Debtors being required to honor such claims.

**13. Amendment of Plan Prior to Confirmation by Debtors**

The Debtors, subject to the terms and conditions of the Plan and the terms of the Plan Support Agreement, reserve the right to modify the terms and conditions of the Plan or waive any conditions thereto if and to the extent necessary or desirable for Confirmation.  The potential impact of any such amendment or waiver on Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes.

**14. Pending and Future Litigation**

The Debtors are involved in various litigation, claims, and other proceedings, including proceedings relating to the conduct of our business and employee relations, which so long as they remain unresolved represent a legal issue and potential Claims for monetary damages.  Additionally, there is a risk of future litigation.  Pending litigation or future litigation could result in a material judgment against the Debtors or the Reorganized Debtors.  Such litigation, and any judgment in connection therewith, could have a material negative effect on the Debtors or the Reorganized Debtors.

**15. DCD Claims**

**Prior to the Petition Date, the Debtors' DMR service allowed for an entirely paperless, digital mail service.  As part of the DMR service, the Debtors also provided a check cashing service called Direct Cash Deposit ("*DCD*").  Under the DCD service, customers could electronically cash checks with the funds deposited into one of the Debtors' bank accounts at Bank of Texas and then credited to the customer.**

**In Q3 2024, the Debtors became aware that certain bad actors were using the DCD service for fraudulent purposes.  Specifically, the bad actors deposited checks issued by the United States Treasury (primarily for tax refunds) made payable to third-party payees.  However, instead of disbursing the funds to the third-party payees, the bad actors kept the funds for themselves.  This resulted in the third-party payees filing claims with the United States for the funds they never received.  The IRS, in turn, reclaimed funds from the Bank of Texas, who then sought to debit Debtor accounts for the same amounts.  As a result, the Debtors' accounts were debited twice for all reclaimed amounts.  As of May 5, 2025, there are no pending reclamation demands of which the Debtors are aware that are not already satisfied or able to be satisfied from previously allocated funds.**

**Upon discovering the fraud, the Debtors immediately discontinued the DCD service and froze all transactions.  However, a review of the DCD records identified approximately 29 additional**

**suspicious transactions initiated by the same bad actors.  The Debtors estimate that this fraud perpetrated upon them could potentially result in the IRS reclaiming additional funds from the Bank of Texas, who may make claims against the Debtors' estates, up to approximately $9 million.  The Debtors reserve all rights as to the nature, amount, and validity of any such claims.  In addition, the Debtors are working with the FBI to investigate the transactions and the bad actors.  However, there can be no assurance that these investigations will bear fruit.**

### B.    Risks Relating to the Capital Structure of the Reorganized Debtors

#### 1.    Variances from Financial Projections

The Financial Projections set forth in **Exhibit C** hereto reflect numerous assumptions, which involve significant levels of judgment and estimation concerning the anticipated future performance of the Reorganized Debtors, as well as assumptions with respect to the prevailing market, economic, political and competitive conditions, which are beyond the control of the Reorganized Debtors, and which may not materialize.  Any significant differences in actual future results versus estimates used to prepare the Financial Projections, such as lower sales, lower pricing, asset impairments, technological changes, litigation, workforce disruptions, negative publicity or competition could result in significant differences from the Financial Projections.  The Debtors believe that the assumptions underlying the Financial Projections are reasonable.  However, unanticipated events and circumstances occurring subsequent to the preparation of the Financial Projections may affect the Debtors' and the Reorganized Debtors' ability to initiate the endeavors, execute on the strategic initiatives and meet the financial benchmarks contemplated by the Plan.  Therefore, the actual results achieved throughout the period covered by the Financial Projections necessarily will vary from the projected results, and these variations may be material and adverse.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization.  The Debtors also may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("***Reorganizations***"), in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets.  The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.  The Financial Projections contained in **Exhibit C** hereto do not currently reflect the impact of fresh start accounting, which may have a material impact on the Financial Projections.

#### 2.    Leverage

~~Although the Reorganized Debtors will have less indebtedness than the Debtors, the Reorganized Debtors will still have a significant amount of secured indebtedness.  On the Effective Date, after giving effect to the transactions contemplated by the Plan, the Reorganized Debtors will have approximately $351 million in secured funded indebtedness.~~**Although the Reorganized Debtors will have less indebtedness than the Debtors, the Reorganized Debtors will still have a significant amount of secured indebtedness.  On the Effective Date, after giving effect to the transactions contemplated by the Plan, the Reorganized Debtors will have approximately $367 million in secured funded indebtedness.**

The degree to which the Reorganized Debtors will be leveraged could have important consequences, placing the Reorganized Debtors at a competitive disadvantage to other, less leveraged competitors, because, among other things:  it could affect the Reorganized Debtors' ability to satisfy their obligations

under their indebtedness following the Effective Date; a portion of the Reorganized Debtors' cash flow from operations will be used for debt service under the Plan and therefore will be unavailable to support operations or for working capital, capital expenditures, expansion, acquisitions or general corporate or other purposes; the Reorganized Debtors' ability to refinance their then-existing debt, obtain additional debt financing or equity financing, or pursue mergers, acquisitions and asset sales, on terms acceptable to them or at all, may be limited and their costs of borrowing may be increased; as a result of their significant indebtedness, the Reorganized Debtors may be more vulnerable to economic downturns and their ability to withstand competitive pressures may be limited; and the Reorganized Debtors' operational flexibility in planning for, or reacting to, changes, opportunities and challenges in their businesses, including changes in the market sector in which they compete, changes in their business and strategic opportunities, and adverse developments in their operations, may be severely limited.

### 3.  Ability to Service Debt

Although the Reorganized Debtors will have less indebtedness than the Debtors, the Reorganized Debtors will still have significant interest expense and principal repayment obligations.  The Reorganized Debtors' ability to make payments on and to refinance their debt will depend on their future financial and operating performance and their ability to generate cash in the future.  This, to a certain extent, is subject to general economic, business, financial, competitive, legislative, regulatory and other factors that are beyond the control of the Reorganized Debtors.

Although the Debtors believe the Plan is feasible, there can be no assurance that the Reorganized Debtors will be able to generate sufficient cash flow from operations or that sufficient future borrowings will be available to pay off the Reorganized Debtors' debt obligations.  The Reorganized Debtors may need to refinance all or a portion of their debt on or before maturity; however, there can be no assurance that the Reorganized Debtors will be able to refinance any of their debt on commercially reasonable terms or at all.

If the Reorganized Debtors' cash flows and capital resources are insufficient to fund their debt service obligations and other cash requirements, the Reorganized Debtors could face substantial liquidity problems and could be forced to reduce or delay investments and capital expenditures or to sell assets or operations, seek additional capital or restructure or refinance their indebtedness and settlement obligations.  The Reorganized Debtors may not be able to effect any such alternative measures, if necessary, on commercially reasonable terms or at all and, even if successful, such alternative actions may not allow the Reorganized Debtors to meet their scheduled debt service obligations and settlement obligations.  The agreements governing the Reorganized Debtors' indebtedness at emergence are expected to (a) have terms and conditions that restrict their ability to dispose of assets and the use of proceeds from any such dispositions and (b) restrict their ability to raise debt capital.

The Reorganized Debtors' inability to generate sufficient cash flows to satisfy their debt obligations, or to refinance their indebtedness on commercially reasonable terms or at all, would materially and adversely affect their financial position and results of operations.

If the Reorganized Debtors cannot make scheduled payments on their debt, an event of default may result.  An event of default may allow the creditors to accelerate the related debt as well as any other debt to which a cross-acceleration or cross-default provision applies.  If the Reorganized Debtors are unable to repay amounts outstanding under their financing agreements when due, the lenders thereunder could, subject to the terms of the financing agreements, seek to foreclose on the collateral that is pledged to secure the indebtedness outstanding under such facility.

