**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

```
------------------------------------------------------------ x
                                        :
In re:                                  :    Chapter 11
                                        :
DOCUDATA SOLUTIONS, L.C., et al.,       :    Case No. 25-90023 (CML)
                                        :
          Debtors.¹                     :    (Jointly Administered)
                                        :
------------------------------------------------------------ x
```

**JOINT PLAN OF REORGANIZATION OF DOCUDATA SOLUTIONS, L.C. AND
ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**HUNTON ANDREWS KURTH LLP**
Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Ashley L. Harper (Texas Bar No. 24065272)
Philip M. Guffy (Texas Bar No. 24113705)
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone: (713) 220-4200
Email:   taddavidson@hunton.com
         ashleyharper@hunton.com
         pguffy@hunton.com

**LATHAM & WATKINS LLP**
Ray C. Schrock (NY Bar No. 4860631)
Alexander W. Welch (NY Bar No. 5624861)
Hugh Murtagh (NY Bar No. 5002498)
Adam S. Ravin (NY Bar No. 4079190)
Jonathan J. Weichselbaum (NY Bar No. 5676143)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email:   ray.schrock@lw.com
         alex.welch@lw.com
         hugh.murtagh@lw.com
         adam.ravin@lw.com
         jon.weichselbaum@lw.com

*Co-Counsel for the Debtors and
Debtors in Possession*

Dated:   May 7, 2025
         Houston, Texas

**THIS PLAN REMAINS SUBJECT TO MATERIAL REVISION AND HAS NOT BEEN
APPROVED BY THE BANKRUPTCY COURT.  THIS IS NOT A SOLICITATION OF
ACCEPTANCE OR REJECTION OF THIS PLAN.  ACCEPTANCES OR REJECTIONS MAY
NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE
BANKRUPTCY COURT.  THIS PLAN IS NOT AN OFFER TO SELL ANY SECURITIES AND IS
NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.
.**

---

¹ A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors'
claims and noticing agent at https://omniagentsolutions.com/DocuDataSolutions.  The Debtors' mailing address
for the purposes of these cases is 2701 E. Grauwyler Road, Irving, TX 75061 USA.

# TABLE OF CONTENTS

Article I. DEFINED TERMS AND RULES OF INTERPRETATION.................................................1
    A.      Defined Terms ............................................................................................................1
    B.      Rules of Interpretation .............................................................................................24
    C.      Consent Rights .........................................................................................................25
    D.      Appendices and Plan Supplement ...........................................................................26
    E.      Deemed Acts .............................................................................................................26

Article II. ADMINISTRATIVE CLAIMS, DIP CLAIMS, PRIORITY TAX CLAIMS, OTHER
           PRIORITY CLAIMS, AND UNITED STATES TRUSTEE STATUTORY FEES ...................26
    A.      Administrative Claims ..............................................................................................26
    B.      DIP Claims ...............................................................................................................28
    C.      Premiums and Fees ..................................................................................................28
    D.      Postpetition Securitization Programs Claims ..........................................................28
    E.      Priority Tax Claims ..................................................................................................28
    F.      Other Priority Claims ...............................................................................................29
    G.      United States Trustee Statutory Fees .......................................................................29
    H.      Restructuring Fees and Expenses ............................................................................29
    I.      Post-Effective Date Fees and Expenses ..................................................................29

Article III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS........................30
    A.      Classification of Claims and Interests .....................................................................30
    B.      Treatment of Claims and Interests ...........................................................................31
    C.      Acceptance or Rejection of this Plan .......................................................................35
    D.      Confirmation Pursuant to Section 1129(a)(10) and 1129(b) of the Bankruptcy Code...................36
    E.      Subordinated Claims ................................................................................................36
    F.      Special Provision Governing Unimpaired Claims ...................................................36
    G.      Vacant and Abstaining Classes ................................................................................36
    H.      Controversy Concerning Impairment .......................................................................37
    I.      Intercompany Interests and Intercompany Claims ...................................................37

Article IV. MEANS FOR IMPLEMENTATION OF THIS PLAN ..................................................37
    A.      General Settlement of Claims and Interests .............................................................37
    B.      Restructuring Transactions .......................................................................................37
    C.      Committee Settlement ..............................................................................................38
    D.      Sub-Group DIP Lenders Settlement .........................................................................39
    E.      Corporate Existence .................................................................................................40
    F.      Vesting of Assets in the Reorganized Debtors Free and Clear of Liens and Claims ....................40
    G.      Cancellation of Existing Agreements, Existing BPA Equity Interests, Other Existing
           Equity Interests, and Certain Intercompany Interests...............................................41
    H.      Sources for Plan Distributions and Transfers of Funds Among Debtors ..................43
    I.      Exit Financing Facilities and Exit Facilities Documents ........................................43
    J.      Exit Securitization Programs and Exit Securitization Programs Documents ...........44
    K.      Issuance of Securities ...............................................................................................45
    L.      Exemption from Registration Requirements.............................................................46
    M.      New Organizational Documents ..............................................................................47
    N.      ETI Funding Obligations; Blocked ETI Shares .......................................................48
    O.      Release of Liens and Claims ....................................................................................48
    P.      Exemption from Certain Taxes and Fees .................................................................49
    Q.      New Board ................................................................................................................49
    R.      Preservation of Causes of Action ............................................................................50
    S.      Corporate Action.......................................................................................................50
    T.      Claims Ombudsman .................................................................................................51

U.   Effectuating Documents; Further Transactions.................................................52
V.   Authority of the Debtors ....................................................................................52
W.   No Substantive Consolidation............................................................................52
X.   Continuing Effectiveness of Final Orders.........................................................52
Y.   Modifications to Executory Contracts and Unexpired Leases ...........................52

Article V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES;
EMPLOYEE BENEFITS; AND INSURANCE POLICIES .........................................53
A.   Assumption of Executory Contracts and Unexpired Leases .............................53
B.   Cure of Defaults; Assignment of Executory Contracts and Unexpired Leases............................53
C.   Rejection of Executory Contracts and Unexpired Leases .................................55
D.   Claims on Account of the Rejection of Executory Contracts or Unexpired Leases.................55
E.   Contracts and Leases Entered into After the Petition Date ...............................55
F.   Reservation of Rights.........................................................................................55
G.   Directors and Officers Insurance Policies .........................................................55
H.   Other Insurance Contracts..................................................................................56
I.   Indemnification Provisions and Reimbursement Obligations ...........................56
J.   Employee Compensation and Benefits ..............................................................57

Article VI. PROVISIONS GOVERNING DISTRIBUTIONS .............................................57
A.   Timing and Calculation of Amounts to Be Distributed ....................................57
B.   Special Rules for Distributions to Holders of Disputed Claims .......................58
C.   Rights and Powers of Distribution Agent ..........................................................58
D.   Delivery of Distributions ...................................................................................58
E.   Compliance with Tax Requirements; Allocations.............................................60
F.   Applicability of Insurance Contracts.................................................................61
G.   Allocation of Distributions Between Principal and Interest ..............................61
H.   No Postpetition Interest on Claims ....................................................................62
I.   Means of Cash Payment.....................................................................................62
J.   Setoffs and Recoupment ....................................................................................62
K.   Claims Paid or Payable by Third Parties ...........................................................62

Article VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
DISPUTED CLAIMS ..................................................................................................63
A.   Allowance and Disallowance of Claims ............................................................63
B.   Claims Administration Responsibilities.............................................................63
C.   Adjustment to Claims or Interests without Objection .......................................64
D.   No Distributions Pending Allowance ................................................................64
E.   Distributions After Allowance ...........................................................................64

Article VIII. CONDITIONS PRECEDENT TO THE OCURRENCE OF THE EFFECTIVE DATE......................64
A.   Conditions Precedent to the Occurrence of the Effective Date .........................64
B.   Timing of Conditions Precedent ........................................................................66
C.   Waiver of Conditions .........................................................................................66
D.   Effect of Non-Occurrence of Conditions to the Effective Date ........................66
E.   Substantial Consummation .................................................................................66

Article IX. DISCHARGE, RELEASE, INJUNCTION, AND RELATED PROVISIONS .........................67
A.   Discharge of Claims and Termination of Interests.............................................67
**B.   Releases by the Debtors** ....................................................................................**67**
**C.   Releases by Holders of Claims and Interests** ................................................**69**
**D.   Exculpation** .........................................................................................................**70**
**E.   Permanent Injunction** ........................................................................................**71**
**F.   SEC Reservation of Rights** ..............................................................................**72**

Article X. RETENTION OF JURISDICTION ...........................................................................72

Article XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN ............................................... 74
    A.      Modification of Plan ................................................................................................... 75
    B.      Effect of Confirmation on Modifications ................................................................... 75
    C.      Revocation of Plan; Reservation of Rights if Effective Date Does Not Occur ........... 75

Article XII. MISCELLANEOUS PROVISIONS ................................................................................. 75
    A.      Immediate Binding Effect ........................................................................................... 75
    B.      Additional Documents ................................................................................................ 76
    C.      Payment of United States Trustee Statutory Fees ...................................................... 76
    D.      Statutory Committee ................................................................................................... 76
    E.      Reservation of Rights ................................................................................................. 76
    F.      Successors and Assigns ............................................................................................... 77
    G.      No Successor Liability ................................................................................................ 77
    H.      Service of Documents ................................................................................................. 77
    I.      Term of Injunctions or Stays ...................................................................................... 78
    J.      Entire Agreement ........................................................................................................ 78
    K.      Governing Law ........................................................................................................... 78
    L.      Exhibits ...................................................................................................................... 79
    M.      Nonseverability of Plan Provisions upon Confirmation ............................................ 79
    N.      Closing of Chapter 11 Cases ...................................................................................... 79
    O.      Conflicts ..................................................................................................................... 79
    P.      No Strict Construction ................................................................................................ 79
    Q.      Section 1125(e) Good Faith Compliance ................................................................... 80
    R.      2002 Notice Parties .................................................................................................... 80

**JOINT PLAN OF REORGANIZATION OF DOCUDATA SOLUTIONS, L.C. AND
ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

DocuData Solutions, L.C. and each of the other debtors and debtors-in-possession in the above-captioned cases (collectively, the "***Debtors***") propose this Plan (as defined herein) for the treatment and resolution of the outstanding Claims against, and Interests in, the Debtors.  Capitalized terms used in this Plan and not otherwise defined have the meanings ascribed to such terms in Article I.A.

Although proposed jointly for administrative purposes, this Plan constitutes a separate Plan for each Debtor for the treatment and resolution of outstanding Claims and Interests herein pursuant to the Bankruptcy Code.  The Debtors seek to consummate the Restructuring Transactions on the Effective Date of this Plan.  Each Debtor is a proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.  The classifications of Claims and Interests set forth in Article III shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable.  This Plan does not contemplate substantive consolidation of any of the Debtors.

This Plan shall be deemed a motion to approve the good-faith compromises and settlements of all Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, including the Committee Settlement and the Sub-Group DIP Lenders Settlement.

Reference is made to the Disclosure Statement for a discussion of the Debtors' history, businesses, results of operations, historical financial information, projections, and future operations, as well as a summary and analysis of this Plan and certain related matters, including distributions to be made under this Plan.  There also are other agreements and documents, which shall be Filed with the Bankruptcy Court, that are referenced in this Plan, the Plan Supplement, or the Disclosure Statement as exhibits and schedules.  All such exhibits and schedules are incorporated into and are a part of this Plan as if set forth in full herein.  Subject to certain restrictions and requirements set forth in 11 U.S.C. § 1127, Fed. R. Bankr. P. 3019, and the terms and conditions set forth in the Plan Support Agreement and this Plan, the Debtors reserve the right to alter, amend, modify, revoke, or withdraw this Plan before its substantial consummation.

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THIS PLAN ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.**

**Article I.
DEFINED TERMS AND RULES OF INTERPRETATION**

A.    *Defined Terms*

The following terms shall have the following meanings when used in capitalized form herein:

1.      "***Administrative Claim***" means a Claim for costs and expenses of administration under sections 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Professional Fee Claims, to the extent Allowed by the Bankruptcy Court; (c) all fees and charges assessed against the Estates under chapter 123 of title 28 United States Code, 28 U.S.C. §§ 1911-1930; (d) Cure Claims; (e) Restructuring Fees and Expenses, in accordance with the Plan Support Agreement or the DIP Orders, as applicable; and (f) the Premiums and Fees; *provided*, that the foregoing clauses (a) through (f) shall not be interpreted as enlarging the scope of sections 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code.  For the purposes of treatment and distributions under this Plan, if the Plan Support Agreement remains effective, the DIP Claims shall be subject to Article II.B.

2.      "*Affiliate*" means, with respect to any Entity, all Entities that would fall within the definition of an "affiliate" as such term is defined in section 101(2) of the Bankruptcy Code.  With respect to any Entity that is not a Debtor, the term "Affiliate" shall apply to such Entity as if the Entity were a Debtor.

3.      "*Allowed*" means with respect to any Claim or Interest (or any portion thereof): (a) any Claim or Interest that has been listed by the Debtors in their Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not "disputed" or "contingent," and with respect to which no contrary Proof of Claim or proof of Interest has been timely Filed as to which no objection or request for estimation has been Filed on or before the Claims Objection Deadline or the expiration of such other applicable period fixed by the Bankruptcy Court; (b) any Claim or Interest that is evidenced by a Proof of Claim or proof of Interest Filed by the applicable Claims Bar Date as to which no objection or request for estimation has been Filed on or before the Claims Objection Deadline or the expiration of such other applicable period fixed by the Bankruptcy Court; (c) any Claim of Interest as to which any objection has been settled, waived, withdrawn, or denied by a Final Order; (d) any Claim or Interest that is allowed (i) by a Final Order, (ii) by an agreement between the Holder of such Claim or Interest and the Debtors prior to the Effective Date, or the Reorganized Debtors on or after the Effective Date or (iii) pursuant to the terms of this Plan; or (e) any General Administrative Claim that is evidenced by a request for payment Filed on or before the General Administrative Claims Bar Date and to which no objection has been Filed on or before the General Administrative Claims Objection Deadline or as to which any objection has been settled, waived, withdrawn, or denied by a Final Order; *provided*, that, Holders of General Administrative Claims that arise in the ordinary course of the Debtors' businesses during the Chapter 11 Cases shall not be required to File a request for payment and the Debtors and the Holders of such General Administrative Claims shall retain all rights and defenses in connection with such General Administrative Claims.  Notwithstanding the foregoing: (x) any Claim or Interest that is expressly disallowed pursuant to this Plan shall not be Allowed unless otherwise ordered by the Bankruptcy Court; (y) unless otherwise specified in this Plan, the Allowed amount of Claims shall be subject to and shall not exceed the limitations under or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable; and (z) the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are reinstated or otherwise Unimpaired pursuant to this Plan.  "Allow," "Allows," and "Allowing" shall have correlative meanings.

4.      "*April 2026 Notes*" means Exela Intermediate LLC's and Exela Finance Inc.'s 11.500% First-Priority Senior Secured Notes due 2026 issued pursuant to the April 2026 Notes Indenture.

5.      "*April 2026 Notes Claim*" means any Claim on account of, arising under, derived from, or based on the April 2026 Notes Indenture, including any Claim for principal amounts outstanding, accrued and unpaid interest (including any compounding), fees, expenses, costs, indemnification, and other amounts arising under, derived from, related to, or based on the April 2026 Notes Documents.

6.      "*April 2026 Notes Collateral Agent*" means Wilmington Savings Fund Society, FSB, solely in its capacity as collateral agent under or in connection with the April 2026 Notes Documents or, as applicable, any successors, assignees, or delegees thereof.

7.      "*April 2026 Notes Deficiency Claim*" means, to the extent that any April 2026 Notes Claim is undersecured, a General Unsecured Claim equal to the difference in value between the full amount of such April 2026 Notes Claim and the value of the collateral securing such April 2026 Notes Claim.

8.      "*April 2026 Notes Documents*" means the April 2026 Notes Indenture together with all other related documents, instruments, and agreements, in each case as supplemented, amended, restated, or otherwise modified from time to time.

9.       "*April 2026 Notes Indenture*" means that certain indenture governing the April 2026 Notes dated as of July 11, 2023, among Exela Intermediate LLC, Exela Finance Inc., the guarantors and affiliated guarantors party thereto, and U.S. Bank Trust Company, National Association, as trustee.

10.       "*April 2026 Notes Indenture Trustee*" means U.S. Bank Trust Company, National Association solely in its capacity as trustee under or in connection with the April 2026 Notes Documents or, as applicable, any successors, assignees, or delegees thereof.

11.       "*Assumed Employee Agreements*" means all existing employment agreements between the Debtors and employees of the Debtors as of the Petition Date (other than awards of stock options, restricted stock, restricted stock units, and other equity awards, equity or equity-based incentive plans, employee stock purchase plans, and any other agreements or awards).

12.       "*Assumed Related Parties Contracts List*" means the list of Related Parties Contracts (including any amendments or modifications thereto) that shall be assumed pursuant to this Plan, which list shall be Filed with the Plan Supplement.

13.       "*Avenue*" means Avenue Capital Group on behalf of its Affiliates, subsidiaries, and certain managed funds and accounts.

14.       "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or similar actions or remedies that may be brought by or on behalf of the Debtors or the Estates under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies arising under chapter 5 and section 724(a) of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws, fraudulent conveyance laws, or other similar related laws, in each case whether or not litigation to prosecute such Claim(s) and Cause(s) of Action was commenced prior to the Effective Date.

15.       "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Cases.

16.       "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division, or such other court having jurisdiction over the Chapter 11 Cases.

17.       "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, the Federal Rules of Civil Procedure, as applicable to the Chapter 11 Cases or any proceedings therein, and the general, local, and chambers rules of the Bankruptcy Court, in each case as amended from time to time and as applicable to the Chapter 11 Cases.

18.       "*Blocked ETI Shares*" has the meaning set forth in Article IV.N.

19.       "*Blocked ETI Shares Documentation*" has the meaning set forth in Article IV.N.

20.       "*Blue Torch*" means Blue Torch Finance LLC, in its capacity as administrative agent and collateral agent under the Prepetition Term Loan Financing Agreement or, as applicable, any successors, assignees, or delegees thereof.

21.       "*Blue Torch Advisors*" means (a) Paul Hastings LLP as legal advisor and (b) any other professionals or advisors retained by Blue Torch with the prior written consent of the Debtors (not to be unreasonably withheld).

22.     "***Blue Torch Super Senior Exit Facility***" means any financing agreement the Reorganized Debtors enter into with Blue Torch Finance, LLC, if any.

23.     "***BPA***" means Debtor Exela Technologies BPA, LLC.

24.     "***BTC***" means BTC International Holdings, Inc..

25.     "***BTC Distribution Shares***" means all of the Interests of XBP held by BTC as of March 25, 2025.

26.     "***BTC Transaction***" means, as set forth in the Restructuring Steps Exhibit, a series of stock transfers, combinations, contributions, mergers, and/or transactions involving both Debtors and non-Debtor Entities whereby the BTC Distribution Shares are contributed, distributed, or cancelled and reissued Pro Rata to the Holders of Exchanged New Parent Interests (after giving effect to the Exchanged Equity Dilution) as of the Effective Date.  For the avoidance of doubt, except with respect to resales by an Entity that is an "Underwriter" under section 1145(b) of the Bankruptcy Code, the BTC Distribution Shares are intended to be exempt from registration as provided by section 1145(a) of the Bankruptcy Code.

27.     "***Business Day***" means any day, other than a Saturday, Sunday, or "legal holiday" (as that term is defined in Bankruptcy Rule 9006(a)), on which commercial banks are open for commercial business with the public in New York City, New York.

28.     "***Cash***" means the legal tender of the United States of America or the equivalent thereof.

29.     "***Cash Collateral***" has the meaning set forth in section 363(a) of the Bankruptcy Code.

30.     "***Causes of Action***" means any action, Claim, cross-claim, third-party claim, cause of action, controversy, dispute demand, right, Lien, indemnity, contribution, interest, guaranty, suit, obligation, liability, lost, debt, fee or expense, damage, judgment, account, defense, offset, power, privilege, proceeding, franchise, remedy, and license of any kind or character whatsoever, whether known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, as applicable, in contract or in tort, in law (whether local, state, or federal U.S. or non-U.S. law) or in equity, or pursuant to any other theory of local, state, or federal U.S. or non-U.S. law.  For the avoidance of doubt, "Causes of Action" include: (a) any right of setoff, counterclaim, or recoupment; (b) any Claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, actual or constructive fraudulent transfer or fraudulent conveyance or voidable transaction or similar law, violation of local, state, or federal or non-U.S. law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code or similar local, state, or federal U.S. or non-U.S. law; (d) any Claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any Avoidance Actions relating to or arising from any state or foreign law pertaining to any Avoidance Action, including preferential transfer, actual or constructive fraudulent transfer, fraudulent conveyance, or similar Claim; (f) the right to object to or otherwise contest Claims or Interests; and  (g) any "lender liability" or equitable subordination Claims or defenses.

31.     "***Chapter 11 Cases***" means (a) when used with reference to a particular Debtor, the voluntary case Filed for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the jointly administered chapter 11 cases for all of the Debtors.

32.    "***Claim***" means any claim, as defined in section 101(5) of the Bankruptcy Code.  Except where otherwise provided in context, "Claim" refers to such a claim against any of the Debtors.

33.    "***Claims Bar Date***" means the applicable deadline by which Proofs of Claim must be Filed under the Claims Bar Date Order.

34.    "***Claims Bar Date Order***" means the *Order (I) Establishing (A) Bar Dates and (B) Related Procedure for Filing Proofs of Claim, (II) Approving the Form and Manner of Notice Thereof and (III) Granting Related Relief* [Docket No. 434].

35.    "***Claims Objection Deadline***" means the date that is ninety (90) days after the Effective Date, which date may be extended pursuant to an order of the Bankruptcy Court upon a motion Filed by the Reorganized Debtors.

36.    "***Claims Ombudsman***" means the individual selected by the Committee and appointed by the Debtors in accordance with Article IV.T of this Plan.

37.    "***Claims Register***" means the official register of Claims and Interests maintained by the Notice and Claims Agent.

38.    "***Class***" means a category of Claims or Interests as set forth in Article III pursuant to section 1122(a) of the Bankruptcy Code.

39.    "***Committee***" means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the United States Trustee.

40.    "***Committee Professional Fees and Indenture Trustee Fees***" means the reasonable and documented fees, costs, and out-of-pocket expenses of the Committee Professionals, subject to a cap of $2,750,000.00 *less* amounts paid to the July 2026 Notes Indenture Trustee, *plus* amounts allocated by agreement between the Debtors and the Committee from (a) the Unsecured Cash Pool or (b) funds otherwise allocable to increase the Convenience Claim recoveries.

41.    "***Committee Professionals***" means (a) McDermott Will & Emery LLP; (b) Brown Rudnick LLP; and (c) FTI Consulting, Inc.

42.    "***Committee Settlement***" means the settlement reached among the Debtors, the Committee, and the Consenting Stakeholders pursuant to rule 9019 of the Bankruptcy Rules, the terms of which are set forth in Article IV.C and embodied in this Plan.

43.    "***Compensation and Benefits Programs***" means all employment, confidentiality, and non-competition agreements, bonus, gainshare, and incentive programs (other than awards of equity interests, stock options, restricted stock, restricted stock units, warrants, rights, convertible, exercisable, or exchangeable securities, stock appreciation rights, phantom stock rights, redemption rights, profits interests, equity-based awards, or contractual rights to purchase or acquire equity interest at any time and all rights arising with respect thereto), vacation, holiday pay, severance, retirement, savings, supplemental retirement, executive retirement, pension, deferred compensation, medical, dental, vision, life and disability insurance, flexible spending account, and other health and welfare benefit plans, employee expense reimbursement, and other compensation and benefit obligations of the Debtors, and all amendments and modifications thereto, applicable to the Debtors' employees, former employees, retirees, and non-employee directors and the employees, former employees, and retirees of their subsidiaries.

44. "*Confirmation*" means the entry of the Confirmation Order or any Final Order Confirming this Plan entered by the Bankruptcy Court on the docket of the Chapter 11 Cases.

45. "*Confirmation Date*" means the date on which Confirmation occurs.

46. "*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court regarding Confirmation of this Plan pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code.

47. "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, as such order may be amended, supplemented, or modified from time to time.

48. "*Consenting Creditor Ad Hoc Group*" means that certain ad hoc group of Holders of outstanding April 2026 Notes Claims that are represented by the Consenting Creditor Ad Hoc Group Advisors.

49. "*Consenting Creditor Ad Hoc Group Advisors*" means Ropes & Gray LLP, SOLIC Capital Advisors, LLC and such other professional advisors as are retained by the Consenting Creditor Ad Hoc Group with the prior written consent of the Debtors.

50. "*Consenting Creditors*" means Holders of certain of the outstanding April 2026 Notes Claims or July 2026 Notes Claims that have executed and delivered counterpart signature pages to the Plan Support Agreement, or signature pages to a Joinder or Transfer Agreement (as applicable), to counsel to the Debtors, counsel to the Consenting Creditors, and counsel to the Consenting ETI Parties, in their capacities as parties to the Plan Support Agreement.

51. "*Consenting ETI Parties*" means, collectively, ETI, GP 3XCV LLC, XCV-STS, LLC, and any of their respective successors and assigns in their capacities as Holders of April 2026 Notes Claims.

52. "*Consenting ETI Party Advisors*" means (a) Cleary Gottlieb Steen & Hamilton LLP as legal advisor and (b) any other professionals or advisors retained by the Consenting ETI Parties with the prior written consent of the Debtors (not to be unreasonably withheld).

53. "*Consenting Stakeholders*" means, collectively, the Consenting Creditors, the Consenting ETI Parties, and the Individual Owners.

54. "*Convenience Claim*" means any Claim that would otherwise be a General Unsecured Claim that is (a) Allowed in the amount of $25,000 or less or (b) irrevocably reduced (and liquidated, if applicable) to $25,000 at the election of the Holder of an Allowed General Unsecured Claim evidenced on the election form timely and validly submitted by such Holder; *provided*, that a General Unsecured Claim may not be subdivided into multiple Claims of $25,000 or less for purposes of receiving treatment as a Convenience Claim; *provided*, *further*, that to the extent that a Holder of a Convenience Claim against a Debtor holds any joint and several liability claims, guaranty claims, or other similar claims against any other Debtors arising from or relating to the same obligations or liability as such Convenience Claim, such Holder shall only be entitled to a distribution on one Convenience Claim against the Debtors in full and final satisfaction of all such Claims.

55. "*Cure Claim*" means any and all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be

agreed upon by the parties under an Executory Contract or Unexpired Lease) that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

56.     "***D&O Insurance Policies***" means, collectively, all insurance policies (including any "tail coverage" and all agreements, documents, or instruments related thereto) issued at any time to, or providing coverage to, any of the Debtors or any of the Debtors' current or former directors, members, managers, or officers for alleged "Wrongful Acts" (as defined in the D&O Insurance Policies), or similarly defined triggering acts, in their capacity as such.

57.     "***Debtor Release***" means the releases set forth in Article IX.B.

58.     "***Debtors***" has the meaning set forth in the preamble to this Plan.

59.     "***Definitive Documents***" means all of the definitive documents necessary to implement the Restructuring Transactions set forth in Section 3.01 of the Plan Support Agreement or the transactions set forth on the Restructuring Steps Exhibit and, in each case, any amendments, modifications, and supplements thereto and any related notes, certificates, agreements, documents, and instruments (as applicable), including: (a) this Plan and all documentation necessary to consummate this Plan, including the Plan Supplement, the Disclosure Statement, the Solicitation Procedures Motion, the Solicitation Procedures Order, the Solicitation Materials, and the Confirmation Order (including any exhibits or supplements Filed with respect to each of the foregoing); (b) the DIP Documents; (c) the Exit Facilities Documents; (d) the Exit Securitization Programs Documents; (e) the New Organizational Documents; (f) the Restructuring Steps Exhibit; (g) the Registration Rights Agreement; (h) the XBP Transaction Documents; (i) the New Parent Warrants Agreement; (j) the Rejected Executory Contract/Unexpired Lease List; (k) the Schedule of Retained Causes of Action; (l) the Assumed Related Parties Contracts List; (m) the Blocked ETI Shares Documentation; and (n) all other customary documents delivered in connection with transactions of this type (including any and all material documents, Bankruptcy Court or other judicial or regulatory orders, amendments, supplements, pleadings (including the First Day Pleadings and all orders sought pursuant thereto), motions, Filings, exhibits, schedules, appendices, or modifications to any of the foregoing and any related notes, certificates, agreements, and instruments (as applicable) necessary to implement the Restructuring Transactions).

60.     "***DIP Agent***" means Ankura Trust Company, LLC, as the collateral agent and administrative agent under the DIP Credit Agreement or, as applicable, any successors, assignees, or delegees thereof.

61.     "***DIP Backstop Commitment Letter***" means that certain Senior Secured Superpriority Priming Debtor-in-Possession and Exit Financing DIP Backstop Commitment Letter, dated as of March 3, 2025, among the DIP Backstop Commitment Parties, Exela Finance, Inc. and Exela Intermediate LLC.