### 4.  Obligations Under Exit Facilities Documents

The Reorganized Debtors' obligations under the Exit Facilities Documents are expected to be secured by liens on substantially all of the assets of the Reorganized Debtors (subject to certain exclusions set forth therein).  If the Reorganized Debtors become insolvent or are liquidated, or if there is a default under certain financing agreements, including, but not limited to, the Exit Facilities Documents, and payment on any obligation thereunder is accelerated, the lenders under and holders of the Exit Facilities would be entitled, subject to the applicable intercreditor agreements and other applicable credit documents, to exercise the remedies available to a secured lender under applicable law, including foreclosure on the collateral that is pledged to secure the indebtedness thereunder, and they would have a claim on the assets securing the obligations under the applicable facility that would be superior to any claim of the holders of unsecured debt.

### 5.  Restrictive Covenants

The financing agreements governing the Reorganized Debtors' indebtedness are expected to contain various covenants that may limit the discretion of the Reorganized Debtors' management by restricting the Reorganized Debtors' ability to, among other things, incur additional indebtedness, incur liens, pay dividends or make certain restricted payments, make investments, consummate certain asset sales, enter into certain transactions with affiliates, merge, consolidate and sell or dispose of all or substantially all of their assets.  As a result of these covenants, the Reorganized Debtors will be limited in the manner in which they conduct their business and may be unable to engage in favorable business activities or finance future operations or capital needs.

Any failure to comply with the restrictions of the financing agreements may result in an event of default. An event of default may allow the creditors to accelerate the related debt as well as any other debt to which a cross-acceleration or cross-default provision applies.  If the Reorganized Debtors are unable to repay amounts outstanding under their financing agreements when due, the lenders thereunder could, subject to the terms of the financing agreements, seek to foreclose on the collateral that is pledged to secure the indebtedness outstanding under such facility.

As a result of these restrictions, the Reorganized Debtors may be limited in how they conduct their business, unable to raise additional debt or equity financing to operate during general economic or business downturns, unable to respond to changing circumstances or to pursue business strategies and unable to compete effectively, execute their growth strategy or take advantage of new business opportunities.

### 6.  Additional Financing

The Reorganized Debtors may be able to incur substantial additional indebtedness in the future. Although agreements governing the Reorganized Debtors' indebtedness are expected to restrict the incurrence of additional indebtedness, these restrictions are and will be subject to a number of qualifications and exceptions and the additional indebtedness incurred in compliance with these restrictions could be substantial.  If new debt is added to the Reorganized Debtors' current debt levels, the related risks that the Debtors now face could intensify.

Moreover, the Reorganized Debtors may need to seek additional financing for general corporate purposes.  For example, they may need funds to make acquisitions or for capital expenditures needed to remain competitive in their market sector.  The Reorganized Debtors may be unable to obtain any desired additional financing on terms that are favorable or acceptable to them, including as a result of their debt

levels or if there is a decline in the demand for their products or in the solvency of their customers, vendors or suppliers or other significantly unfavorable changes in economic conditions occur. Depending on market conditions, adequate funds may not be available to the Reorganized Debtors on acceptable terms or at all, and they may be unable to fund expansion, successfully develop or enhance products, or respond to competitive pressures, any of which could have a material adverse effect on the Reorganized Debtors' competitive position, business, financial condition, results of operations, and cash flows.

**7.    The Reorganized Debtors and Their Affiliates May Incur a Material Amount of U.S. Federal, State and Local Income Taxes as a Result of the Chapter 11 Transactions**

The consummation of the Restructuring Transactions and other transactions undertaken during or in connection with the Chapter 11 Cases (the "***Chapter 11 Transactions***") is expected to give rise to the recognition of a substantial amount of income or gain by the affiliated group of corporations that files a consolidated U.S. federal income tax return with ETI as the common parent ("***ETI Group***"), of which the Debtors are (or were) members or entities disregarded as separate from a member of such group.  In addition, the consummation of the Chapter 11 Transactions is expected to result in (or resulted in) the disaffiliation of the ETI Group for U.S. federal income tax purposes, in which certain deferred intercompany items existing as of the date of such transactions generally will be (or were) accelerated into taxable income, gain, deduction or loss. The Debtors have not yet determined to what extent, if any, the ETI Group will be permitted to take into account such deductions or losses to offset the income or gain recognized by the ETI Group.  Moreover, the ETI Group does not possess a significant amount of carryforwards of net operating losses and has limited other tax attributes, and the Debtors currently do not expect the ETI Group to generate significant amounts of losses in the current taxable year that could otherwise be used to offset the income or gain recognized by the ETI Group.  Accordingly, the U.S. federal, state and local cash tax costs arising in the Chapter 11 Transactions could be material.

Furthermore, the U.S. federal income tax liability arising in connection with the consummation of the Chapter 11 Transactions generally will be a liability of the ETI Group, and each member of the ETI Group (including U.S. subsidiaries of New Parent that are classified as corporations for U.S. federal income tax purposes) will be jointly and severally liable for any such taxes that arose during its period of membership in the ETI Group.  No assurances can be given that the Debtors will have sufficient liquidity to satisfy any resulting current or future cash tax costs.

See Article IV., clause N. of the Plan for a discussion of certain arrangements and other matters relating to the funding of the Transaction Tax Liability.

**C.    Risks Relating to New Parent's Business Operations**

AFTER CONSUMMATION OF THE RESTRUCTURING TRANSACTIONS, NEW PARENT WILL BE COMPRISED OF, AMONG OTHER THINGS, THE DEBTORS' EXISTING BUSINESSES AND THE EXISTING BUSINESSES OF XBP.  THE FOLLOWING PROVIDES A SUMMARY OF CERTAIN OF THE RISKS ASSOCIATED WITH THE DEBTORS' BUSINESSES AND XBP'S BUSINESSES.   THE RISK FACTORS SET FORTH BELOW DISCUSS RISKS ATTENDANT TO THE BUSINESSES OF NEW PARENT ON THAT BASIS, *I.E.*, AS A COMBINATION OF THE DEBTORS' BUSINESSES AND XBP'S BUSINESSES PRIOR TO THE RESTRUCTURING TRANSACTION PURSUANT TO THE PLAN.   HOWEVER, THIS SECTION IS NOT INTENDED TO BE EXHAUSTIVE.  FOR A FURTHER LIST OF RISK FACTORS CONCERNING THE BUSINESSES OF XBP ON A STANDALONE BASIS, REFER TO XBP'S PREVIOUSLY FILED ANNUAL REPORT ON FORM 10-K FOR THE FISCAL YEAR ENDED DECEMBER 31, 2024 AND SUBSEQUENT QUARTERLY