62.     "***DIP Backstop Commitment Parties***" means the DIP Backstop Commitment Parties as defined in the DIP Backstop Commitment Letter.

63.     "***DIP Backstop Premium***" means (a) to the extent the Effective Date occurs prior to the maturity or earlier acceleration or other date on which all amounts under the DIP Facility become due and payable, 5.00% of each of (i) the Exchanged New Parent Interests issued and outstanding on the Effective Date, to be issued to the DIP Backstop Commitment Parties in accordance with the DIP Backstop Commitment Letter on the Effective Date and (ii) the BTC Distribution Shares or (b) to the extent the DIP Facility matures, is accelerated, or all amounts thereunder become due and payable, prior to the Effective Date, $4,000,000 payable in Cash to the DIP Backstop Commitment Parties, in each case in accordance with the DIP Backstop Commitment Letter.

64.     "*DIP Claim*" means any Claim arising from, under, or in connection with the DIP Credit Agreement or any other DIP Documents, including Claims for the aggregate outstanding principal amount of, plus unpaid interest on, the DIP Obligations, and all fees, and other expenses related thereto and arising and payable under the DIP Facility.

65.     "*DIP Credit Agreement*" means that certain Superpriority Priming Debtor-in-Possession Financing Agreement by and among the Debtors, the DIP Agent, and the DIP Lenders, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof.

66.     "*DIP Documents*" means the "Loan Documents" as defined in the DIP Credit Agreement, in each case as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof prior to the Effective Date.

67.     "*DIP Facility*" means the debtor-in-possession term loan credit facility provided by the DIP Lenders under the DIP Credit Agreement.

68.     "*DIP Lenders*" means the lenders with respect to the DIP Facility.

69.     "*DIP Obligations*" means all obligations arising under the DIP Documents, including the New Money Loans and Roll-Up Loans.

70.     "*DIP Orders*" means, together, the Interim DIP Order and Final DIP Order.

71.     "*Disclosure Statement*" means the disclosure statement for this Plan, including all exhibits and schedules thereto, as amended, supplemented, or modified from time to time, that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable law.

72.     "*Disinterested Director*" means Alan Carr, a disinterested director of Exela Intermediate LLC.

73.     "*Disputed*" means, with respect to any Claim or Interest, except as otherwise provided herein, a Claim or Interest that is not yet Allowed, but has not yet been disallowed pursuant to this Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court or other court of competent jurisdiction.

74.     "*Distribution Agent*" means the Reorganized Debtors or any party designated by the Debtors or the Reorganized Debtors to serve as distribution agent under this Plan, or, as applicable, any successors, assignees, or delegees thereof.

75.     "*Distribution Agent Agreement*" means any applicable agreement setting forth the powers, obligations, and compensation of a Distribution Agent.

76.     "*Distribution Record Date*" means, other than with respect to publicly held securities, the date for determining which Holders of Claims are eligible to receive distributions under this Plan on account of Allowed Claims, which date shall be the Confirmation Date or such other date agreed to by the Debtors, the Required Consenting Creditors and the Consenting ETI Parties, subject to Article VIII.

77.     "*DTC*" means the Depository Trust Company or any successor thereto.

78.    "***Effective Date***" means the date on which all conditions specified in <u>Article VIII.A</u> have been (a) satisfied or (b) waived pursuant to <u>Article VIII.C</u>.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

79.    "***Entity***" means an entity as defined in section 101(15) of the Bankruptcy Code.

80.    "***ER3 Securitization Program***" means that certain securitization program governed by various documents, including that certain *Amended and Restated Receivables Purchase Agreement*, dated as of June 17, 2022 (as amended, modified, or supplemented from time to time), by and among non-Debtor Receivables 3, as seller, ETI, as initial servicer, PNC Bank, National Association, as administrative agent, PNC Capital Markets, LLC, as structuring agent, and the purchasers party thereto.

81.    "***Estate***" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

82.    "***ETI***" means Exela Technologies, Inc.

83.    "***ETI Equity Distribution***" means (a) the ETI Split Percentage of the Exchanged New Parent Interests, *plus* (b) the New Parent Warrants, *plus* (c) the ETI Split Percentage of the BTC Distribution Shares.

84.    "***ETI Funding Obligations***" means, collectively, the Initial ETI Funding Obligations and the Subsequent ETI Funding Obligation.

85.    "***ETI Holders***" means the Consenting ETI Parties, other than ETI, and any of their respective successors and assigns with respect to the April 2026 Notes Claims.

86.    "***ETI Penalty***" means, in the event that neither (a) both (i) a commitment for the XBP Funding Requirement is obtained on or prior to the deadline to object to entry of the Confirmation Order (as it may be extended or adjourned) and (ii) the XBP Funding has occurred on or prior to the Effective Date, nor (b) the XBP Alternative Funding has occurred on or prior to the Effective Date, then the ETI Split Percentage shall be reduced by 15% and the Non-ETI Split Percentage shall be increased by 15%.  For example, in the event the ETI Penalty is triggered, assuming no Exchanged Equity Dilution, the ETI Split Percentage would be decreased from 27.5% to 12.5%, and the Non-ETI Split Percentage would be increased from 72.5% to 87.5%.

87.    "***ETI Pro Rata Share***" means, with respect to the ETI Equity Distribution on account of an Allowed Claim, the ratio (expressed in a percentage) that the amount of such Allowed Claim bears to the aggregate amount of all Allowed Claims in its Class that are held by ETI or ETI Holders.

88.    "***ETI Split Percentage***" means, subject to the Exchanged Equity Dilution, 27.5%, subject to (a) Pro Rata reduction (along with the Non-ETI Split Percentage) by the July 2026 Noteholder Split Percentage and (b)  reduction on account of the ETI Penalty (if any).

89.    "***Exchanged Equity Dilution***" means, with respect to Exchanged New Parent Interests, dilution on account of the Premiums and Fees and the New Parent Warrants; *provided*, that for the avoidance of doubt, with respect to distributions of Exchanged New Parent Interests and BTC Distribution Shares contemplated to occur on the Effective Date, no dilutive effect will be given on the Effective Date on account of the New Parent Warrants and any New Parent Interests issuable upon the exercise thereof.

90.     "***Exchanged New Parent Interests***" means New Parent Interests, in the aggregate, equal to the value of the sum of (a) 100% of the Intermediate Interests; (b) NEON Acquisition, LLC; and (c) Reaktr, LLC as set forth on Exhibit H to the Disclosure Statement.

91.     "***Exculpated Parties***" means, collectively:  (a) the Debtors; (b) the Disinterested Director; and (c) the Committee and each member of the Committee.

92.     "***Executory Contract***" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code, other than an Unexpired Lease.

93.     "***Existing BPA Equity Interest***" means any Interest in BPA, all of which are 100% owned by ETI.

94.     "***Exit Debt***" means (a) the Rollover Exit Notes and (b) the indebtedness issued under the Supplemental Exit Facility.

95.     "***Exit Facilities***" means, collectively, the Rollover Exit Facility and the Supplemental Exit Facility.

96.     "***Exit Facilities Documents***" means, collectively, the Rollover Exit Facility Documents and the Supplemental Exit Facility Documents.

97.     "***Exit Financing Facilities Agents***" means the administrative agents and collateral agents or the indenture trustees and collateral agents, as applicable, pursuant to the Exit Facilities.

98.     "***Exit Securitization Programs***" means (a) one or more Postpetition Securitization Programs amended, extended or otherwise modified if and to the extent agreed in writing by the parties to the Postpetition Securitization Programs and/or (b) other alternative exit financing (if any) to refinance all or a portion of the Postpetition Securitization Programs.

99.     "***Exit Securitization Programs Documents***" means the agreements, guarantee, security agreements, deed of trust, mortgage, control agreements, instruments, and other documents to be delivered or entered into in connection with the Exit Securitization Programs.

100.    "***Federal Judgment Rate***" means the federal judgment interest rate in effect pursuant to 28 U.S.C. § 1961 as of the Petition Date, compounded annually.

101.    "***File***" or "***Filed***" or "***Filing***" means file, filed, or filing, respectively, with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

102.    "***Final DIP Order***" means the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 397].

103.    "***Final Order***" means an order entered by the Bankruptcy Court or other court of competent jurisdiction: (a) that has not been reversed, stayed, modified, amended, or revoked, and as to which (i) any right to appeal or seek leave to appeal, certiorari, review, reargument, stay, or rehearing has been waived or (ii) the time to appeal or seek leave to appeal, certiorari, review, reargument, stay, or rehearing has expired and no appeal, motion for leave to appeal, or petition for certiorari, review, reargument, stay, or

rehearing is pending or (b) as to which an appeal has been taken, a motion for leave to appeal, or petition for certiorari, review, reargument, stay, or rehearing has been filed and (i) such appeal, motion for leave to appeal or petition for certiorari, review, reargument, stay, or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which leave to appeal, certiorari, review, reargument, stay, or rehearing was sought and (ii) the time to appeal (in the event leave is granted) further or seek leave to appeal, certiorari, further review, reargument, stay, or rehearing has expired and no such appeal, motion for leave to appeal, or petition for certiorari, further review, reargument, stay, or rehearing is pending; *provided*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not preclude such order from being a Final Order.

104.    "***Final Securitization Order***" means the *Final Order (I) Authorizing Certain Debtors to Continue Selling, Contributing, and Servicing Receivables and Related Assets Pursuant to the Securitization Program, (II) Modifying the Automatic Stay, and (III) Granting Related Relief* [Docket No. 303].

105.    "***First Day Pleadings***" means any petition, motion, application, or proposed order Filed at the commencement of the Chapter 11 Cases.

106.    "***Gates***" means Gates Capital Management, Inc on behalf of its Affiliates, subsidiaries, and certain managed funds and accounts.

107.    "***Gates Backstop Commitment***" means a commitment by Gates to backstop the funding of the remaining 49.99% of Cash under the Gates Exit Facility required to repay the Prepetition Term Loan Facility, subject to a Pro Rata, dollar-for-dollar reduction to the extent the Projected Emergence Liquidity exceeds $35,000,000 and such excess Cash is used to pay down the Prepetition Term Loan Facility.

108.    "***Gates Backstop Premium***" means, in exchange for the Gates Funding Commitment and Gates Backstop Commitment, a fee equal to 4% of each of (a) the Exchanged New Parent Interests and (b) the BTC Distribution Shares, which fee shall be payable to Gates on the Effective Date.

109.    "***Gates Exit Facility***" means the exit financing facility to be provided on the terms and conditions set forth in the term sheet Filed at Docket No. 401-1, consisting of the Gates Backstop Commitment and the Gates Funding Commitment, and which shall also consist of (a) $6,000,000 to repay DIP Claims of Sub-Group DIP Lenders under the Interim DIP Order and (b) an uncommitted $10,000,000 incremental facility as provided for under the Prepetition Term Loan Facility.

110.    "***Gates Funding Commitment***" means a commitment by Gates to fund 50.01% of the Cash under the Gates Exit Facility required to repay the Prepetition Term Loan Facility, subject to a Pro Rata, dollar-for-dollar reduction to the extent the Projected Emergence Liquidity exceeds $35,000,000 and such excess Cash is used to pay down the Prepetition Term Loan Facility.

111.    "***General Administrative Claim***" means any Administrative Claim, other than a Professional Fee Claim, a Claim for Restructuring Fees and Expenses (in accordance with the Plan Support Agreement or the DIP Orders, as applicable), a DIP Claim, a Postpetition Securitization Claim, a Claim for the Premiums and Fees, or a Claim for fees and charges assessed against the Estates under chapter 123 of title 28 United States Code, 28 U.S.C. §§ 1911-1930.

112.    "***General Administrative Claims Bar Date***" means the Business Day that is thirty (30) days after the Effective Date, or such other date as approved by Final Order of the Bankruptcy Court, which shall be the deadline to File requests for payment of General Administrative Claims.

113.    "*General Administrative Claims Objection Deadline*" means the Business Day that is 60 days after the Effective Date; *provided* that the General Administrative Claims Objection Deadline may be extended pursuant to an order of the Bankruptcy Court upon a motion Filed by the Reorganized Debtors after notice and a hearing.

114.    "*General Unsecured Claim*" means a prepetition Claim that is not secured by a Lien on property in which one of the Debtors' Estates has an interest that is not: (a) a Convenience Claim; (b) an Intercompany Claim; (c) an Other Priority Claim; (d) a Priority Tax Claim; (e) a July 2026 Notes Claim; or (f) a Subordinated Claim; *provided*, that pursuant to the Committee Settlement, the April 2026 Notes Deficiency Claims, if any, shall be waived and obtain no recovery on account of such April 2026 Notes Deficiency Claims.

115.    "*Governance Term Sheet*" means the term sheet setting forth the preliminary material terms in respect of the corporate governance of New Parent, including all exhibits and schedules thereto, as it may be altered, amended, modified, or supplemented from time to time.

116.    "*Governmental Unit*" means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

117.    "*Holder*" means any Entity that is the record or beneficial owner of any Claim or Interest, including any nominees, investment managers, investment advisors, sub-advisors, or managers of funds or discretionary accounts that hold, or trustees of trusts that hold, any Claim or Interest.

118.    "*Impaired*" means, with respect to any Claim or Interest, a Claim or Interest that is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

119.    "*Indemnification Provisions*" means each of the Debtors' indemnification provisions in effect as of the Petition Date, whether in the Debtors' memoranda and articles of association, bylaws, limited liability company agreements, operating agreements, certificates of incorporation, certificates of formation, other formation documents, board resolutions, management or indemnification agreements, employment contracts, or otherwise providing a basis for any obligation of a Debtor to indemnify, defend, reimburse, or limit the liability of, or to advance fees and expenses to, any of the Debtors' current and former directors, officers, equity holders, managers, members, employees, accountants, investment bankers, attorneys, and other professionals of the Debtors, and each of the foregoing solely in their capacity as such.

120.    "*Indenture Trustees*" means, collectively, the April 2026 Notes Indenture Trustee and the July 2026 Notes Indenture Trustee.

121.    "*Independent Tax Advisor*" means Ernst & Young.

122.    "*Individual Owners*" means, collectively, Par Chadha (in his capacity as chairman of the board of directors of ETI), GP 2XCV LLC, and General Pacific, LLC.

123.    "*Initial ETI Funding Obligation*" means the first $15,000,000 owed by the Debtors or Reorganized Debtors in connection with the Transaction Tax Liability.  Payment of the Initial ETI Funding Obligation may be in the form of the purchase for Cash of $15,000,000 of Rollover Exit Notes or the purchase of New Parent Interests for $15,000,000 in Cash at Plan Equity Value.

124.    "*Insurance Contracts*" means (a) any and all insurance policies issued at any time to, or that otherwise may provide or may have provided coverage to, any of the Debtors, regardless of whether

the insurance policies were issued to a Debtor or to a Debtor's prior Affiliates, subsidiaries, or parents or otherwise, or to any of their predecessors, successors, or assigns; (b) any and all agreements, documents, surety bonds, or other instruments relating thereto, including any and all agreements with a third party administrator for claims handling, risk control or related services, any and all D&O Insurance Policies, and any and all Workers' Compensation Contracts; and (c) any and all collateral documents and security agreements securing the Debtor's obligations under the insurance policies, including escrow accounts, deposit accounts, Cash Collateral, and letters of credit.  For the avoidance of doubt, Insurance Contracts include any insurance policies issued at any time to the Debtors' prior Affiliates, subsidiaries, and parents or otherwise, or to any of their predecessors, successors, or assigns, under which Debtors had, have, or may have any rights solely to the extent of the Debtors' rights thereunder.

125.    "***Insurer***" means any company or other Entity that issued or entered into an Insurance Contract (including any third-party administrator) and any respective predecessors and/or Affiliates thereof.

126.    "***Intercompany Claim***" means any Claim against any of the Debtors held by another Debtor.

127.    "***Intercompany Interest***" means any Interest in one Debtor held by another Debtor.

128.    "***Interest***" means any equity security within the meaning of section 101(16) of the Bankruptcy Code including, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, membership interests, and any other equity, ownership, or profits interests in any Debtor, and options, warrants, rights, stock appreciation rights, phantom units, incentives, commitments, calls, redemption rights, repurchase rights, or other securities or arrangements to acquire or subscribe for, or which are convertible into, or exercisable or exchangeable for, the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, membership interests, or any other equity, ownership, or profits interests in any Debtor or its Affiliates and subsidiaries (in each case whether or not arising under or in connection with any employment agreement).

129.    "***Interim DIP Order***" means the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 58].

130.    "***Interim Securitization Order***" means the *Interim Order (I) Authorizing Certain Debtors to Continue Selling, Contributing, and Servicing Receivables and Related Assets Pursuant to the Securitization Program, (II) Modifying the Automatic Stay, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* [Docket No. 59].

131.    "***Intermediate Interests***" means the new equity Interests in Exela Technologies BPA, LLC after cancellation of all Existing BPA Equity Interests and prior to the consummation of the XBP Transaction.

132.    "***Joinder***" means a joinder to the Plan Support Agreement, substantially in the form attached as Exhibit B thereto, providing, among other things, that such Person signatory thereto is bound by the terms of the Plan Support Agreement to the extent provided therein.

133.    "***July 2026 Noteholder Split Percentage***" means the percentage that, when applied to the July 2026 Noteholders Equity Distribution, results in each Holder of an Allowed July 2026 Notes Claim receiving the same percentage recovery as is received by each Non-ETI Holder of an Allowed April 2026 Notes Claim, including as a result of the Exchanged Equity Dilution.

134.    "*July 2026 Noteholders Equity Distribution*" means (a) the July 2026 Noteholder Split Percentage of the Exchanged New Parent Interests *plus* (b) the July 2026 Noteholder Split Percentage of the BTC Distribution Shares.

135.    "*July 2026 Notes*" means Exela Intermediate LLC's and Exela Finance Inc.'s 11.500% First-Priority Senior Secured Notes due 2026 issued pursuant to the July 2026 Notes Indenture.

136.    "*July 2026 Notes Claim*" means any Claim on account of, arising under, derived from, or based on the July 2026 Notes Indenture, including any Claim for principal amounts outstanding, accrued and unpaid interest (including any compounding), fees, expenses, costs, indemnification, and other amounts arising under, derived from, related to, or based on the July 2026 Notes Documents.

137.    "*July 2026 Notes Documents*" means the July 2026 Notes Indenture together with all other related documents, instruments, and agreements, in each case as supplemented, amended, restated, or otherwise modified from time to time.

138.    "*July 2026 Notes Indenture*" means that certain indenture governing the July 2026 Notes dated as of December 9, 2021, among Exela Intermediate LLC, Exela Finance Inc., the guarantors and affiliated guarantors party thereto and U.S. Bank, National Association, as trustee.

139.    "*July 2026 Notes Indenture Trustee*" means CSC Delaware Trust Company, solely in its capacity as trustee under or in connection with the July 2026 Notes Documents or, as applicable, any successors, assignees, or delegees thereof.

140.    "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

141.    "*Nasdaq ISE Exchange*" means the Nasdaq International Securities Exchange.

142.    "*New Board*" means the initial directors or managers, as applicable, of New Parent (following consummation of the XBP Transaction) selected in accordance with Article IV.Q of this Plan, whose identities shall be set forth as part of the Plan Supplement.

143.    "*New Money Loans*" has the meaning set forth in Section 2.01(a) of the DIP Credit Agreement.

144.    "*New Organizational Documents*" means the new Organizational Documents of the Reorganized Debtors (including the New Parent Warrants Agreement), after giving effect to the Restructuring Transactions, as applicable, including any shareholders agreement, limited liability company agreement, or similar document.

145.    "*New Parent*" means XBP (or such other Entity described in the Restructuring Steps Exhibit as the ultimate direct and indirect parent of the Reorganized Debtors) after the consummation of all transactions set forth in the Restructuring Steps Exhibit, including, and as applicable, the issuance of the Intermediate Interests and exchange thereof for Exchanged New Parent Interests (subject to the Exchanged Equity Dilution as set forth in this Plan) pursuant to the formula(s) set forth in the Restructuring Steps Exhibit, including the BTC Transaction and the XBP Transaction.

146.    "*New Parent Interests*" means the common equity of New Parent, whether (a) previously issued and outstanding prior to the consummation of the Restructuring Transactions or (b) authorized and issued pursuant to this Plan, the New Organizational Documents (including upon exercise of the New Parent Warrants, as applicable), including any authorized but unissued units, shares, or other equity interests, after

the consummation of all transactions set forth in the Restructuring Steps Exhibit, including, and as applicable, the issuance of the Intermediate Interests and exchange thereof for Exchanged New Parent Interests (subject to the Exchanged Equity Dilution as set forth in this Plan) pursuant to the formula(s) set forth in the Restructuring Steps Exhibit, including the BTC Transaction and the XBP Transaction.

147.    "***New Parent Shareholder Rights Plan***" means a shareholder rights plan for New Parent.

148.    "***New Parent Warrants***" means warrants to be issued on the terms set forth in the New Parent Warrants Agreement and exercisable (a) for an amount of New Parent Interests equal to seven-and-one-half percent (7.5%) of the Exchanged New Parent Interests issued and outstanding on the Effective Date after giving effect to the Exchanged Equity Dilution and (b) on a "cash" or "cashless basis" within five (5) years of the Effective Date at an equity value of the Plan Equity Value.

149.    "***New Parent Warrants Agreement***" means the form of warrant agreement governing the New Parent Warrants.

150.    "***Non-Debtor Affiliates***" means the Debtors' Affiliates that are not Debtors.

151.    "***Non-ETI Equity Distribution***" means (a) the Non-ETI Split Percentage of the Exchanged New Parent Interests *plus* (b) the Non-ETI Split Percentage of the BTC Distribution Shares.

152.    "***Non-ETI Holder***" means a Holder of an April 2026 Notes Claim that is not ETI or an ETI Holder.

153.    "***Non-ETI Split Percentage***" means, subject to the Exchanged Equity Dilution, 72.5%, subject to (a) Pro Rata reduction (along with the ETI Split Percentage) by the July 2026 Noteholder Split Percentage and (b) increase on account of the ETI Penalty (if any).

154.    "***Non-Priority Tax Claim***" means any Claim of a Governmental Unit that is not a Priority Tax Claim.

155.    "***Non-Tax Unsecured Cash Pool Target Recovery***" means the percentage recovery that Holders of Allowed General Unsecured Claims would receive under this Plan if (a) the amount of the Unsecured Cash Pool were $4.75 million less any amounts paid to reimburse Committee Professional Fees and Indenture Trustee Fees in accordance with the Committee Settlement; and (b) Non-Priority Tax Claims were excluded from the calculation of the amount of aggregate Allowed General Unsecured Claims.

156.    "***Non-Voting Classes***" means, collectively, Classes 1, 2, 7, 8, 9, 10, and 11.

157.    "***Noteholder Pro Rata Share***" means, with respect to the Non-ETI Equity Distribution on account of an Allowed Claim, the ratio (expressed in a percentage) that the amount of such Allowed Claim bears to the aggregate amount of all Allowed Claims in its Class that are held by Non-ETI Holders.

158.    "***Notice and Claims Agent***" means Omni Agent Solutions, Inc., in its capacity as noticing, claims, and solicitation agent for the Debtors, pursuant to an order of the Bankruptcy Court.

159.    "***Notice of Effective Date***" means the notice announcing the occurrence of the Effective Date, to be Filed by the Debtors with the Bankruptcy Court on the Effective Date.

160.    "*Notice of Revised Allocation Exhibit*" means, if any, a revised form of Exhibit H to the Disclosure Statement, included in the Plan Supplement, setting forth a revised allocation of New Parent Interests.

161.    "*Organizational Documents*" means, with respect to any Person other than a natural person, the organizational and governance documents for each such Person including limited liability company agreements, operating agreements, certificates of incorporation, certificates of formation, certificates of limited partnership, articles of organization (or equivalent organizational documents), warrants agreements, certificates of designation for preferred stock or other forms of preferred equity, by-laws, partnership agreements, operating agreements, limited liability company agreements, shareholders' agreements, members' agreement, or equivalent governing documents.

162.    "*Other Existing Equity Interest*" means any Interest in Debtor Neon Acquisition, LLC or Debtor XCV-EMEA.  For the avoidance of doubt, Other Existing Equity Interests do not include Intercompany Interests.

163.    "*Other Priority Claim*" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

164.    "*Other Secured Claim*" means any Secured Claim other than a DIP Claim, a Postpetition Securitization Programs Claim, or an April 2026 Notes Claim.

165.    "*Person*" means a person as defined in section 101(41) of the Bankruptcy Code.

166.    "*Petition Date*" means March 3, 2025.

167.    "*Plan*" means this joint plan of reorganization under chapter 11 of the Bankruptcy Code, as it may be altered, amended, modified, or supplemented from time to time in accordance with the terms of the Bankruptcy Code, the Bankruptcy Rules, or the terms hereof, as the case may be, and the Plan Supplement, which is incorporated herein by reference, including all exhibits and schedules hereto and thereto.

168.    "*Plan Equity Value*" means the per-unit or per-share value of the New Parent Interests as of the Effective Date, as set forth in the Disclosure Statement and as agreed pursuant to the settlements entered into and incorporated in the Plan.

169.    "*Plan Securities*" means, collectively, the Exchanged New Parent Interests, the Intermediate Interests, the BTC Distribution Shares, and the New Parent Warrants.

170.    "*Plan Supplement*" means one or more supplemental appendices to this Plan, which shall include, among other things, draft forms of documents (or terms sheets thereof), schedules, and exhibits to this Plan, as may be amended, modified, or supplemented from time to time on or before the Effective Date, including the following documents: (a) the New Organizational Documents; (b) the Exit Facilities Documents; (c) the New Parent Warrants Agreement; (d)  XBP Transaction Documents; (e) to the extent known and determined, a document disclosing the identity of the members of the directors and officers of the Reorganized Debtors; (f) the Rejected Executory Contract/Unexpired Lease List; (g) a Schedule of Retained Causes of Action; (h) the Governance Term Sheet; (i) the Exit Securitization Programs Documents; (j) the Restructuring Steps Exhibit; (k) the Registration Rights Agreement; (l) the New Parent Shareholder Rights Plan; (m) the Assumed Related Parties Contracts List; (n) the Blocked ETI Shares Documentation; (o) the Notice of Revised Allocation Exhibit; and (p) such other documents as may be specified in this Plan.

171.     "*Plan Supplement Filing Date*" means the date on which the initial Plan Supplement is Filed with the Bankruptcy Court, which shall be at least five (5) Business Days before the deadline to File objections to Confirmation.

172.     "*Plan Support Agreement*" means that certain Plan Support Agreement, dated as of April 24, 2025, by and among the Debtors, the Consenting Creditors, the Consenting ETI Parties, and the Individual Owners (as amended, supplemented, or modified from time to time, including all exhibits, attachments, and appendices incorporated therein), attached as Exhibit B to the Disclosure Statement.

173.     "*Plan Term Sheet*" means that certain Plan Term Sheet attached as Exhibit A to the Plan Support Agreement.

174.     "*Postpetition Securitization Programs*" means, collectively, the Prepetition Securitization Programs, as continued on a postpetition basis and otherwise in accordance with the Plan Support Agreement and the Securitization Orders.

175.     "*Postpetition Securitization Programs Claim*" means any Administrative Claim on account of the Securitization Program Obligations (as defined in the Final Securitization Order).

176.     "*Postpetition Securitization Programs Documents*" means the documents governing the Postpetition Securitization Programs in accordance with the terms thereof and the Securitization Orders, as applicable, prior to the Effective Date.

177.     "*Premiums and Fees*" means the DIP Backstop Premium, the Gates Backstop Premium, and the XBP Alternative Funding Fee (if any).

178.     "*Prepetition Securitization Programs*" means, collectively, in each case as of the Petition Date, (a) the ER3 Securitization Program; (b) the securitization facility governed by that certain Secured Promissory Note, dated as of February 27, 2023, between non-Debtor Receivables 3 Holdco, LLC and BRF Finance Co., LLC (as assignee of B. Riley Commercial Capital, LLC); and (c) the Rust Securitization Program.

179.     "*Prepetition Securitization Programs Documents*" means the documents governing the Prepetition Securitization Programs.

180.     "*Prepetition Term Loan Claim*" means any Claim on account of, arising under, derived from, or based on the Prepetition Term Loan Financing Agreement, including any Claim for principal amounts outstanding, accrued and unpaid interest (including any compounding), fees, expenses, costs, indemnification, and other amounts arising under, derived from, related to, or based on the Prepetition Term Loan Documents.

181.     "*Prepetition Term Loan Documents*" means the Prepetition Term Loan Financing Agreement together with all other related documents, instruments, and agreements in respect of the Prepetition Term Loans, in each case, as amended, restated, amended and restated, modified, or supplemented from time to time in accordance with the terms thereof.

182.     "*Prepetition Term Loan Facility*" means the financing facility provided under the Prepetition Term Loan Documents.

183.     "*Prepetition Term Loan Financing Agreement*" means that certain Financing Agreement, dated as of July 11, 2023, as may be amended and restated, modified, or supplemented from time to time in accordance with the terms thereof, by and among Exela Intermediate LLC and Exela Finance Inc., as

17

borrowers, the guarantors and affiliated guarantors party thereto, the lenders party thereto from time to time, and Blue Torch Finance LLC, as collateral agent and administrative agent.