~~REPORTS ON FORM 10-Q. FOR A FURTHER LIST OF RISK FACTORS GENERALLY APPLICABLE TO THE BUSINESSES OF THE DEBTORS AND XBP, REFER TO EXELA'S HISTORICAL ANNUAL REPORTS ON FORM 10-K (LAST FILED APRIL 3, 2024) AND QUARTERLY REPORTS ON FORM 10-Q (LAST FILED NOVEMBER 14, 2024).~~**AFTER CONSUMMATION OF THE RESTRUCTURING TRANSACTIONS, NEW PARENT WILL BE COMPRISED OF, AMONG OTHER THINGS, THE DEBTORS' EXISTING BUSINESSES AND THE EXISTING BUSINESSES OF XBP. THE FOLLOWING PROVIDES A SUMMARY OF CERTAIN OF THE RISKS ASSOCIATED WITH THE DEBTORS' BUSINESSES AND XBP'S BUSINESSES. THE RISK FACTORS SET FORTH BELOW DISCUSS RISKS ATTENDANT TO THE BUSINESSES OF NEW PARENT ON THAT BASIS, *I.E.*, AS A COMBINATION OF THE DEBTORS' BUSINESSES AND XBP'S BUSINESSES PRIOR TO THE RESTRUCTURING TRANSACTION PURSUANT TO THE PLAN. HOWEVER, THIS SECTION IS NOT INTENDED TO BE EXHAUSTIVE. FOR A FURTHER LIST OF RISK FACTORS CONCERNING THE BUSINESSES OF XBP ON A STANDALONE BASIS, REFER TO XBP'S PREVIOUSLY-FILED ANNUAL REPORT ON FORM 10-K FOR THE FISCAL YEAR ENDED DECEMBER 31, 2024 AND SUBSEQUENT QUARTERLY REPORTS ON FORM 10-Q. FOR A FURTHER LIST OF RISK FACTORS GENERALLY APPLICABLE TO THE BUSINESSES OF THE DEBTORS AND XBP, REFER TO EXELA'S HISTORICAL ANNUAL REPORTS ON FORM 10-K (LAST FILED APRIL 3, 2024) AND QUARTERLY REPORTS ON FORM 10-Q (LAST FILED NOVEMBER 14, 2024).**

1. **Certain of the New Parent's Contracts May Be Subject to Termination Rights, Audits, and/or Investigations**

Many of New Parent' customer contracts may be terminated by the New Parent's customers without cause and without any fee or penalty, with only limited notice. New Parent may not be able to replace a customer that elects to terminate or fails to renew its contract with them.

In addition, a portion of New Parent's revenues is derived from contracts with the U.S. federal and state governments and their agencies and from contracts with foreign governments and their agencies. Government entities typically finance projects through appropriated funds. The public procurement environment is unpredictable and this could adversely affect New Parent's ability to perform work under new and existing contracts, including as a result of New Parent's business being diverted to a small or disadvantaged or minority-owned business pursuant to set-aside programs.

Moreover, government contracts are generally subject to a right to conduct audits and investigations by government agencies. If the government finds that it was inappropriately charged any costs to a contract, the costs are not reimbursable or, if already reimbursed, the cost must be refunded to the government. Additionally, New Parent may be subject to various civil and criminal penalties and administrative sanctions, which may include termination of contracts, forfeiture of profits, suspension of payments, fines and suspensions or debarment from doing business with the government. Further, the negative publicity that could arise from any such penalties, sanctions or findings in such audits or investigations could have an adverse effect on New Parent's reputation in the industry and reduce New Parent's ability to compete for new contracts and could materially adversely affect New Parent's results of operations and financial condition.

2. **New Parent May Not Be Able to Offset Increased Costs with Increased Fees Under Long-Term Contracts**

The pricing and other terms of New Parent's customer contracts, particularly New Parent's long-term contract center agreements, are based on estimates and assumptions New Parent makes at the time New

Parent enters into those contracts.  These estimates reflect New Parent's best judgments regarding the nature of the engagement and New Parent's expected costs to provide the contracted services and could differ from actual results.  Not all New Parent's larger long-term contracts allow for escalation of fees as New Parent's cost of operations increase and those that allow for such escalations do not always allow increases at rates comparable to increases that New Parent experiences.  Where New Parent cannot negotiate long-term contract terms that provide for fee adjustments to reflect increases in its cost of service delivery, New Parent's business, financial conditions, and results of operation would be materially impacted.

### 3.  New Parent's Business Process Automation Solutions Often Require Long Selling Cycles and Long Implementation Periods

New Parent often faces long selling cycles to secure new contracts for its business process automation solutions. If New Parent is successful in obtaining an engagement, the selling cycle can be followed by a long implementation period.  Delays in internal approvals, technology implementations, or customer decisions can prolong these cycles.  Even if New Parent succeeds in developing a relationship with a potential customer and begin to discuss the services in detail, the potential customer may choose a competitor or decide to retain the work in-house prior to the time a contract is signed.  Additionally, New Parent may not begin receiving revenue until after the implementation period and New Parent's solution is fully operational, leading to upfront expenses without immediate profits.  These extended cycles can strain finances, especially when hiring new staff before revenue collection.  New Parent's inability to obtain contractual commitments after a selling cycle, maintain contractual commitments after the implementation period or limit expenses prior to the receipt of corresponding revenue may have a material adverse effect on New Parent's business, results of operation and financial condition.

### 4.  New Parent Faces Significant Competition from U.S.-Based and Non-U.S.-Based Companies and from Customers Who May Elect to Perform Services In-House

New Parent's industry is highly competitive, fragmented and subject to rapid change.  New Parent competes primarily against local, national, regional and large multi-national information and payment technology companies, including focused BPO companies based in offshore locations, BPO divisions of information technology companies located in India, other BPO and BPA and consulting services and digital transformation solution providers and the in-house capabilities of New Parent's customers and potential customers.  These competitors may include entrants from adjacent industries or entrants in geographic locations with lower costs than those in which New Parent operates.

Some of New Parent's competitors have stronger financial, marketing and technological capabilities, larger customer bases, and better brand recognition.  Expansion of customers' global delivery centers or strategic partnership with larger firms may increase competition.  Further, New Parent expects competition to intensify in the future as more companies enter New Parent's markets and customers consolidate the services they require among fewer vendors.  Increased competition, New Parent's inability to compete successfully against competitors, pricing pressures or loss of market share could result in reduced operating margins which could adversely affect New Parent's business, results of operations and financial condition.

### 5.  New Parent's Industry is Characterized by Rapid Technological Change and Failure to Address Rapid Technological Change Could Adversely Affect New Parent's Results of Operations and Financial Condition

The process of developing new services and solutions is inherently complex and uncertain, requiring accurate anticipation of customer needs and emerging trends.  It requires that New Parent make

long-term investments and commit significant resources before knowing whether these investments will eventually result in services that achieve customer acceptance and generate the revenues required to provide desired returns. If New Parent fails to accurately anticipate and meet its customers' needs through the development of new technologies and service offerings or if New Parent's new services are not widely accepted, New Parent could lose market share and customers to its competitors and that could materially adversely affect New Parent's results of operations and financial condition.

More specifically, the business process solutions industry is characterized by rapid technological change, evolving industry standards and changing customer preferences. The success of New Parent's business depends, in part, upon New Parent's ability to develop technology and solutions that keep pace with changes in New Parent's industry and the industries of its customers. Although New Parent has made, and will continue to make, significant investments in the research, design and development of new technology and platforms-driven solutions, New Parent may not be successful in addressing these changes on a timely basis or in marketing the changes New Parent implements. In addition, products or technologies developed by others may render New Parent's services uncompetitive or obsolete. Failure to address these developments could have a material adverse effect on New Parent's business, results of operations and financial condition.

In addition, existing and potential customers are actively shifting their businesses away from paper-based environments to electronic environments with reduced needs for physical document management and processing. This shift may result in decreased demand for the physical document management services New Parent provides such that New Parent's business and revenues may become more reliant on technology-based services in electronic environments, which are typically provided at lower prices compared to physical document management services. Though New Parent has solutions for customers seeking to make these types of transitions, a significant shift by New Parent's customers away from physical documents to non-paper based technologies, whether now existing or developed in the future, could adversely affect New Parent's business, results of operation and financial condition.

Also, some of the large international companies in the industry have significant financial resources and compete with New Parent to provide document processing services and/or business process services. New Parent competes primarily on the basis of technology, performance, price, quality, reliability, brand, distribution and customer service and support. New Parent's success in future performance is largely dependent upon New Parent's ability to compete successfully, to promptly and effectively react to changing technologies and customer expectations and to expand into additional market segments. To remain competitive, New Parent must develop services and applications; periodically enhance its existing offerings; remain cost efficient; and attract and retain key personnel and management. If New Parent is unable to compete successfully, New Parent could lose market share and important customers to its competitors and that could materially adversely affect New Parent's results of operations and financial condition.