184.    "***Prepetition Term Loans***" means the senior secured first-lien term loans issued pursuant to the Prepetition Term Loan Financing Agreement.

185.    "***Priority Tax Claim***" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

186.    "***Pro Rata***" means, as applicable, (a) the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class or (b) a proportionate allocation.

187.    "***Professional Fee Claim***" means a Claim by a Retained Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code (subject to any applicable agreements by such Retained Professional with respect thereto).

188.    "***Professional Fee Escrow Account***" means a segregated interest-bearing account funded by the Debtors with Cash no later than two (2) Business Days before the anticipated Effective Date in an amount equal to the Professional Fee Escrow Amount.

189.    "***Professional Fee Escrow Amount***" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses the Retained Professionals have incurred or shall incur in rendering services in connection with the Chapter 11 Cases before and as of the Effective Date, which shall be estimated pursuant to the method set forth in <u>Article II.A.2</u>.

190.    "***Projected Emergence Liquidity***" means the projected, unrestricted Cash on hand of the Debtors or Reorganized Debtors on the Effective Date (as determined in good faith by the Debtors' Chief Restructuring Officer).

191.    "***Proof of Claim***" means a proof of Claim Filed against any Debtor in the Chapter 11 Cases.

192.    "***Registration Rights Agreement***" means a registration rights agreement with respect to New Parent Interests in the form attached to the Plan Supplement and in accordance with the Plan Support Agreement, granting registration rights to all recipients of New Parent Interests (including the BTC Distribution Shares) under this Plan.

193.    "***Reinstatement***" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code. "Reinstated" shall have a correlative meaning.

194.    "***Rejected Executory Contract/Unexpired Lease List***" means the list of Executory Contracts and/or Unexpired Leases (including any amendments or modifications thereto), if any, that shall be rejected pursuant to this Plan, which shall be Filed with the Plan Supplement.

195.    "***Related Parties***" means, with respect to an Entity, each of, and in each case in its capacity as such, such Entity's current and former Affiliates, and such Entity's and such Affiliates' current and former members, directors, managers, officers, proxyholders, control persons, investment committee members, special committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds (including any beneficial holders for the account of whom such funds are

managed), predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, Representatives, investment managers, and other professionals and advisors, each in their capacity as such, and any such Person's or Entity's respective heirs, executors, estates, and nominees.

196.   "***Related Parties Contracts***" means Executory Contracts or Unexpired Leases (in each case, including any amendments or modifications thereto) with the Debtors' Related Parties.  For the avoidance of doubt, Related Parties Contracts do not include the Prepetition Securitization Programs Documents or the Postpetition Securitization Programs Documents.

197.   "***Release Opt-Out Form***" means the form to be provided to Holders (other than Debtors) of Claims and Interests in Non-Voting Classes through which such Holders may elect to affirmatively opt out of the Third-Party Release.

198.   "***Released Parties***" means, collectively, each of, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each Non-Debtor Affiliate; (d) each of the Debtors' and Non-Debtor Affiliates' current and former directors and officers; (e) XBP;  (f) each Consenting Stakeholder; (g) the Committee and each of its members in such capacity; (h) Blue Torch; (i) the April 2026 Notes Indenture Trustee; (j) the July 2026 Notes Indenture Trustee; (k) the April 2026 Notes Collateral Agent; (l) the DIP Agent; (m) each DIP Lender; (n) the DIP Backstop Commitment Parties; (o) the Exit Financing Facility Agents; (p) each lender under the Exit Facilities; (q) the Securitization Programs Parties; (r) each Holder of a Claim in a Voting Class that does not affirmatively elect to "opt out" of the Third-Party Release as provided on its respective ballot; (s) each Holder of a Claim or Interest in a Non-Voting Class that does not affirmatively elect to "opt out" of the Third-Party Release as provided on its respective Release Opt-Out Form; and (t) each Related Party of each Entity in clauses (a) through (s); *provided*, that any Holder of a Claim or Interest that timely objects to the Third-Party Release, either through (i) a formal objection Filed on the docket of the Chapter 11 Cases or (ii) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or via electronic mail, as applicable, before the Confirmation Hearing, shall not be a "Released Party."

199.   "***Releases***" means, collectively, the Debtor Release and the Third-Party Release as set forth in Article IX.

200.   "***Releasing Parties***" means, collectively, each of, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each Non-Debtor Affiliate; (d) each of the Debtors', and Non-Debtor Affiliates' current and former directors and officers; (e) XBP;  (f) each Consenting Stakeholder; (g) the Committee and each of its members in such capacity; (h) Blue Torch; (i) the April 2026 Notes Indenture Trustee; (j) the July 2026 Notes Indenture Trustee; (k) the April 2026 Notes Collateral Agent; (l) the DIP Agent; (m) each DIP Lender; (n) the DIP Backstop Commitment Parties; (o) the Exit Financing Facility Agents; (p) each lender under the Exit Facilities; (q) the Securitization Programs Parties; (r) each Holder of a Claim in a Voting Class that does not affirmatively elect to "opt out" of the Third-Party Release as provided on its respective ballot; (s) each Holder of a Claim or Interest in a Non-Voting Class that does not affirmatively elect to "opt out" of the Third-Party Release as provided on its respective Release Opt-Out Form; and (t) each Related Party of each Entity in clauses (a) through (s), solely to the extent such Related Party (I) would be obligated to grant a release under principles of agency if it were so directed by the Entity in the foregoing clauses (a) through (s) to whom they are related or (II) may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity in clause (a) through (s); *provided*, that, any Holder of a Claim or Interest that timely objects to the Third-Party Release, either

through (i) a formal objection Filed on the docket of the Chapter 11 Cases or (ii) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or via electronic mail, as applicable, before the Confirmation Hearing, shall not be a "Releasing Party."

201. "***Reorganized Debtors***" means, the Debtors, or any successors thereto, by merger consolidation, or otherwise, on or after the Effective Date, including New Parent.

202. "***Representatives***" means, with respect to any Person, such Person's Affiliates and its and their directors, officers, members, partners, managers, employees, agents, investment bankers, attorneys, accountants, advisors, investment advisors, investors, managed accounts or funds, management companies, fund advisors, advisory board members, professionals, and other representatives, in each case, solely in their capacities as such.

203. "***Required Consenting Creditors***" has the meaning set forth in the Plan Support Agreement.

204. "***Restructuring Fees and Expenses***" means the reasonable and documented fees, costs, and out-of-pocket expenses of (a) the Consenting Creditor Ad Hoc Group Advisors, the DIP Agent, the Blue Torch Advisors, the Consenting ETI Party Advisors, the advisors to the Sub-Group DIP Lenders (subject to a cap of $500,000 in the aggregate), and XBP (subject to a cap of $1,000,000 and in the event (x) the Plan Support Agreement terminates or (y) the Effective Date does not otherwise occur, payable solely to the extent that neither of the foregoing is the result of XBP's action or inaction) incurred in accordance with and payable under the terms of the Plan Support Agreement or the DIP Documents, as applicable; (b) the advisors and counterparties to the Securitization Programs Parties incurred in accordance with the Postpetition Securitization Program Documents; and (c) the July 2026 Notes Indenture Trustee in accordance with the Committee Settlement and the Plan Support Agreement.  For the avoidance of doubt, the foregoing parties shall not be required to provide the Debtors with attorney or financial advisor time entries.

205. "***Restructuring Steps Exhibit***" means the document setting forth the sequence of certain Restructuring Transactions, which shall be included in the Plan Supplement.

206. "***Restructuring Transactions***" means the transactions described in <u>Article IV.B</u> and/or set forth in the Restructuring Steps Exhibit, including, for the avoidance of doubt, the XBP Transaction, the BTC Transaction and the transfer by the Consenting ETI Parties of any other material assets and businesses to the extent set forth in the Plan Support Agreement.

207. "***Retained Professional***" means an Entity: (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and/or 1103 of the Bankruptcy Code and to be compensated for services rendered before the Effective Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to sections 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

208. "***Roll-Up Loans***" has the meaning set forth in Section 2.01(b) of the DIP Credit Agreement.

209. "***Rollover Exit Facility***" means the facility or indenture under which the Rollover Exit Notes shall be issued pursuant to the Rollover Exit Facility Documents, to be provided on the terms and conditions set forth in the Rollover Exit Facility Term Sheet.

210.     "***Rollover Exit Facility Documents***" means, collectively, all agreements, documents, and instruments delivered or entered into in connection with the Rollover Exit Facility (including any guaranty agreements, pledge and collateral agreements, intercreditor agreements, and other security documents).

211.     "***Rollover Exit Facility Term Sheet***" means that certain term sheet that sets forth the principal terms of the Rollover Exit Facility, Filed at Docket No. 401-1.

212.     "***Rollover Exit Notes***" means 5-year senior secured notes in an aggregate outstanding principal amount equal to (a) the DIP Claims outstanding on the Effective Date, which shall be funded on a cashless basis by rolling over such DIP Claims; *provided*, that pursuant to the Sub-Group DIP Lender Settlement, such aggregate amount shall be less (i) $6,000,000 of Allowed DIP Claims held by the Sub-Group DIP Lenders as of the Effective Date, which shall be converted into debt under the Supplemental Exit Facility and (ii) $4,000,000 of DIP Claims held as of the Effective Date by the Sub-Group DIP Lenders which shall be cancelled Pro Rata on the Effective Date; (b) an additional amount funded in Cash on account of any XBP Alternative Funding or any ETI Funding Obligations made in the form of Rollover Exit Notes in accordance with the terms hereof; and (c) an additional amount funded in Cash, if any, on account of the uncommitted $10,000,000 incremental facility under the Rollover Exit Notes.

213.     "***Rust Securitization Program***" means that certain securitization program governed by that certain Receivables Purchase Agreement, dated as of February 12, 2024, among Rust Consulting, Inc., BancTec (Canada) Inc., Novitex Enterprise Solutions Canada, Inc. / Solutions D'Enterprise Novitex Canada, Inc., HOVG, LLC, and SOURCEHOV CANADA COMPANY, as originators, EXELA BR SPV, LLC, as seller, and BR EXAR, LLC, in its capacity as buyer, as amended restated, amended and restated, supplemented, or otherwise modified from time to time, and related agreements and documents.

214.     "***Schedule of Retained Causes of Action***" means the schedule of Causes of Action of the Debtors that are not released, waived, or transferred pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time, which shall be included in the Plan Supplement.

215.     "***SEC***" means the United States Securities and Exchange Commission.

216.     "***Secured Claim***" means a Claim: (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) otherwise Allowed pursuant to this Plan or order of the Bankruptcy Court as a Secured Claim.

217.     "***Securities***" means any instruments that qualify as a "security" under Section 2(a)(1) of the Securities Act.

218.     "***Securities Act***" means the Securities Act of 1933, as now in effect or hereafter amended, or any regulations promulgated thereunder.

219.     "***Securitization Orders***" means, collectively, the Interim Securitization Order and the Final Securitization Order.

220.     "***Securitization Programs Agents***" means the administrative agents under the applicable Prepetition Securitization Programs Documents or the Postpetition Securitization Programs Documents or, as applicable, any successors, assignees, or delegees thereof.

221.    "*Securitization Programs Parties*" means, collectively, the Securitization Programs Agents and each investor or purchaser under the applicable Prepetition Securitization Programs Documents and Postpetition Securitization Programs Documents.

222.    "*Solicitation Materials*" means any documents, forms, ballots, notices, and other materials provided in connection with the solicitation of votes on this Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code.

223.    "*Solicitation Procedures Motion*" means the *Emergency Motion of Debtors for Entry of Order (I) Conditionally Approving the Disclosure Statement; (II) Scheduling Combined Hearing to Consider (A) Final Approval of Disclosure Statement, (B) Approval of Solicitation Procedures and Forms of Ballots, and (C) Confirmation of Plan; (III) Establishing an Objection Deadline to Object to Disclosure Statement and Plan; (IV) Approving the Form and Manner of Notice of Combined Hearing and Objection Deadline; (V) Approving Procedures for Assumption of Contracts and Leases and Form and Manner of Cure Notice; and (VI) Granting Related Relief* [Docket No. 439].

224.    "*Solicitation Procedures Order*" means an order of the Bankruptcy Court granting the relief requested in the Solicitation Procedures Motion.

225.    "*Sub-Group DIP Lenders*" means collectively, HoldCo Asset Management LP, CCUR Holdings, Inc. and OSP, LLC, each on behalf of their Affiliates, subsidiaries and certain managed funds and accounts.

226.    "*Sub-Group DIP Lenders Settlement*" means the settlement reached among the Debtors, the Sub-Group DIP Lenders, and the Consenting Stakeholders and approved as part of the entry of the Final DIP Order, the terms of which are set forth in Article IV.D and embodied in this Plan.

227.    "*Subordinated Claim*" means any Claim against the Debtors that is subject to subordination under section 509(c), section 510(b), or section 510(c) of the Bankruptcy Code, including any Claim for reimbursement, indemnification, or contribution (except indemnification or reimbursement Claims assumed hereunder).  For the avoidance of doubt, Subordinated Claim includes any Claim arising out of or related to any agreement for the purchase or sale of securities of the Debtors or any of its Affiliates or any agreements related or ancillary to such agreement for the purchase or sale of securities of the Debtors or any of its Affiliates.

228.    "*Subsequent ETI Funding Obligation*" means the amount of any Transaction Tax Liability in excess of $25,000,000.  Payment of the Subsequent ETI Funding Obligation may be in the form of the purchase for Cash of Rollover Exit Notes or the purchase of New Parent Interests for Cash at Plan Equity Value.

229.    "*Supplemental Exit Facility*" means either the Gates Exit Facility or, solely to the extent consented to by Blue Torch, the Blue Torch Super Senior Exit Facility, which shall be disclosed in the Plan Supplement.

230.    "*Supplemental Exit Facility Documents*" means, collectively, all agreements, documents, and instruments delivered or entered into in connection with the Supplemental Exit Facility (including any guaranty agreements, pledge and collateral agreements, intercreditor agreements, and other security documents).

231.    "*Third-Party Release*" means the releases given by the Releasing Parties to the Released Parties in Article IX.C.

232.    "**_Transaction Tax Liability_**" means any federal, state, or local tax liability arising or resulting from or being triggered by (a) the Restructuring Transactions occurring under this Plan, (b) the steps taken under the Definitive Documents or pursuant to the Restructuring Steps Exhibit, and/or (c) the Governance Changes,[1] including any related or similar transactions, in each case, as determined by the Independent Tax Advisor; _provided_, that for the avoidance of doubt, any tax directly resulting from the cancellation or reduction of Intercompany Claims under this Plan shall not be included in Transaction Tax Liability, and Transaction Tax Liability shall be determined without regard to any impact from such cancellation or reduction.  The Debtors and the Reorganized Debtors, as applicable, and the Consenting ETI Parties shall cooperate in good faith with the Independent Tax Advisor to assist with its determination of the Transaction Tax Liability and prompt preparation and filing of all applicable tax returns.

233.    "**_Transfer Agreement_**" means the transfer agreement, substantially in the form attached as Exhibit C to the Plan Support Agreement, providing, among other things, that a transferee is bound to the terms of the Plan Support Agreement.

234.    "**_Unexpired Lease_**" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

235.    "**_Unimpaired_**" means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

236.    "**_United States_**" means the United States of America, its agencies, departments, or agents.

237.    "**_United States Trustee_**" means the Office of the United States Trustee for the Southern District of Texas.

238.    "**_United States Trustee Statutory Fees_**" means all fees due under 28 U.S.C § 1930(a)(6).

239.    "**_Unsecured Cash Pool_**" means Cash in the amount that is the sum of (a) $4.75 million less any amounts paid to reimburse Committee Professional Fees and Indenture Trustee Fees in accordance with the Committee Settlement and (b) such additional amount that results in each Holder of an Allowed General Unsecured Claim (including, for the avoidance of doubt, Allowed Non-Priority Tax Claims) receiving a percentage recovery equal to the Non-Tax Unsecured Cash Pool Target Recovery; _provided_, that such additional amounts required under the foregoing clause (b) shall not result in a more than 90% recovery on account of each Allowed General Unsecured Claim (including, for the avoidance of doubt, Allowed Non-Priority Tax Claims).

240.    "**_Voting Classes_**" means, collectively, Classes 3, 4, 5 and 6.

241.    "**_Workers' Compensation Contracts_**" means the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation Insurance Contracts.

242.    "**_XBP_**" means XBP Europe Holdings, Inc..

---

[1]    "**_Governance Changes_**" has the meaning ascribed to such term in the _ETI Entities' Statement and Reservation of Rights Regarding the Motion of the Debtors for Interim and Final Orders (I) Authorizing The Debtors to Obtain Postpetition Financing, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief_ [Docket No. 168].

243.     "**_XBP Alternative Funding_**" means the provision of the XBP Funding Requirement by the Consenting ETI Parties, including, by the purchase in exchange for $18,000,000 Cash of (a) Rollover Exit Notes or (b) New Parent Interests at Plan Equity Value on the Effective Date.

244.     "**_XBP Alternative Funding Fee_**" means a fee equal to 1.4% of each of (a) the Exchanged New Parent Interests and (b) the BTC Distribution Shares, which fee shall be issued to the Consenting ETI Parties on the Effective Date in the event the XBP Alternative Funding occurs and the full amount of the XBP Alternative Funding is funded by the Consenting ETI Parties.

245.     "**_XBP Funding_**" means the funding of the Debtors or Reorganized Debtors of $18,000,000 by XBP on the Effective Date through a borrowing under and in accordance with its existing debt facility (whether under an accordion or otherwise).

246.     "**_XBP Funding Requirement_**" means the Debtors or Reorganized Debtors receiving $18,000,000 in Cash either (a) directly from XBP pursuant to the XBP Funding or (b) on account of the XBP Alternative Funding.

247.     "**_XBP Transaction_**" means, as set forth in the Restructuring Steps Exhibit, a series of stock transfers, sales, acquisitions, consolidations, combinations, contributions, mergers, amalgamations, and/or transactions involving both Debtors and non-Debtor Entities whereby New Parent becomes the ultimate corporate parent of the Reorganized Debtors.

248.     "**_XBP Transaction Documents_**" means all contracts, agreements, and documents necessary to effectuate the XBP Transaction.

249.     "**_XCV-EMEA_**" means XCV-EMEA, LLC.

B.     *Rules of Interpretation*

1.     For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference herein to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented; (d) any reference to any Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (e) unless otherwise specified, all references herein to "Articles" are references to Articles of this Plan; (f) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document created or entered into in connection with this Plan, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with, applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (h) unless otherwise specified, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (i) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (j) any reference to directors or board of directors includes managers, managing members or any similar governing body, as the context requires, and references to "shareholders," "directors," and/or "officers" shall also include "members" and/or

"managers," as applicable, as such terms are defined under the applicable limited liability company laws; (k) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interests," "Holders of Interests," "Disputed Interests," and the like, as applicable; (l) captions and headings to Articles and subdivisions thereof are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (m) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (n) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (o) unless otherwise specified, all references to statutes, regulations, orders, rules of courts, and the like shall mean as in effect on the Effective Date and as applicable to the Chapter 11 Cases; (p) any effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of this Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall control; (q) references to docket numbers are references to the docket numbers of documents Filed in the Chapter 11 Cases under the Bankruptcy Court's CM/ECF system; and (r) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail.

2.      Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to this Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Unless otherwise specified herein, any references to the "Effective Date" shall mean the Effective Date or as soon as reasonably practicable thereafter.

3.      All references in this Plan to monetary figures refer to currency of the United States, unless otherwise expressly provided.

4.      Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to the "Debtors" or to the "Reorganized Debtors" mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

C.      *Consent Rights*

Notwithstanding anything to the contrary in this Plan, the Confirmation Order, or the Disclosure Statement, any and all consent, consultation, and approval rights set forth in the Plan Support Agreement, including rights and limitations with respect to the form and substance of any Definitive Document (including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents) shall be incorporated herein by this reference (including to the applicable definitions in Article I.A) and fully enforceable as if stated in full herein.  In case of a conflict with respect to consent, consultation, or approval rights between the Plan Support Agreement, on the one hand, and this Plan, on the other hand, the former shall control and govern. For the avoidance of doubt, and notwithstanding anything to the contrary set forth herein or in the Plan Support Agreement, such consent rights shall not apply to any amendments, restatements, supplements, or other modifications of the Postpetition Securitization Programs Documents, and any consent, waivers, or other deviations under or from any Postpetition Securitization Programs Documents that are delivered, or entered into, after the consummation of this Plan.

D.      *Appendices and Plan Supplement*

The Plan Supplement and appendices to this Plan are incorporated into this Plan by reference and are a part of this Plan as if set forth in full herein.  The documents contained in the exhibits and Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

E.      *Deemed Acts*

Whenever an act or event is expressed under this Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred by virtue of this Plan and/or Confirmation Order without any further act by any party.

**Article II.**
**ADMINISTRATIVE CLAIMS, DIP CLAIMS, PRIORITY TAX CLAIMS,**
**OTHER PRIORITY CLAIMS, AND UNITED STATES TRUSTEE STATUTORY FEES**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Priority Tax Claims, and Other Priority Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

A.      *Administrative Claims*

1.      Underline General Administrative Claims

Subject to the terms of the Confirmation Order, and the provisions of sections 328, 330(a), and 331 of the Bankruptcy Code, except to the extent that a Holder of an Allowed General Administrative Claim and the applicable Debtor(s) or Reorganized Debtor(s), as applicable, agree to less favorable treatment with respect to such Allowed General Administrative Claim, each Holder of an Allowed General Administrative Claim shall receive, in full and final satisfaction of its Administrative Claim, an amount in Cash equal to the unpaid amount of such Allowed General Administrative Claim in accordance with the following: (a) if such General Administrative Claim is Allowed on or before the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter or, if not then due, when such Allowed General Administrative Claim is due or as soon as reasonably practicable thereafter; (b) if such General Administrative Claim is Allowed after the Effective Date, on the date such General Administrative Claim is Allowed or as soon as reasonably practicable thereafter or, if not then due, when such Allowed General Administrative Claim is due or as soon as reasonably practicable thereafter; (c) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as the case may be; or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court; *provided*, that Allowed General Administrative Claims that arise in the ordinary course of the Debtors' businesses during the Chapter 11 Cases shall be paid by such applicable Debtor or Reorganized Debtor in full in Cash in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice without further notice to or order of the Bankruptcy Court.  Nothing in the foregoing or otherwise in this Plan shall prejudice the Debtors' or the Reorganized Debtors' rights and defenses regarding any asserted General Administrative Claim.

Except as otherwise provided in this Plan and section 503(b)(1)(D) of the Bankruptcy Code, unless previously Filed or paid, requests for payment of General Administrative Claims must be Filed and served on the Debtors or Reorganized Debtors, as applicable, pursuant to the procedures specified herein, in the Confirmation Order, the Notice of Effective Date, or any other order entered by the Court (as applicable) no later than the General Administrative Claims Bar Date; *provided*, that the foregoing shall not apply to either (a) the Holders of Claims under section 503(b)(1)(D) of the Bankruptcy Code or (b) the Bankruptcy Court or U.S. Trustee as Holders of General Administrative Claims.  Holders of General Administrative Claims that are required to File and serve a request for payment of such General Administrative Claims that

do not File and serve such request by the General Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such General Administrative Claims against the Debtors and their respective Estates and property or the Reorganized Debtors, and such General Administrative Claims shall be deemed satisfied as of the Effective Date.  All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article IX.E hereof.  Nothing in this Article II.A shall limit, alter, or impair the terms and conditions of the Claims Bar Date Order with respect to the Claims Bar Date for Filing administrative expense Claims arising under section 503(b)(9) of the Bankruptcy Code.

2.   Professional Fee Claims

a.   *Professional Fee Applications*

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred before the Effective Date must be Filed no later than forty-five (45) days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders.  Subject to any applicable agreements by the Retained Professionals with respect to Professional Fee Claims, the Reorganized Debtors shall pay Professional Fee Claims owing to the Retained Professionals in Cash in the amount the Bankruptcy Court Allows from funds held in the Professional Fee Escrow Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; *provided*, that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.  To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the Allowed amount of Professional Fee Claims owing to the Retained Professionals, the Reorganized Debtors shall promptly pay such amounts upon entry of the order approving such Professional Fee Claims.

b.   *Professional Fee Escrow Account*

No later than the anticipated Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Retained Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full in Cash pursuant to one or more Final Orders of the Bankruptcy Court.  No Liens, Claims, or Interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way.  No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors or the Reorganized Debtors.  When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full in Cash pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall be remitted to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity being required.

c.   *Professional Fee Escrow Amount*

Five (5) days before the anticipated Effective Date, each Retained Professional shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the anticipated Effective Date.  For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Retained Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court, and such Retained Professionals are not bound to any extent by the estimates.  If a Retained Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such

27

Retained Professional.  The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; *provided*, that the Reorganized Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

For the avoidance of doubt, the terms of this <u>Article II.A.2.c</u> shall not apply to the parties entitled to receive the Restructuring Fees and Expenses, which are authorized to be paid in accordance with the Confirmation Order, this Plan, engagement and/or fee letters with the Debtors, the Plan Support Agreement, the DIP Documents, the Exit Securitization Programs Documents, the Plan Term Sheet, the Committee Settlement and the Exit Facilities Documents (as applicable).

B.     *DIP Claims*

Notwithstanding anything to the contrary herein, in exchange for full and final satisfaction, settlement, release, and discharge of DIP Claims, each Holder of an Allowed DIP Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed DIP Claim, an equal amount of Rollover Exit Notes under the Rollover Exit Facility; *provided*, that (a) for the Allowed DIP Claims of the Sub-Group DIP Lenders:  (i) $4,000,000 of such DIP Claims held as of the Effective Date shall be cancelled Pro Rata among the Sub-Group DIP Lenders and receive no distribution, (ii) $6,000,000 of such DIP Claims held as of the Effective Date shall receive, Pro Rata amongst the Sub-Group DIP Lenders, $6,000,000 of notes (or equivalent) under the applicable Supplemental Exit Facility, and (iii) the remainder shall receive Rollover Exit Notes.  The Rollover Exit Notes are expected to be delivered via DTC.

C.     *Premiums and Fees*

On the Effective Date, each of the Premiums and Fees shall be paid, to the extent due and payable, in accordance with the terms of this Plan.

D.     *Postpetition Securitization Programs Claims*

All Postpetition Securitization Programs Claims shall be Allowed Claims.  Except to the extent that a Holder of an Allowed Postpetition Securitization Programs Claim agrees to less favorable treatment, any such Claims against the Debtors arising under the Postpetition Securitization Programs shall be paid in full in Cash.

On the Effective Date, all reasonable and documented fees and out-of-pocket expenses incurred by the advisors to the parties to the Postpetition Securitization Programs shall be paid in full in Cash in accordance with the Securitization Orders.

E.     *Priority Tax Claims*

Priority Tax Claims shall be Allowed in an aggregate amount of no greater than as set forth on **<u>Appendix A</u>** to this Plan by the applicable taxing authority and corresponding Allowed amount.  Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor(s) against which such Allowed Priority Tax Claim is asserted agree to a less favorable treatment, or such Allowed Priority Tax Claim has already been paid during the Chapter 11 Cases, on account of such Priority Tax Claim, in exchange for full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code in the form of five (5) equal payments over five (5) years.  Nothing in the foregoing or otherwise in this Plan shall prejudice the Debtors' or the Reorganized Debtors' rights and defenses regarding any asserted Priority Tax Claim.

F.    *Other Priority Claims*

Except to the extent that a Holder of an Allowed Other Priority Claim and the Debtor(s) against which such Allowed Other Priority Claim is asserted agree to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and the discharge of each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim due and payable on or before the Effective Date shall receive, as soon as reasonably practicable after the Effective Date, on account of such Claim: (1) Cash in an amount equal to the amount of such Allowed Other Priority Claim; or (2) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code such that its Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.  To the extent any Allowed Other Priority Claim is not due and owing on or before the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors (or the Reorganized Debtors, as applicable) and such Holder, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.  Nothing in the foregoing or otherwise in this Plan shall prejudice the Debtors' or the Reorganized Debtors' rights and defenses regarding any asserted Other Priority Claim.