6. **New Parent Often Relies on Third-Party Hardware and Software**

Although New Parent developed its platform-driven solutions internally, New Parent relies, in some cases, on third-party hardware and software in connection with its service offerings which New Parent either purchases or leases from third-party vendors.  While New Parent is able to select from various competing hardware and software applications, detecting design defects or software errors is challenging due to complexity and unique specifications.  Any errors or defects in third-party hardware or software incorporated into New Parent's service offerings, may result in a delay or loss of revenue, diversion of resources, damage to New Parent's reputation, or potential claims against New Parent.

Further, this hardware and software may not continue to be available on commercially reasonable terms or at all.  Any loss of the right to use any of this hardware or software, or any increases in the price charged by third-party vendors, could negatively affect New Parent's business until equivalent technology is either developed by New Parent or, if available, is identified, obtained and integrated on commercially reasonable terms.  Further, changing hardware vendors or software licensors could detract from management's ability to focus on the ongoing operations of New Parent's business or could cause delays in the operations of New Parent's business.

7. **New Parent's Ability to Deliver Its Services Depends on the Infrastructure of the Internet**

The Internet's infrastructure comprises many different networks and services that are highly fragmented and distributed by design.  This infrastructure is run by a series of independent third-party organizations that work together to provide the infrastructure and supporting services of the Internet.  The Internet has experienced a variety of outages and other delays as a result of damages to portions of its infrastructure, denial-of-service attacks or related cyber incidents, and it could face outages and delays in the future, potentially reducing the availability of the Internet to New Parent or its customers for delivery of New Parent's Internet-based services.  Any resulting interruptions in New Parent's services or the ability of its customers to access New Parent's services could result in a loss of potential or existing customers and harm New Parent's business.  Additionally, regulatory actions in certain countries may limit access to the Internet or change the legal protections available to businesses that depend on the Internet for the delivery of its services, which would negatively impact access to New Parent's services, increase New Parent's risk or add liabilities, impede New Parent's growth, productivity and operational effectiveness, result in the loss of potential or existing customers and harm New Parent's business.

8. **Some of New Parent's Work Involves Greater Risk Than Other Types of Claim Processing or Document Management Engagements**

New Parent provides certain business process solutions for customers that, for financial, legal or other reasons, may present higher risks compared to other types of claims processing or document management engagements.  Examples of higher risk engagements include class action and other legal distributions involving significant sums of money, economic analysis and expert testimony in high stakes legal mailers, and engagements where New Parent receives or processes sensitive data, including personal consumer or private health information.

While New Parent attempts to identify higher risk engagements and customers and mitigate its exposure by taking certain preventive measures and, where necessary, turning down certain engagements, these efforts may be ineffective and an actual or alleged error or omission on New Parent's part, the part of New Parent's customer or other third parties or possible fraudulent activity in one or more of these higher-risk engagements could result in the diversion of management resources, damage to New Parent's reputation, increased service costs or impaired market acceptance of New Parent's services, any of which could negatively impact New Parent's business and financial condition.

9. **New Parent's Business Could Be Materially and Adversely Affected If They Do Not Protect Its Intellectual Property or Its Services Are Found to Infringe on the Intellectual Property of Others**

New Parent's success depends in part on certain methodologies and practices New Parent utilizes in developing and implementing applications and other proprietary intellectual property rights.  In order to protect such rights, New Parent relies upon a combination of nondisclosure and other contractual arrangements, as well as trade secret, copyright, trademark and patent laws.  New Parent also generally enters into confidentiality agreements with its employees, customers and potential customers and limit access to and distribution of New Parent's proprietary information.  There can be no assurance that the laws, rules, regulations and treaties in effect in the U.S., India and the other jurisdictions in which New Parent operates and the contractual and other protective measures New Parent takes are adequate to protect them from misappropriation or unauthorized use of its intellectual property, or that such laws will not change.  There can be no assurance that the resources invested by New Parent to protect its intellectual property will be sufficient or that its intellectual property portfolio will adequately deter misappropriation or improper use of New Parent's technology, and its intellectual property rights may not prevent competitors from independently developing or selling products and services similar to or duplicative of New Parent's.  New Parent may not be able to detect unauthorized use and take appropriate steps to enforce its rights, and any such steps may be costly and unsuccessful.  Infringement by others of New Parent's intellectual property, including the costs of enforcing its intellectual property rights, may have a material adverse effect on New Parent's business, results of operations and financial condition.  New Parent could also face competition in some countries where they have not invested in an intellectual property portfolio.  If New Parent is not able to protect its intellectual property, the value of New Parent's brand and other intangible assets may be diminished, and its business may be adversely affected.  Further, although New Parent believes that it is not infringing on the intellectual property rights of others, claims may nonetheless be successfully asserted against New Parent in the future, and New Parent may be the target of enforcement of patents or other intellectual property by third parties, including aggressive and opportunistic enforcement claims by non-practicing entities.  Regardless of the merit of such claims, responding to infringement claims can be expensive and time-consuming.  If New Parent is found to infringe any third-party rights, New Parent could be required to pay substantial damages or New Parent could be enjoined from offering some of its products and services.  The costs of defending any such claims could be significant, and any successful claim may require New Parent to modify its services.  The value of, or New Parent's ability to use, its intellectual property may also be negatively impacted by dependencies on third parties, such as New Parent's ability to obtain or renew on reasonable terms licenses that New Parent needs in the future, or New Parent's ability to secure or retain ownership or rights to use data in certain software analytics or services offerings.  Any such circumstances may have a material adverse effect on New Parent's business, results of operations and financial condition.

### 10.  New Parent's Revenues Are Highly Dependent on a Limited Number of Industries.

A substantial portion of the New Parent's revenues are derived from three specific industry based segments: ITPS, HS, and LLPS.  New Parent's success largely depends on continued demand for its services from customers in these segments, and a downturn or reversal of the demand for business process solutions in any of these segments, or the introduction of regulations that restrict or discourage companies from engaging the New Parent's services, could materially adversely affect New Parent's business, financial condition and results of operations.  For example, consolidation in any of these industries or combinations or mergers, particularly involving New Parent's customers, may decrease the potential number of customers for New Parent's services.  New Parent has been affected by the worsening of economic conditions and significant consolidation in the financial services industry and continuation of this trend may negatively affect New Parent's revenues and profitability.

### 11.  New Parent Derives Significant Revenue From Commercial and Government Contracts

Many of the contracts New Parent is awarded through competitive bidding procedures are extremely complex and require the investment of significant resources in order to prepare accurate bids and proposals.  Competitive bidding imposes substantial costs and presents a number of risks that may adversely affect New Parent's financial position, including: (i) the substantial cost and managerial time and effort that New Parent spends to prepare bids and proposals for contracts that may or may not be awarded to New Parent; (ii) the need to estimate accurately the resources and costs that will be required to implement and service any contracts New Parent is awarded, sometimes in advance of the final determination of its full scope and design; (iii) the expense and delay that may arise if New Parent's competitors protest or challenge awards made to New Parent pursuant to competitive bidding and the risk that such protests or challenges could result in the requirement to resubmit bids and in the termination, reduction or modification of the awarded contracts, or may eventually lead to litigation; and (iv) the opportunity cost of not bidding on and winning other contracts New Parent might otherwise pursue.