G.    *United States Trustee Statutory Fees*

The Debtors and the Reorganized Debtors, as applicable, shall pay all United States Trustee Statutory Fees, for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

H.    *Restructuring Fees and Expenses*

The Restructuring Fees and Expenses incurred, or estimated to be incurred, up to and including the Effective Date (or, with respect to necessary post-Effective Date activities, after the Effective Date), shall be paid in full in Cash on the Effective Date in accordance with, and subject to, the terms of the Plan Support Agreement, the DIP Orders, or the Securitization Orders, as applicable (unless otherwise provided in any other order of the Bankruptcy Court), without any requirement to File a fee application with the Bankruptcy Court or without any requirement for Bankruptcy Court or United States Trustee review or approval (unless otherwise provided in any other order of the Bankruptcy Court), and without notice and a hearing pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise.  All Restructuring Fees and Expenses to be paid on the Effective Date shall be estimated before and as of the Effective Date and such estimates shall be delivered to the Debtors at least five (5) days before the anticipated Effective Date; *provided*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Fees and Expenses.  On the Effective Date, or as soon as practicable thereafter, final invoices for all Restructuring Fees and Expenses incurred before and as of the Effective Date shall be submitted to the Debtors.  In addition, the Debtors and the Reorganized Debtors, as applicable, shall continue to pay, when due and payable in the ordinary course, pre-Effective Date Restructuring Fees and Expenses related to this Plan and the implementation, consummation, and defense of this Plan and the Restructuring Transactions, incurred before the Effective Date, in accordance with any engagement and/or fee letters with the Debtors, the Plan Support Agreement, the DIP Documents, the Exit Facilities Documents, the Plan Term Sheet, the Committee Settlement, and the Exit Securitization Programs Documents (as applicable).

I.    *Post-Effective Date Fees and Expenses*

Except as otherwise specifically provided in this Plan, from and after the Effective Date, each Reorganized Debtor shall in the ordinary course of business pay (subject to the receipt of an invoice) in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by such Debtor or Reorganized Debtor (as applicable) after the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court.  Upon the Effective Date, any requirement that Retained Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or

compensation for services rendered after such date shall terminate, and each Debtor or Reorganized Debtor (as applicable) may employ and pay any Retained Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

## Article III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests*

This Plan constitutes a separate chapter 11 plan of reorganization for each Debtor.  The provisions of this Article III govern Claims against and Interests in the Debtors.  Except for the Claims addressed in Article II (or as otherwise set forth herein), all Claims and Interests are placed in Classes for each of the applicable Debtors.  For all purposes under this Plan, each Class shall exist for each of the Debtors; *provided*, that any Class that is vacant as to a particular Debtor shall be treated in accordance with Article III.G.  In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, DIP Claims, Priority Tax Claims, Claims for the Premiums and Fees, and Other Priority Claims as described in Article II.

A Claim or Interest is placed in a particular Class only to the extent that such Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  To the extent applicable, a Claim or Interest is placed in a particular Class for all purposes, including voting, Confirmation and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code.  However, a Claim or Interest is placed in a particular Class for the purpose of receiving distributions (if any) under this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest and has not been paid, released or otherwise settled prior to the Effective Date.

**Summary of Classification and Treatment of Claims and Interests**

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Other Secured Claims | Unimpaired | No (Presumed to Accept) |
| 2 | Prepetition Term Loan Claims | Unimpaired | No (Presumed to Accept) |
| *3* | *April 2026 Notes Claims* | *Impaired* | *Yes* |
| *4* | *Convenience Claims* | *Impaired* | *Yes* |
| *5* | *July 2026 Notes Claims* | *Impaired* | *Yes* |
| *6* | *General Unsecured Claims* | *Impaired* | *Yes* |
| 7 | Subordinated Claims | Impaired | No (Deemed to Reject) |
| 8 | Intercompany Claims | Impaired / Unimpaired | No (Presumed to Accept / Deemed to Reject) |
| 9 | Intercompany Interests | Impaired / Unimpaired | No (Presumed to Accept / Deemed to Reject) |

| 10 | Existing BPA Equity Interests | Impaired | No (Deemed to Reject) |
| 11 | Other Existing Equity Interests | Impaired | No (Deemed to Reject) |

B.     *Treatment of Claims and Interests*

   1.     <u>*Class 1 — Other Secured Claims*</u>

      a.     *Classification*: Class 1 consists of all Other Secured Claims.

      b.     *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim, at the option of the applicable Debtor shall, on the Effective Date, (i) be paid in full in Cash, (ii) receive the collateral securing its Allowed Other Secured Claim including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, (iii) Reinstatement of its Allowed Other Secured Claim, or (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

      c.     *Voting*: Class 1 is Unimpaired, and Holders of Other Secured Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Other Secured Claims are not entitled to vote to accept or reject this Plan.  Holders of Other Secured Claims shall be provided a Release Opt-Out Form solely for purposes of affirmatively opting out of the Third-Party Release.

   2.     <u>*Class 2 – Prepetition Term Loan Claims*</u>

      a.     *Classification*: Class 2 consists of all Prepetition Term Loan Claims.

      b.     *Allowance*: Prepetition Term Loan Claims shall be deemed Allowed in the aggregate principal amount of $38,500,000, plus accrued and unpaid interest at the default rate accruing after the Petition Date, plus all accrued and unpaid interest as of the Petition Date, plus fees, reimbursement obligations, premiums, and other obligations due and owing under the Prepetition Term Loan Financing Agreement.

      c.     *Treatment*: Except to the extent that a Holder of an Allowed Prepetition Term Loan Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Prepetition Term Loan Claim, each Holder of an Allowed Prepetition Term Loan Claim on the Effective Date shall be paid in full in Cash.

      d.     *Voting*: Class 2 is Unimpaired, and Holders of Prepetition Term Loan Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Prepetition Term Loan Claims are not entitled to vote to accept or reject this Plan.  Holders of Prepetition Term Loan Claims shall be provided a Release Opt-Out Form solely for purposes of affirmatively opting out of the Third-Party Release.

3.    <u>*Class 3 — April 2026 Notes Claims*</u>

    a.    *Classification*: Class 3 consists of all April 2026 Notes Claims.

    b.    *Allowance*: April 2026 Notes Claims shall be deemed Allowed in the aggregate amount of $1,214,106,629.

    c.    *Treatment*: Except to the extent that a Holder of an April 2026 Notes Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed April 2026 Notes Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in accordance with the Definitive Documents and in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed April 2026 Notes Claim, either:

        (i)     if such Holder is a Non-ETI Holder, its Noteholder Pro Rata Share of the Non-ETI Equity Distribution; or

        (ii)    if such Holder is ETI or an ETI Holder, its ETI Pro Rata Share of the ETI Equity Distribution.

    d.    *Voting*: Class 3 is Impaired, and Holders of April 2026 Notes Claims are entitled to vote to accept or reject this Plan.

4.    <u>*Class 4 — Convenience Claims*</u>

    a.    *Classification*: Class 4 consists of all Convenience Claims.

    b.    *Treatment*: Except to the extent that a Holder of an Allowed Convenience Claim agrees to a less favorable treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date or as soon as reasonably practicable thereafter, Cash in an amount equal to no less than 70% of such Allowed Convenience Claim amount pursuant to the Committee Settlement; *provided*, that to the extent that a Holder of an Allowed Convenience Claim against a Debtor holds any joint and several liability Claims, guaranty Claims, or other similar Claims against any other Debtors arising from or relating to the same obligations or liability as such Convenience Claim, such Holder shall only be entitled to a distribution on one Convenience Claim against the Debtors in full and final satisfaction of all such Claims.

    c.    *Voting*: Class 4 is Impaired, and Holders of Convenience Claims are entitled to vote to accept or reject this Plan.

5.    <u>*Class 5 — July 2026 Notes Claims*</u>

    a.    *Classification*: Class 5 consists of all July 2026 Notes Claims.

    b.    *Allowance*: July 2026 Notes Claims shall be deemed Allowed in the aggregate amount of $25,666,358.

    c.    *Treatment*: Except to the extent that a Holder of a July 2026 Notes Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed July 2026 Notes Claim shall receive, in full and final satisfaction, settlement, release, and discharge and in exchange for such Allowed July 2026 Notes Claim, and as a

carve out of the collateral (or value of such collateral) securing the April 2026 Notes Claims, its Pro Rata share of the July 2026 Noteholder Equity Distribution.

d.      *Voting*: Class 5 is Impaired, and Holders of July 2026 Notes Claims are entitled to vote to accept or reject this Plan.

6.    <u>Class 6 — *General Unsecured Claims*</u>

a.      *Classification*: Class 6 consists of all General Unsecured Claims.

b.      *Treatment*: Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date, as a carve out of collateral (or the value of such collateral) securing the April 2026 Notes Claims, its Pro Rata share of the Unsecured Cash Pool, with such amount being paid out over the following schedule:  (i) 1/3 paid within nine (9) months of the Effective Date; (ii) 1/3 paid within eighteen (18) months of the Effective Date; and (iii) 1/3 paid within twenty-seven (27) months of the Effective Date.  Holders of Allowed General Unsecured Claims shall be entitled to interest (which interest shall be treated for all purposes as an incremental distribution on account of such Allowed General Unsecured Claim) on unpaid portions of such Holder's Pro Rata share of the Unsecured Cash Pool, accruing at 4% per annum, paid in-kind, commencing on the Effective Date, and such payment obligations shall be secured by collateral reasonably acceptable to the Debtors, the Required Consenting Creditors, and the Committee (the "**GUC Payment Obligations Collateral**").

c.      *Voting*: Class 6 is Impaired and Holders of General Unsecured Claims are entitled to vote to accept or reject this Plan.

7.    <u>Class 7 — *Subordinated Claims*</u>

a.      *Classification*: Class 7 consists of all Subordinated Claims.

b.      *Treatment*: On the Effective Date, each Subordinated Claim shall be cancelled, released and extinguished, and each Holder of a Subordinated Claim shall not receive or retain any distribution, property, or other value on account of its Subordinated Claim.

c.      *Voting*: Class 7 is Impaired and not receiving any distribution under this Plan, and Holders of Subordinated Claims are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Subordinated Claims are not entitled to vote to accept or reject this Plan.  Holders of Subordinated Claims shall be provided a Release Opt-Out Form solely for purposes of affirmatively opting out of the Third-Party Release.

8.    <u>Class 8 — *Intercompany Claims*</u>

a.      *Classification*: Class 8 consists of all Intercompany Claims.

b.      *Treatment*: On or as soon as reasonably practicable after the Effective Date, all Intercompany Claims will be adjusted, Reinstated, or discharged, as determined by the Debtors or the Reorganized Debtors with the reasonable consent of the

Required Consenting Creditors and the Consenting ETI Parties, as applicable, or as provided in the Restructuring Steps Exhibit.

c.  *Voting*: Class 8 is either (i) Unimpaired, in which case Holders of Allowed Intercompany Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, or (ii) Impaired, and not receiving any distribution under this Plan, in which case Holders of Allowed Intercompany Claims are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, in each case, Holders of Allowed Intercompany Claims are not entitled to vote to accept or reject this Plan.

9.  *Class 9 — Intercompany Interests*

a.  *Classification*: Class 9 consists of all Intercompany Interests.

b.  *Treatment*: On or as soon as reasonably practicable after the Effective Date, all Intercompany Interests will be adjusted, Reinstated, or discharged as determined by the Debtors or the Reorganized Debtors with the reasonable consent of the Required Consenting Creditors and the Consenting ETI Parties, as applicable, or as provided in the Restructuring Steps Exhibit; *provided,* that Subordinated Claims will be cancelled, released, or extinguished pursuant to Article III.B.7.

c.  *Voting*: Class 9 is either (i) Unimpaired, in which case Holders of Allowed Intercompany Interests are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, or (ii) Impaired, and not receiving any distribution under this Plan, in which case Holders of Allowed Intercompany Interests are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, in each case, Holders of Allowed Intercompany Interests are not entitled to vote to accept or reject this Plan.

10.  *Class 10 — Existing BPA Equity Interests*

a.  *Classification*: Class 10 consists of all Existing BPA Equity Interests.

b.  *Treatment*: Holders of Existing BPA Equity Interests are not entitled to receive a recovery or distribution on account of such Existing BPA Equity Interests. On the Effective Date, Existing BPA Equity Interests shall, subject to the Restructuring Steps Exhibit, be canceled, released, discharged, and extinguished, and shall be of no further force or effect.

c.  *Voting*: Class 10 is Impaired and not receiving any distribution under this Plan, and Holders of Existing BPA Equity Interests are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Existing BPA Equity Interests are not entitled to vote to accept or reject this Plan. Holders of Existing BPA Equity Interests shall be provided a Release Opt-Out Form solely for purposes of affirmatively opting out of the Third-Party Release.

11.  *Class 11 — Other Existing Equity Interests*

a.  *Classification*: Class 11 consists of all Other Existing Equity Interests.

b.  *Treatment*: Holders of Other Existing Equity Interests are not entitled to receive a recovery or distribution on account of such Other Existing Equity Interests. On

the Effective Date, Other Existing Equity Interests shall be either (i) treated in accordance with the Restructuring Steps Exhibit or (ii) canceled, released, discharged, and extinguished, and shall be of no further force or effect.

c.   *Voting*: Class 11 is Impaired and not receiving any distribution under this Plan, and Holders of Other Existing Equity Interests are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Other Existing Equity Interests are not entitled to vote to accept or reject this Plan. Holders of Other Existing Equity Interests shall be provided a Release Opt-Out Form solely for purposes of affirmatively opting out of the Third-Party Release.

C.   *Acceptance or Rejection of this Plan*

1.   Presumed Acceptance of this Plan

Claims in Classes 1 and 2 are Unimpaired under this Plan and their Holders are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Claims in Class 1 and 2 are not entitled to vote on this Plan and the votes of such Holders shall not be solicited. Notwithstanding their non-voting status, Holders of such Claims shall receive a Release Opt-Out Form solely for purposes of providing such Holders with the opportunity to opt out of the Third-Party Release.

2.   Voting Class

Claims in Classes 3, 4, 5 and 6 are Impaired under this Plan and the Holders of Allowed Claims in such Class are entitled to vote to accept or reject this Plan, including by acting through a voting Representative. For purposes of determining acceptance and rejection of this Plan, votes shall be tabulated on a Debtor-by-Debtor basis.

Pursuant to section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted this Plan if (a) the Holders, including Holders acting through a voting Representative, of at least two-thirds (2/3) in amount of Claims actually voting in such Class have voted to accept this Plan and (b) the Holders, including Holders acting through a voting Representative, of more than one-half (1/2) in number of Claims actually voting in such Class have voted to accept this Plan. Holders of Claims in Classes 3, 4, 5 and 6 (or, if applicable, the voting Representatives of such Holders) shall receive ballots containing detailed voting instructions. For the avoidance of doubt, each Claim in the Class entitled to vote to accept or reject this Plan that is not Allowed pursuant to this Plan, and in each case, is wholly contingent, unliquidated, or Disputed, in each case, shall be accorded one (1) vote and valued at one dollar ($1.00) for voting purposes only, and not for purposes of allowance or distribution.

3.   Deemed Rejection of this Plan

Claims and Interests in Classes 7, 10, and 11 are Impaired and will receive no distribution under this Plan and are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Claims and Interests in Classes 7, 10 and 11 are not entitled to vote on this Plan and the votes of such Holders shall not be solicited. Notwithstanding their non-voting status, Holders of such Claims shall receive a Release Opt-Out Form solely for purposes of providing such Holders with the opportunity to opt out of the Third-Party Release.

4.   Presumed Acceptance of this Plan or Deemed Rejection of this Plan

Claims and Interests in Classes 8 and 9 are either (a) Unimpaired and, therefore, conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, or (b) Impaired

and shall receive no distributions under this Plan and, therefore, deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Claims and Interests in Classes 8 and 9 are not entitled to vote on this Plan and votes of such Holders shall not be solicited.

D.      *Confirmation Pursuant to Section 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by an Impaired Class of Claims entitled to vote (*i.e.*, Class 3, 4, 5, or 6).  The Debtors shall seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify this Plan in accordance with Article XI to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and Bankruptcy Rules.

E.      *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Interests, and the respective distributions and treatments under this Plan, shall take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 509 or 510 of the Bankruptcy Code, or otherwise; *provided*, that notwithstanding the foregoing, such Allowed Claims or Interests and their respective treatments set forth herein shall not be subject to setoff, demand, recharacterization, turnover, disgorgement, avoidance, or other similar rights of recovery asserted by any Person.  Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided herein, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination rights relating thereto.  The Debtors or Reorganized Debtors, as applicable, reserve the right to seek a ruling from the Bankruptcy Court determining whether any Claim should be subordinated pursuant to section 510(b) of the Bankruptcy Code and treated under this Plan as a Class 7 Subordinated Claim.

F.      *Special Provision Governing Unimpaired Claims*

Except as otherwise provided herein, nothing under this Plan shall affect or limit the Debtors' or the Reorganized Debtors' rights and defenses (whether legal or equitable) in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

G.      *Vacant and Abstaining Classes*

Any Class of Claims or Interests that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.  Moreover, any Class of Claims that is occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018, but as to which no vote is cast, shall be deemed to accept this Plan pursuant to section 1129(a)(8) of the Bankruptcy Code.

H.      *Controversy Concerning Impairment*

If a controversy arises as to whether any Claim or Interest (or any Class of Claims or Interests) is Impaired under this Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date, absent consensual resolution of such controversy consistent with the Plan Support Agreement among the Debtors and the complaining Entity or Entities.

I.      *Intercompany Interests and Intercompany Claims*

Other than with respect to any April 2026 Notes Claim or July 2026 Notes Claim held by ETI or an ETI Holder, to the extent Intercompany Interests and Intercompany Claims are Reinstated under this Plan, distributions on account of such Intercompany Interests and Intercompany Claims are not being received by Holders of such Intercompany Interests or Intercompany Interests on account of their Intercompany Interests or Intercompany Claims, but for the purposes of administrative convenience and to maintain the Debtors' (and their Affiliates') corporate structure, for the ultimate benefit of the Holders of New Parent Interests, to preserve ordinary course intercompany operations, and in exchange for the Debtors' and Reorganized Debtors' agreement under this Plan to make certain distributions to the Holders of Allowed Claims.

.

## Article IV.
## MEANS FOR IMPLEMENTATION OF THIS PLAN

A.      *General Settlement of Claims and Interests*

In consideration for the classification, distributions, releases, and other benefits provided under this Plan, on the Effective Date, the provisions of this Plan shall constitute a set of integrated, good-faith compromises and settlements of all Claims, Interests, Causes of Action, and controversies resolved pursuant to this Plan and this Plan shall be deemed a motion to approve the good-faith compromises and settlements of all Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromises and settlements under Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such integrated compromises or settlements are in the best interests of the Debtors, the Estates, and Holders of Claims and Interests, and are fair, equitable, and reasonable.  Subject to Article VI, distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final and indefeasible and shall not be subject to avoidance, turnover, or recovery by any other Person.  Notwithstanding the foregoing or similar provisions of this Plan with respect to settlements, such settlements are approved as among the parties to such settlement or similar agreements thereto, and the treatment of all Claims and Interests is approved pursuant to Confirmation by satisfying the requirement of section 1129 of the Bankruptcy Code.

B.      *Restructuring Transactions*

Without limiting any rights and remedies of the Debtors or Reorganized Debtors under this Plan or applicable law, the entry of the Confirmation Order shall constitute authorization for the Debtors and the Reorganized Debtors, as applicable, to take, or to cause to be taken, all actions necessary or appropriate to consummate and implement the provisions of any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan before, on, and after the Effective Date, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, conversion, elections, or dissolution containing terms that are consistent with the terms of this Plan, the Plan Support Agreement, the Restructuring Steps Exhibit, the XBP Transaction Documents, the Plan Supplement, the Exit Facilities, the Exit Securitization Programs Documents, and the other Definitive

Documents and that satisfy the applicable requirements of applicable state law and such other terms to which the applicable Entities may agree, including, for the avoidance of doubt, in connection with the XBP Transaction and the BTC Transaction; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of this Plan, the Plan Support Agreement, the Restructuring Steps Exhibit, the XBP Transaction Documents, the Plan Supplement, the Exit Facilities, the Exit Securitization Programs Documents, and the other Definitive Documents and having such other terms to which the applicable Entities may agree, including, for the avoidance of doubt, in connection with the XBP Transaction or the BTC Transaction; (3) the execution, delivery, and filing, if applicable, of the New Organizational Documents, the XBP Transaction Documents, the Exit Facilities Documents, the Registration Rights Agreement, the New Parent Warrants Agreement, and the Exit Securitization Programs; (4) the filing of appropriate elections or certificates or articles of conversion, formation, incorporation, merger, consolidation, or dissolution with the appropriate governmental authorities pursuant to applicable state law; (5) all other actions that the Debtors, the Reorganized Debtors and/or the applicable Entities reasonably determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law or foreign law in connection with such transactions; and (6) such actions as may be necessary or appropriate to effectuate a corporate restructuring of their respective businesses and to otherwise simplify the overall corporate structure of the Reorganized Debtors.

Consistent with the foregoing, the Restructuring Transactions shall include: (i) cancellation of existing agreements and Existing BPA Equity Interests, Other Existing Equity Interests and certain Intercompany Interests in accordance with Article III.B, as more particularly described in Article IV.G; (ii) entry into and performance under the Exit Facilities and Exit Facilities Documents, as more particularly described in Article IV.I; (iii) entry into and performance under the Exit Securitization Programs and Exit Securitization Programs Documents, as more particularly described in Article IV.J; (iv) issuance of Plan Securities, as more particularly described in Article IV.K; (v) issuance and effectiveness of New Organizational Documents, as more particularly described in Article IV.M; (vi) consummation of the BTC Transaction, as more particularly described in the Restructuring Steps Exhibit; and (vii) the XBP Transaction, as more particularly described in the Restructuring Steps Exhibit.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions (including the BTC Transaction, the XBP Transaction, and any other transaction described in, approved by, contemplated by, or necessary to effectuate this Plan).

Subject to BTC's and XBP's satisfaction with the definitive documentation with respect to the Restructuring Transactions, including the XBP Transaction Documents, the Governance Term Sheet, the Registration Rights Agreement, and the New Organizational Documents, each of BTC and XBP agrees to engage in the Restructuring Transactions, as applicable, to issue or distribute, as applicable, the Plan Securities and to perform any other obligation under this Plan and the Definitive Documents and in accordance with the Restructuring Steps Exhibit, in each case contemplated hereunder and thereunder to be performed by it. In connection therewith, each of BTC and XBP will submit to the jurisdiction of the Bankruptcy Court in respect of such agreements and obligations and acknowledge that it is a participant in this Plan.

C.   *Committee Settlement*

This Plan incorporates the Committee Settlement, a compromise and settlement of numerous issues and disputes between and among (a) the Debtors and the Consenting Stakeholders; and (b) the Committee, designed to achieve a reasonable and effective resolution of certain Claims and issues in connection with the Chapter 11 Cases. Except as expressly set forth herein or the Confirmation Order, the Committee

Settlement constitutes a settlement of all potential issues and Claims between and among (a) the Debtors and the Consenting Stakeholders; and (b) the Committee.  The key terms of the Committee Settlement include:

- The inclusion in the Plan of the July 2026 Noteholder Equity Distribution, subject to the terms of the Committee Settlement;

- Payment of Allowed Convenience Claims in Cash in an amount equal to no less than 70% of such Allowed Convenience Claims;

- Establishment of the Unsecured Cash Pool;

- All fees for professionals retained by the Committee shall be capped (the "***Committee Professional Fee Cap***") at $2.75 million, less amounts paid to the July 2026 Notes Indenture Trustee under the July 2026 Notes Indenture, plus amounts allocated by agreement between the Debtors and the Committee from (a) the Unsecured Cash Pool or (b) funds otherwise allocable to increase the Convenience Claims recoveries;

- The Required Consenting Creditors, the Debtors and the Committee shall work in good faith to agree on an appropriate and cost-effective Claims reconciliation process including a potential engagement of a Claims Ombudsman;

- Upon the Effective Date, the Debtors and their Estates shall waive preference claims held against Holders of General Unsecured Claims;

- In consideration for the settlement contemplated by the Committee Settlement, the Committee shall support the Plan and recommend to its constituents that they vote to accept the Plan and shall support the relief and treatment (including such releases as agreed and granted by the Debtors and other supporting parties) provided for in the Plan and the other Definitive Documents;

- April 2026 Notes Deficiency Claims shall be waived and shall not recover from the Unsecured Cash Pool; and

- Resolution of all objections raised by the Committee in the Chapter 11 Cases.

D.    *Sub-Group DIP Lenders Settlement*

This Plan incorporates the agreement reached in connection with the Sub-Group DIP Lenders Settlement that was approved as part of the entry of the Final DIP Order, among (a) the Debtors and the Consenting Stakeholders; and (b) the Sub-Group DIP Lenders, which settlement is designed to achieve a reasonable and effective resolution of such issues and disputes.  Except as expressly set forth herein or in the Confirmation Order, the Sub-Group DIP Lenders Settlement constitutes a settlement of all potential issues and Claims between and among (a) the Debtors and the Consenting Stakeholders; and (b) the Sub-Group DIP Lenders.  Pursuant to the Sub-Group DIP Lenders Settlement:

- The New Money Loans authorized by the Final DIP Order shall be initially funded by Avenue and Gates; *provided*, that all Holders of April 2026 Notes Claims or July 2026 Notes Claims are entitled to fund their Pro Rata share of the New Money Loans;

- All DIP Lenders shall be required to roll their DIP Claims into the Rollover Exit Facility, subject to the other terms of the Sub-Group DIP Lenders Settlement;

- The Sub-Group DIP Lenders shall be entitled to convert $6,000,000 of Allowed DIP Claims held as of the Effective Date into debt under the Supplemental Exit Facility, which debt shall be *pari passu* with the other debt under the Supplemental Exit Facility or incorporated into such facility on the same terms with customary sacred rights;

- DIP Claims held by the Sub-Group DIP Lenders as of the Effective Date shall be cancelled Pro Rata in an aggregate amount of $4,000,000;

- The Debtors shall reimburse up to $500,000 of Restructuring Fees and Expenses incurred in the aggregate by the advisors to the Sub-Group DIP Lenders; and

- The Sub-Group DIP Lenders agree not to object or vote to reject this Plan and to pursue the Restructuring Transactions consistent with the Plan Support Agreement.

E.      *Corporate Existence*

Except as otherwise provided in this Plan, the Plan Support Agreement, the Restructuring Steps Exhibit, or the XBP Transaction Documents, each Debtor, as a Reorganized Debtor, shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each Debtor is incorporated or formed and pursuant to the respective memorandum and articles of association, certificate of incorporation and bylaws (or other formation documents) in effect before the Effective Date, except to the extent such memorandum and articles of association, certificate of incorporation and bylaws (or other formation documents) are amended by this Plan, the BTC Transaction, the XBP Transaction Documents, the Debtors, or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to this Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law), without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable law.

On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may, without the need for approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, take such action as permitted by applicable law, and such Reorganized Debtor's Organizational Documents, as such Reorganized Debtor may determine is reasonable and appropriate (including in connection with the BTC Transaction or the XBP Transaction), including causing: (a) a Reorganized Debtor to be merged into another Reorganized Debtor or an Affiliate of a Reorganized Debtor; (b) a Reorganized Debtor to be dissolved; (c) the conversion of a Reorganized Debtor from one entity type to another entity type; (d) the legal name of a Reorganized Debtor to be changed; (e) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter; or (f) the reincorporation of a Reorganized Debtor under the law of jurisdictions other than the law under which the applicable Debtor currently is incorporated.

F.      *Vesting of Assets in the Reorganized Debtors Free and Clear of Liens and Claims*

Except as otherwise expressly provided in this Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein pursuant to sections 1123(a)(5), 1123(b)(3), 1141(b) and (c), and other applicable provisions of the Bankruptcy Code, on and after the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to this Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, other encumbrances or interests, except for those Liens, Claims, charges, or other encumbrances arising from or related to the Exit Facilities Documents and the Exit Securitization Programs Documents.  In addition, all

rights, benefits, and protections provided to any of the Debtors pursuant to the Plan, the Plan Supplement, or the Confirmation Order including the release, exculpation, and injunction provisions provided in Article IX of this Plan, shall vest in each respective Reorganized Debtor unless expressly provided otherwise by this Plan or the Confirmation Order.  On and after the Effective Date, the Reorganized Debtors may (1) operate their respective businesses, (2) use, acquire, and dispose of their respective property, and (3) prosecute, compromise or settle any Claims, Interests, or Causes of Action, in each case without notice to, supervision of, or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, including for the avoidance of doubt any restrictions on the use, acquisition, sale, lease, or disposal of property under section 363 of the Bankruptcy Code.  Anything in this Plan to the contrary notwithstanding, the Unimpaired Claims against a Debtor shall remain the obligations solely of such Debtor or such Reorganized Debtor and shall not become obligations of any other Debtor or Reorganized Debtor by virtue of this Plan, the Chapter 11 Cases, or otherwise.