## 12. <u>New Parent's Profitability Depends On New Parent's Ability to Obtain Adequate Pricing for Its Services</u>

New Parent's success depends on New Parent's ability to obtain adequate pricing for its services. Depending on competitive market factors, future prices New Parent obtains for its services may decline from previous levels.  If New Parent is unable to obtain adequate pricing for its services, it could materially adversely affect New Parent's results of operations and financial condition.  In addition, New Parent's contracts are increasingly requiring tighter timelines for implementation as well as more stringent service level metrics.  This makes the bidding process for new contracts much more difficult and requires New Parent to adequately consider these requirements in the pricing of New Parent's services.

New Parent, from time to time, engages in restructuring actions to reduce New Parent's cost structure. If New Parent is unable to continue to maintain its cost base at or below the current level and maintain process and systems changes resulting from prior restructuring actions or to realize the expected cost reductions in the ongoing strategic transformation program, it could materially adversely affect New Parent's results of operations and financial condition.  In addition, in order to meet the service requirements of New Parent's customers, which often includes 24/7 service, and to optimize New Parent's employee cost base, including New Parent's back-office support, New Parent often locates its delivery service and back-office support centers in lower-cost locations, including several developing countries.  Concentrating New Parent's centers in these locations presents a number of operational risks, many of which are beyond New Parent's control, including the risks of political instability, natural disasters, safety and security risks, labor disruptions, excessive employee turnover and rising labor rates.

New Parent's ability to sustain and improve profit margins is dependent on a number of factors, including New Parent's ability to continue to improve the cost efficiency of New Parent's operations through such programs as robotic process automation, to absorb the level of pricing pressures on New Parent's services through cost improvements and to successfully complete information technology initiatives.   If any of these factors adversely materialize or if New Parent is unable to achieve and maintain productivity improvements through restructuring actions or information technology initiatives, New Parent's ability to offset labor cost inflation and competitive price pressures would be impaired, each of which could materially adversely affect New Parent's results of operations and financial condition.

13. **Defects or Disruptions in New Parent's Services Could Diminish Demand for New Parent's Services**

Since New Parent's customers use New Parent's services for important aspects of its business, any errors, defects, disruptions in service or other performance problems could hurt New Parent's reputation and may damage New Parent's customers' businesses. As a result, customers could elect to not renew New Parent's services or delay or withhold payment to New Parent. New Parent could also lose future sales or customers may make warranty or other claims against New Parent, which could result in an increase in New Parent's allowance for expected credit losses, an increase in collection cycles for accounts receivable or the expense and risk of litigation.

14. **New Parent is Subject to Regular Customer and Third-Party Security Reviews**

Many of New Parent's customer contracts require that New Parent maintain certains physical and/or information security standards, and, in certain cases, New Parent permits a customer to audit New Parent's compliance with these contractual standards.  Any failure to meet such standards or pass such audits may have a material adverse impact on New Parent's business.  Further, customers from time to time may require stricter physical and/or information security than they negotiated in their contracts and may condition continued volumes and business on the satisfaction of such additional requirements.  Some of these requirements may be expensive to implement or maintain and may not be factored into New Parent's contract pricing.  Further, on an annual basis New Parent obtains third-party audits of certain of New Parent's locations in accordance with Statement on Standards for Attestation Engagements No. I6 (SSAE 16) put forth by the Auditing Standards Board (ASB) of the American Institute of Certified Public Accountants (AICPA).  SSAE 16 is the current standard for reporting on controls at service organizations, and many of New Parent's customers expect that New Parent will perform an annual SSAE 16 audit, and report to them the results.  Negative findings in such an audit and/or the failure to adequately remediate in a timely fashion such negative findings may cause customers to terminate their contracts or otherwise have a material adverse effect on New Parent's reputation, results of operation and financial condition.

15. **Cybersecurity Issues, Vulnerabilities, and Criminal Activity Could Result in a Data Breach**

New Parent collects and retain large volumes of internal and customer data, including personally identifiable information and other sensitive data both physically and electronically, for business purposes, and New Parent's various information technology systems enter, process, summarize and report such data.  New Parent also maintains personally identifiable information about New Parent's employees.  Safeguarding customer, employee and New Parent's own data is a key priority for New Parent, and New Parent's customers and employees have come to rely on New Parent for the protection of its information.  Despite New Parent's efforts to protect sensitive, confidential or personal data or information, New Parent can provide no assurances that its security measures designed to protect New Parent's customers' and New Parent's customers' customers' data will always be effective.  New Parent's services and underlying infrastructure may in the future be materially breached or compromised as a result of the following:

- third-party attempts to fraudulently induce New Parent's employees, partners or customers to disclose sensitive information such as usernames, passwords or other information to gain access to New Parent's customers' data or IT systems, or New Parent's data or New Parent's IT systems;

- efforts by individuals or groups of hackers and sophisticated organizations, such as state-sponsored organizations or nation-states, to launch coordinated attacks, including

ransomware, destructive malware and distributed denial-of-service attacks;

- third-party attempts to abuse New Parent's marketing, advertising, messaging or social products and functionalities to impersonate persons or organizations and disseminate information that is false, misleading or malicious;

- cyberattacks on New Parent's internally built infrastructure on which many of New Parent's service offerings operate, or on third-party cloud-computing platform providers;

- vulnerabilities resulting from enhancements and updates to New Parent's existing service offerings;

- vulnerabilities in the products or components across the broad ecosystem that New Parent's services operate in conjunction with and are dependent on;

- vulnerabilities existing within new technologies and infrastructures;

- attacks on, or vulnerabilities in, the many different underlying networks and services that power the Internet that New Parent's products depend on, most of which are not under New Parent's control or the control of New Parent's vendors, partners or customers; and

- employee or contractor errors or intentional acts that compromise New Parent's security systems.

These risks are mitigated, to the extent possible, by enhanced processes and internal security controls. However, New Parent's ability to mitigate these risks may be impacted by the following:

- frequent changes to, and growth in complexity of, the techniques used to breach, obtain unauthorized access to, or sabotage IT systems and infrastructure, which are generally not recognized until launched against a target, and could result in New Parent's being unable to anticipate or implement adequate measures to prevent such techniques;

- the continued evolution of New Parent's internal IT systems as New Parent early adopts new technologies and new ways of sharing data and communicating internally and with partners and customers, which increases the complexity of New Parent's IT systems;

- authorization by New Parent's customers to third-party technology providers to access its customer data, which may lead to New Parent's customers' inability to protect its data that is stored on New Parent's servers; and

- New Parent's limited control over its customers or third-party technology providers, or the processing of data by third-party technology providers, which may not allow New Parent to maintain the integrity or security of such transmissions or processing.

Yet, New Parent remains vulnerable to such threats. A security breach or incident could result in unauthorized parties obtaining access to, or the denial of authorized access to, New Parent's IT systems or data, or New Parent's customers' systems or data, including intellectual property and proprietary, sensitive or other confidential information. A security breach could also result in a loss of confidence in the security of New Parent's services, damage New Parent's reputation, negatively impact New Parent's future sales, disrupt New Parent's business and lead to increases in insurance premiums and legal, regulatory and financial exposure and liability. As an example, in June 2022 the Debtors experienced a network outage which required them, among other things, to incur costs to respond to the incident and to limit access to their applications and services by their employees and customers. The Debtors believe the June 2022 network outage caused some of their customers to reduce volumes, look for alternate vendors and consider other providers for new requirements resulting in claims against the Debtors and lost revenue. Finally, the detection, prevention and remediation of known or potential security vulnerabilities, including those arising from third-party hardware or software, may result in additional

financial burdens due to additional direct and indirect costs, such as additional infrastructure capacity spending to mitigate any system degradation and the reallocation of resources from development activities.