G.  *Cancellation of Existing Agreements, Existing BPA Equity Interests, Other Existing Equity Interests, and Certain Intercompany Interests.*

On the Effective Date, except with respect to the Exit Facilities Documents and the Exit Securitization Programs Documents, or to the extent otherwise provided in this Plan, the XBP Transaction Documents, the Confirmation Order, or any other Definitive Document, all notes, bonds, indentures, credit agreements, certificates, securities, purchase rights, options, warrants, calls, puts, awards, commitments, obligations, registration rights, preemptive rights, rights of first refusal, rights of first offer, co-sale rights, investor rights, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any existing indebtedness or obligations of or ownership interest in the Debtors or giving rise to any rights, commitments, or obligations relating to Claims against or Interests in the Debtors shall be deemed canceled and surrendered, and the obligations of the Debtors or the Reorganized Debtors, as applicable, and any Non-Debtor Affiliates thereunder or in any way related thereto shall be deemed satisfied in full, released, and discharged and the obligations of the Debtors pursuant, relating, or pertaining to any agreements, notes, bonds, indentures, credit agreements, certificates, securities, purchase rights, options, warrants, calls, puts, awards, commitments, registration rights, preemptive rights, rights of first refusal, rights of first offer, co-sale rights, investor rights, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any existing indebtedness or obligations of or ownership interest in the Debtors or giving rise to any rights or obligations relating to Claims against or Interests in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated or assumed pursuant to this Plan, if any) shall be released and discharged; *provided*, that, notwithstanding such cancellation, satisfaction, release, and discharge, anything to the contrary contained in this Plan, the XBP Transaction Documents, the Confirmation Order, or any such document or instrument that governs the rights, claims, or remedies of the Holder of a Claim or Interest shall continue in effect solely for purposes of: (1) enabling the Holder of such Claim or Interest to receive distributions on account of such Claim or Interest under this Plan as provided herein; (2) allowing and preserving the rights of the DIP Agent, the April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the Exit Financing Facilities Agents, and the Securitization Programs Agents, as applicable, to make distributions as specified under this Plan on account of Allowed Claims, as applicable, including allowing the April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Exit Financing Facilities Agents, and the Securitization Programs Agents, as applicable, to submit invoices for any amount and enforce any obligation owed to them under this Plan to the extent authorized or allowed by the applicable documents; (3) permitting the Reorganized Debtors and any other Distribution Agent, as applicable, to make distributions on account of applicable Claims and Interests, as applicable; (4) preserving the DIP Agent's, the April 2026 Notes Indenture Trustee's, the July 2026 Notes Indenture Trustee's, the April 2026 Notes Collateral Agent's, the Exit Financing Facilities Agents', and the

Securitization Programs Agents', as applicable, rights, if any, to compensation and indemnification as against any money or property distributable to the Holders of April 2026 Notes Claims, July 2026 Notes Claims, DIP Claims, and Postpetition Securitization Programs Claims, as applicable, including permitting the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Exit Financing Facilities Agents, and the Securitization Programs Agents, as applicable, to maintain, enforce, and exercise any priority of payment or charging liens against such distributions each pursuant and subject to the terms of the April 2026 Notes Indenture, July 2026 Notes Indenture, DIP Credit Agreement, and Postpetition Securitization Programs Documents, as applicable, as in effect on or immediately before the Effective Date; (5) preserving all rights, remedies, indemnities, powers, and protections, including rights of enforcement, of the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Exit Financing Facilities Agents, and the Securitization Programs Agents, as applicable, against any person other than a Released Party (which Released Parties include the Debtors, Reorganized Debtors, and Non-Debtor Affiliates), and any exculpations of the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Exit Financing Facilities Agents, and the Securitization Programs Agents, as applicable; *provided*, that the April 2026 Notes Indenture Trustee, April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Exit Financing Facilities Agents, and the Securitization Programs Agents shall remain entitled to indemnification or contribution from the Holders of April 2026 Notes Claims, July 2026 Notes Claims, DIP Claims, and Postpetition Securitization Programs Claims, each pursuant and subject to the terms of the April 2026 Notes Indenture, July 2026 Notes Indenture, DIP Credit Agreement, and Postpetition Securitization Programs Documents, as applicable, as in effect on the Effective Date; (6) permitting the April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Exit Financing Facilities Agents, and the Securitization Programs Agents, as applicable, to enforce any obligation (if any) owed to them under this Plan; (7) permitting the April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee the DIP Agent, the Exit Financing Facilities Agents, and the Securitization Programs Agents to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court; and (8) permitting the April 2026 Notes Indenture Trustee, April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Exit Financing Facilities Agents, and the Securitization Programs Agents to perform any functions that are necessary to effectuate the foregoing; *provided*, *further*, that nothing in this <u>Article IV</u> shall affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or this Plan, or (except as set forth in (5) above) the Releases of the Released Parties pursuant to <u>Article IX</u>, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable, except as expressly provided for in this Plan.  For the avoidance of doubt, nothing in this <u>Article IV</u> shall cause the Reorganized Debtors' obligations under the Exit Facilities Documents and the Exit Securitization Programs Documents to be deemed satisfied in full, released, or discharged; *provided*, *further*, that notwithstanding this sentence, the April 2026 Notes Claims, July 2026 Notes Claims, DIP Claims, and Postpetition Securitization Programs Claims shall be deemed satisfied in full, released, and discharged on the Effective Date.  In furtherance of the foregoing, as of the Effective Date, Holders of April 2026 Notes Claims, July 2026 Notes Claims, DIP Claims, and Postpetition Securitization Programs Claims shall be deemed to have released any such Claims against the Reorganized Debtors under the April 2026 Notes Indenture, the July 2026 Notes Indenture, the DIP Documents, and the Postpetition Securitization Programs Documents, and each of such Claims against any of the Reorganized Debtors in respect of such April 2026 Notes Claims, July 2026 Notes Claims, DIP Claims, and Postpetition Securitization Programs Claims.

Except as otherwise provided in this Plan or the Confirmation Order, on the Effective Date, the April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Securitization Programs Agents and each of their respective directors, officers, employees, agents, Affiliates, controlling persons, and legal and financial advisors shall be automatically and fully released and discharged from any further responsibility under the April 2026 Notes Indenture, the July 2026 Notes Indenture, the DIP Credit Agreement, the Prepetition Securitization Programs Documents,

and the Postpetition Securitization Programs Documents, as applicable.  The April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Securitization Programs Agents, and each of their respective directors, officers, employees, agents, Affiliates, controlling persons, and legal and financial advisors shall be discharged and shall have no further obligation or liability in respect of the April 2026 Notes Indenture, the July 2026 Notes Indenture, the DIP Credit Agreement, the Prepetition Securitization Programs Documents, and the Postpetition Securitization Programs Documents, as applicable, except as provided in this Plan and the Confirmation Order, and after the performance by the April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Securitization Programs Agents, and their Representatives and professionals of any obligations and duties required under or related to this Plan or the Confirmation Order, the April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, the Securitization Programs Agents, and each of their respective directors, officers, employees, agents, Affiliates, controlling persons, and legal and financial advisors shall be relieved of and released from any obligations and duties arising thereunder.  The fees, expenses, and costs of the April 2026 Notes Indenture Trustee, the April 2026 Notes Collateral Agent, the July 2026 Notes Indenture Trustee, the DIP Agent, and the Securitization Programs Agents, including fees, expenses, and costs of each of their respective professionals incurred after the Effective Date in connection with the April 2026 Notes Indenture, the July 2026 Notes Indenture Trustee, the DIP Credit Agreement, or the Prepetition Securitization Programs Documents, as applicable, and reasonable and documented fees, costs, and expenses associated with effectuating distributions pursuant to this Plan, including the fees and expenses of counsel, if any, shall be paid in accordance with the terms of this Plan and the applicable Definitive Documents.

H.      *Sources for Plan Distributions and Transfers of Funds Among Debtors*

        The Debtors shall fund Cash distributions under this Plan with Cash on hand, including Cash from operations, and the proceeds of the DIP Facility, Exit Facilities, and the Exit Securitization Programs.  The Debtors shall make non-Cash distributions as required under this Plan in the form of Exit Debt and Plan Securities.  Cash payments to be made pursuant to this Plan shall be made by the Reorganized Debtors in accordance with Article VI.  Subject to any applicable limitations set forth in any post-Effective Date agreement, the Reorganized Debtors shall be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under this Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers shall be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and shall not violate the terms of this Plan.

        From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date agreement (including the New Organizational Documents, the Exit Facilities Documents, and the Exit Securitization Programs Documents), shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing in accordance with, and subject to, applicable law.

I.      *Exit Financing Facilities and Exit Facilities Documents*

        To the extent required and subject to the occurrence of the Effective Date, Confirmation of this Plan shall be deemed to constitute approval by the Bankruptcy Court of the Exit Facilities Documents (including all transactions contemplated thereby, such as any supplementation or syndication of the Exit Debt, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the incurrence of Liens securing the Exit Facilities and the payment of all fees, payments, indemnities, and expenses associated therewith) and, subject to the occurrence of the Effective Date, authorization for the applicable Reorganized Debtors to enter into and perform their obligations under the Exit Facilities Documents and such other documents as may be

reasonably required or appropriate, subject to any consent or approval rights under the Definitive Documents. On or around the Effective Date, the Reorganized Debtors shall execute and deliver the Exit Facilities Documents, and shall execute, deliver, file, record, and issue any other related notes, guarantees, security documents, instruments, or agreements in connection therewith, in each case, without (a) further notice to the Bankruptcy Court, or (b) further act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity.

On the Effective Date, the Exit Facilities Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Exit Facilities Documents are being extended, and shall be deemed to have been extended, and all related payments made in connection therewith shall have been made, in each case, in good faith, for legitimate business purposes, for reasonably equivalent value, as an inducement to the applicable lenders to extend credit under the Exit Facilities, are reasonable, shall not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the Liens and security interests to be granted, carried forward, continued, amended, and/or reaffirmed under the Exit Facilities Documents shall: (1) be continuing, legal, binding, and enforceable Liens on, and security interests in, the collateral granted in accordance with the terms of the applicable Exit Facilities Documents; (2) be granted, carried forward, continued, amended, extended, reaffirmed, and deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted thereunder; and (3) not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and shall thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

J.      *Exit Securitization Programs and Exit Securitization Programs Documents*

To the extent required and subject to the occurrence of the Effective Date, Confirmation of this Plan shall be deemed to constitute approval by the Bankruptcy Court of the Exit Securitization Programs Documents (including all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the incurrence of Liens securing the Exit Securitization Programs and the payment of all fees, payments, indemnities, and expenses associated therewith) and, subject to the occurrence of the Effective Date, authorization for the applicable Reorganized Debtors to enter into and perform their obligations under the Exit Securitization Programs Documents and such other documents as may be reasonably required or appropriate, subject to any consent or approval rights under the Definitive Documents. On or around the Effective Date, the Reorganized Debtors shall execute and deliver the Exit Securitization Programs Documents, and shall execute, deliver, file, record, and issue any other related notes, guarantees, security documents, instruments, or agreements in connection therewith, in each case, without (a) further notice to the Bankruptcy Court, or (b) further act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity.

On the Effective Date, the Exit Securitization Programs Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Exit Securitization Programs Documents are being extended, and shall be deemed to have been extended, and all related payments made in connection therewith shall have been made, in each case, in good faith, for legitimate business purposes, for reasonably equivalent value, as an inducement to the applicable lenders to extend credit under the Exit Securitization Programs, are reasonable, shall not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the Liens and security interests to be granted, carried forward, continued, amended, extended, and/or reaffirmed under the Exit Securitization Programs Documents shall: (1) be continuing, legal, binding, and enforceable Liens on, and security interests in, the collateral granted in accordance with the terms of the applicable Exit Securitization Programs Documents; (2) be granted, carried forward, continued, amended, extended, reaffirmed, and deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted thereunder; and (3) not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and shall thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

K.    *Issuance of Securities*

On the Effective Date, (a) New Parent shall issue or reserve for issuance and deliver the Plan Securities in accordance with the terms of this Plan, the Restructuring Steps Exhibit, and the New Organizational Documents; *provided*, that New Parent Interests issued to the Consenting ETI Parties on the Effective Date shall be Blocked ETI Shares, as described in greater detail in Article IV.N, and (b) BPA, XCV-EMEA, and BTC, as applicable and/or their respective designee(s), shall effectuate the BTC Transaction in accordance with the terms of this Plan and the Restructuring Steps Exhibit.

The issuance and delivery of the Plan Securities is authorized without the need for further corporate or other action or any consent or approval of any national securities exchange upon which the Plan Securities may be listed on or immediately following the Effective Date. All of the Plan Securities issuable under this Plan, the XBP Transaction Documents, the Restructuring Steps Exhibit, and the Confirmation Order shall, when so issued be duly authorized, validly issued, fully paid, and non-assessable. The issuance and delivery of the Plan Securities in accordance and connection with this Plan, the Restructuring Steps Exhibit, the XBP Transaction Documents, and the Confirmation Order are authorized without the need for any further limited liability company or corporate action and without any further action by any Holder of a Claim or Interest, except, in the case of New Parent Interests, BTC Distribution Shares, and New Parent Warrants, as may be required under applicable stock exchange rules on which the Securities of XBP or New Parent are then listed.

Any Holder of an Allowed April 2026 Notes Claim, Allowed July 2026 Notes Claim, and Holder of a Claim on account of Premiums and Fees may designate that all or a portion of such Holder's share of the Plan Securities to be distributed as part of the treatment of such Allowed April 2026 Notes Claim, July

2026 Notes Claim, or Claim on account of Premiums and Fees be registered in the name of, and delivered to, its designee by delivering notice thereof to counsel to the Debtors and to the Notice and Claims Agent at least five (5) Business Days prior to the Effective Date.  Any such designee must be an "accredited investor" as such term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

On the Effective Date, the New Parent, BPA, XCV-EMEA, and BTC, as applicable and/or their respective designee(s), which may include the Distribution Agent, shall issue and/or distribute, as applicable, Plan Securities (excluding, for the avoidance of doubt, New Parent Interests issuable on account of the New Parent Warrants) to the Holders of Allowed April 2026 Notes Claims, Allowed July 2026 Notes Claims, and Claims on account of the Premiums and Fees pursuant to this Plan and the Restructuring Steps Exhibit (including the XBP Transaction and the BTC Transaction).

Each distribution, issuance, and conversion referred to in <u>Article VI</u> hereof shall be governed by the terms and conditions set forth in this Plan and the XBP Transaction Documents, applicable to such distribution, issuance, or conversion and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

1.    <u>Listing / Transfer of Plan Securities</u>

On the Effective Date, New Parent shall issue the Plan Securities pursuant to this Plan and the New Organizational Documents.  New Parent intends that the Exchanged New Parent Interests will be listed on the national stock exchange on which the New Parent Interests are then listed and will use its commercially reasonable efforts to effectuate the same.  Distributions of the Plan Securities (other than the New Parent Warrants, which shall be delivered in certificated form or book-entry form on the books and records of the applicable issuer or its transfer agent) shall be delivered via book-entry transfer by the Distribution Agent through the facilities of DTC.  Upon the Effective Date, after giving effect to the Restructuring Transactions, the New Parent Interests shall be that number of shares or membership interests as may be designated in the New Organizational Documents.

On and after the Effective Date, transfers of Plan Securities shall be made in accordance with applicable United States law, United States securities laws (as applicable), and the New Organizational Documents.

L.    *Exemption from Registration Requirements*

No registration statement shall be filed under the Securities Act, or pursuant to any state securities laws, with respect to the offer, issuance and distribution of the Plan Securities or the Rollover Exit Notes under this Plan (including in respect of the Premiums and Fees), the XBP Transaction Documents, the Restructuring Steps Exhibit, the Confirmation Order and the New Parent Warrants Agreement.

The offering, sale, issuance, and distribution of the Plan Securities (including in respect of the Premiums and Fees and, if applicable, the issuance of New Parent Interests upon exercise of the New Parent Warrants) in exchange for Claims pursuant to <u>Article II</u>, <u>Article III</u> and other provisions of this Plan, the Confirmation Order, the DIP Backstop Commitment Letter, and the XBP Transaction Documents shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable United States, state, or local law requiring registration for the offer or sale of a security pursuant to section 1145(a) of the Bankruptcy Code.  Any and all such Plan Securities (including New Parent Interests issuable upon the exercise of New Parent Warrants) issued pursuant to Section 1145(a) of the Bankruptcy Code may be resold without registration under the Securities Act by the recipients thereof pursuant to the exemption provided by Section 4(a)(1) of the Securities Act, unless the holder (i) is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy

Code, (ii) is an "affiliate" of New Parent, as applicable (as defined in rule 144(a)(1) in the Securities Act), or (iii) has been such an "affiliate" within ninety (90) days of such transfer, in each case subject to (1) compliance with any applicable state or foreign securities laws, if any, and any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Securities; (2) the restrictions, if any, on the transferability of such Securities in the Organizational Documents of the issuer of, or in agreements or instruments applicable to holders of, such Securities; and (3) any other applicable regulatory approval.

The offering, sale, issuance, and distribution of the Rollover Exit Notes is being made in reliance upon Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder and on equivalent state law registration exemptions or, solely to the extent such exemptions are not available, other available exemptions from registration under the Securities Act.  Any recipients of the Plan Securities that are Affiliates of New Parent, and any Entity receiving Rollover Exit Notes under this Plan or acquiring New Parent Interests or Rollover Exit Notes on account of the ETI Funding Obligations or the XBP Alternative Funding, will receive restricted Plan Securities or Rollover Exit Notes, as applicable, that may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144A, Regulation S, and/or Rule 144 of the Securities Act, subject to, in each case, the transfer provisions, if any, and other applicable provisions set forth in the Organizational Documents of the applicable issuers.

The Reorganized Debtors and New Parent need not provide any further evidence other than this Plan and the Confirmation Order with respect to the treatment of the Plan Securities or Rollover Exit Notes under applicable securities laws.

Notwithstanding anything to the contrary in this Plan, no Person or Entity (including, for the avoidance of doubt, DTC) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by this Plan, including, for the avoidance of doubt, whether the Plan Securities and Rollover Exit Notes are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.  All such Persons and Entities including DTC shall be required to accept and conclusively rely upon this Plan or the Confirmation Order in lieu of a legal opinion regarding whether the Plan Securities and Rollover Exit Notes are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.  Notwithstanding any policies, practices, or procedures of DTC, DTC and any participants and intermediaries shall fully cooperate and take all actions to facilitate any and all transactions necessary or appropriate for implementation of this Plan or other contemplated thereby, including any and all distributions pursuant to this Plan.

M.      *New Organizational Documents*

Subject to Article IV.E, the Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and provisions of this Plan, the Plan Support Agreement, and the Restructuring Steps Exhibit, including the BTC Transaction and the XBP Transaction Documents.  Without limiting the generality of the foregoing, as of the Effective Date, each of the Reorganized Debtors shall be governed by the New Organizational Documents applicable to it. On the Effective Date, the Organizational Documents of each of the Reorganized Debtors will be deemed to be modified to prohibit the issuance of non-voting equity Securities, solely to the extent required under section 1123(a)(6) of the Bankruptcy Code.  On or immediately before the Effective Date, each Reorganized Debtor shall file its applicable New Organizational Documents, if any, with the applicable Secretary of State and/or other applicable authorities in its jurisdiction of incorporation or formation in accordance with applicable laws of its jurisdiction of incorporation or formation, to the extent required for such New Organizational Documents to become effective.

N.      *ETI Funding Obligations; Blocked ETI Shares*

The Consenting ETI Parties shall provide the Reorganized Debtors a commitment to pay the ETI Funding Obligations.  Payment of the ETI Funding Obligations may be in the form of the purchase by one or more of the Consenting ETI Parties for Cash of (a) Rollover Exit Notes or, (b)  New Parent Interests at Plan Equity Value.

Any settlement of the Transaction Tax Liability that occurs prior to the Effective Date shall require the consent of the Required Consenting Creditors (such consent not to be unreasonably withheld), and after the Effective Date, shall require the consent of the New Board (such consent not to be unreasonably withheld).  For the avoidance of doubt, any amounts of the Transaction Tax Liability between $15,000,000 and $25,000,000 shall be the obligation of the Reorganized Debtors and the Reorganized Debtors shall pay any such amounts promptly when due.

On the Effective Date all New Parent Interests received by the Consenting ETI Parties pursuant to the Plan (collectively, the "***Blocked ETI Shares***") shall be deposited or placed in one or more segregated accounts or given to a collateral agent pursuant to documentation in form and substance reasonably satisfactory to the Debtors, the Consenting ETI Parties, and the Required Consenting Creditors (the "***Blocked ETI Shares Documentation***"), *provided*, that such documentation shall permit the Consenting ETI Parties to sell such Blocked ETI Shares so long as the proceeds are applied to the ETI Funding Obligation.  The Blocked ETI Shares Documentation shall provide that if the Consenting ETI Parties fail to pay the ETI Funding Obligations when due (as determined by the Independent Tax Advisor), the Reorganized Debtors shall be permitted, and the Consenting ETI Parties shall consent to, the Reorganized Debtors' directing the sale of the Blocked ETI Shares to satisfy the ETI Funding Obligations (inclusive of any reasonable fees and expenses incurred by the Reorganized Debtors in connection with the sale of the Blocked ETI Shares).

The Blocked ETI Shares Documentation shall provide that (a) following payment of the Initial ETI Funding Obligation through purchase of Rollover Exit Notes for Cash, 50% of the Blocked ETI Shares shall be released and (b) following payment of the Initial ETI Funding Obligation through the purchase of New Parent Interests for Cash at the Plan Equity Value on the Effective Date, 90% of the Blocked ETI Shares shall be released.  The Blocked ETI Shares Documentation shall also provide that upon (x) payment in full of the Transaction Tax Liability (as such Transaction Tax Liability is determined by the Independent Tax Advisor) and satisfaction of the ETI Funding Obligations or (y) the funding in Cash of an amount equal to the ETI Funding Obligations estimated by the Independent Tax Advisor into a segregated or collateral deposit account subject to documentation in form and substance reasonably satisfactory to the Debtors, the Consenting ETI Parties, and the Required Consenting Creditors, all remaining Blocked ETI Shares shall be released.  For the avoidance of doubt, the Blocked ETI Shares shall be entitled to the benefits of the Registration Rights Agreement.

O.      *Release of Liens and Claims*

To the fullest extent provided under section 1141(c) and other applicable provisions of the Bankruptcy Code, except as otherwise provided in this Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document entered into or delivered in connection with this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to <u>Article VI</u>, all Liens, Claims, mortgages, deeds of trust, or other security interests against the assets or property of the Debtors or the Estates shall be fully released, canceled, terminated, extinguished, and discharged, in each case without further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity; *provided*, that (1) the Liens granted to the DIP Agent pursuant to the DIP Credit Agreement and (2) any and all Liens or security securing the Debtor's obligations under the Insurance Contracts, which, for avoidance of doubt,

includes grants of security interests in escrow accounts, deposit accounts, Cash Collateral, and letters of credit issued for the benefit of Insurers, shall remain in full force and effect solely to the extent provided for in this Plan.  The filing of the Confirmation Order with any federal, state, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens, Claims, and other Interests to the extent provided in the immediately preceding sentence.  Any Person or Entity holding such Liens, Claims, or Interests shall, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction, and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors.

P.     *Exemption from Certain Taxes and Fees*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any issuance, transfer or exchange (whether from a Debtor to a Reorganized Debtor or to any other Person) under, pursuant to, in contemplation of, or in connection with this Plan (including the BTC Transaction, the XBP Transaction and the other Restructuring Transactions), including pursuant to (1) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtors, the Reorganized Debtors, or any of their Affiliates, including the Exit Debt, the Plan Securities, or related instruments or documentation, (2) the maintenance, creation, modification, consolidation, termination, refinancing, or recording of any mortgage, Lien, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (3) the making, assignment, or recording of any lease or sublease, (4) the grant of collateral security for any or all of the Exit Debt or other indebtedness, or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan (including the BTC Transaction, the XBP Transaction and the other Restructuring Transactions), shall not be subject to any document tax, recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate U.S. federal, state or local governmental officials, agents, or filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, and shall forego the collection of any such tax, fee or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, fee or governmental assessment.

Q.     *New Board*

As of the Effective Date, except as set forth in this <u>Article IV.Q</u>, all directors, managers, and other members of existing boards or governance bodies of the Debtors, as applicable, shall cease to hold office or have any authority from and after such time to the extent not previously included in the roster of the New Board.

The New Board shall consist of seven (7) directors, consisting of (a) New Parent's Chief Executive Officer, (b) two (2) members selected by the Consenting ETI Parties, and (c) four (4) members selected by the Consenting Creditors (other than the Consenting ETI Parties and Holders of July 2026 Notes); *provided*, that if the ETI Penalty occurs, the New Board shall instead consist of (x) New Parent's Chief Executive Officer, (y) one (1) member selected by the Consenting ETI Parties, and (z) five (5) members selected by the Consenting Creditors (other than the Consenting ETI Parties and Holders of July 2026 Notes Claims). The membership of the New Board must comply with the independence requirements for listing on the Nasdaq ISE Exchange.

The New Board's maintenance of office and/or replacement shall be in accordance with the New Organizational Documents of New Parent.

R.     *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to the Releases and exculpation set forth in this section and in Article IX below, all Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor on the Effective Date, including each Cause of Action set forth in the Schedule of Retained Causes of Action included in the Plan Supplement. Thereafter, the Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, whether arising before or after the Petition Date, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. **No Entity may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any specific Cause of Action as any indication that the Debtors or the Reorganized Debtors shall not pursue any or all available Causes of Action. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in this Plan**, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches, shall apply to any Cause of Action upon, after, or as a consequence of the Confirmation or the occurrence of the Effective Date. In addition, the Debtors and the Reorganized Debtors expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any of the Debtors are a plaintiff, defendant, or an interested party, against any Person or Entity, including the plaintiffs or co-defendants in such lawsuits. For the avoidance of doubt, in no instance shall any Cause of Action preserved pursuant to this Article IV.R include any Claim or Cause of Action released or exculpated under this Plan (including by the Debtors).

S.     *Corporate Action*

Each of the Debtors, New Parent, and the other Reorganized Debtors may take any and all actions to execute, deliver, File or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the provisions of this Plan, the XBP Transaction Documents, and the transactions set forth in the Restructuring Steps Exhibit, and without further notice to or order of the Bankruptcy Court, any act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of New Parent, the Debtors, or the other Reorganized Debtors or by any other Person (except for those expressly required pursuant hereto or by the Definitive Documents).

Upon the Effective Date, all actions contemplated by this Plan, the XBP Transaction Documents, and the Restructuring Steps Exhibit shall be deemed authorized, approved, and, to the extent taken before the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, or officers of New Parent, the Debtors, the other Reorganized Debtors, or any other Entity (except for those expressly required pursuant to this Plan or the Definitive Documents), including: (1) assumption and rejection (as applicable) of Executory Contracts and Unexpired Leases; (2) selection of the directors, managers, and officers for each of the Reorganized Debtors; (3) the execution of the New Organizational Documents and the Exit Facilities Documents; (4) the issuance and delivery of the Plan Securities; (5) the incurrence of the Exit Facilities; (6) the Exit Securitization Programs; (7) the XBP Transaction; (8) the BTC Transaction; (9) implementation of the Restructuring Transactions; (10) entry into and performance of the Registration Rights Agreement; (11) appointment of the Claims Ombudsman; and (12) all other acts or actions contemplated, or reasonably necessary or appropriate to promptly consummate the transactions contemplated by this Plan and the XBP Transaction Documents (whether occurring before,

on, or after the Effective Date).  All matters provided for in this Plan and the XBP Transaction Documents involving the company structure of the Debtors, and any company action required by the Debtors in connection therewith, shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, authorized persons, or officers of the Debtors, the Reorganized Debtors, or otherwise.

Before, on, and after the Effective Date, the appropriate officers, directors, managers, or authorized persons of the Debtors, the Reorganized Debtors, or any direct or indirect subsidiaries of the Reorganized Debtors (including any president, vice-president, chief executive officer, treasurer, general counsel, secretary, or chief financial officer thereof) shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, memoranda and articles of association, certificates of incorporation, certificates of formation, bylaws, operating agreements, other organization documents, and instruments contemplated by this Plan and the XBP Transaction Documents (or necessary or desirable to effect the transactions contemplated by this Plan and the XBP Transaction Documents) in the name of and on behalf of the applicable Debtors or applicable Reorganized Debtors, including the (1) New Organizational Documents, (2) Exit Facilities Documents, (3) Exit Securitization Programs Documents, (4) XBP Transaction Documents, (5) the New Parent Warrants Agreement, and (6) all other agreements, documents, securities, and instruments relating to or contemplated by the foregoing.  Before or on the Effective Date, each of the Debtors and Reorganized Debtors is authorized, with the consent of the Required Consenting Creditors and the Consenting ETI Parties, to change its name or corporate form and to take such other action as required to effectuate a change of name or corporate form in the jurisdiction of incorporation of the applicable Debtor or Reorganized Debtor.  To the extent the Debtors change their names or corporate form before the closing of the Chapter 11 Cases, the Debtors shall change the case captions accordingly.

The authorizations, approvals and directives contemplated by this Article IV.S shall be effective notwithstanding any requirements under non-bankruptcy law.

T.    *Claims Ombudsman*

Subject to entering into an agreement on reasonable terms (the "***Claims Ombudsman Agreement***") reasonably acceptable to the Debtors, the Committee, the Consenting ETI Parties, and the Required Consenting Creditors, on the Effective Date or as soon as reasonably practicable thereafter, the Debtors shall appoint a Claims Ombudsman, with duties that include (a) certain rights with respect to the reconciliation, allowance, and settlement of Claims by or on behalf of (and in consultation with) the Reorganized Debtors, (b) consultation rights with respect to distributions to the Holders of Convenience Claims and General Unsecured Claims, and (c) such other matters as may be agreed upon between the Debtors, the Committee, and the Reorganized Debtors (as applicable).  The Claims Ombudsman shall, on behalf of the Holders of General Unsecured Claims, be the deemed secured party in respect of, and shall have the exclusive authority to take any action to enforce the security interest in, the GUC Payment Obligations Collateral.