### 16.  **The Use or Capabilities of AI in New Parent's Offerings May Result in Increased Costs, Reputational Harm and Liability**

New Parent is increasingly building AI into many of New Parent's offerings.  As with many innovations, AI presents additional risks and challenges that could affect New Parent's business.  If New Parent enables or offer solutions that draw controversy due to its perceived or actual impact on human rights, privacy, employment, or in other social contexts, New Parent may experience reputational harm, competitive harm or legal liability.  Data practices by New Parent or others that result in controversy could also impair the acceptance of AI solutions.  This in turn could undermine the decisions, predictions or analysis AI applications produce, subjecting New Parent to competitive harm, legal liability or reputational harm.  The rapid evolution of AI will require the application of resources to develop, test and maintain New Parent's products and services to help ensure that AI is implemented ethically in order to minimize unintended, harmful impact.

Uncertainty around new and emerging AI applications such as generative AI content creation may require additional investment in the development of proprietary datasets, machine learning models and systems to test for accuracy, bias and other variables, which are often complex, may be costly and could impact New Parent's profit margin as New Parent decides to further expand generative AI into its product offerings.

### 17.  **Currency Fluctuations Could Have a Material Adverse Effect on New Parent's Results of Operations**

The functional currencies of New Parent's businesses outside of the U.S. are the local currencies. Changes in exchange rates between these foreign currencies and the U.S. Dollar will affect the recorded levels of New Parent's assets, liabilities, net sales, cost of goods sold and operating margins and could result in exchange gains or losses.  The primary foreign currencies to which New Parent has exposure are the European Union Euro, Swedish Krona, British Pound Sterling, Canadian Dollar and Indian rupees. Exchange rates between these currencies and the U.S. Dollar in recent years have fluctuated significantly and may do so in the future.  New Parent's operating results and profitability may be affected by any volatility in currency exchange rates and New Parent's ability to manage effectively currency transaction and translation risks.  To the extent the U.S. Dollar strengthens against foreign currencies, New Parent's foreign revenues and profits will be reduced when converted into and reported in U.S. Dollars.

### 18.  **Fluctuations in the Costs of Raw Materials May Adversely Impact New Parent's Results of Operations**

Purchases of paper, ink, energy and other raw materials represent a large portion of New Parent's costs. Increases in the costs of these inputs may increase New Parent's costs and they may not be able to pass these costs on to customers through higher prices.  In addition, New Parent may not be able to resell waste paper and other print-related by-products or may be adversely impacted by decreases in the prices for these by-products.  Increases in the cost of materials may adversely impact customers' demand for New Parent's printing and printing-related services.

19. **Sales Tax Laws in the U.S. May Change**

New Parent's U.S. subsidiaries collect and remit sales tax in states in which the subsidiaries have physical presence or in which New Parent believes sufficient nexus exists which obligates New Parent to collect sales tax.  Other states may, from time to time, claim that New Parent has state-related activities constituting physical nexus to require such collection.  Additionally, many other states seek to impose sales tax collection or reporting obligations on companies that sell goods to customers in their state, or directly to the state and its political subdivisions, regardless of physical presence.  Such efforts by states have increased recently, as states seek to raise revenues without increasing the income tax burden on residents.  New Parent cannot predict whether the nature or level of contacts New Parent has with a particular state will be deemed enough to require New Parent to collect sales tax in that state nor can New Parent be assured that Congress or individual states will not approve legislation authorizing states to impose tax collection or reporting obligations on New Parent's activities.  A successful assertion by one or more states that New Parent should collect sales tax could result in substantial tax liabilities related to past sales and would result in considerable administrative burdens and costs for New Parent.

20. **If the New Parent Fails to Maintain an Effective System of Disclosure Controls and Internal Control Over Financial Reporting, New Parent's Ability to Produce Financial Statements or Comply with Applicable Regulations Could Be Impaired**

As a public company, New Parent is subject to the reporting requirements of the Exchange Act, the Sarbanes-Oxley Act of 2002, as amended (the "***Sarbanes-Oxley Act***"), and the listing standards of the Nasdaq.  New Parent expects that the requirements of these rules and regulations will continue to increase its legal, accounting and financial compliance costs, make some activities more difficult, time consuming and costly, and place significant strain on its personnel, systems and resources.  The Sarbanes-Oxley Act requires, among other things, that New Parent maintains effective disclosure controls and procedures and internal control over financial reporting.  New Parent is continuing to develop and refine its disclosure controls and other procedures that are designed to ensure that information required to be disclosed by them in the reports that they will file with the SEC is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms, and that information required to be disclosed in reports under the Exchange Act is accumulated and communicated to its principal executive and financial officers.  In order to maintain and improve the effectiveness of its disclosure controls and procedures and internal control over financial reporting, New Parent has expended, and anticipate that they will continue to expend, significant resources, including accounting-related costs and significant management oversight.

New Parent's current controls and any new controls that New Parent develops may become inadequate because of changes in conditions in New Parent's business.  Further, deficiencies in New Parent's disclosure controls or New Parent's internal control over financial reporting may be discovered in the future.  Any failure to develop or maintain effective controls, or any difficulties encountered in its implementation or improvement could harm New Parent's operating results or cause New Parent to fail to meet its reporting obligations and may result in a restatement of the New Parent's financial statements for prior periods.  Any failure to implement and maintain effective internal control over financial reporting could adversely affect the results of management evaluations of New Parent's internal control over financial reporting that New Parent is required to include in its periodic reports that New Parent files with the SEC.  Ineffective disclosure controls and procedures and internal control over financial reporting could also cause investors to lose confidence in the New Parent's reported financial and other information, which would likely have a negative effect on the trading price of New Parent's Common

Stock. In addition, if New Parent is unable to meet these requirements, New Parent may not be able to remain listed on the Nasdaq.

Management assessed the effectiveness of the Debtors' internal control over financial reporting as of December 31, 2023 and based on its assessment, the Debtors' management, including the Debtors' Executive Chairman and Interim Chief Financial Officer, has concluded that the Debtors' internal control over financial reporting was not effective as of December 31, 2023 due to material weaknesses in the Debtors' internal control over financial reporting.

Any failure to maintain effective disclosure controls and internal control over financial reporting could have a material and adverse effect on the New Parent's business and operating results and cause a decline in the price of the New Parent's Common Stock.

### D.    Risks Related to the Plan Securities

**AFTER CONSUMMATION OF THE RESTRUCTURING TRANSACTIONS, NEW PARENT WILL BE COMPRISED OF, AMONG OTHER THINGS, THE DEBTORS' EXISTING BUSINESSES AND THE EXISTING BUSINESSES OF XBP. ACCORDINGLY, THE VALUE OF THE PLAN SECURITIES, INCLUDING THE NEW PARENT INTERESTS WILL DEPEND ON, AMONG OTHER THINGS, THE PERFORMANCE OF THE DEBTORS' AND XBP'S BUSINESSES UNDER COMMON OWNERSHIP. THE FOLLOWING PROVIDES A SUMMARY OF CERTAIN OF THE RISKS ASSOCIATED WITH THE PLAN SECURITIES. THE RISK FACTORS SET FORTH BELOW DISCUSS RISKS ATTENDANT TO THE PLAN SECURITIES AS SECURITIES IN NEW PARENT ON SUCH BASIS. THIS SECTION IS NOT INTENDED TO BE EXHAUSTIVE.**

### 1.    New Parent's ability to achieve continued and sustained profitability is uncertain

New Parent's profitability depends on, among other things, its ability to generate revenue in excess of its expenses. However, New Parent has significant and continuing fixed costs and expenses, which it may not be able to reduce adequately to sustain such profitability if its revenue continues to decrease, or if revenue does not increase commensurately with an increase in costs. In addition, New Parent may encounter unforeseen expenses, difficulties, complications, delays and other unknown events that may cause its costs to exceed its expectations.