Subject to the terms of the Claims Ombudsman Agreement, the Claims Ombudsman (a) shall be entitled to a reasonable fee (the "***Claims Ombudsman Fee***"), the terms, amount, and structure of which shall be set forth in the Claims Ombudsman Agreement, (b) may employ, with the prior written consent of the Debtors or the Reorganized Debtors, but without further order of the Bankruptcy Court, professionals (the "***Claims Ombudsman Professionals***") to assist in carrying out the duties described above and (c) shall have standing to appear before and be heard by the Bankruptcy Court and other courts of competent jurisdiction in connection with each of the foregoing duties, rights, and authorities.  The Claims Ombudsman Fee and the reasonable and documented fees and expenses incurred by the Claims Ombudsman Professionals (the "***Claims Ombudsman Professionals Fees***") shall be expenses of the Reorganized Debtors; *provided*, that the Claims Ombudsman Fee and the Claims Ombudsman Professionals Fees shall be in all respects subject to (a) a budget satisfactory to the Reorganized Debtors

and the Required Consenting Creditors and/or (b) a cap set forth in the Claims Ombudsman Agreement in each case satisfactory to the Reorganized Debtors and the Required Consenting Creditors.  The Claims Ombudsman shall be a fiduciary to Holders of Convenience Claims and General Unsecured Claims.  The Claims Ombudsman and the Claims Ombudsman Professionals, each in their capacities as such, shall be exculpated, except for fraud, bad faith, willful misconduct, or gross negligence.

U.      *Effectuating Documents; Further Transactions*

Before, on, and after the Effective Date, the Debtors, the Reorganized Debtors, and the directors, managers, officers, authorized persons, and members of the boards of directors or managers and directors or managers of the foregoing, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, notes, instruments, certificates, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and provisions of this Plan, the XBP Transaction Documents, the New Organizational Documents, the Exit Facilities Documents, the BTC Transaction, and any Securities issued pursuant to this Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant to this Plan.

V.      *Authority of the Debtors*

Effective on the Confirmation Date, the Debtors and the Reorganized Debtors shall be empowered and authorized to take or cause to be taken, before the Effective Date, all actions necessary or appropriate to achieve the Effective Date and enable the Reorganized Debtors to implement effectively the provisions of this Plan, the XBP Transaction Documents, the Confirmation Order, the Definitive Documents, and the Restructuring Transactions.

W.      *No Substantive Consolidation*

This Plan is being proposed as a joint chapter 11 plan of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan for each Debtor.  This Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in this Plan.

X.      *Continuing Effectiveness of Final Orders*

Payment authorization granted to the Debtors under any prior Final Order entered by the Bankruptcy Court shall continue in effect after the Effective Date.  Accordingly, the Debtors or the Reorganized Debtors may pay or otherwise satisfy any Claim to the extent permitted by, and subject to, the applicable Final Order without regard to the treatment that would otherwise be applicable to such Claim under this Plan.

Y.      *Modifications to Executory Contracts and Unexpired Leases*

The Debtors are authorized to enter into, and perform under, amendments or modifications of any Executory Contracts or Unexpired Leases with the counterparty to such Executory Contract or Unexpired Lease and pay any amounts due as a result of such amendment or modification.

**Article V.**
**TREATMENT OF EXECUTORY CONTRACTS**
**AND UNEXPIRED LEASES; EMPLOYEE BENEFITS; AND INSURANCE POLICIES**

A.      *Assumption of Executory Contracts and Unexpired Leases*

On the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors will be assumed by the Debtors in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts and Unexpired Leases that:

(i)      have been assumed or rejected by the Debtors by prior order of the Bankruptcy Court;

(ii)     are the subject of a motion to reject Filed by the Debtors pending on the Effective Date;

(iii)    are identified as rejected Executory Contracts and Unexpired Leases by the Debtors, subject to the consent of the Required Consenting Creditors, on the Rejected Executory Contract/Unexpired Lease List, to be Filed in the Plan Supplement, which Plan Supplement may be amended by the Debtors, subject to the consent of the Required Consenting Creditors, to add or remove Executory Contracts and Unexpired Leases by Filing with the Bankruptcy Court an amended Plan Supplement and serving it on the affected non-Debtor contract parties prior to the Effective Date;

(iv)     are Related Parties Contracts that are not included on the Assumed Related Parties Contracts List, subject to the consent of the Required Consenting Creditors; or

(v)      are rejected or terminated pursuant to the terms of this Plan.

To the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned (as applicable) pursuant to this Plan or any prior order of the Bankruptcy Court (including any "change of control" provision) prohibits, restricts or conditions, or purports to prohibit, restrict or condition, or is modified, breached or terminated, or deemed modified, breached or terminated by, (i) the commencement of these Chapter 11 Cases or the insolvency or financial condition of any Debtor at any time before the closing of its respective Chapter 11 Case, (ii) any Debtor's or any Reorganized Debtor's assumption or assumption and assignment (as applicable) of such Executory Contract or Unexpired Lease or (iii) the Confirmation or consummation of this Plan, then such provision shall be deemed modified such that the transactions contemplated by this Plan shall not entitle the non-Debtor party thereto to modify or terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights or remedies with respect thereto, and any required consent under any such contract or lease shall be deemed satisfied by the Confirmation of this Plan.

Each Executory Contract and Unexpired Lease assumed and/or assigned pursuant to this Plan shall revest in and be fully enforceable by the applicable Reorganized Debtor or the applicable assignee in accordance with its terms and conditions, except as modified by the provisions of this Plan, any order of the Bankruptcy Court approving its assumption and/or assignment, or applicable law.

The inclusion or exclusion of a contract or lease on any schedule or exhibit shall not constitute an admission by any Debtor that such contract or lease is an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder.

B.      *Cure of Defaults; Assignment of Executory Contracts and Unexpired Leases*

Any defaults under each Executory Contract and Unexpired Lease to be assumed, or assumed and assigned, pursuant to this Plan shall be satisfied, pursuant to and to the extent required by section 365(b)(1) of the Bankruptcy Code, by payment of the applicable Cure Claim.

In the event of an assumption, or an assumption and assignment, of an Executory Contract or Unexpired Lease under this Plan, at least twenty-one (21) days prior to the deadline to object to this Plan, the Debtors shall File and serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption, or proposed assumption and assignment, which will: (a) list the applicable Cure Claim, if any; (b) if applicable, identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for Filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption, or proposed assumption and assignment under this Plan, or any related Cure Claim, must be Filed, served, and actually received by the Debtors prior to the deadline to object to this Plan (notwithstanding anything in the schedules or a Proof of Claim to the contrary).  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, or proposed assumption and assignment, or Cure Claim will be deemed to have consented to such matters and will be deemed to have forever released and waived any objection to such proposed assumption, proposed assumption and assignment, and Cure Claim.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving each proposed assumption, or proposed assumption and assignment, of Executory Contracts and Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

In the event of a dispute regarding (a) the amount of any Cure Claim, (b) the ability of any Debtor or assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or assumed and assigned or (c) any other matter pertaining to assumption or assignment, the applicable cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving such assumption, or assumption and assignment; provided, however, that following the resolution of any such dispute, the Debtors or the Reorganized Debtors, as applicable, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming or assuming and assigning it.  The Debtors or the Reorganized Debtors, as applicable, shall be authorized to effect such rejection by Filing a written notice of rejection with the Bankruptcy Court and serving such notice on the applicable counterparty within ten (10) days of the entry of such Final Order.

Subject to any Disputed Cure Claims, assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to this Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assumption and assignment, in each case as provided in section 365 of the Bankruptcy Code.  Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned by Final Order shall be deemed disallowed and expunged (subject to any Disputed Cure Claims), without further notice to or action, order, or approval of the Bankruptcy Court.

With respect to any Executory Contract or Unexpired Lease assumed and assigned pursuant to this Plan, upon and as of the Effective Date, the applicable assignee shall be deemed to be substituted as a party thereto for the applicable Debtor party to such assigned Executory Contract or Unexpired Lease and, accordingly, the Debtors and the Reorganized Debtors shall be relieved, pursuant to and to the extent set forth in section 365(k) of the Bankruptcy Code, from any further liability under such assigned Executory Contract or Unexpired Lease.

C.      *Rejection of Executory Contracts and Unexpired Leases*

The Debtors reserve the right at any time prior to the Effective Date, except as otherwise specifically provided herein, to seek to reject any Executory Contract or Unexpired Lease and to File a motion requesting authorization for the rejection of any such contract or lease.  All Executory Contracts and Unexpired Leases listed on the Rejected Executory Contract/Unexpired Lease List shall be deemed rejected as of the Effective Date.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejections described in this Article V pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  Rejection of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall not constitute a termination of any preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.

D.      *Claims on Account of the Rejection of Executory Contracts or Unexpired Leases*

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to this Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after service of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.

Any Person or Entity that is required to File a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against the Debtors, the Reorganized Debtors or the Estates, and the Debtors, the Reorganized Debtors, and their Estates and their respective assets and property shall be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article IX.F.

E.      *Contracts and Leases Entered into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor may be performed by the applicable Debtor or Reorganized Debtor in the ordinary course of business without further approval of the Bankruptcy Court.

F.      *Reservation of Rights*

Nothing contained in this Plan shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.  If there is a dispute regarding a Debtor's or Reorganized Debtor's liability under an assumed Executory Contract or Unexpired Lease, the Reorganized Debtors shall be authorized to move to have such dispute heard by the Bankruptcy Court pursuant to Article X.

G.      *Directors and Officers Insurance Policies*

On the Effective Date the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Insurance Policies (including any "tail coverage" and all agreements, documents, or instruments related thereto) in effect before the Effective Date pursuant to sections 105 and 365(a) of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court. Confirmation of this Plan shall not discharge, impair, or otherwise modify any indemnity obligations

assumed by the foregoing assumption of the D&O Insurance Policies, and each such indemnity obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under this Plan as to which no Proof of Claim need be Filed. The Debtors and, after the Effective Date, the Reorganized Debtors shall retain the ability to supplement such D&O Insurance Policies as the Debtors or Reorganized Debtors, as applicable, may deem necessary. For the avoidance of doubt, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Insurance Policies.

In addition, on or after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Insurance Policies (including any "tail policy" and all agreements, documents, or instruments related thereto) in effect on or before the Effective Date, with respect to conduct occurring prior thereto, and all current and former directors, officers, and managers of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policies for the full term of such policies regardless of whether such current and former directors, officers, and managers remain in such positions after the Effective Date, all in accordance with and subject in all respects to the terms and conditions of the D&O Insurance Policies, which shall not be altered.

H.    *Other Insurance Contracts*

On the Effective Date, each of the Debtors' Insurance Contracts in existence as of the Effective Date shall be Reinstated and continued in accordance with their terms and, to the extent applicable, shall be deemed assumed by the applicable Reorganized Debtor pursuant to section 365 of the Bankruptcy Code and Article V. Nothing in this Plan shall affect, impair, or prejudice the rights of the insurance carriers, the insureds, or the Reorganized Debtors under the Insurance Contracts in any manner, and such insurance carriers, the insureds, and Reorganized Debtors shall retain all rights and defenses under such Insurance Contracts. The Insurance Contracts shall apply to and be enforceable by and against the insureds and the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors, as existed before the Effective Date.

I.    *Indemnification Provisions and Reimbursement Obligations*

On and as of the Effective Date, and except as prohibited by applicable law, the Indemnification Provisions shall be deemed rejected as of the Effective Date.

The New Organizational Documents shall provide to the fullest extent provided by law for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to the Debtors' and the Reorganized Debtors' post-Effective Date directors, officers, equity holders, managers, members, employees, accountants, investment bankers, attorneys, other professionals, agents of the Debtors, and such directors', officers', equity holders', managers', members', and employees' respective Affiliates (each of the foregoing solely in their capacity as such) at least to the same extent as the Indemnification Provisions, against any Claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted.

Prior to the Effective Date, the Debtors shall fund and purchase appropriate D&O insurance and "tail coverage" for the Debtors' directors, officers, managers, and employees, solely in their capacities as such for the Debtors.

J.    *Employee Compensation and Benefits*

    1.    Compensation and Benefits Programs

    Subject to the provisions of this Plan, all Compensation and Benefits Programs (other than awards of stock options, restricted stock, restricted stock units, and other equity awards, equity or equity-based incentive plans, employee stock purchase plans, and any other agreements or awards, or provisions set forth in any Compensation and Benefits Programs or Assumed Employee Agreements that provide for rights to acquire Interests and any agreement or plan whose value is related to Interests or other ownership interests of the Debtors, which, in each case, shall not constitute or be deemed to constitute Executory Contracts and shall be deemed terminated on the Effective Date) shall be treated as Executory Contracts under this Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.  All Proofs of Claim Filed for amounts due under any Compensation and Benefits Program shall be considered satisfied by the applicable agreement and/or program and agreement to assume and cure in the ordinary course as provided in this Plan.  All collective bargaining agreements to which any Debtor is a party, and all Compensation and Benefits Programs which are maintained pursuant to such collective bargaining agreements or to which contributions are made or benefits provided pursuant to a current or past collective bargaining agreement, shall be deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code and the Reorganized Debtors reserve all of their rights under such agreements.  For the avoidance of doubt, the Debtors and Reorganized Debtors, as applicable, shall honor all their obligations under section 1114 of the Bankruptcy Code.

    None of the Restructuring Transactions, or any assumption of Compensation and Benefits Programs pursuant to the terms herein shall be deemed to trigger any applicable change of control, vesting, termination, acceleration, or similar provisions therein; *provided*, that the Assumed Employee Agreements shall be assumed and governed by the terms thereof.  Subject to the preceding sentence, no counterparty shall have rights under a Compensation and Benefits Program assumed pursuant to this Plan other than those applicable immediately before such assumption.

    2.    Workers' Compensation Programs

    As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (a) all applicable state workers' compensation laws; and (b) the Workers' Compensation Contracts.  All Proofs of Claims Filed by the Debtors' current or former employees on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court based upon the treatment provided for herein; *provided*, that nothing in this Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to the Workers' Compensation Contracts; *provided*, *further*, that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable non-bankruptcy law and/or the Workers' Compensation Contracts.

### Article VI.
### PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Timing and Calculation of Amounts to Be Distributed*

    Unless otherwise provided in this Plan, on the Effective Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of the distributions that this Plan provides for Allowed Claims in the applicable Class; *provided*, that any Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business

during the Chapter 11 Cases or assumed by the Debtors before the Effective Date shall be paid or performed in the ordinary course of business.

If any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day and shall be deemed to have been completed as of the required date.

If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in <u>Articles VI</u> and <u>VII</u>.  Except as otherwise provided herein, Holders of Claims shall not be entitled to postpetition interest, dividends, or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.      *Special Rules for Distributions to Holders of Disputed Claims*

Except as otherwise agreed by the relevant parties: (1) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (2) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or such Claims or Interests have been Allowed or expunged.

C.      *Rights and Powers of Distribution Agent*

1.      <u>Powers of the Distribution Agent</u>

The Distribution Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan and the XBP Transaction Documents; (b) make all distributions contemplated hereby and by the XBP Transaction Documents; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, the XBP Transaction Documents, the Distribution Agent Agreement, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

2.      <u>Expenses Incurred on or After the Effective Date and Indemnification</u>

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date, and any reasonable compensation and expense reimbursement claims, made by the Distribution Agent shall be addressed paid in accordance with the applicable Distribution Agent Agreement.

D.      *Delivery of Distributions*

1.      <u>Record Date for Distributions</u>

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.  The Distribution Record Date shall not apply to distributions in respect of Securities deposited with DTC, the Holders of which shall receive distributions, if any, in accordance with the customary exchange procedures of DTC or this Plan. For the avoidance of doubt, in connection with a distribution through the facilities of DTC (if any), DTC shall be considered a single Holder for purposes of distributions.

2.      Delivery of Distributions in General

Except as otherwise provided herein, the Distribution Agent shall make distributions to Holders of Allowed Claims as of the Distribution Record Date, or, if applicable, to such Holder's designee, as appropriate: (a) at the address for each such Holder as indicated on the Debtors' records as of the Distribution Record Date; (b) to the signatory set forth on any Proof of Claim Filed by such Holder or other Representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have not been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the applicable Distribution Agent, as appropriate, after the date of any related Proof of Claim; or (d) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf; *provided*, that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors and, solely with respect to distributions to be made to Holders of April 2026 Notes Claims, the Required Consenting Creditors and the Consenting ETI Parties (acting reasonably).

All distributions to Holders of DIP Claims shall be made to the DIP Agent or the Exit Financing Facilities Agents, as applicable, and the DIP Agent or the Exit Financing Facilities Agents shall be, and shall act as, the Distribution Agent with respect to the DIP Claims in accordance with the terms and conditions of this Plan and the applicable debt documents.

All distributions to Holders of Postpetition Securitization Programs Claims shall be made to the Securitization Programs Agents and the Securitization Programs Agents shall be, and shall act as, the Distribution Agent with respect to the Postpetition Securitization Programs Claims in accordance with the terms and conditions of this Plan and the applicable debt documents.

All distributions to Holders of April 2026 Notes Claims and July 2026 Notes Claims shall be made to the respective Indenture Trustees, and the respective Indenture Trustees shall be, and shall act as, the Distribution Agents with respect to the April 2026 Notes Claims and the July 2026 Notes Claims, respectively, in accordance with the terms and conditions of this Plan and the applicable debt documents. With respect to any distributions of Plan Securities, to the extent the distribution procedures set forth herein conflict with those contemplated under the XBP Transaction Documents, the procedures under the XBP Transaction Documents shall control unless XBP and the Debtors (or the Reorganized Debtors) consent otherwise, such consent not to be unreasonably withheld or delayed, including after taking into account the advice provided by the Distribution Agent.  As applicable, the Indenture Trustees may transfer or direct the transfer of such distributions directly through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with the respective Holders of such Claims to the extent consistent with the customary practices of DTC.  Notwithstanding anything to the contrary herein, such distributions shall be subject in all respect to any rights of the Indenture Trustees to assert a charging lien against such distributions.  All distributions to be made to April 2026 Notes Claims and July 2026 Notes Claims through DTC shall be made eligible for distributions through the facilities of DTC and, for the avoidance of doubt, under no circumstances will the Indenture Trustees be responsible for making or required to make any distribution under the Plan to Holders of April 2026 Notes Claims and July 2026 Notes Claims if such distribution is not eligible to be distributed through the facilities of DTC.

3.      Minimum Distributions

Notwithstanding any provision in this Plan to the contrary, no Distribution Agent shall be required to make distributions or payments of less than $100 (whether in Cash or otherwise) with respect to Impaired Claims.  No fractional shares of Plan Securities shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to this Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of Plan Securities that is not a whole number,

the actual distribution of shares of Plan Securities shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefore.  The total number of authorized shares of Plan Securities to be distributed under this Plan shall be adjusted as necessary to account for the foregoing rounding.  For distribution purposes (including rounding), DTC shall be treated as a single Holder.

        4.     <u>Undeliverable Distributions</u>

        In the event that any distribution to any Holder of Allowed Claims is returned as undeliverable, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one (1) year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder of Claims to such property or interest in property shall be discharged and forever barred.

E.     *Compliance with Tax Requirements; Allocations*

        In connection with this Plan, the XBP Transaction Documents, the Restructuring Steps Exhibit, and all distributions hereunder or thereunder, the Reorganized Debtors and any other applicable Distribution Agent (including for purposes of this <u>Article VI</u>, the Debtors) shall comply with all applicable withholding and reporting requirements imposed by any Governmental Unit, and all distributions hereunder and under all related agreements shall be subject to any such withholding and reporting requirements. Notwithstanding any provision in this Plan to the contrary, the Reorganized Debtors and any other applicable Distribution Agent shall have the right, but not the obligation, to take any and all actions that may be necessary or appropriate to comply with such applicable withholding and reporting requirements, including (a) withholding distributions and amounts therefrom pending receipt of information necessary to facilitate such distributions, including properly executed withholding certification forms, and (b) in the case of a non-Cash distribution that is subject to withholding, withholding an appropriate portion of such property and either liquidating such withheld property to generate sufficient funds to pay applicable withholding taxes (or reimburse the distributing party for any advance payment of the withholding tax) or pay the withholding tax using its own funds and retain such withheld property.  Notwithstanding any provision in this Plan to the contrary, each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution, in each case, imposed on such Holder.  Any amounts withheld or reallocated pursuant to this <u>Article VI.E</u> shall be treated as if distributed to the Holder of the Allowed Claim.

        Any Person or Entity entitled to receive any property as an issuance or distribution under or in connection with this Plan shall, upon request of New Parent, the other Reorganized Debtors, or any other applicable Distribution Agent, deliver to the applicable Reorganized Debtor or any other applicable Distribution Agent, or such other Person designated by the Reorganized Debtors or the Distribution Agent, a valid properly completed and duly executed IRS Form W-9 or, if the payee is a foreign Person or Entity for U.S. federal income tax purpose, an applicable IRS Form W-8 (together with all attachments), or any other forms or documents reasonably requested by a Reorganized Debtor or Distribution Agent to reduce or eliminate any withholding required by any Governmental Unit.

The Reorganized Debtors reserve the right to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, Liens, and encumbrances.

F.     *Applicability of Insurance Contracts*

Notwithstanding anything to the contrary in this Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order (including any provision that purports to be preemptory or supervening or confers Bankruptcy Court jurisdiction):

1.     on and after the Effective Date, all Insurance Contracts (a) are found to be and shall be treated as, Executory Contracts under this Plan and shall be assumed pursuant to sections 105 and 365 of the Bankruptcy Code by the applicable Debtor, and/or (b) shall vest in the Reorganized Debtors and ride through and continue in full force and effect in accordance with their respective terms in either case such that the Reorganized Debtors shall become and remain jointly and severally liable in full for, and shall satisfy, any premiums, deductibles, self-insured retentions, and/or any other amounts or obligations arising in any way out of the receipt of payment from an Insurer in respect of the Insurance Contracts and as to which no Proof of Claim or Administrative Claim need be Filed; and

2.     solely with respect to Insurance Contracts, which, for avoidance of doubt, includes any and all collateral or security securing the Debtor's obligations under the insurance policies, including escrow accounts, deposit accounts, Cash Collateral, and letters of credit, the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in this Plan, if and to the extent applicable, shall be deemed lifted without further order of this Bankruptcy Court, solely to permit (a) claimants with valid workers' compensation claims or direct action claims against Insurers under applicable non-bankruptcy law to proceed with their claims; (b) Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (i) workers' compensation claims, (ii) claims where a claimant asserts a direct claim against an Insurer under applicable non-bankruptcy law, or an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay or the injunctions set forth in this Plan to proceed with its claim, and (iii) all costs in relation to each of the foregoing; and (c) the Insurers to collect from any or all of the collateral or security provided by or on behalf of the Debtors (or the Reorganized Debtors) at any time and to hold the proceeds thereof as security for the obligations of the Debtors (or the Reorganized Debtors) and/or apply such proceeds to the obligations of the Debtors (or the Reorganized Debtors) under the applicable Insurance Contracts, in such order as the applicable Insurer may determine.

Nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including Insurers under any Insurance Contracts, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any rights or defenses, including coverage defenses, held by such Insurers under the Insurance Contracts and/or applicable non-bankruptcy law.

G.     *Allocation of Distributions Between Principal and Interest*

Except as otherwise required by law (as reasonably determined by the Reorganized Debtors), distributions with respect to an Allowed Claim shall be allocated for United States federal (and applicable state and local) income tax purposes first to the principal portion of such Allowed Claim and, thereafter, to the remaining portion of such Allowed Claim, if any.

H.     *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in this Plan, any other Definitive Document, the Confirmation Order, the DIP Orders, or any other Final Order of the Bankruptcy Court, or required by applicable bankruptcy law (including as required pursuant to section 506(b) or section 511 of the Bankruptcy Code), postpetition interest shall not accrue or be paid on any Claims and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any Claim.

I.     *Means of Cash Payment*

Payments of Cash made pursuant to this Plan shall be in United States dollars and shall be made, at the option of the Debtors or the Reorganized Debtors (as applicable), by checks drawn on, or wire transfer from, a domestic bank selected by the Debtors or the Reorganized Debtors.  Cash payments to foreign creditors may be made, at the option of the Debtors or the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

J.     *Setoffs and Recoupment*

Except as otherwise provided herein, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable bankruptcy or non-bankruptcy law, or as may be agreed to by the Holder of an Allowed Claim, may set off or recoup against any Allowed Claim and the distributions to be made pursuant to this Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature that the applicable Debtor or Reorganized Debtor may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised, settled, or assigned on or before the Effective Date (whether pursuant to this Plan, a Final Order or otherwise); *provided*, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to this Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action.

Notwithstanding anything to the contrary herein, nothing in this Plan or the Confirmation Order shall modify the rights, if any, of any counterparty to a rejected Executory Contract or Unexpired Lease to assert any right of setoff or recoupment that such party may have under applicable bankruptcy law or non-bankruptcy law, including the (1) ability, if any, of such parties to setoff or recoup a security deposit held pursuant to the terms of their rejected Unexpired Lease(s) with the Debtors, or any successors to the Debtors, under this Plan, (2) assertion of rights of setoff or recoupment, if any, in connection with Claims reconciliation, or (3) assertion of setoff or recoupment as a defense, if any, to any Claim or action by the Debtors, the Reorganized Debtors, or any successors of the Debtors.

K.     *Claims Paid or Payable by Third Parties*

1.     <u>Claims Paid by Third Parties</u>

A Claim shall be correspondingly reduced, and the applicable portion of such Claim shall be disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives a payment on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the Reorganized Debtors to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Claim as of the date of any such distribution under this Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Reorganized Debtors annualized interest at the

Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

        2.     <u>Claims Payable by Insurers</u>

No distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Contracts until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Contract. To the extent that one or more of the Insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such Insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

        3.     <u>Insurance Contracts</u>

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Contract. Notwithstanding anything to the contrary herein, nothing contained in this Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including Insurers, under any Insurance Contracts or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any defenses, including coverage defenses, held by such Insurers.

**Article VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

A.    *Allowance and Disallowance of Claims*

After the Effective Date, and except as otherwise provided in this Plan, the Reorganized Debtors shall have and shall retain any and all available rights and defenses that the Debtors had with respect to any Claim immediately before the Effective Date, including the right to assert any objection to Claims based on the limitations imposed by section 502 of the Bankruptcy Code. The Debtors and the Reorganized Debtors may, but are not required to, contest the amount and validity of any Disputed Claim or contingent or unliquidated Claim in the ordinary course of business in the manner and venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced.

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (1) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (2) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

B.    *Claims Administration Responsibilities*

Except as otherwise specifically provided in this Plan, after the Effective Date, the Reorganized Debtors shall have the authority: (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect

63

any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court; *provided*, that the procedures governing the items set forth in the foregoing clauses (1) through (3) shall be subject to the reasonable consent of the Required Consenting Creditors and the Consenting ETI Parties, after consultation with the Claims Ombudsman.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately before the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to this Plan.

C.      *Adjustment to Claims or Interests without Objection*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

D.      *No Distributions Pending Allowance*

If any portion of a Claim is Disputed, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Claim becomes an Allowed Claim; provided that if only a portion of a Claim is Disputed, such Claim shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

E.      *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan and the XBP Transaction Documents.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under this Plan and the XBP Transaction Documents as of the Effective Date, without any postpetition interest to be paid on account of such Claim.

## Article VIII.
## CONDITIONS PRECEDENT TO THE OCURRENCE OF THE EFFECTIVE DATE

A.      *Conditions Precedent to the Occurrence of the Effective Date*

The following are conditions precedent to the occurrence of the Effective Date that must be satisfied or waived pursuant to the provisions of <u>Article VIII.C</u>:

1.      the Bankruptcy Court shall have entered the Final DIP Order and the Final Securitization Order;

2.      XBP shall have agreed to take all necessary actions in furtherance of the Restructuring Transactions including execution of Definitive Documents to which XBP is a party, which shall be in form and substance reasonably acceptable to XBP, the Debtors, and the Required Consenting Creditors.