New Parent's revenues have declined over the last few years due to, among other things, the COVID-19 pandemic, a loss of clients, the completion of certain one-off projects, currency fluctuation exposure, the transition of XBP's clients to lower revenue but higher margin systems and platforms, and changes of clients' technology that has resulted in fewer transactions that fall under the contractual arrangements with New Parent. In addition, one of New Parent's top 10 clients ended its contract with New Parent in April 2023. Contracts with several other large clients are up for renewal. Although these contracts are expected to be renewed, there can be no assurances that they will be renewed on favorable terms or at all.

Further, New Parent's revenues may be adversely affected by many factors, including but not limited to a future pandemic; a potential recession in Europe; the inability to attract new clients to use its services; a failure by existing clients to renew their contracts or use additional services (or a decision by existing clients to cease or reduce using New Parent's services); the lengthening of its sales cycles and implementation periods; changes in its client mix; failure of clients to pay invoices on a timely basis or at all; a failure in the performance of New Parent's solutions or internal controls that adversely affects its reputation or results in loss of business; the loss of market share to existing or new competitors; the failure to enter or succeed in new markets; regional or global economic conditions or regulations

affecting perceived need for or value of New Parent's services; or New Parent's inability to develop new offerings, expand its offerings or drive adoption of its new offerings on a timely basis and thus potentially not meeting evolving market needs.

New Parent's future profitability also may be impacted by non-cash charges and potential impairment of goodwill, which will negatively affect its reported financial results. Even if it achieves profitability on an annual basis, New Parent may not be able to achieve profitability on a quarterly basis. New Parent may incur significant losses in the future for a number of reasons, including those described elsewhere herein. Any inability of New Parent to achieve continued and sustained profitability may adversely impact its financial position and may require New Parent to seek additional financing.

    **2.**   **New Parent may need to raise debt or equity financing, which it may be unable to do on favorable terms or at all.  In addition, New Parent must obtain the consent of certain shareholders prior to any additional issuances of equity**

New Parent may be unable to generate continued and sustained profitability or may incur significant losses in the future. As a result, New Parent may need to raise additional capital through debt and/or equity financing at some point in the future. Any debt agreements New Parent enters into at such time may include financial or operational covenants which may constrain its ability to operate its business, and any inability to satisfy covenants contained in any debt agreements may require prepayment and/or refinancing of such debt. New Parent may also be unable to raise debt and/or equity financing at an attractive price or on attractive terms or at all.

The limited public float of New Parent may also adversely affect its ability to raise debt and/or equity financing on attractive terms or at all.

    **3.**   **Potential Dilution**

The ownership percentage represented by the Plan Securities distributed under the Plan as of the Effective Date will be subject to dilution.  In the future, similar to all companies, additional equity financings or other equity issuances by New Parent could adversely affect the value of the Plan Securities.  The amount and dilutive effect of any of the foregoing could be material.

    **4.**   **Interests Subordinated to the New Parent's Indebtedness**

In any subsequent liquidation, dissolution, or winding up of New Parent, the Plan Securities would rank below all debt claims against New Parent.  As a result, holders of the Plan Securities will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of New Parent until after all applicable holders of debt have been paid in full.

    **5.**   **Estimated Valuations of Plan Securities Are Not Intended to Represent Potential Market Values**

The Debtors' estimated recoveries set forth in this Disclosure Statement are not intended to represent the market value of New Parent's securities.  The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including, among others: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; (d) the Debtors' ability to maintain adequate liquidity to fund operations; (e) the assumption that capital and equity markets remain consistent with current conditions; and (f) the Debtors' ability to maintain critical existing customer relationships.

### 6. Dividends

New Parent may not pay any dividends on the Plan Securities.  In such circumstances, the success of an investment in the Plan Securities will depend entirely upon any future appreciation in the value of the Plan Securities.  There is, however, no guarantee that the Plan Securities will appreciate in value or even maintain its initial value.

### 7. Restrictions on Ability to Resell Plan Securities and Rollover Exit Notes

Plan Securities issued to an entity that is deemed to be an "underwriter" under section 1145(b) of the Bankruptcy Code, as well as the Rollover Exit Notes, will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration or an applicable exemption from registration under the Securities Act and other applicable law. In addition, and subject to the foregoing, while the Plan Securities issued pursuant to section 1145(a) of the Bankruptcy Code may generally be resold by the holder thereof without registration under the Securities Act, such securities will not be freely tradable if, at the time of transfer, the holder thereof is an "affiliate" of New Parent as defined in Rule 144(a)(1) under the Securities Act or had been such an "affiliate" within 90 days of such transfer. Such affiliate holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.  Even if a trading market develops for the Plan Securities or Rollover Exit Notes, such holders should be aware that they may be required to bear the financial risk of an investment in the Plan Securities for an indefinite period of time.  For further discussion, see Section X ("*Securities Law Matters*") of this Disclosure Statement.

### 8. Market Price for Plan Securities May Be Highly Volatile

~~Although the Plan Securities will be listed on [NASDAQ] for trading, there can be no assurance a trading market is maintained, and the Rollover Exit Notes are a new issue of securities for which there is currently no trading market.  Even if such a market were to exist, the market price for the Plan Securities and Rollover Exit Notes may be highly volatile and could be subject to wide fluctuations and could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors, including, without limitation, prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, New Parent.~~  **Although the Plan Securities will be listed on NASDAQ for trading, there can be no assurance a trading market is maintained, and the Rollover Exit Notes are a new issue of securities for which there is currently no trading market.  Even if such a market were to exist, the market price for the Plan Securities and Rollover Exit Notes may be highly volatile and could be subject to wide fluctuations and could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors, including, without limitation, prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, New Parent.**

In addition, the trading volume of the Plan Securities and Rollover Exit Notes may fluctuate and cause significant price variations to occur.  Volatility in the market price or trading volume of the Plan Securities or Rollover Exit Notes may prevent investors from being able to sell at or above the price they paid to acquire shares of the Plan Securities or Rollover Exit Notes, or at all.  Accordingly, holders of these securities may bear certain risks associated with holding securities for an indefinite period of time.

E.    **Additional Factors**

1.    **The Debtors Could Withdraw the Plan**

Subject to, and without prejudice to, the rights of any party in interest, the Plan may be revoked or withdrawn by the Debtors before the Confirmation Date.

2.    **The Debtors Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  Additionally, the Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

3.    **No Representations Outside This Disclosure Statement Are Authorized**

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

4.    **No Legal or Tax Advice Is Provided by This Disclosure Statement**

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each holder of a Claim or Interest should consult its own legal counsel and accountant as to legal, tax, and other matters concerning its Claim or Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

5.    **No Admission Made**

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or holders of Claims or Interests.  Additionally, nothing contained herein constitutes any corporate approval necessary to effectuate any of the actions contemplated by the Plan, including but not limited to, approvals required by the board of directors for XBP.

## X.
## SECURITIES LAW MATTERS

The Debtors believe that any offers of Plan Securities and Rollover Exit Notes that may be deemed to be made in connection with the solicitation of votes on the Plan, will be exempt from the registration requirements of the Securities Act pursuant to Section 1145 of the Bankruptcy Code or Section 4(a)(2) of the Securities Act (or another available exemption under the Securities Act), as applicable.

## A.  Issuance of 1145 Securities

The Plan provides for the offer, issuance, sale or distribution of shares of Plan Securities to Holders of Allowed April 2026 Notes Claims and Allowed July 2026 Notes Claims (if they vote in favor of the plan in sufficient numbers to carry the class) and to Holders of Administrative Claims on account of the Premiums and Fees.  The Debtors believe that the offer, issuance, sale or distribution by New Parent of Plan Securities, as distributions, among others, on the Allowed April 2026 Notes Claims, Allowed July 2026 Notes Claims and Administrative Claims on account of the Premiums and Fees (as applicable) (collectively, the "*1145 Securities*") will be exempt from registration under section 5 of the Securities Act and under any state or local laws requiring registration for offer or sale of a security pursuant to section 1145(a) of the Bankruptcy Code, except with respect to an entity that is an underwriter as defined in section 1145(b) of the Bankruptcy Code (see below).