3.      the XBP Transaction shall have occurred and been consummated;

4.      the Plan Support Agreement shall not have been terminated as to the Required Consenting Creditors or the Consenting ETI Parties and shall be in full force and effect;

5.      the ETI Funding Obligations shall be in full force and effect;

6. the transactions contemplated by the Restructuring Steps Exhibit shall have been consummated;

7. each of the New Parent Warrants Agreement and the XBP Transaction Documents shall be on terms and conditions reasonably acceptable to the Required Consenting Creditors, the Consenting ETI Parties, and XBP;

8. Executory Contracts and Unexpired Leases shall either have been assumed, assumed and assigned, or rejected;

9. the Plan shall contain the Releases;

10. the Bankruptcy Court shall have entered the Confirmation Order in form and substance materially consistent with and subject to the consent rights set forth in the Plan Support Agreement;

11. the Exit Facilities Documents shall have been executed (or deemed executed) and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the Debtors, and the Required Consenting Creditors), other than such conditions that relate to the effectiveness of this Plan and related transactions;

12. the Exit Securitization Programs Documents shall have been executed (or deemed executed) and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the applicable Debtors and the Securitization Programs Parties), other than such conditions that relate to the effectiveness of this Plan and related transactions;

13. the XBP Funding or the XBP Alternative Funding has occurred or will occur simultaneously with the Effective Date;

14. the Debtors, the Required Consenting Creditors, and the Committee shall have reached agreement with respect to the GUC Payment Obligations Collateral such that, as of the Effective Date, the Claims Ombudsman shall be in a position to properly perfect the security interest in the GUC Payment Obligations Collateral;

15. the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements, and exhibits to the Plan shall be consistent with the Plan Support Agreement and otherwise approved by the parties thereto consistent with their respective consent and approval rights as set forth in the Plan Support Agreement, and shall have been Filed in a manner consistent with the Plan Support Agreement;

16. all Restructuring Fees and Expenses shall have been paid in full in Cash;

17. the Definitive Documents shall (i) be materially consistent with the Plan Support Agreement and otherwise approved by the Required Consenting Creditors, the Consenting ETI Parties, and the Debtors consistent with their respective consent and approval rights as set forth in the Plan Support Agreement; (ii) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties; and (iii) be adopted on terms materially consistent with the Plan Support Agreement and the Plan Term Sheet;

18. the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, actions, documents, and other agreements that are necessary to implement and effectuate the Plan and each of the other Restructuring Transactions; and the Debtors shall have paid in full all professional fees and expenses of the Retained Professionals that require the Bankruptcy Court's approval or amounts sufficient

to pay such fees and expenses after the Effective Date shall have been placed in the Professional Fee Escrow Account pending the Bankruptcy Court's approval of such fees and expenses; and

      19. the Debtors shall have paid in full all professional fees and expenses of the Retained Professionals that require the Bankruptcy Court's approval or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Professional Fee Escrow Account pending the Bankruptcy Court's approval of such fees and expenses.

B.    *Timing of Conditions Precedent*

      Notwithstanding when a condition precedent to the Effective Date occurs, for the purposes of this Plan, such condition precedent shall be deemed to have occurred simultaneously upon the completion of the conditions precedent to the Effective Date; provided, that to the extent a condition precedent (the "**Prerequisite Condition**") may be required to occur prior to another condition precedent (a "**Subsequent Condition**") then, for purposes of this Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to the applicable Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

C.    *Waiver of Conditions*

      Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  Each of the conditions precedent of this Plan may be waived in writing by the Debtors with the prior written consent of any party expressly given a consent right hereunder or in the Plan Support Agreement with respect to the condition to be waived; *provided*, that (a) waiver of the conditions precedent in Article VIII.A.19 shall require the consent of the affected Retained Professionals; (b) waiver of the condition precedent in Article VIII.A.14 shall require the consent of the Committee (such consent not to be unreasonably withheld); and (c) waiver of the conditions precedent in Article VIII.A, 3, 5, 6, 7, 8, 9, 10, 11, 12, 13, 15, 16, 17, and 18 shall require the consent of the Required Consenting Creditors and the Consenting ETI Parties (such consent not to be unreasonably withheld).  If this Plan is confirmed for fewer than all of the Debtors as provided for in this Plan, only the conditions applicable to the Debtor or Debtors for which this Plan is confirmed must be satisfied or waived for the Effective Date to occur.

      The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(c) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

D.    *Effect of Non-Occurrence of Conditions to the Effective Date*

      If the Confirmation of this Plan or the Effective Date does not occur with respect to one or more of the Debtors on or before the termination of the Plan Support Agreement, then this Plan shall, with respect to such applicable Debtor or Debtors, be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders, or any other Person or Entity; (3) constitute an allowance of any Claim or Interest; or (4) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Person or Entity in any respect.

E.    *Substantial Consummation*

      "Substantial consummation" of this Plan, as defined in section 1102(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date upon the Filing of the Notice of Effective Date.

## Article IX.
## DISCHARGE, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.     *Discharge of Claims and Termination of Interests*

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in this Plan, the XBP Transaction Documents, the Confirmation Order, the Definitive Documents, or in any contract, instrument, or other agreement or document created or entered into, the distributions, rights, and treatment that are provided in this Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, demands against, Liens on, obligations of, rights against, and Interests in, the Debtors, the Reorganized Debtors, the Estates, or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted this Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to this Plan and the Committee Settlement, the provisions of this Plan shall constitute a good-faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest including all controversies among the Debtors, the Consenting Stakeholders, the Committee, the Sub-Group DIP Lenders, and all other Holders of Claims against the Debtors, including (a) Claims, Interests and controversies relating to the settlements embodied in the Committee Settlement and the Sub-Group DIP Lenders Settlement, each of which is integrated with, and non-severable from, the provisions of this Plan and the global comprise and settlement embodied herein, and (b) in connection with the Committee Settlement, the distribution to which Holders of Claims in Classes 4, 5, and 6 are entitled, and in connection with the Sub-Group DIP Lenders Settlement, the distributions and treatment to which the Sub-Group DIP Lenders are entitled. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, the Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of this Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against the Debtors and the Estates and Causes of Action against other Entities.

B.     **Releases by the Debtors**

**To the fullest extent permitted by applicable law and approved by the Bankruptcy Court, and except as otherwise expressly set forth in this Plan, the XBP Transaction Documents, or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, as of the Effective Date,**

in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Debtor, Reorganized Debtor, and the Estates, in each case on behalf of itself and its respective successors, assigns, and Representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, has and is deemed to have, forever and unconditionally released, and absolved each Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Debtors, the Estates, or the Reorganized Debtors that such Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, including (1) the management, ownership, or operation of the Debtors, the Non-Debtor Affiliates, or the Consenting ETI Parties, (2) the purchase, sale, or rescission of any Security of the Debtors, the Non-Debtor Affiliates, or the Consenting ETI Parties, (3) the subject matter of, or the transactions, events, circumstances, acts or omissions giving rise to, any Claim or Interest that is treated in the Restructuring Transactions, including the negotiation, formulation, or preparation of the Restructuring Transactions, (4) the business or contractual arrangements between any Debtor or Non-Debtor Affiliate or Consenting ETI Party and any other Entity (including Consenting Stakeholders), (5) the Debtors', Non-Debtor Affiliates', and the Consenting ETI Parties' in- or out-of-court restructuring efforts, (6) intercompany transactions, (7) the formulation, preparation, dissemination, negotiation, Filing, or consummation of this Plan, the XBP Transaction Documents, the Disclosure Statement, the Plan Support Agreement, the Definitive Documents, the Prepetition Term Loan Documents, the April 2026 Notes Documents, the July 2026 Notes Documents, the DIP Documents, the Exit Facilities Documents, the Prepetition Securitization Programs Documents, the Postpetition Securitization Programs Documents, the Exit Securitization Programs Documents (and any financing permitted thereunder), the New Organizational Documents, the Chapter 11 Cases, the BTC Transaction, the Committee Settlement, the Sub-Group DIP Lenders Settlement, or any Restructuring Transaction, (8) any contract, instrument, release, or other agreement or document created or entered into in connection with this Plan, the XBP Transaction Documents, the Disclosure Statement, the Plan Support Agreement, the Definitive Documents, the Prepetition Term Loan Documents, the April 2026 Notes Documents, the July 2026 Notes Documents, the DIP Documents, the Exit Facilities Documents, the Prepetition Securitization Programs Documents, the Postpetition Securitization Programs Documents, the Exit Securitization Programs Documents (and any financing permitted thereunder), the Chapter 11 Cases, the pursuit of Confirmation of this Plan, the administration and implementation of this Plan, the BTC Transaction, the Committee Settlement, the Sub-Group DIP Lenders Settlement, or the Restructuring Transactions, including the issuance or distribution of Securities pursuant to this Plan and the XBP Transaction Documents, (9) the distribution, including any disbursements made by a Distribution Agent, of property under this Plan, the XBP Transaction Documents, or any other related agreement, or (10) any other act or omission, transaction, agreement, event, or other occurrence related to any of the foregoing and taking place on or before the Effective Date; *provided*, that the Debtors do not release Claims or Causes of Action (1) that are of a commercial nature and arise in the ordinary course of business, such as accounts receivable and accounts payable on account of goods being sold and services being performed; (2) arising under an Executory Contract or Unexpired Lease that is assumed by the Debtors; or (3) arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud (but not, for the avoidance of doubt, fraudulent transfers), gross negligence, or willful misconduct). Notwithstanding anything to the contrary in the foregoing, the Releases set forth above do not release (1) any obligations of any Person or Entity under this Plan, the XBP Transaction Documents, the Confirmation Order, any other Definitive Document, any Restructuring Transaction, any document,

instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan, the XBP Transaction Documents, or any agreement, Claim, or obligation arising or assumed under this Plan or the XBP Transaction Documents or (2) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by each of the Released Parties, including the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing this Plan and the XBP Transaction Documents; (2) a good-faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

C.      *Releases by Holders of Claims and Interests*

To the fullest extent permitted by applicable law and approved by the Bankruptcy Court, and except as otherwise expressly set forth in this Plan, the XBP Transaction Documents, or the Confirmation Order, as of the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and Representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, has and is deemed to have, forever and unconditionally, released, and absolved each Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Debtors, the Estates, or the Reorganized Debtors that such Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, including (1) the management, ownership, or operation of the Debtors, the Non-Debtor Affiliates, or the Consenting ETI Parties, (2) the purchase, sale, or rescission of any Security of the Debtors, the Non-Debtor Affiliates, or the Consenting ETI Parties, (3) the subject matter of, or the transactions, events, circumstances, acts or omissions giving rise to, any Claim or Interest that is treated in the Restructuring Transactions, including the negotiation, formulation, or preparation of the Restructuring Transactions, (4) the business or contractual arrangements between any Debtor, Non-Debtor Affiliate, or Consenting ETI Party and any other Entity (including Consenting Stakeholders), (5) the Debtors', Non-Debtor Affiliates', and Consenting ETI Parties' in- or out-of-court restructuring efforts, (6) intercompany transactions, (7) the formulation, preparation, dissemination, negotiation, Filing, or consummation of this Plan, the XBP Transaction Documents, the Disclosure Statement, the Plan Support Agreement, the Definitive Documents, the Prepetition Term Loan Documents, the April 2026 Notes Documents, the July 2026 Notes Documents, the DIP Documents, the Exit Facilities Documents, the Prepetition Securitization Programs Documents, the Postpetition Securitization Programs Documents, the Exit Securitization Programs Documents (and any financing permitted thereunder), the New Organizational Documents, the Chapter 11 Cases, the BTC Transaction, the Committee Settlement, the Sub-Group DIP Lenders Settlement, or any Restructuring Transaction, (8) any contract, instrument, release, or other agreement or document created or entered into in connection with this Plan, the XBP Transaction Documents, the Disclosure Statement, the Plan Support Agreement, the Definitive Documents, the Prepetition Term Loan Documents, the April 2026 Notes Documents, the July 2026 Notes Documents, the DIP Documents,

the Exit Facilities Documents, the Prepetition Securitization Programs Documents, the Postpetition Securitization Programs Documents, the Exit Securitization Programs Documents (and any financing permitted thereunder), the Chapter 11 Cases, the pursuit of Confirmation of this Plan, the administration and implementation of this Plan, the BTC Transaction, the Committee Settlement, the Sub-Group DIP Lenders Settlement, or the Restructuring Transactions, including the issuance or distribution of Securities pursuant to this Plan and the XBP Transaction Documents, (9) the distribution, including any disbursements made by a Distribution Agent, of property under this Plan, the XBP Transaction Documents, or any other related agreement, or (10) any other act or omission, transaction, agreement, event, or other occurrence relating to any of the foregoing and taking place on or before the Effective Date; *provided*, that the Releasing Parties do not release Claims or Causes of Action (1) arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud (but not, for the avoidance of doubt, fraudulent transfers), gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud, gross negligence, or willful misconduct) or (2) against a Released Party arising from any obligations owed to the Releasing Party that are wholly unrelated to the Debtors or the Reorganized Debtors.  Notwithstanding anything to the contrary in the foregoing, the Releases set forth above do not release (1) any obligations of any Person or Entity under this Plan, the XBP Transaction Documents, the Confirmation Order, any other Definitive Document, any Restructuring Transaction, any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan, the XBP Transaction Documents, or any agreement, Claim, or obligation arising or assumed under this Plan or the XBP Transaction Documents or (2) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) given and made after due notice and opportunity for hearing; and (3) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

D.    *Exculpation*

Effective as of the Effective Date, to the fullest extent permitted by law, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any Claims or Causes of Action for any act taken or omitted to be taken between the Petition Date and the Effective Date in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or consummation (as applicable) of this Plan, the XBP Transaction Documents, the Plan Support Agreement, and the Disclosure Statement including any disbursements made by a Distribution Agent in connection with this Plan, the XBP Transaction Documents, the Disclosure Statement, the Definitive Documents, the Plan Supplement, the Prepetition Term Loan Documents, the April 2026 Notes Documents, the July 2026 Notes Documents, the DIP Documents, the Exit Facilities Documents, the Prepetition Securitization Programs Documents, the Postpetition Securitization Programs Documents, the Exit Securitization Programs Documents (and any financing permitted thereunder), the New Organizational Documents, the BTC Transaction, the Committee Settlement, the Sub-Group DIP Lenders Settlement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with this Plan, the XBP Transaction Documents, or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or

consummation of this Plan and the XBP Transaction Documents; *provided*, that the foregoing provisions of this exculpation shall not operate to waive or release: (1) any Claims or Causes of Action arising from willful misconduct, actual fraud (but not, for the avoidance of doubt, fraudulent transfers), or gross negligence of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (2) the rights of any Person or Entity to enforce this Plan, the XBP Transaction Documents, and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with this Plan and the XBP Transaction Documents or assumed pursuant to this Plan, the XBP Transaction Documents, or Final Order of the Bankruptcy Court; *provided*, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions, or inactions.

The Exculpated Parties have, and upon consummation of this Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to this Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan.

The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity.  For the avoidance of doubt and notwithstanding anything else herein, the foregoing exculpation shall be limited to Persons that served as Estate fiduciaries during the Chapter 11 Cases.

E.      *Permanent Injunction*

Except as otherwise expressly provided in the Plan Support Agreement, this Plan or the Confirmation Order, from and after the Effective Date, all Persons and Entities are, to the fullest extent provided under Section 524 and other applicable provisions of the Bankruptcy Code, permanently enjoined from (1) commencing or continuing, in any manner or in any place, any suit, action or other proceeding of any kind; (2) enforcing, attaching, collecting, or recovering in any manner or means any judgment, award, decree, or order; (3) creating, perfecting, or enforcing any Lien or encumbrance; (4) asserting a right of setoff or subrogation of any kind; or (5) commencing or continuing in any manner any action or other proceeding of any kind, in each case on account of or with respect to any Claim, demand, liability, obligation, debt, right, Cause of Action, Interest, or remedy released or to be released, exculpated or to be exculpated, settled or to be settled, or discharged or to be discharged pursuant to this Plan or the Confirmation Order against any Person or Entity so released, discharged, or exculpated (or the property or estate of any Person or Entity so released, discharged, or exculpated).  All injunctions or stays provided for in the Chapter 11 Cases under Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

No Person or Entity may commence or pursue a Claim or Cause of Action, as applicable, of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action, as applicable, subject to Article IX hereof, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action, as applicable, represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action, as applicable, against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party, as applicable; *provided*, that the foregoing shall only apply to Claims or Causes of Action brought

against a Released Party is such Person or Entity bringing such Claim or Cause of Action is a Releasing Party.  At the hearing for the Bankruptcy Court to determine whether such Claim or Cause of Action represents a colorable Claim of any kind, the Bankruptcy Court may, or shall if any Debtor, Reorganized Debtor, Exculpated Party, Released Party, or other party in interest requests by motion (oral motion being sufficient), direct that such Person or Entity seeking to commence or pursue such Claim or Cause of Action File a proposed complaint with the Bankruptcy Court embodying such Claim or Cause of Action, such complaint satisfying the applicable Rules of Federal Procedure, including Rule 8 and Rule 9 (as applicable), which the Bankruptcy Court shall assess before making a determination.  For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any Claims or Causes of Action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending.  The Bankruptcy Court reserves jurisdiction to adjudicate any such claims to the maximum extent provided by the law.

**F.**      *SEC Reservation of Rights*

Notwithstanding any language to the contrary in the Disclosure Statement, Plan and/or Confirmation Order, no provision shall (i) preclude the SEC from enforcing its police or regulatory powers or (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, Causes of Action, proceedings or investigations against any non-Debtor Person or non-Debtor Entity in any forum.

## Article X.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, except to the extent set forth herein or under applicable federal law, the Bankruptcy Court shall retain on and after the Effective Date jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and this Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

A.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

B.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Retained Professionals authorized pursuant to the Bankruptcy Code or this Plan;

C.      resolve any matters related to: (1) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party with respect to which a Debtor may be liable and to hear, determine, and, if necessary, adjudicate, any Disputed Cure Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (2) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (3) the Reorganized Debtors seeking to amend, modify, or supplement, after the Effective Date, any Executory Contracts and Unexpired Leases to be assumed or rejected; and (4) any dispute regarding whether a contract or lease is or was executory or expired;

D.      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan and the Confirmation Order;

E.      adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

F.      adjudicate, decide, or resolve any and all matters related to Causes of Action;

G.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

H.      resolve any cases, controversies, suits, or disputes that may arise in connection with any Claims, including Claim objections, allowance, disallowance, estimation, and distribution;

I.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of this Plan, the Confirmation Order, and all contracts, instruments, releases, and other agreements or documents created in connection with this Plan, the Confirmation Order, or the Disclosure Statement, including the Plan Support Agreement;

J.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

K.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the interpretation or enforcement of this Plan, the Confirmation Order, or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to this Plan or the Confirmation Order, or any Entity's rights arising from or obligations incurred in connection with this Plan or the Confirmation Order;

L.      issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of this Plan or the Confirmation Order;

M.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in this Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

N.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid;

O.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

P.      determine any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with this Plan, the Confirmation Order, or the Disclosure Statement;

Q.      enter an order or final decree concluding or closing the Chapter 11 Cases;

R.      adjudicate any and all disputes arising from or relating to distributions to Holders of Claims and Interests under this Plan;

S.       consider any modification of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

T.       determine requests for payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

U.       hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan;

V.       hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

W.       hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

X.       hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the releases, injunctions, and exculpations provided under Article IX;

Y.       resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

Z.       enforce all orders previously entered by the Bankruptcy Court; and

AA.       hear any other matter not inconsistent with the Bankruptcy Code, this Plan, or the Confirmation Order.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Article X, the provisions of this Article X shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Notwithstanding anything to the contrary in this Plan: (1) the Bankruptcy Court's jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose before the Effective Date, including any Claims based in whole or in part on any conduct of the Debtors occurring on or before the Effective Date, shall be non-exclusive; (2) any dispute arising under or in connection with the Exit Facilities Documents and the Exit Securitization Programs Documents, and shall be dealt with in accordance with the provisions of the applicable document; and (3) as of the Effective Date, the Exit Facilities Documents and the Exit Securitization Programs Documents shall be governed by the jurisdictional provisions therein.

## Article XI.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN

A.      *Modification of Plan*

Subject to the limitations contained in this Plan, the Debtors or Reorganized Debtors reserve the right to, following consultation with the Committee but without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court, in accordance with the Bankruptcy Code and the Bankruptcy Rules: (1) amend or modify this Plan before the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; (2) amend or modify this Plan after the entry of the Confirmation Order in accordance with section 1127(b) of the Bankruptcy Code upon order of the Bankruptcy Court; and (3) remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan upon order of the Bankruptcy Court.  In addition, after the Confirmation Date, so long as such action does not adversely affect the treatment of Holders of Allowed Claims pursuant to this Plan, the Debtors may make appropriate technical adjustments, remedy any defect or omission or reconcile any inconsistencies in this Plan, the Plan Supplement and/or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of this Plan, and any Holder of a Claim that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented.  For the avoidance of doubt, the Postpetition Securitization Programs Documents shall not be modified without the consent of the Securitization Programs Parties as required therein.  Any amendment to Article III.B.2 or any amendment that otherwise adversely affects the Holders of Prepetition Term Loan Claims shall be subject to the reasonable consent of Blue Torch.

B.      *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to this Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.      *Revocation of Plan; Reservation of Rights if Effective Date Does Not Occur*

Subject to the occurrence of the Effective Date, the Debtors reserve the right to revoke or withdraw this Plan before the entry of the Confirmation Order and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw this Plan, or if entry of the Confirmation Order or the Effective Date does not occur, or if the Plan Support Agreement terminates in accordance with its terms before the Effective Date, then: (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount of any Claim or Interest or Class of Claims or Interests), assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases effected by this Plan, and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors or any other Entity.

**Article XII.**
**MISCELLANEOUS PROVISIONS**

A.      *Immediate Binding Effect*

Notwithstanding Bankruptcy Rules 3020(e), 6004(g), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan and the documents and instruments contained in the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims and Interests (irrespective of whether Holders of such Claims or Interests are deemed to have accepted this Plan), all Entities that are parties to or are subject

to the settlements, compromises, releases, discharges, and injunctions described in this Plan, each Entity acquiring property under this Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases, and notwithstanding whether or not such Person or Entity (1) shall receive or retain any property, or interest in property, under this Plan, (2) has Filed a Proof of Claim in the Chapter 11 Cases (if applicable) or (3) failed to vote to accept or reject this Plan, affirmatively voted to reject this Plan, or is conclusively presumed to reject this Plan.  The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rule 3020(e) and 7062.

B.      *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.  The Debtors or Reorganized Debtors, as applicable, and all Holders of Claims and Interests receiving distributions pursuant to this Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.

C.      *Payment of United States Trustee Statutory Fees*

All United States Trustee Statutory Fees due and payable to the United States Trustee before the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, any and all United States Trustee Statutory Fees shall be paid to the United States Trustee when due and payable.  The Debtors shall File all monthly operating reports due before the Effective Date when they become due, using UST Form 11-MOR.  After the Effective Date, the Reorganized Debtors shall each File with the Bankruptcy Court separate UST Form 11-PCR reports when they become due, until the earliest of the Debtors' or Reorganized Debtors' case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. The United States Trustee shall not be required to File a request for an Administrative Claim for United States Trustee Statutory Fees, and shall not be treated as providing any release under this Plan.

D.      *Statutory Committee*

On the Effective Date, the current and former members of the Committee, and their respective officers, employees, counsel, advisors and agents, will be released from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases and the Committee will dissolve; provided, however, that following the Effective Date, the Committee will continue in existence and have standing and a right to be heard for the following limited purposes: (a) pursuing Claims and final fee applications Filed pursuant to sections 330 and 331 of the Bankruptcy Code; and (b) any appeals of the Confirmation Order related to the Committee Settlement, and the Reorganized Debtors shall be responsible for the reasonable and documented post-Effective Date fees and expenses incurred by the advisors to the Committee solely with respect to these limited matters; *provided*, that such fees and expenses shall be subject to the Committee Professional Fee Cap.  Following the completion of the Committee's remaining duties set forth above, the Committee will be dissolved, and the retention or employment of the Committee's respective attorneys, accountants and other agents will terminate without further notice to, or action by, any Entity.

E.      *Reservation of Rights*

This Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  None of the Filing of this Plan, any statement or provision contained in this Plan, or the taking of any action by any Debtor with respect to this Plan, the Disclosure Statement, or the Plan

Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests before the Effective Date.

F.     *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, Representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.     *No Successor Liability*

Except as otherwise expressly provided in this Plan and the Confirmation Order, each of the Reorganized Debtors (1) is not, and shall not be deemed to assume, agree to perform, pay, or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other Person relating to or arising out of the operations or the assets of the Debtors on or before the Effective Date, (2) is not, and shall not be, a successor to the Debtors by reason of any theory of law or equity or responsible for the knowledge or conduct of any Debtor before the Effective Date, and (3) shall not have any successor or transferee liability of any kind or character.

H.     *Service of Documents*

After the Effective Date, any pleading, notice, or other document required by this Plan to be served on or delivered to the Reorganized Debtors shall also be served on:

| Debtors | Counsel to the Debtors |
|---|---|
| DocuData Solutions, L.C.<br>2701 E. Grauwyler Road<br>Irving, TX 75061 USA<br>Attn: Randall S. Eisenberg; Stephen Spitzer<br>reisenberg@alixpartners.com<br>sspitzer@alixpartners.com | Hunton Andrews Kurth LLP<br>600 Travis Street, Suite 4200<br>Houston, TX 77002<br>Attn: Timothy A. ("Tad") Davidson II; Ashley L. Harper; Philip M. Guffy<br>taddavidson@hunton.com<br>ashleyharper@hunton.com<br>pguffy@hunton.com<br><br>and<br><br>Latham & Watkins LLP<br>1271 Avenue of the Americas<br>New York, NY 10020<br>Attn: Ray C. Schrock; Alexander W. Welch; Hugh Murtagh; Adam Ravin; Jonathan Weichselbaum<br>ray.schrock@lw.com<br>alex.welch@lw.com<br>hugh.murtagh@lw.com<br>adam.ravin@lw.com<br>jon.weichselbaum@lw.com |

| **United States Trustee** | **Counsel to the Consenting Creditor Ad Hoc Group** |
|---|---|
| Office of the United States Trustee for the Southern District of Texas Trustee 515 Rusk Street, Suite 3516 Houston, TX 77002 Attn: Jana Whitworth Jana.Whitworth@usdoj.gov | Ropes & Gray LLP 1211 Avenue of the Americas New York, NY US 10036-8704 Attn: Matthew Roose; Sam Badawi ryan.dahl@ropesgray.com matthew.roose@ropesgray.com sam.badawi@ropesgray.com and Ropes & Gray LLP 191 N. Wacker Drive Chicago, IL 60606 Attn: Eric P. Schriesheim eric.schriesheim@ropesgray.com |
| **Counsel to the Consenting ETI Parties** | **Counsel to the Committee** |
| Cleary Gottlieb Steen & Hamilton LLP One Liberty Plaza New York, NY 10006 Attn: Sean A. O'Neal, Kara A. Hailey soneal@cgsh.com khailey@cgsh.com | Brown Rudnick LLP Seven Times Square, 47th Floor New York, NY 10036 Attn: Robert J. Stark and McDermott Will & Emery LLP 2501 North Harwood Street, Suite 1900 Dallas, TX 75201-1664 Attn: Charles R. Gibbs |

I.      *Term of Injunctions or Stays*

Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

J.      *Entire Agreement*

On the Effective Date, this Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

K.      *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of this Plan, the Plan Supplement, and any agreements, documents, instruments, or contracts executed or entered into in connection with this Plan (except as otherwise set forth in those

agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided*, that corporate governance matters relating to Debtors or Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the jurisdiction of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

L.      *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of this Plan as if set forth in full in this Plan.  Except as otherwise provided in this Plan, such exhibits and documents included in the Plan Supplement shall initially be Filed with the Bankruptcy Court on or before the Plan Supplement Filing Date.  After the exhibits and documents are Filed, copies of such exhibits and documents shall have been available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://omniagentsolutions.com/DocuDataSolutions or the Bankruptcy Court's website at www.txs.uscourts.gov.  To the extent any exhibit or document is inconsistent with the terms of this Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of this Plan shall control.

M.      *Nonseverability of Plan Provisions upon Confirmation*

If, before Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to this Plan and may not be deleted or modified without the consent of the Debtors; and (3) nonseverable and mutually dependent.

N.      *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

O.      *Conflicts*

To the extent that any provision of the Plan Support Agreement, the Disclosure Statement, or any order entered before Confirmation (for avoidance of doubt, not including the Confirmation Order) referenced in this Plan (or any exhibits, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of this Plan, this Plan shall govern and control.  To the extent that any provision of this Plan conflicts with or is in any way inconsistent with any provision of the Confirmation Order, the Confirmation Order shall govern and control.

P.      *No Strict Construction*

This Plan is the product of extensive discussions and negotiations between and among, *inter alia*, the Debtors, the Consenting Creditor Ad Hoc Group, the Consenting ETI Parties, XBP and their respective professionals.  Each of the foregoing was represented by counsel of its choice who either participated in the formulation and documentation of, or was afforded the opportunity to review and provide comments on,

this Plan and the Disclosure Statement, the exhibits and schedules thereto, and the other agreements and documents ancillary or related thereto.  Accordingly, unless explicitly indicated otherwise, the general rule of contract construction known as "contra proferentem" or other rule of strict construction shall not apply to the construction or interpretation of any provision of this Plan and the Disclosure Statement, the exhibits and schedules thereto, and the other agreements and documents ancillary or related thereto. Notwithstanding anything to the contrary contained in this Plan or in the Disclosure Statement, in the case of any conflict or inconsistency between this Plan and the Restructuring Steps Exhibit, the Restructuring Steps Exhibit shall govern and control.