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state or local securities laws if three principal requirements are satisfied:  (a) the securities must be offered and sold under a plan of reorganization and must be securities issued by the debtor, an affiliate participating in a joint plan with the debtor, or a successor to the debtor under the plan; (b) the securities must be in exchange for a claim against, an interest in, or a claim for an administrative expense in the case concerning, the debtor or such affiliate; and (c) the securities must be issued entirely in exchange for such a claim or interest, or "principally" in exchange for such claim or interest and "partly" for cash or property.

The issuance of the Plan Securities under the Plan on account of April 2026 Notes Claims, July 2026 Notes Claims and Administrative Claims on account of the Premiums and Fees satisfies the requirements of section 1145(a)(1) of the Bankruptcy Code.

The exemptions of section 1145(a)(1) do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, an interest in, or a claim for an administrative expense against the debtor with a view to distributing any security received in exchange for such claim or interest ("accumulators"); (b) offers to sell securities offered or sold under a plan for the holders of such securities ("distributors"); (c) offers to buy securities offered or sold under a plan from the holders of such securities, if the offer to buy is (i) with a view to distributing such securities and (ii) under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an "issuer" (as defined in section 2(a)(11) of the Securities Act) with respect to the securities.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code includes Persons directly or indirectly controlling, controlled by or under direct or indirect common control with the issuer.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise.  Such Persons are referred to as "affiliates" of the issuer. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be an issuer for these purposes and therefore an underwriter.  In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who receives ten percent or more of a class of securities of a reorganized debtor may be presumed to be in a relationship of

"control" with the reorganized debtor and, therefore, an underwriter, although the staff of the SEC has not taken a position on this view.

## B.     Subsequent Transfers of 1145 Securities

Section 1145(c) of the Bankruptcy Code provides that securities issued pursuant to section 1145(a) are deemed to have been issued in a public offering.  In general, therefore, these securities may be resold without registration under the Securities Act or other federal or state securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is (i) an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code, (ii) is an "affiliate" of the issuer (as defined in rule 144(a)(1) in the Securities Act), or (iii) has been such an "affiliate" within ninety (90) days of such transfer.  In addition, such section 1145 exempt securities may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

To the extent that Persons who receive 1145 Securities pursuant to the Plan are deemed to be underwriters, resales by such Persons of 1145 Securities would not be exempted from registration under the Securities Act or other applicable laws by reason of section 1145 of the Bankruptcy Code and section 4(a)(1) of the Securities Act.  However, Persons deemed to be underwriters may be permitted to resell such 1145 Securities without registration pursuant to the limited safe harbor resale provisions of Rule 144 promulgated under the Securities Act or another available exemption under the Securities Act.

Generally, Rule 144 of the Securities Act permits the public sale of securities if certain conditions are met, including a required holding period, certain current public information regarding the issuer being available, and compliance with applicable volume, manner of sale and notice requirements.  The staff of the SEC has taken the position that Persons who are deemed to be underwriters solely because they are affiliates of a reorganized debtor are not subject to the holding period requirements of Rule 144.  Accordingly, affiliates of New Parent that receive 1145 Securities under the Plan may resell those securities following the Effective Date in reliance on Rule 144, subject to certain current public information regarding the issuer being available, and compliance with the applicable volume, manner of sale and notice requirements.

Whether or not any particular Person would be deemed to be an "underwriter" with respect to the 1145 Securities or any other security to be issued pursuant to the Plan depends upon various facts and circumstances applicable to that Person.  Accordingly, the Debtors express no view as to whether any particular Person receiving 1145 Securities or any other securities under the Plan would be considered an "underwriter" under section 1145(b) of the Bankruptcy Code with respect to such securities, or whether such Person may freely resell such securities or the circumstances under which they may resell such securities.

## C.     Issuance of Private Placement Securities

The Rollover Notes, and any Plan Securities issued to an Entity that is an "underwriter" with respect to such Plan Securities, as that term is defined in section 1145(b) of the Bankruptcy Code (collectively, the "***Private Placement Securities***"), shall be issued in reliance upon Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder and on equivalent state law registration exemptions or, solely to the extent such exemptions are not available, other available exemptions from registration under the Securities Act.

 Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving a public offering are exempt from registration under Section 5 of the Securities Act.

Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under the Securities Act.

The Private Placement Securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act.

Rule 144 provides a limited safe harbor for the public resale of restricted securities if certain conditions are met. These conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer. Rule 144 defines an affiliate of the issuer as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."

A non-affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") and who has not been an affiliate of the issuer during the 90 days preceding such sale may resell restricted securities after a one-year holding period whether or not there is current public information regarding the issuer.

An affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act may resell restricted securities after the one-year holding period if at the time of the sale certain current public information regarding the issuer is available. An affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144.

*Legends.* To the extent certificated or issued by way of direct registration on the records of the issuer's transfer agent, certificates evidencing Private Placement Securities, will bear a legend substantially in the form below (and, in the case of the Rollover Exit Notes, may bear additional legends customary for debt securities issued pursuant to Section 4(a)(2) under the Securities Act):

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON THE EFFECTIVE DATE, HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

New Parent reserves the right to reasonably require certification, legal opinions or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of any such securities. New Parent also reserves the right to stop the transfer of any such securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. All persons who receive such securities will be deemed to acknowledge and agree that they will not offer, sell or otherwise transfer any such securities except in accordance with an exemption from registration, including under Rule 144 under the Securities Act, if and when available, or pursuant to an effective registration statement.

In any case, recipients of securities issued under the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE, SECTION 4(A)(2) UNDER THE SECURITIES ACT, AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.

The Reorganized Debtors intend to cause the Plan Securities (other than the New Parent Warrants), and the Rollover Exit Notes to be eligible for book-entry treatment under the facilities of the Depository Trust Company ("**DTC**").  Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) will be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan under applicable securities laws, including, for the avoidance of doubt, whether the Plan Securities and the Rollover Exit Notes are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

## XI.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The Debtors expect to provide a discussion of certain material U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain Holders of Claims following the filing of the Plan Supplement and the Restructuring Steps Exhibit.  The steps of the Restructuring Transactions remain subject to ongoing analysis and, as noted above, the Plan provides for the commitment of funds to satisfy any Transaction Tax Liability resulting therefrom.

## XII.
## <u>CONCLUSION AND RECOMMENDATION</u>

The Debtors believe the Plan is in the best interests of all stakeholders and urge the Holders of Claims in the Voting Classes to vote in favor thereof.

Respectfully submitted, as of the date first set forth above,

**DocuData Solutions, L.C. (on behalf of itself and all other Debtors)**

By:    */s/ Randall S. Eisenberg*

Name:  Randall S. Eisenberg

Title:   Chief Restructuring Officer of Exela Technologies BPA, LLC, Exela Intermediate LLC, Exela Finance Inc., XCV-EMEA, LLC, and Neon Acquisition, LLC

**EXHIBIT A**

**Plan**

## EXHIBIT B

**Plan Support Agreement**

## EXHIBIT C

**Financial Projections**

**[To come]**

## EXHIBIT D

**Liquidation Analysis**

**[To come]**

## EXHIBIT E

**Valuation Analysis**

**[To come]**

**EXHIBIT F-1**

**Company Organizational Chart**

**EXHIBIT F-2**

**Debtors' Organizational Chart**

**EXHIBIT F-3**

**Debtors' Facilities**

**<u>EXHIBIT G</u>**

**Listing of Debtors**

## EXHIBIT H

~~Percentage Ownership of Intermediate Interests~~**Allocation of New Parent Interests**