Q.      *Section 1125(e) Good Faith Compliance*

The Debtors, the Reorganized Debtors, the Consenting Creditor Ad Hoc Group, the Consenting ETI Parties, and each of their respective current and former officers, directors, members (including *ex officio* members), managers, employees, partners, advisors, attorneys, professionals, accountants, investment bankers, investment advisors, actuaries, Affiliates, financial advisors, consultants, agents, and other Representatives of each of the foregoing Entities (whether current or former, in each case in his, her or its capacity as such) have, and upon Confirmation shall be deemed to have, solicited votes on this Plan from the Voting Class in compliance with the applicable provisions of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with the solicitation, and acted in "good faith" under section 1125(e) of the Bankruptcy Code; and therefore, no such parties, individuals, or the Debtors or the Reorganized Debtors shall have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on this Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under this Plan.

R.      *2002 Notice Parties*

After the Effective Date, the Debtors and the Reorganized Debtors, as applicable, are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed a renewed request after the Confirmation Hearing to receive documents pursuant to Bankruptcy Rule 2002.

Respectfully submitted, as of the date first set forth above,

**DocuData Solutions, L.C.**
**(on behalf of itself and all other Debtors)**

By:      */s/ Randall S. Eisenberg*
Name:  Randall S. Eisenberg
Title:   Chief Restructuring Officer of Exela Technologies
          BPA, LLC, Exela Intermediate LLC, Exela Finance
          Inc., XCV-EMEA, LLC, and Neon Acquisition, LLC

**Appendix A**

**Allowed Priority Tax Claims**

The total amount of Allowed Priority Tax Claims is **$42,308,560.81**.  The following recoveries are set forth for purposes of allocating Allowed Priority Tax Claims to the applicable Debtors.

| Taxing Authority | Debtor(s) | Allowed Amount |
|---|---|---|
| Alabama Dept of Revenue | SourceHOV Healthcare, Inc. | $28,049.45 |
| Alabama Dept of Revenue | SOURCECORP Management, Inc. | $5,100.69 |
| Alabama Dept of Revenue | Exela Enterprise Solutions, Inc. | $3,791.43 |
| Alabama Dept of Revenue | SOURCECORP BPS Inc. | $3,758.45 |
| Alabama Dept of Revenue | Regulus Group LLC | $1,971.68 |
| Alabama Dept of Revenue | BancTec, Inc. and Subsidiaries | $1,769.52 |
| Alabama-Birmingham Tax Commissioner | Exela Enterprise Solutions, Inc. | $111.39 |
| Alaska Dept of Revenue | SourceHOV Healthcare, Inc. | $80.02 |
| Arizona Dept of Revenue | Regulus Group LLC | $33,424.69 |
| Arizona Dept of Revenue | Exela Enterprise Solutions, Inc. | $23,582.57 |
| Arizona Dept of Revenue | Novitex Government Solutions, LLC | $21,241.32 |
| Arizona Dept of Revenue | United Information Services, Inc | $7,160.29 |
| Arizona Dept of Revenue | SourceHOV Healthcare, Inc. | $5,378.64 |
| Arizona Dept of Revenue | BancTec, Inc. and Subsidiaries | $2,342.31 |
| Arizona Dept of Revenue | J & B Software, Inc. | $1,859.41 |
| Arizona Dept of Revenue | HOV Services, Inc. | $3.69 |
| Arkansas Dept of Revenue | BancTec, Inc. and Subsidiaries | $731.86 |
| Arkansas Dept of Revenue | SourceHOV Healthcare, Inc. | $182.67 |
| California Dept of Revenue | SOURCECORP BPS Inc. | $152,456.94 |
| California Dept of Revenue | SOURCECORP Management, Inc. | $80,007.49 |
| California Dept of Revenue | SourceHOV Healthcare, Inc. | $66,804.03 |
| California Dept of Revenue | Regulus Integrated Solutions LLC | $24,243.47 |
| California Dept of Revenue | Regulus Group LLC | $14,008.71 |
| California Dept of Revenue | United Information Services, Inc | $5,381.71 |
| California Dept of Revenue | Novitex Government Solutions, LLC | $4,922.92 |
| California Dept of Revenue | Exela Enterprise Solutions, Inc. | $3,838.31 |
| California Dept of Revenue | Rust Consulting, Inc. | $389.04 |
| Colorado Dept of Revenue | SOURCECORP BPS Inc. | $27,683.54 |
| Colorado Dept of Revenue | SourceHOV Healthcare, Inc. | $8,600.69 |
| Colorado Dept of Revenue | SOURCECORP Management, Inc. | $7,570.90 |
| Colorado Dept of Revenue | Rust Consulting, Inc. | $5,596.58 |
| Colorado Dept of Revenue | Exela Enterprise Solutions, Inc. | $4,584.77 |
| Colorado Dept of Revenue | BancTec, Inc. and Subsidiaries | $749.42 |
| Connecticut Dept of Revenue | United Information Services, Inc | $365,483.69 |
| Connecticut Dept of Revenue | Exela Enterprise Solutions, Inc. | $40,702.53 |
| Connecticut Dept of Revenue | SOURCECORP Management, Inc. | $18,526.69 |
| Connecticut Dept of Revenue | SOURCECORP BPS Inc. | $15,485.67 |

| Taxing Authority | Debtor(s) | Allowed Amount |
|---|---|---|
| Connecticut Dept of Revenue | SourceHOV Healthcare, Inc. | $12,206.93 |
| Delaware Dept of Revenue | Exela Enterprise Solutions, Inc. | $1,340.01 |
| Delaware Dept of Revenue | SourceHOV Healthcare, Inc. | $580.43 |
| Detroit City-Michigan Tax Commissioner | SOURCECORP BPS Inc. | $1,026.26 |
| Detroit City-Michigan Tax Commissioner | Novitex Government Solutions, LLC | $285.50 |
| District of Columbia Dept of Revenue | Novitex Government Solutions, LLC | $75,055.41 |
| District of Columbia Dept of Revenue | Exela Enterprise Solutions, Inc. | $9,080.71 |
| District of Columbia Dept of Revenue | SOURCECORP BPS Inc. | $4,160.16 |
| District of Columbia Dept of Revenue | Rust Consulting, Inc. | $95.15 |
| Florida Dept of Revenue | Exela Enterprise Solutions, Inc. | $2,205.52 |
| Florida Dept of Revenue | Novitex Government Solutions, LLC | $1,452.03 |
| Florida Dept of Revenue | United Information Services, Inc | $923.83 |
| Florida Dept of Revenue | SourceHOV Healthcare, Inc. | $498.39 |
| Florida Dept of Revenue | HOVG, LLC | $50.00 |
| Florida Dept of Revenue | Rust Consulting, Inc. | $25.00 |
| Florida Dept of Revenue | SOURCECORP BPS Inc. | $1.24 |
| Georgia Dept of Revenue | SOURCECORP BPS Inc. | $142,360.35 |
| Georgia Dept of Revenue | SourceHOV Healthcare, Inc. | $39,476.01 |
| Georgia Dept of Revenue | Exela Enterprise Solutions, Inc. | $27,444.23 |
| Georgia Dept of Revenue | United Information Services, Inc | $14,689.72 |
| Georgia Dept of Revenue | Regulus Group LLC | $7,431.29 |
| Georgia Dept of Revenue | HOVG, LLC | $5,229.89 |
| Georgia Dept of Revenue | J & B Software, Inc. | $4,521.57 |
| Georgia Dept of Revenue | SOURCECORP Management, Inc. | $4,254.41 |
| Georgia Dept of Revenue | BancTec, Inc. and Subsidiaries | $1,329.42 |
| Georgia Dept of Revenue | Novitex Government Solutions, LLC | $488.48 |
| Georgia Dept of Revenue | HOV Services, Inc. | $450.78 |
| Hawaii Dept of Revenue | SourceHOV Healthcare, Inc. | $4,776.62 |
| Idaho Dept of Revenue | Novitex Government Solutions, LLC | $1,316.61 |
| Idaho Dept of Revenue | Exela Enterprise Solutions, Inc. | $340.16 |
| Idaho Dept of Revenue | SourceHOV Healthcare, Inc. | $200.69 |
| Illinois Dept of Revenue | SOURCECORP BPS Inc. | $122,494.60 |
| Illinois Dept of Revenue | Exela Enterprise Solutions, Inc. | $61,110.34 |
| Illinois Dept of Revenue | BancTec, Inc. and Subsidiaries | $47,966.83 |
| Illinois Dept of Revenue | Regulus Group LLC | $39,884.68 |
| Illinois Dept of Revenue | SOURCECORP Management, Inc. | $22,063.50 |
| Illinois Dept of Revenue | SourceHOV Healthcare, Inc. | $18,611.67 |
| Illinois Dept of Revenue | J & B Software, Inc. | $2,314.80 |
| Illinois Dept of Revenue | Regulus Integrated Solutions LLC | $1,890.43 |
| Illinois Dept of Revenue | Managed Care Professionals, LLC | $964.18 |
| Illinois Dept of Revenue | United Information Services, Inc | $461.00 |
| Illinois Dept of Revenue | HOV Services, Inc. | $245.40 |
| Indiana Dept of Revenue | SourceHOV Healthcare, Inc. | $24,752.95 |
| Indiana Dept of Revenue | SOURCECORP BPS Inc. | $3,422.62 |
| Indiana Dept of Revenue | United Information Services, Inc | $2,392.86 |

| Taxing Authority | Debtor(s) | Allowed Amount |
|---|---|---|
| Indiana Dept of Revenue | Regulus Group LLC | $1,832.47 |
| Iowa Dept of Revenue | United Information Services, Inc | $103,994.79 |
| Iowa Dept of Revenue | Regulus Integrated Solutions LLC | $52,530.44 |
| Iowa Dept of Revenue | SourceHOV Healthcare, Inc. | $19,983.72 |
| Iowa Dept of Revenue | SOURCECORP Management, Inc. | $14,982.18 |
| Iowa Dept of Revenue | Exela Enterprise Solutions, Inc. | $7,808.80 |
| Iowa Dept of Revenue | SOURCECORP BPS Inc. | $2,419.71 |
| Iowa Dept of Revenue | Rust Consulting, Inc. | $1,617.82 |
| Iowa Dept of Revenue | Regulus Group LLC | $840.02 |
| Kansas Dept of Revenue | SOURCECORP BPS Inc. | $4,286.32 |
| Kansas Dept of Revenue | SourceCorp Management, Inc. | $68.98 |
| Kansas Dept of Revenue | Exela Enterprise Solutions, Inc. | $3.32 |
| Kentucky Dept of Revenue | SOURCECORP BPS Inc. | $826,454.49 |
| Kentucky Dept of Revenue | Regulus Group LLC | $114,172.38 |
| Kentucky Dept of Revenue | SourceHOV Healthcare, Inc. | $25,038.47 |
| Kentucky Dept of Revenue | United Information Services, Inc | $2,725.06 |
| Kentucky Dept of Revenue | Exela Enterprise Solutions, Inc. | $1,679.52 |
| Kentucky Dept of Revenue | BancTec, Inc. and Subsidiaries | $1,088.70 |
| Kentucky Dept of Revenue | HOV Services, Inc. | $60.00 |
| Kentucky-Clay County Tax Commissioner | Regulus Group LLC | $179.39 |
| Kentucky-Jackson County Tax Commissioner | Regulus Group LLC | $628.07 |
| Kentucky-Jefferson County Tax Commissioner | Regulus Group LLC | $4,776.25 |
| Kentucky-Laurel County Tax Commissioner | SOURCECORP BPS Inc. | $134,298.24 |
| Kentucky-Laurel County Tax Commissioner | Regulus Group LLC | $1,005.17 |
| Kentucky-Louisville City Tax Commissioner | Regulus Group LLC | $44,879.64 |
| Kentucky-Louisville City Tax Commissioner | SOURCECORP BPS Inc. | $616.52 |
| Kentucky-Louisville City Tax Commissioner | Exela Enterprise Solutions, Inc. | $432.12 |
| Kentucky-Mt Vernon City Tax Commissioner | SOURCECORP BPS Inc. | $87,692.87 |
| Louisiana Dept of Revenue | Exela Enterprise Solutions, Inc. | $14,486.60 |
| Louisiana Dept of Revenue | SourceHOV Healthcare, Inc. | $4,588.58 |
| Louisiana Dept of Revenue | BancTec, Inc. and Subsidiaries | $2,105.24 |
| Louisiana Dept of Revenue | SOURCECORP BPS Inc. | $1,631.25 |
| Louisiana Dept of Revenue | SOURCECORP Management, Inc. | $1,065.21 |
| Maine Dept of Revenue | SourceHOV Healthcare, Inc. | $2,910.94 |
| Maine Dept of Revenue | Exela Enterprise Solutions, Inc. | $1,843.56 |
| Maine Dept of Revenue | SOURCECORP BPS Inc. | $661.03 |

| Taxing Authority | Debtor(s) | Allowed Amount |
|---|---|---|
| Maryland Dept of Revenue | Novitex Government Solutions, LLC | $99,462.54 |
| Maryland Dept of Revenue | Exela Enterprise Solutions, Inc. | $68,010.89 |
| Maryland Dept of Revenue | SOURCECORP BPS Inc. | $11,216.58 |
| Maryland Dept of Revenue | SourceHOV Healthcare, Inc. | $3,781.44 |
| Massachusetts Dept of Revenue | Exela Enterprise Solutions, Inc. | $83,338.78 |
| Massachusetts Dept of Revenue | HOVG, LLC | $37,176.55 |
| Massachusetts Dept of Revenue | Regulus Group LLC | $14,883.06 |
| Massachusetts Dept of Revenue | SOURCECORP BPS Inc. | $8,105.03 |
| Massachusetts Dept of Revenue | United Information Services, Inc | $2,204.04 |
| Massachusetts Dept of Revenue | SOURCECORP Management, Inc. | $1,586.35 |
| Massachusetts Dept of Revenue | SourceHOV Healthcare, Inc. | $565.26 |
| Michigan Dept of Revenue | United Information Services, Inc | $147,982.96 |
| Michigan Dept of Revenue | SOURCECORP BPS Inc. | $128,154.37 |
| Michigan Dept of Revenue | Exela Enterprise Solutions, Inc. | $62,771.24 |
| Michigan Dept of Revenue | SOURCECORP Management, Inc. | $25,517.09 |
| Michigan Dept of Revenue | SourceHOV Healthcare, Inc. | $21,060.20 |
| Michigan Dept of Revenue | Regulus Group LLC | $5,594.89 |
| Michigan Dept of Revenue | BancTec, Inc. and Subsidiaries | $5,497.13 |
| Michigan Dept of Revenue | Novitex Government Solutions, LLC | $4,104.28 |
| Michigan Dept of Revenue | HOV Services, Inc. | $64.23 |
| Michigan-Detroit City Tax Commissioner | United Information Services, Inc | $15,314.06 |
| Michigan-Detroit City Tax Commissioner | Exela Enterprise Solutions, Inc. | $12,301.37 |
| Michigan-Detroit City Tax Commissioner | SOURCECORP BPS Inc. | $5,283.89 |
| Michigan-Detroit City Tax Commissioner | Novitex Government Solutions, LLC | $1,377.41 |
| Michigan-Detroit City Tax Commissioner | HOV Services, Inc. | $579.52 |
| Michigan-Detroit City Tax Commissioner | SOURCECORP BPS Inc. | $513.35 |
| Minnesota Dept of Revenue | Rust Consulting, Inc. | $190,699.86 |
| Minnesota Dept of Revenue | Exela Enterprise Solutions, Inc. | $10,946.56 |
| Minnesota Dept of Revenue | SourceHOV Healthcare, Inc. | $4,765.11 |
| Minnesota Dept of Revenue | SOURCECORP BPS Inc. | $3,110.30 |
| Minnesota Dept of Revenue | J & B Software, Inc. | $402.00 |
| Minnesota Dept of Revenue | HOV Services, Inc. | $260.54 |
| Mississippi Dept of Revenue | SourceHOV Healthcare, Inc. | $2,836.86 |
| Mississippi Dept of Revenue | Exela Enterprise Solutions, Inc. | $535.52 |
| Missouri Dept of Revenue | Managed Care Professionals, LLC | $41,022.65 |
| Missouri Dept of Revenue | SourceHOV Healthcare, Inc. | $19,823.57 |
| Missouri Dept of Revenue | Exela Enterprise Solutions, Inc. | $5,870.03 |
| Missouri Dept of Revenue | SOURCECORP BPS Inc. | $1,412.47 |
| Missouri Dept of Revenue | SOURCECORP Management, Inc. | $300.00 |
| Missouri-Kansas City Tax Commissioner | Exela Enterprise Solutions, Inc. | $208.46 |
| Missouri-St Louis Tax Commissioner | Exela Enterprise Solutions, Inc. | $2,839.92 |
| Missouri-St Louis Tax Commissioner | Managed Care Professionals, LLC | $10.09 |
| Montana Dept of Revenue | Economic Research Services, Inc. | $3,437.00 |
| Montana Dept of Revenue | SourceHOV Healthcare, Inc. | $2,203.80 |
| Nebraska Dept of Revenue | SourceHOV Healthcare, Inc. | $493.79 |

| Taxing Authority | Debtor(s) | Allowed Amount |
|---|---|---|
| Nevada Dept of Revenue | Exela Enterprise Solutions, Inc. | $5,469.48 |
| Nevada Dept of Revenue | SOURCECORP BPS Inc. | $3,482.61 |
| Nevada Dept of Revenue | SourceHOV Healthcare, Inc. | $730.80 |
| Nevada Dept of Revenue | Rust Consulting, Inc. | $426.84 |
| New Hampshire Dept of Revenue | SOURCECORP BPS Inc. | $299.90 |
| New Hampshire Dept of Revenue | SourceHOV Healthcare, Inc. | $257.94 |
| New Hampshire Dept of Revenue | BancTec, Inc. and Subsidiaries | $208.63 |
| New Hampshire Dept of Revenue | SOURCECORP Management, Inc. | $50.00 |
| New Jersey Dept of Revenue | BancTec, Inc. and Subsidiaries | $9,540.48 |
| New Jersey Dept of Revenue | Regulus Group LLC | $3,819.80 |
| New Jersey Dept of Revenue | Exela Enterprise Solutions, Inc. | $423.42 |
| New Mexico Dept of Revenue | SourceHOV Healthcare, Inc. | $6,260.71 |
| New Mexico Dept of Revenue | Exela Enterprise Solutions, Inc. | $45.00 |
| New York Dept of Revenue | Exela Enterprise Solutions, Inc. | $374,576.92 |
| New York Dept of Revenue | SOURCECORP BPS Inc. | $47,777.00 |
| New York Dept of Revenue | SOURCECORP Management, Inc. | $28,582.04 |
| New York Dept of Revenue | SourceHOV Healthcare, Inc. | $13,072.15 |
| New York Dept of Revenue | United Information Services, Inc | $7,889.20 |
| New York Dept of Revenue | HOV Services, Inc. | $29.52 |
| New York Dept of Revenue | BancTec, Inc. and Subsidiaries | $14.76 |
| North Carolina Dept of Revenue | SourceHOV Healthcare, Inc. | $35,007.15 |
| North Carolina Dept of Revenue | Regulus Integrated Solutions LLC | $5,374.17 |
| North Carolina Dept of Revenue | Rust Consulting, Inc. | $2,978.46 |
| North Carolina Dept of Revenue | BancTec, Inc. and Subsidiaries | $1,181.97 |
| North Carolina Dept of Revenue | SOURCECORP Management, Inc. | $294.51 |
| North Carolina Dept of Revenue | Exela Enterprise Solutions, Inc. | $241.80 |
| North Dakota Dept of Revenue | SourceHOV Healthcare, Inc. | $828.25 |
| North Dakota Dept of Revenue | Exela Enterprise Solutions, Inc. | $5.00 |
| Ohio Dept of Revenue | SourceHOV Healthcare, Inc. | $7,301.95 |
| Ohio Dept of Revenue | BancTec, Inc. and Subsidiaries | $4,032.72 |
| Ohio Dept of Revenue | United Information Services, Inc | $815.83 |
| Ohio Dept of Revenue | Exela Enterprise Solutions, Inc. | $442.04 |
| Ohio Local-Ohio Tax Commissioner | SOURCECORP BPS Inc. | $2,972.54 |
| Ohio Local-Ohio Tax Commissioner | Exela Enterprise Solutions, Inc. | $1,010.98 |
| Ohio Local-Ohio Tax Commissioner | Exela Enterprise Solutions, Inc. | $721.79 |
| Ohio Local-Ohio Tax Commissioner | SourceHOV Healthcare, Inc. | $308.24 |
| Oklahoma Dept of Revenue | SourceHOV Healthcare, Inc. | $9,034.02 |
| Oklahoma Dept of Revenue | Exela Enterprise Solutions, Inc. | $6,067.14 |
| Oklahoma Dept of Revenue | SOURCECORP Management, Inc. | $1,937.94 |
| Oregon Dept of Revenue | Economic Research Services, Inc. | $39,915.64 |
| Oregon Dept of Revenue | SourceHOV Healthcare, Inc. | $7,784.08 |
| Pennsylvania Dept of Revenue | Exela Enterprise Solutions, Inc. | $16,729.32 |
| Pennsylvania Dept of Revenue | SourceHOV Healthcare, Inc. | $9,149.60 |
| Pennsylvania Dept of Revenue | Regulus Group LLC | $7,902.06 |
| Pennsylvania Dept of Revenue | Rust Consulting, Inc. | $2,789.50 |

| Taxing Authority | Debtor(s) | Allowed Amount |
|---|---|---|
| Pennsylvania Dept of Revenue | BancTec, Inc. and Subsidiaries | $2,007.30 |
| Pennsylvania-Butler Town Dept of Revenue | SourceHOV Healthcare, Inc. | $695.22 |
| Pennsylvania-City of Philadelphia Tax Commissioner | Exela Enterprise Solutions, Inc. | $14,002.09 |
| Pennsylvania-City of Philadelphia Tax Commissioner | J & B Software, Inc. | $2,354.00 |
| Pennsylvania-City of Philadelphia Tax Commissioner | Regulus Group LLC | $1,973.00 |
| Pennsylvania-City of Pittsburgh LST Tax Commissioner | Exela Enterprise Solutions, Inc. | $43.54 |
| Pennsylvania-City of Pittsburgh Tax Commissioner | Exela Enterprise Solutions, Inc. | $3,349.24 |
| Pennsylvania-City of Pittsburgh Tax Commissioner | SourceHOV Healthcare, Inc. | $1,449.65 |
| Pennsylvania-East Lampeter Tax Commissioner | SourceHOV Healthcare, Inc. | $464.11 |
| Pennsylvania-Penn Town LST Tax Commissioner | Regulus Group LLC | $50.00 |
| Puerto Rico Dept of Revenue | Exela Enterprise Solutions, Inc. | $12,621.35 |
| Rhode Island Dept of Revenue | Exela Enterprise Solutions, Inc. | $8,057.91 |
| South Carolina Dept of Revenue | SourceHOV Healthcare, Inc. | $227,627.63 |
| South Carolina Dept of Revenue | SOURCECORP BPS Inc. | $16,689.61 |
| South Carolina Dept of Revenue | Exela Enterprise Solutions, Inc. | $15,182.14 |
| South Carolina Dept of Revenue | United Information Services, Inc | $2,579.96 |
| South Carolina Dept of Revenue | Regulus Group LLC | $1,293.36 |
| South Carolina Dept of Revenue | SOURCECORP Management, Inc. | $873.58 |
| South Carolina Dept of Revenue | BancTec, Inc. and Subsidiaries | $774.09 |
| South Dakota Dept of Revenue | SOURCECORP BPS Inc. | $25.00 |
| Tennessee Dept of Revenue | SourceHOV Healthcare, Inc. | $1,330.00 |
| Tennessee Dept of Revenue | United Information Services, Inc | $378.00 |
| Tennessee Dept of Revenue | BancTec, Inc. and Subsidiaries | $327.22 |
| Tennessee Dept of Revenue | Exela Enterprise Solutions, Inc. | $5.25 |
| Texas Dept of Revenue | SOURCECORP Management, Inc. | $15,594.35 |
| Texas Dept of Revenue | SOURCECORP BPS Inc. | $4,912.32 |
| Texas Dept of Revenue | Exela Enterprise Solutions, Inc. | $1,957.44 |
| Texas Dept of Revenue | SourceHOV Healthcare, Inc. | $1,611.27 |
| Texas Dept of Revenue | Regulus Group LLC | $1,565.29 |
| Texas Dept of Revenue | BancTec, Inc. and Subsidiaries | $917.51 |
| Texas Dept of Revenue | Regulus Integrated Solutions LLC | $30.00 |
| Texas Dept of Revenue | Rust Consulting, Inc. | $30.00 |
| US Dept of Treasury | Exela Enterprise Solutions, Inc. | $2,723,794.00 |

| Taxing Authority | Debtor(s) | Allowed Amount |
|---|---|---|
| US Dept of Treasury | SOURCECORP BPS Inc, Exela Enterprise Solutions, Inc, SourceHOV Healthcare, Inc, United Information Services, Inc., Regulus Group LLC, Rust Consulting, Inc, SOURCECORP Management, Inc., BancTec, Inc and Subsidiaries, Novitex Government Solutions, LLC, Economic Research Services, Inc, Regulus Integrated Solutions LLC, J & B Software, Inc, Managed Care Professionals, LLC, HOVG, LLC, and HOV Services, Inc. | $11,177,796.00 |
| US Dept of Treasury | SOURCECORP BPS Inc. | $5,793,035.73 |
| US Dept of Treasury | Exela Enterprise Solutions, Inc. | $3,913,681.17 |
| US Dept of Treasury | SourceHOV Healthcare, Inc. | $2,820,017.64 |
| US Dept of Treasury | UNITED INFORMATION SERVICES, INC. | $2,289,201.01 |
| US Dept of Treasury | Regulus Group LLC | $1,652,555.83 |
| US Dept of Treasury | Rust Consulting, Inc. | $1,543,259.55 |
| US Dept of Treasury | SOURCECORP Management, Inc. | $1,472,611.97 |
| US Dept of Treasury | BANC TEC INC AND SUBSIDIARIES | $1,072,592.52 |
| US Dept of Treasury | NOVITEX GOVERNMENT SOLUTIONS, LLC | $772,418.29 |
| US Dept of Treasury | Economic Research Services, Inc. | $641,638.10 |
| US Dept of Treasury | Regulus Integrated Solutions LLC | $461,135.41 |
| US Dept of Treasury | J & B Software, Inc. | $318,485.98 |
| US Dept of Treasury | MANAGED CARE PROFESSIONALS LLC | $87,170.13 |
| US Dept of Treasury | HOVG, LLC | $68,029.14 |
| US Dept of Treasury | HOV SERVICES, INC. | $28,927.30 |
| Utah Dept of Revenue | Exela Enterprise Solutions Inc. | $51,178.31 |
| Utah Dept of Revenue | SOURCECORP BPS Inc. | $11,471.81 |
| Utah Dept of Revenue | SourceHOV Healthcare, Inc. | $3,591.54 |
| Utah Dept of Revenue | SOURCECORP Management, Inc. | $2,678.10 |
| Utah Dept of Revenue | BancTec, Inc. and Subsidiaries | $2,606.38 |
| Utah Dept of Revenue | HOV Services, Inc. | $85.22 |
| Vermont Dept of Revenue | SourceHOV Healthcare, Inc. | $50.00 |
| Virginia Dept of Revenue | Novitex Government Solutions, LLC | $55,064.74 |
| Virginia Dept of Revenue | Exela Enterprise Solutions, Inc. | $44,587.38 |
| Virginia Dept of Revenue | J & B Software, Inc. | $6,841.58 |
| Virginia Dept of Revenue | SourceHOV Healthcare, Inc. | $5,731.59 |
| Virginia Dept of Revenue | SOURCECORP BPS Inc. | $5,403.40 |
| Virginia Dept of Revenue | Economic Research Services, Inc. | $5,185.75 |
| Virginia Dept of Revenue | BancTec, Inc. and Subsidiaries | $1,553.11 |
| Virginia Dept of Revenue | Rust Consulting, Inc. | $186.97 |

| Taxing Authority | Debtor(s) | Allowed Amount |
|---|---|---|
| Virginia Dept of Revenue | SOURCECORP Management, Inc. | $30.00 |
| Virginia Dept of Revenue | Regulus Group LLC | $20.00 |
| West Virginia Dept of Revenue | SourceHOV Healthcare, Inc. | $4,751.00 |
| West Virginia Dept of Revenue | Exela Enterprise Solutions, Inc. | $2,842.92 |
| West Virginia Dept of Revenue | BancTec, Inc. and Subsidiaries | $125.33 |
| Wisconsin Dept of Revenue | SourceHOV Healthcare, Inc. | $15,689.20 |
| Wisconsin Dept of Revenue | SOURCECORP BPS Inc. | $909.00 |
| Wyoming Dept of Revenue | Exela Enterprise Solutions, Inc. | $609.65 |
|  | **TOTAL** | **$42,308,560.81** |